UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

CHARLOTTE FREEMAN, KATHLEEN
SNYDER, RANDOLPH FREEMAN, G.F.,
a minor, I.F., a minor, CHARLOTTE FREEMAN
FOR THE ESTATE OF BRIAN S. FREEMAN,
DANNY CHISM, LINDA FALTER, RUSSELL
FALTER, RUSSELL FALTER FOR THE
ESTATE OF SHAWN P. FALTER, SHANNON
MILLICAN, MITCHELL MILLICAN,
SHANNON MILLICAN FOR THE ESTATE OF
JOHNATHON M. MILLICAN, BILLY
WALLACE, STEFANIE WALLACE, D.W.,
a minor, C.W., a minor, A.W., a minor, TRACIE
ARSIAGA, CEDRIC HUNT, SR., ROBERT
BARTLETT, SHAWN BARTLETT, LISA
RAMACI, ISABELL VINCENT, CHARLES
VINCENT, LISA RAMACI FOR THE ESTATE
OF STEVEN VINCENT, GWENDOLYN
MORIN-MARENTES, E.M., a minor, AUDREY
MORIN, STEVE MORIN, GWENDOLYN
MORIN-MARENTES FOR THE
ESTATE OF STEVE MORIN, JR., AMY LYNN
ROBINSON, FLOYD BURTON ROBINSON,
JACOB MICHAEL ROBINSON, LUCAS
WILLIAM ROBINSON, AMY LYNN
ROBINSON AND FLOYD BURTON
ROBINSON FOR THE ESTATE OF JEREMIAH
ROBINSON, DEBORAH NOBLE, CHARLES E.
MATHENY, III, DEBORAH NOBLE FOR THE
ESTATE OF CHARLES E. MATHENY, IV,
SILVER FARR, PATRICK FARR, PATRICK
FARR FOR THE ESTATE OF CLAY P. FARR,
RAYANNE HUNTER, W.H., a minor, T.H.,
a minor, FABERSHA FLYNT LEWIS,
LORENZO SANDOVAL, SR., LORENZO
SANDOVAL, JR., LORENZO SANDOVAL, SR.
FOR THE ESTATE OF ISRAEL DEVORA-
GARCIA, H. JOSEPH BANDHOLD, DONALD
C. BANDHOLD, NANETTE SAENZ, JUAN
SAENZ, NANETTE SAENZ FOR THE ESTATE
OF CARLOS N. SAENZ, JOHN VACHO,
ASHLEY VACHO, JOHN VACHO FOR THE
ESTATE OF CAROL VACHO, JOHN VACHO
FOR THE ESTATE OF NATHAN J. VACHO,

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ NOV 10 2014 ★

BROOKLYN OFFICE

CV 14-6601

**COMPLAINT**
**JURY TRIAL DEMANDED**

IRIZARRY, J.

POLLAK, M.J.

JEANETTE WEST, SHELBY WEST, JEANETTE :
WEST FOR THE ESTATE OF ROBERT H.          :
WEST, DONNA ENGEMAN, SUZZETTEE            :
LAWSON, C.L., a minor, SUZZETTEE           :
LAWSON FOR THE ESTATE OF ISAAC S.         :
LAWSON, JUDY ANN CRABTREE, RONALD         :
WAYNE CRABTREE, DEBRA WIGBELS,            :
RONALD WILLIAM CRABTREE, JUDY             :
HUENINK, SEAN SLAVEN, CHASTITY DAWN :
SLAVEN, NICOLE LANDON, MISTI FISHER,      :
FRED FRIGO, LYNN FOREHAND, LANCE          :
HAUPT, RHONDA HAUPT, TIFANY HAUPT,        :
SABRINA CUMBE, DAVID W. HAINES, DAWN:
HAINES, C.H., a minor, SANGSOON KIM,       :
SEOP (STEVE) KIM, MICHELLE KIM, SEOP       :
(STEVE) KIM FOR THE ESTATE OF JANG H.     :
KIM, HELEN FRASER, RICHARD FRASER,        :
RICHARD FRASER FOR THE ESTATE OF          :
DAVID M. FRASER, TRICIA ENGLISH,          :
N.W.E., a minor, N.C.E., a minor, A.S.E., a minor, :
TODD DAILY FOR THE ESTATE OF SHAWN        :
L. ENGLISH, PHILIP S. FORD, LINDA GIBSON, :
JOHN GIBSON, DENISE BLOHM, CHRIS          :
BLOHM, KIANA BLOHM, JEREMY BLOHM,         :
JOANNE GUTCHER, TRACY ANDERSON,           :
JEFFREY ANDERSON, ANASTASIA FULLER,       :
A.F., a minor, ANNE F. HARRIS, PAUL D.      :
HARRIS, HYUNJUNG GLAWSON, YOLANDA :
M. BROOKS, CURTIS GLAWSON, SR., RYAN      :
SABINISH, ANN CHRISTOPHER, ANN            :
CHRISTOPHER FOR THE ESTATE OF KWESI :
CHRISTOPHER, D.J.F, a minor, AVA TOMSON, :
RICHARD TOMSON, BRADLEY                   :
STARCEVICH, GLENDA STARCEVICH,            :
ARIANA REYES, TRENTON STARCEVICH,         :
AVA TOMSON FOR THE ESTATE OF              :
LUCAS V. STARCEVICH, KAREN                :
FUNCHEON, ROBERT FUNCHEON, KAREN          :
FUNCHEON FOR THE ESTATE OF                :
ALEXANDER J. FUNCHEON, HOLLY              :
BURSON-GILPIN, HOLLY BURSON-GILPIN        :
FOR THE ESTATE OF JEROME POTTER,          :
NANCY UMBRELL, MARK UMBRELL,              :
NANCY UMBRELL AND MARK UMBRELL            :
FOR THE ESTATE OF COLBY J. UMBRELL,       :
ILENE DIXON, DAN DIXON, SHELLEY ANN       :

SMITH, WILLIAM FARRAR, SR., WILLIAM :
FARRAR, SR. FOR THE ESTATE OF WILLIAM :
A. FARRAR, TONYA K. DRESSLER, ARDITH :
CECIL DRESSLER, MELISSA DRESSLER, :
ELIZABETH BROWN, MARIAN BROWN, :
WAYNE BROWN, ELIZABETH BROWN FOR :
THE ESTATE OF JOSHUA D. BROWN, :
DANIELLE SWEET, A.B., a minor, :
G.B., a minor, DANIELLE SWEET :
FOR THE ESTATE OF RYAN A. BALMER, :
DONNA KUGLICS, LES KUGLICS, EMILY :
KUGLICS, DONNA KUGLICS FOR THE :
ESTATE OF MATTHEW J. KUGLICS, SYLVIA :
JOHNSON SPENCER, RAYMOND NIGEL :
SPENCER, SR., JOHN D. LAMIE, PAULA C. :
BOBB-MILES, JOHNNY JAVIER MILES, SR., :
J.J.M., JR., a minor, RACQUEL :
ARNAE BOBB MILES, PAULA C. :
BOBB-MILES FOR THE ESTATE OF :
BRANDON K. BOBB, URSULA ANN JOSHUA, :
BRITTANY MARIONIQUE JOSHUA, ASHLEY :
GUDRIDGE, MARION CRIMENS, TIMOTHY :
W. ELLEDGE, CHRISTOPHER LEVI, BRENDA :
HABSIEGER, MICHAEL HABSIEGER, JACOB :
MICHAEL HABSIEGER, KELLI D. HAKE, :
DENICE YORK, RUSSEL YORK, JILL HAKE, :
PETER HAKE, G.H., a minor, KELLI D. HAKE :
FOR THE ESTATE OF CHRISTOPHER M. :
HAKE, MARIA E. CALLE, CYNTHIA :
DELGADO, KIM MILLER, WALTER BAILEY, :
CASSANDRA BAILEY, KACEY GILMORE, :
TERRELL GILMORE, JR., KYNESHA :
DHANOOLAL, MERLESE PICKETT, HARRY :
PICKETT, RACHEL M. GILLETTE, REBEKAH :
A. COLDEWE, PATRICIA SMITH, MICHAEL :
SMITH, JACQUELINE A. SMITH, DAVID :
HARTLEY, DAVID HARTLEY FOR THE :
ESTATE OF JEFFERY HARTLEY, ALLEN :
SWINTON, TEMIKA SWINTON, T.S., a minor, :
T.S., a minor, T.B., a minor, MARY JANE :
VANDEGRIFT, JOHN VANDEGRIFT, :
PAM MARION, DONNIE MARION, PAULA :
MENKE, DANIEL MENKE, MATTHEW :
MENKE, NICHOLE LOHRING, :
ROSEMARIE ALFONSO, K.B., a minor, :
MICHELLE BENAVIDEZ, DANIEL :

```
BENAVIDEZ, SR., CHRISTINA BIEDERMAN,      :
DANIEL BENAVIDEZ, JR., JENNIFER           :
MORMAN, MICHELLE BENAVIDEZ FOR THE        :
ESTATE OF KENNITH W. MAYNE,               :
CHRISTOPHER MILLER, ANGIE JACKSON,        :
TRINA JACKSON, S.J., a minor,             :
GREGORY BAUER, THERESA DAVIS, LINDA       :
DAVID, MICHAEL DAVID, CHRISTOPHER         :
DAVID, LINDA DAVID FOR THE ESTATE OF      :
TIMOTHY A. DAVID, TIMOTHY KARCHER,        :
KENNETH J. DREVNICK, TONYA LOTTO,         :
JERRY L. MYERS, THERESA HART, WAYNE       :
NEWBY, VERONICA HICKMAN,                  :
DAVID EUGENE HICKMAN, DEVON               :
FLETCHER HICKMAN                          :
                                          :
                Plaintiffs,               :
                                          :
     -against-                            :
                                          :
HSBC HOLDINGS PLC ("HSBC"), HSBC BANK     :
PLC ("HSBC-EUROPE"), HSBC BANK MIDDLE     :
EAST LIMITED ("HSBC MIDDLE EAST"),        :
HSBC BANK USA, N.A. ("HSBC-US"),          :
BARCLAYS, STANDARD CHARTERED BANK,        :
ROYAL BANK OF SCOTLAND, N.V., CREDIT      :
SUISSE,  BANK SADERAT PLC, AND JOHN       :
DOES 1-50                                 :
                                          :
                Defendants.               :
-------------------------------------------------------------------x
```

Plaintiffs Charlotte Freeman, Kathleen Snyder, Randolph Freeman, G.F., a minor, I.F., a minor, Charlotte Freeman for the Estate of Brian S. Freeman, Danny Chism, Linda Falter, Russell Falter, Russell Falter for the Estate of Shawn P. Falter, Shannon Millican, Mitchell Millican, Shannon Millican for the Estate of Johnathon M. Millican, Billy Wallace, Stefanie Wallace, D.W., a minor, C.W., a minor, A.W., a minor, Tracie Arsiaga, Cedric Hunt, Sr., Robert Bartlett, Shawn Bartlett, Lisa Ramaci, Isabell Vincent, Charles Vincent, Lisa Ramaci for the Estate of Steven Vincent, Gwendolyn Morin-Marentes, E.M, a minor, Audrey Morin, Steve Morin, Gwendolyn Morin-Marentes for the Estate of Steve Morin, Jr., Amy Lynn Robinson, Floyd Burton Robinson, Jacob Michael Robinson, Lucas William Robinson, Amy Lynn Robinson and Floyd Burton Robinson for the Estate of Jeremiah Robinson, Deborah Noble, Charles E. Matheny, III, Deborah Noble for the Estate of Charles E. Matheny, IV, Silver Farr, Patrick Farr, Patrick Farr for the Estate of Clay P. Farr, Rayanne Hunter, W.H., a minor, T.H., a minor, Fabersha Flynt Lewis, Lorenzo Sandoval, Sr., Lorenzo Sandoval, Jr., Lorenzo Sandoval, Sr., for the Estate of Israel Devora-Garcia, H. Joseph Bandhold, Donald C. Bandhold, Nanette Saenz,

Juan Saenz, Nanette Saenz for the Estate of Carlos N. Saenz, John Vacho, Ashley Vacho, John Vacho for the Estate of Carol Vacho, John Vacho for the Estate of Nathan J. Vacho, Jeanette West, Shelby West, Jeanette West for the Estate of Robert H. West, Donna Engeman, Suzzette Lawson, C.L., a minor, Suzzettee Lawson for the Estate of Isaac S. Lawson, Judy Ann Crabtree, Ronald Wayne Crabtree, Debra Wigbels, Ronald William Crabtree, Judy Huenink, Sean Slaven, Chastity Dawn Slaven, Nicole Landon, Misti Fisher, Fred Frigo, Lynn Forehand, Lance Haupt, Rhonda Haupt, Tifany Haupt, Sabrina Cumbe, David W. Haines, Dawn Haines, C.H., a minor, Sangsoon Kim, Seop (Steve) Kim, Michelle Kim, Seop (Steve) Kim for the Estate of Jang H. Kim, Helen Fraser, Richard Fraser, Richard Fraser for the Estate of David M. Fraser, Tricia English, N.W.E., a minor, N.C.E., a minor, A.S.E., a minor, Todd Daily for the Estate of Shawn L. English, Philip S. Ford, Linda Gibson, John Gibson, Denise Blohm, Chris Blohm, Kiana Blohm, Jeremy Blohm, Joanne Gutcher, Tracy Anderson, Jeffrey Anderson, Anastasia Fuller, A.F., a minor, Anne F. Harris, Paul D. Harris, Hyunjung Glawson, Yolanda M. Brooks, Curtis Glawson, Sr., Ryan Sabinish, Ann Christopher, Ann Christopher for the Estate of Kwesi Christopher, D.J.F., a minor, Ava Tomson, Richard Tomson, Bradley Starcevich, Glenda Starcevich, Ariana Reyes, Trenton Starcevich, Ava Tomson for the Estate of Lucas V. Starcevich, Karen Funcheon, Robert Funcheon, Karen Funcheon for the Estate of Alexander J. Funcheon, Holly Burson-Gilpin, Holly Burson-Gilpin for the Estate of Jerome Potter, Nancy Umbrell, Mark Umbrell, Nancy Umbrell and Mark Umbrell for the Estate of Colby J. Umbrell, Ilene Dixon, Dan Dixon, Shelley Ann Smith, William Farrar, Sr., William Farrar, Sr. for the Estate of William A. Farrar, Tonya K. Dressler, Ardith Cecil Dressler, Melissa Dressler, Elizabeth Brown, Marian Brown, Wayne Brown, Elizabeth Brown for the Estate of Joshua D. Brown, Danielle Sweet, A.B., a minor, G.B., a minor, Danielle Sweet for the Estate of Ryan A. Balmer, Donna Kuglics, Les Kuglics, Emily Kuglics, Donna Kuglics for the Estate of Matthew J. Kuglics, Sylvia Johnson Spencer, Raymond Nigel Spencer, Sr., John D. Lamie, Paula C. Bobb-Miles, Johnny Javier Miles, Sr., J.J.M., Jr., a minor, Racquel Arnae Bobb Miles, Paula C. Bobb-Miles for the Estate of Brandon K. Bobb, Ursula Ann Joshua, Brittany Marionique Joshua, Ashley Gudridge, Marion Crimens, Timothy W. Elledge, Christopher Levi, Brenda Habsieger, Michael Habsieger, Jacob Michael Habsieger, Kelli D. Hake, Denice York, Russel York, Jill Hake, Peter Hake, G.H., a minor, Kelli D. Hake for the Estate of Christopher M. Hake, Maria E. Calle, Cynthia Delgado, Kim Miller, Walter Bailey, Cassandra Bailey, Kacey Gilmore, Terrell Gilmore, Jr., Kynesha Dhanoolal, Merlese Pickett, Harry Pickett, Rachel M. Gillette, Rebekah A. Coldewe, Patricia Smith, Michael Smith, Jacqueline A. Smith, David Hartley, David Hartley for the Estate of Jeffery Hartley, Allen Swinton, Temika Swinton, T.S., a minor, T.S., a minor, T.B., a minor, Mary Jane Vandegrift, John Vandegrift, Pam Marion, Donnie Marion, Paula Menke, Daniel Menke, Matthew Menke, Nichole Lohring, Rosemarie Alfonso, K.B., a minor, Michelle Benavidez, Daniel Benavidez, Sr., Christina Biederman, Daniel Benavidez, Jr., Jennifer Morman, Michelle Benavidez for the Estate of Kennith W. Mayne, Christopher Miller, Angie Jackson, Trina Jackson, S.J., a minor, Gregory Bauer, Theresa Davis, Linda David, Michael David, Christopher David, Linda David for the Estate of Timothy A. David, Timothy Karcher, Kenneth J. Drevnick, Tonya Lotto, Jerry L. Myers, Theresa Hart, Wayne Newby, Veronica Hickman, David Eugene Hickman and Devon Fletcher Hickman by their attorneys, allege the following:

## NATURE OF THE ACTION

1.      This is a Complaint for damages and equitable relief pursuant to 18 U.S.C. § 2333(a). Plaintiffs allege that each of the Defendants named herein is liable to Plaintiffs for committing acts of international terrorism for violations of 18 U.S.C. § 2339A and § 2339B and that Defendants HSBC BANK USA, N.A. ("HSBC-US"), BARCLAYS, STANDARD CHARTERED BANK, AND ROYAL BANK OF SCOTLAND N.V. committed acts of international terrorism in violation of 18 U.S.C. § 2332d.

2.      The Complaint arises out of the Islamic Republic of Iran's ("Iran") decades-long scheme to evade U.S. sanctions and provide material support to Hezbollah, a Foreign Terrorist Organization ("FTO") (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")) and other terrorist organizations through Iran's Islamic Revolutionary Guard Corps-Qods Force (referred to herein as the "IRGC-QF" or the "Qods Force").

3.      In October 2007, Bank Saderat Iran together with its branches and subsidiaries (including Defendant Bank Saderat Plc) was officially designated by the United States as a Specially Designated Global Terrorist ("SDGT" as that term is defined under U.S. Executive Order 13224, and Title 31, Parts 594, 595, 596, and 597 of the U.S. Code of Federal Regulations).

4.      In November 2007, the IRGC-QF was officially designated by the United States as an SDGT.

5.      Iran is a U.S.-designated State Sponsor of Terrorism pursuant to section 6(j) of the Export Administration Act, section 40 of the Arms Export Control Act, and section 620A of the Foreign Assistance Act.

6.    According to the U.S. government, the Qods Force annually provides $100-$200 million to Hezbollah, and delivers lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi terror cells, including but not limited to Kata'ib Hezbollah ("KH"), Asa'ib Ahl al-Haq ("AAH") and the "Promised Day Brigades."

7.    KH, AAH, and the Promised Day Brigades, and other Iraqi terror cells and organizations, are sometimes referred to herein collectively as the "Special Groups."

8.    The Special Groups have targeted and killed American, British and Iraqi forces, as well as Iraqi and American civilians.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2333(a) as a civil action brought by citizens of the United States, who have been injured by reason of acts of international terrorism.

10.    Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. §§ 1391(b) and 1391(d).

11.    Defendants are subject to personal jurisdiction in the United States pursuant to 18 U.S.C. § 2334(a), CPLR § 302, and Fed. R. Civ. P. 4(k)(1)-(2). Defendant HSBC Bank USA, N.A. is also subject to personal jurisdiction under CPLR § 301. Defendants' unlawful conduct was purposefully directed at the United States, and the conspiracy was specifically designed to effectuate the flow of billions of U.S. dollars through the United States in violation of U.S. laws, and in fact resulted in hundreds of billions of dollars illegally passing through the United States.

## THE PARTIES

A.      **THE PLAINTIFFS**

### THE JANUARY 20, 2007 ATTACK - KARBALA

12.      On the night of January 20, 2007, American military officers and their Iraqi counterparts met at the Provincial Joint Coordination Center ("PJCC") in Karbala, about thirty miles south of Baghdad, to plan security coordination for the upcoming observance of the Shi'a Muslim holiday of Ashura.

13.      Just after nightfall, a five-car convoy of black GMC Suburban trucks – the type frequently used by the U.S. government – made its way through three checkpoints, approaching the PJCC.

14.      The vehicles contained approximately a dozen men dressed in U.S. military-style fatigues, carrying American-type weapons.

15.      After they entered the compound, the vehicles split up, with some parking in front and others circling to the back of the main building.

16.      After exiting their vehicles, the AAH terrorists threw grenades and opened fire with automatic rifles. One U.S. soldier, Johnathon M. Millican, jumped on one of the grenades that were thrown into the Coordination Center's main office, an upper-floor office that also contained the provincial Iraqi police chief's office.  Although he was killed, and three other U.S. soldiers injured, his selfless act provided his fellow soldiers in the PJCC's main building a few extra moments to recover and begin returning fire.

17.      For his act of bravery, Johnathon M. Millican received the Silver Star, posthumously.

18.      At the same time that AAH terrorists were attacking the PJCC's main building,

8

other AAH operatives detonated explosives throughout the PJCC and abducted four soldiers before fleeing the compound.

19.     The AAH getaway vehicles drove east, crossing the Euphrates River and then turning north.

20.     Realizing the likelihood of escaping with their captives was low, the AAH operatives murdered the four Americans and abandoned their bodies and the vehicles near the town of Mahawil.

21.     Only one of the four abducted U.S. soldiers, Brian S. Freeman, was still alive when rescuers reached the scene. Two of the soldiers were found in the back of one of the SUVs, handcuffed and shot dead. A third soldier was found dead on the ground, near the abandoned vehicles. Nearby, the fourth soldier, who had also been shot in the head, bled to death on the way to the hospital.

22.     The terrorist group that planned and executed the attack, AAH, was trained and armed by Iran's Qods Force with Hezbollah's assistance.

23.     On March 20, 2007, two months after the attack was perpetrated, Hezbollah leader Ali Musa Daqduq and AAH leader Qais al-Khazali and his brother Laith al-Khazali were captured by Coalition forces in southern Iraq.

24.     The United States government charged them with responsibility for the Karbala attack.

25.     Documents captured with Qais al-Khazali showed that the Qods Force had gathered detailed information on "soldiers' activities, shift changes and defenses" at the PJCC "and this information was shared with the attackers."

26.     A 22-page memorandum found with Daqduq "detailed the planning, preparation,

approval process and conduct of the [Karbala] operation," among others. Other documents discussed tactics to attack Iraqi and Coalition forces.

27.     Daqduq also had a personal journal that noted his having met with Special Groups members who were targeting other Iraqis and Coalition Forces in the Diyala province using Improvised Explosive Devices ("IEDs"), as well as small-arms fire.

28.     According to U.S. military officials, both Daqduq and Qais al-Khazali admitted that senior leadership within the Qods Force knew of and helped plan the Karbala attack.

29.     It was later reported that U.S. spy satellites spotted a training center in Iran that contained a mockup of the PJCC, indicating that Iran had duplicated the PJCC's layout to train the AAH operatives for the attack.

30.     The terror attack on the PJCC was commanded by Azhar al-Dulaymi. He was trained by Hezbollah operatives, including Daqduq, near the city of Qom, Iran, where he and his AAH operatives trained to execute military-style, precision kidnappings.

31.     Although al-Dulaymi commanded the attack, Daqduq, a longtime Hezbollah commander, masterminded it.

32.     Daqduq advised AAH commanders al-Dulaymi and Qais al-Khazali and served as a liaison between the IRGC-QF and Qais al-Khazali, who along with his brother Laith al-Khazali, oversaw the attack.

33.     The United States Treasury Department's November 19, 2012 press release announcing Daqduq's designation as an SDGT stated, in part: *"Daqduq is a senior Hezbollah commander responsible for numerous attacks against Coalition Forces in Iraq, including planning an attack on the Karbala Joint Provincial Coordination Center (JPCC) on January 20, 2007, which resulted in the deaths of five U.S. soldiers."*

34.     Daqduq is Lebanese-born and served in Hezbollah for 24 years prior to the attack. He served as a bodyguard for Hezbollah leader Hassan Nasrallah and also led Hezbollah operations in large areas of Lebanon.

35.     According to the U.S. government, Daqduq *"was in Iraq working as a surrogate for Iranian Revolutionary Guards Corps Quds Force operatives involved with special groups."*

36.     In 2005, he was directed by senior Lebanese Hezbollah leadership to go to Iran and work with the IRGC-QF to train Iran's proxies in Iraq.

37.     According to the U.S. government: *"In May 2006, [Daqduq] traveled to Tehran with Yussef Hashim, a fellow Lebanese Hezbollah and head of their operations in Iraq. There they met with the commander and deputy commander of the Iranian Quds Force special external operations."*

38.     Daqduq was ordered to Iraq to report on the training and operations of the Iraqi Special Groups.

39.     In the year prior to his capture in 2007, Daqduq made four trips to Iraq where he monitored and reported on the training and arming of the Special Groups in mortars and rockets, manufacturing and employment of IEDs, and kidnapping operations.

40.     Most significantly, Daqduq was tasked with organizing the Special Groups in ways that mirrored how Hezbollah was organized in Lebanon.

41.     Daqduq also helped the Qods Force train Iraqis in Iran. Using training groups of approximately 20 to 60 Iraqis at a time, Daqduq instructed his trainees how to use Explosively Formed Penetrators ("EFP"), mortars and rockets, as well as intelligence, sniper and kidnapping operations. The Qods Force then sent the trainees back to Iraq where they were organized into Special Groups.

42.     The IRGC-QF also supplied the groups with weapons and a funding stream estimated at between $750,000 and $3 million per month.

43.     On April 26, 2007, the Commander of the Multi-National Force-Iraq, Gen. David Petraeus, gave a briefing in which he stated:

> The Iranian involvement has really become much clearer to us and brought into much more focus during the interrogation of the members -- the heads of the Khazali network and some of the key members of that network that have been in detention now for a month or more. This is the head of the secret cell network, the extremist secret cells. They were provided substantial funding, training on Iranian soil, advanced explosive munitions and technologies as well as run of the mill arms and ammunition, in some cases advice and in some cases even a degree of direction. When we captured these individuals -- the initial capture, and then there have been a number of others since then -- we discovered, for example, a 22-page memorandum on a computer that detailed the planning, preparation, approval process and conduct of the operation that resulted in five of our soldiers being killed in Karbala. It also detailed -- there are numerous documents which detailed a number of different attacks on coalition forces, and our sense is that these records were kept so that they could be handed in to whoever it is that is financing them. And there's no question, again, that Iranian financing is taking place through the Quds force of the Iranian Republican Guards Corps.

44.     The Americans killed during the Karbala attack included Brian S. Freeman, Johnathon M. Millican, Shawn P. Falter and Johnathan B. Chism. The Americans injured during the Karbala attack included Billy Wallace.

**The Freeman Family**

45.     Plaintiff Charlotte Freeman is a citizen of the United States and a resident of the State of California. She is the widow of Brian S. Freeman.

46.     Plaintiff Kathleen Snyder is a citizen of the United States and a resident of the State of California. She is the mother of Brian S. Freeman.

47.     Plaintiff Randolph Freeman is a citizen of the United States and a resident of the State of California. He is the father of Brian S. Freeman.

48.     Plaintiff G.F., a minor represented by his legal guardian Charlotte Freeman, is a citizen of the United States and a resident of the State of California. He is the son of Brian S. Freeman.

49.     Plaintiff I.F., a minor represented by her legal guardian Charlotte Freeman, is a citizen of the United States and a resident of the State of California. She is the daughter of Brian S. Freeman.

50.     Plaintiff Charlotte Freeman brings an action on behalf of the Estate of Brian S. Freeman as its legal representative.

51.     As a result of the attack, and the death of Brian S. Freeman, Plaintiffs Charlotte Freeman, Kathleen Snyder, Randolph Freeman, G.F. and I.F. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/father's society, companionship, comfort, advice and counsel.

**The Chism Family**

52.     Plaintiff Danny Chism is a citizen of the United States and a resident of the State of Louisiana. He is the father of Johnathan B. Chism.

53.     As a result of the attack, and the death of Johnathan B. Chism, Plaintiff Danny Chism has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

**The Falter Family**

54.     Plaintiff Linda Falter is a citizen of the United States and a resident of the State of New York. She is the step-mother of Shawn P. Falter.

55.     Plaintiff Russell Falter is a citizen of the United States and a resident of the State of New York. He is the father of Shawn P. Falter.

56.     Plaintiff Russell Falter brings an action on behalf of the Estate of Shawn P. Falter, as its legal representative.

57.     As a result of the attack, and the death of Shawn P. Falter, Plaintiffs Linda Falter and Russell Falter have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

**The Millican Family**

58.     Plaintiff Shannon Millican is a citizen of the United States and a resident of the State of Alabama.  She is the widow of Johnathon M. Millican.

59.     Plaintiff Mitchell Millican is a citizen of the United States and a resident of the State of Alabama.  He is the father of Johnathon M. Millican.

60.     Plaintiff Shannon Millican brings an action on behalf of the Estate of Johnathon M. Millican, as its legal representative.

61.     As a result of the attack, and the death of Johnathon M. Millican, Plaintiffs Shannon Millican and Mitchell Millican have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's society, companionship, comfort, advice and counsel.

**The Wallace Family**

62.     Plaintiff Billy Wallace was wounded while helping to defend the PJCC's main building.

63.     He sustained serious shrapnel injuries when a grenade exploded in the doorway of the room that he was defending.

64.     Mr. Wallace also suffered hearing loss and tinnitus.

65.     He suffers from Post-Traumatic Stress Disorder ("PTSD") for which he has

received ongoing treatment.

66. As a result of the attack, and the injuries he suffered, Plaintiff Billy Wallace has experienced severe physical and mental anguish and extreme emotional pain and suffering.

67. Plaintiff Stefanie Wallace is a citizen of the United States and a resident of the State of North Carolina.  She is the wife of Billy Wallace.

68. Plaintiff D.W., a minor represented by his legal guardians Billy Wallace and Stefanie Wallace, is a citizen of the United States and a resident of the State of North Carolina. He is the son of Billy Wallace.

69. Plaintiff C.W., a minor represented by his legal guardians Billy Wallace and Stefanie Wallace, is a citizen of the United States and a resident of the State of North Carolina. He is the son of Billy Wallace.

70. Plaintiff A.W., a minor represented by his legal guardians Billy Wallace and Stefanie Wallace, is a citizen of the United States and a resident of the State of North Carolina. He is the son of Billy Wallace.

71. As a result of the attack, and the injuries Billy Wallace suffered, Plaintiffs Stefanie Wallace, D.W., C.W. and A.W. have experienced severe mental anguish and extreme emotional pain and suffering.

## THE APRIL 4, 2004 ATTACK – BAGHDAD

**The Arsiaga Family**

72. On April 4, 2004, Robert R. Arsiaga, aged 25, from Texas, was serving in the United States military in Iraq when his unit was attacked with rocket-propelled grenades and small-arms fire.

73. Robert R. Arsiaga was a citizen of the United States at the time of the attack.

74.    Robert R. Arsiaga was killed in the attack.

75.    The terrorist group that planned and executed the attack, the Mahdi Army, was trained and armed by Iran's Qods Force with the assistance of Hezbollah.

76.    Plaintiff Tracie Arsiaga is a citizen of the United States and a resident of the State of Texas. She is the widow of Robert R. Arsiaga.

77.    As a result of the attack, and the death of Robert R. Arsiaga, Plaintiff Tracie Arsiaga has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice and counsel.

**The Cason Family**

78.    On April 4, 2004, Ahmed A. Cason, aged 24, from Alabama, was serving in the United States military in Iraq when his unit was attacked with rocket-propelled grenades and small-arms fire.

79.    Ahmed A. Cason was a citizen of the United States at the time of the attack.

80.    Ahmed A. Cason was killed in the attack.

81.    The terrorist group that planned and executed the attack, the Mahdi Army, was trained and armed by Iran's Qods Force with the assistance of Hezbollah.

82.    Plaintiff Cedric Hunt, Sr. is a citizen of the United States and a resident of the State of Alabama. He is the step-father of Ahmed A. Cason.

83.    As a result of the attack, and the death of Ahmed A. Cason, Plaintiff Cedric Hunt, Sr. has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

## THE MAY 3, 2005 ATTACK – BAGHDAD

### The Bartlett Family

84.     On May 3, 2005, Robert Bartlett, then 31, from Virginia, was serving in the U.S. military in Iraq.

85.     Robert Bartlett is a citizen of the United States.

86.     He was driving in a convoy when an Improvised Explosive Device ("IED") struck his vehicle.

87.     The weapon used to injure Robert Bartlett was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

88.     As a result of the attack, part of Robert Bartlett's head was severed.

89.     He also suffered third-degree burns on his neck, face and hands; internal bleeding; and a collapsed lung.

90.     Robert Bartlett has undergone multiple surgeries, including plastic surgery on his head and his bottom lip.

91.     Robert Bartlett suffers from Post-Traumatic Stress Disorder ("PTSD") and has constant nightmares.

92.     He has participated in group therapy to treat the emotional injuries he sustained as a result of the attack.

93.     As a result of the attack, and the injuries he suffered, Plaintiff Steve Bartlett has experienced severe physical and mental anguish and extreme emotional pain and suffering.

94.     Plaintiff Shawn Bartlett is a citizen of the United States and a resident of the State of Arizona. He is the brother of Robert Bartlett.

95.     As a result of the attack, and the injuries Robert Bartlett suffered, Plaintiff Shawn

Bartlett has experienced severe mental anguish and extreme emotional pain and suffering.

## THE AUGUST 2, 2005 ATTACK – BASRA

### The Vincent Family

96.     On August 2, 2005, Steven Vincent, aged 49, from New York, a journalist, was reporting on the Iraqi war in Basra when he was kidnapped and shot.

97.     Steven Vincent was a citizen of the United States at the time of the attack.

98.     Steven Vincent was killed in the attack.

99.     The terrorist group that planned and executed the attack was trained and armed by Iranian-backed Special Groups.

100.     Plaintiff Lisa Ramaci is a citizen of the United States and a resident of the State of New York. She is the widow of Steven Vincent.

101.     Plaintiff Isabell Vincent is a citizen of the United States and a resident of the State of California.  She is the mother of Steven Vincent.

102.     Plaintiff Charles Vincent is a citizen of the United States and a resident of the State of California. He is the father of Steven Vincent.

103.     Plaintiff Lisa Ramaci brings an action on behalf of the Estate of Steven Vincent, as its legal representative.

104.     As a result of the attack, and the death of Steven Vincent, Plaintiffs Lisa Ramaci, Isabell Vincent and Charles Vincent have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband/son's society, companionship, comfort, advice and counsel.

## THE SEPTEMBER 28, 2005 ATTACK – UMM QASR

**The Morin Family**

105.    On September 28, 2005, Steve Morin, Jr., aged 34, from Texas, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

106.    Steve Morin, Jr. was a citizen of the United States at the time of the attack.

107.    Steve Morin, Jr. was killed in the attack.

108.    The weapon used to kill Steve Morin, Jr. was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

109.    Plaintiff Gwendolyn Morin-Marentes is a citizen of the United States and a resident of the State of Texas. She is the widow of Steve Morin, Jr.

110.    Plaintiff E.M., a minor represented by his legal guardian Gwendolyn Morin-Marentes, is a citizen of the United States and a resident of the State of Texas. He is the son of Steve Morin, Jr.

111.    Plaintiff Audrey Morin is a citizen of the United States and a resident of the State of Texas.  She is the mother of Steve Morin, Jr.

112.    Plaintiff Steve Morin is a citizen of the United States and a resident of the State of Texas. He is the father of Steve Morin, Jr.

113.    Plaintiff Gwendolyn Morin-Marentes brings an action on behalf of the Estate of Steve Morin, Jr., as its legal representative.

114.    As a result of the attack, and the death of Steve Morin, Jr., Plaintiffs Gwendolyn Morin-Marentes, E.M., Audrey Morin and Steve Morin have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's society, companionship, comfort, advice and counsel.

## THE OCTOBER 6, 2005 ATTACK – BAGHDAD

### The Robinson Family

115.    On October 6, 2005, Jeremiah Robinson, aged 20, from Arizona, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

116.    Jeremiah Robinson was a citizen of the United States at the time of the attack.

117.    Jeremiah Robinson was killed in the attack.

118.    The weapon used to kill Jeremiah Robinson was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

119.    Plaintiff Amy Lynn Robinson is a citizen of the United States and a resident of the State of Arizona.  She is the mother of Jeremiah Robinson.

120.    Plaintiff Floyd Burton Robinson is a citizen of the United States and a resident of the State of Arizona. He is the father of Jeremiah Robinson.

121.    Plaintiff Jacob Michael Robinson is a citizen of the United States and a resident of the State of Arizona. He is the brother of Jeremiah Robinson.

122.    Plaintiff Lucas William Robinson is a citizen of the United States and a resident of the State of Arizona. He is the brother of Jeremiah Robinson.

123.    Plaintiffs Amy Lynn Robinson and Floyd Burton Robinson bring an action on behalf of the Estate of Jeremiah Robinson, as its legal representative.

124.    As a result of the attack, and the death of Jeremiah Robinson, Plaintiffs Amy Lynn Robinson, Floyd Burton Robinson, Jacob Michael Robinson and Lucas William Robinson have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## THE FEBRUARY 18, 2006 ATTACK – BAGHDAD

### The Matheny Family

125.    On February 18, 2006, Charles E. Matheny, IV, aged 23, from Washington, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

126.    Charles E. Matheny, IV was a citizen of the United States at the time of the attack.

127.    Charles E. Matheny, IV was killed in the attack.

128.    The weapon used to kill Charles E. Matheny, IV was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

129.    Plaintiff Deborah Noble is a citizen of the United States and a resident of the State of Washington.  She is the mother of Charles E. Matheny, IV.

130.    Plaintiff Charles E. Matheny, III is a citizen of the United States and a resident of the State of Washington. He is the father of Charles E. Matheny, IV.

131.    Plaintiff Deborah Noble brings an action on behalf of the Estate of Charles E. Matheny, IV, as its legal representative.

132.    As a result of the attack, and the death of Charles E. Matheny, IV, Plaintiffs Deborah Noble and Charles E. Matheny, III have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## THE FEBRUARY 26, 2006 ATTACK – BAGHDAD

### The Farr Family

133.    On February 26, 2006, Clay P. Farr, aged 21, from California, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

134.    Clay P. Farr was a citizen of the United States at the time of the attack.

135.    Clay P. Farr was killed in the attack.

136.    The weapon used to kill Clay P. Farr was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

137.    Plaintiff Silver Farr is a citizen of the United States and a resident of the State of California.  She is the step-mother of Clay P. Farr.

