IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---

CHARLOTTE FREEMAN, et al.,

                  Plaintiffs,

        v.

HSBC HOLDINGS PLC, et al.,

                  Defendants.

Case No. 14-cv-6601 (DLI)(CLP)

Oral Argument Requested

Served: March 16, 2015

---

## MEMORANDUM OF LAW OF DEFENDANT BANK SADERAT PLC IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT

---

Jeremy D. Frey
PEPPER HAMILTON LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel:  (212) 808-2700

Attorneys for Defendant Bank Saderat PLC

On the Brief:

Jeremy D. Frey
Adam B. Michaels
Megan L. Traversari
Matthew D. Foster

Dated:  March 16, 2015

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION ................................................................................................. 1

II.    SUMMARY OF THE ARGUMENT ................................................................... 1

III.   PLAINTIFFS' ATA CLAIMS ARE BARRED BY THE ACT OF WAR
       LIMITATION ...................................................................................................... 2

       A.    Background on the Iraq War:  Legal Context ........................................... 2

       B.    Summary of Certain Details Regarding Plaintiffs and their Claims ..................... 3

       C.    Act Of War Limitation Is Jurisdictional: the Court Should Dismiss the
             Complaint under Rule 12(b)(1) .................................................................. 3

       D.    Iraq War is a Declared War or Armed Conflict ........................................ 6

       E.    ATA Claims Are Barred Because the Injuries Occurred in the Course of
             War and Armed Conflict ............................................................................ 8

IV.    CLAIMS AGAINST BSPLC MUST BE DISMISSED FOR LACK OF
       PERSONAL JURISDICTION UNDER FED. R. CIV. P. 12(B)(2) ................... 12

       A.    Operative Standard .................................................................................. 12

       B.    BSPLC Is Not Subject To New York Long-Arm Jurisdiction Under CPLR
             § 302 ......................................................................................................... 13

             1.    BSPLC Has Not Transacted Business in New York ................................. 13

             2.    Plaintiffs' Claims Do Not Arise From Any New York Business
                   Activity .......................................................................................... 16

       C.    BSPLC Is Not Subject To Personal Jurisdiction Under Fed. R. Civ. P. 4(k) ....... 18

V.     PLAINTIFFS' ATA COUNTS DO NOT ADEQUATELY ALLEGE
       PROXIMATE CAUSATION FOR PLAINTIFFS' INJURIES ......................... 21

VI.    PLAINTIFFS' ATA COUNTS DO NOT ADEQUATELY ALLEGE MENS REA
       AS TO BSPLC ................................................................................................... 24

VII.   ROTHSTEIN'S BAR OF AIDER-AND-ABETTOR LIABILITY UNDER ATA
       INCLUDES CONSPIRACY ............................................................................. 26

VIII.  CONCLUSION ................................................................................................... 29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Ahmad v. Christian Friends of Israeli Communities*, 2014 U.S. Dist. LEXIS 62053
(S.D.N.Y. 2014)................................................................................26

*Alexander v. Porter*, 2014 U.S. Dist. LEXIS 177841 (E.D.N.Y. Dec. 23, 2014)........................13

*Arar v. Ashcroft*, 532 F.3d 157 (2d Cir. 2008)...........................................11

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................12

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194 (2d Cir. 1990) ...................12

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779 (2d Cir. 1999)............13

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .....................................12, 21, 24

*Biton v. Palestinian Interim Self-Gov't Auth.*, 412 F. Supp. 2d 1 (D.D.C. 2005)...................4, 7, 8

*Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685 (7th Cir. 2008) .........................24, 27

*Daimler AG v. Bauman*, 134 S. Ct. 746 (2014) .............................................12

*Daventree Ltd. v. Republic of Azer.*, 349 F. Supp. 2d 736 (S.D.N.Y. 2004) .................................19

*Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.)*, 60 F.3d 591 (9th Cir. 1995) ..............28

*Ehrenfeld v. Bin Mahfouz*, 9 N.Y.3d 501 (2007) .......................................13

*Erickson v. Pardus*, 551 U.S. 89 (2007) ...................................................12

*Gibbons v. Ogden*, 22 U.S. 1 (1824).......................................................5

*Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474 (E.D.N.Y. 2012)...............................4, 7, 8

*HSH Nordbank AG N.Y. Branch v. Street*, 2012 U.S. Dist. LEXIS 99830 (S.D.N.Y. 2012).......17

*J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107 (2d Cir. 2004) ...............................11

*Kaplan v. Central Bank of Islamic Republic of Iran*
961 F. Supp. 2d 185 (D.D.C. 2013).............................................6, 7, 8, 9, 10, 23

*Estate of Klieman v. Palestinian Auth.*, 424 F. Supp. 2d 153 (D.D.C. 2006).......................4, 7, 8

*Lerner v. Fleet Bank, N.A.*, 318 F.3d 113 (2d Cir. 2003) ...........................................24

*Licci v. Lebanese Can. Bank, SAL*, 20 N.Y.3d 327 (2012)..........................................14, 15, 16, 18

*Morris v. Khadr*, 415 F. Supp. 2d 1323 (D. Utah 2006)..................................................................4

*Morrison v. National Australia Bank Ltd*, 561 U.S. 247, 130 S. Ct. 2869 (2010) ........................5

*O'Neill v. Asat Trust Reg. (In re Terrorist Attacks on September 11, 2001 (Asat Trust Reg.))*, 714 F.3d 659 (2d Cir. 2013)........................................................12, 19, 20, 22, 23, 24

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 2007 U.S. Dist. LEXIS 11807 (S.D.N.Y. 2007)...............................................................................21

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) .............................................................. passim

*Salvani v. ADVFN PLC*, 2014 U.S. Dist. LEXIS 133783 (S.D.N.Y. 2014)................................11

*Saudi v. Marine Atlantic. Ltd.*, 306 Fed. Appx. 653 (2d Cir. 2009) .............................................12

*Schaaf v. Resid. Funding Corp.*, 517 F.3d 544 (8th Cir. 2008) ....................................................21

*Sokolow v. PLO*, 583 F. Supp. 2d 451 (S.D.N.Y. 2008).............................................................4, 8

*Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt.*, LLC, 450 F.3d 100 (2d Cir. 2006) ...............16

*Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414 (E.D.N.Y. 2013) .........................21, 24, 25

*Stutts v. De Dietrich Group*, 2006 U.S. Dist. LEXIS 47638 (E.D.N.Y. 2006)..........4, 6, 7, 8, 9, 10

*Tamam v. Fransabank SAL*, 677 F. Supp. 2d 720 (S.D.N.Y. 2010)..........................12, 16, 17, 18

*In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d 539 (S.D.N.Y. 2005)...............19

*United Phosphorus, Ltd., v. ANGUS Chemical Company*, 322 F.3d 942 (7th Cir. 2003)..............5

*Vista Mktg., LLC v. Park*, 999 F. Supp. 2d 1294 (M.D. Fla. 2014)............................................28

*Weiss v. Nat'l Westminster Bank*, 453 F. Supp. 2d 609 (E.D.N.Y. 2006) ..............................21, 24

*Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196 (2d Cir. 2001) ..................................................12

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980)...............................................19

## STATUTES

18 U.S.C. § 2.................................................................................................................................28

18 U.S.C. § 17(a) ...........................................................................................................................5

18 U.S.C. § 371.............................................................................................................................28

18 U.S.C. § 1204(c) ...............................................................................................5

18 U.S.C. § 1466A(e) ...........................................................................................5

18 U.S.C. § 2250(b) .............................................................................................5

18 U.S.C. § 2252A(d) ..........................................................................................5

18 U.S.C. § 2285(e) .............................................................................................5

18 U.S.C. § 2331 ...............................................................................................1,6

18 U.S.C. §§ 2332a(a) ........................................................................................28

18 U.S.C. § 2333(a) ...........................................................1, 3, 4, 5, 24, 25, 27

18 U.S.C. § 2334(a) ............................................................................................18

18 U.S.C. §§ 2336(a) ..........................................................4, 5, 6, 8, 9, 10

18 U.S.C. §§ 2339A ................................................................................1, 24, 25

18 U.S.C. § 3146(c) .............................................................................................5

42 U.S.C. §§ 1651-1654 ...................................................................................11

50 U.S.C. §§ 1541-48 .........................................................................................2

CPLR § 302(a) ..............................................................................13, 14, 16, 18

**OTHER AUTHORITIES**

31 C.F.R. §§ 560.210, *et seq.* ......................................................................15

Fed. R. Civ. P. 4(k) .......................................................................................18, 19

Fed. R. Civ. P. 12(b)(1) ..............................................................................3, 4, 6, 11

Fed. R. Civ. P. 12(b)(6) ..........................................................................6, 11, 23, 24

Fed. R. Civ. P. 14 ..............................................................................................18

## I.      INTRODUCTION

In a four count complaint, the plaintiffs seek recovery from the defendants under the Anti-Terrorism Act (18 U.S.C. § 2333(a)) ("ATA") for injuries arising from the death or wounding in Iraq during the Iraq War between 2004 and 2011 of 84 active duty U.S. servicemen ("Servicemen"), a contractor ("Contractor") and a journalist ("Journalist").  The plaintiffs seek damages in the nature of wrongful death, personal injury, survival, consortium and solatium claims.  Plaintiffs include decedents and the wounded, as well as various family members and step-relatives.  The deaths and injuries here were tragic.  The Servicemen bravely answered our nation's call to duty and made sacrifices all Americans honor.  The other plaintiffs' deaths were likewise in service of our nation's vital interests.  All are mourned losses and injuries.

The named defendants are nine financial institutions, including Bank Saderat PLC ("BSPLC").  BSPLC is a bank incorporated in England and Wales, and is a wholly-owned subsidiary of a private Iranian commercial bank.  The complaint seeks treble damages for the plaintiffs' injuries based on an alleged far reaching conspiracy by the defendant banks and others, including Iran, to "perpetrate acts of international terrorism under 18 U.S.C. § 2331(1)," among other things.  Compl. ¶ 761c.  BSPLC is joined with all other defendants only in Counts 1 and 2 regarding 18 U.S.C. §§ 2339A and B.  BSPLC denies these allegations and now moves to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1), (b)(2) and (b)(6).

## II.     SUMMARY OF THE ARGUMENT

In pursuing the defendant banks, the complaint argues for liability unmoored from limiting principles through novel application of the ATA.  First, the complaint demands the defendant banks be liable to active duty U.S. servicemen in Iraq (and relatives) for combat-related injuries, as well as to two other plaintiffs for injuries arising in the course of that armed conflict, and to have all such awards trebled.  As an issue of subject matter jurisdiction, however,

plaintiffs' civil claims are barred by the ATA's statutory "act of war" limitation.  Second, with

BSPLC the plaintiffs seek to expand the limitations of personal jurisdiction to be based solely on

its indirect contacts with U.S. banks.  This expansive approach is not the law, and personal

jurisdiction against BSPLC fails.  Third, the complaint also seeks extravagant relief without

regard to the proper limitations of proximate causation and with only conclusory allegations of

scienter.  There is no plausibility to plaintiffs' claims that without these transfers Iran would not

have allegedly done the same.  The chain of inferences offered here does not support proximate

cause.  Finally, Counts 1 and 2 are based on a theory of secondary liability denied by the Second

Circuit in *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013).  For all the foregoing reasons and

those submitted by BSPLC's co-defendants, to the extent applicable (in which motions BSPLC

joins), the complaint against BSPLC must be dismissed.

## III.   PLAINTIFFS' ATA CLAIMS ARE BARRED BY THE ACT OF WAR LIMITATION

### A.   Background on the Iraq War:  Legal Context

In 2003, U.S. combat troops were committed to battle in Iraq pursuant to a Joint

Resolution of Congress (under the War Powers Resolution law, 50 U.S.C. §§ 1541-48) titled

"Authorization for Use of Military Force Against Iraq Resolution of 2002."  This is commonly

referred to as the "Iraq Resolution" or the "Iraq War Resolution."  It was signed into law by

President Bush on October 16, 2002.  The U.S. military invasion of Iraq started on or about

March 20, 2003.  U.S. combat troops remained in Iraq until about December 18, 2011.[1]  There

was an attempt to revoke the Iraq War Resolution in the U.S. Senate on or about November 29,

2011, which was defeated.  President Obama ordered resumed active military operations in Iraq

---

[1] http://www.reuters.com/article/2011/12/18/us-iraq-withdrawal-idUSTRE7BH03320111218.

(with air strikes and limited ground troops) on or about August 8, 2014 and thereafter.[2]   In early

February 2015, the President asked Congress to substitute the Iraq War Resolution with

authorization to use U.S. combat forces against ISIL (or ISIS) in a new War Powers Resolution.

In a February 11, 2015 letter to Congress, the President offered a new draft Joint Resolution to

do so, which, among other things, would also repeal the existing Iraq War Resolution.[3]

Accordingly, the Iraq War Resolution remains in effect today and has continued to provide legal

authority for U.S. military operations in Iraq.

### B.    Summary of Certain Details Regarding Plaintiffs and their Claims

Each of the plaintiffs' allegations regarding their injuries, most of which are

largely formulaic, are summarized on Exhibit 1, which lists plaintiffs in chronological order

based on date of injury.  As indicated, all 84 Servicemen were injured in Iraq from Rocket-

Propelled Grenades (RPGs), Improvised Explosive Devices (IEDs), Improvised Rocket-Assisted

Munitions (IRAMs), mortar fire, grenades or gunfire during the Iraq War.  The Journalist, Mr.

Vincent, a distinguished reporter, was "reporting on the Iraqi war" when he was kidnapped and

killed in Basra on about August 2, 2005.  Compl. ¶ 96.  The Contractor, Mr. Christopher, is

alleged to have been a contractor in Iraq when an IED "detonated near him" on March 31, 2007.

Compl. ¶ 352.  Based on these allegations not only were all plaintiffs injured during the admitted

"Iraqi war," but also in its course.

### C.    Act Of War Limitation Is Jurisdictional: the Court Should Dismiss the Complaint under Rule 12(b)(1)

In Counts 1 and 2, plaintiffs seek treble damages against BSPLC for their injuries

under 18 U.S.C. § 2333(a).  They do so in disregard of the ATA's express act of war limitation.

---

[2] http://www.bbc.com/news/world-middle-east-30003441.

[3] http://www.nytimes.com/2015/02/12/us/obama-war-authorization-congress.html?_r=0.

18 U.S.C. §§ 2336(a) provides that "[n]o action shall be *maintained* under [the ATA] for injury or loss by reason of an act of war."  (emphasis)  Section 2331(4) defines acts of war broadly to include any acts in the "course of war" whether (1) declared, (2) an armed conflict between nations, or (3) an armed conflict between military forces of any origin.  This Court should follow the course of at least four other courts which examined the issue on motions under Rules 12(b)(1) or (b)(6) and dismiss the claims under the act of war limitation based on the allegations of the complaint, and without discovery.

Most courts to address the issue have found Section 2336(a)'s act of war limitation to be jurisdictional.  *Estate of Klieman v. Palestinian Auth.*, 424 F. Supp. 2d 153, 162-63 (D.D.C. 2006); *Biton v. Palestinian Interim Self-Gov't Auth.*, 412 F. Supp. 2d 1, 7 (D.D.C. 2005); *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1334 (D. Utah 2006) (default case where act of war limitation decided on jurisdictional grounds); and *Sokolow v. PLO*, 583 F. Supp. 2d 451, 458-59 (S.D.N.Y. 2008).  One court has found that act of war is an element, *Stutts v. De Dietrich Group*, 2006 U.S. Dist. LEXIS 47638, *4 (E.D.N.Y. 2006), and one other court decided it is an affirmative defense but with little discussion.  *See Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 508 (E.D.N.Y. 2012).

While it may be more debatable whether the act of war limitation is an issue of subject matter jurisdiction or an element, it is surely not an affirmative defense as shown by the statute's prohibition that "no action shall be *maintained*"  by reason of an act of war.  The statute employs a verb that means both "to assert (a position or opinion)" *and* "to continue (something)."  *Black's Law Dictionary* 1097 (10th ed. 2014).  In using the verb "to maintain," the statute explicitly directs that ATA's private right of action under Section 2333(a) shall not apply to acts of war.  In this context, interpretation of Section 2336(a) must apply the ordinary-

meaning rule of construction, *i.e.*, that the words in a statute must be understood in their ordinary, everyday meanings. *Gibbons v. Ogden*, 22 U.S. 1, 71 (1824). Accordingly, Section 2336(a) addresses whether the court has the power to hear such a civil case, not solely whether the plaintiff may be entitled to relief. *Morrison v. National Australia Bank Ltd,* 561 U.S. 247, 253, 130 S. Ct. 2869, 2877 (2010); *United Phosphorus, Ltd., v. ANGUS Chemical Company,* 322 F.3d 942 (7th Cir. 2003) (Sherman Act limitation an issue of subject matter jurisdiction).

Further, when Congress has provided affirmative defenses for Title 18 offenses, it has done so unequivocally. *See* 18 U.S.C. § 1204(c) (international parental kidnapping) ("It shall be an affirmative defense under this section that . . ."); 18 U.S.C. § 3146(c) (penalty for failure to appear) ("It is an affirmative defense . . ."); 18 U.S.C. § 17(a) (insanity) ( "It is an affirmative defense . . ."); 18 U.S.C. § 2250(b) (sex offender registration) ("[I]t is an affirmative defense that . . ."); 18 U.S.C. § 1466A(e) (child pornography) ("It shall be an affirmative defense . . ."); 18 U.S.C. § 2252A(d) (child pornography) ("It shall be an affirmative defense . . ."); 18 U.S.C. § 2285(e) (submersible vessels) ("It is an affirmative defense . . ."). That Congress did not do so with respect to Section 2336(a) supports its plain meaning.

Finally, allocating the burden of proof to a defendant would make little sense. The proof of the matter lies more within the knowledge of a plaintiff than a defendant. Whether the plaintiffs – in this case U.S. troops (and relatives) on active duty in Iraq – were injured by reason of acts of war is more susceptible of proof by them than defendant banks far removed from the theatre of battle. Any burden in this respect is appropriately allocated to plaintiffs.

The act of war limitation is an issue of subject matter jurisdiction rather than an element of the claim. The act of war limitation by its terms governs all Section 2333(a) actions. It is not definitional, and limits civil cases otherwise involving acts of terrorism. And this is the

view of the considerable majority of courts to consider the issue.  Application of the extraterritorial ATA is an area fraught with delicacy, uncertainty, and difficult issues of proof. The issues joined by application of the ATA in this case include the statute's limitation that federal courts not engage in litigating tort liability of 10-year old events involving foreign armed conflicts.  Understanding Section 2336(a) as jurisdictional has the virtue of permitting the matter to be resolved early in the litigation, either as a result of a facial challenge under Rule 12(b)(1) (as here) or on the court's own initiative.  This Court is not a war crimes tribunal.  Section 2336(a)'s subject matter jurisdiction limitation prevents the litigating of cases in courts where the cause does not belong in the first instance.

For purposes of this motion, whether Section 2336(a) is an element of the cause of action or jurisdictional currently makes little difference, except for its categorization as a Rule 12(b)(1) or as a Rule 12(b)(6) motion (though it does in some other respects).  In either event, this Court can and should dismiss this case under the act of war limitation.  *See Kaplan v. Central Bank of Islamic Republic of Iran,* 961 F. Supp. 2d 185 (D.D.C. 2013) (dismissing ATA case under act of war on motion to dismiss regardless whether Section 2336(a) is jurisdictional, an element or an affirmative defense).

### D.      Iraq War is a Declared War or Armed Conflict

18 U.S.C. §2331(4)'s act of war definition requires a declared war, an armed conflict between two or more nations, or an armed conflict between military forces of any origin. In *Stutts*, injuries occurring during the course of the Gulf War, which was authorized by a Congressional War Powers resolution (as here), was characterized by the court as a "declared war" or an "armed conflict."  2006 U.S. Dist. LEXIS 47638, *19-20.  In *Kaplan,* which involved

2006 clashes between Hizbollah[4] and Israeli forces, the court extensively reviewed the case law. It upheld the principles articulated in *Biton v. Palestinian Interim Self-Gov't Auth.*, 412 F. Supp. 2d 1, 7 (D.D.C. 2005) (civilian bus bombing), *Estate of Klieman v. Palestinian Auth.*, 424 F. Supp. 2d 153 (D.D.C. 2006) (civilian bus bombing) and *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, (E.D.N.Y. 2012) (sniper shooting of Israeli-led government delegation at a border observation post) that, in at least some circumstances, targeted killings of civilians may not be (or may be) within Section 2331(4).  *Kaplan* held that, at least in the context of that case, Hizbollah was a non-national military force engaged in "armed conflict" with Israel under Section 2331(4)(C).  961 F. Supp. 2d 185, 204.

In the present case, like *Stutts*, the Joint Congressional Iraq War Resolution signed into law by the President is sufficient to bring the Iraq War within the definition of a "declared war."  In any event, under the plaintiffs' theory of the complaint, the government of Iran (and the Iranian Qods Force) allegedly engaged in acts of terrorism against the plaintiffs through proxies in Iraq, such as the Badr Corps, Mahdi Army, KH, AAH, and other Special Groups, and in at least one instance Lebanese Hizbollah.  Compl. ¶¶ 839-975; ¶¶ 12-44.  This is sufficient to permit this Court to consider this case within Section 2331(4)(B) as engaging in "an armed conflict. . . between two or more nations" for these purposes.[5]  Under *Kaplan* and *Stutts*, based on the allegations in the complaint, this case satisfies Section 2331(4)(C) as involving "armed conflict" between U.S. military forces and "military forces of any origin."  This is because the circumstances of the alleged armed conflict, and the alleged capacities of the

---

[4] Hizbollah has numerous spellings.  Unless a quotation requires otherwise, we have adopted this style.

[5]*See also* http://www.washingtonpost.com/wp-dyn/content/article/2007/01/25/AR2007012502199.html, reporting on January 27, 2007 that the President formally authorized U.S. troops to kill Iranian operatives found in Iraq.

plaintiffs in it, are "sufficient to comfortably distinguish [this case]. . . and to preserve the availability of the ATA for cases [involving targeted civilian injuries] like *Biton*, *Klieman* and *Gill* going forward." *Kaplan,* 961 F. Supp. 2d at 204.  *See also Sokolow*, 583 F. Supp. 2d 451, 455 (involving civilian injuries at a bus stop, cafeteria, on a civilian bus and street bombings in Israel).

> ### E.   ATA Claims Are Barred Because the Injuries Occurred in the Course of War and Armed Conflict

Even with the plaintiffs' bare allegations concerning the circumstances of their injuries, this Court should nevertheless hold that the plaintiffs' claims arising from the theatre of war in Iraq and during the course of that war are barred under the ATA's act of war limitation in 18 U.S.C. § 2336(a).

In *Stutts v. De Dietrich Group*, 2006 U.S. Dist. LEXIS 47638 (E.D.N.Y. 2006), plaintiffs (as here) included both U.S. servicemen and private contractors who were deployed or working in the Gulf region during the 1991 Gulf War.  *Id*. at *4-5.  They sued under, *inter alia*, the ATA.  Plaintiffs sought recovery for injuries sustained as a result of exposure to toxic agents contained in Iraqi chemical weapons.  *Id*. at *5.  The exposure was alleged to have occurred when the weapons were destroyed by U.S. and Coalition forces during the Gulf War.  *Id*. Plaintiffs sought relief from the suppliers of the components for the weapons and the banks that acted as correspondents under letters of credit issued to the supplier defendants.  *Id*.  The complaint alleged that the bank defendants knew or should have known of Iraq's use of chemical weapons prior to the Gulf War, but notwithstanding this knowledge the bank defendants allegedly issued letters of credit as correspondent banks to Iraq for the benefit of the supplier defendants.  *Id*. at *11.

In addressing the ATA claim, Judge Glasser was not persuaded by plaintiffs' argument that the act of war limitation was not applicable because, among other things (1) injuries occurred after the cessation of armed hostilities, (2) injuries arose from "friendly fire," and (3) Section 2336(a) does not apply to injuries that "just happen to occur during wartime." *Id*. *19. The court stated that the plaintiffs' own allegations that the injuries occurred during the Gulf War "put this case squarely within the limitation under § 2336 for 'acts of war.'" *Id*. This Court can and should follow *Stutts'* lead here.

Like *Stutts*, this is not a case about terrorists with suicide vests blowing up civilians on commuter busses, as so many of these ATA cases have been. Plaintiffs seek treble damages for wartime injuries sustained in the course of that war while the Servicemen were in active military service. Allowing these plaintiffs to maintain this action offers the prospect of endless potential suits by injured soldiers and their relatives seeking compensation for combat-related injuries from third parties like the bank defendants. Judge Glasser had no hesitation in categorically holding that the act of war limitation applied to bar the plaintiffs' claims in *Stutts*.

