UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

CHARLOTTE FREEMAN, et al.,

Plaintiffs,

-against-

14-CV-6601 (DLI/CLP)

HSBC HOLDINGS PLC, et al.,

Defendants.

**DEFENDANTS' JOINT MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

March 16, 2015

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ........................................................................................................................ 2

I.  Statutory Background ........................................................................................................ 2

II.  Plaintiffs' Allegations ....................................................................................................... 3

ARGUMENT .............................................................................................................................. 9

I.  The Rule 12(b)(6) Standard .............................................................................................. 9

II.  The Complaint Fails Plausibly To Allege Proximate Cause ........................................... 10

    A.  *Rothstein* Held That an Alleged Provider of Financial Services to Iran,
    Even When Acting in Violation of U.S. Law, Was Too Remote To Be
    Held Liable Under the ATA for Injuries Allegedly Caused by Terrorist
    Entities Funded by Iran ......................................................................................... 11

    B.  The Complaint's Causal Allegations Here Are More Attenuated and Less
    Complete Than in *Rothstein* ................................................................................. 14

III.  There Is No Civil Conspiracy Liability Under the ATA ................................................. 21

IV.  The Complaint Fails Plausibly To Allege That Non-U.S. Moving Defendants Are
"United States Person[s]" or That They Engaged in "a Financial Transaction with
the Government" of Iran Under Section 2332d ............................................................... 24

CONCLUSION ......................................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abecassis v. Wyatt*, 785 F. Supp. 2d 614 (S.D. Tex. 2011) ........................................24

*Ahmad v. Christian Friends of Israeli Cmtys.*, No. 13 Civ. 3376 (JMF), 2014 WL 1796322 (S.D.N.Y. May 5, 2014)..............................................................3, 11, 7, 19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)...............................................................9, 10, 19

*Bailey v. United States*, 516 U.S. 137 (1995) .............................................................25

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .........................................................9

*Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994)..................21, 22

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ......................................24

*Daimler AG v. Bauman*, 134 S. Ct. 746 (2014) .........................................................25

*Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837 (2d Cir. 1998) ...................................................................................................22, 23

*Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474 (E.D.N.Y. 2012).....................................14

*Hemi Grp., LLC v. City of New York*, 559 U.S. 1 (2010) ......................................3, 19, 20

*Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258 (1992) ......................................3, 11

*In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118 (2d Cir. 2013)............................. passim

*Krys v. Pigott*, 749 F.3d 117 (2d Cir. 2014) .............................................................10

*Lexmark Int'l. Inc. v. Control Components Inc.*, 134 S. Ct. 1377 (2014)..............................10, 15

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013)........................4

*Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571 (E.D.N.Y. 2005)...................................14

*Linde v. Arab Bank, PLC*, 944 F. Supp. 2d 215 (E.D.N.Y. 2013)...................................2, 3, 22, 23

*Mastafa v. Chevron Corp.*, 770 F.3d 170 (2d Cir. 2014)....................................9, 10, 23

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109 (2d Cir.2013) .......................................................................................................9

*Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705 (2d Cir. 2013) ...........................................9, 10

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) ................................................ passim

*Sergeants Benevolent Ass'n. Health and Welfare Fund v. Sanofi Aventis U.S. LLP*, 20 F. Supp. 3d 305 (E.D.N.Y. 2014) .................................................................3, 20

*Strauss v. Credit Lyonnais*, No. CV-06-0702 (CPS), 2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006) ........................................................................................................14

*UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121 (2d Cir. 2010) ...............................3

*Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91 (D.D.C. 2002) ........................23

*United States v. Chalmers*, 474 F. Supp. 2d 555 (S.D.N.Y. 2007) ...............................24

*United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012) ...................................................23

*Weiss v. Nat'l Westminster*, 768 F.3d 202 (2d Cir. 2010) ...........................................15

*Zito v. Leasecomm Corp.*, No. 02 Civ.8074 (GEL), 2003 WL 22251352 (S.D.N.Y. Sept. 30, 2003) ..........................................................................................................23

## Statutes & Rules

18 U.S.C. § 2331 ...........................................................................................................2

18 U.S.C. § 2331(a) .....................................................................................................11

18 U.S.C. § 2332d .........................................................................................2, 8, 24, 25

18 U.S.C. § 2332d(a) ...................................................................................................25

18 U.S.C. § 2332d(b)(2) ..............................................................................................24

18 U.S.C. § 2333(a) ..................................................................................................2, 3

18 U.S.C. § 2336(a) .....................................................................................................23

18 U.S.C. § 2339A .........................................................................................2, 8, 21, 24

18 U.S.C. § 2339B .............................................................................................8, 21, 24

Anti-Terrorism Act, 18 U.S.C. § 2333 .................................................................. passim

Fed. R. Civ. P. 8(a)(2) ..................................................................................................10

Securities Exchange Act of 1934 ..................................................................................22

**Other Authorities**

31 C.F.R. 560.516 (2006), *amended* 73 Fed. Reg. 66541 (Nov. 10, 2008)....................................5

## INTRODUCTION

Attacks on U.S. soldiers, including those during the Iraq war, are abhorrent.  But the undersigned Defendants—European financial institutions (the "Moving Defendants")[1]—are not responsible for these heinous acts.  The Moving Defendants did not commit any acts of terrorism and did not support terrorists.  The pending Complaint, however, seeks to stretch the civil provision of the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, to enable monetary recovery from these financial institutions in regard to unrelated attacks on U.S. forces.  To try to achieve this, the Complaint portrays a broadly-alleged conspiracy among the Moving Defendants, Iranian commercial banks and the Government of Iran to process U.S. dollar-denominated transactions and then, using a far-fetched causal chain with missing links and unknown actors, jumps from that commercial banking work to the detonation of improvised explosive devices and other bombings and attacks in Iraq.

As demonstrated below, clear precedent in this Circuit holds that the Complaint's allegations fail to state a claim under the ATA as a matter of law.  First, the Complaint fails plausibly to allege that the Moving Defendants proximately caused Plaintiffs' injuries.  In *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013), the Second Circuit held that plaintiffs asserting ATA civil claims must plausibly allege proximate cause and affirmed dismissal of ATA claims against a European bank based on causal allegations more plausible, direct and substantiated than those alleged here.  Second, because all of Plaintiffs' claims for relief are grounded in a conspiracy theory of liability, they must all be dismissed on the independent basis

---

[1] The "Moving Defendants" for purpose of this Joint Motion to Dismiss are HSBC Holdings PLC ("HSBC"), HSBC Bank PLC ("HSBC-Europe"), HSBC Bank Middle East Limited ("HSBC Middle East"), HSBC Bank USA, N.A. ("HSBC-US"), Barclays Bank PLC ("Barclays"), Standard Chartered Bank, The Royal Bank of Scotland N.V. ("RBS N.V.") and Credit Suisse AG.

that conspiracy claims and other secondary theories of liability are not cognizable under the ATA.  *See id.* at 97-98 (dismissing aiding-and-abetting claims under the ATA); *Linde v. Arab Bank, PLC*, 944 F. Supp. 2d 215, 216 (E.D.N.Y. 2013) (applying *Rothstein* to dismiss all conspiracy-based claims under the ATA).  Finally, as to the Third and Fourth Claims for Relief, brought against some of the Moving Defendants under 18 U.S.C. § 2332d, those claims must be dismissed because the Complaint fails to plausibly allege that non-U.S. Moving Defendants are "United States person[s]" or that they engaged in "a financial transaction with the government" of Iran.

