UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

CHARLOTTE FREEMAN, KATHLEEN :
SNYDER, RANDOLPH FREEMAN, G.F., :
a minor, I.F., a minor, CHARLOTTE FREEMAN :
FOR THE ESTATE OF BRIAN S. FREEMAN, :
DANNY CHISM, LINDA FALTER, RUSSELL :
FALTER, RUSSELL FALTER FOR THE :
ESTATE OF SHAWN P. FALTER, SHANNON :
MILLICAN, MITCHELL MILLICAN, :
SHANNON MILLICAN FOR THE ESTATE OF :
JOHNATHON M. MILLICAN, BILLY :
WALLACE, STEFANIE WALLACE, D.W., :
a minor, C.W., a minor, A.W., a minor, :
EVAN KIRBY, JOHNNY WASHBURN, :
MARVIN THORNSBERRY, CYNTHIA :
THORNSBERRY, A.B., a minor, M.T., a minor, :
N.T., a minor, L.T., a minor TRACIE ARSIAGA :
CEDRIC HUNT, SR., ROBERT BARTLETT, :
TERREL CHARLES BARTLETT, SHAWN :
BARTLETT, LISA RAMACI, ISABELL :
VINCENT, CHARLES VINCENT, LISA :
RAMACI FOR THE ESTATE OF STEVEN :
VINCENT, GWENDOLYN MORIN-MARENTES :
E.M., a minor, AUDREY MORIN, STEVE :
MORIN, SR., GWENDOLYN MORIN- :
MARENTES, FOR THE ESTATE OF STEVE :
MORIN, JR., AMY LYNN ROBINSON, FLOYD :
BURTON ROBINSON, JACOB MICHAEL :
ROBINSON, LUCAS WILLIAM ROBINSON, :
AMY LYNN ROBINSON AND FLOYD :
BURTON ROBINSON FOR THE ESTATE OF :
JEREMIAH ROBINSON, DEBORAH NOBLE, :
CHARLES E. MATHENY, III, DEBORAH :
NOBLE FOR THE ESTATE OF CHARLES E. :
MATHENY, IV, SILVER FARR, PATRICK :
FARR, CARROL ALDERETE, ANTHONY :
ALDERETE, PATRICK FARR FOR THE :
ESTATE OF CLAY P. FARR, RAYANNE :
HUNTER, W.H., a minor, T.H., a minor, :
FABERSHA FLYNT LEWIS, LORENZO :
SANDOVAL, SR., LORENZO SANDOVAL, JR., :
LORENZO SANDOVAL, SR. FOR THE ESTATE :
OF ISRAEL DEVORA-GARCIA, H. JOSEPH :
BANDHOLD, DONALD C. BANDHOLD, ERIK :

**AMENDED COMPLAINT**
**JURY TRIAL DEMANDED**

**14-CV-6601 (DLI)(CLP)**

ROBERTS, ROBIN ROBERTS, JAMES CRAIG     :
ROBERTS, CARA ROBERTS, COLIN     :
ROBERTS, NANETTE SAENZ, JUAN SAENZ,     :
NANETTE SAENZ FOR THE ESTATE OF     :
CARLOS N. SAENZ, JOHN VACHO, ASHLEY     :
VACHO, JOHN VACHO FOR THE ESTATE OF     :
CAROL VACHO, JOHN VACHO FOR THE     :
ESTATE OF NATHAN J. VACHO, JEANETTE     :
WEST, SHELBY WEST, JEANETTE WEST FOR     :
THE ESTATE OF ROBERT H. WEST, DONNA     :
ENGEMAN, SUZZETTEE LAWSON,     :
C.L., a minor, SUZZETTEE LAWSON FOR THE     :
ESTATE OF ISAAC S. LAWSON, JUDY ANN     :
CRABTREE, RONALD WAYNE CRABTREE,     :
DEBRA WIGBELS, RONALD WILLIAM     :
CRABTREE, JUDY HUENINK, SEAN SLAVEN,     :
CHASTITY DAWN LAFLIN, NICOLE LANDON,     :
MISTI FISHER, JUDY HUENINK FOR THE     :
ESTATE OF BENJAMIN J. SLAVEN, FRED     :
FRIGO, LYNN FOREHAND, LANCE HAUPT,     :
RHONDA HAUPT, TIFANY HAUPT, SABRINA     :
CUMBE, DAVID W. HAINES, DAWN HAINES,     :
C.H., a minor, MACKENZIE HAINES,     :
SANGSOON KIM, SEOP (STEVE) KIM,     :
MICHELLE KIM, SEOP (STEVE) KIM FOR     :
THE ESTATE OF JANG H. KIM, HELEN     :
FRASER, RICHARD FRASER, RICHARD     :
FRASER FOR THE ESTATE OF DAVID M.     :
FRASER, TRICIA ENGLISH, N.W.E., a minor,     :
N.C.E., a minor, A.S.E., a minor, TODD DAILY     :
FOR THE ESTATE OF SHAWN L. ENGLISH,     :
PHILIP S. FORD, LINDA GIBSON, JOHN     :
GIBSON, STEPHANIE GIBSON WEBSTER,     :
SEAN ELLIOTT, TRAVIS GIBSON, DENISE     :
BLOHM, CHRIS BLOHM, KIANA BLOHM,     :
JEREMY BLOHM, JOANNE GUTCHER,     :
TRACY ANDERSON, JEFFREY ANDERSON,     :
ANASTASIA FULLER, A.F., a minor, ANNE F.     :
HARRIS, PAUL D. HARRIS, HYUNJUNG     :
GLAWSON, YOLANDA M. BROOKS, CURTIS     :
GLAWSON, SR., RYAN SABINISH, ANN     :
CHRISTOPHER, ANN CHRISTOPHER FOR     :
THE ESTATE OF KWESI CHRISTOPHER,     :
NANCY FUENTES, ARMANDO FUENTES,     :
JULIO FUENTES, T.F, a minor, EMMA     :
MCGARRY ON BEHALF OF D.J.F., a minor,     :

AVA TOMSON, RICHARD TOMSON,                        :
BRADLEY STARCEVICH, GLENDA                        :
STARCEVICH, ARIANA REYES, TRENTON          :
STARCEVICH, AVA TOMSON FOR THE            :
ESTATE OF LUCAS V. STARCEVICH, KAREN  :
FUNCHEON, ROBERT FUNCHEON, KAREN      :
FUNCHEON FOR THE ESTATE OF                   :
ALEXANDER J. FUNCHEON, HOLLY               :
BURSON-GILPIN, HOLLY BURSON-GILPIN     :
FOR THE ESTATE OF JEROME POTTER,          :
NANCY UMBRELL, MARK UMBRELL,              :
NANCY UMBRELL AND MARK UMBRELL           :
FOR THE ESTATE OF COLBY J. UMBRELL,      :
DAN DIXON, DAN DIXON FOR THE ESTATE    :
OF ILENE DIXON, REBECCA J. OLIVER,          :
DANIEL C. OLIVER, SHELLEY ANN SMITH,   :
WILLIAM FARRAR, SR., WILLIAM FARRAR,  :
SR. FOR THE ESTATE OF WILLIAM A.            :
FARRAR, TONYA K. DRESSLER, ARDITH        :
CECIL DRESSLER, MELISSA DRESSLER,         :
ELIZABETH BROWN, MARIAN BROWN,           :
WAYNE BROWN, ELIZABETH BROWN FOR      :
THE ESTATE OF JOSHUA D. BROWN,              :
DANIELLE SWEET, A.B., a minor,                    :
G.B., a minor, DANIELLE SWEET                      :
FOR THE ESTATE OF RYAN A. BALMER,         :
DONNA KUGLICS, LES KUGLICS, EMILY        :
KUGLICS, DONNA KUGLICS FOR THE            :
ESTATE OF MATTHEW J. KUGLICS, SYLVIA   :
JOHNSON SPENCER, RAYMOND NIGEL           :
SPENCER, SR., JOHN D. LAMIE, PAULA C.      :
BOBB-MILES, JOHNNY JAVIER MILES, SR.,    :
J.J.M., JR., a minor, RACQUEL ARNAE BOBB  :
MILES, PAULA C. BOBB-MILES FOR THE        :
ESTATE OF BRANDON K. BOBB, URSULA        :
ANN JOSHUA, BRITTANY MARIONIQUE          :
JOSHUA, ASHLEY GUDRIDGE, MARION          :
CRIMENS, TIMOTHY W. ELLEDGE,                 :
CHRISTOPHER LEVI, BRENDA HABSIEGER,   :
MICHAEL HABSIEGER, JACOB MICHAEL        :
HABSIEGER, KELLI D. HAKE, DENICE YORK, :
RUSSEL YORK, JILL HAKE, PETER HAKE,       :
G.H., a minor, ZACHARY HAKE, KERI           :
COTTON, SKYLAR HAKE, KELLI D. HAKE       :
FOR THE ESTATE OF CHRISTOPHER M.          :
HAKE, MARIA E. CALLE, CYNTHIA               :

DELGADO, CYNTHIA DELGADO FOR THE :
ESTATE OF GEORGE DELGADO, KIM :
MILLER, MICHAEL J. MILLER, WALTER :
BAILEY, CASSANDRA BAILEY, KACEY :
GILMORE, TERRELL GILMORE, JR., :
KYNESHA DHANOOLAL, MERLESE :
PICKETT, HARRY CROMITY, RACHEL M. :
GILLETTE, REBEKAH A. COLDEWE, :
PATRICIA SMITH, MICHAEL SMITH, :
JACQUELINE A. SMITH, DAVID HARTLEY, :
DAVID HARTLEY FOR THE ESTATE OF :
JEFFERY HARTLEY, ALLEN SWINTON, :
TEMIKA SWINTON, T.S., a minor, T.S., a minor, :
T.B., a minor, MARY JANE VANDEGRIFT, :
JOHN VANDEGRIFT, JOHN VANDEGRIFT :
FOR THE ESTATE OF MATTHEW R. :
VANDEGRIFT, PAM MARION, DONNIE :
MARION, PAULA MENKE, DANIEL MENKE, :
MATTHEW MENKE, NICHOLE LOHRING, :
ROSEMARIE ALFONSO, K.B., a minor, :
MICHELLE BENAVIDEZ, DANIEL :
BENAVIDEZ, SR., CHRISTINA BIEDERMAN, :
DANIEL BENAVIDEZ, JR., JENNIFER :
MORMAN, MICHELLE BENAVIDEZ FOR THE :
ESTATE OF KENNITH W. MAYNE, :
CHRISTOPHER MILLER, ANGIE JACKSON, :
TRINA JACKSON, S.J., a minor, GREGORY :
BAUER, THERESA DAVIS, LINDA DAVID, :
MICHAEL DAVID, CHRISTOPHER DAVID, :
LINDA DAVID FOR THE ESTATE OF :
TIMOTHY A. DAVID, TIMOTHY KARCHER, :
KENNETH J. DREVNICK, MEGAN MARIE :
RICE, R.N.R, a minor, TONYA LOTTO, :
JERRY L. MYERS, JEFFREY D. PRICE, MEGAN :
MARIE RICE FOR THE ESTATE OF ZACHARY :
T. MYERS, CASSIE SMITH, DEBBIE SMITH, :
JAMES SMITH, CORY SMITH, CHRISTINA :
SMITH, GEORGE D. WHITE, NATALIA :
WHITE, K.W., a minor, GEORGE J. WHITE, :
EDNA LUZ BURGOS, JOHN MCCULLY, :
STEPHANIE MCCULLY, T.M., a minor, :
R.M., a minor, B.D., a minor, THERESA HART, :
WAYNE NEWBY, VERONICA HICKMAN, :
DAVID EUGENE HICKMAN, DEVON :
FLETCHER HICKMAN :
:

Plaintiffs,                                    :
                                               :
-against-                                      :
                                               :
HSBC HOLDINGS PLC, HSBC BANK PLC,              :
HSBC BANK MIDDLE EAST LIMITED,                 :
HSBC BANK USA, N.A., BARCLAYS BANK             :
PLC, STANDARD CHARTERED BANK,                  :
ROYAL BANK OF SCOTLAND, N.V., CREDIT           :
SUISSE AG, BANK SADERAT PLC,                   :
COMMERZBANK AG AND JOHN                        :
DOES 1-50                                      :
                                               :
Defendants.                                    :
------------------------------------------------------------x

# TABLE OF CONTENTS

I.     NATURE OF THE ACTION ................................................................ 2

II.    JURISDICTION AND VENUE ....................................................... 12

III.   THE DEFENDANTS ......................................................................... 12

    A.    THE HSBC DEFENDANTS ...................................................... 12

    B.    DEFENDANT BARCLAYS BANK PLC ................................... 14

    C.    DEFENDANT STANDARD CHARTERED BANK ................... 14

    D.    DEFENDANT ROYAL BANK OF SCOTLAND N.V. ("ABN Amro (RBS N.V.)") ............................................................................. 15

    E.    DEFENDANT CREDIT SUISSE AG ........................................ 16

    F.    DEFENDANT BANK SADERAT PLC ..................................... 16

    G.    DEFENDANT COMMERZBANK AG ...................................... 17

IV.   FACTUAL ALLEGATIONS ............................................................. 17

    A.    IRAN'S LONG HISTORY OF SUPPORTING AND FINANCING TERRORISM ............................................................................... 17

    B.    U.S. SANCTIONS AND IRAN'S RELIANCE ON U.S. DOLLARS ......................... 18

    C.    THE U-TURN EXEMPTION AND ITS REVOCATION ......................... 19

    D.    IRAN'S ILLEGAL ARMS SHIPMENTS THROUGH ISLAMIC REPUBLIC OF IRAN SHIPPING LINES (IRISL) ................................. 25

    E.    IRAN'S AGENTS HEZBOLLAH AND IRGC FOMENT TERRORISM IN IRAQ ..................................................................... 27

    F.    IRAN FUNDED THE DESIGN AND PRODUCTION OF EXPLOSIVELY FORMED PENETRATORS ("EFPS") USED TO KILL OR MAIM COALITION FORCES, INCLUDING THE PLAINTIFFS ................................. 33

    G.    IRAN SUPPORTED SPECIAL GROUPS IN IRAQ THAT COORDINATED WITH HEZBOLLAH AND THE IRGC ................................. 38

i

      1.      **THE BADR CORPS/BADR ORGANIZATION** ..................................... 38

      2.      **JAYSH AL MAHDI ("JAM" or the "MAHDI ARMY")** ..................................... 39

      3.      **KATA'IB HEZBOLLAH ("KH")** .................................................... 40

      4.      **ASA'IB AHL AL-HAQ ("AAH" OR "LEAGUE OF THE RIGHTEOUS")** ..... 44

   **H.**  **ALL OF THE ATTACKS AT ISSUE IN THIS COMPLAINT WERE ACTS OF INTERNATIONAL TERRORISM** .................................................... 45

**V.**    **OVERVIEW OF THE CONSPIRACY** .................................................... 46

   **A.**  **AGREEMENT AND KNOWLEDGE** .................................................... 46

   **B.**  **ACTS AND EFFECTS** .................................................... 50

   **C.**  **BANK SADERAT PLC's AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY** .................................................... 53

   **D.**  **THE CENTRAL BANK OF IRAN'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY** .................................................... 56

   **E.**  **BANK MELLI IRAN AND BANK MELLI PLC'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY** .................................................... 59

   **F.**  **BANK MELLAT'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY** .................................................... 63

   **G.**  **BANK SEPAH'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY** .................................................... 64

   **H.**  **JOHN DOE DEFENDANTS' 1-50 AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY** .................................................... 65

   **I.**  **THE HSBC DEFENDANTS' AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY** .................................................... 65

      1.      **HSBC-EUROPE'S 2001 "BANK MELLI PROPOSAL"** ..................................... 69

      2.      **DEFENDANT HSBC-US'S  AGREEMENT TO PARTICIPATION IN THE CONSPIRACY IN VIOLATION OF 18 U.S.C. § 2332d** ..................................... 75

   **J.**  **DEFENDANT BARCLAYS' AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY** .................................................... 84

**K.** **DEFENDANT STANDARD CHARTERED BANK'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY** ................................................. 91

**L.** **DEFENDANT ROYAL BANK OF SCOTLAND N.V.'S ("ABN AMRO (RBS N.V.)") AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY** .. 100

**M.** **DEFENDANT CREDIT SUISSE'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY** ......................................................... 111

**N.** **DEFENDANT COMMERZBANK AG'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY** ........................................... 122

**VI.** **THE PLAINTIFFS** ................................................................ 129

**1.** **THE JANUARY 20, 2007 ATTACK – KARBALA** ................................ 129

**2.** **THE APRIL 4, 2004 ATTACK – BAGHDAD** .................................... 139

**3.** **THE MAY 3, 2005 ATTACK – BAGHDAD** ...................................... 140

**4.** **THE AUGUST 2, 2005 ATTACK – BASRA** ..................................... 141

**5.** **THE SEPTEMBER 28, 2005 ATTACK – UMM QASR** ......................... 142

**6.** **THE OCTOBER 6, 2005 ATTACK – BAGHDAD** ............................... 143

**7.** **THE FEBRUARY 18, 2006 ATTACK – BAGHDAD** ............................ 144

**8.** **THE FEBRUARY 26, 2006 ATTACK – BAGHDAD** ............................ 145

**9.** **THE MARCH 13, 2006 ATTACK – RUSTAMIYAH** ............................ 147

**10.** **THE APRIL 1, 2006 ATTACK – BAGHDAD** .................................... 148

**11.** **THE APRIL 12, 2006 ATTACK – MISIAB** ..................................... 149

**12.** **THE APRIL 25, 2006 ATTACK – SADR CITY** ................................. 149

**13.** **THE MAY 5, 2006 ATTACK – BAGHDAD** ...................................... 150

**14.** **THE MAY 14, 2006 ATTACK – BAGHDAD** .................................... 152

**15.** **THE JUNE 5, 2006 ATTACK – BAGHDAD** ..................................... 153

**16.** **THE JUNE 8, 2006 ATTACK – AL KUT** ....................................... 154

**17.  THE JUNE 9, 2006 ATTACK – DIWANIYAH** ....................................................... 155

**18.  THE OCTOBER 17, 2006 ATTACK – BAQUBAH** ................................................ 156

**19.   THE OCTOBER 22, 2006 ATTACK – BAGHDAD** ............................................... 158

**20.  THE NOVEMBER 13, 2006 ATTACK – BAGHDAD** ........................................... 159

**21.  THE NOVEMBER 26, 2006 ATTACK – BAGHDAD** ........................................... 160

**22.  THE DECEMBER 3, 2006 ATTACK – BAGHDAD** .............................................. 161

**23.  THE DECEMBER 10, 2006 ATTACK – BAGHDAD** ............................................ 162

**24.  THE DECEMBER 31, 2006 ATTACK – BAGHDAD** ............................................ 163

**25.  THE JANUARY 18, 2007 ATTACK – BAGHDAD** ............................................... 164

**26.  THE JANUARY 22, 2007 ATTACK – BAGHDAD** ............................................... 165

**27.  THE JANUARY 25, 2007 ATTACK – BAGHDAD** ............................................... 166

**28.  THE MARCH 15, 2007 ATTACK – BAQUBAH** .................................................. 167

**29.  THE MARCH 20, 2007 ATTACK – BAGHDAD** ................................................. 167

**30.  THE MARCH 23, 2007 ATTACK – NASIRIYAH** ............................................... 168

**31.  THE MARCH 31, 2007 ATTACK – DIWANIYAH** .............................................. 169

**32.  THE APRIL 6, 2007 ATTACK – BAGHDAD** ..................................................... 170

**33.  THE APRIL 16, 2007 ATTACK – BAGHDAD** ................................................... 171

**34.  THE APRIL 29, 2007 ATTACK – BAGHDAD** ................................................... 172

**35.  THE MAY 3, 2007 ATTACK – BAGHDAD** ....................................................... 173

**36.  THE MAY 3, 2007 ATTACK – MUSAYYIB** ...................................................... 174

**37.  THE MAY 6, 2007 ATTACK – BAGHDAD** ....................................................... 174

**38.  THE MAY 6, 2007 ATTACK – BAGHDAD** ....................................................... 175

**39.  THE MAY 8, 2007 ATTACK – SALMAN PAK** .................................................. 176

**40. THE MAY 11, 2007 ATTACK – AL ISKANDARIYAH** ......................................... 177

**41. THE JUNE 2, 2007 ATTACK – BAGHDAD** ................................................ 177

**42. THE JUNE 5, 2007 ATTACK – KIRKUK** ................................................. 179

**43. THE JUNE 21, 2007 ATTACK – BAGHDAD** .............................................. 181

**44. THE JULY 6, 2007 ATTACK – BAGHDAD** ............................................... 182

**45. THE JULY 17, 2007 ATTACK – BAGHDAD** .............................................. 182

**46. THE JANUARY 6, 2008 ATTACK – BAGHDAD** ........................................... 184

**47. THE MARCH 17, 2008 ATTACK – BAGHDAD** ........................................... 185

**48. THE MARCH 17, 2008 ATTACK – BAGHDAD** ........................................... 185

**49. THE MARCH 23, 2008 ATTACK – BAGHDAD** ........................................... 186

**50. THE MARCH 29, 2008 ATTACK – BAGHDAD** ........................................... 189

**51. THE MARCH 30, 2008 ATTACK – BAGHDAD** ........................................... 190

**52. THE MARCH 30, 2008 ATTACK – BAGHDAD** ........................................... 191

**53. THE MARCH 31, 2008 ATTACK – BAGHDAD** ........................................... 192

**54. THE APRIL 6, 2008 ATTACK – BAGHDAD** ............................................. 192

**55. THE APRIL 6, 2008 ATTACK – BAGHDAD** ............................................. 193

**56. THE APRIL 7, 2008 ATTACK – BAGHDAD** ............................................. 194

**57. THE APRIL 8, 2008 ATTACK – KHARGULIAH** ......................................... 195

**58. THE APRIL 12, 2008 ATTACK** ....................................................... 195

**59. THE APRIL 21, 2008 ATTACK – BASRA** .............................................. 197

**60. THE APRIL 28, 2008 ATTACK – BAGHDAD** ............................................ 198

**61. THE AUGUST 4, 2008 ATTACK – BAGHDAD** ........................................... 199

**62. THE AUGUST 26, 2008 ATTACK – SADR CITY** ........................................ 200

**63. THE SEPTEMBER 4, 2008 ATTACK – BAGHDAD** ............................................. 200

**64. THE OCTOBER 16, 2008 ATTACK – BAQUBAH** .............................................. 202

**65. THE JANUARY 10, 2009 ATTACK – BAGHDAD** ............................................. 203

**66. THE APRIL 22, 2009 ATTACK – BAGHDAD** ................................................... 204

**67. THE JUNE 28, 2009 ATTACK – BAGHDAD** ................................................... 204

**68. THE JUNE 29, 2009 ATTACK – BAGHDAD** ................................................... 205

**69. THE JULY 16, 2009 ATTACK – BASRA** ......................................................... 206

**70. THE SEPTEMBER 8, 2009 ATTACK – TIKRIT** ............................................. 207

**71. THE JUNE 29, 2011 ATTACK – WASIT PROVINCE** .................................... 209

**72. THE JULY 7, 2011 ATTACK BAGHDAD** ....................................................... 211

**73. THE NOVEMBER 14, 2011 ATTACK – BAGHDAD** ...................................... 212

**FIRST CLAIM FOR RELIEF** ....................................................................................... 213

**SECOND CLAIM FOR RELIEF** ................................................................................... 219

**THIRD CLAIM FOR RELIEF** ...................................................................................... 223

**FOURTH CLAIM FOR RELIEF** .................................................................................. 228

**FIFTH CLAIM FOR RELIEF** ....................................................................................... 231

Plaintiffs Charlotte Freeman, Kathleen Snyder, Randolph Freeman, G.F., a minor, I.F., a minor, Charlotte Freeman for the Estate of Brian S. Freeman, Danny Chism, Linda Falter, Russell Falter, Russell Falter for the Estate of Shawn P. Falter, Shannon Millican, Mitchell Millican, Shannon Millican for the Estate of Johnathon M. Millican, Billy Wallace, Stefanie Wallace, D.W., a minor, C.W., a minor, A.W., a minor, Evan Kirby, Johnny Washburn, Marvin Thornsberry, Cynthia Thornsberry, A.B., a minor, M.T., a minor, N.T., a minor, L.T., a minor, Tracie Arsiaga, Cedric Hunt, Sr., Robert Bartlett, Terrel Charles Bartlett, Shawn Bartlett, Lisa Ramaci, Isabell Vincent, Charles Vincent, Lisa Ramaci for the Estate of Steven Vincent, Gwendolyn Morin-Marentes, E.M, a minor, Audrey Morin, Steve Morin Sr., Gwendolyn Morin-Marentes for the Estate of Steve Morin, Jr., Amy Lynn Robinson, Floyd Burton Robinson, Jacob Michael Robinson, Lucas William Robinson, Amy Lynn Robinson and Floyd Burton Robinson for the Estate of Jeremiah Robinson, Deborah Noble, Charles E. Matheny, III, Deborah Noble for the Estate of Charles E. Matheny, IV, Silver Farr, Patrick Farr, Carrol Alderete, Anthony Alderete, Patrick Farr for the Estate of Clay P. Farr, Rayanne Hunter, W.H., a minor, T.H., a minor, Fabersha Flynt Lewis, Lorenzo Sandoval, Sr., Lorenzo Sandoval, Jr., Lorenzo Sandoval, Sr., for the Estate of Israel Devora-Garcia, H. Joseph Bandhold, Donald C. Bandhold, Erik Roberts, Robin Roberts, James Craig Roberts, Cara Roberts, Colin Roberts, Nanette Saenz, Juan Saenz, Nanette Saenz for the Estate of Carlos N. Saenz, John Vacho, Ashley Vacho, John Vacho for the Estate of Carol Vacho, John Vacho for the Estate of Nathan J. Vacho, Jeanette West, Shelby West, Jeanette West for the Estate of Robert H. West, Donna Engeman, Suzzettee Lawson, C.L., a minor, Suzzettee Lawson for the Estate of Isaac S. Lawson, Judy Ann Crabtree, Ronald Wayne Crabtree, Debra Wigbels, Ronald William Crabtree, Judy Huenink, Sean Slaven, Chastity Dawn Laflin, Nicole Landon, Misti Fisher, Judy Huenink for the Estate of Benjamin J. Slaven, Fred Frigo, Lynn Forehand, Lance Haupt, Rhonda Haupt, Tifany Haupt, Sabrina Cumbe, David W. Haines, Dawn Haines, C.H., a minor, Mackenzie Haines, Sangsoon Kim, Seop (Steve) Kim, Michelle Kim, Seop (Steve) Kim for the Estate of Jang H. Kim, Helen Fraser, Richard Fraser, Richard Fraser for the Estate of David M. Fraser, Tricia English, N.W.E., a minor, N.C.E., a minor, A.S.E., a minor, Todd Daily for the Estate of Shawn L. English, Philip S. Ford, Linda Gibson, John Gibson, Stephanie Gibson Webster, Sean Elliott, Travis Gibson, Denise Blohm, Chris Blohm, Kiana Blohm, Jeremy Blohm, Joanne Gutcher, Tracy Anderson, Jeffrey Anderson, Anastasia Fuller, A.F., a minor, Anne F. Harris, Paul D. Harris, Hyunjung Glawson, Yolanda M. Brooks, Curtis Glawson, Sr., Ryan Sabinish, Ann Christopher, Ann Christopher for the Estate of Kwesi Christopher, Nancy Fuentes, Armando Fuentes, Julio Fuentes, T.F., a minor, Emma McGarry on behalf of D.J.F., a minor, Ava Tomson, Richard Tomson, Bradley Starcevich, Glenda Starcevich, Ariana Reyes, Trenton Starcevich, Ava Tomson for the Estate of Lucas V. Starcevich, Karen Funcheon, Robert Funcheon, Karen Funcheon for the Estate of Alexander J. Funcheon, Holly Burson-Gilpin, Holly Burson-Gilpin for the Estate of Jerome Potter, Nancy Umbrell, Mark Umbrell, Nancy Umbrell and Mark Umbrell for the Estate of Colby J. Umbrell, Dan Dixon individually and for the Estate of Ilene Dixon, Rebecca J. Oliver, Daniel C. Oliver, Shelley Ann Smith, William Farrar, Sr., William Farrar, Sr. for the Estate of William A. Farrar, Tonya K. Dressler, Ardith Cecil Dressler, Melissa Dressler, Elizabeth Brown, Marian Brown, Wayne Brown, Elizabeth Brown for the Estate of Joshua D. Brown, Danielle Sweet, A.B., a minor, G.B., a minor, Danielle Sweet for the Estate of Ryan A. Balmer, Donna Kuglics, Les Kuglics, Emily Kuglics, Donna Kuglics for the Estate of Matthew J. Kuglics, Sylvia Johnson Spencer, Raymond Nigel Spencer, Sr., John D. Lamie, Paula C. Bobb-Miles, Johnny Javier Miles, Sr., J.J.M., Jr., a minor, Racquel Arnae Bobb Miles, Paula C. Bobb-Miles

for the Estate of Brandon K. Bobb, Ursula Ann Joshua, Brittany Marionique Joshua, Ashley Gudridge, Marion Crimens, Timothy W. Elledge, Christopher Levi, Brenda Habsieger, Michael Habsieger, Jacob Michael Habsieger, Kelli D. Hake, Denice York, Russel York, Jill Hake, Peter Hake, G.H., a minor, Zachary Hake, Keri Cotton, Skylar Hake, Kelli D. Hake for the Estate of Christopher M. Hake, Maria E. Calle, Cynthia Delgado, Cynthia Delgado for the Estate of George Delgado, Kim Miller, Michael J. Miller, Walter Bailey, Cassandra Bailey, Kacey Gilmore, Terrell Gilmore, Jr., Kynesha Dhanoolal, Merlese Pickett, Harry Cromity, Rachel M. Gillette, Rebekah A. Coldewe, Patricia Smith, Michael Smith, Jacqueline A. Smith, David Hartley, David Hartley for the Estate of Jeffery Hartley, Allen Swinton, Temika Swinton, T.S., a minor, T.S., a minor, T.B., a minor, Mary Jane Vandegrift, John Vandegrift, John Vandegrift for the Estate of Matthew R. Vandegrift, Pam Marion, Donnie Marion, Paula Menke, Daniel Menke, Matthew Menke, Nichole Lohring, Rosemarie Alfonso, K.B., a minor, Michelle Benavidez, Daniel Benavidez, Sr., Christina Biederman, Daniel Benavidez, Jr., Jennifer Morman, Michelle Benavidez for the Estate of Kennith W. Mayne, Christopher Miller, Angie Jackson, Trina Jackson, S.J., a minor, Gregory Bauer, Theresa Davis, Linda David, Michael David, Christopher David, Linda David for the Estate of Timothy A. David, Timothy Karcher, Kenneth J. Drevnick, Megan Marie Rice, R.N.R., a minor, Tonya Lotto, Jerry L. Myers, Jeffrey D. Price, Megan Marie Rice for the Estate of Zachary T. Myers, Cassie Smith, Debbie Smith, James Smith, Cory Smith, Christina Smith, George D. White, Natalia White, K.W., a minor, George J. White, Edna Luz Burgos, John McCully, Stephanie McCully, T.M., a minor, R.M., a minor, B.D., a minor, Theresa Hart, Wayne Newby, Veronica Hickman, David Eugene Hickman and Devon Fletcher Hickman by their attorneys, allege the following:

I. **NATURE OF THE ACTION**

1. Running a protracted terror campaign claiming the lives of at least hundreds of Americans while simultaneously trying to complete a clandestine Weapons of Mass Destruction program is an extremely expensive proposition requiring billions of U.S. dollars ("USD").

2. For the Islamic Republic of Iran ("Iran") this was especially true since Iran's domestic currency, the Rial, is one of the world's least valued currencies, and is essentially worthless for purposes of global trade and commerce.

3. During the last decade, therefore, Iran intensified its efforts to access the U.S. financial system while simultaneously evading U.S. sanctions intended to circumscribe its access.

4. Fortunately for Iran, despite ever intensifying efforts over the past decade by the

United States, European Union and United Nations to isolate it and restrict its capacity to fund terrorism and obtain Weapons of Mass Destruction, Iran had an assortment of Western financial institutions willing to substantially assist its sanctioned endeavors.

5.      This is a civil action under 18 U.S.C. § 2333(a) by American nationals and/or their families for treble damages against six Western international banks which knowingly conspired with Iran and its banking agents (including defendant Bank Saderat Plc, Bank Melli Iran, Bank Mellat, and Bank Sepah) to evade U.S. economic sanctions and disguise financial payments, which thus foreseeably enabled Iran and its agents to fund the U.S.-designated Foreign Terrorist Organization Hezbollah, the U.S.-designated Islamic Revolutionary Guard Corps ("IRGC"), and an IRGC subdivision known as the "Islamic Revolutionary Guard Corps-Qods Force" ("IRGC-QF"), their terrorist agents (including a litany of Iraqi Shi'a terror groups occasionally referred to herein collectively as "Special Groups"), and other terrorists who killed, injured, or maimed the Plaintiffs and/or their families in Iraq from 2004 to 2011.

6.      The named Defendants herein are HSBC Holdings Plc, HSBC Bank Plc, HSBC Bank Middle East Ltd., HSBC Bank USA, N.A. (occasionally referred to herein collectively as the "HSBC Defendants), Barclays Bank Plc ("Barclays"), Standard Chartered Bank, Royal Bank of Scotland N.V. (referred to herein as "ABN Amro (RBS N.V.)"), Credit Suisse AG ("Credit Suisse"), Bank Saderat Plc, Commerzbank AG ("Commerzbank"), and John Does 1-50.

7.      Each Defendant committed acts of international terrorism and violated 18 U.S.C. § 2339A and § 2339B when they conspired with Iran to evade U.S. sanctions against Iran knowing, or deliberately indifferent to the fact, that Iran would use some of the funds it laundered through the United States to finance the IRGC, IRGC-QF, and Hezbollah for the purpose of killing and maiming, *inter alia*, American citizens serving as part of the Coalition

Forces in Iraq during the years 2004 to 2011.

8.      The United States officially designated Iran as a State Sponsor of Terrorism on January 19, 1984, pursuant to § 6(j) of the Export Administration Act, § 40 of the Arms Export Control Act, and § 620A of the Foreign Assistance Act.

9.      The United States designated Hezbollah as a Foreign Terrorist Organization ("FTO") (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")) in and since 1997.

10.     In October 2007, the United States designated the IRGC-QF as a Specially Designated Global Terrorist ("SDGT") pursuant to Executive Order ("E.O.") 13324, explaining that:

> The Qods Force has had a long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701.
>
> *In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.* [Emphasis added.]

11.     In October 2007 Defendant Bank Saderat Plc, together with its parent company Bank Saderat Iran, was designated by the United States as an SDGT.

12.     As used in this Complaint, "the Conspiracy" refers to an illegal criminal agreement, beginning in 1987 and, on information and belief, continuing to the present, between Iran and its banking agents and various international financial institutions, including the Defendants in this action, by which Defendants knowingly participated in a criminal scheme in

which they agreed to alter, falsify, or omit information from payment messages that involved Iran or Iranian parties (including several Iranian banks (referred to herein collectively as "Iranian Bank Co-conspirators") such as Bank Melli and Bank Saderat, as well as the Islamic Republic of Iran Shipping Lines ("IRISL")) that serve as financial conduits for the IRGC.

13.     The aims and objectives of the Conspiracy, all of which were foreseeable to the Defendants, and which each Defendant knew or was deliberately indifferent to, included, among others:

a.     Concealing Iran's financial activities and transactions from detection, scrutiny, or monitoring by U.S. regulators, law enforcement, and/or depository institutions.

b.     Facilitating illicit transactions totaling at least $50 million USD for the benefit of Hezbollah;

c.     Facilitating illicit transactions totaling at least $100 million USD for the benefit of the IRGC and Defendant Bank Saderat Plc, and other U.S. Specially Designated Nationals ("SDNs") (such as, as alleged below, Iranian Bank Co-conspirators Bank Melli Iran, Bank Mellat, and Bank Sepah);

d.     Facilitating at least hundreds of illicit transactions on behalf of IRSIL totaling more than $60 million, including over 150 "stripped" transactions after IRISL was designated an SDN; and

e.     Enabling Iran, the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc), Hezbollah, and Special Groups to plan for, conspire to, and perpetrate acts of international terrorism under 18 U.S.C. § 2331(1); homicides, attempted homicides, or conspiracies to commit homicide under 18 U.S.C. § 2332(a)-(c); bombings using destructive devices under 18 U.S.C. § 2332a; bombings and attempted bombings under 18 U.S.C. § 2332f; engaging in terrorist activity under 8 U.S.C. § 1189(a)(3)(B)(iii)-(iv); and/or engaging in terrorism under 22 U.S.C. § 2656f.

14.     Although the Conspiracy was effectuated in a variety of ways, two primary techniques were used by Iran acting in concert with both Iranian Bank Co-conspirators, IRISL and the Defendants herein:

5

a.     The Defendants removed or altered the names, Bank Identifier Codes ("BICs"), and other identifying information of the Iranian Bank Co-conspirators or Iranian counter-parties in the payment messages sent through U.S. correspondent banks – a practice commonly known and referred to as "stripping" transactions;

b.     The Defendants converted ordinary transactions involving SWIFT "MT 103" payment messages (that would disclose the details of the counter-parties to the transactions) into bank-to-bank transfers known as SWIFT "MT 202" payment messages (that did not require the transmitting bank to include information disclosing the originator, beneficiary, and counter-parties), for the specific purpose of concealing the origin and destination of Iranian funds transfers.

15.     For example, a November 2008 U.S. diplomatic cable noted: "When processing the transactions for the IRGC and IRGC-QF, Bank Melli requested that its name be removed from financial transactions."

16.     Absent the criminal collusion and conspiratorial conduct of the Defendants named herein, Iran and its agents, including the IRGC, IRISL, and Banks Melli and Saderat could not have successfully hidden the volume of financial transactions that they succeeded in illegally clearing actions through the United States in USD.

17.     The connection between the IRGC, IRGC-QF and Bank Melli, their "deceptive banking practices" and the attacks that injured the Plaintiffs is further illustrated by a 2009 U.S. diplomatic cable which stated:

> *Iran's Islamic Revolutionary Guards Corps (IRGC) and IRGC-Qods Force, who channel funds to militant groups that target and kill Coalition and Iraqi forces and innocent Iraqi civilians, have used Bank Melli and other Iranian banks to move funds internationally.* Bank Melli used deceptive banking practices to obscure its involvement from the international banking system by requesting that its name be removed from financial transactions when handling financial transactions on behalf of the IRGC. [Emphasis added.]

18.     Iran's objectives were not secret. Its pursuit of Weapons of Mass Destruction was the subject of hundreds of news reports, U.S. government reports, and Congressional testimony,

as well as U.N. Security Council resolutions and European Union regulations.

19.     Iran's "deceptive banking practices" were not entirely secret either.

20.     Beginning in September, 2006, the U.S. Treasury and State departments launched a quiet campaign to warn 40 major international banks and financial institutions about the risks of conducting business with the Iranian government, particularly targeting financial transactions involving the IRGC.

21.     According to the March 26, 2007 edition of the *Washington Post*, Defendants Standard Chartered Bank, Commerzbank and the HSBC Defendants were among those briefed by U.S. government officials about the dangers posed (in terms of both proliferation and terror financing) in conducting business with Iran.

22.     On April 19, 2007, the Wolfsberg Group, an association of 12 global banks whose purported aim is to develop financial services industry standards, issued a statement "endorsing measures to enhance the transparency of international wire transfers to promote the effectiveness of global anti-money laundering and anti-terrorist financing programs. The measures include both the development of an enhanced payment message format, which would include more detailed information about those conducting wire transfers in certain instances, as well as calling for the global adoption of basic messaging principles aimed at promoting good practice with respect to the payment system." This statement was directed to the increasingly apparent risks inherent in MT 202 "cover payments" – one of the methods Defendants used to conceal their illegal USD transfers on behalf of Iran.

23.     Defendants ABN Amro (RBS N.V.), Barclays, Credit Suisse, and HSBC were all members of the Wolfsberg Group, and were listed on the press statement.

24.     Iran's efforts to kill and maim U.S. and British citizens in Iraq and to thwart U.S.

policy objectives in Iraq were also readily apparent and widely reported.

25.     In fact, Iran's role in funding "militant groups that target and kill Coalition and Iraqi forces and innocent Iraqi civilians" was a matter of public record. For example, on October 10, 2005, the British Broadcasting Company (BBC) reported that:

> An armour-piercing version of the bomb - blamed for the deaths of eight British soldiers this year - marks the latest advance in the insurgents' arsenal. *The UK has accused Iran of supplying the new weapon to militants in southern Iraq, via the Lebanese Hezbollah militia group,* although Tehran has denied this. [Emphasis added.]

26.     The BBC followed up with multiple reports in 2006 describing military briefings on Iranian material support to Shi'a groups targeting British and U.S. forces. For example, on June 23, 2006, the BBC reported:

> BBC world affairs correspondent, Paul Reynolds, says both the American and British military in Iraq have claimed for some time that Iran, or factions within the Iranian government, have been supporting Shias politically and militarily.
>
> For example, the British ambassador to Baghdad William Patey accused the Iranian Revolutionary Guard of helping to supply the technology which has been used in bomb attacks against British troops in the south.
>
> "Since January we have seen an upsurge in their support, particularly to the Shia extremist groups," Gen Casey said.
>
> "They are using surrogates to conduct terrorist operations both against us and against the Iraqi people.
>
> "We are quite confident that the Iranians, through the special operations forces, are providing weapons, IED [improvised explosive device] technology and training to Shia extremist groups in Iraq," he said.

27.     In another example, on September 26, 2008 CNN reported that U.S. officials claimed Iran had provided Shi'a militia in Iraq with "millions of dollars" and that:

> The official said that high-grade military explosives and specialized timers are among the "boutique military equipment" moving from Iran into Iraq. Some of the equipment is of the same type that Hezbollah, an Iranian-backed Shiite militia, used against Israeli forces in Lebanon during the summer, the official said. The

origin of the weapons was easy to discern because of Iranian markings on it, he said. Because Iran maintains tight control over armaments, he said, shipment of the weapons into Iraq had to involve "elements associated with the Iranian government."

28. Each of the Defendants knew about the existence of the Conspiracy, directly conspired with Iran through Defendant Bank Saderat Plc, Bank Melli, and others, to facilitate the Conspiracy, took affirmative, extensive and unlawful actions to facilitate the Conspiracy over long periods of time, and each was aware of the existence and participation of other co-conspirators, including other Defendants named herein.

29. Each of the Defendants knew that Iran was a U.S.-designated State Sponsor of Terrorism at the time they agreed to join and actively took part in the Conspiracy, each Defendant knew that Iran was clandestinely routing billions of dollars through the United States to hide its unlawful conduct, and each Defendant took affirmative steps to help Iran in its unlawful conduct.

30. Each of the Defendants also knew or was deliberately indifferent to the fact that Iran, as a U.S.-designated State Sponsor of Terrorism, would (and, in fact, did) channel hundreds of millions of the dollars that Defendants helped launder and conceal from U.S. regulators and law enforcement agencies to the IRGC and Hezbollah as part of the Conspiracy, and each of the Defendants also knew or was deliberately indifferent to the well-publicized fact that Iran and its terror proxies were killing and maiming American civilians and servicemen in Iraq, and that U.S. nationals would foreseeably be injured or killed as a result of the substantial assistance those dollars provided to the IRGC and Hezbollah.

31. Each of the Defendants also knew or was deliberately indifferent to the foreseeable (and almost inevitable) consequences of providing Iran, a State Sponsor of Terrorism, with access to hundreds of *billions* of dollars of concealed payments and the resulting

funding of Iranian controlled organizations and terrorism proxies who targeted American civilians and servicemen through acts of international terrorism in Iraq from 2004 to 2011.

32. Without the active participation of the Defendants in the Conspiracy, Iran could not have transferred the same volume of USD to the IRGC and Hezbollah, nor could it have done so with the same ease and efficiency.

33. The transfers of hundreds of millions of dollars by Iran to the IRGC and Hezbollah was within the scope of the Conspiracy and in furtherance of the Conspiracy; and the provision of material support to the IRGC and Hezbollah was the natural and reasonably foreseeable consequence of the Defendants' unlawful agreement to help Iran launder money through the United States.

34. As set forth below, the HSBC Defendants, Commerzbank, Standard Chartered Bank, Barclays, and Credit Suisse altered, falsified, or omitted information from payment messages that they facilitated on behalf of Bank Saderat knowing, or deliberately indifferent to the fact that Bank Saderat was an SDGT that provided material support to Iran's terrorist activities, and, in the case of the HSBC Defendants, knew there was direct evidence of Bank Saderat "funding of Hezbollah."

35. As set forth below, the HSBC Defendants, and Defendants Standard Chartered Bank, ABN Amro (RBS N.V.), and Commerzbank facilitated numerous payments totaling more than $60 million on behalf of IRISL knowing, or deliberately indifferent to the fact that IRISL was designated an SDN by the United States for (as stated in the U.S. Treasury Department's September 10, 2008 press release announcing IRISL's designation) "facilitating shipments of military cargo destined for the (Iranian) Ministry of Defense and Armed Forces Logistics (MODAFL)," which could be used for terrorist attacks on Coalition forces, including American

nationals.

36.     IRISL *did*, in fact, facilitate shipments of military cargo to Hezbollah, one of the organizations responsible for acts of international terrorism that killed and injured American citizens in Iraq, including the Plaintiffs.

37.     As alleged below, Defendant Standard Chartered Bank, altered, falsified, or omitted information from payment messages (worth billions of dollars) that it facilitated on behalf of the National Iranian Oil Company, an agent of the IRGC, knowing, or deliberately indifferent to the risk involved in rendering those payments without any transparency to U.S. regulators and law enforcement and thereby directly providing the IRGC with access to billions of USD that it could move – undetected – through the global financial system.

38.     Furthermore, as alleged below, Defendants HSBC Bank USA, N.A., Barclays, Standard Chartered Bank, ABN Amro (RBS N.V.), and Commerzbank committed acts of international terrorism in violation of 18 U.S.C. § 2332d.

39.     Defendant HSBC Bank USA, N.A. is a U.S. person that knowingly conducted financial transactions with Iran in the United States in violation of 18 U.S.C. § 2332d and it was reasonably foreseeable that Iran would provide material support to acts of international terrorism that killed and injured American citizens in Iraq.

40.     Plaintiffs further allege that the U.S. branches of Defendants Barclays, Standard Chartered Bank, ABN Amro (RBS N.V.), and Commerzbank are U.S. persons that knowingly conducted financial transactions with Iran in the United States in violation of 18 U.S.C. § 2332d and it was reasonably foreseeable that Iran would provide material support to acts of international terrorism that killed and injured American citizens in Iraq.

41.     Each of the Plaintiffs was injured as a result of an act of international terrorism

for which Iran and its state-controlled organizations and terrorism proxies, including Hezbollah, were responsible.

## II.    <u>JURISDICTION AND VENUE</u>

42.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2333(a) as a civil action brought by citizens of the United States and/or their estates, survivors, or heirs, who have been injured by reason of acts of international terrorism.

43.     Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. §§ 1391(b) and 1391(d).

44.     Defendants are subject to personal jurisdiction in the United States pursuant to 18 U.S.C. § 2334(a), CPLR § 302, and Fed. R. Civ. P. 4(k)(1)-(2). Defendant HSBC Bank USA, N.A. is also subject to personal jurisdiction under CPLR § 301. Defendants' unlawful conduct was purposefully directed at the United States, and the Conspiracy was specifically designed to effectuate the flow of billions of USD through the United States in violation of U.S. laws, and in fact resulted in hundreds of billions of dollars illegally passing through the United States.

## III.    <u>THE DEFENDANTS</u>

### A.    <u>THE HSBC DEFENDANTS</u>

45.     Defendant HSBC Holdings Plc ("HSBC Holdings") is a public limited company organized under the laws of the United Kingdom. HSBC Holdings directly or indirectly owns, *inter alia*, Defendants HSBC Bank Plc, Defendant HSBC Bank Middle East Limited, and Defendant HSBC Bank USA, N.A. (as noted above, referred to herein collectively as the "HSBC Defendants"). HSBC Holdings is occasionally referred to internally (and in this Complaint) as

"HSBC Group," or "The Group," and members and affiliates of HSBC Holdings (including the named HSBC Defendants herein) are occasionally referred to herein as "HSBC Group members."

46.     Defendant HSBC Holdings constitutes the ultimate parent company of one of the world's largest banking and financial services groups with approximately 6,300 offices in over 75 countries and territories.

47.     HSBC Group members comprise financial institutions throughout the world that are owned by various intermediate holding companies, and ultimately, but indirectly, by Defendant HSBC Holdings, which, as alleged above, is incorporated and headquartered in England.

48.     Defendant HSBC Bank Plc ("HSBC-Europe," often referred to internally at HSBC Group as "HBEU"), is a financial institution registered under the laws of England and Wales.

49.     Defendant HSBC Bank Middle East Limited ("HSBC-Middle East" often referred to internally by members of HSBC Group as "HBME"), is a financial institution registered under the laws of the Jersey Channel Islands.

50.     Defendant HSBC Bank USA, N.A. ("HSBC-US," often referred to internally by members of HSBC Group as "HBUS"), is a national bank chartered under the National Bank Act (12 U.S.C. § 2 *et seq.*) that constitutes a "U.S. person" under the definitions set forth in 31 C.F.R. Part 560.314 of the Iranian Transactions Regulations (the "ITR") and 18 U.S.C. § 2332d(b)(2) of the Anti-Terrorism Act.

51.     According to the fact sheets published on HSBC-US's official website, HSBC-US's headquarters are in McLean, VA, and it has its principal office in New York City.

52.     HSBC-US operates more than 240 bank branches throughout the United States, with offices and branches in New York, California, Connecticut, Delaware, Washington, D.C., Florida, Maryland, New Jersey, Oregon, Pennsylvania, Virginia, and Washington State.

53.     HSBC-US is the principal subsidiary of HSBC USA Inc., which is, in turn, an indirect, wholly-owned subsidiary of HSBC North America Holdings, Inc. ("HNAH"). HNAH's businesses serve customers in retail banking and wealth management, commercial banking, private banking, and global banking and markets.

**B.     DEFENDANT BARCLAYS BANK PLC**

54.     Defendant Barclays Bank Plc ("Barclays") is a global financial services provider headquartered in London, United Kingdom. Defendant is a wholly-owned subsidiary of Barclays Plc, a public limited liability company organized under the laws of England and Wales. As used in this Complaint, "Barclays" refers to Barclays Bank Plc, the wholly-owned subsidiary of Barclays Plc, not Barclays Plc, Defendant Barclays Bank Plc's parent company.

55.     Barclays is one of the largest banks in the world. Barclays' home country regulator is the United Kingdom's Financial Services Authority ("FSA").

56.     At all relevant times, Barclays maintained a New York branch that functioned as the primary U.S. dollar ("USD") clearer for all of Barclays, its affiliates, and its customers. The branch thus constitutes a "U.S. person" under the definitions set forth in § 560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

**C.     DEFENDANT STANDARD CHARTERED BANK**

57.     Defendant Standard Chartered Bank ("SCB") is one of the world's largest international banks, with over 1,700 branches, offices, and outlets in more than 70 countries. Headquartered in London, SCB operates principally in Asia, Africa, and the Middle East, and

has operations in consumer, corporate and institutional banking, and treasury services.

58. Since 1976, SCB has had a license issued by the state of New York to operate as a foreign bank branch in New York, New York ("SCB-NY"). The branch provides wholesale banking services, primarily U.S.-dollar clearing for international wire payments. SCB-NY is the seventh largest dollar clearer in the world, clearing approximately 195 billion USD per day. SCB-NY also constitutes a "U.S. person" under the definitions set forth in § 560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

**D.    DEFENDANT ROYAL BANK OF SCOTLAND N.V. ("ABN Amro (RBS N.V.)")**

59. In October 2007, a consortium consisting of Fortis, the Royal Bank of Scotland Group ("RBS"), and Banco Santander acquired ABN Amro Holding N.V., the parent company of ABN Amro Bank N.V., using the acquisition vehicle RFS Holdings.

60. The former ABN Amro Bank N.V. subsequently underwent a restructuring process to transfer its Dutch State-acquired businesses and activities out of the existing ABN Amro Group. To do so, the relevant Dutch State-acquired businesses were first transferred to a new legal entity owned by ABN Amro Holding N.V.

61. On February 5, 2010, through a statutory demerger process, the former ABN Amro Bank N.V. was renamed RBS N.V.

62. Ultimately, RBS acquired ABN Amro Holding N.V. As such, RBS acquired the New York and Chicago branches of ABN Amro Bank N.V. and began integrating certain business lines handled by these branches into its other U.S. operations. These former branches constitute a "U.S. person" under the definitions set forth in §560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

63.     In this Complaint "ABN Amro (RBS N.V.)" refers to the named Defendant herein.

### E.     DEFENDANT CREDIT SUISSE AG

64.     Defendant Credit Suisse AG ("Credit Suisse") is a financial services company headquartered in Zurich, Switzerland. Its U.S. headquarters is located at 11 Madison Avenue, New York, New York.

65.     Credit Suisse serves clients worldwide through its Private Banking unit, which includes a Wealth Management and Corporate & Institutional Clients unit, an Investment Banking unit, and an Asset Management unit.

66.     Credit Suisse's New York branch is subject to oversight and regulation by the Board of Governors of the U.S. Federal Reserve System and the New York State Banking Department. The branch thus constitutes a "U.S. person" under the Iranian Transaction Regulations and § 2332d(b)(2).

### F.     DEFENDANT BANK SADERAT PLC

67.     Bank Saderat Iran is one of the largest banks in Iran. It has approximately 3,400 offices worldwide, including, as discussed below, a United Kingdom subsidiary (Defendant Bank Saderat Plc) and branches in Frankfurt, Paris, Athens, Dubai and Beirut.

68.     Bank Saderat Iran was nationalized after the Iranian Revolution, but allegedly privatized in 2009. According to Bank Saderat Iran, 49% of its shares are owned by the Iranian government, but it is technically a non-governmental entity.

69.     In 2002, Bank Saderat Iran's London bank branch became a subsidiary, incorporated under United Kingdom law, i.e. Defendant Bank Saderat Plc.

70.     Defendant Bank Saderat Plc maintains its principal office in London, United

Kingdom.

G.      **DEFENDANT COMMERZBANK AG**

71.     Defendant Commerzbank AG ("Commerzbank") is a financial services company headquartered in Frankfurt, Germany, and has over 1,200 branches in Germany alone.

72.     Commerzbank maintains 23 foreign branches, including a New York branch licensed by the State of New York since 1967.

73.     The New York branch of Commerzbank constitutes a "U.S. person" under the Iranian Transaction Regulations and § 2332d(b)(2).

74.     Commerzbank is listed on exchanges in Germany, London, and Switzerland.

75.     Defendants Barclays, SCB, ABN Amro (RBS N.V.), Credit Suisse Commerzbank, and the HSBC Defendants are sometimes referred to herein collectively as "the Western Bank Defendants."

IV.     **FACTUAL ALLEGATIONS**

A.      **IRAN'S LONG HISTORY OF SUPPORTING AND FINANCING TERRORISM**

76.     Since the Iranian Revolution in 1979, Iran has been a principal source of extremism and terrorism throughout the Middle East and the rest of the world, responsible for bombings, kidnappings and assassinations across the globe.

77.     As noted above, the United States designated Iran a State Sponsor of Terrorism on January 19, 1984. That designation has remained in force throughout the relevant time period to this Action.

78.     Since its 1984 designation, the United States has attempted to constrain and deter Iran's sponsorship and conduct of terrorist activities, as well as its development of Weapons of

Mass Destruction, by imposing a wide variety of trade and economic sanctions intended to reduce the flow of financial resources, especially U.S. dollars, for Iran's support of such activities.

**B.**     **U.S. SANCTIONS AND IRAN'S RELIANCE ON U.S. DOLLARS**

79.     On June 25, 1996, a truck bomb decimated a building at the Khobar Towers complex in Saudi Arabia that was used to house American military personnel, killing 19 Americans and wounding another 372 people. It was soon established that the operatives responsible for the bombing were trained and equipped by the IRGC.

80.     Soon thereafter, Congress responded by passing the 1996 Iran-Libya Sanctions Act, finding that:

> (1) The efforts of the Government of Iran to acquire weapons of mass destruction and the means to deliver them *and its support of acts of international terrorism* endanger the national security and foreign policy interests of the United States and those countries with which the United States shares common strategic and foreign policy objectives.

> (2) The objective of preventing the proliferation of weapons of mass destruction and *acts of international terrorism* through existing multilateral and bilateral initiatives *requires additional efforts to deny Iran the financial means* to sustain its nuclear, chemical, biological, and missile weapons programs. [Emphasis added.]

81.     To ensure that U.S. financial institutions that process international wire transfers do not assist Iran it its support of international terrorism and weapons proliferation or facilitate other prohibited transactions, U.S. financial institutions have been (and are) required to use sophisticated computer systems to monitor and screen all wire transfer activities. Banks in New York that process most of the world's USD payments depend on these automated systems to prevent Iran and other sanctioned entities (as well as terrorists, money launderers, and other criminals) from gaining access to the United States banking system. In this way, financial

institutions are supposed to be the first line of defense to prevent Iran from accessing the U.S. financial system to fund or otherwise engage in terrorism and other prohibited conduct.

82.     At the same time, because on average, 60 percent of Iranian government revenues and 90 percent of export revenues originate from oil and gas resources, a market largely denominated in USD (known as "petrodollars"[1]), and because Iran's currency, the Rial, has (in part due to U.S. sanctions) remained one of the world's least valued currencies, the Iranian regime has been desperately dependent on access to U.S. Dollars.

83.     Thus, reliably consistent access to, and the ability to facilitate trade in, USD has been critical to the capacity of the Iranian regime to fund its terror proxies such as Hezbollah in Lebanon and to fuel its other terrorism and weapons proliferation activities through the IRGC.

84.     The importance of funding Hezbollah, the IRGC and later, Kata'ib Hezbollah and other Special Groups became even more acute for Iran after the 2003 U.S. invasion of Iraq. After that event, Iran directed Hezbollah to create "Unit 3800" (discussed below) and began devoting more and more financial resources to gain influence in Iraq, inflict casualties on American citizens in Iraq, and intensify its quest for Weapons of Mass Destruction.

85.     *None* of these goals could be accomplished without U.S. currency, access to the international financial system, and the agreement of Western financial institutions, such as the Western Bank Defendants, willing to shield Iran's unlawful activities from detection.

C.     **THE U-TURN EXEMPTION AND ITS REVOCATION**

86.     Alongside sanctions, the United States government designed an exemption to permit Iran circumscribed access to U.S. dollars through a narrowly tailored exemption to the Iran Trade Regulations known as the "U-Turn exemption" (Section 560.516 of the Iranian Trade

---

[1]     Because the United States was the largest producer and consumer of oil in the world, the world oil market had been priced in USD since the end of World War II.

Regulations), while insisting on careful monitoring of all Iranian transactions to both deter and detect terror financing and weapons proliferation activities. The purpose of the U-Turn exemption was to provide Iranian parties indirect access to USD transactions *provided* they were fully disclosed and not earmarked for terrorist or other proscribed purposes.

87.     Until November 2008, U.S. financial institutions were authorized to process certain funds transfers (under the U-Turn exemption) for the direct or indirect benefit of Iranian banks, other persons in Iran or the Government of Iran, *provided* such payments were initiated offshore by a *non-Iranian*, non-U.S. financial institution and only passed through the U.S. financial system *en route* to another offshore, *non-Iranian*, non-U.S. financial institution – provided none of the parties to the transactions had been designated an SDN, or that the transaction was for an SDN's benefit.

88.     The U-Turn exemption was therefore conditioned on transparency to permit careful monitoring of all Iranian transactions to both deter and detect terror financing and weapons proliferation activities. Because so much of Iran's international trade has historically flowed through the United States in USD, and because Iran's primary terrorist proxy, Hezbollah, operates in Lebanon (itself a dollarized economy, largely dependent on U.S. currency), maintaining transparency in the processing of Iranian USD transactions has been a vital part of the architecture of U.S. national security for decades and was reflected in the Iranian Trade Regulations.

89.     Iran's access – through the U-Turn exemption – was intended to be closely monitored, including filtering all U-Turn exemption transactions through the sophisticated computer systems used by U.S. financial institutions to monitor and screen all wire transfers.

90.     The Western Bank Defendants, however, knowingly and intentionally agreed to, and did manipulate, tens of thousands of financial transactions and the records of such transactions to defeat such monitoring and screening, and prevent transparency, in order to provide funds to Iran for unlawful uses, including the support of terrorism and terrorist organizations.

91.     Over time, however, U.S. authorities began to understand the contours of the Conspiracy set forth in this Complaint.

92.     Initially, the realization that Iran was engaging in "deceptive banking practices" led the U.S. to target key Iranian financial institutions, entities, and individuals under proliferation, terrorism, and Iraq-related authorities, i.e., E.O. 13382, E.O. 13224, and E.O. 13438, respectively.

93.     The apparent assumption made initially by U.S. authorities was that Iran and its banking agents (Iranian Bank Co-conspirators Bank Sepah, Bank Melli, Bank Saderat and others) were engaged in deception that was exploiting unwitting Western financial institutions who were engaged in high risk but legal business with Iran.

94.     The truth was otherwise. In fact, despite Iran's feeble economy during the entire relevant period of time, its oil exports still provided the regime with revenues in USD through, among others the National Iranian Oil Company ("NIOC", which was later designated an SDN pursuant to E.O. 13382 and identified as an agent or affiliate of the IRGC) and the Central Bank of Iran.

95.     The challenge Iran faced was that it was almost entirely dependent on USD but U.S. sanctions and the attendant monitoring of Iran's financial activities were incompatible with its terror financing and Weapons of Mass Destruction proliferation goals.

96.     Moreover, during the time period between 2004 and 2011, both Lebanon (where Iran's agent, Hezbollah is based) and Iraq (where Iran's proxies were launching terror attacks) were USD dollarized economies and funding Iran's terror proxies was a highly "dollar-sensitive" endeavor.

97.     To free itself from U.S. sanctions and the attendant monitoring of its financial activities, Iran needed more than willing partners among Western financial institutions to assist its illegal goals.

98.     Instead, Iran needed the active assistance of at least *several* of the world's *largest* (non-U.S.) banks that were already accustomed to large volumes of dollar clearing and thus would be less likely to raise suspicions.

99.     In early 2001, for example, the Central Bank of Iran asked Defendant SCB to act as its correspondent bank with respect to U.S.-dollar payments on behalf of NIOC. As set forth in the Complaint, SCB agreed to participate in the Conspiracy and deliberately removed identifying data on SWIFT messages for these and other wire transfers.

100.     The sheer size and volume of these transactions would have raised numerous red flags if not undertaken by a bank of SCB's size and existing USD clearing activity.

101.     Even a large international bank worries about attracting attention when their illegal dollar clearing activities for Iran markedly increased. For example, as detailed below, in 2003 Defendant Commerzbank's employees expressed concern that Commerzbank's increased volume of illegal dollar clearing activities on behalf of Bank Melli and Bank Saderat would draw unwanted attention.

102.    In the spring of 2006, the Manhattan District Attorney's Office first discovered evidence of the Conspiracy engaged in by certain European banks (including the Western Bank Defendants herein) on behalf of Iran and Iranian banks.

103.    As the New York State Department of Financial Services later observed:

> By 2008 it was clear that this system of wire transfer checks had been abused, and that U.S. foreign policy and national security could be compromised by permitting U-Turns to continue. In November 2008, the U.S. Treasury Department revoked authorization for "U-Turn" transactions because it suspected Iran of using its banks – including the CBI/Markazi, Bank Saderat and Bank Melli – to finance its nuclear weapons and missile programs. *The U.S. also suspected that Iran was using its banks to finance terrorist groups, including Hezbollah, Hamas and the Palestinian Islamic Jihad, and engaging in deceptive conduct to hide its involvement in various other prohibited transactions, such as assisting OFAC-sanctioned weapons dealers.* [Emphasis added].

104.    These findings led to a wide-ranging investigation that ultimately resulted in the entry of a series of Deferred Prosecution Agreements with the Western Bank Defendants (as well as other European and Japanese banks) and it exposed the vulnerability of America's terror financing security architecture inherent in the U-Turn exemption because foreign banks, including the Western Bank Defendants herein, were conspiring with Iran to help it evade U.S. sanctions and secret hundreds of billions of dollars through the U.S. financial system undetected.

105.    On October 11, 2007, the Financial Action Task Force ("FATF") released a statement of concern that "Iran's lack of a comprehensive anti-money laundering/counter-terrorist finance regime represents a significant vulnerability within the international financial system."

106.    FATF's October 11, 2007 statement further noted that "FATF members are advising their financial institutions to take the risk arising from the deficiencies in Iran's AML/CFT regime into account for enhanced due diligence."

107.    The U.S. criminal investigations would ultimately find that "the risk arising from the deficiencies in Iran's AML/CFT regime" ultimately included willful money laundering and terror financing by Iran with the *active*, **critical** assistance of the Defendants herein.

108.    Based on figures from the International Monetary Fund and the Central Bank of Iran, from 2004 through 2011 Iran's total revenues from oil and natural gas sales totaled approximately $972.9 Billion.

109.    Without the Conspiracy between the Defendants herein and other foreign financial institutions, Iran could not have transferred the volume of USD it did for the benefit of Hezbollah and the IRGC through the international financial system, nor could it have exploited the U-Turn exemption to blind U.S. regulators and law enforcement to the degree and for the duration that it did.

110.    As former Manhattan District Attorney Robert M. Morgenthau told Congress in 2009, his office came to believe that "the U-Turn exemption constituted a glaring hole that undermined both the enforcement of, and the rationale behind, the Iranian sanctions program."

111.    Effective November 10, 2008, OFAC revoked the U-Turn exemption in its entirety. As of that date, U.S. depository institutions were no longer authorized to process any Iranian U-Turn payments.

112.    In revoking the U-Turn exemption, the U.S. government explained:

> Iran's access to the international financial system enables the Iranian regime to facilitate its support for terrorism and proliferation. The Iranian regime disguises its involvement in these illicit activities through the use of a wide array of deceptive techniques, specifically designed to avoid suspicion and evade detection by responsible financial institutions and companies. Iran also is finding ways to adapt to existing sanctions, including by turning to non-designated Iranian banks to handle illicit transactions.

The Treasury Department is taking a range of measures, including today's action, to counter these deceptive activities.

**D.** **IRAN'S ILLEGAL ARMS SHIPMENTS THROUGH ISLAMIC REPUBLIC OF IRAN SHIPPING LINES (IRISL)**

113. IRISL is Iran's national maritime carrier; a global operator with a worldwide network of subsidiaries, branch offices and agent relationships. It provides a variety of maritime transport services, including bulk, break-bulk, cargo and containerized shipping.

114. It has a long history of facilitating arms shipments on behalf of the IRGC and the Iranian military, including copper discs that are the key component in Explosively Formed Penetrators ("EFPs") (discussed below) used to kill and maim many of the Plaintiffs herein. [2]

115. For example, a November 2007 State Department cable noted: "Washington remains concerned about on-going conventional arms transfers from China to Iran, particularly given Iran's clear policy of providing arms and other support to Iraqi insurgents and terrorist groups like the Taliban and Hezbollah…. We have specific information that Chinese weapons and components for weapons transferred to Iran are being used against U.S. and Coalition Forces in Iraq, which is a grave U.S. concern."

116. The cable went on to note that an IRISL flagged vessel in China was loaded with containers of cargo, including cartridges, for Iran's Defense Industries Organization ("DIO") for delivery to Bandar Abbas, Iran.

117. An April 2008 State Department cable warned of an IRISL shipment of chemical weapons precursors from China aboard the IRISL-flagged M/V Iran *Teyfouri*.

118. In September 2008, the U.S. Treasury Department designated IRISL an SDN stating: "Not only does IRISL facilitate the transport of cargo for U.N. designated proliferators, it

---

[2] "IED" is an acronym for "improvised explosive device" – a term used here and elsewhere as short-hand to connote a roadside bomb. In fact, the EFPs deployed by the IRGC and Hezbollah in Iraq were not "improvised" but professionally manufactured and specifically designed to target U.S. and coalition forces' armor.

also falsifies documents and uses deceptive schemes to shroud its involvement in illicit commerce."

119.    The Treasury Department further noted that "[i]n order to ensure the successful delivery of military-related goods, IRISL has deliberately misled maritime authorities through the use of deception techniques. These techniques were adopted to conceal the true nature of shipments ultimately destined for MODAFL [Iran's Ministry of Defense and Armed Forces Logistics]."

120.    In January 2009 a former Russian merchant ship, the *Monchegorsk*, flying a Cypriot flag, was originally spotted leaving an Iranian port, and heading for the Suez canal. Egyptian authorities were alerted and the *Monchegorsk* was forced into an Egyptian port to be searched. Munitions, believed headed for Gaza, were found hidden in the cargo, including components for mortars and thousands of cases of powder, propellant, and shell casings for 125mm and 130mm guns.

121.    In October 2009, U.S. troops boarded a German-owned freighter, the *Hansa India* in the Gulf of Suez and found eight containers full of ammunition, headed to Syria from Iran.

122.    The vessel carried seven containers of small arms ammunition, as well as one container containing copper discs of the type used in EFPs to kill and maim many of the Plaintiffs herein..

123.    The *Hansa India* was registered to the Hamburg-based shipping company Leonhardt & Blumberg, but had been under charter to IRISL for several years.

124.    In November 2009, the Government of Israel intercepted an IRISL-flagged ship, the M/V *Francop* headed for Beirut, then Latakia, Syria with munitions crates stamped "IRISL" or including documentation marked with the IRGC-QF logo. The munitions included over two

thousand 107mm "Katyusha" rockets, more than six hundred 122mm "Grad 20" rockets, various rocket fuses, mortar shells, rifle cartridges, fragment grenades and 7.62mm bullets.

125. The *Francop*, owned by the Cypriot shipping company UFS, was carrying containers clearly marked IRISL.

126. United Nations Security Council Resolution 1929, adopted on June 9, 2010 froze certain assets of IRISL and it called on the international community to refuse financial and insurance services to both the IRGC and IRISL.

E. **IRAN'S AGENTS HEZBOLLAH AND IRGC FOMENT TERRORISM IN IRAQ**

127. As previously noted, Iran has had a long, deep, strategic partnership with the Lebanese-based Foreign Terrorist Organization Hezbollah, which historically has served as Iran's proxy and agent, enabling Iran to project extremist violence and terror throughout the Middle East and around the globe.

128. Through its proxy, agent, and strategic partner, Hezbollah, Iran: orchestrated a series of kidnappings of Westerners in Lebanon, including several Americans, in the 1980s; killed more than two hundred U.S. Marines at their barracks in Beirut, Lebanon, in 1983; hijacked TWA flight 847 in 1985; and launched two major 1990s attacks on Jewish targets in Argentina – the 1992 bombing of the Israeli Embassy (killing twenty-nine) and the 1994 bombing of a Jewish community center (killing eighty five).

129. As a result of its mission, conduct, and terrorist activities, on January 25, 1995 Hezbollah was designated a Specially Designated Terrorist (SDT) by the United States.

130. On October 8, 1997, Hezbollah was designated an FTO by the United States. It has retained that designation ever since.

131. On October 31, 2001, pursuant to E.O. 13224, Hezbollah was designated an

SDGT by the United States.

132.     For more than 30 years, Iran, through the IRGC, has funded, trained and equipped Hezbollah.

133.     The IRGC-QF's "Department 2000" manages Iran's relationship with Hezbollah, which includes the flow of some of Iran's most sophisticated weapon systems, including military grade EFPs, anti-tank guided missiles ("ATGMs"), and various rockets, such as the Fajr-5.

134.     Beginning with the 2003 U.S. overthrow of Saddam Hussein's regime in Iraq, Iran has assiduously worked to expand its influence in Iraq and throughout the region in a variety of ways, including fomenting violence and terrorism when such activities have served its ambitions.

135.     In doing so, it has relied on both Hezbollah and the IRGC.

136.     According to a December 20, 2004 *Washington Post* article, "Western diplomats and political analysts in Beirut estimated that Hezbollah received $200 million a year from Iran."

137.     As the U.S. government noted when it designated Defendant Bank Saderat Plc, Iran has provided tens of millions of U.S. dollars in funding to Hezbollah through the international financial system, including $50 million that Defendant Bank Saderat Plc provided to Hezbollah.

138.     Sometime after the 2003 U.S. invasion of Iraq, Hezbollah created "Unit 3800," an entity dedicated to supporting Iraqi Shi'a terrorist groups targeting Multi National Forces in Iraq ("MNF-I").

139.     Unit 3800 was established by Hezbollah leader Hassan Nasrallah at Iran's request.

140.     Unit 3800 has trained and advised various Shi'a militias in Iraq, later termed "Special Groups."

141.    Hezbollah training camps in southern Lebanon and Iran, and Hezbollah's expertise in the use of EFPs, kidnapping, communications and small-unit operations, were critical to the IRGC's operations in Iraq between 2004 and 2011.

142.    Iran's support of terrorist groups in Iraq was described in the 2005 U.S. State Department's Country Reports on Terrorism, which observed: "Iran has provided political and ideological support for several terrorist and militant groups active in Iraq. Attractive to terrorists in part because of the limited presence of the United States and other Western governments there, Iran is also a safe haven in that known terrorists, extremists, and sympathizers are able to transit its territory and cross the long and porous border into Iraq. Iran also equips terrorists with technology and provides training in extremist ideology and militant techniques."

143.    The IRGC's subversion of Iraq has not been limited to terrorism. The IRGC has also infiltrated Iraqi society, providing "political and ideological support" via charitable associations such as Khomeini Social Help Committee – in Karbala, Najaf, Kut, and Sadr City and the Imam Mohammad Bagher Institute in Najaf.

144.    The IRGC also purchased or developed 7 television stations in Iraq and at least 3 radio stations.

145.    All of these "investments" required substantial funding in USD (as Iraqi local currency was not widely accepted in Iraq during this time period).

146.    According to the same U.S. State Department's 2005 Country Reports on Terrorism: "[t]he IRGC was increasingly involved in supplying lethal assistance to Iraqi militant groups, which destabilizes Iraq …Senior Iraqi officials have publicly expressed concern over Iranian interference in Iraq, and there were reports that Iran provided funding, safe passage, and arms to insurgent elements."

147.    By early 2005, the presence of Hezbollah operatives in Iraq became an open secret when Iraqi interior minister Falah al-Naqib announced the arrest of eighteen Lebanese Hezbollah members on terrorism charges.

148.    Two years later, according to U.S. intelligence estimates, following the 2007 arrest of Hezbollah's senior operative in Iraq, the IRGC-QF provided Hezbollah and one of its local trainers, Ali Musa Daqduq (who is discussed in greater detail below), up to $3 million in U.S. currency every *month*.

149.    In October 2007, the IRGC-QF was designated as an SDGT pursuant to E.O. 13324 for its terrorism-related activities. The U.S. Treasury Department's press release announcing the designation noted that:

> The Qods Force has had a long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701.
>
> *In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.* [Emphasis added.]

150.    In 2008, Pentagon Press Secretary Geoff Morrell reported on the "smuggling system -- in which the Iranians are providing their allies within Iraq, these special groups, with the munitions that are then used to take on us, whether it be EFPs or rockets or conventional arms. These are being used by these special groups and being provided by the Iranians."

151.    According to a 2010 report by the Combatting Terrorism Center at West Point, Iran pays Iraqi "insurgent" groups "between $4,000 and $13,000 per rocket or roadside bomb,

depending on the circumstances."

152.    Because of the perceived unreliability and value of the post-Hussein regime Iraqi currency, Special Groups in Iraq (like most people in Iraq) used U.S. currency almost exclusively.

153.    According to Brigadier Gen. Kevin J. Bergner, a U.S. military spokesman, "the Qods Force has provided armor-piercing weapons to extremist groups in Iraq, funneling them up to $3 million a month and training Iraqi militiamen at three camps near Tehran."

154.    General Bergner added, "[t]he Iranian Qods Force is using Lebanese Hezbollah essentially as a proxy, as a surrogate in Iraq ... Our intelligence reveals that senior leadership in Iran is aware of this activity."

155.    On January 9, 2008, the U.S. Treasury Department designated four individuals and one entity under E.O. 13438 for threatening the peace and stability of Iraq and the government of Iraq. Three of the individuals, Ahmed Foruzandeh (a Brigadier General in the IRGC-QF), Abu Mustafa Al-Sheibani, and Isma'il Hafiz Al Lami (a/k/a "Abu Dura") were all based in Iran and/or received funding from Iran.

156.    Regarding Abu Mustafa Al-Sheibani, the Treasury Department press release stated:

> Iran-based Abu Mustafa Al-Sheibani leads a network of Shia extremists that commit and provide logistical and material support for acts of violence that threaten the peace and stability of Iraq and the Government of Iraq. Al-Sheibani's Iran-sponsored network was created to affect the Iraqi political process in Iran's favor. The network's first objective is to fight U.S. forces, attacking convoys and killing soldiers. Its second objective is to eliminate Iraqi politicians opposed to Iran's influence. *Elements of the IRGC were also sending funds and weapons to Al-Sheibani's network.*

> Al-Sheibani's network – consisting of several hundred members – conducted IED attacks against Americans in the Baghdad region. As of

March 2007, Al-Sheibani, known to transport Katyusha rockets to be used for attacks against Coalition Forces, launched rockets against Americans and made videos of the attacks to get money from Iran. *As of April 2007, a member of Al-Sheibani's network supervised the transport of money and explosives from Iran for eventual arrival in Baghdad.* In early-May 2007, Al-Sheibani's network assisted members of a Shia militia group by transporting them to Iran for training and providing them with weapons for their activities in Iraq.

Additionally, Al-Sheibani commands several pro-Iranian insurgent groups in southern Iraq that work to destabilize Iraq and sabotage Coalition efforts. These groups use a variety of weapons, to include mortars, Katyusha rockets, and anti-tank landmines. *Ordered by IRGC headquarters to create disorder, the task of these groups is to attack bases of Coalition Forces in southern Iraq, particularly British forces.* [Emphasis added.]

157.     To that end, Iran (with Hezbollah's aid) has armed, trained, and funded a variety of Special Groups and infiltrated and co-opted Iraqi security forces in an effort to kill or maim Coalition forces to coerce the United States into withdrawing them and terrorize its civilian population in order to increase Iran's own influence.

158.     Iran's DIO (designated as an SDN by the U.S. on March 30, 2007) was listed as an entity of concern for military procurement activities in an early warning document distributed by the German government to industry in July 2005.

159.     The DIO was also designated by the United Nations.

160.     Weapons caches seized from Special Groups in Iraq included large quantities of weapons produced by Iran in 2006 and 2007, including many 107 mm artillery rockets with closely clustered DIO lot numbers and production dates between 2005 and 2007, as well as rounds and fuses for 60 mm and 81 mm mortars with DIO lot markings and 2006 production dates.

161.     According to the U.S. State Department, the DIO used Bank Melli in Hamburg to receive payments and to transfer funds.

162.     Bank Melli in Hamburg was a customer of Defendant Commerzbank during the relevant period and both Bank Melli and Commerzbank were active participants in the Conspiracy set forth herein.

**F.       IRAN FUNDED THE DESIGN AND PRODUCTION OF EXPLOSIVELY FORMED PENETRATORS ("EFPS") USED TO KILL OR MAIM COALITION FORCES, INCLUDING THE PLAINTIFFS**

163.     As noted above, the EFPs deployed by the IRGC and Hezbollah in Iraq were not truly "improvised" explosive devices but professionally manufactured and specifically designed to target U.S. and coalition forces' armor.

164.     EFPs constitute "weapons of mass destruction" as that term is defined in 18 U.S.C. § 2332a(2)(A).

165.     First used by Hezbollah against Israeli armor in Lebanon, EFPs are known as shaped charges, usually made with a manufactured concave copper disk and a High Explosive packed behind the liner.

166.     In Iraq, EFPs were often triggered by a passive infra-red device that set off the explosion within the casing of the EFP, forcing the copper disk forward, turning it into a high velocity slug that could pierce most military-grade armor.

167.     To produce these weapons, copper sheets are often loaded onto a punch press to yield copper discs. These discs are annealed in a furnace to soften the copper. The discs are then loaded into a large hydraulic press and formed into the disk-like final shape.

168.     Unlike homemade explosive devices such as traditional IEDs, EFPs are far more sophisticated and are designed specifically to target vehicles such as armored patrols and supply convoys, though Hezbollah and the Special Groups have deployed them against U.S. and Iraqi civilians as well.

169. In 2006, the U.S. State Department's Country Reports on Terrorism further documented Iran's specific efforts to provide terrorists with lethal EFPs to ambush and murder U.S. and other Coalition forces: "Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hizballah. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hizballah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. *These individuals then passed on this training to additional militants in Iraq.*" (Emphasis added.)

170. According to the U.S. State Department's 2006 Country Reports on Terrorism:

> Iran provided guidance and training to select Iraqi Shia political groups, and weapons and training to Shia militant groups to enable anti-Coalition attacks. Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hezbollah. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hezbollah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. These individuals then passed on this training to additional militants in Iraq.

171. Also in 2006, Brigadier Gen. Michael Barbero, Deputy Chief of Staff for Strategic Operations of the Multi-National Force – Iraq stated: "Iran is definitely a destabilizing force in Iraq. I think it's irrefutable that Iran is responsible for training, funding and equipping some of these Shi'a extremist groups and also providing advanced IED technology to them, and there's clear evidence of that."

172. That same year, the Deputy Chief of Staff for Intelligence with the MNF-I, U.S.

Army Major General Richard Zahner, declared that "[l]abels on weapons stocks seized inside and outside Iraq point to Iranian government complicity in arming Shiite militias in Iraq […] Iran is funneling millions of dollars for military goods into Iraq […] You'll find a red label on the C-4 [explosive] printed in English and will tell you the lot number and name of the manufacturer."

173.    Major General Zahner further added: "the control of military-grade explosives in Iran is controlled through the state apparatus and is not committed through rogue elements right there. It is a deliberate decision on the part of elements associated with the Iranian government to affect this type of activities."

174.    General Bergner commented on Iran funding Hezbollah operatives in Iraq: "[a]ctions against these Iraqi groups have allowed coalition intelligence officials to piece together the Iranian connection to terrorism in Iraq […] Iran's Quds Force, a special branch of Iran's Revolutionary Guards, is training, funding and arming the Iraqi groups. […] It shows how Iranian operatives are using Lebanese surrogates to create Hezbollah-like capabilities. And it paints a picture of the level of effort in funding and arming extremist groups in Iraq."

175.    Bergner further commented: "The groups operate throughout Iraq. They planned and executed a string of bombings, kidnappings, sectarian murders and more against Iraqi citizens, Iraqi forces and coalition personnel. They receive arms -- including explosively formed penetrators, the most deadly form of improvised explosive device -- and funding from Iran. They also have received planning help and orders from Iran."

176.    In May 2007, the Commander of the Multinational Division-Center, U.S. Army Major General Richard Lynch, commented that "[m]ost of our casualties have come from improvised explosive devices. That's still the primary threat to our soldiers -- IEDs. And we

have an aggressive campaign to counter those IEDs, but they still are taking a toll on our soldiers: 13 killed, 39 soldiers wounded. *What we're finding is that the technology and the financing and the training of the explosively formed penetrators are coming from Iran.* The EFPs are killing our soldiers, and we can trace that back to Iran." [Emphasis added]

177. According to the U.S. State Department's 2007 Country Reports on Terrorism:

> Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to some Iraqi militant groups that target Coalition and Iraqi security forces and Iraqi civilians. In this way, Iranian government forces have been responsible for attacks on Coalition forces. The Islamic Revolutionary Guard Corps (IRGC)-Qods Force, continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devices (IEDs), and are specially designed to defeat armored vehicles used by Coalition Forces. The Qods Force, in concert with Lebanese Hezbollah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. These individuals then passed on this training to additional militants inside Iraq, a "train-the-trainer" program. In addition, the Qods Force and Hezbollah have also provided training inside Iraq. In fact, Coalition Forces captured a Lebanese Hezbollah operative in Iraq in 2007.

178. Other U.S. Government reports, such as the Department of Defense's 2007 "Measuring Stability and Security in Iraq" quarterly report to Congress, similarly concluded that:

> The Iranian regime's primary tool for exercising clandestine influence in Iraq is the Islamic Revolutionary Guard Corps' (IRGC) Qods Force (QF), which provides arms, intelligence, funds, training, and propaganda support to Iraqi Shi'a militants targeting and killing Coalition and Iraqi forces, as well as Iraqi civilians. The QF seeks to increase long-term Iranian strategic influence in Iraq and the withdrawal of U.S. forces. Among the weapons it provides to Iraqi militants are improvised explosive devices (IEDs), advanced IED technologies (including explosively formed projectiles (EFPs)), and rockets and mortars used for indirect fire attacks.

179. These observations continued in 2008. According to the U.S. State Department's 2008 Country Reports on Terrorism:

The Qods Force, an elite branch of the Islamic Revolutionary Guard Corps (IRGC), is the regime's primary mechanism for cultivating and supporting terrorists abroad. The Qods Force provided aid in the form of weapons, training, and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hezbollah, Iraq-based militants, and Taliban fighters in Afghanistan.…

Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi militant groups that targeted Coalition and Iraqi forces and killed innocent Iraqi civilians. Iran's Qods Force continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces as well as civilians. Tehran was responsible for some of the lethality of anti-Coalition attacks by providing militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles. The Qods Force, in concert with Lebanese Hezbollah, provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry.

180.    Likewise, the State Department's 2011 Country Reports on Terrorism reported:

Despite its pledge to support the stabilization of Iraq, Iran continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi Shia militant groups targeting U.S. and Iraqi forces, as well as civilians. Iran was responsible for the increase of lethal attacks on U.S. forces and provided militants with the capability to assemble explosives designed to defeat armored vehicles. The IRGC-QF [Islamic Revolutionary Guard Corps-Quds Force], in concert with Lebanese Hezbollah, provided training outside of Iraq as well as advisors inside Iraq for Shia militants in the construction and use of sophisticated improvised explosive device technology and other advanced weaponry.

181.    Similarly, in 2011, the U.S. Ambassador to Iraq, James F. Jeffrey, was quoted saying: "fresh forensic testing on weapons used in the latest deadly attacks in the country bolsters assertions by U.S. officials that Iran is supporting Iraqi insurgents with new weapons and training. […] We're not talking about a smoking pistol. There is no doubt this is Iranian."

182.    All of the foregoing support from Iran and its agents for attacks on Coalition forces and Iraqi civilians was financed and facilitated in substantial part by funds transfers

initiated by Iran through Iranian banks (including the Central Bank of Iran, Bank Melli and Defendant Bank Saderat Plc) on behalf of and for the benefit of the IRGC, Hezbollah and IRISL as part of the Conspiracy set forth in detail herein.

183.    Moreover, although both Iran and Hezbollah utilize a variety of means to raise and transport USD, because of the size and scope of Iran's efforts to murder Americans in Iraq and subvert the U.S-sponsored and freely elected government in Iraq, it required access to hundreds of millions of dollars that it could only be reliably and effectively transferred through the global financial system with the illicit assistance of the Western Bank Defendants.

## G.    IRAN SUPPORTED SPECIAL GROUPS IN IRAQ THAT COORDINATED WITH HEZBOLLAH AND THE IRGC

### 1.    THE BADR CORPS/BADR ORGANIZATION

184.    The Badr Corps was established in 1982 as the military wing of the Supreme Council for Islamic Revolution in Iraq.

185.    From its headquarters in Iran, the Badr Corps operated extensive networks throughout Iraq in the 1990s. The group smuggled men and weapons into Iraq to conduct attacks against the Iraqi regime of Saddam Hussein.

186.    Like Hezbollah, the Badr Corps established clandestine offices in businesses and social organizations in Iraq.

187.    The Badr Corps also used front companies to recruit operatives, collect intelligence, and circulate propaganda materials in Shi'a populated areas.

188.    Before 2003, the Badr Corps served as Iran's most important surrogate inside Iraq, acting as a *de facto* arm of the IRGC-QF.

189.    The Badr Corps received training and weapons from the IRGC and Hezbollah.

190.    After Saddam Hussein's overthrow in 2003, the Badr Corps renamed itself the

Badr Organization, and many of its operatives joined the newly formed Iraqi security forces.

191.    Published reports indicate that thousands of members of the Badr Organization remained on the IRGC-QF payroll after 2004.

192.    Several senior Badr Corps operatives later emerged as key conduits for funneling weapons to Iranian proxies in Iraq from 2004-2011, including Abu Mustafa al-Sheibani, a key smuggler of deadly Iranian IEDs, and Jamal Ja'far Muhammad, a/k/a Abu Mahdi al-Muhandis (a.k.a. "The Engineer"), who later led Kata'ib Hezbollah (discussed further below).

193.    "Department 1000" of the IRGC-QF, known as the Ramezan Corps, is in charge of Iraq operations and remains the largest Qods Force command outside of Iran. It coordinated, armed and influenced the Badr Organization.

194.    Although the Badr Organization evolved into a major political organization with seats in the new Iraqi parliament, it also played a significant role in facilitating Special Groups operations in Iraq. A proportion of senior Special Groups commanders such as Al-Muhandis are, or were, Badr Corp personnel.

195.    After 2003, the IRGC inserted hundreds of its Iranian-trained operatives into Iraq's state security organs (notably the Ministry of Interior intelligence structure) in part through its influence within the Badr Organization.

### 2.    JAYSH AL MAHDI ("JAM" or the "MAHDI ARMY")

196.    Jaysh al Mahdi ("JAM" or the "Mahdi Army") was established by radical Shi'a cleric Muqtada al-Sadr in June 2003. On April 18, 2004 it led the first major armed confrontation against U.S.-led forces in Iraq from the Shi'a community.

197.    JAM was co-founded by Imad Mughniyah, one of Hezbollah's most senior commanders.

198.    JAM expanded its territorial control of mixed or predominantly Shi'a neighborhoods and displaced or killed the local Sunni population. JAM was able to gain initial control in many of the neighborhoods surrounding Baghdad by offering the Shi'a population protection and social services.

199.    Al-Sadr dissolved part of his militia after 2007, but he maintained a small group of Iranian-supported militants called the Promised Day Brigades ("PDB") to carry out attacks against Coalition forces.

200.    The PDB has received funding, training and weapons from the IRGC, and, as noted above, is one of the Special Groups.

201.    The PDB actively targeted U.S. forces in an attempt to disrupt security operations and further destabilize Iraq. For example, on June 28, 2011 PDB issued a statement claiming responsibility for 10 mortar and Katyusha rocket attacks against U.S. military convoys in which U.S. officials confirmed that three U.S. troops were killed.

### 3.    KATA'IB HEZBOLLAH ("KH")

202.    KH has functioned as Iran's go-to militia in Iraq and received support from Lebanese Hezbollah, including training in weapons use; IED construction and operation; and sniper, rocket, and mortar attacks.

203.    Historically, KH operated mainly in Shi'a areas of Baghdad, such as Sadr City, and throughout the south.

204.    On June 24, 2009 the United States designated KH an FTO.

205.    The State Department's notice of KH's FTO designation stated that "[t]he organization has been responsible for numerous violent terrorist attacks since 2007, including improvised explosive device bombings, rocket propelled grenade attacks, and sniper operations.

Kata'ib Hezbollah [sic] also targeted the International Zone in Baghdad in a November 29, 2008 rocket attack that killed two UN workers. In addition, KH has threatened the lives of Iraqi politicians and civilians that support the legitimate political process in Iraq."

206.    KH was also simultaneously designated an SDGT under E.O. 13224, because it was "responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq since 2007." The U.S. Treasury Department also designated KH pursuant to E.O. 13438.

207.    The Treasury Department's press release announcing KH's designation explained that KH had "committed, directed, supported, or posed a significant risk of committing acts of violence against Coalition and Iraqi Security Forces…."

208.    The press release also quoted then-Under Secretary for Terrorism and Financial Intelligence Stuart Levey as stating "[t]hese designations play a critical role in our efforts to protect Coalition troops, Iraqi security forces, and civilians from those who use violence against innocents to intimidate and to undermine a free and prosperous Iraq." The press release also stated: "[f]urther, the IRGC-Qods Force provides lethal support to Kata'ib Hizballah and other Iraqi Shia militia groups who target and kill Coalition and Iraqi Security Forces."

209.    The press release further reported that between March 2007 and June 2008, KH led a number of attacks against U.S. forces in Iraq, advising: "[a]s of 2008, Kata'ib Hizballah was funded by the IRGC-Qods Force and received weapons training and support from Lebanon-based Hizballah. In one instance, Hizballah provided training--to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks--to Kata'ib Hizballah members in Iran."

210.    Furthermore, the press release noted:

Recordings made by Kata'ib Hizballah for release to the public as propaganda videos further demonstrate that Kata'ib Hizballah conducted

attacks against Coalition Forces. In mid-August 2008, Coalition Forces seized four hard drives from a storage facility associated with a Kata'ib Hizballah media facilitator. The four hard drives included approximately 1,200 videos showing Kata'ib Hizballah's sophisticated planning and attack tactics, techniques, and procedures, and Kata'ib Hizballah's use of the most lethal weapons--including RPG-29s, IRAMs, and EFPs--against Coalition Forces in Iraq.

One of the hard drives contained 35 attack videos edited with the Kata'ib Hizballah logo in the top right corner. Additionally, between February and September 2008, Al-Manar in Beirut, Lebanon, broadcast several videos showing Kata'ib Hizballah conducting multiple attacks against Coalition Forces in Iraq.

Immediately preceding the Government of Iraq's approval of the United States-Iraq security agreement in late November 2008, Kata'ib Hizballah posted a statement that the group would continue fighting Coalition Forces and threatened to conduct attacks against the Government of Iraq if it signed the security agreement with the United States.

211.    In 2008, the U.S. Department of Defense stated KH, "also known as Hezbollah Brigades, is a terrorist group believed to receive funding, training, logistics and material support from Iran to attack Iraqi and coalition forces using what the military calls 'explosively formed penetrators' – roadside bombs designed to pierce armor-hulled vehicles – and other weapons such as rocket-assisted mortars."

212.    As noted above and as stated by the U.S Treasury Department in its July 2009 press release, throughout 2008, *Al-Manar*, Hezbollah's official television outlet in Lebanon (and itself a designated SDGT since May 2006) played numerous videos of KH launching rocket and IED attacks against U.S. troops. In this manner, Hezbollah helped publicize KH's activities and increase its profile among leading Shi'a terrorist groups.

213.    Although KH's leadership remains murky, one individual reportedly associated with the group is Abu Mahdi al-Muhandis.

214.    Al-Muhandis is wanted in Kuwait for his alleged role in the 1983 bombings of the

American and French embassies in Kuwait City, as well as for his alleged involvement in the assassination attempt on the Kuwaiti Emir in 1985.

215.    The U.S. Treasury Department designated al-Muhandis an SDGT in July 2009, and announced the designation in the same press release announcing KH's designation. The press release noted:

> As of early 2007, al-Muhandis formed a Shia militia group employing instructors from Hizballah to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces. The groups received training in guerilla warfare, handling bombs and explosives, and employing weapons--to include missiles, mortars, and sniper rifles.  In another instance as of September 2007, al-Muhandis led networks that moved ammunition and weapons--to include explosively formed penetrators (EFPs)--from Iran to Iraq, distributing them to certain JAM militias to target Coalition Forces. As of mid-February 2007, al-Muhandis also ran a weapons smuggling network that moved sniper rifles through the Iran-Iraq border to Shia militias that targeted Coalition Forces.

> Al-Muhandis also provided logistical support for attacks against Iraqi Security Forces and Coalition Forces conducted by JAM Special Groups and certain Shia militias. In one instance, in April 2008, al-Muhandis facilitated the entry of trucks--containing mortars, Katyusha rockets, EFPs, and other explosive devices--from Iran to Iraq that were then delivered to JAM Special Groups in Sadr City, Baghdad. Additionally, al-Muhandis organized numerous weapons shipments to supply JAM Special Groups who were fighting Iraqi Security Forces in the Basrah and Maysan provinces during late March-early April 2008.

> In addition to facilitating weapons shipments to JAM Special Groups and certain Shia militias, al-Muhandis facilitated the movement and training of Iraq-based Shia militia members to prepare them to attack Coalition Forces. In one instance in November 2007, al-Muhandis sent JAM Special Groups members to Iran to undergo a training course in using sniper rifles. Upon completion of the training course, the JAM Special Groups members had planned to return to Iraq and carry out special operations against Coalition Forces. Additionally, in early March 2007, al-Muhandis sent certain Shia militia members to Iran for training in guerilla warfare, light arms, marksmanship, improvised explosive devices (IED) and anti-aircraft missiles to increase the combat ability of the militias to fight Coalition Forces.

> In addition to the reasons for which he is being designated today, al-

Muhandis participated in the bombing of Western embassies in Kuwait and the attempted assassination of the Emir of Kuwait in the early 1980s. Al-Muhandis was subsequently convicted in absentia by the Kuwaiti government for his role in the bombing and attempted assassination.

216.    In a July 2010 press briefing, U.S. General Ray Odierno identified KH as the group behind increased threats to U.S. bases in Iraq. General Odierno reported that KH operatives had gone to Iran for special training and then returned to Iraq.

217.    General Odierno stated, "[T]hey are clearly connected to Iranian IRGC [Iranian Revolutionary Guard Corps]."

218.    Historically, KH operated mainly in Shi'a areas of Baghdad, such as Sadr City, and throughout the south.

## 4.    ASA'IB AHL AL-HAQ ("AAH" OR "LEAGUE OF THE RIGHTEOUS")

219.    AAH is a Shi'a Special Group supported by Hezbollah and the IRGC-QF that has conducted assassinations and operations against Iraqi civilians, Iraqi Security Forces and Coalition forces.

220.    AAH was originally established by Senior Sadrist and MNF-I detainee Qais al-Khazali.

221.    AAH split from al-Sadr's JAM in 2006. Since that time, AAH has conducted: thousands of IED attacks against U.S. and Iraqi forces; targeted kidnappings of Westerners; rocket and mortar attacks on the U.S. Embassy; murders of American soldiers; and assassination of Iraqi officials.

222.    At all relevant times, AAH received significant funding from Iran, and had links to Iran's IRGC-QF and Hezbollah.

223.    Lebanese Hezbollah operative Ali Musa Daqduq provided training to AAH fighters.

224.    Daqduq reported to Youssef Hashim, the head of Lebanese Hezbollah Special Operations, and the latter reported to Abdul Reza Shahlai, the director of the IRGC-QF External Operations.

225.    AAH was one of the Iranian entities responsible for the January 20, 2007 Karbala attack that killed or injured some of the Plaintiffs (discussed below).

**H.    ALL OF THE ATTACKS AT ISSUE IN THIS COMPLAINT WERE ACTS OF INTERNATIONAL TERRORISM**

226.    At no time relevant to this Action did the United States declare war or enact an Authorization for the Use of Military force against Iran.

227.    At no time relevant to this Action did the United States engage in an armed conflict with the military forces of Iran, or did Iran's military forces or their agents engage in lawful acts of war against Coalition forces.

228.    At all relevant times to this action, the conduct of Hezbollah, the IRGC and the Special Groups in killing and injuring Coalition forces and civilians were conducted by operatives who did not carry fixed distinctive signs recognizable at a distance, carry arms openly, conduct their operations in accordance with the laws and customs of war, or enjoy any form of combatant immunity for their acts.

229.    The specific attacks alleged herein were all carried out by terrorists and terrorist organizations and entities like Hezbollah and the Special Groups, not by armed forces of recognized governments or military forces.

230.    The injuries Plaintiffs sustained were not the result or in the course of a declared war with Iran, or armed conflict between the United States and Iran.

231.    The conduct of Iran, the IRGC, Hezbollah, and the Special Groups violated the laws of armed conflict (including, *e.g.*, AAH operatives masquerading as members of U.S. armed forces and executing defenseless prisoners), and the attacks upon Iraqi and other civilians constituted a substantial, rather than an incidental, part of their objectives and conduct.

232.    The acts of the IRGC, Hezbollah, and/or the Special Groups that injured the Plaintiffs were acts of international terrorism within the meaning of 18 U.S.C. § 2331, involving violent acts intended to influence the United States by coercion (by coercing the withdrawal of Coalition forces from Iraq) and to intimidate and coerce the Iraqi population, and also were acts engaging in terrorist activities within the meaning of 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or engaging in terrorism within the meaning of  22 U.S.C. § 2656f.

## V.    OVERVIEW OF THE CONSPIRACY

### A.    AGREEMENT AND KNOWLEDGE

233.    As noted above, "the Conspiracy" identified in this Complaint first began in the years immediately after Iran was first designated by the United States as a State Sponsor of Terrorism in 1984.

234.    As a result of that designation, Iran developed various ways to circumvent U.S. sanctions levied against the regime and to facilitate the free movement of U.S. dollars that Iran obtained (largely from the sale of petroleum) without detection by the U.S. government in order to pursue foreseeably illicit objectives, including:

a.    concealing hundreds of billions of dollars of Iran's U.S. dollar-denominated transactions from detection, scrutiny, or monitoring by U.S. regulators, U.S. law enforcement, and/or U.S. depository institutions;

b.    assisting Iran in transferring at least $150 million USD to the IRGC-QF, Hezbollah, Special Groups, and other instruments of Iranian state-sponsored terrorism; and

       c.      assisting Iran in acquiring technology and components for its illegal Weapons of Mass Destruction program.

235.    To further those objectives, Iran enlisted several Iranian state-owned banks as well as Defendant Bank Saderat Plc and various international financial institutions, including the Western Bank Defendants in this Action, which agreed to alter, falsify, or omit information from payment messages that involved Iran or Iranian parties, in particular several Iranian banks (as noted above, referred to herein occasionally as the "Iranian Bank Co-conspirators" (including Defendant Bank Saderat Plc)), as well as IRISL, for the express purpose of concealing Iran's financial transactions from detection, scrutiny, or monitoring by U.S. regulators, law enforcement, and/or depository institutions.

236.    The Conspiracy between Iran, the IRGC, IRISL, Defendant Bank Saderat Plc, the other Iranian Bank Co-conspirators, and the Western Bank Defendants began no later than 1987, and upon information and belief, continues to the present (though individual Defendants joined the Conspiracy at different dates).

237.    The Conspiracy orchestrated by Iran made it possible for Iran to transfer: (1) hundreds of billions of dollars in U.S. currency through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies; and (2) hundreds of millions of dollars to Hezbollah, the IRGC, and other terrorist organizations actively engaged in murdering and maiming U.S. servicemen and civilians in Iraq.

238.    Each of the Defendants knowingly entered into an agreement with Iran and its agents, including but not limited to Defendant Bank Saderat Plc, other Iranian Bank Co-conspirators, including but not limited to the Central Bank of Iran, Bank Melli (including Bank Melli's United Kingdom subsidiary Melli Bank Plc), and Bank Sepah (which are all

instrumentalities of Iran), as well as the IRGC-controlled IRISL, under which the conspirators agreed to alter, falsify, or omit information from payment messages for USD-denominated transactions that were purposefully directed at, and processed through, the United States. As alleged in detail below, each Defendant committed numerous overt acts in furtherance of the Conspiracy and knowingly and unlawfully agreed to engage in "stripping" hundreds of millions – and in some cases, billions – of U.S. dollar denominated transactions on behalf of Iran knowing that Iran was a designated State Sponsor of Terrorism.

239.    Each Defendant entered into its agreement with Iran and the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc) aware that other co-conspirators (either the Defendants herein, or other foreign financial institutions) were also actively participating in the Conspiracy, shared the common goal of the scheme's purpose of providing Iran and the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc) the ability to illegally transfer billions of dollars (undetected) through the United States, and were aware of many of the (often same or similar) methods being used by other members of the Conspiracy to effectuate it.

240.    Accordingly, each Defendant understood that its conduct was part of a larger scheme engineered by Iran; each Defendant knew the participation of other conspirators was essential to the Conspiracy's success; and each Defendant knew of and joined in the overriding scheme and sought to achieve and facilitate a common goal of helping Iran to transfer billions of dollars through the United States while avoiding detection, scrutiny, or monitoring by U.S. regulators, U.S. law enforcement, and/or U.S. depository institutions.

241.    In addition, each Defendant also knew, or was deliberately indifferent, to several of the Conspiracy's foreseeable purposes and criminal objectives of:

        a.      Facilitating illicit transactions totaling at least $50 million USD for the benefit of Hezbollah;

b.     Facilitating illicit transactions totaling at least $100 million USD for the benefit of the IRGC and Defendant Bank Saderat Plc, and other U.S. SDNs (such as Iranian Bank Co-conspirators Bank Melli Iran, Bank Mellat, and Bank Sepah);

c.     Facilitating at least hundreds of illicit transactions on behalf of IRSIL totaling more than $60 million, including over 150 "stripped" transactions *after* IRISL was designated; and

d.     Enabling Iran, the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc), Hezbollah, and Special Groups to plan for, conspire to, and perpetrate acts of international terrorism under 18 U.S.C. § 2331(1); homicides, attempted homicides, or conspiracies to commit homicide under 18 U.S.C. § 2332(a)-(c); bombings and attempted bombings under 18 U.S.C. § 2332f; attacks using Weapons of Mass Destruction under 18 U.S.C. § 2332a; engaging in terrorist activity under 8 U.S.C. § 1189(a)(3)(B)(iii)-(iv); and/or engaging in terrorism under 22 U.S.C. § 2656f.

242.    As set forth below, each of the Defendants knew that Iran was a U.S.-designated State Sponsor of Terrorism and that U.S. laws and regulations required it to fully disclose all funds transfers through the United States made on behalf of Iran, Iranian entities and Iranian banks.

243.    Despite that knowledge, each of the Defendants knowingly conspired with Iran, and its agents (including Defendant Bank Saderat Plc) to violate those U.S. laws and regulations to conceal hundreds of millions (and in some cases, billions) of dollars in funds transfers routed through the United States on behalf of Iran, IRISL, and the Iranian Bank Co-conspirators, including Defendant Bank Saderat Plc.

244.    During the relevant time period, from 2004-2011, each of the Defendants knowingly agreed to join the Conspiracy, knowingly and willfully participated in the Conspiracy, knew or were deliberately indifferent to the Conspiracy's criminal purposes and objectives, and took initiatives to improve its workings, and was aware of the participation of many (if not all) of

its members, as set forth in greater detail herein.

**B.    ACTS AND EFFECTS**

245.    Through the Conspiracy Iran provided material support to Hezbollah, the IRGC and Special Groups that targeted American citizens in Iraq, and with substantial assistance from the Western Bank Defendants, it concealed and disguised the nature, location, source, and origin of the material support it provided to these terrorists, knowing and intending that the funds be used in preparation for and in carrying out acts of terrorism against Americans and others, including civilians, in Iraq.

246.    As part of the Conspiracy, each of the Defendants took affirmative steps to violate U.S. criminal laws and to conceal from U.S. depository institutions, law enforcement, and counter-terrorism agencies the flow of hundreds of millions of U.S. dollars (and in some cases, billions of dollars) it was moving through the United States, including transfers for the benefit of the IRGC and Hezbollah, and through them to KH and other terrorist organizations actively engaged in murdering and maiming U.S. servicemen and civilians in Iraq.

247.    The conduct of each Defendant, its awareness of other Defendants' and conspirators participation and conduct and the resulting "glaring hole" in America's terror financing and sanctions architecture described by former Manhattan District Attorney Robert M. Morgenthau, provided Iran with vital access to the U.S. financial system.

248.    U.S. "dollar clearing" – primarily (in this case) through the Clearing House Interbank Payments System or "CHIPS" system – is an elaborate intra-bank system in the U.S. by which banks settle the credits and debits on their accounts with other banks all across the globe on a daily basis.

249.    The U.S. "dollar clearing" system is critical not only to the workings of the global

economy, but provides financial institutions (and states) with critical, essentially access to global trade and credit in U.S. dollars.

250.     Thus, once Iran gained clandestine access to the U.S. "dollar clearing" system it could not only launder billions of dollars in funds transfers, but it could also borrow against the funds it held in Defendant's banks – facilitating further undetected transactions around the world in USD – for both ordinary commercial purposes and the illegal aims and objectives of the Conspiracy.

251.     This broad based access to the U.S. "dollar clearing" system was essential to Iran because of the scope of Iran's global ambitions at the time, which included driving the United States and its Coalition partners out of Iraq, dominating that country, and acquiring Weapons of Mass Destruction.

252.     Thus, among the effects of the Conspiracy, a State Department diplomatic cable from March 2008 noted: "Bank Melli and the Central Bank of Iran also provide crucial banking services to the Qods Force, the IRGC's terrorist supporting arm that was headed by UNSCR 1747 designee Commander Ghassem Soleimani. Soleimani's Qods Force leads Iranian support for the Taliban, Hezbollah [sic], Hamas [sic] and the Palestinian Islamic Jihad. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. Bank Melli use of Deceptive Banking Practices … When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from payment instructions for US dollar denominated transactions."

253.     In addition, absent the access to the U.S. "dollar clearing" system afforded to

Bank Saderat by the HSBC Defendants, Defendants SCB, Barclays, Credit Suisse and Commerzbank, both Iran and Hezbollah's access to USDs would have been diminished, and Iran's efforts to transfer large sums of USD to Hezbollah would have been substantially impaired.

254.     By knowingly agreeing to enter into the Conspiracy and, by knowing or being deliberately indifferent to its lethal purposes, and by committing multiple overt acts in furtherance of the Conspiracy, the Defendants provided Iran with the means by which it could transfer more than $150 million to the IRGC, Hezbollah and Special Groups, which were actively engaged in planning and perpetrating the murder and maiming of hundreds of Americans in Iraq during the same period of time that the Conspiracy was proceeding, thereby substantially enhancing Iran, the IRGC's, Hezbollah's, and Special Groups' ability to inflict the injuries described herein.

255.     The Conspiracy was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries because the Conspiracy substantially assisted Iran, IRISL, the IRGC, Hezbollah, and/or Special Groups in committing the acts of international terrorism that injured the Plaintiffs by providing them collectively with more than $200 million USD in funding that were used, *inter alia*, to arm, train and fund Iranian terror proxies in Iraq who targeted American citizens.

256.     By knowingly agreeing to enter the Conspiracy, and participating in and committing overt acts in the course of the Conspiracy that resulted in damage and injury to the Plaintiffs, Defendants committed acts of international terrorism as defined by 18 U.S.C. §§ 2331, 2339A and 2339B that caused injury to the Plaintiffs in this action, and are civilly liable under 18 U.S.C. § 2333(a) of the Anti-Terrorism Act ("ATA") to the Plaintiffs, American citizens who

have been injured by reason of acts of international terrorism perpetrated by Iran through its agents, including the IRGC, Hezbollah, and the Special Groups.

257.    Defendant HSBC-US not only knowingly participated in the Conspiracy, but as a U.S. person within the meaning of 18 U.S.C. § 2332d, also committed further acts of international terrorism in violation of 18 U.S.C. §§ 2331 and 2332d by knowingly (or with reason to know) facilitating financial transactions with Iran, which it knew was a designated State Sponsor of Terrorism. HSBC-US's acts were a cause of the injuries sustained by the Plaintiffs in this action, and thus HSBC-US is therefore civilly liable under 18 U.S.C. § 2333(a) of the ATA to the Plaintiffs.

258.    Defendants Barclays, SCB, ABN Amro (RBS N.V.), and Commerzbank not only knowingly participated in the Conspiracy, but because their respective New York branches constitute U.S. persons within the meaning of 18 U.S.C. § 2332d, these Defendants also committed further acts of international terrorism in violation of 18 U.S.C. §§ 2331 and 2332d by knowingly (or with reason to know) facilitating financial transactions with Iran, which each such Defendant knew was a designated State Sponsor of Terrorism. Those acts were a cause of the injuries sustained by the Plaintiffs in this action, and thus these Defendants are therefore civilly liable under 18 U.S.C. § 2333(a) of the ATA to the Plaintiffs.

## C.    BANK SADERAT PLC's AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

259.    On September 8, 2006, the U.S. Office of Foreign Assets Control ("OFAC") amended § 560.516 of the Iranian Transaction Regulations ("ITRs") and excluded Bank Saderat from the U-Turn exemption.

260.    In announcing the 2006 change to the ITRs excluding Bank Saderat from the U-Turn exemption, OFAC's announcement stated:

OFAC has amended the Iranian Transactions Regulations (ITR) to cut off Bank Saderat, one of Iran's largest government-owned banks, from the U.S. financial system. Bank Saderat has been a significant facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah….

261. According to then-Under Secretary for Terrorism and Financial Intelligence Stuart Levey, "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hezbollah and other terrorist organizations each year. We will no longer allow a bank like Saderat to do business in the American financial system, even indirectly."

262. The Treasury Department press release announcing the changes to the ITR stated that "a Hezbollah-controlled organization [] has received $50 million directly from Iran through Bank Saderat since 2001."

263. Assistant Treasury Secretary for Terrorist Financing Daniel Glaser testified before the Senate Committee on Banking, Housing and Urban Affairs that "Hezbollah uses Saderat to send money to other terrorist organizations as well."

264. For many years preceding the revocation of its U-Turn exemption, Bank Saderat illegally routed its USD transactions through the United States with the assistance of various Western commercial banks.

265. From 2002 forward, Defendant Bank Saderat Plc continued Bank Saderat's existing practice of: (1) illegally routing its USD transactions through the United States; and (2) transferring tens of millions of dollars to Hezbollah and other designated terrorist groups.

266. As detailed in a Deferred Prosecution Agreement entered into by Lloyds TSB Bank Plc ("Lloyds") on January 9, 2009 with U.S. law enforcement, Defendant Bank Saderat Plc directed illegal funds transfers to the U.S. and worked with Lloyds to strip its USD transactions of any reference to Iran or Bank Saderat.

267.    In 2003, Lloyds exited its relationship with Bank Saderat Plc and Defendant Credit Suisse assumed Lloyds' role of illegally transferring USD through the United States while stripping references to Bank Saderat Plc and Iran from the transactions (as set forth below and, as also discussed below, in a Deferred Prosecution Agreement that Defendant Credit Suisse signed in 2009).

268.    Notwithstanding the revocation of its access to the U-Turn exemption, Bank Saderat (and Bank Saderat Plc) continued to illegally direct USD transactions through the United States with the active assistance of the other Defendants listed herein.

269.    On February 13, 2004, Defendant SCB opened accounts for Bank Saderat Plc.

270.    The HSBC Defendants also maintained one or more accounts for Bank Saderat Plc during the relevant time period.

271.    In an October 9, 2006 email, Defendant HSBC-Middle East's Regional Head of Legal and Compliance noted the U.S. government's "direct evidence against Bank Saderat particularly in relation to the alleged funding of Hezbollah" but nonetheless maintained the account(s) thereafter and continued to facilitate transactions for Bank Saderat Plc.

272.    In October 2007, Bank Saderat Iran, (including Defendant Bank Saderat Plc), was designated an SDGT pursuant to E.O. 13224. The U.S. Treasury Department's press release regarding Bank Saderat's designation stated:

> Bank Saderat, its branches, and subsidiaries: Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hezbollah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence.

273.     As set forth below, Defendant Barclays closed its accounts for Bank Saderat Plc, in 2008, months *after* Bank Saderat Plc was designated an SDGT, and more than a year after the U.S. Treasury Department reported that "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hezbollah and other terrorist organizations each year."

274.     The HSBC Defendants, and Defendants Commerzbank, SCB, Barclays, and Credit Suisse altered, falsified, or omitted information from USD payment messages that they facilitated on behalf of Bank Saderat (and Bank Saderat Plc) at all times knowing, or deliberately indifferent to the fact that Bank Saderat was facilitating Iranian sponsored terrorism and, after October 2007, knowing, or deliberately indifferent to the fact that Bank Saderat (including Bank Saderat Plc) was an SDGT so designated because of its role as a "significant facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah."

275.     Moreover as a Lebanese-based terrorist organization, Hezbollah was (and remains) particularly in need of USD because much of the Lebanese economy is "dollarized" (*i.e.* banking and retail transactions, credit and debt instruments are often, if not primarily conducted in USD).

276.     Accordingly, Bank Saderat Plc's provision of tens of millions of dollars to Hezbollah provided Hezbollah with substantial assistance in carrying out its terrorist activities in Iraq, including Hezbollah's participation in the terrorist attacks that injured the Plaintiffs.

277.     Moreover, Plaintiffs' injuries herein were a reasonably foreseeable result of Bank Saderat Plc's provision of tens of millions of dollars to Hezbollah.

**D.     THE CENTRAL BANK OF IRAN'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY**

278.     The Central Bank of Iran ("CBI") is fully controlled and run by individuals

directly appointed by the Government of Iran ("GOI").

279. At all relevant times, the CBI has not functioned in the same manner as central banks in Western countries that are institutionally designed to be independent from political interference nor is its purpose limited to "regulating" Iranian banks and managing Iran's currency and internal interest rates.

280. Instead, the CBI is an alter-ego and instrumentality of the Iranian government and its Supreme Leader and it has routinely used Iranian banks like Bank Melli and Bank Saderat as conduits for terror financing and weapons proliferation on behalf of the Iranian regime.

281. At all relevant times, the CBI was an active participant in the Conspiracy. For example, leading up to the adoption of UN Security Council Resolution 1747 (March 2007), which resulted in the freezing of assets belonging to Iran's Bank Sepah, the CBI furthered the Conspiracy by using non-Iranian financial institutions to shield Bank Sepah's assets from the impact of impending sanctions.

282. Throughout the relevant time period, the CBI maintained accounts at Bank Melli, Bank Melli Plc, Bank Saderat and Defendant Bank Saderat Plc in various currencies.

283. Bank Melli's U.K. subsidiary (later Bank Melli Plc) managed the CBI's accounts in Europe.

284. In the wake of U.S. and later European Union designations against Iranian banks (including Bank Saderat and Bank Melli), the CBI often acted as a secret proxy for those designated entities.

285. As part of the Conspiracy, the CBI utilized Defendant Bank Saderat Plc to transfer funds to Hezbollah.

286. The CBI also maintained accounts and unlawfully transferred funds in furtherance

of the Conspiracy with the assistance of Defendants SCB, ABN Amro (RBS N.V.) and the HSBC Defendants, including facilitating billions of dollars in funds transfers on behalf of the IRGC, through the aforementioned NIOC (as noted above, Iran's national oil company, designated as an SDN by the United States because NIOC is an IRGC agent).

287.    For example, in furtherance of the Conspiracy, in early 2001, the CBI asked Defendant SCB to act as its correspondent bank with respect to USD payments on behalf of NIOC. As alleged herein, SCB agreed to participate in the Conspiracy and remove identifying data on SWIFT messages for these and other wire transfers.

288.    Thereafter, between 2001 and 2006, the CBI sent approximately 2,226 payment messages for a total value of *$28.9 billion* to SCB in London, the vast majority of which were illegally routed through the U.S. as described herein.

289.    As detailed further below, in furtherance of the Conspiracy, the CBI and Defendant ABN Amro (RBS N.V.) (which also maintained accounts for the CBI and had numerous business dealings with the CBI) conspired to provide illegal material support to Iran and Iranian parties.

290.    Between 2002 and 2004, Defendant ABN Amro (RBS N.V.) accepted USD deposits from the CBI on a regular basis with average deposits in the range of $200 million, and the CBI instructed, and ABN Amro (RBS N.V.) agreed, to follow illegal procedures to launder USD-denominated deposits to the CBI's accounts with other European banks with branches or offices in London.

291.    In furtherance of the Conspiracy, the CBI coordinated with Defendant ABN Amro (RBS N.V.)'s Central Bank Desk in Amsterdam regarding the procedure to be followed for repayment of USD deposits to their accounts with European banks with offices or branches in

London. This procedure stipulated that payment messages sent to U.S. clearing banks for payment of USD funds to the CBI should not contain *any* reference to the CBI, or *any other* reference relating to Iran.

292.    In 2001, the CBI also approached members of HSBC Group, specifically Defendants HSBC-Middle East and HSBC-Europe, to obtain their agreement to move the CBI's U.S. dollar clearing business from National Westminster Bank Plc to the HSBC Defendants, and intended to clear USD transactions through Defendant HSBC-US. Pursuant to that agreement, the CBI eventually moved its U.S. dollar clearing to the HSBC Defendants, and by late 2003 the CBI was one of six Iranian banks that used members of HSBC Group for (mostly illegal) U.S. dollar clearing business.

293.    With Defendant HSBC Holdings' knowledge and in furtherance of the Conspiracy, Defendants HSBC-Middle East and HSBC-Europe manually intervened in the processing of payments by the CBI and removed the CBI's name and country of origin. Defendant HSBC-US also knew that other HSBC Defendants were altering and omitting information in SWIFT payment messages regarding Iranian parties, but nevertheless knowingly continued processing transactions despite its knowledge.

### E.    BANK MELLI IRAN AND BANK MELLI PLC'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

294.    Bank Melli Iran, one of the largest banks in Iran, was established in 1927 by order of the Iranian Parliament.

295.    Following the Iranian Revolution in 1979, all banks in Iran were nationalized, and even now most are effectively controlled by the Iranian regime.

296.    Melli Bank Plc in London was established in January 2002 as a wholly-owned subsidiary of Bank Melli Iran.

297.     According to the U.S. government, from 2004-2011, Bank Melli Iran and Melli Bank Plc in London transferred approximately $100 million USD to the IRGC-QF, which trained, armed, and funded terrorist groups that targeted and killed and maimed American and Iraqi forces and civilians.

298.     Specifically, according to the U.S. government in a November 10, 2009 diplomatic cable:

> Islamic Revolutionary Guards Corps (IRGC) and IRGC-Qods Force, who channel funds to militant groups that target and kill Coalition and Iraqi forces and innocent Iraqi civilians, have used Bank Melli and other Iranian banks to move funds internationally. Bank Melli used deceptive banking practices to obscure its involvement from the international banking system by requesting that its name be removed from financial transactions when handling financial transactions on behalf of the IRGC.

299.     Bank Melli Iran and Melli Bank Plc were designated as SDNs pursuant to E.O. 13382 in October 2007, and included on OFAC's SDN list, which resulted in, *inter alia*, their exclusion from the U-Turn exemption. The U.S. Treasury Department press release announcing the designation stated:

> Bank Melli also provides banking services to the [Iranian Revolutionary Guard Corps] and the Qods Force. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions.

300.     In April 2008, Assistant Treasury Secretary for Terrorist Financing Daniel Glaser testified before the House Committee on Foreign Affairs, Subcommittee on the Middle East and South Asia and the Subcommittee on Terrorism, Nonproliferation and Trade, that:

> Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. When handling

financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions.

301.    In addition, in mid-2007, Bank Melli in Hamburg ("BMI Hamburg") transferred funds for DIO whose weapons caches were seized from Special Groups in Iraq, included large quantities of weapons produced by Iran in 2006 and 2007, including many 107 mm artillery rockets as well as rounds and fuses for 60 mm and 81 mm mortars.

302.    Since at least the mid-1980s, Bank Melli has maintained accounts at one time or another with Defendants ABN Amro (RBS N.V.), Barclays, Credit Suisse, SCB, Commerzbank and the HSBC Defendants.

303.    As early as 1987, Bank Melli instructed Defendant Barclays to process USD transactions in favor of Bank Melli's London branch by referencing only Bank Melli's account number at Midland Bank Plc without referencing Bank Melli's name.

304.    Bank Melli further instructed Barclays to send separate instructions, which included full transaction details, to Bank Melli's London Branch.

305.    Barclays agreed and assisted Bank Melli in its illegal conduct and continued to do so even after Bank Melli was designated by the United States and publicly identified as a major source of the IRGC's funding.

306.    No later than December 2000 Bank Melli opened an account with Defendant ABN Amro (RBS N.V.)'s UAE branch and worked with ABN Amro (RBS N.V.) to strip its USD-denominated transactions.

307.    Similarly, in July 2003, Defendant SCB learned that a competitor was exiting the Iranian business completely and sought to pick up this business and add U.S.-dollar accounts for

five Iranian banks at SCB-London. Among the banks whose business SCB sought to (and did) acquire was Bank Melli's.

308.     In January 2004, SCB decided to proceed with the Iranian business, and no later than February 13, 2004, SCB opened accounts for Bank Melli and thereafter participated in the Conspiracy by facilitating unlawful transactions for Bank Melli.

309.     During the relevant time period, Defendant Credit Suisse also maintained accounts for Bank Melli.

310.     Credit Suisse also advised Bank Melli and conspired with Bank Melli on ways to format Bank Melli's transfers in order to specifically avoid detection by U.S. depository institutions' computerized OFAC filters.

311.     During the relevant time period (beginning no later than July 2003) Defendant Commerzbank conspired with Bank Melli to route USD clearing business through Commerzbank.

312.     Commerzbank further advised Bank Melli to list "non ref"' in the ordering party field in all payment messages in order to trigger a manual review of the payment, thereby enabling Commerzbank personnel to ensure that the messages did not contain any Iranian information.

313.     Defendant HSBC-Europe also maintained accounts for Bank Melli, and used HSBC-US to provide illegal USD clearing services to Bank Melli during the relevant period, i.e. despite several SWIFT messages that were intended to be stripped before transmittal to New York but were blocked because Bank Melli was referenced in error, HSBC-US continued to routinely provide dollar clearing services to the HSBC Defendants knowing that they were violating U.S. law and money laundering on behalf of Bank Melli.

314.     As discussed below, HSBC-US knew of and allowed this unlawful conduct to occur – HSBC-US violated, *inter alia*, 18 U.S.C. § 2332d.

F.     **BANK MELLAT'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY**

315.     Bank Mellat provides banking services in support of Iran's Weapons of Mass Destruction program through the Atomic Energy Organization of Iran ("AEOI") and Novin Energy Company.

316.     Both AEOI and Novin Energy Company have been designated by the United States under E.O. 13382, and both have also been designated by the UN Security Council under UNSCRs 1737 and 1747.

317.     During the relevant time period, Bank Mellat provided financial services and maintained accounts for AEOI and Novin Energy Company, and as part of the Conspiracy, Bank Mellat affirmatively worked to prevent disclosure of its dollar-denominated transactions on behalf of these customers.

318.     Bank Mellat has facilitated the movement of millions of dollars on behalf of the IRGC for Iran's Weapons of Mass Destruction program since at least 2003.

319.     In June 2006, Bank Mellat was involved in a transfer totaling over $250 million dollars into an account it held for Novin Energy Company.

320.     As part of the Conspiracy, the CBI effected the payment(s) to Bank Mellat's account in London for further credit to Bank Mellat's client – Novin Energy Company.

321.     In 2007, Bank Sepah facilitated payments to accounts at Bank Mellat on behalf of entities associated with Iran's Aerospace Industries Organization ("AIO"), a subsidiary of Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL") that was designated by the United States on June 28, 2005.

322. Defendant Credit Suisse also facilitated USD payments on behalf of AIO with Credit Suisse employees stripping the wire transfers before routing them through the U.S.

323. The AIO is the Iranian organization responsible for ballistic missile research, development and production activities and organizations, including the Shahid Hemmat Industries Group ("SHIG") and the Shahid Bakeri Industries Group ("SBIG"), which were both listed under UN Security Council Resolution 1737 and designated under E.O. 13382.

324. Bank Mellat was designated by the United States on October 25, 2007 in connection with Weapons of Mass Destruction proliferation activities, and included on OFAC's SDN list. The designation, *inter alia*, excluded Bank Mellat from accessing the U-Turn exemption.

## G. BANK SEPAH'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

325. Bank Sepah is an Iranian government-owned and controlled financial institution.

326. In 2007, the U.S. Treasury Department designated Bank Sepah for providing support and services to designated Iranian proliferation firms. The designation was effected pursuant to E.O. 13382, due to Bank Sepah's Weapons of Mass Destruction proliferation-related activities.

327. Bank Sepah International Plc, a wholly-owned subsidiary of Bank Sepah in the United Kingdom, was also designated.

328. According to the U.S. Treasury Department, Bank Sepah was the financial linchpin of Iran's missile procurement network and actively assisted Iran's pursuit of missiles capable of carrying Weapons of Mass Destruction.

329. As a result of the designation, Bank Sepah (including Bank Sepah International Plc) was excluded from accessing the U-Turn exemption.

330.     During the relevant time period, Defendant HSBC-Europe provided illegal USD clearing services to Bank Sepah.

**H.     JOHN DOE DEFENDANTS' 1-50 AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY**

331.     Other non-defendant co-conspirators (including other Iranian financial institutions and entities) conspired with the named Defendants and identified non-defendant Conspirators herein. Plaintiffs may amend this Complaint to identify such other non-Defendant co-conspirators as additional evidence warrants.

332.     The true names, residences and capacities, whether individual, corporate or otherwise, of Defendants John Does 1 through 50 (collectively, the "Does") are presently unknown to Plaintiffs, who therefore sue those Defendants under such fictitious names. The Does are other financial institutions, their agents, officers and/or employees that conspired with the Western Bank Defendants, Iran, and the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc). Each of the Does is responsible in some manner for the acts alleged herein and for the damages that each Plaintiff sustained. As warranted by the evidence, Plaintiffs will amend this Complaint to show the true names and capacities of the Does when they are ascertained and confirmed.

**I.     THE HSBC DEFENDANTS' AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY**

333.     The HSBC Defendants have a longstanding relationship with Iran. HSBC Group established a relationship with the Tehran office of Bank Melli Iran in 1999 and established an "Iran Representative" office in Iran that same year.

334.     In December 2000, HSBC Group members entered into a $500 million project finance agreement with six Iranian commercial banks: Bank Saderat Iran, Bank Melli, Bank

Mellat, Bank Tejarat, Bank Sepah and the Export Development Bank.

335.     Beginning in the late 1990s, Defendant HBSC-Europe and Defendant HSBC-Middle East devised a procedure whereby their Iranian Bank Co-conspirators put a cautionary note in their SWIFT payment messages including language such as, "*care sanctioned country,*" "*do not mention our name in NY,*" and "*do not mention Iran.*"

336.     Payments with these cautionary notes automatically fell into what Defendant HSBC-Europe termed a "repair queue," where employees of HBSC-Europe and HSBC-Middle East employees manually removed all references to Iranian-sanctioned entities.

337.     Between 2001 and 2007, the HSBC Defendants actively participated in the Conspiracy by repeatedly undertaking various methods to facilitate payments on behalf of Iran through the United States that would evade U.S. sanctions by disguising Iran's financial activities as its funds passed through U.S. financial institutions, including Defendant HSBC-US.

338.     Unlawful Iranian funds transfers from HSBC-Europe and HSBC-Middle East were sent through the HSBC Group's USD correspondent accounts at HSBC-US by:

> a.     Deleting references to Iran from the payment instructions (a.k.a. "stripping" the transactions) or otherwise altering the messages to either omit or falsify information that would have otherwise indicated Iran's involvement in the transaction; and
>
> b.     Styling transactions as bank-to-bank "cover" transactions between two non-Iranian banks, solely because the MT 202 payment message format used for such transactions did not expressly obligate HSBC to identify the transaction's originator and beneficiary, thus avoiding any disclosure of the transaction's Iranian connections, and blocking HSBC-US's electronic filters from recognizing the transaction, let alone assessing whether it qualified for any OFAC exemption or license.

339.     Defendant HSBC-Europe created detailed plans to avoid triggering HSBC-US's OFAC filter and reduce the need for "manual intervention" (*e.g.* – formatting USD transactions), sparing HSBC-Europe's employees the need to physically alter the messages in order to remove

references that might otherwise identify the presence of Iranian parties, and associated scrutiny).

340. This enabled the HSBC Defendants' business with Iran to proceed quickly and profitably.

341. In 2010, facing U.S. government investigations, HSBC-US hired Deloitte LLP as its outside auditor to identify and examine HSBC Group's OFAC sensitive transactions involving Iran and other prohibited countries or persons that went through the bank.

342. That "review" identified more than 25,000 illegal transactions, totaling more than $19.4 billion that involved Iran.

343. The payments had been sent to HSBC-US and other financial institutions in the United States without referencing Iran, ensuring that the payments would be processed without delay and not be blocked or rejected by automated OFAC filtering systems.

344. The review also revealed that Defendants HSBC-Europe and HSBC-Middle East processed approximately $20 billion in transactions for Iran. The HSBC Defendants deliberately amended payment messages and used MT 202 cover payments to conceal the nature of the transactions from HSBC-US automated filters and those of other financial institutions in the United States, and HSBC-US was aware that other HSBC Defendants used such methods to alter payment messages.

345. At the same time, the HSBC Defendants further educated their Iranian co-conspirators on how to format payment messages to avoid detection and scrutiny, thus ensuring that Iran could solicit other conspirators to facilitate payments in like manner. Accordingly, the HSBC Defendants' (and other Defendants' and conspirators') willingness to process payments in this manner enabled Iran to flood the global financial system with undetectable U.S. dollar payments and effectuate otherwise preventable funds transfers to Hezbollah and the IRGC.

346.     Defendant HSBC Holdings was aware of Defendants HBSC-Europe and HSBC-Middle East's involvement in the Conspiracy as early as 2000.

347.     For example, HSBC Group AML Compliance Head Susan Wright ("Wright") received an email on June 9, 2000 from Bob Cooper, an HSBC colleague, informing Wright of an existing procedure the HSBC Defendants were already employing to avoid OFAC filter detection. Cooper explained:

> a.     A client bank had been "*automatically replacing a remitter's name with that of*" the client bank and that bank was utilizing bank-to-bank "cover payments" because the payment message formats did not expressly require identification of either the underlying party originating the transaction or the transaction's ultimate beneficiary.

> b.     In the future, for OFAC sensitive transactions, that bank would "*arrange cover for the payment using MT202/203 remittances.*"

> c.     In addition, that bank planned to send a separate 'MT100 message' to the recipient bank, providing full payment details for the originator and ultimate beneficiary.

348.     Cooper's June 9 email overtly acknowledged that "[i]n this way a payment in US$ can be made for an individual or company on the OFAC list, without the name being 'detected' by the OFAC filters that all US banks would apply."

349.     Several days later (June 14, 2000), Susan Wright forwarded Cooper's June 9, 2000 email to the then-current head of HSBC Group Compliance, Matthew King ("King"). In her cover email, Wright stated that the "practice" detailed by Cooper was "unacceptable" and informed King that it was her position that:

> a.     "We advised them that this was contrary to SWIFT guidelines (drawn up to address FATF concerns re money laundering via wire transfers) which required that the full details (names and addresses) of remitters and beneficiaries are included."

> b.     "From a Group perspective I consider the continuation of this practice [the client bank's future plan to conceal OFAC sensitive transactions behind

bank-to-bank transfers] to be unacceptable as a deliberate and calculated method to avoid US OFAC sanctions and has the potential to raise serious regulatory concerns and embarrass the Group."

350.     Senior HSBC Group officials were aware of the Conspiracy and the specific methods and overt acts by which Iran, Iranian banks and the HSBC Defendants were carrying out the Conspiracy. However, despite this awareness, senior HSBC Group and HSBC Group members' compliance officials (including compliance officials at Defendants HSBC Holdings, HSBC-Europe, HSBC-Middle East, and HSBC-US) did *not* put an end to this "practice" but instead, with clear knowledge of its purpose and aware that other banks participated in the Conspiracy, knowingly employed similar techniques to evade OFAC requirements, thus allowing the HSBC Defendants to continue deploying and refining  their "procedures" to facilitate illegal payments for Iran.

### 1.     HSBC-EUROPE'S 2001 "BANK MELLI PROPOSAL"

351.     In or around January 2001, Bank Melli's London branch maintained a USD account with several other major international banks, but was interested in establishing a relationship with HSBC that would give HSBC the majority of Bank Melli's USD clearing business.

352.     In an April 30, 2001 letter, Defendant HSBC-Europe presented Bank Melli in London with a proposal (the "Bank Melli Proposal") for processing Bank Melli payments. HSBC-Europe's proposal boasted that HSBC-Europe was "…confident that we have found a solution to processing your payments with minimal manual intervention."

353.     The Bank Melli Proposal expressly underscored that, if it adopted HSBC-Europe's "solution," Bank Melli would not be identified as a sender in any payment message and thus ensure that transactions would not run into any 'speed bumps' or other obstacles. The

"solution" provided specific alternative wording, as it explained:

> "The key is to **always** populate field 52 – if you do not have an ordering party then quote 'One of our Clients,' **never leave blank.** This means that the outgoing payment instruction from HSBC will not quote 'Bank Melli' as sender – just HSBC London and whatever is in field 52. This then negates the need to quote 'DO NOT MENTION OUR NAME IN NEW YORK' in field 72." [Emphasis in original.]

354.　　HSBC-Europe's proposal further requested, "In order to test our proposed solution we would appreciate if you used the following templates when submitting your next payments to the following customer, or alternatively submit a USD 1 test payment" and provided the following:

**MT202**
20:　　*Your Ref….*
21:　　*Related Ref….*
32:　　*Amount/currency/Value date….*
50:　　**DO NOT QUOTE IF IRANIAN**
52:　　*Customer Name* **OR** *One of our clients* **MUST BE COMPLETED**
53:　　**/68296908**
54:
56:
57:　　*Beneficiary Banker (SWIFT codes where possible)*
58:　　*Beneficiary (SWIFT codes where possible)*
70:　　*Any Payments details for beneficiary…*
72:　　**Please leave blank**
**MT100**
Pay as above.

(Emphasis in original.)

355.　　Thus, the Bank Melli Proposal documented the HSBC Defendants' active coordination and participation in the Conspiracy to illegally remove, omit or falsify essential information so as not to trigger OFAC filters or otherwise permit HSBC-US or other U.S depository institutions to detect Iranian transactions.

356.　　In 2001, John Wilkinson ("Wilkinson") served as HSBC-Europe's Institutional Banking Relationship Manager for HSBC-Europe's Bank Melli account.

357. In a June 28, 2001 email titled "**Re: Bank Melli**" to HSBC-US, Wilkinson discussed the Bank Melli Proposal, describing HSBC-Europe's "usual method" to alter payment messaging wording and the rationale for doing so:

- "Once the proposition goes live, we have instructed Bank Melli to alter the format of its [sic] payments to achieve straight through processing. The field 52 input of 'one of our clients' is a standard phrase used by MPD [Multicurrency Payments Department] in these situations."

- "Since sending the letter we have further asked them to only put 'One of our clients' in field 52, thus removing the chance of them inputting an 'Iranian referenced' customer name, that causes fall out of the cover payment sent to HSBC-US and a breach of OFAC regulations."

358. In further support of his position to continue this standard 'procedure,' Wilkinson explained that a payment involving an Iranian bank had been blocked because HSBC-Europe's MPD [Multicurrency Payments Department] "failed to spot the poor input and did not follow the normal procedure of altering the payment."

359. In other words, the HSBC Defendants' "normal" procedure was to conspire with Iranian banks, including Bank Melli, to *deliberately* alter payments for the express purpose of avoiding detection and analysis by U.S. banks, regulators and law enforcement.

360. In an email exchange in October 2001 between David Bagley ("Bagley"), Defendant HSBC-Middle East's Regional Head of Legal and Compliance, and Matthew King, a member (and later head of) HSBC Group's Audit Department, King noted: "[w]e also have to bear in mind pending US legislation which will in effect give the US extraterritorial authority over foreign banks, particularly if we are unfortunate enough to process a payment which turns out to be connected to terrorism. My own view therefore is that some of the routes traditionally used to avoid the impact of US OFAC sanctions may no longer be acceptable."

361. HSBC Group AML Head Susan Wright and Money Laundering Control Officer John Allison received copies of King's e-mail.

362. King's email confirms that senior HSBC Group member employees comprehended that the HSBC Defendants (and other banks) had "traditionally" used "routes" (a euphemism for altering payment messages) to avoid disclosing a transaction's Iranian connections and that some of those transactions might prove to be "connected to terrorism."

363. A January 2003 memorandum authored by HSBC-Middle East and disseminated to other members of the HSBC Defendants confirms not only the HSBC Defendants' ongoing participation in the Conspiracy but also their knowledge of the participation of other co-conspirators and Iran's desire to further evade U.S. sanctions. The memorandum stated in relevant part:

- "It is believed that some service providers amend the payments to ensure Iran is not mentioned in the body of the payment instruction to their USD correspondent. This process minimizes the risk of payment being referred to OFAC."

- "Currently, it is estimated that Iranian banks issue up to 700 USD payments a day using their USD providers, mainly banks in the UK and Europe, which in turn use their New York USD correspondents to effect the payments."

364. Acknowledging the existence of the Conspiracy, the memorandum advised:

- "[T]here is substantial income opportunity to sell a USD payments proposition to Iranian banks in view of the impending FATF regulations...The [requirements of the] new regulations…increases the risk of Iranian payments being held in the USA as they may fall foul of the OFAC regulations. The Iranian Banks have now prioritized this issue and are now actively seeking a solution from their banks, including HSBC."

365. From at least 2003 forward, HSBC provided banking services to, among other Iranian entities, NIOC (which, as noted previously, was later designated pursuant to E.O. 13382 and identified as an agent or affiliate of the IRGC).

366.     Over the course of the next several years, the HSBC Defendants continued their participation in the Conspiracy.

367.     In an October 9, 2006 email Bagley [HSBC-Middle East's Regional Head of Legal and Compliance] informed senior HSBC Group officials that key U.S. policymakers were "…in favour of withdrawing the U-Turn exemption from all Iranian banks. This on the basis that, whilst having direct evidence against Bank Saderat particularly in relation to the alleged funding of Hezbollah, they suspected all major Iranian State owned banks of involvement in terrorist funding and WMD [weapons of mass destruction] procurement."

368.     Further demonstrating his awareness of the risks HSBC was engaged in with Iran, David Bagley was listed as the contact person on the on April 19, 2007 Wolfsberg Group press release calling for more transparency for international wire transfers "to promote the effectiveness of global anti-money laundering and anti-terrorist financing programs."

369.     Eight months later, in a June 8, 2007 email, Bagley informed HSBC Holding's CEO, Michael Geoghegan, and others that "[U.S. Treasury Under Secretary for Counter Terrorist Financing and Sanctions] Levey essentially threatened that if HSBC did not withdraw from relationships with [redacted] we may well make ourselves a target for action in the US."

370.     Bagley's email thus confirmed that various relationships continued to exist with Iran and Iranian banks, including Bank Saderat.

371.     Bagley not only acknowledged that HSBC had "…an agency banking relationship in HSBC-EUROPE both for [redacted] and other Iranian banks," but he confessed that "[t]here are further complications surrounding the process of closure with all Iranian banks as we have some USD 9m in reimbursements due from Sepah, where we are running off trade lines, where we may need cooperation from Central Bank of Iran."

372.     On December 11, 2012, the U.S. Department of Justice ("DOJ") announced that Defendants HSBC Holdings and HSBC-US had admitted to Anti-Money Laundering ("AML") and OFAC sanctions violations, and had agreed to enter into a Deferred Prosecution Agreement ("DPA") and pay a $1.256 billion forfeiture. As explained further *infra*, DOJ issued a press release announcing the Deferred Prosecution Agreement, and summarizing the HSBC Defendants' illegal conduct.

373.     In connection with the Deferred Prosecution Agreement, DOJ filed a four-count felony criminal information against HSBC Holdings and HSBC-US, charging them with willfully failing to maintain an effective AML program, willfully failing to conduct due diligence on their foreign correspondent affiliates, and violating International Emergency Economic Powers Act ("IEEPA") and the Trading with the Enemy Act ("TWEA"). HSBC Holdings and HSBC-US waived federal indictment, agreed to the filing of the information, and claimed to have accepted responsibility for HSBC's and its employees' criminal conduct.

374.     Despite its agreement to overhaul its U.S. and global compliance functions, HSBC remained a conduit for illicit funds.

375.     On December 9, 2010, the U.S. Treasury Department designated Tajco, describing it as, "a multipurpose, multinational business venture involved in international trade as well as real estate and presided over by Ali, Husayn and Kassim Tajideen…. Since at least December 2007, Ali Tajideen used Tajco Sarl, operating as Tajco Company LLC, as the primary entity to purchase and develop properties in Lebanon on behalf of Hizballah."

376.     The designation also covered Kairaba Supermarket, a subsidiary business of Tajco Ltd.

377.     A July 13, 2012 article published by *Reuters* entitled "Special Report: HSBC's

money-laundering crackdown riddled with lapses" reported that a HSBC-US compliance officer had identified suspicious transactions involving Hezbollah, specifically Tajco and Kairaba Supermarket.

378.    In December 2013, the Treasury Department announced that Defendant HSBC-US agreed to remit $32,400 to settle potential civil liability for three apparent violations of the Global Terrorism Sanctions Regulations, 31 C.F.R. Part 594. The fine reflected the fact that HSBC-US facilitated transactions in late 2010 and early 2011 worth about $40,000 that benefited Tajco.

379.    Although a relatively small sum, the facilitation of terrorism financing for Hezbollah considerably after Defendants HSBC Holdings and HSBC-US began negotiating their deal with DOJ, strongly suggests that as of early 2011, the HSBC Defendants had not seriously remediated even after being caught committing hundreds of felonies.

## 2.    DEFENDANT HSBC-US'S   AGREEMENT TO PARTICIPATION IN THE CONSPIRACY IN VIOLATION OF 18 U.S.C. § 2332d

380.    As alleged in greater detail below, although Defendant HSBC-US periodically complained about Defendants HSBC-Middle East and HSBC-Europe's conduct, and proposed new procedures and policies for HSBC Group members that would have provided HSBC-US improved transparency, at all relevant times, HSBC-US was aware that the HSBC Defendants were participating in the Conspiracy to unlawfully transmit Iranian funds through U.S. banks (including HSBC-US), but HSBC-US took no measures to prevent HSBC-US from facilitating hundreds of millions of dollars of payments to Iran in violation of 18 U.S.C. § 2332d. Accordingly, in addition to violating § 2332d, HSBC-US's conduct evidenced its agreement to continue participating in the Conspiracy despite its complaints, its knowledge or deliberate indifference to the Conspiracy's criminal objectives and purposes, and its commission of

multiple overt acts.

381.    As one key example of HSBC-US's failure to take substantive measures to ensure it would not facilitate the HSBC Defendant's provision of illegal material support and services to Iran, a July 12, 2001 e-mail to senior employees at HSBC-US contained a memorandum authored by HSBC Group Representative for Iran, John Richards. Richards's memorandum outlined the business opportunities members of HSBC Group were presented with in connection with prospects to expand and grow HSBC Group's relationships with Iran, the CBI and Bank Melli, explaining:

> a.    "We have been approached by the Central Bank of Iran to take back their USD clearing business from Natwest. In principal I am keen to do this but on the clear proviso that it can be done profitably and on a sustainable basis."
>
> b.    "One of our key objectives for the year is to develop HSBC's Asset Management activities in Iran and with the Central Bank now managing the oil price stabilization fund amounting to some USD10bn there is considerable scope for this. Obviously many foreign banks are chasing the same business and so we need to demonstrate some competitive or relational advantage. The proposal from the Central Bank was therefore not unwelcome…The Central Bank manages their transactions through Bank Melli London…"
>
> c.    "In summary if we can make this business independently profitable and sustainable the benefits that we can derive particularly from the Treasury Asset Management and Investment spin offs will be substantial."

382.    Richards's memorandum also demonstrates the HSBC Defendants' awareness that other foreign banks (including Defendants) were eagerly pursuing U.S. dollar clearing business with the CBI.

383.    On July 12, 2001, Denise Reilly, HSBC-US's Senior Manager in Payment Operations, sent an e-mail titled "Re: Bank Melli" to various senior HSBC-US employees in which she stated, "It was relayed to us that the Group (with the Backing of Bond)[the Chairman]

was looking to significantly grow our presence in Iran." Reilly also explained that the "current lines of credit [for Iran] were reported to be $800m, trade lines of $150m and growth was anticipated in trade, cash management and internet banking." Thus, HSBC-US senior employees understood the significance to the HSBC Defendants of their Iranian business and specifically, the HSBC Defendants' relationship with Bank Melli.

384.    As early as 2001, senior HSBC-US payments, compliance and business managers were informed that Iranian USD payments were being sent by Defendant HSBC-Europe through HSBC-US after references to Iran had been deleted.

385.    HSBC-US employees were also informed of an HSBC-Europe proposal to streamline the processing of U-turn transactions by omitting references to Iran so that the transactions would not be halted by the OFAC filter in the United States. Emails at the time show that senior HSBC-US officials expressed discomfort with the HSBC-Europe proposal, but took no other action to stop or prevent the activity already occurring.

386.    As noted above, a senior HSBC-US employee received an e-mail on June 28, 2001 titled "*Re: Bank Melli*," which described HSBC-Europe's "usual method" of altering payment messaging and the reasons for doing so.

387.    Another example of HSBC-US' knowledge and acquiescence in the Conspiracy is memorialized in a November 14, 2002 memorandum entitled "COMPLIANCE-OFAC ISSUES IN GENERAL AND SPECIFIC TO IRAN" authored by HSBC-Europe's Multicurrency Payments Department Head Malcolm Eastwood ("the Eastwood Memorandum").

388.    The Eastwood Memorandum was sent to both HSBC-US and HSBC-Europe employees and forwarded to additional HSBC-US employees in separate emails.

389.    The Eastwood Memorandum discussed both HSBC's "cover payment method" of evading U.S. sanctions and the specific actions taken by HSBC to modify the contents of payment messages. In relevant parts, the Eastwood Memorandum stated:

- "As the custodian of HSBC-Europe's payments operation I currently feel that we may be exposing ourselves to unnecessary and unacceptable Reputational and Operational Risk when we are handling payments originating from FIs [financial institutions] domiciled in or who are a local branch of an FI domiciled in an OFAC regulated country."

- "HSBC-Europe's historical practice has been to send these types of payments where the U Turn principal applies (ie funds are generally moving from an European bank to another European bank for the credit of an OFAC regulated entity) via the Cover Payment method. This means that the payment instructions received by HSBC-US contains no mention of the country or entity involved. My understanding is that this has been accepted practice for many years and that HSBC-Europe IBL hold accounts, some in USD for FIs domiciled in these countries ie Cuban, Iranian etc."

- "The Iranian banks continue to send us what I describe as conditional payment instructions which for HSBC-Europe require an element of amendment by ourselves. This introduces operational risk and under FATF principles we should not be amending these payments instructions. Acceptance of these items over many years means that we are bound by the precedents currently in place, and I believe that we need to break these precedents…"

- "[W]e need…[t]o agree a 'template' payment instruction for these U Turn Payments which can be used by PCM Sales and the RM team and sent to the Iranian Banks stipulating that payments must be formatted in this way, confirming that we will be sending these via the Serial method and that any deviation from this template will be at the Iranian Banks own risk."

- "Whilst I am told that there are significant business opportunities particularly with countries such as Iran there are also substantial Reputational and Operational Risks, not to mention financial losses associated with it."

390.    In addition, HSBC-US's OFAC filter occasionally stopped an Iranian-related transaction, sent by an HSBC Group affiliate, in which the identifying information had

inadvertently been retained, demonstrating that undisclosed U-Turn exemption transactions continued to be sent through HSBC-US correspondent accounts.

391.    HSBC-US employees were copied on similar memoranda issued by other of the HSBC Defendants during the relevant period. For example, a January 2003 memorandum circulated by HSBC-Middle East (and received by several HSBC-US employees) also noted that "[t]he Group now has an excellent relationship with all Iranian banks and some very larger Iranian corporates such as National Iranian Oil Co, National Petrochemical Co, National Iranian Gas Co, National Iranian Steel Co, top Iranian insurance companies, Ministry of Power, Ministry of Post and Telecommunications, etc."

392.    The memorandum also confirmed the HSBC Defendants' awareness that other non-Iranian banks were participating in the Conspiracy, stating:

- "It is believed that some service providers amend the payments to ensure Iran is not mentioned in the body of the payment instruction to their USD correspondent. This process minimizes the risk of payment being referred to OFAC."

- "Currently, it is estimated that Iranian banks issue up to 700 USD payments a day using their USD providers, mainly banks in the UK and Europe, which in turn use their New York USD correspondents to effect the payments."

- "[T]here is substantial income opportunity to sell a USD payments proposition to Iranian banks in view of the impending FATF regulations...The [requirements of the] new regulations…increases the risk of Iranian payments being held in the USA as they may fall foul of the OFAC regulations. The Iranian Banks have now prioritised this issue and are now actively seeking a solution from their banks, including HSBC."

393.    An October 2003 document entitled "IRAN-STRATEGY DISCUSSION PAPER" circulated to senior HSBC-US employees further documented the HSBC Defendants' eagerness to facilitate funds transfers for Iran, noting: "One of the reasons to accelerate our process of engagement is to demonstrate, to the authorities within Iran, that we are committed to

the development of their country. This is seen to be particularly important given the more aggressive/pragmatic approach to Iranian business adopted by French and German competitor banks."

394.     Nevertheless, despite being copied on such memos, HSBC-US took no further action to stop the unlawful activities.

395.     Even when HSBC-US blocked payments, it failed to take further action to ensure that other HSBC Defendants would not continue these practices. For example in late December 2002, HSBC-US's OFAC filter stopped and rejected a payment listing Bank Melli as the originator of the payment that contained a field that read, "**Do not mention our name in NY**."

396.     An internal HSBC-US email dated December 30, 2002 informed HSBC-US's compliance team about the payment, which once again confirmed the HSBC Defendants' ongoing process of altering payments.

397.     On June 13, 2003, HSBC-US's OFAC filter stopped another transaction, this time for $150,000. It included both a reference to Bank Melli and the words, "*do not mention our name.*"

398.     In a June 16, 2003 email entitled "PLC-Re do not mention our name," HSBC-US compliance officers were notified about the June 13 blocked transaction and received additional confirmation of the HSBC Defendants' illegal practice of altering fields within Iranian payment messages for the express purpose of escaping detection in the United States.

399.     During 2004, in furtherance of the Conspiracy, HSBC Group members sent approximately *7,000* Iranian transactions through USD accounts in the United States without disclosing their source.

400. HSBC-US did not report any of the HSBC Defendants' illegal conduct to any of its regulators or to U.S. law enforcement at that time.

401. During 2005, in furtherance of the Conspiracy, HSBC-Europe and HSBC-Middle East together sent about *5,700* Iranian transactions through USD accounts in the United States without disclosing their source.

402. On April 19, 2005, HSBC-US's OFAC filter again stopped a ($362,000) payment from Bank Melli because it contained the phrase "*do not mention our name in New York.*" HSBC-Europe re-submitted the payment on April 22, 2005, but HSBC-US stopped it again, this time sending HSBC-Europe a SWIFT message requesting full disclosure of the name and address of the underlying originator and ultimate beneficiary.

403. In early May 2005, HSBC-US stopped a $6.9 million wire payment originating with Defendant Credit Suisse in Zurich because the payment details included the phrase "*Bank Melli Iran.*"

404. In fact, 44 of the payments stopped by HSBC-US's OFAC filter in May 2005 alone (inadvertently) disclosed Iranian involvement.

405. On June 3, 2005, HSBC-US informed Defendant HSBC Holdings that additional HSBC-Europe transfers in the amounts of $1.9 million and $160,000 had been stopped by HSBC-US due to the lack of full disclosure of the originator, beneficiary, and purpose of the payment.

406. HSBC-Europe responded that both payments were foreign exchange related, the originators were Bank Tejarat and Bank Melli, and the beneficiaries were Persia International Bank and Defendant Credit Suisse's Zurich office, respectively.

407. HSBC-US responded by requesting that HSBC-Europe follow up with the banks to obtain the names and addresses of the initial originators and ultimate beneficiaries, as well as confirmation of the underlying purpose of the payments.

408. According to information provided by Bank Melli through HSBC-Europe, the $160,000 payment denoted an internal transfer from Bank Melli's account with HSBC-Europe to Bank Melli's account with Defendant Credit Suisse's Zurich office.

409. From July 2005 to June 2006, HSBC-Middle East sent more than 2,500 Iranian transactions through its U.S. dollar accounts in the U.S. that illegally concealed the required data relating to Iran.

410. On November 23, 2005, in an email entitled "Cover payment processed to Credit Suisse re 'Bank Melli' – USD 100,000" an HSBC-US OFAC Compliance officer notified HSBC-Europe that, on November 7, 2005, a $100,000 transaction involving Bank Melli had been processed through HSBC-Europe's account at HSBC-US without transparent documentation:

> We are bringing this to your attention as this situation indicates that cover payment involving Iran are still being processed by PLC [referring to HSBC-Europe]. It was our understanding that Group payments involving Iran would be fully disclosed as to the originators and beneficiaries.

411. In furtherance of the Conspiracy, from April 2006 through December 2007, about 50% of the estimated 700 Iranian payments sent by HSBC-Europe to USD accounts at HSBC-US and elsewhere continued to not disclose their connection to Iran.

412. In addition, HSBC-US was the conduit for at least 24 post-U.S. designation transactions on behalf of IRISL and its various front companies through March, 2010.

413. During the relevant time period, HSBC-US knew that Iran was a designated State Sponsor of Terrorism, and that HSBC-US's USD clearing operations were being used by the

HSBC Defendants to facilitate unlawful payments on behalf of Iran in furtherance of the Conspiracy.

414. As noted above, on December 11, 2012, Defendants HSBC Holdings and HSBC-US entered into a Deferred Prosecution Agreement with DOJ. DOJ issued a press release announcing the Deferred Prosecution Agreement's entry, including the fact that the Deferred Prosecution Agreement resulted in HSBC Holdings and HSBC-US admitting to anti-money laundering ("AML") and sanctions violations, as well as the fact that they would pay a $1.256 billion USD forfeiture.

415. In addition the $1.256 billion forfeiture under the Deferred Prosecution Agreement, HSBC Holdings and HSBC-US also agreed to pay $665 million in civil penalties – $500 million to the OCC and $165 million to the Federal Reserve – for these HSBC Defendants' AML program violations.

416. DOJ's press release announcing the Deferred Prosecution Agreement quoted then-Assistant Attorney General Lanny Breuer as stating, "HSBC is being held accountable for stunning failures of oversight – and worse – that led the bank to permit narcotics traffickers and others to launder hundreds of millions of dollars through HSBC subsidiaries, and to facilitate hundreds of millions more in transactions with sanctioned countries. The record of dysfunction that prevailed at HSBC for many years was astonishing." United States Attorney for the Eastern District of New York Loretta Lynch was quoted as stating, "HSBC's willful flouting of U.S. sanctions laws and regulations resulted in the processing of hundreds of millions of dollars in OFAC-prohibited transactions. Today's historic agreement, which imposes the largest penalty in any [Bank Secrecy Act] prosecution to date, makes it clear that all corporate citizens, no matter how large, must be held accountable for their actions."

417.    Manhattan District Attorney Cyrus R. Vance Jr. was quoted in the same press release as stating, "New York is a center of international finance, and those who use our banks as a vehicle for international crime will not be tolerated. … Sanctions enforcement is of vital importance to our national security and the integrity of our financial system. The fight against money laundering and terror financing requires global cooperation, and our joint investigations in this and other related cases highlight the importance of coordination in the enforcement of U.S. sanctions."

**J.      DEFENDANT BARCLAYS' AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY**

418.    Until at least May 2008, Defendant Barclays maintained correspondent banking relationships with several of the Iranian Bank Co-conspirators, including Bank Saderat and Bank Melli.

419.    Barclays is a member of SWIFT and has historically used the SWIFT system to transmit international payment messages with financial institutions around the world. Barclays originally processed USD payment messages through numerous global locations. Over time, Barclays consolidated its USD payment processing so that the payments were predominately processed at Barclays' Payment Processing Centre located in Poole, England ("Poole").

420.    Barclays knowingly and willfully engaged in conduct that caused its New York branch and other financial institutions in the United States to process payments in violation of U.S. sanctions.  As part of this effort to evade U.S. sanctions, Barclays:

    a.      followed instructions from Iran and its agents not to mention their names in USD payment messages sent to the New York branch and to other financial institutions located in the United States;

    b.      routed USD payments through an internal Barclays sundry account, thereby hiding the payments' connection to Iranian entities;

       c.       amended or reformatted USD payment messages to remove information identifying Iranian entities; and

       d.       re-sent messages as cover payments to take advantage of cover payments' lack of transparency.

421.    Beginning in 1987, Bank Melli Iran instructed Barclays to process USD transactions in favor of Bank Melli's London branch by referencing only Bank Melli's account number at Midland Bank Plc without referencing Bank Melli's name. Bank Melli further instructed Barclays to send separate instructions, which included full transaction details, to Midland Bank Plc and Bank Melli's London Branch.

422.    In response, Barclays memorialized Bank Melli's instructions in a memorandum sent by its Head Office to Barclays' international offices, and, as early as the late 1990s, included them in Barclays' "List of Correspondents" ("LOC"), which contained information related to Barclays' correspondent banking relationships and assisted Barclays' employees in effectuating international payments.

423.    Barclays' LOC contained instructions on how to process payments for both sanctioned and non-sanctioned banks with which Barclays had correspondent relationships. Over time the LOC grew to include instructions for payments related to several of Barclays' correspondent bank clients and included instructions to use cover payments when processing USD payments to the United States, omitting the name of U.S.-sanctions targets from the payment messages so that U.S. financial institutions could not identify the sanctions nexus of the payments.

424.    In a November 1987 Head Office Circular, Barclays distributed payment instructions received from an Iranian bank directing Barclays "to amend the procedures governing the transfer of U.S. Dollars for any purpose in favour of our London branch" and to

route such payments "without mentioning the name of our bank." The reason for, and effect of, these instructions was to disguise sanctioned entity payments from Barclays' correspondents in the United States so that such correspondents would unwittingly process the illegal payments.

425. Barclays' employees followed the instructions in the LOC when processing USD payments involving sanctioned banks, thereby ensuring that the name of the bank would not appear in any MT 202 cover payment messages sent to Barclays' New York branch. For example, with regard to USD payments sent on behalf of an Iranian bank, the LOC stated, "[t]he cover MT202 for the direct Payment Order to be arranged by the remitting Bank <u>without mentioning [the Iranian bank's]</u> name ...." (Underlining in original.)

426. Barclays' LOC also contained instructions to contact the remitter or beneficiary for routing instructions for certain payments involving sanctioned entities. The general instructions for Iranian banks stated:

> USD PAYMENTS TO IRAN
> Certain payments may be blocked by the US Authorities. Therefore any branch with a USD transfer is advised to contact the remitter beneficiary or beneficiary's bankers to request specific routing instructions.

427. Barclays' standard operating procedures allowed and even educated its employees how to bypass both Poole's and the U.S. financial institution's OFAC filters to permit illegal payments.

428. Pursuant to these "standard" procedures, when the Poole filter identified a payment message that referenced an Iranian entity, that payment message was stopped for further review by Barclays' employees in Poole.

429. If the Poole-based employees found that the payment message referenced to an Iranian entity, they would follow one of the following procedures: (i) return the payment

message to the remitting area via a pre-formatted fax cover sheet; (ii) alter or delete fields in the SWIFT message; or (iii) change the routing of the payment message from a serial payment to a cover payment in order to hide any connection to the Iranian entity.

430. The then-Senior Manager for Barclays Group Payments Industry Management in Poole explained that if the MT 202 payment message contained beneficiary information that caused it to be stopped by the OFAC filter in the U.K, that information was removed to ensure the payment was not stopped by the OFAC filter when resubmitted.

431. The same Senior Manager noted that he was aware that payment operators amended payment messages in order to facilitate U.S. dollar payments to Iran and that this was a "*common practice*" at Barclays.

432. As noted above, consistent with Barclays' "standard" procedures, when a payment was flagged by the Poole OFAC filter, Barclays' employees generally returned the flagged payment message to the original remitting bank. Barclays' employees used a specific fax cover sheet to advise the remitting area of Barclays that the payment message had been cancelled and would further identify the specific words in the payment message that had caused the message to be stopped by the Poole filter. The fax cover sheet contained the following language:

> OFAC ITEM: Wording below is contained in the message and does not comply with the Office of Foreign Assets Control regulations applicable to all payments sent via the U.S.A. Payments to U.S.A. must NOT contain the word listed below.

433. Subsequently, because Barclays was advising the remitting bank of the prohibited language, some of these payment messages would thereafter be re-sent by the remitting bank without the offending language. This deliberate omission enabled the payment message to pass through the Poole filter without being blocked and then to be processed by Barclays' New York branch and unwitting U.S. financial institutions.

434.    In November 2001, the use of the fax cover sheet was identified by Barclays'
internal auditors as problematic because (according to a Barclays internal audit report) "without
adequate guidance the recipient of the fax advice may not be aware of the implications and may
merely remove the offending text and re-submit the payment without any wider consideration."
In early 2002, as a result of this internal audit report, the language of the fax template was re-
worded in an attempt to mitigate these issues. The fax language was changed to:

> OFAC ITEM: Wording below is contained in the message and
> does not comply with the U.S.A. / U.K. / E.C. / U.N. Sanctions.

435.    Despite the altered wording in the fax cover sheet, no implementing guidance was
circulated, and Barclays' "standard" practices nevertheless continued, as did the resubmission of
prohibited OFAC-sanctioned transactions with the offending text removed.

436.    Barclays' employees generated internal correspondence that documented
Barclays' awareness and acceptance of the fact that transactions were being processed via MT
202 cover payments for the specific purpose of hiding the identity of Iranian entities in order to
ensure that Barclays could continue its unfettered processing of payments involving Iranian
entities through Barclays' New York branch. For example, one Barclays employee explained in
an email:

> [W]e can get around [OFAC seizure] by sending only cover payments to
> US banks and then make MT103 direct to beneficiary's bank. The MT202
> cover must not mention of [sic] the offending entity which could cause
> funds to be seized. A good example is Cuba which the US says we
> shouldn't do business with but we do.

437.    Barclays' employees understood the advantage of using cover payments. The
cover payment, with its limited information fields, was a better mechanism to process OFAC-
prohibited transactions than using a more detailed serial payment. An employee noted in an
email: "If we were to route the payment via the serial payment method ... the payment would

clearly be seized by the US authorities" but by using cover payments, "the US Treasury [would] remain blissfully unaware of [the payment's] existence."

438.    In December 2002, internal correspondence also brazenly acknowledged Barclays' use of MT 202 cover payment messages to detour U.S. Iranian sanctions, stating:

> To circumvent US legislation, [Barclays is] currently rout[ing] US$ items for sanctioned institutions via unnamed account numbers, without mention of the sanctioned party. For customer transfers, payment cover is routed via MT202 to New York, naming only the account holding bank. A direct MT103 is them [sic] sent to the account holding bank. Further investigation suggests that we are carrying out this practice on behalf of four [Iranian bank] customers….

439.    A January 2004 report provided to Barclays' Group Risk Oversight Committee noted that a recent failure "illustrat[ed] why the whole sanctions process needs to be reviewed and brought up to date."

440.    In July 2004, an internal assessment of Barclays' payments processing explained:

> Cover payments are an issue for this project as they are effectively a way of by passing [sic] sanctions. . . . There is nothing in these payment messages [MT103 and MT202] that identifies them as linked for the purpose of screening.

441.    In April 2005, Barclays noted in an internal memo the risk of using MT 202 cover payments rather than MT 103 serial payments, and also acknowledged that other financial institutions such as the Western Bank Defendants facilitated payments for Iran in the same manner:

> Changing to different message types would be much more expensive to us. *Moral risk exists if we carry on using cover payments but that is what the industry does.* I[n] M[y] H[umble] O[pinion] we should carry on using cover payments and accept that there is a risk of these being used on occasion to hide true beneficiaries (who may or may not be sanctioned individuals or entities). [Emphasis added.]

442.     In the spring of 2006, Barclays' senior management learned that four cover payments involving sanctioned parties had been routed through Barclays' New York branch and were processed because the cover payments did not mention the sanctioned beneficiary or originator.

443.     Throughout this entire time period, Barclays knew that Iran was a designated State Sponsor of Terrorism and knew that Barclays was facilitating unlawful payments on behalf of Iran in furtherance of the Conspiracy.

444.     Barclays also continued to facilitating unlawful payments on behalf of Bank Saderat after Barclays knew that Bank Saderat had been designated an SDGT for its facilitation of payments to Hezbollah.

445.     It also continued to facilitating unlawful payments on behalf of Bank Melli after Barclays knew that Bank Melli had been designated by the United States in part for its facilitation of payments to the IRGC.

446.     On August 18, 2010, DOJ announced that Barclays had entered into a DPA with federal and New York State prosecutors, and agreed to forfeit $298 million dollars in connection with violations of IEEPA and TWEA. A criminal information was filed August 16, 2010, in the U.S. District Court for the District of Columbia charging Barclays with one count of violating IEEPA and one count of violating TWEA. Barclays waived indictment, agreed to the filing of the information, and has accepted and acknowledged responsibility for its criminal conduct.

447.     In the press release announcing the Deferred Prosecution Agreement, then-FBI Assistant Director-in-Charge Janice K. Fedarcyk was quoted as stating, "Barclays Bank has admitted a decade-long pattern of violating U.S. banking laws, and taking certain steps to

conceal prohibited transactions. Corporate responsibility entails more than just acting discreetly on behalf of one's clients. It means, first and foremost, acting lawfully."

**K.  DEFENDANT STANDARD CHARTERED BANK'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY**

448.    Defendant SCB provided banking services to Iranian clients starting in or about 1993.

449.    At some point thereafter, SCB began formulating plans to further the Conspiracy.

450.    For example, on June 1, 1995 SCB's General Counsel wrote an e-mail advising SCB's regulatory compliance staff, "if SCB London were to ignore OFACs regulations AND SCB NY were not involved in any way & (2) had no knowledge of SCB Londons [sic] activities & (3) could not be said to be in a position to control SCB London, then IF OFAC discovered SCB London's [sic] breach, there is nothing they could do against SCB London, or more importantly against SCBNY." He also instructed that a memorandum containing this plan was "highly confidential & MUST NOT be sent to the US."

451.    SCB's role in the Conspiracy grew dramatically in early 2001, when the CBI approached SCB to act as the CBI's recipient bank for U.S. dollar proceeds from daily oil sales made by NIOC.

452.    An e-mail dated February 19, 2001 from SCB's Head of Inbound Sales, Institutional Banking, characterized CBI's solicitation of SCB as "*very prestigious*" because "*in essence, SCB would be acting as Treasurer to the CBI . . . .*"

453.    On September 24, 2012, the U.S Treasury Department made a determination that NIOC was an agent or affiliate of the IRGC.

454.    Thus, SCB was knowingly laundering billions of dollars in violation of multiple U.S. laws for the benefit of among others, the IRGC.

455.     In a follow up e-mail dated March 23, 2001, SCB's Group Legal Advisor wrote to its Product Manager, Corporate & Institutional Banking and its General Counsel (the e-mail was also forwarded to SCB's Group Head of Audit) that "our payment instructions [for Iranian Clients] should not identify the client or the purpose of the payment."

456.     SCB and the CBI quickly developed operating procedures to mask the involvement of Iranian entities in payment instructions sent to SCB's New York branch (as noted above "SCB- NY"). When the beneficiary bank of a CBI payment was an Iranian bank, SCB London would send an MT 100 or MT 103 to the beneficiary bank's non-U.S., non-Iranian correspondent bank with full details of the Iranian beneficiary bank, and a *separate* MT 202 to SCB-NY with no mention of the Iranian beneficiary bank.

457.     In fact, SCB London set up routing rules within its payment system to route all incoming SWIFT messages from the CBI to a repair queue, meaning that the payments were subject to manual review and processing by wire operators, to prevent SCB London from automatically processing outbound payment instructions cleared through the United States with a reference to the CBI in the payment message.

458.     SCB London's payment processing team initially instructed the CBI to insert SCB London's BIC in field 52 (ordering institution) of its incoming payment instructions so that SCB's payment system would not populate that field with the CBI's BIC.

459.     When the CBI failed to insert SBC's BIC, SCB London wire operators would manually change field 52 to reference SCB London's BIC in order to mask the CBI's involvement in the payments.

460.     Inevitably, SCB's willingness to further the Conspiracy in this manner attracted more illicit business.

461.     As early as February 2002, several additional Iranian banks approached SCB London to discuss the possibility of opening new accounts.

462.     SCB London's Legal, Compliance, and Cash Management groups identified the need for written procedures for the operation of these additional Iranian banks' dollar-denominated accounts.

463.     SCB's central role in the Conspiracy was memorialized in an internal memorandum regarding SCB's procedures for processing payments sent through the United States from the Iranian banks.

464.     The document was entitled "Standard Chartered Bank Cash Management Services UK - Quality Operating Procedure: Iranian Bank Processing."

465.     It was first issued to SCB London staff on February 20, 2004 and included detailed instructions regarding the omission of the Iranian remitting bank's BIC:

> Ensure that if the field 52 of the payment is blank or that of the remitting bank that it is overtyped at the repair stage to a "." (Note: if this is not done then the Iranian Bank SWIFT code may appear - depending on routing - in the payment message being sent to [SCB-NY]).

466.     In addition to inserting a "." in field 52, the memorandum also instructed staff to use cover payments to effect Iranian bank payments, which resulted in SCB London omitting any reference to the involvement of Iranian beneficiaries or beneficiary banks in SWIFT payment messages sent to SCB-NY.

467.     Approximately 60,000 payments related to Iran, totaling $250 billion were eventually processed by SCB as part of the Conspiracy.

468.     An e-mail dated March 9, 2003, from SCB's Head of Transactional Banking Solutions, UK/Europe Corporate & Institutional Banking to several of SCB's wholesale bank business managers indicates that SCB learned that another bank was "*withdrawing their*

*services*" with one of its Iranian client banks "primarily for reputational risk reasons."

469.    In a memorandum accompanying the news of the aforementioned bank's reduction in Iranian business entitled "Summary of the Risks/Issues to be Addressed with Regard to Iranian Bank USD Clearing that Require Management Direction from Middle East Senior Management Team," the risks posed by additional Iranian business that might "trigger an action" from OFAC, "leaving SCB exposed, with potential reputational damage" were considered, but ultimately rejected in favor of pursuit of further Iranian business.

470.    An October 15, 2003 e-mail from SCB's Manager, Cash Management Services, London to SCB's Product Manager, Corporate & Institutional Banking and its Head of Cash Management Services, UK (forwarded to SCB's Head of Legal & Compliance, Americas and Head of Legal for Corporate & Institutional Banking) outlined how the CBI was instructed to "send in their MT 202's with a [SCB London's business identifier code] as this is what we required them to do in the initial set up of the account. Therefore, the payments going to NY do not appear to NY to have come from an Iranian Bank."

471.    When SCB anticipated that its business with the Iranian Bank Co-conspirators, including Defendant Bank Saderat Plc, would grow too large for SCB employees to "repair" manually the instructions for New York bound wire transfers, SCB automated the process by building an electronic repair system with "specific repair queues," for each Iranian client.

472.    SCB's payment "Quality Operations Procedures" manual contained instructions on how to manually "repair" or "over-type field 52 as [SCB London]" in SWIFT MT 202 payment message fields to hide CBI's role as originator of the MT 202 transactions SCB was processing.

473.    In October 2004, SCB consented to a formal enforcement action and executed a

written agreement with the N.Y. State Banking Department and the Federal Reserve Board of New York ("FRBNY"), which required SCB to adopt sound BSA/AML practices with respect to foreign bank correspondent accounts (the "Written Agreement").

474. The Written Agreement arose as a result of identified flaws in AML risk controls at SCB-NY. The Written Agreement required SCB to adopt sound AML practices with respect to foreign bank correspondent accounts.

475. The Written Agreement also required SCB to hire an independent consultant to conduct a retrospective transaction review for the period of July 2002 through October 2004.

476. The review was intended to identify suspicious activity involving accounts or transactions at, by, or through SCB-NY.

477. SCB retained Deloitte & Touche LLP ("D&T") to conduct the required independent review and to report its findings to the regulators.

478. On August 30, 2005 and again on September 17, 2005, D&T provided SCB confidential historical transaction review reports that D&T had prepared for two other major foreign banking clients that were under investigation for OFAC violations and money laundering activities.

479. D&T's reports contained detailed and highly confidential information concerning foreign banks involved in illegal U.S. dollar clearing activities.

480. SCB then asked D&T to delete from its draft "independent" report any reference to certain types of payments that could ultimately reveal SCB's illegal Iranian-related practices.

481. In an e-mail dated October 1, 2005, SCB's Group Head of Legal & Compliance, Wholesale Bank, forwarding the *Quality Operating Procedure* to SCB's Group Head of Compliance and Regulatory Risk, its Group Legal Advisor and its Head of Financial Crime Risk

Systems and Monitoring, observed that "read in isolation, is clearly ... designed to hide, deliberately, the Iranian connection of payments."

482. A few days later, in an e-mail dated October 8, 2005, D&T's Global Leader of Anti-Money Laundering/Trade Sanctions Division wrote to SCB's Head of Compliance, that D&T had "agreed" to accede to SCB's request that D&T delete from its draft "independent" report any reference to certain types of payments that could ultimately reveal SCB's illegal Iranian U-Turn practices because "this is too much and too politically sensitive for both SCB and Deloitte. That is why I drafted the watered-down version." (Emphasis added.)

483. In a December 1, 2005 internal memorandum entitled "*Project Gazelle*," SCB's Group Head of Compliance and Regulatory Risk and its CEO in the United Arab Emirates wrote to SCB's Group Executive Director for Risk and its Group Head of Global Markets, acknowledging that SCB repair procedures for U-Turn exemption transactions did "not provide assurance that it does not relate to a prohibited transaction, and therefore SCB NY is exposed to the risk of a breach of sanctions."

484. A February 23, 2006 internal memorandum entitled "Iranian Business" sent from SCB's General Counsel advising SCB's Audit and Risk Committee confirmed SCB's continued recognition that the Conspiracy was expressly designed to enable Iran, and the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc) to evade U.S. detection of their transactions and confirmed that "certain US$ clearing transactions handled in London were processed with the name of the Iranian Bank excluded or removed from the 'remitter field'" despite the "requirement that due diligence in respect of 'U-turn' payments should be undertaken by our office in New York."

485. In September 2006, New York State regulators requested that SCB provide them

with statistics on Iranian U-Turns SCB handled, including the number and dollar volume of such transactions for a 12-month period.

486.     In response, SCB searched its records for 2005 and 2006.

487.     In an e-mail dated September 26, 2006 from SCB's Project Manager for the Lookback Review to SCB's Head of Cash Management Services (2002-2005) and Head of Compliance (2005-2007) at SCB-NY, SCB's Head of Operations and Head of Cash SCB identified 2,626 transactions totaling over $16 billion (for Iranian banks).

488.     Faced with the prospect of disclosing *billions* of dollars in Iranian transactions, SCB-NY's Head of Compliance was directed by his superiors at SCB instead to provide only four ***days*** of U-Turn data to regulators (masquerading as a 2-year log).

489.     In October 2006, the CEO for SCB's U.S. operations e-mailed the SCB Group Executive Director in London:

> Firstly, we believe [the Iranian business] needs urgent reviewing at the Group level to evaluate if its returns and strategic benefits are . . . still commensurate with the potential to cause very serious or even catastrophic reputational damage to the Group. Secondly, there is equally importantly potential of risk of subjecting management in US and London (e.g. you and I) and elsewhere to personal reputational damages and/or serious criminal liability.

490.     SCB's Group Executive Director responded (as quoted by an SCB-NY branch officer): "You f---ing Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians."

491.     In 2007, SCB successfully convinced the N.Y. State Banking Department and FRBNY to lift their consent order on SCB based on the "watered down" D&T report and its other fraudulent disclosures.

492.     As noted above, from approximately January 2001 through 2007, SCB transferred at least *$250 billion* through SCB-NY on behalf of the Iranian Bank Co-conspirators, including

Bank Melli and the CBI, as well as Defendant Bank Saderat Plc.

493. SCB-NY processed approximately 60,000 wire transfers on behalf of Iranian Bank Co-conspirators, with roughly half the transactions originating with SCB's London office and the other half with SCB's branch in Dubai, UAE.

494. In early 2009, after being contacted by U.S. law enforcement authorities, SCB conducted yet another "internal investigation" into its OFAC procedures.

495. Nonetheless, SCB-NY was the conduit for at least 50 post-U.S. designation transactions on behalf of IRISL and its various front companies through June 2010.

496. As of 2011, however, even after its internal investigation and open law enforcement investigations commenced in the U.S., the New York State Banking Department still found that SCB-NY had:

      a.     no documented evidence of investigation before release of funds for transactions with parties whose names matched the OFAC-sanctioned list; and

      b.     outsourced SCB-NY's entire OFAC compliance process to Chennai, India, with no evidence of any oversight or communication between the Chennai and SCB-NY.

497. On December 10, 2012 DOJ announced that SCB had agreed to forfeit $227 million to the Justice Department for conspiring to violate IEEPA, and that the forfeiture was part of Deferred Prosecution Agreements SCB entered into with DOJ and the Manhattan District Attorney's office for illegally moving millions of dollars through the U.S. financial system on behalf of, *inter alia*, sanctioned Iranian entities. SCB also entered into settlement agreements with OFAC and the Board of Governors of the Federal Reserve System, as well as with New York State Department of Financial Services regulators.

498. DOJ filed a criminal information charging SCB with one count of knowingly and willfully conspiring to violate IEEPA. SCB waived the federal indictment, agreed to the filing of the information and, according to DOJ's press release "accepted responsibility for its criminal conduct and that of its employees."

499. DOJ's press release announcing the Deferred Prosecution Agreement quoted then-Assistant Attorney General Lanny Bruer as stating, "[f]or years, Standard Chartered Bank deliberately violated U.S. laws governing transactions involving Sudan, Iran, and other countries subject to U.S. sanctions. The United States expects a minimum standard of behavior from all financial institutions that enjoy the benefits of the U.S. financial system. Standard Chartered Bank's conduct was flagrant and unacceptable. Together with the Treasury Department and our state and local partners, we will continue our unrelenting efforts to hold accountable financial institutions that intentionally mislead regulators to do business with sanctioned countries."

500. Manhattan District Attorney Cyrus Vance Jr. stated in the press release, "Investigations of financial institutions, businesses, and individuals who violate U.S. sanctions by misusing banks in New York are vitally important to national security and the integrity of our banking system. Banks occupy positions of trust. It is a bedrock principle that they must deal honestly with their regulators. I will accept nothing less; too much is at stake for the people of New York and this country. These cases give teeth to sanctions enforcement, send a strong message about the need for transparency in international banking, and ultimately contribute to the fight against money laundering and terror financing."

501. On August 19, 2014, Benjamin M. Lawsky, New York State's Superintendent of Financial Services, announced an order regarding SCB's failures to remediate AML compliance

problems as required in SCB's 2012 settlement with the New York State Department of Financial Services (NYDFS).

502.    Under the August 2014 NYDFS order, SCB was required to suspend dollar clearing through SCB-NY for high-risk retail business clients at SCB's Hong Kong subsidiary; exit high-risk client relationships within certain business lines at SCB's branches in the UAE; not accept new dollar-clearing clients or accounts across its operations without prior approval from NYDFS; pay a $300 million penalty; and take other remedial steps.

503.    In addition, according to an October 29, 2014 article in *The New York Times*, federal and Manhattan prosecutors have reopened their investigation into SCB. *The New York Times* reported that prosecutors are questioning whether SCB failed to disclose the extent of its wrongdoing to the government, thus imperiling SCB's 2012 settlement.

## L.    DEFENDANT ROYAL BANK OF SCOTLAND N.V.'S ("ABN AMRO (RBS N.V.)") AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

504.    As alleged above, Defendant RBS N.V. is the legal successor to ABN Amro Bank. As noted above, this Defendant is referred to herein as "ABN Amro (RBS N.V.)".

505.    In May 1995, top officials of ABN Amro (RBS N.V.) in Amsterdam sent an e-mail to the entire management of ABN Amro (RBS N.V.) in Europe, Asia, South America, Africa, the Caribbean, and North America, advising them that any financial transactions in USD undertaken for or on behalf of Iranian persons or banks were subject to seizure or blocking in the United States.

506.    Soon after President Clinton signed the Executive Order implementing sanctions against Iran in May 1995, Iranian banks sought the services of ABN Amro (RBS N.V.) and other banks in aiding Iran to circumvent U.S. laws. ABN Amro (RBS N.V.) employees were aware of

these requests, discussed these requests with the other facilitating banks, and thereafter approved of ABN Amro (RBS N.V.) conducting the illegal transactions, contrary to the advice of outside counsel retained by ABN Amro (RBS N.V.) that its involvement in such transactions would potentially violate U.S. law.

507.     From approximately 1995 until in or about 2005, ABN Amro (RBS N.V.) conspired with the Iranian Bank Co-conspirators (including the CBI, Bank Melli and Defendant Bank Saderat Plc) and their agents to conceal evidence of ABN Amro (RBS N.V.)'s financial transactions from the U.S. government, law enforcement, and intelligence agencies, as well as U.S. financial institutions charged with detecting and blocking certain Iranian transactions.

508.     ABN Amro (RBS N.V.) was, at the same time, aware that numerous other non-Iranian financial institutions were engaged in the Conspiracy to conceal evidence of the Iranian Bank Co-conspirators' financial transactions from the U.S. government, law enforcement and intelligence agencies, as well as U.S. financial institutions charged with detecting and blocking certain Iranian transactions.

509.     From approximately 1995 until in or about 2005, ABN Amro (RBS N.V.) furthered the Conspiracy by methodically removing and/or falsifying payment messages on its funds transfer systems to disguise the movement of hundreds of millions of USD illegally through the U.S. financial system on behalf of the Iranian Bank Co-conspirators (including Bank Melli Iran). In furtherance of the Conspiracy, ABN Amro (RBS N.V.) and the Iranian Bank Co-conspirators developed methods by which ABN Amro (RBS N.V.) would format USD payments so that such payments would evade U.S. sanctions and detection by automated filters used by financial institutions in the United States.

510. When ABN Amro (RBS N.V.) employees received payment messages from the Iranian Bank Co-conspirators that contained words that could trigger a U.S. bank's OFAC filter, ABN Amro (RBS N.V.) would manually alter or amend the messages to ensure that the transaction would go undetected by financial institutions in the United States.

511. ABN Amro (RBS N.V.) thereby caused financial institutions in the United States to process transactions involving the Iranian Bank Co-conspirators that U.S. financial institutions would not otherwise have processed.

512. In order to bypass the U.S. sanctions, certain offices, branches, and subsidiaries of ABN Amro (RBS N.V.) also altered letters of credit and foreign exchange transactions by replacing the names of the Iranian Bank Co-conspirators (including Bank Melli Iran) on those transactions.

513. Beginning as early as 1995 and continuing until in or about 2005, ABN Amro (RBS N.V.) undertook various acts in furtherance of the Conspiracy. For example:

> [T]he Dubai branch of ABN created procedures and guidelines to facilitate the processing of prohibited USD transactions. For instance, one section of the ABN payment manual entitled "Special Conditions" listed specific instructions on how to effectuate these payments and avoid OFAC filters. A specific instruction from this manual stated: "Payments by order of Iranian Banks …maintaining accounts with ABN, Dubai are to be handled with extra care to ensure the wordings "Iran" etc. are not mentioned in the payment due to OFAC regulations."

514. In June 1995, an Iranian bank co-conspirator requested of ABN Amro (RBS N.V.) officials in Dubai that ABN Amro (RBS N.V.) act as a conduit for all USD transactions for that Iranian bank in Dubai. The Iranian bank requested that all of its USD payments be routed through or be issued in the name of ABN Amro (RBS N.V.) and carry no reference to the fact that these payments were issued on its behalf, and that all of its USD receipts would come into ABN Amro (RBS N.V.)'s account.

515. Thereafter, ABN Amro (RBS N.V.) undertook various specific acts to conceal its actions on behalf of Iran.

516. ABN Amro (RBS N.V.) instructed the Iranian Bank Co-conspirators to include the code word "SPARE" in their payment messages through the bank so ABN Amro (RBS N.V.) could first segregate these messages from normal message payment processing and then amend the message by removing/altering any potentially problematic text. The payment message would then be stopped by ABN Amro (RBS N.V.), routed into a special queue, and manually altered to avoid any OFAC filters. In this manner, ABN Amro (RBS N.V.) assisted sanctioned entities and ensured the processing of USD transactions by formatting payment messages so they would not be rejected or blocked by OFAC filters at financial institutions in the United States.

517. ABN Amro (RBS N.V.) added to its payment manuals the "Special Conditions" that were to be used on behalf of the Iranian Bank Co-conspirators in order to evade detection and circumvent the laws of the United States.

518. ABN Amro (RBS N.V.) used these same or materially similar procedures with respect to letters of credit, and the processing of USD checks and traveler's checks.

519. ABN Amro (RBS N.V.) and the Iranian Bank Co-conspirators knew and discussed the fact that without such alterations, amendments, and code words, the automated OFAC filters at clearing banks in the United States would likely halt most of the payment messages and other transactions, and, in many cases, would reject or block the sanctions-related transactions and report the same to OFAC.

520. ABN Amro (RBS N.V.) also removed the names, BICs, and any other identifying information of the Iranian Bank Co-conspirators in the payment messages sent to ABN Amro (RBS N.V.)'s U.S. correspondent banks.

521.     In order to circumvent U.S. sanctions, certain Iranian Bank Co-conspirators requested that ABN Amro (RBS N.V.) omit their names and BICs from payment messages sent by ABN Amro (RBS N.V.) to ABN Amro (RBS N.V.)'s U.S. correspondent banks. ABN Amro (RBS N.V.) complied with the requests of these Iranian Bank Co-conspirators and omitted their names and identifiers in order to help bypass the OFAC filtering mechanisms of U.S. financial institutions.

522.     ABN Amro (RBS N.V.) also used MT 202 SWIFT cover payment messages to shield the identities of the Iranian Bank Co-conspirators. Instead of using serial MT 103 payment messages that contain the names and details of counter-parties to transactions, ABN Amro (RBS N.V.) began using MT 202 cover payment messages expressly for the purpose of avoiding revealing the identity of the ordering customer and beneficiary party for USD payments sent through financial institutions in the United States.

523.     The CBI coordinated with ABN Amro (RBS N.V.)'s Central Bank Desk in Amsterdam regarding the procedure to be followed for repayment of USD deposits to their accounts with European Banks in London. This procedure stipulated that payment messages sent to U.S. clearing banks for payment of USD funds to the CBI should not contain any reference to the CBI or any other reference relating to Iran.

524.     In or about June and July 1995, officials at ABN Amro (RBS N.V.)'s Amsterdam Headquarters and New York offices were advised by outside U.S. counsel that the proposal by Iranian banks for ABN Amro (RBS N.V.) to serve as a conduit or means to bypass and avoid the sanctions imposed by the United States upon Iran risked breaching U.S. law.

525.     An internal memorandum generated by ABN Amro (RBS N.V.) at the time stated "[t]he fund transfer mechanics proposed by [the first Iranian Bank] are an attempt to circumvent

the Iranian trade embargo. Given that violations of the Executive Order and OFAC regulations carry substantial penalties, not to mention the negative publicity, the [first Iranian Bank] proposal must be strictly scrutinized and ABN Amro must weigh the risks before proceeding with any such transfers."

526.    Also in June 1995, another Iranian Bank Co-conspirator sent a written communication to certain banks in the UAE and the Iranian Bank's correspondent banks instructing those banks to undertake USD payments for the Iranian bank in the name of a European financial institution "WITHOUT MENTIONING OUR BANK'S NAME" to defeat and circumvent the sanctions imposed upon Iran by the United States.

527.    Like the first request, the Iranian Bank Co-conspirator's request was forwarded to officials located in several departments of the Amsterdam Headquarters of ABN Amro (RBS N.V.)

528.    As early as 1997, in an internal strategy paper for the Middle East and Africa region named "Desert Spring," prepared by ABN Amro (RBS N.V.)'s Middle East and Africa Regional office, ABN Amro (RBS N.V.) described a "product initiative" with "opportunities in LC discounting for Central Bank and Bank Melli, Iran" and "deposit mobilization from Iranian nationals."

529.    On or about February 5, 2000, an official at the Dubai branch of ABN Amro (RBS N.V.) wrote to a Regional Director of one of the Iranian Bank Co-conspirators assuring him that ABN Amro (RBS N.V.) would take care of carrying out the scheme to evade and defeat the U.S. sanctions. The ABN Amro (RBS N.V.) official's note stated: "[w]e understand the special nature of your US$ transactions and will ensure that all operations departments concerned are properly briefed regarding this, as well."

530.    A July 19, 2003 e-mail written by John Ciccarone, Head of ABN Amro (RBS N.V.)'s USD Payments Product Management at ABN Amro (RBS N.V.)'s New York branch, discussed the use of MT 202 cover payments, stating: "There is no way the payment will get stopped as all NY ever sees is a bank to bank instruction."

531.    In a July 25, 2003 e-mail, John Philbin, Senior Relationship Banker for Iranian banks, wrote to Mr. Ciccarone:

> Surely Iran is the most obvious case in point for these structures. Twenty-four years of US sanctions and OFAC listing and Iran continues to sell oil and gas in USD. And, it imports and pays in USD as well. All of this is clearly done though accounts in Europe and elsewhere. There is a very good case to be made for getting an overall acceptance that when issues are purely US, we should not be a part of it. In fact we should see it as an opportunity. OFAC is not the Bible for money laundering (e.g. Cuba is prominent on OFAC). It is a tool of broader US policy. We therefore need to distinguish between US foreign policy on the one hand and AML/anti-Terrorism on the other, however much the US administration may wish to insist that the two are closely linked. It is well worth working on a solution for clients who find themselves in this position or who fear (Syria, Saudi Arabia) that they, one day soon might find themselves there.

532.    Also in 2003, Diane Perrin, a member of ABN Amro (RBS N.V.)'s Group Compliance team at the Defendant's Amsterdam Head Office, stated that "as a European Institution, we do not comply with US Sanctions because those sanctions are politically motivated."

533.    A memorandum entitled "Proposal for Establishing a Representative Office in Tehran, Iran" also drafted in 2003 by ABN Amro (RBS N.V.)'s Country Representative in the UAE, Jan Willem van den Bosch, similarly stated:

> The Central Bank of Iran is faced with difficulties for USD denominated clearing transactions due to sanctions imposed by the US. The OFAC filter impounds all Iran related payments and receipts in the US. The Swiss and other European Banks have worked out a solution for this. The payment instructions are sent directly to the beneficiary's bank and cover payment

is made to the beneficiary bank's US Correspondent as inter-bank payments.

534.    Bosch later coordinated the meeting in Dubai between ABN Amro (RBS N.V.)'s

Managing Board Member and CFO Tom De Swann and top functionaries of the CBI, including

Aziz Farrashi, the CBI's Director General.

535.    During the meeting with the CBI's officials, ABN Amro (RBS N.V.) officials

discussed the establishment of the Representative Office by ABN Amro (RBS N.V.) in Tehran

and further business development, including the acceptance of USD deposits by the CBI's Desk

in Amsterdam.

536.    In an April 20, 2004 e-mail, Mr. Philbin, the Senior Relationship Banker at ABN

Amro (RBS N.V.) for Iranian banks, mentioned the possibility of using a Jersey Special Purpose

Vehicle as a way to circumvent OFAC restrictions:

> Mike Louwerens [ABN Amro's Vice President and Senior Analyst of
> Country Risk Management Department] mentioned this to me today and
> sent the attached. The structure below is very interesting and could have
> applicability for the banks in Iran as well. But whether that is the case or
> not, what is clear is that this structure envisages our making and receiving
> payments in USD which will clear through AA in New York. And for
> which Mike Bowman sees no objection. I am sending a second note in
> which OEM (Maarten Seckel) gives a go ahead based on Bowman's nihil
> obstat. The Way for our doing significant business with the Iranian banks
> in cash may yet be clear.

537.    On July 23, 2004, ABN Amro (RBS N.V.) and its New York branch entered into

a Written Agreement with the Federal Reserve Banks of New York and Chicago (collectively,

the "Reserve Banks") and other regulators that had detected deficiencies at ABN Amro (RBS

N.V.)'s New York Branch relating to AML policies, procedures, and practices that included:

> a pattern of previously undisclosed unsafe and unsound practices
> warranting further enforcement action…. A. ABN AMRO lacked adequate
> risk management and legal review policies and procedures to ensure

compliance with applicable U.S. law, and failed to adhere to those policies and procedures that it did have. As a result, one of ABN AMRO's overseas branches was able to develop and implement "special procedures" for certain funds transfers, check clearing operations, and letter of credit transactions that were designed and used to circumvent the compliance systems established by the Branches to ensure compliance with the laws of the U.S. In particular, the "special procedures" circumvented the Branches' systems for ensuring compliance with the regulations issued by the Office of Foreign Assets Control ("OFAC") (31 C.F.R. Chapter V).

538.    U.S. regulators also found that "[p]rior to August 1, 2004, the New York Branch processed wire transfers originated by Bank Melli Iran, a financial institution owned or controlled by the Government of Iran. The payment instructions on the wire transfers had been modified by one of ABN Amro's overseas branches such that any reference to Bank Melli Iran was removed."

539.    U.S. regulators also found that "[p]rior to August 1, 2004, the Branches advised a number of letters of credit issued by Bank Melli Iran. The letters of credit had been reissued by one of ABN Amro's overseas branches such that any reference to Bank Melli Iran was removed."

540.    As DOJ later concluded: "Each year between and including 1996 and 2004, ABN caused ABN's U.S. affiliate to file false, misleading, and inaccurate Annual Reports of Blocked Property to OFAC. In each of those reports, the U.S. affiliate of ABN certified to OFAC that all information provided was accurate and that all material facts in connection with the report had been set forth."

541.    Nonetheless, in September 2004, Michael Louwerens, ABN Amro (RBS N.V.)'s Vice President and Senior Analyst of Country Risk Management Department, travelled to Iran at the behest of ABN Amro (RBS N.V.)'s Head Office and reported back that he had communicated with the Chief Representative of HSBC in Tehran (presumably John Richards)

and concluded that ABN Amro (RBS N.V.)'s USD payments procedures (to conceal Iranian financial activity) were in line with prevailing market practices of HSBC and other banks.

542. In addition, ABN Amro (RBS N.V.)'s then New York branch was the conduit for at least 90 post- U.S. designation transactions on behalf of IRISL and its various front companies through March, 2010.

543. On May 10, 2010, DOJ issued a press release announcing that ABN Amro's successor entity, Defendant Royal Bank of Scotland N.V., had agreed to forfeit $500 million to the United States in connection with a conspiracy to defraud the United States, to violate IEEPA, TWEA, and the Bank Secrecy Act ("BSA").

544. In connection with a Deferred Prosecution Agreement ABN Amro (RBS N.V.) entered into, a criminal information was filed in U.S. District Court for the District of Columbia charging Defendant with one count of violating the BSA and one count of conspiracy to defraud the United States and violate IEEPA and TWEA. ABN Amro (RBS N.V.) waived indictment, agreed to the filing of the information, and, according to the press release "accepted and acknowledged responsibility for its conduct."

545. According to the criminal information, ABN Amro (RBS N.V.)'s participation in the conspiracy continued "until in or about December 2007." Prior to that time, ABN Amro (RBS N.V.) willfully and knowingly conspired, *inter alia*, "to engage in financial transactions with entities affiliated with Iran … in violation of the International Emergency Economic Powers Act, Title 50, United States Code, Section 1705, and regulations and embargoes issued thereunder…."

546. The criminal information confirmed that ABN Amro (RBS N.V.) was an active participant in the Conspiracy.

547. The criminal information stated that: "It was part of the conspiracy that the defendant discussed with the co-conspirators how to format United States Dollar message payments so that such payments would avoid detection by automated filters used by financial institutions in the United States and thus evade United States sanctions."

548. The criminal information further stated that: "It was part of the conspiracy that the defendant removed names and references to the co-conspirators in United States Dollar message payments routed through the United States."

549. The criminal information further stated that: "It was part of the conspiracy that the defendant altered the names and references to the co-conspirators in United States Dollar message payments routed through the United States."

550. The criminal information further stated that: "It was part of the conspiracy that the defendant instructed the co-conspirators to use code words in United States Dollar payment messages."

551. The criminal information further stated that: "It was part of the conspiracy that the defendant created a special processing queue to manually and materially alter any of the co-conspirators' United States Dollar message payments that were to be routed through the United States."

552. The criminal information further stated that: "It was part of the conspiracy that the defendant created "Special Conditions" in the defendant's payment manuals in order to process any co-conspirators' United States Dollar transactions."

553. Finally, the criminal information further stated that: "It was part of the conspiracy that the defendant caused its United States affiliates to submit materially false and misleading reports or statements to the United States Department of the Treasury, OFAC."

## M. DEFENDANT CREDIT SUISSE'S AGREEMENT TO, AND PARTICIPATION IN, THE CONSPIRACY

554.     Like the other Defendants in this Action, Credit Suisse worked hand-in-glove with Iran and Iranian Bank Co-conspirators acting at Iran's behest to develop procedures to structure USD payments in ways that would evade U.S. sanctions and leave U.S. regulators, law enforcement and financial institutions blind as to Iran's financial activities.

555.     To this end, Credit Suisse worked diligently to develop methods that would avoid disclosing the true originators and/or beneficiaries of Iranian transactions it was transacting through the United States, deleting or omitting certain information when transactions were to be processed through the United States, and providing incorrect information in wire transfer instructions executed through the United States on behalf of U.S.-sanctioned individuals and entities.

556.     Credit Suisse worked closely with Bank Melli, Bank Saderat, Iran's Atomic Energy Organization (and other designated Weapons of Mass Destruction proliferators) for many years.

557.     Before 2003, Credit Suisse was an active participant in the Conspiracy, but the sheer volume of its illegal conduct accelerated greatly in 2003 when Lloyds exited its Iran business and Bank Melli Plc, Defendant Bank Saderat Plc, and other Iranian agents moved their accounts to Credit Suisse.

558.     For the next two years, Credit Suisse became one of the main USD clearing banks for the Iranian banking system, increasing the number of Iranian USD payments from approximately 49,000 in 2002 to nearly 200,000 in 2005.

559.     The procedures Credit Suisse developed and refined over time to assist Iran were embodied in internal directives, memoranda, and e-mails involving, among others, a Credit

Suisse Bank Payments Sector Head, Credit Suisse's Treasury and Trade Finance Departments, the Head of Credit Suisse's Iran Desk, and in e-mails between Credit Suisse and its Iranian bank clients.

560. Since at least the mid-1990s, when it first agreed to assist Iran in carrying out the Conspiracy, Credit Suisse's Iran Desk began adding internal warnings to the accounts of its Iranian bank clients, instructing Credit Suisse employees: "*Do not mention the name of the Iranian bank in payment orders*." Such warnings ensured that payment orders given by the Iranian Bank Co-conspirators would not be processed automatically, but rather would be manually reviewed, "corrected" if necessary and effectuated by Credit Suisse employees.

561. For example, in June 1995, the Credit Suisse representative office in Dubai, United Arab Emirates, issued a memorandum recognizing Iran and the Iranian bank's general scheme to ensure that *any* foreign banks the Iranian Bank Co-conspirators did business with masked their transactions, and advised:

> Following the decision by the American authorities to declare a unilateral embargo against the Islamic Republic of Iran on April 30th, (an Iranian bank) approached Credit Suisse to open (a type of correspondent banking account for U.S. dollar transactions). Crucial to them was that the name of the bank would not be mentioned on the transfer orders... Subsequently, (the Iranian bank) was informed that though payments in such a way are basically feasible, to omit the name of the bank could lead to some problems. Meanwhile, operations through this account have started... Some transfers have been rejected by the American banks as the name of (the Iranian bank) appears under the rubric 'Ordering Bank.' Question: a) what can be done to avoid this?

562. Almost immediately after President Clinton issued E.O. Nos. 12957, 12959, and 13059, which strengthened existing U.S. sanctions against Iran, the Iranian Bank Co-conspirators began requesting that Credit Suisse omit their names and BICs from payment messages Credit Suisse sent to its U.S. correspondent banks.

563. Credit Suisse complied with the Iranian Bank Co-conspirators' illegal requests and omitted their names and identifiers in order to help bypass U.S. financial institutions' sanctions filters.

564. After a 1998 corporate reorganization, in order to further its ongoing efforts to evade U.S. sanctions and ensure that other U.S. financial institutions would automatically process this new stream of payments, Credit Suisse notified its Iranian clients about the change in USD clearing from Credit Suisse First Boston AG ("CSFB") to third-party U.S. correspondents and provided them with a pamphlet entitled "How to transfer USD payments."

565. The pamphlet provided detailed payment instructions on how to avoid triggering U.S. OFAC filters.

566. In a 1998 letter to an Iranian Bank Co-conspirator explaining the transfer of its USD clearing services to Bank of New York, Defendant Credit Suisse wrote:

> In order to provide your esteemed institution with our clearing services in U.S. Dollars, we have introduced a procedure to facilitate your USD payments through our clearing system. The change of our USD-clearer to Bank of New York, New York, will not affect our mutual relationship on any clearing transaction in U.S. Dollars as long as the established procedure will be followed.

567. Beginning as early as 1995 and continuing until 2005, Credit Suisse, both internally and in coordination with the Iranian Bank Co-conspirators, created procedures and guidelines to facilitate the processing of prohibited USD transactions by its U.S. correspondent banks, primarily Bank of New York.

568. By using Credit Suisse's internal processing system, employees manually keyed in "Order of a Customer" when Iranian payments had to be processed as serial payments through U.S. banks.

569. This procedure was promoted at Credit Suisse, as demonstrated by an email from

a Team Leader in the Bank Payments Unit:

> In order to put an end, once and for all, to the discussions regarding the processing of USD payment orders of Iranian banks, I have worked out various examples that are to be considered binding for everyone.

570. Attached to the email were several screenshots of Credit Suisse's payment application illustrating how to format payment messages to ensure that they would pass through the U.S. financial institutions undetected by U.S. OFAC filters.

571. For example, one such screenshot showed all incoming payment message listing an Iranian bank as the ordering institution in SWIFT payment message field "52" and contained the following explicit instructions: "Population of field 52 with 'one of our clients' in case of serial payments via the US."

572. A second screenshot showed an incoming payment with the reference "*without mentioning our banks [sic] name*" in field 52 and contained the following instructions: "Population of field 52 with 'one of our clients' in case of serial payments."

573. Until 2004, Credit Suisse's use of "*Order of a Customer*" was its standard procedure for processing bank payment messages involving Credit Suisse's Iranian customers.

574. Credit Suisse's internal communications also reveal a continual dialogue about evading U.S. sanctions spanning approximately a decade, assessing how to better process Iranian transactions in order to promote and increase business from existing and future Iranian clients.

575. In February 1999, Credit Suisse's Iran Desk added internal warnings to the Customer Information Files (or "CIFs") it maintained for the accounts of its Iranian bank customers, expressly directing Credit Suisse employees: "*Do not mention the name of the Iranian bank in payment orders*."

576. Credit Suisse documented similar directives in subsequent years. For example in

2002, another warning was loaded in the CIF that likewise stated: "FOR USD-PAYMENTS OUTSIDE CREDIT SUISSE/CS FIRST BOSTON DO NOT MENTION THE NAME OF THE IRANIAN BANK."

577.     Credit Suisse later decided to remove warnings from the CIFs and replaced them with long-term instructions concerning Iranian entities that instructed: "*Execute USD payment orders always with direct order and cover payment*." These instructions explained that they were intended to ensure (according to Credit Suisse's internal documentation) that "an Iranian origin will never be named in USD payments carried out for Iranian banks (because of the US sanctions)!"

578.     An internal Credit Suisse memorandum dated March 12, 1999 stated:

> Payment orders in USD can only be paid via the American clearing, if the name of the Iranian party is not mentioned (US sanctions). Otherwise, the amounts are returned by the American banks. Even though corresponding warnings have been loaded, there (sic) almost every week cases that are processed incorrectly by us.

579.     Between 2000 and 2004, Credit Suisse's Iran Desk provided similar instructions to its Iranian Bank co-conspirator clients via a standard letter, which stated in part: "*The most important issue is that you and/or your* correspondents do not mention your good bank's name in field 52."

580.     Credit Suisse's Iran Desk also informed Iranian Bank Co-conspirator clients that Credit Suisse would utilize cover payments to effect payments to or through the United States, stating in one memorandum, for example, "[o]ur payment department will stop all USD payments initiated by your fine bank in any case and shall be effected [by]... 'Direct payment order and cover payment order.'"

581.     In order to prevent straight-through processing of all payment orders sent by

Iranian Bank Co-conspirators, Credit Suisse configured its payment system to interdict the payments for manual review. Credit Suisse employees then reviewed the payments to ensure that they contained no references to Iran. If such references were detected, Credit Suisse employees would either delete the reference or contact the Iranian Bank Co-conspirators to request further instructions.

582. Over time, Credit Suisse employees developed practices to omit information on the involvement of Iranian Bank Co-conspirators, including:

a. Entering in an empty field, or replacing the name of the Iranian Bank Co-conspirators with, "*Order of a Customer*" or a similar phrase instead of the ordering institution in payment messages;

b. Forwarding payment messages received from Iranian Bank Co-conspirators falsely referencing "Credit Suisse" or Credit Suisse's BIC code instead of an Iranian bank as the originating institution. For example, a November 2000 email circulated by a team leader in Credit Suisse's Bank Payments Unit contained screenshots of an incoming payment order from an Iranian bank co-conspirator in which Credit Suisse was listed as the ordering institution in field "52" of the SWIFT payment message. The instructions were to make no changes to the misleading information in the SWIFT message's field "52" for serial payment messages made to U.S. financial institutions;

c. Inserting "Credit Suisse" as the ordering institution in payments originating with an Iranian bank co-conspirator;

d. Removing references to Iranian names, addresses, cities, and telephone numbers from customer payments;

e. Substituting abbreviations for Iranian customer names. For example, in an April 16, 2003 email, the Head of Credit Suisse's Iran Desk wrote to the Credit Suisse representative office in Tehran, "*entry to their account works when account number plus XXX is stipulated as beneficiary. What is also important of course is that applicant will give details of final beneficiary as reference for the beneficiary, then it should work*"); and

f. Converting MT 103 SWIFT Messages to MT 202 SWIFT Messages to hide the details of Iranian transactions, and using MT 202 cover payment messages approximately 95% of the time to facilitate outgoing customer payments involving Iran or Iranian parties.

583.    A Credit Suisse internal email dated September 24, 2003, sent from a team leader in Customer Payments to a Sector Head within Customer Payments, described the process for Credit Suisse's Iranian USD processing:

> The procedure is identical for all Iranian banks: 1) We attempt to send all USD payments directly to the bank, of the beneficiary. Only cover payments are made through the US. In such cases, the ordering institution is not disclosed. 2) Should 1) not be possible (if the beneficiary bank is an American bank, or if no Swift connection or no correspondent was named), then the payment will be made though America. We make sure that the ordering institution is not mentioned (this has been programmed into the system as a default) and that the ordering customer has no connection to 'Iran'. 3) Should 1) and 2) not be possible, then the payment order will be forwarded to Investigations for further clarifications with the ordering institution.

584.    In addition, Credit Suisse actually instructed its Iranian Bank Co-conspirator customers how to format USD payments so that such payments would evade U.S. sanctions and detection by automated filters used by U.S. financial institutions.

585.    Payment instructions included a letter from Credit Suisse's Iran Desk to an Iranian customer dated October 16, 2003, that stated: "This is to provide you our recommendation for the entry of funds how to handle bank-to-bank payments on your account with Credit Suisse and the following procedures should be applied in order to avoid any difficulties."

586.    In December 2003, an Iranian bank asked Credit Suisse for an additional USD account identifying the Iranian beneficiary bank only by a designated abbreviation (first letter of each word constituting the bank's name, together with the abbreviation commonly used for a type of legal entity, i.e., Plc).

587.    On January 28, 2004, Credit Suisse confirmed that it had opened the requested account, writing to the Iranian bank, "Reference is made to the various conversations and your

email, dated December 18, 2003 wherein you asked us to open a new USD account...Now, we would like to confirm the account number ....”

588.    In addition, Credit Suisse promised the Iranian Bank Co-conspirators, including Bank Saderat and Bank Melli, that no messages would leave Credit Suisse without being hand-checked by a Credit Suisse employee to ensure that they had been formatted to avoid U.S. OFAC filters.

589.    Credit Suisse also took a further step in the Conspiracy beyond *training* the Iranian Bank Co-conspirators how to format their payment messages to evade the OFAC filters; it also gave Iranian Bank Co-conspirators materials to use in training *other* banks on how to prepare payment messages to evade U.S. OFAC filters and sanctions regimes.

590.    In August 2003, Credit Suisse reached an agreement with the London branches of a number of Iranian Bank Co-conspirators to take over the banks’ London branches’ USD clearing activity.

591.    As a result of this agreement, Credit Suisse became one of the main USD clearing banks for the Iranian banking system.

592.    Through its subsidiary Credit Suisse Asset Management Limited, United Kingdom (“CSAM”), Credit Suisse used code words for Iranian customers, including Iranian Bank Co-conspirators, when executing trades involving U.S. securities that were transmitted through the U.S.

593.    Credit Suisse knew that without such alterations, amendments, and code words, automated OFAC filters at U.S. clearing banks would likely halt the payment messages and securities transactions, and, in many cases, reject or block the sanctions-related transactions and report the same to OFAC.

594.     Credit Suisse manipulated payment messages and removed any identifying reference to sanctioned countries and entities so that the OFAC filters at the U.S. clearing banks would not identify the transactions and so that, as a result, the transactions would be automatically processed.

595.     In July 2004, an ordinance issued by the Swiss Federal Banking Commission on money laundering to implement the Financial Action Task Force's Special Recommendation on Terrorist Financing VII entered into force.

596.     The ordinance required the disclosure of the remitter in payment orders, and prompted Credit Suisse to issue an internal directive prohibiting the use of the "Order of a Customer" method when making international wire transfers.

597.     In preparation for the implementation of the ordinance, in April 2004 Credit Suisse's Iran Desk began to inform its Iranian Bank Co-conspirator clients that neither "Order of a Customer" nor "Credit Suisse" could be used to replace references to Iranian banks on payment messages. Credit Suisse again, however, provided information about the use of the cover payment method to send USD payments, ensuring that the Iranian Bank Co-conspirators (and, by extension, Iran and IRGC-QF) remained cognizant of other means of ensuring an uninterrupted flow of surreptitious USD.

598.     Although Credit Suisse's payment processing units ceased the use of the "Order of a Customer" method following the Swiss Federal Banking Commission's July 2004 ordinance, Credit Suisse employees continued removing and/or altering information in SWIFT payment messages sent to one of its U.S. correspondent banks.

599.     For example, in May 2005, an internal Credit Suisse email stated:

> If we do not have a key contact with the beneficiary's bank, we have to carry out the payment via the US, e.g. via BKTRUS33. However, no

reference to Iran may be made in the field reserved for information on the ordering party (no Iranian telephone numbers either). No such reference should be made in fields 70 or 72 either.

600. Between March 2004 and November 2005, Credit Suisse repeatedly sent letters to its Iranian bank co-conspirator customers describing its internal procedures for forwarding Iranian payment orders as:

Our Payment department will stop all USD-payments initiated by your fine bank in any case and shall be effected as outlined in the drawing "Direct payment order and cover payment order."

601. From August 2003 to November 2006, Credit Suisse illegally processed electronic funds transfers, in the aggregate amount of at least *$480,072,032*, through financial institutions located in the United States for the benefit of Iran and Iranian financial institutions.

602. For a brief period of time, Credit Suisse became one of the main USD clearing banks for the Iranian banking system, increasing the number of Iranian USD payments from approximately 49,000 in 2002 to nearly 200,000 in 2005.

603. In January 2006, Credit Suisse established a "Sensitive Countries" Task Force to implement the exit decision and ultimately ceased USD clearing transactions for Iran in November 2006.

604. On September 11, 2006, Credit Suisse directed its payments centers to discontinue certain prohibited payments by an Iranian Bank co-conspirator. Using the MT 202 cover payment method, during the six weeks from September 11, 2006, to October 27, 2006, Credit Suisse nevertheless processed 54 outbound payments involving that Iranian Bank Co-conspirator, the total value of which was in excess of $8 million.

605. In March 2007, following the Deferred Prosecution Agreements of Lloyds and ABN Amro (RBS N.V.), Credit Suisse commenced an internal investigation of its historic USD

clearing business involving U.S.-sanctioned countries and persons. Shortly thereafter, Credit Suisse was contacted by U.S. and New York law enforcement officials.

606.     On December 16, 2009, DOJ issued a press release announcing that Credit Suisse had agreed to forfeit $536 million to the United States and to the Manhattan District Attorney's Office in connection with violations of IEEPA and New York State law, as a result of violations relating to transactions Credit Suisse illegally conducted on behalf of customers from, *inter alia*, Iran.

607.     In connection with a Deferred Prosecution Agreement Credit Suisse entered into, DOJ filed a criminal information in the U.S. District Court for the District of Columbia charging Credit Suisse with one count of violating IEEPA. Credit Suisse waived indictment, agreed to the filing of the information, and, according to the press release, accepted and acknowledged responsibility for its criminal conduct.

608.     Credit Suisse also simultaneously entered into an agreement with OFAC to settle the apparent civil violations of IEEPA and other authorities arising from its conduct. Credit Suisse also agreed to forfeit the funds as part of the Deferred Prosecution Agreements it had entered into with the DOJ, the Manhattan District Attorney's Office and in settlement of OFAC's civil claims.

609.     The press release announcing the agreements quoted then-Treasury Under-Secretary for Terrorism and Financial Intelligence Stuart Levey as stating "[t]his case provides a timely lesson about how Iran seeks to involve others in deceptive conduct to evade legal and regulatory controls. Those who do business with Iran expose themselves to the risk, and the consequences, of participating in transactions supporting proliferation, terrorism or sanctions evasion."

610.    As noted in a criminal information entered in connection with, as discussed below, a March 11, 2015 Deferred Prosecution Agreement between Defendant Commerzbank and DOJ:

> COMMERZBANK AG and others … unlawfully, willfully and knowingly combined, conspired, confederated and agreed with one another and with others to commit offenses against the United States, that is, to engage in financial transactions with Sanctioned Entities and SDNs in violation of IEEPA, and the executive orders and regulations issued thereunder.… The goal of the conspiracy was for COMMERZBANK and others …to enrich themselves by engaging in a conspiracy and a scheme to violate IEEPA, and the executive orders and regulations issued thereunder. A further goal of the conspiracy was for COMMERZBANK and others … to violate executive orders and regulations prohibiting the exportation, directly and indirectly, of services from the United States to Sanctioned Entities and SDNs.

611.    Like many of the other Defendants who entered into the Conspiracy, Commerzbank adopted a variety of methods to facilitate Iran's goals.

612.    In particular, Commerzbank worked with both Bank Melli and Bank Saderat to facilitate the goals of the Conspiracy, stripping, altering or changing tens of thousands of payment messages.

613.    On April 17, 2003, Commerzbank finalized a policy entitled, "Routing Instructions Iranian banks for USD payments." This policy admonished employees to "[u]nder no circumstances mention the Iranian background in the cover order." In other words, the Germany-based recipients of this policy were to, under no circumstances, mention the Iranian customer or connection in payment messages sent to the United States.

614.    Taking advantage of the fact that Lloyds and other competitors were existing the Iran business, Commerzbank attracted more Iranian clients and the resulting increase in the volume and significance of Iranian business at Commerzbank led to the establishment of a

centralized process for handling certain Iranian dollar denominated payments within Commerzbank, and the Defendant designated one group of employees within Commerzbank's Frankfurt Back Office to manually process those payments. The job of this group was to review payments and amend them if necessary, to ensure that they would not get stopped by OFAC filters when sent to financial institutions in the United States, including Commerzbank's New York branch.

615.    This increase in volume was in part due to illicit transactions undertaken by Commerzbank on behalf of Bank Melli and Bank Saderat.

616.    In July 2003, a Back Office employee emailed other employees explaining that two state-owned Iranian banks, Bank Melli and Bank Saderat, wanted to begin routing their entire USD clearing business through Commerzbank. The Back Office employee closed his email by writing, "If for whatever reason [Commerzbank] New York inquires why our turnover has increase [sic] so dramatically under no circumstances may anyone mention that there is a connection to the clearing of Iranian banks!!!!!!!!!!!!!!" (Exclamation marks in original).

617.    On September 17, 2003, a Back Office employee sent an email advising a major Iranian Bank that maintained a US dollar account with Commerzbank to list "non ref"' in the ordering party field in all of its future payment messages. The author of the email had tested Commerzbank's compliance systems in Frankfurt, and knew that writing "non ref" would trigger a manual review of the payment, thereby enabling Commerzbank personnel to ensure that the messages did not contain any Iranian information.

618.    In fact, Commerzbank personnel explained to employees of Iranian bank clients the kinds of information that could lead to payments being delayed, rejected, or blocked within

the United States, and encouraged the Iranian banks to omit this type of information from their payment requests so that Commerzbank employees would not have to manually remove it.

619.    On October 13, 2003, the head of Commerzbank's Internal Audit division sent an email to a member of Commerzbank's senior management advising that Iranian bank names in payment messages transiting through the United States were being "neutralized" and warned that "it raises concerns if we consciously reference the suppression of the ordering party in our work procedures in order to avoid difficulties in the processing of payments with the U.S.A."

620.    On November 19, 2003, a memo was circulated to senior management memorializing the internal rules Commerzbank had developed for processing Iranian payments, including using MT 202 cover transactions (i.e., splitting a payment into two messages and sending a MT 103 to the foreign (non-U.S.) branch of the beneficiary and an MT 202 to the clearing institution in the United States) and using serial MT 103 messages that manually replaced the name of the [Iranian] ordering party with the bank code for Commerzbank Frankfurt to avoid detection by U.S. authorities.

621.    It appears that Commerzbank may have ceased stripping some transactions in July 2004, relying primarily on cover payments (MT 202s) to effectuate it unlawful conduct. At the same time, Commerzbank conspired with Bank Melli to facilitate over 100 checks totaling approximately $2 million that Commerzbank issued for illegal payments in the United States.

622.    DOJ described "the rigor with which the Bank enforced the policy during this period" by citing to an email from a Back Office employee who wrote about Commerzbank's procedures for facilitating the Conspiracy "NO EXPERIMENTS PLEASE!!! Have fun with this and greetings." (Emphasis in original.)

623. This ongoing conduct involving both "stripping" transactions and converting otherwise transparent MT 103 SWIFT messages into opaque MT 202 cover transactions resulted in tens of millions of dollars being illegally transferred on behalf of Iran.

624. However, in parallel to its illegal conduct on behalf of Bank Saderat and Bank Melli, as noted above, Commerzbank also directly coordinated with IRISL in laundering U.S. Dollars through the United States despite the fact that IRISL was Iran's primary means of transporting both conventional and non-conventional weapons.

625. Between 2002 and 2008 (and upon information and belief, even later), Commerzbank worked directly with IRISL to facilitate illicit payments through the United States.

626. In January 2005, Commerzbank's New York branch rejected a series of payments on behalf of Lancelin Shipping Company Ltd., an IRISL-formed entity registered in Cyprus because the payment messages contained references to IRISL Europe GmbH, a wholly-owned IRISL subsidiary registered in Hamburg.

627. This prompted a direct meeting between the relationship managers in Commerzbank's Hamburg branch and employees from IRISL on January 24, 2005. A memorandum summarizing the meeting noted that: "[d]ue to the tense political relations between Iran and the U.S., sanctions that have existed for some years against Iran and Iranian companies have been tightened…. *The number of rejected payments recently increased sharply since the word "IRISL" results in inquiries at foreign banks.* Based on inquiries from Commerzbank, New York we assume that it appears as a term on the embargo list." [Emphasis in original.]

628.     In a written presentation that Commerzbank delivered to IRISL on January 25, 2005, following the in-person meeting, the Hamburg relationship manager stated: "*[t]he current rejections show that IRISL is in the OFAC list*" (emphasis in original).

629.     The presentation then explained that "payments which are sent through a ... subsidiary are unlikely to be rejected to our present knowledge."

630.     Commerzbank ultimately adopted a process it termed a "safe payments solution" by which IRISL initiated USD transfers through the U.S. using the accounts of less conspicuous subsidiaries to prevent its New York branch or other clearing banks from flagging IRISL USD transactions, but to assist IRISL in its bookkeeping, it would sweep those accounts daily and zero them out so that IRISL could keep track of which funds belonged to it – as opposed to its subsidiaries.

631.     On April 18, 2006, Commerzbank's New York branch rejected a payment on behalf of Lancelin, citing "US sanctions against Iran." As a result, Commerzbank altered the structure of the "safe payment solution," suggesting the use of two other subsidiaries to process payments on behalf of IRISL and IRISL Europe GmbH.

632.     In fact, in only four months *following* IRISL's designation in 2008, Commerzbank illegally transferred almost $40 Million on behalf of IRISL subsidiaries and related entities through Commerzbank's New York branch, or other U.S. financial institutions.

633.     Only months earlier, a private U.S. State Department cable warned of an IRISL flagged vessel in China loaded with cargo, for Iran's DIO and the dangers of on-going conventional arms transfers from China to Iran, "particularly given Iran's clear policy of providing arms and other support to Iraqi insurgents and terrorist groups like the Taliban and Hezbollah.... We have specific information that Chinese weapons and components for weapons

transferred to Iran are being used against U.S. and Coalition Forces in Iraq, which is a grave U.S. concern."

634. Less than a year after Commerzbank in Hamburg provided IRISL with at least $40 million in illegal (post-designation) USD transactions, in October, 2009, U.S. troops boarded a German-owned freighter, the *Hansa India* in the Gulf of Suez and found eight containers full of ammunition, headed to Syria from Iran.

635. The *Hansa India* was registered to the Hamburg-based shipping company Leonhardt & Blumberg, but had in fact been under charter to IRISL for several years.

636. The *Hansa India* carried seven containers of small arms ammunition, as well as one container containing copper discs, as noted above a key component in EFPs used to kill and maim many of the Plaintiffs herein.

637. Although Commerzbank worked to shield its New York branch from knowing all of the details of its illicit activities on behalf of Iran and IRISL, Commerzbank's New York branch was nonetheless aware that it was being used to facilitate unlawful conduct. For example, in June 2006, in response to a request from the new the Chief Compliance Officer, asking if there were any concerns they wanted her to share with the new Global Head of Compliance in Germany, a New York compliance employee responded "[p]ersistent disregarding of OFAC rules by foreign branches. Hamburg is notorious for it."

638. In February of 2007, Commerzbank's then Chief Executive Officer Klaus-Peter Mueller and board member Martin Blessing met with U.S. Treasury Deputy Secretary Robert Kimmitt. In the meeting, Mueller complained about the portrayal of Commerzbank by the *Wall Street Journal* (in January 2007 article) which he said made it appear that the bank was trying to evade sanctions on Iran. "This," claimed Mueller "is far from the case."

639.   The *Wall Street Journal* reported on January 10, 2007 that "Commerzbank AG, Germany's second largest bank, said it will stop handling dollar transactions for Iran at its New York branch by Jan. 31." It went on to report that "[a]t present, Commerzbank handles both dollar and euro transactions for Iran's state owned banks. Like several other European banks, it will cease handling only dollar transactions."

640.   The *Journal* article went on to report:

> The risks of doing business with Iran are the same in all currencies," said Mr. [Stuart] Levey. Intelligence officials say Bank Saderat, a large, state-controlled Iranian bank placed on a U.S. Treasury blacklist in October for allegedly funding terrorism, has been able to process dollar transactions through Commerzbank's New York branch in recent months by using the accounts of two other Iranian banks. Commerzbank says it ceased dealing with Saderat after it was put on the U.S. blacklist and has no knowledge of any subsequent transactions. "Commerzbank has no knowledge of Bank Saderat directly or indirectly using the accounts of other Iranian banks to process dollar transactions," the bank said in a statement. Commerzbank, in a response to an inquiry from *The Wall Street Journal* about its dealings with Iran, also said "all such [dollar clearing] transactions are currently being phased out" as of Jan. 31. It added that "any clearing conducted by our U.S. operations is in strict compliance" with U.S. government regulations.

641.   Commerzbank's assurances to the *Wall Street Journal* like its assurances U.S. Treasury Deputy Secretary Robert Kimmitt, were plainly false.

642.   As noted above, on September 10, 2008, the U.S. designated IRISL, IRISL Europe GmbH, and several IRISL subsidiaries based on evidence that the IRISL family of companies was engaged in weapons of mass destruction proliferation activity and the fact that "IRISL has pursued new strategies which could afford it the potential to evade future detection of military shipments."

643.   The next day, September 11, 2008, a senior official at OFAC personally forwarded the press release announcing IRISL's SDN designation to the Head of Compliance at Commerzbank in New York. The press release was then forwarded to Commerzbank employees

in Germany with responsibilities related to IRISL. In the email, the relationship manager noted that the U.S. government alleged "that IRISL as Iranian government carrier systematically circumvents the Iranian arms embargo."

644.     Nonetheless, between September 10, 2008, and December 31, 2008 alone, Commerzbank illegally directed close to $40 million on behalf of IRISL subsidiaries and related entities through the United States.

## VI.     THE PLAINTIFFS

### 1.     THE JANUARY 20, 2007 ATTACK – KARBALA

645.     On the night of January 20, 2007, Iran launched a coordinated terrorist attack against the Provincial Joint Coordination Center ("PJCC") in Karbala, about thirty miles south of Baghdad. The attack was largely planned by Hezbollah under the direction of Ali Musa Daqduq and carried out by the aforementioned Iraqi Shi'a terrorist group known as Asa'ib Ahl al-Haq ("AAH") and led by Qais al-Khazali.

646.     Just after nightfall, a five-car convoy of black GMC Suburban trucks – the type frequently used by the U.S. government – made its way through three checkpoints, approaching the PJCC.

647.     The vehicles contained approximately a dozen AAH operatives dressed in U.S. military-style fatigues, carrying American-type weapons.

648.     After they entered the compound, the vehicles split up, with some parking in front and others circling to the back of the main building.

649.     After exiting their vehicles, the AAH terrorists threw grenades and opened fire with automatic rifles. One U.S. soldier, Johnathon M. Millican, jumped on one of the grenades that was thrown into the Coordination Center's main office, an upper-floor office that also

contained the provincial Iraqi police chief's office. Although he was killed, and three other U.S. soldiers injured, his selfless act provided his fellow soldiers in the PJCC's main building a few extra moments to recover and begin returning fire.

650. For his act of bravery, Johnathon M. Millican received the Silver Star, posthumously.

651. At the same time that AAH terrorists were attacking the PJCC's main building, other AAH operatives detonated explosives throughout the PJCC and abducted four soldiers before fleeing the compound.

652. The AAH getaway vehicles drove east, crossing the Euphrates River and then turning north.

653. Realizing the likelihood of escaping with their captives was low, the AAH operatives murdered the four Americans and abandoned their bodies and the vehicles near the town of Mahawil. Three of the four Americans died at the scene.

654. Only one of the four abducted U.S. soldiers, Brian S. Freeman, was still alive when rescuers reached the scene. Two of the soldiers were found in the back of one of the SUVs, handcuffed and shot dead. A third soldier was found dead on the ground, near the abandoned vehicles. Brian S. Freeman had also been shot in the head, but died on the way to the hospital.

655. The terrorist group that planned and executed the attack, AAH, was trained and armed by Iran's IRGC with Hezbollah's assistance.

656. On March 20, 2007, two months after the attack was perpetrated, Hezbollah leader Ali Musa Daqduq and AAH leader Qais al-Khazali and his brother Laith al-Khazali were captured by Coalition forces in southern Iraq.

657. The United States government charged them with responsibility for the Karbala

attack.

658.    Documents captured with Qais al-Khazali showed that the IRGC-QF had gathered detailed information on "soldiers' activities, shift changes and defenses" at the PJCC "and this information was shared with the attackers."

659.    A 22-page memorandum found with Daqduq "detailed the planning, preparation, approval process and conduct of the [Karbala] operation," among others. Other documents discussed tactics to attack Iraqi and Coalition forces.

660.    Daqduq also had a personal journal that noted his having met with Special Groups members who were targeting other Iraqis and Coalition Forces in the Diyala province using Improvised Explosive Devices ("IEDs"), as well as small-arms fire.

661.    According to U.S. military officials, both Daqduq and Qais al-Khazali admitted that senior leadership within the IRGC-QF knew of and helped plan the Karbala attack.

662.    It was later reported that U.S. spy satellites spotted a training center in Iran that contained a mockup of the PJCC, indicating that Iran had duplicated the PJCC's layout to train the AAH operatives for the attack.

663.    The terror attack on the PJCC was commanded by Azhar al-Dulaymi. He was trained by Hezbollah operatives, including Daqduq, near the city of Qom, Iran, where he and his AAH operatives trained to execute military-style, precision kidnappings.

664.    Although al-Dulaymi commanded the attack, Daqduq, a longtime Hezbollah commander, masterminded it.

665.    Daqduq advised AAH commanders al-Dulaymi and Qais al-Khazali and served as a liaison between the IRGC-QF and Qais al-Khazali, who along with his brother Laith al-Khazali, oversaw the attack.

666.     The U.S. Treasury Department's November 19, 2012 press release announcing Daqduq's designation as an SDGT stated, in part: "*Daqduq is a senior Hezbollah commander responsible for numerous attacks against Coalition Forces in Iraq, including planning an attack on the Karbala Joint Provincial Coordination Center (JPCC) on January 20, 2007, which resulted in the deaths of five U.S. soldiers.*"

667.     Daqduq is Lebanese-born and served in Hezbollah for 24 years prior to the attack. He served as a bodyguard for Hezbollah leader Hassan Nasrallah and also led Hezbollah operations in large areas of Lebanon.

668.     According to the U.S. government, Daqduq "*was in Iraq working as a surrogate for Iranian Revolutionary Guards Corps Quds Force operatives involved with special groups.*"

669.     In 2005, he was directed by senior Lebanese Hezbollah leadership to go to Iran and work with the IRGC-QF to train Iran's proxies in Iraq.

670.     According to the U.S. government: "*In May 2006, [Daqduq] traveled to Tehran with Yussef Hashim, a fellow Lebanese Hezbollah and head of their operations in Iraq. There they met with the commander and deputy commander of the Iranian Quds Force special external operations.*"

671.     Daqduq was ordered to Iraq to report on the training and operations of the Iraqi Special Groups.

672.     In the year prior to his capture in 2007, Daqduq made four trips to Iraq where he monitored and reported on the training and arming of the Special Groups in mortars and rockets, manufacturing and employment of IEDs, and kidnapping operations.

673.     Most significantly, Daqduq was tasked with organizing the Special Groups in ways that mirrored how Hezbollah was organized in Lebanon.

674. Daqduq also helped the IRGC train Iraqis in Iran. Using training groups of approximately 20 to 60 Iraqis at a time, Daqduq instructed his trainees how to use EFPs, mortars and rockets, as well as intelligence, sniper and kidnapping operations. The IRGC then sent the trainees back to Iraq where they were organized into Special Groups.

675. The IRGC also supplied the groups with weapons and a funding stream estimated at between $750,000 and $3 million per month.

676. On April 26, 2007, the Commander of the Multi-National Force-Iraq, Gen. David Petraeus, gave a briefing in which he stated:

> The Iranian involvement has really become much clearer to us and brought into much more focus during the interrogation of the members -- the heads of the Khazali network and some of the key members of that network that have been in detention now for a month or more. This is the head of the secret cell network, the extremist secret cells. They were provided substantial funding, training on Iranian soil, advanced explosive munitions and technologies as well as run of the mill arms and ammunition, in some cases advice and in some cases even a degree of direction. When we captured these individuals -- the initial capture, and then there have been a number of others since then -- we discovered, for example, a 22-page memorandum on a computer that detailed the planning, preparation, approval process and conduct of the operation that resulted in five of our soldiers being killed in Karbala. It also detailed -- there are numerous documents which detailed a number of different attacks on coalition forces, and our sense is that these records were kept so that they could be handed in to whoever it is that is financing them. And there's no question, again, that Iranian financing is taking place through the Quds force of the Iranian Republican Guards Corps.

677. The Americans killed during the Karbala attack included Brian S. Freeman, Johnathon M. Millican, Shawn P. Falter and Johnathan B. Chism. The Americans injured during the Karbala attack included Plaintiffs Billy Wallace, Evan Kirby, Johnny Washburn and Marvin Thornsberry.

**The Freeman Family**

678. Brian S. Freeman was a citizen of the United States and domiciled in the State of

California when he was killed in Iraq.

679.    Plaintiff Charlotte Freeman is a citizen of the United States and domiciled in the State of California. She is the widow of Brian S. Freeman.

680.    Plaintiff Kathleen Snyder is a citizen of the United States and domiciled in the State of Utah. She is the mother of Brian S. Freeman.

681.    Plaintiff Randolph Freeman is a citizen of the United States and domiciled in the State of California. He is the father of Brian S. Freeman.

682.    Plaintiff G.F., a minor represented by his legal guardian Charlotte Freeman, is a citizen of the United States and domiciled in the State of California. He is the son of Brian S. Freeman.

683.    Plaintiff I.F., a minor represented by her legal guardian Charlotte Freeman, is a citizen of the United States and domiciled in the State of California. She is the daughter of Brian S. Freeman.

684.    Plaintiff Charlotte Freeman brings an action individually and on behalf of the Estate of Brian S. Freeman as its legal representative.

685.    As a result of the attack, and the death of Brian S. Freeman, Plaintiffs Charlotte Freeman, Kathleen Snyder, Randolph Freeman, G.F. and I.F. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/father's society, companionship, comfort, advice and counsel.

**The Chism Family**

686.    Johnathan B. Chism was a citizen of the United States and domiciled in the State of Louisiana when he was killed in Iraq.

687.    Plaintiff Danny Chism is a citizen of the United States and domiciled in the State

of Louisiana. He is the father of Johnathan B. Chism.

688.    As a result of the attack, and the death of Johnathan B. Chism, Plaintiff Danny Chism has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

**The Falter Family**

689.    Shawn P. Falter was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

690.    Plaintiff Linda Falter is a citizen of the United States and domiciled in the State of New York. She is the step-mother of Shawn P. Falter.

691.    Plaintiff Russell Falter is a citizen of the United States and domiciled in the State of New York. He is the father of Shawn P. Falter.

692.    Plaintiff Russell Falter brings an action individually and on behalf of the Estate of Shawn P. Falter, as its legal representative.

693.    As a result of the attack, and the death of Shawn P. Falter, Plaintiffs Linda Falter and Russell Falter have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

**The Millican Family**

694.    Johnathon M. Millican was a citizen of the United States and domiciled in the State of Alaska when he was killed in Iraq.

695.    Plaintiff Shannon Millican is a citizen of the United States and domiciled in the State of Alabama. She is the widow of Johnathon M. Millican.

696.    Plaintiff Mitchell Millican is a citizen of the United States and domiciled in the State of Alabama. He is the father of Johnathon M. Millican.

697. Plaintiff Shannon Millican brings an action individually and on behalf of the Estate of Johnathon M. Millican, as its legal representative.

698. As a result of the attack, and the death of Johnathon M. Millican, Plaintiffs Shannon Millican and Mitchell Millican have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's society, companionship, comfort, advice and counsel.

**The Wallace Family**

699. Plaintiff Billy Wallace is a citizen of the United States and domiciled in the State of North Carolina.

700. Mr. Wallace was wounded while helping to defend the PJCC's main building.

701. He sustained serious shrapnel injuries when a grenade exploded in the doorway of the room that he was defending.

702. Mr. Wallace also suffered hearing loss and tinnitus.

703. He suffers from Post-Traumatic Stress Disorder ("PTSD") for which he has received ongoing treatment.

704. As a result of the attack, and the injuries he suffered, Billy Wallace has experienced severe physical and mental anguish and extreme emotional pain and suffering.

705. Plaintiff Stefanie Wallace is a citizen of the United States and domiciled in the State of North Carolina. She is the wife of Billy Wallace.

706. Plaintiff D.W., a minor represented by his legal guardians Billy Wallace and Stefanie Wallace, is a citizen of the United States and domiciled in the State of North Carolina. He is the son of Billy Wallace.

707. Plaintiff C.W., a minor represented by his legal guardians Billy Wallace and

Stefanie Wallace, is a citizen of the United States and domiciled in the State of North Carolina. He is the son of Billy Wallace.

708.    Plaintiff A.W., a minor represented by his legal guardians Billy Wallace and Stefanie Wallace, is a citizen of the United States and domiciled in the State of North Carolina. He is the son of Billy Wallace.

709.    As a result of the attack, and the injuries Billy Wallace suffered, Plaintiffs Stefanie Wallace, D.W., C.W. and A.W. have experienced severe mental anguish and extreme emotional pain and suffering.

**The Kirby Family**

710.    Plaintiff Evan Kirby is a citizen of the United States and domiciled in the State of Ohio.

711.    Mr. Kirby was wounded while helping to defend the PJCC's main building.

712.    As a result of an explosion that occurred during the attack, Mr. Kirby was thrown high into the air and sustained injuries to his back and spine.

713.    The aforementioned injuries have caused him great pain.

714.    As a result of the attack, and the injuries he suffered, Evan Kirby has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**The Washburn Family**

715.    Plaintiff Johnny Washburn is a citizen of the United States and domiciled in the State of Washington.

716.    Mr. Washburn was wounded while helping to defend the PJCC's main building.

717.    He was in the same room as Johnathon M. Millican when the grenade detonated that killed Mr. Millican.

718.    In addition to witnessing Mr. Millican's murder, Mr. Washburn also observed other soldiers being killed and injured.

719.    Mr. Washburn attempted to assist the aforementioned soldiers.

720.    His clothing was covered in blood, causing him great distress, as he was initially unable to determine if the blood was his own or belonged to one of the surrounding soldiers.

721.    These images and memories of what he witnessed throughout the attack have caused him great distress.

722.    He has experienced sleep-related problems and headaches following the attack.

723.    As a result of the attack, and the injuries he suffered, Johnny Washburn has experienced severe mental anguish and extreme emotional pain and suffering.

**The Thornsberry Family**

724.    Plaintiff Marvin Thornsberry is a citizen of the United States and domiciled in the State of Michigan.

725.    Mr. Thornsberry was in the PJCC's adjacent building when the attack occurred.

726.    He has experienced survivor's guilt following the attack.

727.    Mr. Thornsberry has been prescribed medication to address issues of depression and anxiety.

728.    As a result of the attack, and the injuries he suffered, Marvin Thornsberry has experienced severe mental anguish and extreme emotional pain and suffering.

729.    Plaintiff Cynthia Thornsberry is a citizen of the United States and domiciled in the State of Michigan. She is the wife of Marvin Thornsberry.

730.    Plaintiff A.B., a minor represented by his legal guardian Cynthia Thornsberry, is a citizen of the United States and domiciled in the State of Michigan. He is the son of Cynthia

Thornsberry and the step-son of Marvin Thornsberry.

731.    Plaintiff M.T., a minor represented by her legal guardians Marvin Thornsberry and Cynthia Thornsberry, is a citizen of the United States and domiciled in the State of Michigan. She is the daughter of Marvin Thornsberry and Cynthia Thornsberry.

732.    Plaintiff N.T., a minor represented by his legal guardians, Marvin Thornsberry and Cynthia Thornsberry, is a citizen of the United States and domiciled in the State of Michigan. He is the son of Marvin Thornsberry and Cynthia Thornsberry.

733.    Plaintiff L.T., a minor represented by her legal guardians, Marvin Thornsberry and Cynthia Thornsberry, is a citizen of the United States and domiciled in the State of Michigan. She is the daughter of Marvin Thornsberry and Cynthia Thornsberry.

734.    As a result of the attack and the injuries Marvin Thornsberry suffered, Plaintiffs Cynthia Thornsberry, A.B., M.T., N.T., and L.T. have experienced severe mental anguish and extreme emotional pain and suffering.


## 2.    <u>THE APRIL 4, 2004 ATTACK – BAGHDAD</u>

**<u>The Arsiaga Family</u>**

735.    Robert R. Arsiaga was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

736.    On April 4, 2004, Robert R. Arsiaga, aged 25, was serving in the United States military in Iraq when his unit was attacked with rocket-propelled grenades and small-arms fire.

737.    Robert R. Arsiaga was killed in the attack.

738.    The terrorist group that planned and executed the attack, the Mahdi Army, was trained and armed by Iran's IRGC with the assistance of Hezbollah.

739.    Plaintiff Tracie Arsiaga is a citizen of the United States and domiciled in the State

of Texas. She is the widow of Robert R. Arsiaga.

740. As a result of the attack, and the death of Robert R. Arsiaga, Plaintiff Tracie Arsiaga has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice and counsel.

**The Cason Family**

741. Ahmed A. Cason was a citizen of the United States and domiciled in the State of Alabama when he was killed in Iraq.

742. On April 4, 2004, Ahmed A. Cason, aged 24, was serving in the United States military in Iraq when his unit was attacked with rocket-propelled grenades and small-arms fire.

743. Ahmed A. Cason was killed in the attack.

744. The terrorist group that planned and executed the attack, the Mahdi Army, was trained and armed by Iran's IRGC with the assistance of Hezbollah.

745. Plaintiff Cedric Hunt, Sr. is a citizen of the United States and domiciled in the State of Alabama. He is the step-father of Ahmed A. Cason.

746. As a result of the attack, and the death of Ahmed A. Cason, Plaintiff Cedric Hunt, Sr. has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his step-son's society, companionship, comfort, advice and counsel.

### 3. THE MAY 3, 2005 ATTACK – BAGHDAD

**The Bartlett Family**

747. Plaintiff Robert Bartlett is a citizen of the United States and domiciled in the State of Virginia.

748. On May 3, 2005, Robert Bartlett, then 31, was serving in the U.S. military in Iraq.

749. He was driving in a convoy when an EFP struck his vehicle.

750. The weapon used to injure Mr. Bartlett was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

751. As a result of the attack, part of Mr. Bartlett's head was severed.

752. He also suffered third-degree burns on his neck, face and hands; internal bleeding; and a collapsed lung.

753. Mr. Bartlett has undergone multiple surgeries, including plastic surgery on his head and his bottom lip.

754. Mr. Bartlett suffers from Post-Traumatic Stress Disorder ("PTSD") and has constant nightmares.

755. He has participated in group therapy to treat the emotional injuries he sustained as a result of the attack.

756. As a result of the attack, and the injuries he suffered, Steve Bartlett has experienced severe physical and mental anguish and extreme emotional pain and suffering.

757. Plaintiff Terrel Charles Bartlett is a citizen of the United States and domiciled in the State of Arizona. He is the father of Robert Bartlett.

758. Plaintiff Shawn Bartlett is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Robert Bartlett.

759. As a result of the attack, and the injuries Robert Bartlett suffered, Plaintiffs Terrel Charles Bartlett and Shawn Bartlett have experienced severe mental anguish and extreme emotional pain and suffering.

## 4. <u>THE AUGUST 2, 2005 ATTACK – BASRA</u>

**<u>The Vincent Family</u>**

760. Steven Vincent was a citizen of the United States and domiciled in the State of

New York when he was killed in Iraq.

761.    On August 2, 2005, Steven Vincent, aged 49, a journalist, was reporting on the Iraqi war in Basra when he was kidnapped and shot.

762.    Steven Vincent was killed in the attack.

763.    The terrorist group that planned and executed the attack was trained and armed by Iranian-backed Special Groups.

764.    Plaintiff Lisa Ramaci is a citizen of the United States and domiciled in the State of New York. She is the widow of Steven Vincent.

765.    Plaintiff Isabell Vincent is a citizen of the United States and domiciled in the State of California. She is the mother of Steven Vincent.

766.    Plaintiff Charles Vincent is a citizen of the United States and domiciled in the State of California. He is the father of Steven Vincent.

767.    Plaintiff Lisa Ramaci brings an action individually and on behalf of the Estate of Steven Vincent, as its legal representative.

768.    As a result of the attack, and the death of Steven Vincent, Plaintiffs Lisa Ramaci, Isabell Vincent and Charles Vincent have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband/son's society, companionship, comfort, advice and counsel.

## 5.    <u>THE SEPTEMBER 28, 2005 ATTACK – UMM QASR</u>

**<u>The Morin Family</u>**

769.    Steve Morin, Jr. was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

770.    On September 28, 2005, Steve Morin, Jr., aged 34, was serving in the U.S.

military in Iraq when an EFP detonated near his vehicle.

771.    Steve Morin, Jr. was killed in the attack.

772.    The weapon used to kill Steve Morin, Jr. was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

773.    Plaintiff Gwendolyn Morin-Marentes is a citizen of the United States and domiciled in the State of Texas. She is the widow of Steve Morin, Jr.

774.    Plaintiff E.M., a minor represented by his legal guardian Gwendolyn Morin-Marentes, is a citizen of the United States and domiciled in the State of Texas. He is the son of Steve Morin, Jr.

775.    Plaintiff Audrey Morin is a citizen of the United States and domiciled in the State of Texas. She is the mother of Steve Morin, Jr.

776.    Plaintiff Steve Morin, Sr. is a citizen of the United States and domiciled in the State of Texas. He is the father of Steve Morin, Jr.

777.    Plaintiff Gwendolyn Morin-Marentes brings an action individually and on behalf of the Estate of Steve Morin, Jr., as its legal representative.

778.    As a result of the attack, and the death of Steve Morin, Jr., Plaintiffs Gwendolyn Morin-Marentes, E.M., Audrey Morin and Steve Morin, Sr. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's/son's society, companionship, comfort, advice and counsel.


## 6.    THE OCTOBER 6, 2005 ATTACK – BAGHDAD

**The Robinson Family**

779.    Jeremiah Robinson was a citizen of the United States and domiciled in the State of Arizona when he was killed in Iraq.

780.     On October 6, 2005, Jeremiah Robinson, aged 20, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

781.     Jeremiah Robinson was killed in the attack.

782.     The weapon used to kill Jeremiah Robinson was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

783.     Plaintiff Amy Lynn Robinson is a citizen of the United States and domiciled in the State of Arizona. She is the mother of Jeremiah Robinson.

784.     Plaintiff Floyd Burton Robinson is a citizen of the United States and domiciled in the State of Arizona. He is the father of Jeremiah Robinson.

785.     Plaintiff Jacob Michael Robinson is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Jeremiah Robinson.

786.     Plaintiff Lucas William Robinson is a citizen of the United States and domiciled in the State of Arizona. He is the brother of Jeremiah Robinson.

787.     Plaintiffs Amy Lynn Robinson and Floyd Burton Robinson bring an action individually and on behalf of the Estate of Jeremiah Robinson, as its legal representatives.

788.     As a result of the attack, and the death of Jeremiah Robinson, Plaintiffs Amy Lynn Robinson, Floyd Burton Robinson, Jacob Michael Robinson and Lucas William Robinson have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 7.     THE FEBRUARY 18, 2006 ATTACK – BAGHDAD

**The Matheny Family**

789.     Charles E. Matheny, IV was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

790. On February 18, 2006, Charles E. Matheny, IV, aged 23, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

791. Charles E. Matheny, IV was killed in the attack.

792. The weapon used to kill Charles E. Matheny, IV was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

793. Plaintiff Deborah Noble is a citizen of the United States and domiciled in the State of Washington. She is the mother of Charles E. Matheny, IV.

794. Plaintiff Charles E. Matheny, III is a citizen of the United States and domiciled in the State of Washington. He is the father of Charles E. Matheny, IV.

795. Plaintiff Deborah Noble brings an action individually and on behalf of the Estate of Charles E. Matheny, IV, as its legal representative.

796. As a result of the attack, and the death of Charles E. Matheny, IV, Plaintiffs Deborah Noble and Charles E. Matheny, III have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## 8.     THE FEBRUARY 26, 2006 ATTACK – BAGHDAD

**The Farr Family**

797. Clay P. Farr was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

798. On February 26, 2006, Clay P. Farr, aged 21, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

799. Clay P. Farr was killed in the attack.

800. The weapon used to kill Clay P. Farr was an Iranian-manufactured EFP provided

to Iranian-funded and -trained terror operatives in Iraq.

801.    Plaintiff Silver Farr is a citizen of the United States and domiciled in the State of California. She is the step-mother of Clay P. Farr.

802.    Plaintiff Patrick Farr is a citizen of the United States and domiciled in the State of California. He is the father of Clay P. Farr.

803.    Plaintiff Carrol Alderete is a citizen of the United States and domiciled in the State of California. She is the mother of Clay P. Farr.

804.    Plaintiff Anthony Alderete is a citizen of the United States and domiciled in the State of California. He is the step-father of Clay P. Farr.

805.    Plaintiff Patrick Farr brings an action individually and on behalf of the Estate of Clay P. Farr, as its legal representative.

806.    As a result of the attack, and the death of Clay P. Farr, Plaintiffs Silver Farr, Patrick Farr, Carrol Alderete and Anthony Alderete have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

**The Hunter Family**

807.    Wesley Hunter was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

808.    On February 26, 2006, Wesley Hunter, aged 26, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

809.    Wesley Hunter was injured in the attack, and he died on September 18, 2008 from the injuries he sustained in the attack.

810.    The weapon used to kill Wesley Hunter was an Iranian-manufactured EFP

provided to Iranian-funded and -trained terror operatives in Iraq.

811.    Plaintiff Rayanne Hunter is a citizen of the United States and domiciled in the State of North Carolina. She is the widow of Wesley Hunter.

812.    Plaintiff W.H., a minor represented by his legal guardian Rayanne Hunter, is a citizen of the United States and domiciled in the State of North Carolina. He is the son of Wesley Hunter.

813.    Plaintiff T.H., a minor represented by her legal guardian Rayanne Hunter, is a citizen of the United States and domiciled in the State of North Carolina. She is the daughter of Wesley Hunter.

814.    As a result of the attack, and the death of Wesley Hunter, Plaintiffs Rayanne Hunter, W.H. and T.H. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

## 9.    THE MARCH 13, 2006 ATTACK – RUSTAMIYAH

**The Lewis Family**

815.    Bryan A. Lewis was a citizen of the United States and domiciled in the State of Louisiana when he was killed in Iraq.

816.    On March 13, 2006, Bryan A. Lewis, aged 32, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

817.    Bryan A. Lewis was killed in the attack.

818.    The weapon used to kill Bryan A. Lewis was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

819.    Plaintiff Fabersha Flynt Lewis is a citizen of the United States and domiciled in

the State of Florida. She is the widow of Bryan A. Lewis.

820.    As a result of the attack, and the death of Bryan A. Lewis, Plaintiff Fabersha Flynt Lewis has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice and counsel.

## 10.    THE APRIL 1, 2006 ATTACK – BAGHDAD

**The Devora-Garcia Family**

821.    Israel Devora-Garcia was domiciled in the State of Texas when he was killed in Iraq. He became a citizen of the United States posthumously.

822.    On April 1, 2006, Israel Devora-Garcia, aged 23, was serving in the U.S. military in Iraq when an EFP detonated while he was conducting a dismounted patrol.

823.    Israel Devora-Garcia was killed in the attack.

824.    The weapon used to kill Israel Devora-Garcia was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

825.    Plaintiff Lorenzo Sandoval, Sr. is a citizen of the United States and domiciled in the State of Texas. He is the father of Israel Devora-Garcia.

826.    Plaintiff Lorenzo Sandoval, Jr. is a citizen of the United States and domiciled in the State of Texas. He is the brother of Israel Devora-Garcia.

827.    Plaintiff Lorenzo Sandoval, Sr. brings an action individually and on behalf of the Estate of Israel Devora-Garcia, as its legal representative.

828.    As a result of the attack, and the death of Israel Devora-Garcia, Plaintiffs Lorenzo Sandoval, Sr. and Lorenzo Sandoval, Jr. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 11.    THE APRIL 12, 2006 ATTACK – MISIAB

**The Bandhold Family**

829.    Scott Bandhold was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

830.    On April 12, 2006, Scott Bandhold, aged 37, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

831.    Scott Bandhold was killed in the attack.

832.    The weapon used to kill Scott Bandhold was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

833.    Plaintiff H. Joseph Bandhold is a citizen of the United States and domiciled in the State of New York. He is the brother of Scott Bandhold.

834.    Plaintiff Donald C. Bandhold is a citizen of the United States and domiciled in the State of Virginia. He is the brother of Scott Bandhold.

835.    As a result of the attack, and the death of Scott Bandhold, Plaintiffs H. Joseph Bandhold and Donald C. Bandhold have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their brother's society, companionship, comfort, advice and counsel.

## 12.    THE APRIL 25, 2006 ATTACK – SADR CITY

**The Roberts Family**

836.    Plaintiff Erik Roberts is a citizen of the United States and domiciled in the State of Florida.

837.    On April 25, 2006, Erik Roberts, then 22, was serving in the U.S. military in Iraq.

838.    He was driving in a convoy when an EFP struck his vehicle.

839.    Mr. Roberts' right femur was severed.

840.    He had had more than one dozen surgeries to treat his right femur and has suffered numerous infections.

841.    As a result of the attack, and the injuries he suffered, Erik Roberts has experienced severe physical and mental anguish and extreme emotional pain and suffering.

842.    Plaintiff Robin Roberts is a citizen of the United States and domiciled in the State of Tennessee. She is the mother of Erik Roberts.

843.    Plaintiff James Craig Roberts is a citizen of the United States and domiciled in the State of Ohio. He is the father of Erik Roberts.

844.    Plaintiff Cara Roberts is a citizen of the United States and domiciled in the State of Tennessee. She is the sister of Erik Roberts.

845.    Plaintiff Colin Roberts is a citizen of the United States and domiciled in the State of Tennessee. He is the brother of Erik Roberts.

846.    As a result of the attack, and the injuries Erik Roberts suffered, Plaintiffs Robin Roberts, James Craig Roberts, Cara Roberts and Colin Roberts have experienced severe mental anguish and extreme emotional pain and suffering.

## 13.    THE MAY 5, 2006 ATTACK – BAGHDAD

**The Saenz Family**

847.    Carlos N. Saenz was a citizen of the United States and domiciled in the State of Nevada when he was killed in Iraq.

848.    On May 5, 2006, Carlos N. Saenz, aged 46, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

849.    Carlos N. Saenz was killed in the attack.

850.    The weapon used to kill Carlos N. Saenz was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

851.    Plaintiff Nanette Saenz is a citizen of the United States and domiciled in the State of Las Vegas. She is the widow of Carlos N. Saenz.

852.    Plaintiff Juan Saenz is a citizen of the United States and domiciled in the State of Las Vegas. He is the son of Carlos N. Saenz.

853.    Plaintiff Nanette Saenz brings an action individually and on behalf of the Estate of Carlos N. Saenz, as its legal representative.

854.    As a result of the attack, and the death of Carlos N. Saenz, Plaintiffs Nanette Saenz and Juan Saenz have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Vacho Family**

855.    Nathan J. Vacho was a citizen of the United States and domiciled in the State of Wisconsin when he was killed in Iraq.

856.    On May 5, 2006, Nathan J. Vacho, aged 29, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

857.    Nathan J. Vacho was killed in the attack.

858.    The weapon used to kill Nathan J. Vacho was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

859.    Plaintiff John Vacho is a citizen of the United States and domiciled in the State of Wisconsin. He is the father of Nathan J. Vacho.

860.    Plaintiff Ashley Vacho is a citizen of the United States and domiciled in the State

of Wisconsin. She is the sister of Nathan J. Vacho.

861.    Carol Vacho was a citizen of the United States at the time of the death of Nathan J. Vacho. She was the mother of Nathan J. Vacho.

862.    Plaintiff John Vacho brings an action individually and on behalf of the Estate of Carol Vacho, as its legal representative.

863.    Plaintiff John Vacho also brings an action on behalf of the Estate of Nathan J. Vacho, as its legal representative.

864.    As a result of the attack, and the death of Nathan J. Vacho, Plaintiffs John Vacho and Ashley Vacho, and John Vacho individually and in his capacity as the legal representative for the Estate of Carol Vacho, have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 14.    THE MAY 14, 2006 ATTACK – BAGHDAD

**The West Family**

865.    Robert H. West was a citizen of the United States and domiciled in the State of Ohio when he was killed in Iraq.

866.    On May 14, 2006, Robert H. West, aged 37, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

867.    Robert H. West was killed in the attack.

868.    The weapon used to kill Robert H. West was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

869.    Plaintiff Jeanette West is a citizen of the United States and domiciled in the State of Colorado. She is the widow of Robert H. West.

870.     Plaintiff Shelby West is a citizen of the United States and domiciled in the State of Colorado. She is the daughter of Robert H. West.

871.     Plaintiff Jeanette West brings an action individually and on behalf of the Estate of Robert H. West, as its legal representative.

872.     As a result of the attack, and the death of Robert H. West, Plaintiffs Jeanette West and Shelby West have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Engeman Family**

873.     John W. Engeman was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

874.     On May 14, 2006, John W. Engeman, aged 45, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

875.     John W. Engeman was killed in the attack.

876.     The weapon used to kill John W. Engeman was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

877.     Plaintiff Donna Engeman is a citizen of the United States and domiciled in the State of Texas. She is the widow of John W. Engeman.

878.     As a result of the attack, and the death of John W. Engeman, Plaintiff Donna Engeman has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice and counsel.

## 15.     THE JUNE 5, 2006 ATTACK – BAGHDAD

**The Lawson Family**

879.     Isaac S. Lawson was a citizen of the United States and domiciled in the State of

California when he was killed in Iraq.

880.    On June 5, 2006, Isaac S. Lawson, aged 35, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

881.    Isaac S. Lawson was killed in the attack.

882.    The weapon used to kill Isaac S. Lawson was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

883.    Plaintiff Suzzettee Lawson is a citizen of the United States and domiciled in the State of California. She is the widow of Isaac S. Lawson.

884.    Plaintiff C.L., a minor represented by her legal guardian Suzzettee Lawson, is a citizen of the United States and domiciled in the State of California. She is the daughter of Isaac S. Lawson.

885.    Plaintiff Suzzettee Lawson brings an action individually and on behalf of the Estate of Isaac S. Lawson, as its legal representative.

886.    As a result of the attack, and the death of Isaac S. Lawson, Plaintiffs Suzzettee Lawson and C.L. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

## 16.    THE JUNE 8, 2006 ATTACK – AL KUT

**The Crabtree Family**

887.    Daniel Crabtree was a citizen of the United States and domiciled in the State of Ohio when he was killed in Iraq.

888.    On June 8, 2006, Daniel Crabtree, aged 31, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

889.    Daniel Crabtree was killed in the attack.

890.    The weapon used to kill Daniel Crabtree was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

891.    Plaintiff Judy Ann Crabtree is a citizen of the United States and domiciled in the State of Georgia. She is the mother of Daniel Crabtree.

892.    Plaintiff Ronald Wayne Crabtree is a citizen of the United States and domiciled in the State of Ohio. He is the father of Daniel Crabtree.

893.    Plaintiff Debra Wigbels is a citizen of the United States and domiciled in the State of Georgia. She is the sister of Daniel Crabtree.

894.    Plaintiff Ronald William Crabtree is a citizen of the United States and domiciled in the State of Ohio. He is the brother of Daniel Crabtree.

895.    As a result of the attack, and the death of Daniel Crabtree, Plaintiffs Judy Ann Crabtree, Ronald Wayne Crabtree, Debra Wigbels and Ronald William Crabtree have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 17.    THE JUNE 9, 2006 ATTACK – DIWANIYAH

### The Slaven Family

896.    Benjamin J. Slaven was a citizen of the United States and domiciled in the State of Nebraska when he was killed in Iraq.

897.    On June 9, 2006, Benjamin J. Slaven aged 22, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

898.    Benjamin J. Slaven was killed in the attack.

899.    The weapon used to kill Benjamin J. Slaven was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

900.    Plaintiff Judy Huenink is a citizen of the United States and domiciled in the State of Nebraska. She is the mother of Benjamin J. Slaven.

901.    Plaintiff Sean Slaven is a citizen of the United States and domiciled in the State of Nebraska. He is the brother of Benjamin J. Slaven.

902.    Plaintiff Chastity Dawn Laflin is a citizen of the United States and domiciled in the State of Nebraska. She is the sister of Benjamin J. Slaven.

903.    Plaintiff Nicole Landon is a citizen of the United States and domiciled in the State of Nebraska. She is the sister of Benjamin J. Slaven.

904.    Plaintiff Misti Fisher is a citizen of the United States and domiciled in the State of Texas. She is the sister of Benjamin J. Slaven.

905.    Plaintiff Judy Huenink brings an action individually and on behalf of the Estate of Benjamin J. Slaven, as its legal representative.

906.    As a result of the attack, and the death of Benjamin J. Slaven, Plaintiffs Judy Huenink, Sean Slaven, Chastity Dawn Laflin, Nicole Landon and Misti Fisher have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 18.    THE OCTOBER 17, 2006 ATTACK – BAQUBAH

**The Frigo Family**

907.    Nathan J. Frigo was a citizen of the United States and domiciled in the State of Indiana when he was killed in Iraq.

908.    On October 17, 2006, Nathan J. Frigo, aged 23, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

909.    Nathan J. Frigo was killed in the attack.

910. The weapon used to kill Nathan J. Frigo was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

911. Plaintiff Fred Frigo is a citizen of the United States and domiciled in the State of Indiana. He is the father of Nathan J. Frigo.

912. As a result of the attack, and the death of Nathan J. Frigo, Plaintiff Fred Frigo has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

**The Haupt Family**

913. Ryan Haupt was a citizen of the United States and domiciled in the State of Arizona when he was killed in Iraq.

914. On October 17, 2006, Ryan Haupt, aged 24, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

915. Ryan Haupt was killed in the attack.

916. The weapon used to kill Ryan Haupt was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

917. Plaintiff Lynn Forehand is a citizen of the United States and domiciled in the State of Tennessee. She is the mother of Ryan Haupt.

918. Plaintiff Lance Haupt is a citizen of the United States and domiciled in the State of Arizona. He is the father of Ryan Haupt.

919. Plaintiff Rhonda Haupt is a citizen of the United States and domiciled in the State of California. She is the sister of Ryan Haupt.

920. Plaintiff Tifany Haupt is a citizen of the United States and domiciled in the State of California. She is the sister of Ryan Haupt.

921.    Plaintiff Sabrina Cumbe is a citizen of the United States and domiciled in the State of California. She is the sister of Ryan Haupt.

922.    As a result of the attack, and the death of Ryan Haupt, Plaintiffs Lynn Forehand, Lance Haupt, Rhonda Haupt, Tifany Haupt and Sabrina Cumbe have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 19.    THE OCTOBER 22, 2006 ATTACK – BAGHDAD

### The Haines Family

923.    Plaintiff David W. Haines is a citizen of the United States and domiciled in the State of Kentucky.

924.    On October 22, 2006, David W. Haines, then 41, was serving in the U.S. military in Iraq.

925.    Mr. Haines was a member of a mounted patrol conducting a route reconnaissance to the military hospital in Baghdad when an EFP struck his vehicle.

926.    The weapon used to injure Mr. Haines was an Iranian-manufactured EFP provided to Iranian-funded and -trained operatives in Iraq.

927.    As a result of the attack, Mr. Haines sustained a fracture of his right femur that resulted in his right and left legs being different lengths; shrapnel injuries to his right hand, left arm, right leg, and buttocks; burns to his body; and nerve damage.

928.    He has undergone multiple surgeries to repair the fracture to his femur and had multiple skin grafts.

929.    As a result of the nerve damage that he incurred, Mr. Haines continues to experience limited mobility in his left arm and hand and sensation problems.

930.    He has been diagnosed with PTSD and has sought counseling for emotional injuries resulting from the attack.

931.    As a result of the attack, and the injuries he suffered, David W. Haines has experienced severe physical and mental anguish and extreme emotional pain and suffering.

932.    Plaintiff Dawn Haines is a citizen of the United States and domiciled in the State of Kentucky. She is the wife of David W. Haines.

933.    Plaintiff C.H., a minor represented by his legal guardian Dawn Haines, is a citizen of the United States and domiciled in the State of Kentucky. He is the son of David W. Haines.

934.    Plaintiff Mackenzie Haines is a citizen of the United States and domiciled in the State of Kentucky. She is the sister of David W. Haines.

935.    As a result of the attack, and the injuries suffered by David W. Haines, Plaintiffs Dawn Haines, C.H. and Mackenzie Haines have experienced severe mental anguish, and extreme emotional pain and suffering.

## 20.    THE NOVEMBER 13, 2006 ATTACK – BAGHDAD

**The Kim Family**

936.    Jang H. Kim was domiciled in the State of California when he was killed in Iraq. He became a citizen of the United States posthumously.

937.    On November 13, 2006, Jang H. Kim, aged 20, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

938.    Jang H. Kim was killed in the attack.

939.    The weapon used to kill Jang H. Kim was an Iranian-manufactured EFP provided to Kata'ib Hezbollah operatives in Iraq.

940.    Plaintiff Sangsoon Kim is a citizen of the United States and domiciled in the State

of California. She is the mother of Jang H. Kim.

941. Plaintiff Seop (Steve) Kim is a citizen of the United States and domiciled in the State of California. He is the father of Jang H. Kim.

942. Plaintiff Michelle Kim is a citizen of the United States and domiciled in the State of California. She is the sister of Jang H. Kim.

943. Plaintiff Seop (Steve) Kim brings an action individually and on behalf of the Estate of Jang H. Kim, as its legal representative.

944. As a result of the attack, and the death of Jang H. Kim, Plaintiffs Sangsoon Kim, Seop (Steve) Kim and Michelle Kim have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 21.   THE NOVEMBER 26, 2006 ATTACK – BAGHDAD

**The Fraser Family**

945. David M. Fraser was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

946. On November 26, 2006, David M. Fraser, aged 25, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

947. David M. Fraser was killed in the attack.

948. The weapon used to kill David M. Fraser was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

949. Plaintiff Helen Fraser is a citizen of the United States and domiciled in the State of Texas. She is the mother of David M. Fraser.

950. Plaintiff Richard Fraser is a citizen of the United States and domiciled in the State

of Texas. He is the father of David M. Fraser.

951.    Plaintiff Richard Fraser brings an action individually and on behalf of the Estate of David M. Fraser, as its legal representative.

952.    As a result of the attack, and the death of David M. Fraser, Plaintiffs Helen Fraser and Richard Fraser have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## 22.    THE DECEMBER 3, 2006 ATTACK – BAGHDAD

**The English Family**

953.    Shawn L. English was a citizen of the United States and domiciled in the State of Ohio when he was killed in Iraq.

954.    On December 3, 2006, Shawn L. English, aged 35, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

955.    Shawn L. English was killed in the attack.

956.    The weapon used to kill Shawn L. English was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

957.    Plaintiff Tricia English is a citizen of the United States and domiciled in the State of Ohio. She is the widow of Shawn L. English.

958.    Plaintiff N.W.E., a minor represented by his legal guardian Tricia English, is a citizen of the United States and domiciled in the State of Ohio. He is the son of Shawn L. English.

959.    Plaintiff N.C.E., a minor represented by his legal guardian Tricia English, is a citizen of the United States and domiciled in the State of Ohio. He is the son of Shawn L. English.

960. Plaintiff A.S.E., a minor represented by his legal guardian Tricia English, is a citizen of the United States and domiciled in the State of Ohio. He is the son of Shawn L. English.

961. Todd Daily brings an action on behalf of the Estate of Shawn L. English, as its legal representative.

962. As a result of the attack, and the death of Shawn L. English, Plaintiffs Tricia English, N.W.E., N.C.E. and A.S.E. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

## 23.   THE DECEMBER 10, 2006 ATTACK – BAGHDAD

**The Ford Family**

963. Philip C. Ford was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

964. On December 10, 2006, Philip C. Ford, aged 21, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

965. Philip C. Ford was killed in the attack.

966. The weapon used to kill Philip C. Ford was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

967. Plaintiff Philip S. Ford is a citizen of the United States and domiciled in the State of Texas. He is the father of Philip C. Ford.

968. As a result of the attack, and the death of Philip C. Ford, Plaintiff Philip S. Ford has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

**The Gibson Family**

969.    Brennan C. Gibson was a citizen of the United States and domiciled in the State of Oregon when he was killed in Iraq.

970.    On December 10, 2006, Brennan C. Gibson aged 26, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

971.    Brennan C. Gibson was killed in the attack.

972.    The weapon used to kill Brennan C. Gibson was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

973.    Plaintiff Linda Gibson is a citizen of the United States and domiciled in the State of Oregon. She is the mother of Brennan C. Gibson.

974.    Plaintiff John Gibson is a citizen of the United States and domiciled in the State of Oregon. He is the step-father of Brennan C. Gibson.

975.    Plaintiff Stephanie Gibson Webster is a citizen of the United States and domiciled in the State of Oregon. She is the sister of Brennan C. Gibson.

976.    Plaintiff Sean Elliott is a citizen of the United States and domiciled in the State of Oregon. He is the brother of Brennan C. Gibson.

977.    Plaintiff Travis Gibson is a citizen of the United States and domiciled in the State of Oregon. He is the brother of Brennan C. Gibson.

978.    As a result of the attack, and the death of Brennan C. Gibson, Plaintiffs Linda Gibson, John Gibson, Stephanie Gibson Webster, Sean Elliott and Travis Gibson have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 24.    THE DECEMBER 31, 2006 ATTACK – BAGHDAD

**The Blohm Family**

979.     Alan R. Blohm was a citizen of the United States and domiciled in the State of Alaska when he was killed in Iraq.

980.     On December 31, 2006, Alan R. Blohm, aged 21, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

981.     Alan R. Blohm was killed in the attack.

982.     The weapon used to kill Alan R. Blohm was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

983.     Plaintiff Denise Blohm is a citizen of the United States and domiciled in the State of Michigan. She is the mother of Alan R. Blohm.

984.     Plaintiff Chris Blohm is a citizen of the United States and domiciled in the State of Michigan. He is the father of Alan R. Blohm.

985.     Plaintiff Kiana Blohm is a citizen of the United States and domiciled in the State of Michigan. She is the sister of Alan R. Blohm.

986.     Plaintiff Jeremy Blohm is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Alan R. Blohm.

987.     As a result of the attack, and the death of Alan R. Blohm, Plaintiffs Denise Blohm, Chris Blohm, Kiana Blohm and Jeremy Blohm have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 25.     THE JANUARY 18, 2007 ATTACK – BAGHDAD

**The Rechenmacher Family**

988.     William Joshua Rechenmacher was a citizen of the United States and domiciled in

the State of Florida when he was killed in Iraq.

989.    On January 18, 2007, William Joshua Rechenmacher, aged 24, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

990.    William Joshua Rechenmacher was killed in the attack.

991.    The weapon used to kill William Joshua Rechenmacher was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

992.    Plaintiff Joanne Gutcher is a citizen of the United States and domiciled in the State of Florida. She is the mother of William Joshua Rechenmacher.

993.    As a result of the attack, and the death of William Joshua Rechenmacher, Plaintiff Joanne Gutcher has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## 26.    THE JANUARY 22, 2007 ATTACK – BAGHDAD

### The Stout Family

994.    Brandon L. Stout was a citizen of the United States and domiciled in the State of Michigan when he was killed in Iraq.

995.    On January 22, 2007, Brandon L. Stout, aged 23, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

996.    Brandon L. Stout was killed in the attack.

997.    The weapon used to kill Brandon L. Stout was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

998.    Plaintiff Tracy Anderson is a citizen of the United States and domiciled in the State of Michigan. She is the mother of Brandon L. Stout.

999.    Plaintiff Jeffrey Anderson is a citizen of the United States and domiciled in the

State of Michigan. He is the step-father of Brandon L. Stout.

1000.   As a result of the attack, and the death of Brandon L. Stout, Plaintiffs Tracy Anderson and Jeffrey Anderson have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## 27.   THE JANUARY 25, 2007 ATTACK – BAGHDAD

**The Fuller Family**

1001.   Alexander H. Fuller was a citizen of the United States and domiciled in the State of Massachusetts when he was killed in Iraq.

1002.   On January 25, 2007, Alexander H. Fuller, aged 21, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1003.   Alexander H. Fuller was killed in the attack.

1004.   The weapon used to kill Alexander H. Fuller was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1005.   Plaintiff Anastasia Fuller is a citizen of the United States and domiciled in the State of Massachusetts. She is the widow of Alexander H. Fuller.

1006.   Plaintiff A.F., a minor represented by her legal guardian Anastasia Fuller, is a citizen of the United States and domiciled in the State of Massachusetts. She is the daughter of Alexander H. Fuller.

1007.   As a result of the attack, and the death of Alexander H. Fuller, Plaintiffs Anastasia Fuller and A.F. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

## 28. THE MARCH 15, 2007 ATTACK – BAQUBAH

**The Harris Family**

1008.  Blake Harris was a citizen of the United States and domiciled in the State of Georgia when he was killed in Iraq.

1009.  On March 15, 2007, Blake Harris, aged 27, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1010.  Blake Harris was killed in the attack.

1011.  The weapon used to kill Blake Harris was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1012.  Plaintiff Anne F. Harris is a citizen of the United States and domiciled in the State of Georgia. She is the step-mother of Blake Harris.

1013.  Plaintiff Paul D. Harris is a citizen of the United States and domiciled in the State of Georgia. He is the father of Blake Harris.

1014.  As a result of the attack, and the death of Blake Harris, Plaintiffs Anne F. Harris and Paul D. Harris have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## 29. THE MARCH 20, 2007 ATTACK – BAGHDAD

**The Glawson Family**

1015.  Curtis E. Glawson was a citizen of the United States and domiciled in the State of Alabama when he was killed in Iraq.

1016.  On March 20, 2007, Curtis E. Glawson, aged 24, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1017.  Curtis E. Glawson was killed in the attack.

1018.    The weapon used to kill Curtis E. Glawson was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1019.    Plaintiff Hyunjung Glawson is a citizen of the United States and domiciled in the State of Florida. She is the widow of Curtis E. Glawson.

1020.    Plaintiff Yolanda M. Brooks is a citizen of the United States and domiciled in the State of Alabama. She is the mother of Curtis E. Glawson.

1021.    Plaintiff Curtis Glawson, Sr. is a citizen of the United States and domiciled in the State of Georgia. He is the father of Curtis E. Glawson.

1022.    As a result of the attack, and the death of Curtis E. Glawson, Plaintiffs Hyunjung Glawson, Yolanda M. Brooks and Curtis Glawson, Sr. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's society, companionship, comfort, advice and counsel.

## 30.    THE MARCH 23, 2007 ATTACK – NASIRIYAH

**Ryan Sabinish**

1023.    Plaintiff Ryan Sabinish is a citizen of the United States and domiciled in the State of Minnesota.

1024.    On March 23, 2007, Ryan Sabinish, then 25, was serving in the U.S. military in Iraq.

1025.    Mr. Sabinish, a gunner, was tasked with protecting his base from mortar and rocket attacks.

1026.    While he was conducting his operations, his vehicle was struck by an EFP.

1027.    The weapon used to injure Mr. Sabinish was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1028.   As a result of the attack, Mr. Sabinish experienced severe blood loss and sustained injuries to his back, hip, and lower extremities.

1029.   In addition, shrapnel penetrated and scarred his right arm.

1030.   Mr. Sabinish has been diagnosed with Traumatic Brain Injury ("TBI").

1031.   He also suffers from PTSD.

1032.   Mr. Sabinish has been hospitalized for his emotional injuries and has sought mental health treatment as an outpatient. He continues to seek treatment.

1033.   He has been prescribed medication to address his emotional health issues, and he continues to take medication to treat his emotional injuries.

1034.   As a result of the attack, and the injuries he suffered, Ryan Sabinish has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## 31.   THE MARCH 31, 2007 ATTACK – DIWANIYAH

**The Christopher Family**

1035.   Kwesi Christopher was a citizen of the United States and domiciled in Brooklyn, in the State of New York, when he was killed in Iraq.

1036.   On March 31, 2007, Kwesi Christopher, aged 25, a former soldier in the U.S. military, was serving as a civilian contractor in Iraq when an EFP detonated near him.

1037.   Kwesi Christopher was killed in the attack.

1038.   The weapon used to kill Kwesi Christopher was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1039.   Plaintiff Ann Christopher is a citizen of the United States and domiciled in the State of Florida. She is the mother of Kwesi Christopher.

1040.   Plaintiff Ann Christopher brings an action individually and on behalf of the Estate

of Kwesi Christopher, as its legal representative.

1041.   As a result of the attack, and the death of Kwesi Christopher, Plaintiff Ann Christopher has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## 32.   THE APRIL 6, 2007 ATTACK – BAGHDAD

**The Fuentes Family**

1042.   Daniel A. Fuentes was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

1043.   On April 6, 2007, Daniel A. Fuentes, aged 19, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1044.   Daniel A. Fuentes was killed in the attack.

1045.   The weapon used to kill Daniel A. Fuentes was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1046.   Plaintiff Nancy Fuentes is a citizen of the United States and domiciled in the State of New York. She is the mother of Daniel A. Fuentes.

1047.   Plaintiff Armando Fuentes is a citizen of the United States and domiciled in the State of New York. He is the father of Daniel A. Fuentes.

1048.   Plaintiff Julio Fuentes is a citizen of the United States and domiciled in the State of New York. He is the brother of Daniel A. Fuentes.

1049.   Plaintiff T.F., a minor represented by her legal guardians Nancy Fuentes and Armando Fuentes, is a citizen of the United States and domiciled in the State of New York. She is the sister of Daniel A. Fuentes.

1050.   Plaintiff D.J.F., a minor, is a citizen of the United States and domiciled in the

State of New York. He is the son of Daniel A. Fuentes.

1051. Emma McGarry is a citizen of the United States and domiciled in the State of New York. She was the fiancée of Daniel A. Fuentes and is the legal guardian of Plaintiff D.J.F.

1052. As a result of the attack, and the death of Daniel A. Fuentes, Plaintiffs Nancy Fuentes, Armando Fuentes, Julio Fuentes, T.F. and D.J.F. have experienced the loss of their son's/brother's/father's society, companionship, comfort, advice and counsel.

## 33.   THE APRIL 16, 2007 ATTACK – BAGHDAD

**The Starcevich Family**

1053. Lucas V. Starcevich was a citizen of the United States and domiciled in the State of Illinois when he was killed in Iraq.

1054. On April 16, 2007, Lucas V. Starcevich, aged 25, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1055. Lucas V. Starcevich was killed in the attack.

1056. The weapon used to kill Lucas V. Starcevich was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1057. Plaintiff Ava Tomson is a citizen of the United States and domiciled in the State of Illinois. She is the mother of Lucas V. Starcevich.

1058. Plaintiff Richard Tomson is a citizen of the United States and domiciled in the State of Illinois. He is the step-father of Lucas V. Starcevich.

1059. Plaintiff Bradley Starcevich is a citizen of the United States and domiciled in the State of Illinois. He is the father of Lucas V. Starcevich.

1060. Plaintiff Glenda Starcevich is a citizen of the United States and domiciled in the State of Illinois. She is the step-mother of Lucas V. Starcevich.

1061.   Plaintiff Ariana Reyes is a citizen of the United States and domiciled in the State of Illinois. She is the sister of Lucas V. Starcevich.

1062.   Plaintiff Trenton Starcevich is a citizen of the United States and domiciled in the State of Illinois. He is the brother of Lucas V. Starcevich.

1063.   Plaintiff Ava Tomson brings an action individually and on behalf of the Estate of Lucas V. Starcevich, as its legal representative.

1064.   As a result of the attack, and the death of Lucas V. Starcevich, Plaintiffs Ava Tomson, Richard Tomson, Bradley Starcevich, Glenda Starcevich, Ariana Reyes and Trenton Starcevich have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 34.   THE APRIL 29, 2007 ATTACK – BAGHDAD

**The Funcheon Family**

1065.   Alexander J. Funcheon was a citizen of the United States and domiciled in the State of Kansas when he was killed in Iraq.

1066.   On April 29, 2007, Alexander J. Funcheon, aged 21, was serving in the U.S. military in Iraq when an EFP detonated near his unit.

1067.   Alexander J. Funcheon was killed in the attack.

1068.   The weapon used to kill Alexander J. Funcheon was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1069.   Plaintiff Karen Funcheon is a citizen of the United States and domiciled in the State of Kansas. She is the mother of Alexander J. Funcheon.

1070.   Plaintiff Robert Funcheon is a citizen of the United States and domiciled in the State of Kansas. He is the father of Alexander J. Funcheon.

1071.  Plaintiff Karen Funcheon brings an action individually and on behalf of the Estate of Alexander J. Funcheon, as its legal representative.

1072.  As a result of the attack, and the death of Alexander J. Funcheon, Plaintiffs Karen Funcheon and Robert Funcheon have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## 35.  <u>THE MAY 3, 2007 ATTACK – BAGHDAD</u>

**<u>The Potter Family</u>**

1073.  Jerome Potter was a citizen of the United States and domiciled in the State of Washington when he was killed in Iraq.

1074.  On May 3, 2007, Jerome Potter, aged 24, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1075.  Jerome Potter was killed in the attack.

1076.  The weapon used to kill Jerome Potter was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1077.  Plaintiff Holly Burson-Gilpin is a citizen of the United States and domiciled in the State of Washington. She is the mother of Jerome Potter.

1078.  Plaintiff Holly Burson-Gilpin brings an action individually and on behalf of the Estate of Jerome Potter, as its legal representative.

1079.  As a result of the attack, and the death of Jerome Potter, Plaintiff Holly Burson-Gilpin has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## 36.     THE MAY 3, 2007 ATTACK – MUSAYYIB

**The Umbrell Family**

1080.   Colby J. Umbrell was a citizen of the United States and domiciled in the State of Pennsylvania when he was killed in Iraq.

1081.   On May 3, 2007, Colby J. Umbrell aged 26, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1082.   Colby J. Umbrell was killed in the attack.

1083.   The weapon used to kill Colby J. Umbrell was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1084.   Plaintiff Nancy Umbrell is a citizen of the United States and domiciled in the State of Pennsylvania. She is the mother of Colby J. Umbrell.

1085.   Plaintiff Mark Umbrell is a citizen of the United States and domiciled in the State of Pennsylvania. He is the father of Colby J. Umbrell.

1086.   Plaintiffs Nancy Umbrell and Mark Umbrell bring an action individually on behalf of the Estate of Colby J. Umbrell, as its legal representatives.

1087.   As a result of the attack, and the death of Colby J. Umbrell, Plaintiffs Nancy Umbrell and Mark Umbrell have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## 37.     THE MAY 6, 2007 ATTACK – BAGHDAD

**The Dixon Family**

1088.   Robert J. Dixon was a citizen of the United States and domiciled in the State of Minnesota when he was killed in Iraq.

1089.   On May 6, 2007, Robert J. Dixon aged 27, was serving in the U.S. military in Iraq

when an EFP detonated near his vehicle.

1090.   Robert J. Dixon was killed in the attack.

1091.   The weapon used to kill Robert J. Dixon was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1092.   Plaintiff Ilene Dixon was a citizen of the United States at the time of the death of Robert J. Dixon. She was the mother of Robert J. Dixon.

1093.   Plaintiff Dan Dixon is a citizen of the United States and domiciled in the State of Michigan. He is the father of Robert J. Dixon. He brings this action individually and on behalf of the Estate of Ilene Dixon, as its legal representative.

1094.   As a result of the attack, and the death of Robert J. Dixon, Plaintiff Dan Dixon individually and in his capacity as the legal representative for the Estate of Ilene Dixon has experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## 38.   THE MAY 6, 2007 ATTACK – BAGHDAD

**The Martinez Family**

1095.   Virgil C. Martinez was a citizen of the United States and domiciled in the State of Utah when he was killed in Iraq.

1096.   On May 6, 2007, Virgil C. Martinez, aged 33, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1097.   Virgil C. Martinez was killed in the attack.

1098.   The weapon used to kill Virgil C. Martinez was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1099.   Plaintiff Rebecca J. Oliver is a citizen of the United States and domiciled in the

State of Utah. She is the mother of Virgil C. Martinez.

1100.    Plaintiff Daniel C. Oliver is a citizen of the United States and domiciled in the State of Utah. He is the step-father of Virgil C. Martinez.

1101.    As a result of the attack, and the death of Virgil C. Martinez, Plaintiffs Rebecca J. Oliver and Daniel C. Oliver have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## 39.    THE MAY 8, 2007 ATTACK – SALMAN PAK

**The Little Family**

1102.    Kyle A. Little was a citizen of the United States and domiciled in the State of Massachusetts when he was killed in Iraq.

1103.    On May 8, 2007, Kyle A. Little, aged 20, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1104.    Kyle A. Little was killed in the attack.

1105.    The weapon used to kill Kyle A. Little was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1106.    Plaintiff Shelley Ann Smith is a citizen of the United States and domiciled in the State of Massachusetts. She is the mother of Kyle A. Little.

1107.    As a result of the attack, and the death of Kyle A. Little, Plaintiff Shelley Ann Smith has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## 40.   THE MAY 11, 2007 ATTACK – AL ISKANDARIYAH

**The Farrar Family**

1108.   William A. Farrar was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

1109.   On May 11, 2007, William A. Farrar, aged 20, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1110.   William A. Farrar was killed in the attack.

1111.   The weapon used to kill William A. Farrar was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1112.   Plaintiff William Farrar, Sr. is a citizen of the United States and domiciled in the State of California. He is the father of William A. Farrar.

1113.   Plaintiff William Farrar, Sr. brings an action individually and on behalf of the Estate of William A. Farrar, as its legal representative.

1114.   As a result of the attack, and the death of William A. Farrar, Plaintiff William Farrar, Sr. has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

## 41.   THE JUNE 2, 2007 ATTACK – BAGHDAD

**The Dressler Family**

1115.   Shawn E. Dressler was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

1116.   On June 2, 2007, Shawn E. Dressler, aged 22, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1117.   Shawn E. Dressler was killed in the attack.

1118.   The weapon used to kill Shawn E. Dressler was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1119.   Plaintiff Tonya K. Dressler is a citizen of the United States and domiciled in the State of Arizona. She is the mother of Shawn E. Dressler.

1120.   Plaintiff Ardith Cecil Dressler is a citizen of the United States and domiciled in the State of Arizona. He is the father of Shawn E. Dressler.

1121.   Plaintiff Melissa Dressler is a citizen of the United States and domiciled in the State of Arizona. She is the sister of Shawn E. Dressler.

1122.   As a result of the attack, and the death of Shawn E. Dressler, Plaintiffs Tonya K. Dressler, Ardith Cecil Dressler and Melissa Dressler have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Brown Family**

1123.   Joshua D. Brown was a citizen of the United States and domiciled in the State of Michigan when he was killed in Iraq.

1124.   On June 3, 2007, Joshua D. Brown, aged 26, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1125.   Joshua D. Brown was killed in the attack.

1126.   The weapon used to kill Joshua D. Brown was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1127.   Plaintiff Elizabeth Brown is a citizen of the United States and domiciled in the State of Michigan. She is the widow of Joshua D. Brown.

1128.   Plaintiff Marian Brown is a citizen of the United States and domiciled in the State

of Michigan. She is the mother of Joshua D. Brown.

1129.   Plaintiff Wayne Brown is a citizen of the United States and domiciled in the State of Michigan. He is the father of Joshua D. Brown.

1130.   Plaintiff Elizabeth Brown brings an action individually and on behalf of the Estate of Joshua D. Brown, as its legal representative.

1131.   As a result of the attack, and the death of Joshua D. Brown, Plaintiffs Elizabeth Brown, Marian Brown and Wayne Brown have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's society, companionship, comfort, advice and counsel.

## 42.   <u>THE JUNE 5, 2007 ATTACK – KIRKUK</u>

**<u>The Balmer Family</u>**

1132.   Ryan A. Balmer was a citizen of the United States and domiciled in the State of Indiana when he was killed in Iraq.

1133.   On June 5, 2007, Ryan A. Balmer, aged 33, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1134.   Ryan A. Balmer was killed in the attack.

1135.   The weapon used to kill Ryan A. Balmer was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1136.   Plaintiff Danielle Sweet is a citizen of the United States and domiciled in the State of Florida. She is the widow of Ryan A. Balmer.

1137.   Plaintiff A.B., a minor represented by his legal guardian Danielle Sweet, is a citizen of the United States and domiciled in the State of Florida. He is the son of Ryan A. Balmer.

1138.   Plaintiff G.B., a minor represented by her legal guardian Danielle Sweet, is a citizen of the United States and domiciled in the State of Florida. She is the daughter of Ryan A. Balmer.

1139.   Plaintiff Danielle Sweet brings an action individually and on behalf of the Estate of Ryan A. Balmer, as its legal representative.

1140.   As a result of the attack, and the death of Ryan A. Balmer, Plaintiffs Danielle Sweet, A.B. and G.B. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

**The Kuglics Family**

1141.   Matthew J. Kuglics was a citizen of the United States and domiciled in the State of Ohio when he was killed in Iraq.

1142.   On June 5, 2007, Matthew J. Kuglics, aged 25, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1143.   Matthew J. Kuglics was killed in the attack.

1144.   The weapon used to kill Matthew J. Kuglics was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1145.   Plaintiff Donna Kuglics is a citizen of the United States and domiciled in the State of Ohio. She is the mother of Matthew J. Kuglics.

1146.   Plaintiff Les Kuglics is a citizen of the United States and domiciled in the State of Ohio. He is the father of Matthew J. Kuglics.

1147.   Plaintiff Emily Kuglics is a citizen of the United States and domiciled in the State of Ohio. She is the sister of Matthew J. Kuglics.

1148.   Plaintiff Donna Kuglics brings an action individually and on behalf of the Estate of Matthew J. Kuglics, as its legal representative.

1149.   As a result of the attack, and the death of Matthew J. Kuglics, Plaintiffs Donna Kuglics, Les Kuglics and Emily Kuglics have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 43.   <u>THE JUNE 21, 2007 ATTACK – BAGHDAD</u>

**<u>The Spencer Family</u>**

1150.   Raymond N. Spencer was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

1151.   On June 21, 2007, Raymond N. Spencer, aged 23, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1152.   Raymond N. Spencer was killed in the attack.

1153.   The weapon used to kill Raymond N. Spencer was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1154.   Plaintiff Sylvia Johnson Spencer is a citizen of the United States and domiciled in the State of California. She is the step-mother of Raymond N. Spencer.

1155.   Plaintiff Raymond Nigel Spencer, Sr. is a citizen of the United States and domiciled in the State of California. He is the father of Raymond N. Spencer.

1156.   As a result of the attack, and the death of Raymond N. Spencer, Plaintiffs Sylvia Johnson Spencer and Raymond Nigel Spencer, Sr. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## 44.  THE JULY 6, 2007 ATTACK – BAGHDAD

**The Lamie Family**

1157.  Gene Lamie was a citizen of the United States and domiciled in the State of Georgia when he was killed in Iraq.

1158.  On July 6, 2007, Gene Lamie, aged 25, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1159.  Gene Lamie was killed in the attack.

1160.  The weapon used to kill Gene Lamie was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1161.  Plaintiff John D. Lamie is a citizen of the United States and domiciled in the State of Georgia. He is the brother of Gene Lamie.

1162.  As a result of the attack, and the death of Gene Lamie, Plaintiff John D. Lamie has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his brother's society, companionship, comfort, advice and counsel.

## 45.  THE JULY 17, 2007 ATTACK – BAGHDAD

**The Bobb Family**

1163.  Brandon K. Bobb was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

1164.  On July 17, 2007, Brandon K. Bobb, aged 20, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1165.  Brandon K. Bobb was killed in the attack.

1166.  The weapon used to kill Brandon K. Bobb was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1167.   Plaintiff Paula C. Bobb-Miles is a citizen of the United States and domiciled in the State of Texas. She is the mother of Brandon K. Bobb.

1168.   Plaintiff Johnny Javier Miles, Sr. is a citizen of the United States and domiciled in the State of Alabama. He is the step-father of Brandon K. Bobb.

1169.   Plaintiff J.J.M., Jr., a minor represented by his legal guardian Paula C. Bobb-Miles, is a citizen of the United States and domiciled in the State of Texas. He is the brother of Brandon K. Bobb.

1170.   Plaintiff Racquel Arnae Bobb Miles is a citizen of the United States and domiciled in the State of Texas. She is the sister of Brandon K. Bobb.

1171.   Plaintiff Paula C. Bobb-Miles brings an action individually and on behalf of the Estate of Brandon K. Bobb, as its legal representative.

1172.   As a result of the attack, and the death of Brandon K. Bobb, Plaintiffs Paula C. Bobb-Miles, Johnny Javier Miles, Sr., J.J.M. Jr. and Racquel Arnae Bobb Miles have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**The Joshua Family**

1173.   Ron J. Joshua, Jr. was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

1174.   On July 17, 2007, Ron J. Joshua, Jr., aged 19, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1175.   Ron J. Joshua, Jr. was killed in the attack.

1176.   The weapon used to kill Ron J. Joshua, Jr. was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1177.   Plaintiff Ursula Ann Joshua is a citizen of the United States and domiciled in the State of Texas. She is the mother of Ron J. Joshua, Jr.

1178.   Plaintiff Brittany Marionique Joshua is a citizen of the United States and domiciled in the State of Texas. She is the sister of Ron J. Joshua, Jr.

1179.   As a result of the attack, and the death of Ron J. Joshua, Jr., Plaintiffs Ursula Ann Joshua and Brittany Marionique Joshua have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 46.   THE JANUARY 6, 2008 ATTACK – BAGHDAD

**The Gudridge Family**

1180.   James D. Gudridge was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

1181.   On January 6, 2008, James D. Gudridge, aged 20, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1182.   James D. Gudridge was killed in the attack.

1183.   The weapon used to kill James D. Gudridge was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1184.   Plaintiff Ashley Gudridge is a citizen of the United States and domiciled in the State of New York. She is the sister of James D. Gudridge.

1185.   As a result of the attack, and the death of James D. Gudridge, Plaintiff Ashley Gudridge has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her brother's society, companionship, comfort, advice and counsel.

## 47.    THE MARCH 17, 2008 ATTACK – BAGHDAD

**The Elledge Family**

1186.   Michael D. Elledge was a citizen of the United States and domiciled in the State of Indiana when he was killed in Iraq.

1187.   On March 17, 2008, Michael D. Elledge, aged 41, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1188.   Michael D. Elledge was killed in the attack.

1189.   The weapon used to kill Michael D. Elledge was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1190.   Plaintiff Marion Crimens is a citizen of the United States and domiciled in the State of Florida. She is the mother of Michael D. Elledge.

1191.   Plaintiff Timothy W. Elledge is a citizen of the United States and domiciled in the State of Georgia. He is the brother of Michael D. Elledge.

1192.   As a result of the attack, and the death of Michael D. Elledge, Plaintiffs Marion Crimens and Timothy W. Elledge have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 48.    THE MARCH 17, 2008 ATTACK – BAGHDAD

**Christopher Levi**

1193.   Plaintiff Christopher Levi is a citizen of the United States and domiciled in Holbrook, in the State of New York.

1194.   On March 17, 2008, Christopher Levi, then 23, was serving in the U.S. military in Iraq.

1195.  Mr. Levi was in a convoy when an EFP struck his vehicle.

1196.  The weapon used to injure Mr. Levi was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1197.  As a result of the attack, Mr. Levi lost both of his legs.

1198.  He also sustained a fracture of his right ulna and loss of the second metacarpal in his right hand.

1199.  In addition to adjusting to life as a double amputee through the use of prosthetics and a wheelchair, Mr. Levi continues to experience numbness in his left arm.

1200.  He also suffers from TBI.

1201.  As a result of the attack, and the injuries he suffered, Christopher Levi has experienced severe physical and mental anguish and extreme emotional pain and suffering.


## 49.    THE MARCH 23, 2008 ATTACK – BAGHDAD

**The Habsieger Family**

1202.  Andrew J. Habsieger was a citizen of the United States and domiciled in the State of Missouri when he was killed in Iraq.

1203.  On March 23, 2008, Andrew J. Habsieger, aged 22, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1204.  Andrew J. Habsieger was killed in the attack.

1205.  The weapon used to kill Andrew J. Habsieger was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1206.  Plaintiff Brenda Habsieger is a citizen of the United States and domiciled in the State of Missouri. She is the mother of Andrew J. Habsieger.

1207.  Plaintiff Michael Habsieger is a citizen of the United States and domiciled in the

State of Missouri. He is the father of Andrew J. Habsieger.

1208. Plaintiff Jacob Michael Habsieger is a citizen of the United States and domiciled in the State of Missouri. He is the brother of Andrew J. Habsieger.

1209. As a result of the attack, and the death of Andrew J. Habsieger, Plaintiffs Brenda Habsieger, Michael Habsieger and Jacob Michael Habsieger have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## The Hake Family

1210. Christopher M. Hake was a citizen of the United States and domiciled in the State of Oklahoma when he was killed in Iraq.

1211. On March 23, 2008, Christopher M. Hake, aged 26, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1212. Christopher M. Hake was killed in the attack.

1213. The weapon used to kill Christopher M. Hake was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1214. Plaintiff Kelli D. Hake is a citizen of the United States and domiciled in the State of Oklahoma. She is the widow of Christopher M. Hake.

1215. Plaintiff Denice York is a citizen of the United States and domiciled in the State of Oklahoma. She is the mother of Christopher M. Hake.

1216. Plaintiff Russel York is a citizen of the United States and domiciled in the State of Oklahoma. He is the step-father of Christopher M. Hake.

1217. Plaintiff Jill Hake is a citizen of the United States and domiciled in the State of Oklahoma. She is the step-mother of Christopher M. Hake.

1218.   Plaintiff Peter Hake is a citizen of the United States and domiciled in the State of Oklahoma. He is the father of Christopher M. Hake.

1219.   Plaintiff G.H., a minor represented by his legal guardian Kelli D. Hake, is a citizen of the United States and domiciled in the State of Oklahoma. He is the son of Christopher M. Hake.

1220.   Plaintiff Zachary Hake is a citizen of the United States and domiciled in the State of Oklahoma. He is the brother of Christopher M. Hake.

1221.   Plaintiff Keri Cotton is a citizen of the United States and domiciled in the State of Oklahoma. She is the sister of Christopher M. Hake.

1222.   Plaintiff Skylar Hake is a citizen of the United States and domiciled in the State of Oklahoma. He is the brother of Christopher M. Hake.

1223.   Plaintiff Kelli D. Hake brings an action individually and on behalf of the Estate of Christopher M. Hake, as its legal representative.

1224.   As a result of the attack, and the death of Christopher M. Hake, Plaintiffs Kelli D. Hake, Denice York, Russel York, Jill Hake, Peter Hake, G.H., Zachary Hake, Keri Cotton and Skylar Hake have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/father's/brother's society, companionship, comfort, advice and counsel.

**The Delgado Family**

1225.   George Delgado was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

1226.   On March 23, 2008, George Delgado, aged 21, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1227.   George Delgado was killed in the attack.

1228.   The weapon used to kill George Delgado was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1229.   Plaintiff Maria E. Calle is a citizen of the United States and domiciled in the State of California. She is the mother of George Delgado.

1230.   Plaintiff Cynthia Delgado is a citizen of the United States and domiciled in the State of California. She is the sister of George Delgado.

1231.   Plaintiff Cynthia Delgado brings an action individually and on behalf of the Estate of George Delgado, as its legal representative.

1232.   As a result of the attack, and the death of George Delgado, Plaintiffs Maria E. Calle and Cynthia Delgado have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 50.   THE MARCH 29, 2008 ATTACK – BAGHDAD

**The Miller Family**

1233.   Patrick J. Miller was a citizen of the United States and domiciled in the State of Florida when he was killed in Iraq.

1234.   On March 29, 2008, Patrick J. Miller aged 23, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1235.   Patrick J. Miller was killed in the attack.

1236.   The weapon used to kill Patrick J. Miller was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1237.   Plaintiff Kim Miller is a citizen of the United States and domiciled in the State of Florida. She is the mother of Patrick J. Miller.

1238.   Plaintiff Michael J. Miller is a citizen of the United States and domiciled in the State of Florida. He is the brother of Patrick J. Miller.

1239.   As a result of the attack, and the death of Patrick J. Miller, Plaintiffs Kim Miller and Michael J. Miller have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 51.   THE MARCH 30, 2008 ATTACK – BAGHDAD

**The Bailey Family**

1240.   Plaintiff Walter Bailey is a citizen of the United States and domiciled in the State of Florida.

1241.   On March 30, 2008, Walter Bailey, then 19, was serving in the U.S. military in Iraq.

1242.   Mr. Bailey was returning to base when his vehicle was struck by an EFP.

1243.   The weapon used to injure Mr. Bailey was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1244.   As a result of the attack, Mr. Bailey sustained multiple pieces of shrapnel in his right arm and both legs. He was also struck by shrapnel in his face and arm.

1245.   As a result of the attack, Walter Bailey lost consciousness.

1246.   He has been diagnosed with both TBI and PTSD.

1247.   Mr. Bailey has also experienced memory loss.

1248.   He has sought and continues to avail himself of counseling for the emotional injuries caused by the attack.

1249.   As a result of the attack, and the injuries he suffered, Walter Bailey has experienced severe physical and mental anguish and extreme emotional pain and suffering.

1250.  Plaintiff Cassandra Bailey is a citizen of the United States and domiciled in the State of Florida. She is the wife of Walter Bailey.

1251.  As a result of the injuries suffered by Walter Bailey, Cassandra Bailey has sought counseling and been prescribed medication.

1252.  As a result of the attack, and the injuries Walter Bailey suffered, Plaintiff Cassandra Bailey has experienced severe mental anguish, and extreme emotional pain and suffering.

## 52.  THE MARCH 30, 2008 ATTACK – BAGHDAD

### The Gilmore Family

1253.  Terrell W. Gilmore, Sr. was a citizen of the United States and domiciled in the State of Louisiana when he was killed in Iraq.

1254.  On March 30, 2008, Terrell W. Gilmore, Sr., aged 38, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1255.  Terrell W. Gilmore, Sr. was killed in the attack.

1256.  The weapon used to kill Terrell W. Gilmore, Sr. was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1257.  The terrorist group that planned and executed the attack, the Mahdi Army/Special Groups, was trained and armed by Iran's IRGC-QF with the assistance of Hezbollah.

1258.  Plaintiff Kacey Gilmore is a citizen of the United States and domiciled in the State of Louisiana. She is the daughter of Terrell W. Gilmore, Sr.

1259.  Plaintiff Terrell Gilmore, Jr. is a citizen of the United States and domiciled in the State of Louisiana. He is the son of Terrell W. Gilmore, Sr.

1260.  As a result of the attack, and the death of Terrell W. Gilmore, Sr., Plaintiffs Kacey

Gilmore and Terrell Gilmore, Jr. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's society, companionship, comfort, advice and counsel.

## 53.   THE MARCH 31, 2008 ATTACK – BAGHDAD

**The Dhanoolal Family**

1261.   Dayne D. Dhanoolal was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

1262.   On March 31, 2008, Dayne D. Dhanoolal, aged 26, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1263.   Dayne D. Dhanoolal was killed in the attack.

1264.   The weapon used to kill Dayne D. Dhanoolal was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1265.   Plaintiff Kynesha Dhanoolal is a citizen of the United States and domiciled in the State of Georgia. She is the widow of Dayne D. Dhanoolal.

1266.   As a result of the attack, and the death of Dayne D. Dhanoolal, Plaintiff Kynesha Dhanoolal has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice and counsel.

## 54.   THE APRIL 6, 2008 ATTACK – BAGHDAD

**The Pickett Family**

1267.   Emanuel Pickett was a citizen of the United States and domiciled in the State of North Carolina when he was killed in Iraq.

1268.   On April 6, 2008, Emanuel Pickett, aged 34, was serving in the U.S. military

when he was involved in a mortar attack.

1269.    Emanuel Pickett was killed in the attack.

1270.    The terrorist group that planned and executed the mortar attack, the Mahdi Army, was trained and armed by Iran's IRGC-QF with the assistance of Hezbollah.

1271.    Plaintiff Merlese Pickett is a citizen of the United States and domiciled in the State of North Carolina. She is the mother of Emanuel Pickett.

1272.    Plaintiff Harry Cromity is a citizen of the United States and domiciled in the State of North Carolina. He is the brother of Emanuel Pickett.

1273.    As a result of the attack, and the death of Emanuel Pickett, Plaintiffs Merlese Pickett and Harry Cromity have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 55.    THE APRIL 6, 2008 ATTACK – BAGHDAD

**The Scott Family**

1274.    Stephen K. Scott was a citizen of the United States and domiciled in the State of Alabama when he was killed in Iraq.

1275.    On April 6, 2008, Stephen K. Scott, aged 54, was serving in the U.S. military when he was involved in a mortar attack.

1276.    Stephen K. Scott was killed in the attack.

1277.    The terrorist group that planned and executed the mortar attack was trained and armed by Iran's IRGC-QF with the assistance of Hezbollah.

1278.    Plaintiff Rachel M. Gillette is a citizen of the United States and domiciled in the State of Missouri. She is the daughter of Stephen K. Scott.

1279.    Plaintiff Rebekah A. Coldewe is a citizen of the United States and domiciled in

the State of Missouri. She is the daughter of Steven K. Scott.

1280.   As a result of the attack, and the death of Stephen K. Scott, Plaintiffs Rachel M. Gillette and Rebekah A. Coldewe have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their father's society, companionship, comfort, advice and counsel.

## 56.   THE APRIL 7, 2008 ATTACK – BAGHDAD

### The Smith Family

1281.   Timothy Smith was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

1282.   On April 7, 2008, Timothy Smith, aged 25, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1283.   Timothy Smith was killed in the attack.

1284.   The weapon used to kill Timothy Smith was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1285.   Plaintiff Patricia Smith is a citizen of the United States and domiciled in the State of California. She is the mother of Timothy Smith.

1286.   Plaintiff Michael Smith is a citizen of the United States and domiciled in the State of California. He is the father of Timothy Smith.

1287.   Plaintiff Jacqueline A. Smith is a citizen of the United States and domiciled in the State of California. She is the sister of Timothy Smith.

1288.   As a result of the attack, and the death of Timothy Smith, Plaintiffs Patricia Smith, Michael Smith and Jacqueline A. Smith have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort,

advice and counsel.

## 57.  THE APRIL 8, 2008 ATTACK – KHARGULIAH

**The Hartley Family**

1289.  Jeffery Hartley was a citizen of the United States and domiciled in the State of Texas when he was killed in Iraq.

1290.  On April 8, 2008, Jeffery Hartley, aged 25, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1291.  Jeffery Hartley was killed in the attack.

1292.  The weapon used to kill Jeffery Hartley was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1293.  Plaintiff David Hartley is a citizen of the United States and domiciled in the State of Texas. He is the father of Jeffery Hartley.

1294.  Plaintiff David Hartley brings an action individually and on behalf of the Estate of Jeffery Hartley, as its legal representative.

1295.  As a result of the attack, and the death of Jeffery Hartley, Plaintiff David Hartley has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

## 58.  THE APRIL 12, 2008 ATTACK

**The Swinton Family**

1296.  Plaintiff Allen Swinton is a citizen of the United States and domiciled in the State of Georgia.

1297.  On April 12, 2008, Allen Swinton, then 33, was serving in the U.S. military in

Iraq.

1298.   Mr. Swinton's unit was providing escort duties when his vehicle was struck by an EFP.

1299.   The weapon used to injure Mr. Swinton was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1300.   As a result of the explosion, Mr. Swinton's artery was severed; he lost a great amount of blood; multiple pieces of shrapnel entered his lower extremities; and his right hand was injured.

1301.   Mr. Swinton underwent surgery to tie his artery; he also underwent multiple surgeries to remove shrapnel from his body.

1302.   He has also undergone physical therapy to treat the injuries he sustained to his legs and hand.

1303.   Mr. Swinton continues to experience pain in his lower extremities and will likely require additional treatment to address the remaining shrapnel in his body.

1304.   As a result of the attack, and the injuries he suffered, Allen Swinton has experienced severe physical and mental anguish and extreme emotional pain and suffering.

1305.   Plaintiff Temika Swinton is a citizen of the United States and domiciled in the State of Georgia. She is the wife of Allen Swinton and brings this action individually and on behalf of her three minor children.

1306.   Plaintiff T.S., a minor represented by her legal guardian Temika Swinton, is a citizen of the United States and domiciled in the State of Georgia. She is the daughter of Allen Swinton and Temika Swinton.

1307.   Plaintiff T.S., a minor represented by her legal guardian Temika Swinton, is a

citizen of the United States and domiciled in the State of Georgia. She is the daughter of Allen Swinton and Temika Swinton.

1308. Plaintiff T.B., a minor represented by her legal guardian Temika Swinton, is a citizen of the United States and domiciled in the State of Georgia. She is the daughter of Temika Swinton and the step-daughter of Allen Swinton.

1309. As a result of the attack, and the injuries Allen Swinton suffered, Plaintiffs Temika Swinton, T.S., T.S. and T.B. have experienced severe mental anguish and extreme emotional pain and suffering.

## 59.   THE APRIL 21, 2008 ATTACK – BASRA

**The Vandegrift Family**

1310. Matthew R. Vandegrift was a citizen of the United States and domiciled in the State of Colorado when he was killed in Iraq.

1311. On April 21, 2008, Matthew R. Vandegrift, aged 28, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1312. Matthew R. Vandegrift was killed in the attack.

1313. The weapon used to kill Matthew R. Vandegrift was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1314. Plaintiff Mary Jane Vandegrift is a citizen of the United States and domiciled in the State of Colorado. She is the mother of Matthew R. Vandegrift.

1315. Plaintiff John Vandegrift is a citizen of the United States and domiciled in the State of Colorado. He is the father of Matthew R. Vandegrift.

1316. Plaintiff John Vandegrift brings an action individually and on behalf of the Estate of Matthew R. Vandegrift, as its legal representative.

1317.  As a result of the attack, and the death of Matthew R. Vandegrift, Plaintiffs Mary Jane Vandegrift and John Vandegrift have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## 60.  THE APRIL 28, 2008 ATTACK – BAGHDAD

**The Marion Family**

1318.  Adam L. Marion was a citizen of the Unites States and domiciled in the State of North Carolina when he was killed in Iraq.

1319.  On April 28, 2008, Adam L. Marion, aged 26, was serving in the U.S. military in Iraq when his unit was attacked with Improvised Rocket-Assisted Munitions ("IRAMs").

1320.  Adam L. Marion was killed in the attack.

1321.  The terrorist group that planned and executed the attack, the Mahdi Army/Special Groups, was trained and armed by Iran's IRGC-QF with the assistance of Hezbollah.

1322.  Plaintiff Pam Marion is a citizen of the United States and domiciled in the State of North Carolina. She is the mother of Adam L. Marion.

1323.  Plaintiff Donnie Marion is a citizen of the United States and domiciled in the State of North Carolina. He is the father of Adam L. Marion.

1324.  As a result of the attack, and the death of Adam L. Marion, Plaintiffs Pam Marion and Donnie Marion have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## 61.  THE AUGUST 4, 2008 ATTACK – BAGHDAD

**The Menke Family**

1325.  Jonathan D. Menke was a citizen of the United States and domiciled in the State of Indiana when he was killed in Iraq.

1326.  On August 4, 2008, Jonathan D. Menke, aged 22, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1327.  Jonathan D. Menke was killed in the attack.

1328.  The weapon used to kill Jonathan D. Menke was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1329.  Plaintiff Paula Menke is a citizen of the United States and domiciled in the State of Indiana. She is the step-mother of Jonathan D. Menke.

1330.  Plaintiff Daniel Menke is a citizen of the United States and domiciled in the State of Indiana. He is the father of Jonathan D. Menke.

1331.  Plaintiff Matthew Menke is a citizen of the United States and domiciled in the State of Indiana. He is the step-brother of Jonathan D. Menke.

1332.  Plaintiff Nichole Lohring is a citizen of the United States and domiciled in the State of Indiana. She is the sister of Jonathan D. Menke.

1333.  As a result of the attack, and the death of Jonathan D. Menke, Plaintiffs Paula Menke, Daniel Menke, Matthew Menke and Nichole Lohring have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 62.  THE AUGUST 26, 2008 ATTACK – SADR CITY

**The Alfonso Family**

1334.  Carlo E. Alfonso was domiciled in the State of Washington when he was killed in Iraq.

1335.  On August 26, 2008, Carlo E. Alfonso, aged 23, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1336.  Carlo E. Alfonso was killed in the attack.

1337.  The weapon used to kill Carlo E. Alfonso was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1338.  Plaintiff Rosemarie Alfonso is a citizen of the United States and domiciled in the State of Washington. She is the widow of Carlo E. Alfonso.

1339.  Plaintiff K.B., a minor represented by his legal guardian Rosemarie Alfonso, is a citizen of the United States and domiciled in the State of Washington. He is the son of Carlo E. Alfonso.

1340.  As a result of the attack, and the death of Carlo E. Alfonso, Plaintiffs Rosemarie Alfonso and K.B. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice and counsel.

## 63.  THE SEPTEMBER 4, 2008 ATTACK – BAGHDAD

**The Mayne Family**

1341.  Kennith W. Mayne was a citizen of the United States and domiciled in the State of Colorado when he was killed in Iraq.

1342.  On September 4, 2008, Kennith W. Mayne, aged 29, was serving in the U.S.

military in Iraq when an EFP detonated near his vehicle.

1343.   Kennith W. Mayne was killed in the attack.

1344.   The weapon used to kill Kennith W. Mayne was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1345.   Plaintiff Michelle Benavidez is a citizen of the United States and domiciled in the State of Colorado. She is the mother of Kennith W. Mayne.

1346.   Plaintiff Daniel Benavidez, Sr. is a citizen of the United States and domiciled in the State of Colorado. He is the step-father of Kennith W. Mayne.

1347.   Plaintiff Christina Biederman is a citizen of the United States and domiciled in the State of Colorado. She is the sister of Kennith W. Mayne.

1348.   Plaintiff Daniel Benavidez, Jr. is a citizen of the United States and domiciled in the State of Colorado. He is the brother of Kennith W. Mayne.

1349.   Plaintiff Jennifer Morman is a citizen of the United States and domiciled in the State of Colorado. She is the sister of Kennith W. Mayne.

1350.   Plaintiff Michelle Benavidez brings an action individually and on behalf of the Estate of Kennith W. Mayne, as its legal representative.

1351.   As a result of the attack, and the death of Kennith W. Mayne, Plaintiffs Michelle Benavidez, Daniel Benavidez, Sr., Christina Biederman, Daniel Benavidez, Jr. and Jennifer Morman have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**Christopher Miller**

1352.   Plaintiff Christopher Miller is a citizen of the United States and domiciled in the State of Ohio.

1353.   On September 4, 2008, Christopher Miller, then 19, was serving in the U.S. military in Iraq.

1354.   Mr. Miller's vehicle was struck by an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1355.   As a result of the attack, Mr. Miller lost part of his right leg, rendering him a below-the-leg amputee.

1356.   He also lost part of his left leg.

1357.   Mr. Miller developed gangrene in both his leg and foot, necessitating multiple medical procedures.

1358.   During part of his treatment, he was placed in a medically-induced coma.

1359.   Mr. Miller has received physical therapy.

1360.   He has also received counseling for his emotional injuries.

1361.   As a result of the attack, and the injuries he suffered, Christopher Miller has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## 64.   THE OCTOBER 16, 2008 ATTACK – BAQUBAH

**The Eggleston Family**

1362.   Cody J. Eggleston was a citizen of the United States and domiciled in the State of Oregon when he was killed in Iraq.

1363.   On October 16, 2008, Cody J. Eggleston, aged 21, was serving in the U.S. military when he was involved in a mortar attack.

1364.   Cody J. Eggleston was killed in the attack.

1365.   The terrorist group that planned and executed the mortar attack, the Mahdi Army/Special Groups, was trained and armed by Iran's IRGC-QF with the assistance of

Hezbollah.

1366.   Plaintiff Angie Jackson is a citizen of the United States and domiciled in the State of Oregon. She is the mother of Cody J. Eggleston.

1367.   Plaintiff Trina Jackson is a citizen of the United States and domiciled in the State of Oregon. She is the sister of Cody J. Eggleston.

1368.   Plaintiff S.J., a minor represented by her legal guardian Angie Jackson, is a citizen of the United States and domiciled in the State of Oregon. She is the sister of Cody J. Eggleston.

1369.   As a result of the attack, and the death of Cody J. Eggleston, Plaintiffs Angie Jackson, Trina Jackson and S.J. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 65.   THE JANUARY 10, 2009 ATTACK – BAGHDAD

**The Bauer Family**

1370.   Justin Bauer was a citizen of the United States and domiciled in the State of Colorado when he was killed in Iraq.

1371.   On January 10, 2009, Justin Bauer, aged 24, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1372.   Justin Bauer was killed in the attack.

1373.   The weapon used to kill Justin Bauer was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1374.   Plaintiff Gregory Bauer is a citizen of the United States and domiciled in the State of Wyoming. He is the father of Justin Bauer.

1375.  As a result of the attack, and the death of Justin Bauer, Plaintiff Gregory Bauer has experienced severe mental anguish, extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice and counsel.

## 66.  THE APRIL 22, 2009 ATTACK – BAGHDAD

**The Davis Family**

1376.  Brad A. Davis was a citizen of the United States and domiciled in the State of Ohio when he was killed in Iraq.

1377.  On April 22, 2009, Brad A. Davis, aged 21, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1378.  Brad A. Davis was killed in the attack.

1379.  The weapon used to kill Brad A. Davis was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1380.  Plaintiff Theresa Davis is a citizen of the United States and domiciled in the State of Ohio. She is the mother of Brad A. Davis.

1381.  As a result of the attack, and the death of Brad A. Davis, Plaintiff Theresa Davis has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her son's society, companionship, comfort, advice and counsel.

## 67.  THE JUNE 28, 2009 ATTACK – BAGHDAD

**The David Family**

1382.  Timothy A. David was a citizen of the United States and domiciled in the State of Michigan when he was killed in Iraq.

1383.  On June 28, 2009, Timothy A. David, aged 28, was serving in the U.S. military in

Iraq when an EFP detonated near his vehicle.

1384.   Timothy A. David was killed in the attack.

1385.   The weapon used to kill Timothy A. David was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1386.   Plaintiff Linda David is a citizen of the United States and domiciled in the State of Michigan. She is the mother of Timothy A. David.

1387.   Plaintiff Michael David is a citizen of the United States and domiciled in the State of Michigan. He is the father of Timothy A. David.

1388.   Plaintiff Christopher David is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Timothy A. David.

1389.   Plaintiff Linda David brings an action individually and on behalf of the Estate of Timothy A. David, as its legal representative.

1390.   As a result of the attack, and the death of Timothy A. David, Plaintiffs Linda David, Michael David and Christopher David have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## 68.   THE JUNE 29, 2009 ATTACK – BAGHDAD

**Timothy Karcher**

1391.   Plaintiff Timothy Karcher is a citizen of the United States and domiciled in the State of Texas.

1392.   On June 29, 2009, Timothy Karcher, age 42, was serving in the U.S. military in Iraq.

1393.   Mr. Karcher was on patrol with his unit on the outskirts of Sadr City in Baghdad

when his vehicle was struck by an EFP.

1394.   The weapon used to injure Mr. Karcher was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1395.   As a result of the attack, he lost both of his legs, suffered internal bleeding, kidney failure, serious cardiac and respiratory complications and nearly died several times (both during surgeries and while suffering post-operative complications).

1396.   Mr. Karcher received extensive medical treatment at various hospitals, where he spent many months.

1397.   As a result of the attack, and the injuries he suffered, Timothy Karcher has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## 69.   THE JULY 16, 2009 ATTACK – BASRA

**The Drevnick Family**

1398.   Daniel P. Drevnick was a citizen of the United States and domiciled in the State of Minnesota when he was killed in Iraq.

1399.   On July 16, 2009, Daniel P. Drevnick, aged 22, was serving in the U.S. military when he was involved in a mortar attack.

1400.   Daniel P. Drevnick was killed in the attack.

1401.   The terrorist group that planned and executed the mortar attack was trained and armed by Iran's IRGC-QF with the assistance of Hezbollah.

1402.   Plaintiff Kenneth J. Drevnick is a citizen of the United States and domiciled in the State of Minnesota. He is the father of Daniel P. Drevnick.

1403.   As a result of the attack, and the death of Daniel P. Drevnick, Plaintiff Kenneth J. Drevnick has experienced severe mental anguish, extreme emotional pain and suffering, and loss

of his son's society, companionship, comfort, advice and counsel.

## 70.     THE SEPTEMBER 8, 2009 ATTACK – TIKRIT

**The Myers Family**

1404.   Zachary T. Myers was a citizen of the United States and domiciled in the State of Ohio when he was killed in Iraq.

1405.   On September 8, 2009, Zachary T. Myers, aged 21, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1406.   Zachary T. Myers was killed in the attack.

1407.   The weapon used to kill Zachary T. Myers was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1408.   Plaintiff Megan Marie Rice is a citizen of the United States and domiciled in the State of Ohio. She is the widow of Zachary T. Myers.

1409.   Plaintiff R.N.R., a minor represented by her legal guardian Megan Marie Rice, is a citizen of the United States and domiciled in the State of Ohio. She is the daughter of Zachary T. Myers.

1410.   Plaintiff Tonya Lotto is a citizen of the United States and domiciled in the State of Ohio. She is the mother of Zachary T. Myers.

1411.   Plaintiff Jerry L. Myers is a citizen of the United States and domiciled in the State of Ohio. He is the father of Zachary T. Myers.

1412.   Plaintiff Jeffrey D. Price is a citizen of the United States and domiciled in the State of Ohio. He is the brother of Zachary T. Myers.

1413.   Plaintiff Megan Marie Rice brings an action individually and on behalf of the Estate of Zachary T. Myers, as its legal representative

1414.  As a result of the attack, and the death of Zachary T. Myers, Plaintiffs Megan Marie Rice, R.N.R., Tonya Lotto, Jerry L. Myers and Jeffrey D. Price have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their spouse's/father's/son's/brother's society, companionship, comfort, advice and counsel.

**The Smith Family**

1415.  Shannon M. Smith was a citizen of the United States and domiciled in the State of Ohio when he was killed in Iraq.

1416.  On September 8, 2009, Shannon M. Smith was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1417.  Shannon M. Smith was killed in the attack.

1418.  The weapon used to kill Shannon M. Smith was an Iranian-manufactured EFP provided to Iranian-funded and trained terror operatives in Iraq.

1419.  Plaintiff Cassie Smith is a citizen of the United States and domiciled in the State of Ohio. She is the widow of Shannon M. Smith.

1420.  Plaintiff Debbie Smith is a citizen of the United States and domiciled in the State of Ohio. She is the mother of Shannon M. Smith.

1421.  Plaintiff James Smith is a citizen of the United States and domiciled in the State of Ohio. He is the father of Shannon M. Smith.

1422.  Plaintiff Cory Smith is a citizen of the United States and domiciled in the State of Ohio. He is the brother of Shannon M. Smith.

1423.  Plaintiff Christina Smith is a citizen of the United States and domiciled in the State of Ohio. She is the sister of Shannon M. Smith.

1424.  As a result of the attack, and the death of Shannon M. Smith, Plaintiffs Cassie

Smith, Debbie Smith, James Smith, Cory Smith and Christina Smith have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their spouse's/son's/brother's/sister's society, companionship, comfort, advice and counsel.

## 71. THE JUNE 29, 2011 ATTACK – WASIT PROVINCE

**The White Family**

1425. Plaintiff George D. White is a citizen of the United States and domiciled in the State of Texas.

1426. On June 29, 2011, George D. White, then 39, was serving in the U.S. military in Iraq when his unit was attacked with Improvised Rocket-Assisted Munitions ("IRAMs") deployed by Kata'ib Hezbollah.

1427. The rocket fire and one of the many explosions caused George D. White to be thrown toward the bunker.

1428. Immediately following the attack, George D. White suffered vision and hearing loss as well as ringing in his ears. The vision loss – encompassing his night vision – and the ringing in his ears continue to the present.

1429. He has been diagnosed with TBI, and has experienced severe headaches, nightmares and difficulty sleeping – all conditions that he has received treatment for.

1430. In addition, George D. White suffers from PTSD and depression.

1431. As a result of the attack, and the injuries he suffered, George D. White has experienced severe physical and mental anguish and extreme emotional pain and suffering.

1432. Plaintiff Natalia White is a citizen of the United States and domiciled in the State of Texas. She is the wife of George D. White.

1433. Plaintiff K.W., a minor represented by her legal guardian George D. White, is a

citizen of the United States and domiciled in the State of Texas. She is the daughter of George D. White.

1434.  Plaintiff George J. White is a citizen of the United States and domiciled in the State of Florida. He is the father of George D. White.

1435.  Plaintiff Edna Luz Burgos is a citizen of the United States and domiciled in the State of Arizona. She is the mother of George D. White.

1436.  As a result of the attack, and the injuries George D. White suffered, Plaintiffs Natalia White, K.W., George J. White and Edna Luz Burgos have experienced severe mental anguish and extreme emotional pain and suffering.

**The McCulley Family**

1437.  Plaintiff John McCulley is a citizen of the United States and domiciled in the State of Georgia.

1438.  On June 29, 2011, John McCulley, then 32, was serving in the U.S. military in Iraq when his unit was attacked with Improvised Rocket-Assisted Munitions ("IRAMs") deployed by Kata'ib Hezbollah.

1439.  Two rockets landed near Mr. McCulley.

1440.  Mr. McCulley was struck by shrapnel.

1441.  His right arm was severed at the elbow, and his left leg was badly damaged.

1442.  Mr. McCulley was hospitalized on several occasions to treat his injuries, and he has had more than 20 surgeries.

1443.  Mr. McCulley has been diagnosed with TBI, PTSD, and has been treated for depression.

1444.  As a result of the attack, and the injuries he suffered, John McCulley has

experienced severe physical and mental anguish and extreme emotional pain and suffering.

1445.   Plaintiff Stephanie McCulley is a citizen of the United States and domiciled in the State of Georgia. She is the wife of John McCulley.

1446.   Plaintiff T.M., a minor represented by his legal guardians John McCulley and Stephanie McCulley, is a citizen of the United States and domiciled in the State of Georgia. He is the son of John McCulley.

1447.   Plaintiff R.M., a minor represented by his legal guardians John McCulley and Stephanie McCulley, is a citizen of the United States and domiciled in the State of Georgia. He is the son of John McCulley.

1448.   Plaintiff B.D., a minor represented by his legal guardians John McCulley and Stephanie McCulley, is a citizen of the United States and domiciled in the State of Georgia. He is the son of John McCulley.

1449.   As a result of the attack, and the injuries John McCulley suffered, Plaintiffs Stephanie McCulley, T.M., R.M. and B.D. have experienced severe mental anguish and extreme emotional pain and suffering.

## 72.   <u>THE JULY 7, 2011 ATTACK BAGHDAD</u>

**<u>The Newby Family</u>**

1450.   Nicholas W. Newby was a citizen of the United States and domiciled in the State of Idaho when he was killed in Iraq.

1451.   On July 7, 2011, Nicholas W. Newby, aged 20, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1452.   Nicholas W. Newby was killed in the attack.

1453.   The weapon used to kill Nicholas W. Newby was an Iranian-manufactured EFP

provided to Iranian-funded and -trained terror operatives in Iraq.

1454.   Plaintiff Theresa Hart is a citizen of the United States and domiciled in the State of Idaho. She is the mother of Nicholas W. Newby.

1455.   Plaintiff Wayne Newby is a citizen of the United States and domiciled in the State of Idaho. He is the father of Nicholas W. Newby.

1456.   As a result of the attack, and the death of Nicholas W. Newby, Plaintiffs Theresa Hart and Wayne Newby have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's society, companionship, comfort, advice and counsel.

## 73.    THE NOVEMBER 14, 2011 ATTACK – BAGHDAD

**The Hickman Family**

1457.   David Emanuel Hickman was a citizen of the United States and domiciled in the State of North Carolina when he was killed in Iraq.

1458.   On November 14, 2011, David Emanuel Hickman, aged 23, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

1459.   David Emanuel Hickman was killed in the attack.

1460.   The weapon used to kill David Emanuel Hickman was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

1461.   Plaintiff Veronica Hickman is a citizen of the United States and domiciled in the State of North Carolina. She is the mother of David Emanuel Hickman.

1462.   Plaintiff David Eugene Hickman is a citizen of the United States and domiciled in the State of North Carolina. He is the father of David Emanuel Hickman.

1463.   Plaintiff Devon Fletcher Hickman is a citizen of the United States and domiciled in the State of North Carolina. He is the brother of David Emanuel Hickman.

1464. As a result of the attack, and the death of David Emanuel Hickman, Plaintiffs Veronica Hickman, David Eugene Hickman and Devon Fletcher Hickman have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) AGAINST ALL DEFENDANTS FOR VIOLATIONS OF 18 U.S.C. § 2339A CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

1465. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

1466. In knowingly agreeing to provide, and providing, material support to Iran in an illegal manner, and knowing, or deliberately indifferent to the fact that the objects and aims of the Conspiracy were to be used in preparation for or carrying out multiple acts set forth in 18 U.S.C. § 2339A, each Defendant violated § 2339A's express prohibition against conspiring to provide material support within the meaning of § 2339A, and committed and completed overt acts in furtherance of the Conspiracy.

1467. Each Defendant's conduct in agreeing to provide Iran with hundreds of millions (or more) of USD in an illegal manner, violated 18 U.S.C. § 2339A's express prohibition against concealing or disguising the nature, location, source, or ownership of material support or resources, knowing that the material support or resources are to be used in preparation for, or in carrying out, a violation of any of 18 U.S.C. §§ 32, 37, 81, 175, 229, 351, 831, 842(m)-(n), 844(f) or (i), 930 (c), 956, 1091, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, 2340A, or 2442, 42 U.S.C. § 2284, 49 U.S.C. §§

46502 or 60123 (b), or any offense listed in 18 U.S.C. § 2332b (g)(5)(B) (except for §§ 2339A and 2339B).

1468.   Both the Conspiracy itself and the acts of international terrorism that injured the Plaintiffs constitute acts of international terrorism under 18 U.S.C. § 2331, and constitute "engaging in terrorist activity" under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or "engaging in terrorism" under 22 U.S.C. § 2656f.

1469.   The Conspiracy between Iran and its agents and the Defendants (including Defendants John Does 1-50), and other non-defendant Conspirators resulted in the transfer of: (a) more than two hundred billion dollars in U.S. currency through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies; and (b) hundreds of millions of dollars to Hezbollah, the IRGC and other terrorist organizations (including the Special Groups) actively engaged in murdering and maiming U.S. nationals in Iraq.

1470.   The Defendants (including Defendants John Does 1-50) together with other non-defendant Conspirators (including Iran) agreed to, and did in fact, purposefully transfer billions of USD through the United States knowing that such funds would be delivered to Iran and Iranian agents, and that the payment messages facilitating such funds transfers had been deliberately and intentionally structured, designed, and processed in a manner expressly designed to ensure that such funds would not be detected or monitored by U.S. regulators and law enforcement agencies.

1471.   At the time each Defendant knowingly agreed to provide Iran material support in an illegal manner, each Defendant knew that the United States had formally designated Iran as a State Sponsor of Terrorism and knew or was deliberately indifferent to the fact that, *inter alia*,

Iran used the IRGC and Hezbollah as primary mechanisms to enable it to cultivate and support terrorism.

1472. Among other things, and as documented in the U.S. State Department's 2013 Country Reports on Terrorism, between 2004 and 2011 the IRGC, in concert with Hezbollah, provided training outside of Iraq, as well as sending advisors to Iraq, to assist, train, supply and guide Special Groups in the construction and use of EFPs and other advanced weaponry, devices that constitute "weapons of mass destruction" as defined in 18 U.S.C. § 2332a, incorporating the definition of "destructive devices" set forth in 18 U.S.C. § 924(4)(A)-(C).

1473. Each Defendant knew or was deliberately indifferent to the fact that Iran, the IRGC, Hezbollah, and the Special Groups engaged or engages in terrorist activity (8 U.S.C. § 1182(a)((3)(B)(iii)-(iv)), terrorism (22 U.S.C § 2656f), or acts of international terrorism (18 U.S.C. § 2331), including facilitating, funding, preparing for, and supporting terrorist activity by the Special Groups.

1474. Through this clandestine stream of U.S. dollars, each Defendant knew, or was deliberately indifferent to the fact that as a result of knowingly agreeing to join the Conspiracy to provide Iran with illegal material support, such conduct foreseeably (and in fact did) facilitate hundreds of millions of dollars in payments to the IRGC and Hezbollah through the international financial system, including payments initiated, processed, altered, modified, falsified, or released by or through the Defendants.

1475. Each Defendant knowingly and purposefully agreed to provide material support and services to Iran in an illegal manner, knowing or deliberately indifferent to the fact that such illegal support and services facilitated Iran's clandestine support for the IRGC and Hezbollah, and that such agreements and resultant overt acts and conduct would foreseeably facilitate acts of

international terrorism, terrorist activities, and terrorism, including homicides, attempted homicides, or conspiracies to commit homicide against U.S. nationals by the IRGC, Hezbollah and/or the Special Groups (including KH, JAM and AAH), as well as attacks conducted by weapons of mass destruction, such as EFPs, and bombings, attempted bombings, or conspiracies to bomb places of public use, state or government facilities, public transportation systems, or infrastructure facilities by the IRGC, Hezbollah, and/or the Special Groups

1476.  The material support that Defendants knowingly agreed to illegally provide to Iran, provided foreseeable, substantial assistance to the IRGC, Hezbollah and the Special Groups, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries.

1477.  Each Defendant also: knew of the existence of other conspirators including some or all of the Defendants; was aware that the other conspirators (including Defendants and Iranian Bank Co-conspirators) engaged in the same or similar conduct, and that the other conspirators shared the objective of providing material support to Iran in an illegal manner for the explicit purpose of enabling Iran to avoid U.S. sanctions and regulations enacted specifically to prevent Iran's ability to finance, support, prepare for, plan, or carry out acts of international terrorism, including the types of acts that injured the Plaintiffs.

1478.  Each Defendant also knew or was deliberately indifferent to the fact that one of the specific aims and objectives of the Conspiracy was keeping U.S. depository institutions, law enforcement and counter-terrorism agencies blind to Iran's movement of U.S. dollars through the international financial system, and thus also knew or was deliberately indifferent to the fact that the overt acts they performed in furtherance of the Conspiracy facilitated that specific objective.

1479.  Having entered into an agreement to provide Iran material support in an illegal

manner, in direct contravention of U.S. laws and regulations enacted expressly to mitigate Iran's sponsorship of terrorism and terrorist organizations (including Weapons of Mass Destruction proliferation activities in furtherance of such sponsorship) each Defendant also knew or was deliberately indifferent to the fact, that the Conspiracy's aims would foreseeably result in Iran transferring millions of dollars in order to engage in terrorist activities (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), terrorism (22 U.S.C. § 2656f), and acts of international terrorism (18 U.S.C. § 2331).

1480. The Defendants' overt acts and agreement to purposefully transfer billions of dollars through the United States to Iran in a manner expressly designed to ensure that the funds could be transferred by and to Iran without being monitored by U.S. regulators and law enforcement agencies, involved acts that were dangerous to human life, by their nature, and as further evidenced by their consequences.

1481. The Defendants' acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

1482. Each Defendant's agreement to enter into the Conspiracy and purposeful transfer of billions of dollars through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies foreseeably resulted in material support being delivered in order to carry out or prepare for violations of, *inter alia*, 18 U.S.C. §§ 2332(a)-(c), 2332a, and § 2332f by the IRGC, Hezbollah and/or the Special Groups, and were thus themselves acts of international terrorism because they either were, or objectively appear to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations

by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating the IRGC, Hezbollah and/or the Special Groups' abilities to prepare for, support, fund, train, initiate, and/or carry out mass destruction and murder.

1483.  Each Defendant's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and foreseeably, substantially enhanced the IRGC, Hezbollah and the Special Groups' ability to engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and/or commit acts of international terrorism (18 U.S.C. § 2331) (including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f and 2339A). Each Defendant's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

1484.  Furthermore, each Plaintiff's injuries constitutes a harm falling within the foreseeable risk contemplated by each Defendant's violations, including each Defendant's knowing agreement to enter into the Conspiracy, each Defendant's performance of overt acts in furtherance of the Conspiracy, and each Defendant's knowledge or deliberate indifference to the full scope, objectives, and results of the Conspiracy. Injuries resulting from terrorist attacks (including attacks launched by IRGC, Hezbollah and the Special Groups) that were planned, supported by, funded, or assisted by Iran are precisely the risks contemplated by Executive Orders, statutes and regulations (including without limitation designations under Executive Orders specifically concerning the IRGC, Defendant Bank Saderat Plc, and the IRISL) enacted specifically to ensure that Iran had restricted access to USD and financial services under conditions of maximum transparency, that such dollars were not to be used by or for the benefit of SDNs, that such USD would not facilitate Iran's efforts to acquire, develop, and distribute Weapons of Mass Destruction (including weapons such as EFPs directed at Coalition forces) and

that any funds Iran did receive that touched U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies.

1485. Through its conduct as described above, by knowingly entering into the Conspiracy and violating 18 U.S.C. § 2339A in the manner and with the state of mind alleged above, each Defendant committed acts of international terrorism and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## SECOND CLAIM FOR RELIEF

## CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) AGAINST ALL DEFENDANTS FOR VIOLATIONS OF 18 U.S.C. § 2339B CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

1486. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

1487. In knowingly agreeing to provide, and providing, material support to Iran in an illegal manner, and knowing, or deliberately indifferent to the fact that the objects and aims of the Conspiracy were to provide material support to Foreign Terrorist Organizations (FTOs), each Defendant violated § 2339B's express prohibition against conspiring to provide material support within the meaning of § 2339B, and committed and completed overt acts in furtherance of the Conspiracy

1488. The Defendants herein (including Defendants John Does 1-50) and Iran agreed to, and did in fact, purposefully transfer hundreds of billions of dollars through the United States expressly in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies and evade U.S. sanctions; minimize the transparency of their financial activities; and knowingly, or with deliberate indifference, facilitated tens of millions of dollars in payments to Hezbollah through the international financial system. In doing so, the Defendants

were willing to, and did, commit numerous felonies under U.S. law to assist Iran in concealing its financial activities and violated 18 U.S.C. § 2339B by knowingly, or with deliberate indifference, entering the Conspiracy, which provided material support to FTOs that were responsible for Plaintiffs' injuries.

1489. At the time each Defendant knowingly agreed to provide Iran material support in an illegal manner, each Defendants knew that Iran had, since 1984, been officially designated by the United States as a State Sponsor of Terrorism, subject to various U.S. sanctions, and knew or were deliberately indifferent to the fact that such designation was based in part on Iran's sponsorship and patronage of Hezbollah and other FTOs, and that Iran used Hezbollah as a primary mechanism to enable it to cultivate and support terrorism.

1490. Each Defendant knew, or was deliberately indifferent to the fact that, Hezbollah was designated an FTO at all times relevant to this action. Each Defendant also knew that Hezbollah engaged in terrorist activities (8 U.S.C. § 1183(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and acts of international terrorism (18 U.S.C. § 2331).

1491. Each Defendant knew or was deliberately indifferent to the fact that their agreement to provide Iran material support in an illegal manner, and the overt acts they completed in connection with the Conspiracy unlawfully evaded U.S. sanctions and regulations directed at mitigating the risk that Iran would carry out, support, fund, plan for, prepare, conspire with, or facilitate acts of international terrorism by FTOs, including acts planned, attempted, and perpetrated by Iran's proxy, agent, and strategic partner, Hezbollah.

1492. Both the Conspiracy itself and the acts of international terrorism that injured the Plaintiffs constitute acts of international terrorism under 18 U.S.C. § 2331, and constitute "engaging in terrorist activity" under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or "engaging in

terrorism" under 22 U.S.C. § 2656f.

1493.   Each Defendant also: knew of the existence of other conspirators including some or all of the Defendants; was aware that the other conspirators (including Defendants and Iranian Bank Co-conspirators) engaged in the same or similar conduct, and that the other conspirators shared the objective of providing material support and services to Iran in an illegal manner for the explicit purpose of enabling Iran to avoid U.S. sanctions and regulations enacted specifically to prevent Iran's ability to finance, support, prepare for, plan, or carry out acts by FTOs including Iran's proxy, agent, and strategic partner, Hezbollah.

1494.   Each Defendant also knew or was deliberately indifferent to the fact that one of the specific aims and objectives of the Conspiracy was keeping U.S. depository institutions, law enforcement and counter-terrorism agencies blind to Iran's movement of U.S. dollars through the international financial system, and thus also knew or was deliberately indifferent to the fact that the overt acts they performed in furtherance of the Conspiracy facilitated that specific objective.

1495.   Having entered into an agreement to provide Iran material support in an illegal manner, in direct contravention of U.S. laws and regulations enacted expressly to mitigate Iran's sponsorship of terrorism and terrorist organizations (including Weapons of Mass Destruction proliferation activities in furtherance of such sponsorship) each Defendant also knew or was deliberately indifferent to the fact, that the Conspiracy's aims would foreseeably result in Iran transferring millions of dollars to Hezbollah, an FTO.

1496.   The material support that each Defendant, through the Conspiracy, knowingly, or with deliberate indifference, provided to Hezbollah, constituted substantial assistance to Hezbollah, thereby facilitating acts of terrorism in violation of §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f, and that have caused injuries to Plaintiffs.

1497. The Defendants' overt acts in entering into the Conspiracy and knowingly agreeing to provide Iran – a known and designated State Sponsor of Terrorism – material support and services in an illegal manner, and resultant, purposeful transfer of billions of USD through the United States in a manner expressly designed to ensure that the funds could be transferred without being monitored by U.S. regulators and law enforcement agencies – involved acts that were dangerous to human life, by their nature, and as further evidenced by their consequences.

1498. The Defendants' acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

1499. Each Defendant's agreement to enter into the Conspiracy and purposeful transfer (collectively) of billions of dollars through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies foreseeably resulted in material support being provided to FTOs, and were thus themselves acts of international terrorism because they either were, or objectively appear to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion (in part to cause them to withdraw Coalition forces from Iraq), and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Hezbollah's role in killing and injuring hundreds of American nationals in Iraq.

1500. Each Defendant's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and foreseeably, substantially accelerated and multiplied Hezbollah's ability to engage in terrorist activity (8 U.S.C. § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and/or commit acts of international terrorism under the

definition set forth in 18 U.S.C. § 2331. Each Defendant's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

1501. Furthermore, each Plaintiff's injuries constitutes a harm falling within the risk contemplated by each Defendant's violations, including each Defendant's knowing agreement to enter into the Conspiracy, the overt acts each Defendant performed in furtherance of the Conspiracy, and each Defendant's knowledge of, or deliberate indifference to, the fact that a specific, foreseeable aim and purpose of the Conspiracy was to provide material support to Hezbollah and other FTOs. Injuries resulting from terrorist attacks planned, designed, assisted, funded, initiated, and/or overseen by Hezbollah are precisely the risks contemplated by statutes, regulations and Executive Orders designed to ensure that Hezbollah's sponsor, principal, and strategic partner – Iran – had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions were transparent and could be blocked if warranted.

1502. Through its conduct as described above, by knowingly entering into the Conspiracy and violating 18 U.S.C. § 2339B in the manner and with the state of mind alleged above, each Defendant committed acts of international terrorism and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## THIRD CLAIM FOR RELIEF

## CIVIL LIABILITY AGAINST HSBC BANK USA, N.A. UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 USC § 2332d CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

1503. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

1504. Defendant HSBC-US is a juridical person organized under the laws of the United

States pursuant to 18 USC § 2332d(b)(2)(C), and is also a person within the United States pursuant to 18 U.S.C. § 2332d(b)(2)(D).

1505.   As alleged above, at all relevant times HSBC-US knew that Iran was a country designated by the United States under section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C. 2405) as a country supporting international terrorism, yet HSBC-US nevertheless engaged in thousands of financial transactions with Iran in violation of 18 U.S.C. § 2332d.

1506.   Defendant HSBC-US also knew or was deliberately indifferent to the fact that Hezbollah had been designated an FTO.

1507.   Defendant HSBC-US also knew or was deliberately indifferent to the fact that the IRGC-QF had been designated an SDGT.

1508.   Defendant HSBC-US also knew or was deliberately indifferent to the fact that Bank Saderat (including Defendant Bank Saderat Plc) had been designated an SDGT.

1509.   Defendant HSBC-US also knew, or was deliberately indifferent to the fact that the IRGC had been designated as an SDN.

1510.   Defendant HSBC-US also knew or was deliberately indifferent to the fact that Bank Melli (including Melli Bank Plc), Bank Saderat (including Defendant Bank Saderat Plc) Bank Mellat, and Bank Sepah had been designated as SDNs before November 2008, and, as such, were excluded from accessing the U-Turn exemption in the Iranian Transaction Regulations.

1511.   Defendant HSBC-US also knew, or was deliberately indifferent to the fact that the IRISL and multiple IRISL entities had been designated as SDNs.

1512.   As alleged above, HSBC-US knowingly conducted illegal financial transactions on behalf of Iran through Bank Melli and other Iranian counter-parties that did not fall within the

safe harbor provisions of the regulations issued by U.S. Treasury Department – regulations passed for the specific purposes of mitigating the risk that funds transfers to Iran could be used to: engage in terrorist activity under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), terrorism under 22 U.S.C. § 2656f, or acts of international terrorism under 18 U.S.C. § 2331.

1513.  In fact, the transactions at issue (including at least the $183 million HSBC-US facilitated on behalf of sanctioned entities in Iran that were identified in HSBC-US's December 11, 2012 Deferred Prosecution Agreement with DOJ) explicitly violated 31 C.F.R 535.701(a)(2) and 31 C.F.R 560.203.

1514.  Defendant HSBC-US knew that Defendants HSBC-Europe and HSBC-Middle East were deliberately altering and omitting information in funds transfer payment messages being processed through HSBC-US, thereby evading U.S. laws and regulations whose express purpose was (and is) to ensure that only a very limited class of payments could be facilitated to Iran, and that payment messages for such funds transfers required transparency in order to ensure that the transfers qualified for the limited exceptions and exemptions, and did not result in U.S. depository institutions processing transactions for the benefit of SDNs.

1515.  As alleged in detail above, throughout the relevant time period, HSBC-US knew that other HSBC Defendants such as HSBC-Europe and HSBC-Middle East were providing material support to Iran in a manner violating U.S. laws and regulations, and HSBC-US also knew its own systems were being used to facilitate the HSBC Defendants' illegal conduct.

1516.  Defendant HSBC-US also thus knew or was deliberately indifferent to the fact that Iran, the IRGC, IRISL, Hezbollah, and Defendant Bank Saderat Plc all engaged in terrorist activity under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), terrorism under 22 U.S.C. § 2656f, and acts of international terrorism under 18 U.S.C. § 2331 (including violations of 18 U.S.C. §§ 1114, 1203,

1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f), and that Iran provided massive support and sponsorship for violations of all these statutes, while also providing support for other acts of international terrorism, such as those planned, attempted, and/or perpetrated by the Special Groups.

1517. Knowing that Defendants HSBC-Europe and HSBC-Middle East were moving billions of sanctions-evading Iranian USD through HSBC-US's offices with the specific intent of defeating HSBC-US's OFAC filters and violating HSBC-US reporting requirements, it was reasonably foreseeable that HSBC-US's conduct would aid Iran and Iran's agents, proxies, and strategic partners (including Hezbollah, the IRGC, and Special Groups) to engage in terrorist activity under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), terrorism under 22 U.S.C. § 2656f, and acts of international terrorism under 18 U.S.C. § 2331.

1518. Because Defendant HSBC-US is a financial institution operating in the United States, at all times relevant to the complaint, it is deemed by law to be aware of all designations made to the SDN list, including without limitation designations for Iran, Hezbollah, the IRGC, the IRGC-QF, Bank Saderat (including Defendant Bank Saderat Plc), Bank Melli, Bank Mellat, Bank Sepah, IRISL (and multiple IRISL entities).

1519. Defendant HSBC-US thus also knew or was deliberately indifferent to the fact that Bank Melli (including Melli Bank Plc), Bank Saderat (including Defendant Bank Saderat Plc) Bank Mellat, and Bank Sepah had been designated as SDNs before November 2008, and, as such, were excluded from accessing the U-Turn exemption in the Iranian Transaction Regulations.

1520. Defendant HSBC-US's conduct foreseeably and substantially enhanced Hezbollah's, the IRGC and Special Groups' and other Iranian-sponsored terrorists' ability to

engage in terrorist activity, including preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus HSBC-US's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

1521. Defendant HSBC-US's knowing or deliberately indifferent provision of illegal financial services to Iran, enabled Iran to move billions of U.S. dollars through the United States without those funds being monitored by U.S. regulators and law enforcement agencies and therefore involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

1522. Defendant HSBC-US's acts transcended national boundaries in terms of the means by which they were accomplished.

1523. Defendant HSBC-US's conduct itself constitutes an act of international terrorism because it either was, or objectively appears to have been intended to: (a) intimidate or coerce the civilian population of the United States and other nations, (b) influence the policy of the governments of the United States and other nations by intimidation or coercion, and/or (c) affect the conduct of the governments of the United States and other nations by facilitating Iran's ability to prepare for and/or carry out mass destruction and murder.

1524. Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by Defendant HSBC-US's violations, including its knowing agreement to provide illegal services to Iran. Injuries resulting from terrorist attacks (including attacks launched by Hezbollah or the Special Groups) that were planned, supported by, funded, or assisted by the IRGC and/or Hezbollah are precisely the risks contemplated by Executive Orders, statutes and regulations designed to ensure that Iran had restricted access to U.S. dollars and financial

services, and that any funds it did receive that touched U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies, and that the transactions were not for the benefit of SDNs.

1525. Through its conduct as described above, by violating § 2332d in the manner and with the state of mind alleged above, HSBC-US committed acts of international terrorism, and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

**FOURTH CLAIM FOR RELIEF**

**CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a) AGAINST STANDARD CHARTERED BANK, ROYAL BANK OF SCOTLAND N.V. AND COMMERZBANK FOR VIOLATIONS OF 18 USC § 2332d CONSTITUTING ACTS OF INTERNATIONAL TERRORISM**

1526. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

1527. Defendants SCB, ABN Amro (RBS N.V.), and Commerzbank each utilized their respective New York branches in connection with their agreement to provide Iran material support in an illegal manner in order to effectuate and facilitate the Conspiracy, and each of those respective New York branches is a "person in the United States" within the scope of 18 U.S.C. § 2332d(b)(2)(D).

1528. As set forth above, each of the above-referenced Defendants knew was deliberately indifferent to the fact that Iran was designated under section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C. 2405) as a country supporting international terrorism and nonetheless knowingly engaged in thousands of illegal financial transactions with the government of Iran through their U.S. operations.

1529. The New York branch of each of the above-referenced Defendants also knew, or

was deliberately indifferent to the fact that Hezbollah had been designated as an FTO, that the IRGC-QF and Bank Saderat (including Defendant Bank Saderat Plc) had each been designated an SDGT, and that multiple other Iranian actors and agents (including the IRGC, Bank Melli, Bank Mellat, Bank Sepah, IRISL (and multiple IRISL entities)) had been designated as SDNs.

1530. The New York branches of the above-referenced Defendants also knew or were deliberately indifferent to the fact that Bank Melli (including Melli Bank Plc), Bank Saderat (including Defendant Bank Saderat Plc), Bank Mellat, and Bank Sepah had been designated as SDNs before November 2008, and, as such, were excluded from accessing the U-Turn exemption in the Iranian Transaction Regulations.

1531. As set forth above, the illegal transactions knowingly facilitated through New York by the respective New York branches of the above-referenced Defendants thus did not fall within the safe harbor provisions of the regulations issued by the U.S. Treasury Department for U-Turn exemption transactions, and therefore violated the criminal provisions of 18 U.S.C § 2332d(a).

1532. In fact, the transactions at issue explicitly violated 31 C.F.R 535.701(a)(2) and 31 C.F.R 560.203.

1533. Each of the above-referenced Defendants' New York branch's acts transcended national boundaries in terms of the means by which they were accomplished.

1534. Each of the above-referenced Defendants' New York branch's conduct foreseeably and substantially enhanced Hezbollah's, the IRGC and Special Groups' and other Iranian sponsored terrorists' ability to engage in terrorist activity, including preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and thus each of the above

Defendants' New York branch's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

1535. Each of the above-referenced Defendant's New York branch knowingly, or with deliberate indifference, provided financial services to Iran in the United States, knowing that its conduct enabled Iran to move millions (or in some cases, billions) of USD through the United States without those funds being monitored by U.S. regulators and law enforcement agencies. That conduct involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

1536. Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by each of the above-referenced Defendants' New York branch's unlawful conduct, including their knowing agreement to provide illegal services to Iran. Injuries resulting from terrorist attacks (including attacks launched by Hezbollah or the Special Groups) that were planned, supported by, funded, or assisted by the IRGC and/or Hezbollah are precisely the risks contemplated by Executive Orders, statutes and regulations designed to ensure that Iran had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions could be monitored by U.S. regulators and law enforcement agencies.

1537. Each of the above-referenced Defendants' criminal violations of the provisions of 18 U.S.C. § 2332d(a) was a sufficient cause of Plaintiffs' injuries, and, for the reasons alleged in Plaintiffs' Third Claim for Relief against Defendant HSBC-US, constitutes an act of international terrorism rendering each of the above Defendants civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## FIFTH CLAIM FOR RELIEF

## CIVIL LIABILITY AGAINST COMMERZBANK AG UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2339A CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

1538.  Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

1539.  Defendant Commerzbank provided material support to the IRGC through Commerzbank's acts on behalf of IRISL, and Commerzbank violated § 2339A in concealing and disguising the nature, location, source, and ownership of material support it provided to IRISL, knowing or deliberately indifferent to the fact that IRISL and the IRGC would use that support in preparation for, or in carrying out acts of international terrorism, including violations of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f .

1540.  Defendant Commerzbank knew or was deliberately indifferent that to the fact that the IRISL had been designated an SDN for Weapons of Mass Destruction-related activities that included arms shipments, including shipments destined for Hezbollah and other terrorists.

1541.  Defendant Commerzbank's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and substantially accelerated and multiplied the IRGC's ability to engage in terrorist activity (8 U.S.C § 1182(a)(3)(B)(iii)-(iv)), terrorism (22 U.S.C. § 2656f), and/or commit acts of international terrorism as that terms is defined in 18 U.S.C. § 2331.

1542.  The material support that Commerzbank knowingly and illegally provided to the IRISL provided foreseeable, substantial assistance to the IRGC, Hezbollah and the Special Groups, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. §§ 1114, 1203, 1362, 2332(a), 2332(b), 2332(c), 2332a, and/or 2332f that caused Plaintiffs' injuries, and

thus Commerzbank's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

1543.   Commerzbank's illegal conduct transcended national boundaries in terms of the means by which it was accomplished.

1544.   Commerzbank's knowing or deliberately indifferent provision of illegal financial services to the IRGC and IRISL, involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

1545.   Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by Commerzbank's material support to the IRGC and IRISL. Injuries resulting from terrorist attacks perpetrated, planned, supported by, funded, or assisted by Iran and Hezbollah are precisely the risks contemplated by statutes and regulations designed to ensure that the IRGC, IRISL and Iran had restricted access to USD and financial services, and that any funds they did receive that touched U.S. depository institutions were transparent and could be blocked if warranted, and did not benefit an SDN.

1546.   Through its conduct as described above, by knowingly or with deliberate indifference providing material support to Iran, the IRGC, and IRISL, and thereby violating 18 U.S.C. § 2339A in the manner and with the state of mind alleged above, Commerzbank is civilly liable for damages to each Plaintiff for their  injuries pursuant to 18 U.S.C. § 2333(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a)     Accept jurisdiction over this action;

(b)     Enter judgment against the Defendants and in favor of Plaintiffs for compensatory damages in amounts to be determined at trial;

(c)     Enter judgment against Defendants and in favor of Plaintiffs for treble damages pursuant to 18 U.S.C. § 2333(a);

(d)     Enter judgment against Defendants and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a);

(e)     Enter an Order declaring that Defendants have violated the Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq*.; and

(f)     Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: April 2, 2015

By      /s/ Gary M. Osen
        Gary M. Osen
        Peter Raven-Hansen, Of Counsel
        Ari Ungar
        Joshua D. Glatter
        Aaron Schlanger
        Naomi B. Weinberg
        **OSEN LLC**
        2 University Plaza, Suite 201
        Hackensack, NJ 07601
        (201) 265 6400
        (201) 265 0303 Fax

345 Seventh Avenue, 21st Floor
New York, New York 10001
(646) 380-0470
(646) 380-0471 Fax

**TURNER & ASSOCIATES, P.A.**
C. Tab Turner
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
(501) 791-2277

Attorneys for Plaintiffs