UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

CHARLOTTE FREEMAN, et al.,

                           Plaintiffs,

          -against-

HSBC HOLDINGS PLC, et al.,

                       Defendants.

14-CV-6601 (DLI/CLP)

**DEFENDANTS' JOINT MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

May 29, 2015

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................ 2

I.     STATUTORY BACKGROUND .............................................................................. 2

II.    PLAINTIFFS' ALLEGATIONS ............................................................................. 3

ARGUMENT ..................................................................................................................... 9

I.     THE RULE 12(b)(6) STANDARD ......................................................................... 9

II.    THE COMPLAINT FAILS PLAUSIBLY TO ALLEGE PROXIMATE CAUSE .......... 10

        A.    *Rothstein* And Its Progeny Hold That The Alleged Provision Of Financial Services To Iran, Even When In Violation Of U.S. Law, Is Too Remote To Support Liability Under Section 2333 For Injuries Allegedly Caused By Terrorist Entities Funded By Iran ................................................................. 10

        B.    *Rothstein* And Its Progeny Foreclose Plaintiffs' Causal Theory Here ................. 15

III.   THERE IS NO CONSPIRACY-BASED LIABILITY UNDER SECTION 2333 ........... 20

IV.   THE COMPLAINT FAILS PLAUSIBLY TO ALLEGE THAT NON-U.S. MOVING DEFENDANTS ARE "UNITED STATES PERSON[S]" OR THAT THEY ENGAGED IN "A FINANCIAL TRANSACTION WITH THE GOVERNMENT" OF IRAN UNDER SECTION 2332D ................................................ 25

CONCLUSION ................................................................................................................. 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abecassis v. Wyatt*, 785 F. Supp. 2d 614 (S.D. Tex. 2011) ...........................................26

*Ahmad v. Christian Friends of Israeli Comtys.*, No. 13 Civ. 3376 (JMF), 2014
 WL 1796322 (S.D.N.Y. May 5, 2014) ...................................................................17

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)..........................................3, 17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)..................................................................9, 10

*Bailey v. United States*, 516 U.S. 137 (1995) ...........................................................26

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................9

*Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994) .....................22

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ...................................26

*Daimler AG v. Bauman*, 134 S. Ct. 746 (2014) ........................................................26

*Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837 (2d
 Cir. 1998) ................................................................................................23, 24

*Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474 (E.D.N.Y. 2012)...................................14

*Hemi Grp., LLC v. City of New York*, 559 U.S. 1 (2010) .........................................3, 17

*Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258 (1992) .....................................3, 11

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229 (2d
 Cir. 1999), *as amended* (Aug. 18, 1999)...............................................................17

*Lexmark Int'l. Inc. v. Static Control Components Inc.*, 134 S. Ct. 1377 (2014) ...................10, 20

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013).......................4

*Linde v. Arab Bank, PLC*, 944 F. Supp. 2d 215 (E.D.N.Y. 2013)........................................ passim

*Linde v. Arab Bank, PLC*, No. 04 Civ. 02799 (E.D.N.Y. Apr. 8, 2015) .......................................14

*Linde v. Arab Bank, PLC*, No. 04 Civ. 02799 (E.D.N.Y. Aug. 10, 2004)....................................22

*Linde v. Arab Bank, PLC*, No. 04 Civ. 02799 (E.D.N.Y. May 10, 2013) .........................14, 23, 24

*Mastafa v. Chevron Corp.*, 770 F.3d 170 (2d Cir. 2014)....................................................9, 10, 25

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109 (2d Cir. 2013) ................................................................................................................9

*O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)*, 714 F.3d 118 (2d Cir. 2013) ....................................................................................... passim

*Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705 (2d Cir. 2013) ............................................9, 10

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) ................................................ passim

*Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414 (E.D.N.Y. 2013) ................................13, 15

*Stutts v. De Dietrich Group*, No. 03 Civ. 4059 (IGL), 2006 WL 1867060 (E.D.N.Y. June 30, 2006) ........................................................................................18, 19

*Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91 (D.D.C. 2002)........................................25

*United States v. Chalmers*, 474 F. Supp. 2d 555 (S.D.N.Y. 2007)................................................26

*United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012)....................................................................25

*Zito v. Leasecomm Corp.*, No. 02 Civ. 8074 (GEL), 2003 WL 22251352 (S.D.N.Y. Sept. 30, 2003)............................................................................................25

**Statutes & Rules**

31 C.F.R. § 560.516 (2006), *amended* 73 Fed. Reg. 66541 (Nov. 10, 2008)................................5

18 U.S.C. § 2331 ............................................................................................................2, 3

18 U.S.C. § 2332 ...........................................................................................................21

18 U.S.C. § 2332d ............................................................................................2, 8, 25, 26

18 U.S.C. § 2332d(a) ...................................................................................................27

18 U.S.C. § 2332d(b)(2) ...............................................................................................25

18 U.S.C. § 2332d(b)(2)(D)..........................................................................................21

18 U.S.C. § 2333 ................................................................................................... passim

18 U.S.C. § 2333(a) ...................................................................................2, 3, 11, 20

18 U.S.C. § 2336(a) .....................................................................................................25

18 U.S.C. § 2339A............................................................................................... passim

18 U.S.C. § 2339B .................................................................................................8, 21, 24, 25

50 App. U.S.C. 2405 ..............................................................................................................21

Fed. R. Civ. P. 8(a)(2)...........................................................................................................10

**Other Authorities**

Prohibiting New Investment in Burma, Exec. Order No. 13047, 62 Fed. Reg.
     28,301 (May 20, 1997)........................................................................................................26

## INTRODUCTION

Attacks on U.S. soldiers, including those during the Iraq war, are abhorrent.  But the undersigned Defendants—European financial institutions (the "Moving Defendants")[1]—are not responsible for these heinous acts.  The Moving Defendants did not commit any acts of terrorism and did not support terrorists.  Nonetheless, the Amended Complaint (the "Complaint") seeks to stretch the civil provision of the Anti-Terrorism Act (the "ATA"), 18 U.S.C. § 2333, beyond its bounds in an effort to seek monetary recovery from these financial institutions in regard to unrelated attacks on U.S. forces.  To try to achieve this, the Complaint seeks to paint with broad and conclusory allegations a portrait of an alleged conspiracy among the Moving Defendants, Iranian banks and the Government of Iran to process U.S. dollar-denominated transactions and then, relying on a far-fetched causal theory with multiple unknown actors, jumps from that commercial banking work to the detonation of explosive devices and other bombings and attacks in Iraq.

As demonstrated below, clear and controlling precedent in this Circuit holds that the Complaint's allegations fail to state a claim under the ATA as a matter of law.  First, the Complaint fails plausibly to allege that the Moving Defendants proximately caused Plaintiffs' injuries.  In *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013), the Second Circuit held that plaintiffs asserting Section 2333 claims must plausibly allege proximate cause and affirmed dismissal of such claims against a European bank based on causal allegations that were more plausible, direct and substantiated than those alleged here.  The Second Circuit's subsequent

---

[1] The "Moving Defendants" for purpose of this Joint Motion to Dismiss are HSBC Holdings PLC ("HSBC"), HSBC Bank PLC ("HSBC-Europe"), HSBC Bank Middle East Limited ("HSBC Middle East"), HSBC Bank USA, N.A. ("HSBC-US"), Barclays Bank PLC ("Barclays"), Standard Chartered Bank, The Royal Bank of Scotland N.V. ("RBS N.V."), Commerzbank AG and Credit Suisse AG.

decision in *O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)*, 714 F.3d 118,

123 (2d Cir. 2013), applying *Rothstein*, also rejected the kind of indirect causal allegations

asserted here.  Second, because Plaintiffs' claims are grounded in a conspiracy theory of liability,

those claims must be dismissed on the independent basis that conspiracy claims and other

theories of secondary liability are not cognizable under Section 2333.  *See Rothstein*, 708 F.3d at

97-98 (dismissing aiding-and-abetting claims under the ATA); *Linde v. Arab Bank, PLC*, 944 F.

