UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

CHARLOTTE FREEMAN, et al.,                    :
                                              :        Case No. 14-CV-6601 (DLI)(CLP)
                        Plaintiffs,           :
                                              :
            -against-                         :
                                              :
HSBC HOLDINGS PLC, et al.,                    :
                                              :
                        Defendants.           :
_____

**PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iv

INTRODUCTION ........................................................................................................... 1

STANDARD OF REVIEW ............................................................................................. 6

FACTUAL ALLEGATIONS ........................................................................................... 7

A. THE ACTS OF TERRORISM IN IRAQ ..................................................................... 7

B. IRAN'S SUPPORT FOR THE TERROR CAMPAIGN IN IRAQ WAS WELL
KNOWN ....................................................................................................................... 10

C. THE CRIMINAL CONSPIRACY ............................................................................. 11

    1.    **HSBC, Barclays, SCB, RBS, Credit Suisse and Commerzbank Criminally
Conspired With Bank Saderat** ........................................................................ 13

    2.    **HSBC, Barclays, SCB, RBS, Credit Suisse and Commerzbank Criminally
Conspired With Bank Melli** ............................................................................ 14

    3.    **Defendants HSBC, SCB, RBS and Commerzbank facilitated illegal funds transfers
through the United States on behalf of IRISL** ................................................. 15

    4.    **The Defendants Were All Aware of the Illegal Nature of Their Conduct** ................ 16

ARGUMENT ................................................................................................................. 18

I. THE COMPLAINT PLAUSIBLY STATES A CLAIM FOR PRIMARY LIABILITY
UNDER 18 U.S.C. § 2333(a) BASED ON THE DEFENDANTS' CONSPIRACY ............... 18

    A.    **The Second Circuit Has Not Precluded Claims Under the ATA Predicated on
Criminal Conspiracy Violations of §§ 2339A or 2339B.** ............................. 18

    B.    **Plaintiffs Have Properly Pled Allegations Constituting Conspiracy Under
§§ 2339A and 2339B** ...................................................................................... 23

C. Credit Suisse Ignores Its Role in the Conspiracy By Eliding Over Its Admitted, Essential and Sustained Involvement in What the U.S. Government Found to be SDN Bank Melli's "deceptive banking practices." ....................................... 28

D. Violations of §§ 2339A, 2339B and 2332d Inherently Have an "Objective Terroristic Purpose." ........................................................................................... 29

II. PLAINTIFFS HAVE PLAUSIBLY PLED CAUSATION. ............................................ 31

A. The ATA § 2333(a) remedy requires proximate causation. ........................................ 33

B. The Non-conclusory Allegations of the Complaint Satisfy the Proximate Causation Standard Applicable to ATA Claims. ........................................... 33

C. The ATA Does Not Require Plaintiffs to Plead That Defendants Supplied the Funds Used for Particular Attacks. ........................................... 38

D. Defendants' Conspiracy with Iranian Banks to Criminally Evade U.S. Terror-financing Controls was a Substantial Factor in the Sequence of Responsible Causation, and Plaintiffs' Injuries Were a Reasonably Foreseeable Consequence of Such Transfers. ........................................... 42

III. THE COMPLAINT PLAUSIBLY PLEADS VIOLATIONS OF 18 U.S.C § 2332d. .... 44

A. § 2333(a) creates primary liability for violations of § 2333d. ................................... 45

B. HSBC-US, SCB, RBS and Commerzbank are U.S Persons for Purposes of § 2332d. ........................................... 46

C. The § 2332d Defendants Knowingly Engaged in Financial Transactions with the Government of Iran. ........................................... 50

IV. THIS COURT HAS SPECIFIC PERSONAL JURISDICTION OVER BANK SADERAT, PLC AND COMMERZBANK. ........................................... 54

A. Federal and State Long Arm Jurisdiction. ................................................................. 55

    1. Personal Jurisdiction Over Saderat Exists Under ATA § 2334(a). ...................... 55

    **2.**    **Personal Jurisdiction Over Saderat and Commerzbank Exists Under C.P.L.R. § 302(a)(1).** ................................................................................... **55**

    **3.**    **Personal Jurisdiction Over Saderat and Commerzbank Also Exists Under C.P.L.R. § 302(a)(2).** ...................................................................... **59**

   **B.**   **Personal Jurisdiction Over Saderat and Commerzbank Comports with Constitutional Due Process.** .......................................................... **60**

   **C.**   **Commerzbank's Asserted "book-entry" Limitation on Personal Jurisdiction is Incomprehensible.** ................................................................................ **62**

**V. THE ACT OF WAR DEFENSE DOES NOT APPLY TO THE TERRORIST ATTACKS THAT INJURED THE PLAINTIFFS.** .................................................. **62**

   **A.**   **Sporadic Terrorist Attacks Are Not an "Armed Conflict" Within the Meaning of the ATA, and There Was No "Armed Conflict" With Iraq or Iran at the Time of the Attacks.** ..................................................................................................... **65**

   **B.**   **Even If the Acts of International Terrorism Did Occur During an Armed Conflict, They Were Not Conducted by "Military Forces" Within the Meaning of the Act-of-War Defense.** ..................................................................................... **67**

   **C.**   **The Attacks Were Not Committed "In the Course of" an Armed Conflict.** ............. **73**

**CONCLUSION** ................................................................................................. **76**

# TABLE OF AUTHORITIES

**Cases**

*Abecassis v. Wyatt*,
    785 F. Supp. 2d 614 (S.D. Tex. 2010)……………………………………………..*passim*

*Acosta v. The Islamic Republic of Iran*,
    574 F. Supp. 2d 15 (D.D.C. 2008)……………………………………………………24

*Am. Banknote Corp. v. Daniele*,
    845 N.Y.S.2d 266 (1st Dept. 2007)………………………………………………...59

*Arista Records, LLC v. Doe 3*,
    604 F.3d 110 (2d Cir. 2010)……………………………………………………….6

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
    305 F.3d 120 (2d Cir. 2002)……………………………………………………...61

*Beach v. Citigroup Alternative Investments LLC*,
    No. 12 Civ. 7717(PKC), 2014 WL 904650 (S.D.N.Y. March 7, 2014)…………………60

*Belkin v. The Islamic Republic of Iran*,
    667 F. Supp. 2d 8 (D.D.C. 2009)………………………………………………...24

*Bensusan Rest. Corp. v. King*,
    126 F.3d 25 (2d Cir. 1997)……………………………………………………….59

*Best Van Lines, Inc. v. Walker*,
    490 F.3d 239 (2d Cir. 2007)………………………………………………...54, 60-61

*Biton v. Palestinian Interim Self-Government Auth.*,
    510 F. Supp. 2d 144 (D.D.C. 2007)……………………………………………...55

*Biton v. The Palestinian Interim Self-Gov't Auth.*,
    412 F. Supp. 2d 1 (D.D.C. 2005)………………………………………………...63

*Boim v. Holy Land Found. for Relief and Dev. (Boim III)*,
    549 F.3d 685 (7th Cir. 2008)……………………………………………..*passim*

*Boim v. Quranic Literacy Inst.*,
    340 F. Supp. 2d 885 (N.D. Ill. 2004)…………………………………………….24

*Brady v. Basic Research, L.L.C.*,
    No. 13–CV–7169 (SJF), 2015 WL 1542094 (E.D.N.Y. Mar. 31, 2015)………………...60

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)……………………………………………………………………...61

*Burnett v. Al Baraka Investment and Development Corp.*,
No. CIV.A.02–1616 (JR) (D.D.C. Aug. 27, 2003)………………………………………36

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994)……………………………………………………………………18-19

*Chloé v. Queen Bee of Beverly Hills, LLC*,
616 F.3d 158 (2d Cir. 2010)……………………………………………………………...54

*Commodity Futures Trading Comm'n v. Gibraltar Monetary Corp.*,
No. 04-80132-CIV, 2006 WL 1789018 (S.D. Fla. May 30, 2006)………………………47

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000)…………………………………………………………………...47, 48-49

*Dale v. Banque SCS Alliance S.A.*,
No. 02Civ.3592(RCC)(KNF), 2005 WL 2347853, (S.D.N.Y. Sept. 22, 2005)…………54

*Daventree Ltd. v. Republic of Azerbaijan*,
349 F. Supp. 2d 736 (S.D.N.Y. 2004)…………………………………………………...55

*Emerald Asset Advisors, LLC v. H. Cy Schaffer*,
895 F. Supp. 2d 418 (E.D.N.Y. 2012)…………………………………………………...60

*Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch*,
919 F. Supp. 2d 411 (S.D.N.Y. 2013)…………………………………………………..52-53

*Estate of Klieman v. Palestinian Authority*,
424 F. Supp. 2d 153 (D.D.C. 2006)…………………………………………………63, 73-74

*Gill v. Arab Bank, PLC*,
893 F. Supp. 2d 474 (E.D.N.Y. 2012)……………………………………………*passim*

*Goldberg v. UBS AG*,
660 F. Supp. 2d 410 (E.D.N.Y. 2009)…………………………………………………39, 61-62

*Hemi Grp. LLC v. City of New York*,
559 U.S. 1 (2010)………………………………………………………………………...33

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010)………………………………………………………………………...39

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
    333 F.3d 156 (D.C. Cir. 2003)…………………………………………………………….2

*Hussain v. Mukasey*,
    518 F.3d 534 (7th Cir. 2008)……………………………………………………………39

*In re Chiquita Brands Int'l Inc. Alien Tort Statute & S'holder Derivative Litig.*,
    690 F. Supp. 2d 1296 (S.D. Fl. 2010)…………………………………………………39

*In re Satyam Computer Services Ltd. Securities Litigation*,
    915 F. Supp. 2d 450 (S.D.N.Y. 2013)………………………………………………...60

*In re Sept. 11 Litig.*,
    751 F.3d 86 (2d Cir. 2014) *cert. denied sub nom. Cedar & Washington Associates,*
    *LLC v. Port Auth. of New York & New Jersey*, 135 S. Ct. 742 (2014)………………63,64

*In re Terrorist Attacks on Sept. 11, 2001*,
    349 F. Supp. 2d 765 (S.D.N.Y. 2005)………………………………………………...55

*In re Terrorist Bombings of U.S. Embassies in E. Africa*,
    552 F.3d 93 (2d Cir. 2008)…………………………………………………………...26-27

*Kaplan v. Central Bank of Islamic Republic of Iran*,
    961 F. Supp. 2d 185 (D.D.C. 2013)…………………………………………………..63,66

*Keiler v. Harlequin Enterprises Ltd.*,
    751 F.3d 64 (2d Cir. 2014)…………………………………………………………...7

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
    376 F.3d 1123 (D.C. Cir. 2004)………………………………………………………39

*King v. Burwell*,
    No. 14-114, 2015 WL 2473448 (U.S. June 25, 2015)………………………………49, 74

*Lerner v. Fleet Bank N.A.*,
    459 F.3d 273 (2d Cir. 2006)…………………………………………………………...33

*Lerner v. Fleet Bank N.A.*,
    318 F.3d 113 (2d Cir. 2003)…………………………………………………………...33

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013)…………………………………………………………55-56

*Licci v. Lebanese Canadian Bank, SAL*,
    20 N.Y.3d 327 (2012)……………………………………………………………58, 59, 62

*Linde v. Arab Bank, PLC*,
  No. 04–cv–2799 (BMC)(VVP), 2015 WL 1565479 (April 8, 2014 E.D.N.Y.).......*passim*

*Linde v. Arab Bank, PLC*,
  944 F. Supp. 2d 215 (E.D.N.Y. 2013)……………………………………………...21

*Linde v. Arab Bank, PLC*,
  384 F. Supp. 2d 571 (E.D.N.Y. 2005)……………………………………………...39

*Matter of Extradition of Marzook*,
  924 F. Supp. 565 (S.D.N.Y. 1996)……………………………………………...24-25

*Metro. Life Ins. Co. v. Robertson–Ceco Corp.*,
  84 F.3d 560 (2d Cir. 1996)……………………………………………………………61

*Moore v. Paine Webber, Inc.*,
  189 F.3d 165 (2d Cir. 1999)……………………………………………………...33

*Morris v. Khadr*,
  415 F. Supp. 2d 1323 (D. Utah 2006)…………………………………………63, 68, 70

*Nat'l Council of Resistance of Iran v. Dep't of State*,
  373 F.3d 152 (D.C. Cir. 2004)……………………………………………………...51

*O'Neill v. Al-Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)*,
  714 F.3d 118 (2d Cir. 2013)……………………………………………………36, 42

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*,
  595 F.3d 86 (2d Cir. 2010)…………………………………………………………...7

*Pan American World Airways, Inc. v. Aetna Cas. & Surety Co.*,
  505 F.2d 989 (2d Cir. 1974)……………………………………………………...71

*Pinkerton v. United States*,
  328 U.S. 640 (1946)……………………………………………………………...23

*Rothstein v. UBS AG*,
  708 F.3d 82 (2d Cir. 2013)………………………………………………………*passim*

*Shpak v. Curtis*,
  10-CV-1818 RRM JO, 2011 WL 4460605 (E.D.N.Y. Sept. 26, 2011)………………59-60

*Sisso v. Islamic Republic of Iran*,
  448 F. Supp. 2d 76 (D.D.C. 1990)……………………………………………………61

*Smith v. Califano*,
597 F.2d 152 (9th Cir. 1979)……………………………………………………………….47

*Sokolow v. Palestine Liberation Organization*,
60 F. Supp. 3d 509 (S.D.N.Y. 2014)……………………………………………………….20

*Sokolow v. Palestinian Liberation Org.*,
583 F. Supp. 2d 451 (S.D.N.Y. 2008)………………………………………………….63, 68

*Stansell v. BGP, Inc.*,
No. 8:09–cv–2501–T–30AEP, 2011 WL 1296881 (S.D. Fla. Mar. 31, 2011)…..39, 63, 74

*Strauss v. Credit Lyonnais, S.A.*,
925 F. Supp. 2d 414 (E.D.N.Y. 2013)……………………………………………….20, 29-30

*Strauss v. Credit Lyonnais S.A.*,
2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006)……………………………………………..39

*Stutts v. De Dietrich Group*,
No. 03-CV-4058 (ILG), 2006 WL 1867060 (E.D.N.Y. 2006)………………………63, 73

*Tamam v. Fransabank Sal*,
677 F. Supp. 2d 720 (S.D.N.Y. 2010)………………………………………………...58

*Turkmen v. Ashcroft*,
589 F.3d 542 (2d Cir. 2009)……………………………………………………………..6-7

*Turkmen v. Hasty*,
No. 13-1002, 2015 WL 3756331 (2d. Cir. June 17, 2015)………………………………38

*Ungar v. Islamic Republic of Iran*,
211 F. Supp. 2d 91 (D.D.C. 2002)……………………………………………………23-24

*United States v. Bruno*,
873 F.2d 555 (2d Cir. 1989)……………………………………………………………...24

*United States v. Chalmers*,
474 F. Supp. 2d 555 (S.D.N.Y. 2007)…………………………………………………...48

*United States v. Coplan*,
703 F.3d 46 (2d Cir. 2012)………………………………………………………………23

*United States v. Gallerani*,
68 F.3d 611 (2d Cir. 1995)……………………………………………………...23-24

*U.S. v. Garcia*,
  509 F. App'x 40 (2d Cir. 2013)……………………………………………………………...25, 26

*United States v. Lindh*,
  212 F. Supp. 2d 541 (E.D. Va. 2002)………………………………………………….69, 72

*United States v. Parkes*,
  497 F.3d 220 (2d Cir. 2007)……………………………………………………………24

*Weinstein v. Islamic Republic of Iran*,
  609 F.3d 43 (2d Cir. 2010)……………………………………………………………52

*Weiss v. Arab Bank, PLC*,
  No. 06 CV 1623(NG)(VVP), 2007 WL 4565060 (E.D.N.Y. Dec. 21, 2007)………*passim*

*Weiss v. National Westminster Bank PLC*,
  768 F.3d 202 (2d Cir. 2014)……………………………………………………...38

*Weiss v. Nat'l Westminster Bank PLC*,
  453 F. Supp. 2d 609 (E.D.N.Y. 2006)……………………………………………...39

*Wultz v. Islamic Rep. of Iran*,
  762 F. Supp. 2d 18 (D.D.C. 2011)……………………………………………………55

*Wultz v. Islamic Republic of Iran*,
  755 F. Supp. 2d 1 (D.D.C. 2010)……………………………………………………...39

*Zito v. Leasecomm Corp.*,
  No. 02 Civ. 8074 (GEL), 2003 WL 22251352 (S.D.N.Y. Sept. 30, 2003)………………23

## Statutes & Rules

Fed. R. Civ. P. 4(k)(C)……………………………………………………………...54

18 U.S.C. § 956(a)(1)……………………………………………………………….20

18 U.S.C. § 1956(c)(4)……………………………………………………………...44

18 U.S.C. § 2331(1)(A)……………………………………………………………...22

18 U.S.C. § 2331(1)(B)……………………………………………………………...30

18 U.S.C. § 2331(3)……………………………………………………………...47

18 U.S.C. § 2331(4)……………………………………………………………...73

18 U.S.C. § 2331(4)(C)…………………………………………………………..68

18 U.S.C. § 2332a(a)(1)…………………………………………………………20

18 U.S.C. § 2332a(c)(2)(A)………………………………………………………9

18 U.S.C. § 2332b(a)(2)…………………………………………………………20

18 U.S.C. 2332d………………………………………………………………….5

18 U.S.C. 2332d(a)……………………………………………………………..44

18 U.S.C. 2332d(b)(1)………………………………………………………….44

18 U.S.C. 2332d(b)(2)……………………………………………………44, 46-47

18 U.S.C. § 2332f(a)(2)…………………………………………………………20

18 U.S.C. § 2333(a)……………………………………………………………..68

18 U.S.C. § 2334(a)…………………………………………………….5, 54, 55

18 U.S.C. § 2336………………………………………………………………..6

18 U.S.C. § 2339A…………………………………………………………...20-21

18 U.S.C. § 2339B……………………………………………………………..21

28 U.S.C. § 1602……………………………………………………………….75

28 U.S.C. § 1605A……………………………………………………………..75

31 C.F.R. § 560.203…………………………………………………………44, 47

31 C.F.R. § 560.204…………………………………………………………29, 47

31 C.F.R. § 560.304…………………………………………………………...52

31 C.F.R. § 560.313…………………………………………………………...51

31 C.F.R. § 560.319…………………………………………………………...48

31 C.F.R. § 560.327…………………………………………………………...50

31 C.F.R. § 560.516………………………………………………………..47, 50

31 C.F.R. § 594.315………………………………………………………………...50

N.Y. C.P.L.R. § 302(a)(1)…………………………………………………………55-56

N.Y. C.P.L.R. § 302(a)(2)………………………………………………………...59

## **Other Authorities**

136 Cong. Rec. S4568-01 (daily ed. April 19, 1990)……………………………………...67-68

David D. Siegel, *Practice Commentary for Rule 4*……………………………………………55

Exec. Order No. 13599, 77 Fed. Reg. 26 (Feb. 6, 2012)……………………………………...52

H. Rep. 102-1040, at 7 (1992)…………………………………………………67, 69-70

Pub. L. No. 104-208, 110 Stat. 3009-166, § 570(b)…………………………………………..48

Pub. L. No. 104-208, 110 Stat. 3009-170, § 581(c)…………………………………………...48

Pub. L. No. 102-1, 105 Stat. 3 (Jan. 4, 1991)………………………………………………67

S. Rep. 102-342 at 46 (1992)………………………………………………………67

S.C. Res. 1546, U.N. Doc. S/RES/1546 (June 7, 2004)………………………………………65

S.C. Res. 1511, U.N. Doc. S/RES/1511 (Oct. 16, 2003)……………………………………...65

S.C. Res. 678, U.N. Doc. S/RES/678 (Nov. 29, 1990)………………………………………67

Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949 (GPW), art. 4(A)(2)………………………………………………………………………...68

Protocol Additional to the Geneva Convention of Aug. 12, 1949, and Relating to the Protection of Victims of International Armed Conflicts, June 8, 1977 (Protocol I), art. 44(3)……………..69

## INTRODUCTION

The Amended Complaint ("AC" or "Complaint") sets forth criminal conduct that is unprecedented in its scope and in the magnitude of terrorism that it facilitated. Improvised explosive devices ("IEDs") (including Iranian explosively formed penetrators ("EFPs")) killed hundreds of Americans (as well as Coalition Forces and innocent civilians) in Iraq between 2004 and 2011. While no civil case previously brought under the Anti-Terrorism Act ("ATA") is therefore entirely analogous to this one, Plaintiffs' factual allegations clearly satisfy the statute's requirements.

The Complaint makes clear that as a U.S.-designated State Sponsor of Terrorism, Iran faced a long-standing dilemma. On one hand, the vast majority of its foreign trade involved oil and natural gas exports, which were paid for in U.S. Dollars ("USD"). AC ¶82. On the other hand, it could not move or invest the USD payments for its oil and gas exports around the world on any significant scale without clearing those dollars through the United States, where those transactions would be scrutinized by U.S. regulators and law enforcement to detect and prevent terror-financing. Unsurprisingly, as a State Sponsor of Terrorism, Iran wanted to use large sums of its export dollars precisely to finance terrorism, as well as to support its clandestine nuclear program. Iran's solution to its dilemma was to order its own instrumentalities, including state-controlled entities and banks such as the Central Bank of Iran ("CBI"), to help it secretly launder its USD oil and natural gas revenues through the United States, thereby avoiding detection by U.S. regulatory authorities.

But Iran's state-owned entities and banks could not accomplish this alone. For this money-laundering - terror-financing scheme to succeed, they needed large foreign banks who actively engaged in USD-clearing willing to collude in Iran's illicit activities. Put another way,

for such a conspiracy to work, Iran could not depend on small regional banks; it required the complicity of large foreign banks *already* engaged in huge volumes of USD clearing, so that their "new" Iranian business would not automatically raise alarms for U.S. regulators. And, of course, these large foreign banks also had to agree to and execute a complex and continuing criminal conspiracy with a known State Sponsor of Terrorism for the purpose of violating multiple U.S. criminal laws (as set forth in detail below).

