UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

CHARLOTTE FREEMAN, et al.,                    :
                                              :        Case No. 14-CV-6601 (DLI)(CLP)
                              Plaintiffs,      :
                                              :
        -against-                             :
                                              :
HSBC HOLDINGS PLC, et al.,                    :
                                              :
                              Defendants.      :
_____:


**PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................... iv

INTRODUCTION ...................................................................................... 1

STANDARD OF REVIEW .......................................................................... 6

FACTUAL ALLEGATIONS ......................................................................... 7

    A.    The Criminal Conspiracy ............................................................. 7

        1. Defendants Intentionally Joined an Agreement to Commit Unlawful Acts. ................................................................................... 9

        2. Defendants Were Aware of the Conspiracy's Unlawful Aims and Objectives. ............................................................................. 11

        3. Many of the Conspiracy's Beneficiaries Were Integral to Iran's Terror Apparatus. ................................................................... 17

        4. Defendants Substantially Assisted Iran's Terror Apparatus. ..................... 22

        5. Iran's Terror Apparatus Was Responsible for the Acts of Terrorism That Injured Plaintiffs. ............................................................... 23

    B.    Iran's Support for the Terror Campaign in Iraq Was Well-Known and Foreseeable. ....................................................................... 24

I.    THE ATA ESTABLISHES LIABILITY FOR CONSPIRACY. ................................. 25

    A.    By a Chain of Statutory Incorporations by Reference, 18 U.S.C. §2333(a) Incorporates Conspiracy Violations of §§2339A and 2339B. ......................... 26

    B.    18 U.S.C. §2333(d) Provides an Alternative Legal Basis for Plaintiffs' Conspiracy Claims. ................................................................. 31

II.    THE COMPLAINT PLAUSIBLY PLEADS CONSPIRACY UNDER 18 U.S.C. §§2339A AND 2339B. ................................................................. 32

    A.    The Complaint Plausibly Pleads the Existence of an Unlawful Agreement. . 32

i

B.      The Complaint Plausibly Pleads Defendants' State of Mind in Joining the Conspiracy. ...................................................................................... 34

C.      The Law Does Not Require a Showing That Each Co-Conspirator Shared All of the Same Goals or Motives. .......................................................... 38

D.      The Complaint Plausibly Pleads That Plaintiffs' Injuries Were Proximately Caused by the Conspiracy. ............................................................... 41

1. Conspirators Are Liable for All Acts Foreseeably Committed in Furtherance of the Conspiracy. .................................................. 41

2. Plaintiffs Do Not Have to Show But-For Causation. .................................... 42

3. SDGT Designations Are Probative of Proximate Cause, as Well as Knowledge. ................................................................................ 43

III.      THE COMPLAINT PLAUSIBLY PLEADS CAUSATION FOR THE NON-CONSPIRACY CLAIMS (FIFTH, SIXTH AND SEVENTH CLAIMS). ................. 44

A.      The ATA §2333(a) Remedy Requires Traditional Proximate Causation. ...... 45

B.      The Complaint's Non-Conclusory Allegations Differentiate *Rothstein* and Plausibly Plead Proximate Causation for the Non-Conspiracy Claims. ......... 45

1. Saderat's Semantic Causation Argument .................................... 48

2. Commerzbank's "Indirect" Causation Argument Regarding the Fifth Claim for Relief .............................................................. 49

3. Commerzbank's "Indirect" Causation Argument Regarding the Sixth Claim for Relief .............................................................. 52

4. Standard Chartered Bank's Causation Argument Regarding the Seventh Claim for Relief .............................................................. 54

IV.      THE COMPLAINT PLAUSIBLY PLEADS THAT STANDARD CHARTERED BANK HAD THE REQUISITE STATE OF MIND TO VIOLATE §2339A IN SUPPORT OF THE SEVENTH CLAIM FOR RELIEF. .......................................... 57

V.      THE COMPLAINT PLAUSIBLY PLEADS VIOLATIONS OF 18 U.S.C. §2332D UNDERLYING THE THIRD AND FOURTH CLAIMS FOR RELIEF. ................ 58

A.      §2333(a) Creates Primary Liability for Violations of §2332d. ........................ 60

B.      HSBC-US Is a U.S Person for Purposes of §2332d. ........................................ 61

C.      The U.S. Branches of Standard Chartered Bank, RBS N.V., and Commerzbank Are U.S Persons for Purposes of §2332d. .............................. 61

D.      The Complaint Plausibly Pleads That the §2332d Defendants Knowingly Engaged in Financial Transactions with the Government of Iran. ................. 65

VI.     THIS COURT HAS SPECIFIC PERSONAL JURISDICTION OVER BANK SADERAT, PLC AND ALL CLAIMS AGAINST COMMERZBANK .................... 68

A.      This Court Has Personal Jurisdiction Over Bank Saderat. ........................... 69

1. This Court Has Personal Jurisdiction Over Bank Saderat Under C.P.L.R. §302(a)(1). ....................................................................................... 69

2. This Court Also Has Personal Jurisdiction Over Bank Saderat Under C.P.L.R. §302(a)(2). ............................................................................ 73

3. Even if C.P.L.R. §302 Is Not Satisfied, This Court Has Personal Jurisdiction Over Bank Saderat Under Rule 4(k)(2). ................................ 74

4. Bank Saderat Has Minimum Contacts With the United States and Exercise of Specific Personal Jurisdiction Over It Is Reasonable. ............ 75

B.      This Court Has Pendent Personal Jurisdiction Over Plaintiffs' Sixth Claim for Relief (Commerzbank). .................................................................... 77

VII.    THE ACT OF WAR DEFENSE DOES NOT APPLY TO THE TERRORIST ATTACKS THAT INJURED PLAINTIFFS. ................................................ 78

A.      Sporadic Terrorist Attacks Are Not an "Armed Conflict" Within the Meaning of the ATA, and There Was No "Armed Conflict" With Iraq or Iran at the Time of the Attacks. .......................................................... 81

B.      Even if the Acts of International Terrorism Did Occur During an Armed Conflict, They Were Not Conducted by "Military Forces" Within the Meaning of the Act-of-War Defense. ................................................... 83

C.      The Attacks Were Not Committed "in the Course of" an Armed Conflict. .. 89

CONCLUSION ........................................................................................... 91

# TABLE OF AUTHORITIES

**Cases**

31 C.F.R. §560.304 ............................................................................................... 67

*Abecassis v. Wyatt*
    7 F. Supp. 3d 668 (S.D. Tex. 2014) ...................................................... 31

*Abecassis v. Wyatt*
    785 F. Supp. 2d 614 (S.D. Tex. 2011) ..................................... 60, 63, 66

*Action Embroidery Corp. v. Atlantic Embroidery, Inc.*
    368 F.3d 1174 (9th Cir. 2004) ............................................................... 78

*Alcohol Monitoring Systems, Inc. v. Actsoft, Inc.*
    682 F. Supp. 2d 1237 (D. Colo. 2010) .................................................. 78

*Arista Records, LLC v. Doe 3*
    604 F.3d 110 (2d Cir. 2010) ..................................................................... 6

*Bell Atl. Corp v. Twombly*
    550 U.S. 544 (2007) .................................................................................. 7

*Biton v. The Palestinian Interim Self-Government Authority*
    412 F. Supp. 2d 1 (D.D.C. 2005) .................................................... 79, 89

*Blumenthal v. United States*
    332 U.S. 539 (1947) .......................................................................... 34, 42

*Boim v. Holy Land Found. for Relief and Dev.*
    549 F.3d 685 (7th Cir. 2008) (en banc) ("*Boim III*") ................. passim

*Bristol-Myers Squibb Co. v. Matrix Labs. Ltd.*
    No. 15-1922-CV, 2016 WL 3553442 (2d Cir. June 30, 2016) ............ 26

*Cavu Releasing, LLC. v. Fries*
    419 F. Supp. 2d 388 (S.D.N.Y. 2005) ................................................. 71

*Central Bank of Denver v. First Interstate Bank of Denver*
    511 U.S. 164 (1994) ................................................................................ 25

*Chloé v. Queen Bee of Beverly Hills, LLC*
    616 F.3d 158 (2d Cir. 2010) ................................................................. 68

*Commodity Futures Trading Commission v. Gibraltar Monetary Corp.*
    No. 04-80132-CIV, 2006 WL 1789018 (S.D. Fla. May 30, 2006) ........... 62

*Crosby v. National Foreign Trade Council*
   530 U.S. 363 (2000) ....................................................................................... 62, 63

*Dale v. Banque SCS Alliance S.A.*
   No. 02Civ.3592(RCC)(KNF), 2005 WL 2347853 (S.D.N.Y. Sept. 22, 2005) ....................... 68

*Daventree Limited v. Republic of Azerbaijan*
   349 F. Supp. 2d 736 (S.D.N.Y. 2004) ................................................................... 78

*Denny v. Barber*
   576 F.2d 465 (2d Cir. 1978) ............................................................................. 1

*Devore v. Pfizer, Inc.*
   867 N.Y.S.2d 425 (1st Dep't 2008) ..................................................................... 74

*Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*
   135 F.3d 837 (2d Cir. 1998) ............................................................................. 25

*DT Boring, Inc. v. Chicago Public Building Commission*
   No. 15-C-11222, 2016 WL 3580756 (N.D. Ill. June 28, 2016) ....................................... 41

*Emerald Asset Advisors, LLC v. H. Cy Schaffer*
   895 F. Supp. 2d 418 (E.D.N.Y. 2012) .................................................................. 73

*Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch*
   919 F. Supp. 2d 411 (S.D.N.Y. 2013) .................................................................. 67

*Estate of Klieman v. Palestinian Authority*
   424 F. Supp. 2d 153 (D.D.C. 2006) ............................................................ 79, 89, 90

*Gill v. Arab Bank, PLC*
   893 F. Supp. 2d 474 (E.D.N.Y. 2012) ............................................................ passim

*Goldberg v. UBS AG*
   690 F. Supp. 2d 92 (E.D.N.Y. 2010) ............................................................... 31, 76

*Halberstam v. Welch*
   705 F.2d 472 (D.C. Cir. 1983) .................................................................... passim

*Hemi Group LLC v. City of New York*
   559 U.S. 1 (2010) ....................................................................................... 48

*In re Chiquita Brands International, Inc. Alien Tort Statute & Shareholder Derivative Litigation*
   No. 08-01916-MD, 2015 WL 71562 (S.D. Fla. Jan. 6, 2015) ........................................ 42

*In re Sept. 11 Litigation*
   751 F.3d 86 (2d Cir. 2014) *cert. denied sub nom. Cedar & Washington Associates, LLC v. Port Auth. of New York & New Jersey*, 135 S. Ct. 742 (2014) ............................. 79, 80, 81, 91

*In re Terrorist Attacks on Sept. 11, 2001*
   392 F. Supp. 2d 539 (S.D.N.Y. 2005), *aff'd*, 538 F.3d 71 (2d Cir. 2008) .............................. 74

*Kaplan v. Central Bank of Islamic Republic of Iran*
   961 F. Supp. 2d 185 (D.D.C. 2013) .......................................................................... 79, 82, 83

*King v. Burwell*
   135 S. Ct. 2480 (2015) ...................................................................................................... 64, 90

*LaSala v. Lloyds TSB Bank*
   514 F. Supp. 2d 447 (S.D.N.Y. 2007) ...................................................................................... 74

*Lelchook v. Commerzbank*
   No. 10-cv-05795-AKH, 2011 WL 4087448 (S.D.N.Y. Aug. 2, 2011) ............................... 53, 82

*Lerner v. Fleet Bank N.A.*
   318 F.3d 113 (2d Cir. 2003) ...................................................................................................... 45

*Lerner v. Fleet Bank N.A.*
   459 F.3d 273 (2d Cir. 2006) ...................................................................................................... 48

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci IV")*
   732 F.3d 161 (2d Cir. 2013) ......................................................................................... 69, 75, 76

*Licci v. American Express Bank Ltd.*
   704 F. Supp. 2d 403 (S.D.N.Y. 2010) ..................................................................................... 72

*Licci v. Lebanese Canadian Bank, SAL ("Licci III")*
   20 N.Y.3d 327 (2012) ................................................................................................... 69, 70, 72

*Linde v. Arab Bank, PLC*
   944 F. Supp. 2d 215 (E.D.N.Y. 2013) ..................................................................................... 28

*Linde v. Arab Bank, PLC*
   97 F. Supp. 3d 287 (E.D.N.Y. 2015) ................................................................... 29, 31, 42, 48

*Linde v. Arab Bank, PLC*
   No. 04–cv–2799 (BMC)(PK), 2015 WL 1565479 (E.D.N.Y. April 8, 2014) ......................... 27

*Lujan v. Cabana Management, Inc.*
   284 F.R.D. 50 (E.D.N.Y. 2012) ............................................................................................... 32

*Metropolitan Life Insurance Co. v. Robertson–Ceco Corp.*
  84 F.3d 560 (2d Cir. 1996) ........................................................................ 76

*Miller Pipeline Corp. v. British Gas plc*
  901 F. Supp. 1416 (S.D. Ind. 1995) ........................................................ 78

*Moore v. Paine Webber, Inc.*
  189 F.3d 165 (2d Cir. 1999) ...................................................................... 48

*Morris v. Khadr*
  415 F. Supp. 2d 1323 (D. Utah 2006) .......................................... 79, 86, 88

*National Council of Resistance of Iran v. Department of State II (NCRI)*
  373 F.3d 152 (D.C. Cir. 2004) .................................................... 51, 52, 66

*Noble Sec., Inc. v. MIZ Engineering, Ltd.*
  611 F. Supp. 2d 513 (E.D. Va. 2009) ...................................................... 78

*O'Neill v. Al-Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)*
  714 F.3d 118 (2d Cir. 2013) ............................................................ 42, 50

*Ocasio v. United States*
  136 S. Ct. 1423 (2016) ............................................................................ 40

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*
  595 F.3d 86 (2d Cir. 2010) ........................................................................ 7

*Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.*
  505 F.2d 989 (2d Cir. 1974) ...................................................................... 88

*PDK Labs, Inc. v. Friedlander*
  103 F.3d 1105 (2d Cir. 1997) .................................................................... 71

*Pinkerton v. United States*
  328 U.S. 640 (1946) ................................................................................ 41

*Robinson Engineering Co. Pension Plan and Trust v. George*
  223 F.3d 445 (7th Cir. 2000) .................................................................... 78

*Rothstein v. UBS AG*
  708 F.3d 82 (2d Cir. 2013) ............................................................... passim

*Rubin v. Islamic Republic of Iran*
  No. 14-1935, 2016 WL 3903409 (7th Cir. July 19, 2016) ...................... 75

*Shpak v. Curtis*
　No. 10-CV-1818 RRM JO, 2011 WL 4460605 (E.D.N.Y. Sept. 26, 2011) ............................ 71

*Smith v. Califano*
　597 F.2d 152 (9th Cir. 1979) ...................................................................................... 62

*Smith v. United States*
　133 S. Ct. 714 (2013) .................................................................................................. 41

*Sokolow v. Palestine Liberation Organization*
　583 F. Supp. 2d 451 (S.D.N.Y. 2008) ........................................................................ 79

*Sokolow v. Palestine Liberation Organization*
　60 F. Supp. 3d 509 (S.D.N.Y. 2014) .......................................................................... 27

*Stansell v. BGP, Inc.*
　2011 WL 1296881 (M.D. Fla. 2011) .............................................................. 31, 79, 90

*Stratagem Development. Corp. v. Heron International N.V.*
　153 F.R.D. 535 (S.D.N.Y. 1994) ............................................................................... 78

*Strauss v. Crédit Lyonnais, S.A.*
　2006 WL 2862704 (E.D.N.Y. 2006) .................................................................. 31, 49, 51

*Strauss v. Crédit Lyonnais, S.A.*
　925 F. Supp. 2d 414 (E.D.N.Y. 2013) ....................................................................... 27

*Strauss v. Crédit Lyonnais, S.A.*
　No. 06-cv-702(DLI)(MDG), 2016 WL 1305160 (E.D.N.Y. Mar. 31, 2016) ................... passim

*Stutts v. De Dietrich Group*
　2006 WL 1867060 (E.D.N.Y. 2006) .......................................................................... passim

*Tamam v. Fransabank Sal*
　677 F. Supp. 2d 720 (S.D.N.Y. 2010) ....................................................................... 72

*Trans World Airlines, Inc. v. 47th St. Photo, Inc.*
　No. 88 CIV. 1936 (PNL), 1990 WL 481956 (S.D.N.Y. Apr. 16, 1990) ........................ 70

*United States v. Amiel*
　95 F.3d 135 (2d Cir. 1996) ........................................................................................ 32

*United States v. Bell*
　524 F.2d 202 (2d Cir. 1975) ...................................................................................... 80

*United States v. Capanelli*
    479 F.3d 163 (2d Cir. 2007) ........................................................................ 40

*United States v. Cervantes*
    466 F.2d 736 (7th Cir. 1972) ....................................................................... 40

*United States v. Chalmers*
    474 F. Supp. 2d 555 (S.D.N.Y. 2007) .......................................................... 63

*United States v. Ferraina*
    19 F.3d 145 (2d Cir. 2002) .......................................................................... 34

*United States v. Garcia*
    509 F. App'x 40 (2d Cir. 2013) ............................................................... 34, 57

*United States v. Gurary*
    860 F.2d 521 (2d Cir. 1988) ........................................................................ 40

*United States v. Hawkins*
    547 F.3d 66 (2d Cir. 2008) .......................................................................... 33

*United States v. Lanza*
    790 F.2d 1015 (2d Cir. 1986) ...................................................................... 34

*United States v. Lindh*
    212 F. Supp. 2d 541 (E.D. Va. 2002) ...................................................... 84, 89

*United States v. Maldonado-Rivera*
    922 F.2d 934 (2d Cir. 1990) ........................................................................ 40

*United States v. Southland Corp*
    760 F.2d 1366 (2d Cir. 1985) ...................................................................... 40

*United States v. Stavroulakis*
    952 F.2d 686 (2d Cir. 1992) ........................................................................ 34

*United States v. Ulbricht*
    31 F. Supp. 3d 540 (S.D.N.Y. 2014) ............................................................ 35

*United States v. Vario*
    943 F.2d 236 (2d Cir. 1991) ........................................................................ 41

*Utility Air Regulatory Group v. EPA*
    134 S. Ct. 2427 (2014) ................................................................................ 64

*Walden v. Fiore*
    134 S. Ct. 1115 (2014) ................................................................................. 74

*Waldman v. Palestine Liberation Organization*
    No. 15-3135-CV, 2016 WL 4537369 (2d Cir. Aug. 31, 2016) ............................... 74

*Weinstein v. Islamic Republic of Iran*
    609 F.3d 43 (2d Cir. 2010) ............................................................................ 67

*Weiss v. Arab Bank, PLC*
    No. 06 CV 1623(NG)(VVP), 2007 WL 4565060 (E.D.N.Y. Dec. 21, 2007) ......... 79, 85, 87, 90

*Weiss v. National Westminster Bank, PLC*
    768 F.3d 202 (2d Cir. 2014) .......................................................................... 87

*Wultz v. Islamic Republic of Iran*
    755 F. Supp. 2d 1 (D.D.C. 2010) ................................................................... 31

## Statutes

18 U.S.C. §1956(c)(4) ...................................................................................... 64

18 U.S.C. §2331(1) .......................................................................................... 29

18 U.S.C. §2331(1)(B) ...................................................................................... 33

18 U.S.C. §2331(3) .......................................................................................... 67

18 U.S.C. §2331(4) .......................................................................................... 100

18 U.S.C. §2331(4)(C) ...................................................................................... 94

18 U.S.C. §2332(b) .......................................................................................... 30

18 U.S.C. §2332a(c)(2)(A) .................................................................................. 1

18 U.S.C. §2332b(a)(2) ...................................................................................... 30

18 U.S.C. §2332b(b)(1)(C) .................................................................................. 30

18 U.S.C. §2332d ...................................................................................... *passim*

18 U.S.C. §2332d(a) .......................................................................................... 63

18 U.S.C. §2332d(b)(1) ...................................................................................... 64

18 U.S.C. §2332d(b)(2) ................................................................................ 64, 66, 67

18 U.S.C. §2332f(a)(2) ...................................................................................... 30

18 U.S.C. §2333(a) ............................................................ *passim*

18 U.S.C. §2333(d) ............................................................ 3, 27, 34

18 U.S.C. §2334(a) ............................................................ 6

18 U.S.C. §2336 ................................................................. 7

18 U.S.C. §2336(a) ............................................................ 89, 93

18 U.S.C. §2339A .............................................................. *passim*

18 U.S.C. §2339B .............................................................. *passim*

18 U.S.C. §2339C .............................................................. 33

18 U.S.C. §956(a)(1) .......................................................... 30

C.P.L.R. §302(a) ............................................................... 78

C.P.L.R. §302(a)(1) ........................................................... *passim*

C.P.L.R. §302(a)(2) ........................................................... *passim*

Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997, Pub. L. No. 104-208, 110 Stat. 3009-166 ...................................... 69, 70

Justice Against Sponsors of Terrorism Act §2(a)
Pub. L. No. 114-222, Sept. 28, 2016 ................................... 42

Justice Against Sponsors of Terrorism Act §2(a)(1)
Pub. L. No. 114-222, Sept. 28, 2016 ................................... 70

Justice Against Sponsors of Terrorism Act §2(a)(4)
Pub. L. No. 114-222, Sept. 28, 2016 ................................... 34

Justice Against Sponsors of Terrorism Act §2(a)(5)
Pub. L. No. 144-222, Sept. 28, 2016 ................................... *passim*

Justice Against Sponsors of Terrorism Act §2(a)(6)
Pub. L. No. 144-222, Sept. 28, 2016 ................................... 6, 56, 83

Justice Against Sponsors of Terrorism Act §2(a)(7)
Pub. L. No. 114-222, Sept. 28, 2016 ................................... 56

Justice Against Sponsors of Terrorism Act §2(b)
Pub. L. No. 114–222, Sept. 28, 2016 .................................. 3, 85, 97

Justice Against Sponsors of Terrorism Act §4(a)
 Pub. L. No. 144-222, Sept. 28, 2016........................................................................ 3, 27

**Other Authorities**

Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949
 (Geneva III), art. 4(A)(2) ........................................................................... 84, 85

House Report No. 102-1040 (1992)..................................................................... 84, 85

Protocol Additional to the Geneva Convention of Aug. 12, 1949, and Relating to the Protection
 of Victims of International Armed Conflicts, June 8, 1977 (Protocol I), art. 44(3) ................ 85

*Restatement (Second) of Torts* §§ 876 (1979)........................................................ 27, 36

Senate Report No. 102-342 (1992) ......................................................................... 84

United National Security Counsil Rsolution 1511
 U.N. Doc. S/RES/1511 (Oct. 16, 2003) .................................................................. 82

United Nations Security Council Resolution 1546
 U.N. Doc. S/RES/1546 (June 7, 2004) .................................................................. 82

United Nations Security Council Resolution 678
 U.N. Doc. S/RES/678 (Nov. 29, 1990) ................................................................... 83

**Rules**

Fed. R. Civ. P. 4(k)(2)......................................................................... 68, 69, 74, 77

Fed. R. Civ. P. 8(a) ............................................................................................ 6

**Regulations**

31 C.F.R. §560.203 ......................................................................................... 59, 62

31 C.F.R. §560.204 ............................................................................................. 62

31 C.F.R. §560.313 ............................................................................................. 66

31 C.F.R. §560.319 ............................................................................................. 63

31 C.F.R. §560.327 ............................................................................................. 65

31 C.F.R. §560.516 ......................................................................................... 62, 65

31 C.F.R. §594.315 ............................................................................................. 65

# INTRODUCTION

The Second Amended Complaint ("Complaint" or "SAC")[1] sets forth a criminal conspiracy (the "Conspiracy") that is unprecedented in the scope and magnitude of terrorism that it facilitated. Comprising admissions Defendants made in judicial proceedings, government findings, and whistleblower-supplied documents that detail the stratagems Standard Chartered Bank and other Defendants employed to facilitate Iran's successful decades-long effort to evade sanctions and arms embargoes, the Complaint sets forth the aims and foreseeable results of the Conspiracy that inexorably led to Iran devising, manufacturing and supplying Improvised Explosive Devices ("IEDs") (including signature Iranian weapons – Explosively Formed Penetrators ("EFPs")) that killed and maimed hundreds of Americans in Iraq between 2004 and 2011, including Plaintiffs.[2]

Collectively, Defendants' myriad briefs recycle nearly every failed argument invoked by ATA defendants over the past fifteen years, including, most notably, their talismanic incantation

---

[1] Defendants argue that this Court must dismiss the Complaint with prejudice without leave to amend if it agrees with Defendants' arguments, because the SAC is the third complaint Plaintiffs have filed. In support, Defendants cite *Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978). Joint Mem. at 2, 30 n. 13. In *Denny*, however, the court had already dismissed the complaint twice after hearings. Here Plaintiffs amended twice to add additional plaintiffs and to reflect new facts provided by whistleblower disclosures against Defendant Standard Chartered Bank, and the Court will be ruling for the first time on Defendants' Motion to Dismiss.

[2] EFPs are a particularly effective form of manufactured IED sometimes known as a shaped charge, usually made with a manufactured concave copper disk and a high explosive packed behind the liner. Metallurgic analysis by U.S. technicians helped confirm that the high-purity copper EFP liners were not produced in Iraq. Differences in the liners indicated the kind of press that was required to fabricate them – a heavy hydraulic press not commonly seen in Iraq. To produce these weapons, copper sheets were often loaded onto a punch press to yield copper discs. These discs were annealed in a furnace to soften the copper. The discs were then loaded into a large hydraulic press and formed into the disk-like final shape. This manufacturing process is critical to the design and lethality of the weapon. When the explosives inside an EFP detonate, the blast energy inverts the copper plate into a ragged slug traveling over a mile per second, capable of punching through armor even 300 feet away. The EFPs manufactured by Hezbollah and the IRGC were far more sophisticated than homemade explosive devices such as traditional IEDs used by al Qaeda and other terrorist groups, and they were designed specifically to target American and Coalition armored vehicles – with lethal results. They were also identifiable as weapons of Iranian-origin. SAC ¶¶259-279. Under the ATA, IEDs and EFPs are deemed "weapons of mass destruction" as that term is defined in 18 U.S.C. §2332a(c)(2)(A).

of "*Rothstein*" in the apparent belief that this Court is incapable of distinguishing obviously different pleadings simply because both mention Iran and banks.[3] By styling their Joint Memorandum on behalf of the "Moving Defendants" and distancing themselves from their former customer and co-conspirator, Bank Saderat Plc ("Bank Saderat" or "Saderat") (which was compelled to file its own brief), Defendants also hope to obscure their long-standing involvement with this Specially Designated Global Terrorist ("SDGT").

In sum, it is clear that the Moving Defendants do not view the Deferred Prosecution Agreements ("DPAs") they signed (or the fines they have paid) as marks of shame, but rather *as grants of immunity*, shielding them from further legal consequences of a decade of serving as what Judge Posner termed "financial angels" of the world's most lethal and prolific State Sponsor of Terrorism. *Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685, 690 (7th Cir. 2008) (en banc) ("*Boim III*"). Having escaped meaningful criminal prosecution, at least so far, they now ask this Court to rule, as a matter of law, that they are entirely beyond the reach of American civil justice.

