# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

     -against-                  Cr. No. 12-763

HSBC BANK USA, N.A. and
HSBC HOLDINGS PLC,

              Defendants.

- - - - - - - - - - - - - - - -X

## DEFERRED PROSECUTION AGREEMENT

Defendant HSBC Bank USA, N.A., a federally chartered banking institution and subsidiary of HSBC North America Holdings, Inc., and defendant HSBC Holdings plc, a financial institution holding company organized under the laws of England and Wales (collectively, "the HSBC Parties"), by their undersigned representatives, pursuant to authority granted by the HSBC Parties' Boards of Directors, and the United States Department of Justice, Criminal Division, Asset Forfeiture and Money Laundering Section, the United States Attorney's Office for the Eastern District of New York, and the United States Attorney's Office for the Northern District of West Virginia (collectively, the "Department"), enter into this deferred prosecution agreement (the "Agreement"). The terms and conditions of this Agreement are as follows:

## Criminal Information and Acceptance of Responsibility

1.    The HSBC Parties acknowledge and agree that the
Department will file the attached four-count criminal Information
in the United States District Court for the Eastern District of
New York ("the Court") charging the HSBC Parties with (a) wilfully
failing to maintain an effective anti-money laundering program,
in violation of Title 31, United States Code, Section 5318(h) and
regulations issued thereunder; (b) wilfully failing to conduct and
maintain due diligence on correspondent bank accounts held on
behalf of foreign persons, in violation of Title 31, United States
Code, Section 5318(i) and regulations issued thereunder; (c)
wilfully violating and attempting to violate the Trading with the
Enemy Act, Title 50 United States Code Appendix Sections 3, 5, 16,
and regulations issued thereunder; and (d) wilfully violating and
attempting to violate the International Emergency Economic Powers
Act, Title 50 United States Code Sections 1702 and 1705, and
regulations issued thereunder. In so doing, the HSBC Parties: (a)
knowingly waive their right to indictment on this charge, as well
as all rights to a speedy trial pursuant to the Sixth Amendment
to the United States Constitution, Title 18, United States Code,
Section 3161, and Federal Rule of Criminal Procedure 48(b); and
(b) knowingly waive for purposes of this Agreement any objection

2

with respect to venue and consent to the filing of the Information, as provided under the terms of this Agreement.

   2.    The HSBC Parties admit, accept and acknowledge that they are responsible for the acts of their officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts attached hereto as Attachment A and incorporated by reference into this Agreement, and that the allegations described in the Information and the facts described in Attachment A are true and accurate. Should the Department pursue the prosecution that is deferred by this Agreement, the HSBC Parties agree that they will neither contest the admissibility of nor contradict the Statement of Facts in any such proceeding, including any guilty plea or sentencing proceeding. Neither this Agreement nor the criminal Information is a final adjudication of the matters addressed in such documents.

## Term of the Agreement

   3.    This Agreement is effective for a period beginning on the date on which the Information is filed and ending five (5) years from that date (the "Term"). However, the HSBC Parties agree that, in the event the Department determines, in its sole discretion, that the HSBC Parties have knowingly violated any provision of this Agreement, an extension or extensions of the Term of the Agreement may be imposed by the Department, in its sole discretion, for up

3

to a total additional period of one year, without prejudice to the
Department's right to proceed as provided in Paragraphs 16 through
19 below. Any extension of the Agreement extends all terms of this
Agreement for an equivalent period. Conversely, in the event the
Department finds, in its sole discretion, that the provisions of
this Agreement have been satisfied, the Term of the Agreement may
be terminated early.

### Relevant Considerations

4.    The Department enters into this Agreement based on the
individual facts and circumstances presented by this case.
Among the facts considered were the following:  (a) the HSBC
Parties' willingness to acknowledge and accept responsibility for
the actions of their officers, directors, employees, and agents
as charged in the Information and as set forth in the Statement
of Facts; (b) the HSBC Parties' extensive remedial actions taken
to date, which are described in the Statement of Facts and
Paragraph 5 below; (c) the HSBC Parties' agreement to continue
to enhance their anti-money laundering programs; (d) the HSBC
Parties' agreement to continue to cooperate with the Department
in any ongoing investigation of the conduct of the HSBC Parties
and their current or former officers, directors, employees,
agents and consultants, as provided in Paragraph 6 below; (e) the
HSBC Parties' willingness to settle any and all civil and criminal

4

claims currently held by the Department for any act within the scope of the Statement of Facts; and (f) the HSBC Parties' cooperation with the Department, including conducting multiple extensive internal investigations, voluntarily making U.S. and foreign employees available for interviews, and collecting, analyzing, and organizing voluminous evidence and information for the Department.

5.    The HSBC Parties have taken, will take, and/or shall continue to adhere to, the following remedial measures:

> a. HSBC North America has a new leadership team, including a new Chief Executive Officer, General Counsel, Chief Compliance Officer, AML Director, Deputy Chief Compliance Officer and Deputy Director of its Global Sanctions program.
>
> b. As a result of its AML violations and program deficiencies, HSBC North America and HSBC Bank USA "clawed back" deferred compensation (bonuses) for a number of their most senior AML and compliance officers, to include the Chief Compliance Officer, AML Director and Chief Executive Officer.
>
> c. In 2011, HSBC Bank USA spent $244 million on AML, approximately nine times more than what it spent in 2009.
>
> d. In particular, HSBC Bank USA has increased its AML staffing from 92 full time employees and 25 consultants as of January 2010 to approximately 880 full time employees and 267 consultants as of May 2012.
>
> e. HSBC Bank USA has reorganized its AML department to strengthen its reporting lines and elevate its status

within the institution as a whole by (i) separating the Legal and Compliance departments; (ii) requiring that the AML Director report directly to the Chief Compliance Officer; and (iii) providing that the AML Director regularly report directly to the Board and senior management about HSBC Bank USA's Bank Secrecy Act ("BSA") and anti-money laundering ("AML") program.

f. HSBC Bank USA has revamped its KYC program and now treats HSBC Group Affiliates as third parties that are subject to the same due diligence as all other customers.

g. HSBC Bank USA has implemented a new customer risk-rating methodology based on a multifaceted approach that weighs the following factors: (1) the country where the customer is located, (2) the products and services utilized by the customer, (3) the customer's legal entity structure, and (4) the customer and business type.

h. HSBC Bank USA has exited 109 correspondent relationships for risk reasons.

i. HSBC Bank USA has a new automated monitoring system. The new system monitors every wire transaction that moves through HSBC Bank USA. The system also tracks the originator, sender and beneficiary of a wire transfer, allowing HSBC Bank USA to look at its customer's customer.

j. HSBC Bank USA has made significant progress in remediating all customer KYC files in order to ensure they adhere to the new AML policies discussed above and plans to have completed remediation of 155,554 customers by December 2012.

k. HSBC Bank USA has exited the Banknotes business.

l. HSBC Bank USA has spent over $290 million on remedial measures.

6

m. HSBC Holdings also has a new leadership team, including a new CEO, Chairman, Chief Legal Officer and Head of Global Standards Assurance.

n. HSBC Group has simplified its control structure so that the entire organization is aligned around 4 global businesses, 5 regional geographies, and 10 global functions. This allows HSBC Group to better manage its business and communication, and better understand and address risks worldwide.

o. Since January 2011, HSBC Group has begun to apply a more consistent global risk appetite and as a result has sold 42 businesses and withdrawn from 9 countries.

p. HSBC Group has undertaken to implement single global standards shaped by the highest or most effective anti-money laundering standards available in any location where the HSBC Group operates. This new policy will require that all HSBC Group Affiliates will, at a minimum, adhere to U.S. anti-money laundering standards.

q. HSBC Group has elevated the Head of HSBC Group Compliance position to a Group General Manager, which is one of the 50 most senior employees at HSBC globally. HSBC Group has also replaced the individual serving as Head of HSBC Group Compliance.

r. The Head of HSBC Group Compliance has been given direct oversight over every compliance officer globally, so that both accountability and escalation now flow directly to and from HSBC Group Compliance.

s. Eighteen of the top twenty-one most senior officers at HSBC Group are new in post since the beginning of 2011.

t. Material or systemic AML control weaknesses at any affiliate that are reported by the Regional and Global Business Compliance heads are now shared with all other

7

Regional and Global Business Compliance heads facilitating horizontal information sharing.

u. The senior leadership team that attends HSBC Group Management Board meetings is collectively and individually responsible for reviewing all of the information presented at the meeting, as well as all written documentation provided in advance of the meeting, and determining whether it affects their respective entity or region. In addition, if an executive believes that something occurring within his or her area of responsibility affects another business or affiliate within HSBC Group, it is that executive's responsibility to seek out the executives from that business or affiliate and work to address the issue.

v. HSBC Group has restructured its senior executive bonus system so that the extent to which the senior executive meets compliance standards and values has a significant impact on the amount of the senior executive's bonus, and failure to meet those compliance standards and values could result in the voiding of the senior executive's entire year-end bonus.

w. HSBC Group has commenced a review of all customer KYC files across the entire Group. The first phase of this remediation will cost an estimated $700 million to complete over five years.

x. HSBC Group will defer a portion of the bonus compensation for its most senior officers, namely its Group General Managers and Group Managing Directors, during the pendency of the deferred prosecution agreement, subject to EU and UK legal and regulatory requirements.

y. HSBC Group has adopted a set of guidelines to be taken into account when considering whether HSBC Group should do business in countries posing a particularly high corruption/rule of law risk as well as limiting

8

business in those countries that pose a high financial
crime risk.

z. Under HSBC Group's new global sanctions policy, HSBC
Group will be utilizing key Office of Foreign Assets
Control ("OFAC") and other sanctions lists to conduct
screening in all jurisdictions, in all currencies.

Upon the application of the HSBC Parties, the Corporate
Compliance Monitor (discussed infra at paragraphs 9-13) may modify,
adjust, or discontinue any remedial or compliance measure listed
in this Agreement if the Monitor finds that continuation of the
measure is impractical, inconsistent with any recommendation of the
Monitor, or inadvisable for any other reason, subject to Department
approval.

