# Exhibit D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

UNITED STATES OF AMERICA )
)
v. )  No. _1¢-124 (CKK)_
)
The former ABN AMRO BANK N.V., )
now known as )  DEFERRED PROSECUTION
THE ROYAL BANK OF SCOTLAND N.V., )  AGREEMENT
)
Defendant. )
)

---

**FILED**

**MAY 1 0 2010**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

The Royal Bank of Scotland N.V. ("RBS N.V."), formerly known as ABN

AMRO Bank N.V., (both RBS N.V. and the former ABN AMRO Bank N.V. are referred

to herein as "ABN")[1] an international financial institution registered and organized under

the laws of the Netherlands, as authorized to specifically act and approve this agreement

by the Managing Board of ABN in a corporate resolution dated May 4, 2010, hereby

enters into this Deferred Prosecution Agreement (the "Agreement") with the Asset

Forfeiture and Money Laundering Section of the Criminal Division of the United States

---

[1] ABN AMRO Holding N.V., the parent company of the former ABN AMRO Bank N.V., was acquired in October 2007 by a consortium of Fortis, the Royal Bank of Scotland ("RBS"), and Banco Santander, using the acquisition vehicle RFS Holdings. In October 2008, the Dutch State announced that it had acquired the Dutch businesses of Fortis. In December 2008, the Dutch State replaced Fortis as a stakeholder in RFS Holdings. The former ABN AMRO Bank N.V. subsequently underwent a restructuring process to transfer its Dutch State-acquired businesses and activities out of the existing ABN AMRO Group. To achieve this, the relevant Dutch State-acquired businesses were first transferred to a new legal entity owned by ABN AMRO Holding N.V. On February 5, 2010, through a statutory demerger process, the former ABN AMRO Bank N.V. was renamed RBS N.V., and the newly created Dutch legal entity was re-named ABN AMRO N.V. ("new ABN AMRO"). Full legal separation, at which time ABN AMRO Bank N.V. ceased to own new ABN AMRO, was completed on April 1, 2010. New ABN AMRO is now 100% owned by the Dutch Government. RBS N.V. is a subsidiary undertaking of, and controlled by, RBS. This Agreement is with RBS N.V. and not new ABN AMRO. Both RBS N.V. and the former ABN AMRO Bank N.V. are referred throughout this Agreement as "ABN."

Department of Justice and the United States Attorney's Office for the District of Columbia (collectively, the "United States").

1. **Charges**: ABN agrees that it shall waive indictment and agrees to the filing of a two-count Criminal Information ("Information") in the United States District Court for the District of Columbia, charging ABN with:

(a) knowingly and willfully conspiring, in violation of Title 18, United States Code, Section 371:

(i) to defraud the United States and the U.S. Department of Treasury, Office of Foreign Assets Control ("OFAC"); and

(ii) to commit the following criminal offenses:

a. engaging in transactions with entities associated with state sponsors of terrorism, in violation of the International Emergency Economic Powers Act, Title 50, United States Code, Section 1705, and regulations issued thereunder; and

b. engaging in transactions with entities associated with Cuba, a state sponsor of terrorism, in violation of the Trading With the Enemy Act, Title 50, United States Code, Appendix, Sections 1-6, 7-39, and 41-44, and regulations issued thereunder; and

(b) willfully failing to establish an adequate anti-money laundering program in violation of Title 31, United States Code, Sections 5318(h) and 5322.

2. **Acceptance of Responsibility**: ABN accepts and acknowledges responsibility for its conduct and that of its employees as set forth in the Factual Statement attached hereto as Exhibit A and incorporated herein by reference (the "Factual

Statement"). If the United States, pursuant to Paragraph 10 of this Agreement, initiates a prosecution that is deferred by this Agreement against ABN, ABN agrees that it will neither contest the admissibility of the Factual Statement, reports, or any other documents provided by ABN to the United States or the government of the Netherlands, nor contradict in any such proceeding the facts contained within the Factual Statement. Except as provided in Paragraph 4 below, ABN waives and forgoes any right under the United States Constitution, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other rule, that any plea, plea discussions, and any relating statements made by or on behalf of ABN prior or subsequent to this Agreement, or any leads derived therefrom, shall be inadmissible, suppressed, or otherwise excluded from evidence at any judicial proceeding arising from this Agreement.

3.    **Forfeiture Amount**: As a result of ABN's conduct, including the conduct set forth in the Factual Statement, the parties agree that the United States could institute a civil and/or criminal forfeiture action against certain funds held by ABN and certain funds held by or passed through certain accounts at ABN. Said funds would be forfeitable pursuant to Title 18, United States Code, Sections 981 or 982. ABN hereby acknowledges that at least $500,000,000 was involved in transactions described in the Factual Statement, and that such transactions by ABN, or involving funds that were held at, or passed through certain accounts at ABN, violated: Title 50, United States Code, Section 1705 and the regulations issued thereunder; Title 50, United States Code, Appendix, Sections 1-6, 7-39, and 41-44 and the regulations issued thereunder; and/or Title 18, United States Code, Sections 1956 and 1957.    In lieu of forfeiture resulting

3

from a criminal forfeiture proceeding, ABN hereby agrees to pay to the United States the sum of $500,000,000 (the "Forfeiture Amount"). ABN hereby agrees that the funds paid by ABN pursuant to this Agreement shall be considered substitute *res* for the purpose of forfeiture to the United States pursuant to Title 18, United States Code, Sections 981 and 982, and ABN releases any and all claims it may have to such funds. ABN shall pay the Forfeiture Amount within five (5) business days from the entry of this Agreement pursuant to payment instructions as directed by the United States in its sole discretion.

4. **Court is Not Bound**: ABN and the United States understand that the Agreement must be approved by the United States District Court for the District of Columbia in accordance with Title 18, United States Code, Section 3161(h)(2). If that Court declines to approve this Agreement for any reason, the United States and ABN are released from any obligation imposed upon them by this Agreement, this Agreement shall be null and void, and the United States shall not premise any prosecution of ABN upon any admissions or acknowledgements contained herein, including in the Factual Statement.

5. **Deferral of Prosecution**: In consideration of ABN's remedial actions to date and its willingness to: (a) acknowledge and accept responsibility for its actions; (b) have terminated the conduct set forth in the Factual Statement; (c) continue its cooperation with the United States as stated in Paragraphs 6 and 7; (d) demonstrate its future good conduct and full compliance with Financial Action Task Force international Anti-Money Laundering and Combating Financing of Terrorism best practices and the Wolfsberg Anti-Money Laundering Principles for Correspondent Banking; and (e) settle

4

any and all civil and criminal claims currently held by the United States for any act within the scope of the Factual Statement, the United States agrees as follows:

    i.    the United States shall recommend to the Court, pursuant to Title 18, United States Code, Section 3161(h)(2), that prosecution of ABN on the Information filed pursuant to Paragraph 1 be deferred for a period of twelve (12) months from the date of the filing of the Information referred to in Paragraph 1. In determining the appropriate length of deferral, the United States has taken the following factors, among others, into consideration: (a) the extraordinary remedial actions already taken by ABN, including the retention of an independent third party to conduct an extensive transaction review; (b) the fact that in December 2005 ABN voluntarily agreed to a Cease and Desist Order as well as an Order of Assessment of a Civil Money Penalty, Monetary Payment and Order to File Reports Issued Upon Consent with OFAC and federal, state, and foreign banking regulators; (c) ABN's full compliance with the terms of those written settlements; and (d) the extensive cooperation already provided by ABN to the United States since an agreement in principle was reached by ABN and the United States to resolve this investigation. ABN shall consent to a motion, the contents to be agreed upon by the parties, to be filed by the United States with the Court promptly upon execution of this Agreement, pursuant to Title 18, United States Code, Section 3161(h)(2), in which the United States will present this Agreement to the Court and move for a continuance of all further criminal proceedings, including trial, for a period of twelve (12) months, for speedy trial exclusion of all time covered by such a continuance, and for approval by the Court of this deferred prosecution. ABN further agrees to waive and does hereby expressly waive any and all rights to a speedy trial pursuant to the Fifth and Sixth

5

Amendments of the United States Constitution; Title 18, United States Code, Section 3161; Federal Rule of Criminal Procedure 48(b); and any applicable Local Rules of the United States District Court for the District of Columbia for the period that this Agreement is in effect. ABN agrees that any and all statutes of limitation are tolled and waived for the period from October 1, 2004, through May 10, 2011. ABN agrees to waive and forgo any and all defenses, bars, or claims based on Title 18, United States Code, Section 3282, or any other statute of limitations for the time period from October 1, 2004, until May 10, 2011. ABN agrees to this waiver based upon its own assessment of the matter after full consultation with its legal counsel; and

   ii. the United States shall, if ABN is in full compliance with all of its obligations under this Agreement, within thirty (30) days of the expiration of the time period set forth above in Paragraph 5(i), or less at the discretion of the United States, seek dismissal with prejudice of the Information filed against ABN.

