# Exhibit G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | No. CR - 09 - 007 |
| | ) | |
| v. | ) | |
| | ) | |
| LLOYDS TSB BANK PLC, | ) | DEFERRED PROSECUTION |
| | ) | AGREEMENT |
| Defendant. | ) | |
| | ) | |
| | ) | |

Defendant Lloyds TSB Bank plc ("LLOYDS"), a financial institution registered and organized under the laws of England and Wales, by and through its attorneys, Linklaters LLP and Sullivan & Cromwell LLP, and the United States Department of Justice, Criminal Division, Asset Forfeiture and Money Laundering Section (the "United States") hereby enter into this Deferred Prosecution Agreement (the "Agreement").

1.    **Charges**: LLOYDS agrees that it shall waive indictment and agree to the filing of a One (1) count Criminal Information in the United States District Court for the District of Columbia, charging it with knowingly and willfully violating and attempting to violate regulations issued under the International Emergency Economic Powers Act, Title 50, United States Code, Section 1705, to wit, Title 31, Code of Federal Regulations, Sections 560.203 and 560.204, which prohibit: (a) the exportation from the United States of a service to Iran without authorization and (b) any transaction within the United States that evaded and avoided, or had the purpose of evading and avoiding such regulations.

2.    **Acceptance of Responsibility**: LLOYDS accepts and acknowledges responsibility for its conduct and that of its employees as set forth in the Factual

Statement attached hereto as Exhibit A and incorporated herein by reference (the "Factual Statement"). Should the United States, pursuant to Paragraph 10 of this Agreement, initiate a prosecution that is deferred by this Agreement against LLOYDS, LLOYDS agrees that it will neither contest the admissibility of the Factual Statement or any other documents provided by LLOYDS to the United States nor contradict in any such proceeding the facts contained within the Factual Statement.

3.    **Forfeiture Amount**: As a result of LLOYDS' conduct, including the conduct set forth in the Factual Statement, the parties agree that the United States could institute a civil and/or criminal forfeiture action against certain funds held by LLOYDS and that such funds would be forfeitable pursuant to Title 18, United States Code, Sections 981 and 982. If LLOYDS were convicted of a crime based on the conduct set forth in the Factual Statement, forfeiture of the proceeds of such conduct would be mandatory pursuant to Title 18, United States Code, Section 982. LLOYDS hereby acknowledges that approximately $350,000,000 was involved in transactions described in the Factual Statement, and that such conduct violated Title 50, United States Code, Section 1705. In lieu of a criminal prosecution that would result in a mandatory order of forfeiture, LLOYDS hereby agrees to pay the sum of $175,000,000 (the "Settlement Amount").[1] LLOYDS hereby agrees that the funds paid by LLOYDS pursuant to this Agreement shall be considered substitute *res* for the purpose of forfeiture to the United States pursuant to Title 18, United States Code, Section 981, and LLOYDS releases any and all claims it may have to such funds. LLOYDS shall wire-transfer the Settlement

---

[1]  Pursuant to a Deferred Prosecution Agreement with the District Attorney of the County of New York ("DANY") being entered into contemporaneously, LLOYDS has also agreed to pay separately $175,000,000 to the State of New York for violations of New York State Penal Law Sections 175.05 and 175.10.

Amount in lieu of forfeiture to the United States within five (5) business days of the date of this Agreement.

4. **Court is Not Bound**: LLOYDS and the United States understand that the Agreement must be approved by the United States District Court for the District of Columbia, in accordance with 18 U.S.C. § 3161(h)(2). Should that Court decline to approve this Agreement for any reason, the United States and LLOYDS are released from any obligation imposed upon them by this Agreement, this Agreement shall be null and void, and the United States shall not premise any prosecution of LLOYDS, its employees, officers or directors upon any admissions or acknowledgements contained herein.

5. **Deferral of Prosecution**: In consideration of LLOYDS' willingness to: (a) acknowledge responsibility for its actions; (b) voluntarily terminate the conduct set forth in the Factual Statement; (c) cooperate with the United States as stated in Paragraphs 6 and 7; (d) demonstrate its future good conduct and full compliance with international Anti-Money Laundering and Combating Financing of Terrorism best practices and the Wolfsberg Anti-Money Laundering Principles for Correspondent Banking; and, (e) settle any and all civil and criminal claims currently held by the United States for any act within the scope of or related to the Factual Statement, the United States agrees as follows:

i. the United States shall recommend to the Court, pursuant to 18 U.S.C. § 3161(h)(2), that prosecution of LLOYDS on the Information filed pursuant to Paragraph 1 be deferred for a period of twenty four (24) months, or less at the discretion of the United States, from the date of the filing of the Information referred to in Paragraph 1. LLOYDS shall consent to a motion, the contents to be agreed upon by the

3

parties, to be filed by the United States with the Court promptly upon execution of this Agreement, pursuant to 18 U.S.C. § 3161(h)(2), in which the United States will present this Agreement to the Court and move for a continuance of all further criminal proceedings, including trial, for a period of twenty four (24) months, for speedy trial exclusion of all time covered by such a continuance, and for approval by the Court of this deferred prosecution. LLOYDS further agrees to waive and does hereby expressly waive any and all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the District of Columbia for the period that this Agreement is in effect; and

        ii.     the United States shall, if LLOYDS is in full compliance with all of its obligations under this Agreement and the Deferred Prosecution Agreement it enters with DANY, within thirty (30) days or earlier of the expiration of the time period set forth above in Paragraph 5(i), seek dismissal with prejudice of the Information filed against LLOYDS pursuant to Paragraph 1, and this Agreement shall expire and be of no further force or effect.