138.    Plaintiff Patrick Farr is a citizen of the United States and a resident of the State of California. He is the father of Clay P. Farr.

139.    Plaintiff Patrick Farr brings an action on behalf of the Estate of Clay P. Farr, as its legal representative.

140.    As a result of the attack, and the death of Clay P. Farr, Plaintiffs Silver Farr and Patrick Farr have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

**The Hunter Family**

141.    On February 26, 2006, Wesley Hunter, aged 26, from New York, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

142.    Wesley Hunter was a citizen of the United States at the time of the attack.

143.    Wesley Hunter was injured in the attack, and he died on September 18, 2008 from the injuries he sustained in the attack.

144.    The weapon used to kill Wesley Hunter was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

145.    Plaintiff Rayanne Hunter is a citizen of the United States and a resident of the State of North Carolina. She is the widow of Wesley Hunter.

146.   Plaintiff W.H., a minor represented by his legal guardian Rayanne Hunter, is a citizen of the United States and a resident of the State of North Carolina. He is the son of Wesley Hunter.

147.   Plaintiff T.H., a minor represented by her legal guardian Rayanne Hunter, is a citizen of the United States and a resident of the State of North Carolina. She is the daughter of Wesley Hunter.

148.   As a result of the attack, and the death of Wesley Hunter, Plaintiffs Rayanne Hunter, W.H. and T.H. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

## THE MARCH 13, 2006 ATTACK – RUSTAMIYAH

**The Lewis Family**

149.   On March 13, 2006, Bryan A. Lewis, aged 32, from Louisiana, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

150.   Bryan A. Lewis was a citizen of the United States at the time of the attack.

151.   Bryan A. Lewis was killed in the attack.

152.   The weapon used to kill Bryan A. Lewis was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

153.   Plaintiff Fabersha Flynt Lewis is a citizen of the United States and a resident of the State of Florida.  She is the widow of Bryan A. Lewis.

154.   As a result of the attack, and the death of Bryan A. Lewis, Plaintiff Fabersha Flynt Lewis has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice and counsel.

## THE APRIL 1, 2006 ATTACK – BAGHDAD

#### The Devora-Garcia Family

155.    On April 1, 2006, Israel Devora-Garcia, aged 23, from Texas, was serving in the U.S. military in Iraq when an IED detonated while he was conducting a dismounted patrol.

156.    Israel Devora-Garcia was a citizen of the United States at the time of the attack.

157.    Israel Devora-Garcia was killed in the attack.

158.    The weapon used to kill Israel Devora-Garcia was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

159.    Plaintiff Lorenzo Sandoval, Sr. is a citizen of the United States and a resident of the State of Texas.  He is the father of Israel Devora-Garcia.

160.    Plaintiff Lorenzo Sandoval, Jr. is a citizen of the United States and a resident of the State of Texas. He is the brother of Israel Devora-Garcia.

161.    Plaintiff Lorenzo Sandoval, Sr. brings an action on behalf of the Estate of Israel Devora-Garcia, as its legal representative.

162.    As a result of the attack, and the death of Israel Devora-Garcia, Plaintiffs Lorenzo Sandoval, Sr. and Lorenzo Sandoval, Jr. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## THE APRIL 12, 2006 ATTACK – MISIAB

#### The Bandhold Family

163.    On April 12, 2006, Scott Bandhold, aged 37, from New York, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

164.    Scott Bandhold was a citizen of the United States at the time of the attack.

165. Scott Bandhold was killed in the attack.

166. The weapon used to kill Scott Bandhold was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

167. Plaintiff H. Joseph Bandhold is a citizen of the United States and a resident of the State of New York. He is the brother of Scott Bandhold.

168. Plaintiff Donald C. Bandhold is a citizen of the United States and a resident of the State of Virginia. He is the brother of Scott Bandhold.

169. As a result of the attack, and the death of Scott Bandhold, Plaintiffs H. Joseph Bandhold and Donald C. Bandhold have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice and counsel.

## THE MAY 5, 2006 ATTACK – BAGHDAD

**The Saenz Family**

170. On May 5, 2006, Carlos N. Saenz, aged 46, from Nevada, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

171. Carlos N. Saenz was a citizen of the United States at the time of the attack.

172. Carlos N. Saenz was killed in the attack.

173. The weapon used to kill Carlos N. Saenz was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

174. Plaintiff Nanette Saenz is a citizen of the United States and a resident of the State of Las Vegas. She is the widow of Carlos N. Saenz.

175. Plaintiff Juan Saenz is a citizen of the United States and a resident of the State of Las Vegas. He is the son of Carlos N. Saenz.

176.    Plaintiff Nanette Saenz brings an action on behalf of the Estate of Carlos N. Saenz, as its legal representative.

177.    As a result of the attack, and the death of Carlos N. Saenz, Plaintiffs Nanette Saenz and Juan Saenz have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

## The Vacho Family

178.    On May 5, 2006, Nathan J. Vacho, aged 29, from Wisconsin, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

179.    Nathan J. Vacho was a citizen of the United States at the time of the attack.

180.    Nathan J. Vacho was killed in the attack.

181.    The weapon used to kill Nathan J. Vacho was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

182.    Plaintiff John Vacho is a citizen of the United States and a resident of the State of Wisconsin. He is the father of Nathan J. Vacho.

183.    Plaintiff Ashley Vacho is a citizen of the United States and a resident of the State of Wisconsin. She is the sister of Nathan J. Vacho.

184.    Plaintiff John Vacho brings an action on behalf of the Estate of Carol Vacho, as its legal representative. Carol Vacho was the mother of Nathan J. Vacho.

185.    Plaintiff John Vacho brings an action on behalf of the Estate of Nathan J. Vacho, as its legal representative.

186.    As a result of the attack, and the death of Nathan J. Vacho, Plaintiffs John Vacho and Ashley Vacho, and John Vacho in his capacity as the legal representative for the Estate of

Carol Vacho, have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## THE MAY 14, 2006 ATTACK – BAGHDAD

**The West Family**

187.    On May 14, 2006, Robert H. West, aged 37, from Ohio, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

188.    Robert H. West was a citizen of the United States at the time of the attack.

189.    Robert H. West was killed in the attack.

190.    The weapon used to kill Robert H. West was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

191.    Plaintiff Jeanette West is a citizen of the United States and a resident of the State of Colorado.  She is the widow of Robert H. West.

192.    Plaintiff Shelby West is a citizen of the United States and a resident of the State of Colorado. She is the daughter of Robert H. West.

193.    Plaintiff Jeanette West brings an action on behalf of the Estate of Robert H. West, as its legal representative.

194.    As a result of the attack, and the death of Robert H. West, Plaintiffs Jeanette West and Shelby West have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Engeman Family**

195.    On May 14, 2006, John W. Engeman, aged 45, from New York, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

196.    John W. Engeman was a citizen of the United States at the time of the attack.

197.   John W. Engeman was killed in the attack.

198.   The weapon used to kill John W. Engeman was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

199.   Plaintiff Donna Engeman is a citizen of the United States and a resident of the State of Texas.  She is the widow of John W. Engeman.

200.   As a result of the attack, and the death of John W. Engeman, Plaintiff Donna Engeman has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice and counsel.

## THE JUNE 5, 2006 ATTACK – BAGHDAD

**The Lawson Family**

201.   On June 5, 2006, Isaac S. Lawson, aged 35, from California, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

202.   Isaac S. Lawson was a citizen of the United States at the time of the attack.

203.   Isaac S. Lawson was killed in the attack.

204.   The weapon used to kill Isaac S. Lawson was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

205.   Plaintiff Suzzette Lawson is a citizen of the United States and a resident of the State of California.  She is the mother of Isaac S. Lawson.

206.   Plaintiff C.L., a minor represented by her legal guardian Suzzettee Lawson, is a citizen of the United States and a resident of the State of California. She is the daughter of Isaac S. Lawson.

207.   Plaintiff Suzzettee Lawson brings an action on behalf of the Estate of Isaac S. Lawson, as its legal representative.

208.     As a result of the attack, and the death of Isaac S. Lawson, Plaintiffs Suzzettee Lawson and C.L. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/father's society, companionship, comfort, advice and counsel.

## THE JUNE 8, 2006 ATTACK – AL KUT

### The Crabtree Family

209.     On June 8, 2006, Daniel Crabtree, aged 31, from Ohio, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

210.     Daniel Crabtree was a citizen of the United States at the time of the attack.

211.     Daniel Crabtree was killed in the attack.

212.     The weapon used to kill Daniel Crabtree was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

213.     Plaintiff Judy Ann Crabtree is a citizen of the United States and a resident of the State of Georgia.  She is the mother of Daniel Crabtree.

214.     Plaintiff Ronald Wayne Crabtree is a citizen of the United States and a resident of the State of Ohio. He is the father of Daniel Crabtree.

215.     Plaintiff Debra Wigbels is a citizen of the United States and a resident of the State of Georgia. She is the sister of Daniel Crabtree.

216.     Plaintiff Ronald William Crabtree is a citizen of the United States and a resident of the State of Ohio. He is the brother of Daniel Crabtree.

217.     As a result of the attack, and the death of Daniel Crabtree, Plaintiffs Judy Ann Crabtree, Ronald Wayne Crabtree, Debra Wigbels and Ronald William Crabtree have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

# THE JUNE 9, 2006 ATTACK – DIWANIYAH

## The Slaven Family

218.   On June 9, 2006, Benjamin J. Slaven aged 22, from Nebraska, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

219.   Benjamin J. Slaven was a citizen of the United States at the time of the attack.

220.   Benjamin J. Slaven was killed in the attack.

221.   The weapon used to kill Benjamin J. Slaven was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

222.   Plaintiff Judy Huenink is a citizen of the United States and a resident of the State of Nebraska. She is the mother of Benjamin J. Slaven.

223.   Plaintiff Sean Slaven is a citizen of the United States and a resident of the State of Nebraska. He is the brother of Benjamin J. Slaven.

224.   Plaintiff Chastity Dawn Slaven is a citizen of the United States and a resident of the State of Nebraska. She is the sister of Benjamin J. Slaven.

225.   Plaintiff Nicole Landon is a citizen of the United States and a resident of the State of Nebraska. She is the sister of Benjamin J. Slaven.

226.   Plaintiff Misti Fisher is a citizen of the United States and a resident of the State of Texas. She is the sister of Benjamin J. Slaven.

227.   As a result of the attack, and the death of Benjamin J. Slaven, Plaintiffs Judy Huenink, Sean Slaven, Chastity Dawn Slaven, Nicole Landon and Misti Fisher have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## THE OCTOBER 17, 2006 ATTACK – BAQUBAH

### The Frigo Family

228.    On October 17, 2006, Nathan J. Frigo, aged 23, from Indiana, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

229.    Nathan J. Frigo was a citizen of the United States at the time of the attack.

230.    Nathan J. Frigo was killed in the attack.

231.    The weapon used to kill Nathan J. Frigo was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

232.    Plaintiff Fred Frigo is a citizen of the United States and a resident of the State of Indiana. He is the father of Nathan J. Frigo.

233.    As a result of the attack, and the death of Nathan J. Frigo, Plaintiff Fred Frigo has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

### The Haupt Family

234.    On October 17, 2006, Ryan Haupt, aged 24, from Arizona, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

235.    Ryan Haupt was a citizen of the United States at the time of the attack.

236.    Ryan Haupt was killed in the attack.

237.    The weapon used to kill Ryan Haupt was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

238.    Plaintiff Lynn Forehand is a citizen of the United States and a resident of the State of Tennessee. She is the mother of Ryan Haupt.

239.    Plaintiff Lance Haupt is a citizen of the United States and a resident of the State

of Arizona. He is the father of Ryan Haupt.

240.    Plaintiff Rhonda Haupt is a citizen of the United States and a resident of the State of California. She is the sister of Ryan Haupt.

241.    Plaintiff Tifany Haupt is a citizen of the United States and a resident of the State of California. She is the sister of Ryan Haupt.

242.    Plaintiff Sabrina Cumbe is a citizen of the United States and a resident of the State of California. She is the sister of Ryan Haupt.

243.    As a result of the attack, and the death of Ryan Haupt, Plaintiffs Lynn Forehand, Lance Haupt, Rhonda Haupt, Tifany Haupt and Sabrina Cumbe have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## THE OCTOBER 22, 2006 ATTACK – BAGHDAD

### The Haines Family

244.    On October 22, 2006, David W. Haines, then 41, from Kentucky, was serving in the U.S. military in Iraq.

245.    David W. Haines is a citizen of the United States.

246.    David W. Haines was a member of a mounted patrol conducting a route reconnaissance to the military hospital in Baghdad when an IED struck his vehicle.

247.    The weapon used to injure David W. Haines was an Iranian-manufactured IED provided to Iranian-funded and –trained operatives in Iraq.

248.    As a result of the attack, David W. Haines sustained a fracture of his right femur that resulted in his right and left legs being different lengths; shrapnel injuries to his right hand, left arm, right leg, and buttocks; burns to his body; and nerve damage.

249. He has undergone multiple surgeries to repair the fracture to his femur and had multiple skin grafts.

250. As a result of the nerve damage that he incurred, David W. Haines continues to experience limited mobility in his left arm and hand and sensation problems.

251. David W. Haines has been diagnosed with PTSD and has sought counseling for emotional injuries resulting from the attack.

252. As a result of the attack, and the injuries he suffered, David W. Haines has experienced severe physical and mental anguish and extreme emotional pain and suffering.

253. Plaintiff Dawn Haines is a citizen of the United States and a resident of the State of Kentucky. She is the wife of David W. Haines.

254. Plaintiff C.H., a minor represented by his legal guardian Dawn Haines, is a citizen of the United States and a resident of the State of Kentucky. He is the son of David W. Haines.

255. As a result of the attack, and the injuries suffered by David W. Haines, Plaintiffs Dawn Haines and C.H. have experienced severe mental anguish, and extreme emotional pain and suffering.

## THE NOVEMBER 13, 2006 ATTACK – BAGHDAD

### The Kim Family

256. On November 13, 2006, Jang H. Kim, aged 20, from California, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

257. Jang H. Kim became a citizen of the United States posthumously.

258. Jang H. Kim was killed in the attack.

259. The weapon used to kill Jang H. Kim was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

260.   Plaintiff Sangsoon Kim is a citizen of the United States and a resident of the State of California.  She is the mother of Jang H. Kim.

261.   Plaintiff Seop (Steve) Kim is a citizen of the United States and a resident of the State of California. He is the father of Jang H. Kim.

262.   Plaintiff Michelle Kim is a citizen of the United States and a resident of the State of California. She is the sister of Jang H. Kim.

263.   Plaintiff Seop (Steve) Kim brings an action on behalf of the Estate of Jang H. Kim, as its legal representative.

264.   As a result of the attack, and the death of Jang H. Kim, Plaintiffs Sangsoon Kim, Seop (Steve) Kim and Michelle Kim have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## THE NOVEMBER 26, 2006 ATTACK – BAGHDAD

### The Fraser Family

265.   On November 26, 2006, David M. Fraser, aged 25, from Texas, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

266.   David M. Fraser was a citizen of the United States at the time of the attack.

267.   David M. Fraser was killed in the attack.

268.   The weapon used to kill David M. Fraser was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

269.   Plaintiff Helen Fraser is a citizen of the United States and a resident of the State of Texas.  She is the mother of David M. Fraser.

270.   Plaintiff Richard Fraser is a citizen of the United States and a resident of the State

of Texas. He is the father of David M. Fraser.

271.    Plaintiff Richard Fraser brings an action on behalf of the Estate of David M. Fraser, as its legal representative.

272.    As a result of the attack, and the death of David M. Fraser, Plaintiffs Helen Fraser and Richard Fraser have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## THE DECEMBER 3, 2006 ATTACK – BAGHDAD

**The English Family**

273.    On December 3, 2006, Shawn L. English, aged 35, from Ohio, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

274.    Shawn L. English was a citizen of the United States at the time of the attack.

275.    Shawn L. English was killed in the attack.

276.    The weapon used to kill Shawn L. English was an Iranian-manufactured IED provided to Iranian-funded and –trained terror operatives in Iraq.

277.    Plaintiff Tricia English is a citizen of the United States and a resident of the State of Ohio. She is the widow of Shawn L. English.

278.    Plaintiff N.W.E., a minor represented by his legal guardian Tricia English, is a citizen of the United States and a resident of the State of Ohio. He is the son of Shawn L. English.

279.    Plaintiff N.C.E., a minor represented by his legal guardian Tricia English, is a citizen of the United States and a resident of the State of Ohio. He is the son of Shawn L. English.

280.    Plaintiff A.S.E., a minor represented by his legal guardian Tricia English, is a

citizen of the United States and a resident of the State of Ohio. He is the son of Shawn L. English.

281.  Todd Daily brings an action on behalf of the Estate of Shawn L. English, as its legal representative.

282.  As a result of the attack, and the death of Shawn L. English, Plaintiffs Tricia English, N.W.E., N.C.E. and A.S.E. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

## THE DECEMBER 10, 2006 ATTACK – BAGHDAD

### The Ford Family

283.  On December 10, 2006, Philip C. Ford, aged 21, from Texas, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

284.  Philip C. Ford was a citizen of the United States at the time of the attack.

285.  Philip C. Ford was killed in the attack.

286.  The weapon used to kill Philip C. Ford was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

287.  Plaintiff Philip S. Ford is a citizen of the United States and a resident of the State of Texas. He is the father of Philip C. Ford.

288.  As a result of the attack, and the death of Philip C. Ford, Plaintiff Philip S. Ford has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

### The Gibson Family

289.  On December 10, 2006, Brennan C. Gibson aged 26, from Oregon, was serving in

the U.S. military in Iraq when an IED detonated near his vehicle.

290. Brennan C. Gibson was a citizen of the United States at the time of the attack.

291. Brennan C. Gibson was killed in the attack.

292. The weapon used to kill Brennan C. Gibson was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

293. Plaintiff Linda Gibson is a citizen of the United States and a resident of the State of Oregon. She is the mother of Brennan C. Gibson.

294. Plaintiff John Gibson is a citizen of the United States and a resident of the State of Oregon. He is the step-father of Brennan C. Gibson.

295. As a result of the attack, and the death of Brennan C. Gibson, Plaintiffs Linda Gibson and John Gibson have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## THE DECEMBER 31, 2006 ATTACK – BAGHDAD

### The Blohm Family

296. On December 31, 2006, Alan R. Blohm, aged 21, from Alaska, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

297. Alan R. Blohm was a citizen of the United States at the time of the attack.

298. Alan R. Blohm was killed in the attack.

299. The weapon used to kill Alan R. Blohm was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

300. Plaintiff Denise Blohm is a citizen of the United States and a resident of the State of Michigan. She is the mother of Alan R. Blohm.

301. Plaintiff Chris Blohm is a citizen of the United States and a resident of the State

of Michigan. He is the father of Alan R. Blohm.

302. Plaintiff Kiana Blohm is a citizen of the United States and a resident of the State of Michigan. She is the sister of Alan R. Blohm.

303. Plaintiff Jeremy Blohm is a citizen of the United States and a resident of the State of Michigan. He is the brother of Alan R. Blohm.

304. As a result of the attack, and the death of Alan R. Blohm, Plaintiffs Denise Blohm, Chris Blohm, Kiana Blohm and Jeremy Blohm have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## THE JANUARY 18, 2007 ATTACK – BAGHDAD

### The Rechenmacher Family

305. On January 18, 2007, William Joshua Rechenmacher, aged 24, from Florida, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

306. William Joshua Rechenmacher was a citizen of the United States at the time of the attack.

307. William Joshua Rechenmacher was killed in the attack.

308. The weapon used to kill William Joshua Rechenmacher was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

309. Plaintiff Joanne Gutcher is a citizen of the United States and a resident of the State of Florida. She is the mother of William Joshua Rechenmacher.

310. As a result of the attack, and the death of William Joshua Rechenmacher, Plaintiff Joanne Gutcher has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## THE JANUARY 22, 2007 ATTACK – BAGHDAD

**The Stout Family**

311.   On January 22, 2007, Brandon L. Stout, aged 23, from Michigan, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

312.   Brandon L. Stout was a citizen of the United States at the time of the attack.

313.   Brandon L. Stout was killed in the attack.

314.   The weapon used to kill Brandon L. Stout was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

315.   Plaintiff Tracy Anderson is a citizen of the United States and a resident of the State of Michigan.  She is the mother of Brandon L. Stout.

316.   Plaintiff Jeffrey Anderson is a citizen of the United States and a resident of the State of Michigan. He is the step-father of Brandon L. Stout.

317.   As a result of the attack, and the death of Brandon L. Stout, Plaintiffs Tracy Anderson and Jeffrey Anderson have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## THE JANUARY 25, 2007 ATTACK – BAGHDAD

**The Fuller Family**

318.   On January 25, 2007, Alexander H. Fuller, aged 21, from Massachusetts, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

319.   Alexander H. Fuller was a citizen of the United States at the time of the attack.

320.   Alexander H. Fuller was killed in the attack.

321.   The weapon used to kill Alexander H. Fuller was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

322. Plaintiff Anastasia Fuller is a citizen of the United States and a resident of the State of Massachusetts. She is the widow of Alexander H. Fuller.

323. Plaintiff A.F., a minor represented by her legal guardian Anastasia Fuller, is a citizen of the United States and a resident of the State of Massachusetts. She is the daughter of Alexander H. Fuller.

324. As a result of the attack, and the death of Alexander H. Fuller, Plaintiffs Anastasia Fuller and A.F. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

## THE MARCH 15, 2007 ATTACK – BAQUBAH

**The Harris Family**

325. On March 15, 2007, Blake Harris, aged 27, from Georgia, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

326. Blake Harris was a citizen of the United States at the time of the attack.

327. Blake Harris was killed in the attack.

328. The weapon used to kill Blake Harris was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

329. Plaintiff Anne F. Harris is a citizen of the United States and a resident of the State of Georgia. She is the step-mother of Blake Harris.

330. Plaintiff Paul D. Harris is a citizen of the United States and a resident of the State of Georgia. He is the father of Blake Harris.

331. As a result of the attack, and the death of Blake Harris, Plaintiffs Anne F. Harris and Paul D. Harris have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## THE MARCH 20, 2007 ATTACK – BAGHDAD

**The Glawson Family**

332.    On March 20, 2007, Curtis E. Glawson, aged 24, from Alabama, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

333.    Curtis E. Glawson was a citizen of the United States at the time of the attack.

334.    Curtis E. Glawson was killed in the attack.

335.    The weapon used to kill Curtis E. Glawson was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

336.    Plaintiff Hyunjung Glawson is a citizen of the United States and a resident of the State of Florida. She is the widow of Curtis E. Glawson.

337.    Plaintiff Yolanda M. Brooks is a citizen of the United States and a resident of the State of Alabama.  She is the mother of Curtis E. Glawson.

338.    Plaintiff Curtis Glawson, Sr. is a citizen of the United States and a resident of the State of Georgia. He is the father of Curtis E. Glawson.

339.    As a result of the attack, and the death of Curtis E. Glawson, Plaintiffs Hyunjung Glawson, Yolanda M. Brooks and Curtis Glawson, Sr. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's society, companionship, comfort, advice and counsel.

## THE MARCH 23, 2007 ATTACK – NASIRIYAH

**The Sabinish Family**

340.    On March 23, 2007, Ryan Sabinish, then 25, from Minnesota, was serving in the U.S. military in Iraq.

341.    Ryan Sabinish is a citizen of the United States.

41

342.     Ryan Sabinish, a gunner, was tasked with protecting his base from mortar and rocket attacks.

343.     While Ryan Sabinish was conducting his operations, his vehicle was struck by an IED.

344.     The weapon used to injure Ryan Sabinish was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

345.     As a result of the attack, Ryan Sabinish experienced severe blood loss and sustained injuries to his back, hip, and lower extremities.

346.     In addition, shrapnel penetrated and scarred Ryan Sabinish's right arm.

347.     Ryan Sabinish has been diagnosed with Traumatic Brain Injury ("TBI").

348.     He also suffers from PTSD.

349.     Ryan Sabinish has been hospitalized for his emotional injuries and has sought mental health treatment as an outpatient. He continues to seek treatment.

350.     He has been prescribed medication to address his emotional health issues, and he continues to take medication to treat his emotional injuries.

351.     As a result of the attack, and the injuries he suffered, Plaintiff Ryan Sabinish has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## THE MARCH 31, 2007 ATTACK – DIWANIYAH

### The Christopher Family

352.     On March 31, 2007, Kwesi Christopher, aged 25, from Brooklyn, a former soldier in the U.S. military, was serving as a civilian contractor in Iraq when an IED detonated near him.

353.     Kwesi Christopher was a citizen of the United States at the time of the attack.

354.     Kwesi Christopher was killed in the attack.

355. The weapon used to kill Kwesi Christopher was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

356. Plaintiff Ann Christopher is a citizen of the United States and a resident of the State of Florida. She is the mother of Kwesi Christopher.

357. Plaintiff Ann Christopher brings an action on behalf of the Estate of Kwesi Christopher, as its legal representative.

358. As a result of the attack, and the death of Kwesi Christopher, Plaintiff Ann Christopher has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## THE APRIL 6, 2007 ATTACK – BAGHDAD

**The Fuentes Family**

359. On April 6, 2007, Daniel A. Fuentes, aged 19, from New York, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

360. Daniel A. Fuentes was a citizen of the United States at the time of the attack.

361. Daniel A. Fuentes was killed in the attack.

362. The weapon used to kill Daniel A. Fuentes was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

363. Emma McGarry is a citizen of the United States and a resident of Levittown, in the State of New York. She was the fiancée of Daniel A. Fuentes and is the legal guardian of Plaintiff D.J.F., a minor and a citizen of the United States and a resident of the State of New York.

364. D.J.F. is the son of Daniel A. Fuentes.

365. As a result of the attack, and the death of Daniel A. Fuentes, Plaintiff D.J.F. has

experienced the loss of his father's society, companionship, comfort, advice and counsel.

## THE APRIL 16, 2007 ATTACK – BAGHDAD

### The Starcevich Family

366.   On April 16, 2007, Lucas V. Starcevich, aged 25, from Illinois, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

367.   Lucas V. Starcevich was a citizen of the United States at the time of the attack.

368.   Lucas V. Starcevich was killed in the attack.

369.   The weapon used to kill Lucas V. Starcevich was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

370.   Plaintiff Ava Tomson is a citizen of the United States and a resident of the State of Illinois.  She is the mother of Lucas V. Starcevich.

371.   Plaintiff Richard Tomson is a citizen of the United States and a resident of the State of Illinois. He is the step-father of Lucas V. Starcevich.

372.   Plaintiff Bradley Starcevich is a citizen of the United States and a resident of the State of Illinois. He is the father of Lucas V. Starcevich.

373.   Plaintiff Glenda Starcevich is a citizen of the United States and a resident of the State of Illinois. She is the step-mother of Lucas V. Starcevich.

374.   Plaintiff Ariana Reyes is a citizen of the United States and a resident of the State of Illinois. She is the sister of Lucas V. Starcevich.

375.   Plaintiff Trenton Starcevich is a citizen of the United States and a resident of the State of Illinois. He is the brother of Lucas V. Starcevich.

376.   Plaintiff Ava Tomson brings an action on behalf of the Estate of Lucas V. Starcevich, as its legal representative.

377.    As a result of the attack, and the death of Lucas V. Starcevich, Plaintiffs Ava Tomson, Richard Tomson, Bradley Starcevich, Glenda Starcevich, Ariana Reyes and Trenton Starcevich have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## THE APRIL 29, 2007 ATTACK – BAGHDAD

**The Funcheon Family**

378.    On April 29, 2007, Alexander J. Funcheon, aged 21, from Kansas, was serving in the U.S. military in Iraq when an IED detonated near his unit.

379.    Alexander J. Funcheon was a citizen of the United States at the time of the attack.

380.    Alexander J. Funcheon was killed in the attack.

381.    The weapon used to kill Alexander J. Funcheon was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

382.    Plaintiff Karen Funcheon is a citizen of the United States and a resident of the State of Kansas.  She is the mother of Alexander J. Funcheon.

383.    Plaintiff Robert Funcheon is a citizen of the United States and a resident of the State of Kansas. He is the father of Alexander J. Funcheon.

384.    Plaintiff Karen Funcheon brings an action on behalf of the Estate of Alexander J. Funcheon, as its legal representative.

385.    As a result of the attack, and the death of Alexander J. Funcheon, Plaintiffs Karen Funcheon and Robert Funcheon have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## THE MAY 3, 2007 ATTACK – BAGHDAD

### The Potter Family

386.   On May 3, 2007, Jerome Potter, aged 24, from Washington, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

387.   Jerome Potter was a citizen of the United States at the time of the attack.

388.   Jerome Potter was killed in the attack.

389.   The weapon used to kill Jerome Potter was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

390.   Plaintiff Holly Burson-Gilpin is a citizen of the United States and a resident of the State of Washington.  She is the mother of Jerome Potter.

391.   Plaintiff Holly Burson-Gilpin brings an action on behalf of the Estate of Jerome Potter, as its legal representative.

392.   As a result of the attack, and the death of Jerome Potter, Plaintiff Holly Burson-Gilpin has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## THE MAY 3, 2007 ATTACK – MUSAYYIB

### The Umbrell Family

393.   On May 3, 2007, Colby J. Umbrell aged 26, from Pennsylvania, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

394.   Colby J. Umbrell was a citizen of the United States at the time of the attack.

395.   Colby J. Umbrell was killed in the attack.

396.   The weapon used to kill Colby J. Umbrell was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

397.    Plaintiff Nancy Umbrell is a citizen of the United States and a resident of the State of Pennsylvania. She is the mother of Colby J. Umbrell.

398.    Plaintiff Mark Umbrell is a citizen of the United States and a resident of the State of Pennsylvania. He is the father of Colby J. Umbrell.

399.    Plaintiffs Nancy Umbrell and Mark Umbrell bring an action on behalf of the Estate of Colby J. Umbrell, as its legal representative.

400.    As a result of the attack, and the death of Colby J. Umbrell, Plaintiffs Nancy Umbrell and Mark Umbrell have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## THE MAY 6, 2007 ATTACK – BAGHDAD

**The Dixon Family**

401.    On May 6, 2007, Robert J. Dixon aged 27, from Minnesota, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

402.    Robert J. Dixon was a citizen of the United States at the time of the attack.

403.    Robert J. Dixon was killed in the attack.

404.    The weapon used to kill Robert J. Dixon was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

405.    Plaintiff Ilene Dixon is a citizen of the United States and a resident of the State of Michigan. She is the mother of Robert J. Dixon.

406.    Plaintiff Dan Dixon is a citizen of the United States and a resident of the State of Michigan. He is the father of Robert J. Dixon.

407.    As a result of the attack, and the death of Robert J. Dixon, Plaintiffs Ilene Dixon and Dan Dixon have experienced severe mental anguish, extreme emotional pain and suffering,

and loss of their son's society, companionship, comfort, advice and counsel.

## THE MAY 8, 2007 ATTACK – SALMAN PAK

### The Little Family

408.    On May 8, 2007, Kyle A. Little, aged 20, from Massachusetts, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

409.    Kyle A. Little was a citizen of the United States at the time of the attack.

410.    Kyle A. Little was killed in the attack.

411.    The weapon used to kill Kyle A. Little was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

412.    Plaintiff Shelley Ann Smith is a citizen of the United States and a resident of the State of Massachusetts.  She is the mother of Kyle A. Little.

413.    As a result of the attack, and the death of Kyle A. Little, Plaintiff Shelley Ann Smith has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## THE MAY 11, 2007 ATTACK – AL ISKANDARIYAH

### The Farrar Family

414.    On May 11, 2007, William A. Farrar, aged 20, from California, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

415.    William A. Farrar was a citizen of the United States at the time of the attack.

416.    William A. Farrar was killed in the attack.

417.    The weapon used to kill William A. Farrar was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

418.    Plaintiff William Farrar, Sr. is a citizen of the United States and a resident of the

State of California. He is the father of William A. Farrar.

419.   Plaintiff William Farrar, Sr. brings an action on behalf of the Estate of William A. Farrar, as its legal representative.

420.   As a result of the attack, and the death of William A. Farrar, Plaintiff William Farrar, Sr. has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

## THE JUNE 2, 2007 ATTACK – BAGHDAD

### The Dressler Family

421.   On June 2, 2007, Shawn E. Dressler, aged 22, from California, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

422.   Shawn E. Dressler was a citizen of the United States at the time of the attack.

423.   Shawn E. Dressler was killed in the attack.

424.   The weapon used to kill Shawn E. Dressler was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

425.   Plaintiff Tonya K. Dressler is a citizen of the United States and a resident of the State of Arizona. She is the mother of Shawn E. Dressler.

426.   Plaintiff Ardith Cecil Dressler is a citizen of the United States and a resident of the State of Arizona. He is the father of Shawn E. Dressler.

427.   Plaintiff Melissa Dressler is a citizen of the United States and a resident of the State of Arizona. She is the sister of Shawn E. Dressler.

428.   As a result of the attack, and the death of Shawn E. Dressler, Plaintiffs Tonya K. Dressler, Ardith Cecil Dressler and Melissa Dressler have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship,

comfort, advice and counsel.

**The Brown Family**

429.   On June 3, 2007, Joshua D. Brown, aged 26, from Michigan, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

430.   Joshua D. Brown was a citizen of the United States at the time of the attack.

431.   Joshua D. Brown was killed in the attack.

432.   The weapon used to kill Joshua D. Brown was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

433.   Plaintiff Elizabeth Brown is a citizen of the United States and a resident of the State of Michigan. She is the widow of Joshua D. Brown.

434.   Plaintiff Marian Brown is a citizen of the United States and a resident of the State of Michigan.  She is the mother of Joshua D. Brown.

435.   Plaintiff Wayne Brown is a citizen of the United States and a resident of the State of Michigan. He is the father of Joshua D. Brown.

436.   Plaintiff Elizabeth Brown brings an action on behalf of the Estate of Joshua D. Brown, as its legal representative.

437.   As a result of the attack, and the death of Joshua D. Brown, Plaintiffs Elizabeth Brown, Marian Brown and Wayne Brown have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's society, companionship, comfort, advice and counsel.

## THE JUNE 5, 2007 ATTACK – KIRKUK

**The Balmer Family**

438.   On June 5, 2007, Ryan A. Balmer, aged 33, from Indiana, was serving in the U.S.

50

military in Iraq when an IED detonated near his vehicle.

439. Ryan A. Balmer was a citizen of the United States at the time of the attack.

440. Ryan A. Balmer was killed in the attack.

441. The weapon used to kill Ryan A. Balmer was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

442. Plaintiff Danielle Sweet is a citizen of the United States and a resident of the State of Florida. She is the widow of Ryan A. Balmer.

443. Plaintiff A.B., a minor represented by his legal guardian Danielle Sweet, is a citizen of the United States and a resident of the State of Florida. He is the son of Ryan A. Balmer.

444. Plaintiff G.B., a minor represented by her legal guardian Danielle Sweet, is a citizen of the United States and a resident of the State of Florida. She is the daughter of Ryan A. Balmer.

445. Plaintiff Danielle Sweet brings an action on behalf of the Estate of Ryan A. Balmer, as its legal representative.

446. As a result of the attack, and the death of Ryan A. Balmer, Plaintiffs Danielle Sweet, A.B. and G.B. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Kuglics Family**

447. On June 5, 2007, Matthew J. Kuglics, aged 25, from Ohio, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

448. Matthew J. Kuglics was a citizen of the United States at the time of the attack.

449.   Matthew J. Kuglics was killed in the attack.

450.   The weapon used to kill Matthew J. Kuglics was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

451.   Plaintiff Donna Kuglics is a citizen of the United States and a resident of the State of Ohio. She is the mother of Matthew J. Kuglics.

452.   Plaintiff Les Kuglics is a citizen of the United States and a resident of the State of Ohio. He is the father of Matthew J. Kuglics.

453.   Plaintiff Emily Kuglics is a citizen of the United States and a resident of the State of Ohio. She is the sister of Matthew J. Kuglics.

454.   Plaintiff Donna Kuglics brings an action on behalf of the Estate of Matthew J. Kuglics, as its legal representative.

455.   As a result of the attack, and the death of Matthew J. Kuglics, Plaintiffs Donna Kuglics, Les Kuglics and Emily Kuglics have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## THE JUNE 21, 2007 ATTACK – BAGHDAD

### The Spencer Family

456.   On June 21, 2007, Raymond N. Spencer, aged 23, from California, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

457.   Raymond N. Spencer was a citizen of the United States at the time of the attack.

458.   Raymond N. Spencer was killed in the attack.

459.   The weapon used to kill Raymond N. Spencer was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

460.    Plaintiff Sylvia Johnson Spencer is a citizen of the United States and a resident of the State of California.  She is the step-mother of Raymond N. Spencer.

461.    Plaintiff Raymond Nigel Spencer, Sr. is a citizen of the United States and a resident of the State of California. He is the father of Raymond N. Spencer.

462.    As a result of the attack, and the death of Raymond N. Spencer, Plaintiffs Sylvia Johnson Spencer and Raymond Nigel Spencer, Sr. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## THE JULY 6, 2007 ATTACK – BAGHDAD

### The Lamie Family

463.    On July 6, 2007, Gene Lamie, aged 25, from Georgia, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

464.    Gene Lamie was a citizen of the United States at the time of the attack.

465.    Gene Lamie was killed in the attack.

466.    The weapon used to kill Gene Lamie was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

467.    Plaintiff John D. Lamie is a citizen of the United States and a resident of the State of Georgia.  He is the brother of Gene Lamie.

468.    As a result of the attack, and the death of Gene Lamie, Plaintiff John D. Lamie has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his brother's society, companionship, comfort, advice and counsel.

## THE JULY 17, 2007 ATTACK – BAGHDAD

**The Bobb Family**

469. On July 17, 2007, Brandon K. Bobb, aged 20, from Florida, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

470. Brandon K. Bobb was a citizen of the United States at the time of the attack.

471. Brandon K. Bobb was killed in the attack.

472. The weapon used to kill Brandon K. Bobb was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

473. Plaintiff Paula C. Bobb-Miles is a citizen of the United States and a resident of the State of Texas. She is the mother of Brandon K. Bobb.

474. Plaintiff Johnny Javier Miles, Sr. is a citizen of the United States and a resident of the State of Alabama. He is the step-father of Brandon K. Bobb.