He is not alone. Judge Lamberth in *Kaplan*, 961 F. Supp. 2d 185 (D.D.C. 2013), took the same approach. *Kaplan* did not involve soldiers as here, but American civilians in Israel. Plaintiffs claimed in that case that BSPLC and others violated the ATA with the very same conduct as alleged here – even referencing the very same transfers and funds. *Kaplan* involved allegations that Lebanese Hizbollah (not KH) was responsible for a 2006 rocket barrage fired into towns in northern Israel, which resulted in the civilian plaintiffs' injuries.

Even with civilian plaintiffs in *Kaplan*, Judge Lamberth needed nothing more to rule on the applicability of the act of war doctrine. For Judge Lamberth, regardless of whether the act of war limitation was a matter of subject matter jurisdiction, an element or an affirmative

-9-

defense, the limitation applied on defendants' motion to dismiss.  Like Judge Glasser, there was

no need, in Judge Lamberth's view, to further consider specific circumstances, including the

possibility that civilians might have been targeted as part of the rocket barrage.  Neither as part

of the analysis did the Court attempt to sift the chronology of events, *e.g.*, whether the alleged

Hizbollah rocket barrage triggered the war or was in response to it.  For Judge Lamberth, like

Judge Glasser, it was enough that the injuries resulted from and were part of armed hostilities in

an observable war or other "armed conflict."  In *Stutts* it was the Gulf War.  In *Kaplan* it was

combat between Israel and Hizbollah that came to be known as the Second Lebanon War.  In

*Freeman,* it is what the complaint itself refers to as the "Iraqi war."

    The wisdom of these approaches (and by courts which have been demonstrably

and consistently sympathetic to the remedial purposes of the ATA) hardly needs elaboration.

The broad act of war limitation in Section 2336(a) was meant to assure that the extraterritorial

ATA was cabined,[6] so that actions could not ordinarily be "maintained"  arising from modern,

foreign armed conflicts that include both conventional war and the nearly inevitable clashes of

remnants, insurgents and other "forces of any origin" occurring in its aftermath.  Particularly not

for a virtually unlimited source of claims from soldiers injured in the line of duty, contractors,

and others who may be directly or collaterally injured as part of armed conflicts, such as by

exploding ordnance (as chiefly alleged here) or in an attack at dusk by armed hostiles on

garrisoned troops.

    The injury and loss of life to U.S. soldiers, their families and other U.S. nationals

resulting from the Iraq War, or any war or other "armed conflict," is terrible.  However, for the

---

[6] The extraterritoriality of the ATA means that there is particular reason for caution in interpreting the act of war limitation.   What we recognize as a basis for civil liability of non-U.S. corporations invites foreign nations, and their armed services, to do the same.

Servicemen and other plaintiffs (and likely for the Contractor[7]), the government provides

financial support for the injuries and loss of our military dead and wounded.  *See* DAVID F.

BURRELLI AND JENNIFER R. CORWELL, CONG. RESEARCH SERV., RL32769, MILITARY DEATH

BENEFITS: STATUS AND PROPOSALS (2008).  Injured servicemen can also receive military pay,

and payments under programs from both the Social Security Administration and Veteran's

Affairs.  The point is not that this compensation is adequate.  It is that injuries occurring in the

course of armed conflict or war (and not compensable under the ATA) are addressed through

other solutions and causes of action than ATA claims in U.S. courts for alleged foreign torts such

as these occurring in military combat zones during hostilities.

      In their ambitious reach to join all these parties in a broad claim of conspiracy

against the defendant banks, the plaintiffs have resorted to a bare, formulaic pleading of the

circumstances of their injuries.  This was not by indirection, but by design.  As a result, Plaintiffs

have not sufficiently shown subject matter jurisdiction as to the act of war limitation.  Under

Rule 12(b)(1), it is the plaintiffs' burden by a preponderance.  On a facial challenge at this point,

it appears that all inferences are drawn in the plaintiffs' favor.  *See Arar v. Ashcroft*, 532 F.3d

157, 168 (2d Cir. 2008); *but see J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir.

2004) (assuming facts pled as true but no inferences favorable to plaintiff); *Salvani v. ADVFN

PLC,* 2014 U.S. Dist. LEXIS 133783, *11 (S.D.N.Y. 2014) (same).  To the extent the act of war

limitation is an element, plaintiffs have not sufficiently alleged facts to show that their claims

plausibly fall outside that limitation under Rule 12(b)(6).  They have failed to meet their burden

---

[7]*See* 42 U.S.C. §§ 1651-1654 (providing medical treatment and compensation to employees of defense contractors and subcontractors injured in the scope of employment on foreign U.S. military bases, lands used by the U.S. for military purposes, public work contracts, and contracts under the Foreign Assistance Act).

and the pleading standard required by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007),

*Erickson v. Pardus*, 551 U.S. 89 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

## IV. CLAIMS AGAINST BSPLC MUST BE DISMISSED FOR LACK OF PERSONAL JURISDICTION UNDER FED. R. CIV. P. 12(B)(2)

### A. Operative Standard

On a motion to dismiss under Fed. R. Civ. P. 12(b)(2), the plaintiff bears the

burden of establishing that the court has personal jurisdiction over a foreign defendant. *Whitaker*

*v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001). To withstand a Rule 12(b)(2) motion,

the plaintiff must plead "factual allegations [that] constitute a *prima facie* showing of

jurisdiction." *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990).

This requirement "does not mean that plaintiff must show only some evidence that defendant is

subject to jurisdiction; it means that plaintiff must plead facts which, if true, are sufficient in

themselves to establish jurisdiction." *Tamam v. Fransabank SAL*, 677 F. Supp. 2d 720, 725

(S.D.N.Y. 2010); *see O'Neill v. Asat Trust Reg. (In re Terrorist Attacks on September 11, 2001*

*(Asat Trust Reg.))*, 714 F.3d 659, 674 (2d Cir. 2013).

The test for specific personal jurisdiction[8] over BSPLC is a two-step inquiry: (1)

whether New York's long-arm statute law provides a basis for personal jurisdiction and if so, (2)

whether exercising personal jurisdiction comports with constitutional due process. *Saudi v.*

*Marine Atlantic. Ltd.*, 306 Fed. Appx. 653, 654 (2d Cir. 2009).

---

[8] Plaintiffs do not assert BSPLC is subject to the Court's general personal jurisdiction, *see* Compl. ¶ 11, nor could they since BSPLC is a UK incorporated bank barred from unlicensed dealings with U.S. persons since about 1987, pursuant to the U.S. trade sanctions program. *See Daimler AG v. Bauman*, 134 S. Ct. 746, 749 (2014).

**B.     BSPLC Is Not Subject To New York Long-Arm Jurisdiction Under CPLR § 302**

For personal jurisdiction under CPLR § 302(a)(1),[9] "two requirements must be met: (1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity."  *Alexander v. Porter*, 2014 U.S. Dist. LEXIS 177841, **4-5 (E.D.N.Y. Dec. 23, 2014).

**1.     BSPLC Has Not Transacted Business in New York**

"[T]he overriding criterion necessary to establish a transaction of business is some act by which the defendant purposefully avails itself of the privilege of conducting activities within [New York]."  *Ehrenfeld v. Bin Mahfouz*, 9 N.Y.3d 501, 508 (2007).  Courts look at the totality of the circumstances in making this determination.  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 787 (2d Cir. 1999).  Here, the complaint does not identify any sufficient contacts between BSPLC and New York, or otherwise plead plausible facts to support that BSPLC transacted business in New York.  The complaint does not specify any banking transaction involving BSPLC that occurred in New York.  Nor does the complaint make any allegation that BSPLC is qualified or licensed to do business in New York, solicits or has customers in New York, maintains any office in New York, or has a New York mailing address. It does not even allege that BSPLC maintained and used a correspondent bank account in New York.

What is alleged is that BSPLC had correspondent accounts with various non-U.S. banks.  The complaint claims those non-U.S. banks had correspondent banking relationships in New York which they used to fulfill U.S. dollar transactions for their clients, presumably

---

[9] Plaintiffs do not specify which subsection of CPLR § 302 they rely upon.  *See* Compl. ¶ 11. Given the facial inapplicability of CPLR §§ 302(a)(2) and (a)(3), it is presumed that plaintiffs rely upon Section 302(a)(1).

including BSPLC, although even that is not alleged in anything but conclusory fashion.  The bare allegation that BSPLC conducted business with non-U.S. banks outside the United States, which in turn conducted business with banks in New York, provides no basis to find that BSPLC purposely availed itself of New York for jurisdictional purposes.

The New York Court of Appeals recently considered the reach of New York's long-arm statute in *Licci v. Lebanese Can. Bank ("LCB"), SAL*, 20 N.Y.3d 327 (2012), and elaborated what constitutes transaction of business in New York for a foreign bank.  In *Licci*, American and foreign citizens injured in alleged Hizbollah rocket attacks in Israel sued LCB under the ATA and other statutes.  *Id*. at 894.  LCB, a Lebanese bank in Beirut, was alleged to have facilitated financial transactions for Hizbollah.  *Id*. at 894-95.  Plaintiffs claimed personal jurisdiction over LCB under CPLR § 302(a)(1).  *Id*. at 895.  Like BSPLC, LCB did not have any place of business in the U.S.  *Id*.  Unlike BSPLC, however, LCB had a correspondent bank account in New York, which it allegedly *directly* used to transfer funds many times to and from Hizbollah's claimed financial arm.  *Id*. at 894, 899.

On a certified question from the Second Circuit, the New York Court of Appeals held that maintaining a correspondent bank account may, depending on the particular facts, be sufficient for jurisdiction if "the defendant's use of that account was purposeful" and sufficiently related to the claim.  *Id*. at 899.  Since LCB had a correspondent account in New York and also allegedly directed specific funds transfers through it to Hizbollah, personal jurisdiction was found.  The Court distinguished, however, the activity alleged against LCB from cases in which the defendant's use of a New York correspondent account was "essentially adventitious."  *Id*. at 900.

Here, plaintiffs do not allege the existence of any BSPLC bank account in New York.  Unlike *Licci*, there is not even a correspondent account in New York, much less one that was used by BSPLC as in *Licci*.  For this reason alone, the plaintiffs' claim for specific jurisdiction over BSPLC fails.

In this context, plaintiffs do not even allege any course of dealing directly by BSPLC touching New York.  Nor could they plausibly do so.  U.S. sanctions have generally prohibited U.S. persons from unlicensed trade-related transactions with an Iranian-owned bank such as BSPLC since 1987.  31 C.F.R. §§ 560.210, *et seq.*  Instead, the complaint only alleges that BSPLC maintained correspondent accounts outside of the U.S. with other non-U.S. banks that were counterparties to BSPLC for dollar denominated banking transactions (and presumably other currencies as well).  Until about September 8, 2006, under the U.S. trade sanctions, banking "U-turn" transactions in dollars with a bank in the U.S. were permitted to BSPLC, but not directly.  Compl. ¶ 748.  All such transactions had to both originate and conclude outside the U.S. with a non-U.S. bank that was not subject to the trade sanctions program.  After September 8, 2006,  BSPLC could no longer engage in any such U-turn transactions, even indirectly.

The complaint alleges that billions of dollars in U-turn transactions were effectuated by Iranian banks, including BSPLC (which though Iranian-owned, is not an Iranian bank but a British bank and citizen of Great Britain) through U.S. banks in New York in this manner during the alleged relevant period of time, which extends to the present.  Compl. ¶¶ 11 and 767.  Plaintiffs, however, do not allege even a single specific U-turn transaction directly routed through New York by BSPLC at any time.  Plaintiffs' allegations that unidentified U.S. dollar transactions initiated by BSPLC customers were processed in a manner that caused them to pass through New York via a series of daisy-chained transactions involving numerous other

foreign banks does not satisfy plaintiffs' burden of establishing that BSPLC purposefully availed itself of New York.

Any other result here will be something new for the world.  It will mean specific jurisdiction may result anytime a non-U.S. financial institution (with no other U.S. contacts) uses a non-U.S. correspondent bank outside the U.S., which in turn fulfills customer orders through New York.  A rule other than the one advanced by BSPLC would be a virtual "big bang" of new U.S. jurisdiction.  Without any correspondent account in New York of its own and without proof of purposeful availment of that account by BSPLC (as in *Licci*), the complaint fails to adequately allege any basis for the exercise of personal jurisdiction over BSPLC in New York as a matter of law.

### 2.   Plaintiffs' Claims Do Not Arise From Any New York Business Activity

CPLR § 302(a)(1) limits long-arm jurisdiction over defendants to claims that "arise from" their business transactions in New York.  *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt.*, LLC, 450 F.3d 100, 103 (2d Cir. 2006).  Even if BSPLC's alleged business transactions with non-U.S. banks outside New York could possibly constitute the transaction of business in New York (which they do not), long-arm jurisdiction over BSPLC is foreclosed because plaintiffs have not adequately pled that their claims arise from any of BSPLC's supposed New York business.

In *Tamam v. Fransabank SAL,* 677 F. Supp. 2d 720 (S.D.N.Y. 2010), Israeli citizens claiming injury from Hizbollah sued Lebanese banks seeking to hold them liable for dollar exchanges for Hizbollah front groups via their correspondent bank accounts in New York.  *Id.* at 724.  On the defendants' motion under Rule 12(b)(2), the court found that plaintiffs adequately alleged that defendant banks provided financial services to Hizbollah front groups

and also maintained U.S. correspondent accounts in New York to facilitate foreign currency

conversions.  Still, the plaintiffs failed to allege actual money transfers from the Hizbollah front

groups through those correspondent banks in New York.  *Id*. at 727.  Considering the

"information and belief" allegation that the bank defendants processed funds and cleared dollars

through New York for the benefit of the Hizbollah fronts, the court acknowledged that "the

processing of … funds through [U.S.] correspondent banks may indicate that [the Lebanese

banks] purposefully availed themselves of business opportunities in New York."  *Id*.  The court

still concluded, however, that "the use of correspondent accounts in New York nonetheless

[could not] form the basis of personal jurisdiction because the Amended Complaint [did] not set

forth a 'substantial relationship' between the correspondent bank accounts and Hizbullah's

terrorist activity."  *Id*.  The "events giving rise to the physical injuries and deaths for which

Plaintiffs [sought] redress [were] missile attacks in Israel, not funds transfers in New York."  *Id*.

at 728.  Since the plaintiffs failed to allege a connection between the use of its U.S. bank

correspondent accounts in New York and any transfer of money among the Hizbollah front

group accounts, the court dismissed for lack of personal jurisdiction.  *Id*. at 734; *see HSH*

*Nordbank AG N.Y. Branch v. Street,* 2012 U.S. Dist. LEXIS 99830, *15 (S.D.N.Y. 2012) (noting

that *Taman's* "[d]ismissal for lack of personal jurisdiction was based upon the plaintiffs' failure

to allege specific transfers through New York accounts").

        The same result is required here, as plaintiffs' allegations do not even rise to the

level deemed insufficient in *Tamam* to establish a nexus between any New York activity and the

claims asserted.  In their 1,363 paragraph complaint, plaintiffs have failed to identify a single U-

turn transaction routed through New York involving BSPLC directly or indirectly, much less a

U-turn transaction involving BSPLC and an account associated with terrorism.[10]  Unlike the

plaintiffs in *Licci*, who identified specific account holders, specific accounts with alleged ties to

terrorism (indeed, even listing the account number of one of them), and specific dollar

transactions,[11] plaintiffs here have not identified any BSPLC account holder or BSPLC account

at all.  *See* First Am. Compl. in *Licci v. American Express Bank LTD, et al.*, 08-cv-7253

(S.D.N.Y.), ¶¶ 44-56 (Exhibit 2).  At bottom, plaintiffs simply have not sufficiently alleged any

actual money transfers involving BSPLC and accounts associated with terrorism that were

purposely routed by BSPLC through banks in New York.  They have not established any nexus

between BSPLC's supposed New York conduct and their claims of terrorism financing.  As

recently restated by the *Tamam* court, "a defendant may not be subject to personal jurisdiction

under CPLR § 302(a)(1) simply because [its] contact with New York was a link in a chain of

events giving rise to the cause of action."  *Tamam*, 677 F. Supp. at 729.

    **C.**    **BSPLC Is Not Subject To Personal Jurisdiction Under Fed. R. Civ. P. 4(k)**

In the complaint, plaintiffs also cite Fed. R. Civ. P. 4(k)(1) and 4(k)(2).  Compl. at

¶ 11.  As a threshold matter, Rule 4(k)(1)[12] has no application here because that rule provides for

personal jurisdiction when service is authorized by a federal statute.  BSPLC was not served

pursuant to the nationwide service of process provision of the ATA, 18 U.S.C. § 2334(a), but

---

[10] The press release concerning money transfers to Bank Saderat Iran's branch in Beirut, as referenced in ¶ 1288 of the complaint, does not indicate that these transfers were U-Turn transactions that passed through New York.

[11] In distinguishing *Tamam*, the New York Court of Appeals in *Licci* noted that the plaintiffs in *Tamam*, unlike the *Licci* plaintiffs "did not allege actual transfers from Hizballah front group accounts in Lebanon through correspondent banks in New York."  *Licci* at n.7.

[12] Given that BSPLC is neither "subject to the jurisdiction of a court of general jurisdiction in [New York]" nor a party joined under Rule 14 or 19, *see* Fed. R. Civ. P. 4(k)(1)(A) and 4(k)(1)(B), plaintiffs appear to be invoking subsection C of Rule 4(k)(1).

instead was served in Great Britain as permitted by the Hague Convention.  *In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d 539, 557 (S.D.N.Y. 2005) (Rule 4(k)(1) was unavailable to establish personal jurisdiction in ATA lawsuit when "[d]efendants were not served in the United States pursuant to the ATA").

Personal jurisdiction under Rule 4(k)(2), on the other hand, requires that "there must be a federal claim, personal jurisdiction must not exist over the defendant in New York or any other state, and the defendant must have sufficient minimum contacts with the United States as a whole such that the exercise of jurisdiction does not violate Fifth Amendment due process."  *In re Terrorist Attacks on Sept. 11, 2001*, 392 F. Supp. 2d 539, 557 (S.D.N.Y. 2005).  The minimum contacts test requires a plaintiff to allege jurisdictional facts sufficient to show that defendants "purposefully directed their activities at residents of the forum and the litigation results from alleged injuries that arise out of or [are] related to those activities," *Daventree Ltd. v. Republic of Azer.*, 349 F. Supp. 2d 736, 763 (S.D.N.Y. 2004), such that defendants could reasonably foresee being brought into court in the forum.  *See also World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).  This the plaintiffs have not done and cannot do.

In the multi-district litigation surrounding the September 11 terrorist attacks, the Second Circuit considered what constitutes a purposeful direction of activity at the forum in its recent ruling affirming the dismissal under Rule 12(b)(2) of ATA and other claims brought against foreign individuals and institutions alleged to have financed Al Qaeda. *O'Neill v. Asat Trust Reg. (In re Terrorist Attacks on September 11, 2001)*, 714 F.3d 659, 674 (2d Cir. 2013).  In *O'Neill*, plaintiffs sued, among others, five financial institutions and numerous individual bank personnel for allegedly providing financial services to Al Qaeda and Al Qaeda front charities. The chain of interference was the same as here:  the provision of this alleged material support by

financial institutions produced U.S. injuries through terrorist acts.  The Second Circuit dismissed the claims for lack of personal jurisdiction.  It stated, "[p]roviding indirect funding to an organization that was openly hostile to the United States does not constitute this type of intentional conduct" than can give rise to personal jurisdiction.  *Id*. at 675.  It went on to elaborate, that "[i]t may be that, but for access to financial institutions, Al Qaeda could not have funded its terrorist attacks.  But that does not mean that [they] 'purposefully directed'" their activities to New York.  *Id*.  The court cited with approval the proposition that "we decline to say. . . that the provision of financial services to an entity that carries out a terrorist attack on [U.S.] citizens could make [a defendant]. . . subject to the jurisdiction of American courts."  *Id*. at 676.  Personal jurisdiction over BSPLC is likewise denied as a matter of law in this case under *O'Neill*.

Personal jurisdiction over BSPLC is also barred by other due process considerations.  In *Walden v. Fiore*, the Supreme Court just recently clarified several points regarding the minimum contacts due process inquiry.  134 S. Ct. 1115, 1121 (2014).  First, "[t]he inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation.  For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State."  *Id*. at 1121.  Second, among other things, "the relationship must arise out of contacts that the '*defendant himself*'" has with the forum.  *Id*. at 1122 (emphasis in original).  As we have elaborated, there is no sufficient suit-related conduct by BSPLC creating a substantial connection to New York, and none arising out of contacts by BSPLC with this forum.  The complaint fails to show that BSPLC has sufficient contacts to

-20-

justify personal jurisdiction under the due process clause.  There is no necessity for any

jurisdictional discovery, as the lack thereof is apparent from the pleadings.

**V.      PLAINTIFFS' ATA COUNTS DO NOT ADEQUATELY ALLEGE PROXIMATE
         CAUSATION FOR PLAINTIFFS' INJURIES**

        Plaintiffs' ATA claims against BSPLC in Counts 1 and 2 fail to state a claim

under *Twombly* because plaintiffs fail to allege facts sufficient to support the required elements

of causation.  The ATA's "by reason of" language requires plaintiffs to show that BSPLC's

actions were both the cause-in-fact and the proximate cause of plaintiffs' injuries.  *Strauss v.*

*Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 432 (E.D.N.Y. 2013); *Weiss v. Nat'l Westminster*

*Bank*, 453 F. Supp. 2d 609, 631 (E.D.N.Y. 2006).  In a post-*Twombly* pleading, plaintiffs cannot

rely on conclusory allegations of causation.  *See, e.g., Schaaf v. Resid. Funding Corp.*, 517 F.3d

544, 549-53 (8th Cir. 2008) (citing *Twombly* and dismissing claims for failure to establish a

causal connection between defendant's acts and plaintiff's loss); *Pension Comm. of the Univ. of*

*Montreal Pension Plan v. Banc of Am. Sec., LLC*, 2007 U.S. Dist. LEXIS 11807, *32 (S.D.N.Y.

2007) (dismissing tort claims because proximate cause assertions failed to establish defendant's

actions were a "substantial factor in the sequence of responsible causation").

        In its simplest form, the complaint alleges that the defendant banks, including

BSPLC and others, conspired to provide material support to Iran to engage in acts of terrorism in

Iraq through terrorists and named "proxy" terrorist organizations, including Iran's Quods Force,

Lebanese Hizbollah and the defined "Special Groups."  By these means, the plaintiffs were

allegedly injured in Iraq between 2004 and 2011.  Specifically with respect to BSPLC, plaintiffs

(among other things) cite to a U.S. government release from October 2007 that "from 2001 to

2006 Bank Saderat [not BSPLC] transferred $50 million from the Central Bank of Iran through

its subsidiary in London [BSPLC] to its [Bank Saderat's] branch in Beirut for the benefit of

Hezbollah fronts in Lebanon that support acts of violence."  Compl.  ¶ 753.  More generally, the

complaint also alleges that the conspiracy to "strip" (not a term of art) SWIFT messages of

certain information defeated the ability of the government to monitor Iran's access to foreign

exchange, facilitating Iran's funding of terrorist acts that injured the plaintiffs.  *Id*. at ¶ 757-776.

      *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) and *O'Neill,* 714 F.3d 659, deny

that the "chain of inferences" offered here against the defendant banks, including BSPLC, can

support a sufficient showing of proximate causation.   It goes without saying that the chain of

inference is huge.  Both *Rothstein* and *O'Neill* involved virtually identical allegations (for these

purposes) to those in *Freeman.*  In *Rothstein*, UBS was alleged to have illegally transferred U.S.

currency to Iran and Iranian government entities.  The transfers were forbidden and had not been

reported to OFAC.  The plaintiffs were U.S. citizens injured in Israel between 1997 and 2006 in

alleged attacks by Hamas or Hizbollah.  The plaintiffs claimed that their injuries were

proximately caused by UBS's illegal provision of hundreds of millions of dollars to Iran, which

had been used by Iran to support the terrorist organizations.

      The *Rothstein* court ruled that there was no proximate cause shown due to several

independent defects.  *Rothstein*, 708 F.3d at 94-95.  There was no adequate showing that the

bank was a participant in the attacks, or that the funds were actually provided to the FTOs by

Iran, or that without the foreign-currency exchanged dollars, Iran would not have allegedly done

the same thing.  For purposes of proximate causation, *Rothstein* also found no value in the

allegations that the funds transfers to Iran involved potential illegality.  All these are true of

*Freeman* as well.  There is no adequate allegation of cause-in-fact, and the plaintiffs' elaborate

claims about "U-turn stripping" have no conceptual role to play in the proximate cause analysis.

*Rothstein* also noted that plaintiffs did not "allege that UBS provided money to Hizbollah or

Hamas." *Id*. at 97.  The same is not quite so in *Freeman*, but the distinction is without a difference.