## BACKGROUND

### I.    STATUTORY BACKGROUND

While the ATA is largely comprised of criminal prohibitions relating to terrorism,[2] Section 2333(a) of the ATA creates a civil cause of action for U.S. nationals "injured . . . by reason of an act of international terrorism".  Section 2333(a) incorporates the definition of "international terrorism" in 18 U.S.C. § 2331, to wit, activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> (B) appear to be intended—
>
>> (i) to intimidate or coerce a civilian population;
>>
>> (ii) to influence the policy of a government by intimidation or coercion; or
>>
>> (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
>
> (C) occur primarily outside the territorial jurisdiction of the United States.

---

[2] For example, Section 2339A makes it unlawful to "provide material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out, a violation of" one of several substantive terrorism offenses.

A Section 2333 claim thus logically consists of several basic elements.  First, the plaintiff must be a U.S. national.  Second, the plaintiff must plausibly allege that the defendant directly committed an act of international terrorism as defined in Section 2331.  *See Rothstein*, 708 F.3d at 97; *Linde*, 944 F. Supp. 2d at 216-17.  Third, the plaintiff must plausibly allege that he or she was injured "by reason of" the defendant's act of international terrorism, 18 U.S.C. § 2333(a)—which the Second Circuit has defined to require a showing that the defendant's terrorist act was both a "but for" and a "proximate" cause of the plaintiff's injury.  *See Rothstein*, 708 F.3d at 95 (quoting *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258, 267-68 (1992)); *accord In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 123 (2d Cir. 2013); *Ahmad v. Christian Friends of Israeli Cmtys.*, No. 13 Civ. 3376 (JMF), 2014 WL 1796322, at *4 (S.D.N.Y. May 5, 2014) (dismissing ATA complaint on, among other grounds, failure plausibly to allege "but-for causation", let alone "the more demanding standard of proximate causation").  As the Supreme Court has held, "proximate cause . . . requires 'some direct relation between the injury asserted and the injurious conduct alleged.'"  *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (quoting *Holmes*, 503 U.S. at 268); *accord UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 132 (2d Cir. 2010); *Sergeants Benevolent Ass'n. Health and Welfare Fund v. Sanofi Aventis U.S. LLP*, 20 F. Supp. 3d 305, 317-19 (E.D.N.Y. 2014).

## II.     PLAINTIFFS' ALLEGATIONS

The Complaint is premised on an alleged conspiracy among the Moving Defendants, several Iranian commercial banks and the Government of Iran.  *See, e.g.*, Compl. ¶ 755.  Plaintiffs begin their factual allegations relating to this alleged conspiracy with an "Overview of the Conspiracy".  *Id.* ¶¶ 754-838.  The Complaint defines "the Conspiracy" as "an agreement between Iran and various international financial institutions, including the Defendants in this action, in which they agreed to alter, falsify, or omit information from payment messages

3

that involved Iran or Iranian parties, in particular several Iranian banks referred to herein occasionally as the 'Iranian Bank co-conspirators' (including Defendant Bank Saderat Plc) for the express purpose of concealing Iran's and Iranian parties' (including the Iranian Bank co-conspirators) financial activities and transactions from detection, scrutiny, or monitoring by U.S. regulators, law enforcement, and/or depository institutions."  *Id.* ¶ 754.

Plaintiffs allege that, as part of the Conspiracy, the Moving Defendants variously provided U.S. dollar-denominated correspondent banking services for Iranian bank customers, such as Bank Melli, Bank Saderat, and the Central Bank of Iran.[3]  *Id.* ¶¶ 810, 1154, 1295, 788. As Plaintiffs concede in the Complaint, "*most* of [the Moving Defendants'] transactions could have been processed legally".  *Id.* ¶ 775 (emphasis in original).  For most of the period that the Moving Defendants are alleged to have engaged in such services, clearing U.S. dollar-denominated transactions for Iranian banks was not prohibited outright.  *See id.* ¶ 770.  Thus, even though U.S. trade sanctions barred U.S. banks from many kinds of financial transactions with Iranian parties, the U.S. sanctions regime also permitted certain bank clearing services

---

[3] Correspondent banking involves the use of wire transfer instructions to facilitate the transfers of funds from an account in one bank to an account in another bank.  *See generally Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 166 (2d Cir. 2013) (describing international correspondent banking).  Often, there are multiple banks involved in a wire transaction:  a local bank, whose customer is the sending party; a receiving bank, whose customer is the receiving party; and one or more intermediary banks that provide correspondent banking services to the banks at either end of the transaction if they do not have direct relationships with each other.  Typically, banks providing clearing services for U.S. dollar-denominated transactions are located in the U.S.  *See* Compl. ¶¶ 1005-07.  In many instances, a U.S. bank or a U.S. branch of a foreign bank acting as a clearing bank would have information only about its direct counterparties but not about every upstream and downstream participant in the transaction.  Plaintiffs here allege that Iranian banks maintained accounts at the Moving Defendant financial institutions and that the Moving Defendants either cleared U.S. dollar-denominated fund transfers for these Iranian banks (when acting as a clearing bank) or used their own correspondent relationships with clearing banks to execute U.S. dollar-denominated wire transfers for the Iranian banks.  *See id.* ¶¶ 1014-1295.

pursuant to the "U-Turn" exemption, at least until November 2008.[4]   *See id.* ¶¶ 770, 1004.

Plaintiffs allege, however, that when dealing with Iranian entities, the Moving Defendants

omitted, altered or falsified certain Iranian identifying information in the payment messages for

transactions being processed through U.S. clearing banks in order to avoid U.S. scrutiny of the

transactions.  *See*, *e.g.*, *id.* ¶ 757.  Plaintiffs refer to this as "stripping".  *Id.*  Plaintiffs also allege

that, between 2009 and 2012, the Moving Defendants acknowledged to the U.S. Government

their respective failures to include such identifying information in banking transactions with

Iranian entities, entered into deferred prosecution agreements with the Government, and agreed

to pay civil penalties and/or forfeitures.  *See id.*  ¶¶ 1051, 1130, 1180, 1224, 1283.  The deferred

prosecution agreements, which form the basis of Plaintiffs' allegations regarding the Moving

Defendants' alleged unlawful acts, are not alleged to have linked the Moving Defendants to any

terrorists, terrorist organizations or terrorist activity.  *See*, *e.g.*, *id.* ¶¶ 1051, 1130, 1180, 1224,

1283.