Supp. 2d 215, 216 (E.D.N.Y. 2013) (applying *Rothstein* to dismiss all conspiracy-based claims

under the ATA).  Finally, the Third and Fourth Claims for Relief, brought against some of the

Moving Defendants under 18 U.S.C. § 2332d, must be dismissed for the additional reason that

the Complaint fails plausibly to allege that non-U.S. Moving Defendants are "United States

person[s]" or that they engaged in "a financial transaction with the government" of Iran.

## BACKGROUND

## I.    STATUTORY BACKGROUND

While the ATA is largely comprised of criminal prohibitions relating to

terrorism,[2] Section 2333(a) of the ATA creates a civil cause of action for U.S. nationals

"injured . . . by reason of an act of international terrorism".  Section 2333(a) incorporates the

definition of "international terrorism" in 18 U.S.C. § 2331, to wit, activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the
> criminal laws of the United States or of any State, or that would be a criminal
> violation if committed within the jurisdiction of the United States or of any State;
>
> (B) appear to be intended—
>
>> (i) to intimidate or coerce a civilian population;

---

[2] For example, 18 U.S.C. § 2339A, a criminal provision of the ATA, makes it unlawful to
"provide[] material support or resources . . . knowing or intending that they are to be used in
preparation for, or in carrying out, a violation of" one of several substantive terrorism offenses.

(ii) to influence the policy of a government by intimidation or coercion; or

(iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States.

A Section 2333 claim thus logically consists of several basic elements.  First, the plaintiff must be a U.S. national.  Second, the plaintiff must plausibly allege that the defendant directly committed an act of international terrorism as defined in Section 2331.  *See Rothstein*, 708 F.3d at 97; *Linde*, 944 F. Supp. 2d 215, 216-17.  Third, the plaintiff must plausibly allege that he or she was injured "by reason of" the defendant's act of international terrorism, 18 U.S.C. § 2333(a)—which the Second Circuit has defined to require plausible allegations that the defendant's act proximately caused the plaintiff's injury.  *See Rothstein*, 708 F.3d at 95 (quoting *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258, 267-68 (1992)); *accord Al Rajhi*, 714 F.3d at 123-24.  As the Supreme Court has held, proximate cause requires "some direct relation between the injury asserted and the injurious conduct alleged".  *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (quoting *Holmes*, 503 U.S. at 268); *accord Rothstein*, 708 F.3d at 91-92 ("with respect to 'proximate causation, the central question . . . is whether the alleged violation led directly to the plaintiff's injuries'") (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)).

## II.   PLAINTIFFS' ALLEGATIONS

The Complaint is premised on an alleged conspiracy principally among the Moving Defendants, several Iranian banks and the Government of Iran.  *See, e.g.*, Am. Compl. ¶ 5.  Plaintiffs define "the Conspiracy" as "an illegal criminal agreement, beginning in 1987 and, on information and belief, continuing to the present, between Iran and its banking agents and various international financial institutions, including the Defendants in this action, by which

3

Defendants knowingly participated in a criminal scheme in which they agreed to alter, falsify, or omit information from payment messages that involved Iran or Iranian parties (including several Iranian banks (referred to herein collectively as 'Iranian Bank Co-conspirators') such as Bank Melli and Bank Saderat, as well as the Islamic Republic of Iran Shipping Lines ('IRISL'))". *Id.* ¶ 12.

Plaintiffs allege that, as part of the Conspiracy, the Moving Defendants variously provided U.S. dollar-denominated correspondent banking services to Iranian bank customers, such as Bank Melli, Bank Saderat and the Central Bank of Iran.[3]  *Id.* ¶¶ 253, 274, 282, 285, 302. For most of the period that the Moving Defendants are alleged to have engaged in such services, clearing U.S. dollar-denominated transactions for Iranian banks was not prohibited outright.  *See id.* ¶ 87.  Thus, even though U.S. trade sanctions barred U.S. banks from many kinds of financial transactions with certain identified Iranian parties, the U.S. sanctions regime also permitted certain dollar-clearing services pursuant to the "U-Turn" exemption, at least until November

---

[3] Correspondent banking involves the use of wire transfer instructions to facilitate the transfers of funds from an account in one bank to an account in another bank.  *See generally Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 166 (2d Cir. 2013) (describing international correspondent banking).  Often, there are multiple banks involved in a wire transaction:  a local bank, whose customer is the sending party; a receiving bank, whose customer is the receiving party; and one or more intermediary banks that provide correspondent banking services to the banks at either end of the transaction if they do not have direct relationships with each other.  Banks providing clearing services for U.S. dollar-denominated transactions are often located in the U.S.  *See* Am. Compl. ¶¶ 248-49.  In many instances, a U.S. bank or a U.S. branch of a foreign bank acting as a clearing bank would have information only about its direct counterparties but not about every upstream and downstream participant in the transaction.  Plaintiffs here allege that Iranian banks maintained accounts at the Moving Defendant financial institutions and that the Moving Defendants either cleared U.S. dollar-denominated fund transfers for these Iranian banks (when acting as a clearing bank) or used their own correspondent relationships with clearing banks to execute U.S. dollar-denominated wire transfers for the Iranian banks.  *See id.* ¶¶ 333-644.

2008.[4]  *Id.*  Plaintiffs allege, however, that when dealing with Iranian entities under the U-Turn

exemption, the Moving Defendants omitted or altered certain Iranian identifying information in

the payment messages for transactions being processed through U.S. clearing banks in order to

avoid U.S. scrutiny of the transactions.  *See*, *e.g.*, *id.* ¶¶ 12, 238, 240.  Plaintiffs refer to this as

"stripping".  *Id.* ¶ 238.  Plaintiffs also allege that, at various times between 2009 and 2015, the

Moving Defendants acknowledged to the U.S. Government their respective failures to include

such identifying information in banking transactions with certain Iranian entities, entered into

deferred prosecution agreements with the U.S. Government, and agreed to pay civil penalties

and/or forfeitures.  *See id.* ¶¶ 104, 372, 446, 497, 544, 606, 610.  Nothing in the deferred

prosecution agreements, which form the basis of Plaintiffs' allegations regarding the Moving

Defendants' alleged unlawful acts, connects the Moving Defendants, or alleges the Moving

Defendants provided any support, to any terrorist, terrorist organization or terrorist activity.  *Id.*

        The Complaint further alleges that the Iranian Government sponsored terrorist

groups.  *Id.* ¶¶ 76-225.  Plaintiffs specifically allege that the Government of Iran used certain

Iranian banks, which are alleged to be "banking agents" for Iran, *id.* ¶¶ 5, 12, to transfer funds to

the terrorist organizations Hezbollah and the Islamic Revolutionary Guard Corps-Qods Force

("IRGC-QF").  *Id.* ¶¶ 5, 13, 245.  Plaintiffs further allege in this regard that the purported

Conspiracy provided "ease and efficiency" for Iran's funding of terrorist organizations, *id.* ¶ 32,

and that "[w]ithout the Conspiracy . . . Iran could not have transferred the volume of USD it did

---

[4] The "U-Turn" exemption referred to a Treasury Department regulation under which certain
funds transfers for the direct or indirect benefit of Iranian banks, other persons in Iran or the
Government of Iran could be cleared through the United States, provided such payments were
initiated offshore by a non-Iranian, non-U.S. financial institution and only passed through the
U.S. financial system en route to another offshore, non-Iranian, non-U.S. financial institution.  31
C.F.R. § 560.516 (2006), *amended* 73 Fed. Reg. 66541 (Nov. 10, 2008).

for the benefit of Hezbollah and the IRGC through the international financial system, nor could it have exploited the U-Turn exemption to blind U.S. regulators and law enforcement to the degree and for the duration that it did". *Id.* ¶ 109; *see also id.* ¶¶ 16, 183, 253. The U.S. dollars, in turn, were allegedly important to Iran's funding of terrorism because the terrorist groups operated in "dollarized economies". *Id.* ¶ 96; *see also id.* ¶¶ 82, 94-95, 145, 152.