Iran's need for clandestine access to U.S. dollar clearing became even more acute after 2003 because it decided to instigate a terror campaign in Iraq on a scale (and at a cost) it had never previously attempted. The terror campaign, orchestrated by its proxy, Hezbollah (a U.S.-designated Foreign Terrorist Organization or "FTO"),[1] the Iranian Revolutionary Guards Corps ("IGRC"), and its specialized terrorism directorate, the Qods Force ("IRGC-QF") (a U.S.-designated Specially Designated Global Terrorist ("SDGT")[2] specifically required US dollars to fuel the violence. Nearly all of these funds were therefore cleared through the United States by the Defendants and their co-conspirators, including Defendant and SDGT, Bank Saderat,[3] Specially Designated National ("SDN") Bank Melli, SDN IRGC, and SDN Islamic Republic of

---

[1]     Foreign Terrorist Organization is defined as an organization designated under 8 U.S.C. § 1189, which authorizes the Secretary of State to designate an organization as a foreign terrorist organization. Pursuant to § 1189, the Secretary of State designated Hezbollah an FTO on October 8, 1997. U.S. Dep't of State Bureau of Counterterrorism, Foreign Terrorist Organizations, http://www.state.gov/j/ct/rls/other/des/123085.htm (last visited July 1, 2015).

[2]     Specially Designated Global Terrorists are designated pursuant to Executive Order 13224 issued under the International Emergency Economic Powers Act, ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, which authorizes the President to declare a national emergency when an extraordinary threat to the United States arises that originates in substantial part in a foreign state. For a general explanation of the mechanics of SDGT designation, see *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162, 166 (D.C. Cir. 2003).

[3]     U.S. Treasury officials repeatedly affirmed that "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hezbollah and other terrorist organizations each year" and that "a Hezbollah-controlled organization [] has received $50 million directly from Iran through Bank Saderat since 2001." AC ¶¶261-62.

Iran Shipping Lines ("IRISL").[4]

According to U.S. government findings – on which almost all of the factual allegations of this Complaint directly rest – at least $200 million (of this illegal stream of hundreds of *billions* of dollars that Iran laundered through the U.S.) flowed to Hezbollah, a U.S.-designated FTO, and to the IRGC's Qods Force, itself designated an SGDT (in large part for its role in facilitating the terror campaign in Iraq that injured the Plaintiffs). The United States government has also publicly identified these two instruments of Iranian-sponsored terrorism as having orchestrated, trained, planned, recruited, armed, and paid for terrorist attacks against Americans in Iraq, and as having exclusively and jointly designed, manufactured, and supplied a signature weapon – the EFP – that was used to target, maim, and murder Americans and others.

Defendants dismiss these allegations as "conclusory." Yet they are not only based on (and frequently directly quote) detailed U.S. government factual findings (many associated with the designation of terrorist entities), they are also predicated upon, and frequently quote, Defendants' *own admissions* in Deferred Prosecution Agreements ("DPAs"), which they "agree[d] and stipulate[d]" to be "true and accurate" and to "establish beyond a reasonable doubt" the deferred criminal charges. *See, e.g.*, Commerzbank DPA, Att. A at ¶1 attached as Exhibit A to the Schlanger Decl.[5] After such admissions in public filings, it would take a willing

---

[4]     Bank Melli, the IRGC and IRISL were designated pursuant to Executive Order 13382 issued under IEEPA.

[5]     *See, e.g.* AC ¶497 referencing SCB's DPA. *See* Exhibit B to the Schlanger Declaration at ¶20 ("DOJ has alleged, and SCB accepts, that its conduct, as described herein, violated Title 18, United States Code, Section 371, *by conspiring* to violate the International Emergency Economic Powers Act … specifically Title 50, United States Code, Section 1705, which makes it a crime to willfully attempt to commit, conspire to commit, or aid and abet in the commission of any violation of the regulations prohibiting the export of services from the United States to Iran ….") (emphasis added). *See also* Schlanger Decl. Exhibit C, HSBC DPA, Att. A at ¶2 ("HSBC Bank USA and HSBC Holdings hereby agree and stipulate that the following information is true and accurate."); Schlanger Decl. Exhibit D, Barclays DPA, Ex. 1 ¶18 ("DOJ alleges, and Barclays admits, that Barclays' conduct, as described herein, violated TWEA…. DOJ further alleges, and Barclays admits, that Barclays' conduct, as described herein, violated the International Emergency Economic Powers Act"); Schlanger Decl. Exhibit E, ABN Amro (RBS) DPA, Ex. A ¶23 ("The Government alleges and ABN agrees that ABN violated Title 18, United States Code, Section 371, by conspiring …); Schlanger Decl. Exhibit E, Credit Suisse DPA, Ex. A ¶14 ("DOJ has alleged, and Credit Suisse

suspension of disbelief to accept Defendants' claim that the very same admissions asserted in the Complaint are "conclusory."

It is clear that the Defendants do not view the Deferred Prosecution Agreements they signed or the fines they paid as marks of shame, but rather *as grants of immunity*, shielding them from the legal consequences of a decade of serving as what Judge Posner termed "financial angels"[6] of the world's most lethal State Sponsor of Terrorism. Having escaped meaningful criminal prosecution because they are considered "too big to jail," they now ask this Court to rule, as a matter of law, that they are entirely beyond the reach of American justice.

The ATA, however, offers them no such safe harbor from their crimes.

First, under settled Second Circuit precedent, they are liable for all of the foreseeable acts of the conspiracy they willingly joined, whether or not they shared every one of its objectives or "intended to achieve a terroristic purpose," as the HSBC and RBS Defendants claim.

Second, the Second Circuit's decision in *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013), does not require dismissal of the Complaint for failure to plead proximate causation. Unlike the *Rothstein* complaint, the Complaint here plausibly alleges the direct link between the co-conspirators' conduct and their substantial assistance to Hezbollah and the IRGC, which orchestrated the acts of international terrorism that injured the Plaintiffs. No court has ever accepted the Defendants' assertion that Plaintiffs must trace specific funds to – (1) the specific attacks that injured them; (2) the specific terrorists who detonated the EFPs that killed or injured them; or (3) the specific terrorists who kidnapped and murdered them or their family members.

---

admits, that Credit Suisse's conduct, as described herein, violated Title 50, United States Code, Section 1705, part of the International Emergency Economic Powers Act … which makes it a crime to willfully violate or attempt to violate any regulation issued under IEEPA, to wit, Title 31, Code of Federal Regulations, Sections 560.203 and 560.204 …").

[6]      *Boim v. Holy Land Found. for Relief and Dev. (Boim III)*, 549 F.3d 685, 690 (7th Cir. 2008).

This Court should not be the first to do so, for the multiple sound reasons that all courts that have previously considered this assertion have rejected it.

Third, Defendants' ultimate fallback, that Iran might have financed the terrorist attacks on Plaintiffs without Defendants' participation, is merely an indirect way of arguing for the same "but for" causation standard that every court to date has rejected. *See Boim III*, 549 F.3d at 696 ("the tortfeasor cannot avoid liability by pointing to an alternative *unlawful* cause of the damage that he inflicted...."). Without the Defendants' assistance, Iran might still have played a role as the arsonist of Iraq, setting fire to America's painstaking efforts to bring stability and security to that country during and after the occupation. But it was the Defendants, more than any other known actors, that provided the gasoline for the fire. It was they who decided **to give Iran clandestine access to hundreds of billions of dollars** – the "access to the international financial system" that the U.S. government itself concluded had "enable[d] the Iranian regime to facilitate its support for terrorism and proliferation." The magnitude and lethality of the terrorism that attended this conduct was not just foreseeable, but brutally inevitable.

Fourth, the Complaint plausibly states claims under 18 U.S.C. § 2332d against specific defendants that were both "juridical persons organized under the laws of the United States" and persons "in the United States" within the meaning of this provision. The Defendants' effort to define the "government of a state sponsor of terrorism" to exclude the agents and instrumentalities through which it operates would give State Sponsors of Terrorism (and Defendants) a get-out-of-§2332d-for-free card that would neuter this and numerous other criminal provisions.

Fifth, Congress expressly created nationwide personal jurisdiction for ATA claims. 18 U.S.C. § 2334(a) (authorizing nationwide service of process wherever the defendant resides, is

found, or has an agent). In addition, New York's long arm statute provides personal jurisdiction. Both bases of jurisdiction satisfy the applicable due process limits for the unlawful transactions purposefully directed through the United States that are at the center of Plaintiffs' claims.

Finally, Congress did not simultaneously create a civil remedy for American victims of "acts of international terrorism," and then remove it by labeling acts of international terrorism as "acts of war." What Bank Saderat Plc ("Bank Saderat" or "Saderat") itself calls "clashes" of violence in the "aftermath" of major combat operations in Iraq are squarely acts of international terrorism. They were not an "armed conflict" within the meaning of the ATA's "act-of-war" exception, 18 U.S.C. § 2336. Hezbollah, the IRGC and their terrorist proxies were not "military forces" either. *Id.* Just as this Court should not be the first to accept Defendants' strict "but for" causation argument, it should also not be the first to find that the kidnapping and murder of Americans in Iraq by criminal gangs who did not fight openly, wear uniforms, or follow the laws of war, are "acts of war" that immunize Defendants from liability.

This Court should deny Defendants' motions to dismiss and give Plaintiffs the chance to prove their claims – the type of claims that Congress vindicated and that the ATA affords.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a), which governs the Complaint, does not "'require heightened fact pleading of specifics.'" *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' … A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (citations omitted).

A complaint need not "contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." *Keiler v. Harlequin Enterprises Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014). "The court accepts all well-pleaded allegations in the complaint as true, drawing all reasonable inferences in the plaintiff's favor." *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010).

## FACTUAL ALLEGATIONS

### A. THE ACTS OF TERRORISM IN IRAQ

Following the end of combat operations against the Government of Iraq and its military force in May, 2003, Iran was determined to increase its influence in Iraq. To this end, Iran armed, trained, and funded a variety of Shi'a groups in an effort to kill and maim Coalition troops, and slaughter, kidnap and mutilate ordinary Iraqis. AC ¶¶10, 149, 171, 175.

Iran executed its terror campaign in Iraq with substantial assistance from Hezbollah, a Lebanese terrorist organization that the United States first designated an FTO in 1997. AC ¶9. Hezbollah established Unit 3800, dedicated to aiding Shi'a terror cells in Iraq. AC ¶138. Unit 3800 trainers and operatives worked alongside officers from the IRGC (led by General Qassem Suleimani), which the United States first designated an SDGT in 2007. AC ¶10. The IRGC formed Department 1000 (also known as the Ramezan Corps) expressly to facilitate terrorist attacks on Coalition Forces and civilians in Iraq. AC ¶193.

The January 20, 2007 coordinated terrorist attack against the Provincial Joint Coordination Center ("PJCC") in Karbala is a paradigmatic example of Iran's terror campaign

during this time period.[7] It was planned by Hezbollah under the direction of IRGC protégé and surrogate and senior Hezbollah commander Ali Musa Daqduq,[8] and carried out by an Iraqi Shi'a terrorist group known as Asa'ib Ahl al-Haq ("AAH"), AC ¶645, with detailed intelligence provided to the terrorists by the IRGC. AC ¶658. The commander of the AAH strike team was himself trained in Iran by Hezbollah operatives for this mission. AC ¶¶663-64. Thus, although AAH operatives ultimately pulled the triggers that killed the captive U.S. servicemen (in cold blood), their kidnapping and murder was orchestrated, trained, funded, and informed by Hezbollah and the IRGC, the very entities to which Iran's banking co-conspirators were found by the United States government to have transferred more than $100 million USD. AC ¶¶137, 252, 261-62.

In fact, when the U.S. designated the IRGC's Qods Force in October 2007 as an SDGT, it specifically found that it "provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians." AC ¶10. In addition to Hezbollah itself, Iran armed, trained, and funded:

- Kata'ib Hezbollah ("KH"); AC ¶¶ 202-18[9];
- Mahdi Army ("JAM"); AC ¶¶196-98, 215;
- Asaib Ahl al-Haq; AC ¶¶219-25; and
- Promised Day Brigades; AC ¶¶199-201.

---

[7]    Plaintiffs' decedents Johnathon M. Millican, Brian S. Freeman, Shawn P. Falter and Johnathan B. Chism were among those killed in the attack. Plaintiffs Billy Wallace, Evan Kirby, Johnny Washburn and Marvin Thornsberry were injured in the attack.

[8]    The U.S. Treasury Department's November 19, 2012 press release announcing Daqduq's designation as an SDGT stated, in part: "Daqduq is a senior Hezbollah commander responsible for numerous attacks against Coalition Forces in Iraq, including planning an attack on the Karbala Joint Provincial Coordination Center (JPCC) on January 20, 2007, which resulted in the deaths of five U.S. soldiers." According to the U.S. government, Daqduq *was in Iraq working as a surrogate for Iranian Revolutionary Guards Corps Quds Force operatives involved with special groups.*" AC ¶¶666, 668.

[9]    On June 24, 2009 Kata'ib Hezbollah was designated an FTO under Section 219 of the Immigration and Nationality Act and also designated an SDGT. http://www.state.gov/r/pa/prs/ps/2009/july/125582.htm.

Iran's funding of these groups was not limited to generalized financial support. Intelligence estimates indicate that Iran specifically paid its terror proxies in Iraq "between $4,000 and $13,000 per rocket or roadside bomb, depending on the circumstances." AC ¶151. Iran's arming of these groups through Hezbollah and the IRGC included a wide array of weapons, but the key signature of Iran's efforts to kill and maim Americans in Iraq was the EFP – shaped charges, made with a manufactured concave copper disk and a high explosive packed behind the liner.[10] In Iraq, EFPs were often triggered by a passive infrared device that detonated the explosion within the EFP's casing, forcing the copper disk forward and turning it into a high velocity slug that could pierce most military-grade armor. AC ¶¶165-68. Unlike homemade explosive devices such as traditional IEDs used by Al Qaeda and other terrorist groups, the EFPs manufactured by Hezbollah and IRGC were far more sophisticated and were designed specifically to target American and Coalition armored vehicles – with lethal results. *Id.* They were also identifiable as weapons of Iranian-origin. AC ¶176.

The Complaint specifically quotes the U.S. State Department's 2006 Country Reports on Terrorism:

> Iran provided guidance and training to select Iraqi Shia political groups, and weapons and training to Shia militant groups to enable anti-Coalition attacks. Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hezbollah. *The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces*. The Revolutionary Guard, along with Lebanese Hezbollah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. These individuals then passed on this training to additional militants in Iraq.

AC ¶170 (emphasis added).

---

[10]     Under the ATA, IEDs and EFPs are deemed "weapons of mass destruction" as that term is defined in 18 U.S.C. § 2332a(c)(2)(A).

**B.      IRAN'S SUPPORT FOR THE TERROR CAMPAIGN IN IRAQ WAS WELL KNOWN.**

Contemporaneous U.S. government reports were not the only publicly available sources linking Iran, Hezbollah and the IRGC to "the increasing lethality of anti-Coalition attacks by … Shia militants" and their use of Iranian-origin EFPs. The Complaint cites numerous, credible, public sources linking Iran and its proxies to these lethal weapons, including the:

1. 2006 public statement by Brigadier Gen. Michael Barbero, Deputy Chief of Staff for Strategic Operations of the Multi-National Force – Iraq, "I think it's irrefutable that Iran is responsible for training, funding and equipping some of these Shi'a extremist groups and also providing advanced IED technology to them, and there's clear evidence of that." AC ¶171.

2. 2006 public statement by General Kevin Bergner that Shi'a groups in Iraq "receive arms -- including explosively formed penetrators, the most deadly form of improvised explosive device -- and funding **from Iran**. They also have received planning help and orders from Iran." AC ¶175 (emphasis added).

3. May 2007 public statement by the Commander of the Multinational Division-Center, U.S. Army Major General Richard Lynch, "*What we're finding is that the technology and the financing and the training of the explosively formed penetrators are coming from Iran. The EFPs are killing our soldiers, and **we can trace that back to Iran**.*" AC ¶176 (emphasis added).

4. Department of Defense's 2007 quarterly report to Congress, which similarly concluded, "The Iranian regime's primary tool for exercising clandestine influence in Iraq is the Islamic Revolutionary Guard Corps' (IRGC) Qods Force (QF), which provides arms, intelligence, funds, training, and propaganda support to Iraqi Shi'a militants targeting and killing Coalition and Iraqi forces, as well as Iraqi civilians…. Among the weapons it provides to Iraqi militants are improvised explosive devices (IEDs), advanced IED technologies (including explosively formed projectiles (EFPs)), and rockets and mortars used for indirect fire attacks." AC ¶178.

The Complaint also cites numerous occasions in which the direct link between Iran and the use of EFPs against Coalition Forces in Iraq was publicized in the media. AC ¶¶25-27.

It is therefore *highly* plausible that Iran's role in sponsoring terrorism was well known to the Defendants, as was its role in orchestrating terrorist attacks against American targets and civilians in Iraq. So, too, Defendants well understood that Iran was using its banks – Defendants'

own customers – to transfer funds to terrorists, and that this was a reason for U.S. terror-financing regulation. In fact, this is more than plausible; it was admitted by an HSBC compliance officer in a 2006 email to senior HSBC Group officials:

> … whilst *having direct evidence against Bank Saderat particularly in relation to the alleged funding of Hezbollah*, [U.S. policymakers] suspected all major Iranian State owned banks of involvement in terrorist funding and WMD [weapons of mass destruction] procurement.

AC ¶367 (emphasis added).

## C.    THE CRIMINAL CONSPIRACY

Against this backdrop of widely documented Iranian-orchestrated terrorism directed at Americans in Iraq, the Complaint alleges that the Defendants (knowing that Iran was a U.S.-designated State Sponsor of Terrorism) actively participated in a *criminal* conspiracy with Iran (the "Conspiracy") and its agents to alter, falsify, or omit information from payment messages they directed through accounts in the United States on behalf of Iran and Iranian-controlled banks such as Bank Melli and Bank Saderat, on behalf of such Iranian instrumentalities as the Islamic Republic of Iran Shipping Lines ("IRISL"), and National Iranian Oil Company ("NIOC"), that served as financial conduits to the IRGC. AC ¶¶12, 37.

The aims and objectives of the Conspiracy, included, among others:

1.    Concealing Iran's financial activities and transactions from detection, scrutiny, or monitoring by U.S. regulators, law enforcement, and/or depository institutions;

2.    Facilitating illicit transactions totaling at least $50 million USD for the benefit of Hezbollah;

3.    Facilitating illicit transactions totaling at least $100 million USD for the benefit of the IRGC;

4.    Facilitating at least hundreds of illicit transactions on behalf of IRISL totaling more than $60 million USD, including over 150 "stripped" transactions *after* IRISL was designated an SDN; and

5.   Enabling Iran and its agents to perpetrate the acts of international terrorism that injured the Plaintiffs in this case. AC ¶13.

Although the Conspiracy was effectuated through various methods, two primary techniques were used by Iran acting in concert with the Defendants:

1.   The Defendants removed or altered the names, Bank Identifier Codes ("BICs"), and other identifying information of the Iranian banks or other Iranian counter-parties in the payment messages sent through U.S. correspondent banks – a practice commonly known and referred to as "stripping" transactions; and

2.   The Defendants converted ordinary transactions involving SWIFT "MT 103" payment messages (that would disclose the details of the counter-parties to the transactions)[11] into bank-to-bank transfers known as SWIFT "MT 202" payment messages (that did not require the transmitting bank to include information disclosing the originator, beneficiary, and counter-parties), for the specific purpose of concealing the origin and destination of Iranian funds transfers. AC ¶14.

The existence of the Conspiracy and the Defendants' role in illegally concealing Iran's financial activities and transactions from detection, scrutiny, or monitoring by U.S. regulators, law enforcement, and/or depository institutions is not in dispute. Over the past six years, each Defendant (except Bank Saderat) entered into a DPA with U.S. prosecutors (often accompanied by consent orders with federal, and, in some cases, state regulators) and *admitted* to concealing Iranian financial activities and transactions from detection, scrutiny, or monitoring by U.S. regulators, law enforcement, and/or depository institutions. HSBC (AC ¶¶372-73); Barclays Bank Plc ("Barclays") (AC ¶¶446-47); ABN Amro ("Royal Bank of Scotland N.V" or "RBS") (AC ¶¶543-53); Credit Suisse AG ("Credit Suisse") (AC ¶¶606-09); Standard Chartered Bank ("SCB") (AC ¶¶497-99); Commerzbank AG ("Commerzbank") (AC ¶610).

This criminal conduct was so pervasive, and Iran's success in furthering the aims of the

---

[11]   When a bank customer sends an international wire payment, the de facto standard to execute such a payment is the MT103 SWIFT message. When a financial institution sends a bank-to-bank credit transfer, the de facto standard is the MT202 SWIFT message. The crucial difference, during the relevant time period, was that MT202 payments typically did *not* require the bank to identify the originating party to the transactions, and banks typically did not include that information in MT202 messages.

Conspiracy so complete, that the United States felt compelled to remove the so-called U-turn exemption, that, for more than a decade, permitted Iran to engage in circumscribed, but lawful, dollar clearing activities in the United States. In revoking the U-Turn exemption in 2008, the U.S. government explained:

> Iran's access to the international financial system enables the Iranian regime to facilitate its **support for terrorism** and proliferation. *The Iranian regime disguises its involvement in these illicit activities through the use of a wide array of deceptive techniques, specifically designed to avoid suspicion and evade detection by responsible financial institutions and companies.* Iran also is finding ways to adapt to existing sanctions, including by turning to non-designated Iranian banks to handle illicit transactions.

AC ¶112 (emphasis added).