The ATA, however, offers no such safe harbor for their crimes.

On the contrary, Congress expressly enacted the ATA to empower Americans precisely like the Plaintiffs to hold such entities legally accountable. Furthermore, less than three weeks ago, Congress affirmed its intent "to provide civil litigants with the broadest possible basis [under the ATA], consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that

---

[3]     Moving Defendants' Joint Memorandum alone mentions *Rothstein* sixty times in 30 pages, as if repetition can substitute for analysis, but fails to mention the seminal civil ATA case, *Boim v. Holy Land Found. for Relief and Dev.* (en banc) (*Boim III*), 549 F.3d 685 (7th Cir. 2008), even once.

engage in terrorist activities against the United States." Justice Against Sponsors of Terrorism Act ("JASTA"), §2(b), Pub. L. No. 114–222, Sept. 28, 2016.[4]

In sum, the Complaint plausibly and sufficiently pleads ATA claims, entitling Plaintiffs to their day in court.

First, Plaintiffs' First and Second Claims for Relief against all Defendants are predicated on the incorporated criminal conspiracy provisions of 18 U.S.C. §2339A and §2339B, (as well as JASTA §4(a), adding §2333(d) to the ATA). Yet the Moving Defendants' Joint Memorandum relegates this threshold conspiracy argument to the end of their brief. Joint Mem. at 24-27. Defendants bury it not just because their "no-conspiracy defense" is inconsistent with both the holding and language of the seminal ATA case, *Boim III*, (and now by §2333(d)'s express terms), but also to avoid proximate causation standards of conspiracy law that are fatal to that defense. Under both settled Second Circuit precedent and the legal framework Congress has expressly found applicable in JASTA §2(a)(5), Defendants are liable for *all* of the foreseeable acts of the conspiracy they willingly joined, whether or not they shared every one of its objectives or "intended to achieve a terroristic purpose," as the HSBC and RBS Defendants incorrectly claim they must. HSBC/RBS Mem. at 1.

Second, notwithstanding Defendants' efforts to re-write the Complaint's allegations, Plaintiffs allege *not only* that Iran acted indirectly by providing material support to the terrorists responsible for the attacks that injured them, but also that Iran was *itself* directly involved in, and is legally responsible for, those acts of terrorism.[5] The fact that the identities of the terrorists who

---

[4]     JASTA applies to pending civil actions "arising out of an injury to a person, property, or business on or after September 11, 2001." All injuries alleged in the Complaint occurred after September 11, 2001.

[5]     *See, e.g.* SAC ¶250 ("[Iran's] Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces…"), SAC ¶257 ("Ordered by IRGC headquarters to create disorder, the task of these groups is to attack bases of Coalition Forces in southern Iraq…")

detonated Iranian-manufactured weapons may remain unknown does not mean – as Defendants imply – that the terrorist acts at issue were caused *solely* by "multiple unknown actors." Joint. Mem. at 1, 9. On the contrary, the Complaint plausibly pleads that Iran bears primary responsibility for the attacks perpetrated by its instrumentalities and agents (*e.g.*, Hezbollah, the Islamic Revolutionary Guard Corps ("IRGC") (including the IRGC-Qods Force ("IRGC-QF")), Ministry of Defense and Armed Forces Logistics ("MODAFL"), Islamic Republic of Iran Shipping Lines ("IRISL") and Mahan Air), and that by illegally funding those agents, Defendants aided in those attacks.

Third, *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013), on which Defendants' causation arguments hinge, does not require dismissal of even the Complaint's non-conspiracy claims for failure to plead proximate causation. *Rothstein* merely affirmed that traditional tort principles of proximate cause are applicable to the ATA. *Id.* at 91 (affirming that a defendant is liable "to those with respect to whom his acts were a substantial factor in the sequence of responsible causation and whose injury was reasonably foreseeable or anticipated as a natural consequence") (citation omitted). It simply declined to mechanically extend Congress's finding that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct" to State Sponsors of Terrorism, because even State Sponsors of Terrorism "have many legitimate agencies, operations, and programs to fund." *Id.* at 97. The *Rothstein* plaintiffs fatally failed to plead that the support UBS provided was not directed toward Iran's "legitimate agencies, operations, and programs," relying instead on a supposed "presumption" of causation that the Second Circuit rejected. *Id.* at 95-97. (Plaintiffs argued "causation may be presumed" when defendant has committed a "*per se* violation of a statute.") Defendants extrapolate from this that "the *mere* provision of banking

services to Iran, a [S]tate [S]ponsor of [T]errorism, is too indirect to satisfy the proximate cause standard." Joint Mem. at 18 (emphasis added).

Plaintiffs agree.

The Complaint, however, does not allege "the mere provision of banking services to Iran." In sharp contrast to *Rothstein*'s insufficient pleadings, the Complaint details U.S. government findings that the Conspiracy delivered at least:

- $50 million to Hezbollah (a U.S.-designated Foreign Terrorist Organization ("FTO") that organized attacks on Plaintiffs);

- at least $100 million to the IRGC (Iran's prime instrument for supporting terrorism and weapons proliferation, which planned, supplied, and organized attacks on Plaintiffs); [6] and

- at least $100 million for the benefit of IRISL (Iran's prime instrument for transporting weapons, including components and manufacturing devices for the signature weapons used in attacks on Plaintiffs). SAC ¶¶23, 1022-1023.

Furthermore, the Complaint alleges – also voluminously – that Defendants had a transparent channel for financial transactions on behalf of Iran's *legitimate* activities, and *intentionally chose to engage in non-transparent conduct designed to evade U.S. laws* – conduct whose only possible purpose and explanation was to help a State Sponsor of Terrorism fund its *illegitimate* entities, operations, and programs.

*Fourth*, Congress expressly created nationwide service of process for ATA claims. 18 U.S.C. §2334(a) (authorizing nationwide service of process wherever the defendant resides, is found, or has an agent). In addition, New York's long arm statute provides personal jurisdiction. Both bases of jurisdiction satisfy the applicable due process limits for the unlawful transactions purposefully directed through the United States that are at the center of Plaintiffs' claims.

---

[6] Moreover, these sums do not include the still (pre-discovery) unquantified sums that the HSBC Defendants, Standard Chartered Bank, and RBS N.V. illegally processed for the IRGC through their customer, the National Iranian Oil Company ("NIOC"), a U.S. government-identified IRGC agent during the relevant period.

Personal jurisdiction here is especially consistent with Congress's finding that "Persons, entities, or countries that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States or the national security, foreign policy, or economy of the United States, necessarily direct their conduct at the United States, and *should reasonably anticipate being brought to court in the United States to answer for such activities*." JASTA §2(a)(6) (emphasis added).

*Finally*, Congress did not simultaneously create a civil remedy for American victims of "acts of international terrorism," in order to snatch it away by then labeling those same acts of international terrorism "acts of war." Bank Saderat's contention that the terrorist attacks in this case took place in a "Declared War," BS Mem. at 6-9, or, alternatively, that they occurred in an "armed conflict" within the meaning of the ATA's "act-of-war" defense (18 U.S.C. §2336) are equally untenable. What Bank Saderat calls "clashes" of violence in the "aftermath" of major combat operations in Iraq are, in fact, acts of international terrorism. FTO Hezbollah, the IRGC and their terrorist proxies were not "military forces" either. *Id*. This Court should not be the first to find that the kidnapping and murder of Americans in Iraq by terrorists that did not fight openly, wear uniforms, or follow the laws of war, are "acts of war" that immunize Defendants from liability.

This Court should deny Defendants' motion to dismiss and give Plaintiffs the chance to prove their claims – the type of claims that Congress vindicated and that the ATA affords.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a) does not "require heightened fact pleading of specifics," *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Bell Atl.*

*Corp v. Twombly*, 550 U.S. 544, 570 (2007). "The Court accepts all well-pleaded allegations in the complaint as true, drawing all reasonable inferences in the plaintiff's favor." *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010).

## FACTUAL ALLEGATIONS

### A.     The Criminal Conspiracy

Against a backdrop of widely documented Iranian-orchestrated terrorism directed at Americans in Iraq, the Complaint alleges that Defendants actively participated in the Conspiracy with Iran, a U.S.-designated State Sponsor of Terrorism, knowing of Iran's designation. The Conspiracy's chief objectives were:

1. concealing Iran's Eurodollar[7] financial transactions through the U.S. from detection, scrutiny or monitoring by U.S. regulators, law enforcement, and/or depository institutions; and

2. facilitating illicit transactions through the U.S. on behalf of such Iranian instrumentalities of terrorism as Hezbollah[8]; the IRGC; IRISL (including transactions after it was designated a Specially Designated National ("SDN"); Iranian-controlled banks such as Defendant Bank Saderat[9] (an SDGT) and Bank Melli (an SDN)[10]; and Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL") (also an SDN), Mahan Air (an SDGT), and the NIOC. SAC ¶¶19-23.

---

[7]     Eurodollar refers to a time deposit denominated in U.S. dollars that is maintained by a bank outside the United States. Payment transactions in the Eurodollar market are not typically settled by the physical transfer of USD-denominated banknotes from one counterparty to another. Instead, Eurodollar transactions are settled electronically in New York through a bank-owned clearinghouse, and then maintained by book entries of credits and debits in the respective counterparties' accounting systems (based on the Society for Worldwide Interbank Financial Telecommunication network--"SWIFT-NET"--messages sent between the counterparties and their correspondent banks). SAC ¶1, n. 1.

[8]     Hezbollah, a Lebanon-based terrorist organization, was first designated a Foreign Terrorist Organization by the United States in 1997. The designation has remained in effect since that time. SAC ¶11.

[9]     During the relevant period, Defendant Bank Saderat was a customer of Defendants HSBC (SAC ¶¶478, 521), Barclays (SAC ¶¶576, 614), SCB (SAC ¶¶623, 645, 660, 668), RBS (SAC ¶874), Credit Suisse (SAC ¶¶932-933), and Commerzbank (SAC ¶994).

[10]     During the relevant period, Bank Melli was a customer of Defendants HSBC (SAC ¶¶426, 446), Barclays (SAC ¶¶426-427), SCB (SAC ¶¶431-432), RBS (SAC ¶¶426, 430), Credit Suisse (SAC ¶¶442-443), and Commerzbank (SAC ¶¶444, 1001).

The acts of international terrorism that injured Plaintiffs were planned, authorized, and/or perpetrated by these instrumentalities and entities, and were the foreseeable – indeed inevitable – results of the Conspiracy.

The Defendants effectuated the Conspiracy by various means, including:

1. removing or altering identifying information of the payment messages they sent through U.S. correspondent banks (commonly referred to as "stripping"). HSBC (SAC ¶¶479-482), Barclays (SAC ¶¶576, 581-583), SCB (SAC ¶¶619-622, 629-630), RBS (SAC ¶¶871-873, 876-878), Credit Suisse (SAC ¶¶930-931, 936-937), and Commerzbank (SAC ¶¶992-994);

2. converting SWIFT[11] payment messages through U.S. banks from ones that disclosed Iranian counter-parties to the transactions into ones that did not.[12] HSBC (SAC ¶¶482-484), Barclays (SAC ¶¶581, 586-595), SCB (SAC ¶¶628-632, 636-639), RBS (SAC ¶¶876-896), Credit Suisse (SAC ¶¶931, 936-940, 960), and Commerzbank (SAC ¶¶994, 997-999);

3. intentionally avoiding conducting the required screening of Iran-linked Letters of Credit documents for compliance with the U.S. Office of Foreign Assets Control ("OFAC"); the U.S. State Department's United States Munitions List ("USML") of defense-related export controlled items; and/or the U.S. Bureau of Industry and Security's ("BIS") Commerce Control List ("CCL") of dual-use export controlled items, and Denied Persons List ("DPL") of export denied entities[13]; and

4. knowingly and willfully facilitating the laundering the proceeds of Iranian petroleum sales for the NIOC and other sanctioned Iranian entities. These "petrodollar" transactions, including trade-finance and foreign exchange, provided Iran with illegal access to *billions* of dollars to which it otherwise would not have had access, and included the *direct* funding of the IRGC and its network of front companies through the Defendants. SAC ¶25.

---

[11] SWIFT-Brussels is a cooperative society under Belgian law owned by its member financial institutions. SWIFT-Brussels's global private network, SWIFT-NET, enables financial institutions to send and receive information about financial transactions in the Eurodollar market, among other financial markets, in a standardized message format. SAC ¶22, n. 4.

[12] When a bank customer sends an international wire payment, the de facto standard to execute such a payment is the MT 103. When a financial institution sends a bank-to-bank credit transfer, the de facto standard is the MT 202. The crucial difference, during the relevant period, was that MT 202 payments typically did *not* require the bank to identify the originating party to the transactions, and banks typically did not include that information in MT 202 messages. SAC ¶25.

[13] *See* SAC ¶¶173-196 with regard to Letters of Credit and the regulatory architecture the U.S. employed in furtherance of its trade embargo against Iran.

The U.S. government's so-called "U-Turn Exemption" (available to Iran until November 10, 2008) provided Iran with a legal and transparent method of transferring Eurodollars through the U.S. financial system to fund its legitimate agencies, operations, and programs. Because the core aim of the Conspiracy was Iran's manipulation of the U.S. financial system for terrorism and for the benefit of other illegitimate agencies, operations, and programs, however, Iran was unwilling to subject all of its Eurodollar transactions to the scrutiny and transparency required by the U-Turn Exemption. Instead, Iran (including Defendant Bank Saderat) used the above-mentioned unlawful means to launder hundreds of billions of dollars through the United States undetected. SAC ¶¶140-149.[14]

### 1. Defendants Intentionally Joined an Agreement to Commit Unlawful Acts.

Each Moving Defendant entered into a Deferred Prosecution Agreement with U.S. prosecutors (often accompanied by consent orders with federal, and, in some cases, state regulators) in which it *admitted* that it knowingly concealed Iranian financial activities and transactions from detection, scrutiny, or monitoring by U.S. law enforcement and regulatory authorities. HSBC (SAC ¶¶523-524); Barclays (SAC ¶¶616-618); Standard Chartered Bank (SAC ¶¶839-843); RBS (SAC ¶¶919-929); Credit Suisse (SAC ¶¶988-990); and Commerzbank (SAC ¶992). Below are merely a few examples demonstrating each Defendant's agreement to join, and its involvement in, the Conspiracy.

### a. Bank Saderat

- SAC ¶163 (quoting the New York State Department of Financial Services ("DFS") identifying Saderat as one of the Iranian banks "engaging in deceptive

---

[14] Defendants' exploitation of the U-Turn Exemption was so pervasive that the U.S. revoked it altogether in 2008. As former Manhattan District Attorney Robert M. Morgenthau pointedly told Congress in 2009, "the U-Turn exemption constituted a glaring hole that undermined both the enforcement of, and the rationale behind, the Iranian sanctions program." SAC ¶170.

conduct to hide its involvement in various other prohibited transactions, such as assisting OFAC-sanctioned weapons dealers")

- SAC ¶¶375, 692-693, 742-43 (setting forth Bank Saderat Plc's agreement to clandestinely finance the illegal acquisition of U.S.-embargoed equipment on behalf of Mahan Air and various sub-agencies of MODAFL)

- SAC ¶18 (quoting U.S. government finding that Bank Saderat Plc acted on behalf of Iran's Central Bank ("CBI") to launder funds to Hezbollah)

**b. Standard Chartered Bank**

- SAC ¶¶636-39 (describing Standard Chartered Bank's 2004 internal policy document outlining the Bank's methods of laundering money on Iran's behalf)

- SAC ¶842 (noting the Department of Justice's filing of a criminal information charging Standard Chartered Bank with "knowingly and willfully conspiring to violate" U.S. sanctions laws)

**c. HSBC Defendants**

- SAC ¶¶501-507 (describing HSBC's "Bank Melli proposal" containing specific instructions to Bank Melli on how to avoid OFAC sanctions screening filters)

- SAC ¶¶541-543 (describing the "Eastwood Memorandum,"[15] which detailed HSBC's "cover payment method" of evading U.S. sanctions and specific actions HSBC took to modify the contents of payment messages)

**d. Barclays**

- SAC ¶¶584-599 (describing Barclays' "List of Correspondents," which contained instructions to its employees on how to process payments for sanctioned Iranian banks so as to bypass OFAC controls in the United States)

- SAC ¶¶427-428 (describing Bank Melli's instructions to process Eurodollar transactions referencing only Bank Melli's Eurodollar account number at Midland Park Plc in London without referencing Bank Melli Iran's name in the SWIFT-NET payment orders)

---

[15]    The Eastwood Memorandum was entitled "COMPLIANCE-OFAC ISSUES IN GENERAL AND SPECIFIC TO IRAN." SAC ¶541.

**e. RBS N.V.**

- SAC ¶¶881-883 (describing one section of RBS' payment manual entitled "Special Conditions," which listed specific instructions on how to effectuate payments by Iranian banks and avoid OFAC filters)
- SAC ¶¶919-929 (describing criminal information filed against RBS N.V. for conspiracy, including, *inter alia*, meeting with representatives of the Iranian co-conspirator banks, creating "Special Conditions" for said co-conspirator banks in RBS N.V.'s payment manuals, and submitting materially false and misleading reports to OFAC)

**f. Credit Suisse**

- SAC ¶¶941-943 (describing Credit Suisse's pamphlets and letters to its Iranian co-conspirators explaining its procedures for illegally clearing USD transactions through its affiliates in the United States)

- SAC ¶¶962-963 (describing how Credit Suisse instructed its Iranian bank co-conspirator customers to format USD payments so as to evade U.S. sanctions)

- SAC ¶967 (noting that Credit Suisse provided its Iranian bank co-conspirator customers with materials to use for training *other* banks on how to properly prepare USD payment messages so as to evade U.S. sanctions)

**g. Commerzbank**

- SAC ¶997 (describing Commerzbank's policy document entitled "Routing Instructions Iranian banks for USD payments," which set forth its internal processes for evading U.S. sanctions)

- SAC ¶1012 (noting Commerzbank's coordination with IRISL to assist it in laundering U.S. dollars through the United States)

- SAC ¶¶1019-1020 (describing Commerzbank's adoption of a "safe payments solution" by which IRISL initiated USD funds transfers through the U.S., using the accounts of less conspicuous subsidiaries)

**2.      Defendants Were Aware of the Conspiracy's Unlawful Aims and Objectives.**

First, all Moving Defendants knew they were conspiring with a State Sponsor of Terrorism. SAC ¶10. Second, as noted above, they all knew that Iran had a legal channel to transfer funds for Iran's *legitimate* operations via the U-Turn Exemption, but purposefully chose unlawful and clandestine avenues instead. SAC ¶¶140-149. The only conceivable reason Iran

could have had for enlisting Defendants in the Conspiracy to launder hundreds of billions of dollars in this *unlawful* manner was to facilitate and conceal transfers for its illegitimate purposes – particularly terrorism. More specifically, U.S. regulators acknowledged that Iran was using "'U-Turn' transactions … to finance terrorist groups, including Hezbollah, Hamas and the Palestinian Islamic Jihad, and engaging in deceptive conduct to hide its involvement in various other prohibited transactions, such as assisting OFAC-sanctioned weapons dealers." SAC ¶163. Thus, Defendants joined the Conspiracy *knowing or consciously avoiding knowing* that it was intended to, and resulted in, Iran successfully transferring millions of dollars to fund entities like FTO Hezbollah and the IRGC to commit terrorism.

Bank Saderat, an SDGT that transferred millions of dollars *directly* to FTO Hezbollah, axiomatically knew the Conspiracy's goals. SAC ¶¶365-367. Moving Defendants were also fully aware of the foreseeable consequences of conspiring with Iran. For example, as early as October 2001, HSBC's compliance and audit departments acknowledged the risk of its money laundering on behalf of Iranian banks "particularly if we are unfortunate enough to process a payment which turns out to be connected to terrorism." SAC ¶510. An October 2006 email from a senior HSBC compliance staff member notes there was "direct evidence against Bank Saderat particularly in relation to the alleged funding of Hezbollah" and that the U.S. government "suspected all major Iranian State owned banks of involvement in terrorist funding and WMD procurement." SAC ¶518. By June 2007, the U.S. Treasury Department directly warned HSBC to withdraw from relationships with Iranian banks. ¶520; HSBC nonetheless continued its illegal conduct at least until 2010. SAC ¶¶526-531.

Standard Chartered Bank and Credit Suisse also secretly facilitated Letters of Credit for Iran that evaded the U.S. embargo on dual-use goods and materials. SAC ¶¶673-838. That the

Letters of Credit required alteration (*i.e.*, necessitated criminal conduct) itself signaled Iran's malignant intentions. However, as detailed in the Complaint, the attendant circumstances – the contraband nature and destination of the goods involved, the use of shady middlemen (often customers of Standard Chartered Bank), and the glaring indications that the true parties-in-interest were IRGC and MODAFL entities – all make inescapable the inference that Defendants knowingly served as merchants of death on behalf of a State Sponsor of Terrorism. *Id.*

Standard Chartered Bank further manifested its guilty knowledge in a 2006 e-mail involving the revocation of Bank Saderat's U-Turn exemption. When Standard Chartered Bank's U.K. Group Executive Director was apprised by a senior U.S. executive that its Iranian business could "subject[] management in US and London (e.g. you and I) and elsewhere to … serious criminal liability," he responded: **"You f---ing Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians."** SAC ¶¶665-66 (emphasis added). In light of published reports that Standard Chartered Bank continued to maintain accounts for Bank Saderat in such a way that they had "no markers against them"[16] as of 2015, it is clear that such warnings went unheeded. SAC ¶865.

Standard Chartered Bank, in particular, continued knowingly to work with Iranian banks subject to strict U.S. sanctions, conceal the Iranian connection to the transactions by stripping information from the Letters of Credit, and facilitate the unlawful delivery of goods under U.S. embargo to Iran's military and/or the IRGC — all in the service of transactions that Standard Chartered knew were not for Iran's legitimate agencies, operations, or programs. SAC ¶¶673-676. In September 2012, Standard Chartered Bank and the New York State Department of

---

[16] According to the same published report: "The status of numerous Iranian and Iran-connected entities was still being reviewed by [SCB] as late as 2013.... These included entities that had internal 'markers' and 'blocks' placed against them, a way for the bank to flag up concern about links to Tehran." SAC ¶865.

Financial Services ("DFS") executed a Consent Order in which DFS identified approximately *59,000* transfers Standard Chartered laundered through the United States on behalf of U.S.-sanctioned Iranian customers, totaling approximately *$250 billion* in illegal transactions. DFS subsequently concluded that "SCB operated as a rogue institution." SAC ¶¶839-840.[17]

Standard Chartered Bank and Credit Suisse were not the only Defendants that understood the particularly lethal consequences of their conduct. Commerzbank representatives also memorialized their awareness of, and indifference to, the ongoing efforts of U.S. regulatory authorities' continuing efforts to circumscribe Iran's illegal efforts to obtain U.S. dollars for IRISL. In a written presentation that Commerzbank delivered to IRISL on January 25, 2005, Commerzbank's Hamburg relationship manager stated: "*[t]he current rejections show that IRISL is in the OFAC list*." SAC ¶¶1015-17 (emphasis in the original). But rather than modify its banking practices to conform to U.S. regulations and to prevent a known instrumentality of Iran and weapons proliferator from gaining access to millions of dollars in U.S. currency, Commerzbank instead undertook efforts to *assist* Iran and IRISL in evading U.S. sanctions, using IRISL's subsidiaries as proxies. SAC ¶¶1019-1021. The following year, in June 2006, a Commerzbank employee in New York responding to Commerzbank's new Chief Compliance

_____

[17]     Less than two years later, in August 2014, DFS announced that Standard Chartered Bank had failed to remediate its compliance problems as required in its 2012 settlement. SAC ¶853. DFS ordered Standard Chartered to: (1) suspend dollar clearing through Standard Chartered's New York branch for high-risk retail business clients at its Hong Kong subsidiary; (2) exit high-risk client relationships within certain business lines at its branches in the United Arab Emirates; (3) decline new dollar-clearing clients or accounts across its operations without prior approval from DFS; (4) pay a $300 million penalty; and (5) take other remedial steps. SAC ¶854. Additionally, according to an October 29, 2014 article in *The New York Times*, federal and Manhattan prosecutors have reopened their investigation into Standard Chartered, questioning whether Standard Chartered had failed to disclose the extent of its wrongdoing to the government, thus imperiling Standard Chartered's 2012 settlement. SAC ¶856. In August 2015, *The New York Times* reported that Standard Chartered was *once again* under investigation: "The Justice Department is examining whether it committed sanctions violations beyond those covered in the 2012 deal, which centered on what the bank called 'Project Gazelle,' an effort to forge 'new relationships with Iranian companies.'" SAC ¶864. In September 2015, the *Financial Times* reported that it had reviewed documents indicating Standard Chartered was "determined to keep working with Iranian companies" and noted that as late as 2013 Standard Chartered still had accounts open for SDGT Bank Saderat with no internal notations about closing them. SAC ¶865.

Officer's query regarding compliance concerns, noted the "[p]ersistent disregarding of OFAC rules by foreign branches. Hamburg is notorious for it." SAC ¶1030.

On September 10, 2008, the U.S. designated IRISL, IRISL Europe GmbH, and several IRISL subsidiaries SDNs based on evidence that the IRISL network of companies was engaged in WMD proliferation activity and the fact that "IRISL has pursued new strategies which could afford it the potential to evade future detection of military shipments." SAC ¶1035. The next day, on September 11, 2008, a senior OFAC official personally forwarded the press release announcing IRISL's designation to Commerzbank's Head of Compliance in New York. SAC ¶1036. The press release was then forwarded to Commerzbank employees in Germany with IRISL-related responsibilities. In the email, the relationship manager noted that the U.S. government alleged "that IRISL as Iranian government carrier systematically circumvents the Iranian arms embargo." SAC ¶1037. Nonetheless, between September 10, 2008, and December 31, 2008 alone, Commerzbank illegally directed *close to $40 million on behalf of IRISL subsidiaries and related entities through its New York branch and other U.S. financial institutions*. SAC ¶1038.

Commerzbank also maintained an account for a notorious Hezbollah fundraising organization in Germany known as Waisenkinderprojekt Libanon e.V. (in English, "the Orphans Project Lebanon e.V.," hereinafter, "Waisenkinderprojekt"). It did so, despite the fact that prior public German government reports had identified Waisenkinderprojekt as a Hezbollah fundraising organization, and that on July 24, 2007 the United States had designated the Lebanese organization that was the primary recipient of funds donated from the account (Hezbollah's Martyrs Foundation) as an SDGT.[18] SAC ¶1039. Accordingly, Commerzbank

<hr />

[18] *See*, https://www.treasury.gov/press-center/press-releases/Pages/hp503.aspx.

either knew, or consciously avoided knowing, that by continuing to provide financial services to Waisenkinderprojekt it was providing material support to FTO Hezbollah. SAC ¶1040.

Barclays was no better. In an April 2005 internal memo, it demonstrated its knowledge and indifference to the "moral risk" of using MT 202 cover payments, noting that:

> [c]hanging to different message types would be much more expensive to us. *Moral risk exists if we carry on using cover payments but that is what the industry does.* I[n] M[y] H[umble] O[pinion] we should carry on using cover payments and accept that there is a risk of these being used on occasion to hide true beneficiaries (who may or may not be sanctioned individuals or entities). [SAC ¶611 (emphasis added.)]