## Cooperation

6. The HSBC Parties shall continue to cooperate fully with
the Department in any and all investigations, subject to applicable
laws and regulations and the attorney-client and attorney work
product privileges. At the request of the Department, the HSBC
Parties shall also cooperate fully with other domestic or foreign
law enforcement authorities and agencies in any investigation of
the HSBC Parties or any of their present and former officers,
directors, employees, agents and consultants, or any other party.
The HSBC Parties also agree that they shall:

a. Use their good faith efforts to make available, at their cost, the HSBC Parties' current and former officers, directors, employees, agents and consultants, when requested by the Department, to provide additional information and materials concerning any and all investigation; to testify, including providing sworn testimony before a grand jury or in a judicial proceeding; and to be interviewed by law enforcement authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the HSBC Parties, may have material information regarding these matters;

b. Provide any information, materials, documents, databases, or transaction data in the HSBC Parties' possession, custody, or control, or in the possession custody or control of any affiliate, wherever located, requested by the Department in connection with the investigation or prosecution of any current or former officers, directors, employees, agents and consultants;

c. Continue to abide by the terms of the "Consent Cease and Desist Order" entered with the Board of Governors of the Federal Reserve System, dated October 4, 2010;

d. Continue to abide by the terms of the "Consent Cease and Desist Order" entered with the Office of the Comptroller of the Currency ("OCC"), dated October 6, 2010;

e. Abide by the terms of the "Consent Cease and Desist Order" entered with the Board of Governors of the Federal Reserve System, dated December 11, 2012;

f. Continue to apply the OFAC sanctions list to the same extent as any United Nations or European Union sanctions or freeze lists to United States Dollar ("USD") transactions, the acceptance of customers, and all USD cross-border Society for Worldwide Interbank

Financial Telecommunications ("SWIFT") incoming and outgoing messages involving payment instructions or electronic transfer of funds;

g. Except as otherwise permitted by United States law, not knowingly undertake any USD cross-border electronic funds transfer or any other USD transaction for, on behalf of, or in relation to any person or entity resident or operating in, or the governments of, Iran, North Korea, Sudan (except for those regions and activities exempted from the United States embargo by Executive Order No. 13412), Syria or Cuba;

h. Implement compliance procedures and training designed to ensure that the HSBC Parties' compliance officer in charge of sanctions is made aware in a timely manner of any known requests or attempts by any entity (including, but not limited to, the HSBC Parties' customers, financial institutions, companies, organizations, groups, or persons) to withhold or alter its name or other identifying information where the request or attempt appears to be related to circumventing or evading U.S. sanctions laws. The HSBC Parties' Head of Compliance, or his or her designee, shall report to the Department, in a timely manner, the name and contact information, if available to the HSBC Parties, of any entity that makes such a request;

i. Maintain the electronic database of SWIFT Message Transfer payment messages and all documents and materials produced by the HSBC Parties to the Department as part of this investigation relating to USD payments processed during the period from 2001 through 2007 in electronic format for a period of five years from the date of this Agreement;

j. Notify the Department of any criminal, civil, administrative or regulatory investigation or action of the Bank or its current directors, officers, employees, consultants, representatives, and agents

11

related to the HSBC Parties' compliance with U.S. sanctions laws, the HSBC Parties' involvement in money laundering, or the HSBC Parties' anti-money laundering program;

k. Provide information, materials, and testimony as necessary or requested to identify or to establish the original location, authenticity, or other basis for admission into evidence of documents or physical evidence in any criminal or judicial proceeding; and

l. Develop and implement policies and procedures for mergers and acquisitions requiring that the HSBC Parties conduct appropriate risk-based due diligence on potential new business entities, including appropriate BSA and anti-money laundering due diligence by legal, audit, and compliance personnel. If the HSBC Parties discover inadequate anti-money laundering controls as part of their due diligence of newly acquired entities or entities merged with the HSBC Parties, it shall report such conduct to the Department as required in Attachment B to this Agreement.

### Forfeiture Amount

7.   As a result of the HSBC Parties' conduct, including the conduct set forth in the Statement of Facts, the parties agree the Department could institute a civil and/or criminal forfeiture action against certain funds held by the HSBC Parties and that such funds would be forfeitable pursuant to Title 18, United States Code, Sections 981 and 982. The HSBC Parties hereby acknowledge that at least $881,000,000 was involved in transactions, in violation of Title 18, United States Code,

12

Sections 1956 and 1957; and that at least $375,000,000 was

involved in transactions in violation of Title 50, United States

Code, Appendix, Sections 3, 5 and 16 and the regulations issued

thereunder, or Title 50, United States Code, Section 1705 and the

regulations issued thereunder. In lieu of a criminal prosecution

and related forfeiture, the HSBC Parties hereby agree to pay to

the United States the sum of $1,256,000,000 (the "Forfeiture

Amount"). The HSBC Parties hereby agree the Forfeiture Amount

shall be considered substitute *res* for the purpose of forfeiture

to the United States pursuant to Title 18, United States Code,

Sections 981 and 982, and the HSBC Parties release any and all

claims they may have to such funds. The HSBC Parties shall pay

the Forfeiture Amount plus any associated transfer fees within

five (5) business days of the date on which this Agreement is

signed, pursuant to payment instructions as directed by the

Department in its sole discretion.

### Conditional Release from Liability

8.     In return for the full and truthful cooperation of the

HSBC Parties, and their compliance with the other terms and

conditions of this Agreement, the Department agrees, subject to

Paragraphs 16 through 19 below, not to use any information related

to the conduct described in the attached Statement of Facts against

the HSBC Parties or any of their corporate parents, subsidiaries,

13

affiliates, predecessors, successors or assigns, in any criminal

or civil case, except: (a) in a prosecution for perjury or

obstruction of justice; or (b) in a prosecution for making a false

statement. In addition, the Department agrees, except as provided

herein, that it will not bring any criminal case against the HSBC

Parties or any of their corporate parents, subsidiaries,

affiliates, predecessors, successors or assigns, related to the

conduct described in the attached Statement of Facts and the

Information.

> a. This Paragraph does not provide protection against
> prosecution for conduct not disclosed by the HSBC
> Parties to the Department prior to the date on which
> this Agreement was signed, nor does it provide
> protection against prosecution for any future
> involvement by the HSBC Parties in criminal activity,
> including any future involvement in money laundering
> or any future failure to maintain an effective
> anti-money laundering program.

> b. In addition, this Paragraph does not provide any
> protection against prosecution of any present or former
> officers, directors, employees, agents and consultants
> of the HSBC Parties for any violations committed by
> them, including any conduct described in the Statement
> of Facts or any conduct disclosed to the Department by
> the HSBC Parties.

> c. Finally, other than transactions during the period set
> forth in the Statement of Facts that have already been
> disclosed and documented to the United States, this
> Paragraph does not provide any protection against
> prosecution of the HSBC Parties, or any of their
> affiliates, successors, related companies, employees,

14

officers or directors, who knowingly and wilfully transmitted or approved the transmission of funds that went to or came from persons or entities designated by OFAC at the time of the transaction as Specially Designated Terrorists, Specially Designated Global Terrorists, Foreign Terrorist Organizations, and proliferators of Weapons of Mass Destruction (the "Special SDN Transactions"), including transactions disclosed and documented to the United States that occurred after January 1, 2008. Any prosecution related to the Special SDN Transactions may be premised upon any information provided by or on behalf of the HSBC Parties to the Department or any investigative agencies, whether prior to or subsequent to this Agreement, or any leads derived from such information, including the attached Statement of Facts.

### Corporate Compliance Monitor

9. Within sixty (60) calendar days of the filing of the Agreement and the accompanying Information, or promptly after the Department's selection pursuant to Paragraph 10 below, HSBC Holdings agrees to retain an independent compliance monitor (the "Monitor"). In particular, within thirty (30) calendar days after the execution of this Agreement, and after consultation with the Department, HSBC Holdings will propose to the Department a pool of three qualified candidates to serve as the Monitor. If the Department, in its sole discretion, is not satisfied with the candidates proposed, the Department reserves the right to seek additional nominations from HSBC Holdings. The Monitor candidates shall have, at a minimum, the following qualifications:

a. demonstrated expertise with respect to the BSA and other applicable U.S. and U.K. anti-money laundering laws;

b. experience designing and/or reviewing corporate compliance policies, procedures and internal controls, including BSA and anti-money laundering policies, procedures and internal controls;

c. the ability to access and deploy resources as necessary to discharge the Monitor's duties as described in the Agreement; and

d. sufficient independence from HSBC Holdings to ensure effective and impartial performance of the Monitor's duties as described in the Agreement.

10.    The Department retains the right, in its sole discretion, to accept or reject any Monitor candidate proposed by HSBC Holdings, though HSBC Holdings may express their preference(s) among the candidates.   In the event the Department rejects all proposed Monitors, HSBC Holdings shall propose another candidate within ten (10) calendar days after receiving notice of the rejection. This process shall continue until a Monitor acceptable to both parties is chosen. The Department may also propose the names of qualified Monitor candidates for consideration. The term of the monitorship, as set forth in Attachment B, shall commence upon the Department's acceptance of a Monitor candidate proposed by HSBC Holdings. If the Monitor resigns or is otherwise unable to fulfill his or her obligations as set out herein and Attachment B, HSBC Holdings shall

16

within sixty (60) calendar days recommend a pool of three qualified
Monitor candidates from which the Department will choose a
replacement.

11.   The Monitor will be retained by HSBC Holdings for a period
of not less than sixty (60) months from the date the Monitor is
selected. The term of the monitorship, including the circumstances
that may support an extension of the term, as well as the Monitor's
powers, duties, and responsibilities, will be as set forth in
Attachment B.

12.   HSBC Holdings agrees that it will not employ or be
affiliated with the Monitor for a period of not less than one
year from the date on which the Monitor's term expires.

13.   The Monitor's term shall be five (5) years from the date
on which the Monitor is retained by HSBC Holdings, subject to
extension or early termination as described in Paragraph 3.

### Deferred Prosecution

14.   In consideration of:   (a) the past and future
cooperation of the HSBC Parties described in Paragraph 6 above; (b)
the HSBC Parties' forfeiture, totaling $1,256,000,000; and (c)
the HSBC Parties' implementation and maintenance of remedial
measures described in the Statement of Facts and Paragraph 5 above,
the Department agrees that any prosecution of the HSBC Parties for
conduct set forth in the Information or the attached Statement of

17

Facts, and for the conduct that the HSBC Parties disclosed to the Department prior to the signing of this Agreement, be and hereby is deferred for the Term of this Agreement.

15.    The Department further agrees that if the HSBC Parties fully comply with all of their obligations under this Agreement, the Department will not continue the criminal prosecution against the HSBC Parties described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire. Within thirty (30) days of the Agreement's expiration, the Department shall seek dismissal with prejudice of the criminal Information filed against the HSBC Parties described in Paragraph 1.

## Breach of the Agreement

16.    If, during the Term of this Agreement, the Department determines, in its sole discretion, that the HSBC Parties have (a) committed any crime under U.S. federal law subsequent to the signing of this Agreement, (b) at any time provided in connection with this Agreement deliberately false, incomplete, or misleading information, or (c) otherwise breached the Agreement, the HSBC Parties shall thereafter be subject to prosecution for any federal criminal violation of which the Department has knowledge, including the charges in the Information described in Paragraph 1, which may be pursued by the Department in the United States District Court for the Eastern District of New York or any other appropriate venue.

18

Any such prosecution may be premised on information provided by the HSBC Parties. Any such prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the HSBC Parties notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, the HSBC Parties agree the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year.

17.    In the event the Department determines the HSBC Parties have breached this Agreement, the Department agrees to provide the HSBC Parties with written notice of such breach prior to instituting any prosecution resulting from such breach. The HSBC Parties shall, within thirty (30) days of receipt of such notice, have the opportunity to respond to the Department in writing to explain the nature and circumstances of such breach, as well as the actions the HSBC Parties have taken to address and remediate the situation, which explanation the Department shall consider in determining whether to institute a prosecution.