  6. **Cooperation**: ABN agrees, acknowledges, and understands that its cooperation with this investigation and any subsequent prosecution against other entities or individuals is an important and material factor underlying the decision by the United States to enter into this Agreement. ABN agrees for the duration of this agreement, in accordance with and subject to all applicable United States and foreign law, to cooperate fully, honestly, without reservation, and affirmatively with the United States and with any other federal, state or local governmental department or agency designated by the United States ("Designated Agency") relating to the Information and Statement of Facts. This cooperation includes, but is not limited to, the following:

(a)  Completely and truthfully disclosing all additional information and materials in its possession, custody, or control to the United States that the United States or its Designated Agency may request, including, but not limited to, all information about the activities of ABN and present and former directors, officers, employees, consultants, representatives, agents, subsidiary entities, any entities in which ABN has a minority ownership interest, and affiliated entities;

(b)  Assembling, organizing, translating, and providing, in a responsive and prompt fashion, all additional information and materials in the possession, custody, or control of ABN as may be requested by the United States;

(c)  Using its good faith efforts to make available, at its cost, ABN's and its successors' current and former directors, officers, employees, consultants, representatives, and agents to provide additional information and materials and to testify when requested by the United States, including sworn testimony before a grand jury or in any judicial proceeding and interviews with the United States and designated agencies;

(d)  Identifying witnesses and notifying the United States of witnesses who, to ABN's knowledge and information, may have material information concerning the conduct set forth in the Information and Statement of Facts;

(e)  Providing information, materials, and testimony as necessary or requested to identify or establish the original location, authenticity, or other basis for admission into evidence of documents or physical evidence in any criminal or judicial proceeding;

(f)  Consenting to the disclosure of information or materials, which were initially obtained by the United States from ABN, to any designated agency as the United States, in its sole discretion, deems appropriate;

7

(g)　Obtaining, collecting, and providing to the United States in Washington, D.C., upon request, any additional information or materials, which the Bank has a contractual or business right or obligation to inspect, audit, and maintain and which are relevant to any criminal investigation;

(h)　Cooperating in any other reasonable request by the United States, as determined by the United States in its sole and non-reviewable discretion, in any law enforcement action, operation, transaction, procedure, or training;

(i)　Cooperating in any other reasonable request by the United States to assist any federal or state regulatory agency in educating and informing other financial institutions, businesses, and individuals of applicable federal and state laws and regulations which are relevant to this matter;

(j)　Implementing compliance procedures and training designed to ensure that the ABN compliance officer in charge of sanctions is made aware, in a timely manner, of any known requests or attempts by any entity (including, but not limited to, ABN customers, financial institutions, companies, organizations, groups, or persons) to withhold or alter its name or other identifying information where the request or attempt appears to be related to circumventing or evading U.S. sanctions laws. The ABN compliance officer in charge of sanctions shall report to the United States the name and contact information of any entity that makes such a request;

(k)　Applying the OFAC sanctions list to the same extent as any European, Dutch, or United Nations sanctions or freeze lists are applied to U.S. Dollar transactions and the acceptance of customers and screening and checking against the OFAC list all U.S. Dollar cross-border Society for Worldwide Interbank Financial Telecommunications

8

("SWIFT") incoming and outgoing messages involving payment instructions or electronic transfer of funds, whether through any international, regional, or local SWIFT gateway or payment center of ABN or any electronic, magnetic or optical device, telephone instrument, or computer;

(l)  Except as otherwise permitted by United States law, and in accordance with European Union laws pertaining to transactions with Cuba, undertaking no U.S. Dollar cross-border electronic funds transfer or any other U.S. Dollar transaction for, on behalf of, or in relation to any person or entity resident or operating in, or the governments of, Iran, North Korea, the Sudan (except for those regions and activities exempted from the United States embargo by Executive Order No. 13412), Syria, Cuba, or Burma;

(m)  Requiring the use of the SWIFT Message Transfer ("MT") 202COV bank-to-bank payment message where appropriate for all U.S. Dollar cross-border electronic funds transfer cover payments;

(n)  Maintaining appropriate and specific, and, where necessary, enhanced due diligence policies, procedures and controls that are reasonably designed to detect and report instances of money laundering through foreign correspondent and private banking accounts;

(o)  Maintaining the electronic database of SWIFT MT payment messages and other internal ABN documents relating to U.S. Dollar payments processed during the period from January 1, 2002, through April 30, 2007, in electronic format for a period of five (5) years from the date of this Agreement;

(p)  Providing the United States with written summaries concerning the actions of ABN's subsidiaries and affiliates;

(q)   Seeking, to the extent reasonably possible, to ensure that any subsidiary financial institution in which ABN holds an ownership interest: (1) does, and will continue to, apply and filter its clients and U.S. Dollar transactions against the OFAC list; (2) will not conduct any U.S. Dollar transactions with or on behalf of an OFAC designated person or entity except where permitted by United States law; and (3) in conducting any U.S. Dollar transactions or transactions through the United States, will comply with all United States laws; and

(r)   In light of prior remediation and reporting obligations met pursuant to the 2005 Cease and Desist Order and Order of Assessment of a Civil Money Penalty, Monetary Payment and Order to File Reports Issued on Consent, with the De Nederlandsche Bank, the Board of Governors of the Federal Reserve System, the State of Illinois Department of Financial and Professional Regulation, the New York State Banking Department, and OFAC, providing a certification by ABN's Head of Compliance nine (9) months from the date that this Agreement is entered that he or she (1) has reviewed the foregoing commitments contained in Paragraph 6 of this Agreement; (2) has made inquiries with relevant ABN personnel, including the responsible heads of internal audit and operations; and (3) based on those inquiries, can attest that ABN has, to the best of his or her ability to determine, complied with the commitments contained in Paragraph 6 of this Agreement.

7.     ABN agrees that for the term of this Agreement, in accordance with applicable laws, it shall supply and/or make available upon request by the United States any additional relevant documents, electronic data, or other objects in ABN's possession, custody, or control as of the date of this Agreement relating to any transaction within the

10

scope of or relating to the Factual Statement. Nothing in this Agreement shall be construed to require ABN to produce any documents, records or tangible evidence that are protected by the attorney-client privilege or attorney work product doctrine. To the extent that a United States request requires transmittal through formal government channels, ABN agrees to use its best efforts to facilitate such a transfer and agrees not to oppose any such request, either publicly or privately.

8. **Government Commitments**: In return for the full and truthful cooperation of ABN and compliance with the terms and conditions of this Agreement, the United States agrees that neither it nor the National Security Division of the United States Department of Justice shall seek to prosecute ABN, its corporate parents, subsidiaries, affiliates, successors, or predecessors for any acts by ABN or its former affiliates or subsidiaries that are within the scope of the Factual Statement from 1995 through December 31, 2007, unless: (a) other than the transactions that have already been disclosed and documented to the United States, ABN knowingly and willfully transmitted or approved the transmission of U.S. Dollar-denominated funds that went to or came from persons or entities designated at the time of the transaction by OFAC as a Specially Designated Terrorist, a Specially Designated Global Terrorist, a Foreign Terrorist Organization, or a proliferator of Weapons of Mass Destruction (an "Undisclosed Special SDN Transaction"); or (b) in the sole discretion of the United States, there is a willful and material breach of this Agreement. In the event of a breach resulting in a prosecution of ABN or a prosecution related to an Undisclosed Special SDN transaction, the United States may use any information provided by or on behalf of ABN to the United States or

11

any investigative agency, whether prior to or subsequent to this Agreement, and/or any leads derived from such information, including the attached Factual Statement.