      6.    **Cooperation**:  LLOYDS agrees that it shall, within 270 days from the date of this Agreement, conduct a review of payment data held by LLOYDS, its affiliates, successors or related companies as of the date of this Agreement related to United States Dollar ("USD") payments for the period from April 2002 through December 2007, as follows:

      (a)    Provide to DANY and the United States all available incoming and outgoing Society for Worldwide Interbank Financial Telecommunications ("SWIFT")

4

Message Transfer ("MT") 100 and MT 200 series payment messages relating to USD payments processed during the period from April 2002 through December 2007 through the correspondent accounts held by Iranian banks (also referred to as "the vostro accounts"), in electronic format as well as in the form of a spreadsheet or other electronic summary, and all existing periodic or monthly account statements for the vostro accounts; and

    (b)    Conduct a review of all available incoming and outgoing USD SWIFT MT 100 and MT 200 series payment messages processed through (i) LLOYDS' payments processing centers located in the United Kingdom during the period from April 2002 through December 2007, and (ii) LLOYDS' branch in Dubai during the period from April 2002 through December 2007, and compare such data against the lists of persons and entities designated by OFAC as Specially Designated Terrorists ("SDTs"), Specially Designated Global Terrorists ("SDGTs"), Foreign Terrorist Organizations ("FTOs") and proliferators of Weapons of Mass Destruction ("WMDs") who were on such lists at any time during the period from April 2002 through December 2007. LLOYDS will provide in electronic form to DANY and the United States a report containing information relating to any confirmed match, and any other match that cannot be eliminated as a false positive after investigation by LLOYDS and all payments messages and other documentation associated with such matches;

    (c)    The review shall be performed with the assistance of an independent consultant selected by LLOYDS.

    7.    LLOYDS agrees that for the term of this Agreement, in accordance with applicable laws, it shall supply and/or make available upon request by the United States

any additional relevant documents, electronic data, or other objects in LLOYDS' possession, custody or control as of the date of this Agreement relating to any transaction within the scope of or relating to the Factual Statement known at the time of the signing of this Agreement or discovered as a result of the review as described in Paragraph 6. Nothing in this Agreement shall be construed to require LLOYDS to produce any documents, records or tangible evidence that are protected by the attorney-client privilege or work product doctrine.

  **8.**   **Government Commitments**:   In return for the full and truthful cooperation of LLOYDS and compliance with the terms and conditions of this Agreement, the United States agrees that it shall not seek to prosecute LLOYDS, or any of its affiliates, successors or related companies, for any act within the scope of or related to the Factual Statement that violated federal law during the period of March 15, 1995 through the date of this Agreement unless: (a) in violation of U.S. law, LLOYDS, or any of its affiliates, successors, related companies, employees, officers or directors, knowingly and willfully transmitted or approved the transmission of funds that went to or came from persons or entities designated at the time of the transaction by OFAC as SDTs, SDGTs, FTOs or a proliferator of WMD (the "Special SDN Transactions"); or (b) there is a willful and material breach of this Agreement. It is the intention of the parties to this Agreement that all criminal and civil investigations arising from LLOYDS' conduct or for any act within the scope of or related to the Factual Statement, that have been, or could have been, conducted by the United States prior to the date of this Agreement shall not be pursued further as to LLOYDS, and that the United States will not bring any additional charges against LLOYDS or any of its affiliates, successors or

related companies, relating to these matters with the following exceptions: (i) conduct relating to the Special SDN Transactions and (ii) Action No 07 Civ. 9235. Any prosecution related to the Special SDN transactions may be premised upon any information provided by or on behalf of LLOYDS to the United States or any investigative agencies, whether prior to or subsequent to this Agreement, or any leads derived from such information, including the attached Factual Statement.

9.      **Waiver of Rights**: LLOYDS hereby further expressly agrees that within six months of a material and willful breach of this Agreement by LLOYDS, any violations of federal law that were not time-barred by the applicable statute of limitations as of the date of this Agreement and (a) which relate to the Factual Statement or (b) were hereinafter discovered pursuant to the review of information provided pursuant to Paragraph 6 or 7 may, in the sole discretion of the United States, be charged against LLOYDS, notwithstanding the provisions or expiration of any applicable statute of limitations. LLOYDS also expressly waives any challenges to the venue or jurisdiction of the United States District Court for the District of Columbia.