475. Plaintiff J.J.M., Jr., a minor represented by his legal guardian Paula C. Bobb-Miles, is a citizen of the United States and a resident of the State of Texas. He is the brother of Brandon K. Bobb.

476. Plaintiff Racquel Arnae Bobb Miles is a citizen of the United States and a resident of the State of Texas. She is the sister of Brandon K. Bobb.

477. Plaintiff Paula C. Bobb-Miles brings an action on behalf of the Estate of Brandon K. Bobb, as its legal representative.

478. As a result of the attack, and the death of Brandon K. Bobb, Plaintiffs Paula C. Bobb-Miles, Johnny Javier Miles, Sr., J.J.M. Jr. and Racquel Arnae Bobb Miles have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Joshua Family**

479.    On July 17, 2007, Ron J. Joshua, Jr., aged 19, from Texas, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

480.    Ron J. Joshua, Jr. was a citizen of the United States at the time of the attack.

481.    Ron J. Joshua, Jr. was killed in the attack.

482.    The weapon used to kill Ron J. Joshua, Jr. was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

483.    Plaintiff Ursula Ann Joshua is a citizen of the United States and a resident of the State of Texas.  She is the mother of Ron J. Joshua, Jr.

484.    Plaintiff Brittany Marionique Joshua is a citizen of the United States and a resident of the State of Texas. She is the sister of Ron J. Joshua, Jr.

485.    As a result of the attack, and the death of Ron J. Joshua, Jr., Plaintiffs Ursula Ann Joshua and Brittany Marionique Joshua have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## THE JANUARY 6, 2008 ATTACK – BAGHDAD

**The Gudridge Family**

486.    On January 6, 2008, James D. Gudridge, aged 20, from New York, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

487.    James D. Gudridge was a citizen of the United States at the time of the attack.

488.    James D. Gudridge was killed in the attack.

489.    The weapon used to kill James D. Gudridge was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

490.     Plaintiff Ashley Gudridge is a citizen of the United States and a resident of the State of New York.  She is the sister of James D. Gudridge.

491.     As a result of the attack, and the death of James D. Gudridge, Plaintiff Ashley Gudridge has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her brother's society, companionship, comfort, advice and counsel.

## THE MARCH 17, 2008 ATTACK – BAGHDAD

### The Elledge Family

492.     On March 17, 2008, Michael D. Elledge, aged 41, from Indiana, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

493.     Michael D. Elledge was a citizen of the United States at the time of the attack.

494.     Michael D. Elledge was killed in the attack.

495.     The weapon used to kill Michael D. Elledge was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

496.     Plaintiff Marion Crimens is a citizen of the United States and a resident of the State of Florida.  She is the mother of Michael D. Elledge.

497.     Plaintiff Timothy W. Elledge is a citizen of the United States and a resident of the State of Georgia. He is the brother of Michael D. Elledge.

498.     As a result of the attack, and the death of Michael D. Elledge, Plaintiffs Marion Crimens and Timothy W. Elledge have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## THE MARCH 17, 2008 ATTACK – BAGHDAD

### The Levi Family

499.    On March 17, 2008, Christopher Levi, then 23, was serving in the U.S. military in Iraq.

500.    Christopher Levi is a citizen of the United States and a resident of Holbrook, New York.

501.    Christopher Levi was in a convoy when an IED struck his vehicle.

502.    The weapon used to injure Christopher Levi was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

503.    As a result of the attack, Christopher Levi lost both of his legs.

504.    He also sustained a fracture of his right ulna and loss of the second metacarpal in his right hand.

505.    In addition to adjusting to life as a double amputee through the use of prosthetics and a wheelchair, Christopher Levi continues to experience numbness in his left arm.

506.    Christopher Levi suffers from TBI.

507.    As a result of the attack, and the injuries he suffered, Plaintiff Christopher Levi has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## THE MARCH 23, 2008 ATTACK – BAGHDAD

### The Habsieger Family

508.    On March 23, 2008, Andrew J. Habsieger, aged 22, from Missouri, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

509.    Andrew J. Habsieger was a citizen of the United States at the time of the attack.

510.    Andrew J. Habsieger was killed in the attack.

511.    The weapon used to kill Andrew J. Habsieger was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

512.    Plaintiff Brenda Habsieger is a citizen of the United States and a resident of the State of Missouri.  She is the mother of Andrew J. Habsieger.

513.    Plaintiff Michael Habsieger is a citizen of the United States and a resident of the State of Missouri. He is the father of Andrew J. Habsieger.

514.    Plaintiff Jacob Michael Habsieger is a citizen of the United States and a resident of the State of Missouri. He is the brother of Andrew J. Habsieger.

515.    As a result of the attack, and the death of Andrew J. Habsieger, Plaintiffs Brenda Habsieger, Michael Habsieger and Jacob Michael Habsieger have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Hake Family**

516.    On March 23, 2008, Christopher M. Hake, aged 26, from Oklahoma, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

517.    Christopher M. Hake was a citizen of the United States at the time of the attack.

518.    Christopher M. Hake was killed in the attack.

519.    The weapon used to kill Christopher M. Hake was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

520.    Plaintiff Kelli D. Hake is a citizen of the United States and a resident of the State of Oklahoma. She is the widow of Christopher M. Hake.

521.    Plaintiff Denice York is a citizen of the United States and a resident of the State of Oklahoma.  She is the mother of Christopher M. Hake.

522.    Plaintiff Russel York is a citizen of the United States and a resident of the State of Oklahoma. He is the step-father of Christopher M. Hake.

523.    Plaintiff Jill Hake is a citizen of the United States and a resident of the State of Oklahoma. She is the step-mother of Christopher M. Hake.

524.    Plaintiff Peter Hake is a citizen of the United States and a resident of the State of Oklahoma. He is the father of Christopher M. Hake.

525.    Plaintiff G.H., a minor represented by his legal guardian Kelli D. Hake, is a citizen of the United States and a resident of the State of Oklahoma. He is the son of Christopher M. Hake.

526.    Plaintiff Kelli D. Hake brings an action on behalf of the Estate of Christopher M. Hake, as its legal representative.

527.    As a result of the attack, and the death of Christopher M. Hake, Plaintiffs Kelli D. Hake, Denice York, Russel York, Jill Hake, Peter Hake and G.H. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/father's society, companionship, comfort, advice and counsel.

**The Delgado Family**

528.    On March 23, 2008, George Delgado, aged 21, from California, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

529.    George Delgado was a citizen of the United States at the time of the attack.

530.    George Delgado was killed in the attack.

531.    The weapon used to kill George Delgado was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

532.    Plaintiff Maria E. Calle is a citizen of the United States and a resident of the State

of California. She is the mother of George Delgado.

533.    Plaintiff Cynthia Delgado is a citizen of the United States and a resident of the State of California. She is the sister of George Delgado.

534.    As a result of the attack, and the death of George Delgado, Plaintiffs Maria E. Calle and Cynthia Delgado have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## THE MARCH 29, 2008 ATTACK – BAGHDAD

**The Miller Family**

535.    On March 29, 2008, Patrick J. Miller aged 23, from Florida, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

536.    Patrick J. Miller was a citizen of the United States at the time of the attack.

537.    Patrick J. Miller was killed in the attack.

538.    The weapon used to kill Patrick J. Miller was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

539.    Plaintiff Kim Miller is a citizen of the United States and a resident of the State of Florida.  She is the mother of Patrick J. Miller.

540.    As a result of the attack, and the death of Patrick J. Miller, Plaintiff Kim Miller has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## THE MARCH 30, 2008 ATTACK – BAGHDAD

**The Bailey Family**

541.    On March 30, 2008, Walter Bailey, then 19, from Florida, was serving in the U.S. military in Iraq.

542. Walter Bailey is a citizen of the United States.

543. Walter Bailey was returning to base when his vehicle was struck by an IED.

544. The weapon used to injure Walter Bailey was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

545. As a result of the attack, Walter Bailey sustained multiple pieces of shrapnel in his right arm and both legs. He was also struck by shrapnel in his face and arm.

546. As a result of the attack, Walter Bailey lost consciousness.

547. He has been diagnosed with both TBI and PTSD.

548. Walter Bailey has also experienced memory loss.

549. He has sought and continues to avail himself of counseling for the emotional injuries caused by the attack.

550. As a result of the attack, and the injuries he suffered, Plaintiff Walter Bailey has experienced severe physical and mental anguish and extreme emotional pain and suffering.

551. Plaintiff Cassandra Bailey is a citizen of the United States and a resident of the State of Florida. She is the wife of Walter Bailey.

552. As a result of the injuries suffered by Walter Bailey, Cassandra Bailey has sought counseling and been prescribed medication.

553. As a result of the attack, and the injuries Walter Bailey suffered, Plaintiff Cassandra Bailey has experienced severe mental anguish, and extreme emotional pain and suffering.

## THE MARCH 30, 2008 ATTACK – BAGHDAD

### The Gilmore Family

554. On March 30, 2008, Terrell W. Gilmore, Sr., aged 38, from Louisiana, was

serving in the U.S. military in Iraq when an IED detonated near his vehicle.

555.    Terrell W. Gilmore, Sr. was a citizen of the United States at the time of the attack.

556.    Terrell W. Gilmore, Sr. was killed in the attack.

557.    The weapon used to kill Terrell W. Gilmore, Sr. was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

558.    The terrorist group that planned and executed the attack, the Mahdi Army/Special Groups, was trained and armed by Iran's Qods Force with the assistance of Hezbollah.

559.    Plaintiff Kacey Gilmore is a citizen of the United States and a resident of the State of Louisiana. She is the daughter of Terrell W. Gilmore, Sr.

560.    Plaintiff Terrell Gilmore, Jr. is a citizen of the United States and a resident of the State of Louisiana. He is the son of Terrell W. Gilmore, Sr.

561.    As a result of the attack, and the death of Terrell W. Gilmore, Sr., Plaintiffs Kacey Gilmore and Terrell Gilmore, Jr. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's society, companionship, comfort, advice and counsel.

## THE MARCH 31, 2008 ATTACK – BAGHDAD

### The Dhanoolal Family

562.    On March 31, 2008, Dayne D. Dhanoolal, aged 26, from New York, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

563.    Dayne D. Dhanoolal was a citizen of the United States at the time of the attack.

564.    Dayne D. Dhanoolal was killed in the attack.

565.    The weapon used to kill Dayne D. Dhanoolal was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

566.   Plaintiff Kynesha Dhanoolal is a citizen of the United States and a resident of the State of Georgia.  She is the widow of Dayne D. Dhanoolal.

567.   As a result of the attack, and the death of Dayne D. Dhanoolal, Plaintiff Kynesha Dhanoolal has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice and counsel.

## THE APRIL 6, 2008 ATTACK – BAGHDAD

### The Pickett Family

568.   On April 6, 2008, Emanuel Pickett, aged 34, from North Carolina, was serving in the U.S. military when he was involved in a mortar attack.

569.   Emanuel Pickett was a citizen of the United States at the time of the attack.

570.   Emanuel Pickett was killed in the attack.

571.   The terrorist group that planned and executed the mortar attack, the Mahdi Army, was trained and armed by Iran's Qods Force with the assistance of Hezbollah.

572.   Plaintiff Merlese Pickett is a citizen of the United States and a resident of the State of North Carolina.  She is the mother of Emanuel Pickett.

573.   Plaintiff Harry Pickett is a citizen of the United States and a resident of the State of North Carolina. He is the brother of Emanuel Pickett.

574.   As a result of the attack, and the death of Emanuel Pickett, Plaintiffs Merlese Pickett and Harry Pickett have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## THE APRIL 6, 2008 ATTACK – BAGHDAD

### The Scott Family

575.   On April 6, 2008, Stephen K. Scott, aged 54, from Alabama, was serving in the

U.S. military when he was involved in a mortar attack.

576.    Stephen K. Scott was a citizen of the United States at the time of the attack.

577.    Stephen K. Scott was killed in the attack.

578.    The terrorist group that planned and executed the mortar attack was trained and armed by Iran's Qods Force with the assistance of Hezbollah.

579.    Plaintiff Rachel M. Gillette is a citizen of the United States and a resident of the State of Missouri.  She is the daughter of Stephen K. Scott.

580.    Plaintiff Rebekah A. Coldewe is a citizen of the United States and a resident of the State of Missouri. She is the daughter of Steven K. Scott.

581.    As a result of the attack, and the death of Stephen K. Scott, Plaintiffs Rachel M. Gillette and Rebekah A. Coldewe have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's society, companionship, comfort, advice and counsel.

## THE APRIL 7, 2008 ATTACK – BAGHDAD

**The Smith Family**

582.    On April 7, 2008, Timothy Smith, aged 25, from California, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

583.    Timothy Smith was a citizen of the United States at the time of the attack.

584.    Timothy Smith was killed in the attack.

585.    The weapon used to kill Timothy Smith was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

586.    Plaintiff Patricia Smith is a citizen of the United States and a resident of the State of California.  She is the mother of Timothy Smith.

587.    Plaintiff Michael Smith is a citizen of the United States and a resident of the State of California. He is the father of Timothy Smith.

588.    Plaintiff Jacqueline A. Smith is a citizen of the United States and a resident of the State of California. She is the sister of Timothy Smith.

589.    As a result of the attack, and the death of Timothy Smith, Plaintiffs Patricia Smith, Michael Smith and Jacqueline A. Smith have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## THE APRIL 8, 2008 ATTACK – KHARGULIAH

### The Hartley Family

590.    On April 8, 2008, Jeffery Hartley, aged 25, from Texas, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

591.    Jeffery Hartley was a citizen of the United States at the time of the attack.

592.    Jeffery Hartley was killed in the attack.

593.    The weapon used to kill Jeffery Hartley was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

594.    Plaintiff David Hartley is a citizen of the United States and a resident of the State of Texas. He is the father of Jeffery Hartley.

595.    Plaintiff David Hartley brings an action on behalf of the Estate of Jeffery Hartley, as its legal representative.

596.    As a result of the attack, and the death of Jeffery Hartley, Plaintiff David Hartley has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

## THE APRIL 12, 2008 ATTACK

**The Swinton Family**

597.    On April 12, 2008, Allen Swinton, then 33, from Georgia, was serving in the U.S. military in Iraq.

598.    Allen Swinton is a citizen of the United States.

599.    Allen Swinton's unit was providing escort duties when his vehicle was struck by an IED.

600.    The weapon used to injure Allen Swinton was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

601.    As a result of the explosion, Allen Swinton's artery was severed; he lost a great amount of blood; multiple pieces of shrapnel entered his lower extremities; and his right hand was injured.

602.    Allen Swinton underwent surgery to tie his artery; he also underwent multiple surgeries to remove shrapnel from his body.

603.    He has also undergone physical therapy to treat the injuries he sustained to his legs and hand.

604.    Allen Swinton continues to experience pain in his lower extremities and will likely require additional treatment to address the remaining shrapnel in his body.

605.    As a result of the attack, and the injuries he suffered, Plaintiff Allen Swinton has experienced severe physical and mental anguish and extreme emotional pain and suffering.

606.    Plaintiff Temika Swinton is a citizen of the United States and a resident of the State of Georgia. She is the wife of Allen Swinton.

607.    Plaintiff T.S., a minor represented by her legal guardian Temika Swinton, is a

citizen of the United States and a resident of the State of Georgia. She is the daughter of Allen Swinton.

608.    Plaintiff T.S., a minor represented by her legal guardian Temika Swinton, is a citizen of the United States and a resident of the State of Georgia. She is the daughter of Allen Swinton.

609.    Plaintiff T.B., a minor represented by her legal guardian Temika Swinton, is a citizen of the United States and a resident of the State of Georgia. She is the step-daughter of Allen Swinton.

610.    As a result of the attack, and the injuries Allen Swinton suffered, Plaintiffs Temika Swinton, T.S., T.S. and T.B. have experienced severe mental anguish and extreme emotional pain and suffering.

## THE APRIL 21, 2008 ATTACK - BASRA

611.    On April 21, 2008, Matthew R. Vandegrift, aged 28, from Colorado, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

612.    Matthew R. Vandegrift was a citizen of the United States at the time of the attack.

613.    Matthew R. Vandegrift was killed in the attack.

614.    The weapon used to kill Matthew R. Vandegrift was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

615.    Plaintiff Mary Jane Vandegrift is a citizen of the United States and a resident of the State of Colorado.  She is the mother of Matthew R. Vandegrift.

616.    Plaintiff John Vandegrift is a citizen of the United States and a resident of the State of Colorado. He is the father of Matthew R. Vandegrift.

617.    As a result of the attack, and the death of Matthew R. Vandegrift, Plaintiffs Mary

Jane Vandegrift and John Vandegrift have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## THE APRIL 28, 2008 ATTACK - BAGHDAD

618.    On April 28, 2008, Adam L. Marion, aged 26, from North Carolina, was serving in the U.S. military in Iraq when his unit was attacked with Improvised Rocket-Assisted Munitions ("IRAMs").

619.    Adam L. Marion was a citizen of the Unites States at the time of the attack.

620.    Adam L. Marion was killed in the attack.

621.    The terrorist group that planned and executed the attack, the Mahdi Army/Special Groups, was trained and armed by Iran's Qods Force with the assistance of Hezbollah.

622.    Plaintiff Pam Marion is a citizen of the United States and a resident of the State of North Carolina. She is the mother of Adam L. Marion.

623.    Plaintiff Donnie Marion is a citizen of the United States and a resident of the State of North Carolina. He is the father of Adam L. Marion.

624.    As a result of the attack, and the death of Adam L. Marion, Plaintiffs Pam Marion and Donnie Marion have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel

## THE AUGUST 4, 2008 ATTACK – BAGHDAD

**The Menke Family**

625.    On August 4, 2008, Jonathan D. Menke, aged 22, from Indiana, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

626.    Jonathan D. Menke was a citizen of the United States at the time of the attack.

627.    Jonathan D. Menke was killed in the attack.

628.    The weapon used to kill Jonathan D. Menke was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

629.    Plaintiff Paula Menke is a citizen of the United States and a resident of the State of Indiana. She is the step-mother of Jonathan D. Menke.

630.    Plaintiff Daniel Menke is a citizen of the United States and a resident of the State of Indiana. He is the father of Jonathan D. Menke.

631.    Plaintiff Matthew Menke is a citizen of the United States and a resident of the State of Indiana. He is the step-brother of Jonathan D. Menke.

632.    Plaintiff Nichole Lohring is a citizen of the United States and a resident of the State of Indiana. She is the sister of Jonathan D. Menke.

633.    As a result of the attack, and the death of Jonathan D. Menke, Plaintiffs Paula Menke, Daniel Menke, Matthew Menke and Nichole Lohring have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## THE AUGUST 26, 2008 ATTACK – SADR CITY

### The Alfonso Family

634.    On August 26, 2008, Carlo E. Alfonso, aged 23, from Washington, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

635.    Carlo E. Alfonso was killed in the attack.

636.    The weapon used to kill Carlo E. Alfonso was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

637.    Plaintiff Rosemarie Alfonso is a citizen of the United States and a resident of the

State of Washington.  She is the widow of Carlo E. Alfonso.

638.    Plaintiff K.B., a minor represented by his legal guardian Rosemarie Alfonso, is a citizen of the United States and a resident of the State of Washington. He is the son of Carlo E. Alfonso.

639.    As a result of the attack, and the death of Carlo E. Alfonso, Plaintiffs Rosemarie Alfonso and K.B. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

## THE SEPTEMBER 4, 2008 ATTACK – BAGHDAD

**The Mayne Family**

640.    On September 4, 2008, Kennith W. Mayne, aged 29, from Colorado, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

641.    Kennith W. Mayne was a citizen of the United States at the time of the attack.

642.    Kennith W. Mayne was killed in the attack.

643.    The weapon used to kill Kennith W. Mayne was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

644.    Plaintiff Michelle Benavidez is a citizen of the United States and a resident of the State of Colorado.  She is the mother of Kennith W. Mayne.

645.    Plaintiff Daniel Benavidez, Sr. is a citizen of the United States and a resident of the State of Colorado. He is the step-father of Kennith W. Mayne.

646.    Plaintiff Christina Biederman is a citizen of the United States and a resident of the State of Colorado. She is the sister of Kennith W. Mayne.

647.    Plaintiff Daniel Benavidez, Jr. is a citizen of the United States and a resident of

the State of Colorado. He is the brother of Kennith W. Mayne.

648.    Plaintiff Jennifer Morman is a citizen of the United States and a resident of the State of Colorado. She is the sister of Kennith W. Mayne.

649.    Plaintiff Michelle Benavidez brings an action on behalf of the Estate of Kennith W. Mayne, as its legal representative.

650.    As a result of the attack, and the death of Kennith W. Mayne, Plaintiffs Michelle Benavidez, Daniel Benavidez, Sr., Christina Biederman, Daniel Benavidez, Jr. and Jennifer Morman have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Miller Family**

651.    On September 4, 2008, Christopher Miller, then 19, from Ohio, was serving in the U.S. military in Iraq.

652.    Christopher Miller is a citizen of the United States.

653.    Christopher Miller's vehicle was struck by an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

654.    As a result of the attack, Christopher Miller lost part of his right leg, rendering him a below-the-leg amputee.

655.    He also lost part of his left leg.

656.    Christopher Miller developed gangrene in both his leg and foot, necessitating multiple medical procedures.

657.    During part of his treatment, he was placed in a medically-induced coma.

658.    Christopher Miller has also received physical therapy.

659.    He has also received counseling for his emotional injuries.

660.    As a result of the attack, and the injuries he suffered, Plaintiff Christopher Miller has experienced severe mental anguish and extreme emotional pain and suffering.

## THE OCTOBER 16, 2008 ATTACK – BAQUBAH

**The Eggleston Family**

661.    On October 16, 2008, Cody J. Eggleston, aged 21, from Oregon, was serving in the U.S. military when he was involved in a mortar attack.

662.    Cody J. Eggleston was a citizen of the United States at the time of the attack.

663.    Cody J. Eggleston was killed in the attack.

664.    The terrorist group that planned and executed the mortar attack, the Mahdi Army/Special Groups, was trained and armed by Iran's Qods Force with the assistance of Hezbollah.

665.    Plaintiff Angie Jackson is a citizen of the United States and a resident of the State of Oregon.  She is the mother of Cody J. Eggleston.

666.    Plaintiff Trina Jackson is a citizen of the United States and a resident of the State of Oregon. She is the daughter of Cody J. Eggleston.

667.    Plaintiff S.J., a minor represented by her legal guardian Angie Jackson, is a citizen of the United States and a resident of the State of Oregon. She is the daughter of Cody J. Eggleston.

668.    As a result of the attack, and the death of Cody J. Eggleston, Plaintiffs Angie Jackson, Trina Jackson and S.J. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/father's society, companionship, comfort, advice and counsel.

## THE JANUARY 10, 2009 ATTACK – BAGHDAD

**The Bauer Family**

669.    On January 10, 2009, Justin Bauer, aged 24, from Colorado, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

670.    Justin Bauer was a citizen of the United States at the time of the attack.

671.    Justin Bauer was killed in the attack.

672.    The weapon used to kill Justin Bauer was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

673.    Plaintiff Gregory Bauer is a citizen of the United States and a resident of the State of Wyoming. He is the father of Justin Bauer.

674.    As a result of the attack, and the death of Justin Bauer, Plaintiff Gregory Bauer has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

## THE APRIL 22, 2009 ATTACK – BAGHDAD

**The Davis Family**

675.    On April 22, 2009, Brad A. Davis, aged 21, from Ohio, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

676.    Brad A. Davis was a citizen of the United States at the time of the attack.

677.    Brad A. Davis was killed in the attack.

678.    The weapon used to kill Brad A. Davis was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

679.    Plaintiff Theresa Davis is a citizen of the United States and a resident of the State of Ohio.  She is the mother of Brad A. Davis.

680.    As a result of the attack, and the death of Brad A. Davis, Plaintiff Theresa Davis has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## THE JUNE 28, 2009 ATTACK – BAGHDAD

### The David Family

681.    On June 28, 2009, Timothy A. David, aged 28, from Michigan, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

682.    Timothy A. David was a citizen of the United States at the time of the attack.

683.    Timothy A. David was killed in the attack.

684.    The weapon used to kill Timothy A. David was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

685.    Plaintiff Linda David is a citizen of the United States and a resident of the State of Michigan.  She is the mother of Timothy A. David.

686.    Plaintiff Michael David is a citizen of the United States and a resident of the State of Michigan. He is the father of Timothy A. David.

687.    Plaintiff Christopher David is a citizen of the United States and a resident of the State of Michigan. He is the brother of Timothy A. David.

688.    Plaintiff Linda David brings an action on behalf of the Estate of Timothy A. David, as its legal representative.

689.    As a result of the attack, and the death of Timothy A. David, Plaintiffs Linda David, Michael David and Christopher David have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

74

## THE JUNE 29, 2009 ATTACK – BAGHDAD

### The Karcher Family

690.    On June 29, 2009, Timothy Karcher, age 42 and a resident of Texas, was serving in the U.S. military in Iraq.

691.    Timothy Karcher is a citizen of the United States.

692.    Timothy Karcher was on patrol with his unit on the outskirts of Sadr City in Baghdad when his vehicle was struck by an IED.

693.    The weapon used to injure Timothy Karcher was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

694.    As a result of the attack, he lost both of his legs, suffered internal bleeding, kidney failure, serious cardiac and respiratory complications and nearly died several times (both during surgeries and while suffering post-operative complications).

695.    Timothy Karcher received extensive medical treatment at various hospitals, where he spent many months.

696.    As a result of the attack, and the injuries he suffered, Plaintiff Timothy Karcher has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## THE JULY 16, 2009 ATTACK – BASRA

### The Drevnick Family

697.    On July 16, 2009, Daniel P. Drevnick, aged 22, from Minnesota, was serving in the U.S. military when he was involved in a mortar attack.

698.    Daniel P. Drevnick was a citizen of the United States at the time of the attack.

699.    Daniel P. Drevnick was killed in the attack.

700.    The terrorist group that planned and executed the mortar attack was trained and

armed by Iran's Qods Force with the assistance of Hezbollah.

701.    Plaintiff Kenneth J. Drevnick is a citizen of the United States and a resident of the State of Minnesota. He is the father of Daniel P. Drevnick.

702.    As a result of the attack, and the death of Daniel P. Drevnick, Plaintiff Kenneth J. Drevnick has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

## THE SEPTEMBER 8, 2009 ATTACK – TIKRIT

**The Myers Family**

703.    On September 8, 2009, Zachary T. Myers, aged 21, from Ohio, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

704.    Zachary T. Myers was a citizen of the United States at the time of the attack.

705.    Zachary T. Myers was killed in the attack.

706.    The weapon used to kill Zachary T. Myers was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

707.    Plaintiff Tonya Lotto is a citizen of the United States and a resident of the State of Ohio. She is the mother of Zachary T. Myers.

708.    Plaintiff Jerry L. Myers is a citizen of the United States and a resident of the State of Ohio. He is the father of Zachary T. Myers.

709.    As a result of the attack, and the death of Zachary T. Myers, Plaintiffs Tonya Lotto and Jerry L. Myers have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## THE JULY 7, 2011 ATTACK – BAGHDAD

### The Newby Family

710.    On July 7, 2011, Nicholas W. Newby, aged 20, from Idaho, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

711.    Nicholas W. Newby was a citizen of the United States at the time of the attack.

712.    Nicholas W. Newby was killed in the attack.

713.    The weapon used to kill Nicholas W. Newby was an Iranian-manufactured IED provided to Iranian-funded and -trained terror operatives in Iraq.

714.    Plaintiff Theresa Hart is a citizen of the United States and a resident of the State of Idaho. She is the mother of Nicholas W. Newby.

715.    Plaintiff Wayne Newby is a citizen of the United States and a resident of the State of Idaho. He is the father of Nicholas W. Newby.

716.    As a result of the attack, and the death of Nicholas W. Newby, Plaintiffs Theresa Hart and Wayne Newby have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## THE NOVEMBER 14, 2011 ATTACK – BAGHDAD

### The Hickman Family

717.    On November 14, 2011, David Emanuel Hickman, aged 23, from North Carolina, was serving in the U.S. military in Iraq when an IED detonated near his vehicle.

718.    David Emanuel Hickman was a citizen of the United States at the time of the attack.

719.    David Emanuel Hickman was killed in the attack.

720.    The weapon used to kill David Emanuel Hickman was an Iranian-manufactured

IED provided to Iranian-funded and -trained terror operatives in Iraq.

721.    Plaintiff Veronica Hickman is a citizen of the United States and a resident of the State of North Carolina. She is the mother of David Emanuel Hickman.

722.    Plaintiff David Eugene Hickman is a citizen of the United States and a resident of the State of North Carolina. He is the father of David Emanuel Hickman.

723.    As a result of the attack, and the death of David Emanuel Hickman, Plaintiffs Veronica Hickman, David Eugene Hickman and Devon Fletcher Hickman have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## B.    THE DEFENDANTS

### THE HSBC DEFENDANTS

724.    Defendant HSBC Holdings plc ("HSBC Holdings") is a public limited company organized under the laws of the United Kingdom. HSBC Holdings directly or indirectly owns, *inter alia*, Defendants HSBC Bank plc, Defendant HSBC Bank Middle East Limited, and Defendant HSBC Bank USA, N.A. (referred to herein collectively as the "HSBC Defendants"). HSBC Holdings is occasionally referred to internally (and in this Complaint) as "HSBC Group," or "The Group," and members and affiliates of HSBC Holdings (including the named HSBC Defendants herein) are occasionally referred to herein as "HSBC Group members."

725.    Defendant HSBC Holdings constitutes the ultimate parent company of one of the world's largest banking and financial services groups with approximately 6,300 offices in over 75 countries and territories.

726.    HSBC's group of affiliated companies comprises financial institutions throughout the world that are owned by various intermediate holding companies, and ultimately, but

indirectly, by Defendant HSBC Holdings, which, as alleged above, is incorporated and headquartered in England.

727.    Defendant HSBC Bank plc ("HSBC-Europe" often referred to internally at HSBC Group as "HBEU"), is a financial institution registered under the laws of England and Wales.

728.    Defendant HSBC Bank Middle East Limited ("HSBC-Middle East" often referred to internally by members of HSBC Group as "HBME"), is a financial institution registered under the laws of the Jersey Channel Islands.

729.    Defendant HSBC Bank USA, N.A. ("HSBC-US" often referred to internally by members of HSBC Group as "HBUS"), is a national bank chartered under the National Bank Act (12 U.S.C. § 2 *et seq.*) that constitutes a "U.S. person" under the definitions set forth in 31 C.F.R. Part 560.314 of the Iranian Transactions Regulations (the "ITR") and 18 U.S.C. § 2332d(b)(2) of the Anti-Terrorism Act.

730.    According to the fact sheets published on HSBC-US's official website, HSBC-US's headquarters are in McLean, VA, and it has its principal office in New York City.

731.    HSBC-US operates more than 240 bank branches throughout the United States, with offices and branches in New York, California, Connecticut, Delaware, Washington, D.C., Florida, Maryland, New Jersey, Oregon, Pennsylvania, Virginia, and Washington State.

732.    HSBC-US is the principal subsidiary of HSBC USA Inc., ("HUSA") which is, in turn, an indirect, wholly-owned subsidiary of HSBC North America Holdings, Inc. ("HNAH"). HNAH's businesses serve customers in retail banking and wealth management, commercial banking, private banking, and global banking and markets.

## BARCLAYS BANK PLC

733.     Defendant Barclays Bank PLC[1] ("Barclays") is a global financial services provider headquartered in London, United Kingdom. It is a wholly-owned subsidiary of Barclays PLC, a public limited liability company organized under the laws of England and Wales.

734.     Barclays is one of the largest banks in the world. Barclays' home country regulator is the United Kingdom's Financial Services Authority ("FSA").

735.     At all relevant times, Barclays maintained a New York branch that functioned as the primary U.S. dollar ("USD") clearer for all of Barclays, its affiliates, and its customers. The branch thus constitutes a "U.S. person" under the definitions set forth in § 560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

## STANDARD CHARTERED BANK

736.     Standard Chartered Bank ("SCB") is one of the world's largest international banks, with over 1,700 branches, offices, and outlets in more than 70 countries. Headquartered in London, SCB operates principally in Asia, Africa, and the Middle East, and has operations in consumer, corporate and institutional banking, and treasury services.

737.     Since 1976, SCB has had a license issued by the state of New York to operate as a foreign bank branch in New York, New York ("SCB New York"). The branch provides wholesale banking services, primarily U.S.-dollar clearing for international wire payments. SCB New York is the seventh largest dollar clearer in the world, clearing approximately 195 billion USD per day. The branch also constitutes a "U.S. person" under the definitions set forth in § 560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

---

[1]     As used in this Complaint, "Barclays" refers to Barclays Bank PLC, the wholly-owned subsidiary of Barclays PLC, not Barclays PLC, Barclays Bank PLC's parent company.

## ROYAL BANK OF SCOTLAND N.V. ("ABN AMRO")

738.    In October 2007, a consortium consisting of Fortis, the Royal Bank of Scotland Group ("RBS"), and Banco Santander acquired ABN AMRO Holding N.V., the parent company of ABN AMRO Bank N.V., using the acquisition vehicle RFS Holdings.

739.    The former ABN AMRO Bank N.V. subsequently underwent a restructuring process to transfer its Dutch State-acquired businesses and activities out of the existing ABN AMRO Group.  To do so, the relevant Dutch State-acquired businesses were first transferred to a new legal entity owned by ABN AMRO Holding N.V.

740.    On February 5, 2010, through a statutory demerger process, the former ABN AMRO Bank N.V. was renamed RBS N.V.

741.    Ultimately, the RBS Group acquired ABN AMRO Holding N.V.  As such, RBS Group acquired the New York and Chicago branches of ABN AMRO Bank N.V. and began integrating certain business lines handled by these branches into its other U.S. operations. These former branches constitute a "U.S. person" under the definitions set forth in §560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

### CREDIT SUISSE AG

742.    Defendant Credit Suisse AG is a financial services company headquartered in Zurich, Switzerland. Its U.S. headquarters is located at 11 Madison Avenue, New York, New York.

743.    Credit Suisse serves clients worldwide through its Private Banking unit, which includes a Wealth Management and Corporate & Institutional Clients unit, an Investment Banking unit, and an Asset Management unit.

744.    Credit Suisse's New York branch is subject to oversight and regulation by the

Board of Governors of the U.S. Federal Reserve System and the New York State Banking Department. It constitutes a "U.S. person" under the Iranian Transaction Regulations and § 2332d(b)(2).

### BANK SADERAT PLC

745.    Defendant Bank Saderat Plc (UK) is a bank incorporated in England and Wales. It is a wholly-owned subsidiary of Bank Saderat Iran.

746.    Bank Saderat Iran was nationalized after the Iranian Revolution, but allegedly privatized in 2009. According to Bank Saderat Iran, 49% of its shares are owned by the Iranian government, but it is a non-governmental entity.

747.    Bank Saderat Iran is one of the largest banks in Iran. It has approximately 3,400 branch offices worldwide, including in London, Frankfurt, Paris, Athens, Dubai and Beirut.

748.    On September 8, 2006,  the U.S. Office of Foreign Assets Control ("OFAC") amended § 560.516 of the ITR and excluded Bank Saderat from the "U-Turn" exemption contained in the ITRs.  As alleged in greater detail below, the U-Turn exemption constituted a limited exception to U.S. sanctions directed against Iran, under which U.S. financial institutions were permitted to certain funds transfers for the direct or indirect benefit of Iranian banks, other persons in Iran or the Government of Iran. In November 2008, the ITR's U-Turn exemption was revoked entirely.

749.    In announcing the 2006 change to the ITRs excluding Bank Saderat from U-Turn financial transactions,  OFAC's announcement stated:

> OFAC has amended the Iranian Transactions Regulations (ITR) to cut off Bank Saderat, one of Iran's largest government-owned banks, from the U.S. financial system. Bank Saderat has been a significant facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah....

750.   According to then-Under Secretary for Terrorism and Financial Intelligence Stuart Levey, "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hezbollah and other terrorist organizations each year. We will no longer allow a bank like Saderat to do business in the American financial system, even indirectly."

751.   The Treasury Department press release announcing the changes to the ITR stated that "a Hezbollah-controlled organization [] has received $50 million directly from Iran through Bank Saderat since 2001."

752.   Assistant Treasury Secretary for Terrorist Financing Daniel Glaser testified before the Senate Committee on Banking, Housing and Urban Affairs that "Hezbollah uses Saderat to send money to other terrorist organizations as well."

753.   In October 2007, Bank Saderat Iran, (including Defendant Bank Saderat Plc), was designated an SDGT pursuant to Executive Order 13224. The U.S. Treasury Department's press release regarding Bank Saderat's designation stated:

> Bank Saderat, its branches, and subsidiaries: Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hezbollah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence.

## FACTUAL ALLEGATIONS

## OVERVIEW OF THE CONSPIRACY

754.   As used in this Complaint, "the Conspiracy" refers to an agreement between Iran and various international financial institutions, including the Defendants in this action, in which they agreed to alter, falsify, or omit information from payment messages that involved Iran or

Iranian parties, in particular several Iranian banks referred to herein occasionally as the "Iranian Bank co-conspirators" (including Defendant Bank Saderat Plc) for the express purpose of concealing Iran's and Iranian parties' (including the Iranian Bank co-conspirators) financial activities and transactions from detection, scrutiny, or monitoring by U.S. regulators, law enforcement, and/or depository institutions.

755.    The Conspiracy between Iran, Defendant Bank Saderat Plc, the other Iranian Bank co-conspirators, and the HSBC Defendants, Defendants Barclays, Standard Chartered Bank, Royal Bank of Scotland, N.V., Credit Suisse[2] began no later than 1987, and upon information and belief, continues to the present.

756.    The Conspiracy orchestrated by Iran was largely coordinated and agreed to in London, U.K. and made it possible for Iran to transfer: (1) billions of dollars in U.S. currency through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies; and (2) hundreds of millions of dollars to Hezbollah, the IRGC-QF, and other terrorist organizations actively engaged in murdering and maiming U.S. servicemen and civilians in Iraq.