In *Freeman,* the plaintiffs allege that BSPLC was involved in transfers of funds not to Hizbollah, but to its parent's "branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence."  Compl. ¶ 1288.  Like the allegations in *Rothstein*, these also do not allege a transfer of funds to Hizbollah.  They support an allegation of transfers to BSPLC's parent's bank branch.  It is another step to the alleged Hizbollah fronts, and then yet another step that the funds were allegedly transferred to Hizbollah.  And many steps of causation to injuries in Iraq.  The complaint does not identify the "fronts" at issue, nor identify that they were account holders, nor plausibly claim that BSPLC knew that its transfers were for Hizbollah fronts.  There is no supported claim that BSPLC knew the alleged transfers to its parent bank were allegedly for the benefit of Hizbollah, and there is no support for any claim that BSPLC would have had any reason to be on notice that the ultimate beneficiaries were alleged "Hezbollah fronts."  This makes these allegations insufficient for proximate causation just as much as in *Rothstein,* since the allegations are too attenuated to support proximate causation of the injuries (many of which were after 2006, and all were in Iraq).[13]  Importantly, the attenuation presented here was addressed after *Rothstein* in *O'Neill*.

In *O'Neill*, five defendants (including two banks) were dismissed under Rule 12(b)(6) for failure to show proximate causation.  714 F.3d 118 (2d Cir. 2013).  As noted, plaintiffs were injured in the 9/11 attacks and the defendants, including the banks, were "alleged

---

[13] Under the allegations of the complaint, both geography and temporality also present defects for plaintiffs. To demonstrate the point, these very same claims have been used as alleged proximate causation for injuries in Israel.  *See Kaplan*.  The allegations of support by BSPLC relate to Lebanese Hizbollah and not Iraq.  Additionally, the allegations relate to 2001 to 2006.  U-turn transactions were denied to BSPLC after September 8, 2006.  There is no coincidence between the dates of alleged support provided by BSPLC and the dates of many plaintiffs' injuries.

to have provided *funding to purported charity organizations* known to support terrorism, that, in turn, provided funding to Al Qaeda and other terrorist organizations." *Id*. at 124 (emphasis added). On appeal, the Second Circuit turned away these claims as no proximate causation could be shown that "banking services to organizations and individuals said to be affiliated with Al Qaeda. . . proximately caused" the 9/11 attacks. *Id*. Like *O'Neill*, *Freeman* involves the alleged provision of banking services to an alleged intermediary, and an equally huge chain of inferences.[14]

Accordingly, there is no showing of either cause-in-fact or that the conduct of the defendant was "a substantial factor in the sequence of responsible causation," or that plaintiffs' injuries were "reasonably foreseeable or anticipated as a natural consequence." *Weiss v. Nat'l Westminster Bank*, 453 F. Supp. 2d 609, 631 (E.D.N.Y. 2006) (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003)). *Rothstein* and *O'Neill* foreclose the plaintiffs' virtually identical claims here.[15]

## VI.   PLAINTIFFS' ATA COUNTS DO NOT ADEQUATELY ALLEGE MENS REA AS TO BSPLC

*Twombly* applies with equal force to the plaintiffs' allegation of scienter under Section 2333(a). A defendant must engage in knowing misconduct to be liable under Section 2333(a). *See Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 694 (7th Cir. 2008). For a Section 2339A violation, plaintiffs must allege facts sufficient to establish that BSPLC provided material support, knowing or intending that such support would be used to carry out a specified terrorist act. Under Section 2339B, plaintiffs must allege sufficient facts that BSPLC

---

[14] While there is no allegation that BSPLC maintained any account for an organization associated with terrorism, *O'Neill* would still deny plaintiffs' claims for failure to show proximate causation for a bank with such an account as well.

[15] This Court's ruling in *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414 (E.D.N.Y. 2013), may be distinguishable on the facts, and was issued before the Circuit's ruling in *O'Neill*.

provided material support, knowingly or with deliberate indifference, to a foreign terrorist organization.  *See*, *e.g.*, *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414 (E.D.N.Y. 2013). Plaintiffs fail to plausibly allege that BSPLC acted with the requisite scienter for a violation of Section 2333(a) as required.

Plaintiffs' complaint exhaustively alleges all manner of mental states, and repeatedly so, in Counts 1 and 2.  These allegations are conclusory and fail to satisfy *Twombly's* requirements.[16]  *See* Compl. ¶¶ 1299 *et seq.*  They are unsupported by facts, based only on conjecture, or provide no inference of mental state in support of the claims.  As to BSPLC, the complaint basically argues for scienter because funds were:  (i) provided to Iran, (ii) obtained for Iran through U-turn transactions that involved data "stripping" by correspondent banks,[17] and (iii) transferred by BSPLC to its parent branch in Beirut for the benefit of "Hezbollah fronts" between 2001 and 2006.

Just as much as with proximate cause, the provision of funds to Iran, and its alleged procurement through "stripping" of SWIFT messages, do not supply any inference of a mental state to support terrorism as required by the ATA or Sections 2339A or B.  "Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund." *Rothstein v. UBS*, 708 F.3d at 97.  The same was true for the illegality[18] associated with funds provided by UBS.  *Id.*  ("[W]hile the Complaint alleges that 'UBS knew full well that the cash

---

[16] In its turn, Section 2339A incorporates various other criminal statutes and their respective mental states. The same is true for each of them alleged.

[17] During the relevant period of time, BSPLC could have no direct dealings with any U.S. banks under the Iran trade sanctions program.  See IV *supra*.

[18] The illegality alleged is of a regulatory nature.  The alleged "stripping" of SWIFT messages would not have impacted whether the underlying U-turn transactions were permissible under the U-turn exception in the first instance.  There is no reason to believe that permissible U-turn transactions would not have been processed in any event, but only with delays.

dollars it was providing [to Iran] would be used to cause and facilitate terrorist attacks by. . . Hizbollah. . .,' these are conclusory allegations that do not meet *Twombly*'s plausibility standard").

Similarly, the allegations as to transfers by BSPLC to its parent's branch in Beirut can provide factual support (but likely not any evidentiary basis) only that such transfers occurred.  These allegations provide no further grounds to infer that the transfers were done with knowledge or notice to BSPLC that the alleged accounts of its parent for the benefit of unidentified customers were actually Hizbollah fronts.  Nor does it provide any factual basis to infer any knowledge on the part of BSPLC that the funds were in fact to be provided to Hizbollah, if indeed they were.  Likewise, this allegation provides no basis to infer BSPLC's knowledge or intention that such funds be used to support any designated terrorist acts.  *See Ahmad v. Christian Friends of Israeli Communities*, 2014 U.S. Dist. LEXIS 62053 (S.D.N.Y. 2014) (dismissing ATA claim because plaintiffs' conclusory allegations failed to allege any facts that would demonstrate that defendants knew or were indifferent from knowing that their financial support would be used to support a violent act).  Plaintiffs have failed to meet their burden with respect to the scienter requirements under the ATA.

**VII.  *ROTHSTEIN'S* BAR OF AIDER-AND-ABETTOR LIABILITY UNDER ATA INCLUDES CONSPIRACY**

In *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013), victims of alleged Hamas and Hizbollah attacks in Israel sued UBS under the ATA for illegal U.S. currency transactions with Iran.  As here, plaintiffs claimed the bank's provision of dollars to Iran facilitated terrorist attacks.  The district court granted the defendants' motion to dismiss.  The Second Circuit affirmed, ruling, *inter alia*, that plaintiffs failed to state a claim because the ATA does not provide for civil liability on an aiding-and-abetting theory.  *Id.* at 97.  The Second Circuit

-26-

reasoned that Congress, having included in the ATA several express provisions for aiding and abetting in criminal provisions, did not intend Section 2333 to authorize civil recovery on such grounds in the absence of any textual basis for it. *Id.*; *see also Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 689 (7th Cir. 2008) ("statutory silence on the subject of secondary liability means there is none; and section 2333(a) . . . does not mention aiders and abettors or other secondary actors."). The Second Circuit in *Rothstein* specifically cited to *Boim* for this broad proposition. 708 F.3d at 97.

The plaintiffs here, apparently hoping to circumvent *Rothstein's* plain rule, have substituted conspiracy for aiding and abetting. That does not work. *Rothstein* still compels dismissal. Plaintiffs' claims are aiding and abetting claims in every respect but in name. As in *Rothstein*, plaintiffs do not contend that BSPLC or the other defendant banks directly engaged in or gave material support to acts of international terrorism. Instead, they assert that the defendant banks assisted Iran in doing so by providing mechanisms through which Iran could fund terrorist organizations. As plaintiffs allege in the complaint:

- The conspiracy to circumvent monitoring by US regulators was "orchestrated by Iran" that made it possible for "Iran to transfer … hundreds of millions of dollars" to terrorist organizations. Compl. ¶ 756.

- The conspiracy allowed "Iran to hide U.S. dollar transactions for designated FTOs and other terrorist organizations." Compl. ¶ 775.

- "Defendants were willing to, and did, commit numerous felonies under U.S. law to assist Iran in concealing its financial activities." Compl. ¶ 1301.

- "[T]he Defendants provided Iran with the means by which it could transfer more than $150 million to the IRGC-QF, Hezbollah and Special Groups, which were actively engaged in planning and perpetrating the murder and maiming of hundreds of Americans in Iraq…." Compl. ¶ 763.

- "[T]he Conspiracy substantially assisted Iran, the IRGC-QF, Hezbollah, and/or Special Groups in committing the acts of international terrorism." Compl. ¶ 762.

- "The material support that Defendants knowingly and/or recklessly provided to Iran, provided substantial assistance to the IRGC-QF, Hezbollah and the Special Groups, thereby preparing and facilitating acts of terrorism…." Compl. ¶ 1304.

- "The Defendants' … [conspiracy] … foreseeably resulted in material support being delivered in order to carry out or prepare for violations of [the ATA] by the IRGC-QF, Hezbollah and/or the Special Groups…" Compl. ¶ 1311.

These allegations make plain that plaintiffs' theory is that BSPLC and the other defendants are liable for assisting Iran to financially support Hizbollah and other terrorist organizations, which is precisely what *Rothstein* forecloses.

But even if plaintiffs' theory of recovery were not actually an aiding and abetting theory, dismissal is, of course, still required by *Rothstein*. The ATA does not authorize secondary civil liability for aiding and abetting. It also does not authorize secondary civil liability for conspiracy. As with aiding and abetting, various criminal provisions of the ATA include express provisions regarding conspiracy, *see e.g.*, 18 U.S.C. §§ 2332a(a); 2332b(a)(1)(B); 2332f(a)(2); 2332g(c)(1). But Section 2333 is silent on any form of secondary liability. Applying the Second Circuit's rationale in *Rothstein*, there is no basis to infer that Congress intended a private right of action under the ATA for conspiracy any more than for aiding and abetting. Just as much as there is no general federal statute for civil liability for aiding and abetting (unlike 18 U.S.C. § 2 for criminal liability), there is also no such statute for civil conspiracy (unlike 18 U.S.C. § 371). *See Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.)*, 60 F.3d 591, 592 (9th Cir. 1995) (§ 10 of the Securities Exchange Act has neither aiding and abetting nor conspiracy liability); *Vista Mktg., LLC v. Park*, 999 F. Supp. 2d 1294, 1296 (M.D. Fla. 2014) (Stored Communication Act does not include "secondary liability," *i.e.*, either conspiracy or aiding and abetting). These closely related forms of secondary liability must be treated the same way under the ATA.

-28-

Denying aiding and abetting liability but permitting it for conspiracy in a civil context would make no sense and reduce the matter to mere nomenclature: criminal conspiracy's distinction of being an inchoate offense gives way in a civil context, which requires consummation of the tort for damages. Unlike in criminal jurisprudence, there is exceedingly little practical difference between civil conspiracy and civil aiding and abetting. *Rothstein's* ruling denying aiding and abetting under the ATA compels dismissal of the ATA conspiracy claims in this case.

## VIII.   CONCLUSION

The plaintiffs' claims attempt to press the ATA's civil cause of action far beyond its limits. For the foregoing reasons, the Court should dismiss plaintiffs' claims against BSPLC for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim, as may be shown.

/s/ Jeremy D. Frey
Jeremy D. Frey
PEPPER HAMILTON LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel:  (212) 808-2700

Attorneys for Defendant Bank Saderat PLC

# EXHIBIT 1

**FREEMAN, et al. v. HSBC HOLDINGS PLC, et al.**
**SUMMARY OF PLAINTIFFS/DECEDENTS FROM COMPLAINT**

| Plaintiff/Decedent | Relationship to Deceased/Injured Claimant (Cause of Death/Injury) | US Citizen | US Military | Date of Injury | Place of Injury | Location in Complaint |
|---|---|---|---|---|---|---|
| **THE ARSIAGA FAMILY** | | | | | | |
| Robert R. Arsiaga | Self; deceased (RPGs and small arms fire) | Y | Y | 4/4/2004 | Baghdad | Pages 15-16 |
| Tracie Arsiaga | Widow | Y | | | | |
| | | | | | | |
| **THE CASON FAMILY** | | | | | | |
| Ahmed A. Cason | Self; deceased (RPGs and small arms fire) | Y | Y | 4/4/2004 | Baghdad | Page 16 |
| Cedric Hunt, Sr. | Step-father | Y | | | | |
| | | | | | | |
| **THE BARTLETT FAMILY** | | | | | | |
| Robert Bartlett | Self; injured (IED) | Y | Y | 5/3/2005 | Baghdad | Pages 17-18 |
| Shawn Bartlett | Brother | Y | | | | |
| | | | | | | |
| **THE VINCENT FAMILY** | | | | | | |
| Estate of Steven Vincent, brought by legal representative Lisa Ramaci | Self; deceased (kidnapped and shot) | Y | N (journalist) | 8/2/2005 | Basra | Page 18 |
| Lisa Ramaci | Widow | Y | | | | |
| Isabell Vincent | Mother | Y | | | | |
| Charles Vincent | Father | Y | | | | |
| | | | | | | |
| **THE MORIN FAMILY** | | | | | | |
| Estate of Steve Morin, Jr., brought by legal representative Gwendolyn Morin-Marentes | Self; deceased (IED) | Y | Y | 9/28/2005 | Umm Qasr | Page 19 |
| Gwendolyn Morin-Marentes | Widow | Y | | | | |
| E.M. (minor represented by his legal guardian Gwendolyn Morin-Marentes) | Son | Y | | | | |
| Audrey Morin | Mother | Y | | | | |
| Steve Morin | Father | Y | | | | |
| | | | | | | |

**FREEMAN, et al. v. HSBC HOLDINGS PLC, et al.**
**SUMMARY OF PLAINTIFFS/DECEDENTS FROM COMPLAINT**

| Plaintiff/Decedent | Relationship to Deceased/Injured Claimant (Cause of Death/Injury) | US Citizen | US Military | Date of Injury | Place of Injury | Location in Complaint |
|---|---|---|---|---|---|---|
| **THE ROBINSON FAMILY** | | | | | | |
| Estate of Jeremiah Robinson, brought by legal representatives Amy Lynn Robinson and Floyd Burton Robinson | Self; deceased (IED) | Y | Y | 10/6/2005 | Baghdad | Page 20 |
| Amy Lynn Robinson | Mother | Y | | | | |
| Floyd Burton Robinson | Father | Y | | | | |
| Jacob Michael Robinson | Brother | Y | | | | |
| Lucas William Robinson | Brother | Y | | | | |
| | | | | | | |
| **THE MATHENY FAMILY** | | | | | | |
| Estate of Charles E. Matheny, IV, brought by legal representative Deborah Noble | Self; deceased (IED) | Y | Y | 2/18/2006 | Baghdad | Page 21 |
| Deborah Noble | Mother | Y | | | | |
| Charles E. Matheny, III | Father | Y | | | | |
| | | | | | | |
| **THE FARR FAMILY** | | | | | | |
| Estate of Clay P. Farr, brought by legal representative Patrick Farr | Self; deceased (IED) | Y | Y | 2/26/2006 | Baghdad | Pages 21-22 |
| Silver Farr | Step-mother | Y | | | | |
| Patrick Farr | Father | Y | | | | |
| | | | | | | |
| **THE HUNTER FAMILY** | | | | | | |
| Wesley Hunter | Self; injured; now deceased (IED) | Y | Y | 2/26/2006 | Baghdad | Pages 22-23 |
| Rayanne Hunter | Widow | Y | | | | |
| W.H. (minor represented by his legal guardian Rayanne Hunter) | Son | Y | | | | |
| T.H. (minor represented by her legal guardian Rayanne Hunter) | Daughter | Y | | | | |
| | | | | | | |
| **THE LEWIS FAMILY** | | | | | | |
| Bryan A. Lewis | Self; deceased (IED) | Y | Y | 3/13/2006 | Rustamiyah | Page 23 |
| Fabersha Flynt Lewis | Widow | Y | | | | |
| | | | | | | |

**FREEMAN, et al. v. HSBC HOLDINGS PLC, et al.**
**SUMMARY OF PLAINTIFFS/DECEDENTS FROM COMPLAINT**

| Plaintiff/Decedent | Relationship to Deceased/Injured Claimant (Cause of Death/Injury) | US Citizen | US Military | Date of Injury | Place of Injury | Location in Complaint |
|---|---|---|---|---|---|---|
| **THE DEVORA-GARCIA FAMILY** | | | | | | |
| Estate of Israel Devora-Garcia, brought by legal representative Lorenzo Sandoval, Sr. | Self; deceased (IED) | Y | Y | 4/1/2006 | Baghdad | Page 24 |
| Lorenzo Sandoval, Sr. | Father | Y | | | | |
| Lorenzo Sandoval, Jr. | Brother | Y | | | | |
| | | | | | | |
| **THE BANDHOLD FAMILY** | | | | | | |
| Scott Bandhold | Self; deceased (IED) | Y | Y | 4/12/2006 | Misiab | Pages 24-25 |
| H. Joseph Bandhold | Brother | Y | | | | |
| Donald C. Bandhold | Brother | Y | | | | |
| | | | | | | |
| **THE SAENZ FAMILY** | | | | | | |
| Estate of Carlos N. Saenz, brought by legal representative Nanette Saenz | Self; deceased (IED) | Y | Y | 5/5/2006 | Baghdad | Pages 25-26 |
| Nanette Saenz | Widow | Y | | | | |
| Juan Saenz | Son | Y | | | | |
| | | | | | | |
| **THE VACHO FAMILY** | | | | | | |
| Estate of Nathan J. Vacho, brought by legal representative John Vacho | Self; deceased (IED) | Y | Y | 5/5/2006 | Baghdad | Pages 26-27 |
| John Vacho | Father | Y | | | | |
| Ashley Vacho | Sister | Y | | | | |
| Estate of Carol Vacho, brought by legal representative John Vacho | Mother | Unk | | | | |
| | | | | | | |
| **THE WEST FAMILY** | | | | | | |
| Estate of Robert H. West, brought by legal representative Jeanette West | Self; deceased (IED) | Y | Y | 5/14/2006 | Baghdad | Page 27 |
| Jeanette West | Widow | Y | | | | |
| Shelby West | Daughter | Y | | | | |
| | | | | | | |
| **THE ENGEMAN FAMILY** | | | | | | |
| John W. Engeman | Self; deceased (IED) | Y | Y | 5/14/2006 | Baghdad | Pages 27-28 |
| Donna Engeman | Widow | Y | | | | |
| | | | | | | |

**FREEMAN, et al. v. HSBC HOLDINGS PLC, et al.**
**SUMMARY OF PLAINTIFFS/DECEDENTS FROM COMPLAINT**

| Plaintiff/Decedent | Relationship to Deceased/Injured Claimant (Cause of Death/Injury) | US Citizen | US Military | Date of Injury | Place of Injury | Location in Complaint |
|---|---|---|---|---|---|---|
| **THE LAWSON FAMILY** | | | | | | |
| Estate of Isaac S. Lawson, brought by legal representative Suzzettee Lawson | Self; deceased (IED) | Y | Y | 6/5/2006 | Baghdad | Pages 28-29 |
| Suzzettee Lawson | Mother | Y | | | | |
| C.L. (minor represented by her legal guardian Suzzettee Lawson) | Daughter | Y | | | | |
| | | | | | | |
| **THE CRABTREE FAMILY** | | | | | | |
| Daniel Crabtree | Self; deceased (IED) | Y | Y | 6/8/2006 | Al Kut | Page 29 |
| Judy Ann Crabtree | Mother | Y | | | | |
| Ronald Wayne Crabtree | Father | Y | | | | |
| Debra Wigbels | Sister | Y | | | | |
| Ronald William Crabtree | Brother | Y | | | | |
| | | | | | | |
| **THE SLAVEN FAMILY** | | | | | | |
| Benjamin J. Slaven | Self; deceased (IED) | Y | Y | 6/9/2006 | Diwaniyah | Page 30 |
| Judy Huenink | Mother | Y | | | | |
| Sean Slaven | Brother | Y | | | | |
| Chastity Dawn Slaven | Sister | Y | | | | |
| Nicole Landon | Sister | Y | | | | |
| Misti Fisher | Sister | Y | | | | |
| | | | | | | |
| **THE FRIGO FAMILY** | | | | | | |
| Nathan J. Frigo | Self; deceased (IED) | Y | Y | 10/17/2006 | Baqubah | Page 31 |
| Fred Frigo | Father | Y | | | | |
| | | | | | | |
| **THE HAUPT FAMILY** | | | | | | |
| Ryan Haupt | Self; deceased (IED) | Y | Y | 10/17/2006 | Baqubah | Pages 31-32 |
| Lynn Forehand | Mother | Y | | | | |
| Lance Haupt | Father | Y | | | | |
| Rhonda Haupt | Sister | Y | | | | |
| Tifany Haupt | Sister | Y | | | | |
| Sabrina Cumbe | Sister | Y | | | | |
| | | | | | | |

**FREEMAN, et al. v. HSBC HOLDINGS PLC, et al.**
**SUMMARY OF PLAINTIFFS/DECEDENTS FROM COMPLAINT**

| Plaintiff/Decedent | Relationship to Deceased/Injured Claimant (Cause of Death/Injury) | US Citizen | US Military | Date of Injury | Place of Injury | Location in Complaint |
|---|---|---|---|---|---|---|
| **THE HAINES FAMILY** | | | | | | |
| David W. Haines | Self; injured (IED) | Y | Y | 10/22/2006 | Baghdad | Pages 32-33 |
| Dawn Haines | Wife | Y | | | | |
| C.H. (minor represented by his legal guardian Dawn Haines) | Son | Y | | | | |
| | | | | | | |
| **THE KIM FAMILY** | | | | | | |
| Estate of Jang H. Kim, brought by legal representative Seop (Steve) Kim | Self; deceased (IED) | (became a citizen posthumously) | Y | 11/13/2006 | Baghdad | Pages 33-34 |
| Sangsoon Kim | Mother | Y | | | | |
| Seop (Steve) Kim | Father | Y | | | | |
| Michelle Kim | Sister | Y | | | | |
| | | | | | | |
| **THE FRASER FAMILY** | | | | | | |
| Estate of David M. Fraser, brought by legal representative Richard Fraser | Self; deceased (IED) | Y | Y | 11/26/2006 | Baghdad | Pages 34-35 |
| Helen Fraser | Mother | Y | | | | |
| Richard Fraser | Father | Y | | | | |
| | | | | | | |
| **THE ENGLISH FAMILY** | | | | | | |
| Estate of Shawn L. English, brought by legal representative Todd Daily | Self; deceased (IED) | Y | Y | 12/3/2006 | Baghdad | Pages 35-36 |
| Tricia English | Widow | Y | | | | |
| N.W.E. (minor represented by his legal guardian Tricia English) | Son | Y | | | | |
| N.C.E. (minor represented by his legal guardian Tricia English) | Son | Y | | | | |
| A.S.E. (minor represented by his legal guardian Tricia English) | Son | Y | | | | |
| | | | | | | |
| **THE FORD FAMILY** | | | | | | |
| Philip C. Ford | Self; deceased (IED) | Y | Y | 12/10/2006 | Baghdad | Page 36 |
| Philip S. Ford | Father | Y | | | | |
| | | | | | | |