       The Complaint further alleges that the Iranian Government sponsored terrorist

groups.  *Id.* ¶¶ 839-873.  Plaintiffs specifically allege that the Government of Iran used Iranian

commercial banks to transfer funds to the terrorist organizations Hezbollah and the Islamic

Revolutionary Guard Corps-Qods Force ("IRGC-QF").  *Id.* ¶¶ 778-79.  The Complaint does not,

however, identify a single banking transaction by the Moving Defendants that allegedly involved

funds going to any terrorist group.  *Id. passim.*  Nor does the Complaint allege that, but for the

---

[4] The "U-Turn" exemption referred to a Treasury Department regulation under which certain
funds transfers for the direct or indirect benefit of Iranian banks, other persons in Iran or the
Government of Iran could be cleared through the United States, provided such payments were
initiated offshore by a non-Iranian, non-U.S. financial institution and only passed through the
U.S. financial system en route to another offshore, non-Iranian, non-U.S. financial institution.  31
C.F.R. 560.516 (2006), *amended* 73 Fed. Reg. 66541 (Nov. 10, 2008).

Moving Defendants' banking activities, the Government of Iran would have provided fewer funds or less support to Hezbollah or IRGC-QF.  *Id.*  The Complaint instead contains several purely conclusory allegations that the Moving Defendants, "[w]ithin and through [a] clandestine stream of U.S. dollars . . . facilitated millions of dollars in payments to Hezbollah and the IRGC-QF", *id.* ¶ 1299, and "enabl[ed] Iran, the Iranian Bank co-conspirators . . . Hezbollah, and Special Groups to plan for, conspire to, and perpetrate acts of international terrorism", *id.* ¶ 761; *see also id.* ¶¶ 766, 769, 1318; that the Moving Defendants "provided Iran with the means by which it could transfer more than $150 million to the IRGC-QF, Hezbollah and Special Groups", *id.* ¶ 763; *see also id.* ¶ 1297; and that "[a]s a direct result of [the Conspiracy], Iran was able to flood the international financial system with U.S. dollar transactions that could not be, and were not, effectively monitored or filtered by U.S. depository institutions or U.S. officials monitoring the [SWIFT] system", *id.* ¶ 774.

    The Complaint further alleges that Hezbollah and IRGC-QF trained or sponsored other terrorist groups operating in Iraq—principally Asa'ib Ahl al-Haq ("AAH") and the Mahdi Army.  *See, e.g.*, *id.* ¶¶ 22, 30, 940.  The Complaint does not allege that the Moving Defendants had any direct involvement of any kind with Hezbollah or IRGC-QF, or with alleged support by Hezbollah or IRGC-QF of any other named or unnamed Iraq-based terrorist groups.  Nor does the Complaint allege that but for the Moving Defendants' alleged conduct, AAH, the Mahdi Army and other named or unnamed terrorist operatives in Iraq would have received lesser support from Iran, Hezbollah, or IRGC-QF.

    Finally, Plaintiffs allege that they or their family members were injured during seventy different wartime attacks in Iraq.  Of those seventy attacks, Plaintiffs identify the Mahdi Army and AAH as responsible for only five.  *Id.* ¶¶ 16, 75, 571, 621, 664.  Plaintiffs do not

identify the individuals or entities responsible for any of the other sixty-five attacks, almost all of which involved injuries caused by improvised explosive devices that were placed or detonated by unspecified actors.  *Id.* ¶¶ 84-723.  Again, the Complaint does not allege that the Moving Defendants had any direct involvement with any of these named or unnamed terrorists or terrorist groups and does not allege that the attacks would have been avoided but for the Moving Defendants' alleged conduct.

With respect to the purposes of the alleged Conspiracy, the Complaint makes conclusory claims that each Defendant "knew" or was "deliberately indifferent to" the following purposes:  first, "[t]o conceal . . . Iran's U.S. dollar-denominated transactions from detection" by U.S. authorities; second, "[t]o assist Iran in transferring at least $150 million USD to the IRGC-QF, Hezbollah, Special Groups, and other instruments of Iranian state-sponsored terrorism"; and third, "[t]o assist Iran in acquiring technology and components for its illegal Weapons of Mass Destruction [] program".  *Id.* ¶¶ 757; *see also id.* ¶ 761.  Plaintiffs further allege in conclusory fashion that "the Conspiracy substantially assisted Iran, the IRGC-QF, Hezbollah, and/or Special Groups in committing the acts of international terrorism that injured the Plaintiffs by providing them collectively with more than $150 million USD in funding".  *Id.* ¶ 762; *see also id.* ¶¶ 1300-01, 1304, 1316, 1325.

Based on these and other related conspiracy allegations, Plaintiffs contend that the Moving Defendants are somehow liable for injuries caused to U.S. military personnel by wartime acts in Iraq.  *See id.* ¶¶ 1296-1333 (First and Second Claims for Relief); ¶¶ 1334-1363 (Third and Fourth Claims for Relief).  Specifically, Plaintiffs allege that, through the Conspiracy, each of the Moving Defendants violated the criminal material support provisions of 18 U.S.C. § 2339A (Claim 1, *see id.* ¶¶ 1296-1314), which makes it unlawful to "provide[] material support

7

or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out, a violation of" one of several substantive terrorism offenses; and 18 U.S.C. § 2339B (Claim 2, *see id*. ¶¶ 1315-1333), which makes it unlawful to "knowingly provide[] material support or resources to a foreign terrorist organization".  Plaintiffs further allege that certain defendants[5] violated 18 U.S.C. § 2332d (Claims 3 & 4, *see id*. ¶¶ 1334-1363), which makes it unlawful for "a United States person", except as permitted by regulation, "knowing or having reasonable cause to know that a country is designated . . . as a country supporting international terrorism", to "engage[] in a financial transaction with the government of that country".

---

[5] These defendants are HSBC US, Barclays, Standard Chartered Bank and RBS N.V.

# ARGUMENT

## I.    THE RULE 12(b)(6) STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard requires more than a "sheer possibility".  *Id.* (quoting *Twombly*, 550 U.S. at 576).  A plaintiff cannot cross the threshold from "possible" to "plausible" by pleading only "facts that are 'merely consistent with' a defendant's liability", *id.* (quoting *Twombly*, 550 U.S. at 557); the plaintiff instead must plead facts that are "suggestive of" wrongdoing, *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013) (quoting *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 121 (2d Cir. 2013)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted).

In making the plausibility determination, a court may consider only well-pleaded factual allegations.  *See Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014).  The court must ignore "legal conclusions[] and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements".  *Id.* (citation omitted).  "[L]abels and conclusions", "a formulaic recitation of the elements of a cause of action", and "naked assertion[s] devoid of further factual enhancement" all must be disregarded.  *Pension Benefit Guar. Corp.*, 712 F.3d at 717 (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted).