The Complaint does not, however, identify a single banking transaction by any of the Moving Defendants that allegedly was used by the Government of Iran to transfer funds to any terrorist organizations. *Id.* ¶¶ 333-644. Moreover, there is no allegation that, in processing U.S. dollar-denominated transactions for Iranian banks, the Moving Defendants processed even one dollar for any segment of the Iranian Government that allegedly funded terrorist organizations or groups, much less that the Moving Defendants processed transactions directly for any terrorist entity.

The Complaint instead contains several conclusory allegations that the Moving Defendants "knew" or were "deliberately indifferent to", *id.* ¶¶ 13, 241, the following alleged purposes of the alleged Conspiracy: first, "concealing hundreds of billions of dollars of Iran's U.S. dollar-denominated transactions from detection" by U.S. authorities; second, "assisting" Iran in "transferring at least $150 million USD to the IRGC-QF, Hezbollah, Special Groups, and other instruments of Iranian state-sponsored terrorism"; and third, "assisting" Iran in "acquiring technology and components for its illegal Weapons of Mass Destruction program", *id.* ¶ 234. Plaintiffs further allege in conclusory fashion that "the Conspiracy substantially assisted Iran, IRISL, the IRGC, Hezbollah and/or Special Groups in committing the acts of international terrorism that injured the Plaintiffs by providing them collectively with more than $200 million USD in funding", *id.* ¶ 255; *see also id.* ¶¶ 4, 254, 1483, 1500, 1541; that the Moving Defendants

"provided Iran with the means by which it could transfer more than $150 million to the IRGC-QF, Hezbollah and Special Groups", *id.* ¶ 254; that several of the Moving Defendants "facilitat[ed] at least hundreds of illicit transactions on behalf of IRISL totaling more than $60 million", *id.* ¶ 241; *see also id.* ¶ 35; that the Moving Defendants, "[t]hrough [a] clandestine stream of U.S. dollars", *id.* ¶ 1474, allowed Iran to hide these transactions behind the "large volumes of dollar clearing [transactions]", *id.* ¶ 98; *see also id.* ¶¶ 16, 32, 100; and that the Conspiracy "enabl[ed] Iran, the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc), Hezbollah, and Special Groups to plan for, conspire to, and perpetrate acts of international terrorism", *id.* ¶ 13; *see also id.* ¶¶ 5, 241, 1477, 1493.  None of these allegations, however, connects any of the Moving Defendants' U.S. dollar-clearing transactions to any of the alleged terrorist attacks that injured Plaintiffs, or to any terrorist organizations or groups in Iraq or elsewhere.

The Complaint further alleges that Hezbollah and IRGC-QF trained or sponsored other terrorist groups operating in Iraq, collectively called "Special Groups", of which only three are identified in the Complaint—Kata'ib Hezbollah ("KH"), the Mahdi Army and Asa'ib Ahl al-Haq ("AAH").  *Id.* ¶¶ 5, 184-225.  The Complaint does not allege that the Moving Defendants had any direct involvement with any of these three named Iraqi terrorist groups or that the Moving Defendants' dollar-clearing transactions were used to fund any of those groups.  For nearly ninety percent of the attacks alleged in the Complaint (sixty five out of seventy three), almost all of which involved injuries caused by explosive devices, Plaintiffs do not even identify the individuals or entities responsible for placing or detonating those devices.  *Id.* ¶¶ 645-1464. The Complaint does not allege that the Moving Defendants had any involvement with any of these unnamed individuals or entities, that any of the Moving Defendants' dollar-clearing

transactions were used by Iran to fund those unspecified actors, or that the attacks were otherwise financed by the Moving Defendants' conduct.

Based on these and other related conspiracy allegations, Plaintiffs conclusorily contend that the Moving Defendants are liable for injuries caused to U.S. military personnel by wartime acts in Iraq. *See id.* ¶¶ 1465-1502 (First and Second Claims for Relief); ¶¶ 1503-1546 (Third, Fourth and Fifth Claims for Relief). Specifically, Plaintiffs allege that, through the Conspiracy, each of the Moving Defendants violated the criminal material support provisions of 18 U.S.C. § 2339A (First Claim for Relief, *see id.* ¶¶ 1465-1485), which makes it unlawful to "provide[] material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out, a violation of" one of several substantive terrorism offenses; and 18 U.S.C. § 2339B (Second Claim for Relief, *see id.* ¶¶ 1486-1502), which makes it unlawful to "knowingly provide[] material support or resources to a foreign terrorist organization". Plaintiffs further allege that certain Moving Defendants[5] violated 18 U.S.C. § 2332d (Third and Fourth Claims for Relief, *see id.* ¶¶ 1503-1537), which makes it unlawful for "a United States person", except as permitted by regulation, "knowing or having reasonable cause to know that a country is designated . . . as a country supporting international terrorism", to "engage[] in a financial transaction with the government of that country".[6]

---

[5] These defendants are HSBC-US, Standard Chartered Bank, RBS N.V. and Commerzbank AG.

[6] Plaintiffs further allege that Commerzbank AG violated 18 U.S.C. § 2339A by "concealing and disguising the nature, location, source, and ownership of material support it provided to IRISL, knowing or deliberately indifferent to the fact that IRISL and the IRGC would use that support in preparation for, or in carrying out acts of international terrorism". Am. Compl. ¶ 1539; *see also id.* ¶¶ 1540-1546 (Fifth Claim for Relief). Commerzbank AG separately addresses that claim in its supplemental brief.

## ARGUMENT

### I.    THE RULE 12(b)(6) STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard requires more than a "sheer possibility".  *Id.*  A plaintiff cannot cross the threshold from "possible" to "plausible" by pleading only "facts that are 'merely consistent with' a defendant's liability", *id.* (quoting *Twombly*, 550 U.S. at 557); the plaintiff instead must plead facts that are "suggestive of" wrongdoing, *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013) (quoting *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 121 (2d Cir. 2013)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted).

In making the plausibility determination, a court may consider only well-pleaded factual allegations.  *See Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014).  A court must ignore "legal conclusions[] and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements".  *Id.* (citation omitted).  "[L]abels and conclusions", "a formulaic recitation of the elements of a cause of action", and "naked assertion[s] devoid of further factual enhancement" all must be disregarded.  *Pension Benefit Guar. Corp.*, 712 F.3d at 717 (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted).

The portions of the Complaint not excluded must be assessed to determine whether the inferences drawn from the specific alleged facts are actually "plausible".  *Twombly*, 550 U.S. at 556.  This is "a context-specific task that requires the reviewing court to draw on its

9

judicial experience and common sense".  *Mastafa*, 770 F.3d at 177 (internal quotation marks and citation omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'–'that the pleader is entitled to relief.'"  *Pension Benefit Guar. Corp.*, 712 F.3d at 718 (quoting *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2))).

## II.   THE COMPLAINT FAILS PLAUSIBLY TO ALLEGE PROXIMATE CAUSE

The Complaint does not plausibly allege that the Moving Defendants proximately caused Plaintiffs' injuries.  In *Rothstein*, the Second Circuit rejected an indirect causal theory that was similar to, and if anything stronger than, the indirect theory of causation alleged here.  708 F.3d at 95-97.  Because Plaintiffs fail to adequately allege proximate cause, Plaintiffs' claims must be dismissed as a matter of law.  *See id.*; *see also Lexmark Int'l. Inc. v. Static Control Components Inc.*, 134 S. Ct. 1377, 1391 n.6 (2014) (proximate cause "must be adequately alleged at the pleading stage in order for the case to proceed") (citation omitted).