> **1.     HSBC, Barclays, SCB, RBS, Credit Suisse and Commerzbank Criminally Conspired With Bank Saderat**

According to the U.S. Department of the Treasury, Bank Saderat Plc sent at least $50 million USD for the benefit of Hezbollah between 2002 and 2006. As detailed above, Hezbollah was directly involved in funding, training, planning and providing weapons for the attacks that killed or injured nearly all of the Plaintiffs in this case. AC ¶272. According to the DPA entered into between the U.S. Department of Justice and Lloyds TSB, Saderat (along with several other Iranian banks based in London) routinely stripped USD transactions routed through the United States – unlawful conspiratorial conduct continued by Credit Suisse after Lloyds TSB decided to end its business with Iranian banks. AC ¶¶266-67. During the relevant time period of this lawsuit, Saderat was a customer of Defendants HSBC (AC ¶370), Barclays (AC ¶444), SCB (AC ¶471), RBS (AC ¶507), Credit Suisse (AC ¶¶556, 588), and Commerzbank (AC ¶¶615-16). Defendants knew of Saderat's links to Hezbollah (*see, e.g.* AC ¶367), but continued their active collaboration with Saderat in violation of U.S. laws.

Bank Saderat Plc's access to U.S. dollar-clearing in any form was revoked on September

8, 2006. AC ¶259. Saderat was designated an SDGT by the U.S. Treasury Department on October 25, 2007, under Executive Order 13224 (Terrorism). AC ¶272.

## 2. HSBC, Barclays, SCB, RBS, Credit Suisse and Commerzbank Criminally Conspired With Bank Melli

During the relevant time period of this lawsuit, Bank Melli was a customer of Defendants HSBC (AC ¶402), Barclays (AC ¶¶418, 421-22), SCB (AC ¶307-08), ABN Amro (AC¶¶ 507, 538-39), Credit Suisse (AC ¶¶403, 405-06, 410, 556, 588), and Commerzbank (AC ¶¶615-16, 621). Each Defendant listed actively conspired to conceal Bank Melli's transactions from detection, scrutiny, or monitoring by U.S. regulators, law enforcement, and/or depository institutions. For example, as early as 1987, Bank Melli instructed Barclays to process USD transactions in favor of Bank Melli's London branch by referencing only Bank Melli's account number at Midland Bank Plc, without referencing Bank Melli's name. Bank Melli further instructed Barclays to send separate instructions, which included full transaction details, to Bank Melli's London Branch. Barclays agreed to do so. AC ¶¶303, 421. Similarly, Commerzbank agreed that Bank Melli should list "non ref"' in the ordering party field in all payment messages in order to trigger a manual review of the payment, thereby enabling Commerzbank personnel to ensure that the messages did not contain any Iranian identifying information. AC ¶312.

The U.S. Department of the Treasury designated Bank Melli an SDN on October 25, 2007 under Executive Order 13382 (WMD). According to the Treasury Department:

> From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions.

AC ¶299.[12]

---

[12]      Bank Melli's connections to Iran's violent activities were not limited to providing financial services to the

Still, *even after* the 2007 U.S. designation, and *after* Bank Melli was publicly identified as a major source of the IRGC's funding, Barclays and Bank Melli continued their illegal activities. AC ¶¶303-305.

As detailed above, the IRGC was directly involved in funding, training, planning and providing weapons for the attacks that killed or injured the Plaintiffs in this case. AC ¶¶170, 178. The connection between the IRGC, Bank Melli and its "deceptive banking practices," and the attacks on U.S. and Coalition Forces in Iraq was also explicitly set forth in a 2009 U.S. diplomatic cable:

> *Iran's Islamic Revolutionary Guards Corps (IRGC) and IRGC-Qods Force, who channel funds to militant groups that target and kill Coalition and Iraqi forces and innocent Iraqi civilians, have used Bank Melli and other Iranian banks to move funds internationally.* Bank Melli used deceptive banking practices to obscure its involvement from the international banking system by requesting that its name be removed from financial transactions when handling financial transactions on behalf of the IRGC. AC ¶¶17, 298 (emphasis added).

**3.    Defendants HSBC, SCB, RBS and Commerzbank facilitated illegal funds transfers through the United States on behalf of IRISL**

One of the primary ways the IRGC shipped weapons and material to Hezbollah and its Shi'a proxy groups in Iraq was through IRISL. AC ¶¶113-26. In October 2009, U.S. troops boarded an IRISL freighter, the *Hansa India,* headed to Syria from Iran with seven containers of small arms ammunition, as well as one container containing copper discs of the type used in EFPs to kill and maim many of the Plaintiffs. AC ¶¶121-23. During the relevant time period of this lawsuit, including a period of time after IRISL was designated, Defendants HSBC (AC

---

IRGC. For example, in mid-2007, Bank Melli in Hamburg ("BMI Hamburg") transferred funds for Iran's Defense Industries Organization, whose weapons caches were seized from Special Groups in Iraq, included large quantities of weapons produced by Iran in 2006 and 2007, many 107 mm artillery rockets, as well as rounds and fuses for 60 mm and 81 mm mortars. AC ¶301.

¶412), SCB (AC ¶495),[13] RBS (AC ¶542), and Commerzbank (AC ¶¶625, 644), all facilitated illegal funds transfers through the United States on behalf of IRISL, totaling more than $60 million.[14] Commerzbank's role was set forth in some detail in its DPA, which confirms the extensive nature of its unlawful and conspiratorial conduct on IRISL's behalf. AC ¶¶625-31. IRISL was designated an SDN in 2008, chiefly for shipping military cargo on Iran's behalf, some of which actually provided key components of EFPs to Hezbollah. AC ¶¶122, 636. In only four months following IRISL's designation in 2008, Commerzbank illegally transferred almost $40 million on behalf of IRISL subsidiaries and related entities through Commerzbank's New York branch, or other U.S. financial institutions. AC ¶632.

### 4. The Defendants Were All Aware of the Illegal Nature of Their Conduct

The obvious potential repercussions of conspiring with Iran were not lost on the Defendants. For example, as early as October 2001, several years before Iran's terror campaign in Iraq commenced, HSBC's compliance and audit departments were aware that the bank's assistance to Iranian banks might prove problematic – "particularly if we are unfortunate enough to process a payment which turns out to be connected to terrorism." AC ¶360. HSBC's understanding of the dangers posed by its conduct was not confined to the inherent generalized risk of laundering money on behalf of a U.S.-designated State Sponsor of Terrorism. An October 9, 2006 email from a member of HSBC's senior compliance staff makes clear that the bank knew there was "direct evidence against Bank Saderat particularly in relation to the alleged funding of Hezbollah" and that the U.S. government "suspected all major Iranian State owned banks of

---

[13]    SCB also conspired to conceal an enormous volume of transactions directly on behalf of the National Iranian Oil Company ("NIOC"), another IRGC-controlled entity. AC ¶¶451-53. SCB described this arrangement as "very prestigious." AC ¶452.

[14]    Contrary to Defendants' claim that these allegations are "conclusory," they reflect facts set forth in the New York District Attorney's indictment of IRISL in June, 2011, of which the Court can take judicial notice. *See* Schlanger Decl. Exhibit G.

involvement in terrorist funding and WMD [weapons of mass destruction] procurement." AC ¶367. Yet HSBC was keen to shield not only sanctioned countries from scrutiny, but also "an individual or company on the OFAC list." AC ¶348.

By June, 2007, the U.S. Treasury Department directly warned HSBC to withdraw from relationships with Iranian banks. AC ¶¶369-71. HSBC nonetheless continued its illegal conduct at least until 2010. AC ¶¶411-12.

In addition to HSBC, each of the other Defendants was aware of the illegal nature of its conduct, but affirmatively chose to assist a State Sponsor of Terrorism in its effort to secretly launder hundreds of billions of dollars through the United States. Examples of Defendants' knowledge, and specific corroborative statements by Bank employees in the Complaint include:

- **Barclays** ("To circumvent US legislation, [Barclays is] currently rout[ing] US$ items for sanctioned institutions via unnamed account numbers, without mention of the sanctioned party.") AC ¶438.

- **RBS** ("Twenty-four years of US sanctions and OFAC listing and Iran continues to sell oil and gas in USD. And, it imports and pays in USD as well. All of this is clearly done though accounts in Europe and elsewhere. There is a very good case to be made for getting an overall acceptance that when issues are purely US, we should not be a part of it. In fact we should see it as an opportunity. OFAC is not the Bible for money laundering (e.g. Cuba is prominent on OFAC). It is a tool of broader US policy. We therefore need to distinguish between US foreign policy on the one hand and AML/anti-Terrorism on the other, however much the US administration may wish to insist that the two are closely linked.") AC ¶531.

- **Credit Suisse** ("Payment orders in USD can only be paid via the American clearing, if the name of the Iranian party is not mentioned (US sanctions).") AC ¶578.

- **SCB** ("[T]here is equally importantly potential of risk of subjecting management in US and London (e.g. you and I) and elsewhere to personal reputational damages and/or serious criminal liability.") AC ¶¶489-90.

- **Commerzbank** ("[d]ue to the tense political relations between Iran and the U.S., sanctions that have existed for some years against Iran and Iranian companies have been tightened…." (AC ¶627) and ""[p]ersistent disregarding of OFAC rules by foreign branches. Hamburg is notorious for it.") AC ¶637.

- **Saderat** ("[F]rom 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence.") AC ¶272.

In sum, each of the Defendants knew that Iran was – at all relevant times – a U.S.-designated State Sponsor of Terrorism. In fact, each Defendant removed or altered the names, BICs, and other identifying information of the payment messages they sent through U.S. correspondent banks because they knew that such transactions for a State Sponsor of Terrorism would otherwise be blocked by U.S. regulators. HSBC (AC ¶¶338, 347-48), Barclays (AC ¶¶420, 426), SCB (AC ¶¶450, 482), RBS (AC ¶¶509, 512, 516, 531), Credit Suisse (AC ¶¶561, 563, 576, 578), and Commerzbank (AC ¶¶613-14). Likewise, Defendants converted Iranian SWIFT "MT 103" payment messages (that would disclose Iranian counter-parties to the transactions) into SWIFT "MT 202" payment messages (that did not require the transmitting bank to include information disclosing the Iranian originator or beneficiary), because they knew that such transactions for a State Sponsor of Terrorism would otherwise be blocked by U.S. regulators. HSBC (AC ¶338), Barclays (AC ¶¶420-41), SCB (AC ¶¶456, 470, 472), RBS (AC ¶¶522, 530), Credit Suisse (AC ¶¶582, 604) and Commerzbank (AC ¶¶620-21, 623). This conduct led inexorably to the acts of terrorism that grievously injured the Plaintiffs.

## ARGUMENT

I. **THE COMPLAINT PLAUSIBLY STATES A CLAIM FOR PRIMARY LIABILITY UNDER 18 U.S.C. § 2333(a) BASED ON THE DEFENDANTS' CONSPIRACY.**

A. **The Second Circuit Has Not Precluded Claims Under the ATA Predicated on Criminal Conspiracy Violations of §§ 2339A or 2339B.**

The Seventh and Second Circuit Courts of Appeals have rejected "common law" or implied common law claims for civil aiding and abetting, relying upon the Supreme Court's

holding in *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994). *See Boim III*, 549 F.3d 685 and *Rothstein*, 708 F.3d 82. *Central Bank* held that section 10(b) of the Securities and Exchange Act of 1934, which prohibits securities fraud, does not reach aiding and abetting, because it makes no reference to secondary liability. Extrapolating from *Central Bank of Denver*, the Seventh and Second Circuits have held that statutory silence on the subject of secondary liability means there is none, and that because § 2333(a) authorizes awards of damages to private parties but does not mention aiders and abettors or other secondary actors, the statute does not authorize claims predicated on federal common law secondary liability.

However, as the Seventh Circuit held in *Boim III*, 549 F.3d at 691-92, through a chain of statutory incorporation by reference (there, from § 2333(a) to § 2331(1) to § 2339A), Congress enacted a form of "statutory" secondary liability as primary liability. The court then fleshed out that liability by borrowing common law concepts of secondary liability. As Judge Posner wrote for the *en banc* panel:

> *The parties have discussed both issues mainly under the rubrics of "**conspiracy**"* and "aiding and abetting." Although those labels are significant primarily in criminal cases, *they can be used to establish tort liability*, *see, e.g.*, *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983); Restatement (Second) of Torts §§ 876(a), (b) (1979), and there is no impropriety in discussing them in reference to the liability of donors to terrorism under section 2333 just because that liability is primary. *Primary liability in the form of material support to terrorism has the character of secondary liability. Through a chain of incorporations by reference, Congress has expressly imposed liability on a class of aiders and abettors.*

*Boim III at* 691-92 (emphasis added). While the *Boim* plaintiffs rested their claims on aiding and abetting, the Seventh Circuit expressly endorsed primary § 2333(a) liability on the statutorily incorporated alternative theory of conspiracy as well (as shown by the italicized conclusions of the court).

No court in this Circuit has disavowed *Boim III*'s considered dictum, or held that *Rothstein* forecloses claims predicated on *primary* violations of 18 U.S.C. §§ 2339A and 2339B, as opposed to secondary liability claims based on federal common law. *See, e.g., Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 426 (E.D.N.Y. 2013) (citing cases); *Linde v. Arab Bank, PLC*, No. 04–cv–2799 (BMC)(VVP), 2015 WL 1565479, at *27 (April 8, 2014 E.D.N.Y.); *Sokolow v. Palestine Liberation Organization*, 60 F. Supp. 3d 509, 516 (S.D.N.Y. 2014). Indeed, the *Rothstein* plaintiffs did not plead conspiracy – either civil or criminal. Nor did the Circuit in *Rothstein* mention "conspiracy," let alone foreclose conspiracy claims under the ATA, as Defendants' assert.

The Plaintiffs' claim for primary liability here rests on the statutory incorporation by reference, via § 2333(a) and § 2331(1), of the criminal provisions of 18 U.S.C. §§ 2339A[15] and 2339B. Each of these provisions *expressly* delineates conspiracy as an alternative element of each crime:

> **18 U.S.C. § 2339A(a)**: Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 229, 351, 831, 842 (m) or (n), 844 (f) or (i), 930 (c), 956, 1091, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, 2340A, or 2442 of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), section 46502 or 60123 (b) of title 49, or any offense listed in section 2332b (g)(5)(B) (except for sections 2339A and 2339B) or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts *or conspires to do such an act*, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. A violation of this section may be

---

[15] Many of the predicate acts set forth in § 2339A also expressly incorporate conspiracy into their acts. *See, e.g.*, 18 U.S.C. § 956(a)(1) (conspiracy to kill, kidnap, maim, or injure persons or damage property in a foreign country); § 2332a(a)(1) (conspiracy to use weapon of mass destruction against U.S. nationals); § 2332f(a)(2) (conspiracies to bomb government buildings and/or places of public use); § 2332b(a)(2) (conspiracies to perform acts of international terrorism that transcend national boundaries, including, per § 2332b(b)(1)(C), situations where intended victim is member of U.S. uniformed services). Thus, in *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 505 (E.D.N.Y. 2012), Judge Weinstein acknowledged that claims for conspiracy were viable for violations of § 2332(b) because that statute explicitly renders it a crime to engage in a conspiracy to murder or injure U.S. nationals abroad.

prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law. (Emphasis added.)

**18 U.S.C. § 2339B(a)(1)**: Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts **or conspires to do so**, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989). (Emphasis added.)

In contrast, neither statute expressly delineates aiding and abetting as criminal conduct.

Defendants argue that the reasoning of *Linde v. Arab Bank, PLC*, 944 F. Supp. 2d 215 (E.D.N.Y. 2013), dismissing plaintiffs' conspiracy claims, requires a similar disposition here. Jt. Mem. at 22 (citing *Linde* Amended Complaint ¶316). In fact, the *Linde* court dismissed federal common law claims based on civil conspiracy[16] that plaintiffs had pled prior to *Rothstein*'s adoption of *Boim III*'s analysis rejecting federal common law secondary liability.[17] It reasoned that, "Here, as with aiding and abetting liability, the Second Circuit is likely to hold that §2333(a) does not provide for claims for *civil* conspiracy." *Id.* at 216-17 (emphasis added).[18] Had

---

[16]     Defendants erroneously cite ¶316 of the Amended *Linde* complaint, Jt. Mem. at 22, which was not the Claim for Relief at issue before the district court. *See, Linde*, No. 04 Civ. 2799 (E.D.N.Y. Aug. 10, 2004), ECF No. 4, Amended Complaint ¶¶384-90. Plaintiffs' counsel in this case were also counsel in *Linde*.

[18]     The pertinent colloquy between counsel in the instant case and Judge Gershon in *Linde* makes the distinctions clear:

> MR. OSEN (Plaintiffs' Counsel): We also pled consistent with form three and courts in this circuit what Judge Posner referred to as primary liability with the elements of secondary liability.
> THE COURT: *Well I am not talking about that. I am not talking about direct liability claims.* I am talking about what you called in your complaint, at least in Linde which I used as the paradigm, about which you called an aiding and abetting claim.
> MR. OSEN: Right.
> THE COURT: You're saying that you had in mind that that was a common-law claim or maybe you actually said it.
> MR. OSEN: Right. Maybe another way of stating it is that *the first claim for relief was common-law based on violations of 876 Restatement, generally referred to as common-law aiding and abetting.*
> THE COURT: Okay.

Judge Gershon read *Rothstein* to preclude claims based on primary liability for incorporated secondary liability by way of material support to terrorism (i.e. predicated, on criminal violations of §§ 2339A and 2339B), she would have granted summary judgment to the defendant *on all the claims* in that case. Instead, she permitted claims predicated on *primary* liability to proceed to trial.

In fact, <u>no</u> court in this district has interpreted *Rothstein* in the way Defendants urge – a reading that would extinguish accessorial liability in all cases brought under § 2333(a), and foreclose civil liability for acts that merely "involve," but don't actually take the form of, "violent acts" that would be criminal under U.S. law. *See* § 2331(1)(A). (As Judge Cogan recently observed, "No one has ever 'directly' been injured by a wire transfer, *Linde v. Arab Bank plc*, 2015 WL 1565479, at *31.) Accordingly, Plaintiffs' claims in this case, which are predicated on the statutorily incorporated criminal violations of §§ 2339A and 2339B, are proper, as both criminal statutes expressly prohibit criminal conspiracies of the kind detailed in the Complaint.

In this Circuit, Plaintiffs must plead primary violations of the criminal laws that give rise to "statutory" secondary liability under § 2333(a) "through a chain of incorporations by reference" to the predicate criminal statutes. That is precisely what the Plaintiffs in this case have done.

---

MR. OSEN: As opposed to direct liability for violations of 2339A, B or C, which have characteristics of aiding and abetting but are not a standalone aiding and abetting claim. So by its definition, Your Honor, when you provide material support under 2339B, that is material support to a primary tortfeasor who blows up the bus or what have you. So, it therefore has, as Judge Posner said, characteristics of secondary liability but it's a primary liability.
THE COURT: All right, we're on the same page. Mr. Walsh, are we on the same page?
MR. WALSH (Defendant's Counsel): Yes, Your Honor.

Apr. 24, 2013 Hearing, pp. 6:21-7:23, *Linde*, No. 04 Civ. 2799, ECF No. 94 (emphasis added).

## B. Plaintiffs Have Properly Pled Allegations Constituting Conspiracy Under §§ 2339A and 2339B.

Defendants cannot tenably dispute that the Complaint adequately pleads that they conspired with Iran to conceal hundreds of billions of dollars of Iran's financial transactions from detection, scrutiny, or monitoring by U.S. regulators, law enforcement, and/or depository institutions, because they have admitted such conduct in their DPAs. Nor can they dispute that Plaintiffs have alleged that Iran used the conspiracy to transfer at least $50 million USD for the benefit of Hezbollah, at least $100 million USD for the benefit of the IRGC, and more than $60 million on behalf of IRISL, all non-conclusory allegations resting on U.S. government findings or criminal prosecutions. They also cannot dispute that Plaintiffs have plausibly alleged that these recipients of funds – all now designated by the United States – orchestrated the acts of terrorism that injured the Plaintiffs in this case (or, in the case of IRISL, provided lethal supplies that helped facilitate a majority of the attacks at issue). *See, e.g.*, AC ¶¶13, 149, 297-98, 655. Instead, Defendants urge this Court to hold that Plaintiffs are required to plead or prove that they shared Iran's *specific* goal of murdering or injuring U.S. nationals. Jt. Mem. at 24 n.9.[19]

This is simply not the correct legal standard.

Under *Pinkerton v. United States*, 328 U.S. 640 (1946), "[o]nce a conspiracy has been established, the criminal liability of its members extends to all acts of wrongdoing occurring during the course of and in furtherance of the conspiracy."[20] *United States v. Gallerani*, 68 F.3d

---

[19]    *See also* HSBC Supp. Mem. at 4-8 (arguing that Plaintiffs fail to adequately allege scienter); BS Mem. at 24-26 (same). The cases cited by Defendants in the Jt. Mem. at 24 n.9 are inapposite. *United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012) is a criminal case in which the Circuit found the *trial* testimony of a key witness "considerably more equivocal than in the Government's account." Likewise, *Zito v. Leasecomm Corp.*, No. 02 Civ. 8074 (GEL), 2003 WL 22251352 (S.D.N.Y. Sept. 30, 2003) stands for the unremarkable proposition that "'should have known' is not enough to establish conspiracy, which is a crime of specific intent." *Id.* at *20.

[20]    Defendants cite *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91 (D.D.C. 2002) (Jt. Mem. at 24 n.9), which ironically relies upon *Pinkerton* in rejecting a conspiracy claim brought under the Foreign Sovereign Immunities Act against Iran. Applying the correct standard, the *Ungar* court found that plaintiffs failed to

611, 620 (2d Cir. 1995) (internal quotation marks and citation omitted). "[A] defendant who does not directly commit a substantive offense *may nevertheless be liable if the commission of the offense by a co-conspirator in furtherance of the conspiracy was reasonably foreseeable to the defendant as a consequence of their criminal agreement.*" *United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007) (emphasis added). Critically the question of whether or not a given crime was foreseeable and in furtherance of a conspiracy *is a fact question for a jury's resolution. United States v. Bruno*, 873 F.2d 555, 560 (2d Cir. 1989).