Moreover, indifferent to U.S. sanctions and the "moral risk" attendant to continuing to facilitate illegal Eurodollar transfers for sanctioned Iranian banks, Barclays *continued* to partner with Bank Melli after OFAC designated Melli an SDN for transferring millions of dollars to the IRGC. Likewise, Barclays *continued* its efforts on behalf of Bank Saderat after OFAC designated Saderat an SDGT for enabling the transfer of USD funds to FTO Hezbollah. SAC ¶¶614-615.

Although RBS was at all relevant times aware of the United States' imposition of the Iranian sanctions, and the anti-terrorism basis for same, its representatives preferred to substitute their own self-serving judgment for that of the U.S. government. For example, in a July 25, 2003 e-mail, John Philbin, RBS's Senior Relationship Banker for Iranian Banks, wrote in reference to the sanctions regime:

> Surely Iran is the most obvious case in point for these structures. Twenty-four years of US sanctions and OFAC listing and Iran continues to sell oil and gas in USD. And, it imports and pays in USD as well. All of this is clearly done though accounts in Europe and elsewhere. There is a very good case to be made for getting an overall acceptance that when issues are purely US, we should not be a part of it. In fact, we should see it as an opportunity. *OFAC is not the Bible for money laundering* (e.g. Cuba is prominent on OFAC). *It is a tool of broader US policy. We therefore need to distinguish between US foreign policy on the one hand and AML/anti-Terrorism on the other, however much the US administration may wish to insist that the two are closely linked*. It is well worth working on a

> solution for clients who find themselves in this position or who fear (Syria, Saudi Arabia) that they, one day soon might find themselves there. [SAC ¶907 (emphasis added).]

Also in 2003, Diane Perrin, a member of RBS's Group Compliance team at its Amsterdam Head Office, stated, "as a European Institution, we do not comply with US Sanctions because those sanctions are politically motivated." SAC ¶908.

### 3. Many of the Conspiracy's Beneficiaries Were Integral to Iran's Terror Apparatus.

Iran's two principal agents for orchestrating acts of terrorism in Iraq, Hezbollah and the IRGC, were directly responsible for Plaintiffs' injuries. Hezbollah and the IRGC, in turn, were supported by a web of Iranian government entities integral to Iran's terror apparatus, including: (1) Mahan Air; (2) MODAFL; (3) IRISL; and (4) the NIOC. Their role rested on at least two logistical requirements. First, both Hezbollah and IRGC operatives had to be transported in and out of Iraq. Second, they needed specific weapon components and manufacturing equipment to supply their proxies with, *inter alia*, the signature Iranian weapon – the EFP – used in attacks on more than 90% of the Plaintiffs or their family members.

#### a. Mahan Air

In October 2011, the United States designated the Iranian commercial airline Mahan Air an SDGT for having provided financial, material, and technological support to the IRGC and Hezbollah in Iraq. SAC ¶¶19-20. The Treasury explained that Mahan Air had been directly involved with terrorist operations, personnel movements and logistics on the IRGC's behalf:

> Mahan Air also facilitated the covert travel of suspected IRGC-QF[19] officers into and out of Iraq by bypassing normal security procedures and not including information on flight

---

[19] The IRGC-QF is an IRGC directorate. SAC ¶7. It was designated an SDGT in October 2007, and the press release accompanying its designation noted, *inter alia*, its "long history of supporting Hezbollah's [sic] military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support." SAC ¶16.

manifests to eliminate records of the IRGC-QF travel.

Mahan Air crews have facilitated IRGC-QF arms shipments. Funds were also transferred via Mahan Air for the procurement of controlled goods by the IRGC-QF.

In addition to the reasons for which Mahan Air is being designated today, Mahan Air also provides transportation services to Hezbollah, a Lebanon-based designated Foreign Terrorist Organization. Mahan Air has transported personnel, weapons and goods on behalf of Hezbollah and omitted from Mahan Air cargo manifests secret weapons shipments bound for Hezbollah. SAC ¶686.

The Department of Justice also identified Mahan Air as having transported to Iran *thousands* of radio frequency modules recovered by Coalition Forces in Iraq from IEDs that were used to target U.S. and Coalition Forces.[20] These modules had encryption capabilities and a particularly long range that allowed the terrorist members of Iranian-trained Special Groups[21] to operate them across significant distances. Mahan Air transported the modules from Singapore and Thailand to Tehran. Under Secretary of Commerce Eric L. Hirschhorn described this supply chain as "egregious conduct…by foreign companies and individuals who have endangered the lives of U.S. and coalition forces in Iraq." SAC ¶¶687-691.

Notwithstanding Mahan Air's longtime status as the IRGC's and Hezbollah's airline of choice, Standard Chartered Bank – assisted by Defendant Bank Saderat Plc, Bank Melli Iran, and Bank Sepah – knowingly altered Letters of Credit enabling Mahan Air to illegally purchase more than $120 million in U.S. aircraft and aircraft parts prohibited by the U.S. Commerce Control List. SAC ¶685. On at least two of these transactions, Credit Suisse, Zurich also helped facilitate payment on the Letters of Credit, and on at least one occasion Credit Suisse *itself* routed payment through New York on behalf of Bank Melli, UAE, with Standard Chartered Bank's New York

---

[20]     *See*, Superseding Indictment in *U.S. v. Arrijana* at: https://www.justice.gov/opa/file/837996/download.

[21]     Special Groups as used herein refers to a litany of Iraqi Shi'a terror groups that killed, injured, or maimed Plaintiffs and/or their family members. SAC ¶7. As discussed *infra*, these included Kata'ib Hezbollah ("KH"), the Mahdi Army ("JAM"), Asa'ib Ahl al-Haq, and the Promised Day Brigades. SAC ¶¶294-329.

branch clearing and settling the transaction in U.S. dollars. SAC ¶697. Standard Chartered Bank's willingness to disguise illegal transactions financed by Iranian banks enabled Mahan Air to purchase aircraft and replacement parts needed to continue its operations, facilitate travel by IRGC-QF officers and arms shipments in and out of Iraq, transport IED technologies into Iraq, and transport personnel, weapons and goods on Hezbollah's behalf – all of which substantially contributed to Iran's ability to facilitate terrorist attacks in Iraq during the relevant period.

**b. Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL")**

Iran used MODAFL[22] to procure and develop weapons and equipment for the IRGC's use. SAC ¶15. The Complaint sets forth a wide array of MODAFL sub-agencies and companies[23] that participated in the Conspiracy primarily through Standard Chartered Bank, as well as other co-conspirators. Standard Chartered Bank actively helped MODAFL evade U.S. sanctions and acquire embargoed, dual-use goods and materials by:

- Facilitating 173 transactions between 2001 and 2007 totaling more than $130 million on behalf of Khoram Sanat Producing Co. and another Iranian front company named Diamonds Steel. SAC ¶¶826-829. On June 20, 2005, Standard Chartered facilitated Khoram Sanat's illegal purchase from the United States of $2.79 million USD's worth of electromotors for hydraulic presses. SAC ¶825. IRISL transported the machinery into Iran. SAC ¶835. These hydraulic presses are the precise type of machinery required to manufacture EFPs, and, accordingly, required an export license (which Khoram Sanat could not have obtained). SAC ¶¶831-833.

- Facilitating at least 21 Letters of Credit for close to $8 million in embargoed U.S.-origin aircraft parts sold by Mac Aviation (a Standard Chartered accountholder) to sub-agencies of MODAFL. SAC ¶¶741-749. Mac Aviation was indicted in 2008 (and again in 2010) for, *inter alia*, violations of the IEEPA, the ITR, and U.S. export controls.[24] SAC ¶¶729, 737-740.

---

[22]    In October 2007, the U.S. designated MODAFL an SDN. SAC ¶¶12-13.

[23]    Those sub-agencies and companies are described in detail in SAC ¶¶713-14. They are sometimes referred to herein simply as "MODAFL" rather than by their individual names.

[24]    In 1994, a Florida court convicted one of the owners of Mac Aviation, Thomas McGuinn, for exporting defense products to Iran. SAC ¶729, n. 40.

- Facilitating at least 10 Letters of Credit for shipment of embargoed U.S.-origin aircraft parts sold by Monarch Aviation (a Standard Chartered accountholder) to sub-agencies of MODAFL. SAC ¶768. *After* the 2003 indictment of Monarch Aviation's owners, Standard Chartered facilitated at least 316 additional transactions involving Monarch Aviation's accounts[25] totaling $12,110,565. SAC ¶773.

- Facilitating 10 Letters of Credit for $1,067,575 in embargoed U.S.-origin goods sold by Downtown Trading Ltd. (an Iranian front company based in Malaysia) to Iran's military and/or the IRGC. SAC ¶¶719-720.

- Facilitating likely dozens of illegal shipments, including at least one shipment of U.S.-origin aircraft parts (on the Commerce Control List) on behalf of its customer Jetpower Industrial, Ltd. (an Iranian front company based in Hong Kong) to one of MODAFL's sub-agencies.[26] SAC ¶¶782-788.

**c. IRISL**

IRISL is Iran's state-owned shipping line that has a long history of facilitating arms shipments on the IRGC's behalf, including copper disks that form the key component in EFPs. SAC ¶¶22, 50-51, 208-209. For example, a November 2007 State Department cable noted:

> Washington remains concerned about on-going conventional arms transfers from China to Iran, particularly given Iran's clear policy of providing arms and other support to Iraqi insurgents and terrorist groups like the Taliban and Hezbollah….
>
> We have specific information that Chinese weapons and components for weapons transferred to Iran are being used against U.S. and Coalition Forces in Iraq, which is a grave U.S. concern. [SAC ¶198.]

The diplomatic cable noted that an IRISL-flagged vessel was loaded at a Chinese port with multiple containers of cargo bound for delivery at the port of Bandar Abbas, Iran. The cargo included Iranian Defense Industries Organization ("DIO")[27]-manufactured ammunition

---

[25] Monarch Aviation maintained accounts with both Standard Chartered and Credit Suisse. SAC ¶¶751, 753.

[26] In 2011, Jetpower's owner, John Chan, was sentenced to 42 months for conspiring to illegally export, or attempting to illegally export, 10 indicators, used in C-130 military flight simulators, in violation of the Arms Export Control Act. According to U.S. officials, Jetpower repeatedly and illicitly exported arms to Iran prior to Chan's arrest and conviction. SAC ¶¶775-777.

[27] DIO was designated an SDN on March 30, 2007. IRGC Brigadier-General Seyyed Mahdi Farahi was DIO's Managing Director, and he has been sanctioned by the EU since 2008 (*see* http://eur-lex.europa.eu/legal-

cartridges (7.62 x 39 rounds for AK-47 assault rifles). SAC ¶¶199-200.

IRISL was designated an SDN in 2008, in part, for shipping military cargo on Iran's behalf. SAC ¶204. Some of these shipments provided key components of EFPs to Hezbollah. SAC ¶¶50-51, 197-198.[28] In only *four months* following IRISL's designation, Commerzbank illegally transferred almost $40 million on behalf of IRISL subsidiaries and related entities through Commerzbank's New York branch or other U.S. financial institutions. SAC ¶1022. Commerzbank's role was set forth in detail in its DPA, which confirms the extensive nature of its unlawful and conspiratorial conduct on IRISL's behalf. SAC ¶¶992, 1013-1020. During the relevant period, including a period of time <u>after</u> IRISL was designated, Defendants HSBC (SAC ¶568), SCB (SAC ¶671), RBS (SAC ¶918), and Commerzbank (SAC ¶¶1019-1022) facilitated illegal funds transfers through the United States on IRISL's behalf, totaling more than $100 million.[29] SAC ¶¶23, 50, 346, 1022.

### d. The National Iranian Oil Company ("NIOC")

Defendants Standard Chartered Bank (SAC ¶¶406; 624-625), RBS (SAC ¶¶410-411; 907; 910-911), and HSBC (SAC ¶516) maintained accounts for the NIOC during the relevant period when it was IRGC-controlled. SAC ¶¶152, 516.[30] During that time, the NIOC served as

---

content/EN/TXT/?uri=CELEX%3A32008D0475). He was later sanctioned by the U.S. on January 17, 2016. SAC ¶200 n. 18.

[28]     For example, in October 2009, U.S. troops boarded a German-owned but IRISL-chartered freighter, the M/V *Hansa India*, in the Gulf of Suez and found eight containers full of ammunition that were headed to Syria from Iran. The vessel carried seven containers of small arms ammunition (including 12 million bullet casings), as well as one container containing copper discs of the type used in EFPs and stamped "IRISL." SAC ¶¶208, 212. A June 2011 indictment of IRISL in New York makes clear that IRISL participated in the Conspiracy in order to continue illegally and clandestinely transferring funds through the U.S. financial system. SAC ¶218.

[29]     Contrary to Defendants' claim that these allegations are "conclusory," they reflect facts set forth in the New York County District Attorney's indictment of IRISL in June 2011, of which the Court can take judicial notice. SAC ¶218.

[30]     The Iran Threat Reduction and Syria Human Rights Act 2012 indicated the NIOC's key role in supporting the IRGC: "It is the sense of Congress that the National Iranian Oil Company and the National Iranian Tanker

the lifeblood of Iran's illicit financing activities, providing it with access to billions of dollars in oil and natural gas revenues, thereby enabling the IRGC to gain entry (through the Conspiracy) to the global financial system. According to a published report, the NIOC even took an active role in support of Iran's terrorist activities in Iraq by using its own helicopters to conduct surveillance on Coalition Forces' Forward Operating Bases along the Iranian border, and providing intelligence in support of attacks against Coalition Forces. SAC ¶403.

Accordingly, Defendants Standard Chartered Bank,[31] RBS, and HSBC committed felonies in knowingly laundering billions of dollars for an agent of the IRGC – one of the Iranian instrumentalities *directly* responsible for the acts of terrorism that injured Plaintiffs. Standard Chartered Bank, for example, agreed to – and did – work with the CBI to launder NIOC funds transfers through the United States. Subsequently, between 2001 and 2006, Standard Chartered Bank assisted CBI in illegally routing at least 2,226 payment order messages through the United States for a total value of *$28.9 billion*.[32] SAC ¶406. From at least 2003 forward, the HSBC Defendants also conspired to launder Eurodollars on NIOC's behalf, SAC ¶516 n. 28 – despite later acknowledging that U.S. authorities "suspected all major Iranian State owned banks of involvement in terrorist funding and WMD procurement." SAC ¶518.

### 4. Defendants Substantially Assisted Iran's Terror Apparatus.

In addition to the billions of dollars the Moving Defendants laundered directly on behalf of the IRGC (via NIOC) (SAC ¶¶400; 404-406), and the more than $100 million that Bank Melli

---

[31]     Standard Chartered conspired to conceal an enormous volume of transactions directly on the NIOC's behalf, describing this arrangement as "very prestigious." SAC ¶¶623-625.

[32]     The Iranian Helicopter Aviation Company, Kala Naft, and the Ahwaz Pipe Mill Company are all NIOC subsidiaries that were IRGC dominated and controlled at all relevant times. SAC ¶811. Standard Chartered knowingly and illegally facilitated Letters of Credit for all three of these NIOC subsidiaries. SAC ¶¶812-819.

Company are not only owned and controlled by the Government of Iran but that those companies provide significant support to Iran's Revolutionary Guard Corps and its affiliates." SAC ¶402. *See*, https://www.treasury.gov/resource-center/sanctions/Documents/hr_1905_pl_112_158.pdf.

transferred to the IRGC via the Conspiracy (SAC ¶419), the Complaint provides specific details of financial services the Conspiracy effectuated to instrumentalities of Iran's terror apparatus, including: $50 million for Hezbollah, SAC ¶¶18, 236, 367; $120 million in Letters of Credit for (SDGT) Mahan Air, SAC ¶685; $27 million (at least) in Letters of Credit for (SDN) MODAFL, SAC ¶¶715, 720, 737, 741, 768, 773, 781, 800; and $100 million (post-designation) on behalf of IRISL and its subsidiaries and related entities, SAC ¶¶23, 50, 346, 1022.

### 5. Iran's Terror Apparatus Was Responsible for the Acts of Terrorism That Injured Plaintiffs.

Following the end of U.S. combat operations against the Government of Iraq and its military force in May 2003, Iran was determined to increase its influence in Iraq. To this end, Iran, through its agencies and instrumentalities, principally Hezbollah and the IRGC, armed, trained, and funded the Special Groups in an effort to kill and maim Coalition troops, and slaughter, kidnap and mutilate ordinary Iraqis. SAC ¶¶7, 112, 238-239.

Hezbollah worked alongside IRGC operatives to facilitate terrorist attacks on Coalition Forces and civilians in Iraq. SAC ¶¶249-250, 286-291. For example, the January 20, 2007 coordinated terrorist attack against the Provincial Joint Coordination Center ("PJCC") in Karbala was a glaring example of Iran's terror campaign during this period.[33] Hezbollah planned the attack under the direction of IRGC protégé and surrogate, and senior Hezbollah commander, Ali Musa Daqduq.[34] Special Group Asa'ib Ahl al-Haq carried out the attack using detailed IRGC-

---

[33] Plaintiffs' decedents Johnathon M. Millican, Brian S. Freeman, Shawn P. Falter, Jacob N. Fritz and Johnathan B. Chism were among those killed in the attack. Plaintiffs Billy Wallace, Evan Kirby, Johnny Washburn and Marvin Thornsberry were injured in the attack. SAC ¶1080.

[34] The U.S. Treasury Department's November 19, 2012 press release announcing Daqduq's designation as an SDGT stated, in part: "Daqduq is a senior Hezbollah commander responsible for numerous attacks against Coalition Forces in Iraq, including planning an attack on the Karbala Joint Provincial Coordination Center (JPCC) on January 20, 2007, which resulted in the deaths of five U.S. soldiers." According to the U.S. government, Daqduq *was in Iraq working as a surrogate for Iranian Revolutionary Guards Corps Quds Force operatives involved with special groups.*" SAC ¶¶1066-1069.

supplied intelligence. SAC ¶¶1055-1060. Indeed, for this mission, Hezbollah operatives used facilities in Iran to train the AAH strike team commander. SAC ¶¶1061-1062. Thus, although AAH operatives pulled the triggers that killed the captive U.S. servicemen, their kidnapping and murders were orchestrated, trained, funded, and authorized by Iran's agents, Hezbollah and the IRGC – the very entities to which Iran's banking co-conspirators were found by the United States government to have transferred more than $150 million through the U.S. SAC ¶¶23, 346, 357, 419, 422, 423.

In fact, when the U.S. designated the IRGC's Qods Force an SDGT in October 2007, it specifically found that it "provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians." SAC ¶16. As alleged in detail in the Complaint, in addition to Hezbollah itself, Iran also armed, trained, and funded the Special Groups that operated in Iraq during the relevant period.[35]

Iran's funding of these terrorist groups was not limited to generalized financial support. Intelligence estimates indicate that Iran specifically paid its terror proxies in Iraq "between $4,000 and $13,000 per rocket or roadside bomb, depending on the circumstances." SAC ¶252. EFPs – the signature weapon at the forefront of Iran's efforts – were channeled to the Special Groups through Hezbollah and the IRGC to kill and maim Americans in Iraq.

**B.      Iran's Support for the Terror Campaign in Iraq Was Well-Known and Foreseeable.**

Contemporaneous U.S. government reports were not the only publicly available sources linking Iran, Hezbollah and the IRGC to "the increasing lethality of anti-Coalition attacks by …

---

[35]      Kata'ib Hezbollah ("KH"), SAC ¶¶302, 310-322; Mahdi Army ("JAM"), SAC ¶¶294-297; Asaib Ahl al-Haq ("AAH"), SAC ¶¶323-329; and Promised Day Brigades, SAC ¶¶298-301. On June 24, 2009 Kata'ib Hezbollah was designated both an FTO and an SDGT. SAC ¶¶304-307.

Shia militants" and their use of Iranian-origin EFPs. The Complaint cites numerous, credible, public sources linking Iran and its instrumentalities to these lethal weapons. SAC ¶¶266-279. The Complaint also cites numerous occasions in which the media publicized the *direct link* between Iran and the use of EFPs against Coalition Forces in Iraq. SAC ¶¶36-39.

## ARGUMENT

## I.    THE ATA ESTABLISHES LIABILITY FOR CONSPIRACY.

Deep into their Joint Memorandum, and well after it would have mooted their causation arguments, Defendants finally reach the threshold issue: whether conspiracy is available under §2333(a). Citing *Rothstein*'s rejection of common law aiding and abetting under the ATA, and this Circuit's rejection of conspiracy liability under §10(b) of the Securities Exchange Act of 1934 in *Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837 (2d Cir. 1998), Defendants ask this Court to reject conspiracy liability predicated on violations of the material support statutes. Both of these opinions (and the Supreme Court opinion in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994) on which they rely) rest on the relevant statute's silence regarding liability. *See, e.g.*, *Dinsmore*, 135 F.3d at 842 ("there is no mention of conspiracy in the text").

But neither case applies here, because *the ATA is not silent*. First, by a straightforward chain of incorporations by reference, §2333(a) incorporates the express conspiracy provisions of §§2339A and 2339B, creating *primary liability* with "the character of secondary liability," as Judge Posner put it in the seminal en banc decision in *Boim III*. 549 F.3d at 691. *Dinsmore* itself emphasized that "secondary actors who conspire to commit [Rule 10b-5] violations will still be subject to liability so long as they independently satisfy the requirements for primary liability." 135 F.3d at 842.  Second, Congress has now expressly confirmed that the legal framework *Boim*

*III* used "is the proper legal framework for how such liability should function in the context of chapter 113B of title 18," where both §2333(a) and the material support statutes appear. JASTA §2(a)(5).

Congress has also now amended the ATA to add express secondary liability for conspiracy with regard to injuries arising from a terrorist act committed, planned, or authorized by an FTO, like Hezbollah or Kata'ib Hezbollah. JASTA §4(a), adding §2333(d). Although Plaintiffs did not plead this newly-defined claim, this Court may uphold the conspiracy claims (Claims 1 and 2) on *any* available legal theory supported by the factual allegations in the complaint. *See, e.g., Bristol-Myers Squibb Co. v. Matrix Labs. Ltd.*, No. 15-1922-CV, 2016 WL 3553442, at *2 (2d Cir. June 30, 2016) (pleading merely has to contain "factual allegations" that would entitle plaintiff to relief under law, whether or not plaintiff has identified the legal basis). Section 2333(d) therefore, *alone* moots Defendants' arguments against the availability of conspiracy, as Bank Saderat's counsel has publicly conceded:

> JASTA … makes clear that under the ATA's treble damages remedy, there can now be civil liability for those who aid and abet an act of terrorism, as well as those who conspire to do so…. The defense that the statute does not provide civil liability for persons who do not actually commit an act of terror will likely no longer be available to any organization or individual sued in an ATA case.[36]

### A. By a Chain of Statutory Incorporations by Reference, 18 U.S.C. §2333(a) Incorporates Conspiracy Violations of §§2339A and 2339B.

In the seminal ATA case, *Boim III*, the Seventh Circuit rejected "common law" claims for civil aiding and abetting. The court held, in an opinion by Judge Posner, that statutory silence on the subject of (common law) secondary liability means there is none, and that §2333(a) therefore does not authorize claims predicated on federal common law secondary liability. In

---

[36] Jeremy D. Frey, "Will JASTA Yield More Lawsuits Over Terror?" *The National Law Journal,* October 3, 2016, attached as Exhibit K to the Radine Declaration.

*Rothstein*, the Second Circuit expressly adopted *Boim III*'s analysis. *Rothstein*, 708 F.3d at 98.

But *Boim III* also held that, through a chain of statutory incorporation by reference (in that case, from §2333(a) to §2331(1) to §2339A)), Congress enacted a form of statutory secondary liability *as primary liability*. 549 F.3d at 690-92. The court then fleshed out that liability by borrowing common law principles of secondary liability:

> The parties have discussed both issues mainly under *the rubrics of "conspiracy" and "aiding and abetting."* Although those labels are significant primarily in criminal cases, *they can be used to establish tort liability*, *see, e.g.*, *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983); *Restatement (Second) of Torts* §§ 876(a), (b) (1979), and there is no impropriety in discussing *them* in reference to the liability of donors to terrorism under section 2333 just because that liability is primary. *Primary liability in the form of material support to terrorism has the character of secondary liability. Through a chain of incorporations by reference, Congress has expressly imposed liability on a class of aiders and abettors*.

*Id.* (emphasis added). While the *Boim* plaintiffs rested their claims on aiding and abetting, Judge Posner's opinion did not differentiate aiding and abetting and conspiracy: "there is no impropriety in discussing *them* . . . just because that liability is primary." No court in this Circuit had disavowed *Boim III*'s analysis of primary liability with the character of secondary liability. *See, e.g., Strauss v. Crédit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 426 (E.D.N.Y. 2013) (citing cases); *Linde v. Arab Bank, PLC*, No. 04–cv–2799 (BMC)(PK), 2015 WL 1565479, at *27 (E.D.N.Y. April 8, 2014); *Sokolow v. Palestine Liberation Organization*, 60 F. Supp. 3d 509, 516 (S.D.N.Y. 2014). Nor did *Rothstein*. The *Rothstein* plaintiffs did not plead conspiracy – either civil or criminal – and the court there did not mention or address it.

In any case, Congress has now expressly endorsed Judge Posner's resort to the tort law of secondary liability to decide the dimensions of primary liability for material support. In JASTA, Congress found that the authority which Judge Posner cited, *Halberstam v. Welch*, 705 F.2d 472

(D.C. Cir. 1983), "provides the proper legal framework for how such liability should function in the context of chapter 113B of title 18, United States Code." JASTA §2(a)(5).

The Plaintiffs' claim for primary liability here rests on the statutory incorporation by reference, via §2333(a) and §2331(1), of the criminal provisions of §§2339A and 2339B. Each of these provisions *expressly* delineates conspiracy as an alternative element of each crime:

> **18 U.S.C. §2339A(a)**: Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation … or attempts *or conspires to do such an act*, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. (Emphasis added.)[37]

> **18 U.S.C. §2339B(a)(1)**: Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts *or conspires to do so*, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989). (Emphasis added.)

In short, not only is the ATA not silent, but through §§2339A and 2339B it incorporates by reference the very word "conspires."

Notwithstanding Defendants' protestations, *Linde v. Arab Bank, PLC*, 944 F. Supp. 2d 215 (E.D.N.Y. 2013), is not to the contrary. Joint. Mem. at 25 (citing *Linde* Amended Complaint

---

[37] Many of the predicate acts set forth in §2339A also expressly incorporate conspiracy into their acts. *See, e.g.*, 18 U.S.C. §956(a)(1) (conspiracy to kill, kidnap, maim, or injure persons or damage property in a foreign country); §2332a(a)(1) (conspiracy to use weapon of mass destruction against U.S. nationals); §2332f(a)(2) (conspiracies to bomb government buildings and/or places of public use); §2332b(a)(2) (conspiracies to perform acts of international terrorism that transcend national boundaries, including, per §2332b(b)(1)(C), situations where intended victim is member of U.S. uniformed services). Thus, in *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 505 (E.D.N.Y. 2012), Judge Weinstein acknowledged that claims for conspiracy were viable for violations of §2332(b) because that statute explicitly renders it a crime to engage in a conspiracy to murder or injure U.S. nationals abroad.