18.    In the event the Department determines the HSBC Parties have breached this Agreement: (a) all statements made by or on behalf of the HSBC Parties to the Department or to the Court,

19

including the attached Statement of Facts, and any testimony given by the HSBC Parties before a grand jury, a court, or any tribunal, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Department against the HSBC Parties; and (b) the HSBC Parties shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that statements made by or on behalf of the HSBC Parties prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed. The decision whether conduct or statements of any current director or employee, or any person acting on behalf of, or at the direction of, the HSBC Parties will be imputed to the HSBC Parties for the purpose of determining whether the HSBC Parties have violated any provision of this Agreement shall be in the sole discretion of the Department.

19. The HSBC Parties acknowledge the Department has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the HSBC Parties breach this Agreement and this matter proceeds to judgment. The HSBC Parties further acknowledge that any such sentence is solely within the

discretion of the Court and that nothing in this Agreement binds

or restricts the Court in the exercise of such discretion.

### Sale or Merger of HSBC Parties

20.   The HSBC Parties agree that in the event they sell, merge,

or transfer all or substantially all of their business operations

as they exist as of the date of this Agreement, whether such sale

is structured as a sale, asset sale, merger, or transfer, it shall

include in any contract for sale, merger, or transfer a provision

binding the purchaser, or any successor in interest thereto, to the

obligations described in this Agreement.

### Public Statements by HSBC Parties

21.   The HSBC Parties expressly agree that they shall not,

through present or future attorneys, officers, directors,

employees, agents or any other person authorized to speak for the

HSBC Parties make any public statement, in litigation or otherwise,

contradicting the acceptance of responsibility by the HSBC Parties

set forth above or the facts described in the attached Statement

of Facts. Any such contradictory statement shall, subject to cure

rights of the HSBC Parties described below, constitute a breach of

this Agreement, and the HSBC Parties thereafter shall be subject

to prosecution as set forth in Paragraphs 16-19 of this Agreement.

The decision whether any public statement by any such person

contradicting a fact contained in the Statement of Facts will be

imputed to the HSBC Parties for the purpose of determining whether they have breached this Agreement shall be at the sole discretion of the Department. If the Department determines that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Department shall so notify the HSBC Parties, and the HSBC Parties may avoid a breach of this Agreement by publicly repudiating such statement(s) within five (5) business days after notification. The HSBC Parties shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Statement of Facts. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the HSBC Parties in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the HSBC Parties. Subject to this paragraph, the HSBC Parties retain the ability to provide information or take legal positions in litigation or other regulatory proceedings in which the Department or the New York County District Attorney's Office is not a party.

22.    The HSBC Parties agree that if it or any of its direct or indirect subsidiaries or affiliates issues a press release or

22

holds any press conference in connection with this Agreement, the HSBC Parties shall first consult the Department to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Department and the HSBC Parties; and (b) whether the Department has no objection to the release.

23. The Department agrees, if requested to do so, to bring to the attention of governmental and other debarment authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, and the nature and quality of the HSBC Parties' cooperation and remediation. By agreeing to provide this information to debarment authorities, the Department is not agreeing to advocate on behalf of the HSBC Parties, but rather is agreeing to provide facts to be evaluated independently by the debarment authorities.

## Limitations on Binding Effect of Agreement

24. This Agreement is binding on the HSBC Parties and the Department, but specifically does not bind any other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Department will bring the cooperation of the HSBC Parties and their compliance with their other obligations under this Agreement to the attention of such agencies and authorities if requested to do so

23

by the HSBC Parties. Specifically, this Agreement does not bind the Tax Division or the Fraud Section of the Criminal Division of the United States Department of Justice. This Agreement does not bind any affiliates or subsidiaries of HSBC Holdings plc, other than those that are parties to this Agreement, but is binding on HSBC Holdings plc itself. To the extent HSBC Holdings plc's compliance with this Agreement requires it, HSBC Holdings plc agrees to ensure that its wholly-owned subsidiaries, and any successors and assigns, comply with the requirements and obligations set forth in this Agreement, to the full extent permissible under locally applicable laws and regulations, and the instructions of local regulatory agencies.

## Complete Agreement

25. This Agreement sets forth all the terms of the agreement between the HSBC Parties and the Department. No amendments, modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Department, the attorneys for the HSBC Parties and a duly authorized representative of the HSBC Parties.

24

FOR HSBC Bank USA, N.A. and HSBC Holdings plc:

Date: December 10, 2012   By: _____

Stuart A. Alderoty
Senior Executive Vice President
and General Counsel
HSBC Bank USA, N.A.

Date: _____   By: _____

Marc Moses
Group Chief Risk Officer
HSBC Holdings plc

Date: _____   By: _____

David N. Kelley
Anirudh Bansal
Cahill Gordon & Reindel LLP

Date: _____   By: _____

Samuel W. Seymour
Alexander J. Willscher
Sullivan & Cromwell LLP

**FOR HSBC Bank USA, N.A. and HSBC Holdings plc:**

Date:_____ By:  _____
Stuart A. Alderoty
Senior Executive Vice President
and General Counsel
HSBC Bank USA, N.A.

Date: _10 December 2012_ By:  *M. M. Moses*
Marc Moses
Group Chief Risk Officer
HSBC Holdings plc

Date:_____ By:  _____
David N. Kelley
Anirudh Bansal
Cahill Gordon & Reindel LLP

Date:_____ By:  _____
Samuel W. Seymour
Alexander J. Willscher
Sullivan & Cromwell LLP

25

**FOR HSBC Bank USA, N.A. and HSBC Holdings plc:**


Date:_____ By:    _____
                          Stuart A. Alderoty
                          Senior Executive Vice President
                          and General Counsel
                          HSBC Bank USA, N.A.


Date:_____ By:    _____
                          Marc Moses
                          Group Chief Risk Officer
                          HSBC Holdings plc


Date: December 10, 2012 By:   _____
                          David N. Kelley
                          Anirudh Bansal
                          Cahill Gordon & Reindel LLP


Date: December 10, 2012 By:   _____
                          Samuel W. Seymour
                          Alexander J. Willscher
                          Sullivan & Cromwell LLP


25

FOR THE DEPARTMENT OF JUSTICE:

LANNY BREUER
ASSISTANT ATTORNEY GENERAL

LORETTA E. LYNCH
UNITED STATES ATTORNEY
Eastern District of New York

Date: 12/11/2012          BY:

Alexander A. Solomon
Daniel S. Silver
Assistant United States Attorneys

JAIKUMAR RAMASWAMY
Chief, Asset Forfeiture and Money
    Laundering Section Criminal Division
United States Department of Justice

Date: 12/11/2012          BY:

Joseph K. Markel
Craig M. Timm
Trial Attorneys
Asset Forfeiture and Money
Laundering Section

WILLIAM J. IHLENFELD II
UNITED STATES ATTORNEY
Northern District of West Virginia

Date: 12/10/2012          BY:

Michael Stein
Assistant United States Attorney

**BANK OFFICER'S CERTIFICATE**

I have read this Agreement and carefully reviewed every part of it with outside counsel for HSBC Bank USA, N.A. (the "Bank"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Bank, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Bank. Counsel fully advised me of the rights of the Bank, of possible defenses, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of the Bank. I have advised and caused outside counsel for the Bank to advise the Board of Directors fully of the rights of the Bank, of possible defenses, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Bank, in any way to enter into this Agreement.

I am also satisfied with outside counsel's representation in this matter. I certify that I am the Senior Executive Vice President and General Counsel for the Bank and that I have been duly authorized by the Bank to execute this Agreement on behalf of the Bank.

27

Nothing in this Certificate is intended nor shall it be deemed as a waiver by the Bank of the attorney-client privilege or work product protection.

Date: December 10 , 2012

HSBC BANK USA, N.A.

By:  _____

Stuart A. Alderoty
Senior Executive Vice President
and General Counsel
HSBC Bank USA, N.A.

28

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for HSBC Holdings plc (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of the Company. Internal and External counsel have advised the Board of Directors fully of the rights of the Company, of possible defenses, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement.

I am also satisfied with outside counsel's representation in this matter. I certify that I am the Group Chief Risk Officer for the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

29

Nothing in this Certificate is intended nor shall it be deemed as a waiver by the Company of the attorney-client privilege or work product protection.

Date: 10 December , 2012

HSBC Holdings plc

By: *M. M. Moses*

Marc Moses
Group Chief Risk Officer
HSBC Holdings plc

30

**CERTIFICATE OF COUNSEL**

I am counsel for HSBC Bank USA, N.A. and HSBC Holdings plc (collectively, the "Bank") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Bank documents and have discussed the terms of this Agreement with the Bank's Boards of Directors.  Based on our review of the foregoing materials and discussions, I am of the opinion that the representatives of the Bank have been duly authorized to enter into this Agreement on behalf of the Bank and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Bank and is a valid and binding obligation of the Bank.  Further, I have carefully reviewed the terms of this Agreement with the Boards of Directors of the Bank and the Senior Executive Vice President and General Counsel for HSBC Bank USA, N.A., and the Group Chief Risk Officer for HSBC Holdings plc. I have fully advised them of the rights of the Bank, of possible defenses, and of the consequences of entering into this Agreement.  To my knowledge, the decision of the Bank to enter into this Agreement, based on the authorization of the Boards of Directors, is an informed and voluntary one.

Nothing in this Certificate is intended nor shall it be deemed as a waiver by the Bank of the attorney-client privilege or work product protection.

31

Date: December 10 , 2012

By: David N. Kelley
Anirudh Bansal
Cahill Gordon & Reindel LLP
Counsel for HSBC Bank USA, N.A. and HSBC
Holdings plc

By: Samuel W. Seymour
Alexander J. Willscher
Sullivan & Cromwell LLP
Counsel for HSBC Bank USA, N.A. and HSBC
Holdings plc

32

ATTACHMENT A

## **STATEMENT OF FACTS**

1.    The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Asset Forfeiture and Money Laundering Section, the United States Attorney's Office for the Eastern District of New York, and the United States Attorney's Office for the Northern District of West Virginia (collectively, the "Department") and HSBC Bank USA, N.A. ("HSBC Bank USA") and HSBC Holdings plc ("HSBC Holdings"); and as part of a separate Deferred Prosecution Agreement between the New York County District Attorney's Office ("DANY") and HSBC Holdings.

2.    HSBC Bank USA and HSBC Holdings hereby agree and stipulate that the following information is true and accurate.  HSBC Bank USA and HSBC Holdings accept and acknowledge that they are responsible for the acts of their respective officers, directors, employees, and agents as set forth below.  If this matter were to proceed to trial, the Department would prove beyond a reasonable doubt, by admissible evidence, the facts alleged below and set forth in the criminal Information attached to this Agreement.

### Bank Structure

3.    HSBC Bank USA is a federally chartered banking institution and subsidiary of HSBC North America Holdings, Inc. ("HSBC North America").  HSBC North America is an indirect subsidiary of HSBC Holdings.  HSBC Holdings is the ultimate parent company of one of the world's largest banking and financial services groups with approximately 6,900 offices in over 80 countries (collectively, HSBC Holdings and its subsidiaries are the "HSBC Group").  HSBC Group is comprised of  financial institutions throughout the world ("HSBC Group Affiliates") that are owned by various intermediate holding companies and ultimately, but indirectly, by HSBC Holdings, which is incorporated and headquartered in England.  The Department of the Treasury, Office of the Comptroller of the Currency ("OCC") is HSBC Bank USA's primary regulator.