      9.    **Waiver of Rights**: ABN expressly waives:

      (a)    any challenges to the venue or jurisdiction of the United States District Court for the District of Columbia;

      (b)    any right to be charged by an Indictment returned by a grand jury, and agrees to be prosecuted on the Information filed; and

      (c)    any right to trial by jury.

      10.    **Breach of the Agreement**: If the United States determines that ABN has committed a willful and material breach of any provision of this Agreement, the United States shall provide written notice to ABN's counsel of the alleged breach and provide ABN with a two-week period from the date of receipt of said notice, or longer at the discretion of the United States, in which to make a presentation to the United States to demonstrate that no breach has occurred or, to the extent applicable, that the breach is not willful or material, or has been cured. The parties hereto expressly understand and agree that if ABN fails to make the above-noted presentation within such time period, it shall be presumed that ABN is in willful and material breach of this Agreement. The parties further understand and agree that the United States' exercise of discretion under this paragraph is not subject to review in any court or tribunal outside the Criminal Division of the Department of Justice and the United States Attorney's Office for the District of Columbia. In the event of a breach of this Agreement that results in a prosecution, such prosecution may be premised upon any information provided by or on behalf of ABN to the United States or any investigative agencies, whether prior to or subsequent to this

Agreement, and/or any leads derived from such information, including the attached Factual Statement, unless otherwise agreed to by the United States and ABN in writing at the time the information was provided to the United States.

11.     ABN hereby further expressly agrees that within six (6) months of a willful and material breach of this Agreement by ABN, any violations of federal law that were not time-barred by the applicable statute of limitations as of the date of this Agreement, including any claims covered by the tolling agreement signed by the parties, and that: (a) relate to the Factual Statement; or (b) were hereinafter discovered by the United States, may in the sole discretion of the United States be charged against ABN, notwithstanding the provisions or expiration of any applicable statute of limitations.  In the event of a breach, ABN expressly waives (a) any challenges to the venue or jurisdiction of the United States District Court for the District of Columbia; (b) any right to be charged by an Indictment returned by a grand jury, and agrees to be prosecuted on the Information filed in this matter or a superseding Information arising from the facts presented in the Factual Statement.

12.     **Requirement to Obey the Law:**  If the United States determines during the term of this Agreement that ABN has committed any federal crime after the date of the signing of this Agreement, ABN shall, in the sole discretion of the United States, thereafter be subject to prosecution for any federal crimes of which the United States has knowledge, including, but not limited to, the conduct described in the Factual Statement. The discovery by the United States of any purely historical criminal conduct that did not take place during the term of the Agreement will not constitute a breach of this provision.

13.     **Parties Bound by the Agreement**:  This Agreement and all provisions set forth herein bind ABN and all of its subsidiaries in which it holds a majority ownership interest.  It is further understood that this Agreement and all provisions set forth herein are binding on the Asset Forfeiture and Money Laundering Section of the Criminal Division of the United States Department of Justice and the United States Attorney's Office for the District of Columbia, but, unless otherwise provided herein, specifically do not bind any other federal agencies, or any state or local authorities, although the United States will bring the cooperation of ABN and its compliance with its other obligations under this Agreement to the attention of federal, state, or local prosecuting offices or regulatory agencies, if requested by ABN or its attorneys.  Nothing in this Agreement restricts in any way the ability of the United States, any other federal department or agency, or any state or local government from proceeding criminally, civilly, or administratively, against any current or former directors, officers, employees, or agents of ABN or against any other entities or individuals.  The parties to this agreement intend that the Agreement does not confer or provide any benefits, privileges, immunities, or rights to any other individual or entity other than the parties hereto.

14.     **Public Statements**:  ABN expressly agrees that it shall not, through its attorneys, board of directors, agents, officers, employees, consultants, contractors, subcontractors, or representatives, including any person or entity controlled by any of them, make any public statement contradicting, excusing, or justifying any statement of fact contained in the Factual Statement.  Any such public statement by ABN, its attorneys, board of directors, agents, officers, employees, consultants, contractors, subcontractors, or representatives, including any person or entity controlled by any of

14

them, shall constitute a willful and material breach of this Agreement as governed by Paragraph 10 of this Agreement, and ABN would thereafter be subject to prosecution pursuant to the terms of this Agreement. The decision of whether any public statement by any such person contradicting, excusing, or justifying a fact contained in the Factual Statement will be imputed to ABN for the purpose of determining whether ABN has breached this Agreement shall be in the sole and reasonable discretion of the United States. Upon the United States' notification to ABN of a public statement by any such person that in whole or in part contradicts, excuses, or justifies a statement of fact contained in the Factual Statement, ABN may avoid breach of this Agreement by publicly repudiating such statement within seventy-two hours after notification by the United States. This paragraph is not intended to apply to any statement made by any individual in the course of any criminal, regulatory, or civil case initiated by a governmental or private party against such individual regarding that individual's personal conduct.

15. **Sales, Mergers, or Demergers**: ABN agrees that if it sells, merges, demerges, or transfers all or substantially all of its business operations or assets as they exist as of the date of this Agreement to a single purchaser or group of affiliated purchasers during the term of this Agreement, it shall include in any contract for sale, merger, demerger, or transfer, a provision binding the purchaser/successor/transferee ("purchaser(s)") to the obligations described in this Agreement. This provision shall explicitly confirm the assumption of all the obligations described in this Agreement by such purchaser(s). Any such provision in a contract of sale, merger, demerger, or transfer

15

shall not expand or impose additional obligations on ABN as they relate to Paragraphs 6 and 7 of this Agreement.

16.   **Conduct Covered by Agreement**:   It is further understood that this Agreement does not relate to or cover any conduct by ABN other than the actions of ABN or its former affiliates or subsidiaries that are within the scope of the Factual Statement and this Agreement.

17.   **Public Filing**:  ABN and the United States agree that, upon acceptance by the United States District Court for the District of Columbia, this Agreement (and its attachments) and an Order deferring prosecution shall be publicly filed in the United States District Court for the District of Columbia.

18.   **Complete Agreement**:  This Agreement sets forth all the terms of the Agreement between ABN and the United States.  There are no promises, agreements, or conditions that have been entered into other than those expressly set forth in this Agreement, and none shall be entered into and/or be binding upon ABN or the United States unless signed by the United States, ABN's attorneys, and a duly authorized representative of ABN.  This Agreement supersedes any prior promises, agreements, or conditions between ABN and the United States.  ABN agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement and it agrees to abide by all terms and obligations of this Agreement as described herein.


[REST OF THE PAGE IS INTENTIONALLY BLANK]

**Acknowledgement on behalf of RBS N.V.,**

**formerly known as ABN AMRO Bank N.V.**

We, John Collins and Mary Elizabeth Taylor, the duly authorized representatives of The Royal Bank of Scotland N.V., formerly known as ABN AMRO Bank N.V., (the "Bank") hereby expressly acknowledge the following: (1) that we have read this entire Agreement as well as the other documents filed herewith in conjunction with this Agreement, including the Information and Statement of Facts; (2) that we have had an opportunity to discuss this Agreement fully and freely with the Bank's attorneys, (3) that the Bank fully and completely understands each and every provision of this Agreement, (4) that the Bank is fully satisfied with the advice and representation provided by its attorneys; (5) that we are authorized, on behalf of the Bank, to enter this Agreement; and (6) that the Bank enters this Agreement knowingly and voluntarily.


John Collins
General Counsel
The Royal Bank of Scotland
N.V., formerly known as
ABN AMRO Bank N.V

May 10, 2010
Date


Mary Elizabeth Taylor                                    Date
Associate General Counsel/
Head of Litigation,
RBS Americas

17

**Acknowledgement on behalf of RBS N.V.,**

**formerly known as ABN AMRO Bank N.V.**

We, John Collins and Mary Elizabeth Taylor, the duly authorized representatives of The Royal Bank of Scotland N.V., formerly known as ABN AMRO Bank N.V., (the "Bank") hereby expressly acknowledge the following: (1) that we have read this entire Agreement as well as the other documents filed herewith in conjunction with this Agreement, including the Information and Statement of Facts; (2) that we have had an opportunity to discuss this Agreement fully and freely with the Bank's attorneys; (3) that the Bank fully and completely understands each and every provision of this Agreement; (4) that the Bank is fully satisfied with the advice and representation provided by its attorneys; (5) that we are authorized, on behalf of the Bank, to enter this Agreement; and (6) that the Bank enters this Agreement knowingly and voluntarily.