10.     **Breach of the Agreement**: Should the United States determine that LLOYDS has committed a willful and material breach of any provision of this Agreement, the United States shall provide written notice to LLOYDS of the alleged breach and provide LLOYDS with a two-week period from the date of receipt of said notice, or longer at the discretion of the United States, in which to make a presentation to the United States to demonstrate that no breach has occurred or, to the extent applicable, that the breach is not willful or material, or has been cured. The parties hereto expressly understand and agree that, should LLOYDS fail to make the above-noted presentation

7

within such time period, it shall be presumed that LLOYDS is in willful and material breach of this Agreement. The parties further understand and agree that the United States' exercise of discretion under this paragraph is not subject to review in any court or tribunal outside the Criminal Division of the Department of Justice. In the event of a breach of this Agreement that results in a prosecution, such prosecution may be premised upon any information provided by or on behalf of LLOYDS to the United States or any investigative agencies, whether prior to or subsequent to this Agreement, or any leads derived from such information, including the attached Factual Statement, unless otherwise agreed to by the United States and LLOYDS in writing at the time the information was provided to the United States.

11.     Should the United States determine during the term of this Agreement that LLOYDS has committed any federal crime other than those explicitly covered by this Agreement, LLOYDS shall, in the sole discretion of the United States, thereafter be subject to prosecution for any federal crimes of which the United States has knowledge.

12.     LLOYDS agrees that it shall in all respects comply with its obligations in this Agreement and in the Deferred Prosecution Agreement that it has entered with DANY. A violation of LLOYDS' obligations in its Deferred Prosecution Agreement with DANY may be deemed a violation of this Agreement, at the sole discretion of the United States.

13.     **Parties Bound by the Agreement:** It is further understood that this Agreement is binding on LLOYDS and the United States, but specifically does not bind any federal agencies, or any state or local authorities, although the United States will bring the cooperation of LLOYDS and its compliance with its other obligations under

8

this Agreement to the attention of federal, state, or local prosecuting offices or regulatory agencies, if requested by LLOYDS or its attorneys.

14. **Public Statements**: LLOYDS expressly agrees that it shall not, through its attorneys, board of directors, agents, officers or employees, make any public statement contradicting, excusing, or justifying any statement of fact contained in the Factual Statement. Any such public statements by LLOYDS, its attorneys, board of directors, agents, officers or employees, shall constitute a material breach of this Agreement as governed by Paragraph 10 of this Agreement, and LLOYDS would thereafter be subject to prosecution pursuant to the terms of this Agreement. The decision of whether any public statement by any such person contradicting a fact contained in the Factual Statement will be imputed to LLOYDS for the purpose of determining whether LLOYDS has breached this Agreement shall be in the sole and reasonable discretion of the United States. Upon the United States' notification to LLOYDS of a public statement by any such person that in whole or in part contradicts a statement of fact contained in the Factual Statement, LLOYDS may avoid breach of this Agreement by publicly repudiating such statement within seventy-two (72) hours after notification by the United States. This paragraph is not intended to apply to any statement made by any individual in the course of any criminal, regulatory, or civil case initiated by a governmental or private party against such individual regarding that individual's personal conduct.

15. **Sales or Mergers**: LLOYDS agrees that, if it sells or merges all or substantially all of its business operations or assets as they exist as of the date of this Agreement to a single purchaser or group of affiliated purchasers during the term of this Agreement, it shall include in any contract for sale or merger a provision binding the

9

purchaser/successor to the obligations described in this Agreement. Any such provision in a contract of sale or merger shall not expand or impose additional obligations on LLOYDS as they relate to Paragraphs 6 and 7 of this Agreement.

16.     **Conduct Covered by Agreement:** It is further understood that this Agreement does not relate to or cover any conduct by LLOYDS other than for any act within the scope of or related to the Factual Statement and this Agreement.

17.     **Public Filing:** LLOYDS and the United States agree that, upon acceptance by the United States District Court for the District of Columbia, this Agreement (and its attachments) and an Order deferring prosecution shall be publicly filed in the United States District Court for the District of Columbia.

18.     **Complete Agreement:** This Agreement sets forth all the terms of the Agreement between LLOYDS and the United States. There are no promises, agreements, or conditions that have been entered into other than those expressly set forth in this Agreement, and none shall be entered into and/or are binding upon LLOYDS or the United States unless signed by the United States, LLOYDS' attorneys, and a duly authorized representative of LLOYDS. This Agreement supersedes any prior promises, agreements or conditions between LLOYDS and the United States. LLOYDS agrees that it has the full legal right, power and authority to enter into and perform all of its obligations under this Agreement and it agrees to abide by all terms and obligations of this Agreement as described herein.