757.    Each of the Defendants knowingly entered into an agreement with Iran and its agents, including but not limited to Defendant Bank Saderat Plc, and other Iranian Bank co-conspirators, including but not limited to the Central Bank of Iran ("CBI"), Bank Melli (including Bank Melli's United Kingdom subsidiary Melli Bank Plc), and Bank Sepah under which the Defendants agreed to alter, falsify, or omit information from payment messages for U.S. dollar-denominated transactions that were purposefully directed at and processed through the United States (hereinafter referred to occasionally as the practice of "stripping"). The

---

[2]    The HSBC Defendants, and Defendants Barclays, Standard Chartered Bank, Royal Bank of Scotland, N.V., and Credit Suisse are occasionally referred to herein as the "International Bank Defendants."

Conspiracy had at least three illicit objectives:

      a.    To conceal hundreds of billions of dollars of Iran's U.S. dollar-denominated transactions from detection, scrutiny, or monitoring by U.S. regulators, U.S. law enforcement, and/or U.S. depository institutions;

      b.    To assist Iran in transferring at least $150 million USD to the IRGC-QF, Hezbollah, Special Groups, and other instruments of Iranian state-sponsored terrorism; and

      c.    To assist Iran in acquiring technology and components for its illegal Weapons of Mass Destruction ("WMD") program.

758.    As alleged in detail below, each Defendant committed numerous overt acts in furtherance of the Conspiracy and knowingly and unlawfully agreed to engage in "stripping" hundreds of millions – and in some cases, billions – of U.S. dollars on behalf of Iran (including Defendant Bank Saderat Plc and the CBI) knowing that Iran was a designated State Sponsor of Terrorism.

759.    Each Defendant entered into its agreement with Iran and the Iranian Bank co-conspirators (including Defendant Bank Saderat Plc) aware that other co-conspirators (either the Defendants herein or other foreign financial institutions) were also actively participating in the Conspiracy, shared the common goal of the scheme's purpose of providing Iran and the Iranian Bank co-conspirators (including Defendant Bank Saderat Plc) the ability to illegally transfer billions of dollars (undetected) through the United States and were aware of many of the (often same or similar) methods being used by other members of the Conspiracy to effectuate it .

760.    Accordingly, each Defendant understood that its conduct was part of a larger scheme engineered by Iran; each Defendant knew the participation of other conspirators was essential to the Conspiracy's success; and each Defendant knew of and joined in the overriding scheme and sought to achieve and facilitate a common goal of helping Iran to transfer billions of dollars through the United States while avoiding detection, scrutiny, or monitoring by U.S.

regulators, U.S. law enforcement, and/or U.S. depository institutions.

761.   In addition, each Defendant also knew, or was deliberately indifferent, to the Conspiracy's purposes and criminal objectives of:

      a.    Facilitating transactions totaling at least $50 million USD for the benefit of Hezbollah;

      b.    Facilitating transactions totaling at least $100 million USD for the benefit of the IRGC-QF and Defendant Bank Saderat Plc, and other U.S. Specially Designated Nationals (such as Iranian Bank co-conspirators Bank Melli Iran, Bank Mellat, and Bank Sepah); and

      c.    Enabling Iran, the Iranian Bank co-conspirators (including Defendant Bank Saderat Plc), Hezbollah, and Special Groups to plan for, conspire to, and perpetrate acts of international terrorism under 18 U.S.C. § 2331(1); homicides, attempted homicides, or conspiracies to commit homicide under 18 U.S.C. § 2332(a)-(c); bombings and attempted bombings under 18 U.S.C. § 2332f; engaging in terrorist activity under 8 U.S.C. § 1189(a)(3)(B)(iii)-(iv); and/or engaging in terrorism under 22 U.S.C. § 2656f.

762.   The Conspiracy was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries because the Conspiracy substantially assisted Iran, the IRGC-QF, Hezbollah, and/or Special Groups in committing the acts of international terrorism that injured the Plaintiffs by providing them collectively with more than $150 million USD in funding.

763.   By knowingly entering into the Conspiracy, by knowing or being deliberately indifferent to its purposes, and by committing multiple overt acts in furtherance of the Conspiracy, the Defendants provided Iran with the means by which it could transfer more than $150 million to the IRGC-QF, Hezbollah and Special Groups, which were actively engaged in planning and perpetrating the murder and maiming of hundreds of Americans in Iraq during the same period of time that the Conspiracy was proceeding, thereby substantially enhancing Iran, the IRGC-QF's, Hezbollah's, and Special Groups' ability to inflict the injuries described herein.

764.    As set forth below, each of the Defendants knew that Iran was a U.S.-designated State Sponsor of Terrorism and that U.S. laws and regulations required it to fully disclose even otherwise legal funds transfers through the United States made on behalf of Iran, Iranian entities and Iranian banks.

765.    Despite that knowledge, each of the Defendants knowingly conspired with Iran, and the Iranian Bank co-conspirators (including Defendant Bank Saderat Plc) to violate those U.S. laws and regulations to conceal hundreds of millions (and in some cases, billions) of dollars in funds transfers routed through the United States on behalf of Iran, and the Iranian Bank co-conspirators, including Defendant Bank Saderat Plc.

766.    A wide range of prominent international financial institutions, including the Defendants and John Does 1-50, actively and knowingly aided Iran and various Iranian banks' efforts to evade U.S. sanctions; minimize the transparency of their financial activities; and thereby facilitate millions of dollars in funds transfers to Hezbollah and the IRGC-QF through the international financial system.

767.    The Conspiracy began no later than 1987, and upon information and belief, continues to the present.

768.    In a criminal information filed with the District Court for the District of Columbia against Defendant Royal Bank of Scotland N.V., the United States Department of Justice described some of the aims of the Conspiracy as an agreement to "willfully and knowingly conspire, confederate and agree with persons, both known and unknown to the United States, to commit offenses against the United States, that is:

> (a)    to defraud the United States by impeding, impairing, obstructing and defeating the lawful functions of the United States Department of Treasury, Office of Foreign Assets Control, in the application and enforcement of sanctions and embargo regulations against Iran... and

entities affiliated with Iran…; [and]

(b)    to engage in financial transactions with entities affiliated with Iran … in violation of the International Emergency Economic Powers Act, Title 50, United States Code, Section 1705, and regulations and embargoes issued thereunder."

769.    As noted above, to effectuate the goals of the Conspiracy, Iran employed many of its domestic banking institutions, including Iranian Bank Co-conspirators Bank Saderat Iran, Bank Melli, Bank Sepah, and the CBI. In particular, the Dubai (UAE), German and London branches and subsidiaries of Bank Melli facilitated the goals of the Conspiracy by enlisting the assistance of the Defendants to conceal illicit conduct by Bank Melli, Iran and the IRGC-QF.

770.    Despite U.S. trade sanctions against Iran, prior to November 2008, most dollar-denominated banking transactions for Iranian banks and industries could clear through U.S. depository institutions under the "U-Turn" exemption set forth in 31 C.F.R. §560.516  provided that:

(a)    the transaction did not involve the debiting or crediting of an Iranian account (that is, an account of a person located in Iran, or of the government of Iran maintained on the books of a United States depository institution);

(b)    the transaction did not involve a person or entity identified by OFAC  as an SDN or Blocked Person; and

(c)    each of the originating and beneficiary banks of the transaction was a third-country (not Iranian or U.S.) bank.

771.    As alleged above, however, in 2006, Bank Saderat (including Defendant Bank Saderat Plc) was excluded from accessing the U-Turn exemption. In addition, before November 2008, the United States also excluded Bank Melli, Bank Mellat, Bank Sepah, Future Bank, and the Export Development Bank of Iran from accessing the U-Turn exemption.

772.    Thus, until 2008, Iran and certain of the Iranian Bank co-conspirators *could*

potentially have conducted most of its dollar clearing activities in conformity with U.S. laws and regulations, but its transactional activities would have been disclosed to U.S. depository institutions that had (and have) legal obligations to: (a) report suspicious transactions; and (b) filter transactions against the OFAC SDN list and block transactions matching individuals and entities on that list.

773.    Iran therefore organized the Conspiracy because it wanted to keep U.S. depository institutions, law enforcement, and counter-terrorism agencies blind to the flow of U.S. dollars it was moving through the international financial system, including its illegal acquisition of materials needed for developing nuclear weapons program, and transfers to Hezbollah, the Qods Force and other instruments of Iran's global terrorist enterprises and apparatus.

774.    As a direct result of the International Bank Defendants' agreement to facilitate illegal funds transfers on behalf of Iran, Iran was able to flood the international financial system with U.S. dollar transactions that could not be, and were not, effectively monitored or filtered by U.S. depository institutions or U.S. officials monitoring the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") System.

775.    While *most* of these transactions could have been processed legally, their sheer volume allowed Iran to hide U.S. dollar transactions for designated FTOs and other terrorist organizations responsible for the deaths and injuries of the Plaintiffs and their family members in this action.

776.    Although the Conspiracy was effectuated in a variety of ways, three primary techniques were used. Iran, through the Iranian Bank Co-conspirators, including in particular the CBI, transferred U.S. dollars through the international financial system using non-Iranian banks (including the International Bank Defendants herein):

(a)     that agreed to remove the names, Bank Identifier Codes ("BICs"), and other identifying information of the Iranian Bank Co-conspirators in the payment messages sent through U.S. correspondent banks – as noted above, a practice commonly known and referred to as "stripping" transactions;

(b)     that agreed to convert ordinary transactions involving MT 103 SWIFT payment messages (that would have disclosed the details of the counter-parties to the transactions) into bank-to-bank transfers known as MT 202 SWIFT payment messages (that did not require the transmitting bank to include information disclosing the originator, beneficiary, and counter-parties, and hence were employed for the specific purpose of concealing the origin and destination of Iranian funds transfers); and

(c)     directly to agents of, or fronts for, Hezbollah, KH, the Qods Force and other instruments of Iran's terrorist apparatus.

777.     During the relevant time period, from 2000-2011, each of the Defendants knowingly agreed to join the Conspiracy, knowingly and willfully participated in the Conspiracy, knew or were deliberately indifferent to the Conspiracy's criminal purposes and objectives, and took initiatives to improve its workings, and was aware of the participation of many (if not all) of its members, as set forth in greater detail herein.

778.     From 2002 to 2006, as part of the Conspiracy, Iran sent at least $100 million to the Qods Force through Bank Melli Iran and Melli Bank Plc using the types of deceptive banking practices described herein, including removal of its name from financial transactions that were routed through the international financial system.

779.     From 2001 to 2006, as part of the Conspiracy, according to the U.S. government, Iran also transferred at least $50 million to Hezbollah using the CBI to transfer the funds through Defendant Bank Saderat Plc in London to Bank Saderat Iran's branch in Beirut.

780.     As part of the Conspiracy, each of the Defendants took affirmative steps to violate U.S. criminal laws and to conceal from U.S. depository institutions, law enforcement, and counter-terrorism agencies the flow of hundreds of millions of U.S. dollars (and in some cases,

billions of dollars) it was moving through the United States, including transfers for the benefit of the Qods Force and Hezbollah, and through them to KH and other terrorist organizations actively engaged in murdering and maiming U.S. servicemen and civilians in Iraq.

781.    By knowingly agreeing to enter the Conspiracy, and participating in and committing overt acts in the course of the Conspiracy that resulted in damage and injury to the Plaintiffs, Defendants committed acts of international terrorism as defined by 18 U.S.C. §§ 2331, 2339A and 2339B that caused injury to the Plaintiffs in this action, and are civilly liable under 18 U.S.C. § 2333(a) of the Anti-Terrorism Act ("ATA") to the Plaintiffs, American citizens who have been injured by reason of acts of international terrorism perpetrated by Iran through its agents, including the IRGC-QF, Hezbollah, and the Special Groups.

782.    Defendants HSBC BANK USA, N.A., Barclays, Standard Chartered Bank, and Royal Bank of Scotland N.V not only knowingly participated in the Conspiracy, but as U.S. persons within the meaning of 18 U.S.C. § 2332d, these International Bank Defendants also committed further acts of international terrorism in violation of 18 U.S.C. §§ 2331 and 2332d by knowingly (or with reason to know) facilitating financial transactions with Iran, which each such Defendant knew was a designated State Sponsor of Terrorism. Those acts were a cause of the injuries sustained by the Plaintiffs in this action, and thus these Defendants are therefore civilly liable under 18 U.S.C. § 2333(a) of the ATA to the Plaintiffs.

## THE CBI'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

783.    The CBI is fully controlled and run by individuals directly appointed by the Government of Iran ("GOI").

784.    At all relevant times, the CBI was an active participant in the Conspiracy. For example, leading up to the adoption of UN Security Council Resolution 1747 (March 2007),

which resulted in the freezing of assets belonging to Iran's Bank Sepah, the CBI furthered the Conspiracy by using non-Iranian financial institutions to shield Bank Sepah's assets from the impact of impending sanctions.

785.    As of at least 2007, the CBI maintained accounts at Defendant Bank Saderat Plc in various currencies.

786.    In the wake of U.S. and later European Union designations against Iranian banks, the CBI often acted as a secret proxy for those designated entities.

787.    As part of the Conspiracy, the CBI has utilized Defendant Bank Saderat Plc to transfer funds to Hezbollah.

788.    The CBI also maintained accounts and unlawfully transferred funds in furtherance of the Conspiracy with the assistance of Defendants SCB, ABN AMRO and the HSBC Defendants.

789.    For example, in furtherance of the Conspiracy, in February 2001, Defendant SCB agreed to act as a correspondent bank for the CBI with respect to international U.S.-dollar payments. Between 2001 and 2006, the CBI sent approximately 2,226 payment messages for a total value of **$28.9 billion** to SCB London, the vast majority of which were illegally routed through the U.S. as described herein.

790.    As detailed further below, in furtherance of the Conspiracy, the CBI and ABN AMRO (which also maintained accounts for the CBI and had numerous business dealings with the CBI) conspired to provide illegal material support to Iran and Iranian parties.

791.    Between 2002 and 2004, ABN AMRO accepted U.S. dollar deposits from the CBI on a regular basis with average deposits in the range of $200 million, and the CBI instructed

and ABN AMRO agreed to follow illegal procedures to launder U.S. dollar-denominated deposits to the CBI's accounts with other European banks with branches or offices in London.

792. In furtherance of the Conspiracy, the CBI coordinated with ABN AMRO's Central Bank Desk in Amsterdam regarding the procedure to be followed for repayment of USD deposits to their accounts with European banks with offices or branches in London. This procedure stipulated that payment messages sent to U.S. clearing banks for payment of USD funds to the CBI should not contain *any* reference to the CBI, or *any other* reference relating to Iran.

793. In 2001, the CBI approached members of HSBC Group, specifically Defendants HSBC-Middle East and HSBC-Europe, in an effort to move the CBI's U.S. dollar clearing business from National Westminster Bank Plc to the HSBC Defendants, and intended to have the U.S. dollar transactions clear through HSBC-US. The CBI eventually moved its U.S. dollar clearing to the HSBC Defendants, and by late 2003 the CBI was one of six Iranian banks that used members of HSBC Group for (mostly illegal) U.S. dollar clearing business.

794. With Defendant HSBC Holdings' knowledge and in furtherance of the Conspiracy, Defendants HSBC-Middle East and HSBC-Europe manually intervened in the processing of any payments by the CBI and removed the CBI's name and country of origin. Defendant HSBC-US also knew that other HSBC Defendants were altering and omitting information in SWIFT payment messages regarding Iranian parties, but nevertheless knowingly continued processing transactions despite its knowledge.

## BANK MELLI IRAN and BANK MELLI PLC'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

795. Bank Melli Iran, one of the largest banks in Iran, was established in 1927 by order of the Iranian Parliament.

796.   Following the Iranian Revolution in 1979, all banks in Iran were nationalized and are now owned by the GOI.

797.   Melli Bank PLC in London was established in January 2002 as a wholly-owned subsidiary of Bank Melli Iran.

798.   According to the U.S. government, from 2004-2011, Bank Melli Iran and Melli Bank PLC in London transferred approximately $100 million USD to the IRGC-QF, which trained, armed, and funded terrorist groups that targeted and killed and maimed American and Iraqi forces and civilians.

799.   Specifically, according to the U.S. government:

> Islamic Revolutionary Guards Corps (IRGC) and IRGC-Qods Force, who channel funds to militant groups that target and kill Coalition and Iraqi forces and innocent Iraqi civilians, have used Bank Melli and other Iranian banks to move funds internationally. Bank Melli used deceptive banking practices to obscure its involvement from the international banking system by requesting that its name be removed from financial transactions when handling financial transactions on behalf of the IRGC.

800.   Bank Melli has also provided crucial banking services to the IRGC-QF, headed by Qasem Soleimani, himself a designated SDGT since 2011.

801.   Bank Melli Iran and Melli Bank PLC were designated pursuant to Executive Order 13382 in October 2007, and included on OFAC's SDN list, which resulted in, inter alia, their exclusion from the U-Turn exemption. The U.S. Treasury Department press release announcing the designation stated:

> Bank Melli provides banking services to entities involved in Iran's nuclear and ballistic missile programs, including entities listed by the U.N. for their involvement in those programs. ... Through its role as a financial conduit, Bank Melli has facilitated numerous purchases of sensitive materials for Iran's nuclear and missile programs. In doing so, Bank Melli has provided a range of financial services on behalf of Iran's nuclear and missile industries, including opening letters of credit and maintaining accounts.

802.    The press release further stated:

> Bank Melli also provides banking services to the [Iranian Revolutionary
> Guard Corps] and the Qods Force. Entities owned or controlled by the
> IRGC or the Qods Force use Bank Melli for a variety of financial services.
> From 2002 to 2006, Bank Melli was used to send at least $100 million to
> the Qods Force. When handling financial transactions on behalf of the
> IRGC, Bank Melli has employed deceptive banking practices to obscure
> its involvement from the international banking system. For example,
> Bank Melli has requested that its name be removed from financial
> transactions.

803.    According to then-Deputy Secretary of Treasury Robert Kimmitt, "Bank Melli,
Iran's largest bank, has provided a range of financial services on behalf of Iran's nuclear and
missile industries, including opening letters of credit and maintaining accounts. In addition, Bank
Melli facilitated transactions for Bank Sepah and the Iranian Defense Industries Organization
after they were both sanctioned by the United Nations."

804.    According to then-Under Secretary for Terrorism and Financial Intelligence
Stuart Levey, "the United States has designated Iranian banks Melli and Mellat for their
involvement in Iran's nuclear and missile activities, including their support of UN-sanctioned
Iranian proliferation entities."

805.    In April 2008, Assistant Treasury Secretary for Terrorist Financing Daniel Glaser
testified before the House Committee on Foreign Affairs, Subcommittee on the Middle East and
South Asia and the Subcommittee on Terrorism, Nonproliferation and Trade, that:

> Bank Melli is Iran's largest bank and provides banking services to entities
> involved in Iran's nuclear and ballistic missile programs, including entities
> listed by the UN for their involvement in those programs. Through its role
> as a financial conduit, Bank Melli has facilitated numerous purchases of
> sensitive materials for Iran's nuclear and missile programs. This includes
> handling transactions in recent months for Bank Sepah, Defense Industries
> Organization, and Shahid Hemmat Industrial Group. Following the
> designation of Bank Sepah under UNSCR 1747, Bank Melli took
> precautions not to identify Sepah in transactions. Entities owned or

95

controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions.

806.    In addition, in mid-2007, Bank Melli in Hamburg ("BMI Hamburg") transferred funds for Defense Industries Organization ("DIO"), which conducts research and development for Iran's defense and military forces and produces a wide variety of military-related weapons, technologies, and other equipment.

807.    Bank Melli was also one of the primary banks used by Khatam al-Anbiya, an IRGC-controlled construction and engineering company headed by former IRGC Commander Rahim Safavi.

808.    Khatam al-Anbiya has been awarded Iranian government contracts in recent years estimated to total over $7 billion USD, making it a crucial IRGC funding source. In October 2007, in connection with designating the IRGC-QF as an SDGT,  the U.S Treasury Department included Khatam al-Anbiya (along with five IRGC-affiliated individuals) as derivative designations of the IRGC.

809.    From 2002 through 2007, Bank Melli sent and received payments totaling millions of dollars for Khatam al-Anbiya and its subsidiaries by handling their letters of credit, in part through the International Bank Defendants.  These letters of credit have been primarily used to finance Khatam al-Anbiya's purchase of equipment and services from overseas suppliers.

810.    Since at least the mid-1980s, Bank Melli has maintained accounts at one time or another with Defendants ABN AMRO, Barclays, Credit Suisse, SCB and the HSBC Defendants.

811.   As early as 1987, Bank Melli instructed Barclays to process USD transactions in favor of Bank Melli's London branch by referencing only Bank Melli's account number at Midland Bank PLC without referencing Bank Melli's name.

812.   Bank Melli further instructed Barclays to send separate instructions, which included full transaction details, to Bank Melli's London Branch.

813.   Barclays agreed and assisted Bank Melli in its illegal conduct.

814.   No later than December 2000 Bank Melli opened an account with ABN AMRO's UAE branch and worked with ABN AMRO to strip its dollar-denominated transactions.

815.   In July 2003, Defendant SCB learned that a competitor was exiting the Iranian business completely and sought to pick up this business and add U.S.-dollar accounts for five Iranian banks at SCB-London. Among the banks whose business SCB sought to (and did) acquire was Bank Melli's.

816.   In January 2004, SCB decided to proceed with the Iranian business, and no later than February 13, 2004, SCB opened accounts for Bank Melli and thereafter participated in the Conspiracy by facilitating unlawful transactions for Bank Melli.

817.   During the relevant time period, Defendant Credit Suisse also maintained accounts for Bank Melli. Credit Suisse also advised Bank Melli and conspired with Bank Melli on ways to format Bank Melli's transfers in order to specifically avoid detection by U.S. depository institutions' computerized OFAC filters.

818.   Defendant HSBC-Europe also maintained accounts for Bank Melli, and used HSBC-US to provide illegal USD clearing services to Bank Melli during the relevant period.

819.   As discussed below, HSBC-US knew of and allowed this unlawful conduct to occur – in violation of, *inter alia*, 18 U.S.C. § 2332d.

## BANK MELLAT'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

820.   Bank Mellat provides banking services in support of Iran's Weapons of Mass Destruction ("WMD") program through the Atomic Energy Organization of Iran ("AEOI") and Novin Energy Company.

821.   Both AEOI and Novin Energy Company have been designated by the United States under E.O. 13382 and by the UN Security Council under UNSCRs 1737 and 1747.

822.   During the relevant time period, Bank Mellat provided financial services and maintained accounts for AEOI and Novin Energy Company, and as part of the Conspiracy, Bank Mellat affirmatively worked to prevent disclosure of its dollar-denominated transactions on behalf of these customers.

823.   Bank Mellat has facilitated the movement of millions of dollars on behalf of the IRGC for Iran's nuclear program since at least 2003.

824.   In June 2006, Bank Mellat was involved in a transfer totaling over $250 million dollars into an account it held for Novin Energy Company.

825.   As part of the Conspiracy, the CBI effected the payment(s) to Bank Mellat's account in London for further credit to Bank Mellat's client – Novin Energy Company.

826.   According to U.S. diplomatic sources, Bank Melli served as an intermediary for a substantial number of dollar-denominated letters of credit issued by Bank Sepah following Sepah's designation under E.O. 13382, despite the fact that Bank Melli was directed to cease new transactions with Bank Sepah following Sepah's U.S. designation.

827.   In 2007, Bank Sepah facilitated payments to accounts at Bank Mellat on behalf of entities associated with Iran's Aerospace Industries Organization ("AIO"), a subsidiary of Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL") that was designated by the

United States on June 28, 2005.

828.    Ahmad Vahidi serves as Iran's Minister of MODAFL, a position he has held since September 2009.

829.    As a commander of the IRGC-QF, Vahidi was responsible for planning the July 18, 1994 bombing of the Jewish Center in Argentina, which killed 85 people and injured hundreds more.

830.    The AIO is the Iranian organization responsible for ballistic missile research, development and production activities and organizations, including the Shahid Hemmat Industries Group ("SHIG") and the Shahid Bakeri Industries Group ("SBIG"), which were both listed under UN Security Council Resolution 1737 and designated under E.O. 13382.

831.    Bank Mellat was designated by the United States on October 25, 2007 in connection with WMD proliferation activities, and included on OFAC's SDN list   The designation, *inter alia*, excluded Bank Mellat from accessing the U-Turn exemption.

## BANK SEPAH'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

832.    In 2007, the U.S. Department of the Treasury designated Bank Sepah, a state-owned Iranian financial institution, for providing support and services to designated Iranian proliferation firms. The designation was effected pursuant to E.O. 13382, due to Bank Sepah's WMD proliferation-related activities.

833.    Bank Sepah International Plc, a wholly-owned subsidiary of Bank Sepah in the United Kingdom, was also designated.

834.    According to the U.S. Treasury Department, Bank Sepah was the financial linchpin of Iran's missile procurement network and actively assisted Iran's pursuit of missiles capable of carrying WMD.

835.    As a result of the designation, Bank Sepah (including Bank Sepah International Plc) were excluded from accessing the U-Turn exemption.

836.    Defendant HSBC-Europe provided USD clearing services to Bank Sepah.

## JOHN DOE DEFENDANTS' 1-50 AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

837.    Other non-defendant co-conspirators (including other Iranian financial institutions and entities) conspired with the named Defendants and identified non-defendant Conspirators herein. Plaintiffs may amend this Complaint to identify such other non-Defendant co-conspirators as additional evidence warrants.

838.    The true names, residences and capacities, whether individual, corporate or otherwise, of Defendants John Does 1 through 50 (collectively, the "Does") are presently unknown to Plaintiffs, who therefore sue those Defendants under such fictitious names. The Does are other financial institutions, their agents, officers and/or employees that conspired with the International Banking Defendants, Iran, and the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc). Each of the Does is responsible in some manner for the acts alleged herein and for the damages that each Plaintiff sustained. As warranted by the evidence, Plaintiffs will amend this Complaint to show the true names and capacities of the Does when they are ascertained and confirmed.

### IRAN'S LONG HISTORY OF SUPPORTING TERRORISM

839.    Since the Iranian Revolution in 1979, Iran has been a principal source of extremism and terrorism throughout the Middle East and the rest of the world, responsible for bombings, kidnappings and assassinations across the globe.

840.    Iran's neighbor, the Republic of Iraq, has been a frequent target of Iranian-sponsored terrorism.

841.    According to the CIA's 1980 National Foreign Assessment Center's Patterns of International Terrorism: "In 1980 ... the Iranian Government itself initiated numerous acts of international terrorism. ... These attacks occurred in Europe, the Middle East, and the United States. They included armed attacks on Iraqi diplomatic facilities and assassinations of Iraqi citizens. Most prominently, the taking of the US hostages in Tehran was a clear act of international terrorism, violating all norms of diplomatic behavior; this incident clearly was approved by the Iranian Government."

842.    Iran also conducted an assassination campaign against exiled or expatriate regime opponents in Europe during the 1980s and 1990s, *e.g.* killing former Iranian Prime Minister Shappour Bakhtiar on August 6, 1991 near Paris,[3] and Dr. Cyrus Elahi on October 23, 1990, in Paris.

843.    According to the U.S. State Department's 1982 Patterns of Global Terrorism: "Consistent with its radical, anti-Western policies, its zeal for Islamic fundamentalism, and its widespread employment of terrorism within Iran itself, the Khomeini regime supports terrorist groups such as the Iraqi Islamic Revolutionary Council, a Shiite oppositionist group responsible for numerous bombings in Iraq. In a November 1982 press interview, Hojjat al Eslam Mohammad Baqer Hakim, spokesman of the Iraqi Islamic Revolutionary Supreme Assembly, named Iran as one of its primary financial backers."

844.    Iran has also long collaborated and trained terrorists and terrorist groups since the 1979 Revolution. For example, the U.S. State Department's 1983 Patterns of Global Terrorism noted that "Iran also trained Shia dissidents from most of the Arab nations in the Persian Gulf region in terrorist tactics, and Iranian-backed Shias carried out several bombings against Iraqi interests."

---

[3]    A French court convicted Vakili Rad, an IRGC-QF operative, for Bakhtiar's assassination.

845.    Iran has also had a long, deep, strategic partnership with the Lebanese-based Foreign Terrorist Organization Hezbollah, which historically has served as Iran's proxy and agent, enabling Iran to project extremist violence and terror throughout the Middle East and globe.

846.    According to the U.S. State Department's 1984 Patterns of Global Terrorism: "Hezbollah, or the Party of God, is the generic name used by the Iranians and their supporters to distinguish their movement from other Muslim groups in Lebanon. ... Many of these Hezbollah elements continue to receive political indoctrination, training, and financial and materiel support from Iranian Revolutionary Guardsmen based in the Syrian-controlled al Biqa (Bekaa) Valley of eastern Lebanon."

847.    The United States designated Iran a State Sponsor of Terrorism on January 19, 1984. That designation has never been removed or adjusted, and has been renewed every year.

848.    The U.S. State Department's 1985 Patterns of Global Terrorism noted that "Iraq has been a primary target of Iranian-sponsored groups. Iran has trained and financed several Iraqi dissident groups, such as the Da'wa Party ..."  The report further noted "[t]he fundamentalist Shi'a faction Hezbollah in Lebanon and the Da'wa Party in Kuwait and Iraq are among the most active Iranian-backed groups that conducted international terrorism in 1985."

849.    Through its proxy, agent, and strategic partner, Hezbollah, Iran: orchestrated a series of kidnappings of Westerners in Lebanon, including several Americans, in the 1980s; killed more than two hundred U.S. Marines at their barracks in Beirut, Lebanon, in 1983; hijacked TWA flight 847 in 1985; and launched two major 1990s attacks on Jewish targets in Argentina – the 1992 bombing of the Israeli Embassy (killing twenty-nine) and the 1994 bombing of a Jewish community center (killing eighty five).

850.    As alleged above, IRGC-QF commander Ahmad Vahidi (who became Iran's Minister of Defense under former President Mahmoud Ahmadinejad and currently serves in a senior advisory role to Iran's Supreme Leader, Ayatollah Ali Khamenei) played a leading role in planning the bombing of the Jewish Community Center in Argentina.

## IRAN'S HISTORY OF SUPPORTING TERRORISM IN IRAQ

851.    Iran's terrorist campaign against Iraq continued into the 21st century. The U.S. State Department's 2002 Patterns of Global Terrorism noted that "Iran also provided support to extremist groups in Central Asia, Afghanistan, and Iraq with ties to al-Qaida ..."

852.    According to the U.S. State Department's 2003 Patterns of Global Terrorism, "Shortly after the fall of Saddam Hussein, individuals with ties to the Revolutionary Guard may have attempted to infiltrate southern Iraq, and elements of the Iranian Government have helped members of Ansar al-Islam transit and find safe haven in Iran. In a Friday Prayers sermon in Tehran in May, Guardian Council member Ayatollah Ahmad Jannati publicly encouraged Iraqis to follow the Palestinian model and participate in suicide operations against Coalition forces."

853.    Since the U.S. overthrow in 2003 of Saddam Hussein's regime in Iraq, Iran has assiduously worked to expand its influence in Iraq and throughout the region in a variety of ways, including fomenting violence and terrorism when such activities served its ambitions.

854.    According to the U.S. State Department's 2004 Country Reports on Terrorism, "Senior IIG [Iraqi Interim Government] officials have publicly expressed concern over Iranian interference in Iraq, and there were reports that Iran provided funding, safe transit, and arms to insurgent elements, including Muqtada al-Sadr's forces."

855.    Iran increased its support for terrorism in Iraq both financially and militarily by creating and developing terrorist groups operating in Iraq such as Special Groups AAH and KH.

856.    Iran's support of terrorist and militant groups in Iraq was described in the 2005 U.S. State Department's Country Reports on Terrorism, which observed: "Iran has provided political and ideological support for several terrorist and militant groups active in Iraq. Attractive to terrorists in part because of the limited presence of the United States and other Western governments there, Iran is also a safe haven in that known terrorists, extremists, and sympathizers are able to transit its territory and cross the long and porous border into Iraq. Iran also equips terrorists with technology and provides training in extremist ideology and militant techniques."

857.    The following year, in 2006, the U.S. State Department's Country Reports on Terrorism further documented Iran's specific efforts to provide terrorist militants with lethal IEDs to ambush and murder U.S. and other Coalition forces: "Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hizballah. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hizballah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. *These individuals then passed on this training to additional militants in Iraq.*"

858.    In 2006, for example, Brig. Gen. Michael Barbero, Deputy Chief of Staff for Strategic Operations of the Multi-National Force – Iraq ("MNF-I"), stated: "Iran is definitely a destabilizing force in Iraq. I think it's irrefutable that Iran is responsible for training, funding and equipping some of these Shi'a extremist groups and also providing advanced IED technology to them, and there's clear evidence of that."

859.     That same year, the Deputy Chief of Staff for Intelligence with the MNF-I, U.S Army Major General Richard Zahner, declared that "[l]abels on weapons stocks seized inside and outside Iraq point to Iranian government complicity in arming Shiite militias in Iraq [...] Iran is funneling millions of dollars for military goods into Iraq [...] You'll find a red label on the C-4 [explosive] printed in English and will tell you the lot number and name of the manufacturer."

860.     Major General Zahner further added: "the control of military-grade explosives in Iran is controlled through the state apparatus and is not committed through rogue elements right there. It is a deliberate decision on the part of elements associated with the Iranian government to affect this type of activities."

861.     In 2006, U.S. forces in Baghdad detained the Qods Force's Operations and Training Deputy Mohsen Chizari. Chizari was, at the time, the Qods Force's third highest-ranking commander .

862.     Under questioning, Chizari provided detailed information on the import of sophisticated weaponry from Iran to Iraq.

863.     Although released by Iraqi authorities, the U.S. Treasury Department designated Chizari in May 2011.

864.     In May 2007, the Commander of the Multinational Division-Center, U.S. Army Major General Richard Lynch, commented that "[m]ost of our casualties have come from improvised explosive devices. That's still the primary threat to our soldiers -- IEDs. And we have an aggressive campaign to counter those IEDs, but they still are taking a toll on our soldiers: 13 killed, 39 soldiers wounded. What we're finding is that the technology and the

financing and the training of the explosively formed penetrators are coming from Iran. The EFPs are killing our soldiers, and we can trace that back to Iran."

865.    In 2008, Pentagon Press Secretary Geoff Morrell reported on the "smuggling system -- in which the Iranians are providing their allies within Iraq, these special groups, with the munitions that are then used to take on us, whether it be EFPs or rockets or conventional arms. These are being used by these special groups and being provided by the Iranians."

866.    According to a 2010 report by the Combatting Terrorism Center at West Point, Iran pays Iraqi "insurgent" groups *between $4,000 and 13,000 per rocket or roadside bomb, depending on the circumstances*." Iran has also provided insurgent groups with the Hesab, Grad and Fajr rockets.

867.    According to Brig. Gen. Kevin J. Bergner, a U.S. military spokesman, "the Qods Force has provided armor-piercing weapons to extremist groups in Iraq, funneling them up to $3 million a month and training Iraqi militiamen at three camps near Tehran."

868.    Brigadier General Bergner added, "[t]he Iranian Qods Force is using Lebanese Hezbollah essentially as a proxy, as a surrogate in Iraq ... Our intelligence reveals that senior leadership in Iran is aware of this activity."

869.    On January 9, 2008, the U.S. Treasury Department designated four individuals and one entity under E.O. 13438 for threatening the peace and stability of Iraq and the government of Iraq.  Three of the individuals, Ahmed Foruzandeh(a Brigadier General in the IRGC-QF), Abu Mustafa Al-Sheibani, and Isma'il Hafiz Al Lami (Abu Dura) are all based in Iran and/or received funding from Iran.

870.    Regarding Ahmed Foruzandeh, the Treasury Department press release stated:

As of mid-February 2007, Foruzandeh ordered his Iranian intelligence officers to continue targeting Shia and Sunnis to further sectarian violence

106

within Iraq. Foruzandeh is also responsible for planning training courses in Iran for Iraqi militias, including Sayyid al-Shuhada and Iraqi Hezbollah, to increase their ability to combat Coalition Forces. The training includes courses in guerilla warfare, light arms, marksmanship, planting improvised explosive devices (IEDs), and firing anti-aircraft missiles.

Foruzandeh and his subordinates provide financial and material support for acts of violence against Coalition Forces and Iraqi Security Forces. In early-April 2007, Foruzandeh provided $25,000 USD to help fund military operations against Coalition Forces in Salah Ad Din Province, Iraq. Foruzandeh provided the funds to two men claiming to be members of a Sunni terrorist organization in Iraq, promising the men additional funds if they would deliver videos of attacks against Coalition Forces. Foruzandeh also offered to deliver weapons to the border, if the two men could transport the weapons into Iraq in order to fight Coalition Forces. Previously, in August 2004, Foruzandeh drove explosives and associated materials into Iraq from Iran for use in suicide bombings.

871.    Regarding Abu Mustafa Al-Sheibani, the Treasury Department press release

stated:

Iran-based Abu Mustafa Al-Sheibani leads a network of Shia extremists that commit and provide logistical and material support for acts of violence that threaten the peace and stability of Iraq and the Government of Iraq. Al-Sheibani's Iran-sponsored network was created to affect the Iraqi political process in Iran's favor. The network's first objective is to fight U.S. forces, attacking convoys and killing soldiers. Its second objective is to eliminate Iraqi politicians opposed to Iran's influence. Elements of the IRGC were also sending funds and weapons to Al-Sheibani's network.

Al-Sheibani's network – consisting of several hundred members – conducted IED attacks against Americans in the Baghdad region. As of March 2007, Al-Sheibani, known to transport Katyusha rockets to be used for attacks against Coalition Forces, launched rockets against Americans and made videos of the attacks to get money from Iran. As of April 2007, a member of Al-Sheibani's network supervised the transport of money and explosives from Iran for eventual arrival in Baghdad. In early-May 2007, Al-Sheibani's network assisted members of a Shia militia group by transporting them to Iran for training and providing them with weapons for their activities in Iraq.

Additionally, Al-Sheibani commands several pro-Iranian insurgent groups in southern Iraq that work to destabilize Iraq and sabotage Coalition efforts. These groups use a variety of weapons, to include mortars,

Katyusha rockets, and anti-tank landmines. Ordered by IRGC headquarters to create disorder, the task of these groups is to attack bases of Coalition Forces in southern Iraq, particularly British forces.

872. Regarding Abu Dura, the Treasury Department press release stated:

In addition to directing acts of violence against Iraqi government officials and citizens, Abu Dura supported acts of violence against U.S. and Coalition Forces. In July 2006, men under Abu Dura's control attacked a U.S. forces patrol in Sadr City, Baghdad. The purpose of the attack was to kidnap U.S. soldiers and use them as a tool to make U.S. forces leave Iraq. After fleeing to Iran to avoid capture by Coalition Forces, Abu Dura continued to direct attacks in Iraq against Coalition Forces and Sunnis in Iraq during early-2007. Abu Dura maintained contact with proxies in Iraq who carried out those attacks.