**FREEMAN, et al. v. HSBC HOLDINGS PLC, et al.**
**SUMMARY OF PLAINTIFFS/DECEDENTS FROM COMPLAINT**

| Plaintiff/Decedent | Relationship to Deceased/Injured Claimant (Cause of Death/Injury) | US Citizen | US Military | Date of Injury | Place of Injury | Location in Complaint |
|---|---|---|---|---|---|---|
| **THE GIBSON FAMILY** | | | | | | |
| Brennan C. Gibson | Self; deceased (IED) | Y | Y | 12/10/2006 | Baghdad | Pages 36-37 |
| Linda Gibson | Mother | Y | | | | |
| John Gibson | Step-father | Y | | | | |
| | | | | | | |
| **THE BLOHM FAMILY** | | | | | | |
| Alan R. Blohm | Self; deceased (IED) | Y | Y | 12/31/2006 | Baghdad | Pages 37-38 |
| Denise Blohm | Mother | Y | | | | |
| Chris Blohm | Father | Y | | | | |
| Kiana Blohm | Sister | Y | | | | |
| Jeremy Blohm | Brother | Y | | | | |
| | | | | | | |
| **THE RECHENMACHER FAMILY** | | | | | | |
| William Joshua Rechenmacher | Self; deceased (IED) | Y | Y | 1/18/2007 | Baghdad | Page 38 |
| Joanne Gutcher | Mother | Y | | | | |
| | | | | | | |
| **THE FREEMAN FAMILY** | | | | | | |
| Estate of Brian S. Freeman, brought by legal representative Charlotte Freeman | Self; deceased (kidnapped and shot during attack on PJCC) | Y | Y | 1/20/2007 | Karbala | Pages 12-13 |
| Charlotte Freeman | Widow | Y | | | | |
| Kathleen Snyder | Mother | Y | | | | |
| Randolph Freeman | Father | Y | | | | |
| G.F. (minor represented by his legal guardianCharlotte Freeman) | Son | Y | | | | |
| I.F. (minor represented by her legal guardian Charlotte Freeman) | Daughter | Y | | | | |
| | | | | | | |
| **THE CHISM FAMILY** | | | | | | |
| Johnathan B. Chism | Self; deceased (kidnapped and shot during attack on PJCC) | Y | Y | 1/20/2007 | Karbala | Page 13 |
| Danny Chism | Father | Y | | | | |
| | | | | | | |

**FREEMAN, et al. v. HSBC HOLDINGS PLC, et al.**
**SUMMARY OF PLAINTIFFS/DECEDENTS FROM COMPLAINT**

| Plaintiff/Decedent | Relationship to Deceased/Injured Claimant (Cause of Death/Injury) | US Citizen | US Military | Date of Injury | Place of Injury | Location in Complaint |
|---|---|---|---|---|---|---|
| **THE FALTER FAMILY** | | | | | | |
| Estate of Shawn P. Falter, brought by legal representative Russell Falter | Self; deceased (kidnapped and shot during attack on PJCC) | Y | Y | 1/20/2007 | Karbala | Pages 13-14 |
| Linda Falter | Step-mother | Y | | | | |
| Russell Falter | Father | Y | | | | |
| | | | | | | |
| | | | | | | |
| **THE MILLICAN FAMILY** | | | | | | |
| Estate of Johnathon M. Millican, brought by legal representative Shannon Millican | Self; deceased (jumped on live grenade during attack on PJCC) | Y | Y | 1/20/2007 | Karbala | Page 14 |
| Shannon Millican | Widow | Y | | | | |
| Mitchell Millican | Father | Y | | | | |
| | | | | | | |
| **THE WALLACE FAMILY** | | | | | | |
| Billy Wallace | Self; injured (shrapnel from grenade explosion during attack on PJCC) | Y | Y | 1/20/2007 | Karbala | Pages 14-15 |
| Stefanie Wallace | Wife | Y | | | | |
| D.W. (minor represented by his legal guardians Billy Wallace and Stefanie Wallace) | Son | Y | | | | |
| C.W. (minor represented by his legal guardians Billy Wallace and Stefanie Wallace) | Son | Y | | | | |
| A.W. (minor represented by his legal guardians Billy Wallace and Stefanie Wallace) | Son | Y | | | | |
| | | | | | | |
| **THE STOUT FAMILY** | | | | | | |
| Brandon L. Stout | Self; deceased (IED) | Y | Y | 1/22/2007 | Baghdad | Page 39 |
| Tracy Anderson | Mother | Y | | | | |
| Jeffrey Anderson | Step-father | Y | | | | |
| | | | | | | |

**FREEMAN, et al. v. HSBC HOLDINGS PLC, et al.**
**SUMMARY OF PLAINTIFFS/DECEDENTS FROM COMPLAINT**

| Plaintiff/Decedent | Relationship to Deceased/Injured Claimant (Cause of Death/Injury) | US Citizen | US Military | Date of Injury | Place of Injury | Location in Complaint |
|---|---|---|---|---|---|---|
| **THE FULLER FAMILY** | | | | | | |
| Alexander H. Fuller | Self; deceased (IED) | Y | Y | 1/25/2007 | Baghdad | Pages 39-40 |
| Anastasia Fuller | Widow | Y | | | | |
| A.F. (minor represented by her legal guardian Anastasia Fuller) | Daughter | Y | | | | |
| | | | | | | |
| **THE HARRIS FAMILY** | | | | | | |
| Blake Harris | Self; deceased (IED) | Y | Y | 3/15/2007 | Baqubah | Page 40 |
| Anne F. Harris | Step-mother | Y | | | | |
| Paul D. Harris | Father | Y | | | | |
| | | | | | | |
| **THE GLAWSON FAMILY** | | | | | | |
| Curtis E. Glawson | Self; deceased (IED) | Y | Y | 3/20/2007 | Baghdad | Page 41 |
| Hyunjung Glawson | Widow | Y | | | | |
| Yolanda M. Brooks | Mother | Y | | | | |
| Curtis Glawson, Sr. | Father | Y | | | | |
| | | | | | | |
| **THE SABINISH FAMILY** | | | | | | |
| Ryan Sabinish | Self; injured (IED) | Y | Y | 3/23/2007 | Nasiriyah | Pages 41-42 |
| | | | | | | |
| **THE CHRISTOPHER FAMILY** | | | | | | |
| Estate of Kwesi Christopher, brought by legal representative Ann Christopher | Self; deceased (IED) | Y | N (civilian contractor) | 3/31/2007 | Diwaniyah | Pages 42-43 |
| Ann Christopher | Mother | Y | | | | |
| | | | | | | |
| **THE FUENTES FAMILY** | | | | | | |
| Daniel A. Fuentes | Self; deceased (IED) | Y | Y | 4/6/2007 | Baghdad | Pages 43-44 |
| D.J.F. (minor represented by his legal guardian Emma McGarry, fiancee of Daniel A. Fuentes) | Son | Y | | | | |
| | | | | | | |

**FREEMAN, et al. v. HSBC HOLDINGS PLC, et al.**
**SUMMARY OF PLAINTIFFS/DECEDENTS FROM COMPLAINT**

| Plaintiff/Decedent | Relationship to Deceased/Injured Claimant (Cause of Death/Injury) | US Citizen | US Military | Date of Injury | Place of Injury | Location in Complaint |
|---|---|---|---|---|---|---|
| **THE STARCEVICH FAMILY** | | | | | | |
| Estate of Lucas V. Starcevich, brought by legal representative Ava Tomson | Self; deceased (IED) | Y | Y | 4/16/2007 | Baghdad | Pages 44-45 |
| Ava Tomson | Mother | Y | | | | |
| Richard Tomson | Step-father | Y | | | | |
| Bradley Starcevich | Father | Y | | | | |
| Glenda Starcevich | Step-mother | Y | | | | |
| Ariana Reyes | Sister | Y | | | | |
| Trenton Starcevich | Brother | Y | | | | |
| | | | | | | |
| **THE FUNCHEON FAMILY** | | | | | | |
| Estate of Alexander J. Funcheon, brought by legal representative Karen Funcheon | Self; deceased (IED) | Y | Y | 4/29/2007 | Baghdad | Page 45 |
| Karen Funcheon | Mother | Y | | | | |
| Robert Funcheon | Father | Y | | | | |
| | | | | | | |
| **THE POTTER FAMILY** | | | | | | |
| Estate of Jerome Potter, brought by legal representative Holly Burson-Gilpin | Self; deceased (IED) | Y | Y | 5/3/2007 | Baghdad | Page 46 |
| Holly Burson-Gilpin | Mother | Y | | | | |
| | | | | | | |
| **THE UMBRELL FAMILY** | | | | | | |
| Estate of Colby J. Umbrell, brought by legal representatives Nancy Umbrell and Mark Umbrell | Self; deceased (IED) | Y | Y | 5/3/2007 | Musayyib | Pages 46-47 |
| Nancy Umbrell | Mother | Y | | | | |
| Mark Umbrell | Father | Y | | | | |
| | | | | | | |
| **THE DIXON FAMILY** | | | | | | |
| Robert J. Dixon | Self; deceased (IED) | Y | Y | 5/6/2007 | Baghdad | Pages 47-48 |
| Ilene Dixon | Mother | Y | | | | |
| Dan Dixon | Father | Y | | | | |
| | | | | | | |
| **THE LITTLE FAMILY** | | | | | | |
| Kyle A. Little | Self; deceased (IED) | Y | Y | 5/8/2007 | Salman Pak | Page 48 |
| Shelley Ann Smith | Mother | Y | | | | |

**FREEMAN, et al. v. HSBC HOLDINGS PLC, et al.**
**SUMMARY OF PLAINTIFFS/DECEDENTS FROM COMPLAINT**

| Plaintiff/Decedent | Relationship to Deceased/Injured Claimant (Cause of Death/Injury) | US Citizen | US Military | Date of Injury | Place of Injury | Location in Complaint |
|---|---|---|---|---|---|---|
| **THE FARRAR FAMILY** | | | | | | |
| Estate of William A. Farrar, brought by legal representative William Farrar, Sr. | Self; deceased (IED) | Y | Y | 5/11/2007 | Al Iskandariyah | Pages 48-49 |
| William Farrar, Sr. | Father | Y | | | | |
| | | | | | | |
| **THE DRESSLER FAMILY** | | | | | | |
| Shawn E. Dressler | Self; deceased (IED) | Y | Y | 6/2/2007 | Baghdad | Pages 49-50 |
| Tonya K. Dressler | Mother | Y | | | | |
| Ardith Cecil Dressler | Father | Y | | | | |
| Melissa Dressler | Sister | Y | | | | |
| | | | | | | |
| **THE BROWN FAMILY** | | | | | | |
| Estate of Joshua D. Brown, brought by legal representative Elizabeth Brown | Self; deceased (IED) | Y | Y | 6/2/2007 | Baghdad | Page 50 |
| Elizabeth Brown | Widow | Y | | | | |
| Marian Brown | Mother | Y | | | | |
| Wayne Brown | Father | Y | | | | |
| | | | | | | |
| **THE BALMER FAMILY** | | | | | | |
| Estate of Ryan A. Balmer, brought by legal representative Danielle Sweet | Self; deceased (IED) | Y | Y | 6/5/2007 | Kirkuk | Pages 50-51 |
| Danielle Sweet | Widow | Y | | | | |
| A.B. (minor represented by his legal guardian Danielle Sweet) | Son | Y | | | | |
| G.B. (minor represented by her legal guardian Danielle Sweet) | Daughter | Y | | | | |
| | | | | | | |
| **THE KUGLICS FAMILY** | | | | | | |
| Estate of Matthew J. Kuglics, brought by legal representative Donna Kuglics | Self; deceased (IED) | Y | Y | 6/5/2007 | Kirkuk | Pages 51-52 |
| Donna Kuglics | Mother | Y | | | | |
| Les Kuglics | Father | Y | | | | |
| Emily Kuglics | Sister | Y | | | | |
| | | | | | | |

**FREEMAN, et al. v. HSBC HOLDINGS PLC, et al.**
**SUMMARY OF PLAINTIFFS/DECEDENTS FROM COMPLAINT**

| Plaintiff/Decedent | Relationship to Deceased/Injured Claimant (Cause of Death/Injury) | US Citizen | US Military | Date of Injury | Place of Injury | Location in Complaint |
|---|---|---|---|---|---|---|
| **THE SPENCER FAMILY** | | | | | | |
| Raymond N. Spencer | Self; deceased (IED) | Y | Y | 6/21/2007 | Baghdad | Pages 52-53 |
| Sylvia Johnson Spencer | Step-mother | Y | | | | |
| Raymond Nigel Spencer, Sr. | Father | Y | | | | |
| | | | | | | |
| **THE LAMIE FAMILY** | | | | | | |
| Gene Lamie | Self; deceased (IED) | Y | Y | 7/6/2007 | Baghdad | Page 53 |
| John D. Lamie | Brother | Y | | | | |
| | | | | | | |
| **THE BOBB FAMILY** | | | | | | |
| Estate of Brandon K. Bobb, brought by legal representative Paula C. Bobb-Miles | Self; deceased (IED) | Y | Y | 7/17/2007 | Baghdad | Page 54 |
| Paula C. Bobb-Miles | Mother | Y | | | | |
| Johnny Javier Miles, Sr. | Step-father | Y | | | | |
| J.J.M., Jr. (minor represented by his legal guardian Paula C. Bobb-Miles) | Brother | Y | | | | |
| Racquel Arnae Bobb Miles | Sister | Y | | | | |
| | | | | | | |
| **THE JOSHUA FAMILY** | | | | | | |
| Ron J. Joshua, Jr. | Self; deceased (IED) | Y | Y | 7/17/2007 | Baghdad | Page 55 |
| Ursula Ann Joshua | Mother | Y | | | | |
| Brittany Marionique Joshua | Sister | Y | | | | |
| | | | | | | |
| **THE GUDRIDGE FAMILY** | | | | | | |
| James D. Gudridge | Self; deceased (IED) | Y | Y | 1/6/2008 | Baghdad | Pages 55-56 |
| Ashley Gudridge | Sister | Y | | | | |
| | | | | | | |
| **THE ELLEDGE FAMILY** | | | | | | |
| Michael D. Elledge | Self; deceased (IED) | Y | Y | 3/17/2008 | Baghdad | Page 56 |
| Marion Crimens | Mother | Y | | | | |
| Timothy W. Elledge | Brother | Y | | | | |
| | | | | | | |
| **THE LEVI FAMILY** | | | | | | |
| Christopher Levi | Self; injured (IED) | Y | Y | 3/17/2008 | Baghdad | Page 57 |
| | | | | | | |

**FREEMAN, et al. v. HSBC HOLDINGS PLC, et al.**
**SUMMARY OF PLAINTIFFS/DECEDENTS FROM COMPLAINT**

| Plaintiff/Decedent | Relationship to Deceased/Injured Claimant (Cause of Death/Injury) | US Citizen | US Military | Date of Injury | Place of Injury | Location in Complaint |
|---|---|---|---|---|---|---|
| **THE HABSIEGER FAMILY** | | | | | | |
| Andrew J. Habsieger | Self; deceased (IED) | Y | Y | 3/23/2008 | Baghdad | Pages 57-58 |
| Brenda Habsieger | Mother | Y | | | | |
| Michael Habsieger | Father | Y | | | | |
| Jacob Michael Habsieger | Brother | Y | | | | |
| | | | | | | |
| **THE HAKE FAMILY** | | | | | | |
| Estate of Christopher M. Hake, brought by legal representative Kelli D. Hake | Self; deceased (IED) | Y | Y | 3/23/2008 | Baghdad | Pages 58-59 |
| Kelli D. Hake | Widow | Y | | | | |
| Denice York | Mother | Y | | | | |
| Russel York | Step-father | Y | | | | |
| Jill Hake | Step-mother | Y | | | | |
| Peter Hake | Father | Y | | | | |
| G.H. (minor represented by his legal guardian Kelli D. Hake) | Son | Y | | | | |
| | | | | | | |
| **THE DELGADO FAMILY** | | | | | | |
| George Delgado | Self; deceased (IED) | Y | Y | 3/23/2008 | Baghdad | Pages 59-60 |
| Maria E. Calle | Mother | Y | | | | |
| Cynthia Delgado | Sister | Y | | | | |
| | | | | | | |
| **THE MILLER FAMILY** | | | | | | |
| Patrick J. Miller | Self; deceased (IED) | Y | Y | 3/29/2008 | Baghdad | Page 60 |
| Kim Miller | Mother | Y | | | | |
| | | | | | | |
| **THE BAILEY FAMILY** | | | | | | |
| Walter Bailey | Self; injured (IED) | Y | Y | 3/30/2008 | Baghdad | Pages 60-61 |
| Cassandra Bailey | Wife | Y | | | | |
| | | | | | | |
| **THE GILMORE FAMILY** | | | | | | |
| Terrell W. Gilmore, Sr. | Self; deceased (IED) | Y | Y | 3/30/2008 | Baghdad | Pages 61-62 |
| Kacey Gilmore | Daughter | Y | | | | |
| Terrell Gilmore, Jr. | Son | Y | | | | |
| | | | | | | |

**FREEMAN, et al. v. HSBC HOLDINGS PLC, et al.**
**SUMMARY OF PLAINTIFFS/DECEDENTS FROM COMPLAINT**

| Plaintiff/Decedent | Relationship to Deceased/Injured Claimant (Cause of Death/Injury) | US Citizen | US Military | Date of Injury | Place of Injury | Location in Complaint |
|---|---|---|---|---|---|---|
| **THE DHANOOLAL FAMILY** | | | | | | |
| Dayne D. Dhanoolal | Self; deceased (IED) | Y | Y | 3/31/2008 | Baghdad | Pages 62-63 |
| Kynesha Dhanoolal | Widow | Y | | | | |
| | | | | | | |
| **THE PICKETT FAMILY** | | | | | | |
| Emanuel Pickett | Self; deceased (mortar attack) | Y | Y | 4/6/2008 | Baghdad | Page 63 |
| Merlese Pickett | Mother | Y | | | | |
| Harry Pickett | Brother | Y | | | | |
| | | | | | | |
| **THE SCOTT FAMILY** | | | | | | |
| Steven K. Scott | Self; deceased (mortar attack) | Y | Y | 4/6/2008 | Baghdad | Pages 63-64 |
| Rachel M. Gillette | Daughter | Y | | | | |
| Rebekah A. Coldewe | Daughter | Y | | | | |
| | | | | | | |
| **THE SMITH FAMILY** | | | | | | |
| Timothy Smith | Self; deceased (IED) | Y | Y | 4/7/2008 | Baghdad | Pages 64-65 |
| Patricia Smith | Mother | Y | | | | |
| Michael Smith | Father | Y | | | | |
| Jacqueline A. Smith | Sister | Y | | | | |
| | | | | | | |
| **THE HARTLEY FAMILY** | | | | | | |
| Estate of Jeffery Hartley, brought by legal representative David Hartley | Self; deceased (IED) | Y | Y | 4/8/2008 | Kharguliah | Page 65 |
| David Hartley | Father | Y | | | | |
| | | | | | | |
| **THE SWINTON FAMILY** | | | | | | |
| Allen Swinton | Self; injured (IED) | Y | Y | 4/12/2008 | Unk | Pages 66-67 |
| Temika Swinton | Wife | Y | | | | |
| T.S. (minor represented by her legal guardian Temika Swinton) | Daughter | Y | | | | |
| T.S. (minor represented by her legal guardian Temika Swinton) | Daughter | Y | | | | |
| T.B. (minor represented by her legal guardian Temika Swinton) | Step-Daughter | Y | | | | |
| | | | | | | |

**FREEMAN, et al. v. HSBC HOLDINGS PLC, et al.**
**SUMMARY OF PLAINTIFFS/DECEDENTS FROM COMPLAINT**

| Plaintiff/Decedent | Relationship to Deceased/Injured Claimant (Cause of Death/Injury) | US Citizen | US Military | Date of Injury | Place of Injury | Location in Complaint |
|---|---|---|---|---|---|---|
| THE VANDEGRIFT FAMILY | | | | | | |
| Matthew R. Vandegrift | Self; deceased (IED) | Y | Y | 4/21/2008 | Basra | Pages 67-68 |
| Mary Jane Vandegrift | Mother | Y | | | | |
| John  Vandegrift | Father | Y | | | | |
| | | | | | | |
| THE MARION FAMILY | | | | | | |
| Adam L. Marion | Self; deceased (IRAMs) | Y | Y | 4/28/2008 | Baghdad | Page 68 |
| Pam Marion | Mother | Y | | | | |
| Donnie Marion | Father | Y | | | | |
| | | | | | | |
| THE MENKE FAMILY | | | | | | |
| Jonathan D. Menke | Self; deceased (IED) | Y | Y | 8/4/2008 | Baghdad | Pages 68-69 |
| Paula Menke | Step-mother | Y | | | | |
| Daniel Menke | Father | Y | | | | |
| Matthew Menke | Step-brother | Y | | | | |
| Nicole Lohring | Sister | Y | | | | |
| | | | | | | |
| THE ALFONSO FAMILY | | | | | | |
| Carlo E. Alfonso | Self; deceased (IED) | Y | Y | 8/26/2008 | Sadr City | Pages 69-70 |
| Rosemarie Alfonso | Widow | Y | | | | |
| K.B. (minor represented by his legal guardian Rosemarie Alfonso) | Son | Y | | | | |
| | | | | | | |
| THE MAYNE FAMILY | | | | | | |
| Estate of Kennith W. Mayne, brought by legal representative Michelle Benavidez | Self; deceased (IED) | Y | Y | 9/4/2008 | Baghdad | Pages 70-71 |
| Michelle Benavidez | Mother | Y | | | | |
| Daniel Benavidez, Sr. | Step-father | Y | | | | |
| Christina Biederman | Sister | Y | | | | |
| Daniel Benavidez, Jr. | Brother | Y | | | | |
| Jennifer Morman | Sister | Y | | | | |
| | | | | | | |

**FREEMAN, et al. v. HSBC HOLDINGS PLC, et al.**
**SUMMARY OF PLAINTIFFS/DECEDENTS FROM COMPLAINT**

| Plaintiff/Decedent | Relationship to Deceased/Injured Claimant (Cause of Death/Injury) | US Citizen | US Military | Date of Injury | Place of Injury | Location in Complaint |
|---|---|---|---|---|---|---|
| **THE MILLER FAMILY** | | | | | | |
| Christopher Miller | Self; injured (IED) | Y | Y | 9/4/2008 | Baghdad | Pages 71-72 |
| | | | | | | |
| **THE EGGLESTON FAMILY** | | | | | | |
| Cody J. Eggleston | Self; deceased (mortar attack) | Y | Y | 10/16/2008 | Baqubah | Page 72 |
| Angie Jackson | Mother | Y | | | | |
| Trina Jackson | Daughter | Y | | | | |
| S.J. (minor represented by her legal guardian Angie Jackson) | Daughter | Y | | | | |
| | | | | | | |
| **THE BAUER FAMILY** | | | | | | |
| Justin Bauer | Self; deceased (IED) | Y | Y | 1/10/2009 | Baghdad | Page 73 |
| Gregory Bauer | Father | Y | | | | |
| | | | | | | |
| **THE DAVIS FAMILY** | | | | | | |
| Brad A. Davis | Self; deceased (IED) | Y | Y | 4/22/2009 | Baghdad | Pages 73-74 |
| Theresa Davis | Mother | Y | | | | |
| | | | | | | |
| **THE DAVID FAMILY** | | | | | | |
| Estate of Timothy A. David, brought by legal representative Linda David | Self; deceased (IED) | Y | Y | 6/28/2009 | Baghdad | Page 74 |
| Linda David | Mother | Y | | | | |
| Michael David | Father | Y | | | | |
| Christopher David | Brother | Y | | | | |
| | | | | | | |
| **THE KARCHER FAMILY** | | | | | | |
| Timothy Karcher | Self; injured (IED) | Y | Y | 6/29/2009 | Baghdad | Page 75 |
| | | | | | | |
| **THE DREVNICK FAMILY** | | | | | | |
| Daniel P. Drevnick | Self; deceased (mortar attack) | Y | Y | 7/16/2009 | Basra | Pages 75-76 |
| Kenneth J. Drevnick | Father | Y | | | | |
| | | | | | | |

**FREEMAN, et al. v. HSBC HOLDINGS PLC, et al.**
**SUMMARY OF PLAINTIFFS/DECEDENTS FROM COMPLAINT**

| Plaintiff/Decedent | Relationship to Deceased/Injured Claimant (Cause of Death/Injury) | US Citizen | US Military | Date of Injury | Place of Injury | Location in Complaint |
|---|---|---|---|---|---|---|
| **THE MYERS FAMILY** | | | | | | |
| Zachary T. Myers | Self; deceased (IED) | Y | Y | 9/8/2009 | Tikrit | Page 76 |
| Tonya Lotto | Mother | Y | | | | |
| Jerry L. Myers | Father | Y | | | | |
| | | | | | | |
| **THE NEWBY FAMILY** | | | | | | |
| Nicholas W. Newby | Self; deceased (IED) | Y | Y | 7/7/2011 | Baghdad | Page 77 |
| Theresa Hart | Mother | Y | | | | |
| Wayne Newby | Father | Y | | | | |
| | | | | | | |
| **THE HICKMAN FAMILY** | | | | | | |
| David Emanuel Hickman | Self; deceased (IED) | Y | Y | 11/14/2011 | Baghdad | Pages 77-78 |
| Veronica Hickman | Mother | Y | | | | |
| David Eugene Hickman | Father | Y | | | | |
| Devon Fletcher Hickman | Unk | Unk | | | | |