The portions of the Complaint not excluded must be assessed to determine whether the inferences drawn from the specific alleged facts are actually "plausible".  *Twombly*, 550 U.S. at 556.  This is "a context-specific task that requires the reviewing court to draw on its

9

judicial experience and common sense". *Mastafa*, 770 F.3d at 177 (internal quotation marks and citation omitted). "[W]here the well pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'–'that the pleader is entitled to relief'". *Pension Benefit Guar. Corp.*, 712 F.3d at 718 (quoting *Iqbal* 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2))); *see also Mastafa*, 770 F.3d at 194 (rejecting allegations that Chevron conspired with Saddam Hussein to "'maintain control and power over Iraq in order to secure mutual financial benefits through the egregious affronts on the human rights of the Plaintiffs,'" because "Plaintiffs never elaborate upon this assertion in any way that establishes the plausibility of a large international corporation intending—and taking deliberate steps with the purpose of assisting—the Saddam Hussein regime's torture and abuse of Iraqi persons.") (quoting the complaint) (alteration in original); *Krys v. Pigott*, 749 F.3d 117, 132 (2d Cir. 2014) (affirming dismissal of a complaint because its core allegations—including allegations of knowledge—were "conclusory and implausible".)

## II.    THE COMPLAINT FAILS PLAUSIBLY TO ALLEGE PROXIMATE CAUSE

The Complaint does not plausibly allege that the Moving Defendants proximately caused Plaintiffs' injuries.  In *Rothstein*, the Second Circuit rejected a similar causal theory, which—to the extent it differs—presented a stronger claim than the one pressed here.  708 F.3d at 95-97.  *Rothstein* requires dismissal of Plaintiffs' claims as a matter of law.  Indeed, the Supreme Court has held that, "like any other element of [the] cause of action, [proximate causation] must be adequately alleged at the pleading stage in order for the case to proceed.  If a plaintiff's allegations, taken as true, are insufficient to establish proximate causation, then the complaint must be dismissed."  *Lexmark Int'l. Inc. v. Control Components Inc.*, 134 S. Ct. 1377 n.6 (2014) (internal citation omitted).

A.     ***Rothstein*** **Held That an Alleged Provider of Financial Services to Iran, Even When Acting in Violation of U.S. Law, Was Too Remote To Be Held Liable Under the ATA for Injuries Allegedly Caused by Terrorist Entities Funded by Iran**

In *Rothstein*, the Second Circuit affirmed dismissal of an ATA claim because the Court was "not persuaded that Congress intended to permit recovery under § 2333 on a showing of less than proximate cause" and plaintiffs' complaint in that case lacked plausible allegations that the defendant's actions—providing physical U.S. currency to Iran—proximately caused plaintiffs' injuries. *Rothstein*, 708 F.3d at 95. The Court's proximate cause holding rested on the ATA's statutory language requiring that persons seeking recovery under the ATA have been injured "*by reason of* an act of international terrorism". 18 U.S.C. § 2331(a) (emphasis added). The Second Circuit found that the phrase "by reason of" has a "well-understood meaning" in other statutes such as RICO and federal antitrust laws and has "historically been interpreted as requiring proof of proximate cause". *Rothstein*, 708 F.3d at 95. To state an ATA claim, therefore, a plaintiff must plausibly allege, first, that the defendant's purported violative acts were the "'but for' cause of his injury", and, second, that they were also the "proximate cause" of his injury. *Id.* (quoting *Holmes*, 503 U.S. at 267-68); *accord In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 123 (2d Cir. 2013); *Ahmad*, 2014 WL 1796322, at *4 (dismissing ATA complaint on, among other grounds, failure plausibly to allege "but-for causation", let alone "the more demanding standard of proximate causation").

The Second Circuit squarely rejected the argument that a bank's violation of U.S. laws in engaging in financial transactions with a state sponsor of terrorism is a sufficient basis to hold the bank "liable for injuries subsequently caused by a terrorist organization associated with that state". *Rothstein*, 708 F.3d at 96. "[P]laintiffs' contention that proximate cause is established because they were injured after [defendant] violated federal law is a *post hoc, ergo*

11

*propter hoc* proposition that would mean that any provider of U.S. currency to a state sponsor of terrorism would be strictly liable [under the ATA]." *Id.* The Second Circuit concluded: "If Congress had intended to impose strict liability" on the basis of violations of U.S. law, including regulations issued by the Office of Foreign Assets Control ("OFAC"), "it would have found words more susceptible to that interpretation, rather than repeating the language it had used in other statutes to require a showing of proximate cause." *Id.* at 86-87, 96.

The *Rothstein* plaintiffs' deficient allegations regarding the chain of causation between plaintiffs' injuries and defendant UBS's alleged financial transactions with Iran were:

- The plaintiffs were injured by attacks committed by Hamas and Hezbollah,[6] both of which allegedly received extensive funding from Iran. *See id.* at 85, 87.

- Due to restrictions imposed on wire transfers involving Hamas, Hezbollah, and related entities, the terrorists needed physical U.S. banknotes—actual dollar bills—to fund their operations. *See id.* at 86.

- "Iran was subject to United States government sanctions," which "made it difficult for Iran to obtain the large sums of cash dollars needed for the H[e]zbollah and Hamas operations". *Id.* at 87. And further that "'UBS solved this problem for Iran by illegally providing Iran with hundreds of millions of dollars of cash between 1996 and 2004.'" *Id.*

- UBS transferred significant amounts of U.S. banknotes directly to the Iranian Government. *Id.*

- "UBS knew full well that the cash dollars it was providing to a state-sponsor of terrorism such as Iran would be used to cause and facilitate terrorist attacks by Iranian-sponsored terrorist organizations such as Hamas, H[e]zbollah and PIJ." *Id.* at 97 (emphases omitted).

The Second Circuit held that these allegations failed to satisfy the ATA's proximate cause requirement for a number of reasons:

---

[6] In *Rothstein*, Hezbollah was referred to by the alternative spelling "Hizbollah".

- **UBS did not participate in the attacks:** "The Complaint does not allege that UBS was a participant in the terrorist attacks that injured plaintiffs." *Id.*

- **UBS did not provide banknotes directly to terrorists:** "[The Complaint] does not allege that UBS provided money to H[e]zbollah or Hamas. It does not allege that U.S. currency UBS transferred to Iran was given to H[e]zbollah or Hamas." *Id.*

- **UBS's alleged acts were not necessary to Iran's terrorism funding:** "[The Complaint] does not allege that if UBS had not transferred U.S. currency to Iran, Iran, with its billions of dollars in reserve, would not have funded the attacks in which plaintiffs were injured." *Id.*

- **Iran has legitimate uses for financial services:** "[T]he fact remains that Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund." *Id.*

While "[t]he fact that the transfers were made to a state sponsor of terrorism of course made it more likely that the moneys would be used for terrorism than if the transfers were to a state that did not sponsor terrorism," that was insufficient to adequately plead causation. *Id.* The Court concluded that there was "no nonconclusory allegation in the Complaint that plausibly shows that the moneys UBS transferred to Iran were in fact sent to H[e]zbollah or Hamas or that Iran would have been unable to fund the attacks by H[e]zbollah and Hamas without the cash provided by UBS". *Id.* The allegations were therefore insufficient to "meet *Twombly*'s plausibility standard with respect to the need for a proximate causal relationship between the cash transferred by UBS to Iran and the terrorist attacks by H[e]zbollah and Hamas that injured plaintiffs". *Id.*

*Rothstein* thus held that engaging in financial transactions directly with the Government of Iran—even transactions that are unlawful under U.S. law, and even with knowledge that Iran is a state sponsor of terrorism—does not render a financial institution liable for acts committed by terrorists that Iran allegedly sponsors. *See also In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 124 (2d Cir. 2013) (explaining that in *Rothstein*, allegations that

13

"UBS allegedly provided funding to a known state sponsor of terrorism that, in turn, provided

funding to H[e]zbollah and Hamas" were insufficient to state proximate causation under the

ATA).