### A.   *Rothstein* And Its Progeny Hold That The Alleged Provision Of Financial Services To Iran, Even When In Violation Of U.S. Law, Is Too Remote To Support Liability Under Section 2333 For Injuries Allegedly Caused By Terrorist Entities Funded By Iran

In *Rothstein*, plaintiffs who were injured in bombings and rocket attacks "conducted by Hamas or H[e]zbollah"[7] brought a Section 2333 claim against a European financial institution, UBS, alleging that UBS "facilitated" those attacks by directly "furnishing United States currency to Iran".  *Rothstein*, 708 F.3d at 84-87.  The *Rothstein* plaintiffs alleged that U.S. sanctions on Iran "made it difficult for Iran to obtain the large sums of cash dollars needed for the H[e]zbollah and Hamas operations", and that defendant UBS "solved this problem

---

[7] In *Rothstein*, Hezbollah was referred to by the alternative spelling "Hizbollah".

for Iran by illegally providing Iran with hundreds of millions of dollars in cash", *id.* at 87,

"kn[owing] full well that the cash dollars it was providing  . . . would be used to cause and

facilitate terrorist attacks by Iranian-sponsored terrorist organizations such as Hamas [and]

H[e]zbollah", *id.* at 97.  The *Rothstein* plaintiffs further alleged that "the ability of H[e]zbollah

and Hamas to . . . carry out those attacks was substantially increased by those organizations'

receipt of cash dollars from Iran".  *Id.* at 87.  In affirming dismissal of these claims, the Second

Circuit held that plaintiffs had failed plausibly to allege that UBS's actions were the proximate

cause of plaintiffs' injuries.  *Id.* at 95.

      The Second Circuit's proximate cause holding rested on Section 2333's

requirement that persons seeking recovery have been injured "*by reason of* an act of international

terrorism".  18 U.S.C. § 2333(a) (emphasis added).  The Second Circuit found that the phrase

"by reason of" has a "well-understood meaning" in other statutes such as RICO and federal

antitrust laws and has "historically been interpreted as requiring proof of proximate cause".

*Rothstein*, 708 F.3d at 95.  Thus, the *Rothstein* Court held that, in order to state a Section 2333

claim, a plaintiff must plausibly allege that the defendant's conduct was the "proximate cause" of

the plaintiff's injury.  *Id.* (quoting *Holmes*, 503 U.S. at 267-68); *accord Al Rajhi*, 714 F.3d at

123-24.

      The Second Circuit in *Rothstein* also squarely rejected the argument that a bank's

violation of U.S. laws in engaging in financial transactions with Iran, a state sponsor of

terrorism, is a sufficient basis to hold a bank "liable for injuries subsequently caused by a

terrorist organization associated with that state".  *Rothstein*, 708 F.3d at 96.  "[P]laintiffs'

contention that proximate cause is established because they were injured after [defendant]

violated federal law is a *post hoc, ergo propter hoc* proposition that would mean that any

provider of U.S. currency to a state sponsor of terrorism would be strictly liable [under the ATA]." *Id.* The Second Circuit concluded: "If Congress had intended to impose strict liability" on the basis of violations of U.S. law, including regulations issued by the Office of Foreign Assets Control, "it would have found words more susceptible to that interpretation, rather than repeating the language it had used in other statutes to require a showing of proximate cause". *Id.*

Thus, the Second Circuit rejected as legally insufficient the following indirect causal allegations regarding defendant UBS's alleged financial transactions with Iran:

- The plaintiffs were injured by attacks committed by Hamas and Hezbollah, both of which allegedly received extensive funding directly from Iran. *See id.* at 85, 87.

- Due to restrictions imposed on wire transfers involving Hamas, Hezbollah and related entities, the terrorists needed physical U.S. banknotes—actual dollar bills—to fund their operations. *See id.* at 86.

- "Iran was subject to United States government sanctions", which "made it difficult for Iran to obtain the large sums of cash dollars needed for the H[e]zbollah and Hamas operations". *Id.* at 87. And "'UBS solved this problem for Iran by illegally providing Iran with hundreds of millions of dollars in cash between 1996 and 2004.'" *Id.*

- UBS transferred significant amounts of U.S. banknotes directly to the Iranian Government. *See id.*

- "UBS knew full well that the cash dollars it was providing to a state-sponsor of terrorism such as Iran would be used to cause and facilitate terrorist attacks by Iranian-sponsored terrorist organizations such as Hamas, H[e]zbollah and PIJ." *Id.* at 97 (emphases omitted).

The Second Circuit found that these indirect causal allegations failed to satisfy Section 2333's proximate cause requirement for a number of reasons, including:

- **UBS did not participate in the attacks:** "The Complaint does not allege that UBS was a participant in the terrorist attacks that injured plaintiffs." *Id.*

- **UBS did not provide banknotes directly to terrorists:** "[The Complaint] does not allege that UBS provided money to H[e]zbollah or Hamas. It does not allege that U.S. currency UBS transferred to Iran was given to H[e]zbollah or Hamas." *Id.*

- **UBS's alleged acts were not necessary to Iran's terrorism funding:** "[The Complaint] does not allege that if UBS had not transferred U.S. currency to Iran, Iran, with its billions of dollars in reserve, would not have funded the attacks in which plaintiffs were injured." *Id.*

- **Iran has legitimate uses for financial services:** "[T]he fact remains that Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund." *Id.*

The Second Circuit concluded that, while "[t]he fact that the transfers were made to a state sponsor of terrorism of course made it more likely that the moneys would be used for terrorism than if the transfers were to a state that did not sponsor terrorism", these allegations were insufficient to "meet *Twombly*'s plausibility standard with respect to the need for a proximate causal relationship between the cash transferred by UBS to Iran and the terrorist attacks by H[e]zbollah and Hamas that injured plaintiffs". *Id.*

As this Court observed in *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 433 (E.D.N.Y. 2013), under *Rothstein*, the difference between a proximate cause allegation that a defendant provided funds directly to a foreign terrorist organization, such as Hamas or Hezbollah, and a proximate cause allegation that a defendant provided funds to the Government of Iran, a state sponsor of terrorism that "performs myriad legitimate functions in addition to allegedly funding terrorist organizations", is "meaningful". "Congress has specifically found that 'foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct' . . . The same thing cannot be said about a government." *Id.* (citation omitted); *see also Rothstein,* 708 F.3d at 97.

The same meaningful proximate cause distinction identified in *Rothstein* and *Strauss* is borne out in other recent decisions in this District, where courts have found causal allegations sufficient based on a direct causal connection between the defendant's conduct and a designated terrorist organization that perpetrated the attack which injured plaintiff. For example,

in *Linde v. Arab Bank, PLC*, No. 04 Civ. 02799 (E.D.N.Y. Apr. 8, 2015) Memorandum Opinion and Order at 23, the defendant bank maintained an account for a "leader of Hamas" and processed transfers into an account which "explicitly listed 'Hamas' as the beneficiary party". The *Linde* court observed, "here factually in contrast to *Rothstein* the facts proffered support a direct connection between the bank's provision of services and the terrorist acts that caused injury". *Linde*, No. 04 Civ. 02799 (E.D.N.Y. May 10, 2013) ECF No. 943, Transcript of Motion Hearing at 72. Similarly, in *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 479-80 (E.D.N.Y. 2012), the defendant bank was "alleged to have maintained accounts for and provided financial services to Hamas, its leaders, and its affiliates". Here, by contrast, there is no allegation that the Moving Defendants maintained any accounts for or provided any services to any terrorist entity.