In both the civil and criminal terrorism context, courts have not hesitated to refer to *Pinkerton* liability. For example, in *Boim v. Quranic Literacy Inst.*, 340 F. Supp. 2d 885, 895 (N.D. Ill. 2004), Magistrate Judge Keys denied the defendants' motion to dismiss the plaintiffs' claims sounding in conspiracy, and cited *Pinkerton* in holding "the Boims need not show that the defendants knew about the attack that killed David Boim, or that they committed any specific acts in furtherance of that attack; rather, the Boims need only show that the defendants were involved in an agreement to accomplish an unlawful act and that the attack that killed David Boim was a reasonably foreseeable consequence of the conspiracy." *Id.*

Courts in the Second Circuit have also cited *Pinkerton* in terrorism prosecutions. In *Matter of Extradition of Marzook*, 924 F. Supp. 565 (S.D.N.Y. 1996), Judge Duffy explained that the defendant could be held liable for Hamas's foreseeable substantive crimes under *Pinkerton* principles:

---

adequately plead either aiding and abetting or civil conspiracy against Iran for its role in a particular terrorist attack, but numerous other courts in the same district have found Iran liable for civil conspiracy for its role in other terrorist attacks. *See, e.g., Acosta v. The Islamic Republic of Iran*, 574 F. Supp. 2d 15, 27 (D.D.C. 2008) (Iran found liable for conspiring in a November 5, 1990 shooting at the Marriott Hotel located in New York City.); *Belkin v. The Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009) (Iran found liable for conspiring in March 4, 1996 Palestinian Islamic Jihad bombing of Dizengoff Center Shopping Mall in Tel Aviv).

To prove Abu Marzook's responsibility for the acts done by the Hamas conspiracy, *Israel would not need to show that Abu Marzook knew of the specific acts committed in furtherance of the conspiracy, nor that he intended that they occur, nor that he even indirectly engaged in committing the specific crimes*. Israel need only show that Abu Marzook was involved in an "agreement to accomplish an unlawful act," *United States v. Masotto*, 73 F.3d 1233, 1241 (2d Cir. 1996), and that the charged incidents were "reasonably foreseeable consequences" of the conspiracy. *Pinkerton* 328 U.S. at 643, 66 S. Ct. at 1182. Moreover, the existence of the conspiracy may be established "through circumstantial evidence, which only needs to demonstrate a tacit understanding between the conspirators to carry out an unlawful act." *Id. There is no requirement to prove that Abu Marzook "knew every objective of the conspiracy, every detail of the scheme's operation, or the identity of every coconspirator."* *United States v. Wiley*, 846 F.2d 150, 153–54 (2d Cir. 1988).

*Id.* at 585-86.

In *U.S. v. Garcia*, 509 F. App'x 40 (2d Cir. 2013), the Second Circuit described the state

of mind required to establish a criminal conspiracy:

… [A] defendant need only be aware of a high probability of *some* of the conspiracy's unlawful aims. *United States v. Lanza*, 790 F.2d 1015, 1022–23 (2d Cir.1986). A conscious avoidance charge is appropriate where a defendant "assert[s] what amounts to ignorance of the specific objectives alleged in the indictment." *Id*. at 1023.

Here, many red flags made Burgos aware of a high probability that the hydraulic pump that he purchased for his childhood friend would be used to commit robberies, including that the pump was advertised for "forcible entry" use and testimony that co-conspirators had discussed some of their robbery plans in front of Burgos, even asking him to join. A rational jury could conclude that Burgos was aware of such a probability and consciously avoided confirming that fact. Contrary to Burgos's assertion at oral argument and in supplemental briefing, <u>it was not necessary for the government to show that Burgos was aware of a high probability that the pump would be used for robberies of *drug dealers* (as charged in the indictment), only that he was aware of a high probability that the pump would be used for some of the conspiracy's unlawful aims, such as robberies generally</u>. *See Lanza*, 790 F.2d at 1022–23 (holding that "the government must demonstrate that the accused had *some* knowledge of [the conspiracy's] unlawful aims" (italics in original)).

*Id*. at 42 (underscoring added).

In this case, Plaintiffs have sufficiently pled that Iran and the Defendants entered into a conspiracy to evade U.S. sanctions and minimize the transparency of Iran's financial activities in the U.S. Plaintiffs have sufficiently pled that, as part of the Conspiracy, Iran had the complementary (additional) objective of facilitating millions of dollars in payments to Hezbollah and the IRGC through the international financial system. By actively participating in the Conspiracy, the Defendants were willing to, and did, commit numerous felonies under U.S. law to assist Iran in concealing its U.S. dollar clearing in return for lucrative fees, enhanced financial opportunities, and the prospect of increased business ties.

There is no dispute that the Complaint alleges in detail that all of the Defendants knew that: (1) Iran was a U.S.-designated State Sponsor of Terrorism, subject to various U.S. sanctions; (2) Bank Saderat had been designated in 2006 and Bank Melli in 2007; (3) each Defendant's own conduct was intended to evade U.S. sanctions; and (4) their conduct would keep U.S. depository institutions, law enforcement and counter-terrorism agencies blind to Iran's movement of U.S. dollars through the U.S. and the international financial system. Each Defendant was "aware of a high probability of *some* of the conspiracy's unlawful aims," *Garcia*, 509 F. App'x at 42, quoting *Lanza*, 790 F.2d at 1022-23. The Plaintiffs are not required to further allege that each Defendant knew of *all* of Iran's specific unlawful aims or specifically intended to injure the Plaintiffs.

*Garcia*'s logic has also been applied in the terrorism context. In *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93 (2d Cir. 2008), the Second Circuit reiterated the absence of any need to demonstrate each conspirator's awareness of all of a conspiracy's details and aims:

> *We have observed that "[w]here conspirators are charged with pursuing multiple criminal objectives, the government is not required to prove that the defendant*

*agreed to all of the objectives. Rather, the government must show that the defendant shared 'some knowledge of the conspiracy's unlawful aims and objectives.'"* Salameh, 152 F.3d at 151 (quoting *United States v. Heinemann*, 801 F.2d 86, 93 (2d Cir.1986)) (internal brackets and citation omitted); *accord Stavroulakis*, 952 F.2d at 690 ("The policies underlying conspiratorial liability could easily be thwarted by the careful compartmentalization of information, and 'conspirators would go free by their very ingenuity,' if it were required that they agree on all details of the scheme." (quoting *Blumenthal v. United States*, 332 U.S. 539, 557, 68 S. Ct. 248, 92 L.Ed. 154 (1947))).

*Id.* at 113 (emphasis added).

The Second Circuit thereafter affirmed the defendants' convictions, agreeing that a combination of evidence permitted a reasonable factfinder to conclude that the defendants were generally aware that Al Qaeda had initiated a conspiracy to target the United States and U.S. nationals, including the fact that the defendant admitted he had seen Osama Bin Laden acknowledge in a CNN interview his organization's intention to target the United States. *Id.* at 113 n.18.

Both *Terrorist Bombings*[21] and *Garcia* thus complement *Pinkerton*. Here, all Defendants would have had to make *deliberate* and *sustained* efforts to ignore the high probability that Iran and its agents, in launching a more-than-a-decade-long conspiracy to secretly launder hundreds of billions of dollars, intended to use some of its laundered money to facilitate terrorism. Iran was a State Sponsor of Terrorism, Bank Saderat was an SDGT, and the IRGC and IRGC-connected organizations (including IRISL) were designated as SDNs because of the threat posed by allowing a State Sponsor of Terrorism to acquire funds for orchestrating terrorist acts and weapons proliferation. Plaintiffs need not establish that the Defendants were aware that the material support they illegally provided Iran was to be used for a particular terrorist attack, particular categories of terrorist acts, or particular terrorists. Ultimately, more than $200 million

---

[21] Cited in *Gill*, 893 F. Supp. 2d at 554 (summarizing requirements for § 2333(a) conspiracy claim predicated on violation of § 2332(b), which, like §§ 2339A and 2339B, expressly includes conspiracy).

USD was transferred to Hezbollah and the IRGC. Having actively participated in a criminal conspiracy, a co-conspirator cannot be heard to argue that it wasn't *its* transaction that fell into the hands of Hezbollah or the IRGC. Each Defendant actively participated in the overall scheme, and the resulting funding of terrorism was entirely foreseeable.

**C.      Credit Suisse Ignores Its Role in the Conspiracy By Eliding Over Its Admitted, Essential and Sustained Involvement in What the U.S. Government Found to be SDN Bank Melli's "deceptive banking practices."**

Posing as an innocent merely conducting ordinary business, Credit Suisse asserts that the Complaint does not allege that it transacted business "with the Government of Iran or any arm of the Government of Iran, such as the Islamic Republic of Iran's Shipping Lines ("IRISL") or Iran's Defense Industries Organization ("DIO"), which in turn allegedly provided support to terrorist groups in Iraq." CS Mem. at 2.

Credit Suisse forfeited the "routine banking" defense, however, when it entered into a DPA with the U.S. government. It is presumably not "routine" in the banking community to instruct your employees, "Do not mention the name of the Iranian bank in payment orders," as Credit Suisse did. AC ¶560. Nor is it "routine" to provide Iranian banks with a pamphlet entitled, "How to transfer USD payments" to avoid triggering OFAC filters. AC ¶¶563-65. Nor is it "routine" to warn Bank employees that "an Iranian origin will never be named in USD payments carried out for Iranian banks (*because of the US sanctions*)!" AC ¶577 (emphasis added; exclamation in the original).

Credit Suisse also ignores the detailed allegations concerning its criminal activities on behalf of Bank Melli – an instrumentality of Iran (AC ¶¶403, 405-06, 410, 556, 588) – and Iran's Aerospace Industries Organization ("AIO") – a subsidiary of Iran's (U.S.-designated) Ministry

of Defense and Armed Forces Logistics ("MODAFL"). AC ¶¶321-22.[22]

Furthermore, Credit Suisse can take no comfort from the assertion that it terminated banking services for these and other Iranian entities before the U.S. government designated Bank Melli or Bank Saderat and before many of the attacks at issue. CS Mem. at 2-3. First, Credit Suisse's own admitted email and memo trail, reflected in its DPA and quoted only in small part above, indisputably shows that it knew of the illegality of its conduct under U.S. law well before the designations. Second, all U.S. designations are, *by definition*, based on prior unlawful conduct. Bank Melli was, for example, designated *because* of the conduct Credit Suisse conspired to facilitate. Thus, the U.S. government found that:

> When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions. AC ¶¶299-300.

These "deceptive banking practices" were precisely those facilitated by Credit Suisse, as detailed in the Complaint. AC ¶¶556-602. Rather than "wholly conclusory allegations" of conspiracy (Credit Suisse Mem. at 4), these substantially track Credit Suisse's own admissions of textbook evasion of terror-financing controls.

**D.    Violations of §§ 2339A, 2339B and 2332d Inherently Have an "Objective Terroristic Purpose."**

HSBC and RBS argue that the "Plaintiffs fail to allege that the Moving Defendants engaged in banking transactions with an objective terroristic purpose." HSBC Mem. at 1, 4. There is, of course, no requirement that Plaintiffs plead that Defendants subjectively held any

---

[22]    *See* December 16, 2009 Settlement Agreement between the U.S. Department of the Treasury's Office of Foreign Assets Control and Credit Suisse, Schlanger Decl. Exhibit K at ¶16. ("Specifically, from on or about August 19,2003, to on or about November 1,2006, Credit Suisse processed 4,775 electronic funds transfers, in the aggregate amount of USD 480,072,032.00, through financial institutions located in the United States to the benefit of the Government of Iran and/or persons in Iran, including various Iranian financial institutions, in apparent violation of the prohibition against the 'exportation, ... directly or indirectly, from the United States, ... of any ... services to Iran or the Government of Iran,' 31 C.F.R. § 560.204.")

such purpose; knowledge or deliberate indifference suffices. *Strauss*, 925 F. Supp. 2d at 428 ("Plaintiffs must show that Defendant knew or was deliberately indifferent…."). The issue is therefore whether the Complaint alleges actions by Defendants that "appear to be intended" to intimidate, coerce, influence, or affect within the meaning of § 2331(1)(B).

Sections 2339A, 2339B and 2332d are not ordinary crimes; they are terrorism crimes. Each expressly involves knowing or intentional support for "*terrorists*," "*foreign terrorist organizations*," organizations that engage in "*terrorist activity*," or state sponsors of *terrorism*. Knowingly committing any of these terrorist crimes thus inherently "appears to be intended" within the meaning of § 2331(1)(B) and is itself an act of international terrorism. As Judge Cogan recently noted:

> I agree with those courts that have held that a violation of 18 U.S.C. § 2339B is itself an act of international terrorism. *See Goldberg v. UBS AG,* 690 F.Supp.2d 92, 112–15 (E.D.N.Y.2010) (collecting cases); *Strauss v. Credit Lyonnais, S.A.,* No. 06–cv–0702, 2006 WL 2862704, at *1 (E.D.N.Y. Oct. 5, 2006) ("Violations of 18 U.S.C. § 2339B and § 2339C are recognized as international terrorism under 18 U.S.C. § 2333(a)."). Defendant misstates *Weiss v. National Westminster Bank PLC,* 768 F.3d 202, 207 n.6 (2d Cir.2014), in stating that the Second Circuit "expressly held that a violation of Section 2339B is not, by itself, 'an act of international terrorism.' " On the contrary, the Circuit expressly did not reach the issue.

*Linde*, 2015 WL 1565479 at *25.

Defendants here also not only misstate *Weiss's* holding (HSBC Mem. at 1-2 & n.2), but fail even to cite, much less distinguish, *Linde*. Moreover, their rhetorical claim that an objective observer would not infer a terrorist intent from "[s]tandard financial transactions" (*id.* at 4) and the anodyne "provision of funds transfer services involving Iranian commercial banks" (*id.* at 1) utterly ignores that Defendants deliberately and systematically conspired to evade "standard practices" for the express purpose of evading U.S. terror-financing restrictions. That "standard financial transactions" *might* serve an "acceptable purpose" is irrelevant where Defendants

engaged in entirely non-standard, deceptive practices aimed at assisting a State Sponsor of Terrorism and its instrumentalities.

Nor, given the extensive Iranian role in the illicit conspiracy to evade U.S. terror-financing controls and operate outside legitimate banking channels, can Defendants now rely on the claim that Iran has "legitimate agencies, operations, and programs to fund." HSBC Mem. at 4. Iran had a perfectly legal mechanism to access U.S. dollar clearing for its "legitimate" activities. Instead, it affirmatively chose an alternative, criminal mechanism because, as the U.S. government found, it sought to fund terrorism and acquire weapons of mass destruction. To do so, it enlisted the Defendants in this case – all of which knew they were participating in a criminal conspiracy, not "standard financial transactions."

Knowing participation in a criminal conspiracy with a State Sponsor of Terrorism to provide it with hundreds of *billions* of untraceable dollars objectively appears to be intended "to affect the conduct of a government by mass destruction, assassination, or kidnapping," as it in fact did.[23]

## II.    PLAINTIFFS HAVE PLAUSIBLY PLED CAUSATION.

Plaintiffs and Defendants (except Bank Saderat[24]) agree that the controlling causation standard in this case was enunciated in *Rothstein*:

> Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his *acts were a substantial factor in the sequence of responsible causation* and whose injury was reasonably foreseeable or anticipated as a natural consequence.

---

[23]    It is also an act dangerous to human life. *Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 648 (S.D. Tex. 2010) ("giving money to a state sponsor of terrorism in knowing violation of strict rules set for transacting business with that country is an act dangerous to human life.").

[24]    Saderat insists that Plaintiffs are required to plead strict "but for" causation. BS Mem. at 21-22. Courts have consistently rejected this assertion, as Plaintiffs discuss, *infra*.

708 F.3d at 91 (citation omitted; emphasis in original). *Accord*, Jt. Mem. at 11 & *passim*; BS Mem. at 21 & *passim*; Commerzbank Mem. at 8; CS Mem. at 6-7.

After quoting and citing the correct legal standard, however, Defendants repeatedly argue that the facts of this case and the claims asserted here are identical to those in *Rothstein* (*e.g.*, BS Mem. at 23 ("virtually identical")), and that *Rothstein* compels dismissal of the Complaint because it "held that the mere provision of banking service to Iran, a state sponsor of terrorism, is too indirect to satisfy the proximate cause standard." Jt. Mem. at 15. These arguments misapply *Rothstein*'s holding to the present case.

First, unlike the *Rothstein* complaint, the Complaint *here* does not rest on "the mere provision of banking service to Iran." It makes non-conclusory allegations that: more than a hundred million dollars was provided to designated FTO Hezbollah and the IRGC; and Defendants all held accounts for Bank Saderat, an SDGT, and maintained accounts for, and transferred funds on behalf of, SDNs that trained, financed, armed, and guided IED and EFP attacks on Americans in Iraq. These allegations rest on the public findings of the United States government.

Second, again unlike the complaint in *Rothstein*, the Complaint *here* makes non-conclusory allegations of a sustained conspiracy by Defendants to help Iran conceal its illicit financial transactions from U.S. authorities, indisputably effected in part to enable Iran to fund designated terrorist entities and terrorist attacks on Americans in Iraq.

Finally, Defendants simply ignore the Complaint's non-conclusory allegations that the weapons used in the vast majority of the attacks were identifiably designed, manufactured, and/or supplied by Iran and its U.S.-designated terrorist proxies to which the United States government found that co-conspirators (including Saderat) sent funds.

Plaintiffs' non-conclusory allegations are clearly distinct from those made in *Rothstein* and this court should reject Defendants' superficial and false *Freeman=Rothstein* equation.

## A.     The ATA § 2333(a) remedy requires proximate causation.

The *Rothstein* plaintiffs did not plead or argue proximate causation. Instead, they made the extraordinary claim that alleged violations of the ATA's material support statutes created a *presumption* of causation that shifted the evidentiary burden to the defendant to prove that material support provided did not reach the terrorist groups that injured the plaintiffs. 708 F.3d at 96. The Court of Appeals unsurprisingly rejected this "*post hoc, ergo propter hoc*" proposition. *Id.* Instead, the Court reiterated and quoted the conventional proximate causation standard from *Lerner v. Fleet Bank N.A.*, 318 F.3d 113, 123 (2d Cir. 2003),[25] and provided alternative examples of sufficient allegations of proximate causation.

## B.     The Non-conclusory Allegations of the Complaint Satisfy the Proximate Causation Standard Applicable to ATA Claims.

*Rothstein* held that the complaint there did not plausibly satisfy the proximate causation standard:

---

[25]     Defendants further assert that *Rothstein* requires Plaintiffs to assert that the funds the Defendants transferred on Iran's behalf were used "directly" for the attacks on the Plaintiffs, citing all RICO cases, including *Lerner*. Jt. Mem. at 3, 17. As the Court of Appeals subsequently emphasized in a latter *Lerner* opinion, however, "[T]he fact that plaintiffs had not pleaded facts sufficient to support a finding of proximate causation in the RICO action therefore does not necessarily mean that their injuries were, under the facts alleged, not proximately caused by the bank's actions for purposes of the plaintiff's claims under the common law. . . . [It] depend[s] on the cause of action under which the plaintiff brings suit." *Lerner v. Fleet Bank N.A.*, 459 F.3d 273, 284-85 (2d Cir. 2006). This is because RICO plaintiffs are held "to a more stringent showing of proximate cause that would be required at common law." *Moore v. Paine Webber, Inc.*, 189 F.3d 165, 179 (2d Cir. 1999) (Calabresi, J., concurring). Thus, *Hemi Grp. LLC v. City of New York*, 559 U.S. 1 (2010), on which Defendants rely, explained that, "[o]ne consideration we have highlighted as relevant to the RICO 'direct relationship' requirement is whether better situated plaintiffs would have an incentive to sue…. Our precedents make clear that in the RICO context, the focus is on the directness of the relationship between the conduct and the harm." *Id.* at 11-12 (emphasis added). Here, of course, the Plaintiffs are the direct victims of terrorism and are the best – indeed, the only – persons who could "vindicate" the ATA. Furthermore, "[t]he ATA is different than other statutes that reference causation. The tort it condemns is one of secondary action, not primary action. It assumes the existence of a tort by a third party, and then renders the defendant liable for providing support to that third party, not for supporting any particular conduct by that third party." *Linde*, 2015 WL 1565479, at *27. "No one has ever 'directly' been injured by a wire transfer," *id.* at *31, and if that were the standard of causation, no ATA plaintiff could ever recover for the material support for terrorists that Congress criminalized and incorporated by reference in the ATA civil remedy.

[W]e cannot agree that the Complaint sufficiently alleges proximate cause. The Complaint does not allege that UBS was a participant in the terrorist attacks that injured plaintiffs. It does not allege that UBS provided money to Hizbollah or Hamas. It does not allege that U.S. currency UBS transferred to Iran was given to Hizbollah or Hamas. And it does not allege that if UBS had not transferred U.S. currency to Iran, Iran, with its billions of dollars in reserve, would not have funded the attacks in which plaintiffs were injured.

And while the Complaint alleges that "UBS knew full well that *the cash dollars it was providing* to a state-sponsor of terrorism *such as* Iran would be used to cause and facilitate terrorist attacks by Iranian-sponsored terrorist organizations *such as* Hamas, Hizbollah and PIJ" (id. ¶ 108 (emphases added)), these are conclusory allegations that do not meet *Twombly*'s plausibility standard with respect to the need for a proximate causal relationship between the cash transferred by UBS to Iran and the terrorist attacks by Hizbollah and Hamas that injured plaintiffs. The fact that the transfers were made to a state sponsor of terrorism of course made it more likely that the moneys would be used for terrorism than if the transfers were to a state that did not sponsor terrorism. But the fact remains that Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund. We see no non-conclusory allegation in the Complaint that plausibly shows that the moneys UBS transferred to Iran were in fact sent to Hizbollah or Hamas or that Iran would have been unable to fund the attacks by Hizbollah and Hamas without the cash provided by UBS.