¶316). The *Linde* court dismissed federal *common law* claims based on conspiracy[38] that

plaintiffs had pled prior to *Rothstein*'s adoption of *Boim III*'s analysis rejecting federal common

law secondary liability.[39] Had the *Linde* court read *Rothstein* to preclude all "conspiracy claims

and other theories of secondary liability" based on primary liability for incorporated material

support violations, as Defendants contend (Joint. Mem. at 2), it would have granted summary

judgment to the defendant on all of the claims in that case. Instead, it permitted claims predicated

on primary liability to proceed to trial, resulting in a jury verdict for plaintiffs. *See Linde v. Arab*

*Bank, PLC*, 97 F. Supp. 3d 287, 323 (E.D.N.Y. 2015) (denying defendant's post-trial motions

and affirming primary violation by "a series of incorporations by reference").

The HSBC defendants and RBS alone also argue that the underlying violations of

§2339A and §2339B do not satisfy 18 U.S.C. §2331(1)'s definitional requirement that those acts

---

[38]    It reasoned that, "as with aiding and abetting liability, the Second Circuit is likely to hold that §2333(a) does not provide for claims for *civil* conspiracy." *Id.* at 216-17 (emphasis added). Defendants erroneously cite ¶316 of the Amended *Linde* complaint, Joint. Mem. at 25, which was not the Claim for Relief at issue before the district court. *See, Linde*, No. 04 Civ. 2799 (E.D.N.Y. Aug. 10, 2004), ECF No. 4, Amended Complaint ¶¶384-90.

[39]    The pertinent colloquy between counsel in the instant case and Judge Gershon in *Linde* makes the distinctions clear:

> MR. OSEN (Plaintiffs' Counsel): We also pled consistent with form three and courts in this circuit what Judge Posner referred to as primary liability with the elements of secondary liability.
> THE COURT: *Well I am not talking about that. I am not talking about direct liability claims*. I am talking about what you called in your complaint, at least in Linde which I used as the paradigm, about which you called an aiding and abetting claim.
> MR. OSEN: Right.
> THE COURT: You're saying that you had in mind that that was a common-law claim or maybe you actually said it.
> MR. OSEN: Right. Maybe another way of stating it is that *the first claim for relief was common-law based on violations of 876 Restatement, generally referred to as common-law aiding and abetting*.
> THE COURT: Okay.
> MR. OSEN: As opposed to direct liability for violations of 2339A, B or C, which have characteristics of aiding and abetting but are not a standalone aiding and abetting claim. So by its definition, Your Honor, when you provide material support under 2339B, that is material support to a primary tortfeasor who blows up the bus or what have you. So, it therefore has, as Judge Posner said, characteristics of secondary liability but it's a primary liability.
> THE COURT: All right, we're on the same page. Mr. Walsh, are we on the same page?
> MR. WALSH (Defendant's Counsel): Yes, Your Honor.

Apr. 24, 2013 Hearing, at 6:21-7:23, *Linde*, No. 04 Civ. 2799, ECF No. 94 (emphasis added). (Plaintiffs' counsel in this case were also plaintiffs' counsel in *Linde*.)

"appear to be intended … to intimidate or coerce a civilian population." Although they concede (as they must) that this is an objective, not a subjective standard, citing *Boim III*, HSBC/RBS Mem. at 2, they tellingly ignore that opinion's application of it to material support violations.

> A knowing donor to Hamas—that is, a donor who knew the aims and activities of the organization—would know that Hamas was gunning for Israelis (unlike some other terrorist groups, Hamas's terrorism is limited to the territory of Palestine, including Israel [internal citation omitted]), that Americans are frequent visitors to and sojourners in Israel, that many U.S. citizens live in Israel [internal citation omitted]), and that donations to Hamas, by augmenting Hamas's resources, would enable Hamas to kill or wound, or try to kill, or conspire to kill more people in Israel. And given such foreseeable consequences, such donations would "appear to be intended ... to intimidate or coerce a civilian population" or to "affect the conduct of a government by ... assassination," as required by section 2331(1) in order to distinguish terrorist acts from other violent crimes, though it is not a state-of-mind requirement; it is a matter of external appearance rather than subjective intent, which is internal to the intender. [*Boim III*, 549 F.3d at 693-94.]

So too, a bank that knowingly conspired with State Sponsor of Terrorism Iran and its instrumentalities, that knew that Iran was seeking to clandestinely clear billions of U.S. dollars for illegitimate operations (operations it could not legally fund via the U-Turn Exemption), and that systematically concealed transfers from U.S. regulatory authorities and law enforcement, in express violation of the material support statutes and the Iranian sanctions regime, would know that Iran was gunning for Americans serving in Iraq between 2004 and 2011. It would know that many U.S. servicemen were being killed and wounded in Iraq, and that facilitating billions of dollars in funds transfers on Iran's behalf, by augmenting Iran's clandestine resources, would enable Iran to kill or wound, or try to kill, or conspire to kill more Americans in Iraq. Given such eminently foreseeable consequences, such fund transfers would inherently "appear to be intended ... to intimidate or coerce a civilian population" or to "affect the conduct of a government by ... assassination," as required by section 2331(1) – as a matter of external appearance rather than

subjective intent. *See Linde v. Arab Bank, Plc*, 97 F. Supp. 3d at 322 ("I agree with those courts that have held that a violation of 18 U.S.C. § 2339B is itself an act of international terrorism").[40] Violating §§2339A or 2339B by knowingly providing material support for terrorism (and systematically concealing that conduct) "appears to be intended," even if Defendants were actually motivated solely by greed.

**B.     18 U.S.C. §2333(d) Provides an Alternative Legal Basis for Plaintiffs' Conspiracy Claims.**

In JASTA, Congress found it "necessary to recognize the substantive causes of action for aiding and abetting and conspiracy liability under chapter 113B of title 18, United States Code." JASTA §2(a)(4). To provide the "broadest possible basis" for ATA plaintiffs to seek relief from those who provide material support to foreign organizations or persons that engage in terrorist activities against the United States, Congress amended the ATA to add §2333(d):

> In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

Section 2333(d) gives ATA plaintiffs the option ("liability may be asserted") to allege conspiracy with the person (including associations, societies, and individuals) who commits an

---

[40]     *Accord*, *Abecassis v. Wyatt*, 7 F. Supp. 3d 668, 672-673 (S.D. Tex. 2014); *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 42-43 (D.D.C. 2010); *Goldberg v. UBS AG*, 690 F. Supp. 2d 92, 112-15 (E.D.N.Y. 2010) (collecting cases); *Strauss v. Crédit Lyonnais, S.A.*, 2006 WL 2862704, at *1 (E.D.N.Y. 2006) ("Violations of 18 U.S.C. § 2339B and § 2339C are recognized as international terrorism under 18 U.S.C. § 2333(a)."). Ignoring these cases, Defendant instead cites two outlier cases. *Stutts v. De Dietrich Grp.*, 2006 WL 1867060, at *2 (E.D.N.Y. 2006) did not involve claims predicated on violations of §§2339A or 2339B nor did it involve any act of terrorism against U.S. servicemen. The claim was predicated on injuries allegedly caused by exposure to chemicals during U.S. Defense Department environmental clean-up activities conducted after the first Gulf War. The court held that Banks' letters of credit that facilitated sales of chemicals to Iraq a decade earlier "were [not] designed to coerce civilians or government entities as required under §2331." *Id*. *Stansell v. BGP, Inc.*, 2011 WL 1296881 (M.D. Fla. 2011), relied on the defendant's motive as alleged in the complaint to find that plaintiffs had not adequately pled the §2331(1)(B) element. In so doing, the court "relied on the *subjective* intent of the defendants as pled by the plaintiffs," as the later decision noted in distinguishing *Stansell*. *Abecassis v. Wyatt*, 7 F. Supp. 3d at 676 (emphasis added). But "[t]he subjective intent of the defendant is not relevant." *Id*.

act of international terrorism committed, planned, or authorized by an FTO. While §2333(d) does not affect primary liability, it provides an alternative legal theory, predicated on express common law secondary liability, to support Plaintiffs' First and Second Claims for conspiracy to provide material support to FTOs Hezbollah and Kata'ib Hezbollah for injuries arising from acts of terrorism they committed, planned, or authorized.

## II. THE COMPLAINT PLAUSIBLY PLEADS CONSPIRACY UNDER 18 U.S.C. §§2339A AND 2339B.

As noted above, Congress has determined that *Halberstam v. Welch* "provides the proper legal framework for how such liability should function in the context of chapter 113B of title 18, United States Code." JASTA §2(a)(5). *Halberstam* summarized the elements of criminal conspiracy as: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." 705 F.2d at 477. As shown below, Defendants cannot plausibly dispute that Plaintiffs' allegations satisfy these elements. In fact, Defendants studiously avoid discussing conspiracy law for obvious reasons. *See* Joint Mem. at 27-28 n.11 ("the Moving Defendants do not here discuss in detail other legal deficiencies in the Complaint, including Plaintiffs' failure plausibly to allege the necessary elements of a conspiracy").[41]

### A. The Complaint Plausibly Pleads the Existence of an Unlawful Agreement.

"Proof of a tacit, as opposed to explicit, understanding is sufficient to show agreement." *Halberstam*, 705 F.2d at 477. *See also United States v. Amiel*, 95 F.3d 135, 144 (2d Cir. 1996)

---

[41]    *See also* BS Mem. at 19 (calling Plaintiffs' conspiracy allegations "conclusory," but providing no other argument); CB Mem. at 8 (same); HSBC/RBS Mem. (none); SCB Mem. at 10 n.10 ("SCB does not address the SAC's failure to adequately allege a conspiracy claim"); Credit Suisse Mem. at 5-6 (only disputing proximate cause). Since "[a]rguments made for the first time on reply are deemed waived," *Lujan v. Cabana Management, Inc.*, 284 F.R.D. 50, 62 (E.D.N.Y. 2012), Defendants effectively concede the sufficiency of the Complaint's conspiracy allegations by their failure to challenge them in their motions.

("There need not be any written statement or even a speaking of words which expressly communicates agreement."). The Complaint is replete with specific, non-conclusory allegations based on admissions Defendants made to the U.S. government and on other U.S. government findings that evidence an unlawful agreement to secretly launder hundreds of billions of Iran's money through the United States in a manner intended to evade counter-terrorist and counter-proliferation sanctions and to assist Iran in financing the acquisition of blacklisted goods and materials. The Moving Defendants' *admitted* conduct of years of coordination with Iranian co-conspirators in developing internal systems and protocols to launder hundreds of billions of dollars evidences an unlawful agreement. *Halberstam*, 705 F.2d at 481 (duration of joint conduct is relevant in inferring agreement).[42]

The Conspiracy's aims and objectives included, among others, concealing hundreds of billions of dollar-denominated transactions from detection by U.S. regulators and facilitating illicit transactions totaling at least $50 million USD for Hezbollah, at least $100 million for the IRGC, billions of dollars for the IRGC-controlled NIOC, more than $60 million for IRISL *after* its designation, and more than $120 million for Mahan Air (SDGT) and MODAFL to evade U.S. arms embargoes and export controls. All of the foregoing (and more) enabled Iran and its agents to perpetrate the acts of international terrorism that injured Plaintiffs.

The agreement and its purposes can also be inferred from the fact that Defendants all agreed to strip the names of Iranian banks and other Iranian entities from their SWIFT-NET messages; convert ordinary transactions into bank-to-bank transfers to conceal the origin and destination of Iranian funds transfers; alter Letters of Credit on Iran's behalf and knowingly aid Mahan Air, the IRGC and MODAFL to contravene U.S. arms embargoes and export controls;

---

[42] *Accord, United States v. Hawkins*, 547 F.3d 66, 74 (2d Cir. 2008) (holding that factors "establish[ing] an agreement" include a "prolonged cooperation between the parties, a level of mutual trust, [and] standardized transactions") (citation omitted).

and facilitate the illicit transfer of proceeds from the export and import of Iranian petroleum products on behalf of the NIOC and other sanctioned Iranian entities, thereby providing Iran with illegal access to *billions* of dollars and *directly* funding the IRGC and its front companies. *See* SAC ¶¶23, 25. In sum, Defendants' coordinated criminal conduct over a period of many years provides both direct and inferential evidence of a conspiracy to conceal funding of a State Sponsor of Terrorism's illegitimate activities, including acts of international terrorism.

### B. The Complaint Plausibly Pleads Defendants' State of Mind in Joining the Conspiracy.

Knowledge of a conspiracy has two elements: "1) knowing participation or membership in the scheme charged and 2) some knowledge of the unlawful aims and objectives of the scheme." *United States v. Lanza*, 790 F.2d 1015, 1022 (2d Cir. 1986). Further, "some knowledge" of the unlawful aims and objectives of the scheme can be satisfied by allegations showing that Defendant actually knew or was "aware of a *high probability* of *some* of the conspiracy's unlawful aims." *U.S. v. Garcia*, 509 F. App'x 40, 42 (2d Cir. 2013) (first emphasis added) ("A conscious avoidance charge is appropriate where a defendant 'assert[s] what amounts to ignorance of the specific objectives alleged in the indictment.'").[43]

Here, the first element of conspiracy is satisfied by Plaintiffs' allegations that Defendants worked with Iran and Iranian banks and others to deliberately and systematically conceal Iranian transactions from U.S. regulators and law enforcement. The Moving Defendants clearly intended to agree to join the Conspiracy in various capacities, even if, as they argue, they did not always

---

[43] *See also United States v. Ferraina,* 19 F.3d 145, 154-55 (2d Cir. 2002) (same); *United States v. Stavroulakis,* 952 F.2d 686, 690 (2d Cir. 1992) ("The policies underlying conspiratorial liability could easily be thwarted by the *careful compartmentalization of information*, and 'conspirators would go free by their very ingenuity,' if it were required that they agree on *all* details of the scheme.") (emphasis added) (quoting *Blumenthal v. United States,* 332 U.S. 539, 557 (1947)).

intend to make direct transfers to terrorists themselves.[44] *See United States v. Ulbricht*, 31 F. Supp. 3d 540, 561 (S.D.N.Y. 2014) ("There are numerous examples of participants in narcotics conspiracies who did not themselves intend physically to possess or distribute narcotics; an individual may have been a middleman, the protective muscle, the lookout, a decoy, a person with information or contacts, etc.—in any event, the individual may nonetheless be found to be part of the conspiratorial enterprise.").

The second element is detailed in the Complaint in several ways. First, the Moving Defendants all knew they were conspiring with a State Sponsor of Terrorism. SAC ¶42. Second, they all knew that Iran had a legal channel to transfer funds for Iran's *legitimate* operations (in *Rothstein's* terms), but was choosing unlawful and clandestine avenues instead. SAC ¶¶140-149. As Plaintiffs allege in detail, until November 2008, Iran had the ability to *lawfully* transfer U.S. dollars for its legitimate governmental purposes through the United States, *provided it abided by certain conditions and did so transparently*. The only conceivable reason Iran could have for enlisting the Moving Defendants in a criminal conspiracy to launder hundreds of billions of

---

[44]     Examples include:

- **HSBC:** SAC ¶¶507-510 (e-mails describing a "Bank Melli Proposal" boasting "a solution" to "alter the format of its [sic] payments to achieve straight through processing");
- **Credit Suisse:** SAC ¶962 (Credit Suisse instructed its Iranian Bank co-conspirator customers on how to format U.S. dollar payments to evade U.S. sanctions);
- **Standard Chartered Bank:** SAC ¶¶631-32 (instructing CBI how to disguise payment order messages to hide its identity; SAC ¶¶673-838 (working with the Iranian bank co-conspirators on processing letters of credit through New York for IRGC and MODAFL acquisition of embargoed goods);
- **Barclays** SAC ¶¶581-615 (describing Barclays' coordination with Iranian co-conspirators);
- **RBS N.V.:** SAC ¶¶920-929 (ABN Amro's admissions to conspiring "with the co-conspirators [on] how to format United States Dollar message payments so that such payments would … evade United States sanctions"); and
- **Commerzbank:** SAC ¶992 (Commerzbank admissions to knowingly conspiring "to engage in financial transactions with Sanctioned Entities and SDNs" and to "violate executive orders and regulations prohibiting the exportation, directly and indirectly, of services from the United States to Sanctioned Entities and SDNs").

dollars in an *unlawful* manner was to facilitate and conceal transfers for its *illegitimate* purposes – namely terrorism, arms smuggling, and embargo-evading.

Thus, it is highly plausible, if not self-evident, that the Moving Defendants joined the Conspiracy *knowing or consciously avoiding knowing* that it was intended to, and did, enable Iran to successfully transfer millions of dollars to fund its known terrorist proxies, FTO Hezbollah and the IRGC.[45] So too, by secretly facilitating hundreds of millions of dollars in illegal Letters of Credit that evaded the U.S. embargo on dual-use goods and materials – including those used in the manufacture and transport of components of the weapons used to attack Plaintiffs – the Moving Defendants could not have been blind to Iran's objectives. The contraband nature of the cargo, the use of shady middlemen (often with criminal records), the destination of the goods, and the glaring indications that the true parties in interest were IRGC and MODAFL entities all scream "terrorism!" and "lethal support!"[46]

Examples include statements from the Moving Defendant's employees acknowledging the risk that their transactions could support terrorism while continuing to perform illegal transactions on behalf of Iranian customers *after* they were designated as supporters of terrorism:

- **HSBC:** SAC ¶¶510-12 ("some of the routes traditionally used to avoid the impact of US OFAC sanctions may no longer be acceptable" to hide "a payment which turns out to be connected to terrorism"); SAC ¶¶383, 518 (HSBC maintained account(s) for Bank Saderat despite knowing the US had "direct evidence against Bank Saderat particularly in relation to the alleged funding of Hezbollah"); SAC ¶520 (internal

---

[45] These facts were explicitly found by the U.S. government in support of its decision to revoke Bank Saderat and Bank Melli's access to the U-Turn Exemption SAC ¶¶357, 365. Both banks were co-conspirators and customers of the Moving Defendants. Bank Saderat, an SDGT instrumental to the transfer of millions of dollars *directly* to Hezbollah, indisputably knew the goals of the Conspiracy.

[46] "A and B conspire to burglarize C's safe. B, who is the active burglar, after entering the house and without A's knowledge of his intention to do so, burns the house in order to conceal the burglary. A is subject to liability to C, not only for the conversion of the contents of the safe but also for the destruction of the house." *Halberstam*, 705 F.2d at 483 (quoting Restatement (Second) of Torts §876, comment d, illustration 10 (1979)).

warning that a Treasury Counterterror official "essentially threatened" HSBC with action if it did not withdraw from certain relationships)

- **ABN Amro (RBS):** SAC ¶¶906-08 (justifying circumvention of US sanctions premised on "anti-terrorism," because they were "politically motivated")

- **Standard Chartered Bank:** SAC ¶¶665-66 (Bank's US CEO stating that its Iranian business could "subject … management in US and London (e.g. you and I) and elsewhere to personal reputational damages and/or serious criminal liability."); SAC ¶¶684, 757 (knowingly facilitating Letters of Credit for weapons components listed on the USML); SAC ¶865 (maintaining accounts for Bank Saderat and Bank Sepah, both designated, "with no markers against them" as of 2015)

- **Barclays:** SAC ¶614 (maintaining accounts for Bank Saderat after it was designated an SDGT for funding Hezbollah)

- **Credit Suisse:** SAC ¶¶973-980 (changing (but not stopping) its stripping technique after 2004 Swiss Federal Banking Commission rules change.); SAC ¶¶750-757 (Credit Suisse illegally cleared payments through New York for Letters of Credit that financed Iranian acquisitions of goods listed on USML embargo list)

- **Commerzbank:** SAC ¶1022 (transferring nearly $40 million on behalf of IRISL subsidiaries and related entities in just the four months *following* IRISL's 2008 designation by the U.S.)

Saderat's denial of scienter merits separate mention because it is the only Defendant that has itself been designated an SDGT for laundering tens of millions of Eurodollars for Iran's Central Bank to Hezbollah and other FTOs. In spite of this, Saderat claims that the Complaint does "not supply any inference of the requisite mental states required by §§2339A and B as to BSPLC." BS Mem. at 25. Plaintiffs respectfully submit that the U.S. government did not revoke Bank Saderat's access to the U-Turn Exemption in 2006 for *unwittingly* serving as "a significant facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah." SAC ¶365. Nor did Saderat *accidentally* provide re-financing for illegal aircraft purchases by Mahan Air (later designated an SDGT). SAC ¶375. And U.S. government officials did not warn of *unintentional* "direct evidence against Bank Saderat particularly in relation to the alleged funding of Hezbollah." SAC ¶518. Instead, relying

almost exclusively on U.S. government findings, Plaintiffs have sufficiently pled Saderat's requisite state of mind in providing material support to Hezbollah.

In sum, the Moving Defendants fully understood that their Iranian co-conspirators would use some of the hundreds of billions of dollars they were laundering through the United States to support terrorism. As Judge Posner noted in *Boim III*:

> Giving money to Hamas, like giving a loaded gun to a child (which also is not a violent act), is an "act dangerous to human life." And it violates a federal criminal statute enacted in 1994 and thus before the murder of David Boim—18 U.S.C. §2339A(a), which provides that "whoever provides material support or resources ..., knowing or intending that they are to be used in preparation for, or in carrying out, a violation of [18 U.S.C. §2332]," shall be guilty of a federal crime. So we go to 18 U.S.C. §2332 and discover that it criminalizes the killing (whether classified as homicide, voluntary manslaughter, or involuntary manslaughter), conspiring to kill, or inflicting bodily injury on, any American citizen outside the United States.

*Boim III* at 690. Even if transparently giving money to Iran's legitimate activities in compliance with U.S. regulations is arguably not dangerous, laundering **hundreds of billions of dollars** to a State Sponsor of Terrorism in calculated *violation* of those regulations so as to conceal the transactions was an "act dangerous to human life" that foreseeably resulted in funding FTO Hezbollah, the IRGC, and other terrorist entities that participated in the attacks that injured Plaintiffs. As Congress has implicitly recognized, secretly funding Iran's illegitimate activities and terrorist proxies, "directly or indirectly," poses "a significant risk of committing acts of terrorism that threaten the security of nationals of the United States…." JASTA §2(a).

## C. The Law Does Not Require a Showing That Each Co-Conspirator Shared All of the Same Goals or Motives.

Despite the overwhelming evidence that Defendants shared some goals of the conspiracy and its overall purpose, they insist in a single footnote that they did not share the "common goal" of "'murdering and maiming U.S. servicemen and civilians in Iraq'" and did not "specifically

intend[] to attack U.S. soldiers." Joint Mem. at 27-28 n. 11. But neither did the burglar's girlfriend in *Halberstam* ("the leading case regarding federal civil aiding and abetting and conspiracy liability," as Congress found in JASTA §2(a)(5)) share the "goal" of murdering anyone. There, the girlfriend (Hamilton) was held civilly liable under both civil conspiracy *and* aiding and abetting theories for the death of Halberstam after Halberstam was killed by a burglar (Welch), who lived with Hamilton. Hamilton had not participated in Halberstam's murder or even in Welch's many burglaries, and there was no evidence whatsoever that she had a "common goal of murdering" (or even burglarizing) Halberstam. Nevertheless, the D.C. Circuit held that, just as "under a civil conspiracy theory," "[i]t was not necessary that Hamilton knew specifically that Welch was committing burglaries. Rather, when she assisted him, it was enough that she knew he was involved in some type of personal property crime at night -- whether as a fence, burglar, or armed robber made no difference -- because violence and killing is a foreseeable risk in any of these enterprises." *Id*. at 488, Although "Hamilton and Welch did not commit burglaries together," their activities were "symbiotic" because Hamilton knew about Welch's illegal activities and assisted him in various ways (*e.g.*, filing a tax return that hid burglary profits). *Id*. at 486-87.

Thus, it does not matter not whether a particular Defendant had a purpose of supporting terrorism or even knew that another co-conspirator would orchestrate a specific terrorist act. A conspirator "need not even have planned or known about the injurious action, . . . so long as the purpose of the tortious action was to advance the overall object of the conspiracy" – here to conceal the funding of a State Sponsor of Terrorism's illegitimate activities. *Halberstam*, 705 F.2d at 481. If the defendant in *Halberstam* who knew her boyfriend was involved in *some* type of crime at night was deemed liable, *a fortiori* Defendants in this case – that knew they were

involved in massive, sustained money laundering, sanctions evasion, and embargo-evasion scheme for a State Sponsor of Terrorism – are also liable. Funding that State Sponsor's illegitimate enterprises made violence and killing a foreseeable risk of their conspiratorial acts.[47]

Moreover, the fact that the Moving Defendants may have been motivated by *greed* to conspire with Iran is irrelevant. "Where defendants are shown to have intended to defraud the United States, they cannot escape liability by showing that this intent was merely incidental to some other action which constituted their primary motivation." *United States v. Southland Corp.*, 760 F.2d 1366, 1373 (2d Cir. 1985).[48]

The Second Circuit rejected a nearly identical argument to Defendants' "we were just greedy" defense in *United States v. Gurary*, 860 F.2d 521 (2d Cir. 1988). In *Gurary*, defendants sold false invoices for a fraction of their face value. Many of their customers used the invoices to report fictitious business expenses on their corporate taxes. The defendants were charged with, among other things, conspiring to impede the IRS. The defendants argued that they could not know that their customers would use the invoices for tax fraud as opposed to, *e.g.*, embezzlement. The court disagreed. First, "intent to defraud the United States may be incidental to another primary motivation or purpose.... Impeding the IRS, though not defendants' primary purpose, was part and parcel of the scheme." *Id.* at 525. Second, the defendants *must have known* that the invoices would lead to inaccurate tax returns, as they would be recorded on corporate

---

[47]    *See  also United States v. Capanelli*, 479 F.3d 163, 166–67 (2d Cir. 2007) ("The individual conspirators can have incongruent intentions as to particular details or specific goals of the conspiracy, so long as the coconspirators share a 'common purpose' and agree on the 'essential nature' of the enterprise."). *See also Ocasio v. United States*, 136 S. Ct. 1423, 1429-30 (2016) (holding that plaintiffs need only allege that a defendant agreed to "pursue the same common objective" of the conspiracy, even if it did not "agree to commit or facilitate each and every part of the substantive offense"); *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990) ("The goals of all the participants need not be congruent for a single conspiracy to exist, so long as their goals are not at cross-purposes.").

[48]    *United States v. Cervantes*, 466 F.2d 736, 738 (7th Cir. 1972) ("The fact that a conspiracy's various members may play different roles in executing it *and may have dissimilar motives for participating in it*, does not mean that a single conspiracy does not exist.") (emphasis added).

books (even if only to facilitate embezzlement) used in preparation of those tax returns. *Id.* Like the defendant in *Gurary*, the Moving Defendants knew that they were joining a conspiracy through which Iran was able to launder hundreds of billions of dollars in circumvention of sanctions specifically intended to prevent its support of terrorism. Finally, as in *Gurary*, the Moving Defendants' own "motivations" and "primary purpose" in participating in the Conspiracy are *irrelevant* to their liability as long as they possessed "some knowledge" of Iran's unlawful aims and objectives.