1

Applicable Law

4.    Congress enacted the Bank Secrecy Act, Title 31, United States Code, Section 5311 et seq. (the "BSA"), and its implementing regulations to address an increase in criminal money laundering activity through financial institutions.  Among other things, the BSA requires domestic banks, insured banks, and other financial institutions to maintain programs designed to detect and report suspicious activity that might be indicative of money laundering, terrorist financing, and other financial crimes, and to maintain certain records and file reports related thereto that are especially useful in criminal, tax, or regulatory investigations or proceedings.

5.    Pursuant to Title 31, United States Code, Section 5318(h)(1) and Title 12, Code of Federal Regulations, Section 21.21, HSBC Bank USA was required to establish and maintain an anti-money laundering ("AML") compliance program that, at a minimum, provides for: (a) internal policies, procedures, and controls designed to guard against money laundering; (b) an individual or individuals to coordinate and monitor day-to-day compliance with the BSA and AML requirements; (c) an ongoing employee training program; and (d) an independent audit function to test compliance programs.

6.    Pursuant to Title 31, United States Code, Section 5318(i)(1), banks that manage private banking or correspondent accounts in the United States for non-U.S. persons must establish due diligence, and, in some cases, enhanced due diligence, policies, procedures, and controls that are designed to detect and report suspicious activity related to certain specified accounts.  For foreign correspondent accounts, the implementing regulations require that the due diligence requirements set forth in Section 5318(i)(1) include an assessment of the money laundering risk presented by the account based on all relevant factors, including, as appropriate: (i) the nature of the foreign financial institutions' business and the market it serves; (ii) the type, purpose, and anticipated activity of the account; (iii) the nature and duration of the bank's relationship with the account holder; (iv) the AML and supervisory regime of the jurisdiction issuing the license for the account holder; and (v) information reasonably available about the account holder's AML record.

## Department of Justice Charges

7.    The Department alleges, and HSBC Bank USA admits, that HSBC Bank USA's conduct, as described herein, violated the BSA. Specifically, HSBC Bank USA violated Title 31, United States Code, Section 5318(h)(1), which makes it a crime to willfully fail to establish and maintain an effective AML program, and Title 31, United States Code, Section 5318(i)(1), which makes it a crime to willfully fail to establish due diligence for foreign correspondent accounts.

## Conduct in Violation of the BSA

8.    From 2003 to 2006, HSBC Bank USA operated under a written agreement issued by its regulators.  A written agreement is a formal supervisory action that requires a financial institution to correct operational deficiencies.  The written agreement in this instance required HSBC Bank USA to enhance its AML compliance with the BSA, and specifically required HSBC Bank USA to enhance its customer due diligence or "know your customer" ("KYC") profiles and the monitoring of funds transfers for suspicious or unusual activity.

9.    From 2006 to 2010, HSBC Bank USA violated the BSA and its implementing regulations.  Specifically, HSBC Bank USA ignored the money laundering risks associated with doing business with certain Mexican customers and failed to implement a BSA/AML program that was adequate to monitor suspicious transactions from Mexico.  At the same time, Grupo Financiero HSBC, S.A. de C.V. ("HSBC Mexico"), one of HSBC Bank USA's largest Mexican customers, had its own significant AML problems.  As a result of these concurrent AML failures, at least $881 million in drug trafficking proceeds, including proceeds of drug trafficking by the Sinaloa Cartel in Mexico and the Norte del Valle Cartel in Colombia, were laundered through HSBC Bank USA without being detected.  HSBC Group was aware of the significant AML compliance problems at HSBC Mexico, yet did not inform HSBC Bank USA of these problems and their potential impact on HSBC Bank USA's AML program.

10.   There were at least four significant failures in HSBC Bank USA's AML program that allowed the laundering of drug trafficking proceeds through HSBC Bank USA:

a. Failure to obtain or maintain due diligence or KYC information on HSBC Group Affiliates, including HSBC Mexico;

b. Failure to adequately monitor over $200 trillion in wire transfers between 2006 and 2009 from customers located in countries that HSBC Bank USA classified as "standard" or "medium" risk, including over $670 billion in wire transfers from HSBC Mexico;

c. Failure to adequately monitor billions of dollars in purchases of physical U.S. dollars ("banknotes") between July 2006 and July 2009 from HSBC Group Affiliates, including over $9.4 billion from HSBC Mexico; and

d. Failure to provide adequate staffing and other resources to maintain an effective AML program.

11. On October 6, 2010, both the OCC and the Board of Governors of the Federal Reserve Board issued Cease and Desist Orders to HSBC Bank USA and HSBC North America based on these BSA/AML deficiencies and others.

## HSBC Bank USA

12. HSBC Bank USA, headquartered in McLean, Virginia, with its principal office in New York City, operates throughout the United States and has customers and offers services to customers around the world. It offers customers a full range of commercial and consumer banking products and related financial services. Its customers include individuals, small businesses, corporations, financial institutions and foreign governments. Some of the products HSBC Bank USA offered during the period in question are considered high risk by the financial services industry and require stringent AML monitoring and oversight. In addition, HSBC Group Affiliates conducted business in many high risk international locations, including regions of the world presenting a high vulnerability to the laundering of drug trafficking proceeds.

## HSBC Bank USA Failed to Conduct Due Diligence on HSBC Group Affiliates

13. One of HSBC Bank USA's high risk products was its correspondent banking practices and services. Correspondent accounts are established at banks to receive deposits from, make

4

payments on behalf of, or handle other financial transactions
for foreign financial institutions.  In essence, correspondent
banking involves the facilitation of wire transfers between
foreign financial institutions and their customers, and other
financial institutions with which the foreign financial
institution does not have a direct relationship.  Such
correspondent accounts are generally considered high risk
because the U.S. bank does not have a direct relationship with,
and therefore has no diligence information on, the foreign
financial institution's customers who initiated the wire
transfers.  To mitigate this risk, the BSA requires financial
institutions to conduct due diligence on all non-U.S. entities
(_i.e._, the foreign financial institution) for which it maintains
correspondent accounts.  There is no exception for foreign
financial institutions with the same parent company.

14.  HSBC Bank USA maintained correspondent accounts for a
number of foreign financial institutions, including HSBC Group
Affiliates, within its Payments and Cash Management ("PCM")
business.  HSBC Bank USA was required under the BSA to conduct
due diligence on all foreign financial institutions with
correspondent accounts, including HSBC Group Affiliates.

15.  Despite this requirement, from at least 2006 to 2010, HSBC
Bank USA did not conduct due diligence on HSBC Group Affiliates
for which it maintained correspondent accounts, including HSBC
Mexico.  The decision not to conduct due diligence was guided by
a formal policy memorialized in HSBC Bank USA's AML Procedures
Manuals.

### HSBC Bank USA Failed to Adequately Monitor Wire Transfers

16.  Another way for financial institutions to mitigate the
risks associated with correspondent banking is monitoring the
wire transfers to and from these accounts.  From 2006 to 2009,
HSBC Bank USA monitored wire transfers using an automated system
called the Customer Account Monitoring Program ("CAMP").  The
CAMP system would detect suspicious wire transfers based on
parameters set by HSBC Bank USA.  Under the CAMP system, various
factors triggered review, in particular, the amount of the
transaction and the type and location of the customer.  During
this period, HSBC Bank USA assigned each customer a risk
category based primarily on the country in which it was located.
Countries were placed into one of four categories based on the
perceived AML risk of doing business in that country (from
lowest to highest risk): standard, medium, cautionary, and high.

5

Transactions that met the thresholds for review and the parameters for suspicious activity were flagged for additional review by HSBC Bank USA's AML department.  These were referred to as "alerts."

17.  From 2006 to 2009, HSBC Bank USA knowingly set the thresholds in CAMP so that wire transfers by customers located in countries categorized as standard or medium risk, including foreign financial institutions with correspondent accounts, would not be subject to automated monitoring unless the customers were otherwise classified as high risk.  During this period, HSBC Bank USA processed over 100 million wire transfers totaling over $300 trillion.  Over two-thirds of these transactions involved customers in standard or medium risk countries.  Therefore, in this four-year period alone, over $200 trillion in wire transfers were not reviewed in CAMP.

18.  Between 2000 and 2009, HSBC Bank USA, and its executives and officers, were aware of numerous publicly available and industry-wide advisories about the money laundering risks inherent to Mexican financial institutions.  These included:

  a. The U.S. State Department's designation of Mexico as a "jurisdiction of primary concern" for money laundering as early as March 2000;

  b. The U.S. State Department's International Narcotics Control Strategy Reports from as early as 2002 stating with regard to Mexico that "the illicit drug trade continues to be the principal source of funds laundered through the Mexican financial system. . . . The smuggling of bulk shipments of U.S. currency into Mexico and the movement of the cash back into the United States via couriers, armored vehicles, and wire transfers, remain favored methods for laundering drug proceeds. Mexico's financial institutions are vulnerable to currency transactions involving international narcotics-trafficking proceeds that include significant amounts of U.S. currency or currency derived from illegal drug sales in the United States. . . .  According to U.S. law enforcement officials, Mexico remains one of the most challenging money laundering jurisdictions for the United States.";

6

    c. The April 2006 Financial Crimes Enforcement Network ("FinCEN")[1] Advisory concerning bulk cash being smuggled into Mexico and deposited with Mexican financial institutions (discussed in paragraph 22 below);

    d. The federal money laundering investigations that became public in 2007-08, involving Casa de Cambio Puebla, a Mexican-based money services business that had accounts at HSBC Mexico, and Sigue, a U.S.-based money services business, that had accounts at HSBC Mexico; and

    e. The federal money laundering investigation into Wachovia for its failure to monitor wire transactions originating from the correspondent accounts of certain Mexican money services businesses, known as casas de cambio ("CDCs"), which became public in April 2008.[2]

---

[1]     FinCEN is a bureau of the U.S. Department of Treasury. FinCEN's mission is to enhance the integrity of financial systems by facilitating the detection and deterrence of financial crime. FinCEN carries out its mission by receiving and maintaining financial transactions data, analyzing and disseminating that data for law enforcement purposes, and building global cooperation with counterpart organizations in other countries and with international bodies.

[2]     CDCs are licensed non-bank currency exchange businesses located in a number of countries, including Mexico. CDCs allow persons in Mexico to exchange one type of currency for other currency, e.g., exchange a value of pesos for an equal value of U.S. dollars or a value of U.S. dollars for an equal value of pesos. Through CDCs, persons in Mexico can use hard currency, such as pesos or U.S. dollars, and wire transfer the value of that currency to U.S. bank accounts to purchase items in the United States or other countries. CDCs do not operate in the same manner as banks operate in the United States. CDCs do not hold deposits or maintain checking accounts, savings accounts, or issue lines of credit. Nor do CDCs provide personal and/or commercial banking services. A central function of CDCs is to allow persons or businesses in Mexico to exchange or wire transfer the value of hard currency from Mexico to bank accounts in the United States or other countries to conduct commerce.

All of these advisories or events were known to numerous HSBC Bank USA AML officers and business executives at or near the time they occurred.