_____            _____
John Collins                                                         Date
General Counsel
The Royal Bank of Scotland
N.V., formerly known as
ABN AMRO Bank N.V.


Mary Elizabeth Taylor                                    Date
Associate General Counsel/
Head of Litigation,
RBS Americas

17

## Acknowledgment by Defense Counsel

We, the undersigned, are attorneys representing The Royal Bank of Scotland N.V., formerly known as ABN AMRO Bank N.V., in this matter. In connection with such representation, we hereby expressly acknowledge the following: (1) we have reviewed and discussed this Agreement with our client; (2) we have explained fully each of the terms and conditions of this Agreement to our client; (3) we have answered fully each and every question asked of us by our client; and (4) we believe that our client fully and completely understands all of the Agreement's terms.


_____          MAY 10, 2010
Samuel W. Seymour                         _____
Nicolas Bourtin                                   Date
Sullivan & Cromwell LLP
Attorneys for The Royal Bank of
Scotland N.V., formerly known as
ABN AMRO Bank N.V.



_____          MAY 10, 2010
Robert B. Fiske, Jr.                      _____
Martine Beamon                                    Date
Davis Polk & Wardwell LLP


18

**_On Behalf of the Government_**

_5/10/2010_
DATE

_Ronald C. Machen Jr. /by SM_
RONALD C. MACHEN JR.
United States Attorney
District of Columbia

_5/10/2010_
DATE

JAMES MEADE, Acting Chief
Asset Forfeiture and
  Money Laundering Section
Criminal Division
United States Department of Justice

*Exhibit A*

Factual Statement

## EXHIBIT A -- FACTUAL STATEMENT

### I.    Introduction

1.    This Factual Statement is made pursuant to, and is part of, the Deferred Prosecution Agreement dated May 10, 2010, between The Royal Bank of Scotland N.V. ("RBS N.V."), formerly known as ABN AMRO Bank N.V. (both RBS N.V. and the former ABN AMRO Bank N.V. are referred to herein as "ABN"), and the Asset Forfeiture and Money Laundering Section of the Criminal Division of the United States Department of Justice and the United States Attorney's Office for the District of Columbia (collectively, the "Government").

2.    Beginning after the announcement of U.S. sanctions against countries and entities designated as supporting international terrorism in the mid-1990s, certain offices, branches, subsidiaries, and affiliates of ABN systematically violated the laws of the United States by conspiring with entities subject to U.S. sanctions on ways to circumvent the sanctions and by facilitating the movement of hundreds of millions of dollars illegally through the U.S. financial system on behalf of those sanctioned entities.

3.    ABN engaged in this criminal conduct by: (a) methodically removing or falsifying references from outgoing[1] United States Dollar ("USD") payment messages that principally involved countries such as Iran, Libya, the Sudan, and Cuba, banks from Iran, Libya, the Sudan or Cuba, or persons listed as parties or jurisdictions sanctioned by the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC")  (collectively, the "Sanctioned Entities"); (b) advising the Sanctioned Entities

---

[1] References to "outgoing" messages indicate those payment messages that were transmitted by ABN to ABN's U.S. affiliates and correspondent banks.  "Incoming" messages refer to: (a) payment messages sent by the Sanctioned Entities to ABN for further transmission to ABN's U.S. affiliates and correspondent banks; and (b) payment messages that were transmitted to ABN from financial institutions in the United States.

how to evade automated filters at financial institutions in the United States; and (c) willfully failing to maintain or establish appropriate Bank Secrecy Act ("BSA") and Anti-Money Laundering ("AML") procedures or to conduct effective due diligence reviews concerning foreign correspondent accounts.

4.     Additionally, as part of this criminal conduct, ABN: (a) caused financial institutions in the United States to process transactions involving Sanctioned Entities, including banks from Iran, Libya, the Sudan, and Cuba, that the U.S. financial institutions would not otherwise have processed; and (b) prevented financial institutions in the United States from filing required BSA and OFAC-related reports with U.S. authorities.

5.     Certain offices, branches, and subsidiaries of ABN used procedures to alter USD payment messages by:  (a) removing names and references to Sanctioned Entities from payment messages; (b) altering the names of the Sanctioned Entities; (c) instructing the Sanctioned Entities to include the code word "SPARE" in their payment messages so ABN could first segregate these messages from normal message payment processing and then amend the message by removing/altering any potentially problematic text; (d) creating a manual queue to ensure certain payment methods and language were used to effectuate the sanctioned payments; (e) replacing the names of Sanctioned Entities with ABN on letters of credit and foreign exchange transactions; and (f) adding to payment manuals the "Special Conditions" that were to be used for certain Sanctioned Entities in order to circumvent the laws of the United States.  In addition, ABN used these same procedures for Sanctioned Entities with respect to letters of credit, and the processing of USD checks and traveler's checks.  ABN and the Sanctioned Entities knew and discussed the fact that without such alterations, amendments, and code words, the automated OFAC

2

filters at clearing banks in the United States would likely halt the payment messages and other transactions, and, in many cases, would reject or block the sanctions-related transactions and report the same to OFAC. ABN knew that financial institutions in the United States could choose not to process permissible payments on behalf of any of the Sanctioned Entities. By making the transactions appear to be on behalf of ABN and not the Sanctioned Entities, ABN's actions effectively denied the financial institutions in the United States that opportunity. ABN therefore also prevented the financial institutions in the United States from filing required BSA and OFAC-related reports with the U.S. authorities. Further, because of ABN's actions, civil monetary judgments against the Sanctioned Entities could not be enforced in the United States, nor could the Sanctioned Entities' funds be seized since no one, other than ABN, knew the money actually was owned by the Sanctioned Entities. ABN management identified these practices in 2004 and terminated them in 2005. The implementation of more robust controls continued through 2006.

6.     In addition to altering USD payment messages, ABN conspired with the Sanctioned Entities about how to format USD payments so that such payments would evade U.S. sanctions and detection by automated filters used by financial institutions in the United States. When ABN employees received payment messages from the Sanctioned Entities that contained words that could trigger a U.S. bank's OFAC filter, ABN would manually alter or amend the messages to ensure that they would not be detected by financial institutions in the United States. ABN's actions in facilitating these payments were motivated by the profit ABN could make from the Sanctioned Entities.

7.     Each year between and including 1996 and 2004, ABN caused ABN's U.S. affiliate to file false, misleading, and inaccurate Annual Reports of Blocked Property to OFAC. In each of those reports, the U.S. affiliate of ABN certified to OFAC that all information provided was accurate and that all material facts in connection with the report had been set forth.

8.     In May 2005, ABN provided the Government with the results of ABN's internal investigation into its USD business with Sanctioned Entities. In December 2005, ABN was issued a Cease and Desist order from the Federal Reserve and other regulators ordering ABN to make improvements and enhancements to its compliance program to ensure that it would not engage in practices that resulted in the processing of impermissible USD payments for the Sanctioned Entities. After May 2005, ABN provided assistance by sharing with the Government, as well as the relevant regulators, the results of that internal investigation and other relevant materials.

## II.     ABN's Business Organization and Assets

9.     ABN was a leading international financial institution with its headquarters in Amsterdam, Netherlands, operating in more than 50 countries through offices, branches, affiliates, and subsidiaries around the globe, including within the United States. ABN's business included commercial lending, Treasury transactions among governments, Treasury transactions between governments and private investors, consumer deposits and loans, investment banking, private banking or wealth management for individuals, and various other financial activities typically conducted by modern international financial institutions.

10.     At all times relevant to the Factual Statement, ABN was considered a "foreign bank" and a "bank holding company"[2] in the United States. ABN, in the form of its predecessor corporations, began U.S. operations in January 1941. Since that time, ABN has owned several banks in the United States. During the 1990s, by total assets, ABN was the largest foreign bank in the United States.

11.     The United States market was a vital and leading profit center for ABN. In 1996, ABN sought and obtained a listing on the New York Stock Exchange. Further, at certain points in time, U.S. operations or business delivered greater gross profits than did operations in any other country. During the Third Quarter of 2003, for instance, ABN reported net operating income of approximately $2 billion USD. More than thirty-three percent of that total, or approximately $700 million USD for one calendar quarter, arose from the U.S. business unit.