## Acknowledgment

I, Carol Sergeant, the duly authorized representative of Lloyds TSB Bank plc, hereby expressly acknowledge the following: (1) that I have read this entire Agreement; (2) that I have had an opportunity to discuss this Agreement fully and freely with Lloyds TSB Bank plc's attorneys; (3) that Lloyds TSB Bank plc fully and completely understands each and every one of its terms; (4) that Lloyds TSB Bank plc is fully satisfied with the advice and representation provided to it by its attorneys; and (5) that Lloyds TSB Bank plc has signed this Agreement voluntarily.

Lloyds TSB Bank plc

_____
DATE

Carol Sergeant
Chief Risk Director

11

## Counsel for Lloyds TSB Bank plc

We, Joseph P. Armao and Samuel W. Seymour, the attorneys for Lloyds TSB Bank plc, hereby expressly acknowledge the following: (1) that we have discussed this Agreement with our client; (2) that we have fully explained each one of its terms to our client; (3) that we have fully answered each and every question put to us by our client regarding the Agreement; and (4) we believe our client completely understands all of the Agreement's terms.

JAN. 9, 2009

DATE

Joseph P. Armao
Linklaters LLP
1345 Avenue of the Americas
New York, New York 10105

JAN. 9, 2009

DATE

Samuel W. Seymour
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004

12

**On Behalf of the Government**

RICHARD WEBER, Chief
Asset Forfeiture and Money Laundering Section

$1/9/09$

DATE

MIA LEVINE
Assistant Chief
FREDERICK W. REYNOLDS
Trial Attorney
Asset Forfeiture and Money Laundering Section
U.S. Department of Justice, Criminal Division

# EXHIBIT  A

## EXHIBIT A

## FACTUAL STATEMENT

### Introduction

1.      This Factual Statement is made pursuant to, and is part of the Deferred Prosecution Agreements (the "DPAs"), dated January 9, 2009, between the New York County District Attorney's Office ("DANY") and Lloyds TSB Bank plc ("Lloyds"), and the United States Department of Justice ("DOJ") and Lloyds.

2.      Beginning in or about the mid 1990s and continuing until January 2007, Lloyds, in the United Kingdom, systematically violated both New York State and United States laws by falsifying outgoing United States Dollar ("USD") payment messages that involved countries, banks, or persons listed as sanctioned parties by the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"). In doing so, Lloyds removed material data from payment messages in order to avoid detection of the involvement of OFAC-sanctioned parties by filters used by U.S. depository institutions. This allowed transactions to be processed by Lloyds' U.S. correspondent banks that they otherwise could have blocked for investigation, or rejected pursuant to OFAC regulations. During the course of the conduct, Lloyds employees commonly referred to this process as "stripping." Lloyds' criminal conduct was designed to assist its clients in avoiding detection by filters employed by U.S. banks because of United States economic sanctions against Iran, Sudan, and Libya.[1] Lloyds' actions caused U.S. banks to provide services to those sanctioned countries, and falsified business records of banks primarily located in New York, New York ("New York"). This resulted in the processing of

---

[1] U.S. economic sanctions against Libya were lifted in 2004.

transactions in the United States by U.S. financial institutions which may have otherwise been prohibited.

3.　　In or around early 2002, facing generally heightened focus on industry-wide anti-money laundering and sanctions issues, and the possibility that the Financial Action Task Force ("FATF")[2] would recommend to member countries that they require their banks to include originator information on payment messages, concerns were raised within Lloyds about the legal and reputational implications of continuing to provide "stripping" services to OFAC-sanctioned countries and clients. In April 2003, when the issue was brought to the attention of Lloyds' Group Executive Committee ("GEC"), the GEC decided to withdraw from the USD clearing business on behalf of "U.K. Iranian Banks" (as defined below). Lloyds fully exited that business by April 2004. Notwithstanding the decision to cease providing USD clearing services to the U.K. Iranian Banks, Lloyds continued to perform these services on a smaller scale on behalf of four Sudanese banks until January 2007. Lloyds terminated its last relationship with a Sudanese bank in September 2007.

4.　　In April 2007, prosecutors contacted Lloyds' representatives in New York and informed them of an investigation into Lloyds' USD business on behalf of sanctioned entities, and that there was evidence of violations of New York State and United States laws. Prosecutors requested that Lloyds disclose the nature and extent of its misconduct and provide the evidence of that misconduct. As described herein, Lloyds promptly commenced a thorough internal investigation of its international USD clearing business.

---

[2]　FATF is an inter-governmental body whose purpose is the development and promotion of national and international policies to combat money laundering and terrorist financing. The FATF is therefore a 'policy-making body' created in 1989 that works to generate the necessary political will to bring about legislative and regulatory reforms in these areas. The FATF has published certain recommendations in order to meet this objective.

Lloyds has provided prompt and substantial assistance by sharing with DOJ and DANY, as well as other relevant regulators, the results of that internal investigation.

5.     Lloyds accepts and acknowledges that the USD processing described in this Factual Statement constituted serious and systematic misconduct that violated both New York State and United States laws.