873. To that end, Iran (with Hezbollah's aid) has armed, trained, and funded a variety of Special Groups and infiltrated and co-opted Iraqi security forces in an effort to (a) force the U.S. to leave Iraq and (b) destabilize Iraq and terrorize its civilian population to increase Iran's own influence.

## ISLAMIC REVOLUTIONARY GUARD CORPS ("IRGC")/ ISLAMIC REVOLUTIONARY GUARD CORPS - QODS FORCE ("IRGC-QF")

874. The IRGC, or *Pasdaran* (meaning "Guardians" in Persian), was formed by former Iranian Supreme Leader Ayatollah Ruhollah Khomeini in 1979 in the aftermath of the Iranian Revolution. It was created to protect the Revolution against a possible coup by the Iranian military. The IRGC is separate and distinct from Iran's traditional military, the *Artesh* (meaning "Army" in Persian), and its commanders usually report directly to the Supreme Leader, Iran's top decision-maker.

875. The IRGC is charged with protecting the Iranian Revolution, eliminating domestic religious and political dissent internally and abroad, and exporting the Revolution internationally.

876.   The IRGC serves as one of Iran's principal vehicles to foment terror and instability in Iraq. According to the U.S. State Department's 2005 Country Reports on Terrorism: "[t]he IRGC was increasingly involved in supplying lethal assistance to Iraqi militant groups, which destabilizes Iraq ...Senior Iraqi officials have publicly expressed concern over Iranian interference in Iraq, and there were reports that Iran provided funding, safe passage, and arms to insurgent elements."

877.   According to the U.S. State Department's 2006 Country Reports on Terrorism:

> Iran provided guidance and training to select Iraqi Shia political groups, and weapons and training to Shia militant groups to enable anti-Coalition attacks. Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hezbollah. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hezbollah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. These individuals then passed on this training to additional militants in Iraq.

878.   The United States formally designated the IRGC as a Specially Designated National for its WMD proliferation activities  SDGT in October 2007 pursuant to E.O.  13382. As alleged further below, at the same time the IRGC-QF was also designated as an SDGT for its terrorism-related activities pursuant to E.O. 13324.

879.   According to the Treasury Department's press release announcing the designation, the IRGC "is composed of five branches (Ground Forces, Air Force, Navy, Basij militia, and Qods Force special operations) in addition to a counterintelligence directorate and representatives of the Supreme Leader.  It runs prisons, and has numerous economic interests involving defense production, construction, and the oil industry.  Several of the IRGC's leaders have been sanctioned under UN Security Council Resolution 1747."

880.    The Treasury Department press release further stated, "[t]he IRGC has been outspoken about its willingness to proliferate ballistic missiles capable of carrying [WMD]. The IRGC's ballistic missile inventory includes missiles, which could be modified to deliver WMD. The IRGC is one of the primary regime organizations tied to developing and testing the Shahab-3 (Iran's principle Medium Range Ballistic Missile (MRBM)). The IRGC attempted, as recently as 2006, to procure sophisticated and costly equipment that could be used to support Iran's ballistic missile and nuclear programs."

881.    The Qods Force, a paramilitary arm of the IRGC, is mandated with exporting the Iranian Revolution to neighboring countries, beginning with Iraq's Shi'a Southern region during the Iran-Iraq War.

882.    General Qassem Soleimani became commander of the Qods Force in 1998. In 2011, the U.S. Treasury Department, pursuant to E.O. 13224, designated Soleimani an SDGT because of his role in trying to assassinate the Saudi Ambassador in Washington, D.C.

883.    This was not the first time Soleimani had been designated; he had also been designated in May 2011 pursuant to E.O. 13572, which targets human rights abuses in Syria, for his role as the Commander of the IRGC-QF, which, according to the United States, served as the primary conduit for Iran's support to the Syrian General Intelligence Directorate.

884.    Brigadier Gen. Kevin J. Bergner, spokesman for the MNF-I in 2007, commented on Iran funding Hezbollah operatives in Iraq: "[a]ctions against these Iraqi groups have allowed coalition intelligence officials to piece together the Iranian connection to terrorism in Iraq [...] Iran's Quds Force, a special branch of Iran's Revolutionary Guards, is training, funding and arming the Iraqi groups. [...] It shows how Iranian operatives are using Lebanese surrogates to create Hezbollah-like capabilities. And it paints a picture of the level of effort in funding and

arming extremist groups in Iraq."

885.    Bergner further commented: "The groups operate throughout Iraq. They planned and executed a string of bombings, kidnappings, sectarian murders and more against Iraqi citizens, Iraqi forces and coalition personnel. They receive arms -- including explosively formed penetrators, the most deadly form of improvised explosive device -- and funding from Iran. They also have received planning help and orders from Iran."

886.    Following the arrests of terrorists Ali Musa Daqduq (Hezbollah) and Qais al-Khazali (AAH), Bergner also stated that: "[i]t is important to point out that both Ali Musa Daqduq and Qayis Khazali state that senior leadership within the Quds Force knew of and supported planning for the eventual Karbala attack that killed five coalition soldiers. [...] Ali Musa Daqduq contends the Iraqi special groups could not have conducted this complex operation without the support and direction of the Quds Force."

887.    From January 2009 until December 2011, U.S. military forces held Daqduq in Iraq under the terms of the 2008 "Agreement Between the United States of America and the Republic of Iraq on the Withdrawal of United States Forces from Iraq and the Organization of Their Activities during Their Temporary Presence in Iraq" (the Security Agreement). In December 2011, the United States transferred Daqduq to Iraq's custody in accordance with the U.S.'s obligations under the Security Agreement. He was subsequently tried in Iraq on terrorism and other charges. On May 7, 2012, an Iraqi court dismissed terrorism and false documents charges against him, and he was returned to Lebanon.

888.    As noted above, at the same time that Bank Melli and the IRGC were designated pursuant to E.O. 13382 in 2007, the IRGC-QF was also designated an SDGT pursuant to E.O. 13224, , due to the IRGC-QF's provision of support to Hezbollah and other terrorist groups. The

U.S. Treasury Department issued a press release announcing both the WMD proliferation designations and the terrorism designations on October 25, 2007.

889.   The Treasury Department press release announcing the designation stated:

> The Qods Force, a branch of the Islamic Revolutionary Guard Corps (IRGC; aka Iranian Revolutionary Guard Corps), provides material support to the Taliban, Lebanese Hezbollah, Hamas, Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC).

> The Qods Force is the Iranian regime's primary instrument for providing lethal support to the Taliban. The Qods Force provides weapons and financial support to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan. Since at least 2006, Iran has arranged frequent shipments of small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, plastic explosives, and probably man-portable defense systems to the Taliban. This support contravenes Chapter VII UN Security Council obligations. UN Security Council resolution 1267 established sanctions against the Taliban and UN Security Council resolutions 1333 and 1735 imposed arms embargoes against the Taliban. Through Qods Force material support to the Taliban, we believe Iran is seeking to inflict casualties on U.S. and NATO forces.

> The Qods Force has had a long history of supporting Hezbollah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hezbollah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hezbollah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hezbollah and has assisted Hezbollah in rearming in violation of UN Security Council Resolution 1701.

> In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.

890.   According to the U.S. State Department's 2007 Country Reports on Terrorism:

> Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to some Iraqi militant groups that target Coalition and Iraqi security forces and Iraqi civilians. In this way, Iranian government forces have been responsible for attacks on Coalition forces. The Islamic

112

Revolutionary Guard Corps (IRGC)-Qods Force, continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devices (IEDs), and are specially designed to defeat armored vehicles used by Coalition Forces. The Qods Force, in concert with Lebanese Hezbollah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. These individuals then passed on this training to additional militants inside Iraq, a "train-the-trainer" program. In addition, the Qods Force and Hezbollah have also provided training inside Iraq. In fact, Coalition Forces captured a Lebanese Hezbollah operative in Iraq in 2007.

891.     Other U.S. Government reports, such as the Department of Defense's 2007

"Measuring Stability and Security in Iraq" quarterly report to Congress, similarly concluded that:

The Iranian regime's primary tool for exercising clandestine influence in Iraq is the Islamic Revolutionary Guard Corps' (IRGC) Qods Force (QF), which provides arms, intelligence, funds, training, and propaganda support to Iraqi Shi'a militants targeting and killing Coalition and Iraqi forces, as well as Iraqi civilians. The QF seeks to increase long-term Iranian strategic influence in Iraq and the withdrawal of U.S. forces. Among the weapons it provides to Iraqi militants are improvised explosive devices (IEDs), advanced IED technologies (including explosively formed projectiles (EFPs)), and rockets and mortars used for indirect fire attacks.

892.     These observations continued in 2008.  According to the U.S. State Department's

2008 Country Reports on Terrorism:

The Qods Force, an elite branch of the Islamic Revolutionary Guard Corps (IRGC), is the regime's primary mechanism for cultivating and supporting terrorists abroad. The Qods Force provided aid in the form of weapons, training, and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hezbollah, Iraq-based militants, and Taliban fighters in Afghanistan....

Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi militant groups that targeted Coalition and Iraqi forces and killed innocent Iraqi civilians. Iran's Qods Force continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces as well as civilians. Tehran was responsible for some of the

lethality of anti-Coalition attacks by providing militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles. The Qods Force, in concert with Lebanese Hezbollah, provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry.

893.     Likewise, the State Department's 2011 Country Reports on Terrorism reported:

Despite its pledge to support the stabilization of Iraq, Iran continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi Shia militant groups targeting U.S. and Iraqi forces, as well as civilians. Iran was responsible for the increase of lethal attacks on U.S. forces and provided militants with the capability to assemble explosives designed to defeat armored vehicles. The IRGC-QF [Islamic Revolutionary Guard Corps-Quds Force], in concert with Lebanese Hezbollah, provided training outside of Iraq as well as advisors inside Iraq for Shia militants in the construction and use of sophisticated improvised explosive device technology and other advanced weaponry.

894.     Similarly, in 2011, the U.S. Ambassador to Iraq, James F. Jeffrey, was quoted saying: "fresh forensic testing on weapons used in the latest deadly attacks in the country bolsters assertions by U.S. officials that Iran is supporting Iraqi insurgents with new weapons and training. [...] We're not talking about a smoking pistol. There is no doubt this is Iranian."

## HEZBOLLAH: IRAN'S TERROR PROXY

895.     Hezbollah, an FTO based in Lebanon, first emerged during the Lebanese civil war in the early 1980s as a militia comprised of Sh'ia followers of Iran's Supreme Leader, Ayatollah Ruhollah Khomeini. Its members were trained, organized, and funded by an IRGC contingent.

896.     At all relevant times, Hezbollah received material support including, but not limited to, weapons and financing, from Iran.

897.     Indeed, from Hezbollah's inception in 1982, it has had an uninterrupted relationship with Iran. The Hezbollah Program, which sets forth the aims and goals of Hezbollah and was published in February 1985, states: "[w]e are the sons of the umma -- the party of God

the vanguard of which was made victorious by God in Iran....We obey the orders of one leader, wise and just, that of our tutor and <u>faqih</u> who fulfills all the necessary conditions: Ruhollah Musawi Khomeini."

898.    From its inception, Hezbollah served the dual purposes of promoting radical Shi'ite Islam in Lebanon, while simultaneously serving as a primary military arm and projection of Iranian terrorism.

899.    Hezbollah has achieved these goals by developing substantial social, charitable, and business enterprise networks that receive logistical and financial support from Iran.

900.    These networks have enabled Hezbollah to distribute funds to poor youth via the networks or organizations controlled by Hezbollah-controlled or -connected clerics.

901.    During the early years of its existence, Hezbollah was supported by external financing, which chiefly came from Iran.

902.    Hezbollah has served as a proxy for Iran in applying pressure on Western countries, beginning with a large scale wave of kidnappings in 1982.

903.    According to the U.S. State Department's 1984 Patterns of Global Terrorism, Hezbollah receives "political indoctrination, training, and financial and materiel support from Iranian Revolutionary Guardsmen based in the Syrian-controlled al Biqa (Bekaa) Valley of eastern Lebanon."

904.    According to the U.S. State Department's 1985 Patterns of Global Terrorism, Hezbollah owes its inspiration and origin to Iran.  The report notes: "[t]he fundamentalist Shi'a faction Hezbollah in Lebanon ... [is] among the most active Iranian-backed groups that conducted international terrorism in 1985."

905.    According to the U.S. State Department's 1988 Patterns of Global Terrorism:

"Tehran also supports – and exerts significant influence over – the extremist Shia Hezbollah movement's kidnapping of Westerners in Lebanon. Iran provides Hezbollah with money, weapons, and training and has approved - and in some instances may have encouraged - its seizing of some Western hostages."

906.    As a result of its mission, conduct, and terrorist activities, on January 25, 1995 Hezbollah was designated a Specially Designated Terrorist ("SDT").

907.    On October 8, 1997, Hezbollah was designated an FTO. It has retained that designation ever since.

908.    On October 31, 2001, pursuant to E. O. 13224, Hezbollah was designated an SDGT.

909.    The IRGC-QF's "Department 2000" manages Iran's relationship with Hezbollah, which includes the flow of some of Iran's most sophisticated weapon systems, including military grade IEDs, anti-tank guided missiles ("ATGMs"), and various rockets, such as the Fajr-5.

910.    Sometime after 2003, Hezbollah created "Unit 3800," an entity dedicated to supporting Iraqi Shi'a terrorist groups targeting multinational forces in Iraq.

911.    Unit 3800 was established by Hezbollah leader Hassan Nasrallah at Iran's request.

912.    Unit 3800 has trained and advised Iraqi Special Groups.

913.    Hezbollah training camps in southern Lebanon and Iran, and Hezbollah's expertise in the use of IEDs, kidnapping, communications and small-unit operations, were critical to the IRGC-QF's operations in Iraq between 2004 and 2011.

914.    By early 2005, the presence of Hezbollah operatives in Iraq became an open secret when Iraqi interior minister Falah al-Naquib announced the arrest of eighteen Lebanese

Hezbollah members on terrorism charges.

915.    Two years later, according to U.S. intelligence estimates, following the 2007 arrest of Hezbollah's senior operative in Iraq, the Qods Force provided Ali Musa Daqduq (discussed previously above) up to $3 million every month.

916.    Lebanese Hezbollah trainers such as Daqduq are proficient in Arabic and worked more easily with the Special Groups operatives due to their shared language and culture.

917.    In some cases, Iraqi terrorist operatives traveled to Hezbollah's home territory in Lebanon.

918.    Published reports suggest that accounts of interrogations of some terrorist operatives indicate the operatives received initial training in Iran, and then traveled to Lebanon for additional training. Other accounts suggest some terrorist militants received training from Lebanese Hezbollah in Lebanon without any training in Iran.

919.    Those reports consistently describe the terrorist operatives' route into Lebanon as beginning with travel to Tehran following the *same* routes, and supported by the *same* facilitation networks used by militants bound for Iranian training described above. From Tehran, Lebanon-bound Iraqi militants fly to Damascus and then take an overland route across the border into Lebanon.

920.    According to the U.S. State Department's 2007 Country Reports on Terrorism, Iran has provided aid and support to Hezbollah for more than 20 years.

921.    According to the U.S. State Department's 2011 Country Reports on Terrorism: "[s]ince the end of the 2006 Israeli-Hezbollah conflict, Iran has assisted Hezbollah in rearming, in direct violation of UN Security Council Resolution 1701. Iran has provided hundreds of millions of dollars in support of Hezbollah in Lebanon and has trained thousands of Hezbollah

fighters at camps in Iran."

922. Hezbollah's "External Security Organization" provides support to lethal covert actions undertaken by the Qods Force, including assassinations, bombings and other terrorist attacks.

923. Hezbollah's External Security Organization has long supported Qods Force-led terrorist operations, such as the U.S. Embassy and Marine barracks bombings in Lebanon in the 1980s, and the 1992 and 1994 bombings against Israeli targets in Buenos Aires, Argentina.

924. Even before 2004, Hezbollah had become a global organization operating on six continents.

925. Now-deceased Hezbollah military leader Imad Mughniyah worked closely with Lebanese businessmen around the world to create a global network of commercial enterprises in support of Hezbollah's criminal and terrorist activities.

926. Today, Hezbollah is a transnational criminal organization as well as a terrorist organization. Its External Security Organization is headed by Talal Hamiyah and Mustafa Badr al-Din, another longtime Hezbollah leader who oversees the FTO's external terrorist operations.

## IRANIAN SUPPORTED TERROR NETWORKS IN IRAQ THAT HAVE COORDINATED WITH HEZBOLLAH

### THE BADR CORPS/BADR ORGANIZATION

927. The Badr Corps was established in 1982 as the military wing of the Supreme Council for Islamic Revolution in Iraq.

928. From its headquarters in Iran, the Badr Corps operated extensive networks throughout Iraq in the 1990s. The group smuggled men and weapons into Iraq to conduct attacks against the Iraqi regime of Saddam Hussein.

929. Like Hezbollah, the Badr Corps established clandestine offices in businesses and

social organizations in Iraq.

930.    The Badr Corps also used front companies to recruit operatives, collect intelligence, and circulate propaganda materials in Shi'a populated areas.

931.    Before 2003, the Badr Corps served as Iran's most important surrogate inside Iraq, acting as a *de facto* arm of the IRGC-QF.

932.    The Badr Corps received training and weapons from the IRGC-QF and Hezbollah.

933.    After Saddam Hussein's overthrow in 2003, the Badr Corps renamed itself the Badr Organization, and many of its operatives joined the newly formed Iraqi security forces.

934.    Published reports indicate that thousands of members of the Badr Organization remained on the IRGC-QF payroll after 2004.

935.    Several senior Badr Corps operatives later emerged as key conduits for funneling weapons to Iranian proxies in Iraq from 2004-2011, including Abu Mustafa al-Sheibani, a key smuggler of deadly Iranian IEDs, and Jamal Ja'far Muhammad, a/k/a Abu Mahdi al-Muhandis (a.k.a. "The Engineer"), who later led KH.

936.    "Department 1000" of the IRGC-QF, known as the Ramezan Corps, is in charge of Iraq operations and remains the largest Qods Force command outside of Iran. It coordinated, armed and influenced the Badr Organization.

937.    Although the Badr Organization evolved into a major political organization with seats in the new Iraqi parliament, it also played a significant role in facilitating Special Groups operations in Iraq. A proportion of senior Special Groups commanders such as Al-Muhandis are, or were, Badr Corp personnel.

938.    After 2003, the IRGC-QF inserted hundreds of its Iranian-trained operatives into

Iraq's state security organs (notably the Ministry of Interior intelligence structure) in part through its influence within the Badr Organization.

**JAYSH AL MAHDI ("JAM" or the "MAHDI ARMY")**

939.     Jaysh al Mahdi ("JAM" or the "Mahdi Army") was established by radical Shi'a cleric Muqtada al-Sadr in June 2003. On April 18, 2004 it led the first major armed confrontation against U.S.-led forces in Iraq from the Shi'a community.

940.     JAM was co-founded by Imad Mughniyah, one of Hezbollah's most senior commanders.

941.     JAM expanded its territorial control of mixed or predominantly Shi'a neighborhoods and displaced or killed the local Sunni population. JAM was able to gain initial control in many of the neighborhoods surrounding Baghdad by offering the Shi'a population protection and social services.

942.     Al-Sadr dissolved part of his militia after 2007, but he maintained a small group of Iranian-supported militants called the Promised Day Brigades ("PDB") to carry out attacks against Coalition forces.

943.     While the PDB has not historically been a mere extension of Iranian policy in the manner of KH, it has received funding, training and weapons from the IRGC-QF, and, as noted above, is one of the Special Groups.

944.     The PDB actively targeted U.S. forces in an attempt to disrupt security operations and further destabilize Iraq. For example, on June 28, 2011 PDB issued a statement claiming responsibility for 10 mortar and Katyusha rocket attacks against U.S. military convoys in which U.S. officials confirmed that three U.S. troops were killed.

## KATA'IB HEZBOLLAH

945.     KH has functioned as Iran's go-to militia in Iraq and received support from Lebanese Hezbollah, including training in weapons use; IED construction and operation; and sniper, rocket, and mortar attacks.

946.     Historically, KH operated mainly in Shi'a areas of Baghdad, such as Sadr City, and throughout the south.

947.     On June 24, 2009 the United States designated KH an FTO.

948.     The State Department's notice of KH's FTO designation stated that "[t]he organization has been responsible for numerous violent terrorist attacks since 2007, including improvised explosive device bombings, rocket propelled grenade attacks, and sniper operations. Kata'ib Hezbollah [sic] also targeted the International Zone in Baghdad in a November 29, 2008 rocket attack that killed two UN workers. In addition, KH has threatened the lives of Iraqi politicians and civilians that support the legitimate political process in Iraq."

949.     KH was also simultaneously designated an SDGT under E. O. 13224, because it was "responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq since 2007." The U.S. Treasury Department also designated KH pursuant to Executive Order 13438.

950.     The Treasury Department's press release announcing the designation of KH's designation  explained that KH had "committed, directed, supported, or posed a significant risk of committing acts of violence against Coalition and Iraqi Security Forces...."

951.     The press release also quoted then-Under Secretary for Terrorism and Financial Intelligence Stuart Levey as stating "[t]hese designations play a critical role in our efforts to protect Coalition troops, Iraqi security forces, and civilians from those who use violence against innocents to intimidate and to undermine a free and prosperous Iraq." The press release also

stated: "[f]urther, the IRGC-Qods Force provides lethal support to Kata'ib Hizballah and other Iraqi Shia militia groups who target and kill Coalition and Iraqi Security Forces."

952.    The press release further reported that between March 2007 and June 2008, KH led a number of attacks against U.S. forces in Iraq, advising: "[a]s of 2008, Kata'ib Hizballah was funded by the IRGC-Qods Force and received weapons training and support from Lebanon-based Hizballah. In one instance, Hizballah provided training--to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks--to Kata'ib Hizballah members in Iran."

953.    Furthermore, the press release noted:

> Recordings made by Kata'ib Hizballah for release to the public as propaganda videos further demonstrate that Kata'ib Hizballah conducted attacks against Coalition Forces. In mid-August 2008, Coalition Forces seized four hard drives from a storage facility associated with a Kata'ib Hizballah media facilitator. The four hard drives included approximately 1,200 videos showing Kata'ib Hizballah's sophisticated planning and attack tactics, techniques, and procedures, and Kata'ib Hizballah's use of the most lethal weapons--including RPG-29s, IRAMs, and EFPs--against Coalition Forces in Iraq.

> One of the hard drives contained 35 attack videos edited with the Kata'ib Hizballah logo in the top right corner. Additionally, between February and September 2008, Al-Manar in Beirut, Lebanon, broadcast several videos showing Kata'ib Hizballah conducting multiple attacks against Coalition Forces in Iraq.

> Immediately preceding the Government of Iraq's approval of the United States-Iraq security agreement in late November 2008, Kata'ib Hizballah posted a statement that the group would continue fighting Coalition Forces and threatened to conduct attacks against the Government of Iraq if it signed the security agreement with the United States.

954.    In 2008, the Department of Defense stated KH, "also known as Hezbollah Brigades, is a terrorist group believed to receive funding, training, logistics and material support from Iran to attack Iraqi and coalition forces using what the military calls 'explosively formed

penetrators' – roadside bombs designed to pierce armor-hulled vehicles – and other weapons such as rocket-assisted mortars."

955.    As noted above and as stated by the U.S Treasury Department in its July 2009 press release, throughout 2008, *Al-Manar*, Hezbollah's official television outlet in Lebanon - and itself a designated SDGT since May 2006 - played numerous videos of KH launching rocket and IED attacks against U.S. troops. In this manner, Hezbollah helped publicize KH's activities and increase its profile among leading Shi'a terrorist groups.

956.    Although KH's leadership remains murky, one individual reportedly associated with the group is Abu Mahdi al-Muhandis.

957.    Al-Muhandis is wanted in Kuwait for his alleged role in the 1983 bombings of the American and French embassies in Kuwait City, as well as for his alleged involvement in the assassination attempt on the Kuwaiti Emir in 1985.

958.    The U.S. Treasury Department designated al-Muhandis an SDGT in July 2009, and announced the designation in the same press release announcing KH's designation. The press release noted:

> As of early 2007, al-Muhandis formed a Shia militia group employing instructors from Hizballah to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces. The groups received training in guerilla warfare, handling bombs and explosives, and employing weapons--to include missiles, mortars, and sniper rifles. In another instance as of September 2007, al-Muhandis led networks that moved ammunition and weapons--to include explosively formed penetrators (EFPs)--from Iran to Iraq, distributing them to certain JAM militias to target Coalition Forces. As of mid-February 2007, al-Muhandis also ran a weapons smuggling network that moved sniper rifles through the Iran-Iraq border to Shia militias that targeted Coalition Forces.
>
> Al-Muhandis also provided logistical support for attacks against Iraqi Security Forces and Coalition Forces conducted by JAM Special Groups and certain Shia militias. In one instance, in April 2008, al-Muhandis facilitated the entry of trucks--containing mortars, Katyusha rockets,

EFPs, and other explosive devices--from Iran to Iraq that were then delivered to JAM Special Groups in Sadr City, Baghdad. Additionally, al-Muhandis organized numerous weapons shipments to supply JAM Special Groups who were fighting Iraqi Security Forces in the Basrah and Maysan provinces during late March-early April 2008.

In addition to facilitating weapons shipments to JAM Special Groups and certain Shia militias, al-Muhandis facilitated the movement and training of Iraq-based Shia militia members to prepare them to attack Coalition Forces. In one instance in November 2007, al-Muhandis sent JAM Special Groups members to Iran to undergo a training course in using sniper rifles. Upon completion of the training course, the JAM Special Groups members had planned to return to Iraq and carry out special operations against Coalition Forces. Additionally, in early March 2007, al-Muhandis sent certain Shia militia members to Iran for training in guerilla warfare, light arms, marksmanship, improvised explosive devices (IED) and anti-aircraft missiles to increase the combat ability of the militias to fight Coalition Forces.

In addition to the reasons for which he is being designated today, al-Muhandis participated in the bombing of Western embassies in Kuwait and the attempted assassination of the Emir of Kuwait in the early 1980s. Al-Muhandis was subsequently convicted in absentia by the Kuwaiti government for his role in the bombing and attempted assassination.

959. In a July 2010 press briefing, U.S. General Ray Odierno identified KH as the group behind increased threats to U.S. bases in Iraq. General Odierno reported that KH operatives had gone to Iran for special training and then returned to Iraq.

960. General Odierno stated, "[T]hey are clearly connected to Iranian IRGC [Iranian Revolutionary Guard Corps]."

961. Historically, KH operated mainly in Shi'a areas of Baghdad, such as Sadr City, and throughout the south.

## ASA'IB AHL AL-HAQ ("AAH" OR "LEAGUE OF THE RIGHTEOUS")

962. AAH is a Shi'a Special Group supported by Hezbollah and the IRGC-QF that has conducted assassinations and operations against Iraqi civilians, Iraqi Security Forces and Coalition forces.

963.    AAH was originally established by Senior Sadrist and MNF-I detainee Qais al-Khazali.

964.    AAH split from al-Sadr's JAM in 2006. Since that time, AAH has conducted: thousands of IED attacks against U.S. and Iraqi forces; targeted kidnappings of Westerners; rocket and mortar attacks on the U.S. Embassy; murders of American soldiers; and assassination of Iraqi officials.

965.    At all relevant times, AAH received significant funding from Iran, and had links to Iran's IRGC-QF and Hezbollah.

966.    The aforementioned Lebanese Hezbollah operative Ali Musa Daqduq provided training to AAH fighters.

967.    Daqduq reported to Youssef Hashim, the head of Lebanese Hezbollah Special Operations, and the latter reported to Abdul Reza Shahlai, the director of the Qods Force External Operations.

968.    In one instance, AAH claimed responsibility for an attack against the Polish Ambassador to Iraq and a separate attack against the Polish Embassy.

969.    AAH has been responsible for some of the most brazen and complex attacks in Iraq. In May 2007, AAH members kidnapped Peter Moore, a British computer expert, and four security guards from the Iraqi Ministry of Finance Technology Center in Baghdad. Sources report that a group of forty men entered the Ministry dressed in Iraqi Police uniforms, took the five men, and escaped through Baghdad traffic.

970.    It is believed that the hostages were held in Iran during their captivity.

971.    AAH was one of the Iranian entities responsible for the January 2007 Karbala attack (discussed above).

972.    Although the specific attacks alleged herein often targeted U.S. military personnel, they were all carried out by terrorists and terrorist organizations and entities like Hezbollah and the Special Groups, not by armed forces of recognized governments or military forces.

973.    At the time Plaintiffs were injured, no declared war or armed conflict existed between the governments of United States and Iran, and the injuries Plaintiffs sustained were not the result of a declared war with Iran, or open, armed, conflict between the United States and Iran.

974.    The conduct of Iran, the IRGC-QF, Hezbollah, and the Special Groups violated the laws of armed conflict: attacks upon Iraqi and other civilians constituted a substantial, rather than an incidental, part of their objectives and conduct. The conduct of the IRGC-QF, Hezbollah, and the Special Groups also violated the laws of war (including, *e.g.*, AAH operatives masquerading as members of U.S. armed forces and executing defenseless prisoners).

975.    The acts of the IRGC-QF, Hezbollah, and/or the Special Groups that injured the Plaintiffs constituted acts of international terrorism within the meaning of the Anti-Terrorism Act, engaging in terrorist activities within the meaning of 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or engaging in terrorism within the meaning of 22 U.S.C. § 2656f.

## THE LEGAL FRAMEWORK OF U.S. SANCTIONS AGAINST IRAN

976.    Following the Iranian Revolution in 1979, and in light of Iran's long track record of sponsoring and fomenting international terrorism, the U.S. government has, over time, imposed various restrictions and/or sanctions against Iran, including designating it a State Sponsor of Terrorism on January 19, 1984.

977.    The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§

1701-1706, authorizes the President of the United States to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declares a national emergency with respect to that threat. Pursuant to the authority under IEEPA, the President and the Executive Branch have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving U.S.-origin goods.

978.    As alleged in greater detail herein, each of the Defendants conspired to violate 50 U.S.C. § 1705, which makes it a crime to willfully violate, attempt to violate, conspire to violate, or cause to violate any regulation issued under IEEPA.

979.    Specifically, Defendants violated, conspired to violate, or caused violations of 31 C.F.R. §§ 560.203 and 560.204, which prohibit: (a) the exportation from the United States of a service to Iran without authorization; and (b) any transaction within the United States that evaded and avoided, or had the purpose of evading and avoiding, such regulations.

980.    In addition, 31 C.F.R. § 560.208 provides that "notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, no United States person, wherever located, may approve, finance, facilitate, or guarantee any transaction by a foreign person where the transaction by that foreign person would be prohibited by this part if performed by a United States person or within the United States."

981.    In 1987, President Reagan issued Executive Order No. 12613, which imposed a broad embargo on imports of Iranian-origin goods and services.

982.    In 1995 and 1997, President Clinton issued Executive Order Nos. 12957, 12959, and 13059, which strengthened existing U.S. sanctions against Iran. These orders prohibit virtually all trade and investment activities between the United States and Iran.

983.    In Executive Order 12957, issued on March 15, 1995, President Clinton found that "the actions and policies of the Government of Iran constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States and ... declare[d] a national emergency to deal with that threat."

984.    On May 6, 1995, President Clinton issued Executive Order 12959 to take additional steps with respect to the national emergency declared in Executive Order 12957 and to impose comprehensive trade and financial sanctions on Iran. These sanctions prohibit, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran or the government of Iran of any goods, technology, or services from the United States or by a United States person, wherever located.

985.    This prohibition included the exportation, re-exportation, sale, or supply of any goods, technology, or services to a person in a third country with knowledge or reason to know that such goods, technology, or services are intended specifically for supply, trans-shipment, or re-exportation, directly or indirectly, to Iran or the government of Iran.

986.    In April 1996, Congress passed 18 U.S.C. § 2332d, which prohibits financial transactions with the government of a country that has been designated a country supporting international terrorism under section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C. 2405).

987.    On August 19, 1997, President Clinton issued Executive Order 13059 consolidating and clarifying Executive Orders 12957 and 12959 (collectively, the "Executive Orders"). The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to execute them. Pursuant to this authority, the

Secretary of the Treasury promulgated the ITRs, implementing the sanctions imposed by the Executive Orders.

988.    The Executive Orders prohibited virtually all trade and investment activities between the United States and Iran, including, but not limited to, broad prohibitions on: (a) the importation into the United States of goods or services from Iran; (b) the exportation, sale, or supply of goods, technology or services from the United States or by a U.S. person to Iran; (c) trade-related transactions with Iran by U.S. persons, including financing, facilitating or guaranteeing such transactions; and (d) investment by U.S. persons in Iran or in property owned or controlled by Iran.

989.    With the exception of certain exempt or authorized transactions, OFAC regulations implementing the ITRs generally prohibited the export of services to Iran from the United States.

990.    Under 31 C.F.R. § 560.204 of the ITRs no goods, technology, or services could be exported, re-exported, sold, or supplied to Iran, directly or indirectly, from the United States or by a U.S. person wherever located, without authorization.

991.    Section 560.203 of the ITRs prohibited any transaction by any U.S. person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, or that attempted to violate, any of the prohibitions set forth in Part 560. Section 560.203 also prohibited any attempt to violate the prohibitions contained in the ITRs.

992.    And, as explained, above, Section 560.208 prohibits any United States person, wherever located, from approving, financing, facilitating, or guaranteeing any transaction by a foreign person where the transaction by that foreign person would be prohibited under the ITRs if performed by a United States person (defined in Section 560.314 as "*any United States citizen,*

*permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States*" or within the United States.)

993.    The ITRs were in effect at all times relevant to this action.

994.    After the September 11, 2001 terrorist attacks on the United States, President George W. Bush issued Executive Order No. 13224 on September 23, 2001, declaring a national emergency with respect to the "grave acts of terrorism ... and the continuing and immediate threat of further attacks on United States nationals or the United States."

995.    Executive Order No. 13224 blocked all property and interests in property of individuals and entities designated pursuant to the order. E.O. 13224 "aimed at freezing the assets of terrorists and their supporters, and at isolating them from the U.S. financial and commercial systems." Since the Executive Order was issued, several Iranian entities have been designated as SDGTs pursuant to E.O. 13224.

996.    On June 25, 2005, President George W. Bush signed Executive Order 13382. E.O. 13382 was aimed at "at freezing the assets of proliferators of weapons of mass destruction and their supporters, and isolating them from the U.S. financial and commercial systems. Designations under the order prohibit all transactions between the designees and any U.S. person, and freeze any assets the designees may have under U.S. jurisdiction." Since the Executive Order was issued, as alleged above several Iranian entities, including the IRGC, Bank Melli (including Bank Melli's subsidiaries), Bank Mellat, and Bank Sepah, have been designated pursuant to E.O. 13382.

997.    Financial institutions in the United States are obligated to screen financial transactions, including wire payment processing, to make certain they do not execute transactions that violate U.S. sanctions. OFAC regularly publishes a comprehensive list of

sanctioned individuals and entities (as noted above, known as the "Specially Designated National" or SDN list) that includes names of individuals, entities, their variations, and, if known, addresses, dates of birth, passport numbers, and other identifying information.

998.    Due to the vast volume of wire payments processed by financial institutions, most U.S.-based financial institutions employ sophisticated computer software, known as OFAC filters, to automatically screen all wire payments against the official OFAC list (as well as similar lists containing names of individuals and entities sanctioned by the United Nations and the European Union).

999.    When a U.S. bank's computer filters detect a possible match to a sanctioned entity, the payment is stopped and held for further review.

1000.   When a U.S. financial institution detects a funds transfer that violates sanctions, the institution must refuse to process or execute that payment. This is termed a "rejection."

1001.   If a party to the payment is included on OFAC's SDN list, the payment must be frozen (or "blocked") and the bank must notify OFAC. The sending bank must then demonstrate to OFAC that the payment does not violate sanctions before the funds can be released and the payment processed.

1002.   Thus, foreign banks seeking to send U.S. dollar payments involving sanctioned countries or entities through U.S. banks must, where the transaction does not qualify for a license, exemption, or exception, by-pass or subvert the OFAC filters to make sure the payments pass through the U.S. clearing banks.

**THE SO-CALLED 'U-TURN' EXEMPTION**

1003.   While the ITRs promulgated for Iran prohibited USD transactions, they contained a specific exemption for USD transactions that did not directly credit or debit a U.S. financial

institution. As noted above, this exemption was commonly known as the "U-Turn" Exemption.

1004. Until November 2008, Section 560.516 of the ITR authorized U.S. depository institutions to process transfers of funds to or from Iran, or for the direct or indirect benefit of persons in Iran or the government of Iran, if:

      (a)    the transaction did not involve the debiting or crediting of an Iranian account (that is, an account of a person located in Iran, or of the government of Iran maintained on the books of a United States depository institution);

      (b)    the transaction did not involve a person or entity identified by OFAC as a Specially Designated National or Blocked Person; and

      (c)    each of the originating and beneficiary banks of the transaction was a third-country (not Iranian or U.S.) bank.

1005. The U-Turn exemption permitted banks to process Iranian transactions denominated in U.S. dollars that began and ended with a non-U.S. financial institution, but were cleared through a U.S. correspondent bank.

1006. In relevant part, the ITR provided that U.S. banks were "authorized to process transfers of funds to or from Iran, or for the direct or indirect benefit of persons in Iran or the Government of Iran, if the transfer . . . is by order of a foreign bank which is not an Iranian entity from its own account in a domestic bank . . . to an account held by a domestic bank . . . for a [second] foreign bank which is not an Iranian entity." 31 CFR § 560.516(a)(1).

1007. That is, a U.S. dollar transaction to or for the benefit of Iran could be routed through the U.S. as long as a non-U.S. offshore bank originated the transaction and the transaction terminated with a non-U.S. offshore bank.

1008. However, transactions purporting to qualify as U-Turn transactions required transparency and scrutiny, because U-Turn transactions were *only* permissible in circumstances in which no U.S. person or entity had direct contact with the Iranian bank or customer, and were

otherwise permissible (*e.g.*, the transactions were not on behalf of an OFAC-designated person or entity).