# **EXHIBIT 2**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X

YAAKOV LICCI, a minor, by his father and natural
guardian ELIHAV LICCI and by his mother and
natural guardian YEHUDIT LICCI;

ELIHAV LICCI, individually;

YEHUDIT LICCI, individually;

TZVI HIRSH;

ARKADY GRAIPEL;

TATIANA KREMER;

YOSEF ZARONA;

TAL SHANI;

SHLOMO COHEN;

NITZAN GOLDENBERG;

RINA DAHAN;

RAPHAEL WEISS;

AGAT KLEIN;

TATIANA KOVLEYOV;

VALENTINA DEMESH;

RIVKA EPON;

JOSEPH MARIA;

Civ. No. 08-07253-GBD

**FIRST AMENDED
COMPLAINT**



IMMANUEL PENKER;

ESTHER PINTO;

AVISHAI REUVANE;

ELISHEVA ARON;

CHAYIM KUMER;

NECHAMA KUMER;

SARAH YEFET;

SHOSHANA SAPPIR;

RAHMI GUHAD GHANAM, a minor, by his father
and natural guardian FUAD SHCHIV GHANAM and
by his mother and natural guardian SUHA SHCHIV
GHANAM;

FUAD SHCHIV GHANAM, individually;

SUHA SHCHIV GHANAM, individually;

MA'AYAN ARDSTEIN, a minor, by her father and
natural guardian, BRIAN ARDSTEIN, and by her
mother and natural guardian, KEREN ARDSTEIN;

NOA ARDSTEIN, a minor, by her father and natural
guardian, BRIAN ARDSTEIN, and by her mother and
natural guardian, KEREN ARDSTEIN;

NETIYA YESHUA ARDSTEIN, a minor, by his father
and natural guardian, BRIAN ARDSTEIN, and by his
mother and natural guardian, KEREN ARDSTEIN

ARIEL CHAIM ARDSTEIN, a minor, by his father and
natural guardian, BRIAN ARDSTEIN, and by his
mother and natural guardian, KEREN ARDSTEIN

BRIAN ARDSTEIN, individually;

KEREN ARDSTEIN, individually;

MARGALIT RAPPEPORT, a minor, by her mother
and natural guardian, LAURIE RAPPEPORT;

LAURIE RAPPEPPORT, individually;

YAIR MOR,

ORNA MOR;

MICHAEL FUCHS;

MUSHKA KAPLAN, a minor, by her father and
natural guardian CHAIM KAPLAN, and by her
mother and natural guardian RIVKA KAPLAN;

ARYE LEIB KAPLAN, a minor, by his father and
natural guardian CHAIM KAPLAN, and by his
mother and natural guardian RIVKA KAPLAN;

MENACHEM KAPLAN, a minor, by his father and
natural guardian CHAIM KAPLAN, and by his
mother and natural guardian RIVKA KAPLAN;

CHANA KAPLAN, a minor, by her father and natural
guardian CHAIM KAPLAN, and by her mother and
natural guardian RIVKA KAPLAN;

EFRAIM LEIB KAPLAN, a minor, by his father and
natural guardian CHAIM KAPLAN, and by his

mother and natural guardian RIVKA KAPLAN;

CHAIM KAPLAN, individually;

RIVKA KAPLAN, individually;

ROCHELLE SHALMONI;

OZ SHALMONI;

DAVID OCHAYON;

YAAKOV MAIMON;

MIMI BITON;

MIRIAM JUMA'A, as Personal Representative of the Estate of FADYA JUMA'A;

MIRIAM JUMA'A, individually;

SALAH JUMA'A, SAID JUMA'A, and ABD EL-RAHMAN JUMA'A, as Personal Representatives of the Estate of SAMIRA JUMA'A;

SALAH JUMA'A, individually;

SAID JUMA'A, individually;

ABD EL-RAHMAN JUMA'A, individually;

RAHMA ABU-SHAHIN,

ABDEL GAHNI ABDEL GAHNI, as Personal Representative of the Estate of SOLTANA JUMA'A,

ABDEL GAHNI ABDEL GAHNI, individually;

SHADI SALMAN AZZAM, as the Personal

Representative of the Estate of MANAL CAMAL
AZAM;

KANAR SHA'ADI AZZAM, a minor, by his father
and natural guardian, SHADI SALMAN AZZAM;

ADEN SHA'ADI AZZAM, a minor, by his father and
natural guardian, SHADI SALMAN AZZAM;

SHADI SALMAN AZZAM, individually;

ADINA MACHASAN DAGESH,

ARKADY SPEKTOR,

YORI ZOVREV;

THEODORE (TED) GREENBERG;

MAURINE GREENBERG;

JACOB KATZMACHER;

DEBORAH CHANA KATZMACHER;

CHAYA KATZMACHER;

MIKIMI STEINBERG;

JARED SAUTER;

DANIELLE SAUTER;

MYRA MANDEL;

YAAKOV ABUTBUL;

ABRAHAM NATHAN MOR, a minor, by his father
and natural guardian, ZION MOR, and by his mother

and natural guardian, REVITAL MOR;

BAT ZION MOR, a minor, by her father and natural guardian, ZION MOR, and by her mother and natural guardian, REVITAL MOR;

MICHAL MOR, a minor, by her father and natural guardian, ZION MOR, and by her mother and natural guardian, REVITAL MOR;

ODED CHANA MOR, a minor, by her father and natural guardian, ZION MOR, and by her mother and natural guardian, REVITAL MOR;

ZION MOR, individually;

REVITAL MOR, individually;

ADHAM MAHANE TARRABASHI;

EMILLIA SALMAN ASLAN;

JIHAN KAMUD ASLAN;

ZOHARA LOUIE SA'AD;

IYAH ZAID GANAM, a minor, by his father and natural guardian ZIAD SHCHIV GHANAM, and by his mother and natural guardian, GOUROV TISIR GHANAM;

ZIAD SHCHIV GHANAM, individually; and

GOUROV TISIR GHANAM, individually,

Plaintiffs,


-against-

AMERICAN EXPRESS BANK LTD.; and

LEBANESE CANADIAN BANK, SAL

                        Defendants.

--------------------------------------------------------------------- X

          Plaintiffs, complaining of the Defendants, by their attorneys, Jaroslawicz & Jaros, LLC, allege for their First Amended Complaint as follows:

## <u>NATURE OF THIS ACTION</u>

          1.     This is a civil action for a money judgment under the Antiterrorism Act, 18 U.S.C. § 2331 *et seq.*, the Alien Tort Claims Act, 28 U.S.C. § 1350 and causes of action in tort under Israeli law, arising from a series of terrorist rocket attacks on civilians in Israel carried out by the Hizbollah terrorist organization during July and August 2006.

          2.     The plaintiffs are American, Israeli and Canadian civilians who were injured in the terrorist rocket attacks, and the family members and Personal Representatives of the estates of four Israeli civilians who were killed by the terrorist rocket attacks.

          3.     Defendants American Express Bank Ltd. and Lebanese Canadian Bank SAL intentionally and/or negligently provided extensive banking services to Hizbollah, which caused, enabled and facilitated the terrorist rocket attacks in which the plaintiffs and their decedents were harmed and killed.

## THE PARTIES

4.      Plaintiffs Avishai Reuvane, Elisheva Aron, Chayim Kumer, Nechama Kumer Brian Ardstein, Keren Ardstein, Ma'ayan Ardstein, Noa Ardstein, Netiya Yeshua Ardstein, Ariel Chaim Ardstein, Laurie Rappeport, Margalit Rappeport, Yair Mor, Michael Fuchs, Chaim Kaplan, Rivka Kaplan, Mushka Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan, Efraim Kaplan, Theodore (Ted) Greenberg, Maurine Greenberg, Jacob Katzmacher, Deborah Chana Katzmacher, Chaya Katzmacher, Mikimi Steinberg, Jared Sauter, Danielle Sauter and Myra Mandel (sometimes collectively referred to hereinafter as: the "American Plaintiffs") are American citizens who were injured by rocket attacks carried out by the Hizbollah terrorist organization between July 12 and August 14, 2006. The details of the attacks and the nature of these plaintiffs' injuries are set forth below.

5.      Plaintiffs Brian Ardstein, Keren Ardstein, Chaim Kaplan, Rivka Kaplan and Laurie Rappeport bring this action individually and on behalf of their respective minor children (as set forth in the caption and below) plaintiffs Ma'ayan Ardstein, Noa Ardstein, Netiya Yeshua Ardstein, Ariel Chaim Ardstein, Margalit Rappeport, Mushka Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan and Efraim Kaplan.

6.      Plaintiffs Sarah Yefet, Shoshana Sappir, Oz Shalmoni and Rochelle Shalmoni are Canadian citizens (sometimes collectively referred to hereinafter as: the "Canadian Plaintiffs") who were injured by the aforementioned Hizbollah rocket

attacks. The details of the attacks and the nature of these plaintiffs' injuries are set forth below.

7.     Plaintiffs Elihav Licci, Yehudit Licci, Yaakov Licci, Tzvi Hirsh, Arkady Graipel, Tatiana Kremer, Yosef Zarona, Tal Shani, Shlomo Cohen, Nitzan Goldenberg, Rina Dahan, Raphael Weiss, Agat Klein, Tatiana Kovleyov, Valentina Demesh, Rivka Epon, Joseph Maria, Immanuel Penker, Esther Pinto, Fuad Shchiv Ghanam, Suha Shchiv Ghanam, Rahmi Guhad Ghanam, Orna Mor, David Ochayon, Yaakov Maimon, Mimi Biton, Miriam Juma'a, Salah Juma'a, Said Juma'a, Abd El-Rahman Juma'a, Rahma Abu-Shahin, Abdel Gahni Abdel Gahni, Shadi Salman Azzam, Kanar Sha'adi Azzam, Aden Sha'adi Azzam, Kanar Sha'adi Azzam, Adina Machasan Dagesh, Arkady Spektor, Yori Zovrev, Yaakov Abutbul, Zion Mor, Revital Mor Abraham Nathan Mor, Bat Zion Mor, Michal Mor and Oded Chana Mor, Adham Mahane Tarrabashi, Emillia Salman Aslan, Jihan Kamud Aslan, Zohara Louie Sa'ad, Ziad Shchiv Ghanam, Iyah Zaid Ghanam and Gourov Tisir Ghanam are Israeli citizens (sometimes collectively referred to hereinafter as: the "Israeli Plaintiffs") who were injured by the aforementioned Hizbollah rocket attacks. The details of the attacks and the nature of these plaintiffs' injuries are set forth below.

8.     Plaintiffs Elihav Licci, Yehudit Licci, Fuad Shchiv Ghanam, Suha Shchiv Ghanam, Shadi Salman Azzam, Ziad Shchiv Ghanam, Gourov Tisir Ghanam, Zion and Revital Mor bring this action individually and on behalf of their respective minor children (as set forth in the caption and below) plaintiffs Yaakov Licci,

Rahmi Guhad Ghanam, Kanar Sha'adi Azzam, Aden Sha'adi Azzam, Abraham Nathan Mor, Bat Zion Mor, Michal Mor, Oded Chana Mor and Iyah Zaid Ghanam.

9.      Plaintiff Abdel Gahni Abdel Gahni is the heir of Soltana Juma'a and is authorized under Israeli law to bring this action on behalf of the Estate of Soltana Juma'a, and he brings this action both individually and on behalf of the Estate of Soltana Juma'a.

10.      Plaintiff Miriam Juma'a, is the heir of Fadya Juma'a and is authorized under Israeli law to bring this action on behalf of the Estate of Fadya Juma'a, and she brings this action both individually and on behalf of the Estate of Fadya Juma'a.

11.      Plaintiffs Salah Juma'a, Said Juma'a and Abd El-Rahman Juma'a are the heirs of Samira Juma'a and are authorized under Israeli law to bring this action on behalf of the Estate of Samira Juma'a, and they bring this action both individually and on behalf of the Estate of Samira Juma'a.

12.      Plaintiff Shadi Salman Azzam is the heir of Manal Camal Azzam and is authorized under Israeli law to bring this action on behalf of the Estate of Manal Camal Azzam, and brings this action both individually and on behalf of the Estate of Manal Camal Azzam.

13.      Defendant American Express Bank Ltd. ("Amex Bank") is a banking corporation organized under the laws of Connecticut and headquartered in New York.

14.      Defendant Amex Bank does extensive business and holds significant assets in New York.

15.     Defendant Amex Bank is supervised by the New York State Banking Department.

16.     Defendant Amex Bank intentionally and/or negligently provided extensive banking services to Hizbollah, which caused, enabled and facilitated the terrorist rocket attacks in which the plaintiffs and their decedents were harmed and killed.

17.     Defendant Lebanese Canadian Bank SAL ("LCB") is a banking corporation organized under the laws of Lebanon and headquartered in Beirut, Lebanon.

18.     Defendant LCB intentionally and/or negligently provided extensive banking services to Hizbollah, which caused, enabled and facilitated the terrorist rocket attacks in which the plaintiffs and their decedents were harmed and killed. The banking services which harmed the plaintiffs and their decedents were carried out by LCB in and through the State of New York.

## STATEMENT OF FACTS

### Hizbollah

19.     Hizbollah was established in Lebanon circa 1982.

20.     At all times relevant hereto Hizbollah is and was a radical Islamic terrorist organization which views the State of Israel, the United States and other Western countries as its enemies.

21.     At all times relevant hereto Hizbollah sought, as an official and publicly-stated policy and goal of Hizbollah, to destroy the State of Israel and murder or expel its Jewish residents.

22.     At all times relevant hereto Hizbollah sought, as an official and publicly-stated policy and goal of Hizbollah, to ethnically cleanse the territory of the State of Israel of its Jewish population.

23.     Since its founding and until July 12, 2006 (and until the present day), Hizbollah has sought to achieve its goal of destroying the State of Israel and murdering or expelling its Jewish residents through the use of terrorist attacks on Jewish civilians in Israel and elsewhere.

24.     Since its founding and until July 12, 2006 (and until the present day), Hizbollah carried out hundreds of terrorist attacks against Jewish civilians in Israel and elsewhere, which have killed hundreds of innocent civilians and wounded hundreds more.

25.     Since its founding and until July 12, 2006 (and until the present day), Hizbollah has used terrorism against Jewish civilians in Israel and elsewhere in order to coerce, intimidate and influence the Israeli government and public, and thereby ultimately bring about the destruction of the State of Israel and the murder or expulsion of the Jews in Israel.

26.     Since its founding and until July 12, 2006 (and until the present day), Hizbollah has also carried out hundreds of terrorist attacks against American targets which have killed hundreds of U.S. citizens and wounded hundreds more.

27.     Between 1982 and July 12, 2006, Hizbollah's policy and practice of carrying out terrorist attacks against Jewish civilians in Israel and elsewhere, and against United States targets, was notorious and well known to defendants Amex Bank and LCB and to the public at large.

28.     Hizbollah's policy and practice of carrying out terrorist attacks against Jewish civilians in Israel and elsewhere and against United States targets was notorious and well known to defendants Amex Bank and LCB and to the public at large between 1982 and July 12, 2006, because during this period Hizbollah openly, publicly and repeatedly acknowledged having such a policy and carrying out such attacks. Hizbollah made these acknowledgments on its official websites, in its official press releases, on its official television station, Al-Manar, on its official radio station, Al-Nour, and in numerous press conferences and news media interviews conducted by senior Hizbollah officials.

29.     During the period relevant hereto, including the period between 2004 and July 12, 2006, defendant Amex Bank maintained an office in Beirut, Lebanon, staffed by Arabic-speaking officers and employees of defendant Amex Bank, and Amex Bank therefore had and/or should be deemed to have had the same knowledge of and access to Arabic-language websites, press releases, television and radio broadcasts, press conferences and news media reports as any other person in Lebanon.

30.     Additionally, Hizbollah's policy and practice of carrying out terrorist attacks against Jewish civilians in Israel and elsewhere and against United States targets was notorious and well known to defendants Amex Bank and LCB and to

the public at large between 1982 and July 12, 2006, because since its founding, Hizbollah has committed multiple such acts of terrorism, including but not limited to the following:

a) The July 19, 1982, kidnapping of American University president David S. Dodge in Beirut.

b) The April 18, 1983, car bomb attack on the United States Embassy in Beirut in which 63 people were killed.

c) The October 23, 1983, truck bomb attack on the U.S. Marine barracks in Beirut in which 241 American military personnel were killed.

d) The September 20, 1984, car bomb attack on the U.S. Embassy annex in Beirut in which two Americans and 22 others were killed.

e) The March 16, 1984, kidnapping and murder of William Buckley, a CIA operative working at the U.S. Embassy in Beirut.

f) The April 12, 1984, attack on a restaurant near the U.S. Air Force Base in Torrejon, Spain in which eighteen U.S. servicemen were killed and 83 people injured.

g) The December 4, 1984, terrorist hijacking of a Kuwait Airlines plane in which four passengers were murdered, including two Americans.

h) The June 14, 1985, hijacking of TWA Flight 847 in which Robert Stethem, a U.S. Navy diver, was murdered. Other American

passengers were held hostage before being released on June 30, 1985.

i)     The February 17, 1988, kidnapping and subsequent murder of U.S. Marine Col. William Higgins.

j)     The March 17, 1992, bombing of the Israeli Embassy in Buenos Aires that killed 29 people and injured over 200.

k)     The July 18, 1994, bombing of the Jewish community center in Buenos Aires that killed 86 people and injured over 200.

l)     The November 28, 1995, bombardment of towns in northern Israel with missiles aimed at Jewish civilians.

m)     The March 30, 1996, bombardment of northern Israeli towns with 28 missiles. A week later, Hizbollah fired 16 additional missiles, injuring 36 Israelis.

n)     The August 19, 1997, bombardment of northern Israel with dozens of missiles aimed at Jewish civilians.

o)     The December 28, 1998, bombardment on northern Israel with dozens of missiles aimed at Jewish civilians.

p)     The May 17, 1999 bombardment on northern Israel with dozens of missiles aimed at Jewish civilians.

q)     The June 24, 1999, bombardment on northern Israel, killing 2 people.

r)     The April 9, 2002, launching of missiles into northern Israeli towns.

s)      The August 10, 2003, firing of shells that killed a 16-year-old Israeli boy and wound other Israelis.

31.      Additionally, Hizbollah's policy and practice of carrying out terrorist attacks was notorious and well known to defendants Amex Bank and LCB and to the public at large between 1982 and July 12, 2006, because between 1998 and July 12, 2006, the courts of the United States published numerous decisions finding that Hizbollah was responsible for carrying out such terrorist attacks.

32.      Additionally, Hizbollah's policy and practice of carrying out terrorist attacks against Jewish civilians in Israel and elsewhere and against United States targets was notorious and well known to defendants Amex Bank and LCB and to the public at large between 1982 and July 12, 2006, because Hizbollah has been designated by the United States Government as a Specially Designated Terrorist ("SDT") continuously since 1995, as a Foreign Terrorist Organization ("FTO") continuously since 1997, and as a Specially Designated Global Terrorist ("SDGT") continuously since 2001.

## Defendants' Provision of Wire Transfer Services to Hizbollah

33.      Hizbollah is subject to strict economic sanctions programs imposed by the United States as the result of its designation as an SDT, FTO and SDGT (collectively hereinafter: "U.S. Sanctions Regime").

34.      The U.S. Sanctions Regime is intended to prevent Hizbollah from conducting banking activities, and thereby limit its ability to carry out terrorist attacks.

35.     The U.S. Sanctions Regime is effective when it is observed and enforced.

36.     Hizbollah is unable to conduct banking activities via banks and other financial institutions which observe and enforce the U.S. Sanctions Regime.

37.     If all banks and financial institutions worldwide observed and enforced the U.S. Sanctions Regime, the ability of Hizbollah to conduct banking activities would be severely restricted, and Hizbollah's ability to plan, to prepare and to carry out terrorist attacks would be significantly reduced.

38.     Nearly all banks and financial institutions around the world observe and enforce the U.S. Sanctions Regime.

39.     Hizbollah is therefore forced to conduct its banking activities using those very few banks and financial institutions which do not observe and enforce the U.S. Sanctions Regime.

40.     Defendants Amex Bank and LCB do not observe or enforce the U.S. Sanctions Regime.

41.     Defendant LCB conducts much of its business in U.S. dollars.

42.     In order to execute U.S. dollar transactions, defendant LCB requires a correspondent bank in the United States through which to carry out those dollar transactions.

43.     Accordingly, LCB sought and entered into a business relationship with defendant Amex Bank, pursuant to which Amex Bank serves as a correspondent bank for LCB and carries out LCB's U.S. dollar transactions.

44.     Amex Bank served as a correspondent bank for LCB between 2004 (or earlier) and until July 12, 2006 (and later).

45.     Between 2004 (or earlier) and until July 12, 2006 (and later), Hizbollah continuously maintained bank accounts at various LCB branches in Lebanon which are and were titled to the Shahid (Martyrs) Foundation (a/k/a Shahid (Martyrs) Organization) (hereinafter "Shahid").[1]

46.     Shahid is an integral part of Hizbollah and constitutes part of Hizbollah's financial arm.

47.     All of the accounts described in paragraph 45 are collectively referred to hereinafter as "Hizbollah Accounts."

48.     One of the Hizbollah Accounts was and is account number 108987.

49.     At all times, all of the Hizbollah Accounts belonged to Hizbollah and were under the control of Hizbollah.

50.     At all times, all of the funds held in the Hizbollah Accounts belonged to Hizbollah and were under the control of Hizbollah.

51.     At all times, all transactions carried out in all the Hizbollah Accounts were carried by Hizbollah and at the direction of Hizbollah.

52.     Beginning in 2004, defendants Amex Bank and LCB began to provide extensive wire transfer services to Hizbollah.

---

[1]     The name "Shahid," which is Arabic for "martyr," is sometimes spelled "Shaheed."

53.     Specifically, between 2004 and July 12, 2006 (and subsequently), Hizbollah made and received dozens of dollar wire transfers via defendants Amex Bank and LCB, totaling several million dollars (hereinafter: "Hizbollah Wire Transfers").

54.     All the Hizbollah Wire Transfers were made to, from and/or between the Hizbollah Accounts, via Amex Bank in New York.

55.     Amex Bank served as LCB's correspondent bank for the Hizbollah Wire Transfers and carried out the Hizbollah Wire Transfers on behalf of and in concert with LCB and Hizbollah.

56.     Thus, all the Hizbollah Wire Transfers were carried out in and through the State of New York, by both Amex Bank and LCB.

## The Hizbollah Rocket Attacks

57.     Between July 12, 2006 and August 14, 2006, Hizbollah fired thousands of rockets at civilians in northern Israel (collectively hereinafter: "Hizbollah Rocket Attacks").

58.     The plaintiffs were injured and their decedents were killed by the Hizbollah Rocket Attacks, as detailed below.

59.     On July 13, 2006 at approximately 7:30 am, a rocket launched by Hizbollah directly struck plaintiff David Ochayon's apartment building in the Israeli city of Nahariyah. Ochayon was in his home at the time of the powerful explosion and was struck with shrapnel and debris. In addition, he was badly traumatized from the blast and is still being treated for emotional disorders. As a result of this rocket attack

David Ochayon suffered severe physical, psychological, emotional and financial injuries.

60. On July 13, 2006 at approximately 2:00 p.m. a rocket launched by Hizbollah directly hit the business owned by plaintiff Yaakov Maimon in the Israeli town of Safed in the Galilee and collapsed the building on him. The force of the blast seriously physically injured and traumatized Yaakov Maimon. His business was badly damaged as well. As a result of this rocket attack Yaakov Maimon suffered severe physical, psychological, emotional and financial injuries.

61. On July 12, 2006 at approximately 2:30 p.m. a rocket launched by Hizbollah struck the workplace of plaintiff Mimi Biton in Safed and collapsed the building on her. Biton was struck by shrapnel from the explosion and was badly traumatized by the blast and she experiences long-term psychological disorders. As a result of this rocket attack Mimi Biton suffered severe physical, psychological, emotional and financial injuries

62. On July 29, 2006 a rocket launched by Hizbollah landed next to plaintiff Tzvi Hirsh as he was making his way to a bomb shelter near his home in the Israeli town of Kiryat Motzkin near Haifa. Hirsh was hit with shrapnel from the explosion and was badly injured. In addition, he experienced severe trauma. The injuries Hirsh sustained caused him to be permanently confined to a wheelchair. As a result of this rocket attack Tzvi Hirsh suffered severe physical, psychological, emotional and financial injuries.

63.     On July 26, 2006 at approximately 9:30 am a rocket launched by Hizbollah landed next to plaintiff Arkady Graipel as he traveled to work in the Israeli town of Kiryat Yam near Haifa. Arkadi was struck by shrapnel from the explosion. In addition he was badly traumatized from the blast. As a result of this rocket attack Arkady Graipel suffered severe physical, psychological, emotional and financial injuries.