**B.      The Complaint's Causal Allegations Here Are More Attenuated and Less
Complete Than in *Rothstein***

The very gaps in causation that were dispositive in *Rothstein* are also present and

dispositive here:

- **The Moving Defendants did not participate in the attacks:**  As in
*Rothstein*, there are no allegations that the Moving Defendants here were
"participant[s] in the terrorist attacks that injured plaintiffs".  *Rothstein*, 708
F.3d at 97.

- **The Moving Defendants did not provide banking services directly to
terrorists:**  As in *Rothstein*, Plaintiffs do not allege that the Moving
Defendants provided services directly to terrorist entities.  *Id*.

- **The Moving Defendants' actions were not necessary to any terrorism
funding by Iran:**  As in *Rothstein*, Plaintiffs do not allege that, but for the
Moving Defendants' conduct, Iran would not have engaged in the funding of
terrorism that is alleged in the Complaint.  *Id*.

- **Iran has legitimate uses for financial services:**  As in *Rothstein*, "[t]he fact
remains that Iran is a government, and as such it has many legitimate
agencies, operations, and programs to fund." *Id*.

Plaintiffs' allegations therefore cannot, as a matter of law, establish a "proximate

causal relationship" with attacks by terrorist entities allegedly funded by Iran.[7]  *Id*. at 97.  The

---

[7] The attenuated and incomplete theory of causation alleged in *Rothstein* and in the Complaint
here differs fundamentally from many ATA claims previously asserted against financial
institutions.  Typically, ATA plaintiffs allege a more direct relationship between a bank
defendant and the terrorist entity that actually carried out the attacks on the plaintiff.  *See, e.g.*,
*Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 479-80 (E.D.N.Y. 2012) (defendant bank alleged
to have "maintained accounts for and provided services to Hamas"); *Strauss v. Credit Lyonnais*,
No. CV-06-0702 (CPS), 2006 WL 2862704, at *6 (E.D.N.Y. Oct. 5, 2006) (defendant bank
alleged to have maintained accounts for a charity controlled by Hamas); *Linde v. Arab Bank,
PLC*, 384 F. Supp. 2d 571, 577 (E.D.N.Y. 2005) (defendant bank alleged to be "the exclusive
administrator of the death and dismemberment benefit plan" for Hamas for its suicide bombers).

*[Continued on Next Page]*

14

Second Circuit has already held that such conduct is far too remote to satisfy the requisite proximate causation standard. *Accord In re Terrorist Attacks on Sept. 11*, 714 F.3d at 124 (allegations that defendants "provided funding to purported charity organizations known to support terrorism that, in turn, provided funding to al Qaeda and other terrorist organizations" failed to satisfy the proximate cause requirement because plaintiffs did not allege that the "defendants participated in the September 11, 2001 attacks or that they provided money directly to al Qaeda; nor are there factual allegations that the money allegedly donated by the . . . defendants to the purported charities actually was transferred to al Qaeda and aided in the September 11, 2001 attacks").

Indeed, the supposed chain of causation alleged here is even more attenuated and contains greater gaps than the chain asserted in *Rothstein*: (1) while the *Rothstein* plaintiffs alleged injuries from terrorist acts committed by entities that the Government of Iran funded directly, Plaintiffs here claim that the (largely unidentified) terrorists who injured them were allegedly trained and/or sponsored by other upstream terrorist groups that in turn were allegedly funded by the Government of Iran; (2) while the *Rothstein* plaintiffs asserted that the defendant's provision of physical U.S. banknotes to the Government of Iran was critical to the success of the terrorists that injured them, there is no allegation here that the Moving Defendants' banking services for Iranian commercial banks were necessary to any terrorism funding by Iran, much

---

When, as here and in *Rothstein*, an ATA defendant is claimed to have dealt only with a state sponsor of terrorism and neither with a terrorist group allegedly supported by that state nor with a yet further removed terrorist group alleged to have actually perpetrated the attack on the plaintiff, and the defendant did not deal directly with any terrorist entity that inflicted the harm, that "alleged harm" is simply "'too remote' from the defendant's [allegedly] unlawful conduct", reflecting "the reality that 'the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing'". *Lexmark Int'l, Inc.*, 134 S. Ct. at 1390 (citations omitted).

less to the (largely unidentified) terrorists that injured the Plaintiffs; and (3) while the *Rothstein* plaintiffs alleged that the defendant provided funds directly to the Iranian Government, which *Rothstein* found insufficient, Plaintiffs here allege that the Moving Defendants provided banking services to Iranian commercial banks that allegedly were then used by the Government of Iran to fund terrorism.

First, the *Rothstein* plaintiffs asserted that the attacks injuring them were conducted by Hamas or Hezbollah, which, according to plaintiffs, the Government of Iran directly financed. *See id.* at 85-87. Here, by contrast, Plaintiffs allege yet another intervening link in the chain of causation, asserting that Hezbollah and IRGC-QF, funded by the Government of Iran, each in turn supported other groups operating in Iraq, who then carried out the alleged attacks. *See* Compl. ¶¶ 6, 22, 30, 36, 38, 41, 75, 81 (alleged sponsorship and training of Iraqi terrorist operatives by Hezbollah and IRGC-QF), ¶¶ 845-46, 877 (Iran's alleged support of Hezbollah and IRGC-QF). Of the seventy different attacks that Plaintiffs discuss, Plaintiffs attribute five of the attacks to a specific terrorist group: either the Mahdi Army or AAH. *See id.* ¶¶ 16, 75, 571, 621, 664. Plaintiffs do not allege that the Mahdi Army was sponsored directly by the Government of Iran—instead they allege it was "trained and armed by [IRGC-QF] with the assistance of Hezbollah", *id.* ¶¶ 75, 81, which in turn were sponsored by the Government of Iran, *see id.* ¶¶ 753, 802. Likewise, Plaintiffs allege that AAH was "trained and armed by Iran's Qods Force with Hezbollah's assistance". *Id.* ¶ 22; s*ee also id.* ¶¶ 6, 30. As is apparent, the supposed link between the alleged attacks in Iraq and the Government of Iran's alleged financing is even more attenuated here than in *Rothstein*. As noted, Plaintiffs do not allege that the Moving Defendants had any dealings with any of these terrorists or terrorist groups; nor do they allege that Iran would have reduced its support to Hezbollah or IRGC-QF, or that Hezbollah or IRGC-

16

QF in turn would have stopped supporting other terrorist groups in Iraq, absent the Moving Defendants' alleged actions. *See Rothstein*, 708 F.3d at 97.