The Second Circuit's decision in *Al Rajhi*, decided shortly after this Court's decision in *Strauss*, reaffirms the inadequacy, as a matter of law, of proximate cause allegations lacking a direct connection between the defendant and the terrorist organization and terrorist act that allegedly caused the plaintiff's injury. In *Al Rajhi*, the Second Circuit rejected as a matter of law proximate cause claims that the defendants there, including several financial institutions, were liable under Section 2333 to victims of the September 11 attacks because the defendants allegedly provided "financial support" and "'financial [and bank account] services'" to purported charities that in turn allegedly supported al Qaeda. 714 F.3d at 123 (brackets in original) (citations omitted). In affirming dismissal of those claims under Rule 12(b)(6) for failure adequately to plead proximate cause, the *Al Rajhi* Court, relying on *Rothstein*, held, "[s]imply put, plaintiffs do not allege that the Rule 12(b)(6) defendants participated in the September 11, 2001 attacks or that they provided money directly to al Qaeda; nor are there factual allegations that the money allegedly donated by the Rule 12(b)(6) defendants to the purported charities

14

actually was transferred to al Qaeda and aided in the September 11, 2001 attacks."  *Id.* at 124.

As shown below, the absence of any plausible proximate causal allegations here likewise

requires dismissal.

> **B.      *Rothstein* And Its Progeny Foreclose Plaintiffs' Causal Theory Here**

The very gaps in causation that were dispositive in *Rothstein* and its progeny are

also present and dispositive here:

- **The Moving Defendants did not participate in the attacks:**  As in *Rothstein*, there are no allegations here that the Moving Defendants were "participant[s] in the terrorist attacks that injured plaintiffs".  *Rothstein*, 708 F.3d at 97.

- **The Moving Defendants did not provide banking services directly to terrorists:**  As in *Rothstein*, Plaintiffs here do not allege that the Moving Defendants provided services directly to terrorist entities.  *See id.*  Nor do Plaintiffs allege that any of the Moving Defendants' dollar-clearing transactions were used to fund terrorist activity.  *Id.*

- **The Moving Defendants' actions were not necessary to any terrorism funding by Iran:**  As in *Rothstein*, Plaintiffs here do not allege that, if the Moving Defendants had not provided dollar-clearing transactions for Iranian banks, Iran would not have been able to fund terrorist groups.  *See id.*

- **Iran has legitimate uses for financial services:**  As in *Rothstein*, "[t]he fact remains that Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund".  *Id.*

In light of *Rothstein* and its progeny, Plaintiffs' allegations here have not, as a

matter of law, pleaded a proximate causal relationship between the Moving Defendants' alleged

conduct and the attacks that injured Plaintiffs.  The Second Circuit has already held that the mere

provision of banking services to Iran, a state sponsor of terrorism, is too indirect to satisfy the

proximate cause standard.  *See Rothstein*, 708 F.3d at 96; *see also Al Rajhi*, 714 F.3d at 124;

*Strauss*, 925 F. Supp. 2d at 433.  Thus, dismissal is required under *Rothstein*.

Indeed, the causal theory alleged here is even more attenuated than the causal

theory rejected in *Rothstein*.  In *Rothstein*, plaintiffs claimed that the attacks injuring them were

carried out directly by Hamas or Hezbollah, which the Government of Iran allegedly directly financed using U.S. banknotes, and defendant UBS allegedly supplied U.S. banknotes directly to the Government of Iran. *See* 708 F.3d at 85-87.  "In other words, UBS allegedly provided funding to a known state sponsor of terrorism that, in turn, provided funding to H[e]zbollah and Hamas", the perpetrators of the attacks. *Al Rajhi*, 714 F.3d at 124.  The Moving Defendants' alleged role here is much further removed.  According to the Complaint, the Moving Defendants allegedly provided U.S. dollar-clearing transactions for Iranian banks, those Iranian banks allegedly then were separately used by the Government of Iran to provide financial support to Hezbollah and IRGC-QF, Hezbollah and IRGC-QF allegedly then provided support to named and unnamed terrorist groups in Iraq, and these named and unnamed Iraqi terrorist groups, or more often unidentified individuals or entities, allegedly then carried out or facilitated the attacks which injured Plaintiffs.  *See id.* ¶¶ 655, 738, 1257, 1270, 1321, 1365, 1472 (alleged sponsorship and training of Iraqi terrorist operatives by Hezbollah and IRGC-QF), ¶¶ 127-195 (Iran's alleged support of Hezbollah and IRGC-QF), ¶¶ 5, 93 (Iran's alleged use of "banking agents" to fund terrorist organizations), ¶ 132 ("Iran, through the IRGC, has funded, trained and equipped Hezbollah"), ¶ 135 (Iran's alleged reliance on "both Hezbollah and the IRGC" to support Iraqi terrorists).  Plaintiffs thus do not allege that the Moving Defendants "participated in the . . . attacks", or that they "provided money directly to" the individuals or entities that carried out the attacks, or that the money from the U.S. dollar-denominated transactions conducted by the defendants for Iranian banks was "transferred to" the individuals or entities that committed the attacks. *Al Rajhi*, 714 F.3d at 124.  Under *Rothstein* and its progeny, the theory of causation pleaded by plaintiffs here—far less direct than in *Rothstein* itself—fails as a matter of  law.

As to the claims based on sixty five attacks alleged in the Complaint for which Plaintiffs do not even identify the responsible individuals or entities, Am. Compl. ¶¶ 645-1464, dismissal is required for the additional reason that the alleged link between Iran and whomever may be responsible for these attacks is pure speculation, as is the even more distant alleged link between the Moving Defendants and those unspecified actors.  *See, e.g.*, *Ahmad v. Christian Friends of Israeli Comtys.*, No. 13 Civ. 3376 (JMF), 2014 WL 1796322, at *4 (S.D.N.Y. May 5, 2014) (where "the Amended Complaint does not even identify which individuals or organizations were responsible for the attacks that injured the American Plaintiffs", allegations that defendants "transferred funds to an unorganized group of approximately five hundred thousand people, and that some people in that group committed attacks against the American Plaintiffs" are insufficient to satisfy proximate causation) (internal citation omitted).

Plaintiffs' frequent use of the word "foreseeable" in the Complaint does not cure their failure to plead proximate cause.  *See* Am. Compl. ¶¶ 5, 13, 30, 31, 33, 234, 241, 1474-76, 1479, 1482-83, 1495, 1499, 1500.  First, as the Second Circuit recognized in *Rothstein*, the Supreme Court has held that "with respect to 'proximate causation, the central question . . . is whether the alleged violation led directly to the plaintiff's injuries'".  *Rothstein*, 708 F.3d at 91-92 (quoting *Anza*, 547 U.S. at 461); *see also Hemi Grp.*, 559 U.S. at 9 ("the focus" of proximate cause "is on the directness of the relationship between the conduct and the harm").  Thus, in "establishing proximate causation", foreseeability considerations "are *additional elements*, not substitutes for alleging (and ultimately, showing) a direct injury".  *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 235-36 (2d Cir. 1999), *as amended* (Aug. 18, 1999) (emphasis in original).