*Rothstein*, 708 F.3d at 97.

Here, too, Plaintiffs do not allege that the Defendants themselves were the actual primary participants in attacks on them, for as Judge Cogan noted, the tort the ATA "condemns is one of secondary action, not primary action." *Linde*, 2015 WL 1565479, at *27. Here, too, the hundreds of billions of dollars defendants transferred (AC ¶¶44, 104) were indisputably sufficient to increase Iran's ability to fund terrorists to kill Americans in Iraq.

However, Defendants err in asserting that "[l]ike the allegations in *Rothstein*, these [here] also do not allege a transfers of funds to Hizbollah," (BS Mem. at 24),[26] and that "here and in *Rothstein*, a defendant is claimed to have dealt (here, indirectly) with a state sponsor of terrorism and not with a terrorist organization supported by that state or with a yet further removed named

---

[26]     Alone among the Defendants, Saderat qualifies its *Freeman=Rothstein* defense by admitting that although the *Rothstein* plaintiffs did not "'allege that UBS provided money to Hizbollah or Hamas,' ... [t]he same *is not quite so* in *Freeman*, but the distinction is without a difference." BS Mem. 23 (emphasis added).

or unnamed terrorist group alleged to have actually perpetrated the attack on the plaintiff...." Jt. Mem. at 20.

On the contrary, Plaintiffs *do* allege that Defendants provided services to an FTO – Hezbollah – and other designated terrorist organizations, precisely the allegation that the Court of Appeals found missing in *Rothstein*. The Complaint alleges that the conspirators "facilitated illicit transactions totaling at least $50 million USD for the benefit of [FTO] Hezbollah"; at least $100 million USD for the benefit of the [SDN] IRGC and Defendant Bank Saderat Plc, and other U.S. SDNs (such as Iran Bank Co-conspirators Bank Melli Iran, Bank Mellat, and Bank Sepah)"; "more than $60 million" "on behalf of [SDN] IRSIL"; and that Defendant and co-conspirator Commerzbank transferred $40 million post-designation on behalf of SDN IRISL, which shipped component parts of EFPs. AC ¶¶13, 15, 17, 114, 241, 252, 262-63, 271, 272, 298-300, 302-13, 632. It also alleges that the IRGC provided "lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians," AC ¶¶10. *See also* AC ¶¶155-57 (quoting Treasury Department as finding that IRGC-led group's "first objective is to fight U.S. forces, attacking convoys and killing soldiers," and which "conducted IED attacks against Americans in the Baghdad region"). And it alleges that Hezbollah provided training, expertise in the use of EFPs and kidnapping, and support for Shi'a cells in coordination with the IRGC. AC ¶¶138-41, 148.

Commerzbank argues that its deceptive financial practices in support of SDN IRISL merely state a "claim for *indirect* support of terrorist acts." CB Mem. at p. 8 (emphasis in original). According to Commerzbank, it (1) provided support in the form of (illegal) dollar-clearing services to IRISL; (2) IRISL in turn provided material support to FTO Hezbollah; and (3) Hezbollah, among others, was allegedly responsible for the attacks in which Plaintiffs were

injured. *Id.* Commerzbank analogizes these allegations to the allegations in *O'Neill v. Al-Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)*, 714 F.3d 118 (2d Cir. 2013), that the defendant Al Rajhi Bank provided financial services to Al-Haramain Islamic Foundation ("Al-Haramain") (prior to its designation), which had been designated by OFAC as an SDGT for its alleged support of al Qaeda. The Second Circuit held that this allegation did not suffice to plausibly plead proximate cause because there were no allegations that the funds provided by Al-Haramain to al Qaeda went through defendant Al Rajhi Bank. *Al-Rajhi*, 714 F.3d at 668.

But Al-Haramain was an *independent* entity that, along with its other lawful acts, allegedly supported al Qaeda. IRISL, by contrast, *is an instrumentality of Iran*, a State Sponsor of Terrorism, not an independent entity that merely supports Iran. Thus, unlike the factual allegations in *Al-Rajhi*, here the Complaint actually alleges that (1) Commerzbank provided illegal material support to Iran, a State Sponsor of Terrorism, including illegal dollar-clearing services to IRISL; (2) IRISL was one of many ways that this State Sponsor of Terrorism facilitated acts of terrorism (via arms shipments); and (3) this State Sponsor of Terrorism, operating through the IRGC and its proxy, Hezbollah, orchestrated and supplied the weapons for the attacks in which Plaintiffs were injured.[27]

It is no answer to attempt to argue, as Saderat does, that the allegations of funds transferred "for the benefit of" Hezbollah are different from an allegation that they were sent "to" Hezbollah, IRGC-QF, and IRISL. *See* BS Mem. at 24. In fact, the Complaint *does* allege

---

[27]    In *Al-Rajhi*, plaintiffs (in their 12(e) statement) also alleged transfers of funds to FTO Hamas, but made no non-conclusory allegation that Hamas participated in the 9/11 attacks at issue. *See Burnett v. Al Baraka Investment and Development Corp.*, No. CIV.A.02–1616 (JR) (D.D.C. Aug. 27, 2003), ECF No. 266, Plaintiffs' Response to Al Rajhi Bank's Rule 12(e) Request to Plaintiffs, ¶66. The Court said that "plaintiffs did not allege that [the defendants] … provided money directly to al Qaeda ... , nor ... that the money allegedly donated by [defendants] to the purported charities was transferred to al Qaeda and aided in the September 11, 2001 attacks." 714 F.3d at 124. As noted in the text, here in contrast, Plaintiffs allege transfers for FTO Hezbollah, SDGT IRGC-QF, and SDN IRISL, entities designated by the United States in part for orchestrating and/or supplying weapons for attacks on U.S. forces in Iraq, including the distinctive weapons used in EFP attacks.

that Saderat was used "to channel funds *to* terrorist organizations, including Hezbollah ...." AC ¶272 (emphasis added). But even if it had not, the semantic distinction between "for the benefit of" and "to" is hardly a basis for dismissing a complaint as a matter law on a Rule 12(b)(6) motion, especially when reasonable inferences must be drawn in favor of the pleader.

Nor does the mantra that the Plaintiffs' allegations are "conclusory" rescue the Defendants, because the allegations of transfer "for the benefit of Hezbollah" and the IRGC and other designated entities that were engaged in orchestrating attacks on Americans in Iraq rest on findings *by the United States government* that are the result of official investigations. *See, e.g.*, AC ¶15 (quoting U.S. diplomatic cable regarding co-conspirator Bank Melli's processing of transactions for the IRGC and IRGC-QF); AC ¶17 (quoting U.S. diplomatic cable finding that co-conspirator Bank Melli and other Iranian banks used deceptive banking practices to handle "financial transactions **on behalf of the IRGC**," which "channels funds to militant groups that target and kill Coalition and Iraqi forces and innocent Iraqi civilians"); AC ¶252 (same, asserting that Bank Melli was used to provide $100 million to the IRGC-QF); AC ¶262 (quoting Treasury Department that "a Hezbollah-controlled organization [] has received $50 million from Iran through [defendant and co-conspirator] Bank Saderat since 2001"); AC ¶263 (quoting Treasury Department testimony that "Hezbollah uses Saderat to send money to other terrorist organizations as well"); AC ¶271 (noting Defendant HSBC-Middle East Regional Head's acknowledgement that U.S. government has "direct evidence against Bank Saderat particularly in relation to the alleged funding of [FTO] Hezbollah"); AC ¶272 (noting U.S. government finding on designating Bank Saderat as an SDGT that it "transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence").

Saderat argues elsewhere in its brief that none of these U.S. government findings "does anything to establish" elements of Plaintiffs' claims. BS Mem. at 26. Of course, at the pleading stage, Plaintiffs do not have to "establish" their allegations, including allegations that Saderat transferred $50 million for the benefit of Hezbollah. The plausibility of this and all of Plaintiffs' allegations of conspiracy and the resulting funds transfers to Hezbollah and IRGC-QF, among other terrorist entities, is supported by the U.S. government press releases announcing designations, diplomatic cables, official government reports, government indictments, and the DPAs that most of the Defendants themselves entered into with the U.S. government, state banking authorities, and the New York District Attorney's Office. The Court of Appeals in *Rothstein* itself cited the United States government's terrorism designations and reports as support for "[t]he *plausibility*" [of plaintiffs'] allegations …." there. 708 F.3d at 93 (emphasis added).[28] Except for paragraphs summarizing prior allegations, the Complaint scrupulously draws its central allegations from U.S. government findings and the Defendants' own admissions. No more is needed at the pleading stage to make them plausible.

C.      **The ATA Does Not Require Plaintiffs to Plead That Defendants Supplied the Funds Used for Particular Attacks.**

Defendants argue that Plaintiffs are required to allege that the Defendants transferred money to the individuals or entities that "actually perpetrated the attacks" (Jt. Mem. at 20), and that Plaintiffs' failure to identify the specific perpetrators for sixty-five attacks constitutes a deficiency in the Complaint as a matter of law.

---

[28]      *See also Turkmen v. Hasty*, No. 13-1002, 2015 WL 3756331, at *83 n.37 (2d. Cir. June 17, 2015) (plausibility of plaintiffs' allegations is enhanced by reliance on U.S. government document); *cf. Weiss v. National Westminster Bank PLC*, 768 F.3d 202, 210 (2d Cir. 2014) (finding Treasury Department findings announcing SDGT designation create a genuine dispute precluding summary judgment).

*Every* court that has considered this argument has soundly rejected it.[29] *Stansell v. BGP, Inc.*, No. 8:09–cv–2501–T–30AEP, 2011 WL 1296881, at *9 n.5 (S.D. Fla. Mar. 31, 2011) ("the Court is unaware of, and Defendants fail to point to, *any* ATA case in which such strict causation is required. In fact, many courts considering the ATA have definitively held but for causation is not required") (emphasis added). This Court should not be the first to require tracing of dollars in any form.

Judge Posner, in the seminal and still leading ATA case, explained why:

> [T]errorism is *sui generis*. So consider an organization solely involved in committing terrorist acts and a hundred people all of whom know the character of the organization and each of whom contributes $1,000 to it, for a total of $100,000. The organization has additional resources from other, unknown contributors of $200,000 and it uses its total resources of $300,000 to recruit, train, equip, and deploy terrorists who commit a variety of terrorist acts one of which kills an American citizen. His estate brings a suit under section 2333 against one of the knowing contributors of $1,000. The tort principles that we have reviewed would make the defendant jointly and severally liable with all those other contributors. *The fact that the death could not be traced to any of the contributors … and that some of them may have been ignorant of the mission of the organization (and therefore not liable under a statute requiring proof of intentional or reckless misconduct) would be irrelevant. The knowing contributors as a whole would have significantly enhanced the risk of terrorist acts and thus*

---

[29]    *See Boim III*, 549 F.3d at 695-700. *See also Gill*, 893 F. Supp. at 556 ("When the predicate criminal act alleged in an ATA claim involves provision of material financial support to terrorists, as is the case here, the money alleged to have changed hands 'need not be shown to have been used to purchase the bullet that struck the plaintiff.' But moral blame should only follow if the harm caused by providing bank services to terrorists is foreseeable."); *Abecassis*, 785 F. Supp. 2d at 647 (observing that notwithstanding differing judicial enunciations of § 2333(a)'s causation element, "*but for*" *causation is not required.*") (emphasis added); *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 21-23, 53-57 (D.D.C. 2010); *In re Chiquita Brands Int'l Inc. Alien Tort Statute & S'holder Derivative Litig.*, 690 F. Supp. 2d 1296, 1313-1315 (S.D. Fl. 2010); *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 415-18 (E.D.N.Y. 2009); *Strauss v. Credit Lyonnais S.A.*, 2006 WL 2862704, at *18 (E.D.N.Y. Oct. 5, 2006) ("Taking into account the legislative history of these statutes and the purpose behind them, however, it is clear that proximate cause may be established by a showing only that defendant provided material support to, or collected funds for a terrorist organization which brought about plaintiff's injuries."); *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 631 (E.D.N.Y. 2006); *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 585 (E.D.N.Y. 2005). *Cf. Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1130 (D.C. Cir. 2004) (rejecting but-for causation and "directly traceable" requirement as to proximate causation for particular terrorist acts under 28 U.S.C. § 1605(a)(7)'s material support provision pertaining to foreign states.); *Hussain v. Mukasey*, 518 F.3d 534, 538 (7th Cir. 2008) (requiring a link between the material support and the terrorist act "would enable a terrorist organization to solicit funds for an ostensibly benign purpose, and then transfer other equivalent funds in its possession to promote its terrorist activities"); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 29 (2010) (recognizing that "[m]oney is fungible" and that providing any material support to an entity that supports terrorism "frees up other resources within the organization that may be put to violent ends").

> *the probability that the plaintiff's decedent would be a victim, and this would be true even if Hamas had incurred a cost of more than $1,000 to kill the American, so that no defendant's contribution was a sufficient condition of his death.*

*Boim III,* 549 F.3d at 697-98 (emphasis added).

More recently, Judge Cogan explained why he rejected the defendant's proposed jury instruction that plaintiffs had to show that defendants transferred funds "directly" to FTO Hamas:

> No one has ever "directly" been injured by a wire transfer, and further, the language was too suggestive of a requirement to trace specific dollars to specific terrorist attacks, a requirement has been rejected by this Court and others. *See Gill,* 893 F.Supp.2d at 507; *see also Strauss v. Credit Lyonnais, S.A.,* 925 F.Supp.2d 414, 433–34 (E.D.N.Y.2013) ("[P]laintiffs who bring an ATA action are not required to trace specific dollars to specific attacks to satisfy the proximate cause standard. Such a task would be impossible and would make the ATA practically dead letter.").

*Linde,* 2015 WL 1565479, at *31 (citations omitted).

The Complaint here sufficiently alleges, based on U.S. government findings, that the co-conspirators transferred funds to FTO Hezbollah, the IRGC, and IRISL, which orchestrated, trained, and/or provided weapons for the attacks on the Plaintiffs in Iraq. No more is needed.

In fact, even though the cases are agreed that Plaintiffs need not plead that the funds defendants transferred were "used to purchase the bullet that struck the plaintiff," *Gill*, 893 F. Supp. 2d at 572, the Complaint here actually comes close. While Defendants complain that the Complaint does not identify the specific Shi'a group that perpetrated more than sixty of the attacks at issue, *it does identify the distinctive weapon used in each of them*: "an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq." *E.g.*, AC ¶¶750, 772, 782 and *passim*. It alleges that this distinctive weapon was designed, manufactured, and supplied by Iran, and distributed through the IRGC and Hezbollah, allegations that again rely upon U.S. government findings. AC ¶¶163-83. It alleges that the copper discs that are a key

component of EFPs were transported by IRISL. AC ¶¶113-26. It alleges that the U.S. military concluded that the weapons have signatures (including labels) by which their Iranian source is identifiable. AC ¶¶172, 176. It even alleges that Iran paid Iraqi groups "between $4000 and $13,000 *per rocket or roadside bomb,*" quoting a U.S military report. AC ¶151 (emphasis added). And, as noted above, it alleges that the conspirators transferred funds not just to Hezbollah and the IRGC, which trained and armed those groups, but also to IRISL, which transported the copper discs used in EFPs. Indeed, it alleges that Defendant and co-conspirator Commerzbank transferred almost $40 million to IRISL even *after* the U.S. government designated IRISL an SDN in 2008, after which an IRISL charter vessel bound for Syria from Iran was intercepted carrying the copper disc components for EFPs. AC ¶¶634-36.

Defendants also err insofar as they assert or imply that Plaintiffs have not alleged any transfers to participants in IED and EPF attacks. Jt. Mem. at 20. As noted above, the U.S. government found that Hezbollah and the IRGC trained the individuals who planted the devices, that they provided expertise about EFPs, supplied the devices (*e.g.*, AC ¶153 (quoting U.S. military spokesman regarding provision by IRGC of "armor-piercing weapons to extremist groups in Iraq"), and funded them. It is not only the person who detonates an explosive device who is a "perpetrator" or "participant" in the attack. Common sense (and basic criminal law) teaches that the person (or entity) who designs and manufactures the device, gives it to the individual who detonates it, and trains that individual in how to detonate the device remotely, is no less a perpetrator and participant in the crime than the individual(s) who pushes the button or dials the cell phone that triggers the explosion.

No ATA case requires Plaintiffs here to plead that the funds transferred by the Conspiracy were "actually" used to pay the Shi'a terror cells in Iraq or to manufacture the EFP

used in a particular attack at issue. Defendants are free at trial to try to rebut the U.S. military's findings that identified the weapons used in many of the Complaint's enumerated terrorist attacks as Iranian EFPs or to challenge the U.S. government's claims that the IRGC and Hezbollah supplied these weapons, but that is a far cry from arguing that, at the pleading stage, allegations based on the U.S. government's findings fail to state a claim.

### D. Defendants' Conspiracy with Iranian Banks to Criminally Evade U.S. Terror-financing Controls was a Substantial Factor in the Sequence of Responsible Causation, and Plaintiffs' Injuries Were a Reasonably Foreseeable Consequence of Such Transfers.

Finally, Defendants' argument that Plaintiffs have not plausibly shown that Iran would have been unable to fund the attacks at issue without Defendants' transfers of funds is just another way of arguing the universally rejected strict "but for" causation standard. *Rothstein* suggested that such an allegation was one of several *alternative* allegations that might have been sufficient to plead proximate causation,[30] not that it was necessary. 708 F.3d at 96-97.

In any case, the Complaint cites the U.S. government's own assessment that "Iran's access to the international financial system enables the Iranian regime to facilitate its support for terrorism and proliferation. The Iranian regime disguises its involvement in these illicit activities through the use of a wide array of deceptive techniques, specifically designed to avoid suspicion and evade detection by responsible financial institutions and companies." AC ¶112. Given the restrictions which the United States had placed on the dollar clearing of revenues from Iran's oil and gas exports and, in particular, the safeguards it placed to prevent diversion of dollars to terrorism and proliferation (which the Defendants' Conspiracy was expressly designed to

---

[30] Had such an allegation been necessary as opposed to one alternative form of proximate cause, it would hardly have been necessary for the *Rothstein* plaintiffs to have also alleged that "UBS was a participant in the terrorist attacks that injured plaintiffs," another alternative the Court identified. Similarly, *Al Rajhi* also identified *alternative* sufficient allegations, listing them conjunctively without even including the "unable to fund" allegation that Defendants argue is necessary. 714 F.3d at 124.

surreptitiously evade) (AC ¶¶79-112), the allegation that without the Conspiracy between the Defendants and Iran the latter could not have transferred the volume of USD it did for the benefit of Hezbollah and the IRGC through the international financial system is plausible. AC ¶¶16, 32, 98, 100-01, 109.

In *Abecassis*, the court recognized that state sponsors of terrorism could have legitimate uses for funds and found that there were legitimate channels for providing such funds to Iraq, the State Sponsor of Terrorism in question.

> Oil companies were permitted and even encouraged to do business with Iraq. *But they were restricted to doing so within the bounds of the [Oil-for-Food Program] OFP. The allegations are that the defendants all knowingly by-passed the strict rules of the OFP by agreeing to pay the kickbacks described. The purpose of these kickbacks was clearly to provide money to Hussein for unlimited discretionary use rather than the very limited humanitarian uses permitted for money paid to the OFP escrow account.* Given the expanded allegations about Hussein's publicly stated dedication to, and involvement in, attacks on Israel, it was foreseeable that if given off-book money, Hussein would use at least some of it to support terrorist attacks in that country intended and likely to target Americans.

785 F. Supp. 2d at 649 (emphasis added).

Here, too, Iran had legitimate channels for obtaining and clearing U.S. dollars, but instead it conspired with Defendants to by-pass these channels and evade U.S. terror-financing controls to obtain "off-book money … at least some of [which it would use] to support terrorist attacks in that country intended and likely to target Americans." *Id.*[31]

In short, it is highly plausible that the illicit transfer of hundreds of *billions* of dollars to Iran during this conspiracy, AC ¶¶44, 104, and the transfer of at least $150 million for the benefit of the very designated terrorist entities (*e.g.*, AC¶ 13) that orchestrated attacks on Americans in

---

[31]     Defendants' admissions in their DPAs literally describe the intricate methods they developed to evade OFAC regulations. *See, e.g.*, AC ¶436 ("[W]e can get around [OFAC seizure] by sending only cover payments to US banks and then make MT103 direct to beneficiary's bank. The MT202 cover must not mention of [sic] the offending entity which could cause funds to be seized."); AC ¶455 ("our payment instructions [for Iranian clients] should not identify the client or the purpose of the payment"); AC ¶513 ("payments by order of Iranian Banks … maintaining accounts with ABN Dubai are to be handled with extra care to ensure that the wordings 'Iran' etc. are not mentioned in the payment due to OFAC regulations.").

Iraq and supplied the distinctive weapons used in many of them, was "a substantial factor in the sequence of responsible causation" and that the ensuing injuries to the Plaintiffs was "reasonably foreseeable or anticipated as a natural consequence" of such transfers.

## III.  THE COMPLAINT PLAUSIBLY PLEADS VIOLATIONS OF 18 U.S.C § 2332d.

18 U.S.C. § 2332d renders it illegal for a "United States person" to "engage[] in a financial transaction with the government of" a country that it knows, or reasonably should know, to be designated under section 6(j) of the Export Administration Act of 1979 as a country supporting international terrorism, "[e]xcept as provided in regulations issued by the Secretary of the Treasury, in consultation with the Secretary of State." 18 U.S.C. § 2332d(a).

Section 2332d(b)(2) defines "United States person" as any:

(A)    United States citizen or national;
(B)    permanent resident alien;
(C)    juridical person organized under the laws of the United States; or
(D)    any person in the United States.