### D. The Complaint Plausibly Pleads That Plaintiffs' Injuries Were Proximately Caused by the Conspiracy.

#### 1. Conspirators Are Liable for All Acts Foreseeably Committed in Furtherance of the Conspiracy.

As stated above, Defendants simply decline to address proximate cause in the conspiracy context, presumably because they understand that as conspirators, they are liable for *all* acts foreseeably committed in furtherance of the conspiracy. "As to the extent of liability, once the conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy. A conspirator need not participate actively in or benefit from the wrongful action in order to be found liable." *Halberstam*, 705 F.2d at 481.[49]

Plaintiffs' injuries are the foreseeable, direct result of the Conspiracy. Plaintiffs were Iran's intended targets and Defendants knew Iran's goals for the Conspiracy included materially supporting terrorism. It is legally irrelevant that the Conspiracy might (in some cases) by its

---

[49] *Accord Pinkerton v. United States*, 328 U.S. 640 (1946). *See also United States v. Vario*, 943 F.2d 236, 240 (2d Cir. 1991) ("[I]t is a fundamental tenet of the law of conspiracy that reasonably foreseeable acts of individual co-conspirators taken in furtherance of the conspiracy count against all members equally."); *Smith v. United States*, 133 S. Ct. 714, 719 (2013) ("Since conspiracy is a continuing offense, a defendant who has joined a conspiracy continues to violate the law 'through every moment of [the conspiracy's] existence,' and he becomes responsible for the acts of his co-conspirators in pursuit of their common plot.") (citations omitted); *DT Boring, Inc. v. Chicago Pub. Bldg. Comm'n*, No. 15-C-11222, 2016 WL 3580756, at *13 (N.D. Ill. June 28, 2016) ("As with all conspiracy claims, the predicate acts allegedly committed by [a co-conspirator] may serve as the proximate cause of plaintiff's injuries for purposes of plaintiff's § 1962(d) conspiracy claim [against all co-conspirators].").

"very ingenuity" (*Blumenthal v. United States,* 332 U.S. 539, 557 (1947)) protect the Moving Defendants from knowing which particular transfers went directly to terrorism and which merely acted to disguise those transfers.

### 2. Plaintiffs Do Not Have to Show But-For Causation.

Defendants' contention that Plaintiffs have not plausibly shown that Iran would have been unable to fund the attacks at issue without Defendants' funds transfers is just another way of arguing the universally rejected strict "but for" causation standard. *Rothstein* suggested that such an allegation was one of several *alternative* allegations that might have been sufficient to plead proximate causation,[50] not that it was necessary. 708 F.3d at 96-97. As another court in this district has held:

> [R]equir[ing] proof of "but for" causation would make it impossible for the victims of terrorist attacks to hold a terrorist group's "financial angels" liable, and thereby eviscerate the civil liability provisions of the ATA….The fact remains that no court has expressly held that the ATA's civil remedy requires a showing of but-for causation. And in the only Court of Appeals decision to actually decide the issue [*Boim III*], Judge Posner set forth a detailed and compelling explanation of why it does not.

*Linde v. Arab Bank PLC*, 97 F. Supp. 3d 287, 326-28 (E.D.N.Y. 2015) (quoting *Boim III*, 549 F.3d at 690); *see also In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*, No. 08-01916-MD, 2015 WL 71562, at *7 (S.D. Fla. Jan. 6, 2015) (same).

In any case, the Complaint cites the U.S. government's own assessment that:

> Iran's access to the international financial system enables the Iranian regime to facilitate its support for terrorism and proliferation. The Iranian regime disguises its involvement in these illicit activities through the use of a wide array of

---

[50] Had such an allegation been necessary, rather than just a sufficient alternative allegation of proximate cause, it would hardly have been necessary for the *Rothstein* plaintiffs also to allege that "UBS was a participant in the terrorist attacks that injured plaintiffs," another alternative the Court identified. Similarly, *Al Rajhi* also identified *alternative* sufficient allegations, listing them conjunctively without even including the "unable to fund" allegation that Defendants argue is necessary. *O'Neill v. Al-Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)*, 714 F.3d 118, 124 (2d Cir. 2013).

> deceptive techniques, specifically designed to avoid suspicion and evade detection
> by responsible financial institutions and companies.

SAC ¶172. Given the restrictions and safeguards that the United States placed on Iran's access to dollar-clearing services in order to prevent it from using such transactions to finance terrorism and proliferation (which the Defendants' Conspiracy was expressly designed to surreptitiously evade) (SAC ¶¶140-172), the allegation that without the Conspiracy between the Defendants and Iran the latter could not have transferred the volume of U.S. dollars it did for the benefit of Hezbollah and the IRGC through the international financial system is more than plausible. SAC ¶¶16, 23, 44-52, 157-159, 406.

### 3. SDGT Designations Are Probative of Proximate Cause, as Well as Knowledge.

The Moving Defendants argue that the U.S. designation of some of their co-conspirators and Iranian agents to which they provided material support (such as Defendant Saderat, Mahan Air, IRISL, NIOC, and MODAFL) "long after the alleged transactions were completed," Joint Mem. at 8, shows that they could not previously have known that they were dealing with illegitimate agencies, operations, and programs of Iran. This argument misconstrues the evidentiary significance of U.S. designations.

First, SDGT designations constitute evidence of the designee's terrorist conduct and thus provide plausible allegations of proximate cause, regardless of whether they also suggest scienter. By definition, U.S. designations are retrospective – not predictive. Every entity placed on the SDGT or SDN list is – by definition – designated for its past conduct, not its possible future conduct. Because designations are retrospective, Plaintiffs have plausibly alleged that at the time these entities were receiving material support from the Conspiracy, they were engaged in and/or supporting terrorism. In addition, designation for past conduct can also be relevant

evidence that the designated entity's unlawful activities were known to Defendants before the designation (or that they consciously avoided knowing). Here it is knowledge of the activities for which, *e.g.*, Saderat or Mahan Air was designated, not knowledge of the designation itself, that is relevant and probative.

Finally, when several of the Moving Defendants continued to engage in criminal conduct on behalf of designated entities even *after* they were so designated, their post-designation conduct can be probative of their state of mind before designation. *See, e.g.*, SAC ¶865 (Standard Chartered Bank's accounts for Bank Saderat and Bank Sepah "with no markers against them" as of 2015); SAC ¶1022 (Commerzbank illegally transferred almost $40 million on IRISL's behalf after its designation); SAC ¶918 (ABN-Amro's 90 post-designation transactions on IRISL's behalf); SAC ¶614 (Barclays' maintaining accounts for Bank Saderat *after* its designation); SAC ¶383 (HSBC did likewise).

Given all of the foregoing, there is simply no colorable basis for the Moving Defendants' assertion that "there is no allegation that the Moving Defendants maintained any accounts for or provided any services to any terrorist entity." Joint Mem. at 16.

## III.  THE COMPLAINT PLAUSIBLY PLEADS CAUSATION FOR THE NON-CONSPIRACY CLAIMS (FIFTH, SIXTH AND SEVENTH CLAIMS).

Plaintiffs' Fifth, Sixth and Seventh Claims for Relief are *not* predicated on conspiracy to violate the material support statutes. Plaintiffs' Fifth Claim asserts that Commerzbank violated §2339A by knowingly providing material support to IRISL. Plaintiffs' Sixth Claim asserts that Commerzbank violated §2339B by knowingly sending funds to the Martyrs Foundation in Lebanon, an SDGT agent of Hezbollah. Plaintiffs' Seventh Claim asserts that Standard Chartered Bank violated §2339A by knowingly providing (unlawful) material support to Mahan Air, a menagerie of MODAFL entities, and the IRGC, that facilitated more than a hundred million

dollars in embargoed (often dual-use) goods being illegally purchased by these Iranian entities from the United States.

### A.    The ATA §2333(a) Remedy Requires Traditional Proximate Causation.

The *Rothstein* plaintiffs made the extraordinary claim that alleged violations of the ATA's material support statutes created a *presumption* of causation that shifted the evidentiary burden to the defendant to prove that material support provided did not reach the terrorist groups that injured the plaintiffs. 708 F.3d at 96. The Second Circuit unsurprisingly rejected this proposition. *Id.* ("[P]laintiffs' contention that proximate cause is established because they were injured after UBS violated federal law is a *post hoc, ergo propter hoc* proposition that would mean that any provider of U.S. currency to a State Sponsor of Terrorism would be strictly liable for injuries subsequently caused by a terrorist organization associated with that state."). Instead, the Second Circuit reiterated and quoted the traditional proximate causation standard from *Lerner v. Fleet Bank N.A.*, 318 F.3d 113, 123 (2d Cir. 2003):

> Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his *acts were a substantial factor in the sequence of responsible causation* and whose injury was reasonably foreseeable or anticipated as a natural consequence. [*Rothstein*, 708 F.3d at 91 (citation omitted; emphasis in original).]

### B.    The Complaint's Non-Conclusory Allegations Differentiate *Rothstein* and Plausibly Plead Proximate Causation for the Non-Conspiracy Claims.

*Rothstein* held that the complaint in that case did not plausibly satisfy the proximate causation standard:

> [W]e cannot agree that the Complaint sufficiently alleges proximate cause. The Complaint does not allege that UBS was a participant in the terrorist attacks that injured plaintiffs. It does not allege that UBS provided money to Hizbollah or Hamas. It does not allege that U.S. currency UBS transferred to Iran was given to Hizbollah or Hamas. And it does not allege that if UBS had not transferred U.S. currency to Iran, Iran, with its billions of dollars in reserve, would not have funded the attacks in which plaintiffs were injured.

And while the Complaint alleges that "UBS knew full well that *the cash dollars it was providing* to a state-sponsor of terrorism *such as* Iran *would be used to cause and facilitate terrorist attacks* by Iranian-sponsored terrorist organizations *such as* Hamas, Hizbollah and PIJ" (*id.* ¶ 108 (emphases added)), these are conclusory allegations that do not meet *Twombly*'s plausibility standard with respect to the need for a proximate causal relationship between the cash transferred by UBS to Iran and the terrorist attacks by Hizbollah and Hamas that injured plaintiffs. The fact that the transfers were made to a state sponsor of terrorism of course made it more likely that the moneys would be used for terrorism than if the transfers were to a state that did not sponsor terrorism. But the fact remains that Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund. We see no non-conclusory allegation in the Complaint that plausibly shows that the moneys UBS transferred to Iran were in fact sent to Hizbollah or Hamas or that Iran would have been unable to fund the attacks by Hizbollah and Hamas without the cash provided by UBS. [*Rothstein*, 708 F.3d at 97 (emphasis in original).]

Seeking to bring the Complaint within *Rothstein,* Defendants describe their conduct in this case as having:

> allegedly provided U.S. dollar clearing transactions for Iranian banks, those Iranian banks allegedly then were *separately* used by the Government of Iran to provide financial support to Hezbollah and IRGC-QF, Hezbollah and IRGC-QF allegedly then provided support to named and unnamed terrorist groups in Iraq, and these named and unnamed Iraqi terrorist groups, or more often unidentified individuals or entities, allegedly then carried out or facilitated the attacks which injured Plaintiffs. [Joint Mem. at 18 (emphasis added).]

But Defendants' illegal U.S. dollar clearing transactions on behalf of Iran and Iranian banks were not "*separate*" from Iran's material support to terrorism; they *were* the mechanism through which that material support was accomplished. Defendants' insertion of the word "separately" gives the game away. The Complaint, in fact, alleges the *opposite* – relying on U.S. government findings. For example, the U.S. government noted that, from 2002 to 2006, the Moving Defendants' customer, Bank Melli:

> was used to send at least $100 million to the [IRGC] Qods Force. Bank Melli use of Deceptive Banking Practices … When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example,

Bank Melli has requested that its name be removed from payment instructions for US dollar denominated transactions. SAC ¶357.

On summary judgment or at trial, Defendants may argue that the felonies they committed by assisting Bank Melli (among other entities) to conceal the latter's transactions from U.S. regulators and law enforcement are unrelated to Bank Melli's transfers of $100 million to the IRGC's Qods Force. But on this motion to dismiss, even though (1) Bank Melli was a customer of each Moving Defendant, and (2) each Moving Defendant conspired with Bank Melli to remove its name from USD transactions, and (3) Bank Melli transferred $100 million to the IRGC-QF (4) employing the same "deceptive banking practices to obscure its involvement from the international banking system" when "handling financial transactions on behalf of the IRGC," Defendants ask this Court to find – as a *matter of law* – that their conduct was wholly *separate from* and *unrelated to* Bank Melli's $100 million in wire transfers to the IRGC-QF.

The same suspension of belief is required to hold, as *a matter of law*, that although the Moving Defendants each maintained accounts for Bank Saderat and each committed a long string of felonies assisting Bank Saderat to conceal its transactions from U.S. regulators and law enforcement, Saderat's transfer of "illicit transactions totaling at least $50 million USD for the benefit of [FTO] Hezbollah" was wholly *separate* and *unrelated* to the Moving Defendants' *identical* illegal conduct on Bank Saderat's behalf.

HSBC, Standard Chartered Bank and RBS N.V. also ask this Court to conclude that their accounts for the IRGC–controlled National Iranian Oil Company and the long string of felonies they committed in concealing and altering the transactions for NIOC could not have proximately caused Plaintiffs' injuries, even though Plaintiffs cite and rely upon government findings for their allegations that the IRGC provided "lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and

Iraqi forces and innocent Iraqi civilians," SAC ¶16. *See also* SAC ¶257 (quoting Treasury Department as finding that IRGC-led group's "first objective is to fight U.S. forces, attacking convoys and killing soldiers," and which "conducted IED attacks against Americans in the Baghdad region").[51]

Individual Defendants also offer additional variants on the proximate causation argument, addressed *infra*.

### 1. Saderat's Semantic Causation Argument

Saderat argues that the U.S. government's findings that it illegally transferred funds "for the benefit of" Hezbollah are different from an allegation that they were sent "to" Hezbollah. *See* BS Mem. at 22-23. In fact, the Complaint *does* allege that Saderat was used "to channel funds *to* terrorist organizations, including Hezbollah ...." SAC ¶18 (emphasis added). The fact that Defendant sent the money to its sister-bank in Lebanon for "the benefit of Hezbollah fronts in Lebanon" is not remotely exculpatory. It is the same kind of actionable conduct this Court

---

[51]     Defendants also assert that *Rothstein* requires Plaintiffs to assert that the funds Defendants transferred on Iran's behalf were used "directly" for the attacks on the Plaintiffs, citing only RICO cases. Joint. Mem. at 3-4, 21 (but neglecting to cite *Lerner*, the principal case cited in *Rothstein*). As the Court of Appeals subsequently emphasized in a later *Lerner* opinion, however, "[T]he fact that plaintiffs had not pleaded facts sufficient to support a finding of proximate causation in the RICO action therefore does not necessarily mean that their injuries were, under the facts alleged, not proximately caused by the bank's actions for purposes of the plaintiff's claims under the common law.... [It] depend[s] on the cause of action under which the plaintiff brings suit." *Lerner v. Fleet Bank N.A.*, 459 F.3d 273, 284-85 (2d Cir. 2006). This is because RICO plaintiffs are held "to a more stringent showing of proximate cause that would be required at common law." *Moore v. Paine Webber, Inc.*, 189 F.3d 165, 179 (2d Cir. 1999) (Calabresi, J., concurring). Thus, *Hemi Grp. LLC v. City of New York*, 559 U.S. 1, 130 (2010), on which Defendants also rely, explained that, "[o]ne consideration we have highlighted as relevant to the RICO 'direct relationship' requirement is whether better situated plaintiffs would have an incentive to sue.... Our precedents make clear that in the RICO context, the focus is on the directness of the relationship between the conduct and the harm." *Id*. at 11-12 (emphasis added). Here, of course, the Plaintiffs are the direct victims of terrorism and are the best – indeed, the only – persons who could "vindicate" the ATA. Furthermore, "[t]he ATA is different than other statutes that reference causation. The tort it condemns is one of secondary action, not primary action. It assumes the existence of a tort by a third party, and then renders the defendant liable for providing support to that third party, not for supporting any particular conduct by that third party." *Linde*, 97 F. Supp. 3d at 324. "No one has ever 'directly' been injured by a wire transfer," *id*. at 328, and if that were the standard of causation, no ATA plaintiff could ever recover for the material support for terrorists that Congress criminalized and incorporated by reference in the ATA civil remedy. Judge Cogan said in *Linde,* "I cannot conclude that Congress enacted a meaningless provision here." *Id*. at 327. Nor should this Court.

recognized in *Strauss* (2006 WL 2862704, at *6) – except that Crédit Lyonnais, unlike Saderat, was not *itself* an SDGT, it "only" held an account for (at least) one.

Nor does Defendants' mantra that Plaintiffs' allegations are "conclusory" rescue them, because the allegations of transfers "for the benefit of Hezbollah," the IRGC, and other designated entities that were engaged in orchestrating attacks on Americans in Iraq rest on findings *by the United States government* that are the result of official investigations.[52] The Complaint is heavily supported by the U.S. government press releases announcing designations, diplomatic cables, official government reports, government indictments, and the DPAs that the Moving Defendants themselves entered into with the U.S. government, state banking authorities, and the New York County District Attorney's Office.

Saderat's lame rebuttal is that none of these government findings "does anything to establish" elements of Plaintiffs' claims. BS Mem. at 24. Of course, at the pleading stage, Plaintiffs do not have to "establish" their allegations; they just have to show that they are plausible.

### 2. Commerzbank's "Indirect" Causation Argument Regarding the Fifth Claim for Relief

Commerzbank argues that its criminal acts in support of IRISL that are the predicate for the Fifth Claim for Relief merely state a "claim for *indirect* support of terrorist acts," breaking the chain of required causation. CB Mem. at 5 (emphasis in original). According to Commerzbank's gloss, the Complaint alleges that it (1) provided support in the form of (illegal)

---

[52] *See, e.g.*, SAC ¶18 (quoting Treasury Department that "a Hezbollah-controlled organization [] has received $50 million from Iran through [defendant and co-conspirator] Bank Saderat since 2001"); SAC ¶368 (quoting Treasury Department testimony that "Hezbollah uses Saderat to send money to other terrorist organizations as well"); SAC ¶385 (noting U.S. government finding on designating Bank Saderat as an SDGT that it "transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence"). *See also* SAC ¶383 (noting Defendant HSBC-Middle East Regional Head's acknowledgement that the U.S. government has "direct evidence against Bank Saderat particularly in relation to the alleged funding of [FTO] Hezbollah").

dollar-clearing services to IRISL; (2) IRISL in turn provided material support to FTO Hezbollah; and (3) Hezbollah, among others, was allegedly responsible for the attacks in which Plaintiffs were injured. *Id.* Having restyled the allegations against it, Commerzbank then analogizes its own gloss on the Complaint's allegations to the allegations in *O'Neill v. Al-Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)*, 714 F.3d 118 (2d Cir. 2013). In *Al-Rajhi*, defendant Al Rajhi Bank allegedly provided financial services to Al-Haramain Islamic Foundation ("Al-Haramain") (prior to its designation as an SDGT for its support of al Qaeda). The Second Circuit held that this allegation did not alone suffice to plausibly plead proximate cause because there were no allegations that the funds provided by Al-Haramain to al Qaeda went *through* defendant Al Rajhi Bank. *Al-Rajhi*, 714 F.3d at 124.[53]

Here, in contrast, the Complaint *actually* alleges that (1) Commerzbank provided support in the form of extensive money laundering services for IRISL both before and after its designation; (2) IRISL was controlled by, and is directed by, Iran,[54] and served as one of the logistical channels for transporting and supplying IRGC, Hezbollah, and other Iranian instrumentalities of terrorism (shipping weapons, explosives, IED components, etc.); and (3) Iran *itself* (including the IRGC), Hezbollah, and other Iranian instrumentalities of terrorism were responsible for the attacks in which Plaintiffs were injured.

---

[53] In *Al-Rajhi*, plaintiffs' 12(e) statement also alleged transfers of funds to FTO Hamas, but made no non-conclusory allegation that Hamas participated in the 9/11 attacks at issue. *See Burnett v. Al Baraka Investment and Development Corp.*, No. CIV.A.02–1616 (JR) (D.D.C. Aug. 27, 2003), ECF No. 266, Plaintiffs' Response to Al Rajhi Bank's Rule 12(e) Request to Plaintiffs ¶66. The Second Circuit therefore found that "plaintiffs did not allege that [the defendants] … provided money directly to al Qaeda ..., nor ... that the money allegedly donated by [defendants] to the purported charities was transferred to al Qaeda and aided in the September 11, 2001 attacks." 714 F.3d at 124. As noted in the text, here in contrast, Plaintiffs allege transfers for FTO Hezbollah, IRGC, and IRISL, entities designated by the United States in part for orchestrating and/or supplying weapons for attacks on U.S. forces in Iraq, including the distinctive weapons components used in EFP attacks.

[54] Commerzbank makes much of the fact that "unlike Hezbollah, IRISL has *not* been designated by the Secretary of State as an FTO" and "that IRISL is not an *alter ego* of, or controlled by, Hezbollah." CB Mem. at 6. But Commerzbank has the wrong claim; the Fifth Claim for Relief is based on a violation of Section 2339**A**, not 2339B, and the relevant issue is IRISL's control by *Iran*, not Hezbollah.

These allegations closely parallel those made in *Strauss v. Crédit Lyonnais,* in which the complaint alleged not only that Crédit Lyonnais maintained an account for an SDGT (in that case, CBSP), but also identified specific Hamas-controlled counterparties that received funds from CBSP *through* Crédit Lyonnais. *Strauss v. Crédit Lyonnais, S.A.*, No. CV-06-0702, 2006 WL 2862704, at *11 (E.D.N.Y. Oct. 5, 2006) ("plaintiffs have adequately alleged that these various charitable committees are agents of HAMAS because plaintiffs have alleged that the committees are controlled by HAMAS, share leadership with HAMAS, and have as their purpose the support of HAMAS.").

In fact, in *Strauss*, Crédit Lyonnais made arguments similar to the one Commerzbank makes here, urging the district court to dismiss plaintiffs' claims brought in that case under §2339B, "because plaintiffs have failed to adequately allege that Crédit Lyonnais provided material support *directly* to an FTO, but rather have alleged only that it provided material support to organizations with alleged ties to the FTO HAMAS." *Id.* at 10 (emphasis in the original). Judge Sifton rejected this argument, quoting extensively from *National Council of Resistance of Iran v. Department of State II (NCRI),* 373 F.3d 152 (D.C. Cir. 2004). The D.C. Circuit's reasoning applies with the same force to the terror apparatus of a State Sponsor of Terrorism as it does to a Foreign Terrorist Organization. The Circuit explained:

> Just as it is silly to suppose "that Congress empowered the Secretary to designate a terrorist organization ... only for such periods of time as it took such organization to give itself a new name, and then let it happily resume the same status it would have enjoyed had it never been designated" NCRI, 251 F.3d at 200, so too is it implausible to think that Congress permitted the Secretary to designate an FTO to cut off its support in and from the United States, but did not authorize the Secretary to prevent that FTO from marshaling all the same support via juridically separate agents subject to its control. For instance, under NCRI's conception, the Government could designate XYZ organization as an FTO in an effort to block United States support to that organization, but could not, without a separate FTO designation, ban the transfer of material support to XYZ's fund-raising affiliate, FTO Fundraiser, Inc. The crabbed view of alias status advanced

by NCRI is at war not only with the antiterrorism objective of AEDPA, but common sense as well. [*Id.* at 157-58.]

That "crabbed view" is also one that Congress expressly rejected in JASTA, when it found that contributing material support, "directly *or indirectly,*" to organizations that pose a significant risk of committing acts of terrorism threatens the security of U.S. nationals. JASTA §§2(a)(6)-(7) (emphasis added).

When, as here, a Defendant admits to extensive (criminal) collusion with, and provision of tens of millions of dollars in material support to, a designated entity controlled by a State Sponsor of Terrorism that facilitates that State Sponsor of Terrorism's terrorist acts, immunizing that conduct from its foreseeable consequences would stand common sense on its head. All any entity would have to do to elude the reach of the law would be to insist that a State Sponsor of Terrorism use juridically separate agents as intermediaries. Commerzbank may, of course, argue at summary judgment or trial that IRISL is (contrary to the Complaint's allegations) independent of Iran or that because IRISL was "Iran's national maritime carrier" it falls within *Rothstein*'s safe harbor for "legitimate agencies, operations and programs," and that it did not engage in weapons shipments in support of Iranian-sponsored terrorism. But, at the pleading stage, the fact that IRISL is a juridically separate agent of Iran does not immunize Commerzbank from liability any more than the fact that a Hamas-controlled organization is nominally registered as a charity and has its own by-laws would immunize, *e.g.*, Crédit Lyonnais or Arab Bank for sending funds to such an organization. As the D.C. Circuit rightly observed, such a result would be "silly."

3.  **Commerzbank's "Indirect" Causation Argument Regarding the Sixth Claim for Relief**

Commerzbank also characterizes Plaintiffs' allegation that it maintained accounts for the Orphans Project Lebanon, which then transferred funds to Hezbollah's Martyrs Foundation, as

merely a claim for "*indirect* support of terrorist acts." CB Mem. at 8 (emphasis in original). Once again, a Defendant arrives at this argument by restyling the Complaint as if it alleges that the Martyrs Foundation in Lebanon only raises "funds for or otherwise support[s] Hezbollah, not that they are Hezbollah." CB Mem. at 9 n. 8.

Incredibly, Commerzbank fails to inform this Court that Judge Hellerstein rejected precisely the same kind of argument against it in *Lelchook v. Commerzbank*, No. 10-cv-05795-AKH, 2011 WL 4087448 (S.D.N.Y. Aug. 2, 2011). In *Lelchook*, "Commerzbank contend[ed] that the act of maintaining a bank account for a group alleged to be affiliated with a terrorist organization, Hezbollah, is too weak a series of connections to create liability for Hezbollah's acts," citing *Rothstein*. Judge Hellerstein disagreed: "In this case, Plaintiffs allege that Commerzbank maintained a bank account for a Hezbollah front; this distinction takes the case outside the rule of *Rothstein,* for a terrorist front organization has no legitimate function that the United States recognizes." *Id.* at 1.[55] *Lelchook* was correctly decided and its reasoning rebuts Commerzbank's argument here as well.[56]

---

[55]    *See* SAC ¶1040, *citing* https://www.treasury.gov/press-center/press-releases/Pages/hp503.aspx. The U.S. designation of the Martyrs Foundation finds, *inter alia*:

- Senior Martyrs Foundation officials were directly involved in Hezbollah operations against Israel during the July-August 2006 conflict.
- The Goodwill Charitable Organization (GCO), a fundraising office established by the Martyrs Foundation in Dearborn, Michigan. GCO is a Hezbollah front organization that reports directly to the leadership of the Martyrs Foundation in Lebanon.
- Hezbollah recruited GCO leaders and has maintained close contact with GCO representatives in the United States.
- GCO has provided financial support to Hezbollah directly and through the Martyrs Foundation in Lebanon.
- Hezbollah's leaders in Lebanon have instructed Hezbollah members in the United States to send their contributions to GCO and to contact the GCO for the purpose of contributing to the Martyrs Foundation.

[56]    A transcript of Judge Hellerstein's July 18, 2011 bench rulings is attached as Exhibit J to the Radine Decl.