19. Despite this evidence of the serious money laundering risks associated with doing business in Mexico, from at least 2006 to 2009, HSBC Bank USA rated Mexico as standard risk, its lowest AML risk category. As a result, wire transfers originating from Mexico, including transactions from HSBC Mexico, were generally not reviewed in the CAMP system. From 2006 until May 2009, when HSBC Bank USA raised Mexico's risk rating to high, over 316,000 transactions worth over $670 billion from HSBC Mexico alone were excluded from monitoring in the CAMP system.

### HSBC Bank USA Failed to Monitor Banknotes' Transactions with HSBC Group Affiliates

20. HSBC Bank USA's Banknotes business ("Banknotes") involved the wholesale buying and selling of physical currencies (i.e., bulk cash) throughout the world. The business was based in New York with operations centers in London, Hong Kong and Singapore. These operations centers reported to the Head of Global Banknotes in New York. Banknotes was the largest volume trader of physical currency in the world, controlling approximately 60 percent of the global market. Banknotes customers included central banks, global financial institutions and non-bank entities such as CDCs and other money services businesses. Banknotes sold customers physical currency to be utilized in daily operations and/or purchased excess physical currency the customers did not need to have on hand. Banknotes' largest volume currency was the U.S. dollar. Purchased U.S. dollars were transported by Banknotes into the United States and deposited with the Federal Reserve. Banknotes derived its revenue from commissions earned in connection with trading, transporting, and storing the physical currency.

21. Banknotes was a high risk business because of the high risk of money laundering associated with transactions involving physical currency and the high risk of money laundering in countries where some of its customers were located. In an attempt to mitigate these risks, Banknotes' AML Compliance monitored customer transactions. The purpose of transaction monitoring was to identify the volume of currency going to or coming from each customer and to determine whether there was a legitimate business explanation for buying or selling that amount of physical currency.

22.  Despite the high risk of money laundering associated with
the Banknotes business, from 2006 to 2009, Banknotes' AML
compliance consisted of one, or at times two, compliance
officers.  Unlike the CAMP system for wire transfers, Banknotes
did not have an automated monitoring system.  As a result, there
were times when one, or at times two, Banknotes' compliance
officers were responsible for personally reviewing the
transactions of approximately 500 to 600 Banknotes customers.

23.  On April 28, 2006, FinCEN issued Advisory FIN-2006-A003,
"Guidance to Financial Institutions on the Repatriation of
Currency Smuggled into Mexico from the United States," which
reported:

> U.S. law enforcement has observed a dramatic
> increase in the smuggling of bulk cash
> proceeds from the sale of narcotics and
> other criminal activities from the United
> States into Mexico.  Once the U.S. currency
> is in Mexico, numerous layered transactions
> may be used to disguise its origins, after
> which it may be returned directly to the
> United States or further transshipped to or
> through other jurisdictions.

The Advisory was circulated to all Banknotes personnel involved
with Mexico and to those responsible for AML compliance within
HSBC Bank USA.

24.  Despite the Advisory from FinCEN issued several weeks
earlier, Banknotes stopped regular monthly monitoring of
transactions for HSBC Group Affiliates, including HSBC Mexico,
in July 2006, leaving only targeted and quarterly reviews of
HSBC Group Affiliates' Banknotes volumes that did not trigger
automatic monitoring.  As a result, discrepancies and suspicious
activity in HSBC Group Affiliates' transactions were not
monitored and/or reported from July 2006 to July 2009.  At the
time this decision was made, Banknotes purchased approximately
$7 billion in U.S. currency from Mexico each year, with nearly
half of that amount supplied by HSBC Mexico.  From July 2006 to
December 2008, Banknotes purchased over $9.4 billion in physical
U.S. dollars from HSBC Mexico, including over $4.1 billion in
2008 alone.

9

<u>HSBC Bank USA Failed to Provide Adequate Staffing and</u>
<u>Other Resources to Maintain an Effective AML Program</u>

25.   In the face of known AML deficiencies and high risk lines
of business, HSBC Bank USA further reduced the resources
available to its AML program in order to cut costs and increase
its profits.  By 2007, only a year after the written agreement
had been lifted, HSBC Bank USA had fewer AML employees than
required by its own internal plans.  Moreover, beginning in
2007, senior business executives instructed the AML department
to "freeze" staffing levels as part of a bank-wide initiative to
cut costs and increase the bank's return on equity.  This goal
was accomplished by not replacing departing employees, combining
the functions of multiple positions into one, and not creating
new positions.

26.   Even senior compliance officers were not replaced after
they left HSBC Bank USA.  In 2007, HSBC Bank USA's AML Director,
the bank's top AML officer in the United States, left the bank
and was not replaced.  Instead, HSBC Bank USA's Head of
Compliance assumed the role while maintaining all of her other
responsibilities.  A short time later, HSBC North America's
Regional Compliance Officer, the top compliance officer in North
America who oversaw Compliance and AML at HSBC Bank USA, left
and was not replaced.  Instead, over objections from HSBC
Group's Head of Compliance, HSBC North America's COO and HSBC
Group's Head of Legal asked HSBC North America's General Counsel
to assume the role of top compliance officer, in addition to all
of her other responsibilities.  HSBC Group's Head of Legal and
HSBC Group's Head of Compliance have confirmed that the desire
to save costs was the primary justification for merging the two
roles.

27.   In March 2008, HSBC Bank USA's Chief Operating Officer for
Compliance conducted an internal review of the Bank's AML
program ("March 2008 AML Review").  The March 2008 AML Review,
which was presented to senior business executives and compliance
officers, found that the AML program in PCM was "behind the
times" and needed to be fundamentally changed to meet
regulators' expectations and to achieve parity with other banks.
Specifically, the March 2008 AML Review noted that AML
monitoring in PCM was significantly under-resourced.  At the
time, only four employees reviewed the 13,000 to 15,000
suspicious wire alerts generated per month.  In contrast,
following remedial measures undertaken by HSBC, HSBC Bank USA

10

currently has approximately 430 employees reviewing suspicious
wire alerts.

28.  Despite the findings in the March 2008 AML Review, HSBC
Bank USA failed to address the lack of AML resources.  In April
2008, an AML employee told a senior executive in Compliance,
"[HSBC Bank USA] Compliance was in the midst of a staffing
crisis."  During this time, a number of AML employees noted that
requests for additional resources were discouraged and,
ultimately, these employees stopped making staffing requests.
By October 2009, a senior executive in Compliance remarked, "AML
has gone down the hole in the past 18 months."  HSBC Bank USA
did not begin to address the resource problem until late 2009.

### HSBC Mexico

29.  In 2002, HSBC Group acquired Grupo Financiero Bital
("Bital").  Bital was the fifth-largest bank in Mexico with
approximately 1,400 branches and six million customers.  In
early 2004, Bital was rebranded as HSBC Mexico.  HSBC Mexico
offered accounts denominated in Mexican pesos or U.S. dollars.
From at least 2004 through 2008, physical U.S. dollars deposited
at HSBC Mexico branches that were not needed for daily
operations were sold to HSBC Bank USA through Banknotes.

30.  At the time of the acquisition, HSBC Group's Head of
Compliance acknowledged there was "no recognizable compliance or
money laundering function in Bital at present."  HSBC Group
Compliance believed it would take one to four years to achieve
its required AML standards at HSBC Mexico.  However, until at
least 2010, HSBC Mexico's AML program was not fully up to HSBC
Group's required AML standards for HSBC Group Affiliates.  As
described below, before 2009, many of the AML problems at HSBC
Mexico involved U.S. dollar accounts, which ultimately affected
HSBC Bank USA.

### HSBC Mexico Did Not Maintain Sufficient KYC Information
### On U.S. Dollar Customers

31.  From 2002 until at least 2009, HSBC Mexico did not maintain
sufficient KYC information on many of its customers, including
those with U.S. dollar accounts.  A financial institution's KYC
information should include customer information such as address,
the reason for maintaining the account, expected activity and
the source of U.S. dollars.  The lack of sufficient KYC
information at HSBC Mexico was repeatedly raised in internal

11

audits and by HSBC Mexico's regulator, the Comision Nacional Bancaria y Valores (the "CNBV"). These concerns were elevated to the CEOs of HSBC Mexico and HSBC Group.

32. One area in which KYC was particularly poor was HSBC Mexico's Cayman Island U.S. dollar accounts. Mexican law prohibited most individuals from maintaining U.S. dollar denominated deposit accounts in Mexico unless they lived near the U.S.-Mexico border or were a corporation. However, Mexican law permitted almost any Mexican citizen to maintain offshore U.S. dollar accounts. These HSBC Mexico accounts were based in the Cayman Islands, but were essentially offshore in name only, because HSBC Mexico had no physical presence in the Cayman Islands and provided the front and back office services for these accounts at its branches in Mexico. Customers holding these accounts did all of their banking, including depositing physical U.S. dollars, at branches in Mexico. Nevertheless, the accounts were legal under Mexican and Cayman law.

33. In January 2006, HSBC Mexico conducted an internal audit of the Cayman Islands U.S. dollar accounts. At that time, there were only approximately 1,500 such accounts. Over 50 percent of the audited accounts lacked the proper KYC information, while 15 percent of audited accounts did not contain any KYC documentation. Over the next two years, nothing was done to address the KYC issues with these accounts. By 2008, there were 35,000 Cayman Island U.S. dollar accounts. At least 2,200 of these accounts were designated high risk due to suspicious activity within the accounts and/or negative information regarding the account owners. In July 2008, the total outstanding balance of these high risk Cayman accounts was approximately $205 million. Without adequate KYC information, HSBC Mexico knew very little about who these high risk customers were or why they had such large amounts of U.S. dollars. However, even without the benefit of adequate KYC information, the risks were obvious. Indeed, one HSBC Mexico compliance officer noted "the massive misuse of [the HSBC Mexico Cayman Islands U.S. dollar accounts] by organized crime." One example, identified by HSBC Group's Head of Compliance in July 2008, involved "significant USD [U.S. dollar] remittances being made by a number of [HSBC Mexico's Cayman Islands U.S. dollar] customers to a US company alleged to be involved in the supply of aircraft to drug cartels."

12

## HSBC Mexico Failed to Terminate Suspicious Accounts

34.  When suspicious activity was identified, HSBC Mexico repeatedly failed to take action to close the accounts.  Senior business executives at HSBC Mexico repeatedly overruled recommendations from its own AML committee to close accounts with documented suspicious activity.  In July 2007, a senior compliance officer at HSBC Group told HSBC Mexico's Chief Compliance Officer that "[t]he AML committee just can't keep rubber-stamping unacceptable risks merely because someone on the business side writes a nice letter.  It needs to take a firmer stand.  It needs some cojones.  We have seen this movie before, and it ends badly."

35.  Even when HSBC Mexico determined a relationship should be terminated, it often took years for the account to actually be closed.  In December 2008, there were approximately 675 accounts pending closure based on suspicions of money laundering activity.  Closure had been approved for 16 of those accounts in 2005, 130 in 2006, 172 in 2007, and 309 in 2008.  All 675 of these accounts remained open into at least 2009, with transactions being actively conducted through them despite facing pending closure based on suspicion of money laundering activity.