12.     ABN's strong U.S. presence, operations, and facilities were used to solicit, obtain and maintain business and resulting profits throughout the world. For example, ABN marketed itself to foreign financial institutions and international businesses based upon its U.S. presence, business, and clearing services and facilities, particularly emphasizing that it was the largest foreign bank in the United States and that it considered the United States its second "home" market.

13.     The Board of Governors of the Federal Reserve System ("Federal Reserve") had supervisory authority over ABN operations in the United States. In New York, ABN was also subject to oversight and regulation by the New York State Banking Department. In

---

[2] The term "foreign bank" is defined in the International Banking Act, 12 U.S.C. § 3101(7), and the term a "bank holding company" is defined in the Bank Holding Company Act of 1956, 12 U.S.C. § 1841.

Illinois, ABN was also subject to oversight and regulation by the Illinois State Banking Department. ABN's home country supervisor was De Nederlandsche Bank ("DNB").

14.     The December 31, 2009, annual report, which is the most recent annual report for the bank (which at that time was named ABN AMRO Bank N.V.) listed the bank's annual audited consolidated net income attributable to shareholders as $6.14 billion USD; and $5.27 billion USD for Dec 31, 2008. Total audited consolidated assets as of the same dates equaled $676 billion USD and $930 billion USD, respectively.

15.     ABN AMRO Holding N.V., the parent company of the former ABN AMRO Bank N.V., was acquired in October 2007 by a consortium of Fortis, the Royal Bank of Scotland ("RBS"), and Banco Santander, using the acquisition vehicle RFS Holdings. In October 2008, the Dutch State announced that it had acquired the Dutch businesses of Fortis. In December 2008, the Dutch State replaced Fortis as a stakeholder in RFS Holdings. The former ABN AMRO Bank N.V. subsequently underwent a restructuring process to transfer its Dutch State-acquired businesses and activities out of the existing ABN AMRO Group. To achieve this, the relevant Dutch State-acquired businesses were first transferred to a new legal entity owned by ABN AMRO Holding N.V. On February 5, 2010, through a statutory demerger process, the former ABN AMRO Bank N.V. was renamed RBS N.V., and the newly created Dutch legal entity was re-named ABN AMRO N.V. ("new ABN AMRO"). Full legal separation, at which time ABN AMRO Holding N.V. ceased to own new ABN AMRO, was completed on April 1, 2010. New ABN AMRO is now 100% owned by the Dutch Government. RBS N.V. is a subsidiary undertaking of, and controlled by, RBS.

### III.     Applicable Laws and Background

16.     In order to protect its citizens, the United States has employed sanctions and embargoes with regard to state sponsors of terrorism such as Iran, Libya, the Sudan, and Cuba.   Whether by statute, Executive Order, or regulation, those sanctions arose in response to repeated support by those nations for international terror against U.S. citizens and its allies.   To safeguard the national security of the United States and its allies, the U.S. Congress and the President of the United States authorized and implemented such sanctions as the Trading with the Enemy Act, the Iranian Transactions Regulations, and regulations and embargoes against Libya and the Sudan, and made a willful violation of those sanctions a federal criminal offense.

#### A.     *Libyan Sanctions*

17.     On January 7, 1986, President Ronald Reagan issued Executive Order No. 12543, which imposed broad economic sanctions against Libya.   One day later, the President issued Executive Order No. 12544, which also ordered the blocking of all property and interests in property of the Government of Libya.   President George H.W. Bush strengthened those sanctions in 1992 pursuant to Executive Order No. 12801.   On September 22, 2004, President George W. Bush issued Executive Order No. 13357, terminating the national emergency with regard to Libya and revoking the sanction measures imposed by the prior Executive Orders.

#### B.     *Iranian Sanctions*

18.     In 1987, President Reagan issued Executive Order No. 12613, which imposed a broad embargo on imports of Iranian-origin goods and services.   In 1995 and 1997, President William Clinton issued Executive Order Nos. 12957, 12959, and 13059, which

strengthened existing U.S. sanctions against Iran. The Executive Orders prohibited virtually all trade and investment activities between the United States and Iran, including, but not limited to, broad prohibitions on: (a) the importation into the United States of goods or services from Iran; (b) the exportation, sale, or supply of goods, technology or services from the United States or by a U.S. person to Iran; (c) trade-related transactions with Iran by U.S. persons, including financing, facilitating or guaranteeing such transactions; and (d) investment by U.S. persons in Iran or in property owned or controlled by Iran (collectively, the "Iranian Sanctions"). With the exception of certain exempt or authorized transactions, OFAC regulations implementing the Iranian Sanctions generally prohibited the export of services to Iran from the United States. Under the Iranian Transactions Regulations, 31 C.F.R. Part 560, no goods, technology, or services could be exported, re-exported, sold, or supplied to Iran, directly or indirectly, from the United States or by a U.S. person wherever located, without authorization. 31 C.F.R. § 560.204. Section 560.203 prohibited any transaction by any U.S. person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, or that attempted to violate, any of the prohibitions set forth in Part 560. Section 560.203 further prohibited any attempt to violate the prohibitions contained in Part 560. 31 C.F.R. § 560.203. The Iranian Sanctions were in effect at all times relevant to the Statement of Facts.

### C. Sudanese Sanctions

19. On November 3, 1997, President William J. Clinton issued Executive Order No. 13067, which imposed a trade embargo against the Sudan and blocked all property and interests in property of the Government of Sudan. President George W. Bush

strengthened those sanctions in 2006 pursuant to Executive Order No. 13412. The Executive Orders prohibited virtually all trade and investment activities between the United States and the Sudan, including, but not limited to, broad prohibitions on: (a) the importation into the United States of goods or services from the Sudan; (b) the exportation or re-exportation of any goods, technology, or services from the United States or by a U.S. person to the Sudan; and (c) trade- and service-related transactions with the Sudan by U.S. persons, including financing, facilitating or guaranteeing such transactions. The Executive Orders further prohibited "[a]ny transactions by a United States person or within the United States that evades or avoids, has the purposes of evading or avoiding, or attempts to violate any of the prohibitions set forth in [these orders]." With the exception of certain exempt or authorized transactions, OFAC regulations implementing the Sudanese Sanctions generally prohibited the export of services to the Sudan from the United States. The Sudanese Sanctions were in effect at all times relevant to the Statement of Facts.

### D. Cuban Sanctions

20. Beginning with Executive Orders and regulations issued at the direction of President John F. Kennedy, the United States has maintained an economic embargo against Cuba through the enactment of various laws and regulations restricting U.S. trade and economic transactions with Cuba. OFAC controls imports and blocks all transactions relating to Cuban assets based upon the Cuban Assets Control Regulations ("CACR"), which were promulgated under the Trading With the Enemy Act ("TWEA"), Title 50, United States Code Appendix, Sections 1-39, and 41-44.

21.     Unless authorized by OFAC, U.S. persons are prohibited from engaging in financial transactions, among other types of transactions, which are by, at the direction of, or for the benefit of, Cuba or Cuban nationals, or which involve property in which Cuba or Cuban nationals have any direct or indirect interest, including all "transfers of credit and all payments" and "transactions in foreign exchange." 31 C.F.R.§ 515.201(a). Unless authorized by OFAC, U.S. persons are prohibited from engaging in transactions involving property in which Cuba or Cuban nationals have any direct or indirect interest, including all "dealings in . . . any property or evidences of indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States" and all "transfers outside the United States with regard to any property or property interest subject to the jurisdiction of the United States." 31 C.F.R. § 515.201(b). The Cuban Assets Control Regulations also prohibited any "transaction for the purpose or which has the effect of evading or avoiding any of the prohibitions" set forth in the OFAC regulations. 31 C.F.R. § 515.201(c). The Cuban Sanctions were in effect at all times relevant to the Statement of Facts.

### E.     *Bank Secrecy Act*

22.     The Bank Secrecy Act, 31 U.S.C. § 5311 *et seq.,* and its implementing regulations, which Congress enacted to address the increase in criminal money laundering activities utilizing financial institutions, require domestic banks, insured banks and other financial institutions to maintain programs designed to detect and report suspicious activity that might be indicative of money laundering, terrorist financing and other financial crimes, and to maintain certain records and file reports related thereto.

Banks are also required to conduct due diligence for foreign correspondent accounts. The Bank Secrecy Act was in effect at all times relevant to the Statement of Facts.