### Lloyds' Business Organization and Background

6.     Lloyds[3] is a wholly owned subsidiary of Lloyds TSB Group plc. ("LTSB Group").[4] LTSB Group, whose shares are publicly traded, was formed in 1995 by the merger of Lloyds Bank and the Trustee Savings Bank Group. Lloyds is a financial institution registered and organized under the laws of England and Wales. Lloyds provides a wide range of banking and financial services within its Wholesale and International Banking ("W&IB") division in the United Kingdom and has operations in countries around the world, including two branches in the United States, located in New York, New York, and Miami, Florida. Lloyds' U.S. branches are subject to oversight and regulation by the Board of Governors of the Federal Reserve System, the New York State Banking Department, and the State of Florida Office of Financial Regulation. None of the USD payments processed on behalf of OFAC-sanctioned parties were processed by Lloyds' U.S. branches. The United Kingdom's Financial Services Authority ("FSA") is Lloyds' primary home-country regulator.

7.     As of December 2007, LTSB Group assets totaled $701.4 billion (£353.3 billion), and the organization employed over 67,000 staff across its divisions. Net profit

---

[3]  The principal place of business is 25 Gresham Street, London, EC2V 7HN, United Kingdom.
[4]  The registered office of LTSB Group is Henry Duncan House, 120 George Street, Edinburgh, EH2 4LH, Scotland.

for LTSB Group was $7.9 billion (£4 billion) for 2007. The W&IB business accounted for approximately 46%, or $3.6 billion (£1.8 billion), of the LTSB Group profit.[5]

### Applicable Law

8.    In 1995 and 1997, President Clinton issued Executive Order Nos. 12957, 12959, and 13059 which strengthened existing United States sanctions against Iran. The Executive Orders prohibit virtually all trade and investment activities with Iran by U.S. persons or entities, regardless of where they are located, including but not limited to broad prohibitions on the importation of goods or services from Iran; prohibitions on the exportation, sale, or supply of goods, technology or services to Iran; prohibitions on trade-related transactions with Iran, including financing, facilitating or guaranteeing such transactions; and, prohibitions on investment in Iran or in property controlled by Iran (collectively, the "Iranian Sanctions").[6]

9.    With the exception of certain exempt transactions, the OFAC regulations implementing the Iranian Sanctions prohibit U.S. depository institutions from servicing Iranian accounts, and prohibit U.S. depository institutions from directly crediting or debiting Iranian accounts. OFAC regulations permitted U.S. depository institutions to handle certain "U-turn" transactions, in which the U.S. depository institution acts only as an intermediary bank in clearing a USD payment between two non-U.S., non-Iranian banks.

---

[5]  USD amounts calculated based on the foreign exchange rate as of December 31, 2007.
[6]  The Iranian Transactions Regulations are found at 31 CFR part 560 and can be reviewed at the OFAC website, located at www.ustreas.gov/ofac.

10.    In 1997 and 2006, Presidents Clinton and Bush issued Executive Orders Nos. 13067 and 13412, among others, which imposed a trade embargo against Sudan and froze the assets of the government of Sudan (collectively, the "Sudanese Sanctions").[7]

11.    DOJ has alleged, and Lloyds accepts, that its conduct, as described herein, violated Title 50, United States Code, Section 1705, part of the International Emergency Economic Powers Act ("IEEPA"), which makes it a crime to willfully violate or attempt to violate any regulation issued under IEEPA, including the Iranian Transactions Regulations, principally, 31 C.F.R. Section 560.204, which prohibits the exportation of services from the United States to Iran, and the Sudanese Sanctions Regulations, principally, 31 C.F.R. Section 538.205, which, similarly prohibits the exportation of services from the United States to Sudan.

12.    DANY has alleged, and Lloyds accepts, that its conduct, as described herein, violated New York State Penal Law Sections 175.05 and 175.10, which make it a crime to, "with intent to defraud,... (i) make or cause a false entry in the business records of an enterprise (defined as any company or corporation)... or (iv) prevent the making of a true entry or cause the omission thereof in the business records of an enterprise." It is a felony under Section 175.10 of the New York Penal Law, if a violation under Section 175.05 is committed and the person or entity's "intent to defraud includes an intent to commit another crime or to aid or conceal the commission of a crime."

**Lloyds' "Stripping" of USD Payments for the U.K. Iranian Banks That Terminated at U.S. Banks**

13.    Prior to 2002, Lloyds maintained USD correspondent accounts for what were then the London-based branches of Bank Sepah, Bank Melli, Bank Tejerat, Bank

---

[7]  The Sudanese Sanctions Regulations are found at 31 CFR part 538 and can be reviewed at the OFAC website, located at www.ustreas.gov/ofac.