1009. Hence, processing a U-Turn transaction was, effectively, only permissible if the bank conducted sufficient due diligence regarding the parties involved, checking that the Iranian entity was not on any known terrorism blacklist and that the money did, in fact, leave U.S. jurisdiction. As such, it was vital that payment messages for U-Turn transactions were accurate, complete, and transparent.

1010. OFAC regulations required that "[b]efore a United States depository institution initiates a payment on behalf of any customer, or credits a transfer to the account on its books of the ultimate beneficiary, the United States depository institution must determine that the underlying transaction is not prohibited by this part." 31 CFR 560.516 (c).

1011. As alleged above, even before the U-Turn exemption was revoked in its entirety, Defendant Bank Saderat Plc, as well as Iranian Bank Co-conspirators Bank Saderat Iran, Bank Melli (including Melli Bank Plc), Bank Mellat, and Bank Sepah had already been excluded from accessing the exemption as a result of their designation as SDNs for WMD proliferation or (in Bank Saderat's case) terrorism activities.

1012. Effective November 10, 2008, OFAC revoked the U-Turn exemption in its entirety . As of that date, U.S. depository institutions were no longer authorized to process any Iranian U-turn payments.

1013. In revoking the U-Turn exemption, the U.S. government explained:

> Iran's access to the international financial system enables the Iranian regime to facilitate its support for terrorism and proliferation. The Iranian regime disguises its involvement in these illicit activities through the use of a wide array of deceptive techniques, specifically designed to avoid suspicion and evade detection by responsible financial institutions and companies. Iran also is finding ways to adapt to existing sanctions,

including by turning to non-designated Iranian banks to handle illicit transactions.

The Treasury Department is taking a range of measures, including today's action, to counter these deceptive activities.

## THE HSBC DEFENDANTS' AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

1014. The HSBC Defendants have a longstanding relationship with Iran. HSBC Group established a relationship with the Tehran office of Bank Melli Iran ("Bank Melli") in 1999 and established an "Iran Representative" office in Iran that same year.

1015. In December 2000, HSBC Group members entered into a $500 million project finance agreement with six Iranian commercial banks: Bank Saderat Iran, Bank Melli, Bank Mellat, Bank Tejarat, Bank Sepah and the Export Development Bank.

1016. Beginning in the late 1990s, Defendant HBSC-Europe and Defendant HSBC-Middle East devised a procedure whereby their Iranian Bank Co-conspirators put a cautionary note in their SWIFT payment messages including language such as, "*care sanctioned country,*" "*do not mention our name in NY*," and "*do not mention Iran.*"

1017. Payments with these cautionary notes automatically fell into what Defendant HSBC-Europe termed a "repair queue," where employees of HBSC-Europe and HSBC-Middle East employees manually removed all references to Iranian-sanctioned entities.

1018. Between 2001 and 2007, the HSBC Defendants actively participated in the Conspiracy by repeatedly undertaking various methods to facilitate payments on behalf of Iran through the United States that would evade U.S. sanctions by disguising Iran's financial activities as its funds passed through U.S. financial institutions, including Defendant HSBC-US.

1019. Unlawful Iranian funds transfers from HSBC-Europe and HSBC-Middle East were sent through the HSBC Group's U.S. dollar correspondent accounts at HSBC-US by:

a.   Deleting references to Iran from the payment instructions (a.k.a. "stripping" the transactions) or otherwise altering the messages to either omit or falsify information that would have otherwise indicated Iran's involvement in the transaction; and

b.   Styling the transaction as a bank-to-bank "cover" transaction between two non-Iranian banks, solely because the MT 202 payment message format used for such transactions did not expressly obligate HSBC to identify the transaction's originator and beneficiary, thus avoiding any disclosure of the transaction's Iranian connections, and blocking HSBC-US's electronic filters from recognizing the transaction, let alone assessing whether it qualified for any OFAC exemption or license.

1020.   Defendant HSBC-Europe created detailed plans to avoid triggering HSBC-US's OFAC filter and reduce the need for "manual intervention" (*e.g.* – formatting U.S. dollar transactions, sparing HSBC-Europe's employees the need to physically alter the messages in order to remove references that might otherwise identify the presence of Iranian parties, and associated scrutiny), thus enabling business with Iran to proceed quickly and profitably.

1021.   In 2010, facing U.S. government investigations, HSBC-US hired Deloitte LLP as its outside auditor to identify and examine HSBC Group's OFAC sensitive transactions involving Iran and other prohibited countries or persons that went through the bank.

1022.   That "review" identified more than 25,000 transactions, totaling more than $19.4 billion that involved Iran.

1023.   The payments had been sent to HSBC-US and other financial institutions in the United States without referencing the Iranian Bank Co-conspirators, ensuring that the payments would be processed without delay and not be blocked or rejected by automated OFAC filtering systems.

1024.   The review also revealed that HSBC Europe and HSBC Middle East processed approximately $20 billion in transactions for the Iranian co-conspirators. HSBC Defendants deliberately amended payment messages and used MT 202 cover payments to conceal the nature

135

of the transactions from HSBC-US automated filters and those of other financial institutions in the United States, and HSBC-US was aware that HSBC Defendants used such methods to alter payment messages.

1025. At the same time, the HSBC Defendants further educated their Iranian co-conspirators on how to format payment messages to avoid detection and scrutiny, thus ensuring that Iran could solicit other conspirators to facilitate payments in like manner. Accordingly, regardless of whether particular transactions might have qualified for the U-Turn exemption at the time, the HSBC Defendants' (and other Defendants') willingness to process payments in this manner enabled Iran to flood the global financial system with undetectable U.S. dollar payments and effectuate otherwise preventable funds transfers to Hezbollah and the Qods Force.

1026. Defendant HSBC Holdings was aware of Defendants HBSC-Europe and HSBC-Middle East's involvement in the Conspiracy as early as 2000.

1027. For example, HSBC Group AML Compliance Head Susan Wright ("Wright") received an email on June 9, 2000 from Bob Cooper, an HSBC colleague, informing Wright of an existing procedure the HSBC Defendants were already employing to avoid OFAC filter detection.  Cooper explained:

    a.    A client bank had been "*automatically replacing a remitter's name with that of*" the client bank and that bank was utilizing bank-to-bank "cover payments" because the payment message formats did not expressly require identification of either the underlying party originating the transaction or the transaction's ultimate beneficiary.

    b.    In the future, for OFAC sensitive transactions, that bank would "*arrange cover for the payment using MT202/203 remittances.*"

    c.    In addition, that bank planned to send a separate 'MT100 message' to the recipient bank, providing full payment details for the originator and ultimate beneficiary.

1028. Cooper's June 9 email overtly acknowledged that "[i]n this way a payment in US\$ can be made for an individual or company on the OFAC list, without the name being 'detected' by the OFAC filters that all US banks would apply."

1029. Several days later (June 14, 2000), Susan Wright forwarded Cooper's June 9, 2000 email to the then-current head of HSBC Group Compliance, Matthew King ("King"). In her cover email, Wright stated that the "practice" detailed by Cooper was "unacceptable" and informed King that it was her position that:

   a.   "We advised them that this was contrary to SWIFT guidelines (drawn up to address FATF concerns re money laundering via wire transfers) which required that the full details (names and addresses) of remitters and beneficiaries are included."

   b.   "From a Group perspective I consider the continuation of this practice [the client bank's future plan to conceal OFAC sensitive transactions behind bank-to-bank transfers] to be unacceptable as a deliberate and calculated method to avoid US OFAC sanctions and has the potential to raise serious regulatory concerns and embarrass the Group."

1030. This e-mail chain indicates that senior HSBC Group officials were aware of the Conspiracy and the specific methods and overt acts by which Iran, Iranian banks and the HSBC Defendants were carrying out the Conspiracy. However, despite this awareness, senior HSBC Group and HSBC Group members' compliance officials (including compliance officials at Defendants HSBC Holdings, HSBC-Europe, HSBC-Middle East, and HSBC-US) did *not* put an end to this "practice" but instead, with clear knowledge of its purpose and aware that other banks participated in the Conspiracy, knowingly employed similar techniques to evade OFAC requirements, thus allowing the HSBC Defendants to continue deploying and refining their "procedures" to facilitate illegal payments for Iran.

## HSBC-EUROPE'S 2001 "BANK MELLI PROPOSAL"

1031. In or around January 2001, Bank Melli's London branch maintained a USD

137

account with several other major international banks, but was interested in establishing a relationship with HSBC that would give HSBC the majority of Bank Melli's USD clearing business.

1032. In an April 30, 2001 letter, Defendant HSBC-Europe presented Bank Melli in London with a proposal (the "Bank Melli Proposal") for processing Bank Melli payments. HSBC-Europe's proposal boasted that HSBC-Europe was "...confident that we have found a solution to processing your payments with minimal manual intervention."

1033. The Bank Melli Proposal expressly underscored that, if it adopted HSBC-Europe's "solution," Bank Melli would not be identified as a sender in any payment message and thus ensure that transactions would not run into any 'speed bumps' or other obstacles. The "solution" provided specific alternative wording, as it explained:

> "The key is to **always** populate field 52 – if you do not have an ordering party then quote 'One of our Clients,' **never leave blank.** This means that the outgoing payment instruction from HSBC will not quote 'Bank Melli' as sender – just HSBC London and whatever is in field 52. This then negates the need to quote 'DO NOT MENTION OUR NAME IN NEW YORK' in field 72." (Emphasis in original.)

1034. HSBC-Europe's proposal further requested, "In order to test our proposed solution we would appreciate if you used the following templates when submitting your next payments to the following customer, or alternatively submit a USD 1 test payment" and provided the following:

**MT202**
20:   *Your Ref….*
21:   *Related Ref….*
32:   *Amount/currency/Value date….*
50:   <u>**DO NOT QUOTE IF IRANIAN**</u>
52:   *Customer Name* **OR** *One of our clients* **MUST BE COMPLETED**
53:   **/68296908**
54:
56:

> 57:   *Beneficiary Banker (SWIFT codes where possible)*
> 58:   *Beneficiary (SWIFT codes where possible)*
> 70:   *Any Payments details for beneficiary...*
> 72:   **Please leave blank**
> **MT100**
> Pay as above.

(Emphasis in original.)

1035. Thus, the Bank Melli Proposal documented the HSBC Defendants' active coordination and participation in the Conspiracy to illegally remove, omit or falsify essential information so as not to trigger OFAC filters or otherwise permit HSBC-US or other U.S depository institutions to detect Iranian transactions.

1036. In 2001, John Wilkinson ("Wilkinson") served as HSBC-Europe's Institutional Banking Relationship Manager for HSBC-Europe's Bank Melli account.

1037. In a June 28, 2001 email titled **"Re: Bank Melli"** to HSBC-US, Wilkinson discussed the Bank Melli Proposal, describing HSBC-Europe's "usual method" to alter payment messaging wording and the rationale for doing so:

- "Once the proposition goes live, we have instructed Bank Melli to alter the format of its [sic] payments to achieve straight through processing. The field 52 input of 'one of our clients' is a standard phrase used by MPD [Multicurrency Payments Department] in these situations."

- "Since sending the letter we have further asked them to only put 'One of our clients' in field 52, thus removing the chance of them inputting an 'Iranian referenced' customer name, that causes fall out of the cover payment sent to HSBC-US and a breach of OFAC regulations."

1038. In further support of his position to continue this standard 'procedure,' Wilkinson explained that a payment involving an Iranian bank had been blocked because HSBC-Europe's MPD [Multicurrency Payments Department] "failed to spot the poor input and did not follow the normal procedure of altering the payment."

1039.  In other words, the HSBC Defendants' "normal" procedure was to conspire with Iranian banks, including Bank Melli, to *deliberately* alter payments for the express purpose of avoiding detection and analysis by U.S. banks, regulators and law enforcement.

1040.  In an email exchange in October 2001 between David Bagley ("Bagley"), HSBC-Middle East's Regional Head of Legal and Compliance, and Matthew King, a member (and later head of) HSBC Group's Audit Department, King noted: "[w]e also have to bear in mind pending US legislation which will in effect give the US extraterritorial authority over foreign banks, particularly if we are unfortunate enough to process a payment which turns out to be connected to terrorism. My own view therefore is that some of the routes traditionally used to avoid the impact of US OFAC sanctions may no longer be acceptable."

1041.  HSBC Group AML Head Susan Wright and Money Laundering Control Officer John Allison received copies of King's e-mail.

1042.  King's email confirms that senior HSBC Group member employees comprehended that the HSBC Defendants (and other banks) had "traditionally" used "routes" (a euphemism for altering payment messages) to avoid disclosing a transaction's Iranian connections and that some of those transactions might prove to be "connected to terrorism."

1043.  A January 2003 memorandum authored by HSBC-Middle East and disseminated to other members of the HSBC Defendants confirms not only the HSBC Defendants' ongoing participation in the Conspiracy but also their knowledge of the participation of other co-conspirators and Iran's desire to further evade U.S. sanctions. The memorandum stated in relevant part:

> • "It is believed that some service providers amend the payments to ensure Iran is not mentioned in the body of the payment instruction to their USD correspondent. This process minimizes the risk of payment being referred to OFAC."

- "Currently, it is estimated that Iranian banks issue up to 700 USD payments a day using their USD providers, mainly banks in the UK and Europe, which in turn use their New York USD correspondents to effect the payments."

1044. Acknowledging the existence of the Conspiracy the memorandum advised:

- "[T]here is substantial income opportunity to sell a USD payments proposition to Iranian banks in view of the impending FATF regulations...The [requirements of the] new regulations...increases the risk of Iranian payments being held in the USA as they may fall foul of the OFAC regulations. The Iranian Banks have now prioritized this issue and are now actively seeking a solution from their banks, including HSBC."

1045. Over the course of the next several years, the HSBC Defendants continued their participation in the Conspiracy.

1046. In an October 9, 2006 email Bagley [HSBC-Middle East's Regional Head of Legal and Compliance] informed senior HSBC Group officials that key U.S. policymakers were "...in favour of withdrawing the U-Turn exemption from all Iranian banks. This on the basis that, whilst having direct evidence against Bank Saderat particularly in relation to the alleged funding of Hezbollah, they suspected all major Iranian State owned banks of involvement in terrorist funding and WMD [weapons of mass destruction] procurement."

1047. Eight months later, in a June 8, 2007 email Bagley informed HSBC Holding's CEO, Michael Geoghegan, and others that "[U.S. Treasury Under Secretary for Counter Terrorist Financing and Sanctions] Levey essentially threatened that if HSBC did not withdraw from relationships with [redacted] we may well make ourselves a target for action in the US."

1048. Bagley's email thus confirmed that various relationships had and continued to exist with Iran and Iranian banks. Bagley not only acknowledged that HSBC had "...an agency banking relationship in HSBC-EUROPE both for [redacted] and other Iranian banks," but he confessed that "[t]here are further complications surrounding the process of closure with all

Iranian banks as we have some USD 9m in reimbursements due from Sepah, where we are running off trade lines, where we may need cooperation from Central Bank of Iran."

1049. On December 9, 2010, the U.S. Treasury Department designated Tajco, describing it as, "a multipurpose, multinational business venture involved in international trade as well as real estate and presided over by Ali, Husayn and Kassim Tajideen.... Since at least December 2007, Ali Tajideen used Tajco Sarl, operating as Tajco Company LLC, as the primary entity to purchase and develop properties in Lebanon on behalf of Hizballah."

1050. The designation also covered Kairaba Supermarket, a subsidiary business of Tajco Ltd.

1051. On December 11, 2012, the U.S. Department of Justice ("DOJ") announced that Defendants HSBC Holdings and HSBC-US had admitted to Anti-Money Laundering ("AML") and OFAC sanctions violations, and had agreed to enter into a Deferred Prosecution Agreement ("DPA") and pay a $1.256 billion forfeiture.   As explained further infra, DOJ issued a press release announcing the DPA, and summarizing the HSBC Defendants' illegal conduct.

1052. In connection with the DPA, DOJ filed a four-count felony criminal information against HSBC Holdings and HSBC-US, charging them with willfully failing to maintain an effective AML program, willfully failing to conduct due diligence on their foreign correspondent affiliates, and violating International Emergency Economic Powers Act ("IEEPA") and the Trading with the Enemy Act ("TWEA").   HSBC Holdings and HSBC-US waived federal indictment, agreed to the filing of the information, and claimed to have accepted responsibility for HSBC's and its employees' criminal conduct.

1053. A July 13, 2012 article published by *Reuters* entitled "Special Report: HSBC's money-laundering crackdown riddled with lapses" reported that a HSBC-US compliance officer

had identified suspicious transactions involving Hezbollah, specifically Tajco and Kairaba Supermarket.

1054.   In December 2013, the Treasury Department announced that HSBC-US agreed to remit $32,400 to settle potential civil liability for three apparent violations of the Global Terrorism Sanctions Regulations, 31 C.F.R. Part 594. The fine reflected the fact that HSBC-US facilitated transactions in late 2010 and early 2011 worth about $40,000 that benefited Tajco.

## DEFENDANT HSBC-US'S AGREEMENT TO, PARTICIPATION IN, AND KNOWLEDGE OF THE CONSPIRACY, AND VIOLATIONS OF 18 U.S.C. § 2332d

1055.   As alleged in greater detail below, although HSBC-US periodically complained about HSBC-Middle East and HSBC-Europe's conduct, and proposed new procedures and policies for HSBC Group members that would have provided HSBC-US improved transparency, at all relevant times, HSBC-US was aware that the HSBC Defendants were participating in the Conspiracy to unlawfully transmit Iranian funds through U.S. banks (including HSBC-US), but HSBC-US took no measures to prevent HSBC-US from facilitating hundreds of millions of dollars of payments to Iran in violation of 18 U.S.C. § 2332d.   Accordingly, in addition to violating § 2332d, HSBC-US's conduct evidenced its agreement to continue participating in the Conspiracy despite its complaints, its knowledge or deliberate indifference to the Conspiracy's criminal objectives and purposes, and its commission of multiple overt acts.

1056.   As one key example of HSBC-US's failure to take substantive measures to ensure it would not facilitate the HSBC Defendant's provision of illegal material support and services to Iran, a July 12, 2001 e-mail to senior employees at HSBC-US contained a memorandum authored by HSBC Group Representative for Iran, John Richards. Richards's memorandum outlined the business opportunities members of HSBC Group were presented with in connection

with prospects to expand and grow  HSBC Group's  relationships with Iran, the CBI and Bank Melli, explaining:

    a.    "We have been approached by the Central Bank of Iran to take back their USD clearing business from Natwest.  In principal I am keen to do this but on the clear proviso that it can be done profitably and on a sustainable basis."

    b.    "One of our key objectives for the year is to develop HSBC's Asset Management activities in Iran and with the Central Bank now managing the oil price stabilization fund amounting to some USD10bn there is considerable scope for this. Obviously many foreign banks are chasing the same business and so we need to demonstrate some competitive or relational advantage. The proposal from the Central Bank was therefore not unwelcome…The Central Bank manages their transactions through Bank Melli London…"

    c.    "In summary if we can make this business independently profitable and sustainable the benefits that we can derive particularly from the Treasury Asset Management and Investment spin offs will be substantial."

1057. Richards's memorandum also demonstrates the HSBC Defendants' awareness that other foreign banks (including Defendants) were eagerly pursuing U.S. dollar clearing business with the CBI.

1058. On July 12, 2001, Denise Reilly, HSBC-US's Senior Manager in Payment Operations, sent an e-mail titled "Re: Bank Melli" to various senior HSBC-US employees in which she stated, "It was relayed to us that the Group (with the Backing of Bond)[the Chairman] was looking to significantly grow our presence in Iran." Reilly also explained that the "current lines of credit [for Iran] were reported to be $800m, trade lines of $150m and growth was anticipated in trade, cash management and internet banking." Thus, HSBC-US senior employees understood the significance to the HSBC Defendants of their Iranian business and specifically, the HSBC Defendants' relationship with Bank Melli.

1059. As early as 2001, senior HSBC-US payments-, compliance-, and business-managers were informed that Iranian U.S. dollar payments were being sent by HSBC-Europe through HSBC-US after references to Iran had been deleted.

1060. HSBC-US employees were also informed of an HSBC-Europe proposal to streamline the processing of U-turn transactions by omitting references to Iran so that the transactions would not be halted by the OFAC filter in the United States. Emails at the time show that senior HSBC-US officials expressed discomfort with the HSBC-Europe proposal, but took no other action to stop or prevent the activity already occurring.

1061. As noted above, a senior HSBC-US employee received an e-mail on June 28, 2001 titled **"Re: Bank Melli,"** which described HSBC-Europe's "usual method" of altering payment messaging and the reasons for doing so.

1062. Another example of HSBC-US' knowledge and acquiescence in the Conspiracy is memorialized in a November 14, 2002 memorandum entitled "COMPLIANCE-OFAC ISSUES IN GENERAL AND SPECIFIC TO IRAN" authored by HSBC-Europe's Multicurrency Payments Department Head Malcolm Eastwood ("the Eastwood Memorandum").

1063. The Eastwood Memorandum was sent to both HSBC-US and HSBC-Europe employees and forwarded to additional HSBC-US employees in separate emails.

1064. The Eastwood Memorandum discussed both HSBC's "cover payment method" of evading U.S. sanctions and the specific actions taken by HSBC to modify the contents of payment messages. In relevant parts, the Eastwood Memorandum stated:

> • "As the custodian of HSBC-Europe's payments operation I currently feel that we may be exposing ourselves to unnecessary and unacceptable Reputational and Operational Risk when we are handling payments originating from FIs [financial institutions] domiciled in or who are a local branch of an FI domiciled in an OFAC regulated country."

145

- "HSBC-Europe's historical practice has been to send these types of payments where the U Turn principal applies (ie funds are generally moving from an European bank to another European bank for the credit of an OFAC regulated entity) via the Cover Payment method. This means that the payment instructions received by HSBC-US contains no mention of the country or entity involved. My understanding is that his has been accepted practice for many years and that HSBC-Europe IBL hold accounts, some in USD for FIs domiciled in these countries ie Cuban, Iranian etc."

- "The Iranian banks continue to send us what I describe as conditional payment instructions which for HSBC-Europe require an element of amendment by ourselves. This introduces operational risk and under FATF principles we should not be amending these payments instructions. Acceptance of these items over many years means that we are bound by the precedents currently in place, and I believe that we need to break these precedents..."

- "[W]e need...[t]o agree a 'template' payment instruction for these U Turn Payments which can be used by PCM Sales and the RM team and sent to the Iranian Banks stipulating that payments must be formatted in this way, confirming that we will be sending these via the Serial method and that any deviation from this template will be at the Iranian Banks own risk."

- "Whilst I am told that there are significant business opportunities particularly with countries such as Iran there are also substantial Reputational and Operational Risks, not to mention financial losses associated with it."

1065. In addition, HSBC-US's OFAC filter occasionally stopped an Iranian-related transaction, sent by an HSBC Group affiliate, in which the identifying information had inadvertently been retained, demonstrating that undisclosed U-turns continued to be sent through HSBC-US correspondent accounts.

1066. HSBC-US employees were copied on similar memoranda issued by other of the HSBC Defendants during the relevant period. For example, a January 2003 memorandum circulated by HSBC-Middle East (and received by several HSBC-US employees) also noted that "[t]he Group now has an excellent relationship with all Iranian banks and some very larger Iranian corporates such as National Iranian Oil Co, National Petrochemical Co, National Iranian

146

Gas Co, National Iranian Steel Co, top Iranian insurance companies, Ministry of Power, Ministry of Post and Telecommunications, etc."

1067.   The memorandum also confirmed the HSBC Defendants' awareness that other non-Iranian banks were participating in the Conspiracy, stating:

- "It is believed that some service providers amend the payments to ensure Iran is not mentioned in the body of the payment instruction to their USD correspondent. This process minimizes the risk of payment being referred to OFAC."

- "Currently, it is estimated that Iranian banks issue up to 700 USD payments a day using their USD providers, mainly banks in the UK and Europe, which in turn use their New York USD correspondents to effect the payments."

- "[T]here is substantial income opportunity to sell a USD payments proposition to Iranian banks in view of the impending FATF regulations...The [requirements of the] new regulations...increases the risk of Iranian payments being held in the USA as they may fall foul of the OFAC regulations. The Iranian Banks have now prioritised this issue and are now actively seeking a solution from their banks, including HSBC."

1068.   An October 2003 document entitled "IRAN-STRATEGY DISCUSSION PAPER" circulated to senior HSBC-US employees further documented the HSBC Defendants' eagerness to facilitate funds transfers for Iran, noting: "One of the reasons to accelerate our process of engagement is to demonstrate, to the authorities within Iran, that we are committed to the development of their country. This is seen to be particularly important given the more aggressive/pragmatic approach to Iranian business adopted by French and German competitor banks."

1069.   Nevertheless, despite being copied on such memos, HSBC-US took no further action to stop the unlawful activities.

1070.   Even when HSBC-US blocked payments, it failed to take further action to ensure that other HSBC Defendants would not continue these practices. For example in late December

2002, HSBC-US's OFAC filter stopped and rejected a payment listing Bank Melli as the originator of the payment that contained a field that read, "**Do not mention our name in NY.**"

1071.   An internal HSBC-US email dated December 30, 2002 informed HSBC-US's compliance team about the payment, which once again confirmed HSBC's ongoing process of altering payments.

1072.   On June 13, 2003, HSBC-US's OFAC filter stopped another transaction, this time for $150,000. It included both a reference to Bank Melli and the words, "*do not mention our name.*"

1073.   In a June 16, 2003 email entitled "PLC-Re do not mention our name," HSBC-US compliance officers were notified about the June 13 blocked transaction and received additional confirmation of the HSBC Defendants' illegal practice of altering fields within Iranian payment messages for the express purpose of escaping detection in the United States.

1074.   During 2004, in furtherance of the Conspiracy, HSBC Group members sent approximately **7,000** Iranian transactions through U.S. dollar accounts in the United States without disclosing their source.

1075.   HSBC-US did not report any of the HSBC Defendants' illegal conduct to any of its regulators or to U.S. law enforcement at that time.

1076.   During 2005, in furtherance of the Conspiracy, HSBC-Europe and HSBC-Middle East together sent about **5,700** Iranian transactions through U.S. dollar accounts in the United States without disclosing their source.

1077.   On April 19, 2005, HSBC-US's OFAC filter again stopped a ($362,000) payment from Bank Melli because it contained the phrase "*do not mention our name in New York.*" HSBC-Europe re-submitted the payment on April 22, 2005, but HSBC-US stopped it again, this

time sending HSBC-Europe a SWIFT message requesting full disclosure of the name and address of the underlying originator and ultimate beneficiary.

1078.   In early May 2005, HSBC-US stopped a $6.9 million wire payment originating with Defendant Credit Suisse in Zurich because the payment details included the phrase "**Bank Melli Iran.**"

1079.   In fact, 44 of the payments stopped by HSBC-US's OFAC filter in May 2005 alone (inadvertently) disclosed Iranian involvement.

1080.   On June 3, 2005, HSBC-US informed Defendant HSBC Holdings that additional HSBC-Europe transfers in the amounts of $1.9 million and $160,000 had been stopped by HSBC-US due to the lack of full disclosure of the originator, beneficiary, and purpose of the payment.

1081.   HSBC-Europe responded that both payments were foreign exchange related, the originators were Bank Tejarat and Bank Melli, and the beneficiaries were Persia International Bank and Defendant Credit Suisse's Zurich office, respectively.

1082.   HSBC-US responded by requesting that HSBC-Europe follow up with the banks to obtain the names and addresses of the initial originators and ultimate beneficiaries, as well as confirmation of the underlying purpose of the payments.

1083.   According to information provided by Bank Melli through HSBC-Europe, the $160,000 payment denoted an internal transfer from Bank Melli's account with HSBC-Europe to Bank Melli's account with Defendant Credit Suisse's Zurich office.

1084.   From July 2005 to June 2006, HSBC-Middle East sent about 3,000 potentially legal U-Turn transactions through its U.S. dollar accounts in the U.S. of which about 95% did

not lawfully disclose the required data. The comparable figures for HSBC-Europe were 1,700 theoretically legal U-turn transactions of which **75%** did not lawfully disclose the required data.

1085. On November 23, 2005, in an email entitled "Cover payment processed to Credit Suisse re 'Bank Melli' – USD 100,000" an HSBC-US OFAC Compliance officer notified HSBC-Europe that, on November 7, 2005, a $100,000 transaction involving Bank Melli had been processed through HSBC-Europe's account at HSBC-US without transparent documentation:

> We are bringing this to your attention as this situation indicates that cover payment involving Iran are still being processed by PLC [referring to HSBC-Europe]. It was our understanding that Group payments involving Iran would be fully disclosed as to the originators and beneficiaries.

1086. In furtherance of the Conspiracy, from April 2006 through December 2007, about 50% of the estimated 700 Iranian payments sent by HSBC-Europe to U.S. dollar accounts at HSBC-US and elsewhere continued to not disclose their connection to Iran.

1087. During the relevant time period, HSBC-US knew that Iran was a designated State Sponsor of Terrorism, and that its U.S.'s dollar clearing operations were being used by the HSBC Defendants to facilitate unlawful payments on behalf of Iran in furtherance of the Conspiracy.

1088. As noted above, on December 11, 2012, Defendants HSBC Holdings and HSBC-US entered into a DPA with DOJ. DOJ issued a press release announcing the DPA's entry, including the fact that the DPA resulted in HSBC Holdings and HSBC-US admitting to AML and sanctions violations, as well as the fact that they would pay a t $1.256 billion USD forfeiture.

1089.   In addition the $1.256 forfeiture under the DPA , HSBC Holdings and HSBC-US also agreed to pay $665 million in civil penalties -- $500 million to the OCC and $165 million to the Federal Reserve – for these HSBC Defendants' AML program violations.

1090.   DOJ's press release quoted then-Assistant Attorney General Lanny Breuer as stating, "HSBC is being held accountable for stunning failures of oversight – and worse – that led the bank to permit narcotics traffickers and others to launder hundreds of millions of dollars through HSBC subsidiaries, and to facilitate hundreds of millions more in transactions with sanctioned countries. The record of dysfunction that prevailed at HSBC for many years was astonishing."

1091.   United States Attorney for the Eastern District of New York Loretta Lynch was quoted as stating, "HSBC's willful flouting of U.S. sanctions laws and regulations resulted in the processing of hundreds of millions of dollars in OFAC-prohibited transactions. Today's historic agreement, which imposes the largest penalty in any [Bank Secrecy Act] prosecution to date, makes it clear that all corporate citizens, no matter how large, must be held accountable for their actions."

1092.   New York County District Attorney Cyrus R. Vance Jr. was quoted in the press release as stating, "New York is a center of international finance, and those who use our banks as a vehicle for international crime will not be tolerated. ... Sanctions enforcement is of vital importance to our national security and the integrity of our financial system. The fight against money laundering and terror financing requires global cooperation, and our joint investigations in this and other related cases highlight the importance of coordination in the enforcement of U.S. sanctions."

## DEFENDANT BARCLAYS' AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

## BARCLAY'S ACTIONS IN FURTHERANCE OF A COMMON SCHEME TOGETHER WITH THE IRANIAN BANK CO-CONSPIRATORS

1093.   Until at least November 2006, Defendant Barclays maintained correspondent banking relationships with several of the Iranian Bank Co-conspirators, including Bank Melli.

1094.   Barclays is a member of SWIFT and has historically used the SWIFT system to transmit international payment messages with financial institutions around the world. Barclays originally processed USD payment messages through numerous global locations. Over time, Barclays consolidated its USD payment processing so that the payments were predominately processed at Barclays' Payment Processing Centre located in Poole, England ("Poole").

1095.   Barclay's international transfers of USD were routed through the United States in two ways using the SWIFT system: (a) via a serial payment (MT 103 for customer payments and MT 202 for bank-to-bank payments); or (b) via a cover payment (MT 103 plus a separate MT 202).

1096.   Barclays intentionally altered SWIFT messages when an Iranian entity was named in the payment message as well as when the payment message contained explicit instructions not to mention the name of the Iranian bank making the USD payment via the United States.

1097.   In both of these instances, Barclays' employees knew that if these payment messages were sent in an unaltered form, the transactions would be stopped and potentially blocked or rejected in the United States because of the information contained in the message. Barclays employees removed the "problematic" references, and the altered payment messages were thereafter sent to U.S. financial institutions.

1098. Barclays' New York branch maintained an automated filter that screened incoming payment messages against an OFAC list of sanctioned countries, entities, and individuals. This software was designed to identify potential positive matches to OFAC-sanctioned entities in USD payment messages being routed through the New York branch. Payments received by Barclays' New York branch involving sanctioned entities would have been subject to investigation by the bank and then, depending on the results of the investigation, permitted, rejected, or blocked. Because Barclays altered payment messages, its New York branch's OFAC filter did not identify payment messages involving Iran.

1099. Poole also maintained an automated filter. Poole's filter screened outgoing payment messages to the United States against an OFAC list.

1100. However, the stated function of the OFAC filter in Poole was to identify sanctioned entities in USD payment messages before the messages reached the United States, and as one employee emailed, to prevent "*the seizure of funds in the USA.*"

1101. Another practice Barclays developed to ensure that Iranian transactions would be processed through the United States absent detection, scrutiny, or blocking was to change the payment's routing. Barclays routinely cancelled serial payment messages being routed through the United States that contained references to an Iranian entity, knowing that the message could be blocked or rejected in the United States. These cancelled payment messages were thereafter resubmitted using the cover payment method. By using this bifurcated payment method, Barclays was able to disguise the beneficiary and ordering customer information from the automated systems of its New York branch and other U.S. correspondent banks. Barclays would thereby successfully route prohibited transactions through the United States.

1102. Barclays also used "sundry accounts" in furtherance of the Conspiracy. A sundry account is a bank's internal suspense account, and it is typically used for the legitimate purpose of recording miscellaneous items until an appropriate account entry is determined.

1103. Barclays, however, knowingly routed Iranian payments through Barclays' own sundry accounts, thereby disguising the true originator of certain USD payments. The effect of using its sundry account was that the automated systems of Barclays' New York branch identified these payments as originating from Barclays itself, when in reality the payments were from an Iranian entity. Barclays' improper and illicit use of its sundry accounts in this manner ensured that the transactions would evade detection and would be successfully processed by its New York branch.

## BARCLAY'S METHODS OF CONCEALING IRANIAN TRANSACTIONS

1104. Barclays knowingly and willfully engaged in conduct that caused its New York branch and other financial institutions in the United States to process payments in violation of U.S. sanctions. As part of this effort to evade U.S. sanctions, Barclays:

      a.      followed instructions from Iran and its agents not to mention their names in USD payment messages sent to the New York branch and to other financial institutions located in the United States;

      b.      routed USD payments through an internal Barclays sundry account, thereby hiding the payments' connection to Iranian entities;

      c.      amended or reformatted USD payment messages to remove information identifying Iranian entities; and

      d.      re-sent messages as cover payments to take advantage of cover payments' lack of transparency.

1105. Beginning in 1987, Bank Melli Iran instructed Barclays to process USD transactions in favor of Bank Melli's London branch by referencing only Bank Melli's account number at Midland Bank PLC without referencing Bank Melli's name. Bank Melli further

instructed Barclays to send separate instructions, which included full transaction details, to Midland Bank PLC and Bank Melli's London Branch.

1106.   In response, Barclays memorialized Bank Melli's instructions in a memorandum sent by its Head Office to Barclays' international offices, and, as early as the late 1990s, included them in Barclays' "List of Correspondents" ("LOC"), which contained information related to Barclays' correspondent banking relationships and assisted Barclays' employees in effectuating international payments.

1107.   Barclays' LOC contained instructions on how to process payments for both sanctioned and non-sanctioned banks with which Barclays had correspondent relationships. Over time the LOC grew to include instructions for payments related to several of Barclays' correspondent bank clients and included instructions to use cover payments when processing USD payments to the United States, omitting the name of U.S.-sanctions targets from the payment messages so that U.S. financial institutions could not identify the sanctions nexus of the payments.

1108.   In a November 1987 Head Office Circular, Barclays distributed payment instructions received from an Iranian bank directing Barclays "to amend the procedures governing the transfer of U.S. Dollars for any purpose in favour of our London branch" and to route such payments "without mentioning the name of our bank." The reason for, and effect of, these instructions was to disguise sanctioned entity payments from Barclays' correspondents in the United States so that such correspondents would unwittingly process the illegal payments.

1109.   Barclays' employees followed the instructions in the LOC when processing USD payments involving sanctioned banks, thereby ensuring that the name of the bank would not appear in any MT 202 cover payment messages sent to the New York Branch. For example, with

regard to USD payments sent on behalf of an Iranian bank, the LOC stated, "[t]he cover MT202 for the direct Payment Order to be arranged by the remitting Bank <u>without mentioning [the Iranian bank's]</u> name ...." (Underlining in original.)

1110. Barclays' LOC also contained instructions to contact the remitter or beneficiary for routing instructions for certain payments involving sanctioned entities. The general instructions for Iranian banks stated:

> USD PAYMENTS TO IRAN
> Certain payments may be blocked by the US Authorities. Therefore any branch with a USD transfer is advised to contact the remitter beneficiary or beneficiary's bankers to request specific routing instructions.

## BARCLAY'S UNDERSTANDING OF THE CRIMINAL NATURE OF THE CONSPIRACY

1111. In 2001, the then-Compliance Director, Business Banking prepared a memorandum regarding the LOC instructions, which was sent to the then-Head of Group Compliance, copying the then-Governance Director of Corporate Governance. The memorandum stated in relevant part that:

> For Iran and Libya the published internal procedures include directions to make transfers in US dollars which circumvent constraints and breach OFAC sanctions. Instructions for Iraq and Cuba are less prescriptive but would nevertheless constitute a 'workaround'.

1112. Barclays' outside counsel advised Barclays that entries for Iranian banks should be removed in favor of the following: "Only the information required by the transfer documents and no extraneous information should be provided."

1113. Barclays' standard operating procedures allowed and even educated its employees how to bypass both Poole's and the U.S. financial institution's OFAC filters to permit illegal payments.

1114.  Pursuant to these "standard" procedures, when the Poole filter identified a payment message that referenced an Iranian entity, that payment message was stopped for further review by Barclays' employees in Poole.

1115.  If the Poole-based employees found that the payment message referenced to an Iranian entity, they would follow one of the following procedures: (i) return the payment message to the remitting area via a pre-formatted fax cover sheet; (ii) alter or delete fields in the SWIFT message; or (iii) change the routing of the payment message from a serial payment to a cover payment in order to hide any connection to the Iranian entity.