64.     On July 13, 2006 at approximately 3:45 p.m. a rocket launched by Hizbollah landed outside the home of plaintiff Tatiana Kremer in Safed. Kremer was struck by shrapnel from the explosion. In addition, she was badly traumatized from the blast and is still being treated for psychological disorders. As a result of this rocket attack Taitana Kremer suffered severe physical, psychological, emotional and financial injuries.

65.     On August 3, 2006 a rocket launched by Hizbollah slammed into the work place of plaintiff Yosef Zarona in the Israeli city of Acre, north of Haifa. Zarona was struck by shrapnel from the explosion which left him unable to walk without painful effort. In addition, he was badly traumatized from the blast and is still being treated with medication. He has had to stop working on account of his numerous injuries. As a result of this rocket attack Yosef Zarona suffered severe physical, psychological, emotional and financial injuries.

66.     On July 28, 2006 a rocket launched by Hizbollah struck the home of plaintiff Tal Shani in Kibbutz Amir in Israel's Hula Valley. Shani was struck with shrapnel and debris from the powerful blast and suffered severe head wounds. In

addition, she was badly traumatized from the blast and she sustained long term psychological disorders. As a result of this rocket attack Tal Shani suffered severe physical, psychological, emotional and financial injuries.

67.     On August 13, 2006 a rocket launched by Hizbollah directly struck the home of Shlomo Cohen in Haifa as well as his car. The powerful blast severely injured his ears and badly traumatized him. Medical experts are unable to provide treatment for his hearing difficulties. As a result of this rocket attack Shlomo Cohen suffered severe physical, psychological, emotional and financial injuries.

68.     On August 11, 2006 a rocket launched by Hizbollah directly struck the home of a business associate of Nitzan Goldenberg in Kiryat Bialik, near Haifa, while Goldenberg was visiting. Goldenberg was injured by shrapnel and permanently handicapped. One of his hands is paralyzed and does not function. Goldenberg had trained as a chef and was preparing to open his own restaurant at the time of the rocket attack. Because of the serious damage to his hand he is today unable to work in his chosen profession as a chef. As a result of this rocket attack Nitzan Goldenberg suffered severe physical, psychological, emotional and financial injuries.

69.     On August 4, 2006 a rocket launched by Hizbollah struck the house of plaintiff Shadi Salman Azzam, 33, in M'rar village in the Upper Galilee. Shrapnel from the rocket flew into his house and killed his wife, Manal Camal Azzam, who was 28 at the time of her death, and severely wounded the couple's minor children, plaintiff Kanar Sha'adi Azzam and Aden Sha'adi Azzam. The murder of Manal Camal Azzam

caused decedent and her estate severe harm, including conscious pain and suffering and pecuniary loss.

70.     Plaintiff Shadi Salman Azzam saw his wife torn to pieces and his children maimed by the rocket blast, and as a result he has suffered severe psychological harm and has been forced to seek professional mental health care. Before his wife's death Plaintiff Shadi Salman Azzam worked as a builder and made a good salary on which he was able to support his family, but after the attack he stopped working for 4 months and to this day is unable to work the same hours he used to – a fact that has hurt his family's income. In addition, plaintiff Shadi Salman Azzam is now responsible for assuming the duties that his wife previously fulfilled as a mother. As a result of this rocket attack decedent Manal Camal Azzam was murdered and plaintiff Shadi Salman Azzam suffered severe psychological, emotional and financial injuries.

71.     Plaintiff Kanar Sha'adi Azzam, minor, is the eight year-old daughter of plaintiff Shadi Salman Azzam and decedent Manal Camal Azzam. Plaintiff Kanar Sha'adi Azzam suffered severe physical injuries in the same rocket attack that killed her mother. As a result of her own injuries and watching the gruesome death of her mother in their family home, and seeing the maiming of her brother, she suffers from severe psychological and emotional trauma and is undergoing continuous psychological treatment. As a result of this rocket attack plaintiff Kanar Sha'adi Azzam suffered severe physical, psychological and emotional injuries.

72.     Plaintiff Aden Sha'adi Azzam, minor, is the four year-old son of plaintiff Shadi Salman Azzam and decedent Manal Camal Azzam. Plaintiff Aden

Sha'adi Azzam suffered physical shrapnel wounds in the same attack that severely injured his sister and killed his mother. As a result of her own injuries and watching the gruesome death of his mother in their family home, and seeing the maiming of his sister, he suffers from severe psychological and emotional trauma and is undergoing continuous psychological treatment. As a result of this rocket attack plaintiff Aden Sha'adi Azzam suffered severe physical, psychological and emotional injuries.

73.   Plaintiff Adina Machasan Dagesh, 53, is a relative of the Azzam family, and was present in their home at the time of the August 4, 2006 rocket attack. Due to the shock, fear and trauma that she suffered, she is now undergoing continuous psychological treatment to deal with the manifestations of severe psychological and emotional trauma. As a result of this rocket attack, Adina Dagesh suffered severe psychological and emotional injuries.

74.   On August 5, 2006 a rocket launched by Hizbollah landed near the home of the Juma'a family in Arb El-Aramshe, near the Israeli-Lebanese border. The rocket killed Fadya Juma'a, along with her daughters Samira Juma'a and Sultana Juma'a. The murder of Fadya Juma'a, Samira Juma'a and Sultana Juma'a caused decedents and their estates severe harm, including conscious pain and suffering and pecuniary loss.

75.   Plaintiff Miriam Juma'a, aged 88, is the mother of decedent Fadya Juma'a and the grandmother of decedents Samira Juma'a and Sultana Juma'a. Miriam Jum'a suffered severe emotional harm as a result of the death of her daughter and granddaughters, as well as a substantial loss of support. Miriam was very much

attached to her daughter, and dependent on her for care. This rocket attack caused Miriam Juma'a severe psychological and emotional injuries.

76. Plaintiffs Salah Juma'a Said Juma'a, Abdel Rahman Juma'a and Rahma Abu-Shahin are the siblings of decedent Fadya Juma'a. The death of their beloved sister caused them severe emotional harm and distress. As a result of this rocket attack and the death of their sister, Salah Juma'a Said Juma'a, Abdel Rahman Juma'a and Rahma Abu-Shahin suffered severe psychological and emotional injuries.

77. Plaintiff Abedel Gahni Abedel Gahni is the husband of decedent Soltana Juma'a. As a result of the death of his wife and the mother of his children, plaintiff Abedel Gahni Abedel Gahni has suffered terrible psychological and emotional trauma and distress, and financial loss. As a result of this rocket attack and the death of his wife Abedel Gahni Abedel Gahni suffered severe psychological, emotional and financial injuries.

78. On July 25, 2006 and August 4, 2006 Hizbollah rockets landed near plaintiffs Adham Mahane Tarrabashi, Emillia Salman Aslan and Jihan Kamud Aslan in Kfar Maghar in the Galilee. They experienced extreme trauma from the explosions and are undergoing treatment for psychological disorders. As a result of this rocket attack Adham Mahane Tarrabashi, Emillia Salman Aslan and Jihan Kamud Aslan suffered severe psychological and emotional injuries.

79. On July 25, 2006 a rocket launched by Hizbollah struck the work place of plaintiff Zohara Louie Sa'ad in Kfar Maghar. She was psychologically and

emotionally traumatized by the blast. As a result of this rocket attack Zohara Louie Sa'ad suffered severe psychological, emotional and financial injuries.

80.     On July 25, 2006 a rocket launched by Hizbollah directly hit the Kfar Maghar home of plaintiffs Ziad Shchiv Ghanam and Gourov Tisir Ghanam. The blast caused Ziad suffered severe physical injuries. Plaintiff Gourov Tisir Ghanam and the couple's son plaintiff Iyah Zaid Ghanam, who were also in the home, suffered severe psychological trauma as a result of the attack. As a result of this rocket attack Ziad Shchiv Ghanam suffered severe physical, psychological, emotional and financial injuries and plaintiffs Gourov Tisir Ghanam and Iyah Zaid Ghanam suffered severe psychological and emotional injuries.

81.     On August 8, 2006 a rocket launched by Hizbollah landed next to plaintiff Rina Dahan as she was making her way to a bomb shelter in Haifa. Rina was injured in both her legs and she is still in need of medical treatments, including pain-relieving shots. Rina's ability to walk is limited, especially climbing stairs. Rina Dahan's quality of life was severely damaged by her injuries and she is now disabled and dependent on medical care and third party assistance. In addition she was badly emotionally traumatized by the blast. As a result of this rocket attack Rina Dahan suffered severe physical, psychological, emotional and financial injuries.

82.     On August 3, 2006 at approximately 16:15 p.m., a rocket launched by Hizbollah struck outside the car of plaintiff Raphael Weiss in Acre. Weiss sustained shrapnel injury in his head and was rushed to the operating room. As a result of his injury, Weiss has been turned from a healthy active man to a disabled patient confined

to a wheelchair, requiring regular medical treatments and a permanent assistance. As a result of this injury, Weiss suffered a CVA on the left part of his brain, and became epileptic. In addition to his physical injuries Weiss was badly emotionally traumatized by the blast. As a result of this rocket attack Raphael Weiss suffered severe physical, psychological, emotional and financial injuries.

83.     On July 16, 2006, in the morning hours, a rocket launched by Hizbollah struck next to the bomb shelter in Kiryat Yam where plaintiff Agat Klein was seeking refuge. As a result of the powerful blast, Agat Klein suffered serious psychological and emotional damage. She was evacuated to Carmel Hospital in Haifa. Agat Klein continues to suffer from psychological disorders and anxiety attacks. She still has not regained her ability function properly to this day, has trouble functioning and has had to resign from her job. As a result of this rocket attack Agat Klein suffered severe psychological, emotional and financial injuries.

84.     On July 13, 2006 a rocket launched by Hizbollah directly struck the home of plaintiffs Zion Mor and Revital Mor in Safed and injured their entire family. After the explosion, while fighting the smoke, fire and destruction, Zion hysterically rushed to save his family who were in the center of the house at the time. The family home was completely destroyed by the rocket's explosion. Due to the emotional trauma Zion has been severely impaired psychologically and emotionally and remains disabled. Zion is largely unable to work as he must spend his time caring for his wife and children. Zion's wife, plaintiff Revital Mor was sprayed with rocket shrapnel and glass in her legs and she suffered deep tissue injuries and major scars.

Revital has been diagnosed with severe psychological and emotional damage and has been declared mentally debilitated and must rely on anxiety medicines for her day-to-day existence. The couple's minor son, plaintiff Abraham Nathan Mor, was also hit with shrapnel throughout his body, most acutely in his head and back. One of the shrapnel fragments pierced Abraham's appendix which required surgery to remove. Abraham Nathan Mor remains scarred throughout his body as a result of the injuries he sustained in the rocket attack. Another child, plaintiff Bat Zion Mor, was also sprayed with shrapnel throughout her body. The large and visible scars that riddle her body as a result of the injuries she sustained in the rocket attack will never be healed – most notably the significant scars near her nose, near her eyes, on her torso and on her lower back. Another child, plaintiff Michal Mor, suffered severe head trauma caused by large shrapnel fragments that pierced her head. Michal was also severely injured in the belly area. The young girl was rushed to the hospital while on life support and was administered life-saving emergency surgery. Michal Mor remains scarred throughout her body as a result of the injuries she sustained in the rocket attack and suffers from severe headaches and severe psychological and emotional trauma that manifest themselves in acute restlessness, inability to concentrate, scattered thoughts and activities, severe attention deficit, and non-stop tics in her hands. The Mor's youngest child, plaintiff Oded Chana Mor was also sprayed with shrapnel, most acutely in her head and legs. As a result of this rocket attack Zion Mor, Revital Mor, Abraham Nathan Mor, Bat Zion Mor, Michal Mor and Oded Chana Mor suffered severe physical, psychological, emotional and financial injuries.

85.     On July 25, 2006, at approximately 1:55am, a rocket launched by Hizbollah landed near plaintiff Tatiana Kovleyov in Haifa. As a result of the blast, Kovleyov was sprayed with shrapnel in all parts of her body. Her ability to walk has been severely impaired, her left hand does not work, her body is still riddled with shrapnel and she requires ongoing physiotherapeutic care. In addition, Kovleyov has been severely impaired psychologically and emotionally. She suffers depression and sleep impairment among other ailments, for which she requires ongoing psychiatric care. Kovleyov is unable to work, due to the heavy physical and psychological injuries she maintains. As a result of this rocket attack Tatiana Kovleyov suffered severe physical, psychological, emotional and financial injuries.

86.     On July 25, 2006, a rocket launched by Hizbollah landed next to plaintiff Valentina Demesh as she was walking down the street in Haifa. Demesh was sprayed with shrapnel and is suffering from functional disability in her hands and legs. In addition, Valentina has suffered psychological and emotional damage. She suffers from nightmares and other emotional disorders for which she requires ongoing psychiatric care. Damesh has been unable to return to work as a result of her medical condition. As a result of this rocket attack Valentina Demesh suffered severe physical, psychological, emotional and financial injuries.

87.     On August 11, 2006, at approximately 4:00 p.m., a rocket launched by Hizbollah directly struck the home of plaintiff Rivka Epon in Kiryat Shemona in the Galilee Panhandle. Epon was in the house at the time of the explosion and she was hit in the face with shrapnel. The blast broke her nose and jaw and knocked three of her

teeth from her mouth. She continues to suffer from dizziness, an inability to concentrate, headaches, severe ringing in her ears and significant pain in the spot in which a two centimeter piece of rocket shrapnel is still lodged in her body. Rivka suffers from severe psychological and emotional damage and is unable to be alone. She requires continuous psychiatric care. As a result of this rocket attack Rivka Epon suffered severe physical, psychological, emotional and financial injuries.

88. In the afternoon hours of July 28, 2006, a rocket launched by Hizbollah landed outside the home of plaintiff Joseph Maria in Acre. As a result of the powerful explosion Maria suffered a severe stroke and half his body remains paralyzed. His speech is confused and unintelligible, he requires continuous medical care and has nursing care 24 hours a day. Maria was also badly traumatized by the blast and suffers from psychological and emotional damage. As a result of this rocket attack Joseph Maria suffered severe physical, psychological, emotional and financial injuries.

89. On August 13, 2006, at approximately 10 p.m., a rocket launched by Hizbollah exploded outside the bus being operated by plaintiff Immanuel Penker in Naharia. The powerful blast wounded Penker throughout his body including his right hand. Since the attack Penker has undergone surgery several times on his hand, left leg and left eye. In addition he has required skin grafts and figure restructuring. Penker needs medical care as well as occupational therapy due to his injuries and the extensive series of operations he has endured. In addition, he has been badly traumatized by the rocket blast. Since being hit, Penker is not able to work. As a result of this rocket attack

Immanuel Penker suffered severe physical, psychological, emotional and financial injuries.

90.     On July 17, 2006, at approximately 1:10 p.m., Esther Pinto's house in Safed suffered a direct hit from a rocket launched by Hizbollah. Pinto was in her home at the time. In the powerful explosion Pinto was injured in both her legs and required surgery. Her walking remains impaired and she requires regular medical care. Pinto was badly traumatized from the blast and suffers from psychological and emotional damage. As a result of the rocket attack Esther Pinto suffered severe physical, psychological, emotional and financial injuries.

91.     On July 13, 2006, plaintiff Chaim Kaplan was severely injured by two Hizbollah rocket which landed in Safed. The first rocket landed outside his car and severly injured him. The second rocket struck the Kaplan family's home, and also injured Chaim's wife, plaintiff Rivka Kaplan, as well as the couple's minor children plaintiffs Mushka Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan and Efraim Kaplan. As a result of these rocket attacks plaintiffs Chaim Kaplan, Rivka Kaplan, Mushka Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan and Efraim Kaplan suffered severe physical, psychological, emotional and financial injuries.

92.     Plaintiffs Avishai Reuvane and Elisheva Aron were injured on July 13, 2006, by a rocket fired by Hizbollah which landed in Safed. As a result of this rocket attack Avishai Reuvane and Elisheva Aron suffered severe physical, psychological, emotional and financial injuries.

93.     Plaintiff Chayim Kumer, a resident of Safed, suffered a nervous breakdown and was hospitalized as a result of the Hizbollah Rocket Attacks, which in turn caused severe harm to his wife, Plaintiff Nechama Kumer. As a result of the Hizbollah Rocket Attacks plaintiffs Chayim Kumer and Nechama Kumer suffered severe psychological, emotional and financial injuries.

94.     Plaintiffs Sarah Yefet and her daughter Shoshana Sappir were both in their apartment in Safed on July 12, 2006, when the first of several Hizballah rockets struck their home. Both Yefet and Sappir suffered nervous shock and psychological damage as a result of the bomb attacks. They continue to suffer psychological symptoms, including nervousness, lack of sleep, inability to work or concentrate on tasks. Shoshana in particular suffers in relation to her child-rearing responsibilities, and has diminished abilities due to emotional stress and psychological trauma resulting from the bombing. As a result of these rocket attacks Sarah Yefet and Shoshana Sappir suffered severe physical, psychological, emotional and financial injuries.

95.     On July 25, 2006 a rocket exploded in the yard of the home of plaintiffs Fuad and Suha Shchiv Ghanam in the Israeli village of Ma'ar. Fuad suffered severe rocket shrapnel injuries throughout his body. He was also badly traumatized by the blast. Fuad's wife, Suha, suffered rocket shrapnel injuries throughout her body and suffers from severe psychological and emotional trauma. She requires continuous psychiatric care since the attack. The couple's young son plaintiff Rahmi Guhad Ghanam was also injured in the explosion. Rahmi suffered rocket shrapnel wounds throughout his body, In addition, Rhami Ghanam suffers from psychological and

emotional trauma due to the attack. As a result of this rocket attack Fuad, Suha and Rahmi Shchiv Ghanam suffered severe physical, psychological, emotional and financial injuries.

96.     On July 13, 2006, at approximately 14:30, plaintiff Michael Fuchs was driving in his car in Safed when a rocket launched by Hizbollah struck nearby. Massive amounts of shrapnel penetrated Fuchs' car and caused him severe injuries. Fuchs lost large quantities of blood, lost consciousness and was rushed to the intensive care unit of Rebecca Ziv Hospital. Fuchs' throat was slashed as a result of the explosion and his right hand remains completely paralyzed. Fuchs has been permanently disabled. He is unable to work and relies on intensive and expensive medical treatments on an ongoing basis. As a result of this rocket attack Michael Fuchs suffered severe physical, psychological, emotional and financial injuries.

97.     On July 14, 2006, a rocket launched by Hizbollah landed next to plaintiff Yaakov Abutbul as he was leaving his hospital shift in Safed. Abutbul was wounded with shrapnel in his legs, his back and his chest. He subsequently required surgery three times. In addition, he was traumatized by the explosion. As a result of this rocket attack Yaakov Abutbul suffered severe physical, psychological, emotional and financial injuries.

98.     Plaintiffs Karen and Brian Ardstein resided in Safed at the time of the Hizbollah Rocket Attacks. Numerous rockets landed near the family's home. Karen was pregnant at the time the attacks began and due to the ongoing strain, stress and anxiety, and the rocket explosions near the Ardstein home she suffered a miscarriage

and lost the baby. In the wake of the miscarriage, Karen suffered from post-partum depression, damage to her immune system and has developed other medical complications. Brian was greatly traumatized by the rocket attacks and the loss of the baby. In addition, as a result of the rocket attacks and the collapse of tourism in Israel, Brian, a licensed tour guide, lost all of his work and had extreme difficulties supporting his family. The Ardsteins' minor children, plaintiffs Ma'ayan, Noa, Ariel Chaim and Netiya Yeshua Ardstein all suffered emotional and psychological trauma from the Hizbollah Rocket Attacks. All of the children have been diagnosed with permanent and severe emotional disorders and are receiving on-going psychiatric treatment and therapy. As a result of the Hizbollah Rocket Attacks, Brian, Keren, Ma'ayan, Noa, Ariel Chaim and Netiya Yeshua Ardstein suffered severe physical, psychological, emotional and financial injuries.

99.     On July 13, 2006 at approximately 7:00 p.m. a rocket launched by Hizbollah landed outside the home of plaintiffs Laurie Rappeport and her minor daughter Margalit in Safed. The powerful explosion threw Margalit, who was playing outside on a wall, a distance into the air. Margalit was hospitalized as a result of the explosion and suffered severe psychological trauma. Laurie was emotionally distraught over the injury sustained by her young daughter. As a result of this rocket attack Laurie and Margalit Rappeport suffered severe physical, psychological, and emotional injuries.

100.     On July 19, 2006 the art gallery owned by plaintiffs Yair and Orna Mor in Safed was directly hit by a rocket launched by Hizbollah. The business was completely destroyed in the blast. The couple was extremely traumatized by the

destruction of their family's business. As a result of this rocket attack Yair and Orna Mor suffered severe psychological, emotional and financial injuries.

101.   On July 22, 2006, a rocket launched by Hezbollah landed in close proximity to plaintiff Arkady Spektor in Nahariya. Spektor was sprayed with shrapnel in his right thigh, left shoulder, left lung and was hospitalized in Nahariya. As a result of this rocket attack, Arkady Spektor suffered severe physical, psychological and emotional injuries.

102.   On July 28, 2006, a rocket launched by Hezbollah landed about forty meters from plaintiff Yori Zovrev as he was running to a bomb shelter near his home in Nahariya. As a result, he broke his left ankle (compound fracture) and was hospitalized. As a result of this injury, he has suffered severe, constant pain through the present. In addition, he suffers from severe anxiety, manifesting itself in the form of insomnia and inability to rest. As a result of this rocket attack, Zovrev has suffered severe physical and psychological and emotional injuries.

103.   In the summer of 2006, plaintiffs Theodore (Ted) Greenberg and Maurine Greenberg were the proprietors of a tourism business in Safed. The Hizbollah Rocket Attacks caused a complete halt in tourism in northern Israel for several months during the peak tourism season, which in turn caused the Greenbergs severe financial damage. As a result of the Hizbollah Rocket Attacks, Theodore (Ted) Greenberg and Maurine Greenberg suffered severe financial damages.

104.   In the summer of 2006, plaintiffs Jacob Katzmacher and Deborah Chana Katzmacher were the proprietors of an art gallery in the city of Safed (a business

that caters almost exclusively to tourists). The Hizbollah Rocket Attacks caused a complete halt in tourism in northern Israel for several months during the peak tourism season, which in turn caused the Katzmachers severe financial damage. As a result of the Hizbollah Rocket Attacks, Jacob Katzmacher and Deborah Chana Katzmacher suffered severe financial damages.

105.    On July 13, 2008, a rocket launched by Hizbollah landed a few meters away from plaintiff Chaya Katzmacher, in Safed causing her psychological and emotional damage. As a result of this rocket attack, Chaya Katzmacher suffered severe psychological and emotional damage.

106.    On August 11, 2006, at approximately 1:15 p.m., a rocket launched by Hizbollah landed directly on plaintiff Mikimi Steinberg's house in Safed severely damaging the house and the possessions therein. As a result of this rocket attack, Mikimi Steinberg suffered severe financial damages.

107.    In the summer of 2006, plaintiffs Jared Sauter and Danielle Sauter were the owners of a tourism business in the town of Rosh Pina in the Galilee. The Hizbollah Rocket Attacks caused a complete halt in tourism in northern Israel for several months during the peak tourism season, which in turn caused the Sauters severe financial damage. The Sauters' business collapsed and they was forced to relocate to a different city. As a result of the Hizbollah Rocket Attacks, Jared Sauter and Danielle Sauter suffered severe financial damages.

108.    In the summer of 2006 plaintiff Myra Mandel was the owner of an art gallery in Safed. Rockets launched by Hizbollah damaged her art gallery.

Additionally, the Hizbollah Rocket Attacks caused a complete halt in tourism in northern Israel for several months during the peak tourism season, which in turn caused Mandel severe financial damage. As a result of the Hizbollah Rocket Attacks, Myra Mandel suffered severe financial damages.

109. On July 13, 2006, alarms sounded in response to rockets launched by Hizbollah at Safed, and, while running to the bomb shelter, plaintiff Yaakov Licci stumbled and fell on his stomach and suffered an injury requiring that his spleen be immediately removed. On July 20, 2006 while still hospitalized in Safed from the spleen operation, another rocket launched by Hizbollah landed directly on the hospital very close to the room in which Yaakov Licci was staying. Yaakov Licci received shrapnel and glass shard wounds to his entire body, especially to his left foot and hand, his head, his back and his eyes. Yaakov Licci has a fracture in his skull that has no chance of healing, and bulging scars in his limbs, back, and head. In addition, Yaakov Licci suffered severe emotional injuries. While previously a healthy and active boy, Yaakov Licci is now dependant on his psychiatric treatment and medications. Yaakov Licci's condition has not improved. Even today, at 16 years old, he sleeps in his parents' bed. As a result of these rocket attacks, Yaakov Licci suffered severe physical, psychological, emotional and financial injuries.