For the sixty-five other attacks that they allege, Plaintiffs do not even identify the responsible individuals or entities. *See id.* ¶¶ 84-723. The alleged link between Iran and those responsible for these attacks, whoever they may be, much less the more distant link to the Moving Defendants, is nothing more than speculation. *See Ahmad*, 2014 WL 1796322, at *4 (allegations that defendants "transferred funds to an unorganized group of approximately five hundred thousand people, and that some people in that group committed attacks against the American Plaintiffs" "are not even sufficient to show but-for causation . . . let alone the more demanding standard of proximate causation") (internal citation omitted). Again, whoever committed these attacks, Plaintiffs do not allege that the Moving Defendants had any actual dealings with them or that the attacks would not have occurred but for the Moving Defendants' alleged conduct. *See Rothstein*, 708 F.3d at 97.

Second, the *Rothstein* plaintiffs contended that UBS's transfers of physical U.S. banknotes—as opposed to electronically denominated funds in a bank account—were particularly important because terrorist entities "'were unable to freely use banking services (e.g. wire transfers, checks) to pay for those activities due to counterterrorism sanctions and restrictions imposed by the U.S. government'". *Rothstein*, 708 F.3d at 86 (quoting the complaint). Had the terrorist entities "not received cash dollars from Iran, their ability to carry out terrorist attacks . . . would have been severely crippled and limited". *Id*. In other words, UBS AG was providing a physical item—U.S. banknotes—that terrorists allegedly needed to conduct their operations and that, according to plaintiffs, was in scarce supply.

17

Here, however, Plaintiffs assert that the Moving Defendants engaged in electronic fund transfers of pre-existing funds involving Iranian commercial banks and do not plausibly allege that the Moving Defendants' provision of these services was necessary to any Iranian support of terrorism, much less to the operation of the terrorist entities themselves.  Nor do Plaintiffs allege that Iran would have provided any less support to terrorist groups but for Moving Defendants' actions.  *See id.* at 97 (dismissing the complaint because "[i]t does not allege that if [defendant] had not transferred U.S. currency to Iran, Iran, with its billions of dollars in reserve, would not have funded the attacks in which plaintiffs were injured").[8]

Third, the *Rothstein* plaintiffs alleged that UBS provided cash directly to the Iranian Government, as well as to "Iranian Government Organs", which included Iranian commercial banks.  *Rothstein*, 708 F.3d at 86-87.  The Second Circuit, however, found even that more direct causal connection between UBS and the Government of Iran itself insufficient to satisfy proximate cause.  *Id.* at 97.  Here, by contrast, Plaintiffs allege that the Moving Defendants provided financial services to Iranian commercial banks, not cash or anything else to the arms of the Government of Iran engaged in terrorist support.  *See* Compl. ¶ 754; *see also id.* ¶¶ 1014-1295.  The Iranian commercial banks, in turn, allegedly provided services to the Iranian Government, in some instances with the Central Bank of Iran ("CBI") as yet a further

---

[8] Plaintiffs' allegations make clear that most Iranian banks had many avenues for engaging in U.S. dollar-denominated electronic fund transfers and "could potentially have conducted most . . . dollar clearing activities in conformity with U.S. laws and regulations", at least until November 2008.  Compl. ¶ 772 (emphasis omitted); *see also id.* ¶ 775 ("*most* of these transactions could have been processed legally") (emphasis in original).  These allegations— which do not allege that any of the transactions by the Moving Defendants were in fact funding terrorism—fail both the but-for and proximate cause pleading requirements.

intermediary.  *See*, *e.g.*, *id.* ¶¶ 769, 776, 779, 785, 787.[9]  Plaintiffs then assert that the Iranian

Government used these Iranian commercial banks in unspecified transactions for purposes of

funding terrorism.  *See*, *e.g.*, *id.* ¶¶ 753, 802.  Plaintiffs' attenuated causal chain further

highlights the absence of direct relationship that is required to show proximate cause.  *See Hemi*

*Grp.*, 559 U.S. at 9 ("[P]roximate cause . . . requires some direct relation between the injury

asserted and the injurious conduct alleged") (internal quotation marks omitted).  Indeed,

Plaintiffs do not even allege that, but for the Moving Defendants' conduct, the Iranian

Government would have done anything differently in its alleged (undescribed) requests to

Iranian commercial banks to provide funds to terrorist groups.  *See Rothstein*, 708 F.3d at 97;

*Ahmad*, 2014 WL 1796322, at *4.

          Finally, what remains of Plaintiffs' allegations regarding causation consists of the

sort of bald and conclusory assertions that cannot be credited under *Twombly* and *Iqbal*.  For

example, Plaintiffs assert that the Moving Defendants "substantially assisted", Compl. ¶ 762,

"facilitated," *id.* ¶¶ 760, 766, 769, 774, 1299, 1301, 1310, 1316, 1318, 1325, and "enabl[ed]", *id.*

¶ 761, Iran's support for international terrorism, but provide no factual allegations to support

these claims.  *See Iqbal*, 556 U.S. at 681 (allegations' "conclusory nature . . . disentitles them to

the presumption of truth").  Moreover, these conclusory allegations do not even remotely suggest

that the Moving Defendants' alleged conduct proximately caused Plaintiffs' injuries.  *Rothstein*,

708 F.3d at 97 ("The fact that the transfers were made to a state sponsor of terrorism of course

---

[9] Plaintiffs allege that four of the Moving Defendants—Standard Chartered Bank, RBS N.V.,
HSBC-ME, and HSBC-Europe—engaged in some transactions directly with CBI but the bulk of
transactions alleged are with Iranian commercial banks, not the CBI.  *Id.* ¶¶ 788-94.  Plaintiffs
allege that CBI is "fully controlled and run by individuals directly appointed by the Government
of Iran", *id.* ¶ 783, and that other Iranian commercial banks are "nationalized" and "owned by
the [Government of Iran]", *id.* ¶ 796.

made it more likely that the moneys would be used for terrorism" but were still, without further

factual support, insufficient as a matter of law to state proximate cause).  Nor are conclusory

allegations that the Moving Defendants' conduct "provided Iran with the means by which it

could transfer" funds to "IRGC-QF, Hezbollah and Special Groups", *id.* ¶ 763, or "allowed" such

transfers, *id.* ¶ 1297, substantiated with any facts.  Indeed, these allegations are based on nothing

more than Plaintiffs' unsupported claim that the Moving Defendants enabled a "clandestine

stream of U.S. dollars" which in turn allegedly "facilitated" payments to Hezbollah and the

IRGC-QF.  *Id.* ¶ 1299; *see also id.* ¶¶ 774-75.  Assertions that the Moving Defendants were

"deliberately indifferent to the risk that the Conspiracy would foreseeably result in Iran

transferring million of dollars to [terrorists]," *id.* ¶ 1302, *see also id.* ¶¶ 1311, 1322,[10] and that the

Moving Defendants' conduct allegedly "multiplied Hezbollah's ability to engage in terrorist

activity", *id.* ¶ 1331, or allegedly "substantially enhanced" that of IRGC and Hezbollah to do the

same, *id.* ¶ 1312, are likewise unsubstantiated and on their face involve "independent actions of

third and even fourth parties" that fail to allege proximate cause as a matter of law.  *Hemi Grp.*,

559 U.S. at 15.

*        *        *

*Rothstein* rejected an ATA theory of causation markedly stronger than the theory

pressed here.  Because plausible causation allegations are a required element for each of

Plaintiffs' four claims for relief, the Complaint fails to state a claim as a matter of law.