Second, in *Rothstein*, causation allegations more direct than those made here were far too indirect to even merit any detailed analysis of foreseeability.  708 F.3d at 97.  Indeed, while the *Rothstein* Court mentioned foreseeability of harm as a factor in proximate causation, the Court did not analyze the causal allegations there under the foreseeability standard, instead finding failure to plead proximate cause based on the indirect causal connection alleged.  *Id.* Similarly, the Second Circuit held in *Al Rajhi* that provision of "routine banking services to organizations and individuals said to be affiliated with al Qaeda"—again a more direct causal theory than the one alleged here—was nonetheless insufficient to satisfy proximate cause, because, despite plaintiffs' foreseeability allegations, plaintiffs did not allege, among other things, that "the money allegedly donated by the . . . defendants to the purported charities actually was transferred to al Qaeda and aided in September 11, 2001 attacks".  714 F.3d at 124. In *Stutts v. De Dietrich Group*, No. 03 Civ. 4059 (IGL), 2006 WL 1867060, at *4 (E.D.N.Y. June 30, 2006), the court rejected another indirect causal theory that, given the "widespread publicity about Iraq's illegal use of chemical weapons", it was "foreseeable" to a defendant company selling chemicals to Iraq that Iraq would then use the chemicals to develop weapons that injured plaintiffs.  The court in *Stutts* held that "[s]uch general publicity does not provide a causal link between the Bank Defendants' conduct and the plaintiffs' injuries".  *Id.*

Here, Plaintiffs' similar conclusory allegations that the Moving Defendants knew Iran was a state sponsor of terrorism, Am. Compl.  ¶¶ 29-31, 238, 242, 1471, 1489, 1497, were aware of Iran's terrorism funding activities, *id.* ¶¶ 19-21, 25-27, and "knew or [were] deliberately indifferent to the fact that Iran, as a U.S. designated State Sponsor of Terrorism, would (and, in fact, did) channel hundreds of millions of the dollars that Defendants helped launder and conceal from U.S. regulators and law enforcement agencies to the IRGC and

Hezbollah as part of the Conspiracy", *id.* ¶ 30; *see also id.* ¶¶ 7, 31, 1471, 1473, 1474, 1475, 1495, do not establish proximate causation between the Moving Defendants' alleged conduct and the attacks that injured Plaintiffs.  *See Rothstein*, 708 F.3d at 97; *Al Rajhi*, 714 F.3d at 124; *Stutts*, 2006 WL 1867060, at *4.  Nor do those allegations distinguish this case from *Rothstein*, where the defendant allegedly "knew full well that the cash dollars it was providing to a state-sponsor of terrorism such as Iran would be used to cause and facilitate terrorist attacks by Iranian-sponsored terrorist organizations such as Hamas, H[e]zbollah and PIJ", 708 F.3d at 97 (emphases omitted), or from *Al Rajhi*, where the defendant was alleged to have "knowingly provid[ed] financial support" to "purported charity organizations known to support terrorism", 714 F.3d at 123, 124.

Plaintiffs' remaining conclusory allegations that the Moving Defendants "substantially assisted", Am. Compl. ¶ 255, "substantially enhanced", *id.* ¶ 1483, "facilitated", *id.* ¶¶ 34, 274, 1475, 1478, 1488, 1494, "enabled", *id.* ¶ 5, or "provided . . . the means" for, *id.* ¶ 254, Iran's support for terrorism, and that "absent the access to the U.S. 'dollar clearing' system afforded to Bank Saderat by [the Moving Defendants], both Iran and Hezbollah's access to USDs would have been diminished", *id.* ¶ 253, are the same kinds of allegations *Rothstein* rejected as far too remote to establish proximate cause.  The *Rothstein* plaintiffs alleged that "it was difficult for Iran to obtain the large sums of cash dollars needed for H[e]zbollah and Hamas operations" due to U.S. trade sanctions on Iran; that the bank defendant in that case "solved the problem for Iran by illegally providing Iran with hundreds of millions of dollars in cash"; and that the defendant's provision of funds to Iran thus "substantially increased" the ability of terrorist organizations funded by Iran to carry out the attacks.  708 F.3d at 87.  The Second Circuit dismissed these allegations, holding that the mere fact that the defendant's transfer of

funds to Iran made it "more likely that the moneys would be used for terrorism" was not sufficient to adequately plead proximate cause.  *Id.* at 97.

In sum, when, as here and in *Rothstein*, a defendant is claimed to have dealt (here, indirectly) with a state sponsor of terrorism and not with a terrorist organization allegedly supported by that state or with a yet further removed named or unnamed terrorist group alleged to have actually perpetrated the attack on the plaintiff, that "alleged harm" is simply "'too remote' from the defendant's [allegedly] unlawful conduct".  *Lexmark Int'l, Inc.*, 134 S. Ct. at 1390 (citation omitted).  The Complaint must therefore be dismissed for failure plausibly to allege proximate cause.

## III.    THERE IS NO CONSPIRACY-BASED LIABILITY UNDER SECTION 2333

The Complaint must also be dismissed on the independent ground that it is premised on a conspiracy theory of liability that is not cognizable under Section 2333.  Plaintiffs frame their Section 2333 causes of action against each of the Moving Defendants as conspiracy-based claims.[8]  Courts in this Circuit have expressly held that such secondary liability allegations are not a basis for civil recovery under Section 2333.

---

[8] *See, e.g.*, Am. Compl. ¶ 5 ("[t]his is a civil action under 18 U.S.C. § 2333(a) by American nationals and/or their families for treble damages against six Western international banks which knowingly conspired with Iran and its banking agents (including defendant Bank Saderat Plc, Bank Melli Iran, Bank Mellat, and Bank Sepah) to evade U.S. economic sanctions and disguise financial payments"); *id.* ¶ 12 ("As used in this Complaint, 'the Conspiracy' refers to an illegal criminal agreement, beginning in 1987 and, on information and belief, continuing to the present, between Iran and its banking agents and various international financial institutions, including the Defendants in this action, by which Defendants knowingly participated in a criminal scheme in which they agreed to alter, falsify, or omit information from payment messages that involved Iran or Iranian parties (including several Iranian banks (referred to herein collectively as 'Iranian Bank Co-conspirators') such as Bank Melli and Bank Saderat, as well as the Islamic Republic of Iran Shipping Lines ('IRISL')) that serve as financial conduits for the IRGC."); "V. Overview of the Conspiracy"; "V. I. The HSBC Defendants' Agreement To, And Participation In, The Conspiracy"; "V. J. Defendant Barclays' Agreement To, And Participation In, The Conspiracy"; "V. K. Defendant Standard Chartered Bank's Agreement To, And Participation In, The

[*Continued on Next Page*]

In *Rothstein*, the Second Circuit held that, because Congress was "silent as to the permissibility of aiding and abetting liability", Section 2333 does not permit a civil cause of action premised on an aiding-and-abetting theory of liability.  *Rothstein*, 708 F.3d at 97-98.  The Second Circuit observed that Section 2333 is not "a general civil aiding and abetting statute" and that there is "no general presumption that the plaintiff may also sue aiders and abettors" under such a statute.  *Id.* at 97.  "Further counseling against a judicial interpretation of [Section 2333] as authorizing [aiding-and-abetting civil] liability" was Congress' explicit authorization of aiding-and-abetting liability in the ATA's separate criminal provisions.  *Id.* at 97-98.  The Court concluded, "[w]e doubt that Congress, having included in the ATA several express provisions with respect to aiding and abetting in connection with the criminal provisions, can have intended