"Financial transaction" is defined as "a transaction which in any way or degree affects interstate or foreign commerce [ ] involving the movement of funds by wire or other means." 18 U.S.C. §§ 2332d(b)(1), 1956(c)(4). The Iranian Trade Regulations ("ITR") also prohibit *precisely the conduct in which the 2332d Defendants engaged.* For example, 31 C.F.R. 560.203 expressly prohibits "[a]ny transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited."

By a chain of statutory incorporation, violations of § 2332d are acts of international terrorism that may give rise to civil liability through § 2333(a). The § 2332d Defendants (HSBC-US, SCB, RBS and Commerzbank) therefore argue that they are not United States persons for purposes of this section, and that the Complaint alleges no financial transactions with "the

government of Iran." The first argument is refuted by § 2332d's plain language, and the second by the clear case law construing the provision as well as common sense.

**A.      § 2333(a) creates primary liability for violations of § 2333d.**

Plaintiffs have properly alleged that primary liability under the ATA separately exists against Defendants HSBC-US, SCB, RBS and Commerzbank for their direct violations of § 2332d.

As the district court in *Abecassis* held, § 2333(a) violations predicated on primary violations of § 2332d are cognizable:

> [P]laintiffs have also flagged 18 U.S.C. § 2332d as an underlying crime supporting direct liability under the ATA. That statute makes it a crime for a "United States person" to "engage in a financial transaction" with the government of a country that he knows or reasonably should know to be designated under section 6(j) of the Export Administration Act of 1979 as a country supporting international terrorism, "[e]xcept as provided in regulations issued by the Secretary of the Treasury, in consultation with the Secretary of State." 18 U.S.C. §2332d(a). "Financial transaction" is defined to include "a transaction which in any way or degree affects interstate of foreign commerce [ ] involving the movement of funds by wire or other means." 18 U.S.C. §§ 2332d(b)(1), 1956(c)(4). Iraq was designated as a state sponsor of terrorism at all times relevant to this case. Regulations were issued to permit Americans and American companies to take part in the [Oil For Food Program] OFP. The plaintiffs allege that the defendants in this case were issued licenses to do so under those regulations. But the allegations are that the defendants violated the terms of the OFP, and thus the federal regulations insulating them from liability under § 2332d. *The plaintiffs allege that because the defendants participated in the OFP and went through the licensing process, they knew that Iraq was designated as a state sponsor of terrorism.* Of course, as the defendants argue, the definition of "international terrorism" also requires that the underlying criminal violation is an act "dangerous to human life." 18 U.S.C. §2331(1). But like giving a loaded gun to a child, or giving money to Hamas, *see Boim III*, 549 F.3d at 690, ***giving money to a state sponsor of terrorism in knowing violation of strict rules set for transacting business with that country is an act dangerous to human life.*** The allegations in the complaint state a violation of the ATA based on § 2332d.

785 F. Supp. 2d at 648 (emphasis added).

Like the regulations governing financial transactions with Iraq in *Abecassis*, so, too, here,

the ITRs provided Defendants the "federal regulations insulating them from liability under §2332d" *provided they adhered to them*. By knowingly and unlawfully "stripping" and otherwise laundering Iranian dollar transactions through the United States to evade U.S. terror-financing controls, the specified Defendants chose to subvert and evade the regulations that could have insulated them from § 2332d liability for at least some of the transactions.

**B.    HSBC-US, SCB, RBS and Commerzbank are U.S Persons for Purposes of § 2332d.**

HSBC-US is a national bank chartered under federal law with corporate headquarters in McLean, VA, and its principal office in New York. AC ¶¶50-53. HSBC-US acknowledges that it is a "juridical person organized under the laws of the United States."

Defendants SCB, RBS and Commerzbank, however, all assert that their U.S. branches are neither "juridical person[s] organized under the laws of the United States" nor "any person in the United States" under § 2332d(b)(2). All three banks, however, operated branches in the United States (as opposed to separately incorporated subsidiaries, like HSBC-US) during the relevant time period, and these branches were licensed by, and operated under the laws of, New York and the United States.

Congress enacted § 2332d to prohibit two kinds of conduct involving financial transactions with State Sponsors of Terrorism. First, it wanted to prohibit domestic entities (*i.e.* U.S. citizens, permanent resident aliens, and U.S. legal entities) from engaging in unlicensed financial transactions with State Sponsors of Terrorism *anywhere in the world.* Second, it also wanted to prohibit *any* person or entity, whether foreign or domestic, from engaging in unlicensed financial transactions with a State Sponsor of Terrorism *in the United States*. Section § 2332d defines "U.S. persons" to reach both groups. Sections 2332d(b)(2)(A)-(C) forbid domestic entities from engaging in prohibited financial transactions anywhere in the world, while

§ 2332d(b)(2)(D) forbids all persons and entities from engaging in prohibited transactions in the United States. There is nothing "superfluous" about this coverage, as Defendants argue (Jt. Mem. at 26): the definitions precisely match the logical reach of the prohibition.

Nor is "any person" limited to "natural persons," as Defendants would have it. Section 2331(3) defines "person" for the entire terrorism chapter of the U.S. Code (thus including § 2332d) as "*any individual or entity capable of holding a legal or beneficial interest in property*." § 2331(3) (emphasis added). The U.S. branches of SCB, RBS and Commerzbank all qualify as entities "*capable of holding a legal or beneficial interest in property*." Furthermore, this reading is entirely consistent with the manner in which financial transactions with Iran have been circumscribed in the ITRs.[32] For example, as noted above, 31 C.F.R. § 560.203 expressly prohibits "[a]ny transaction by any United States person *or within the United States* that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited." (emphasis added). Likewise, § 560.204 prohibits "the exportation, re-exportation, sale or supply, directly or indirectly, *from the United States*, *or by a United States person, wherever located,* of any goods, technology, or services ..." (emphasis added). Like § 2332d, the ITRs clearly target transactions conducted *in or from the United States* by any person. Similarly, prior to 2008, the ITRs *permitted* certain United States dollar clearing transactions involving Iran by "United States depository institutions" under specific conditions. 31 C.F.R. § 560.516.

---

[32]     Consideration of related regulatory language is entirely appropriate in interpreting § 2332d's statutory definition. *See Smith v. Califano*, 597 F.2d 152, 156 (9th Cir. 1979) (where regulations are reasonable and reflect language and policy underlying statute, court should carefully consider regulations in determining proper interpretation of statute). *Cf. Commodity Futures Trading Comm'n v. Gibraltar Monetary Corp.*, No. 04-80132-CIV, 2006 WL 1789018, at *20, n.8 (S.D. Fla. May 30, 2006) ("When a statute and regulation contain virtually identical language, the interpretation of the statute guides the interpretation of the regulation."). Indeed the Defendants claim that *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000), is on point because in that case the Supreme Court construed what they describe as "identical language" in regulations setting forth Burma-related sanctions.

> The term United States depository institution means any entity (including its foreign branches) organized under the laws of any jurisdiction within the United States, *or any agency, office or branch located in the United States of a foreign entity, that is engaged primarily in the business of banking* (for example, banks, savings banks, savings associations, credit unions, trust companies and United States bank holding companies).

31 C.F.R. § 560.319 (emphasis added). The direct chain of definitions in the ITRs leads directly to the Defendants' doors.

Faced with the plain language of the statute and the actual implementing regulations, Defendants rely on *United States v. Chalmers*, 474 F. Supp. 2d 555 (S.D.N.Y. 2007),[33] a criminal case in which the court refused to impute the conduct of an *independent* entity (a U.S. subsidiary) to a Bahamian corporation that had no independent presence in the United States. *Chalmers* did not address a factual scenario involving a U.S.-licensed branch of a foreign corporation or that entity's U.S. conduct. Moreover, *Chalmers* relied entirely on *Crosby*, 530 U.S. at 379 (as does Jt. Mem. at 26), a Supreme Court case that considered whether a *state* statute boycotting (*inter alia*) *wholly foreign corporations* (having no branch, office, operation, or other presence in the state or the United States)[34] was pre-empted by the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 ("FOEFRPAA").[35] The Supreme Court concluded that the state law was preempted because FOEFRPAA occupied the field of prohibition and did not reach wholly foreign companies. "The state Act ... imposes

---

[33]     Defendants also cite *Abecassis, supra*, 785 F. Supp. 2d 614, but *Abecassis* merely cites *Chalmers* without further analysis.

[34]     The state statute reached any person "(a) having a principal place of business, place of incorporation or its corporate headquarters in Burma (Myanmar) or having any operations, leases, franchises, majority-owned subsidiaries, distribution agreements, or any other similar agreements in Burma (Myanmar), or being the majority-owned subsidiary, licensee or franchise of such a person." Quoted in *Crosby*, 530 U.S. at 366.

[35]     FOEFRPAA provided: "The President is hereby authorized to prohibit, and shall prohibit United States persons from new investment in Burma" but did not itself define "United States persons." Pub. L. No. 104-208, 110 Stat. 3009-166, § 570(b). However, elsewhere in the same Act, Congress provided the following definition: "(1) a natural person who is a citizen or national of the United States; or (2) a corporation, partnership, or other legal entity organized under the United States or any State, territory, possession, or district of the United States." Pub. L. No. 104-208, 110 Stat. 3009-170, § 581(c).

restrictions on foreign companies as well as domestic, whereas the federal Act limits its reach to United States persons." 530 U.S. at 379. *Crosby*'s reasoning does not apply here.

First, FOEFRPAA did not include the words "any person in the United States" in its definition, as § 2332d does. This alone is dispositive. Defendants rely upon the Supreme Court's analysis of a statute that does *not* contain the words "any person in the United States" to argue that those words in § 2332d must exclude U.S. branches of foreign banks "in the United States."

Second, FOEFRPAA has a different purpose than the ATA. It dealt primarily with U.S. foreign aid and investment (*e.g.*, Agency for International Development, debt relief and other governmental expenditures), not prevention of terrorism financing. The Supreme Court has recently cautioned that "'the presumption of consistent usage readily yields to context,' and a statutory term may mean different things in different places." *King v. Burwell*, No. 14-114, 2015 WL 2473448, at *12, n.3 (U.S. June 25, 2015), *quoting Util. Air Regulatory Grp. v. EPA*, 134 S.Ct. 2427, 2441 (2014).

Finally, the Complaint here does not allege that § 2332d reaches conduct by wholly-foreign corporations that conduct financial transactions with Iran *outside the United States*. Instead, it alleges that financial transactions were purposefully conducted by Defendants SCB, RBS and Commerzbank through their U.S.-licensed branches *in the United States* – the very conduct spelled out in the ITRs by a direct chain of reference.

Defendants ask this Court to carve a giant loophole in § 2332d and its implementing regulatory regime. They urge the Court to extend an inapposite holding in *Chalmers* to domestic conduct by U.S. branches of foreign banks to hold that: § 2332d prohibits (1) domestic U.S. entities from engaging in financial transactions with State Sponsors of Terrorism anywhere in the world and (2) "natural persons" from engaging in financial transactions with State Sponsors of

Terrorism in the United States, *but* (3) § 2332d *exempts* U.S.-licensed branches of foreign banks that violate sanctions laws and regulations by deliberately laundering money for State Sponsors of Terrorism *in the United States* through their U.S. branch offices.[36] It is hard to imagine that the *Chalmers* court intended such an absurd result. But if it had, that case was wrongly decided.

The U.S. branches of foreign banks are hybrid entities. They are treated as "foreign" entities for certain purposes. But they are also "juridical person[s] organized under the laws of the United States," because as U.S. branches, they must obtain licenses and register to do business in the United States and are subject to U.S. sanctions against Iran. *See*, Ex. A (AC ¶¶7, 11-16 – Commerzbank) Ex. B (AC ¶¶9, 73-77 – SCB) and Ex. E (AC ¶¶9-13 – RBS) to the Schlanger Decl. That is why they are included in the definition of "United States depository institutions" in the ITR regulations. 31 C.F.R. § 560.516. Similarly, § 560.327 defines a "U.S. financial institution" to include "those branches, offices, and agencies of foreign financial institutions that are located in the United States, but not such institutions' foreign branches, offices, or agencies." The statutory and regulatory scheme is coherent; the Defendants' proposed loophole and *sui generis* interpretation of the statute are not.

C.    **The § 2332d Defendants Knowingly Engaged in Financial Transactions with the Government of Iran.**

Defendants further argue, without any case citation, that Plaintiffs are required to plead that they engaged in "transactions *with the Iranian government itself*," to state a § 2332d claim.

---

[36]    The definition of a "United States person" is nearly identical to the definition contained in the United States Global Terrorism Sanctions regulations, *see* 31 C.F.R. § 594.315, issued by the President Sept. 11, 2001, pursuant to Exec. Or. 13224, 66 Fed. Reg. 490708 (Sept. 23, 2001). These regulations also apply to "any person in the United States" and block financial transactions with SDGTs affiliated with Al Qaeda, Hamas, Hezbollah and other terrorist groups. Yet, under Defendants' theory, U.S. branches of foreign corporations would be allowed to freely operate within the United States and engage in financial transactions with SDGTs without exposing themselves to criminal liability under the Exec. Or. No. 13224 regulations.

Jt. Mem. at 27.[37] Nothing in the language of 18 U.S.C. § 2332d suggests, however, that proscribed "financial transactions with the government of Iran" are limited solely to transactions in the *name* of the government of Iran. If they were so limited, any State Sponsor of Terrorism could simply ask banks to send money to a state instrumentality or wholly-controlled entity not named "the Islamic Republic of Iran," and a party could escape criminal liability under § 2332d simply by engaging in transactions with those entities or alter-egos, agents, or dummy companies established by the Iranian government.[38] *See also, Abecassis*, 785 F. Supp. 2d at 620 (payments to an account "held by Al Wasel and Babel General Trading, a United Arab Emirates company allegedly 'secretly owned and controlled' by Hussein," sufficient to plead proscribed financial transaction with the government of Iraq); *cf., Nat'l Council of Resistance of Iran v. Dep't of State*, 373 F.3d 152, 157-58 (D.C. Cir. 2004) (reasoning that it is "silly" and "implausible" to think that a designated terrorist could escape the consequences of the designation simply by adopting an alias).

The Complaint alleges that the U.S. Treasury Department revoked authorization for "U-Turn" transactions

> because it suspected *Iran of using its banks* – including the CBI/Markazi, Bank Saderat and Bank Melli – to finance its nuclear weapons and missile programs. The U.S. also suspected that *Iran was using its banks to finance terrorist groups,* including Hezbollah, Hamas and the Palestinian Islamic Jihad, and engaging in

---

[37] They add, incredibly, "[n]or can Plaintiffs demonstrate that U.S. clearing banks like HSBC US knew that Iran was the beneficiary of transactions, as the hub of Plaintiffs' allegations is that this information was stripped from wire transfers before it reached the U.S. clearing bank." Jt. Mem. at 27. But the Complaint sets forth in detail HSBC-US's awareness and participation in the unlawful acts of the Conspiracy. *See, e.g.,* AC ¶¶380-407 (detailing HSBC-US's practices and knowledge). Tellingly, the Department of Justice press release announcing the DPA by which HSBC Holdings and HSBC-US agreed to a forfeiture of more than a billion USD cited "HSBC's willful flouting of U.S. sanctions laws and regulations [that] resulted in the processing of hundreds of millions of dollars in OFAC-prohibited transactions." AC ¶416.

[38] Similarly, the ITRs state: "The term entity owned or controlled by the Government of Iran includes any corporation, partnership, association, or other entity in which the Government of Iran owns a 50 percent or greater interest or a controlling interest, and any entity which is otherwise controlled by that government." 31 CFR § 560.313.

deceptive conduct to hide its involvement in various other prohibited transactions…

AC ¶103 (emphasis added).

It further alleges that the CBI "is an alter-ego and instrumentality of the Iranian government." AC ¶¶278-80.[39] The ITRs also define the term "Government of Iran" to include "the Central Bank of Iran." 31 C.F.R. § 560.304. Bank Melli is also "effectively controlled by the Iranian regime." AC ¶295, and in other litigation, Bank Melli has conceded that it is an instrumentality of Iran. *See Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 48 (2d Cir. 2010) ("Bank Melli concedes that it is an instrumentality of Iran."). As the Complaint notes, in its 2004 Consent Order with ABN Amro (RBS N.V.), U.S. regulators found that "the New York Branch processed wire transfers originated by Bank Melli Iran, *a financial institution owned or controlled by the Government of Iran*." AC ¶538 (emphasis added).[40] The Complaint further alleges that on September 24, 2012, the U.S Treasury Department made a determination that the National Iranian Oil Company ("NIOC") was an agent or affiliate of the IRGC. AC ¶453. IRISL has also been held to be an instrumentality of the government of Iran. *See Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch*, 919 F. Supp. 2d 411, 420 (S.D.N.Y. 2013)

---

[39] On February 6, 2012, pursuant to his authority under IEEPA, President Obama issued Executive Order ("E.O.") 13599 which provides that:

> [a]ll property and interests in property of the Government of Iran, *including the Central Bank of Iran,* that are in the United States, that are or hereafter come within the United States, or that hereafter come within the possession or control of any United States person, including any foreign branch, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in. Exec. Order No. 13599, 77 Fed. Reg. 26 (Feb. 6, 2012) (emphasis added).

[40] *See also*, New York State Department Of Financial Services Order Pursuant To Banking Law § 39 attached as Exhibit H to the Schlanger Decl. at ¶1 ("For nearly a decade, SCB programmatically engaged in deceptive and fraudulent misconduct in order to move at least $250 billion through its New York branch on behalf of client Iranian financial institutions ('Iranian Clients') that were subject to U.S. economic sanctions, and then covered up its transgressions. These institutions included no less than the Central Bank of Iran/Markazi ('CBI/Markazi'), as well as Bank Saderat and Bank Melli, both of which are also Iranian State-owned institutions.").

("As Iran's 'national maritime carrier,' IRISL functions as an instrumentality of the government of Iran.").

The Complaint pleads that each of the four Defendants identified in the Third and Fourth Claims for Relief engaged in financial transactions with one or more of these instrumentalities or divisions of the Government of Iran. For example, the Complaint details HSBC-US's knowledge of the manner in which it was being used as an unlawful conduit for financial transactions on behalf of the CBI, Bank Melli and NIOC. AC ¶¶286, 365, 380-414 (*e.g.* July 12, 2001 e-mail to senior employees at HSBC-US advising them that HSBC had "been approached by the Central Bank of Iran to take back their USD clearing business from Natwest"). The Complaint also details the U.S. branch of SCB's knowledge of the manner in which it was used as an unlawful conduit for financial transactions on behalf of the CBI, Bank Saderat, Bank Melli and NIOC. AC ¶¶450-97 (*e.g.* October 2006 e-mail from the CEO for SCB's U.S. operations discussing the "potential of risk of subjecting management in US and London (e.g. you and I) and elsewhere to personal reputational damages and/or serious criminal liability"). RBS's U.S. branch's conduct and its knowledge of the manner in which it was being used as an unlawful conduit for financial transactions on behalf of the CBI and Bank Melli is also set forth in detail. AC ¶¶509-42. Lastly, Commerzbank's U.S. branch was used as an unlawful conduit for financial transactions on behalf of Bank Melli, Bank Saderat and IRISL. AC ¶¶ 610-44 (*e.g.* June 2006 response from one of Commerzbank's New York compliance employee noting "[p]ersistent disregarding of OFAC rules by foreign branches. Hamburg is notorious for it."). This is precisely the kind of conduct directed at, and "in" the United States, that the statute was intended to reach.

## IV. THIS COURT HAS SPECIFIC PERSONAL JURISDICTION OVER BANK SADERAT, PLC AND COMMERZBANK.

Saderat and Commerzbank urge dismissal of the claims against them on the grounds that the Court lacks personal jurisdiction over them. In evaluating whether the requisite showing of personal jurisdiction has been made, the Court must construe the pleadings and any supporting materials in the light most favorable to the plaintiffs. *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010). *See also Dale v. Banque SCS Alliance S.A.*, No. 02Civ.3592(RCC)(KNF), 2005 WL 2347853, at *3 (S.D.N.Y. Sept. 22, 2005) ("In determining whether the plaintiffs have made a prima facie showing of personal jurisdiction, the court will construe jurisdictional allegations liberally and take all uncontroverted factual allegations to be true.").

The parties agree that determining personal jurisdiction over a foreign defendant in a federal-question case such as this requires a two-step inquiry. First, the Court must look to federal law and/or the law of the forum state to determine whether there is a basis for personal jurisdiction. *See, Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007). Under the ATA, Congress expressly created nationwide personal jurisdiction by providing for service in any district wherever a defendant resides, is found, or has an agent. 18 U.S.C. § 2334(a); Fed. R. Civ. P. 4(k)(C). Commerzbank was served under § 2334(a), giving this Court federal long arm jurisdiction over it. In addition, the New York long arm statute provides personal jurisdiction over both Commerzbank and Saderat (which was served under the Hague Convention).

Second, the Court must consider whether the exercise of personal jurisdiction over a foreign defendant comports with due process protections established under the United States Constitution. Both the federal and state assertions of long arm jurisdiction are constitutionally

permissible for claims arising from financial transactions purposefully channeled through the United States.

## A.    Federal and State Long Arm Jurisdiction.

### 1.    Personal Jurisdiction Over Saderat Exists Under ATA § 2334(a).

The second sentence of § 2334(a) of the ATA is a federal long arm statute permitting nationwide service of process where defendant is served, found, or has an agent. *See, e.g.*, David D. Siegel, *Practice Commentary for Rule 4,* at C4-34, in Rule 4, U.S.C. ("There are a number of statutes that authorize service nationwide or beyond, of which § 2361 is just one example.... Finding such a statute in a particular case comes close to doing the whole jurisdictional job on the territorial reach of the federal summons."). Commerzbank does not deny that it was served in compliance with § 2334(a).