### 4. Standard Chartered Bank's Causation Argument Regarding the Seventh Claim for Relief

Defendant Standard Chartered Bank offers two grounds for dismissing Plaintiffs' Seventh Claim for Relief (§2333(a) primary liability for violation of §2339A). First, Standard Chartered argues that *Stutts v. De Dietrich*, No. 03-CV-4058 (ILG), 2006 WL 1867060 (E.D.N.Y. Jun. 30, 2006) mandates dismissal based on what it argues are largely analogous allegations. Second, Standard Chartered Bank argues that the Complaint fails to allege that it actually provided material support used by Iran in preparation for, or in carrying out, acts of terrorism of the kind that injured Plaintiffs. Both arguments are meritless.

### a. *Stutts v. De Dietrich* Is Not Remotely Analogous.

Standard Chartered Bank asserts that *Stutts* compels dismissal of Plaintiffs' Seventh Claim for Relief. SC Mem. at 5-10. In *Stutts*, plaintiffs brought a class action against, *inter alia*, a group of banks for injuries U.S. servicemen allegedly sustained by exposure to chemicals that were released into the environment when U.S. and coalition forces bombed Iraqi depots during the Gulf War in 1991. Plaintiffs' theory was that the defendant banks acted "as correspondent banks under letters of credit issued to Saddam Hussein's Iraqi regime" to purchase chemicals in the early 1980s and that they "must have full and complete knowledge of the transaction, including knowledge of the parties and the goods and materials being sold." *Stutts* Amended Complaint (AC) ¶5.[57]

Judge Glasser summarized the *Stutts* plaintiffs' theory of causation and foreseeability as follows:

---

[57]     The only other non-duplicative allegation against the banking defendants in *Stutts* averred: "The Bank Defendants, nonetheless acted as correspondent banks on letters of credits obtained by the government of Iraq for the benefit of the Supplier Defendants in connection with the sale of goods and services used by Saddam Hussein's regime to produce and/or obtain chemical weapons of mass destruction." *Stutts* AC ¶87.

What the plaintiffs essentially ask the Court to accept is that by providing letters of credit to manufacturers of chemicals, the Bank Defendants should have perceived the risk that those chemicals would be sold to Iraq; that Saddam Hussein would use those chemicals to manufacture lethal weapons; that those weapons would be stockpiled in a location that would one day be bombed by coalition forces; that the bombs would hit and detonate those weapons; that the detonation would cause the toxic emissions to be released; that those emissions would permeate the atmosphere; that the plaintiffs would be present in that atmosphere, inhale those emissions and sustain the injuries alleged.

*Stutts,* 2006 WL 1867060 at *35. Unsurprisingly, Judge Glasser concluded that "[t]o attribute such foresight to the Banks is to attribute a prescience that is beyond human ken." *Id*. at *36.

Standard Chartered Bank argues that by comparison to the *Stutts* allegations, "[t]he absence of proximate cause is even starker here." SC Mem. at 6. The following juxtaposition, however, shows otherwise:

| Defendants in *Stutts* | Standard Chartered Bank |
|---|---|
| Plaintiffs were injured by U.S. Air Force bombing of Iraqi chemical depots. | Plaintiffs were injured by weapons manufactured, designed and deployed *by Iran*, not the U.S. Air Force. |
| Defendants' alleged conduct occurred **before** the ATA's enactment. | Defendants' alleged conduct occurred **after** the ATA's enactment. |
| Plaintiffs did not allege any violations of the material support statutes (18 U.S.C. §2339A or §2339B). | Plaintiffs have alleged violations of 18 U.S.C. §2339A (as well as conspiracy for violating §§2339A and 2339B). |
| Iraq was *not* a designated State Sponsor of Terrorism throughout the relevant period, 1982-1990. | Iran *was* a designated State Sponsor of Terrorism throughout the relevant period. |
| Plaintiffs did not allege money laundering. | Plaintiffs allege and Standard Chartered Bank has admitted to conspiring to launder money for Iran and altering payment messages to assist Iran in evading sanctions. |
| Plaintiffs did not allege violations of U.S. export controls. | Plaintiffs allege and Standard Chartered Bank has admitted to facilitating violations of U.S. export controls (including terrorism-related export controls). |

| | |
|---|---|
| Plaintiffs did not allege direct contacts, let alone conspiracy, with Iraq's military or terror-supporting apparatus. | Plaintiffs allege that Standard Chartered Bank actively conspired with numerous Iranian entities that are part of Iran's terrorism apparatus (IRGC, MODAFL, Mahan Air, Bank Saderat). |
| | |
| Plaintiffs did not allege that banks dealt with any entity later designated as terrorists or agents of FTOs. | Plaintiffs allege that Standard Chartered Bank actively conspired with entities later designated as terrorists or agents of FTOs. |

        **b.**       **The Complaint Plausibly Pleads That Standard Chartered Bank Provided, Concealed, and Disguised Material Support to Iran Used in Preparation for, or in Carrying Out, Acts of Terrorism in Violation of §2339A.**

Standard Chartered Bank also argues that the Complaint contains no "alleg[ation] that SCB provided banking services for Hezbollah, the Islamic Revolutionary Guards Corps ('IRGC'), or any terrorist organization." SC Mem. at 4.[58] This argument conflates liability predicated on violating §2339B – material support for foreign terrorist organizations – with liability for violating §2339A, material support in preparation for, or in carrying out, acts of terrorism, which is the basis for the Seventh Claim for Relief against Standard Chartered Bank.

As discussed *supra*, at 45-48, the Second Circuit in *Rothstein* held that because even State Sponsors of Terrorism "have many legitimate agencies, operations, and programs to fund," funding them cannot be treated as *presumptively* facilitating terrorism. Thus, an ATA complaint alleging financial or other material support to a State Sponsor of Terrorism must plausibly plead that the support provided was not directed toward that state's "legitimate agencies, operations, and programs." *Rothstein*, 708 F.3d at 97. Here, Plaintiffs have pled with great specificity that Standard Chartered Bank provided material support to Iran's *illegitimate* agencies, operations, and programs. As summarized more fully *supra*, the Complaint details Standard Chartered Bank's ongoing and extensive efforts on behalf of Mahan Air and sub-agencies of MODAFL

---

[58]     Even as styled, the statement is not accurate since Standard Chartered facilitated at least four unlawful USD payments to Zener Electronics, a procurement company for Hezbollah. SAC ¶¶798-802.

(helping them illegally purchase more than $120 million in embargoed U.S. aircraft and aircraft parts) and facilitation of more than $130 million in transfers on behalf of Iranian front companies, including $2.79 million USD's worth of electromotors for hydraulic presses, the precise type of machinery required to manufacture EFPs.

Faced with such detailed and voluminous evidence of its role in supplying embargoed manufacturing components, Standard Chartered Bank muses that dual-use equipment like electromotors for hydraulic presses *might have been used to manufacture hockey equipment*, adding that "[n]owhere do Plaintiffs allege that the electromotors that were the subject of the transaction involving SCB were used to manufacture hydraulic presses that, in turn, manufactured EFPs," SC Mem. at 7-8. But the hydraulic presses were not placed on the Commerce Control list (for Anti-Terrorism reasons) because the U.S. government wanted to cripple Iran's hockey leagues. They were embargoed because they are the precise type of machinery required to manufacture EFPs.[59] As discussed *supra*, the kind of "tracing" causation espoused by Standard Chartered Bank is not the legal standard under the ATA. *Boim III,* 549 F.3d at 697-98 (rejecting tracing requirement for terror funding).

## IV. THE COMPLAINT PLAUSIBLY PLEADS THAT STANDARD CHARTERED BANK HAD THE REQUISITE STATE OF MIND TO VIOLATE §2339A IN SUPPORT OF THE SEVENTH CLAIM FOR RELIEF.

Plaintiffs previously addressed their allegations of Standard Chartered Bank's state of mind regarding their conspiracy claims (First and Second Claims for Relief). *See supra*, at 34-41. However, Standard Chartered separately argues, regarding its extensive criminal conduct in facilitating Letters of Credit to Iran's military, that "issuers of letters of credit are third parties

---

[59] The hydraulic pump a defendant provided to his co-conspirators in *Garcia*, 509 F. App'x at 42, also had other uses, but "it was not necessary for the government to show that [defendant] was aware of a high probability that the pump would be used for robberies *of drug dealers* (as charged in the indictment) ….").

ignorant of the specifics of the transactions who merely deal in documents describing the terms of the credit extended." SC Mem. at 6 n.5 (quoting *Stutts*, 2006 WL 1867060, at *13). It is simply impossible for Standard Chartered to make that claim in light of the *Sanctions Compliance Transaction Review – Standard Chartered Bank, Report on Iranian Trade Finance Transactions* ("Promontory Report"), which is incorporated in the Complaint.[60] The Promontory Report – prepared by Standard Chartered Bank's own hired consultant and disclosed by a whistleblower – provides a unique window into Standard Chartered Bank's knowledge of the specifics of its illegal conduct in facilitating Letters of Credit for Iran's terrorist apparatus. It shows that Standard Chartered was not an "ignorant third party": it knowingly acted as *the* critical conduit providing access for Iranian banks, MODAFL, and the IRGC to U.S. suppliers and embargoed U.S. materials. For this, and many other reasons detailed in the Complaint, New York State's Department of Financial Services ("DFS") concluded: *"SCB operated as a rogue institution."* SAC ¶840.

## V. THE COMPLAINT PLAUSIBLY PLEADS VIOLATIONS OF 18 U.S.C. §2332d UNDERLYING THE THIRD AND FOURTH CLAIMS FOR RELIEF.

It is illegal under 18 U.S.C. §2332d for a "United States person" to "engage[] in a financial transaction with the government of" a country that it knows, or reasonably should know, to be designated under section 6(j) of the Export Administration Act of 1979 as a country supporting international terrorism, "[e]xcept as provided in regulations issued by the Secretary of the Treasury, in consultation with the Secretary of State." 18 U.S.C. §2332d(a). The Iranian Trade Regulations ("ITRs") implemented this prohibition, and the U-Turn Exemption fashioned

---

[60]     Exhibit A(1) to the Complaint. The Promontory Report provides extensive descriptions of the types of information Standard Chartered collected in the process of fronting for various Iranian banks financing Letters of Credit for Iran's terrorist apparatus, including "Certificates of Origin," descriptions of the relevant goods, documentation indicating the identity of the Iranian Issuing Bank, and documentation indicating the ultimate recipient of the goods. *Id.* at 3-20.

an exception, which the conspirators could have used *legally* to facilitate transfers for the benefit of Iran's legitimate agencies, operations, and programs. Instead, as discussed above, Defendants conspired with Iran to conceal their U.S. dollar clearing through the United States. SAC ¶¶140-172. The ITRs prohibit precisely the conduct in which the §2332d Defendants engaged. For example, 31 C.F.R. §560.203[61] expressly provides that "[a]ny transaction by any United States person *or within the United States* that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited." (Emphasis added.) By a chain of statutory incorporation, violations of §2332d are acts of international terrorism that may give rise to civil liability through §2333(a). *See supra*, at 26-31 (discussing primary liability).

Section 2332d(b)(2) defines "United States person" as any:

    (A)     United States citizen or national;
    (B)     permanent resident alien;
    (C)     juridical person organized under the laws of the United States; or
    (D)     any person in the United States.

"Financial transaction" is defined as "a transaction which in any way or degree affects interstate or foreign commerce … involving the movement of funds by wire or other means or … a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree." 18 U.S.C. §2332d(b)(1) incorporating §1956(c)(4).

Standard Chartered Bank, RBS N.V., and Commerzbank alone argue that they are not United States persons for purposes of this section (as HSBC-US indisputably is a U.S. person), and all four of them argue that the Complaint's §2332d allegations are defective because they fail to allege financial transactions with "the government of Iran." The first argument is refuted

---

[61] All citations to the C.F.R. cite the language and sections in effect at the times relevant to the SAC; the C.F.R. has since been remapped but retains the same language quoted here.

by §2332d's plain language, and the second by the clear case law construing the provision, as well as common sense.

### A. §2333(a) Creates Primary Liability for Violations of §2332d.

For the same reason that the ATA creates primary liability for conspiracy, it creates primary liability for violations of §2332d. As the district court in *Abecassis* held, §2333(a) violations predicated on primary violations of §2332d are cognizable:

> Iraq was designated as a state sponsor of terrorism at all times relevant to this case. Regulations were issued to permit Americans and American companies to take part in the [Oil For Food Program] OFP. The plaintiffs allege that the defendants in this case were issued licenses to do so under those regulations. But the allegations are that the defendants violated the terms of the OFP, and thus the federal regulations insulating them from liability under § 2332d. The plaintiffs allege that because the defendants participated in the OFP and went through the licensing process, they knew that Iraq was designated as a state sponsor of terrorism. Of course, as the defendants argue, the definition of "international terrorism" also requires that the underlying criminal violation is an act "dangerous to human life." 18 U.S.C. §2331(1). But like giving a loaded gun to a child, or giving money to Hamas, *see Boim III*, 549 F.3d at 690, *giving money to a state sponsor of terrorism in knowing violation of strict rules set for transacting business with that country is an act dangerous to human life.* The allegations in the complaint state a violation of the ATA based on §2332d. [*Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 648 (S.D. Tex. 2011) (emphasis added).]

Like the regulations governing financial transactions with Iraq in *Abecassis*, the ITRs were "federal regulations insulating [Defendants] from liability under §2332d," *provided simply that they obeyed them.* By knowingly and unlawfully "stripping" and otherwise laundering Iranian dollar transactions through the United States to evade U.S. terror-financing controls, in violation of those regulations, HSBC-US, Standard Chartered Bank, RBS, and Commerzbank chose to subvert and evade the regulations that could have insulated them from §2332d liability for at least some of the transactions.

**B.     HSBC-US Is a U.S Person for Purposes of §2332d.**

HSBC-US is a national bank chartered under federal law with corporate headquarters in McLean, Virginia, and its principal office in New York. SAC ¶¶67-68. The Moving Defendants are silent on whether HSBC-US is a "juridical person organized under the laws of the United States," because they cannot argue otherwise.

**C.     The U.S. Branches of Standard Chartered Bank, RBS N.V., and Commerzbank Are U.S Persons for Purposes of §2332d.**

Standard Chartered Bank, RBS N.V., and Commerzbank assert that their U.S. branches are neither "juridical person[s] organized under the laws of the United States" nor "any person in the United States" under §2332d(b)(2). Joint Mem. at 28-30. All three banks, however, operated branches in the United States (as opposed to separately incorporated subsidiaries) during the relevant period, and these branches were licensed by, and operated under the laws of, New York and the United States.

Congress enacted §2332d to prohibit two kinds of conduct involving financial transactions with State Sponsors of Terrorism. First, it wanted to prohibit domestic entities (*i.e.* U.S. citizens, permanent resident aliens, and U.S. legal entities) from engaging in unlicensed financial transactions with State Sponsors of Terrorism *anywhere in the world.* Second, it also wanted to prohibit *any* person or entity, whether foreign or domestic, from engaging in unlicensed financial transactions with State Sponsors of Terrorism *in the United States*. Section §2332d defines "U.S. persons" to reach both groups. Sections 2332d(b)(2)(A)-(C) forbid domestic entities from engaging in prohibited financial transactions anywhere in the world, while §2332d(b)(2)(D) forbids all persons and entities from engaging in prohibited transactions in the United States. There is nothing "superfluous" about this coverage, as Defendants argue (Joint. Mem. at 29): the definitions precisely match the logical reach of the prohibition.

Nor is "any person" limited to "natural persons," as Defendants maintain. Section 2331(3) defines "person" for the entire terrorism chapter of the U.S. Code (thus including §2332d) as "*any individual or entity capable of holding a legal or beneficial interest in property.*" §2331(3) (emphasis added). The U.S. branches of Standard Chartered Bank, RBS and Commerzbank all qualify as entities "*capable of holding a legal or beneficial interest in property.*" Furthermore, this reading is entirely consistent with the manner in which financial transactions with Iran have been circumscribed in the ITRs.[62] For example, as noted above, 31 C.F.R. §560.203 expressly provides that "[a]ny transaction by any United States person *or within the United States* that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited." (Emphasis added.) Likewise, 31 C.F.R. §560.204 prohibits "the exportation, reexportation, sale or supply, directly or indirectly, *from the United States*, *or by a United States person, wherever located,* of any goods, technology, or services...." (Emphasis added.) Like §2332d, the ITRs clearly target transactions conducted *in or from the United States* by any person. Similarly, prior to 2008, the ITRs *permitted* certain United States dollar clearing transactions involving Iran by "United States depository institutions" under specific conditions. 31 C.F.R. §560.516.

> The term United States depository institution means any entity (including its foreign branches) organized under the laws of any jurisdiction within the United States, *or any agency, office or branch located in the United States of a foreign entity, that is engaged primarily in the business of banking* (for example, banks, savings banks, savings associations, credit unions, trust companies and United States bank holding companies).

---

[62] Consideration of related regulatory language is entirely appropriate in interpreting §2332d's statutory definition. *See Smith v. Califano*, 597 F.2d 152, 156 (9th Cir. 1979) (where regulations are reasonable and reflect language and policy underlying statute, court should carefully consider regulations in determining proper interpretation of statute). *Cf. Commodity Futures Trading Comm'n v. Gibraltar Monetary Corp.*, No. 04-80132-CIV, 2006 WL 1789018, at *20, n. 8 (S.D. Fla. May 30, 2006) ("When a statute and regulation contain virtually identical language, the interpretation of the statute guides the interpretation of the regulation."). Indeed, Defendants claim that *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000), is on point because in that case the Supreme Court construed what they describe as "identical language" in regulations setting forth Burma-related sanctions.

31 C.F.R. §560.319 (emphasis added). The chain of definitions in the ITRs leads directly to Defendants' doors.

Faced with the plain language of the statute and the actual implementing regulations, Defendants rely on *United States v. Chalmers*, 474 F. Supp. 2d 555 (S.D.N.Y. 2007),[63] a criminal case in which the court refused to impute the conduct of an *independent* entity (a U.S. subsidiary) to a Bahamian corporation that had no independent presence in the United States. *Chalmers* did not address a factual scenario involving a U.S.-licensed branch of a foreign corporation or that entity's U.S. conduct. Moreover, *Chalmers* relied entirely on *Crosby*, 530 U.S. at 379 (as does Joint. Mem. at 29), a Supreme Court case that considered whether a *state* statute boycotting (*inter alia*) *wholly foreign corporations* (having no branch, office, operation, or other presence in the state or the United States)[64] was pre-empted by the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 ("FOEFRPAA").[65] The Supreme Court concluded that the state law was preempted because FOEFRPAA occupied the field of prohibition and did not reach wholly-foreign companies. "The state Act ... imposes restrictions on foreign companies as well as domestic, whereas the federal Act limits its reach to United States persons." 530 U.S. at 379. *Crosby*'s reasoning does not apply here.

---

[63]     Defendants also cite *Abecassis,* 785 F. Supp. 2d 614, but *Abecassis* merely cites *Chalmers* without further analysis.

[64]     The state statute reached any person "(a) having a principal place of business, place of incorporation or its corporate headquarters in Burma (Myanmar) or having any operations, leases, franchises, majority-owned subsidiaries, distribution agreements, or any other similar agreements in Burma (Myanmar), or being the majority-owned subsidiary, licensee or franchise of such a person." Quoted in *Crosby*, 530 U.S. at 366.

[65]     FOEFRPAA provided: "The President is hereby authorized to prohibit, and shall prohibit United States persons from new investment in Burma" but did not itself define "United States persons." Pub. L. No. 104-208, 110 Stat. 3009-166, §570(b). However, elsewhere in the same Act, Congress provided the following definition: "(1) a natural person who is a citizen or national of the United States; or (2) a corporation, partnership, or other legal entity organized under the United States or any State, territory, possession, or district of the United States." Pub. L. No. 104-208, 110 Stat. 3009-170, §581(c).

First, FOEFRPAA did not include the words "any person in the United States" in its definition, as §2332d does. This alone is dispositive. Defendants rely upon the Supreme Court's analysis of a statute that does *not* contain the words "any person in the United States" to argue that those words in §2332d must exclude U.S. branches of foreign banks "in the United States."

Second, FOEFRPAA has a different purpose than the ATA. It dealt primarily with U.S. foreign aid and investment (*e.g.*, the Agency for International Development, debt relief and other governmental expenditures), not prevention of terrorism financing. *See* JASTA §2(a)(1) ("International terrorism is a serious and deadly problem that threatens the vital interests of the United States."). The Supreme Court has recently cautioned that "'the presumption of consistent usage readily yields to context,' and a statutory term may mean different things in different places." *King v. Burwell*, 135 S. Ct. 2480, 2493 n. 3 (2015), *quoting Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2441 (2014).

Finally, the Complaint here does not allege that §2332d reaches conduct by wholly-foreign corporations that conduct financial transactions with Iran *outside the United States*. Instead, it alleges that financial transactions were purposefully conducted by Standard Chartered Bank, RBS, and Commerzbank through their U.S.-licensed branches *in the United States* – the very conduct spelled out in the ITRs by a direct chain of reference.

Defendants effectively ask this Court to carve a giant loophole in §2332d and its implementing regulatory regime. They urge the Court to extend an inapposite holding in *Chalmers* to domestic conduct by U.S. branches of foreign banks by holding that: §2332d prohibits (1) domestic U.S. entities from engaging in financial transactions with State Sponsors of Terrorism anywhere in the world and (2) "natural persons" from engaging in financial transactions with State Sponsors of Terrorism in the United States, *but* (3) *exempts* U.S.-licensed

branches of foreign banks that violate sanctions laws and regulations by deliberately laundering money for State Sponsors of Terrorism *in the United States*.[66] It is hard to imagine that the *Chalmers* court intended such an absurd result. But if it had, that case was wrongly decided.

The U.S. branches of foreign banks are hybrid entities. They are treated as "foreign" entities for certain purposes, such as personal jurisdiction. But they are also "juridical person[s] organized under the laws of the United States," because as U.S. branches, they must obtain licenses and register to do business in the United States and are subject to U.S. sanctions against Iran. *See* Radine Decl., Ex. F, (Attachment B ¶¶7, 11-16 – Commerzbank), Ex. C (Factual Statement ¶¶9, 73-77 – SCB), and Ex. D (Factual Statement ¶¶9-13 – RBS). That is why they are included in the definition of "United States depository institutions" in the ITR regulations. 31 C.F.R. §560.516. Similarly, §560.327 defines a "U.S. financial institution" to include "those branches, offices, and agencies of foreign financial institutions that are located in the United States, but not such institutions' foreign branches, offices, or agencies." The statutory and regulatory scheme is coherent; Defendants' proposed loophole and *sui generis* interpretation of the statute are not.

### D. The Complaint Plausibly Pleads That the §2332d Defendants Knowingly Engaged in Financial Transactions with the Government of Iran.

Defendants further argue, without any case citation, that Plaintiffs are required to plead that they engaged in "transactions *with the Iranian government itself*," to state a §2332d claim. Joint. Mem. at 29 (emphasis added). Nothing in the language of 18 U.S.C. §2332d suggests, however, that proscribed "financial transactions with the government of Iran" are limited solely

---

[66] The definition of a "United States person" is nearly identical to the definition contained in the United States Global Terrorism Sanctions regulations, *see* 31 C.F.R. §594.315, issued by the President on September 11, 2001, pursuant to Executive Order No. 13224, 66 Fed. Reg. 490708 (Sept. 23, 2001). These regulations also apply to "any person in the United States" and block financial transactions with SDGTs affiliated with al Qaeda, Hamas, Hezbollah and other terrorist groups. Yet, under Defendants' theory, U.S. branches of foreign corporations would be allowed to freely operate within the United States and engage in financial transactions with SDGTs without exposing themselves to criminal liability under the Executive Order No. 13224 regulations.

to transactions in the *name* of the government of Iran. If they were so limited, any State Sponsor of Terrorism could simply ask banks to send money to a state instrumentality or wholly-controlled entity not named "the Islamic Republic of Iran," and a party could escape criminal liability under §2332d by engaging in transactions with those entities or alter-egos, agents, or dummy companies established by the Iranian government.[67] Section 2332d is not so obviously circumvented; it reaches instrumentalities and entities controlled by the Iranian government. *See Abecassis*, 785 F. Supp. 2d at 620 (payments to an account "held by Al Wasel and Babel General Trading, a United Arab Emirates company allegedly 'secretly owned and controlled' by Hussein," sufficient to plead proscribed financial transaction with the government of Iraq); *cf., Nat'l Council of Resistance of Iran v. Dep't of State*, 373 F.3d 152, 157-58 (D.C. Cir. 2004) (reasoning that it is "silly" and "implausible" to think that a designated terrorist could escape the consequences of the designation simply by adopting an alias).

The Complaint alleges that the U.S. Treasury Department revoked authorization for "U-Turn" transactions

> because it suspected *Iran of using its banks* – including the CBI/Markazi, Bank Saderat and Bank Melli – to finance its nuclear weapons and missile programs. The U.S. also suspected that *Iran was using its banks to finance terrorist groups,* including Hezbollah, Hamas and the Palestinian Islamic Jihad, and engaging in deceptive conduct to hide its involvement in various other prohibited transactions….

SAC ¶163 (emphasis added). It further alleges that the CBI "is an alter-ego and instrumentality of the Iranian government." SAC ¶¶391-393.[68] The ITRs themselves define the term

---

[67]     Similarly, the ITRs state: "The term entity owned or controlled by the Government of Iran includes any corporation, partnership, association, or other entity in which the Government of Iran owns a 50 percent or greater interest or a controlling interest, and any entity which is otherwise controlled by that government." 31 C.F.R. §560.313.

[68]     On February 6, 2012, pursuant to his authority under IEEPA, President Obama issued Executive Order ("E.O.") 13599 which provides that:

"Government of Iran" to include "the Central Bank of Iran." 31 C.F.R. §560.304. Bank Melli is also "effectively controlled by the Iranian regime." SAC ¶417, and in other litigation, Bank Melli has conceded that it is an instrumentality of Iran. *See Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 48 (2d Cir. 2010) ("Bank Melli concedes that it is an instrumentality of Iran."). As the Complaint notes, in its 2004 Consent Order with ABN Amro (RBS N.V.), U.S. regulators found that "the New York Branch processed wire transfers originated by Bank Melli Iran, *a financial institution owned or controlled by the Government of Iran*." SAC ¶914 (emphasis added).[69] The Complaint further alleges that the U.S. Treasury Department made a determination that the National Iranian Oil Company was an agent or affiliate of the IRGC. SAC ¶516. IRISL has also been held to be an instrumentality of the government of Iran. *See Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch*, 919 F. Supp. 2d 411, 420 (S.D.N.Y. 2013) ("As Iran's 'national maritime carrier,' IRISL functions as an instrumentality of the government of Iran.").

The Complaint pleads that each of the four Defendants identified in the Third and Fourth Claims for Relief knowingly engaged in financial transactions in the United States with one or more of these instrumentalities or divisions of the Government of Iran. For example, the Complaint details HSBC-US's knowledge[70] that it was an unlawful conduit for financial

---

[a]ll property and interests in property of the Government of Iran, *including the Central Bank of Iran,* that are in the United States, that are or hereafter come within the United States, or that hereafter come within the possession or control of any United States person, including any foreign branch, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in. Exec. Order No. 13599, 77 Fed. Reg. 26 (Feb. 6, 2012) (emphasis added).