## HSBC Mexico's High Volume of U.S. Dollar Exports

36.  Between 2004 and 2007, HSBC Mexico exported over $3 billion U.S. dollars per year to the United States through Banknotes. In November 2007, Banco de Mexico, the central bank of Mexico, expressed concerns about the volume of U.S. dollars exported by HSBC Mexico back to the United States.  Specifically, Banco de Mexico wanted an explanation as to why HSBC Mexico's U.S. dollar exports were significantly larger than its market share would suggest.

37.  In February 2008, HSBC Mexico's CEO met with the head of the CNBV and the head of Mexico's financial intelligence unit, Unidad de Inteligencia Financiera ("UIF").  Again, the volume of HSBC Mexico's U.S. dollar exports was raised as a concern. Specifically, HSBC Mexico's CEO was told that law enforcement in Mexico and the United States were seriously concerned that the U.S. dollars being deposited at HSBC Mexico might represent drug trafficking proceeds.  HSBC Mexico's CEO was also told that Mexican law enforcement possessed a recording of a Mexican drug lord saying that HSBC Mexico was the place to launder money.

13

HSBC Mexico's CEO immediately elevated these issues up to HSBC Group's CEO, Head of Legal, Head of Audit, and Head of Compliance.

38.  An HSBC Mexico internal investigation following the February 2008 meeting with the CNBV and UIF revealed that a very small number of customers accounted for a very large percentage of physical U.S. dollar deposits.  For example, in January 2008, 312 customers accounted for approximately 32 percent of total physical U.S. dollar deposits.

39.  Moreover, a significant amount of the physical U.S. dollar exports came from Culiacan, in the Mexican state of Sinaloa. Culiacan is home to the Sinaloa drug cartel.  HSBC Group and HSBC Mexico were both aware of the money laundering risks in doing U.S. dollar business in Sinaloa state.  In 2007, HSBC Group learned of what was referred to in its employees' emails as a "massive money-laundering scheme" executed by HSBC Mexico employees and managers at multiple branches in Sinaloa state. HSBC Mexico closed all of the accounts involved in this scheme and terminated employees.  However, HSBC Mexico branches continued to accept U.S. dollar deposits in Sinaloa state.  From 2006 to 2008, HSBC Mexico exported over $1.1 billion in physical U.S. dollars from Sinaloa state to HSBC Bank USA.

40.  Despite the warnings from Mexican officials in late 2007 and early 2008, HSBC Mexico exported more physical U.S. dollars in 2008 than in any previous year, over $4.1 billion.  Finally, after the CNBV raised concerns directly with the HSBC Group's CEO in November 2008, HSBC Mexico stopped accepting physical U.S. dollar deposits at its branches.  HSBC Mexico was the first bank in Mexico to adopt such a measure, after which Mexican regulators issued new regulations consistent with this practice.

## HSBC Group

41.  HSBC Group failed to have a formal mechanism for sharing information horizontally among HSBC Group Affiliates.  While informal communication between HSBC Group Affiliates did occur, information generally was reported up through the formal channels to HSBC Group.  HSBC Group then decided what information needed to be distributed back down the reporting lines to HSBC Group Affiliates in other parts of the world.

42.  As discussed above, from 2002 to 2010, HSBC Mexico reported the AML problems it was having up through the formal reporting

14

lines to HSBC Group. During this time, HSBC Mexico did not
communicate – formally or informally – with HSBC Bank USA about
its AML problems. Instead, executives at HSBC Mexico believed
that by reporting the problems to HSBC Group, they had fulfilled
their reporting obligations.

43. Limited information regarding the AML problems at HSBC
Mexico was presented at HSBC Group level management meetings at
which the CEO of HSBC North America attended. These were multi-
hour, high-level meetings that covered issues throughout the
world. The information presented at these meetings regarding
HSBC Mexico's AML problems was not discussed in detail and did
not indicate that the problems affected HSBC Bank USA or
involved the potential laundering of U.S. dollar drug
trafficking proceeds.

44. Notwithstanding the above, HSBC Group failed to adequately
inform HSBC Bank USA about the problems at HSBC Mexico. Senior
HSBC Group executives, including the CEO, Head of Compliance,
Head of Audit, and Head of Legal, were all aware that the
problems at HSBC Mexico involved U.S. dollars and U.S. dollar
accounts, but did not contact their counterparts at HSBC Bank
USA to explain the significance of the problems or the potential
effect on HSBC Bank USA's business.

45. As a result of HSBC Group's failure to communicate, until
2010, HSBC Bank USA was not aware of the significant AML
problems at HSBC Mexico. HSBC North America's General
Counsel/Regional Compliance Officer first learned of the
problems at HSBC Mexico and their potential impact on HSBC Bank
USA in 2010 as a result of this investigation. Upon learning
about potential problems involving HSBC Mexico, she immediately
contacted HSBC Group Compliance. Only then did she learn the
full story of what happened at HSBC Mexico. When she asked why
she had not been informed earlier, she was told by HSBC Group's
Head of Compliance that HSBC does not "air the dirty linen of
one affiliate with another . . . we go in and fix the problems."

## Drug Trafficking Proceeds Laundered Through HSBC Bank USA

46. HSBC Bank USA's AML violations resulted in at least $881
million being laundered through the U.S. financial system. A
significant amount of the laundered funds were drug trafficking
proceeds involved in the Black Market Peso Exchange ("BMPE").
The BMPE is a complex trade-based money laundering system that
is designed to move the proceeds from the sale of illegal drugs

in the United States to the drug cartels outside of the United States, often in Colombia, often through the use of bank accounts.  As set forth below, the use of HSBC Bank USA for BMPE transactions was discovered through a narcotics and money laundering investigation conducted by U.S. Immigration and Customs Enforcement's Homeland Security Investigations ("HSI") El Dorado Task Force in New York, in conjunction with the U.S. Attorney's Office for the Eastern District of New York.

47.  The cartels, many of which operate in Colombia, need to convert U.S. dollars to Colombian pesos.  There are two major obstacles to the conversion of bulk U.S. currency into Colombian pesos: (1) because of U.S. AML laws and regulations, it is difficult to deposit large volumes of bulk cash at banks in the United States; and (2) Colombia has very strict currency controls and tax laws making it difficult and expensive to convert U.S. dollars to Colombian pesos in Colombia.

48.  To solve the first problem, Colombian drug cartels smuggle U.S. currency across the U.S. border into Mexico.  The U.S. currency is smuggled out of the United States because drug traffickers perceive that Mexico had less stringent AML laws, making it easier for the cartels to deposit large amounts of physical U.S. dollars at Mexican banks and CDCs.

49.  To solve the second problem, Colombia's strict currency controls and tax laws, the Colombian cartels use the BMPE.  In the BMPE, middlemen, often referred to as peso brokers, transform bulk cash from the sale of illegal drugs into revenue from the sale of legitimate goods.  In this process, the peso brokers purchase bulk cash in United States dollars from drug cartels at a discounted rate, in return for Colombian pesos that belong to Colombian businessmen.  The peso brokers then use the U.S. dollars to purchase legitimate goods from businesses in the United States and other foreign countries, on behalf of the Colombian businessmen.  These goods are then sent to the Colombian businessmen, who sell the goods for Colombian pesos to recoup their original investment. In the end, the Colombian businessmen obtain U.S. dollars at a lower exchange rate than otherwise available in Colombia, the Colombian cartel leaders receive Colombian pesos while avoiding the costs associated with depositing U.S. dollars directly into Colombian financial institutions, and the peso brokers receive fees for their services as middlemen.

16

50.  The Department alleges, and HSBC Bank USA and HSBC Holdings do not contest, that, beginning in 2008, an investigation conducted by HSI's El Dorado Task Force, in conjunction with the U.S. Attorney's Office for the Eastern District of New York, identified multiple HSBC Mexico accounts associated with BMPE activity.  The investigation further revealed that drug traffickers were depositing hundreds of thousands of dollars in bulk U.S. currency each day into HSBC Mexico accounts.  In order to efficiently move this volume of cash through the teller windows at HSBC Mexico branches, drug traffickers designed specially shaped boxes that fit the precise dimensions of the teller windows.  The drug traffickers would send numerous boxes filled with cash through the teller windows for deposit into HSBC Mexico accounts.  After the cash was deposited in the accounts, peso brokers then wire transferred the U.S. dollars to various exporters located in New York City and other locations throughout the United States to purchase goods for Colombian businesses.  The U.S. exporters then sent the goods directly to the businesses in Colombia.

51.  The Department alleges, and HSBC Bank USA and HSBC Holdings do not contest, that accounts at HSBC Mexico were identified by tracking wire transfers originating from HSBC Mexico into HSI undercover accounts in the United States and through seizures and analysis of U.S.-based business accounts that were funded by wire transfers from accounts targeted for illegal BMPE activity.  Since 2009, the investigation has resulted in the arrest, extradition, and conviction in the United States District Court for the Eastern District of New York of numerous individuals illegally using HSBC Mexico accounts in furtherance of BMPE activity.  The investigation further revealed that, because of its lax AML controls, HSBC Mexico was the preferred financial institution for drug cartels and money launderers.  The drug trafficking proceeds (in physical U.S. dollars) deposited at HSBC Mexico as part of the BMPE were sold to HSBC Bank USA through Banknotes.  In addition, many of the BMPE wire transfers to exporters in the United States passed through HSBC Mexico's correspondent account with HSBC Bank USA.  As discussed above, from 2006 to 2009, HSBC Bank USA did not monitor Banknotes transactions or wire transfers from HSBC Mexico and did not detect the drug trafficking proceeds as they flowed into the United States.

17

## Evasion of U.S. Sanctions

52.  From the mid-1990s through at least September 2006, HSBC Group Affiliates violated both U.S. and New York State criminal laws by knowingly and willfully moving or permitting to be moved illegally hundreds of millions of dollars through the U.S. financial system on behalf of banks located in Cuba, Iran, Libya, Sudan, and Burma, and persons listed as parties or jurisdictions sanctioned by the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC") (collectively, the "Sanctioned Entities") in violation of U.S. economic sanctions.

53.  HSBC Group Affiliates engaged in this criminal conduct by: (a) following instructions from the Sanctioned Entities not to mention their names in U.S. dollar payment messages sent to HSBC Bank USA and other financial institutions located in the United States; (b) amending and reformatting U.S. dollar payment messages to remove information identifying the Sanctioned Entities; (c) using a less transparent method of payment messages, known as cover payments; and (d) instructing at least one Sanctioned Entity how to format payment messages in order to avoid bank sanctions filters that could have caused payments to be blocked or rejected at HSBC Group or HSBC Bank USA.

54.  HSBC Group's conduct, which occurred outside the United States, caused HSBC Bank USA and other financial institutions located in the United States to process payments that otherwise should have been held for investigation, rejected, or blocked pursuant to U.S. sanctions regulations administered by OFAC. Additionally, by its conduct, HSBC Group: (a) prevented HSBC Bank USA and other financial institutions in the United States from filing required BSA and OFAC-related reports with the U.S. Government; (b) caused false information to be recorded in the records of U.S. financial institutions located in New York, New York; and (c) caused U.S. financial institutions not to make records that they otherwise would have been required by law to make.