## IV.    Charges

### A.    *Conspiracy*

23.    The Government alleges and ABN agrees that ABN violated Title 18, United States Code, Section 371, by conspiring:

a.  to defraud the United States by impeding, impairing, obstructing and defeating the lawful functions of the U.S. Department of Treasury, Office of Foreign Assets Control, in the application and enforcement of sanctions and embargo regulations against Iran, Libya, the Sudan, and Cuba, and entities affiliated with Iran, Libya, the Sudan, and Cuba;

b.  to engage in financial transactions with entities affiliated with Iran, Libya, and the Sudan, in violation of the International Emergency Economic Powers Act, Title 50, United States Code, Section 1705, and regulations and embargoes issued thereunder; and

c.  to engage in financial transactions with entities associated with Cuba, in violation of the Trading With the Enemy Act, Title 50, United States Code, Appendix, Sections 1-39, and 41-44, and regulations and embargoes issued thereunder.

### B.    *Bank Secrecy Act/Anti-Money Laundering Charge*

24.    The Government alleges and ABN agrees that ABN did not maintain an adequate BSA/AML program, in violation of Title 31, United States Code, Sections 5318(h) and 5322.

## V.     Conduct of ABN

25.     In order to carry out its many functions and operations, ABN employed a wide range of officers and professionals with expertise in modern finance, management, business administration, risk management, auditing, regulatory compliance, and the law. ABN's management, lawyers, auditors, and compliance officials were well aware of U.S. sanctions against Sanctioned Entities.  For instance, on or about May 18, 1995, top officials of ABN in Amsterdam sent an electronic mail message to the entire management of ABN in Europe, Asia, South America, Africa, the Caribbean, and North America, advising and noting that any financial transactions in USD undertaken for or on behalf of Iranian persons or banks were subject to seizure or blocking in the United States:

> URGENT
> US Sanctions against Iran
> Your attention is urgently drawn to the unilateral imposition of sanctions by the USA against Iran.  Whilst no clear picture of the exact extent of the sanctions has yet emerged, all offices should give special attention to any payment traffic in US$ in favour of Iranian beneficiaries of any sort; it is known that such US$ transfers are being blocked in the USA.

26.     Soon after President Clinton signed the Executive Order implementing sanctions against Iran in May 1995, Iranian banks needed to find a way to conduct USD transactions.  The banks sought the services of ABN and other banks in aiding the Iranians to circumvent U.S. laws.  Certain ABN employees were aware of these requests, discussed these requests with the other facilitating bank, and thereafter approved of ABN conducting the illegal transactions.  This was contrary to the advice of outside counsel that ABN's involvement in such transactions would potentially violate U.S. law.  ABN employees engaged in these transactions in part in order to further strengthen ABN's commercial relationship with its Iranian bank customers.

27.     To overcome U.S. sanctions, certain Sanctioned Entities began requesting that ABN omit their names and Bank Identification Codes ("BICs") from payment messages sent by ABN to ABN's U.S. correspondent banks. ABN complied with the requests of these Sanctioned Entities and omitted those banks' names and identifiers in order to help bypass the OFAC filtering mechanisms of U.S. financial institutions.

28.     ABN and the Sanctioned Entities discussed additional ways to avoid future rejections or delays to any payments. ABN also used cover payments, on their face legitimate payment methods, to shield the identities of the Sanctioned Entities.[3]     For instance, instead of using serial MT 103 payment messages, ABN began to use MT 202 cover payment messages to avoid revealing the identity of the ordering customer and beneficiary party for USD payments sent through financial institutions in the United States.

29.     In addition to using cover payments, ABN agreed to remove the names, BICs, and any other identifying information of the Sanctioned Entities in the payment messages sent to ABN's U.S. correspondent banks. ABN employees knew that any references to the Sanctioned Entities put the payments at risk of detection, rejection, delay, or possible blocking by financial institutions in the United States. For any rejected or blocked payments, the U.S. financial institutions would have been required under U.S. law to file reports with OFAC regarding such transactions.

---

[3] An MT 103 message is the de facto industry standard used in cross-border customer credit transfers; an MT 202 is the de facto industry standard used for making bank-to-bank credit transfers. A cover payment is typically a payment where a SWIFT MT 103 payment message is sent between the originator and the beneficiary banks, but the actual funds are transferred by using an MT 202 bank payment that normally lacks the payment details of the MT 103. In this instance, a U.S. financial institution processing a cover payment would not know who the funds were being transferred for or if the transaction involved a Sanctioned Entity.

30.     As illustration, on or about June 5, 1995, representatives of Iranian Bank A made a request to ABN officials in Dubai that ABN act as a conduit for all USD transactions of Iranian Bank A in Dubai.  They requested that all USD payments of Iranian Bank A be routed through or be issued in the name of ABN and carry no reference to the fact that these payments were issued on behalf of Iranian Bank A, and that all USD receipts of Iranian Bank A would come into ABN's account.

31.     On or about June 5, 1995, officials of ABN in Dubai forwarded Iranian Bank A's request to officials at ABN Headquarters, noting the current financial profit and future profit of entering the scheme with Iranian Bank A:

> Our relations with [Iranian Bank A] are excellent and they frequently help us with our Overnight Dirham funding. They also maintain an average of USD[ollar] 20 mio [million] in call balances with us. Apart from this relationship angle, we will derive the following benefits: (a) from the interest free balances with us; (b) management fees; and (c) TT/DD charges, etc. There is also the possibility of cash backed L/Cs [Letters of Credit] of approx. USD[ollar] 200 mio [million] being routed through us in the future.

32.     On or about June 7, 1995, officials within ABN's Amsterdam Headquarters informed officials of ABN in Dubai that ABN's Central Credit Committee, which included several members of ABN's Board of Directors, should decide whether or not to assist Iranian Bank A through entering into the scheme.

33.     Similarly, on or about June 11, 1995, officials of Iranian Bank B sent a written communication to certain banks in the United Arab Emirates and its correspondent banks instructing those banks to undertake USD payments for Iranian Bank B in the name of a European financial institution "WITHOUT MENTIONING OUR BANK'S NAME" to defeat and circumvent the sanctions imposed upon Iran by the United States (emphasis in original).

34.    On or about June 13, 1995, an official of ABN in Dubai forwarded to officials located in several departments of the Amsterdam Headquarters of ABN a copy of the June 11 request by Iranian Bank B to use the named European financial institution as Iranian Bank B's conduit to defeat and evade the U.S. sanctions, stating: "Enclosed please find a copy of telefax message received from [Iranian Bank B] which is self-explanatory.  As would be obvious, [Iranian Bank B] has worked out an arrangement with [the financial institution] along similarities to what [Iranian Bank A] has proposed to us."

35.    On or about June 14, 1995, officials of ABN in Amsterdam and the named European financial institution communicated on the topic of the U.S. sanctions against Iran.

36.    In or about June and July 1995, officials at ABN's Amsterdam Headquarters and New York offices were advised by outside U.S. counsel that the proposal by Iranian Bank A and other Iranian banks for ABN to serve as a conduit or means to bypass and avoid the sanctions imposed by the United States upon Iran risked breaching U.S. law: "The fund transfer mechanics proposed by [Iranian Bank A] are an attempt to circumvent the Iranian trade embargo.  Given that violations of the Executive Order and OFAC regulations carry substantial penalties, not to mention the negative publicity, the [Iranian Bank A] proposal must be strictly scrutinized and ABN AMRO must weigh the risks before proceeding with any such transfers."

37.    Beginning in or about August 1995, officials of the Dubai branch of ABN accepted and then acted upon the request of Iranian Bank A and other Iranian banks to serve as their conduit to undertake financial transactions, including the processing of

payments, the confirmation or processing of letters of credit, the processing of checks, and the foreign exchange among governmental Treasuries, through the United States without disclosing that the Iranian government, financial institutions or nationals were behind such transactions.

38.     For example, in or about December 1995, officials of ABN in Amsterdam negotiated and acted to facilitate payments totalling approximately $2 million USD by Iranian Bank C to ABN.

39.     On or about February 5, 2000, an official of the Dubai branch of ABN wrote to a Regional Director of Iranian Bank A assuring him that the Bank would take care to carry out the scheme to evade and defeat the U.S. sanctions: "We understand the special nature of your US$ transactions and will ensure that all operations departments concerned are properly briefed regarding this, as well."