Mellat, Bank Saderat, and the Iranian Overseas Investment Bank. During this time, Lloyds was able to provide USD payment processing services through its relationships with other correspondent banks in New York and elsewhere in the United States. By 2002, these Iranian bank branches had become subsidiaries incorporated under United Kingdom law. The U.K. subsidiaries of the Iranian banks for which Lloyds maintained correspondent accounts were Melli Bank, plc., Bank Sepah International, plc., Bank Saderat, plc., and Persia International Bank, plc. The branches and successor U.K. subsidiaries are referred to collectively hereinafter as the "U.K. Iranian Banks." Additionally, Lloyds' branches in Dubai and Tokyo held USD correspondent accounts for certain Iranian banks.

14. The commercial relationships between Lloyds and the U.K. Iranian Banks were managed by personnel within Lloyds' Financial Institutions ("FI") unit, a business unit within the W&IB division of Lloyds.

15. Lloyds used the Society for Worldwide Interbank Financial Telecommunication ("SWIFT")[8] messaging system to transmit its international payment messages.

16. In June 1995, in response to the promulgation of heightened OFAC sanctions against Iran, Lloyds' U.K.-based international payment processing unit ("IPPU") implemented a procedure whereby its processing staff manually reviewed each SWIFT message received from the U.K. Iranian Banks before they were transmitted to the United States to ensure that references to Iran were removed from certain outgoing USD SWIFT messages. This process was described in an internal Lloyds letter dated

---

[8] SWIFT is a cooperative organized under Belgian law that supplies to its members and certain other users secure messaging services for various types of financial transactions and is used by the international banking industry as a means of sending and receiving payment messages in a secure environment.

6

June 24, 1996, which stated that Lloyds' IPPU "decided to handle all the outward payments manually to ensure that the [U.K. Iranian Bank] names were not included on the payment instructions received in the U.S.A."

17.     Lloyds' IPPU memorialized the processing steps in an internal document called the "Payment Services Aide Memoire." The Aide Memoire notes that "any [Iranian] payments received either in paper form or via BIT IMT [a branch system through which Lloyds received payment instructions] expressed in U.S. Dollars must not be processed and should be immediately referred to the section management." The Aide Memoire also states that: "[T]he instructions received from the London Branches of the following [Iranian] banks are to be processed in the normal way." The investigation has disclosed that "the normal way" included removing information when necessary from the Iranian bank's payment instructions. Over time, Lloyds dedicated specific payment processors to focus exclusively on reviewing and amending, if necessary, SWIFT messages pertaining to USD payments for the U.K. Iranian Banks.

18.     For Iranian customer transactions that terminated either at banks located inside the United States or at U.S. banks located outside the United States, the Lloyds' IPPU processor removed the incoming SWIFT payment message from Lloyds' Common System and manually re-keyed the payment back into the Common System. The Common System is the automated payment processing system used by Lloyds to process payments. The processor amended the payment message to ensure the re-keyed message did not contain any references to Iran. The amended message was then transmitted to the relevant U.S. bank. This practice made it appear that the transaction originated with Lloyds.

19. The investigation has revealed that Lloyds' IPPU processors took the following steps to process the payments described in the preceding paragraph:

Step One: A member of Lloyds' IPPU would remove the payment instruction out of Lloyds' Common System by "busting out" the payment so that it could be manually processed (payments could be "busted out" of the Common System for a number of reasons, one of which included the presence of an Iranian reference).

Step Two: A member of Lloyds' IPPU then printed out a copy of the "busted out" payment instruction.

Step Three: A member of Lloyds' IPPU would physically mark up the printed payment instruction to show what information should be changed, including crossing out any reference to Iranian banks or other sanctioned entities and striking a line through Field 52 of the SWIFT payment instruction (Field 52 is used to identify the originating bank – in this case, a sanctioned entity).

Step Four: The marked up and crossed off message would be returned to Lloyds' IPPU repairers who would type the corrected information back into the Common System.

20. By manually amending these payment records in this fashion, Lloyds prevented the U.S. depository institutions located in New York and elsewhere in the United States from recognizing the transactions as originating from sanctioned countries, banks or persons, and then blocking them for investigation or rejecting such transactions. Lloyds additionally prevented those depository institutions from generating business records of transactions to be filed with OFAC, as required by law. Moreover, to the extent that any Iranian payments might have been permissible under an exemption to IEEPA or pursuant to a license issued by OFAC, Lloyds did not include such information in the payment message, and, made no inquiry into the existence of such exemption or license. Instead, Lloyds followed its practice of stripping information from certain outgoing Iranian payment messages. Lloyds' conduct deceived the OFAC filters at its U.S. correspondent banks, preventing them from detecting and blocking or rejecting wire

transfers processed on behalf of sanctioned entities, and preventing them from making and keeping accurate records of their transactions.

## Lloyds' Removal of Iranian Payment Information from USD Payments in its Dubai and Tokyo Branches

21.     Until October 2004, Lloyds maintained USD correspondent accounts for Iranian banks in its Dubai and Tokyo branch offices. In both branches, USD payments that terminated either at banks located inside the United States or at U.S. banks located outside the United States were transmitted on behalf of the Iranian banks in a manner designed to conceal the Iranian origin of the payments, in order to prevent the U.S. correspondent banks from blocking for investigation or rejecting the payments.