1116.  The then-Senior Manager for Barclays Group Payments Industry Management in Poole explained that if the MT 202 payment message contained beneficiary information that caused it to be stopped by the OFAC filter in the U.K, that information was removed to ensure the payment was not stopped by the OFAC filter when resubmitted.

1117.  The same Senior Manager noted that he was aware that payment operators amended payment messages in order to facilitate U.S. dollar payments to Iran and that this was a "*common practice*" at Barclays.

1118.  As noted above, consistent with Barclays' "standard" procedures, when a payment was flagged by the Poole OFAC filter, Barclays' employees generally returned the flagged payment message to the original remitting bank. Barclays' employees used a specific fax cover sheet to advise the remitting area of Barclays that the payment message had been cancelled and would further identify the specific words in the payment message that had caused the message to be stopped by the Poole filter. The fax cover sheet contained the following language:

> OFAC ITEM: Wording below is contained in the message and does not comply with the Office of Foreign Assets Control regulations applicable to all payments sent via the U.S.A. Payments to U.S.A. must NOT contain the word listed below.

1119.   Subsequently, because Barclays was advising the remitting bank of the prohibited language, some of these payment messages would thereafter be re-sent by the remitting bank without the offending language. This deliberate omission enabled the payment message to pass through the Poole filter without being blocked and then to be processed by Barclays' New York branch and unwitting U.S. financial institutions.

1120.   In November 2001, the use of the fax cover sheet was identified by Barclays' internal auditors as problematic because (according to a Barclays internal audit report) "without adequate guidance the recipient of the fax advice may not be aware of the implications and may merely remove the offending text and re-submit the payment without any wider consideration." In early 2002, as a result of this internal audit report, the language of the fax template was re-worded in an attempt to mitigate these issues. The fax language was changed to:

> OFAC ITEM: Wording below is contained in the message and does not comply with the U.S.A. / U.K. / E.C. / U.N. Sanctions.

1121.   Despite the altered wording in the fax cover sheet, no implementing guidance was circulated, and Barclays' "standard" practices nevertheless continued, as did the resubmission of prohibited OFAC-sanctioned transactions with the offending text removed.

1122.   Barclays employees generated internal correspondence that documented Barclays' awareness and acceptance of the fact that transactions were being processed via MT 202 cover payments for the specific purpose of hiding the identity of Iranian entities in order to ensure that Barclays could continue its unfettered processing of payments involving Iranian entities through Barclays' New York branch. For example, one Barclays employee explained in an email:

> [W]e can get around [OFAC seizure] by sending only cover payments to US banks and then make MT103 direct to beneficiary's bank. The MT202 cover must not mention of [sic] the offending entity which could cause

funds to be seized. A good example is Cuba which the US says we shouldn't do business with but we do.

1123. Barclays' employees understood the advantage of using cover payments. The cover payment, with its limited information fields, was a better mechanism to process OFAC-prohibited transactions than using a more detailed serial payment. An employee noted in an email: "If we were to route the payment via the serial payment method ... the payment would clearly be seized by the US authorities" but by using cover payments, "the US Treasury [would] remain blissfully unaware of [the payment's] existence."

1124. In December 2002, internal correspondence also brazenly acknowledged Barclays' use of MT 202 cover payment messages to detour U.S. Iranian sanctions, stating:

> To circumvent US legislation, [Barclays is] currently rout[ing] US$ items for sanctioned institutions via unnamed account numbers, without mention of the sanctioned party. For customer transfers, payment cover is routed via MT202 to New York, naming only the account holding bank. A direct MT103 is them [sic] sent to the account holding bank. Further investigation suggests that we are carrying out this practice on behalf of four [Iranian bank] customers....

1125. A January 2004 report provided to Barclays' Group Risk Oversight Committee noted that a recent failure "illustrat[ed] why the whole sanctions process needs to be reviewed and brought up to date."

1126. In July 2004, an internal assessment of Barclays' payments processing explained:

> Cover payments are an issue for this project as they are effectively a way of by passing [sic] sanctions. . . . There is nothing in these payment messages [MT103 and MT202] that identifies them as linked for the purpose of screening.

1127. In April 2005, Barclays noted in an internal memo the risk of using MT 202 cover payments rather than MT 103 serial payments, and also acknowledged that other financial

institutions such as the International Bank Defendants facilitated payments for Iran in the same manner:

> Changing to different message types would be much more expensive to us. <u>Moral risk exists if we carry on using cover payments but that is what the industry does</u>. I[n] M[y] H[umble] O[pinion] we should carry on using cover payments and accept that there is a risk of these being used on occasion to hide true beneficiaries (who may or may not be sanctioned individuals or entities). (Emphasis added.)

1128. In the spring of 2006, Barclays' senior management learned that four cover payments involving sanctioned parties had been routed through Barclays' New York branch and were processed because the cover payments did not mention the sanctioned beneficiary or originator.

1129. Throughout this entire time period, Barclays knew that Iran was a designated State Sponsor of Terrorism and knew that it was facilitating unlawful payments on behalf of Iran in furtherance of the Conspiracy.

1130. On August 18, 2010, DOJ announced that Barclays had entered into a DPA with federal and New York State prosecutors, and agreed to forfeit $298 million dollars in connection with violations of IEEPA and TWEA. A criminal information was filed August 16, 2010, in the U.S. District Court for the District of Columbia charging Barclays with one count of violating IEEPA and one count of violating TWEA. Barclays waived indictment, agreed to the filing of the information, and has accepted and acknowledged responsibility for its criminal conduct.

1131. In the press release announcing the DPA, then-FBI Assistant Director-in-Charge Janice K. Fedarcyk was quoted as stating, "Barclays Bank has admitted a decade-long pattern of violating U.S. banking laws, and taking certain steps to conceal prohibited transactions. Corporate responsibility entails more than just acting discreetly on behalf of one's clients. It means, first and foremost, acting lawfully."

## DEFENDANT STANDARD CHARTERED BANK'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

1132.   SCB provided banking services to Iranian clients starting in or about 1993.

1133.   At some point thereafter, SCB began formulating plans to further the Conspiracy.

1134.   For example, on June 1, 1995 SCB's General Counsel wrote an e-mail advising the Bank's regulatory compliance staff, "if SCB London were to ignore OFACs regulations AND SCB NY were not involved in any way & (2) had no knowledge of SCB Londons [sic] activities & (3) could not be said to be in a position to control SCB London, then IF OFAC discovered SCB London's [sic] breach, there is nothing they could do against SCB London, or more importantly against SCBNY." He also instructed that a memorandum containing this plan was "highly confidential & MUST NOT be sent to the US."

1135.   SCB's role in the Conspiracy grew dramatically in early 2001, when the CBI approached SCB to act as its recipient bank for U.S. dollar proceeds from daily oil sales made by the National Iranian Oil Company ("NIOC").

1136.   An e-mail dated February 19, 2001 from SCB's Head of Inbound Sales, Institutional Banking, characterized CBI's solicitation of SCB as *"very prestigious"* because *"in essence, SCB would be acting as Treasurer to the CBI . . . ."*

1137.   In a follow up e-mail dated March 23, 2001, SCB's Group Legal Advisor wrote to its Product Manager, Corporate & Institutional Banking and its General Counsel (the e-mail was also forwarded to SCB's Group Head of Audit) that "our payment instructions [for Iranian Clients] should not identify the client or the purpose of the payment."

## SBC'S METHODS OF CONCEALING IRANIAN TRANSACTIONS

1138.   SCB and the CBI quickly developed operating procedures to mask the

involvement of Iranian entities in payment instructions sent to SCB's New York Branch ("SCB-NY"). When the beneficiary bank of a CBI payment was an Iranian bank, SCB London would send an MT 100 or MT 103 to the beneficiary bank's non-U.S., non-Iranian correspondent bank with full details of the Iranian beneficiary bank, and a *separate* MT 202 to SCB-NY with no mention of the Iranian beneficiary bank.

1139.  In fact, SCB London set up routing rules within its payment system to route all incoming SWIFT messages from the CBI to a repair queue, meaning that the payment was subject to manual review and processing by wire operators, to prevent SCB London from automatically processing outbound payment instructions cleared through the United States with a reference to the CBI in the payment message.

1140.  SCB London's payment processing team initially instructed the CBI to insert SCB London's BIC in field 52 (ordering institution) of its incoming payment instructions so that SCB's payment system would not populate that field with the CBI's BIC.

1141.  When the CBI failed to insert SBC's BIC, SCB London wire operators would manually change field 52 to reference SCB London's BIC in order to mask the CBI's involvement in the payments.

1142.  Inevitably, SCB's willingness to further the Conspiracy in this manner attracted more illicit business.

1143.  As early as February 2002, several additional Iranian banks approached SCB London to discuss the possibility of opening new accounts.

1144.  SCB London's Legal, Compliance, and Cash Management groups identified the need for written procedures for the operation of these additional Iranian banks' dollar-denominated accounts.

1145. SCB's central role in the Conspiracy was memorialized in an internal memorandum regarding the bank's procedures for processing payments sent through the United States from the Iranian banks.

1146. The document was entitled "Standard Chartered Bank Cash Management Services UK - Quality Operating Procedure: Iranian Bank Processing."

1147. It was first issued to SCB London staff on February 20, 2004 and included detailed instructions regarding the omission of the Iranian remitting bank's BIC:

> Ensure that if the field 52 of the payment is blank or that of the remitting bank that it is overtyped at the repair stage to a "." (Note: if this is not done then the Iranian Bank SWIFT code may appear - depending on routing - in the payment message being sent to [SCBNY]).

1148. In addition to inserting a "." in field 52, the memorandum also instructed staff to use cover payments to effect Iranian bank payments, which resulted in SCB London omitting any reference to the involvement of Iranian beneficiaries or beneficiary banks in SWIFT payment messages sent to SCB's New York branch.

1149. Approximately 60,000 payments related to Iran, totaling $250 billion were eventually processed by SCB as part of the Conspiracy.

1150. U.S. government regulators have concluded that "the vast majority of those transactions do not appear to have been violations of the [ITRs]." In other words, most (but not all) of the transactions could have qualified for a then-existing U-Turn exemption.

1151. But one of the central goals of the Conspiracy was to evade the transparency required by U.S. laws, and SCB enthusiastically furthered that goal.

1152. An e-mail dated March 9, 2003, from SCB's Head of Transactional Banking Solutions, UK/Europe Corporate & Institutional Banking to several of SCB's wholesale bank business managers indicates that SCB learned that another bank was "*withdrawing their*

*services*" with one of its Iranian client banks "primarily for reputational risk reasons."

1153.  In a memorandum accompanying the news of the aforementioned bank's reduction in Iranian business entitled "Summary of the Risks/Issues to be Addressed with Regard to Iranian Bank USD Clearing that Require Management Direction from Middle East Senior Management Team," the risks posed by additional Iranian business that might "trigger an action" from OFAC, "leaving SCB exposed, with potential reputational damage" were considered, but ultimately rejected in favor of pursuit of further Iranian business.

1154.  An October 15, 2003 e-mail from SCB's Manager, Cash Management Services, London to SCB's Product Manager, Corporate & Institutional Banking and its Head of Cash Management Services, UK (forwarded to SCB's Head of Legal & Compliance, Americas and Head of Legal for Corporate & Institutional Banking) outlined how the CBI was instructed to "send in their MT 202's with a [SCB London's business identifier code] as this is what we required them to do in the initial set up of the account.  Therefore, the payments going to NY do not appear to NY to have come from an Iranian Bank."

1155.  When SCB anticipated that its business with the Iranian Bank Co-conspirators, including Defendant Bank Saderat Plc, would grow too large for SCB employees to "repair" manually the instructions for New York bound wire transfers, SCB automated the process by building an electronic repair system with "specific repair queues," for each Iranian client.

1156.  SCB's payment "Quality Operations Procedures" manual contained instructions on how to manually "repair" or "over-type field 52 as [SCB London]" in SWIFT MT 202 payment message fields to hide CBI's role as originator of the MT 202 transactions SCB was processing.

## SCB MISLEADS U.S. REGULATORS ABOUT ITS ILLEGAL ACTIVITIES

1157.  In October 2004, SCB consented to a formal enforcement action and executed a written agreement with the N.Y. State Banking Department and the Federal Reserve Board of New York ("FRBNY"), which required SCB to adopt sound BSA/AML practices with respect to foreign bank correspondent accounts (the "Written Agreement").

1158.  The Written Agreement arose as a result of identified flaws in AML risk controls at SCB-NY. The Written Agreement required SCB to adopt sound AML practices with respect to foreign bank correspondent accounts.

1159.  The Written Agreement also required SCB to hire an independent consultant to conduct a retrospective transaction review for the period of July 2002 through October 2004.

1160.  The review was intended to identify suspicious activity involving accounts or transactions at, by, or through SCB's New York branch.

1161.  SCB retained Deloitte & Touche LLP ("D&T") to conduct the required independent review and to report its findings to the regulators.

1162.  On August 30, 2005 and again on September 17, 2005, D&T provided SCB confidential historical transaction review reports that D&T had prepared for two other major foreign banking clients that were under investigation for OFAC violations and money laundering activities.

1163.  D&T's reports contained detailed and highly confidential information concerning foreign banks involved in illegal U.S. dollar clearing activities.

1164.  SCB then asked D&T to delete from its draft "independent" report any reference to certain types of payments that could ultimately reveal SCB's illegal Iranian-related practices.

1165.  In an e-mail dated October 1, 2005, SCB's Group Head of Legal & Compliance,

Wholesale Bank, forwarding the <u>Quality Operating Procedure</u> to SCB's Group Head of Compliance and Regulatory Risk, its Group Legal Advisor and its Head of Financial Crime Risk Systems and Monitoring, observed that "read in isolation, is clearly ... designed to hide, deliberately, the Iranian connection of payments."

1166. A few days later, in an e-mail dated October 8, 2005, D&T's Global Leader of Anti-Money Laundering/Trade Sanctions Division wrote to SCB's Head of Compliance, that D&T had "agreed" to accede to SCB's request that D&T delete from its draft "independent" report any reference to certain types of payments that could ultimately reveal SCB's illegal Iranian U-turn practices because "this is too much and too politically sensitive for both SCB and Deloitte. That is why I drafted the watered-down version." (Emphasis added.)

1167. In a December 1, 2005 internal memorandum entitled "<u>Project Gazelle</u>," SCB's Group Head of Compliance and Regulatory Risk and its CEO in the United Arab Emirates wrote to SCB's Group Executive Director for Risk and its Group Head of Global Markets, acknowledging that SCB repair procedures for U-turn transactions "do not provide assurance that it does not relate to a prohibited transaction, and therefore SCB NY is exposed to the risk of a breach of sanctions."

1168. A February 23, 2006 internal memorandum entitled "Iranian Business" sent from SCB's General Counsel advising SCB's Audit and Risk Committee confirmed SCB's continued recognition that the Conspiracy was expressly designed to enable Iran, and Iranian banks (including Defendant Bank Saderat PLC) to evade U.S. detection of their transactions and confirmed that "certain US$ clearing transactions handled in London were processed with the name of the Iranian Bank excluded or removed from the 'remitter field'" despite the "requirement that due diligence in respect of 'U-turn' payments should be undertaken by our

office in New York."

## SCB'S NEW YORK BRANCH'S KNOWLEDGE OF THE CONSPIRACY AND PARTICIPATION IN THE COVER-UP

1169.   In September 2006, New York State regulators requested that SCB provide them with statistics on Iranian U-Turns SCB handled, including the number and dollar volume of such transactions for a 12-month period.

1170.   In response, SCB searched its records for 2005 and 2006.

1171.   In an e-mail dated September 26, 2006 from SCB's Project Manager for the Lookback Review to SCB's Head of Cash Management Services (2002-2005) and Head of Compliance (2005-2007) at SCB's New York branch, SCB's Head of Operations and Head of Cash SCB identified 2,626 transactions totaling over $16 billion (for Iranian banks).

1172.   Faced with the prospect of disclosing *billions* of dollars in Iranian transactions, SCB's Head of Compliance in New York was directed by his superiors at SCB instead to provide only four *days* of U-Turn data to regulators (masquerading as a 2-year log).

1173.   In October 2006, the CEO for SCB's U.S. operations e-mailed the SCB Group Executive Director in London:

> Firstly, we believe [the Iranian business] needs urgent reviewing at the Group level to evaluate if its returns and strategic benefits are . . . still commensurate with the potential to cause very serious or even catastrophic reputational damage to the Group. Secondly, there is equally importantly potential of risk of subjecting management in US and London (e.g. you and I) and elsewhere to personal reputational damages and/or serious criminal liability.

1174.   SCB's Group Executive Director responded (as quoted by an SCB New York branch officer): "You f---ing Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians."

1175.   In 2007, SCB successfully convinced the N.Y. State Banking Department and

FRBNY to lift their consent order on SCB based on the "watered down" D&T report and its other fraudulent disclosures.

1176.   As noted above, from approximately January 2001 through 2007, SCB transferred at least **$250 billion** through its New York branch on behalf of the Iranian Bank Co-conspirators, including Bank Melli and the CBI, as well as Defendant Bank Saderat PLC.

1177.   SCB's New York branch processed approximately 60,000 wire transfers on behalf of Iranian Bank Co-conspirators, with roughly half the transactions originating with SCB's London office and the other half with SCB's branch in Dubai, UAE.

1178.   In early 2009, after being contacted by U.S. law enforcement authorities, SCB conducted an internal investigation into its OFAC procedures.

1179.   As of 2011, however, even after its internal investigation and open law enforcement investigations commenced in the U.S., the New York State Banking Department still found that SCB's New York branch had:

> (a)   no documented evidence of investigation before release of funds for transactions with parties whose names matched the OFAC-sanctioned list; and
>
> (b)   outsourced the New York Branch's entire OFAC compliance process for the New York branch to Chennai, India, with no evidence of any oversight or communication between the Chennai and the New York offices.

1180.   On December 10, 2012 DOJ announced that SCB had agreed to forfeit $227 million to the Justice Department for conspiring to violate IEEPA, and that the forfeiture was part of DPAs SCB entered into with DOJ and the New York County District Attorney's office for illegally moving millions of dollars through the U.S. financial system on behalf of, *inter alia*, sanctioned Iranian entities. SCB also entered into settlement agreements with OFAC and the

Board of Governors of the Federal Reserve System, as well as with New York State Department of Financial Services regulators.

1181.   DOJ filed a criminal information charging SCB with one count of knowingly and willfully conspiring to violate IEEPA. SCB waived the federal indictment, agreed to the filing of the information and, according to DOJ's press release "accepted responsibility for its criminal conduct and that of its employees."

1182.   DOJ's press release announcing the DPA quoted then-Assistant Attorney General Lanny Bruer as stating, "[f]or years, Standard Chartered Bank deliberately violated U.S. laws governing transactions involving Sudan, Iran, and other countries subject to U.S. sanctions. The United States expects a minimum standard of behavior from all financial institutions that enjoy the benefits of the U.S. financial system.   Standard Chartered's conduct was flagrant and unacceptable.  Together with the Treasury Department and our state and local partners, we will continue our unrelenting efforts to hold accountable financial institutions that intentionally mislead regulators to do business with sanctioned countries."

1183.   New York County District Attorney Cyrus Vance Jr. stated in the press release, "Investigations of financial institutions, businesses, and individuals who violate U.S. sanctions by misusing banks in New York are vitally important to national security and the integrity of our banking system.  Banks occupy positions of trust.  It is a bedrock principle that they must deal honestly with their regulators.  I will accept nothing less; too much is at stake for the people of New York and this country. These cases give teeth to sanctions enforcement, send a strong message about the need for transparency in international banking, and ultimately contribute to the fight against money laundering and terror financing."

1184.  On August 19, 2014, Benjamin M. Lawsky, New York State's Superintendent of Financial Services, announced an order regarding SCB's failures to remediate AML compliance problems as required in SCB's 2012 settlement with the New York State Department of Financial Services (NYDFS).

1185.  Under the August 2014 NYDFS order, SCB was required to suspend dollar clearing through SCB's New York branch for high-risk retail business clients at its SCB Hong Kong subsidiary; exit high-risk client relationships within certain business lines at SCB's branches in the UAE; not accept new dollar-clearing clients or accounts across its operations without prior approval from NYDFS; pay a $300 million penalty; and take other remedial steps.

1186.  In addition, according to an October 29, 2014 article in *The New York Times*, federal and New York County prosecutors have reopened their investigation into SCB. *The New York Times* reported that prosecutors are questioning whether SCB failed to disclose the extent of its wrongdoing to the government, thus imperiling SCB's 2012 settlement.

### DEFENDANT ROYAL BANK OF SCOTLAND N.V.'S ("ABN AMRO") AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

1187.  In May 1995, top officials of ABN AMRO in Amsterdam sent an e-mail to the entire management of ABN AMRO in Europe, Asia, South America, Africa, the Caribbean, and North America, advising them that any financial transactions in USD undertaken for or on behalf of Iranian persons or banks were subject to seizure or blocking in the United States.

1188.  Soon after President Clinton signed the Executive Order implementing sanctions against Iran in May 1995, Iranian banks sought the services of ABN AMRO and other banks in aiding Iran to circumvent U.S. laws. ABN AMRO employees were aware of these requests, discussed these requests with the other facilitating bank, and thereafter approved of ABN AMRO

conducting the illegal transactions, contrary to the advice of outside counsel retained by ABN AMRO that its involvement in such transactions would potentially violate U.S. law.

1189. From approximately 1995 until in or about 2005, ABN AMRO conspired with the Iranian Bank Co-conspirators (including the CBI, and Defendant Bank Saderat PLC) and their agents to conceal evidence of ABN AMRO's financial transactions from the U.S. government, law enforcement, and intelligence agencies, as well as U.S. financial institutions charged with detecting and blocking certain Iranian transactions.

1190. ABN AMRO was, at the same time, aware that numerous other non-Iranian financial institutions were engaged in the Conspiracy to conceal evidence of the Iranian Bank Co-conspirators' financial transactions from the U.S. government, law enforcement and intelligence agencies, as well as U.S. financial institutions charged with detecting and blocking certain Iranian transactions.

1191. From approximately 1995 until in or about 2005, ABN AMRO furthered the Conspiracy by methodically removing and/or falsifying payment messages on its funds transfer systems to disguise the movement of hundreds of millions of dollars illegally through the U.S. financial system on behalf of the Iranian Bank Co-conspirators (including Bank Melli Iran). In furtherance of the Conspiracy, ABN AMRO and the Iranian Bank Co-conspirators developed methods by which ABN AMRO would format USD payments so that such payments would evade U.S. sanctions and detection by automated filters used by financial institutions in the United States.

1192. When ABN AMRO employees received payment messages from the Iranian Bank Co-conspirators that contained words that could trigger a U.S. bank's OFAC filter, ABN AMRO

would manually alter or amend the messages to ensure that the transaction would go undetected by financial institutions in the United States.

1193. ABN AMRO thereby caused financial institutions in the United States to process transactions involving the Iranian Bank Co-conspirators that U.S. financial institutions would not otherwise have processed.

1194. In order to bypass the U.S. sanctions, certain offices, branches, and subsidiaries of ABN AMRO also altered letters of credit and foreign exchange transactions by replacing the names of the Iranian Bank Co-conspirators (including Bank Melli Iran) on those transactions.

## DEFENDANT ROYAL BANK OF SCOTLAND N.V.'S METHODS OF CONCEALING IRANIAN TRANSACTIONS

1195. Beginning as early as 1995 and continuing until in or about 2005, ABN AMRO undertook various acts in furtherance of the Conspiracy. For example:

> The Dubai branch of ABN AMRO created procedures and guidelines to facilitate the processing of prohibited USD transactions. One section of the ABN AMRO payment manual entitled "Special Conditions" listed specific instructions on how to effectuate these payments and avoid (U.S.) OFAC filters. A specific instruction from this manual stated: "Payments by order of Iranian Banks ...maintaining accounts with ABN, Dubai are to be handled with extra care to ensure the wordings "Iran" etc. are not mentioned in the payment due to OFAC regulations."

1196. In June 1995, an Iranian bank co-conspirator requested of ABN AMRO officials in Dubai that ABN AMRO act as a conduit for all USD transactions for that Iranian bank in Dubai. The Iranian bank requested that all of its USD payments be routed through or be issued in the name of ABN AMRO and carry no reference to the fact that these payments were issued on its behalf, and that all of its USD receipts would come into ABN AMRO's account.

1197. Thereafter, ABN AMRO undertook various specific acts to conceal its actions on behalf of the Iranian Banking Defendant.

1198. ABN AMRO instructed the Iranian Bank Co-conspirators to include the code word "SPARE" in their payment messages through the bank so ABN AMRO could first segregate these messages from normal message payment processing and then amend the message by removing/altering any potentially problematic text. The payment message would then be stopped by ABN AMRO, routed into a special queue, and manually altered to avoid any OFAC filters. In this manner, ABN AMRO assisted sanctioned entities and ensured the processing of USD transactions by formatting payment messages so they would not be rejected or blocked by OFAC filters at financial institutions in the United States.

1199. ABN AMRO added to its payment manuals the "Special Conditions" that were to be used on behalf of the Iranian Bank Co-conspirators in order to evade detection and circumvent the laws of the United States.

1200. ABN AMRO used these same or materially similar procedures with respect to letters of credit, and the processing of USD checks and traveler's checks.

1201. ABN AMRO and the Iranian Bank Co-conspirators knew and discussed the fact that without such alterations, amendments, and code words, the automated OFAC filters at clearing banks in the United States would likely halt most of the payment messages and other transactions, and, in many cases, would reject or block the sanctions-related transactions and report the same to OFAC.

1202. ABN AMRO also removed the names, BICs, and any other identifying information of the Iranian Bank Co-conspirators in the payment messages sent to ABN AMRO's U.S. correspondent banks.

1203. In order to circumvent U.S. sanctions, certain Iranian Bank Co-conspirators requested that ABN AMRO omit their names and BICs from payment messages sent by ABN

AMRO to ABN AMRO's U.S. correspondent banks. ABN AMRO complied with the requests of these Iranian Bank Co-conspirators and omitted their names and identifiers in order to help bypass the OFAC filtering mechanisms of U.S. financial institutions.

1204. ABN AMRO also used MT 202 SWIFT cover payments to shield the identities of the Iranian Bank Co-conspirators and the Iranian Bank Defendant. Instead of using serial MT 103 payment messages that contain the names and details of counter-parties to transactions, ABN AMRO began using MT 202 cover payment messages expressly for the purpose of avoiding revealing the identity of the ordering customer and beneficiary party for USD payments sent through financial institutions in the United States.

1205. The CBI coordinated with ABN AMRO's Central Bank Desk in Amsterdam regarding the procedure to be followed for repayment of USD deposits to their accounts with European Banks in London. This procedure stipulated that payment messages sent to U.S. clearing banks for payment of USD funds to the CBI should not contain any reference to the CBI or any other reference relating to Iran.

## ROYAL BANK OF SCOTLAND N.V.'S UNDERSTANDING OF THE CRIMINAL NATURE OF THE CONSPIRACY

1206. In or about June and July 1995, officials at ABN AMRO's Amsterdam Headquarters and New York offices were advised by outside U.S. counsel that the proposal by Iranian banks for ABN AMRO to serve as a conduit or means to bypass and avoid the sanctions imposed by the United States upon Iran risked breaching U.S. law.

1207. An internal memorandum generated by ABN AMRO at the time stated "[t]he fund transfer mechanics proposed by [the first Iranian Bank] are an attempt to circumvent the Iranian trade embargo. Given that violations of the Executive Order and OFAC regulations carry substantial penalties, not to mention the negative publicity, the [first Iranian Bank] proposal must

be strictly scrutinized and ABN AMRO must weigh the risks before proceeding with any such transfers."

1208. Also in June 1995, another Iranian bank co-conspirator sent a written communication to certain banks in the UAE and the Iranian Bank's correspondent banks instructing those banks to undertake USD payments for the Iranian bank in the name of a European financial institution "WITHOUT MENTIONING OUR BANK'S NAME" to defeat and circumvent the sanctions imposed upon Iran by the United States.

1209. Like the first request, the Iranian bank co-conspirator's request was forwarded to officials located in several departments of the Amsterdam Headquarters of ABN AMRO.

1210. As early as 1997, in an internal strategy paper for the Middle East and Africa region named "Desert Spring," prepared by ABN AMRO's Middle East and Africa Regional office, ABN AMRO described a "product initiative" with "opportunities in LC discounting for Central Bank and Bank Melli, Iran" and "deposit mobilization from Iranian nationals."

1211. On or about February 5, 2000, an official at the Dubai branch of ABN AMRO wrote to a Regional Director of one of the Iranian Bank Co-conspirators assuring him that ABN AMRO would take care of carrying out the scheme to evade and defeat the U.S. sanctions. The ABN AMRO official's note stated: "[w]e understand the special nature of your US$ transactions and will ensure that all operations departments concerned are properly briefed regarding this, as well."

1212. A July 19, 2003 e-mail written by John Ciccarone, Head of ABN AMRO's USD Payments Product Management at ABN AMRO's New York branch, discussed the use of MT 202 cover payments, stating: "There is no way the payment will get stopped as all NY ever sees is a bank to bank instruction."

1213.  In a July 25, 2003 e-mail, John Philbin, Senior Relationship Banker for Iranian banks, wrote to Mr. Ciccarone:

> Surely Iran is the most obvious case in point for these structures. Twenty-four years of US sanctions and OFAC listing and Iran continues to sell oil and gas in USD. And, it imports and pays in USD as well. All of this is clearly done though accounts in Europe and elsewhere. There is a very good case to be made for getting an overall acceptance that when issues are purely US, we should not be a part of it. In fact we should see it as an opportunity. OFAC is not the Bible for money laundering (e.g. Cuba is prominent on OFAC). It is a tool of broader US policy. We therefore need to distinguish between US foreign policy on the one hand and AML/anti-Terrorism on the other, however much the US administration may wish to insist that the two are closely linked. It is well worth working on a solution for clients who find themselves in this position or who fear (Syria, Saudi Arabia) that they, one day soon might find themselves there.

1214.  Also in 2003, Diane Perrin, a member of ABN AMRO's Group Compliance team at the Defendant's Amsterdam Head Office, stated that "as a European Institution, we do not comply with US Sanctions because those sanctions are politically motivated."

1215.  A memorandum entitled "Proposal for Establishing a Representative Office in Tehran, Iran" also drafted in 2003 by ABN AMRO's Country Representative in the UAE, Jan Willem van den Bosch, similarly stated:

> The Central Bank of Iran is faced with difficulties for USD denominated clearing transactions due to sanctions imposed by the US. The OFAC filter impounds all Iran related payments and receipts in the US. The Swiss and other European Banks have worked out a solution for this. The payment instructions are sent directly to the beneficiary's bank and cover payment is made to the beneficiary bank's US Correspondent as inter-bank payments.

1216.  Bosch later coordinated the meeting in Dubai between ABN AMRO's Managing Board Member and CFO Tom De Swann and top functionaries of the CBI, including Aziz Farrashi, the CBI's Director General.

1217. During the meeting with the Iranians, ABN AMRO officials discussed the establishment of the Representative Office by ABN AMRO in Tehran and further business development, including the acceptance of USD deposits by the Central Bank of Iran's Desk in Amsterdam.

1218. In an April 20, 2004 e-mail, Mr. Philbin, the Senior Relationship Banker at ABN AMRO for Iranian banks, mentioned the possibility of using a Jersey Special Purpose Vehicle as a way to circumvent OFAC restrictions:

> Mike Louwerens [ABN AMRO's Vice President and Senior Analyst of Country Risk Management Department] mentioned this to me today and sent the attached. The structure below is very interesting and could have applicability for the banks in Iran as well. But whether that is the case or not, what is clear is that this structure envisages our making and receiving payments in USD which will clear through AA in New York. And for which Mike Bowman sees no objection. I am sending a second note in which OEM (Maarten Seckel) gives a go ahead based on Bowman's nihil obstat. The Way for our doing significant business with the Iranian banks in cash may yet be clear.

## ABN AMRO MISLEADS U.S. REGULATORS ABOUT ITS ILLEGAL ACTIVITIES

1219. On July 23, 2004, ABN AMRO and the New York Branch entered into a Written Agreement with the Federal Reserve Banks of New York and Chicago (collectively, the "Reserve Banks") and other regulators that had detected deficiencies at ABN AMRO's New York Branch relating to AML policies, procedures, and practices that included:

> a pattern of previously undisclosed unsafe and unsound practices warranting further enforcement action.... A. ABN AMRO lacked adequate risk management and legal review policies and procedures to ensure compliance with applicable U.S. law, and failed to adhere to those policies and procedures that it did have. As a result, one of ABN AMRO's overseas branches was able to develop and implement "special procedures" for certain funds transfers, check clearing operations, and letter of credit transactions that were designed and used to circumvent the compliance systems established by the Branches to ensure compliance with the laws of the U.S. In particular, the "special procedures" circumvented the Branches' systems for ensuring compliance with the

177

regulations issued by the Office of Foreign Assets Control ("OFAC") (31 C.F.R. Chapter V).

1220.  U.S. regulators also found that "[p]rior to August 1, 2004, the New York Branch processed wire transfers originated by Bank Melli Iran, a financial institution owned or controlled by the Government of Iran. The payment instructions on the wire transfers had been modified by one of ABN AMRO's overseas branches such that any reference to Bank Melli Iran was removed."

1221.  U.S. regulators also found that "[p]rior to August 1, 2004, the Branches advised a number of letters of credit issued by Bank Melli Iran. The letters of credit had been reissued by one of ABN AMRO's overseas branches such that any reference to Bank Melli Iran was removed."

1222.  As DOJ later concluded: "Each year between and including 1996 and 2004, ABN caused ABN's U.S. affiliate to file false, misleading, and inaccurate Annual Reports of Blocked Property to OFAC. In each of those reports, the U.S. affiliate of ABN certified to OFAC that all information provided was accurate and that all material facts in connection with the report had been set forth."

1223.  Nonetheless, in September 2004, Michael Louwerens, ABN AMRO's Vice President and Senior Analyst of Country Risk Management Department, travelled to Iran at the behest of ABN AMRO's Head Office and reported back that he had communicated with the Chief Representative of HSBC in Tehran (presumably John Richards) and concluded that ABN AMRO's USD payments procedures (to conceal Iranian financial activity) were in line with prevailing market practices of HSBC and other banks.

1224.  On May 10, 2010, DOJ issued a press release announcing that ABN AMRO's successor entity, Defendant Royal Bank of Scotland N.V., had agreed to forfeit $500 million to

the United States in connection with a conspiracy to defraud the United States, to violate IEEPA, TWEA, and the Bank Secrecy Act ("BSA").

1225. In connection with a DPA ABN AMRO entered into, a criminal information was filed in U.S. District Court for the District of Columbia charging ABN AMRO with one count of violating the BSA and one count of conspiracy to defraud the United States and violate IEEPA and TWEA. ABN AMRO waived indictment, agreed to the filing of the information, and, according to the press release "accepted and acknowledged responsibility for its conduct."

1226. According to the criminal information, ABN AMRO's participation in the conspiracy continued "until in or about December 2007." Prior to that time, ABN AMRO willfully and knowingly conspired, *inter alia*, "to engage in financial transactions with entities affiliated with Iran ... in violation of the International Emergency Economic Powers Act, Title 50, United States Code, Section 1705, and regulations and embargoes issued thereunder...."

1227. The criminal information confirmed that ABN AMRO was an active participant in the Conspiracy.

1228. The criminal information stated that: "It was part of the conspiracy that the defendant discussed with the co-conspirators how to format United States Dollar message payments so that such payments would avoid detection by automated filters used by financial institutions in the United States and thus evade United States sanctions."

1229. The criminal information further stated that: "It was part of the conspiracy that the defendant removed names and references to the co-conspirators in United States Dollar message payments routed through the United States."

1230. The criminal information further stated that: "It was part of the conspiracy that the defendant altered the names and references to the co-conspirators in United States Dollar

message payments routed through the United States."

1231. The criminal information further stated that: "It was part of the conspiracy that the defendant instructed the co-conspirators to use code words in United States Dollar payment messages."

1232. The criminal information further stated that: "It was part of the conspiracy that the defendant created a special processing queue to manually and materially alter any of the co-conspirators' United States Dollar message payments that were to be routed through the United States."

1233. The criminal information further stated that: "It was part of the conspiracy that the defendant created "Special Conditions" in the defendant's payment manuals in order to process any co-conspirators' United States Dollar transactions."

1234. Finally, the criminal information further stated that: "It was part of the conspiracy that the defendant caused its United States affiliates to submit materially false and misleading reports or statements to the United States Department of the Treasury, OFAC."

## DEFENDANT CREDIT SUISSE'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

1235. Like the other Defendants in this Action, Credit Suisse's Zurich office developed a standard procedure of structuring payments to avoid disclosing the true originators and/or beneficiaries of Iranian transactions it was transacting through the United States, deleting or omitting certain information when transactions were to be processed through the United States, and providing incorrect information in wire transfer instructions executed through the United States on behalf of U.S.-sanctioned individuals and entities.

1236. These "standard" procedures were embodied in internal directives, memoranda, and e-mails involving, among others, a Credit Suisse Bank Payments Sector Head, Credit

Suisse's Treasury and Trade Finance Departments, the Head of Credit Suisse's Iran Desk, and in e-mails between Credit Suisse and its Iranian bank clients.

1237.  Since at least the mid-1990s, when it first agreed to assist Iran in carrying out the Conspiracy, Credit Suisse's Iran Desk began adding internal warnings to the accounts of its Iranian bank clients, instructing Credit Suisse employees: *"Do not mention the name of the Iranian bank in payment orders*." Such warnings ensured that payment orders given by the Iranian Bank Co-conspirators would not be processed automatically, but rather would be manually reviewed, "corrected" if necessary and effectuated by Credit Suisse employees.

1238.  For example, in June 1995, the Credit Suisse representative office in Dubai, United Arab Emirates, issued a memorandum recognizing Iran and the Iranian bank's general scheme to ensure that *any* foreign banks the Iranian Bank Co-conspirators did business with masked their transactions, and advised:

>Following the decision by the American authorities to declare a unilateral embargo against the Islamic Republic of Iran on April 30th, (an Iranian bank) approached Credit Suisse to open (a type of correspondent banking account for U.S. dollar transactions). Crucial to them was that the name of the bank would not be mentioned on the transfer orders... Subsequently, (the Iranian bank) was informed that though payments in such a way are basically feasible, to omit the name of the bank could lead to some problems. Meanwhile, operations through this account have started... Some transfers have been rejected by the American banks as the name of (the Iranian bank) appears under the rubric 'Ordering Bank.' Question: a) what can be done to avoid this?