110. On July 21, 2006, a rocket launched by Hizbollah landed on the hospital in Safed where plaintiff Elihav Licci was attending to his son Yaakov Licci who had been hospitalized as a result of a previous rocket attack by Hizbollah. Elihav Licci was injured by the rocket, and suffered shrapnel wounds and glass shards embedded in

his right hand and in his left foot. Some of these shards could not be removed and are still in Elihav's body. Elihav Licci also experienced psychological injuries (severe post trauma disorder) as a result of the rocket attack. As a result of this rocket attack, Yaakov Licci suffered severe physical, psychological, emotional and financial injuries.

111.    On July 13 2006, a rocket launched by Hizbollah landed on a dairy owned by plaintiffs Elihav and Yehudit Licci near Safed, paralyzing the dairy's activity. On July 20, 2006, a rocket launched by Hizbollah landed on the Licci's dairy and destroyed it. The dairy had until that time generated approximately $90,000 monthly revenue. Since the war the dairy has been paralyzed, and the Liccis have been caused severe financial losses. In order to rebuild the dairy the Licci's need to invest over $500,000. As a result of these rocket attacks, plaintiffs Elihav and Yehudit Licci suffered severe financial damages.

112.    On July 19, 2006 the home of plaintiffs Rochelle Shalmani and Oz Shalmani in Carmiel in the Northern Galilee was hit by a Hizballah rocket, partly destroying it. The family could not live in the house in Carmiel due to the damage and the danger of ongoing rocket attacks, and spent several weeks crowded into a small Tel Aviv apartment with 12 other people. The Shalmanis lost significant work time due to the bombing. As result of this rocket attack Rochelle Shalmani and Oz Shalmani suffered severe financial injuries.

## Plaintiffs' Injuries Are the Result of Defendants' Conduct

113. Terrorist organizations such as Hizbollah need to transfer funds through wire transfers in order to operate, and in order to plan, to prepare for and to carry out terrorist attacks.

114. Provision of wire transfer services to Hizbollah enables Hizbollah to operate and to plan, to prepare for and to carry out terrorist attacks, and enhances Hizbollah's ability to plan, to prepare for and to carry out such attacks.

115. Hizbollah carried out the Hizbollah Wire Transfers in order to transfer and receive funds necessary for planning, preparing and carrying out Hizbollah's terrorist activity, including rocket attacks on civilians generally and the Hizbollah Rocket Attacks specifically.

116. The Hizbollah Wire Transfers carried out by the defendants substantially increased and facilitated Hizbollah's ability to plan, to prepare for and to carry out rocket attacks on civilians, including the Hizbollah Rocket Attacks.

117. Hizbollah planned, made the preparations necessary for and carried out the Hizbollah Rocket Attacks utilizing funds received by Hizbollah as part of the Hizbollah Wire Transfers, and/or utilizing funds received by Hizbollah in exchange or consideration for the Hizbollah Wire Transfers, and/or utilizing funds that were freed up and/or otherwise made available to Hizbollah as a result of the Hizbollah Wire Transfers, and/or using funds drawn from a pool of funds created in part by the Hizbollah Wire Transfers.

118. The Hizbollah Wire Transfers were enabled, facilitated and carried out by the conduct of defendants Amex Bank and LCB described herein.

119. The Hizbollah Rocket Attacks were thereby enabled, facilitated and proximately caused by the conduct of defendants Amex Bank and LCB described herein.

120. Plaintiffs' injuries are therefore the direct and proximate result of defendants' conduct.

### Defendant LCB Knew and Intended That Its Conduct Would Result in Harm to the Plaintiffs

121. The Republic of Lebanon and the State of Israel have had hostile relations since 1948.

122. Anti-Israeli sentiment, and support for Hizbollah and its anti-Israel program, goals and activities, is very widespread in Lebanese society.

123. Since the 1980s, Hizbollah is and has been a major and popular political organization in Lebanon.

124. At all relevant times, Hizbollah held a large number of seats in the Lebanese parliament, was part of the Lebanese central government and held seats in numerous municipal governments throughout Lebanon.

125. At all relevant times, Hizbollah enjoyed and enjoys extensive support in the Lebanese public.

126.   At all relevant times, including the period between 2004 and the present day, as a matter of official LCB policy defendant LCB continuously supports and supported Hizbollah and its anti-Israel program, goals and activities.

127.   Specifically, at all relevant times, including the period between 2004 and the present day, as a matter of official LCB policy defendant LCB supports and supported Hizbollah's terrorist activities against Jews in Israel, and Hizbollah's goal of using terrorism to destroy the State of Israel and murder or expel its Jewish inhabitants.

128.   Additionally, at all relevant times, including the period between 2004 and the present day, as a matter of official LCB policy defendant LCB supports and supported Hizbollah's terrorist activities against Jews in Israel, and Hizbollah's goal of using terrorism to coerce, intimidate and influence the Israeli government and public.

129.   At all relevant times, including the period between 2004 and the present day, defendant LCB carried out the Hizbollah Wire Transfers as a matter of official LCB policy, in order to assist and advance Hizbollah's terrorist activities against Jews in Israel, in order to assist and advance Hizbollah's goal of using terrorism to destroy the State of Israel and murder or expel its Jewish inhabitants and in order to assist and advance Hizbollah's goal of coercing, intimidating and influencing the Israeli government and public.

130.   As discussed in paragraphs 20-32 above, at all relevant times, including the period between 2004 and the present day, defendant LCB had actual knowledge that Hizbollah is a violent terrorist organization which had carried out

numerous terrorist attacks against Israeli civilians and American targets and which planned and intended to carry out additional such terrorist attacks.

131.    At all relevant times, including the period between 2004 and the present day, defendant LCB had actual knowledge that terrorist organizations such as Hizbollah require wire transfer services in order to operate and in order to plan, to prepare for and to carry out terrorist attacks, and that providing wire transfer services to Hizbollah would enable Hizbollah to plan, to prepare for and to carry out terrorist attacks and/or enhance Hizbollah's ability to plan, to prepare for and to carry out such attacks, because such knowledge is notorious and known to the public at large.

132.    At all relevant times, including the period between 2004 and the present day, defendant LCB had actual knowledge that terrorist organizations such as Hizbollah require wire transfer services in order to operate and in order to plan, to prepare for and to carry out terrorist attacks, and that providing wire transfer services to Hizbollah would enable Hizbollah to plan, to prepare for and to carry out terrorist attacks and/or enhance Hizbollah's ability to plan, to prepare for and to carry out such attacks, because defendant LCB was aware of the U.S. Sanctions Regime and that the U.S. Sanctions Regime is and was intended to prevent Hizbollah from conducting banking activities, including wire transfers, and thereby limit its ability to operate and to carry out terrorist attacks.

133.    At all relevant times, including the period between 2004 and the present day, defendant LCB had actual knowledge that terrorist organizations such as Hizbollah require wire transfer services in order to operate and in order to plan, to

prepare for and to carry out terrorist attacks, and that providing wire transfer services to Hizbollah would enable Hizbollah to plan, to prepare for and to carry out terrorist attacks and/or enhance Hizbollah's ability to plan, to prepare for and to carry out such attacks, because defendant LCB was aware of the rules promulgated by the inter-governmental Financial Action Task Force ("FATF") and by the Middle East and North Africa Financial Action Task Force ("MENAFATF") (which Lebanon has adopted), requiring banks to know their customers, perform due diligence and not provide banking services to terrorist organizations, and that the FATF and MENAFATF rules are and were intended to prevent terrorist organizations such as Hizbollah from conducting banking activities, including wire transfers, and thereby limit their ability to operate and to carry out terrorist attacks.

134. At all relevant times, including the period between 2004 and until July 12, 2006, defendant LCB had actual knowledge that Shahid is an integral part of Hizbollah and constitutes part of Hizbollah's financial arm, that the Hizbollah Accounts and the funds therein were owned and controlled by Hizbollah, and that the Hizbollah Wire Transfers were being carried out by and at the direction of Hizbollah.

135. At all relevant times, including the several year period prior to July 12, 2006, defendant LCB had actual knowledge that Shahid is an integral part of Hizbollah and constitutes part of Hizbollah's financial arm, that the Hizbollah Accounts and the funds therein were owned and controlled by Hizbollah, and that the Hizbollah Wire Transfers were being carried out by and at the direction of Hizbollah, because the

fact that Shahid is part of Hizbollah's financial arm was notorious public knowledge during the period between 2004 and until July 12, 2006.

136.    The fact that Shahid is an integral part of Hizbollah and constitutes part of Hizbollah's financial arm was openly, publicly and repeatedly acknowledged and publicized by Hizbollah during the several year period prior July 12, 2006, *inter alia* on Hizbollah's official websites, in official press releases issued by Hizbollah, on Hizbollah's official television station, Al-Manar, on Hizbollah's official radio station, Al-Nour, and in numerous press conferences and news media interviews conducted by senior Hizbollah officials.

137.    Additionally, the fact that Shahid is an integral part of Hizbollah and constitutes part of Hizbollah's financial arm was repeatedly publicized for many years prior July 12, 2006, in various English-language publications, including without limitation the following:

a)    On October 8, 1991, The Independent newspaper (published in London) reported that the Martyrs Foundation (i.e. Shahid) supplies stipends to the families of Hizbollah terrorists. *See* Robert Fisk, *Testament of a doomed youth; In the home of a Hizbollah family in Beirut, hears how a father's death sent his son to 'martyrdom' in southern Lebanon*, The Independent, October 8, 1991.

b)    On May 30, 2000, The Irish Times published an article reporting that Hizbollah operatives, including personnel "from the Martyrs' Foundation," were moving into parts of Southern Lebanon. *See Hizbullah moves to consolidate its political gains in Lebanon*, The Irish Times, May 30, 2000.

c)      On November 27, 2001, BBC Worldwide Monitoring service published an English-language transcript of an article which appeared the same day in the Lebanese newspaper Al-Safir, regarding a Shahid event officiated over by Hizbollah Secretary-General Hasan Nasrallah. *See* BBC Worldwide Monitoring, *USA makes "big mistake" if it wages war in Mideast, says Hezbollah leader*, November 27, 2001.

d)      In January 2002, the Middle East Intelligence Bulletin (a joint publication of the United States Committee for a Free Lebanon and the Middle East Forum) published an article on its website reporting that Paraguayan authorities had found fundraising forms for Shahid in the possession of a senior Hizbollah operative. *See* Blanca Madani, *Hezbollah's Global Finance Network: The Triple Frontier*, available at http://www.meib.org/articles/0201_l2.htm.

e)      On June 14, 2002, BBC Worldwide Monitoring service published an English-language translation of a June 8, 2002 article which appeared in the Arabic-language newspaper Al-Sharq al-Awsat (published in London), which reported that "'Al-Shaheed' the Martyrs Foundation … give every month vast amounts of financial aid" to Hizbollah operatives. *See* BBC Worldwide Monitoring, *Iran reportedly agrees to increase Islamic Jihad's budget*, June 14, 2002.

f)      An English-language article published by the wire service Agence France Presse on September 2, 2002, reported that Paraguayan authorities had found receipts for the transfer of over $3.5 million to the "Martyr's Organization" (i.e. Shahid) in the possession of Hizbollah's leader in Latin America.

g)      On November 7, 2003, BBC Worldwide Monitoring service published an English-language transcript of a November 3, 2003 report on Al Manar (Hizbollah's TV station) of a Shahid event led by the Secretary-General of Hizbollah. *See* BBC Worldwide Monitoring, *Lebanese Hezbollah leader discusses Bush's speech, democracy in Mideast,* November 7, 2003.

h)      In July 2003, the Federal Research Division of the Library of Congress issued a report linking Shahid to Hizbollah. *See Terrorist and Organized Crime Groups in the Tri-Border Area (TBA) of South America,* available at http://www.loc.gov/rr/frd/pdf-files/TerrOrgCrime_TBA.pdf, at 72-75 (noting that the "'Martyr' Social Beneficent Organization … is linked to the Hizballah" and that Paraguayan authorities had found fundraising forms for Shahid in the possession of a senior Hizbollah operative).

i)      On December 30, 2004, Slate Magazine published an article about Hizbollah's television station, Al Manar, and which reported that "An Al-Manar public service message tells families of suicide bombers where to go to collect the subsidy from a martyrs' foundation." *See* Jack Shafer, *Who's Afraid of Hezbollah TV?,* Slate Magazine, December 30, 2004.

j)      In February 2005, counterterrorism expert Dr. Matthew Levitt published an article on the website of the Washington Institute for Near East Policy, which confirms that Shahid provides funds for Hizbollah terrorists. *See* Matthew Levitt, *Hizballah Finances: Funding the Party of God,* available at http://www.washingtoninstitute.org/templateC06.php?CID=772.

k)    On March 1, 2005, a summary of Dr. Levitt's February 2005 article was published by the Washington Institute, which reiterates that Shahid "supplies charitable funds for Hizballah-affiliated suicide bombers." *See* Matthew Levitt, *Hizballah Finances: Funding the Party of God*, available at http://www.washingtoninstitute.org/templateC05.php?CID=2266.

l)    On March 28, 2005, the PR Newswire company (a news and information distribution service) distributed a press release issued by Fortress Global Investigations (a major private investigation and security firm operated by former FBI and CIA agents) asserting that Shahid is "a front organization for the terrorist organization, Hezbollah." This press release was published on numerous news and websites.

m)    An article published on May 1, 2005, in Infantry Magazine, reported that the role of the "Shaheed (martyrs) Foundation" is to fund and provide benefits "for the families of those dying for Hizballah's objectives. This includes maintaining a $2,500 stipend for families of suicide bombers and martyrs of Hizballah." Youssef Aboul-Enein, *Hizballah: a discussion of its early formation,* Infantry Magazine, May 1, 2005.

n)    On May 25, 2005, counterterrorism expert (and former FBI agent) Dr. Matthew Levitt appeared before the Committee on Senate Homeland Security and Governmental Affairs, and testified that Shahid "admittedly supplies charitable funds for the family of suicide bombers." *See Terrorists, Criminals and Counterfeit Goods*, CQ Congressional Testimony May 25, 2005.

o) A RICO complaint filed in this Court in November 2004 in the matter of *Ayyash v. Bank Al-Madina*, C.A. 04-9201 (S.D.N.Y.), alleged that Shahid is a "front organization" for Hizbollah. *See Ayyash*, dkt. # 1 at ¶ 48.

p) On March 9, 2006, this Court issued a decision in the *Ayyash* case, expressly noting that "'Al-Shaheed,' [is] a front organization for Hezbollah." *Ayyash v. Bank Al-Madina*, 2006 WL 587342 at *1 n. 1 (S.D.N.Y. March 9, 2006).

138. All of the documents cited in the previous paragraph are and at all times were publicly available on the internet and/or on the Lexis-Nexis news archive. Thus, a simple internet and Lexis-Nexis search would have apprised defendant LCB of all the information contained in the documents cited in the previous paragraph even assuming, strictly *arguendo*, that defendant LCB was not already independently aware of that information.

139. Additionally and/or alternatively, at all times, defendant LCB should have known and had a duty to inform itself of all the facts enumerated in paragraphs 130 - 138 because they are notorious and public knowledge.

140. Additionally and/or alternatively, at all times, defendant LCB should have known and had a duty to inform itself of all the facts enumerated in paragraphs 130 - 138 because defendant LCB had and has statutory duties, *inter alia* under United States law, under the laws of the State of New York, under Lebanese law, and under the rules promulgated by FATF and by MENAFATF, to know its customers, perform due diligence and not provide banking services to terrorist organizations such as Hizbollah.

141. By executing the Hizbollah Wire Transfers, defendant LCB breached its statutory duties to know its customers and perform due diligence and not provide banking services to terrorist organizations such as Hizbollah.

142. Additionally and/or alternatively, at all times, defendant LCB should have known and had a duty to inform itself of all the facts enumerated in paragraphs 130 - 138 because defendant LCB had and has statutory duties, *inter alia* under United States law, under the laws of the State of New York, under Lebanese law, and under the rules promulgated by FATF and MENAFATF, to monitor, report and refuse to execute illegal, suspicious and/or irregular banking transactions. The Hizbollah Wire Transfers were facially suspicious and irregular because they had no business or apparent lawful purpose, and there was no reasonable explanation for them.

143. By executing the Hizbollah Wire Transfers, defendant LCB breached its statutory duties to monitor, report and refuse to execute suspicious and/or irregular banking transactions.

### Defendant Amex Bank Knew or Should Have Known That Its Conduct Would Result in Harm to the Plaintiffs

144. As discussed in paragraphs 20-32 above, at all relevant times, including the period between 2004 and the present day, defendant Amex Bank had actual knowledge that Hizbollah is a violent terrorist organization which had carried

out numerous terrorist attacks against Israeli civilians and American targets and which planned and intended to carry out additional such terrorist attacks.

145.   At all relevant times, including the period between 2004 and the present day, defendant Amex Bank had actual knowledge that terrorist organizations such as Hizbollah require wire transfer services in order to operate and in order to plan, to prepare for and to carry out terrorist attacks, and that providing wire transfer services to Hizbollah would enable Hizbollah to plan, to prepare for and to carry out terrorist attacks and/or enhance Hizbollah's ability to plan, to prepare for and to carry out such attacks, because such knowledge is notorious and known to the public at large.

146.   At all relevant times, including the period between 2004 and the present day, defendant Amex Bank had actual knowledge that terrorist organizations such as Hizbollah require wire transfer services in order to operate and in order to plan, to prepare for and to carry out terrorist attacks, and that providing wire transfer services to Hizbollah would enable Hizbollah to plan, to prepare for and to carry out terrorist attacks and/or enhance Hizbollah's ability to plan, to prepare for and to carry out such attacks, because defendant Amex Bank was aware of the U.S. Sanctions Regime and that the U.S. Sanctions Regime is and was intended to prevent Hizbollah from conducting banking activities, including wire transfers, and thereby limit its ability to operate and to carry out terrorist attacks.

147.   At all relevant times, including the period between 2004 and the present day, defendant Amex Bank had actual knowledge that terrorist organizations such as Hizbollah require wire transfer services in order to operate and in order to plan,

to prepare for and to carry out terrorist attacks, and that providing wire transfer services to Hizbollah would enable Hizbollah to plan, to prepare for and to carry out terrorist attacks and/or enhance Hizbollah's ability to plan, to prepare for and to carry out such attacks, because defendant Amex Bank was aware of the rules promulgated by FATF requiring banks to know their customers, perform due diligence and not provide banking services to terrorist organizations, and that the FATF rules are and were intended to prevent terrorist organizations such as Hizbollah from conducting banking activities, including wire transfers, and thereby limit their ability to operate and to carry out terrorist attacks.

148. At all relevant times, including the period between 2004 and until July 12, 2006, defendant Amex Bank had actual knowledge that Shahid is an integral part of Hizbollah and constitutes part of Hizbollah's financial arm, that the Hizbollah Accounts and the funds therein were owned and controlled by Hizbollah, and that the Hizbollah Wire Transfers were being carried out by and at the direction of Hizbollah.

149. At all relevant times, including the several year period prior to July 12, 2006, defendant Amex Bank had actual knowledge that Shahid is an integral part of Hizbollah and constitutes part of Hizbollah's financial arm, that the Hizbollah Accounts and the funds therein were owned and controlled by Hizbollah, and that the Hizbollah Wire Transfers were being carried out by and at the direction of Hizbollah, because the fact that Shahid is part of Hizbollah's financial arm was notorious public knowledge during the period between 2004 and until July 12, 2006.

150.    The fact that Shahid is an integral part of Hizbollah and constitutes part of Hizbollah's financial arm was openly, publicly and repeatedly acknowledged and publicized by Hizbollah during the several year period prior July 12, 2006, *inter alia* on Hizbollah's official websites, in official press releases issued by Hizbollah, on Hizbollah's official television station, Al-Manar, on Hizbollah's official radio station, Al-Nour, and in numerous press conferences and news media interviews conducted by senior Hizbollah officials.

151.    During the period relevant hereto, including the period between 2004 and July 12, 2006, defendant Amex Bank maintained an office in Beirut, Lebanon, staffed by Arabic-speaking officers and employees of defendant Amex Bank, and Amex Bank therefore had and/or should be deemed to have had the same knowledge of and access to Arabic-language websites, press releases, television and radio broadcasts, press conferences and news media reports as any other person in Lebanon.

152.    Additionally, the fact that Shahid is an integral part of Hizbollah and constitutes part of Hizbollah's financial arm was repeatedly publicized for many years prior July 12, 2006, in various English-language publications, including without limitation the following:

a)    On October 8, 1991, The Independent newspaper (published in London) reported that the Martyrs Foundation (i.e. Shahid) supplies stipends to the families of Hizbollah terrorists. *See* Robert Fisk, *Testament of a doomed youth; In the home of a Hizbollah family in Beirut, hears how a father's death sent his son to 'martyrdom' in southern Lebanon*, The Independent, October 8, 1991.

b)      On May 30, 2000, The Irish Times published an article reporting that Hizbollah operatives, including personnel "from the Martyrs' Foundation," were moving into parts of Southern Lebanon. *See Hizbullah moves to consolidate its political gains in Lebanon,* The Irish Times, May 30, 2000.

c)      On November 27, 2001, BBC Worldwide Monitoring service published an English-language transcript of an article which appeared the same day in the Lebanese newspaper Al-Safir, regarding a Shahid event officiated over by Hizbollah Secretary-General Hasan Nasrallah. *See* BBC Worldwide Monitoring, *USA makes "big mistake" if it wages war in Mideast, says Hezbollah leader,* November 27, 2001.

d)      In January 2002, the Middle East Intelligence Bulletin (a joint publication of the United States Committee for a Free Lebanon and the Middle East Forum) published an article on its website reporting that Paraguayan authorities had found fundraising forms for Shahid in the possession of a senior Hizbollah operative. *See* Blanca Madani, *Hezbollah's Global Finance Network: The Triple Frontier,* available at http://www.meib.org/articles/0201_l2.htm.

e)      On June 14, 2002, BBC Worldwide Monitoring service published an English-language translation of a June 8, 2002 article which appeared in the Arabic-language newspaper Al-Sharq al-Awsat (published in London), which reported that "'Al-Shaheed' the Martyrs Foundation ... give every month vast amounts of financial aid" to Hizbollah operatives. *See* BBC Worldwide Monitoring, *Iran reportedly agrees to increase Islamic Jihad's budget,* June 14, 2002.

f)      An English-language article published by the wire service Agence France Presse on September 2, 2002, reported that Paraguayan authorities had found receipts for the transfer of over $3.5 million to the "Martyr's Organization" (i.e. Shahid) in the possession of Hizbollah's leader in Latin America.

g)      On November 7, 2003, BBC Worldwide Monitoring service published an English-language transcript of a November 3, 2003 report on Al Manar (Hizbollah's TV station) of a Shahid event led by the Secretary-General of Hizbollah. *See* BBC Worldwide Monitoring, *Lebanese Hezbollah leader discusses Bush's speech, democracy in Mideast*, November 7, 2003.

h)      In July 2003, the Federal Research Division of the Library of Congress issued a report linking Shahid to Hizbollah. *See Terrorist and Organized Crime Groups in the Tri-Border Area (TBA) of South America*, available at http://www.loc.gov/rr/frd/pdf-files/TerrOrgCrime_TBA.pdf, at 72-75 (noting that the "'Martyr' Social Beneficent Organization … is linked to the Hizballah" and that Paraguayan authorities had found fundraising forms for Shahid in the possession of a senior Hizbollah operative).

i)      On December 30, 2004, Slate Magazine published an article about Hizbollah's television station, Al Manar, and which reported that "An Al-Manar public service message tells families of suicide bombers where to go to collect the subsidy from a martyrs' foundation." *See* Jack Shafer, *Who's Afraid of Hezbollah TV?*, Slate Magazine, December 30, 2004.

j)      In February 2005, counterterrorism expert Dr. Matthew Levitt published an article on the website of the Washington Institute for Near East Policy, which confirms that Shahid provides funds for Hizbollah terrorists. *See* Matthew Levitt, *Hizballah Finances: Funding the Party of God*, available at http://www.washingtoninstitute.org/templateC06.php?CID=772.

k)      On March 1, 2005, a summary of Dr. Levitt's February 2005 article was published by the Washington Institute, which reiterates that Shahid "supplies charitable funds for Hizballah-affiliated suicide bombers." *See* Matthew Levitt, *Hizballah Finances: Funding the Party of God*, available at http://www.washingtoninstitute.org/templateC05.php?CID=2266.

l)      On March 28, 2005, the PR Newswire company (a news and information distribution service) distributed a press release issued by Fortress Global Investigations (a major private investigation and security firm operated by former FBI and CIA agents) asserting that Shahid is "a front organization for the terrorist organization, Hezbollah." This press release was published on numerous news and websites.

m)      An article published on May 1, 2005, in Infantry Magazine, reported that the role of the "Shaheed (martyrs) Foundation" is to fund and provide benefits "for the families of those dying for Hizballah's objectives. This includes maintaining a $2,500 stipend for families of suicide bombers and martyrs of Hizballah." Youssef Aboul-Enein, *Hizballah: a discussion of its early formation,* Infantry Magazine, May 1, 2005.

n)      On May 25, 2005, counterterrorism expert (and former FBI agent) Dr. Matthew Levitt appeared before the Committee on Senate Homeland Security and Governmental Affairs, and testified that Shahid "admittedly supplies charitable funds for the family of suicide bombers." *See Terrorists, Criminals and Counterfeit Goods*, CQ Congressional Testimony May 25, 2005.

o)      A RICO complaint filed in this Court in November 2004 in the matter of *Ayyash v. Bank Al-Madina*, C.A. 04-9201 (S.D.N.Y.), alleged that Shahid is a "front organization" for Hizbollah. *See Ayyash,* dkt. # 1 at ¶ 48.

p)      On March 9, 2006, this Court issued a decision in the *Ayyash* case, expressly noting that "'Al-Shaheed,' [is] a front organization for Hezbollah." *Ayyash v. Bank Al-Madina*, 2006 WL 587342 at *1 n. 1 (S.D.N.Y. March 9, 2006).