---

[10] Aside from failing the *Twombly* pleading standard, these foreseeability allegations are also
deficient because "the focus" of proximate cause "is on the directness of the relationship between
the conduct and the harm", not on foreseeability.  *Hemi Grp.*, 559 U.S. at 12; *see also Sergeant
Benevolent Ass'n. Health and Welfare Fund*, 20 F. Supp. 3d at 317-319 (rejecting emphasis on
foreseeability in proximate cause analysis based on *Hemi Group*).

## III.   THERE IS NO CIVIL CONSPIRACY LIABILITY UNDER THE ATA

The Complaint must be dismissed for the additional and independent reason that it is premised on a conspiracy theory of liability that is not cognizable under the civil ATA provision.  Plaintiffs frame all of their Section 2333 causes of action as secondary liability conspiracy claims.[11]  The Second Circuit has squarely held that such secondary liability allegations are not a basis for civil recovery under Section 2333.

In *Rothstein*, the Second Circuit concluded that, because Congress was "silent as to the permissibility of aiding and abetting liability", the ATA does not create a civil cause of action for aiding and abetting.  *Rothstein*, 708 F.3d at 97-98.  The Second Circuit began with the observation that the ATA is not "a general aiding and abetting statute" but is instead "a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm".  *Id.* (quoting *Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 182 (1994)).  There is "no general presumption that plaintiff may also sue aiders and abettors" under such statutes.  *Id.*  "Further counseling against a judicial interpretation of [Section 2333] as authorizing [aiding-and-abetting civil] liability" was the fact that Congress had explicitly authorized such liability in the ATA's criminal provisions.  *Id.*  The Court concluded, "[w]e doubt that Congress, having included in the ATA several express provisions with respect to aiding and abetting in connection with the criminal provisions, can have intended § 2333 to authorize civil liability for aiding and abetting through its silence."  *Id.*

---

[11] *See, e.g.*, Compl. ¶ 1301 ("Iran, the Iranian banking co-conspirators, the Defendants . . .  and other non-defendant conspirators committed acts of international terrorism by entering into a Conspiracy . . . .  In doing so, Defendants were willing to, and did, commit numerous felonies under U.S. law to assist Iran in concealing its financial activities and, in the course of doing so, violated 18 U.S.C. § 2339A"), ¶ 1316 (same for 18 U.S.C. § 2339B), ¶ 1353 ("Defendant[]'s role in the Conspiracy was itself an act of international terrorism"), ¶ 1356 ("Defendants . . .  each utilized its New York branches in order to effectuate and facilitate the Conspiracy").

at 98 (citation omitted); *accord In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 123

(rejecting civil ATA aiding-and-abetting liability).

    *Rothstein* and *In re Terrorist Attacks on September 11, 2001* relied upon the

Supreme Court's decision in *Central Bank of Denver*, which held that an "implicit congressional

intent to impose . . . aiding and abetting liability" in the Securities Exchange Act of 1934 could

not plausibly be inferred from "statutory silence". 511 U.S. at 185. The Supreme Court

reasoned that "Congress kn[ows] how to impose aiding and abetting liability when it [chooses] to

do so" and that if Congress had intended to impose it, "we presume it would have used the words

'aid' and 'abet' in the statutory text. But it did not." *Id.* at 176 (citations omitted).

    For the same reasons, the ATA does not authorize a civil cause of action premised

on a conspiracy theory. Judge Gershon has explicitly so held, dismissing "all conspiracy claims

under the ATA", based on *Central Bank* and subsequent decisions in the Second Circuit. *See*

*Linde*, 944 F. Supp. 2d at 217. As Judge Gershon reasoned, *id.* at 216, after the Supreme Court

held in *Central Bank* that Section 10(b) of the Exchange Act does not reach aiding-and-abetting

liability, 511 U.S. at 185, the Second Circuit determined that "*Central Bank* also precludes" a

"conspiracy cause of action under § 10(b)". *Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld*

*& Sorkin*, 135 F.3d 837, 838, 840-41 (2d Cir. 1998). That is, *Dinsmore* decided that the

"Supreme Court's reasoning in *Central Bank*" about not imputing congressional intent to include

a secondary claim in a statute in the face of statutory silence "applies not only to aiding and

abetting claims, but to conspiracy claims as well". *Id.* at 841. The *Dinsmore* court observed that

when Congress wishes to create liability for conspiracy, it does so directly: "[j]ust as Congress

clearly knew how to impose aiding and abetting liability when it chose to do so . . . the existence

of statutes expressly providing for conspiracy liability warrants the same conclusion" with

respect to conspiracy.  *Dinsmore*, 135 F.3d at 842 (internal citations omitted).

        The same result follows as to the ATA.  Because the ATA does not expressly

provide for aiding-and-abetting or conspiracy civil liability, both theories of liability are

unavailable for parties seeking civil recovery.  *See Linde*, 944 F. Supp. 2d at 216-17.  That

Congress chose to include conspiracy theories in neighboring criminal provisions in the ATA

only reinforces the need to respect Congress's decision not to include conspiracy within the

ATA's civil cause of action.  *Id*.  Permitting civil conspiracy liability "would largely undo the

effect of [*Rothstein*] itself, inasmuch as many aiding and abetting claims would simply be

repleaded as conspiracy claims".  *Dinsmore*, 135 F.3d at 843.

        In sum, Plaintiffs' Section 2333 claims must be dismissed because they rest on

assertions of conspiracy liability, and the statute does not authorize civil actions premised on

such secondary liability claims.[12]

---

[12] Because civil conspiracy liability is not available, the Moving Defendants do not here discuss
in detail other legal deficiencies in the Complaint, including Plaintiffs' failure plausibly to allege
the necessary elements of a conspiracy.  For example, courts have dismissed conspiracy
allegations in other contexts when the plaintiff cannot show "that a defendant joined the
conspiracy with the intent to commit the offenses that are its object".  *Zito v. Leasecomm Corp.*,
No. 02 Civ.8074 (GEL), 2003 WL 22251352, at *20 (S.D.N.Y. Sept. 30, 2003); *see also United
States v. Coplan*, 703 F.3d 46, 71 (2d Cir. 2012) (emphasizing "the basic requirement [of
conspiracy] that the person charged with conspiracy *knew* of the existence of the scheme alleged
in the indictment and *knowingly joined and participated* in it") (emphasis in original) (internal
quotation marks omitted).  Plaintiffs allege that Defendants participated in a conspiracy the
object of which, as Plaintiffs allege it, was the "common goal of helping Iran to transfer billions
of dollars through the United States while avoiding detection, scrutiny, or monitoring".  Compl.
¶ 760; *see also id.* ¶ 754.  Plaintiffs do not plausibly allege that the Moving Defendants shared a
"common goal" as part of the alleged Conspiracy, *Ungar v. Islamic Republic of Iran*, 211 F.
Supp. 2d 91, 100 (D.D.C. 2002), of "murdering and maiming U.S. servicemen and civilians in
Iraq", Compl. ¶ 756.  The conclusory allegations in this regard, that Defendants specifically
intended to attack U.S. soldiers, are wholly implausible.  *See Mastafa*, 770 F.3d at 194.  The
Moving Defendants also do not discuss here in detail the statutory bar in 18 U.S.C. § 2336(a) or