Conspiracy"; "V. L. Defendant Royal Bank of Scotland N.V.'s ('ABN AMRO (RBS N.V.)') Agreement To, And Participation In, The Conspiracy"; "V. M. Defendant Credit Suisse's Agreement To, And Participation In, The Conspiracy"; "V. N. Defendant Commerzbank AG's Agreement To, And Participation In, The Conspiracy"; *id.* ¶ 1466 ("[i]n knowingly agreeing to provide, and providing, material support to Iran in an illegal manner, and knowing, or deliberately indifferent to the fact that the objects and aims of the Conspiracy were to be used in preparation for or carrying out multiple acts set forth in 18 U.S.C. § 2339A, each Defendant violated § 2339A's express prohibition against conspiring to provide material support within the meaning of § 2339A, and committed and completed overt acts in furtherance of the Conspiracy") (First Claim for Relief); *id.* ¶ 1487 ("[i]n knowingly agreeing to provide, and providing, material support to Iran in an illegal manner, and knowing, or deliberately indifferent to the fact that the objects and aims of the Conspiracy were to provide material support to Foreign Terrorist Organizations (FTOs), each Defendant violated § 2339B's express prohibition against conspiring to provide material support within the meaning of § 2339B, and committed and completed overt acts in furtherance of the Conspiracy") (Second Claim for Relief); *id.* ¶ 1505 ([a]s alleged above, at all relevant times HSBC-US knew that Iran was a country designated by the United States under section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C. 2405) as a country supporting international terrorism, yet HSBC-US nevertheless engaged in thousands of financial transactions with Iran in violation of 18 U.S.C. § 2332") (Third Claim for Relief); *id.* ¶ 1527 ("Defendants SCB, ABN Amro (RBS N.V.), and Commerzbank each utilized their respective New York branches in connection with their agreement to provide Iran material support in an illegal manner in order to effectuate and facilitate the Conspiracy, and each of those respective New York branches is a 'person in the United States' within the scope of 18 U.S.C. § 2332d(b)(2)(D).") (Fourth Claim for Relief).

§ 2333 to authorize civil liability for aiding and abetting through its silence." *Id*. at 98 (citation

omitted); *accord Al Rajhi*, 714 F.3d at 123 (again rejecting Section 2333 aiding-and-abetting

civil liability).  In rejecting aiding-and-abetting liability under Section 2333, both *Rothstein* and

the Second Circuit's subsequent decision in *Al Rajhi* relied upon the Supreme Court's decision in

*Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 185 (1994), which held

that an "implicit congressional intent to impose . . . aiding and abetting liability" in the Securities

Exchange Act of 1934 could not plausibly be inferred from "statutory silence".  The Supreme

Court explained in *Central Bank* that "Congress kn[ows] how to impose aiding and abetting

liability when it [chooses] to do so" and that if Congress had intended to impose it, "we presume

it would have used the words 'aid' and 'abet' in the statutory text.  But it did not." *Id*. at 176-77

(citations omitted).

 For the same reasons, Section 2333 does not authorize civil recovery based on a

conspiracy theory of liability.  Judge Gershon explicitly so held in the *Linde* case, dismissing "all

conspiracy claims" under Section 2333 based on *Central Bank* and *Rothstein*.  *See Linde*, 944 F.

Supp. 2d 215, 217.  In *Linde*, the plaintiffs asserted claims under Section 2333 based on an

alleged conspiracy to "provide substantial material support to Palestinian terrorist organizations

and to provide a meaningful incentive both to prospective recruits and to individuals

contemplating the commission of independent acts of violence in the name of 'popular

resistance.'" *Linde*, No. 04 Civ. 02799 (E.D.N.Y. Aug. 10, 2004) ECF No. 4, Amended

Complaint ¶ 316.  The *Linde* plaintiffs argued before Judge Gershon that *Rothstein* "[does not]

eliminate [these] conspiracy [claims]" because *Rothstein* and *Central Bank* dealt only with

"common-law" secondary liability, not secondary claims that are "imported from the [ATA's]

criminal law" in the form of Section 2333 claims premised on violations of the criminal

conspiracy provisions found elsewhere in the ATA.  *Linde*, No. 04 Civ. 02799 (E.D.N.Y. May

10, 2013) ECF No. 943, Transcript of Motion Hearing at 10, 9.  The plaintiffs in *Linde* argued

that criminal conspiracy claims pleaded in a civil case should be treated as "[civil] primary

liability with characteristics of secondary liability" and thus should be cognizable under

Section 2333.  *Id.* at 12, 9.

Judge Gershon held that these arguments are precluded by *Rothstein*.  As Judge

Gershon reasoned, *Linde*, 944 F. Supp. 2d 215, 216, after the Supreme Court held in *Central

Bank* that Section 10(b) of the Exchange Act does not reach aiding-and-abetting civil liability,

511 U.S. at 177, the Second Circuit determined that *Central Bank* also precludes a "conspiracy

cause of action under § 10(b)", *Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135

F.3d 837, 838, 841 (2d Cir. 1998).  That is, *Dinsmore* decided that the "Supreme Court's

reasoning in *Central Bank*" about not imputing congressional intent to include a secondary claim

in a statute in the face of statutory silence "applies not only to aiding and abetting claims, but to

conspiracy claims as well".  *Id.*  The *Dinsmore* Court observed that when Congress wishes to

create liability for conspiracy, it does so directly:  "[j]ust as Congress clearly knew how to

impose aiding and abetting liability when it chose to do so . . . the existence of statutes expressly

providing for conspiracy liability warrants the same conclusion" with respect to conspiracy.  *Id.*

at 842 (internal citations omitted).  It logically followed from *Rothstein* and *Dinsmore* that

Section 2333 likewise does not permit conspiracy-based theories of liability.  *See Linde*, 944 F.

Supp. 2d 215, 216.  Judge Gershon further ruled that Congress's choice to include conspiracy

liability in neighboring criminal provisions of the ATA only reinforces Congress's conscious

decision not to include conspiracy-based liability under Section 2333.  *Id*. at 217.

23

In addition, Judge Gershon rejected the *Linde* plaintiffs' asserted difference between pleading a criminal conspiracy that causes a violation of Section 2333 and pleading a civil conspiracy directly under Section 2333, *see Linde*, No. 04 Civ. 02799 (E.D.N.Y. May 10, 2013) ECF 943, Transcript of Motion Hearing at 10, 9.  Judge Gershon held that *Rothstein* precludes all conspiracy-based civil claims under Section 2333, whether characterized as a criminal or a civil conspiracy.  *Linde*, 944. F. Supp. 2d 215, 217.  The *Linde* court thus dismissed "all conspiracy claims" in that case, including both a claim that an alleged criminal conspiracy gave rise to civil liability under Section 2333, and a separate claim of civil conspiracy liability under Section 2333 itself.  *Id.*

Plaintiffs here plead the same kinds of conspiracy-based claims that were dismissed in *Linde*.  Plaintiffs define the alleged "Conspiracy" as "an illegal criminal agreement . . . to alter, falsify, or omit information from payment messages that involved Iran or Iranian parties", Am. Compl. ¶ 12; Plaintiffs allege that the Moving Defendants, through the alleged Conspiracy, violated the "express [criminal] prohibition[s] against conspiring to provide material support within the meaning of" Sections 2339A and 2339B, *id.* ¶¶ 1466, 1487; and Plaintiffs plead that the Moving Defendants thus violated Section 2333 by participating in the Conspiracy, *id.* ¶¶ 5, 12.  As recognized in *Linde*, the reasoning in *Rothstein* and *Dinsmore* precludes these claims as a matter of law.  To construe *Rothstein* otherwise "would largely undo the effect of [*Rothstein*] itself, inasmuch as many aiding and abetting claims would simply be repleaded as conspiracy claims".  *Dinsmore*, 135 F.3d at 843.  Because Plaintiffs' Section 2333 claims are all predicated on an alleged conspiracy, they must all be dismissed.[9]

---

[9] Because conspiracy liability is not available, the Moving Defendants do not here discuss in detail other legal deficiencies in the Complaint, including Plaintiffs' failure plausibly to allege the necessary elements of a conspiracy.  For example, courts have dismissed conspiracy

*[Continued on Next Page]*

IV.   **THE COMPLAINT FAILS PLAUSIBLY TO ALLEGE THAT NON-U.S. MOVING DEFENDANTS ARE "UNITED STATES PERSON[S]" OR THAT THEY ENGAGED IN "A FINANCIAL TRANSACTION WITH THE GOVERNMENT" OF IRAN UNDER SECTION 2332D**

The Third and Fourth Claims of Relief, which allege that some defendants violated a prohibition on certain financial transactions by "United States person[s]" with the government of a designated state sponsor of terrorism, must be dismissed for the additional and independent reason that they fail to satisfy the statutory requirements of 18 U.S.C. § 2332d.