### 2.    Personal Jurisdiction Over Saderat and Commerzbank Exists Under C.P.L.R. § 302(a)(1).

New York's long-arm statute provides in relevant part that "a court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent ... transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. § 302(a)(1).[41] "To establish personal jurisdiction under section 302(a)(1), two requirements must be met: (1) The defendant must have transacted business within the state; and

___

[41]    When a defendant is not subject to jurisdiction in any state's courts, the court may exercise personal jurisdiction over it pursuant to Rule 4(k)(2), which requires "minimum contacts with the United States to satisfy Fifth Amendment due process requirements." *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 807 (S.D.N.Y. 2005). "Rule 4(k)(2) is designed to 'fill a gap in the enforcement of federal law' for courts to exercise personal jurisdiction over defendants 'having sufficient contacts with the United States to justify the application of United States law … but having insufficient contact with any single state to support jurisdiction under state long-arm legislation." *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 760 (S.D.N.Y. 2004) (citations omitted). For due process purposes, jurisdictional contacts can be assessed based on a defendant's ties to the United States as a whole, rather than to any given state. *See Wultz v. Islamic Rep. of Iran*, 762 F. Supp. 2d 18, 25 (D.D.C. 2011). If Saderat is asserting that there is no state in which it would be subject to personal jurisdiction, then the Court can still assess whether the contacts Plaintiffs discuss *infra* meet this Fifth Amendment standard. Furthermore, Plaintiffs contend that the injuries the Conspiracy inflicted on American nationals also form a sufficient contact with the United States in accordance with 5th Amendment Due process analysis. *See*, *Biton v. Palestinian Interim Self-Government Auth.*, 510 F. Supp. 2d 144, 146 (D.D.C. 2007) (collecting cases).

(2) the claim asserted must arise from that business activity." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013), *citing Solé Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006).

Saderat asserts that it did not transact business in the forum because "Plaintiffs … do not allege even a single specific U-turn transaction directly routed through New York by BSPLC at any time." BS Mem. at 16. This statement is flatly untrue.

In a footnote, Saderat alludes to paragraphs of the Complaint that cite U.S. government findings to the contrary (AC ¶¶266-67), but dismisses those findings as discussing "the activity of Lloyds and Credit Suisse relating to several Iranian banks …in a non-specific fashion" that "does not satisfy their burden of pleading specific facts to support their allegation that BSPLC 'directed' illegal fund transfers to the U.S." BS Mem. at 16 n.14. The language of the Deferred Prosecution Agreement involving Lloyds TSB makes clear that Saderat's gloss on the document does not support its claim. The DPA's findings include:

- Prior to 2002, Lloyds maintained USD correspondent accounts for what were then the London-based branches of Bank Sepah, Bank Melli, Bank Tejerat, Bank Mellat, Bank Saderat, and the Iranian Overseas Investment Bank. During this time, Lloyds was able to provide USD payment processing services through its relationships with other correspondent banks in New York and elsewhere in the United States. By 2002, these Iranian bank branches had become subsidiaries incorporated under United Kingdom law. *The U.K. subsidiaries of the Iranian banks for which Lloyds maintained correspondent accounts were Melli Bank, plc., Bank Sepah International, plc.,* **Bank Saderat, plc**., and Persia International Bank, plc. The branches and successor U.K. subsidiaries are referred to collectively hereinafter as the "U.K. Iranian Banks." (Lloyds DPA ¶13 (emphasis added).)

- In June 1995, in response to the promulgation of heightened OFAC sanctions against Iran, Lloyds' U.K.-based international payment processing unit ("IPPU") implemented a procedure whereby its processing staff manually reviewed each SWIFT message received from the U.K. Iranian Banks before **they were transmitted to the United States** to ensure that references to Iran were removed from certain outgoing USD SWIFT messages. (*Id.* ¶16 (emphasis added).)

56

- By manually amending these payment records in this fashion, Lloyds prevented *the U.S. depository institutions located in New York and elsewhere in the United States* from recognizing the transactions as originating from sanctioned countries, banks or persons, and then blocking them for investigation or rejecting such transactions. Lloyds additionally prevented those depository institutions from generating business records of transactions to be filed with OFAC, as required by law. (*Id.* ¶20 (emphasis added).)

*See* Lloyds TSB Deferred Prosecution Agreement, Schlanger Decl. Ex. I. The Complaint also cites a January 10, 2007 article in *The Wall Street Journal* that reported:

> Intelligence officials say Bank Saderat, a large, state-controlled Iranian bank placed on a U.S. Treasury blacklist in October for allegedly funding terrorism, has been able to process dollar transactions *through Commerzbank's New York branch* in recent months by using the accounts of two other Iranian banks.

AC ¶640 (emphasis added).

In sum, the United States government has found that Saderat was among the Iranian banks in the United Kingdom that "stripped" USD transactions that "*were transmitted to the United States*" and "prevented the U.S. depository institutions *located in New York and elsewhere in the United States* from recognizing the transactions as originating from sanctioned countries, banks or persons…." Saderat describes this conduct as transactions that "were processed in a manner that caused them to pass through New York via daisy-chained transactions involving numerous other foreign banks." BS Mem. at 16. A more accurate characterization is that Saderat committed numerous criminal acts in furtherance of a documented criminal conspiracy whose purpose was to inject billions of dollars *through U.S. banks* without detection, giving rise to the claims herein.

Bank Saderat characterizes the imposition of personal jurisdiction over a party that directs a criminal conspiracy designed to route billions of dollars through the United States (undetected) as "new for the world" and a "big bang." BS Mem. at 16. If anything, such conduct demonstrates *more* purposeful conduct directed at the United States than the conduct analyzed in

*Licci*. There, a Lebanese bank was sued for providing financial services to a Hezbollah-controlled organization, and personal jurisdiction rested on "dozens" of international wire transfers that allegedly flowed through the Lebanese bank's correspondent account with American Express in New York.[42] The New York Court of Appeals ultimately held that:

> [C]omplaints alleging a foreign bank's repeated use of a correspondent account in New York on behalf of a client—in effect, a "course of dealing" (see *Indosuez*, 98 N.Y.2d at 247, 746 N.Y.S.2d 631, 774 N.E.2d 696)—show purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States.

*Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 338-39 (2012).

In the present case, Saderat's criminal conduct did not just incidentally touch the United States. On the contrary, it was because it was an Iranian-owned bank subject to strict scrutiny under American law that its conduct was specifically intended to exploit "New York's dependable and transparent banking system" and to transfer USD clandestinely. *Id.* at 339. It would be a "new world" indeed if U.S. courts were powerless to assert jurisdiction over criminal conduct whose ultimate purpose was to prevent "*U.S. depository institutions located in New York and elsewhere in the United States* from recognizing the transactions as originating from sanctioned countries, banks or persons." *See* Schlanger Decl. Exhibit I, Lloyds DPA.

Saderat's reliance on *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720 (S.D.N.Y. 2010), is misplaced because *Tamam* was essentially overruled by *Licci*. Saderat quotes *Tamam* for the proposition that "[t]he "events giving rise to the physical injuries and deaths for which Plaintiffs [sought] redress [were] missile attacks in Israel, not funds transfers in New York." BS Mem. at 18, quoting *Tamam* at 728. But the Court of Appeals in *Licci* recognized that funds transfers through U.S. correspondent banks provide an "articulable nexus or substantial relationship"

---

[42] The Circuit later concluded that the Lebanese bank "deliberately chose to process the many Shahid wire transfers through AmEx in New York." *Licci*, 732 F.3d at 171.

between claims brought against a defendant and the business activity giving rise to personal jurisdiction:

> Not all elements of the causes of action pleaded are related to LCB's use of the correspondent account. And the specific harms suffered by plaintiffs flowed not from LCB's alleged support of a terrorist organization, but rather from rockets. Yet CPLR 302(a)(1) does not require that every element of the cause of action pleaded must be related to the New York contacts; rather, where at least one element arises from the New York contacts, the relationship between the business transaction and the claim asserted supports specific jurisdiction under the statute.

20 N.Y.3d at 341.

Here, the U.S. government revoked Saderat's (legal) access to the U.S. financial system because of: (1) its prior abuse of the U.S. dollar clearing system; and (2) its extensive support for Hezbollah and terrorism generally. That conduct, purposefully directed at "U.S. depository institutions located in New York and elsewhere in the United States" indisputably breached statutory duties that form an element of Plaintiffs' claims.[43]

### 3. Personal Jurisdiction Over Saderat and Commerzbank Also Exists Under C.P.L.R. § 302(a)(2).

Saderat and Commerzbank are also subject to personal jurisdiction under C.P.L.R. § 302(a)(2) as defendants that committed a tortious act within New York State. While the Second Circuit has held that § 302(a)(2) requires a defendant to be physically present in New York to give rise to jurisdiction, *see Bensusan Rest. Corp. v. King*, 126 F.3d 25, 29 (2d Cir. 1997), courts have held that the acts of an agent,[44] which can include the acts of a co-conspirator, provide a

---

[43]    Saderat complains that the Complaint fails to cite the granular details of it unlawful transactions. That specificity is not required at the pleading stage in light of the U.S. government's findings. However, should the Court require that level of specificity, Plaintiffs request, in the alternative, that they be permitted jurisdictional discovery. *See, Am. Banknote Corp. v. Daniele*, 845 N.Y.S.2d 266, 268 (1st Dept. 2007) ("Plaintiffs' pleadings, affidavits and accompanying documentation made a 'sufficient start' to warrant further discovery on the issue of personal jurisdiction. The allegation that defendants used their New York bank account to further their misdeeds may be sufficient to establish long-arm jurisdiction over defendants." (citations omitted)).

[44]    "Whether a defendant's representative is an "agent" for purposes of § 302(a) turns on whether the representative acted 'for the benefit of and with the knowledge and consent of [the] defendant and [the defendant]

sufficient basis for personal jurisdiction under C.P.L.R. § 302(a)(2), even when a defendant was not physically present in the state at the time of the tortious conduct.[45] "Thus, the Court considers whether: "(1) the out-of-state co-conspirator had an awareness of the effects of the activity in New York, (2) the New York co-conspirators' activity was for the benefit of the out-of-state conspirators, and (3) that the coconspirators in New York acted at the behest of or on behalf of, or under the control of the out-of-state conspirators." *Emerald Asset Advisors*, 895 F. Supp. 2d at 431.

Here, the detailed allegations in the Complaint make clear that (1) the out-of-state co-conspirator (Saderat) actively conspired to effectuate the criminal conduct directed at New York (and the United States generally), (2) TSB Lloyds and other co-conspirators (including Defendants herein) engaged in an extended course of conduct in New York and directed toward New York for the benefit of Saderat, and (3) the co-conspirators in New York acted at the behest of and on behalf of Saderat.

### B. Personal Jurisdiction Over Saderat and Commerzbank Comports with Constitutional Due Process.

In cases in which jurisdiction is predicated on the defendant's contacts with the forum, constitutional due process analysis typically proceeds in two steps. First, the Court has to "evaluate the quality and nature of the defendant's contacts with the forum state under a totality

---

exercised some control over [the agent] in the matter.'" *Shpak v. Curtis*, 10-CV-1818 RRM JO, 2011 WL 4460605, at *8 (E.D.N.Y. Sept. 26, 2011) (citations omitted). Plaintiffs' allegations clearly meet this standard.

[45]     *See Emerald Asset Advisors, LLC v. H. Cy Schaffer*, 895 F. Supp. 2d 418, 431 (E.D.N.Y. 2012). ("'[T]he New York activities of a 'co-conspirator' may also be imputed to an out-of-state defendant for purposes of personal jurisdiction under § 302(a)(2) under an agency rationale.' … To establish jurisdiction on this basis, a plaintiff must 'make a *prima facie* showing of a conspiracy and allege specific facts warranting the inference that the defendants were members of the conspiracy.'" (citations omitted)). *See also In re Satyam Computer Services Ltd. Securities Litigation*, 915 F. Supp. 2d 450, 484 (S.D.N.Y. 2013) ("Courts in this Circuit have recognized [a] conspiracy theory of personal jurisdiction, which allows 'the acts of a co-conspirator [to] be attributed to a defendant for the purpose of obtaining personal jurisdiction over the defendant.'") (citations omitted); *Brady v. Basic Research, L.L.C.*, No. 13–CV–7169 (SJF), 2015 WL 1542094 (E.D.N.Y. Mar. 31, 2015); *Beach v. Citigroup Alternative Investments LLC*, No. 12 Civ. 7717(PKC), 2014 WL 904650 (S.D.N.Y. March 7, 2014).

of the circumstances test." *Best Van Lines*, 490 F.3d at 242 (citations and internal quotation marks omitted). This requires the Court to determine whether Saderat and Commerzbank "purposefully availed [themselves] of the privilege of doing business in the forum and could foresee being haled into court there." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002) (internal quotation marks omitted). In the present case, their conduct in "stripping" transactions was designed to channel clandestine funds transfers specifically through the United States – i.e. the definition of "purposeful availment."

Second, the Court is required to evaluate Saderat's contacts with New York and the United States to "determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) (internal quotation marks omitted). Relevant factors at this second step of the analysis may include: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; [and] (3) the plaintiff's interest in obtaining convenient and effective relief...." *Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996). In the present case, Defendants' conduct violated numerous U.S. criminal laws intended to protect the integrity of the U.S. financial system, prevent State Sponsors of Terrorism from secretly accessing it, and (not least) protect American citizens from acts of terrorism. And neither Defendant can claim surprise, when the evidentiary trail shows their numerous deliberate efforts to evade terror-financing controls. *Cf. Sisso v. Islamic Republic of Iran*, 448 F. Supp. 2d 76, 90 (D.D.C. 1990) ("those who engage in this kind of terrorism should hardly be surprised to find that they are called to account for it in the courts of the United States"). The ultimate question is whether defendant's conduct is not "'so unrelated to American interests as to render their [being sued] in the United States arbitrary or fundamentally unfair.'" *Goldberg*, 660 F. Supp. 2d at 431

(alteration in original) (quoting *Yousef*, 327 F.3d at 112) – an impossible standard for serial evaders of U.S. terror-financing controls to meet.

### C. Commerzbank's Asserted "book-entry" Limitation on Personal Jurisdiction is Incomprehensible.

According to Commerzbank, "Plaintiffs cannot pursue claims that 'arise from' book-entry or other transactions that did not actually involve funds transiting through the United States." Mem. at 12. The words "book entry" do not appear in the Complaint and are not explained by Commerzbank, so presumably Commerzbank is alluding to additional criminal conduct that it is aware of, but has not yet been alleged. Obviously, the Court cannot at this stage address hypothetical conduct or allegations. It is sufficient for the Court to assert personal jurisdiction over Commerzbank based on unlawful conduct that Commerzbank purposefully directed at the United States, and that was specifically designed to effectuate the flow of billions of USD through the United States in violation of U.S. laws. Once the Court properly asserts personal jurisdiction over a party, it retains jurisdiction for all elements of the claim. *See*, *Licci*, 20 N.Y.3d at 341 ("CPLR 302(a)(1) does not require that every element of the cause of action pleaded must be related to the New York contacts; rather, where at least one element arises from the New York contacts, the relationship between the business transaction and the claim asserted supports specific jurisdiction under the statute.").

## V. THE ACT OF WAR DEFENSE DOES NOT APPLY TO THE TERRORIST ATTACKS THAT INJURED THE PLAINTIFFS.

Saderat asks this court to find that a defendant that is itself a *designated terrorist* enjoys immunity from liability for *conceded acts of terrorism* under a congressional act commonly called the *Anti-Terrorism* Act (ATA) – a result that would "pervert the very purpose of the ATA," as all but one of the courts that have reached the issue and all of the courts in this Circuit,

including this Circuit's Court of Appeals, have recognized.[46] This Court should reject this invitation to error.

Saderat argues that relabeling acts of international terrorism as "acts of war" under 18 U.S.C. § 2336(a) of the ATA provides it total immunity from civil liability. For purpose of its "facial challenge," Saderat does not dispute that:[47]

- Hezbollah and IRGC-QF were terrorists designated by the United States at all relevant times herein for "training, funding, and guid[ing] select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians" (AC ¶¶9, 10, 149, 177, 179-80);

- the attacks in question were acts of international terrorism within the meaning of the Anti-Terrorism Act ("ATA") (activities involving violent acts that are criminal under U.S. law and appear to be intended to influence the policy of the United States (and Iraq) by coercion) (AC ¶¶232, 1473, 1483, 1490);

- the attacks were carried out by terrorists, not the armed forces of recognized governments (AC ¶229); and

---

[46] *Weiss v. Arab Bank, PLC*, No. 06 CV 1623(NG)(VVP), 2007 WL 4565060, at *5 (E.D.N.Y. Dec. 21, 2007). *See, e.g., In re Sept. 11 Litig.*, 751 F.3d 86, 93 (2d Cir. 2014) *cert. denied sub nom. Cedar & Washington Associates, LLC v. Port Auth. of New York & New Jersey*, 135 S. Ct. 742 (2014) (dictum); *Gill*, 893 F. Supp. 2d at 517; *Stansell*, 2011 WL 1296881, at *11; *Sokolow v. Palestinian Liberation Org.*, 583 F. Supp. 2d 451 (S.D.N.Y. 2008); *Estate of Klieman v. Palestinian Authority*, 424 F. Supp. 2d 153, 166 (D.D.C. 2006); *Morris v. Khadr*, 415 F. Supp. 2d 1323 (D. Utah 2006); *Biton v. The Palestinian Interim Self-Gov't Auth.*, 412 F. Supp. 2d 1 (D.D.C. 2005). A District of Columbia district court applied the defense to the rocket attacks in the Israel-Lebanon War, as discussed below. *Kaplan v. Central Bank of Islamic Republic of Iran*, 961 F. Supp. 2d 185 (D.D.C. 2013). In this Circuit, only *Stutts v. De Dietrich Group*, No. 03-CV-4058 (ILG), 2006 WL 1867060, at *5 (E.D.N.Y. 2006), has applied the exception, but it did so with respect to injuries arising from the destruction of leftover chemical stockpiles by Coalition Forces in the 1991 Persian Gulf War that were not perpetrated or orchestrated by any terrorist group.

[47] Saderat grudgingly concedes that it is making only a "facial challenge" and that "all inferences are drawn in the plaintiffs' favor." BS Mem. at 11. Nevertheless, it erroneously asserts that "[m]ost courts," "the majority," (BS Mem. at 6), to address the issue" have treated the act of war defense as jurisdictional. In fact, four of seven courts to have considered the issue declined to treat it as jurisdictional and two others declined to decide whether it was or was not jurisdictional. *Compare Stansell*, 2011 WL 1296881, at *10-11 (apparently rejecting act of war defense on Rule 12(b)(6) motion); *Stutts*, 2006 WL 1867060, at *5 (ruling on Rule 12(b)(6) motion); *Weiss*, 2007 WL 4565060, at *3 (expressly declining to analyze the motion under Rule 12(b)(1), and treating act of war claim under Rule 12(b)(6); *Gill*, 893 F. Supp. 2d at 508 ("defendant is incorrect insofar as it has argued that the act of war exception ... is jurisdictional. The exception merely provides ATA defendants with an affirmative defense.") (citation omitted); *Kaplan*, 961 F. Supp. 2d at 199-200 (declining to resolve whether the act of war defense is jurisdictional, an affirmative defense, or an element of the claim); *Sokolow*, 583 F. Supp. 2d at 458 (declaring characterization of the legal nature of defendants' [act of war] objections irrelevant" because the alleged terrorist attacks were not acts of war) *with Biton*, 412 F. Supp. 2d at 6-7 (assuming, without discussion, that § 2336(a) is jurisdictional); *Klieman*, 424 F. Supp. 2d 153 (same); *Morris*, 415 F. Supp. 2d 1323 (same).

- the attacks violated the laws of armed conflict (AC ¶228).

Saderat's argument therefore hinges on the legal proposition that acts of international terrorism alleged in the Complaint are also acts of war within the meaning of ATA § 2336(a), giving it a complete defense.

The Second Circuit Court of Appeals flatly rejected that proposition in an opinion that Saderat does not even cite, much less try to explain:[48]

> The purpose of the ATA was "[t]o provide a new civil cause of action in Federal law for international terrorism that provides extraterritorial jurisdiction over terrorist acts abroad against United States nationals." H.R. 2222, 102d Cong. (1992). The statutory exception for an act of war defines it as "any act occurring in the course of—(A) declared war; (B) armed conflict, whether or not war has been declared, between two or more nations; or (C) armed conflict between military forces of any origin." 18 U.S.C. § 2331(4). *Acts of war, then, are distinguished from acts of terrorism.*
>
> .... [T]he ATA is designed precisely to differentiate between acts of terrorism and acts of war*, while CERCLA is silent as to terrorism. Indeed, in the CERCLA context, an event may be both an act of war and an act of terrorism; *under the ATA regime, it may not....*

*In re Sept. 11 Litig.*, 751 F.3d at 93 (emphasis added).

The Court of Appeals' rejection of Saderat's perverse proposition that an act of terrorism may be an act of war – "*under the ATA regime, it may not*" (*id.*) – alone compels the rejection of that proposition here. But even if it did not, the "statutory text, structure, and remedial purposes" of the ATA to which the Court of Appeals looked (*id.*), as well as the legislative history, command the same result.

Drawing all reasonable inferences in Plaintiffs' favor (as Saderat concedes the court must (BS Mem. at 11), Saderat has not shown that there was an armed conflict between the United States and either Iraq or Iran at the time of the attacks; that the attackers (one of which was itself

---

[48] Saderat also makes no effort to address the holdings of the seven district courts that have found that acts of terrorism that violate the laws of war are not "acts of war" within the meaning § 2336(a).

designed an FTO) were "military forces" within the meaning of the ATA; or that their terrorist

attacks were "in the course of," not merely after or even *during*, an armed conflict.