[69]     *See also* New York State Department Of Financial Services Order Pursuant To Banking Law §39 attached as Exhibit L to the Radine Decl. ¶1 ("For nearly a decade, SCB programmatically engaged in deceptive and fraudulent misconduct in order to move at least $250 billion through its New York branch on behalf of client Iranian financial institutions ('Iranian Clients') that were subject to U.S. economic sanctions, and then covered up its transgressions. These institutions included no less than the Central Bank of Iran/Markazi ('CBI/Markazi'), as well as Bank Saderat and Bank Melli, *both of which are also Iranian State-owned institutions*."). (Emphasis added.)

[70]     The Moving Defendants baldly assert: "[n]or can Plaintiffs demonstrate that U.S. clearing banks like HSBC US knew that Iran was the beneficiary of transactions, as the nub of Plaintiffs' allegations is that this information was stripped from wire transfers before it reached the U.S. clearing bank." Joint Mem. at 30. But the Complaint sets

transactions on behalf of the CBI, Bank Melli, and NIOC. SAC ¶¶400, 516, 532-571 (*e.g.* July 12, 2001 e-mail to senior employees at HSBC-US advising them that HSBC had "been approached by the Central Bank of Iran to take back their USD clearing business from Natwest"). The Complaint also details the U.S. branch of Standard Chartered Bank's knowledge that it was an unlawful conduit for financial transactions on behalf of the CBI, Bank Saderat, Bank Melli and NIOC, SAC ¶¶621-672, and RBS's U.S. branch's knowledge that it was used as an unlawful conduit for financial transactions on behalf of the CBI and Bank Melli. SAC ¶¶881-918. Lastly, the Complaint alleges that Commerzbank's U.S. branch knew it was being used as an unlawful conduit for financial transactions on behalf of Bank Melli, Bank Saderat and IRISL. SAC ¶¶992-1038.

## VI. THIS COURT HAS SPECIFIC PERSONAL JURISDICTION OVER BANK SADERAT, PLC AND ALL CLAIMS AGAINST COMMERZBANK

Bank Saderat contests personal jurisdiction under C.P.L.R. §302(a)(1), (2) and Rule 4(k)(2), and Commerzbank contests personal jurisdiction as to Plaintiffs' Sixth Claim, which relates to Commerzbank's material support to Hezbollah through its account for the Waisenkinderprojekt.[71] As shown below, this Court has jurisdiction over Bank Saderat for the same reasons it found jurisdiction over the defendant in *Strauss v. Crédit Lyonnais, S.A.*, No. 06-cv-702(DLI)(MDG), 2016 WL 1305160 (E.D.N.Y. Mar. 31, 2016) and the Second Circuit found jurisdiction over the defendants in *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci*

---

forth in detail HSBC-US's awareness and participation in the unlawful acts of the Conspiracy. *See, e.g.,* SAC ¶¶415; 447-448; 498; 507-508; 2227-2232 (detailing HSBC-US's practices and knowledge). Tellingly, the Department of Justice press release announcing the DPA by which HSBC Holdings and HSBC-US agreed to a forfeiture of more than a billion USD cited "HSBC's willful flouting of U.S. sanctions laws and regulations [that] resulted in the processing of hundreds of millions of dollars in OFAC-prohibited transactions." SAC ¶574.

[71] In evaluating whether the requisite showing of personal jurisdiction has been made, the Court must construe the pleadings and any supporting materials in the light most favorable to the plaintiffs. *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010). *See also Dale v. Banque SCS Alliance S.A.*, No. 02Civ.3592(RCC)(KNF), 2005 WL 2347853, at *3 (S.D.N.Y. Sept. 22, 2005) ("the court will construe jurisdictional allegations liberally and take all uncontroverted factual allegations to be true.").

*IV")*, 732 F.3d 161 (2d Cir. 2013). This Court also has pendent personal jurisdiction over Commerzbank because its material support to Hezbollah shares a common nucleus of fact with Plaintiffs' other claims against Commerzbank, for which it does not contest personal jurisdiction.

### A. This Court Has Personal Jurisdiction Over Bank Saderat.

Bank Saderat is the only foreign bank defendant to contest personal jurisdiction as to the Conspiracy-related claims (Plaintiffs' First and Second Claims for Relief), but it provides no reason to accord it special treatment. This Court in *Strauss* set out the relevant personal jurisdiction standard:

> To make a *prima facie* showing that personal jurisdiction exists, a plaintiff must demonstrate: (1) proper service of process upon the defendant; (2) a statutory basis for personal jurisdiction over the defendant; and (3) that [the court's] exercise of jurisdiction over the defendant is in accordance with constitutional due process principles.

*Strauss*, 2016 WL 1305160, at \*7 (internal quotation marks and citation omitted). Saderat does not contest proper service of process, requiring analysis only of the latter two elements. As shown below, this Court has jurisdiction over Bank Saderat under (a) C.P.L.R. §§302(a)(1) and (2) and (b) Rule 4(k)(2), and jurisdiction comports with due process principles.

### 1. This Court Has Personal Jurisdiction Over Bank Saderat Under C.P.L.R. §302(a)(1).

C.P.L.R. §302(a)(1) has two prongs: "purposeful availment," directly or through an agent, of the privilege of conducting activities within New York, invoking the benefits and protections of its laws, and an "articulable nexus" or "substantial relationship" between the plaintiff's claims and the defendant's transaction in New York. *Id.* at \*9.

In *Licci v. Lebanese Canadian Bank, SAL ("Licci III")*, 20 N.Y.3d 327, 960 N.Y.S.2d 695 (2012), the New York Court of Appeals found purposeful availment on facts similar to those here:

> [A] foreign bank's repeated use of a correspondent account in New York on behalf of a client—in effect, a course of dealing—show[s] purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States.

*Licci III*, 20 N.Y.3d at 339. This is precisely what Plaintiffs have alleged against Bank Saderat – that it repeatedly directed its co-conspirators to clandestinely send Eurodollars through correspondent accounts in New York, including Eurodollars sent to Hezbollah and other terrorist entities. SAC ¶¶364-390.

As shown in detail in Lloyds TSB Bank Plc's ("Lloyds") DPA, Bank Saderat and other Iranian banks (described jointly in the DPA as the "U.K. Iranian Banks") held accounts with Lloyds in order to non-transparently clear money for illegitimate activities through Lloyds's New York correspondent accounts. *See* Lloyds DPA, Radine Decl. Ex. G, Factual Statement ¶13. Lloyds's "processing staff manually reviewed each SWIFT message received from the U.K. Iranian Banks before ***they were transmitted to the United States*** to ensure that references to Iran were removed from certain outgoing USD SWIFT messages." *Id.* ¶16 (emphasis added). Lloyds thereby "prevented ***the U.S. depository institutions located in New York*** ... from recognizing the transactions as originating from sanctioned countries, banks or persons .... [and] from generating business records of transactions to be filed with OFAC, as required by law." *Id.* ¶20 (emphasis added). These Complaint excerpts and the incorporated Lloyds DPA[72] undercut Saderat's counterfactual argument that "[t]here are no allegations of any...specific U-turn or other transaction involving BSPLC directly or indirectly routed through New York." BS Mem. at 14.

---

[72]     Bank Saderat argues that the Lloyds DPA is insufficient to support §302(a)(1) personal jurisdiction because the DPA *also* identifies other Iranian bank co-conspirators using Lloyds to illegally clear dollar-denominated assets through New York. BS Mem. at 15 n.28. Bank Saderat also inexplicably quotes from a discussion of the heightened pleading requirements in a fraud action in a decision on a Rule 9(b) motion to dismiss. *Trans World Airlines, Inc. v. 47th St. Photo, Inc.*, No. 88 CIV. 1936 (PNL), 1990 WL 481956, at *5 (S.D.N.Y. Apr. 16, 1990). The decision does include a brief personal jurisdiction section as well (examining §302(a)(2), not (1)), but it only concludes that jurisdictional discovery is necessary to determine personal jurisdiction. *Id.* at *8.

Bank Saderat also points out that "[t]here are no allegations of any BSPLC bank account in New York, [or a] BSPLC correspondent account in New York." BS Mem. at 14. Bank Saderat has no correspondent accounts in New York because "US sanctions" prohibit it from doing so, as it admits in a footnote. BS Mem. at 15 n. 27. That Bank Saderat instead performed business in New York through a series of agents does not change the jurisdiction analysis. As stated above, §302 explicitly applies to out of state actors who act in New York "*through an agent*." C.P.L.R. §302(a). In fact, whenever a U.S. correspondent bank performs a dollar-clearing transaction for a correspondent account of a foreign bank, as in the *Licci* cases, the U.S. bank is operating as the foreign bank's agent for that purpose.[73] *See PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1110–11 (2d Cir. 1997) (using agents in forum is purposeful availment sufficient to comport with due process); *Cavu Releasing, LLC. v. Fries*, 419 F. Supp. 2d 388, 393 (S.D.N.Y. 2005) (same). Thus, Bank Saderat urges the absurd result that, because it was barred from maintaining a correspondent account in New York and barred from accessing the U-Turn Exemption because of its support for Hezbollah, its illegal use of *other* banks' correspondent accounts in New York to fund terrorism makes it *immune* from suit in New York for injuries resulting from that terrorism.

As for the "nexus" prong of §302(a)(1), showing a nexus is a "relatively permissive" standard that "does not demand a causal connection between the defendant's New York transaction [and] the plaintiff's claim." *Strauss*, 2016 WL 1305160, at *9. Instead, it "requires only a 'relatedness... such that the latter is not completely unmoored from the former'" and that "at least one element [of the plaintiff's claim] arises from the [defendant's] New York contacts."

---

[73]    "Whether a defendant's representative is an 'agent' for purposes of § 302(a) turns on whether the representative acted 'for the benefit of and with the knowledge and consent of [the] defendant and [the defendant] exercised some control over [the agent] in the matter.'" *Shpak v. Curtis*, 10-CV-1818 RRM JO, 2011 WL 4460605, at *8 (E.D.N.Y. Sept. 26, 2011) (citations omitted). Plaintiffs' allegations clearly meet this standard.

*Id.* (quoting *Licci III*, 20 N.Y.3d, at 339). Bank Saderat argues that Plaintiffs have not "identif[ied] a single banking transaction routed through New York involving BSPLC directly or indirectly, much less a banking transaction involving BSPLC and an account associated with terrorism." In fact, Plaintiffs have provided substantial allegations of Bank Saderat's transfer of US dollars to Hezbollah *through New York-based correspondent accounts*, which lost Bank Saderat its access to the U-Turn system and earned it its SDGT status. SAC ¶163 (revocation of U-Turn authorization), SAC ¶365 (Hezbollah), SAC ¶387 (SDGT status). Plaintiffs have also alleged in detail Bank Saderat's collaboration with the Moving Defendants to strip Letters of Credit, *cleared through New York*, SAC ¶745, illegally procuring military equipment on the USML list for MODAFL and U.S. aircraft parts for Mahan Air, SAC ¶¶375-381. More is not required, as "it is not Plaintiffs' burden to adduce any such proof at this stage. Rather, Plaintiffs need only plead facts that, if credited, would establish jurisdiction over Defendant." *Strauss*, 2016 WL 1305160, at *10.

Bank Saderat also quotes *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 728 (S.D.N.Y. 2010) for the proposition that "[t]he 'events giving rise to the physical injuries and deaths for which Plaintiffs [sought] redress [were] missile attacks in Israel, not funds transfers in New York.'" BS Mem. at 17 (quoting *Tamam* 677 F. Supp. 2d, at 728) but fails to acknowledge that the New York Court of Appeals in *Licci III* rejected this reasoning, holding:

> [T]he specific harms suffered by plaintiffs flowed not from LCB's alleged support of a terrorist organization, but rather from rockets. Yet CPLR 302(a)(1) does not require that every element of the cause of action pleaded must be related to the New York contacts; rather, where at least one element arises from the New York contacts, the relationship between the business transaction and the claim asserted supports specific jurisdiction under the statute. [20 N.Y.3d at 341.][74]

---

[74] This holding was then used by the Second Circuit in *Licci IV* to vacate the lower court's dismissal (*Licci v. Am. Exp. Bank Ltd.*, 704 F. Supp. 2d 403, 407 (S.D.N.Y. 2010)) of the complaint, premised in part on *Tamam*.

## 2. This Court Also Has Personal Jurisdiction Over Bank Saderat Under C.P.L.R. §302(a)(2).

Bank Saderat is also subject to personal jurisdiction under C.P.L.R. §302(a)(2) because it committed tortious acts within New York State. The acts of a defendant's agent or co-conspirator within New York provide a sufficient basis for personal jurisdiction under C.P.L.R. §302(a)(2), even when the defendant itself was outside the state at the time of the tortious conduct. *See Emerald Asset Advisors, LLC v. H. Cy Schaffer*, 895 F. Supp. 2d 418, 431 (E.D.N.Y. 2012). ("[T]he New York activities of a 'co-conspirator' may also be imputed to an out-of-state defendant for purposes of personal jurisdiction under § 302(a)(2) under an agency rationale."). Factors courts consider in assessing co-conspirator jurisdiction are:

> (1) the out-of-state co-conspirator had an awareness of the effects of the activity in New York, (2) the New York co-conspirators' activity was for the benefit of the out-of-state conspirators, and (3) that the coconspirators in New York acted at the behest of or on behalf of, or under the control of the out-of-state conspirators.

*Id.* at 431. Here, the detailed allegations in the Complaint make clear that (1) Bank Saderat actively conspired to effectuate the criminal conduct directed at New York (and the United States generally), (2) many of the hundreds of transactions the co-conspirators illegally performed in New York were for Bank Saderat's benefit, and (3) the co-conspirators performed those transactions at the behest of, and on behalf of, Bank Saderat. *See* SAC ¶¶364-390.

Bank Saderat argues that conspiracy-based personal jurisdiction is unavailable because (1) it believes conspiracy liability is unavailable under the ATA,[75] (2) the "tortious act" did not occur in the state because "the last event necessary to make the actor liable" occurred elsewhere, and (3) Plaintiffs have not made out even a prima facie showing of Conspiracy. BS Mem. at 18-19. Grounds (1) and (3) are plainly incorrect and are addressed *supra*, Sections I and II. Ground

---

[75] As noted *supra*, *Bank Saderat's counsel* has since conceded that "there can now be civil liability for those who aid and abet an act of terrorism, as well as those who conspire to do so...."

(2) is premised on a profound misreading of *LaSala v. Lloyds TSB Bank*, 514 F. Supp. 2d 447 (S.D.N.Y. 2007) and *Devore v. Pfizer, Inc.*, 867 N.Y.S.2d 425 (1st Dep't 2008). As those cases make clear, the "last event" test is used for deciding choice of law, *not* personal jurisdiction, and even in *that* context, as one of Bank Saderat's own cases show, "the 'last place' criterion does not displace ordinary interest analysis." *LaSala*, 514 F. Supp. at 464.

### 3. Even if C.P.L.R. §302 Is Not Satisfied, This Court Has Personal Jurisdiction Over Bank Saderat Under Rule 4(k)(2).

If Bank Saderat is right that the New York long arm statute does not reach it (and no other state has personal jurisdiction), then Rule 4(k)(2) applies. To establish personal jurisdiction under Rule 4(k)(2), "there must be a federal claim, personal jurisdiction must not exist over the defendant in New York or any other state, and the defendant must have sufficient minimum contacts with the United States as a whole such that the exercise of jurisdiction does not violate Fifth Amendment due process." *In re Terrorist Attacks on Sept. 11, 2001*, 392 F. Supp. 2d 539, 557 (S.D.N.Y. 2005), *aff'd*, 538 F.3d 71 (2d Cir. 2008) (internal quotation marks and citation omitted). Plaintiffs assert federal claims, and, as shown above, Bank Saderat's numerous transfers through correspondent banks and co-conspirators in the United States to terrorist groups establish sufficient minimum contacts with the United States "as a whole" to satisfy the Fifth Amendment.[76]

---

[76] Bank Saderat's rejoinder is to cite cases in which plaintiffs pleaded *no* connections to the United States sufficient to confer specific jurisdiction except the citizenship of the victims. *See* BS Mem. at 19-21. The *In re Terrorist Attacks on Sept. 11, 2001* family of cases involve donations entirely made outside of the United States to charities that at best foreseeably could have supported al Qaeda. As Bank Saderat admits, *Waldman v. Palestine Liberation Org.*, No. 15-3135-CV, 2016 WL 4537369 (2d Cir. Aug. 31, 2016) and *Walden v. Fiore*, 134 S. Ct. 1115 (2014) only reject theories premised *entirely* on the identity of the victims, rather than the aim of the defendants' conduct. In fact, the *Waldman* court found that the attacks were not "expressly aimed" at the United States because the American victims were not specifically targeted for their citizenship. In the instant case, the terror attacks were clearly intended to harm American forces in order to affect American policy. For instance, Iran designed EFPs specifically to penetrate the armored vehicles used by American forces in Iraq. SAC ¶¶47 n.9, 197 n. 17.

### 4. Bank Saderat Has Minimum Contacts With the United States and Exercise of Specific Personal Jurisdiction Over It Is Reasonable.

The remaining elements of personal jurisdiction are that Bank Saderat had "minimum contacts" with the United States, and that this Court's exercise of personal jurisdiction over Bank Saderat would be "reasonable under the circumstances." *Strauss*, 2016 WL 1305160, at *16. However, as this Court noted, "the Second Circuit observed that it would be 'rare' and 'unusual' for a court to determine that the exercise of personal jurisdiction over a defendant was permitted by §302(a)(1), but prohibited under principles of due process. In fact, the Second Circuit noted that it was aware of no such decisions within this Circuit." *Id.* (quoting *Licci IV*, 732 F.3d at 170). The instant case should not be the first.

The minimum contacts test is satisfied "if 'the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there.'" *Id.* (quoting *Licci IV*, 732 F.3d at 170). Notably, in JASTA §2(a)(6), Congress found that

> entities ... that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States… necessarily direct their conduct at the United States, and **should reasonably anticipate being brought to court in the United States to answer for such activities.**

(emphasis added).[77] Moreover, "as acknowledged by the Second Circuit, . . . 'use of a forum's banking system as part of an allegedly wrongful course of conduct may expose the user to suits seeking redress in that forum when that use is an integral part of the wrongful conduct.'" *Strauss*, 2016 WL 1305160 at *19 (quoting *Licci IV*, 732 F.3d at 172 n. 7).

---

[77]  Although not controlling on a constitutional question, Congress's findings and purposes provide useful guidance in interpreting a statute. *See Rubin v. Islamic Republic of Iran*, No. 14-1935, 2016 WL 3903409, at *7 (7th Cir. July 19, 2016) ("None of the standard objections to judicial reliance on legislative history inhibit our resort to a statutory declaration of purpose for help in interpreting a part of the statute to which it applies.").

Reasonableness includes several factors, such as the burden on the defendant, the interests of the forum (here, New York and the United States) and the justice system generally, and the furthering of national social policies. *Id.* A defendant "bears a heavy burden" to render jurisdiction unreasonable, *id.*, and where minimum contacts are met, "dismissals resulting from the application of the reasonableness test should be few and far between." *Id.* (quoting *Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 575 (2d Cir. 1996)). Bank Saderat does not contest reasonableness, nor could it. Bank Saderat, a UK corporation, has demonstrated that it can litigate this case through its U.S. counsel, especially given "the conveniences of modern communication and transportation." *See id.* at *20 (quoting *Licci IV*, 732 F.3d at 174). Further, New York and the U.S. have a clear "interest in monitoring banks and banking activity to ensure that its system is not used as an instrument in support of terrorism." *Id.*

Lastly, this Court stated, "although not a controlling factor, it is appropriate to consider the federal policy underlying Congress' enactment of the ATA." *Id.* This Court found, *before* the passage of JASTA, that "the legislative history and the express language of the ATA [provide] a clear statutory objective 'to give American nationals broad remedies in a procedurally privileged U.S. forum.'" *Id.* (quoting *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 422 (E.D.N.Y. 2009)). JASTA reaffirms this policy, stating:

> The purpose of this Act is to provide civil litigants with the **broadest possible basis**, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, **wherever acting and wherever they may be found**, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

JASTA §2(b) ("Purpose") (emphasis added). Likewise, Congress's finding in JASTA §2(a)(7) states:

> The United States has a vital interest in providing persons and entities injured as a result of terrorist attacks committed within the United States with full access to the court system

in order to pursue civil claims against persons, entities, or countries that have knowingly or recklessly provided material support or resources, directly or indirectly, to the persons or organizations responsible for their injuries.

In sum, this Court has personal jurisdiction over Bank Saderat under C.P.L.R. §§301(a)(1) and (2) and Rule 4(k)(2).

**B.  This Court Has Pendent Personal Jurisdiction Over Plaintiffs' Sixth Claim for Relief (Commerzbank).**

Commerzbank does not contest that this Court has personal jurisdiction over Plaintiffs' conspiracy-based claims against it, but contends that its transfers to the Martyrs Foundation in Lebanon were unrelated to the Conspiracy. *See* SAC ¶¶1039-1040; CB Mem. at 10. However, even if that were correct – and at the pleading stage it is impossible for the Court to so determine – this Court can exercise *pendent* personal jurisdiction over it for the Sixth Claim even absent specific allegations that the transfers to the Martyrs Foundation were routed through the United States.

As this Court has stated, pendent personal jurisdiction is available for a claim that "arises from the same common nucleus of fact as another claim for which the court properly has jurisdiction over the defendant." *Strauss*, at *20. While Commerzbank's specific transactions on behalf of Bank Saderat, IRISL and the Waisenkinderprojekt vary from one another, Commerzbank's conduct arises from a common nucleus of operative facts: *i.e.,* ATA claims predicated on Defendant providing material support to Iran and its agents during the same time period.[78]

Although this Court did not make a determination as to pendent personal jurisdiction in *Strauss* – having found personal jurisdiction over all of plaintiffs' claims – it did note that in the

---

[78]     In *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 (1966) the Supreme Court defined a "common nucleus of operative facts" as a situation where "a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding."

Second Circuit the doctrine "primarily has been embraced to permit the adjudication of pendent *state law* claims" given similar federal claims. *Id.* (Emphasis added.) District and circuit courts in other circuits, however, have also found pendent personal jurisdiction over *federal claims*, in addition to state claims. *See, e.g.*, *Robinson Engineering Co. Pension Plan and Trust v. George*, 223 F.3d 445, 449 (7th Cir. 2000) (holding that once there was personal jurisdiction for Securities Act and Securities Exchange Act claims, court had pendent personal jurisdiction for RICO claims that arose out of the same nucleus of operative facts.).[79] Plaintiffs know of no case to the contrary.[80]

## VII. THE ACT OF WAR DEFENSE DOES NOT APPLY TO THE TERRORIST ATTACKS THAT INJURED PLAINTIFFS.

Having admitted in a prior brief that "remnants [and] insurgents" conducted the attacks at issue in the "aftermath" of "conventional war," BS 5/29/15 Mem. at 11 (ECF No. 89), Saderat now doubles down and incredibly asserts that "military forces" conducted the attacks in a "*declared war*." BS Mem. at 6-7 (emphasis added). This would surely surprise Congress. The

---

[79]    *See also Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180–81 (9th Cir. 2004) ("Pendent personal jurisdiction is typically found where one or more federal claims for which there is nationwide personal jurisdiction are combined in the same suit with one or more state *or federal claims* for which there is not nationwide personal jurisdiction.") (emphasis added); *Alcohol Monitoring Systems, Inc. v. Actsoft, Inc.*, 682 F. Supp. 2d 1237, 1253 (D. Colo. 2010) (noting that "several courts have applied the concept of pendent personal jurisdiction where the additional claim is *a federal claim*" and holding the same) (emphasis added); *Miller Pipeline Corp. v. British Gas plc*, 901 F. Supp. 1416, 1423-24 (S.D. Ind. 1995) (holding that pendent personal jurisdiction can be used to obtain personal jurisdiction over a defendant for related *federal claims*) (emphasis added); *Noble Sec., Inc. v. MIZ Eng'g, Ltd.*, 611 F. Supp. 2d 513, 556 (E.D. Va. 2009) ("the Fourth Circuit has approved the exercise of pendent personal jurisdiction over claims arising from a common nucleus of operative fact, whether the additional claim is a state claim *or a federal claim*") (emphasis added).

[80]    For the reasons set forth above, jurisdictional discovery is not required. However, to the extent the Court believes a more fulsome jurisdictional record is preferable for deciding jurisdiction over the Sixth Claim, Plaintiffs request that the Court afford them the opportunity to conduct limited jurisdictional discovery concerning Waisenkinderprojekt's Commerzbank transactions through the United States. *See Daventree Limited v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 761 (S.D.N.Y. 2004) ("A plaintiff should be provided with ample opportunity to secure and present evidence relevant to the existence of jurisdiction through jurisdictional discovery.") (internal quotation marks and citations omitted). *See also Stratagem Dev. Corp. v. Heron Int'l N.V.*, 153 F.R.D. 535, 547 (S.D.N.Y. 1994) (finding that where plaintiff failed to make a *prima facie* showing of personal jurisdiction, "the Court has discretion to order further discovery on the jurisdictional issue, provided that plaintiffs make a threshold showing of jurisdiction and establish that their position is not frivolous.").

last time it declared war was June 5, 1942. Act of June 5, 1942, ch. 323, 56 Stat. 307 ("Declaring

that a state of war exists" between the U.S. and, respectively, Rumania, Bulgaria, and Hungary).

But Saderat's "declaration" sets the meager standard for accuracy and common sense for

the rest of its act-of-war argument. It asks this court to find that a defendant that is itself a

*designated terrorist* enjoys immunity from liability for *conceded acts of terrorism* under a

congressional act commonly called the *Anti-Terrorism* Act – a result that would "pervert the very

purpose of the ATA," as all but one of the courts that have reached the issue and all of the courts

in this Circuit, including this Circuit's Court of Appeals, have recognized.[81] This Court should

reject this invitation to error.

For purpose of its "facial challenge," Saderat does not dispute that:[82]

- Hezbollah was designated by the United States at all relevant times herein and the
  IRGC's Qods Force was designated for "training, funding, and guid[ing] select

---

[81]     *Weiss v. Arab Bank, PLC*, No. 06 CV 1623(NG)(VVP), 2007 WL 4565060, at *5 (E.D.N.Y. Dec. 21, 2007). *See, e.g., In re Sept. 11 Litig.*, 751 F.3d 86, 93 (2d Cir. 2014) (dictum) *cert. denied sub nom. Cedar & Washington Associates, LLC v. Port Auth. of New York & New Jersey*, 135 S. Ct. 742 (2014); *Gill*, 893 F. Supp. 2d at 517; *Stansell*, 2011 WL 1296881, at *11; *Sokolow v. Palestine Liberation Org.*, 583 F. Supp. 2d 451 (S.D.N.Y. 2008); *Estate of Klieman v. Palestinian Authority*, 424 F. Supp. 2d 153, 166 (D.D.C. 2006); *Morris v. Khadr*, 415 F. Supp. 2d 1323 (D. Utah 2006); *Biton v. The Palestinian Interim Self-Gov't Auth.*, 412 F. Supp. 2d 1 (D.D.C. 2005). A District of Columbia district court applied the defense to the rocket attacks in the Israel-Lebanon War, as discussed below. *Kaplan v. Central Bank of Islamic Republic of Iran*, 961 F. Supp. 2d 185 (D.D.C. 2013). In this Circuit, only *Stutts v. De Dietrich Group*, No. 03-CV-4058 (ILG), 2006 WL 1867060, at *5 (E.D.N.Y. 2006), has applied the exception, but it did so with respect to injuries arising from the destruction of leftover chemical stockpiles by Coalition Forces in the 1991 Persian Gulf War that were not perpetrated or orchestrated by any terrorist group. *See* the discussion of *Stutts*, *supra* at III.B.4.a.