## Applicable Law

55.  At all times relevant to this matter, various U.S. economic sanctions laws regulated and/or criminalized financial and other transactions involving sanctioned countries, entities, and persons.  Those laws applied to transactions occurring within U.S. territorial jurisdiction and to transactions involving U.S.

18

persons, including U.S. corporations, anywhere in the world.
OFAC promulgated regulations to administer and enforce the
economic sanctions laws, including regulations for economic
sanctions against specific countries, as well as sanctions
against Specially Designated Nationals ("SDNs"). SDNs are
individuals, groups, and entities that have been designated by
OFAC as terrorists, financial supporters of terrorism,
proliferators of weapons of mass destruction, and narcotics
traffickers.

## Cuba Sanctions

56. Beginning with Executive Orders and regulations issued at
the direction of President John F. Kennedy, the United States
has maintained an economic embargo against Cuba through the
enactment of various laws and regulations. These laws,
restricting U.S. trade and economic transactions with Cuba, were
promulgated under the Trading With the Enemy Act ("TWEA"), 50
U.S.C. app. §§ 1-44. These laws are administered by OFAC, and
prohibit virtually all financial and commercial dealings with
Cuba, Cuban businesses, and Cuban assets.

## Iran Sanctions

57. In 1987, President Ronald W. Reagan issued Executive Order
No. 12613, which imposed a broad embargo on imports of Iranian-
origin goods and services. United States sanctions against Iran
were strengthened in 1995 and 1997 when President William J.
Clinton issued Executive Order Nos. 12957, 12959, and 13059.
These Executive Orders prohibit virtually all trade and
investment activities between the United States and Iran. With
the exception of certain exempt or authorized transactions, OFAC
regulations implementing the Iranian sanctions generally
prohibit the export of services to Iran from the United States.
Until 2008, OFAC regulations permitted U.S. depository
institutions to handle certain "U-Turn" transactions, in which
the U.S. depository institution acts only as an intermediary
bank in clearing a U.S. dollar payment between two non-U.S.,
non-Iranian banks.

## Libya Sanctions

58. On January 7, 1986, President Reagan issued Executive Order
No. 12543 imposing broad economic sanctions against Libya.
Subsequently, President Reagan issued Executive Order No. 12544
on January 8, 1986, ordering the blocking of all property and

19

interests in property of the Government of Libya.  President George H. W. Bush strengthened those sanctions in 1992, pursuant to Executive Order No. 12801.  On September 20, 2004, President George W. Bush issued Executive Order No. 13357, terminating the national emergency with regard to Libya and revoking the sanction measures imposed by the prior Executive Orders.

## Sudan Sanctions

59.  On November 3, 1997, President Clinton issued Executive Order No. 13067 imposing a trade embargo against Sudan and blocking all property, and interests in property, of the Government of Sudan.  President George W. Bush strengthened those sanctions in 2006, pursuant to Executive Order No. 13412. Under these Executive Orders, virtually all trade and investment activities between the United States and Sudan are prohibited. With the exception of certain exempt or authorized transactions, OFAC regulations implementing the Sudanese sanctions generally prohibit the export of services to Sudan from the United States.

## Burma Sanctions

60.  On May 20, 1997, President Clinton issued Executive Order No. 13047, which prohibited both new investment in Burma by U.S. persons and U.S. persons' facilitation of new investment in Burma by foreign persons.  On July 28, 2003, President George W. Bush signed the Burmese Freedom and Democracy Act of 2003 ("BFDA") to restrict the financial resources of Burma's ruling military junta.  To implement the BFDA and to take additional steps, President Bush issued Executive Order No. 13310 on July 28, 2003, which blocked all property and interests in property of certain listed Burmese entities[3] and provided for the blocking of property and interest in property of other individuals and entities meeting the criteria set forth in Executive Order No. 13310.  Executive Order No. 13310 also prohibited the importation into the United States of articles that are a product of Burma and the exportation or re-exportation to Burma of financial services from the United States, or by U.S. persons, wherever located.  On July 11, 2012, President Barack Obama signed an executive order easing restrictions to allow U.S. companies to do business in Burma.

---

[3]     President Bush subsequently issued Executive Order Nos. 13448 and 13464, expanding the list of persons and entities whose property must be blocked.

20

Department of Justice Charges

61.  The Department alleges, and HSBC Holdings admits, that its conduct, as described herein, violated TWEA.  Specifically, HSBC Group violated Title 50, United States Code, Appendix Sections 5 and 16, which makes it a crime to willfully violate or attempt to violate any regulation issued under TWEA, including regulations restricting transactions with Cuba.  The Department further alleges, and HSBC Holdings admits, that its conduct, as described herein, violated the International Emergency Economic Powers Act ("IEEPA").  Specifically, HSBC Group violated Title 50, United States Code, Section 1705, which makes it a crime to willfully violate or attempt to violate any regulation issued under IEEPA, including regulations restricting transactions with Iran, Libya, Sudan, and Burma.

New York State Penal Law Charge

62.  DANY alleges, and HSBC Holdings admits, that its conduct, as described herein, violated New York State Penal Law Sections 175.05 and 175.10, which make it a crime to, "with intent to defraud, . . . (i) make[ ] or cause[ ] a false entry in the business records of an enterprise [defined as any company or corporation] . . . or (iv) prevent[ ] the making of a true entry or cause the omission thereof in the business records of an enterprise."  It is a felony under Section 175.10 of the New York State Penal Law if a violation under Section 175.05 is committed and the person or entity's "intent to defraud includes an intent to commit another crime or to aid or conceal the commission thereof."

Conduct in Violation of U.S. Sanctions Laws

63.  From at least 2000 through 2006, HSBC Group knowingly and willfully engaged in conduct and practices outside the United States that caused HSBC Bank USA and other financial institutions located in the United States to process payments in violation of U.S. sanctions.  To hide these transactions, HSBC Group Affiliates altered and routed payment messages in a manner that ensured that payments involving sanctioned countries and entities cleared without difficulty through HSBC Bank USA and other U.S. financial institutions in New York County and elsewhere.  The total value of OFAC-prohibited transactions for the period of HSBC Group's review, from 2000 through 2006, was approximately $660 million.  This includes approximately $250 million involving Sanctioned Entities in Burma; $183 million on

21

behalf of Sanctioned Entities in Iran; $169 million on behalf of
Sanctioned Entities in Sudan; $30 million on behalf of
Sanctioned Entities in Cuba; and $28 million on behalf of
Sanctioned Entities in Libya.

64. Financial institutions in the United States are obligated
to screen financial transactions, including wire payment
processing, to make certain they do not execute transactions
that violate U.S. sanctions. OFAC regularly publishes a
comprehensive list of Sanctioned Entities that includes names of
individuals, entities, their variations, and, if known,
addresses, dates of birth, passport numbers, and other
identifying information. Because of the vast volume of wire
payments processed by financial institutions, most financial
institutions employ sophisticated computer software, known as
OFAC filters, to automatically screen all wire payments against
the official OFAC list (as well as similar lists containing
names of individuals and entities sanctioned by the United
Nations and the European Union). When the filters detect a
possible match to a Sanctioned Entity, the payment is stopped
and held for further review. When a financial institution
detects a funds transfer that violates sanctions, the
institution must refuse to process or execute that payment.
This is termed a "rejection." If a party to the payment is an
SDN, then the payment must be frozen (or "blocked") and the bank
must notify OFAC. The sending bank must then demonstrate to
OFAC that the payment does not violate sanctions before the
funds can be released and the payment processed. Thus, foreign
banks seeking to send payments involving sanctioned countries or
entities through U.S. banks must by-pass or subvert the OFAC
filters to make sure the payments pass through the U.S. clearing
banks. HSBC Group accomplished this using a number of methods.

<u>Amending Payment Messages</u>

65. Specifically, beginning in the 1990s, HSBC Bank plc ("HSBC
Europe"), a wholly owned subsidiary of HSBC Group, devised a
procedure whereby the Sanctioned Entities put a cautionary note
in their SWIFT payment messages including, among others, "care
sanctioned country," "do not mention our name in NY," or "do not
mention Iran.[4] Payments with these cautionary notes

---

[4]     HSBC Group is a member of the Society for Worldwide
Interbank Financial Telecommunications ("SWIFT") and
historically has used the SWIFT system to transmit international

automatically fell into what HSBC Europe termed a "repair queue" where HSBC Europe employees manually removed all references to the Sanctioned Entities. The payments were then sent to HSBC Bank USA and other financial institutions in the United States without reference to the Sanctioned Entities, ensuring that the payments would be processed without delay and not be blocked or rejected and referred to OFAC.

66. HSBC Group was aware of this practice as early as 2000. In 2003, HSBC Group's Head of Compliance acknowledged that amending payment messages "could provide the basis for an action against [HSBC] Group for breach of sanctions." At that time, HSBC Group Compliance instructed HSBC Europe to stop the practice. However, HSBC Europe appealed, and due to the "significant business opportunities" offered by the Sanctioned Entities, HSBC Group's Head of Compliance granted HSBC Europe an extension to continue processing payments in the same manner. HSBC Europe was also concerned about some other factors, including technical and logistical issues with SWIFT, payments, and HSBC Europe's payment processing system. Over the next several years, HSBC Europe and HSBC Middle East Limited ("HSBC Middle East") sought and obtained numerous extensions, allowing the amendment of payment messages from the Sanctioned Entities to continue until 2006.

67. HSBC Bank USA had express policies requiring full transparency in processing payments involving Sanctioned Entities. In 2001, a senior compliance officer at HSBC Group told HSBC Bank USA that HSBC Group would not permit HSBC Group Affiliates to amend payment messages to avoid detection by sanctions filters in the United States. Yet, contrary to this assurance, HSBC Group Affiliates intentionally hid the practice of amending payments involving Sanctioned Entities from HSBC Bank USA. As a result, during the relevant time period, HSBC Bank USA and other financial institutions in the United States processed hundreds of millions of dollars in transactions involving Sanctioned Entities in violation of U.S. sanctions.

Cover Payments

68. Historically, HSBC Group processed U.S. dollar payment messages from and through numerous global locations. During the relevant time period, HSBC Group consolidated its U.S. dollar

payment messages with financial institutions around the world, including its U.S. affiliate, HSBC Bank USA.

23

payment processing so that the payments were predominately processed at HSBC Europe's Multi-Currency Payment Processing Center in England and, later, at HSBC Middle East in Dubai.

69.  International wire payments generally are executed via the secured communications services provided by SWIFT, and the communications underlying the actual payments are commonly referred to as SWIFT messages.  When a bank customer sends an international wire payment, the de facto standard to execute such a payment is the MT 103 SWIFT message (also called a serial payment, or a serial MT 103 payment).  When a financial institution sends a bank-to-bank credit transfer, the de facto standard is the MT 202 SWIFT message.  The crucial difference, during the relevant time period, was that MT 202 payments typically did not require the bank to identify the originating party to the transactions, and banks typically did not include that information in MT 202 messages.[5]  A "cover payment" typically involves both types of messages: an MT 103 message identifying all parties to the transaction is sent from the originating bank to the beneficiary, but the funds are transferred through the United States via an MT 202 message that lacks that detail.  Instead of using MT 103 payment messages for transactions involving the Sanctioned Entities, which would have revealed the identity of the ordering customer and beneficiary, HSBC Group used MT 202 "cover payment" messages for these bank-to-bank credit transfers, which did not.  Consequently, U.S. financial institutions were unable to detect when payments were made to or from a Sanctioned Entity.