40.     Similarly, in or about October 1997, officials of the Dubai branch of ABN visited with officials at Libyan Bank A, a bank partially owned by the Libyan government, and noted that ABN was ready to engage in transactions with Libyan Bank A again.

41.     In or about December 1997, Libyan Bank A opened an account at the Dubai branch of ABN, with the agreement and understanding between the banks that Libyan Bank A's name would not be mentioned in USD transactions sent to the United States on behalf of Libyan Bank A.

42.     From in or about December 1997 until the lifting of U.S. sanctions against Libya in 2004, Libyan Bank A sent payment instructions to ABN for financial transactions in USD to be processed through the United States with the direction: "PLEASE DO NOT QUOTE OUR NAME AS REMITTING BANK."

43.    From in or about December 1997 until 2004, ABN transmitted instructions for financial transactions to ABN's New York branch on behalf of Libyan Bank A without referencing or mentioning Libyan Bank A by name or otherwise.

44.    On or about July 28, 1999, a payment instruction from the Dubai branch of ABN to the New York branch included a reference to Libyan Bank A. The payment was automatically held by the computer system in the New York branch because of the reference to Libyan Bank A. The Dubai branch then sent a communication to the New York branch directing that the payment be made and stating that the reference to Libyan Bank A, a sanctioned Libyan entity, was a typographical error:

> Due to typographical error in our MT100 by one of our staff member the name of [Libyan Bank A] in Field 52A [of the SWIFT MT100 instruction] has been wrongly mentioned which has no relation to this payment transfer. We regret very much for the inconv[enience] . . . and request you to delete the name of [Libyan Bank A] from the captioned payment order and execute the payment as requested.

45.    In or about August 1999, after employees of the New York branch refused to execute the July 28, 1999, payment, the Dubai branch officials of ABN re-executed the transfer through the New York branch without disclosing the involvement or interest of Libyan Bank A.

46.    On or about October 10, 1999, Iranian Bank B agreed with the Dubai branch of ABN to open a USD account in Dubai, as well as other foreign currency accounts at ABN in Amsterdam, with the following terms or understanding: "NOTE: PLEASE DO NOT MENTION THE NAME [IRANIAN BANK B] IN ANY OUTGOING PAYMENT. PAYMENTS TO BE PROCESSED LIKE [LIBYAN BANK A]."

47.    On or about November 26, 1999, ABN told a customer that it would be willing to provide advice on routing Cuban payments to evade U.S. sanctions but that the customer

must contact ABN directly and could not rely upon ABN catching or noticing the reference to Cuba in the money transfer instruction.

48.    Between approximately August 3, 2000 and August 28, 2000, Libyan Bank A sent payment instructions to the Romanian branch of ABN relating to financial transactions in USD, which were processed through the United States, and requested ABN to: "Please do not quote our name as the remitting bank in all your contacts with your USA correspondent or any American bank regarding this payment."

49.    From in or about January 2001, seven subsidiaries and affiliates of ABN used similar procedures as ABN, including cover payments, to process USD transactions on behalf of Sanctioned Entities, including Sudanese banks and persons.  These payments were processed through ABN's New York branch, among other USD clearing banks.

50.    In or about June and July 2003, business and compliance executives of ABN in Amsterdam, London, New York, the United Arab Emirates and elsewhere, discussed and exchanged communications regarding U.S. sanctions.  At the conclusion of those discussions and communications, ABN, through a number of its branches and affiliate banks, continued in the scheme to evade and circumvent U.S. sanctions.

## VI.    Special Services for Sanctioned Entities

51.    The Dubai branch of ABN created a special payment system for the Sanctioned Entities.  Payment messages involving the Sanctioned Entities were pulled from the normal processing procedure, manually reviewed, and, if needed, altered, before they were sent to financial institutions in the United States.  Thus, if the payment message contained a reference that would cause the payment to be stopped in the United States, ABN would alter the payment before sending it to the United States.  As ABN's payment

systems became more automated, ABN instructed the Sanctioned Entities to put the code word "SPARE" into the payment message. The payment message would then be stopped by ABN, routed into a special queue, and then manually altered to avoid any OFAC filters. In this manner, ABN assisted the Sanctioned Entities and assured the processing of USD transactions by formatting payment messages so they would not be rejected or blocked by OFAC filters at financial institutions in the United States.

52.     Beginning as early as 1995 and continuing until in or about 2005, the Dubai branch of ABN created procedures and guidelines to facilitate the processing of prohibited USD transactions. For instance, one section of the ABN payment manual entitled "Special Conditions" listed specific instructions on how to effectuate these payments and avoid OFAC filters. A specific instruction from this manual stated:

> Payments by order of Iranian Banks [A & D] maintaining accounts with ABN, Dubai are to be handled with extra care to ensure the wordings "Iran" etc. are not mentioned in the payment due to OFAC regulations.

53.     On or about October 12, 1999, an official of the Dubai branch of ABN noted that undertaking the special scheme for the Iranian and Libyan banks involved manual intervention in the payment process which readily could result in "errors" leading to losses. The official requested assistance with arriving at an automated or technical solution, which was subsequently instituted.

### A.     Use of Cover Payments

54.     In October 2001, Special Recommendation VII of the Financial Action Task Force[4] stated that countries should take measures to require financial institutions to

---

[4] The Financial Action Task Force was an inter-governmental body, of which the Netherlands was a member, whose purpose was the development and promotion of national and international policies to combat money laundering and terrorist financing.

include accurate and meaningful originator information on funds transfers and related payment messages. It further stated that member countries should closely monitor any funds transfers that did not contain complete originator information.

55.    In 2003, ABN Dubai made a decision to discontinue cover payments and instead use the serial payment method. However, for certain Sanctioned Entities, ABN Dubai continued to use the cover payment method, thereby hiding the Sanctioned Entities' identities and effectuating payments in violation of U.S. sanctions. ABN again created special exceptions to its normal processing of transactions by using cover payments where it should have used serial payments.

### B.    *Personal Checks and Traveler's Checks*

56.    The Sanctioned Entities intentionally sent bundles of checks to ABN Dubai without a stamp or endorsement marked on the checks. ABN would then credit the Sanctioned Entities' accounts at ABN Dubai and send the bundles of checks to ABN Chicago's check processing center for processing and collection. Proceeds were deposited into ABN Dubai's account at the New York branch. ABN Dubai processed and accounted for the checks to make it appear that the payees had accounts at ABN and maintained records of the checks in a handwritten ledger. ABN Dubai created the above procedures specifically to provide prohibited USD clearing services to Sanctioned Entities.

### C.    *Letters of Credit and Foreign Exchange Transactions*

57.    In order to effectuate Letters of Credit and Foreign Exchange transactions, the Dubai branch of ABN purposefully removed the name of any Iranian bank and replaced it with ABN's name so that the Iranian bank's true identity was disguised. This was done

even though the overwhelming majority of these transactions were permissible under U.S. regulations, as they were exempted from Iranian sanctions pursuant to the "u-turn" exemption.[5] However, ABN and the Iranian banks nonetheless removed the Iranian identifiers, believing that any payment message that mentioned the Iranian banks, even a permissible payment, would be stopped and investigated in the United States.

## VII. Failure to Maintain Effective BSA/AML Procedures

58. From in or about January 1998, and continuing until in or about December 2005, the USD clearing center of ABN's New York branch, the U.S. Dollar and Euro Clearing Center ("USDECC") (and formerly the North American Regional Clearing Center ("NARCC")), willfully failed to establish and implement an adequate BSA/AML compliance program or to conduct appropriate due diligence on foreign correspondent accounts.

59. The New York branch was not adequately staffed to coordinate and monitor day-to-day compliance with the BSA. The New York branch also failed to provide adequate training to ensure BSA compliance. These failures to implement an adequate BSA/AML compliance program resulted in a significant number of violations of the requirement to report suspicious transactions and to conduct effective due diligence in reviewing foreign correspondent accounts.

60. The NARCC operated as a clearing institution for funds transfers in USD and served as an intermediary institution. Prior to 1991, the NARCC performed the clearing function primarily for the various branches and operations of ABN (the "Bank Network"). Beginning in 1991, the New York branch marketed the services of the NARCC to institutions outside of, and independent of, the Bank Network. As of May 21,

---

[5] After November 2008, this exemption no longer exists for Iranian sanctions.