22.     Lloyds' Dubai branch maintained USD correspondent accounts for the Bank of Industry and Mine, Bank Saderat, Bank Sepah, Bank Melli, Bank Mellat, Bank Karafarin, and Bank Refah-Kargaran. Between January 2000 and October 6, 2004 (the date by which all the accounts were closed) there were six transactions that terminated either at banks located inside the United States or at U.S. banks located outside the United States.

23.     Lloyds' Tokyo branch maintained two USD correspondent accounts, one for Bank Refah-Kargaran and one for the Seoul branch of Bank Mellat. Between February 1, 2001, and October 26, 2004 (the date by which both accounts were closed), thirty-nine payments terminated either at banks located inside the United States or at U.S. banks located outside the United States.

## Lloyds' Removal of Information from USD Payment Messages Processed on Behalf of Sudanese Banks

24.     Beginning in 1987 and lasting until September 2007, Lloyds maintained United Kingdom-based USD correspondent accounts for four Sudanese banks: National

Bank of Khartoum; Al Baraka Bank; Animal Resources Bank; and the Commercial and Real Estate Bank, which became subject to U.S. sanctions in 1997.

25.    While Lloyds did not have a dedicated "stripping" unit for Sudan as it did for Iran, Lloyds' IPPU similarly ensured that on a transaction-by-transaction basis all outgoing USD payment messages for Sudan did not contain references to Sudan. This manipulation of the Sudanese payment instructions had the same intent and practical effect as the manipulation of the Iranian wire instructions.

26.    Although Lloyds made the decision to exit from the Iranian USD payments business in April 2003, Lloyds' IPPU continued to manipulate Sudanese USD payment instructions until January 2007, although at levels that decreased over time as Lloyds wound down the business and closed all of the Sudanese USD correspondent accounts by September 2007.

### Trade Finance Activity

27.    Lloyds also engaged in certain USD trade finance transactions, primarily from the United Kingdom, Tokyo and Dubai, involving banks from countries subject to OFAC sanctions, principally, Iran and Sudan. The trade finance transactions included import and export letters of credit, inward and outward documentary collections and guarantees. For the period that has been reviewed, from on or about January 1, 2002, to on or about December 31, 2007, Lloyds engaged in approximately 1500 trade finance transactions involving Iranian banks in its United Kingdom, Dubai and Tokyo offices with an aggregate value of approximately $300 million. During the same time period, Lloyds engaged in approximately 300 trade finance transactions involving Sudanese banks in its United Kingdom and Dubai offices with an aggregate value of approximately $21 million. Lloyds removed material information from certain USD payments used to

10

effect the underlying trade finance transactions. A detailed review of 300 of these transactions indicates that a large number of them were cancelled or rejected, and that of those transactions that were completed, only three involved funds that terminated either at banks located inside the United States or at U.S. banks located outside the United States, and many involved payments that did not clear through the United States. Additionally, a number of the Iranian trade finance transactions selected for detailed review involved exports of goods originating in the U.S. to Iran through third countries. Lloyds initiated trade finance transactions involving banks in OFAC-sanctioned countries until December 2007. None of these trade finance transactions were processed by Lloyds' U.S. operations.

### Lloyds' Decision to Terminate the U.K. Iranian Bank Business

28. In or around early 2002, senior Lloyds' IPPU staff and the Director of Lloyds' Group Financial Crime Unit ("GFC") raised concerns with FI about the intentional removal of Iranian-related information in connection with the processing of USD payments for the U.K. Iranian Banks. Some of Lloyds' IPPU staff were concerned that this process might violate United States laws. In April 2002, FI proposed that Lloyds' IPPU no longer remove Iranian-related information from outgoing SWIFT messages sent by the U.K. Iranian Banks and instead, returned to the U.K. Iranian Banks any payment instruction containing an Iranian reference for correction by the U.K. Iranian Banks themselves. FI's proposal was implemented in or around July 2002. At that time, FI personnel met with representatives of the U.K. Iranian Banks and informed them how to format the SWIFT messages to avoid detection by the OFAC filters. Thus, instead of Lloyds' employees stripping the payment messages, the information would be removed by the U.K. Iranian Banks themselves. Lloyds' employees instructed the U.K.

11

Iranian Banks not to leave the originating bank information field blank, but rather to populate that field with a dot, hyphen, or another symbol. In connection with bank-to-bank payments which stayed in the United States, the inclusion of these symbols prevented the Common System from automatically populating that field with the name of the originating Iranian bank. Consequently, the payment message sent to the U.S. correspondent bank would not contain any reference to the ordering institution that would be detected by the OFAC filters at the U.S. correspondent banks. However, even after July 2002, Lloyds' IPPU staff continued to manually re-format outgoing messages on customer payments that terminated at banks in the United States to omit references to Iran because the Common System automatically populated the relevant field with the name of the originating Iranian bank.