1239.  Almost immediately after President Clinton issued Executive Orders Nos. 12957, 12959, and 13059, which strengthened existing U.S. sanctions against Iran, the Iranian Bank Co-conspirators began requesting that Credit Suisse omit their names and BICs from payment messages Credit Suisse sent to its U.S. correspondent banks.

1240.  Credit Suisse complied with the Iranian Bank Co-conspirators' illegal requests

and omitted their names and identifiers in order to help bypass U.S. financial institutions' sanctions filters.

1241.   After a 1998 corporate reorganization, in order to further its ongoing efforts to evade U.S. sanctions and ensure that other U.S. financial institutions would automatically process this new stream of payments, Credit Suisse notified its Iranian clients about the change in USD clearing from Credit Suisse First Boston AG ("CSFB") to third-party U.S. correspondents and provided them with a pamphlet entitled "How to transfer USD payments."

1242.   The pamphlet provided detailed payment instructions on how to avoid triggering U.S. OFAC filters.

1243.   In a 1998 letter to an Iranian bank co-conspirator explaining the transfer of its USD clearing services to Bank of New York, Credit Suisse wrote:

> In order to provide your esteemed institution with our clearing services in U.S. Dollars, we have introduced a procedure to facilitate your USD payments through our clearing system. The change of our USD-clearer to Bank of New York, New York, will not affect our mutual relationship on any clearing transaction in U.S. Dollars as long as the established procedure will be followed.

1244.   Beginning as early as 1995 and continuing until 2005, Credit Suisse, both internally and in coordination with the Iranian Bank co-conspirators, created procedures and guidelines to facilitate the processing of prohibited USD transactions by its U.S. correspondent banks, primarily Bank of New York.

1245.   By using Credit Suisse's internal processing system, employees manually keyed in "Order of a Customer" when Iranian payments had to be processed as serial payments through U.S. banks.

1246.   This procedure was promoted at Credit Suisse, as demonstrated by an email from a Team Leader in the Bank Payments Unit:

> In order to put an end, once and for all, to the discussions regarding the
> processing of USD payment orders of Iranian banks, I have worked out
> various examples that are to be considered binding for everyone.

1247.   Attached to the email were several screenshots of Credit Suisse's payment application illustrating how to format payment messages to ensure that they would pass through the U.S. financial institutions undetected by U.S. OFAC filters.

1248.   For example, one such screenshot showed all incoming payment message listing an Iranian bank as the ordering institution in SWIFT payment message field "52" and contained the following explicit instructions: "Population of field 52 with 'one of our clients' in case of serial payments via the US."

1249.   A second screenshot showed an incoming payment with the reference "*without mentioning our banks [sic] name*" in field 52 and contained the following instructions: "Population of field 52 with 'one of our clients' in case of serial payments."

1250.   Until 2004, Credit Suisse's use of "**Order of a Customer**" was its standard procedure for processing bank payment messages involving Credit Suisse's Iranian customers.

1251.   Credit Suisse's internal communications also reveal a continual dialogue about evading U.S. sanctions spanning approximately a decade, assessing how to better process Iranian transactions in order to promote and increase business from existing and future Iranian clients.

1252.   In February 1999, Credit Suisse's Iran Desk added internal warnings to the Customer Information Files (or "CIFs") it maintained for the accounts of its Iranian bank customers, expressly directing Credit Suisse employees: "*Do not mention the name of the Iranian bank in payment orders.*"

1253.   Credit Suisse documented similar directives in subsequent years. For example in 2002, another warning was loaded in the CIF that likewise stated: "FOR USD-PAYMENTS

OUTSIDE CREDIT SUISSE/CS FIRST BOSTON DO NOT MENTION THE NAME OF THE IRANIAN BANK."

1254. Credit Suisse later decided to remove warnings from the CIFs and replaced them with long-term instructions concerning Iranian entities that instructed: *"Execute USD payment orders always with direct order and cover payment."* These instructions explained that they were intended to ensure (according to Credit Suisse's internal documentation) that "an Iranian origin will never be named in USD payments carried out for Iranian banks (because of the US sanctions)!"

1255. An internal Credit Suisse memorandum dated March 12, 1999 stated:

> Payment orders in USD can only be paid via the American clearing, if the name of the Iranian party is not mentioned (US sanctions). Otherwise, the amounts are returned by the American banks. Even though corresponding warnings have been loaded, there (sic) almost every week cases that are processed incorrectly by us.

1256. Between 2000 and 2004, Credit Suisse's Iran Desk provided similar instructions to its Iranian Bank co-conspirator clients via a standard letter, which stated in part: *"The most important issue is that you and/or your* correspondents do not mention your good bank's name in field 52."

1257. Credit Suisse's Iran Desk also informed Iranian Bank co-conspirator clients that Credit Suisse would utilize cover payments to effect payments to or through the United States, stating in one memorandum, for example, "[o]ur payment department will stop all USD payments initiated by your fine bank in any case and shall be effected [by]... 'Direct payment order and cover payment order.'"

1258. In order to prevent straight-through processing of all payment orders sent by Iranian Bank Co-conspirators, Credit Suisse configured its payment system to interdict the

payments for manual review. Credit Suisse employees then reviewed the payments to ensure that they contained no references to Iran. If such references were detected, Credit Suisse employees would either delete the reference or contact the Iranian Bank Co-conspirators to request further instructions.

1259. Over time, Credit Suisse employees developed practices to omit information on the involvement of Iranian Bank co-conspirators, including:

(a)     Entering in an empty field, or replacing the name of the Iranian Bank Co-conspirators with, **"Order of a Customer"** or a similar phrase instead of the ordering institution in payment messages;

(b)     Forwarding payment messages received from Iranian Bank Co-conspirators falsely referencing "Credit Suisse" or Credit Suisse's BIC code instead of an Iranian bank as the originating institution. For example, a November 2000 email circulated by a team leader in Credit Suisse's Bank Payments Unit contained screenshots of an incoming payment order from an Iranian bank co-conspirator in which Credit Suisse was listed as the ordering institution in field "52" of the SWIFT payment message. The instructions were to make no changes to the misleading information in the SWIFT message's field "52" for serial payment messages made to U.S. financial institutions;

(c)     Inserting "Credit Suisse" as the ordering institution in payments originating with an Iranian bank co-conspirator;

(d)     Removing references to Iranian names, addresses, cities, and telephone numbers from customer payments;

(e)     Substituting abbreviations for Iranian customer names. For example, in an April 16, 2003 email, the Head of Credit Suisse's Iran Desk wrote to the Credit Suisse representative office in Tehran, *"entry to their account works when account number plus XXX is stipulated as beneficiary. What is also important of course is that applicant will give details of final beneficiary as reference for the beneficiary, then it should work"*); and

(f)     Converting MT 103 SWIFT Messages to MT 202 SWIFT Messages to hide the details of Iranian transactions, and using MT 202 cover payment messages approximately 95% of the time to facilitate outgoing customer payments involving Iran or Iranian parties.

1260. A Credit Suisse internal email dated September 24, 2003, sent from a team leader

185

in Customer Payments to a Sector Head within Customer Payments, described the process for

Credit Suisse's Iranian USD processing:

> The procedure is identical for all Iranian banks: 1) We attempt to send all
> USD payments directly to the bank, of the beneficiary. Only cover
> payments are made through the US. In such cases, the ordering institution
> is not disclosed. 2) Should 1) not be possible (if the beneficiary bank is an
> American bank, or if no Swift connection or no correspondent was
> named), then the payment will be made though America. We make sure
> that the ordering institution is not mentioned (this has been programmed
> into the system as a default) and that the ordering customer has no
> connection to 'Iran'. 3) Should 1) and 2) not be possible, then the payment
> order will be forwarded to Investigations for further clarifications with the
> ordering institution.

1261.  In addition, Credit Suisse actually instructed its Iranian bank co-conspirator

customers how to format USD payments so that such payments would evade U.S. sanctions and

detection by automated filters used by U.S. financial institutions.

1262.  Payment instructions included a letter from Credit Suisse's Iran Desk to an

Iranian customer dated October 16, 2003, that stated: "This is to provide you our

recommendation for the entry of funds how to handle bank-to-bank payments on your account

with Credit Suisse and the following procedures should be applied in order to avoid any

difficulties."

1263.  In December 2003, an Iranian bank asked Credit Suisse for an additional USD

account identifying the Iranian beneficiary bank only by a designated abbreviation (first letter of

each word constituting the bank's name, together with the abbreviation commonly used for a

type of legal entity, i.e., PLC).

1264.  On January 28, 2004, Credit Suisse confirmed that it had opened the requested

account, writing to the Iranian bank, "Reference is made to the various conversations and your

email, dated December 18, 2003 wherein you asked us to open a new USD account...Now, we

would like to confirm the account number ...."

1265.  In addition, Credit Suisse promised the Iranian Bank Co-conspirators that no messages would leave Credit Suisse without being hand-checked by a Credit Suisse employee to ensure that they had been formatted to avoid U.S. OFAC filters.

1266.  Credit Suisse also took a further step in the Conspiracy beyond *training* the Iranian Bank Co-conspirators how to format their payment messages to evade the OFAC filters; it also gave Iranian Bank Co-conspirators materials to use in training *other* banks on how to prepare payment messages to evade U.S. OFAC filters and sanctions regimes.

1267.  In August 2003, Credit Suisse reached an agreement with the London branches of a number of Iranian Bank Co-conspirators to take over the banks' London branches' USD clearing activity.

1268.  As a result of this agreement, Credit Suisse became one of the main USD clearing banks for the Iranian banking system.

1269.  Through its subsidiary Credit Suisse Asset Management Limited, United Kingdom ("CSAM"), Credit Suisse used code words for Iranian customers, including Iranian Bank Co-conspirators, when executing trades involving U.S. securities that were transmitted through the U.S.

1270.  Credit Suisse knew that without such alterations, amendments, and code words, automated OFAC filters at U.S. clearing banks would likely halt the payment messages and securities transactions, and, in many cases, reject or block the sanctions-related transactions and report the same to OFAC.

1271.  Credit Suisse manipulated payment messages and removed any identifying reference to sanctioned countries and entities so that the OFAC filters at the U.S. clearing banks

would not identify the transactions and so that, as a result, the transactions would be automatically processed.

1272.  In July 2004, an ordinance issued by the Swiss Federal Banking Commission on money laundering to implement the Financial Action Task Force's Special Recommendation on Terrorist Financing VII entered into force.

1273.  The ordinance required the disclosure of the remitter in payment orders, and prompted Credit Suisse to issue an internal directive prohibiting the use of the "Order of a Customer" method when making international wire transfers.

1274.  In preparation for the implementation of the ordinance, in April 2004 Credit Suisse's Iran Desk began to inform its Iranian bank co-conspirator clients that neither "Order of a Customer" nor "Credit Suisse" could be used to replace references to Iranian banks on payment messages. Credit Suisse again, however, provided information about the use of the cover payment method to send USD payments, ensuring that the Iranian Bank Co-conspirators (and, by extension, Iran and Iran's IRGC-QF) remained cognizant of other means of ensuring an uninterrupted flow of surreptitious USD.

1275.  Although Credit Suisse's payment processing units ceased the use of the "Order of a Customer" method following the Swiss Federal Banking Commission's July 2004 ordinance, Credit Suisse employees continued removing and/or altering information in SWIFT payment messages sent to one of its U.S. correspondent banks.

1276.  For example, in May 2005, an internal Credit Suisse email stated:

> If we do not have a key contact with the beneficiary's bank, we have to carry out the payment via the US, e.g. via BKTRUS33. However, no reference to Iran may be made in the field reserved for information on the ordering party (no Iranian telephone numbers either). No such reference should be made in fields 70 or 72 either.

1277.   Between March 2004 and November 2005, Credit Suisse repeatedly sent letters to its Iranian bank co-conspirator customers describing its internal procedures for forwarding Iranian payment orders as:

> Our Payment department will stop all USD-payments initiated by your fine bank in any case and shall be effected as outlined in the drawing "Direct payment order and cover payment order."

1278.   From August 2003 to November 2006, Credit Suisse illegally processed electronic funds transfers, in the aggregate amount of **$480,072,032**, through financial institutions located in the United States for the benefit of Iran and Iranian financial institutions.

1279.   For a brief period of time, Credit Suisse became one of the main USD clearing banks for the Iranian banking system, increasing the number of Iranian USD payments from approximately 49,000 in 2002 to nearly 200,000 in 2005.

1280.   In January 2006, Credit Suisse established a "Sensitive Countries" Task Force to implement the exit decision and ultimately ceased USD clearing transactions for Iran in November 2006.

1281.   On September 11, 2006, Credit Suisse directed its payments centers to discontinue certain prohibited payments by an Iranian Bank co-conspirator. Using the MT 202 cover payment method, during the six weeks from September 11, 2006, to October 27, 2006, Credit Suisse nevertheless processed 54 outbound payments involving that Iranian Bank co-conspirator, the total value of which was in excess of $8 million.

1282.   In March 2007, Credit Suisse commenced an internal investigation of its historic USD clearing business involving U.S.-sanctioned countries and persons. Shortly thereafter, Credit Suisse was contacted by U.S. and New York law enforcement officials.

1283.   On December 16, 2009, DOJ issued a press release announcing that Credit Suisse

had agreed to forfeit $536 million to the United States and to the New York County District Attorney's Office in connection with violations of IEEPA and New York State law, as a result of violations relating to transactions Credit Suisse illegally conducted on behalf of customers from, *inter alia*, Iran.

1284.  In connection with a DPA Credit Suisse entered into, DOJ filed a criminal information in the U.S. District Court for the District of Columbia charging Credit Suisse with one count of violating IEEPA. Credit Suisse waived indictment, agreed to the filing of the information, and, according to the press release, accepted and acknowledged responsibility for its criminal conduct.

1285.  Credit Suisse also simultaneously entered into an agreement with OFAC to settle the apparent civil violations of IEEPA and other authorities arising from its conduct. Credit Suisse also agreed to forfeit the funds as part of the DPAs it had entered into with the DOJ the New York County District Attorney's Office and in settlement of OFAC's civil claims.

1286.  The press release further quoted then-Treasury Under-Secretary for Terrorism and Financial Intelligence Stuart Levey as stating "[t]his case provides a timely lesson about how Iran seeks to involve others in deceptive conduct to evade legal and regulatory controls. Those who do business with Iran expose themselves to the risk, and the consequences, of participating in transactions supporting proliferation, terrorism or sanctions evasion."

## DEFENDANT BANK SADERAT PLC'S PARTICIPATION IN THE CONSPIRACY

1287.  As noted above, the U.S. Treasury Department has reported that "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hezbollah and other terrorist organizations each year."

1288.  In October 2007, Bank Saderat Iran, including its U.K. subsidiary Defendant

Bank Saderat Plc, was designated an SDGT pursuant to Executive Order 13224. The press release announcing the designation stated that from 2001 to 2006, Defendant Bank Saderat Plc transferred $50 million from the CBI to Bank Saderat Iran's branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence.

1289.  Working on behalf of Iran, Defendant Bank Saderat Plc was one of the primary vehicles through which the Conspiracy was effectuated.

1290.  Defendant Bank Saderat Plc committed overt acts to coordinate with the Defendants herein and other co-conspirators to (1) remove or alter the names, BICs, and other identifying information identifying Bank Saderat Plc or its Iranian counterparties in payment messages sent through U.S. banks and (2) thereby facilitate funds transfers to Hezbollah.

1291.  During the relevant time period, Defendant Bank Saderat Plc maintained one or more accounts with Defendant Barclays, and both entities participated in the Conspiracy as detailed more fully herein.

1292.  In July 2003, Defendant SCB sought to pick up Iranian business and add U.S. dollar accounts for five Iranian banks at SCB-London, including business for Bank Saderat Iran, which in turn including transactions involving Defendant Bank Saderat Plc.

1293.  While SCB sought internal approvals to open accounts for the five banks, there were a number of discussions about whether payments sent through SCB's New York branch should be transparent. The five Iranian banks, including Bank Saderat Iran, objected to transparency in payment messages sent to the United States.

1294.  In January 2004, SCB decided to proceed with the Iranian business. On February 13, 2004, SCB opened accounts for the five Iranian banks, including Bank Saderat Plc.

1295. Defendant Credit Suisse also opened accounts for Bank Saderat Plc, and, like the other Defendants and Conspirators, similarly advised Bank Saderat how to format its wire transfers in order to avoid detection by the OFAC filter.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) FOR COMMITTING ACTS OF INTERNATIONAL TERRORISM FOR VIOLATIONS OF 18 U.S.C. § 2339A

1296. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

1297. The Conspiracy between Iran, the Iranian banking co-conspirators, the Defendants (including Defendants John Does 1-50), and other non-defendant Conspirators allowed Iran to transfer: (1) billions of dollars in U.S. currency through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies; and (2) hundreds of millions of dollars to Hezbollah, the IRGC-QF and other terrorist organizations actively engaged in murdering and maiming U.S. servicemen and civilians in Iraq.

1298. The Conspiracy began no later than 1987 and, upon information and belief, continues to the present.

1299. As a part of the Conspiracy, Iran, the Iranian banking co-conspirators, and the Defendants herein (including Defendants John Does 1-50) and other non-defendant Conspirators purposefully transferred billions of dollars through the United States with the express intent and knowledge that those funds would not be detected or monitored by U.S. regulators and law enforcement agencies. Within and through this clandestine stream of U.S. dollars, the Conspiracy facilitated millions of dollars in payments to Hezbollah and the IRGC-QF through the international financial system.

1300. Each Defendant knew that the United States had formally designated Iran as a State Sponsor of Terrorism and knew or was deliberately indifferent to the fact that *inter alia*, Iran used the IRGC-QF and Hezbollah as primary mechanisms to enable it to cultivate and support terrorists abroad. Among other things, and as documented in the U.S. State Department's 2013 Country Report on Terrorism, between 2004 and 2011 the IRGC-QF, in concert with Hezbollah, provided training outside of Iraq, as well as sent advisors inside Iraq, to assist, train, supply and guide Special Groups in the construction and use of sophisticated improvised explosive device technology and other advanced weaponry.

1301. Iran, the Iranian banking co-conspirators, the Defendants (including Defendants John Does 1-50) and other non-defendant conspirators committed acts of international terrorism by entering into a Conspiracy to: evade U.S. sanctions; minimize the transparency of Iran's financial activities; and facilitate millions of dollars in payments to the IRGC-QF and Hezbollah through the international financial system, including but not limited to, payments through the CBI, Bank Melli, and Defendant Bank Saderat Plc. In doing so, Defendants were willing to, and did, commit numerous felonies under U.S. law to assist Iran in concealing its financial activities and, in the course of doing so, violated 18 U.S.C. § 2339A by knowingly, or with deliberate indifference, providing material support to a State Sponsor of Terrorism and its agents (including but not limited to the IRGC-QF, Hezbollah, KH, AAH, and other Special Groups), and knowing or being deliberately indifferent to the fact that such material support could be used to prepare for or carry out violations of 18 U.S.C. §§ 2332(a), 2332(b), 2332(c), and/or 2332f.

1302. Each Defendant knew, or was deliberately indifferent to the risk that the Conspiracy would foreseeably result in Iran transferring millions of dollars to the IRGC-QF and Hezbollah, other Iranian sponsored terrorists (including KH and AAH), as well as foreseeably

resulting in dollars being used to prepare for or carry out homicides, attempted homicides, and conspiracies to commit homicides against U.S. nationals, or bombings, attempted bombings, or conspiracies to bomb places of public use, state or government facilities, public transportation systems, and/or infrastructure facilities.

1303. Each Defendant knew or was deliberately indifferent to the fact that Iran, the IRGC-QF, Hezbollah, and the Special Groups engaged or engages in terrorist activity, terrorism, or acts of international terrorism as defined by the Anti-Terrorism Act, including facilitating, funding, preparing for, and supporting terrorist activity by the Special Groups.

1304. The material support that Defendants knowingly and/or recklessly provided to Iran, provided substantial assistance to the IRGC-QF, Hezbollah and the Special Groups, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 2332(a), 2332(b), 2332(c), and/or 2332f that caused Plaintiffs' injuries.

1305. The Defendants' overt acts of entering into the Conspiracy and knowingly agreeing to purposefully transfer billions of dollars through the United States in a manner expressly designed to ensure that the funds could be transferred by and to Iran without being monitored by U.S. regulators and law enforcement agencies were acts that were dangerous to human life, by their nature and as further evidenced by their consequences.

1306. The Defendants' acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

1307. Each Defendant acted in concert with, and agreed to combine with, Iran and others, and knowingly entered into an agreement to provide illegal support to Iran and its co-conspirators for acts of international terrorism, terrorism, and/or terrorist activity and to act

unlawfully, in the manner set forth in this Complaint.

1308.   Each Defendant committed overt acts in furtherance of the Conspiracy.

1309.   At all relevant times, each Defendant knew of the Conspiracy; knew the aims of the Conspiracy were unlawful; took affirmative acts to further the Conspiracy; knew or were deliberately indifferent to the Conspiracy's purposes and objectives; and knew that Iran, the Iranian Bank co-conspirators, and other conspirators, (including the International Bank Defendants) were engaging in a common plan and design in furtherance of the Conspiracy.

1310.   Each Defendant knowingly and purposefully agreed to perform services for, and provide support to, Iran knowing or being deliberately indifferent to the fact that such services facilitated Iran's clandestine support for the IRGC-QF and Hezbollah, and would facilitate acts of international terrorism, terrorist activities, and terrorism, including homicides, attempted homicides, or conspiracies to commit homicide against U.S. nationals by the IRGC-QF, Hezbollah and/or the Special Groups, as well as bombings, attempted bombings, or conspiracies to bomb places of public use, state or government facilities, public transportation systems, or infrastructure facilities by the IRGC-QF, Hezbollah, and/or the Special Groups.

1311.   The Defendants' agreement to enter into the Conspiracy and purposeful transfer of billions of dollars through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies foreseeably resulted in material support being delivered in order to carry out or prepare for violations of, *inter alia*, 18 U.S.C. §§ 2332(a)-(c), and § 2332f by the IRGC-QF, Hezbollah and/or the Special Groups, and were themselves acts of international terrorism because they either were, or objectively appear to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by

intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating the IRGC-QF, Hezbollah and/or the Special Groups' abilities to prepare for, support, fund, train, initiate, and/or carry out mass destruction and murder.

1312. Each Defendant's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and substantially enhanced the IRGC-QF, Hezbollah and/or the Special Groups' ability to engage in terrorist activity (*i.e.* 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and/or commit acts of international terrorism (18 U.S.C. § 2331) (including violations of 18 U.S.C. §§ 2332(a)-(c), 2332f, and 2339A) as those terms are defined in the Anti-Terrorism Act. Each Defendant's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

1313. Furthermore, each Plaintiff's injuries constitutes a harm falling within the foreseeable risk contemplated by each Defendant's violations, including each Defendant's knowing agreement to enter into the Conspiracy. Injuries resulting from terrorist attacks (including attacks launched by IRGC-QF, Hezbollah and/or the Special Groups) that were planned, supported by, funded, or assisted by Iran are precisely the risks contemplated by Executive Orders, statutes and regulations (including without limitation Executive Orders specifically concerning the IRGC-QF and Defendant Bank Saderat Plc) enacted specifically to ensure that Iran had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies.

1314. Through its conduct as described above, each Defendant is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## SECOND CLAIM FOR RELIEF

### CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2339B CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

1315. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

1316. Iran, the Iranian Bank Co-conspirators, the Defendants herein (including Defendants John Does 1-50) and other non-defendant conspirators committed acts of international terrorism by entering into the Conspiracy to: evade U.S. sanctions; minimize the transparency of their financial activities; and facilitate millions of dollars in payments to Hezbollah through the international financial system. In doing so, the Defendants were willing to, and did, commit numerous felonies under U.S. law to assist Iran in concealing its financial activities and violated 18 U.S.C. § 2339B by knowingly, or with deliberate indifference, entering the Conspiracy, which provided material support to Foreign Terrorist Organizations ("FTOs") that were responsible for Plaintiffs' injuries.

1317. In agreeing to enter this Conspiracy, each of the Defendants knew that Iran had, since 1984, been officially designated by the United States as a State Sponsor of Terrorism, subject to various U.S. sanctions, and knew or were deliberately indifferent to the fact that such designation was based in part on Iran's sponsorship and patronage of Hezbollah and other FTOs.

1318. Each Defendant knew or was deliberately indifferent to the fact that their conduct as part of the Conspiracy unlawfully evaded U.S. sanctions and regulations directed at mitigating the risk that Iran would carry out, support, fund, plan for, prepare, conspire with, or facilitate acts of international terrorism by FTOs, including acts planned, attempted, and perpetrated by Iran's proxy, agent, and strategic partner, Hezbollah.

1319. Both the Conspiracy itself and the acts of international terrorism that injured the

197

Plaintiffs constituted acts of international terrorism under 18 U.S.C. § 2331, and constitute "engaging in terrorist activity" under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or "engaging in terrorism" under 22 U.S.C. § 2656f.

1320. Each Defendant also: knew of the existence of other conspirators including some or all of the Defendants, as well as the Iranian Bank Co-conspirators; was aware that the other Conspirators (including Defendants and Iranian Bank Co-conspirators) engaged in the same or similar conduct, and that the other conspirators shared the objective of providing illegal financial services to Iran for the explicit purpose of enabling Iran to avoid U.S. sanctions and regulations enacted specifically to prevent Iran's ability to finance, support, prepare for, plan, or carry out acts by FTOs including Iran's proxy, agent, and strategic partner, Hezbollah.

1321. Each Defendant knew or was deliberately indifferent to the fact that its conduct and one of the specific objectives of the Conspiracy was keeping U.S. depository institutions, law enforcement and counter-terrorism agencies blind to Iran's movement of U.S. dollars through the international financial system.

1322. Each Defendant knew, or was deliberately indifferent to the fact, that the Conspiracy's aims would foreseeably result in Iran transferring millions of dollars to Hezbollah, a designated Foreign Terrorist Organization, and would also foreseeably result in millions of dollars flowing to the IRGC-QF, a designated Specially Designated Global Terrorist.

1323. As a result of the Conspiracy, Iran transferred at least $50 million dollars via Defendant Bank Saderat plc to Hezbollah through the international financial system.

1324. As a result of the Conspiracy, Iran in fact transferred at least $100 million dollars through the international financial system via (Iranian Bank Co-conspirator) Bank Melli to the IRGC-QF, as alleged above, a U.S. SDGT that funds, trains and supplies Hezbollah.

1325.  The material support that Defendants, through the Conspiracy, knowingly and/or with deliberate indifference provided to Hezbollah, in concert with Iran (including but not limited to material support Iran's IRGC-QF transmitted to Hezbollah) and the Iranian Bank Co-conspirators (including the CBI, Bank Melli, and Defendant Bank Saderat Plc), provided substantial assistance to Hezbollah, thereby facilitating acts of terrorism in violation of 18 U.S.C. §§ 2332(a), 2332(b), 2332(c), and or 2332f that have caused injuries to Plaintiffs.

1326.  The Defendants' overt acts in entering into the Conspiracy and knowingly agreeing to provide Iran – a known and designated State Sponsor of Terrorism – and purposeful transfer of billions of dollars through the United States in a manner expressly designed to ensure that the funds could be transferred to Iran without being monitored by U.S. regulators and law enforcement agencies – were acts that were dangerous to human life.

1327.  The Defendants' acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

1328.  Each Defendant acted in concert with, and agreed to combine with, Iran and others, and knowingly or intentionally entered into an agreement to provide illegal support to Iran and its co-conspirators for acts of international terrorism, terrorism, and/or terrorist activity and to act unlawfully, in the manner set forth in this Complaint, and committed overt acts in furtherance of the Conspiracy.

1329.  Each Defendant committed overt acts in furtherance of the Conspiracy.

1330.  At all relevant times, each Defendant knew of the Conspiracy; knew the aims of the Conspiracy were unlawful; took affirmative acts to further the Conspiracy; knew or were deliberately indifferent to the Conspiracy's purposes and objectives; and knew Iran and other

conspirators (including Defendants and the Iranian Bank Co-conspirators) were engaged in a common plan and design in furtherance of the Conspiracy.

1331. Each Defendant's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and substantially accelerated and multiplied Hezbollah's ability to engage in terrorist activity and terrorism, and/or commit acts of international terrorism as those terms are defined in the Anti-Terrorism Act. Each Defendant's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

1332. Furthermore, each Plaintiff's injuries constitutes a harm falling within the risk contemplated by each Defendant's violations, including each Defendant's knowing agreement to enter into the Conspiracy. Injuries resulting from terrorist attacks perpetrated by Iran and Hezbollah are precisely the risks contemplated by statutes and regulations designed to ensure that Hezbollah's sponsor, principal, and strategic partner – Iran – had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions were transparent and could be blocked if warranted.

1333. By knowingly or with deliberate indifference providing material support to a designated Foreign Terrorist Organization by entering into the Conspiracy and thus committing an act of international terrorism, each Defendant is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

### THIRD CLAIM FOR RELIEF

### HSBC BANK USA, N.A. CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) FOR ENGAGING IN FINANCIAL TRANSACTIONS WITH THE GOVERNMENT OF IRAN, A COUNTRY DESIGNATED UNDER SECTION 6(J) OF THE EXPORT ADMINISTRATION ACT OF 1979 (50 APP. U.S.C. 2405) AS A COUNTRY SUPPORTING INTERNATIONAL TERRORISM IN VIOLATION OF 18 USC § 2332d

1334. Plaintiffs repeat and re-allege each and every allegation of the foregoing

paragraphs as if fully set forth herein.

1335.  Defendant HSBC-US is a juridical person organized under the laws of the United States pursuant to 18 USC § 2332d(b)(2)(C), and is also a person within the United States pursuant to 18 U.S.C. § 2332d(b)(2)(D).

1336.  As alleged above, at all relevant times HSBC-US knew that Iran was a country designated by the United States under section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C. 2405) as a country supporting international terrorism, yet HSBC-US nevertheless engaged in thousands of financial transactions with the government of Iran in violation of 18 U.S.C. § 2332d.

1337.  As alleged above, the transactions at issue did not fall within the safe harbor provisions of the regulations issued by the Secretary of the Treasury – regulations passed for the specific purposes of mitigating the risk that funds transfers to Iran could be used to prepare for or carry out acts of international terrorism under 18 U.S.C. § 2331, engaging in terrorist activity under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or terrorism under 22 U.S.C. § 2656f.

1338.  In fact, the transactions at issue explicitly violated 31 C.F.R 535.701(a)(2) and 31 C.F.R 560.203.

1339.  Defendant HSBC-US knew that Defendants HSBC-Europe and HSBC-Middle East were deliberately altering and omitting information in funds transfer payment messages being processed through HSBC-US, thereby evading U.S. laws whose express purpose was (and is) to ensure that only a very limited class of payments could be facilitated to Iran, and that payment messages for such funds transfers required transparency in order to ensure that the transfers qualified for the limited exceptions and exemptions.

1340.  It was therefore reasonably foreseeable that HSBC-US's acquiescence in the

Conspiracy would aid Iran and Iran's agents, proxies, and strategic partners (including Hezbollah, the Iranian Bank Co-conspirators, and Special Groups) to prepare for or carry out acts of international terrorism, terrorist activity, and/or terrorism as those terms are defined in the Anti-Terrorism Act.

1341.  Defendant HSBC-US knew (as a matter of law) of Iran's designation as a State Sponsor of Terrorism.

1342.  Defendant HSBC-US also knew (as a matter of law) that Hezbollah had been designated an FTO.

1343.  Defendant HSBC-US also knew (as a matter of law) that the IRGC-QF had been designated an SDGT.

1344.  Defendant HSBC-US also knew (as a matter of law) that Defendant Bank Saderat Plc had been designated an SDGT.

1345.  Defendant HSBC-US also knew (as a matter of law) that Iranian Bank co-conspirators Bank Melli (including Melli Bank Plc), Bank Mellat, and  Bank Sepah had been designated as SDNs before November 2008, and, as such, were excluded from accessing the U-Turn exemption in the ITRs.

1346.  HSBC-US also thus knew or was deliberately indifferent to the fact that both Iran, the IRGC-QF, Hezbollah, and Defendant Bank Saderat Plc engaged in acts of international terrorism under 18 U.S.C. § 2331 (including violations of 18 U.S.C. §§ 2332(a)-(c), 2332f, and 2339A), engaged in terrorist activity under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), engaged in terrorism under 22 U.S.C. § 2656f, and that Iran both violated and provided massive support and sponsorship for violations of all these statutes, while also providing support for other acts of international terrorism such as those planned, attempted, and/or perpetrated by the Special

Groups.

1347.   Defendant HSBC-US's criminal violations of 18 U.S.C. § 2332d(a) constitute statutory accessorial conduct constituting a sufficient cause of each Plaintiff's injuries.

1348.   Defendant HSBC-US's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and substantially enhanced Hezbollah's, the Special Groups', and other Iranian-sponsored terrorists' ability to engage in terrorist activity. Defendant HSBC-US's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

1349.   Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by Defendant HSBC-US's violations, including its knowing agreement to provide illegal services to Iran. Injuries resulting from terrorist attacks (including attacks launched by Hezbollah or the Special Groups) that were planned, supported by, funded, or assisted by the IRGC-QF and/or Hezbollah are precisely the risks contemplated by Executive Orders, statutes and regulations designed to ensure that Iran had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies.

1350.   As alleged in detail above, throughout the relevant time period, HSBC-US knew that other HSBC Defendants such as HSBC-Europe and HSBC-Middle East were transmitting funds to Iran in a manner violating U.S. laws and regulations, and HSBC-US also knew its own systems were being used to facilitate this illegal conduct.

1351.   Defendant HSBC-US's knowing and/or reckless provision of illegal financial services to Iran, knowing that its conduct enabled Iran to move billions of U.S. dollars through the United States without those funds being monitored by U.S. regulators and law enforcement

agencies, were acts that were dangerous to human life, by their nature and as evidenced by their consequences.

1352.   Defendant HSBC-US's acts transcended national boundaries in terms of the means by which they were accomplished.

1353.   Defendant HSBC-US's role in the Conspiracy was itself an act of international terrorism because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States  and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

1354.   By violating § 2332d in the manner and with the state of mind alleged above, HSBC-US committed acts of international terrorism, and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## FOURTH CLAIM FOR RELIEF

### BARCLAYS, STANDARD CHARTERED BANK, AND ROYAL BANK OF SCOTLAND N.V. CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) FOR ENGAGING IN FINANCIAL TRANSACTIONS WITH THE GOVERNMENT OF IRAN, A COUNTRY DESIGNATED UNDER SECTION 6(J) OF THE EXPORT ADMINISTRATION ACT OF 1979 (50 APP. U.S.C. 2405) AS A COUNTRY SUPPORTING INTERNATIONAL TERRORISM IN VIOLATION OF 18 USC § 2332d

1355.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

1356.   Defendants Barclays, SCB, and Royal Bank of Scotland N.V. (as alleged above, a.k.a. "ABN AMRO") each utilized its New York branches in order to effectuate and facilitate the Conspiracy, and each of those branches is a "person in the United States" within the scope of

18 U.S.C. § 2332d(b)(2)(D).

1357.  As set forth above, each of the above listed Defendants knew that Iran was designated under section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C. 2405) as a country supporting international terrorism and nonetheless knowingly engaged in thousands of illegal financial transactions with the government of Iran through their U.S. operations.

1358.  Each of the above Defendants knew that Hezbollah had been designated as an FTO, and that the IRGC-QF and Defendant Bank Saderat Plc had each been designated an SDGT.

1359.  As set forth above, the transactions at issue did not fall within the safe harbor provisions of the regulations issued by the Secretary of the Treasury and therefore violated the criminal provisions of 18 U.S.C § 2332d(a).

1360.  In fact, the transactions at issue explicitly violated 31 C.F.R 535.701(a)(2) and 31 C.F.R 560.203.

1361.  Each of the above Defendants' acts transcended national boundaries in terms of the means by which they were accomplished.

1362.  Each of the above Defendants' conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and substantially enhanced Hezbollah's, the Special Groups' and other Iranian sponsored terrorists' ability to engage in terrorist activity. Each of the above Defendants' conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

1363.  Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by each of the above Defendants' unlawful conduct, including their knowing agreement to provide illegal services to Iran. Injuries resulting from terrorist attacks (including

attacks launched by Hezbollah or the Special Groups) that were planned, supported by, funded, or assisted by the IRGC-QF and/or Hezbollah are precisely the risks contemplated by Executive Orders, statutes and regulations designed to ensure that Iran had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies. Each of the above Defendants' criminal violations of the provisions of 18 U.S.C. § 2332d(a) constitutes statutory accessorial conduct that was a sufficient cause of Plaintiffs' injuries, and, for the reasons alleged in Plaintiffs' Third Claim for Relief against Defendant HSBC-US, constitutes an act of international terrorism rendering each of the above Defendants civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a)    Accept jurisdiction over this action;

(b)    Enter judgment against the Defendants and in favor of Plaintiffs for compensatory damages in amounts to be determined at trial;

(c)    Enter judgment against Defendants and in favor of Plaintiffs for treble damages pursuant to 18 U.S.C. § 2333(a);

(d)    Enter judgment against Defendants and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a);

(e)    Enter an Order declaring that Defendants have violated the Anti-Terrorism Act, 18 U.S.C. § 2331 et seq.; and

(f)    Grant such other and further relief as justice requires.

206

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: November 10, 2014

OSEN LLC

By _____

Gary M. Osen (gosen@osenlaw.com)
Ari Ungar
Joshua D. Glatter
Aaron Schlanger
Naomi B. Weinberg
345 Seventh Avenue, 21st Floor
New York, New York 10001
(646) 380-0470
(646) 380-0471 Fax

2 University Plaza, Suite 201
Hackensack, NJ 07601
(201) 265 6400
(201) 265 0303 Fax

TURNER & ASSOCIATES, P.A.
C. Tab Turner  (tab@tturner.com)
(Motion for Leave to Appear Pro Hac Vice
to follow)
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
(501) 791-2277

Attorneys for Plaintiffs