153.    All of the documents cited in the previous paragraph are and at all times were publicly available on the internet and/or on the Lexis-Nexis news archive. Thus, a simple internet and Lexis-Nexis search would have apprised defendant Amex Bank of all the information contained in the documents cited in the previous paragraph even assuming, strictly *arguendo*, that defendant Amex Bank was not already independently aware of that information.

154.    Additionally and/or alternatively, at all times, defendant Amex Bank should have known and had a duty to inform itself of all the facts enumerated in paragraphs 144 - 153 because they are notorious and public knowledge.

155.    Additionally and/or alternatively, at all times, defendant Amex Bank should have known and had a duty to inform itself of all the facts enumerated in

paragraphs 144 - 153 because defendant Amex Bank had and has statutory duties, *inter alia* under United States law, under the laws of the State of New York and under the rules promulgated by FATF, to know its customers, perform due diligence and not provide banking services to terrorist organizations such as Hizbollah.

156. By executing the Hizbollah Wire Transfers, defendant Amex Bank breached its statutory duties to know its customers and perform due diligence and not provide banking services to terrorist organizations such as Hizbollah.

157. Additionally and/or alternatively, at all times, defendant Amex Bank should have known and had a duty to inform itself of all the facts enumerated in paragraphs 144 - 153 because defendant Amex Bank had and has statutory duties, *inter alia* under United States law, under the laws of the State of New York and under the rules promulgated by FATF, to monitor, report and refuse to execute illegal, suspicious and/or irregular banking transactions. The Hizbollah Wire Transfers were facially suspicious and irregular because they had no business or apparent lawful purpose, and there was no reasonable explanation for them.

158. By executing the Hizbollah Wire Transfers, defendant Amex Bank breached its statutory duties to monitor, report and refuse to execute suspicious and/or irregular banking transactions.

159. The New York State Banking Department conducted an investigation of defendant Amex Bank and found that during the time period in which the Hizbollah Wire Transfers took place: (i) defendant Amex Bank failed to comply with applicable federal and state laws, rules, and regulations relating to terrorism financing

and anti-money laundering policies, procedures, and practices, including the Bank Secrecy Act (31 U.S.C. § 5311 *et seq*.), the rules and regulations promulgated thereunder by the U.S. Department of the Treasury (31 C.F.R. Part 103), and those of the New York State Banking Department (3 N.Y.C.R.R. Part 300); (ii) defendant Amex Bank's international wire transfer and correspondent banking services suffered from compliance and risk management deficiencies; and (iii) defendant Amex Bank's policies, procedures, internal control environment, compliance staffing, training, customer due diligence practices and suspicious activity reporting suffered from deficiencies.

160.    Had defendant Amex Bank complied with applicable federal and state laws, rules, and regulations relating to terrorism financing and anti-money laundering policies, procedures, and practices, including the Bank Secrecy Act (31 U.S.C. § 5311 *et seq*.), the rules and regulations promulgated thereunder by the U.S. Department of the Treasury (31 C.F.R. Part 103), and those of the New York State Banking Department (3 N.Y.C.R.R. Part 300), defendant Amex Bank would not have carried out the Hizbollah Wire Transfers.

161.    Had defendant Amex Bank's international wire transfer and correspondent banking services not suffered from compliance and risk management deficiencies, defendant Amex Bank would not have carried out the Hizbollah Wire Transfers.

162.    Had defendant Amex Bank's policies, procedures, internal control environment, compliance staffing, training, customer due diligence practices and

suspicious activity reporting not suffered from deficiencies, defendant Amex Bank would not have carried out the Hizbollah Wire Transfers.

163.    When acting as the correspondent bank for defendant LCB and when carrying out wire transfers for customers of defendant LCB, defendant Amex Bank is and was at all times provided with and was aware of the names of all the parties to each such wire transfer, including the names of the originator and the intended beneficiary and recipient of each such wire transfer. Thus, defendant Amex Bank knew in real time that each of the Hizbollah Wire Transfers was made to, from and/or between accounts titled to Shahid, and defendant Amex Bank had the technical and practical ability to block and refuse to carry out the Hizbollah Wire Transfers.

## FIRST CAUSE OF ACTION
## ON BEHALF OF THE AMERICAN PLAINTIFFS
## AGAINST DEFENDANT LCB
## INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. § 2333

164.    Plaintiffs repeat and reallege each of the foregoing paragraphs with the same force and effect as if more fully set forth herein.

165.    The actions of defendant LCB in executing the Hizbollah Wire Transfers constituted "acts of international terrorism" as defined in 18 U.S.C. § 2331.

166.    As required by § 2331, the actions of defendant LCB in executing the Hizbollah Wire Transfers constituted a violation of the criminal laws of the United States including, without limitation, the criminal provisions of 18 U.S.C. §§ 2339A, 2339B and 2339C, which prohibit the provision of material support and resources to terrorist organizations.

167.    As required by § 2331, LCB's actions in executing the Hizbollah Wire Transfers were dangerous to human life, since Hizbollah is a violent terrorist organization which since its establishment has murdered hundreds of innocent civilians, and openly proclaims its intention to murder other such innocent civilians.

168.    As required by § 2331, LCB's actions in executing the Hizbollah Wire Transfers transcended national boundaries in terms of the means by which they were accomplished and locales in which LCB operates.

169.    Section 2331(1)(B) defines "international terrorism" as "activities that ... appear to be intended ... to intimidate or coerce a civilian population [or] to influence the policy of a government by intimidation or coercion." However, § 2331(1)(B) does not impose "a state-of-mind requirement; it is a matter of external appearance rather than subjective intent," *Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685, 694 (7th Cir. 2008). This condition was satisfied here by the fact that LCB knowingly and intentionally executed the Hizbollah Wire Transfers when LCB knew full well that Hizbollah is a terrorist organization dedicated to using terrorism in order to intimidate and influence the conduct of the Israeli government and public. This conduct of LCB created the objective "external appearance" that LCB shared Hizbollah's goals of intimidating and coercing a civilian population and of influencing the policy of a government by intimidation and coercion.

170.    Alternatively, to the extent that § 2331(1)(B) imposes a subjective state-of-mind requirement, that requirement was also met here because (like much of the Lebanese public) LCB shares Hizbollah's hostility toward Israel, supports Hizbollah's

use of terrorism to intimidate the Israeli government and public and executed the Hizbollah Wire Transfers with the intention of intimidating and coercing a civilian population and influencing the policy of a government by intimidation and coercion.

171.     The actions of defendant LCB in executing the Hizbollah Wire Transfers therefore constituted "acts of international terrorism" as defined in 18 U.S.C. §§ 2331 and 2333.

172.     As a direct and proximate result of LCB's execution of the Hizbollah Wire Transfers, the American Plaintiffs suffered the harm described herein.

173.     Defendant LCB is therefore liable for all of the American Plaintiffs' damages in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333(a).

**SECOND CAUSE OF ACTION
ON BEHALF OF THE AMERICAN PLAINTIFFS
AGAINST DEFENDANT LCB
AIDING AND ABETTING INTERNATIONAL TERRORISM
PURSUANT TO 18 U.S.C. § 2333**

174.     Plaintiffs repeat and reallege each of the foregoing paragraphs with the same force and effect as if more fully set forth herein.

175.     Hizbollah uses terrorism in an effort to coerce, intimidate and influence government decision-makers and the public in Israel.

176.     Hizbollah's actions described herein are and were dangerous to human life and constituted a violation of the criminal laws of the United States, since Hizbollah is a violent terrorist organization which since its establishment has murdered

hundreds of innocent civilians, and openly proclaims its intention to murder other such innocent civilians.

177.    Hizbollah's actions described herein transcended national boundaries in terms of the means by which they were accomplished, the persons they appeared intended to intimidate or coerce, and the locales in which Hizbollah operates.

178.    The actions of the Hizbollah described herein therefore constituted "acts of international terrorism" as defined in 18 U.S.C. §§ 2331 and 2333.

179.    Defendant LCB knowingly and intentionally carried out the Hizbollah Wire Transfers, totaling millions of dollars, on an on-going basis over a period of several years.

180.    Defendant LCB carried out the Hizbollah Wire Transfers with the specific purpose and intention of enabling and assisting Hizbollah to carry out terrorist attacks against Jewish civilians in Israel.

181.    The actions of defendant LCB therefore constituted aiding and abetting Hizbollah's "acts of international terrorism" within the meaning of 18 U.S.C. §§ 2331 and 2333.

182.    As a direct and proximate result of LCB's conduct the American Plaintiffs suffered the harm described herein.

183.    Defendant LCB is therefore liable for all of the American Plaintiffs' damages in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333(a).

## THIRD CAUSE OF ACTION
## ON BEHALF OF THE ISRAELI PLAINTIFFS AND THE CANADIAN PLAINTIFFS
## (EXCEPT FOR SARAH YEFET, SHOSHANA SAPPIR,
## ROCHELLE SHALMONI AND OZ SHALMONI)
## AGAINST DEFENDANT LCB
## AIDING AND ABETTING VIOLATIONS OF INTERNATIONAL LAW

184.    Plaintiffs repeat and reallege each of the foregoing paragraphs with the same force and effect as if more fully set forth herein.

185.    At all times relevant hereto Hizbollah sought, as an official and publicly stated policy and goal of Hizbollah, to destroy the State of Israel and murder or expel its Jewish residents.

186.    At all times relevant hereto Hizbollah sought, as an official and publicly stated policy and goal of Hizbollah, to ethnically cleanse the territory of the State of Israel of its Jewish population.

187.    At all times relevant hereto, Hizbollah has sought to achieve its goal of destroying the State of Israel and murdering or expelling its Jewish residents by systematically committing thousands of terrorist attacks against Jewish civilians in Israel, including the Hizbollah Rocket Attacks.

188.    Hizbollah's actions described herein, i.e. its attempts to physically exterminate or expel the Jewish residents of Israel and its intentional and systematic use of violence against civilians, constitute genocide, crimes against humanity and war crimes under customary international law, and therefore constitute violations of "the law of nations" within the meaning of 28 U.S.C. § 1350.

189.    Defendant LCB knowingly and intentionally carried out the Hizbollah Wire Transfers, totaling millions of dollars, on an on-going basis over a period of several years.

190.    Defendant LCB carried out the Hizbollah Wire Transfers with the specific purpose and intention of enabling and assisting Hizbollah to carry out its goal of physically exterminating or expelling the Jewish residents of Israel, and its goal of intentionally and systematically using violence against Jewish civilians in Israel.

191.    The actions of defendant LCB therefore constituted aiding and abetting Hizbollah's acts of genocide, crimes against humanity and war crimes under the law of nations.

192.    As a direct and proximate result of LCB's conduct the Israeli Plaintiffs and the Canadian Plaintiffs suffered the harm described herein.

193.    Defendant LCB is therefore liable for all of the damages suffered by the Israeli Plaintiffs and the Canadian Plaintiffs[2] in such sums as may hereinafter be determined.

194.    Defendant LCB's conduct was criminal in nature, dangerous to human life, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

---

[2]    Except for plaintiffs Sarah Yefet, Shoshana Sappir, Rochelle Shalmoni and Oz Shalmoni, who do not bring this cause of action.

## FOURTH CAUSE OF ACTION
## BY ALL PLAINTIFFS
## (EXCEPT FOR SARAH YEFET, SHOSHANA SAPPIR,
## ROCHELLE SHALMONI AND OZ SHALMONI)
## AGAINST DEFENDANT LCB BANK
## <u>NEGLIGENCE</u>
### (Under the Law of the State of Israel)

195.     Plaintiffs repeat and reallege each of the foregoing paragraphs with the same force and effect as if more fully set forth herein.

196.     Pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, plaintiffs hereby give notice of their intention to rely on the law of the State of Israel.

197.     Causes of action in tort in Israeli law are codified in the *Civil Wrongs Ordinance (New Version) - 1968*, (hereinafter "CWO").

198.     The CWO provides that any person injured or harmed by the civil wrongs enumerated in the CWO is entitled to relief from the person liable or responsible for the wrong.

199.     CWO § 35 creates a "civil wrong" of Negligence.

200.     CWO § 35 provides that a person is liable for the civil wrong of Negligence when he commits an act which a reasonable and prudent person would not have committed under the same circumstances; or refrains from committing an act which a reasonable and prudent person would have committed under the same circumstances; or, in the performance of his occupation, does not use the skill or exercise the degree of caution which a reasonable person qualified to act in that occupation would have used or exercised under the same circumstances, and thereby

causes damage to another person toward whom, under those circumstances he is obligated not to act as he did.

201.    CWO § 36 provides that the obligation stated in the last sentence of § 35 is toward all persons, to the extent that a reasonable person would have under the same circumstances foreseen that, in the ordinary course of events, they were liable to be injured by the act or omission.

202.    Under binding precedent of the Israeli Supreme Court, the tort of Negligence also includes intentional and/or reckless conduct.

203.    By carrying out the Hizbollah Wire Transfers defendant LCB carried out acts which a reasonable and prudent person would not have committed under the same circumstances, within the meaning of the CWO.

204.    Defendant LCB refrained from committing acts which a reasonable and prudent person would have committed under the same circumstances, within the meaning of the CWO, in that, *inter alia*, defendant LCB failed to comply with its statutory obligations under United States law, New York law, Lebanese law and the FATF and MENAFATF rules to know its customers and perform due diligence, and to monitor, report and refuse to execute illegal, suspicious and/or irregular banking transactions.

205.    Defendant LCB did not, in the performance of its occupation, use the skill or exercise the degree of caution which a reasonable person qualified to act in those occupations would have used or exercised under the same circumstances, within the meaning of the CWO, in that, *inter alia*, LCB carried out the Hizbollah Wire

Transfers and failed to comply with its statutory obligations to know its customers and perform due diligence, and to monitor, report and refuse to execute illegal, suspicious and/or irregular banking transactions.

206.    Defendant LCB acted negligently in connection with the plaintiffs and their decedents, toward whom, in the circumstances described herein, defendant LCB had an obligation not to act as it did. Defendant LCB was obligated not to act as it did because a reasonable person would, under the same circumstances, have foreseen that, in the ordinary course of events, persons such as the plaintiffs and the decedents were liable to be injured by defendant's LCB's acts and omissions described herein.

207.    Defendant LCB's behavior constitutes Negligence under the CWO, and that negligent behavior was the proximate cause of the injuries to the plaintiffs and the deaths of the decedents, including: death; severe physical injuries, pain and suffering; loss of pecuniary support; loss of income; loss of consortium; emotional distress; loss of society and companionship and loss of solatium.

208.    Defendant LCB is therefore liable for the full amount of plaintiffs' damages. [3]

209.    Under Israeli case law a plaintiff harmed by an act of Negligence caused by intentional or reckless conduct is entitled to punitive damages.

210.    Defendant LCB's conduct was intentional or reckless, warranting an award of punitive damages.

---

[3]    Except for plaintiffs Sarah Yefet, Shoshana Sappir, Rochelle Shalmoni and Oz Shalmoni, who do not bring this cause of action.

## FIFTH CAUSE OF ACTION
## BY ALL PLAINTIFFS
## (EXCEPT FOR PLAINTIFFS SARAH YEFET, SHOSHANA SAPPIR, ROCHELLE SHALMONI AND OZ SHALMONI)
## AGAINST DEFENDANT LCB
## <u>BREACH OF STATUTORY DUTY</u>
### (Under the Law of the State of Israel)

211.     Plaintiffs repeat and reallege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

212.     Pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, plaintiffs hereby give notice of their intention to rely on the law of the State of Israel.

213.     CWO § 63 creates a civil wrong of Breach of Statutory Duty defined as the failure to comply with an obligation imposed under any legal enactment, if the legal enactment is intended for the benefit or protection of another person, and if the breach of the enactment caused that person damage of the kind or nature of damage intended to be prevent by the enactment.

214.     Under Israel's *Interpretation Ordinance (New Version)*, an "enactment" within the meaning of the CWO is defined to mean "every law and every regulation," while the terms "law" and "regulation" are defined in turn as acts of the Knesset (Israel's parliament) and of "any authority in Eretz Israel or in Israel," respectively.

215.     CWO § 63(b) provides that for the purpose of CWO § 63, an enactment is deemed to have been enacted for the benefit or protection of a specific person, if it is intended for the benefit or protection of that person, or for the benefit or

protection of persons in general, or of persons of a category or definition to which that specific person belongs.

216.   Defendant LCB breached and failed to comply with obligations imposed upon it by numerous enactments, which were intended for the benefit and protection of persons in general, and for the benefit and protection of persons of the type, category and definition to which plaintiffs and the decedents belong, within the meaning of the CWO.

217.   The statutory obligations breached by defendant LCB include, without limitation, the provisions of the following enactments:

a)  Section 4 of Israel's *Prevention of Terrorism Ordinance, 5708 – 1948* (which criminally prohibits the provision of material support to terrorist organizations such as Hizbollah);

b)  Sections 145 and 148 of Israel's *Penal Law, 5737 – 1977* (which criminally prohibit the provision of material support to terrorist organizations such as Hizbollah);

c)  Section 85 of Israel's *Defense Regulations (Emergency Period) – 1945* (which criminally prohibits the provision of services and other material support to terrorist organizations such as Hizbollah).

218.   The conduct of defendant LCB described herein breached the enactments listed above, despite the fact that defendant LCB's conduct did not take place in Israel, because Israel has extraterritorial criminal jurisdiction over crimes against the security

of the State of Israel and over crimes against the lives and persons of Israeli citizens as such, pursuant to § 13 of Israel's *Penal Law, 5737 – 1977*.

219.   All of the statutory enactments listed above are intended for the benefit and protection of persons in general, for the specific benefit and protection of innocent civilians such as the plaintiffs and decedents, in that all of the statutory enactments listed above are intended to protect all such persons from terrorist attacks and from all the damages which terrorist attacks are liable to inflict.

220.   Defendant LCB's breach of its statutory obligations was the proximate cause of the harm to the plaintiffs and the deaths of the decedents described herein, and caused plaintiffs damage of the kind and nature intended to be prevented by the statutory enactments which were breached by LCB, including: death; severe physical injuries, pain and suffering; loss of pecuniary support; loss of income; loss of consortium; emotional distress; loss of society and companionship and loss of solatium.

221.   Defendant LCB committed the civil wrong of Breach of Statutory Duty under CWO § 63, and is therefore liable for the full amount of plaintiffs' damages.[4]

222.   Under Israeli case law a plaintiff harmed by a Breach of Statutory Duty caused by intentional or reckless conduct is entitled to punitive damages.

223.   Defendant LCB's conduct was intentional or reckless, warranting an award of punitive damages.

---

[4]     Except for plaintiffs Sarah Yefet, Shoshana Sappir, Rochelle Shalmoni and Oz Shalmoni, who do not bring this cause of action.

## SIXTH CAUSE OF ACTION BY ALL PLAINTIFFS
## AGAINST DEFENDANT AMEX BANK
## <u>NEGLIGENCE</u>
### (Under the Law of the State of Israel)

224.    Plaintiffs repeat and reallege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

225.    Pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, plaintiffs hereby give notice of their intention to rely on the law of the State of Israel.

226.    By carrying out the Hizbollah Wire Transfers defendant Amex Bank carried out acts which a reasonable and prudent person would not have committed under the same circumstances, within the meaning of the CWO.

227.    Defendant Amex Bank refrained from committing acts which a reasonable and prudent person would have committed under the same circumstances, within the meaning of the CWO, in that, *inter alia*, defendant Amex Bank failed to comply with its statutory obligations under United States law, New York law and the FATF rules to know its customers and perform due diligence, and to monitor, report and refuse to execute illegal, suspicious and/or irregular banking transactions. Indeed, as stated above, the New York State Banking Department expressly found that Bank Amex failed to comply with these obligations.

228.    Defendant Amex Bank did not, in the performance of its occupation, use the skill or exercise the degree of caution which a reasonable person qualified to act in those occupations would have used or exercised under the same

circumstances, within the meaning of the CWO, in that, *inter alia*, Amex Bank carried out the Hizbollah Wire Transfers and failed to comply with its statutory obligations to know its customers and perform due diligence, and to monitor, report and refuse to execute illegal, suspicious and/or irregular banking transactions.

229.    Defendant Amex Bank acted negligently in connection with the plaintiffs and their decedents, toward whom, in the circumstances described herein, defendant Amex Bank had an obligation not to act as it did.

230.    Defendant Amex Bank was obligated not to act as it did because a reasonable person would, under the same circumstances, have foreseen that, in the ordinary course of events, persons such as the plaintiffs and the decedents were liable to be injured by defendant's Amex Bank's acts and omissions described herein.

231.    Defendant Amex Bank's behavior constitutes Negligence under the CWO, and that negligent behavior was the proximate cause of the injuries to the plaintiffs and the deaths of the decedents, including: death; severe physical injuries, pain and suffering; loss of pecuniary support; loss of income; loss of consortium; emotional distress; loss of society and companionship and loss of solatium.

232.    Defendant Amex Bank is therefore liable for the full amount of plaintiffs' damages.

233.    Defendant Amex Bank's conduct was intentional and/or reckless, warranting an award of punitive damages.

**WHEREFORE**, the Plaintiffs demand Judgment against the Defendants as follows:

(a)     Against defendants Amex Bank and LCB, jointly and severally, for compensatory damages in an amount to be determined at trial but no less than $650 million;

(b)     Against defendants Amex Bank and LCB, jointly and severally, for punitive damages in an amount to be determined at trial;

(c)     For such other and further relief as justice requires.

Dated:   New York, New York
              January 20, 2009

Yours,

JAROSLAWICZ & JAROS, LLC
*Attorneys for the Plaintiffs*

By:   _____
              Robert J. Tolchin

225 Broadway, 24th floor
New York, New York 10007
(212) 227-2780

NITSANA DARSHAN-LEITNER & CO.
Nitsana Darshan-Leitner, Adv.
*Israeli Counsel for Plaintiffs*
10 Hata'as Street
Ramat Gan, 52512, Israel

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF New York

-------------------------------------------------------------------------x

YAAKOV LICCI, a minor, by his father and natural guardian
ELIHAV LICCI and by his mother and natural guardian
YEHUDIT LICCI, et al.,

                       Index No. 109548/08

                Plaintiffs,
                               **AFFIDAVIT OF**
                               **SERVICE**

          -against-

AMERICAN EXPRESS BANK LTD.
LEBANESE CANADIAN BANK, SAL,

                Defendants.

-------------------------------------------------------------------------x

STATE OF NEW YORK     )
                          ) ss.:
COUNTY OF NEW YORK   )

       Eileen Goldsmith, being duly sworn, deposes and says:

       That she is over eighteen years of age, is not a party to this action; and is employed by the
attorney for the plaintiff(s) herein.  That on January 21, 2009 she served the within:

### FIRST AMENDED COMPLAINT

upon the following, at the address(es) designated by said attorney(s) for that purpose by depositing
a true copy of same enclosed in a postpaid properly addressed wrapper in an official depository under
the exclusive care and custody of the United States Post Office Department within the State of New
York.

TO:

Morrison Foerster LLP
1290 Avenue of the Americas
New York, New York 10104-0050

                               *Eileen Goldsmith*
                              EILEEN GOLDSMITH

Sworn to before me this
January 21, 2009

*Barbara Siegel*
Notary Public

BARBARA SIEGEL
Notary Public, State of New York
No. 01SI4635947
Qualified in Kings County
Commission Expires Oct. 31, 2010