*[Continued on Next Page]*

**IV.  THE COMPLAINT FAILS PLAUSIBLY TO ALLEGE THAT NON-U.S. MOVING DEFENDANTS ARE "UNITED STATES PERSON[S]" OR THAT THEY ENGAGED IN "A FINANCIAL TRANSACTION WITH THE GOVERNMENT" OF IRAN UNDER SECTION 2332D**

Finally, the Third and Fourth Claims of Relief, which allege that some defendants violated a prohibition on certain financial transactions with the government of a designated state sponsor of terrorism, must be dismissed for additional and independent reasons based on the statutory requirements of 18 U.S.C. § 2332d.

First, the Fourth Claim for Relief—alleged against the non-U.S. entities Barclays, Standard Chartered Bank, and RBS N.V.—fails because these entities do not qualify as a "United States person" as defined by the statute.  A "United States person" includes any "(A) United States citizen or national; (B) permanent resident alien; (C) juridical person organized under the laws of the United States; or (D) any person in the United States."  18 U.S.C. § 2332d(b)(2).  Subparagraph (C)—which applies to "juridical person[s]"—does not encompass these defendants, because none is organized under "the laws of the United States".  Plaintiffs do not contend otherwise.  Compl. ¶¶ 734-35, 736-37, 739.

Plaintiffs instead allege that these banks qualify as "any person in the United States" under subparagraph (D) of the definition.  That argument is legally untenable: subparagraph (D) reaches only natural persons located within the territory of the United States— as two district courts have expressly held.  *See Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 648 (S.D. Tex. 2011); *United States v. Chalmers*, 474 F. Supp. 2d 555, 565 (S.D.N.Y. 2007).  And the Supreme Court, in construing identical language with respect to Burma sanctions, noted that this prohibition does not apply to "foreign companies".  *Crosby* v. *Nat'l Foreign Trade Council*,

---

Plaintiffs' failure to plausibly allege conduct satisfying each of the requirements set out in 18 U.S.C. § 2339A and § 2339B as to each Defendant.

530 U.S. 363, 379 (2000) (examining Prohibiting New Investment in Burma, Exec. Order No. 13047, 62 Fed. Reg. 28301 (May 20, 1997)).

Because subparagraph (C) specifically addresses "juridical persons"—*i.e.*, corporations—while the other provisions do not, the remaining subparagraphs are limited to natural persons.  That is confirmed by the fact that if, as Plaintiffs assert, subparagraph (D) also reached "juridical" persons, it would render subparagraph (C) wholly superfluous, as all companies organized under the laws of the United States are also, by definition, in the United States, because that is their place of incorporation.  *See, e.g.*, *Daimler AG* v. *Bauman*, 134 S. Ct. 746, 760 (2014) (a company is located in its place of incorporation and principal place of business).  There is a strong presumption against interpreting a statute in this manner.  *Bailey* v. *United States*, 516 U.S. 137, 145-46 (1995) (recognizing the general assumption that "Congress intended each of its terms to have meaning" and avoid redundancies).  In sum, Section 2332d does not apply to foreign corporations such as these defendants.

Second, Plaintiffs fail to allege a "financial transaction with the government" of Iran.  18 U.S.C. § 2332d(a).  Particularly with respect to Claim 3, Plaintiffs allege only that Iranian banks conducted wire transfers using foreign, non-U.S. banks, which in turn cleared transactions through United States clearinghouses.  *See, e.g.*, Compl. ¶ 1067.  That may mean that U.S. clearing banks engaged in transactions with foreign banks for the benefit of Iran.  But Plaintiffs offer no basis to conclude that those U.S. clearing banks engaged in transactions with the Iranian government itself.  Nor can Plaintiffs demonstrate that U.S. clearing banks like HSBC US knew that Iran was the beneficiary of transactions, as the nub of Plaintiffs' allegations is that this information was stripped from wire transfers before it reached the U.S. clearing bank.

## CONCLUSION

The Complaint fails to state a claim and, accordingly, must be dismissed in its entirety as a matter of law as to each of the Moving Defendants.

MAYER BROWN LLP,

by

*/s/ Mark G. Hanchet*

Mark G. Hanchet
1221 Avenue of the Americas
New York, NY 10020-1001
(212) 506-2500
mhanchet@mayerbrown.com

Andrew J. Pincus
Paul W. Hughes
1999 K Street, N.W.
Washington, DC 20006-1101
(202) 263-3000
apincus@mayerbrown.com
phughes@mayerbrown.com

*Attorneys for Defendant HSBC Holdings PLC, HSBC Bank PLC, HSBC Bank Middle East Limited and HSBC Bank USA, N.A.*

CLIFFORD CHANCE US LLP,

by

*/s/ Steven T. Cottreau*

Steven T. Cottreau
2001 K Street NW
Washington, DC 20006-1001
(202) 912-5000
steve.cottreu@cliffordchance.com

Robert G. Houck
Jamie L. Hoxie
31 West 52nd Street
New York, NY 10019-6131
(212) 878-8000
robert.houck@cliffordchance.com
jamie.hoxie@cliffordchance.com

*Attorneys for Defendant The Royal Bank of Scotland N.V.*

26

SULLIVAN & CROMWELL LLP,

by

/s/ Michael T. Tomaino, Jr.

Michael T. Tomaino, Jr.
Jeffrey T. Scott
Jonathan M. Sedlak
125 Broad Street
New York, NY 10004
(212) 558-4000
tomainom@sullcrom.com
scottj@sullcrom.com
sedlakj@sullcrom.com

*Attorneys for Defendant Barclays Bank PLC*

SULLIVAN & CROMWELL LLP,

by

/s/ Sharon L. Nelles

Sharon L. Nelles
Bradley P. Smith
125 Broad Street
New York, NY 10004
(212) 558-4000
nelless@sullcrom.com
smithbr@sullcrom.com

*Attorneys for Defendant Standard Chartered Bank*

CRAVATH, SWAINE & MOORE LLP,

by

/s/ Richard W. Clary

Richard W. Clary
Michael T. Reynolds
John D. Buretta
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
rclary@cravath.com
mreynolds@cravath.com
jburetta@cravath.com

*Attorneys for Defendant Credit Suisse AG*

27