First, the Fourth Claim for Relief—alleged against the non-U.S. entities Standard Chartered Bank, RBS N.V. and Commerzbank AG—fails because these entities do not qualify as a "United States person" as defined by the statute.  A "United States person" includes any "(A) United States citizen or national; (B) permanent resident alien; (C) juridical person organized under the laws of the United States; or (D) any person in the United States".  18 U.S.C. § 2332d(b)(2).  Subparagraph (C)—which applies to "juridical person[s]"—does not

---

allegations in other contexts where, as here, the plaintiff cannot show "that a defendant joined the conspiracy with the intent to commit the offenses that are its object".  *Zito v. Leasecomm Corp.*, No. 02 Civ. 8074 (GEL), 2003 WL 22251352, at *20 (S.D.N.Y. Sept. 30, 2003); *see also United States v. Coplan*, 703 F.3d 46, 71 (2d Cir. 2012) (emphasizing "the basic requirement [of conspiracy] that the person charged with conspiracy *knew* of the existence of the scheme alleged in the indictment and *knowingly joined and participated* in it") (emphasis in original) (internal quotation marks omitted).  Plaintiffs allege that Defendants participated in a conspiracy the object of which, as Plaintiffs allege it, was the "common goal of helping Iran to transfer billions of dollars through the United States while avoiding detection, scrutiny, or monitoring".  Am. Compl. ¶ 240; *see also id.* ¶ 239.  Plaintiffs do not plausibly allege that the Moving Defendants shared a "common goal" as part of the alleged Conspiracy, *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 100 (D.D.C. 2002), of "murdering and maiming U.S. servicemen and civilians in Iraq", Am. Compl. ¶ 246.  The conclusory allegations in this regard, that Defendants specifically intended to attack U.S. soldiers, are wholly implausible.  *See Mastafa*, 770 F.3d at 194.  The Moving Defendants also do not discuss here in detail the statutory bar in 18 U.S.C. § 2336(a) or Plaintiffs' failure to plausibly allege conduct satisfying each of the requirements set out in 18 U.S.C. § 2339A and § 2339B as to each Defendant.

encompass these defendants, because none is organized under "the laws of the United States". Plaintiffs do not contend otherwise.  *See* Am. Compl. ¶¶ 57-58, 59-63, 71-74.

Plaintiffs instead allege that these banks qualify as "any person in the United States" under subparagraph (D) of the definition.  That argument is legally untenable: subparagraph (D) reaches only natural persons located within the territory of the United States— as two district courts have expressly held.  *See Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 648 (S.D. Tex. 2011); *United States v. Chalmers*, 474 F. Supp. 2d 555, 565 (S.D.N.Y. 2007).  And the Supreme Court, in construing identical language with respect to sanctions against Burma, noted that this prohibition does not apply to "foreign companies".  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 379 (2000) (examining Prohibiting New Investment in Burma, Exec. Order No. 13047, 62 Fed. Reg. 28,301 (May 20, 1997)).

Because subparagraph (C) specifically addresses "juridical persons"—*i.e.*, corporations—while the other provisions do not, the remaining subparagraphs are limited to natural persons.  That is confirmed by the fact that if, as Plaintiffs assert, subparagraph (D) also reached "juridical" persons, it would render subparagraph (C) wholly superfluous, as all companies organized under the laws of the United States are also, by definition, in the United States, because that is their place of incorporation.  *See, e.g.*, *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014) (a company is located in its place of incorporation and principal place of business).  There is a strong presumption against interpreting a statute in this manner.  *Bailey v. United States*, 516 U.S. 137, 145-46 (1995) (recognizing the general assumption that "Congress intended each of its terms to have meaning" and avoid redundancies).  In sum, Section 2332d does not apply to foreign corporations such as these defendants.

Second, Plaintiffs fail to allege a "financial transaction with the government" of Iran.  18 U.S.C. § 2332d(a).  Particularly with respect to the Third Claim for Relief, Plaintiffs allege only that Iranian banks conducted wire transfers using foreign, non-U.S. banks, which in turn cleared transactions through United States clearinghouses.  *See, e.g.*, Am. Compl. ¶¶ 363, 1514-15.  That may mean that U.S. clearing banks engaged in transactions with foreign banks for the benefit of Iran.  But Plaintiffs offer no basis to conclude that those U.S. clearing banks engaged in transactions with the Iranian government itself.  Nor can Plaintiffs demonstrate that U.S. clearing banks like HSBC US knew that Iran was the beneficiary of transactions, as the nub of Plaintiffs' allegations is that this information was stripped from wire transfers before it reached the U.S. clearing bank.

**CONCLUSION**

The Complaint fails to state a claim and, accordingly, should be dismissed with prejudice in its entirety as a matter of law as to each of the Moving Defendants.

Respectfully submitted,

MAYER BROWN LLP,                              CRAVATH, SWAINE & MOORE LLP,

by                                           by
  */s/ Mark G. Hanchet*                          */s/ Richard W. Clary*
  Mark G. Hanchet                                Richard W. Clary
  1221 Avenue of the Americas                    Michael T. Reynolds
  New York, NY 10020-1001                        John D. Buretta
  (212) 506-2500                                 Worldwide Plaza
  mhanchet@mayerbrown.com                        825 Eighth Avenue
                                                 New York, NY 10019
  Andrew J. Pincus                               (212) 474-1000
  Paul W. Hughes                                 rclary@cravath.com
  1999 K Street, N.W.                            mreynolds@cravath.com
  Washington, DC 20006-1101                      jburetta@cravath.com
  (202) 263-3000
  apincus@mayerbrown.com
  phughes@mayerbrown.com                       *Attorneys for Defendant Credit Suisse
                                               AG*

*Attorneys for Defendant HSBC
Holdings PLC, HSBC Bank PLC,
HSBC Bank Middle East Limited and
HSBC Bank USA, N.A.*

SULLIVAN & CROMWELL LLP,

by

_/s/ Michael T. Tomaino, Jr._

Michael T. Tomaino, Jr.
Jeffrey T. Scott
Jonathan M. Sedlak
125 Broad Street
New York, NY 10004
(212) 558-4000
tomainom@sullcrom.com
scottj@sullcrom.com
sedlakj@sullcrom.com

*Attorneys for Defendant Barclays*
*Bank PLC*


SULLIVAN & CROMWELL LLP,

by

_/s/ Sharon L. Nelles_

Sharon L. Nelles
Bradley P. Smith
125 Broad Street
New York, NY 10004
(212) 558-4000
nelless@sullcrom.com
smithbr@sullcrom.com

*Attorneys for Defendant Standard*
*Chartered Bank*


CLIFFORD CHANCE US LLP,

by

_/s/ Steven T. Cottreau_

Steven T. Cottreau
2001 K Street NW
Washington, DC 20006-1001
(202) 912-5000
steve.cottreau@cliffordchance.com

Robert G. Houck
Jamie L. Hoxie
31 West 52nd Street
New York, NY  10019-6131
robert.houck@cliffordchance.com
jamie.hoxie@cliffordchance.com

*Attorneys for Defendant The Royal*
*Bank of Scotland N.V.*


CLEARY GOTTLIEB STEEN &
HAMILTON LLP,

by

_/s/ Lawrence B. Friedman_

Lawrence B. Friedman
Lewis J. Liman
Avram E. Luft
One Liberty Plaza
New York, NY 10006
(212) 225-2000
lfriedman@cgsh.com
lliman@cgsh.com
aluft@cgsh.com

*Attorneys for Defendant*
*Commerzbank AG*