A.      **Sporadic Terrorist Attacks Are Not an "Armed Conflict" Within the Meaning of the ATA, and There Was No "Armed Conflict" With Iraq or Iran at the Time of the Attacks.**

Saderat argues that "the Iraq War is a Declared War or Armed Conflict" (BS Mem. at 7),

citing the Authorization for Use of Military Force Against Iraq Resolution of 2002" and noting

the U.S. military invasion of Iraq started on March 20, 2003. BS Mem. at 2. But it simply omits

the next steps in the relevant chronology, that: President Bush declared on May 1, 2003, that

"major combat operations in Iraq have ended;"[49] the Coalition Provisional Authority ("CPA")

established as the interim government for Iraq disbanded the Iraqi military forces on May 23,

2003; the U.N. Security Council authorized the post-conflict occupation of Iraq by Coalition

Forces in October 2003 to maintain "security and stability"[50] – *all* before the attacks at issue in

this case; and the CPA transferred sovereignty to Iraqi authorities on June 28, 2004, shortly after

the first attack but before the rest, pursuant to a U.N. Security Council Resolution that expressly

assigned the remaining Coalition Forces the task of helping Iraq "*by preventing and deterring*

*terrorism.*"[51] In short, the armed conflict with Iraq ended well before any of the acts of terrorism

---

[49]      *President Bush Announces Major Combat Operations in Iraq Have Ended* (May 1, 2003), available at http://georgewbush-whitehouse.archives.gov/news/releases/2003/05/20030501-15.html.

[50]      S.C. Res. 1511, para. 13, U.N. Doc. S/RES/1511 (Oct. 16, 2003).

[51]      S.C. Res. 1546, U.N. Doc. S/RES/1546 (June 7, 2004) ("*Decides* that the multinational force shall have the authority to take all necessary measures to contribute to the maintenance of security and stability in Iraq in accordance with the letters annexed to this resolution expressing, inter alia, the Iraqi request for the continued presence of the multinational force and setting out its tasks, including by preventing and deterring terrorism …."). The Security Council went on to condemn the kind of terrorist acts here at issue. *Id.* at ¶10 ("*Condemns* all acts of terrorism in Iraq, *reaffirms* the obligations of Member States under [prior] resolutions … , and other relevant international obligations with respect, inter alia, to terrorist activities in and from Iraq or against its citizens, and specifically *reiterates* its call upon Member States to prevent the transit of terrorists to and from Iraq, arms for terrorists, and financing that would support terrorists, and *re-emphasizes* the importance of strengthening the cooperation of the countries of the region, particularly neighbours of Iraq, in this regard …."). *Id.* at ¶ 17 (emphasis in original).

at issue in this case. Furthermore, Saderat's reliance on the AUMF Against Iraq Resolution of 2002 simply underscores that Congress never authorized the use of military force against – and the United States has never been in an "armed conflict" with – Iran.

Calling periodic acts of terrorism over the course of many years an "armed conflict" does not make it one, even when it is perpetrated by gangs or persons with military training. The difference is illustrated by the conflict in Southern Lebanon in 2006 between Israeli defense forces and Hezbollah, which the court in *Kaplan* (incorrectly) deemed an armed conflict for purposes of the act-of-war defense. *Kaplan* emphasized that the rocket attacks at issue in that case were launched as part of an intense conflict that was "temporally limited, discrete, waged between Israel and Lebanon over the course of 34 days during the summer of 2006 and provoked by a discrete event," a border crossing that prompted a violent and sustained ground invasion by Israel. 961 F. Supp. 2d at 203. Indeed, Israel itself formally characterized the conflict as "a long war," and the conflict was generally called the "Israel-Lebanon War." *Id.* at 203 & n.14. In contrast, the prolonged, episodic terrorist attacks on Coalition Forces at issue here occurred *after* the conclusion of major combat operations during and after an occupation, were not between the United States and Iraq or its military forces, and neither occasioned, nor were ever officially characterized as, a conflict with Iran or even with Hezbollah. Indeed, Saderat itself tellingly refers to "*clashes* of remnants, insurgents and other 'forces of any origin' occurring in the "*aftermath*" of "conventional war." BS Mem. at 11 (emphasis added). While Plaintiffs believe that *Kaplan* misconstrued § 2336, its analysis on its own terms does not apply to the attacks here at issue.[52]

---

[52]     *See* July 18, 2011 Court transcript from *Lelchook v. Commerzbank AG*, 10-cv-5795 (S.D.N.Y. 2010), Schlanger Decl. Exhibit J, at 25 (Judge Hellerstein rejecting argument that Hezbollah's launching of rockets during the conflict in Southern Lebanon in 2006 qualified as "acts of war").

The 1991 Persian Gulf War is distinguishable on the same basis as the Israel-Lebanon War. That armed conflict was authorized by an AUMF Against Iraq, Pub. L. No. 102-1, 105 Stat. 3 (Jan. 4, 1991), and the armed violence occurred between U.S. (and allied) armed forces and the Iraqi armed forces in a conflict recognized by U.N. Security Council Resolution 678. S.C. Res. 678, U.N. Doc. S/RES/678 (Nov. 29, 1990). The Persian Gulf War, also like the Israel-Lebanon War, was a temporally limited, intense, sustained conflict between vast armed forces that came to a negotiated end. The court in *Stutts* therefore rested its application of the act-of-war defense exclusively on the plaintiffs' concession that the acts they complained of "occurred during the '1991 Persian Gulf War.'" 2006 WL 1867060, at *4.[53] Neither *Kaplan* nor *Stutts* carries any precedential value for characterizing acts of sporadic terrorist violence that occur *after* major combat operations have ended.

**B.     Even If the Acts of International Terrorism Did Occur During an Armed Conflict, They Were Not Conducted by "Military Forces" Within the Meaning of the Act-of-War Defense.**

Even if the Court somehow held as a matter of law that the acts of international terrorism at issue here had occurred during an armed conflict, it could not conclude that they were not committed by "military forces" within the meaning of section 2336(a) of the ATA. Congress explained that

> [t]he intention of this provision is to bar actions for injuries that result from military action by recognized governments *as opposed to terrorists*, even though governments also sometimes target civilian populations.

H. Rep. 102-1040, at 7 (1992); S. Rep. 102-342 at 46 (1992) (emphasis added).

Senator Grassley, who sponsored the ATA, also explained that section 2336(a) "codifies the court-fashioned act of state doctrine, by barring *claims arising from official acts of foreign*

---

[53]     The *Stutts* court overlooked the statutory requirement that the act of war occur "in the course of," and not simply *during*, the war, as further explained below.

*governments*." 136 Cong. Rec. S4568-01, at S4593 (daily ed. April 19, 1990) (statement of Sen. Grassley) (emphasis added). The attacks at issue here were all orchestrated and/or committed by U.S.-designated terrorists or their proxies – the U.S.-designated Foreign Terrorist Organization Hezbollah, the U.S.-designated Specially Designated Global Terrorist IRGC-Qods Force, and their proxies in Iraq (including the U.S.-designated FTO Kata'ib Hezbollah (AC ¶204)), that, by definition, are not "military forces" within the meaning of the ATA. *Weiss*, 2007 WL 4565060, at *5 ("[A] designated terrorist organization cannot constitute a 'military force of any origin.'").[54]

Undeterred by the case law and the clear legislative history, Saderat argues that terrorists are "military forces of any origin" within the definition of section 2331(4)(C) and therefore qualify for the act of war defense. But this phrase only recognizes that a government may conduct military action in an armed conflict not just by its formal armed forces, but also by "[m]embers of other militias and members of other volunteer groups, including those of organized resistance movements, belonging to a Party to the conflict and operating in and outside their own territory," *provided these kinds of military meet the same conditions as the armed forces of a state* – conditions that critically distinguish them from civilians. *See* Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949 (GPW), art. 4(A)(2). *See Gill*, 893 F. Supp. 2d at 515.

---

[54]     Saderat cites *Sokolow*, 583 F. Supp. 2d 459, to argue that the situs or target of the attack is dispositive in characterizing the attacker as a "military force." BS Mem. at 8. But *Sokolow* never held that either factor was dispositive, nor could it, consistent with the statute. The act-of-war definition describes the *actor*, not the target, and a criminal gang which victimizes soldiers – even in the middle of an armed conflict – does not thereby become a "military force." Nor does the ATA remedy exclude those Americans who wore a military uniform in service of their country; it runs to "*any* national of the United States" injured by an act of international terrorism. 18 U.S.C. § 2333(a) (emphasis added). In fact, in *Morris*, the plaintiff was a U.S. soldier attacked by a member of Al Qaeda during combat in the armed conflict in Afghanistan after 9/11 (an armed conflict authorized by an AUMF expressly naming Al Qaeda as the enemy), yet the court had no difficulty finding that terrorist acts by organized groups like Al Qaeda were not acts of war within the meaning of the ATA. 415 F. Supp. at 1333-34.

In pertinent part, these conditions include:

> (a)   that of having a fixed distinctive sign recognizable at a distance;
> (b)   that of carrying arms openly; and
> (c)   that of conducting their operations in accordance with the laws and customs of war.

GPW, art. 4A(2). *See* also Protocol Additional to the Geneva Convention of Aug. 12, 1949, and Relating to the Protection of Victims of International Armed Conflicts, June 8, 1977 (Protocol I), art. 44(3) (asserting that even a combatant who cannot distinguish himself must carry arms "openly" during engagements). "Nor are these … criteria unique to the GPW; they are also established under customary international law …." *United States v. Lindh*, 212 F. Supp. 2d 541, 557 & n.35 (E.D. Va. 2002) ("all armed forces or militias, regular or irregular, must meet the four criteria if their members are to receive combatant immunity").

Saderat brushes aside this understanding of "military forces" in a footnote erroneously asserting that "the requirement of visibility is relevant to rights of prisoners of war," before dismissing the laws of war as "not relevant in the first instance." BS Mem. at 7 n.6. In fact, visibility – distinctive signs, open carrying – is not just a requirement relevant to POW rights; it is also a key to distinguishing civilians from combatants. *See* Protocol I, art. 44(3) ("In order to promote the protection of the civilian population from the effects of hostilities, combatants are obliged to distinguish themselves from the civilian population while they are engaged in attack or in a military operation preparatory to an attack."). In any case, one need not incorporate the laws of armed conflict into the act-of-war defense "in the first instance" to consider them as part of the background understanding for what Congress meant by the terms of art "armed conflict" and "military forces of any origin." The legislative history of the act-of-war defense itself emphasizes that it applied only to injuries received in "*open*" armed conflict (and therefore not in surreptitious terrorist attacks) (H. Rep. 102-1040, at 7 (emphasis added)), an unmistakable

reference to the basic condition that military forces carry their arms *openly*.

*Gill* therefore rightly concluded that to qualify as a "military force of any origin," for purposes of the act-of-war defense, a group would have to act like the armed forces of a nation by meeting the same conditions. Of course, it is not enough that a force had something resembling military training or functions as a military or paramilitary wing of a terrorist group. *See Weiss*, 2007 WL 4565060, at *6 (allegations that terrorists engage in military or paramilitary activities does not make them a "military force" within the meaning of the ATA); *Morris*, 415 F. Supp. 2d at 1333 (allegation that the group that conducted the terrorist attack received "military" training does not establish that the group operated as a military force).

> Congress, in using that term ["military"], can be said to have designed the statute to contrast the traditional actions of national militaries with those of terrorist groups.... *[A] paramilitary or terrorist group or organization must act as a "military" traditionally (but not universally) does* – *i.e.*, in substantial conformance with the laws of war, with attacks directed at civilians making up an incidental rather than substantial portion of its activities – to have its challenged conduct qualify for protection pursuant to section 2331(4)(C).

*Gill*, 893 F. Supp. 2d at 515 (emphasis added).

Saderat decries a worst case scenario that excluding terrorists from "military forces" for purposes of the act-of-war defense would make armed conflicts "a virtually unlimited source of claims from soldiers." BS Mem. at 11. But excluding terrorists, as Congress intended, still preserves the act-of-war defense for acts of violence committed by the armed forces of states and the militias (or other forces of any origin) that fight openly and conduct their operations like those armed forces. This covers the vast majority of the hostilities by contending forces in armed conflict that inflict injuries on soldiers, but does not extend to acts of terrorism committed by terrorist organizations.[55]

---

[55] Saderat warns that the "extraterritorial ATA" must be "cabined" and that there is "a particular reason for caution in interpreting the act of war limitation" lest foreign nations "do the same." BS Mem. at 11 & n.11. This

Neither Hezbollah nor Iran's other proxies acted like a military force within the meaning of the ATA. They did not carry arms openly. AC ¶228. They did not distinguish themselves from civilians (AC ¶228) – indeed, the only uniforms they wore were stolen U.S. military uniforms (AC ¶647), in blatant violation of Protocol I, art. 37 (prohibiting perfidy). The injuries they inflicted were not the result of "open" armed conflict. They murdered defenseless U.S. prisoners (AC ¶¶231, 653) and a journalist. AC ¶¶760-62. And a substantial additional objective of these terrorists was also to intentionally target and attack civilians, as the U.S. government has repeatedly found. AC ¶¶10, 17, 25, 149, 156, 168, 177-80, 205, 207, 219, 231, 245-46, 297-98. By failing to differentiate themselves from civilians, to carry arms openly, or to refrain from targeting civilians, Hezbollah, the IRGC, and their proxies failed to conduct themselves like "military forces," making their acts criminal acts of international terrorism. *See Pan American World Airways, Inc. v. Aetna Cas. & Surety Co.*, 505 F.2d 989, 1015 (2d Cir. 1974) ("The loss of Pan American 747 [by a terrorist hijacking] was not caused by an act that is recognized as a warlike act. The hijackers did not wear insignia. They did not openly carry arms. Their acts had criminal rather than military overtones.").

Indeed, Saderat itself refers to "clashes of *remnants, and insurgents*, and other 'forces of any origin' occurring in ["conventional war's] aftermath," BS Mem. at 11 (emphasis added). Surely the collection of sectarian killers described in the Complaint fails to meet the definition of an organized and disciplined "military forces" fighting openly in the course of war. "Remnants" and "insurgents" involved in sporadic "clashes" (in Saderat's phrase) against Coalition Forces

---

turns the case law on its head, or more precisely, simply ignores it. In *Weiss*, the Court of Appeals held not only that Congress had clearly expressed its intention for the ATA civil remedy to apply extraterritorially (overcoming the usual presumption against extraterritoriality), but also that it intended it to apply "regardless of the views and laws of other nations." 768 F.3d at 207 n.5 & 208. *Compare* AC ¶490 (quoting Standard Chartered Bank's Group Executive Director: "You f - - ing Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians?"). Any "caution in interpreting the act of war limitation" should therefore be exercised to avoid applying it in ways that immunize designated terrorists and their proxies for conceded acts of international terrorism.

and Iraqi civilians are not "military forces"; they "may be prosecuted legally as criminals for bearing arms against the government and for other offenses …," as our own military recognized during and after the occupation of Iraq. *Counterinsurgency*, FM 3-24 (Dec. 2006) App. D at D-15.[56] This Court should not accord them a status that our own government refuses them. *Id*. ("Insurgents have no special status under international law.")

In fact, *even when groups like these kill U.S. soldiers during a conceded armed conflict, the United States treats their acts as crimes, not acts of war*. Thus, the United States ultimately charged Omar Khadr, an Al Qaeda member who attacked U.S. soldiers during the conceded armed conflict in Afghanistan, with "Murder by an Unprivileged Belligerent " for "attempt[ing] to murder diverse persons, while in the context of and associated with armed conflict and without enjoying combatant immunity, by converting land mines to improvised explosive devices and planting said improvised explosive devices in the ground where, based on previous surveillance, U.S. troops were expected to be traveling." *See* Charge 2, *United States v. Khadr*.[57]

Khadr's planting of IEDs against U.S. troops was essentially the same act involved in the majority of the attacks here at issue. *Morris v. Khadr* therefore correctly held that Khadr's acts in attacking U.S. soldiers were not acts of war and that Al Qaeda was not a military force within the meaning of the ATA. 415 F. Supp. 2d at 1333-34. Neither were the FTOs and SDGTs and their proxies who orchestrated the IED and EFP attacks alleged here. *See* AC ¶¶645-1464.

In *Lindh*, the court noted that "[i]t would be absurd for members of [a force] to enjoy lawful combatant immunity even though the force had no established command structure and its members wore no recognizable symbol or insignia, concealed their weapons, and did not abide by the customary laws of war." 212 F. Supp. 2d at 557, n.35. So, too, it would be absurd to claim

---

[56]    http://usacac.army.mil/cac2/Repository/Materials/COIN-FM3-24.pdf (last accessed July 10, 2015).

[57]    http://www.defense.gov/news/Nov2005/d20051104khadr.pdf (last accessed July 9, 2015).

that Hezbollah and Iran's other their proxies, *including groups the United States government has formally designated as terrorists*, qualify as "military forces" entitled to act-of-war immunity even though they wore no recognizable insignia, concealed their weapons, did not fight openly, planted explosive devices just like Omar Khadr, murdered their prisoners, and generally did not abide by the laws of armed conflict.

**C.    The Attacks Were Not Committed "In the Course of" an Armed Conflict.**

The foregoing construction of "military forces" is reinforced by the restrictive statutory definitional phrase, "in the course of." 18 U.S.C. § 2331(4). *Stutts*, on which Saderat chiefly and repeatedly relies (BS Mem. 4, 7, 8, 9, 10, 11), asserted that the plaintiffs' allegation that the unlawful acts "occurred *during* the '1991 Persian Gulf War' put this case squarely within the exemption under § 2336 for 'acts of war.'" 2006 WL 1867060, at *4 (emphasis added). This assertion – which constituted the entirety of the court's analysis for this conclusion – simply ignored the ATA's actual language. An act of war under § 2332d is not any act "occurring *during*" armed conflict between military forces. It is only an act "occurring *in the course*" of such conflicts. 18 U.S.C. § 2331(4) (emphasis added). "In the course of" is a restrictive phrase, a "gatekeeper" phrase, that "exclude[s] from the scope of a statutory provision a subset of conduct that, by its nature and substance, deviates from or is not sufficiently related to a general set of conduct otherwise governed by the provision." *Klieman*, 424 F. Supp. 2d at 164. *Accord, Biton*, 412 F. Supp. 2d at 7-9 (collecting cases).

Conduct which violates the laws of armed conflict deviates from normal or ordinary acts of war that would entitle the actor to combatant immunity. Therefore, "[a]s a matter of law, an act that violates established norms of warfare and armed conflict under international law is not

an act occurring in the course of armed conflict." *Klieman*, 424 F. Supp. 2d at 166.[58] Crimes committed in wartime – even crimes against soldiers – do not qualify as "acts of war" just because of their timing; an "act of war" must be committed "in the course of" the armed conflict, and then only by military forces acting like the armed forces of the contending parties. The terrorist attacks here committed by what Saderat itself calls a motley collection of "remnants and insurgents" in the "aftermath" of armed conflict were merely non-qualifying criminal acts of terrorism.

To apply the act of war defense to acts of international terrorism (that would otherwise be criminal under both domestic law and the laws of armed conflict) perpetrated by designated terrorists would be perverse for three reasons. First, it would "pervert the very purpose of the ATA, which was enacted to deter terrorist activity and hold liable those who engage in it." *Weiss*, 2007 WL 4565060 at *5. *Accord*, *Stansell*, 2011 WL 1296881, at *11 ("To find that a terrorist organization can be a military force under the ATA would defeat the purpose of the Act...."); *Kaplan*, 961 F. Supp. 2d at 201 (reading acts of war to encompass all acts of international terrorism "would eviscerate 2333(a)"). As the Supreme Court has reminded us, "'we cannot interpret federal statutes to negate their own stated purposes'"; "we must read the words 'in their context and with a view to their place in the overall statutory scheme.' Our duty, after all, is 'to construe statutes, not isolated provisions.'" *King v. Burwell*, 2015 WL 2473448, at *2, *8, *12 (citations omitted). Section 2336 must be construed in the context of a statutory scheme that imposes liability for acts of international terrorism, not construed in isolation to place terrorist acts outside the law's reach.

---

[58]     *Gill* found that this was a "powerful" argument, but rejected the act-of-war defense on related, but slightly different, grounds because of a concern about incorporating laws of armed conflict. 893 F. Supp. 2d at 514. The point, however, is not that Congress incorporated such laws wholesale as a standard of conduct or that a court need do so. Rather, it is that to decide what Congress understood by terms of art such as "military forces" and "course of war" that are used in the law of armed conflict, it is appropriate to consider their contemporaneous meaning in that law itself.

Second, it would give designated terrorists a broader immunity from civil liability than they enjoy from criminal liability (including liability for war crimes). But, as the Seventh Circuit Court of Appeals has said, "There is no textual, structural or logical justification for construing the civil liability imposed by section 2333 more narrowly than the corresponding criminal provisions" (including 18 U.S.C. § 2332a (use of a destructive device, including a bomb, mine, or similar device, against an American national)).

Finally, it would also provide broader immunity to terrorist agents of a state sponsor of terrorism than the state itself enjoys under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.,* which bars sovereign immunity to civil liability for providing material support for killing of American nationals. *Id*. at § 1605A.

For all of these reasons, this Court should not become the first court in this Circuit to accept Saderat's argument that § 2336(a) provides a safe harbor for acts of international terrorism by designated terrorist groups or their agents.

## CONCLUSION

For all of the foregoing reasons, the Court should deny Defendants' motions to dismiss and give Plaintiffs the chance to prove their claims. Defendants may be "too big to jail" but they must remain answerable to their victims – as Congress intended, and the law provides.

Dated: July 10, 2015
      Hackensack, NJ

                                   Respectfully submitted,

                                   OSEN LLC

          By:      /s/ Gary M. Osen
                                   Gary M. Osen
                                   Peter Raven-Hansen, Of Counsel
                                   Ari Ungar
                                   Aaron Schlanger
                                   2 University Plaza, Suite 201
                                   Hackensack, NJ 07601
                                   (201) 265 6400
                                   (201) 265 0303 Fax

                                   TURNER & ASSOCIATES, P.A.
                                   C. Tab Turner
                                   4705 Somers Avenue, Suite 100
                                   North Little Rock, AR 72116
                                   (501) 791-2277

                                   Attorneys for Plaintiffs