[82]     Saderat grudgingly concedes that it is making only a "facial challenge" and that "all inferences are drawn in the plaintiffs' favor." BS Mem. at 6. Nevertheless, it asserts that "many" courts (now backing away from its prior claim that "[m]ost courts," "the majority," (BS 5/29/16 Mem. at 4, 6)) have treated the act of war defense as jurisdictional. BS Mem. at 4. In fact, four of seven courts to have considered the issue declined to treat it as jurisdictional and two others declined to decide whether it was jurisdictional. *Compare Stansell*, 2011 WL 1296881, at *10-11 (apparently rejecting act of war defense on Rule 12(b)(6) motion); *Stutts*, 2006 WL 1867060, at *5 (ruling on Rule 12(b)(6) motion); *Weiss,* 2007 WL 4565060, at *3 (expressly declining to analyze the motion under Rule 12(b)(1), and treating act of war claim under Rule 12(b)(6); *Gill*, 893 F. Supp. 2d at 508 ("defendant is incorrect insofar as it has argued that the act of war exception ... is jurisdictional. The exception merely provides ATA defendants with an affirmative defense.") (citation omitted); *Kaplan*, 961 F. Supp. 2d at 199-200 (declining to resolve whether the act of war defense is jurisdictional, an affirmative defense, or an element of the claim); *Sokolow*, 583 F. Supp. 2d at 458 (declaring characterization of the legal nature of defendants' [act of war] objections irrelevant" because the alleged terrorist attacks were not acts of war) *with Biton*, 412 F. Supp. 2d at 6-7 (assuming, without discussion, that §2336(a) is jurisdictional); *Klieman*, 424 F. Supp. 2d 153 (same); *Morris*, 415 F. Supp. 2d 1323 (same). Now Saderat concedes what it had claimed was the "majority" rule is "debatable." BS Mem. at 4.

groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians" (SAC ¶¶10, 11, 16, 273, 275-276);

- the attacks in question were acts of international terrorism within the meaning of the ATA (activities involving violent acts that are criminal under U.S. law and appear to be intended to influence the policy of the United States (and Iraq) by coercion) (SAC ¶¶336, 2187, 2198, 2205);

- the attacks were carried out by terrorists, not the armed forces or military forces of recognized governments (SAC ¶332); and

- the attacks violated the laws of armed conflict (SAC ¶¶332, 335).

Saderat's argument therefore hinges on the legal proposition that acts of international terrorism alleged in the Complaint are *also* acts of war within the meaning of ATA §2336(a), giving it a complete defense.

In a decision that Saderat completely ignored in a prior opposition brief, and now buries deep in a three-sentence footnote, BS Mem. at 5, n. 12, the Second Circuit flatly rejected that proposition:

The purpose of the ATA was "[t]o provide a new civil cause of action in Federal law for international terrorism that provides extraterritorial jurisdiction over terrorist acts abroad against United States nationals." H.R. 2222, 102d Cong. (1992). The statutory exception for an act of war defines it as "any act occurring in the course of—(A) declared war; (B) armed conflict, whether or not war has been declared, between two or more nations; or (C) armed conflict between military forces of any origin." 18 U.S.C. §2331(4). *Acts of war, then, are distinguished from acts of terrorism.*

.... [T]he ATA is designed precisely to differentiate between acts of terrorism and acts of war, while CERCLA is silent as to terrorism. Indeed, in the CERCLA context, an event may be both an act of war and an act of terrorism; *under the ATA regime, it may not....*

*In re Sept. 11 Litig.*, 751 F.3d at 93 (emphasis added). Saderat's footnote dismisses this as "dicta not supported by the text of the ATA and not controlling." But the Second Circuit has warned against "cavalierly disregard[ing]" dicta from a higher court, especially when they concern "construction of a statute." *United States v. Bell*, 524 F.2d 202, 206 (2d Cir. 1975). Saderat's

entirely perfunctory dismissal of the Second Circuit's consideration of the ATA's purpose and thrice-repeated differentiation of the ATA's distinction between acts of terrorism and acts of war as "not supported" is cavalier. That court's rejection of the proposition that an act of terrorism may be an act of war – "*under the ATA regime, it may not*" – alone compels the rejection of that proposition here. But even if it did not, the "statutory text, structure, and remedial purposes" of the ATA to which the Court of Appeals looked, *In re Sept. 11 Litig.*, 751 F.3d at 93 ("Given the manifestly distinct statutory text, structure, and remedial purposes of CERCLA and the ATA, we do not construe 'act of war' to have the identical meaning in both statutes"), as well as the ATA's clear legislative history, command the same result.

A.     **Sporadic Terrorist Attacks Are Not an "Armed Conflict" Within the Meaning of the ATA, and There Was No "Armed Conflict" With Iraq or Iran at the Time of the Attacks.**

Saderat argues that the Iraq "War is a Declared War or Armed Conflict," BS Mem. at 6, citing the Authorization for Use of Military Force ("AUMF") Against Iraq Resolution of 2002[83] and noting the U.S. military invasion of Iraq started on March 20, 2003. BS Mem. at 2. But it simply omits the next steps in the relevant chronology, that: President Bush declared on May 1, 2003, that "major combat operations in Iraq have ended;"[84] the Coalition Provisional Authority ("CPA") established as the interim government for Iraq disbanded the Iraqi military forces on May 23, 2003; the U.N. Security Council authorized the post-conflict occupation of Iraq by Coalition Forces in October 2003 to maintain "security and stability"[85] – *all* before the attacks at issue in this case; and the CPA transferred sovereignty to Iraqi authorities on June 28, 2004,

---

[83]     Pub. L. No. 107-243, 116 Stat. 1498 (Oct. 16, 2002) (emphasis added).

[84]     *President Bush Announces Major Combat Operations in Iraq Have Ended* (May 1, 2003), available at http://georgewbush-whitehouse.archives.gov/news/releases/2003/05/20030501-15.html.

[85]     S.C. Res. 1511, para. 13, U.N. Doc. S/RES/1511 (Oct. 16, 2003).

shortly after the first attack but before the rest, pursuant to a U.N. Security Council Resolution that expressly assigned the remaining Coalition Forces the task of helping Iraq *"by preventing and deterring terrorism."*[86] In short, the armed conflict with Iraq ended well before any of the acts of terrorism at issue in this case, and the United States remained, first as an occupying authority, and then as support for the Iraqi government, in substantial part to prevent and deter terrorism. Furthermore, Saderat's reliance on the AUMF Against Iraq Resolution of 2002 simply underscores that Congress never authorized the use of military force against – and the United States has never been in an "armed conflict" with – Iran.

Notwithstanding Saderat's repeated invocation of *Kaplan v. Central Bank of Iran*, 961 F. Supp. 2d 185 (D.D.C. 2013), calling acts of terrorism occurring over the course of many years an "armed conflict" does not make it one. Indeed, as noted above, Saderat itself tellingly referred in a prior brief to *"clashes* of remnants, insurgents and other 'forces of any origin'" occurring in the *"aftermath"* of "conventional war." BS 5/29/15 Mem. at 11 (emphasis added). While Plaintiffs agree with Judge Hellerstein's analysis in *Lelchook v. Commerzbank* that *Kaplan* misconstrued §2336,[87] its analysis on its own terms does not apply to the attacks here at issue. It characterized as armed conflict the "temporarily limited, discrete [conflict] waged *between Israel and Lebanon*

---

[86]     S.C. Res. 1546, U.N. Doc. S/RES/1546 (June 7, 2004) ("*Decides* that the multinational force shall have the authority to take all necessary measures to contribute to the maintenance of security and stability in Iraq in accordance with the letters annexed to this resolution expressing, inter alia, the Iraqi request for the continued presence of the multinational force and setting out its tasks, *including by preventing and deterring terrorism* ...."). (Emphasis added.) The Security Council went on to condemn the kind of terrorist acts here at issue. *Id.* ¶10 ("*Condemns* all acts of terrorism in Iraq, *reaffirms* the obligations of Member States under [prior] resolutions ... , and other relevant international obligations with respect, inter alia, to terrorist activities in and from Iraq or against its citizens, and specifically *reiterates* its call upon Member States to prevent the transit of terrorists to and from Iraq, arms for terrorists, and financing that would support terrorists, and *re-emphasizes* the importance of strengthening the cooperation of the countries of the region, particularly neighbours of Iraq, in this regard ...."). *Id.* ¶17 (emphasis in original).

[87]     *Lelchook v. Commerzbank AG*, 10-cv-5795 (S.D.N.Y. 2010). *See* July 18, 2011 Court transcript, Radine Decl. Exhibit J, at 25 (rejecting argument that Hezbollah's launching of rockets during the conflict in Southern Lebanon in 2006 qualified as "acts of war").

over the course of 34 days during the summer of 2006 and provoked by a discrete event," a border crossing that triggered a massive ground invasion by the Israeli armed forces. *Kaplan*, 961 F. Supp. 2d at 203.[88]

The 1991 Persian Gulf War is distinguishable on the same basis as the Israel-Lebanon War. That armed conflict was also authorized by an Authorization for the Use of Military Force *Against Iraq*, Pub. L. No. 102-1, 105 Stat. 3 (Jan. 4, 1991) (emphasis added), and the ensuing armed conflict was between U.S. (and allied) military forces and the Iraqi military forces in a conflict recognized by U.N. Security Council Resolution 678, U.N. Doc. S/RES/678 (Nov. 29, 1990). The Persian Gulf War, also like the Israel-Lebanon War, was a temporally limited, intense, sustained conflict between vast national armed forces that came to a negotiated end. The court in *Stutts* therefore rested its application of the act-of-war defense *exclusively* on the plaintiffs' concession that the acts they complained of "occurred during the '1991 Persian Gulf War.'" 2006 WL 1867060, at *4.[89] Neither *Kaplan* nor *Stutts* carries any precedential value for characterizing acts of sporadic terrorist violence by "remnants and insurgents" that occur *after* major combat operations have ended.

**B.** **Even if the Acts of International Terrorism Did Occur During an Armed Conflict, They Were Not Conducted by "Military Forces" Within the Meaning of the Act-of-War Defense.**

Even if the Court were to hold, as a matter of law, that the acts of international terrorism at issue here occurred in an armed conflict, they were not committed by "military forces" within the meaning of §2336(a) of the ATA. Congress explained that "[t]he intention of this provision is

---

[88]     In contrast, the terrorist attacks on Coalition Forces at issue here occurred *after* the conclusion of major combat operations during and after an occupation, were not between the United States and Iraq or its military forces, and neither occasioned, nor were ever officially characterized as, a conflict with Iran or even with Hezbollah.

[89]     The *Stutts* court overlooked the statutory requirement that the act of war occur "in the course of," and not simply *during*, the war, as further explained below.

to bar actions for injuries that result from military action by recognized governments *as opposed to terrorists*, even though governments also sometimes target civilian populations." H. Rep. 102-1040, at 7 (1992); S. Rep. 102-342 at 46 (1992) (emphasis added). This legislative history shows exactly why the Second Circuit's "dicta" in *In re Sept. 11 Litig.* was both considered and exactly right ("[T]he ATA is designed precisely to differentiate between acts of terrorism and acts of war").

Undeterred by the case law and the clear legislative history, Saderat argues that terrorists are "military forces of any origin" within the definition of §2331(4)(C) and therefore qualify for the act of war defense. *See* BS Mem. at 7. But this phrase only recognizes that a government may conduct military action in an armed conflict not just by its formal "armed forces," but also by "[m]embers of other militias and members of other volunteer groups, including those of organized resistance movements, belonging to a Party to the conflict and operating in and outside their own territory," *provided these kinds of military meet the same conditions as the armed forces of a state* – conditions that distinguish them from civilians and entitle them to combatant immunity. Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949 (Geneva III), art. 4(A)(2). *See Gill*, 893 F. Supp. 2d at 515. In pertinent part, these conditions include:

    (a)    that of having a fixed distinctive sign recognizable at a distance;
    (b)    that of carrying arms openly; and
    (c)    that of conducting their operations in accordance with the laws and customs of war. [Geneva III, art. 4A(2).][90]

Saderat brushes aside this conventional understanding of "military forces" in a footnote

---

[90]    *See also* Protocol Additional to the Geneva Convention of Aug. 12, 1949, and Relating to the Protection of Victims of International Armed Conflicts, June 8, 1977 (Protocol I), art. 44(3) (asserting that even a combatant who cannot distinguish himself must carry arms "openly" during engagements). "Nor are these … criteria unique to [Geneva III]; they are also established under customary international law . . ." followed by the United States. *United States v. Lindh*, 212 F. Supp. 2d 541, 557, nn.34-35 (E.D. Va. 2002) ("all armed forces or militias, regular and irregular, must meet the four criteria if their members are to receive combatant immunity").

erroneously asserting that such requirements relate only "to rights of POWs," before dismissing the laws of war as "not relevant to AOW in the first instance." BS Mem. at 6 n.13. In fact, visibility – distinctive signs, open carrying – and "conducting ... operations in accordance with the laws and customs of war" are requirements not just for POW treatment, but, more importantly, for combatant immunity. *See* Geneva III, art. 87, 99.[91] The act-of-war defense simply and logically tracks that immunity. Furthermore, Saderat again reveals its uncertain command of the applicable body of law when it argues that the act-of-war defense does not incorporate *international* law or law of war. BS Mem. at 8, 11 n. 19. Geneva III is a treaty of the United States and thus part of our domestic law, which Congress must be deemed to know when it enacted the defense, and with which the defense must be interpreted consistently. In fact, the legislative history of the act-of-war provision itself emphasizes that the defense applied only to injuries received in "*open*" armed conflict (and therefore not in surreptitious terrorist attacks) (H. Rep. 102-1040, at 7 (emphasis added)), an unmistakable reference to the basic condition that military forces carry their arms *openly*.

*Gill* therefore rightly concluded that to qualify as a "military force of any origin," for purposes of the act-of-war defense, a group would have to act like the armed forces of a nation by meeting the same conditions. Of course, it is not enough that a force had something resembling military training or functions as a military or paramilitary wing of a terrorist group. *See Weiss*, 2007 WL 4565060, at *6 (allegations that terrorists engage in military or paramilitary activities does not make them a "military force" within the meaning of the ATA); *Morris*, 415 F.

---

[91]     U.S. Dep't of Defense, *Law of War Manual*, §§ 4.4.3.1, 4.4.3.2 (June 2015, updated May 2016) ("[T]he legal immunity that combatants may be afforded is not the same as POW status.... In addition to being associated with humanitarian principles governing the treatment of POWs, the combatant's privilege has also been viewed as an application of the immunity that international law affords States from each other's jurisdiction. In this view, "the act of the soldier *who conforms to the law of war* and does not engage in private acts of warfare is an act of state depriving the enemy state of jurisdiction.") (emphasis added), available at http://www.defense.gov/Portals/1/Documents/DoD_Law_of_War_Manual-June_2015_Updated_May_2016.pdf

Supp. 2d at 1333 (allegation that the group that conducted the terrorist attack received "military" training does not establish that the group operated as a military force).

> Congress, in using that term ["military"], can be said to have designed the statute to contrast the traditional actions of national militaries with those of terrorist groups.... *[A] paramilitary or terrorist group or organization must act as a "military" traditionally (but not universally) does – i.e.*, in substantial conformance with the laws of war, with attacks directed at civilians making up an incidental rather than substantial portion of its activities – to have its challenged conduct qualify for protection pursuant to section 2331(4)(C). [*Gill*, 893 F. Supp. 2d at 515 (emphasis added).][92]

Nor does the ATA remedy exclude those Americans who wore a military uniform in service of their country; it runs to "*any* national of the United States" injured by an act of international terrorism. 18 U.S.C. §2333(a) (emphasis added). In fact, in *Morris*, the plaintiff was a U.S. soldier attacked by a member of al Qaeda during combat in the armed conflict in Afghanistan after 9/11 (an armed conflict authorized by an AUMF expressly naming al Qaeda as the enemy), yet the court had no difficulty finding that terrorist acts by organized groups like al Qaeda were not acts of war within the meaning of the ATA, noting that terrorists are defined as groups that systematically use violence to coerce. 415 F. Supp. 2d at 1333-34. It is unclear how the *Morris opinion's* age (2006) somehow gives it "little persuasive value," BS Mem. at 11 n.20, when the act-of-war defense has remained unchanged since its enactment.

Saderat also breathlessly asserts that excluding terrorists from "military forces" for purposes of the act-of-war defense would make armed conflicts "a virtually unlimited source of claims from soldiers." BS Mem. at 12. But excluding terrorists, as Congress intended, still preserves the act-of-war defense for acts of violence committed by the armed forces of states and

---

[92]    Saderat cites *Sokolow*, 583 F. Supp. 2d at 459, to argue that the situs or target of the attack is dispositive in characterizing the attacker as a "military force." BS Mem. at 11. But *Sokolow* never held that either factor was dispositive, nor could it, consistent with the statute. The act-of-war definition describes the *actor*, not the target, and a terrorist group that targets soldiers – even in the middle of an armed conflict – does not thereby become a "military force."

the militias (or other forces of any origin) that fight openly and conduct their operations like those armed forces (even when they also inflict collateral civilian casualties in accordance with the law-of-war principle of proportionality). This covers the vast majority of the hostilities by contending forces in armed conflict that inflict injuries on soldiers, but does not extend to acts of terrorism committed by terrorist organizations.[93] This was one reason that the court in *Weiss*, 2007 WL 4565060 at *5 held that designated terrorist organizations cannot constitute a "military force of any origin" within the meaning of the act-of-war defense.

The attacks at issue here were all orchestrated and/or committed by U.S.-designated terrorists or their proxies – the U.S.-designated FTO Hezbollah, the U.S.-designated SDGT IRGC-Qods Force, and their proxies in Iraq (including the U.S.-designated FTO Kata'ib Hezbollah (SAC ¶304)). Neither Hezbollah nor Iran's other proxies acted like a military force within the meaning of the ATA. They did not carry arms openly. SAC ¶332. They did not distinguish themselves from civilians (SAC ¶332) – indeed, the only uniforms they wore were stolen U.S. military uniforms (SAC ¶1044), in blatant violation of Protocol I, art. 37 (prohibiting perfidy). The injuries they inflicted were not the result of "open" armed conflict. They murdered defenseless U.S. prisoners (SAC ¶¶335, 1052) and a journalist. SAC ¶¶1232-1234. And a

---

[93]  Saderat warns that the "extraterritorial ATA" must be "cabined" and that there is "a particular reason for caution in interpreting AOW," emphasizing that application of U.S. law extraterritorially "can produce 'international discord.'" BS Mem. at 12, n. 21. Remarkably, for the second time, Saderat fails to acknowledge, much less distinguish, the contrary holding of this Circuit's Court of Appeals *on this precise point*, even after Plaintiffs brought it to their attention in their prior opposition brief. In *Weiss v. National Westminster Bank*, *PLC*, 768 F.3d 202 (2d Cir. 2014), the Court of Appeals held not only that Congress had clearly expressed its intention for the ATA civil remedy to apply extraterritorially, but also that it intended it to apply "regardless of the views and laws of other nations." *Id*. at 207 n. 5, 208. It's one thing to cavalierly dismiss (without explanation) considered dicta of the higher court as "not supported," BS Mem. at 5 n.12, but quite another to assert a proposition expressly rejected by its holding. In accordance with the *Weiss* Court's reasoning for that holding, any "caution in interpreting the act of war limitation" must be exercised to avoid applying it in ways that immunize designated terrorists and their proxies for conceded acts of international terrorism. As Congress affirmed in JASTA §2(b), the ATA's purpose is: "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States."

substantial additional objective of these terrorists was also to intentionally target and attack civilians, as the U.S. government has repeatedly found. SAC ¶¶16, 27, 35, 36, 257, 265, 273-278, 305, 308, 323, 335, 350-351, 419-420. By failing to differentiate themselves from civilians, to carry arms openly, or to refrain from targeting civilians, Hezbollah, the IRGC, and their proxies failed to conduct themselves like "military forces," making their acts criminal acts of international terrorism, as this Circuit has explicitly found in another context. *See Pan American World Airways, Inc. v. Aetna Cas. & Surety Co.*, 505 F.2d 989, 1015 (2d Cir. 1974) ("The loss of Pan American 747 [by a terrorist hijacking] was not caused by an act that is recognized as a warlike act. The hijackers did not wear insignia. They did not openly carry arms. Their acts had criminal rather than military overtones.").

The collection of sectarian killers described in the Complaint (and originally described by Saderat itself as "remnants and insurgents") "may be prosecuted legally as criminals for bearing arms against the government and for other offenses …," as our own military recognized during and after the occupation of Iraq. *Counterinsurgency*, FM 3-24 (Dec. 2006) App. D at D-15.[94] This Court should not accord them a status that our own government refuses them. *Id.* ("Insurgents have no special status under international law.").[95] *Morris* therefore correctly held that Khadr's acts in attacking U.S. soldiers were not acts of war and that al Qaeda was not a military force within the meaning of the ATA. 415 F. Supp. 2d at 1333-34. Neither were the FTOs and SDGTs and their proxies who orchestrated the IED and EFP attacks alleged here.

---

[94]    http://usacac.army.mil/cac2/Repository/Materials/COIN-FM3-24.pdf (last accessed July 10, 2015).

[95]    The United States charged Omar Khadr, an al Qaeda member who attacked U.S. soldiers during armed conflict in Afghanistan, with "Murder by an Unprivileged Belligerent for "attempt[ing] to murder diverse persons, while in the context of and associated with armed conflict and without enjoying combatant immunity, by converting land mines to improvised explosive devices and planting said improvised explosive devices in the ground where, based on previous surveillance, U.S. troops were expected to be traveling." Khadr's planting of IEDs against U.S. troops was essentially the same act involved in the majority of the attacks here at issue. *See* Charge 2, *United States v. Khadr,* http://www.defense.gov/news/Nov2005/d20051104khadr.pdf (last accessed July 9, 2015).

In *Lindh*, the court noted that "[i]t would be absurd for members of [a force] to enjoy lawful combatant immunity even though the force had no established command structure and its members wore no recognizable symbol or insignia, concealed their weapons, and did not abide by the customary laws of war." 212 F. Supp. 2d at 557, n.35. So, too, it would be absurd to claim that Hezbollah and Iran's other proxies*, including groups the United States government has formally designated as terrorists*, qualify as "military forces" entitled to act-of-war immunity even though they wore no recognizable insignia, concealed their weapons, did not fight openly, planted explosive devices, murdered their prisoners, and generally did not abide by the laws of armed conflict, and would therefore not be entitled to combatant immunity.

## C.     The Attacks Were Not Committed "in the Course of" an Armed Conflict.

The foregoing construction of "military forces" is reinforced by the restrictive statutory definitional phrase, "in the course of." 18 U.S.C. §2331(4). *Stutts*, on which Saderat chiefly and repeatedly relies (BS Mem. *passim*), asserted that the plaintiffs' allegation that the unlawful acts "occurred *during* the '1991 Persian Gulf War' put this case squarely within the exemption under §2336 for 'acts of war.'" 2006 WL 1867060, at *4 (emphasis added). This assertion – which constituted the entirety of the court's analysis for this conclusion – did not reflect the ATA's actual language. An act of war under §2332d is not any act "occurring *during*" armed conflict between military forces. It is only an act "occurring *in the course*" of such conflicts. 18 U.S.C. §2331(4) (emphasis added). "In the course of" is a restrictive phrase, a "gatekeeper" phrase, that "exclude[s] from the scope of a statutory provision a subset of conduct that, by its nature and substance, deviates from or is not sufficiently related to a general set of conduct otherwise governed by the provision." *Klieman*, 424 F. Supp. 2d at 164. *Accord, Biton*, 412 F. Supp. 2d at 7-9 (collecting cases). Saderat completely ignores this limitation. BS Mem. at 9 (asserting, like

the plaintiffs in *Stutts*, that the injuries there occurred "*during* the Gulf War").

Conduct which violates the laws of armed conflict deviates from normal or ordinary acts of war that would entitle the actor to combatant immunity. Therefore, "[a]s a matter of law, an act that violates established norms of warfare and armed conflict under international law is not an act occurring in the course of armed conflict." *Klieman*, 424 F. Supp. 2d at 166.[96] Crimes committed in wartime – even crimes against soldiers – do not qualify as "acts of war" just because of their timing; an "act of war" must be committed "in the course of" the armed conflict, and then only by military forces acting like the armed forces of the contending parties. The terrorist attacks here committed by what Saderat itself once called "remnants and insurgents" in the "aftermath" of armed conflict were merely non-qualifying criminal acts of terrorism.

To apply the act of war defense to acts of international terrorism perpetrated by designated terrorists would be perverse. It would "pervert the very purpose of the ATA, which was enacted to deter terrorist activity and hold liable those who engage in it." *Weiss*, 2007 WL 4565060 at *5. *Accord*, *Stansell*, 2011 WL 1296881, at *11 ("To find that a terrorist organization can be a military force under the ATA would defeat the purpose of the Act...."). As the Supreme Court has reminded us, "'[w]e cannot interpret federal statutes to negate their own stated purposes;'" "we must read the words 'in their context and with a view to their place in the overall statutory scheme.' Our duty, after all, is 'to construe statutes, not isolated provisions.'" *King*, 135 S. Ct. 2480, 2489, 2493 (2015) (citations omitted). Section 2336 must be construed in the context of a statutory scheme that imposes liability for acts of international terrorism, exactly

---

[96]     *Gill* found that this was a "powerful" argument, but rejected the act-of-war defense on related, but slightly different, grounds because of a concern about incorporating laws of armed conflict. 893 F. Supp. 2d at 514. As noted above, however, the laws set out by Geneva III are not incorporated in this sense; they *are* U.S. law under the Supremacy Clause. The point, moreover, is not whether Congress incorporated such laws wholesale as a standard of conduct or whether the court need do so. Rather, it is that to decide what Congress understood by terms of art such as "military forces" and "course of war," it is appropriate to consider their contemporaneous meaning in the Geneva III treaty and customary laws that the U.S. follows, with which Congress may be presumed to be familiar.

as the Court of Appeals construed it in *In re Sept. 11 Litig.*, 751 F.3d at 93, not construed in isolation to place terrorist acts that happen to murder our soldiers beyond the law's reach.

## CONCLUSION

For all of the foregoing reasons, the Court should deny Defendants' motions to dismiss and give Plaintiffs the chance to prove their claims. Defendants may be "too big to jail," but they must remain answerable to their victims – as Congress intended and the law provides.


Dated: October 11, 2016
      Hackensack, NJ                               Respectfully submitted,

                                         OSEN LLC

By:    /s/ Gary M. Osen
       Gary M. Osen
       Ari Ungar
       Peter Raven-Hansen, Of Counsel
       Michael J. Radine
       William A. Friedman
       2 University Plaza, Suite 402
       Hackensack, NJ 07601
       (201) 265 6400
       (201) 265 0303 Fax

       TURNER & ASSOCIATES, P.A.
       C. Tab Turner
       4705 Somers Avenue, Suite 100
       North Little Rock, AR 72116
       (501) 791-2277

       Attorneys for Plaintiffs