70.  HSBC Group employees understood that cover payments hid the identity of the ordering customer and beneficiary, and therefore allowed for straight-through processing of transactions that would have otherwise been stopped for review in the United States.  They also knew that using MT 103 payments would likely result in the payment being delayed, rejected, or blocked.

71.  Although HSBC Europe instituted nominal processes to screen for SDNs when processing transactions from Sanctioned Entities, and make determinations as to whether or not payments fit within certain exceptions such as the U-Turn exemption, they employed inadequately trained payment clerks and untested automated

---

[5]      Subsequent changes to MT 202 messaging formats now generally require the inclusion of originating party information when an MT 202 message is utilized to execute a customer payment.

filters in the process.  As a result, HSBC Europe could not verify with a sufficient degree of accuracy or reliability whether payments it processed from Sanctioned Entities complied with OFAC restrictions.  In processing these payments and sending them to HSBC Bank USA, HSBC Europe provided HSBC Bank USA with no information that the payments involved Sanctioned Entities, and thus prevented HSBC Bank USA from exercising its own due diligence and OFAC screening.[6]

72.  As early as July 2001, HSBC Bank USA told HSBC Group's Head of Compliance that it was concerned that the use of cover payments prevented HSBC Bank USA from confirming whether the underlying transactions met OFAC requirements.  From 2001 through 2006, HSBC Bank USA repeatedly told senior compliance officers at HSBC Group that it would not be able to properly screen Sanctioned Entity payments if payments were being sent utilizing the cover method.  These protests were ignored.

73.  HSBC Europe resisted sending serial payments to HSBC Bank USA because it was concerned that payments would be blocked or rejected, and that Sanctioned Entity banks, specifically those from Iran, would discontinue their relationships with HSBC Europe, due to the increased costs associated with serial payments.  These Iranian relationships resulted in revenue of millions of dollars per year for HSBC Group Affiliates outside of the United States.  It was not until 2006 that HSBC Group ordered all HSBC Group Affiliates to use serial payments for U.S. dollar transactions.

<u>Straight-Through Processing Instructions</u>

74.  In April 2001, HSBC Europe instructed an Iranian bank how to evade detection by OFAC filters and ensure its payments would be processed without delay or interference.  The HSBC Europe

---

[6]     Until 2008, OFAC regulations included an exception to the prohibition on Iranian transactions that permitted certain transactions known as "U-Turns."  While HSBC Europe and HSBC Middle East processed approximately $20 billion in otherwise permissible Iranian U-Turn payments during the period, employees amended payment messages and used cover payments to conceal the nature of the transactions from HSBC Bank USA and other financial institutions in the United States, which deprived the U.S. banks of their ability to filter and review the transactions to determine whether they were legal under OFAC regulations.

employee wrote, "we have found a solution to processing your payments with minimal manual intervention . . . . the key is to always populate field 52 – if you do not have an ordering party then quote 'One of our Clients' . . . outgoing payment instruction from HSBC will not quote [Iranian bank] as sender – just HSBC London. . . . This then negates the need to quote 'do not mention our name in New York.'"[7]  Thus, according to the instructions sent by HSBC Europe, if the Iranian bank entered the term "One of our Clients" into Field 52, there would be no interference with the processing of the wire payment, whether it was OFAC-compliant or not.  Ultimately, this business was never taken on, due to protests from HSBC Bank USA.

75.  In July 2001, HSBC Bank USA's Chief Compliance Officer confronted HSBC Group's Head of Compliance on this issue and was assured that "Group Compliance would not support blatant attempts to avoid sanctions, or actions which would place [HSBC Bank USA] in a potentially compromising position."

76.  HSBC Europe issued guidelines to deal with transactions that came from the Sanctioned Entities.  One of these was to refer flagged payments back to the Sanctioned Entity for "clarification."  In doing so, HSBC Europe was alerting the Sanctioned Entity that the payment message as sent was prohibited by OFAC sanctions.  The Sanctioned Entities responded by reformatting the payment so that it would be processed through the U.S. clearing banks, including HSBC Bank USA, without being subject to U.S. filters.

<u>HSBC Bank USA's and HSBC Group's Cooperation and Remedial Actions</u>

77.  From early in this investigation, HSBC Bank USA and HSBC Group have fully cooperated and have provided valuable assistance to law enforcement.  With the assistance of outside counsel, HSBC Bank USA has made numerous, detailed, periodic reports to the Department and DANY concerning those findings.

---

[7]  Field 52 is a data code field in a SWIFT payment message that identifies the bank of the ordering customer, or the "originating bank." When the originating bank was Iranian, its inclusion in a payment message could trigger review by the clearing bank in New York.  For payments using MT 103 messages, Field 52 was mandatory.  For MT 202 cover payments, it was optional.

78.   To date, HSBC Bank USA has produced more than 9 million pages of documents.  HSBC Bank USA has also made past and present employees, including HSBC Group employees throughout the world, available to be interviewed by the Department and DANY as requested.

79.   In addition to the cooperative steps listed above, HSBC Bank USA has assisted the Government in investigations of certain individuals suspected of money laundering and terrorist financing.

80.   HSBC Group discontinued its use of the U-Turn exemption in October 2006, over two years before it was abolished by OFAC. HSBC Group implemented a policy voluntarily discontinuing all business with Iranian banks, persons, and entities, regardless of currency, in 2007.

81.   HSBC Bank USA and HSBC Group have invested hundreds of millions of dollars to remediate the shortcomings in their BSA/AML programs.  Management has made significant strides in improving "tone from the top" and ensuring that a culture of compliance permeates the institution.  The efforts of management have dramatically improved HSBC Bank USA's and HSBC Group's BSA/AML and OFAC compliance programs.  The steps taken evidence HSBC Bank USA's and HSBC Group's current commitment to ensuring the past failures do not recur:

<u>HSBC Bank USA's Remedial Measures</u>

a.   HSBC North America has a new leadership team, including a new Chief Executive Officer, General Counsel, Chief Compliance Officer, AML Director, Deputy Chief Compliance Officer and Deputy Director of its Global Sanctions program.

b.   As a result of its AML violations and program deficiencies, HSBC North America and HSBC Bank USA "clawed back" deferred compensation (bonuses) for a number of their most senior AML and compliance officers, to include the Chief Compliance Officer, AML Director and Chief Executive Officer.

c.   In 2011, HSBC Bank USA spent $244 million on AML, approximately nine times more than what it spent in 2009.

d.   In particular, HSBC Bank USA has increased its AML staffing from 92 full time employees and 25 consultants as of

January 2010 to approximately 880 full time employees and 267 consultants as of May 2012.

e.   HSBC Bank USA has reorganized its AML department to strengthen its reporting lines and elevate its status within the institution as a whole by (i) separating the Legal and Compliance departments; (ii) requiring that the AML Director report directly to the Chief Compliance Officer; and (iii) providing that the AML Director regularly report directly to the Board and senior management about HSBC Bank USA's BSA/AML program.

f.   HSBC Bank USA has revamped its KYC program and now treats HSBC Group Affiliates as third parties that are subject to the same due diligence as all other customers.

g.   HSBC Bank USA has implemented a new customer risk-rating methodology based on a multifaceted approach that weighs the following factors: (1) the country where the customer is located, (2) the products and services utilized by the customer, (3) the customer's legal entity structure, and (4) the customer and business type.

h.   HSBC Bank USA has exited 109 correspondent relationships for risk reasons.

i.   HSBC Bank USA has a new automated monitoring system.  The new system monitors every wire transaction that moves through HSBC Bank USA.  The system also tracks the originator, sender and beneficiary of a wire transfer, allowing HSBC Bank USA to look at its customer's customer.

j.   HSBC Bank USA has made significant progress in remediating all customer KYC files in order to ensure they adhere to the new AML policies discussed above and plans to have completed remediation of 155,554 customers by December 2012.

k.   HSBC Bank USA has exited the Banknotes business.

l.   HSBC Bank USA has spent over $290 million on remedial measures.

## HSBC Group's Remedial Measures

a.   HSBC Group also has a new leadership team, including a new CEO, Chairman, Chief Legal Officer, and Head of Global Standards Assurance.

b.   HSBC Group has simplified its control structure so that the entire organization is aligned around four global businesses, five regional geographies, and ten global functions.  This allows HSBC Group to better manage its business and communication, and better understand and address risks worldwide.

c.   Since January 2011, HSBC Group has begun to apply a more consistent global risk appetite and, as a result, has sold 42 businesses and withdrawn from 9 countries.

d.   HSBC Group has undertaken to implement single global standards shaped by the highest or most effective anti-money laundering standards available in any location where the HSBC Group operates.  This new policy will require that all HSBC Group Affiliates will, at a minimum, adhere to U.S. anti-money laundering standards.

e.   HSBC Group has elevated the Head of HSBC Group Compliance position to a Group General Manager, which is one of the 50 most senior employees at HSBC globally.  HSBC Group has also replaced the individual serving as Head of HSBC Group Compliance.

f.   The Head of HSBC Group Compliance has been given direct oversight over every compliance officer globally, so that both accountability and escalation now flow directly to and from HSBC Group Compliance.

g.   Eighteen of the top twenty-one most senior officers at HSBC Group are new in post since the beginning of 2011.

h.   Material or systemic AML control weaknesses at any affiliate that are reported by the Regional and Global Business Compliance heads are now shared with all other Regional and Global Business Compliance heads facilitating horizontal information sharing.

i.   The senior leadership team that attends HSBC Group Management Board meetings is collectively and individually

responsible for reviewing all of the information presented at the meeting, as well as all written documentation provided in advance of the meeting, and determining whether it affects their respective entity or region.  In addition, if an executive believes that something occurring within his or her area of responsibility affects another business or affiliate within HSBC Group, it is that executive's responsibility to seek out the executives from that business or affiliate and work to address the issue.

j.   HSBC Group has restructured its senior executive bonus system so that the extent to which the senior executive meets compliance standards and values has a significant impact on the amount of the senior executive's bonus, and failure to meet those compliance standards and values could result in the voiding of the senior executive's entire year-end bonus.

k.   HSBC Group has commenced a review of all customer KYC files across the entire Group.  The first phase of this remediation will cost an estimated $700 million to complete over five years.

l.   HSBC Group will defer a portion of the bonus compensation for its most senior officers, namely its Group General Managers and Group Managing Directors, during the pendency of the deferred prosecution agreement, subject to EU and UK legal and regulatory requirements.

m.   HSBC Group has adopted a set of guidelines to be taken into account when considering whether HSBC Group should do business in countries posing a particularly high corruption/rule of law risk as well as limiting business in those countries that pose a high financial crime risk.

n.   Under HSBC Group's new global sanctions policy, HSBC Group will be utilizing key OFAC and other sanctions lists to conduct screening in all jurisdictions, in all currencies.