2003, more than 400 institutions independent of the Bank Network held correspondent accounts with the NARCC.

61.     Beginning in 1998, the New York branch focused substantial marketing efforts on small and mid-sized financial institutions in Russia.  As of December 31, 1998, approximately 30 financial institutions in Russia held correspondent accounts with the NARCC.  After a U.S. financial institution in New York shut down numerous Russian accounts for their involvement with shell companies and other suspicious activities, ABN intentionally marketed ABN's U.S. financial services to these suspicious Russian financial institutions. The number of Russian accounts more than tripled during the following year, and approximately 35 financial institutions in Russia opened correspondent accounts with the NARCC during 2000.  The majority of these financial institutions in Russia had no relationship with the New York branch other than having correspondent accounts with the NARCC, and had no relationship with any member of the Bank Network.  These financial institutions utilized the Bank Network and the New York branch primarily as a means of obtaining access to USD clearing and settlement systems in the United States.

62.     ABN targeted the Russian accounts despite media and other governmental warnings about the high risk involved with these accounts at the time.  A New York branch employee's email to ABN Moscow in 1999 read:

> [P]lease phone them, push really hard, we need new accounts on our books.  I must make my projections of $500,000 in revenues for 1999 from all russian banks.  Please lend me your HAND!

63.     Later in 1999, an employee from ABN Moscow emailed concerns about these new Russian bank account openings to the same New York branch employee:

> There is no logic in opening a/c [accounts] to all those half-dead tiny Russian banks kicked out of [U.S. financial institutions]. We are all heading for trouble if we do it. Hardly any revenue will be generated either. We are losing focus and risk becoming a niche provider to a wrong clientele.

64. On average, the NARCC processed approximately 30,000 funds transfers per day. The location, number, and size of financial institutions holding correspondent accounts with the NARCC and the volume of funds transfers processed posed a substantial risk of money laundering. The New York branch failed to apply an adequate system of internal controls reasonably designed to assure BSA/AML compliance and to manage the risk of money laundering at the NARCC.

65. Until August of 1999, the New York branch did not have a formal procedure for conducting due diligence on financial institutions holding correspondent accounts with the NARCC. Although the New York branch did eventually establish formal procedures, the branch lacked internal controls, did not maintain necessary documentation to adequately assess the potential for money laundering and execute a risk rating for many of these financial institutions, including important information on ownership, management, customer base or business activities. Documentation failed to include information necessary for assessing, in an accurate and meaningful manner, the risk of money laundering that each institution posed, and failed to evidence that the New York branch ever conducted adequate due diligence on the financial institutions. The lack of necessary documentation continued until in or about 2003.

66. In addition, the New York branch failed to adequately monitor funds transfers processed by the NARCC for potential suspicious activity. Until February of 2002, the New York branch relied solely on sporadic manual transaction monitoring by a single

employee, despite the need for automated monitoring of the funds transfers. In February of 2002, the New York branch implemented an automated transaction monitoring system. However, a substantial percentage of funds transfers that the NARCC processed flowed to or from beneficiaries or originators with accounts at institutions independent of the Bank Network. Due to the lack of complete documentation for many of these institutions, the New York branch often lacked information necessary for assessing, in an accurate and meaningful manner, the risk of money laundering and other illicit activity posed by each institution. This prevented the New York branch from incorporating an accurate and meaningful assessment of the risk of money laundering, or information on which the New York branch would base the assessment, into the automated monitoring system.

67.     The New York branch failed to incorporate reliable and publicly available information concerning "shell companies" (business entities that lacked a physical presence) into the automated monitoring system. During the period from August of 2002 to September of 2003, the NARCC processed approximately 20,000 funds transfers, with an aggregate value of approximately $3.2 billion USD, that involved "shell companies" in the United States serving as originators or beneficiaries, and institutions in Russia or other former Republics of the Soviet Union serving as originating or beneficiary institutions. In October of 2000, the Government Accounting Office published a report detailing the risk that criminals in Russia could utilize "shell companies" organized in the United States as a means of concealing identity. The New York branch failed to adequately evaluate this readily available information or other media stories and

implement sufficient transaction monitoring systems and controls for "shell company" activity.

68.     The New York branch failed to incorporate into the automated monitoring system information on institutions that it had identified in suspicious activity reports and information on institutions with correspondent accounts at the NARCC that the New York branch had closed.

69.     The New York branch failed to investigate numerous internal suspicious activity alerts generated by the automated monitoring system of transactions.

70.     Until July of 2002, the New York branch assigned the task of reviewing and investigating the alerts or reports to only three individuals. This staffing level was clearly inadequate in light of both the volume of the alerts or reports and the other functions these individuals performed.

71.     The New York branch failed to provide adequate training regarding BSA/AML compliance.   BSA/AML compliance staff in critical positions displayed a lack of knowledge on the detection and reporting of suspicious transactions and failed to properly monitor or conduct due diligence on foreign correspondent accounts.

## VIII.  Scope of Conduct

72.     From in or about 1995 through in or about December 2005, ABN, through a number of its branches, offices, subsidiaries, and affiliates, executed payment messages designed to evade detection by OFAC filters at financial institutions in the United States. In doing so, ABN altered SWIFT payment messages for Sanctioned Entities and used cover payments.   Further, ABN provided special services to ensure that payments in violation of IEEPA, TWEA, and OFAC regulations, cleared through U.S. financial

institutions. ABN undertook financial transactions and services totaling in the hundreds of millions of USD, in and through the United States, with an intent to evade and circumvent the Iranian, Libyan, Cuban, and Sudanese sanctions and regulations of OFAC. From in or about January 2006 through in or about December 2007, despite the institution of improved controls by ABN and its subsidiaries and affiliates, a limited number of additional transactions involving Sanctioned Entities occurred. From in or about January 1998, and continuing until in or about December 2005, ABN, through the New York Branch, willfully failed to establish and implement an adequate BSA/AML compliance program or to conduct appropriate due diligence on foreign correspondent accounts. During the time periods specified above, financial transactions in an amount in excess of $500,000,000 were conducted in and through the United States via ABN's branches, affiliate banks, and client accounts, which transactions 1) involved violations of IEEPA and TWEA, and/or 2) involved violations of Title 18, United States Code, Sections 1956 and 1957.

## IX.    ABN's Internal Investigation

73.    In 2004, after several years of the Federal Reserve and other regulators raising numerous concerns about ABN's BSA/AML program, ABN self-identified the special procedures used by the Dubai branch of ABN, began an internal investigation into violations of U.S. sanctions, and reported the results of the investigations to the United States and ABN's U.S. and foreign bank regulators. This investigation brought to light many of the various methods ABN used to circumvent U.S. sanctions.

## X.  ABN's Cooperation, Remedial Actions and Mitigation

74.  ABN has made extensive efforts at remediation, including a significant revision of its compliance function.  These efforts included:

a.  Retaining independent outside firms to conduct an extensive transaction review of over 35 million payment messages sent and received over a five-year period;

b.  Implementing enhancements to the transaction filtering process on a global basis;

c.  Retaining an outside, independent firm to validate implementation of ABN's Client Acceptance and Anti-Money Laundering Policy on a global basis;

d.  Creating a Compliance Committee of the Supervisory Board;

e.  Strengthening Audit Committee oversight of Group Audit;

f.  Introducing compliance-based performance objectives for all staff, including the Managing Board;

g.  Launching a High Profile Compliance Initiative;

h.  Reviewing major compliance risks facing ABN and establishing plans and protocols for managing such risks on an annual basis;

i.  Improving reporting lines on compliance issues throughout ABN;

j.  Strengthening communication with regulators;

k.  Working with the Government and relevant Dutch authorities to develop an effective approach to disclose, in compliance with Dutch law, data, communications, and documents underlying the misconduct;

l.  Committing significant resources to conduct internal investigations into the provision of USD clearing services to the Sanctioned Entities;

m.  Providing regular and detailed updates to the Government, on the results of its investigation and forensic SWIFT data analyses and responding to additional specific requests by the Government;

n.  Producing more than eight million pages of documents in response to Government requests; and

o.  Making employees of ABN available for interviews by the Government.

75.  ABN has taken disciplinary action against those employees found to have failed in their duties, including the termination of senior management, audit, legal, and compliance officials in the United States, as well as the dismissals or sanctions of other senior Bank officials.