29.     Senior Lloyds' IPPU staff continued to raise concerns about USD payment processing for the U.K. Iranian Banks, and in September 2002, as part of an overall review of the Iranian USD payments business, the Director of Lloyds' GFC unit requested that Lloyds' IPPU and FI personnel evaluate the risks of these payment practices. Lloyds IPPU continued to express concern about the payment practices while FI maintained that Lloyds should continue to provide the U.K. Iranian Banks with USD payment processing services on the mistaken belief that because Lloyds is a U.K. institution it was not subject to OFAC regulations for such processing activity. This internal debate continued into 2003.

30.     In March 2003, the GFC Director instructed a senior GFC staff member to conduct a sampling analysis of Iranian USD payments. The results of the analysis noted that, prior to July 2002, a dedicated team of Lloyds' IPPU staff manually reviewed and

removed any references to Iran from SWIFT messages submitted by the U.K. Iranian Banks. Shortly after the GFC concluded its analysis, the executive director of Lloyds' Group Risk Management (the overall business unit in which GFC was located) advised the executive director of the W&IB division that regardless of whether the OFAC regulations applied to the USD payment services, they should either operate on a fully transparent basis or be terminated. At its meeting on April 1, 2003, the GEC received a risk report from Group Risk that mentioned the existence of the USD payment processing services provided to the U.K. Iranian Banks. The GEC expressed concerns over the continuance of the business and directed that it receive further information and analysis as a matter of urgency. A week later on April 9, 2003, the GEC received a more detailed analysis that described the systematic removal of Iranian-related information from SWIFT messages and recommended that the GEC terminate the USD correspondent banking accounts held for the Iranian Banks on reputational grounds. The GEC decided that the USD correspondent accounts of the Iranian Banks should be terminated.

31.     On May 22, 2003, the Executive Director of W&IB instructed FI to exit the business. FI relationship managers informed their contacts at the U.K. Iranian Banks that Lloyds was exiting the business. Activity through the accounts was wound down over the ensuing months and all of the USD correspondent accounts maintained by the U.K. Iranian Banks with Lloyds in the United Kingdom were closed by April 2004.

### Transaction Value of Stripping Conduct

32.     From 2002 to 2004, Lloyds processed approximately three hundred million dollars in outgoing USD payment transactions on behalf of the U.K. Iranian Banks that terminated either at banks located inside the United States or at U.S. banks located outside the United States. The payment messages related to these transactions

13

were busted out and processed as described herein to allow them to be processed through U.S. banks in New York and elsewhere without detection by OFAC filters.

33.     From August 2002 to September 2007, Lloyds processed more than twenty million dollars in outgoing USD payment transactions on behalf its Sudanese bank customers through its U.S. correspondent banks in a manner that prevented the U.S. banks from identifying their Sudanese origin.

34.     From August 2002 to April 2004, Lloyds processed approximately twenty million dollars in outgoing USD payment transactions on behalf of a Libyan customer through its U.S. correspondent banks in a manner that prevented the U.S. banks from identifying their Libyan origin.

### Actions Taken by Lloyds

35.     Throughout the course of this investigation Lloyds' cooperation has provided substantial assistance to DANY and DOJ.  Lloyds' prompt and substantial cooperation has included the following:

- Committing substantial resources to conducting an extensive internal investigation into the provision of USD clearing services to the Iranian banks, their U.K. subsidiaries and branches, and banks from other OFAC-sanctioned countries including Sudan and Libya.

- Conducting a review of its operations in the United Kingdom and around the world to determine the existence of USD correspondent accounts held for banks in OFAC-sanctioned countries and confirming the closure of all such accounts.

- Conducting a detailed forensic review across various accounts related to OFAC-sanctioned countries, including an analysis of underlying SWIFT transmission data associated with USD activity for accounts of banks in OFAC-sanctioned countries.

- Conducting a screening of payments cleared through the United States between August 2002 through the closure of those accounts that were processed through vostro accounts held by banks of OFAC-sanctioned countries against names on contemporaneous OFAC terrorist and weapons of mass destruction watch lists. Lloyds found no confirmed matches to any names on such lists.

- Providing regular and detailed updates to DANY and DOJ on the results of its investigation and forensic SWIFT data analyses and responding to additional specific requests of DANY and DOJ.

36.    Lloyds has also agreed, as part of its cooperation with DANY and DOJ, to undertake the further work necessary to enhance and optimize its sanctions compliance programs. The full scope of Lloyds' continued efforts and commitments, including its look-back review of payment messages, are outlined in the DPAs and the Factual Statement.    Lloyds has also agreed to cooperate in DANY and DOJ's ongoing investigations into these banking practices. Furthermore, Lloyds has agreed to be in compliance with the Wolfsberg Anti-Money Laundering Principles of Correspondent banking.