# Exhibit I

17ISLELCHOOK

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  ALEXANDER LELCHOOK, et al.,

4              Plaintiffs,

5         v.                              10 Civ. 5795

6  COMMERZBANK AG,

7              Defendant.

8  ------------------------------x

9                                    July 18, 2011
                                     11:15 a.m.
10
   Before:
11
                   HON. ALVIN K. HELLERSTEIN,
12
                                     District Judge
13
                        APPEARANCES
14
   HEIDEMAN, NUDELMAN, KALIK, PC
15      Attorneys for Plaintiffs
   BY:  RICHARD D. HEIDEMAN
16      NOEL J. NUDELMAN
        MATTHEW S. APFEL
17
   GIBBONS P.C.
18      Attorneys for Defendant
   BY:  JEFFREY L. NAGEL
19      DAVID S. WEINBERGER
        PAUL A. SASO
20      TERRY A. MYERS

21

22

23

24

25

17ISLELCHOOK

1           (Case called)

2           MR. HEIDEMAN:  May it please the court, on behalf of

3      the plaintiffs, my name is Richard Heideman.  I am lead counsel

4      for the plaintiffs.  On my right, and that would be the court's

5      left, is my partner Noel J. Nudelman.  On my left is Matthew S.

6      Apfel, our associate.

7           Thank you very much, your Honor.

8           THE COURT:  Good morning, gentlemen.

9           For the defense?

10          MR. NAGEL:  Jeffrey Nagel from Gibbons P.C. law firm

11     on behalf of Commerzbank, and to my right is Daniel Weinberger,

12     Paul Saso and Terry Myers.

13          THE COURT:  Is your name on here, Mr. Saso?

14          MR. SASO:  Yes, your Honor.

15          THE COURT:  I have got it.

16          Good morning, everybody.

17          The first question I want to address to you is the

18     standing of each of the plaintiffs.  Assuming there is a cause

19     of action clearly the estate is a plaintiff in good standing,

20     but let's deal with the other parties.  I will ask Mr. Heideman

21     to address that issue.

22          You can stay where you are if you want, whatever is

23     more comfortable for you.

24          MR. HEIDEMAN:  May it please the court, the plaintiffs

25     in this case, as the court has already noted, include the

1    estate of David Lelchook.  Mr. Lelchook was the person who was

2    riding his bicycle in Kibbutz Har and was killed by a

3    Hezbollah-launched rocket.  Hezbollah, as the court knows, is a

4    foreign terrorist organization.

5          THE COURT:  Mr. Heideman, just answer the question.

6          What is the standing, assuming that you have good

7    causes of action, of each of the plaintiffs?

8          MR. HEIDEMAN:  Under --

9          THE COURT:  Don't press here.  There is no audience

10   here.  Just answer my questions.

11         MR. HEIDEMAN:  Under the Anti-Terrorism Act U.S.

12   nationals who have suffered an injury have a claim that

13   includes the solatium claims of the individual near family

14   member plaintiffs.  That would include a mother, who was alive

15   at the time that Mr. Lelchook was murdered.  It would include a

16   brother, who was alive and is a plaintiff.  And it would

17   include the spouse and the two daughters.

18         THE COURT:  What section of the law are you referring

19   me to?

20         MR. HEIDEMAN:  We would refer the court specifically

21   to 18 U.S.C. 2333 that reads in part "Any national of the

22   United States injured in his or her person . . . by reason of

23   an act of international terrorism or his or her estate,

24   survivors or heirs, may sue therefor in any appropriate

25   district court of the United States."

17ISLELCHOOK

1          THE COURT:  Are there any cases that support the

2     argument that emotional damage alone will suffice for standing?

3          MR. HEIDEMAN:  Yes, the Linde case, which is Linde v.

4     Arab Bank, which we will cite to in a number of situations

5     today.

6          THE COURT:  Tell me about the case.

7          MR. HEIDEMAN:  The citation for the case is 384 Fed.

8     Supp. 2d 571, where the court specifically indicated that, and

9     I quote, "The congressional purpose (in enacting the

10    Anti-Terrorism Act) was to grant a remedy to U.S. nationals and

11    their families who suffered from injury to an individual or

12    property as a result of international terrorism."

13         THE COURT:  Where is the injury to the person?

14         MR. HEIDEMAN:  May I just continue one more sentence

15    from the court?

16         THE COURT:  Yes.

17         MR. HEIDEMAN:  "The claims of the U.S. nationals suing

18    based on their nonphysical injuries resulting from acts of

19    international terrorism will not be dismissed."

20         And that is generally known in the cases involving

21    acts of terrorism as solatium claims.

22         THE COURT:  Mr. Nagel, what is your view?

23         MR. NAGEL:  Well, your Honor, I raised the point --

24         THE COURT:  Please stand, Mr. Nagel.

25         MR. NAGEL:  Excuse me.

1          I raised the point in our brief about the standing

2    apart from the Article III standing because I was unable to

3    find any cases which dealt with survivors beyond heirs and

4    estate.  Reading survivor there quite broadly to include people

5    that have injuries, that would not necessarily be compensable

6    under the statute.  They do point to Linde.  That is the only

7    case I know of that even indirectly addresses that question.

8          THE COURT:  What was Judge Gershon's reasoning?

9          MR. NAGEL:  In the Linde case?

10         THE COURT:  Yes.

11         MR. NAGEL:  I don't read Linde as broadly as they do.

12   I read Linde to say that U.S. nationals who are heirs who have

13   a claim for emotional damages can proceed under the statute.  I

14   don't read the case to say that anybody --

15         THE COURT:  Who was the plaintiff in Linde?

16         MR. NAGEL:  There were a number of plaintiffs.  It was

17   a Arab Bank case and they list about 30 or 40 plaintiffs in the

18   case.

19         THE COURT:  What was their relationship to the

20   deceased?

21         MR. NAGEL:  That is what is not clear in the opinion.

22   It looks to me from reading it that they were either

23   representatives of the estate or heirs, not the extended

24   family.  I mean, the reading from Mr. Nudelman would mean that

25   cousins or what have you would be able to sue.  I don't read

1    the statute that way.  I read it very specifically to a wife

2    whose husband gets killed.  In this case specifically a child

3    who might have been an heir, but that would be it.

4              THE COURT:  Is there any statutory history that can

5    help us?

6              MR. NAGEL:  I have not been able to locate it on that

7    point.

8              THE COURT:  Is there any reasoning that could help us

9    whether the phrase "injured in his or her person" would include

10   emotional damage if there is no physical damage?

11             MR. NAGEL:  Well, the only support I was able to find

12   was from the New York cases in the state court which suggested

13   that survivors for purposes of general tort law are individuals

14   entitled to receive compensation upon the wrongful death of

15   another and it does not include, for example, the mother and

16   her father.

17             THE COURT:  Generally speaking New York tort law --

18   and I don't know if New York is the governing jurisdiction in

19   this respect -- does not give a recovery for people who suffer

20   only emotional damage.  If there is physical damage you can add

21   emotional damage.  But without physical damage New York law

22   does not provide a recovery.

23             Are these nationals citizens of New York?

24             MR. NAGEL:  I don't believe they are citizens of New

25   York.

1            THE COURT:  Mr. Heideman, where are they citizens?

2            MR. NAGEL:  Some of them are, some are not.

3            MR. HEIDEMAN:   The brother is based in Massachusetts.

4    The mother is based in Massachusetts.  The family was dual

5    national both from Massachusetts and citizens of Israel.  And

6    may I harken back to a request you --

7            THE COURT:  What would be the Massachusetts common law

8    on whether or not there can be a cause of action for someone

9    just serving or just experiencing emotional damage and not

10   physical damage?

11           MR. HEIDEMAN:  I can't answer that question, your

12   Honor.  However --

13           THE COURT:  I would like to know that before I resolve

14   that aspect of the motion.

15           What were you going to say?

16           MR. HEIDEMAN:  Yes, your Honor, you asked a question

17   about the plaintiffs in the Linde case, which is a group of

18   cases, Linde, Liedel, Coulter, and others, both American

19   victims and their family members, and in related cases Judge

20   Gershon has before her also actions for non-Americans.  I will

21   not address that.  Only as it relates to Americans, Judge

22   Gershon's ruling was that all of the near family members'

23   claims were permitted to stand as they have both direct as well

24   as attendant claims arising through the estate.  The direct

25   claims are as a result of what I referred to as the solatium

1    claims.  It wasn't just a spouse.

2           THE COURT:  If Massachusetts law is as New York law

3    is, I would think that would eliminate from your cause of

4    action the brother.  I don't know if there can be an

5    independent claim by the mother and daughters, but clearly the

6    spouse has a claim and the estate has a claim.

7           So I would like supplementary briefing on that issue

8    and we will talk about it at the end of this exercise today.

9    Basically I would rule in the absence of any specific

10   congressional intent whether the law of Massachusetts will

11   support these claims by these other people.  So you don't have

12   to brief it with regard to the estate and you don't have to

13   brief it with regard to the spouse, but actually the mother,

14   the daughters, and the brother you did.  Second, assuming that

15   there are causes of action for acts of terrorism and providing

16   funds for the financing of terrorism -- let's talk about Count

17   1, which alleges a claim for aiding and abetting the murder of

18   a United States citizen in violation of Section 2332(A).

19          Mr. Heideman, I have trouble with this.  Everything

20   that occurred occurred in Germany.  This would be a rather

21   large extension of substantive law to hold someone who is doing

22   business here and therefore is here for purposes of being sued

23   for acts committed elsewhere that so indirectly lead to a

24   particular death.

25          What you are alleging is that Commerzbank with

1       adequate knowledge supported a terrorist organization,

2       Hezbollah, which had as one of its purposes committing

3       terrorism within Israel and the death of an American citizen

4       while in Israel pursuing civilian activities in an area where

5       there were no specific military targets.  There is no war that

6       has been declared.  It's simply terrorism.  Those are the

7       assumptions and allegations you are making.

8               Why should there be a law that will punish a bank,

9       however misguided its financing, for aiding and abetting the

10      death of an American?

11              MR. HEIDEMAN:  May it please the court, as we

12      understand it, defendant Commerzbank opened it's New York

13      operations, its U.S. operations, in 1971 and has operated here

14      in the United States since 1971.

15              THE COURT:  And it's charged with knowing our laws.

16              MR. HEIDEMAN:  And it's charged with knowing our laws.

17              Secondly, in 1979, the State Department issued its

18      first State Department list of state sponsors of terror.

19              THE COURT:  It knew about Hezbollah.  It knew about

20      the charities that funnelled the funds in Hezbollah.  All of

21      this you alleged in the complaint and I accept it as true.

22      Everything you say I know, but answer my question.

23              MR. HEIDEMAN:  In doing business in the United States

24      Commerzbank must be held to be fully cognizant of everything

25      that goes on in the United States about foreign terrorist

1    organizations.  Hezbollah was designated by the State

2    Department in 1997.  Hezbollah prior to that committed the

3    marine barracks bombing in Beirut, Lebanon in 1983.  Hezbollah

4    had been formed in Lebanon in 1982 as the Party of God and

5    committed to terrorist activities.

6            Pursuant to the 1997 determination by the State

7    Department that Hezbollah was a state-designated foreign

8    terrorist organization, and knowing the facts that during the

9    time period of 2000 through 2004, the second intifada was

10   raging that included the sponsorship of terrorist activities by

11   various terrorist organizations, including allegations against

12   Hezbollah, we then get up to 2004, just 2 years before the

13   murder of --

14           THE COURT:  Did you hear my remarks?

15           MR. HEIDEMAN:  Yes, sir.

16           THE COURT:  I know all of this.  It's all alleged.

17   But all this occurred as a bank financing inadvisable with

18   terrorist organizations, but all in Germany.  Why should a bank

19   be charged with aiding and abetting for acts done in Germany

20   that end up with the death of an American in Israel?

21           MR. HEIDEMAN:  Because in 2004, two years before the

22   death of Mr. Lelchook, the German state governments, and there

23   are 16 of them, released -- one or more of them released a

24   report, a publicly released report that not only referenced

25   Hezbollah as a terrorist organization, but also referenced the

17ISLELCHOOK

1  Orphans Project Lebanon, the specific entity for which this

2  bank maintained the bank accounts.  And, therefore, this bank,

3  whether it operated in Germany only, in the United States only,

4  elsewhere in the world, and we understand it's the second

5  largest German bank in the world, very sophisticated, has

6  compliance activities, certainly knows the rules about knowing

7  your customer and certainly is duty bound to have paid

8  attention to not only U.S. but also German information from

9  state sources, government sources, and so in 2004 they

10  specifically either knew or certainly should have known that

11  the Orphans Project Lebanon, and I am using not the German name

12  but the English name, that entity had accounts at its German

13  locations, its New York operations being part of the same

14  corporate entity, and it knew that that entity, or should have

15  known that that entity was collecting in Germany funds and was

16  transferring those funds to Lebanon, and that the entity was a

17  front for Hezbollah because the reports included reference to

18  the Martyrs Foundation, the Al-Shaheed Foundation.

19          THE COURT:  I said several times -- and maybe I should

20  make my question more specific.  In light of Central Park of

21  Denver against First Interstate Bank of Denver, which held in

22  the securities laws context aiding and abetting was not a basis

23  for suing privately.  And in light of Judge Posner's decision

24  in an en banc decision by the Seventh Circuit, Boim against

25  Holy Land Foundation For Relief and Development, how can you

1 say that someone could be liable for aiding be abetting a

2 violation committed in another territory?

3          MR. HEIDEMAN:  Judge Gershon, may it please the court,

4 addressed that in Linde v. Arab Bank at 384 Fed. Supp. 2d 571

5 at 14 where she said, and I quote, "For the reasons set forth

6 comprehensively by the Court of Appeals for the Seventh Circuit

7 in Boim, I conclude that aiding and abetting liability is

8 available under the ATA in . . . in Boim the court found

9 Central Bank not determinative and summarized its reasons as

10 follows, and I quote --

11          THE COURT:  Mr. Heideman, wasn't there an en banc

12 decision?

13          MR. HEIDEMAN:  There was an en banc decision.

14          THE COURT:  539 F.3d 685.

15          MR. HEIDEMAN:  Yes.

16          THE COURT:  Didn't that, in effect, change the law as

17 expressed by the earlier panel decision?

18          MR. HEIDEMAN:  I believe, your Honor, that the law in

19 this district --

20          THE COURT:  Just answer my question, Mr. Heideman.

21          MR. HEIDEMAN:  In the Eastern District --

22          THE COURT:  Just answer my question.  I am not bound

23 by Judge Gershon's decision.  I am not bound by Judge Posner's

24 decision.  I am not bound by an en banc decision of the Seventh

25 Circuit, but I would like to know what we are talking about and

17ISLELCHOOK

1   if the Seventh Circuit en banc panel has reversed, in effect,

2   an earlier panel decision, I would like to know that without

3   slipping off that point.

4          So what is the ruling?  Did Judge Gershon cite to the

5   en banc decision?

6          MR. HEIDEMAN:  I believe her decision was before the

7   en banc decision.

8          THE COURT:  Before.

9          MR. HEIDEMAN:  Yes, sir.

10         THE COURT:  Maybe it's a good idea to tell me that

11  before you ask me to rely on what Judge Gershon said finding

12  authority for her point of view in the panel decision of the

13  Seventh Circuit.

14         MR. HEIDEMAN:  Yes, your Honor.

15         May I also reference to the court the Weiss decision

16  out of the Eastern District of New York where the court held

17  "It poses no threat to honest and vigilant international

18  bankers for this court to find that allegations of such

19  extraordinary conduct following their client's dealings with a

20  designated terrorist organization and foreign terrorist

21  organization are sufficient to plead substantial assistance on

22  a motion to dismiss."

23         Accordingly, we believe that it is appropriate, based

24  upon the pleadings before your Honor, based upon the complaint,

25  for the defendant, Commerzbank, to be determined to have

1    purposely intended to have substantially assisted the terrorist

2    activity of Hezbollah, because they either knew or they should

3    have known from information in their own hands and in their own

4    government, since their pleadings reference very much their

5    German standing and disregard their United States presence,

6    that they either knew or should have known that Hezbollah, a

7    terrorist organization, had a German front that was collecting

8    money and sending that money to its associate organization, a

9    front in Lebanon.

10            And if we go all the way forward, your Honor, to a

11   recent statement by Germany's Interior Minister that we have

12   located, that apparently in March of 2010 a spokesman for

13   Germany's Interior Minister confirmed that "The association

14   Orphans Project Lebanon is linked with Hezbollah in many ways

15   organizationally and through its staff.  Its danger thus

16   essentially corresponds to that of Hezbollah."

17            THE COURT:  I have the point.  I am asking the

18   technical issue on aiding and abetting.  You cite Judge

19   Sifton's decision in Strauss against Credit Lyonnais -- it's

20   not published -- and there is also a decision by Judge Wood of

21   this court in Kaplan against Al-Jazeera.  Judge Sifton assumed

22   the private right of action but dismissed the complaint on

23   other grounds.  I don't know what Judge Wood did.  But, in any

24   event, I understand the issues.

25            Let me hear from Mr. Nagel.

17ISLELCHOOK

1          MR. NAGEL:  Thank you, your Honor.

2          THE COURT:  Just on Count 1, Mr. Nagel.

3          MR. NAGEL:  Yes.  I am happy to start there.

4          THE COURT:  Confine your remarks to Count 1, and then

5     we will go on to Counts 2 and 3.

6          MR. NAGEL:  Your Honor is correct that Boim III, the

7     en banc decision, held there is no private right of action or

8     aiding and abetting under the ATA.  Every court, as far as I

9     know in this district, post Boim III has decided either the

10    cause of action didn't exist or the plaintiffs have failed to

11    plead sufficiently to meet the elements of any such cause of

12    action and dismissed those claims.

13         THE COURT:  I think there is a United States Supreme

14    Court decision in this term, and I don't remember the facts or

15    the name, which reaffirms the holding in Central Bank in a

16    different context.

17         MR. NAGEL:  I recall it as well.  I don't recall the

18    name but I recall the case.  It may have been en banc but in

19    any case.  The citation, by the way, that Mr. Nudelman just

20    read in Weiss out of his brief, the citation to Weiss that he

21    quoted is actually a misquotation in Footnote 16 of our reply

22    brief and we point that out.  He says, "The court held it poses

23    no threat to honest and vigilant bankers for the court to," et

24    cetera, et cetera.  That is not actually a quote from the case.

25    I think what that is a quote from is the briefs of the

1   plaintiffs in that case which the court did not adopt.

2        THE COURT:  This is Judge Sifton's decision.

3        MR. NAGEL:  Yes.

4        THE COURT:  He didn't really decide that aiding and

5   abetting is the cause of action.  I assume he went on to

6   dispose of the case on other grounds.

7        MR. NAGEL:  Correct.

8        THE COURT:  Let me put it a different way:  The basis

9   of Mr. Heideman's argument is that anybody who has very

10  thorough knowledge that the organization that does banking is

11  bent on terrorism should not do that banking because it

12  supports terrorism.  That is short of saying that the bank

13  adopted as its own the purposes of the terrorist organization

14  and aided and abetted it.  At best the conduct that is alleged

15  by Mr. Heideman in connection with the first cause of action is

16  based on negligence, even an extreme basis of awareness and

17  knowledge, but not to the level of joining the terrorists in

18  aiding and abetting in that sense.

19        And I would hold, Mr. Heideman, that the aiding and

20  abetting action in light of Central Bank against Denver, and

21  the reasoning of Boim against Holy Land in its en banc

22  rendition, is the correct interpretation of the law arising

23  from Section 2333.

24        So I am going to dismiss Count 1.

25        Now, Count 2, Count 3, Mr. Nagel, you needn't sit down

17ISLELCHOOK

1   because I think I agree with Mr. Heideman on those counts.

2   They allege -- oh, and the case I had in mind for this term was

3   Janice Capital Group, Inc. against First Derivative Traders,

4   131 Supreme Court 2296 (2011), which reaffirmed the Central

5   Bank rule in connection with a securities fraud lawsuit against

6   the defendant in that case.  It's also a securities case, but I

7   think the reasoning extends.

8           The remedy and the statute says, "Any national of the

9   United States injured in his or her person, property or

10   business by reason of an act of international terrorism, et

11   cetera, may sue in any appropriate district court of the United

12   States and shall recover treble damages."

13          It is not alleged that the act of banking by

14   Commerzbank was an act of terrorism.  It's alleged that it

15   aided an act of terrorism leading to the death of an American

16   citizen performing a lawful and civil pursuit in Israel.  So I

17   have dismissed Count 1, but for Count 2, that is different.  We

18   are under 2339(A), capital (A), and capital (B) and capital

19   (C), three statutes.  2339(A), subsection little (a), provides

20   "Whoever provides material support or resources or conceals or

21   disguises the nature, location, source or ownership of material

22   support or resources knowing or intending that they are to be

23   used in preparation for or in carrying out a violation of

24   various sections, including sections of terrorism, or in

25   preparation for or in carrying out the concealment of an

17ISLELCHOOK

```
 1   escape" -- that doesn't apply -- "or attempts or conspires to
 2   do such an act shall be subject to various penalties, including
 3   if the death of a person results, imprisonment for a term of
 4   years or for life."
 5           So Mr. Heideman arguing that the act of banking for a
 6   listed terrorist organization connected to an organization
 7   listed by our country as a terrorist organization fits the
 8   statute.  Forgetting now about whether he can sustain the cause
 9   of action that would be tested by discovery and a Rule 56
10   motion possibly.  But in terms of allegations hasn't he alleged
11   a sufficient cause of action under (A) and under (B), "Whoever
12   knowingly provides material support or resources to a foreign
13   terrorist organization or attempts or conspires to do so," et
14   cetera, or under (C), "unlawfully, wilfully provides or
15   collects funds with the intention that such funds be used or
16   with the knowledge that such funds are to be used, in full or
17   in part, in order to carry out various terrorist acts."
18           He has alleged that.
19           MR. NAGEL:  He has not.
20           THE COURT:  Tell me why.
21           MR. NAGEL:  I will explain to you why.  I think there
22   is a clarification that needs to be made with respect to 18
23   U.S.C. 2339(A, (B), (C).  The allegations in the complaint
24   actually do not allege a 2339(A) violation.  Count 1 is aiding
25   and abetting.
```

1          THE COURT:  Forget about 1.  It's counts 2 and 3.

2          MR. NAGEL:  Counts 2 deals with 2339(B) and Count 3

3    deals with 2339(C).  There is actually no allegation concerning

4    violation of 2339(A).

5          I don't think that much matters for what I am going to

6    say following that.  But I just want to make that point.

7          THE COURT:  I stand corrected.

8          MR. NAGEL:  So this is my understanding of the

9    Anti-Terrorism Act and how it works and why I think those

10   allegations fail, and I grant you it's a complicated statute so

11   if my understanding differs from yours --

12         THE COURT:  It's not so complicated.

13         MR. NAGEL:  The way I read it is that 2333, which is

14   the base allegation, by reason of an act of terrorism.  You can

15   sue for injury by reason of an act of terrorism, and that

16   requires a couple of elements that you need to allege under

17   that statute, and that is the civil statute that you are suing

18   under.  You are not actually suing under 2339(B) or (C).  That

19   is just the criminal statute.  There is no private right of

20   action under those statutes.

21         THE COURT:  That amplifies what is unlawful.

22         MR. NAGEL:  Absolutely.  It amplifies what is unlawful

23   under 2333(A).  The best discussion I have seen of that is in

24   the Rothstein case by Judge Rakoff and in the Al-Jazeera case

25   by Judge Wood, both of which -- well, one of which we cite in

1    the brief and the Al-Jazeera case just got decided a few weeks

2    ago by Judge Wood and in both of those cases the court explains

3    that "Although Section 2333(A)" -- and I am quoting now from

4    the Al-Jazeera case, the Kaplan v. Jazeera case -- "Although

5    2333(A) does not explicitly contain a state-of-mind

6    requirement, the courts have interpreted the statute to include

7    a requirement that there be some deliberate wrongdoing by the

8    defendant and it requires proof of intentional misconduct."

9            THE COURT:  Why is it not the case, according to the

10   allegations, that Commerzbank indifferent to the law of Saxony,

11   indifferent to the law of the United States, treated these

12   terrorist organizations or these feeder funds to terrorist

13   organizations just like you and me?  You can't bank that way.

14           MR. NAGEL:  There are a couple of problems with the

15   complaint in that regard.  First of all, the client alleges

16   that the bank account at issue here is the bank account by the

17   Orphans Project Lebanon.  The Orphans Project Lebanon is a

18   charitable organization in Germany which has never been, even

19   today, much less back in 2006, has never been on a designated

20   terrorist watch list of any kind, in the United States or in

21   Germany.  And the allegation in the complaint is that the bank

22   account held by the Orphans Project gave money to the Martyrs

23   Foundation and that the Martyrs Foundation was a known

24   Hezbollah front.

25           The Martyrs Foundation, a separate charity based in

17ISLELCHOOK

1    Lebanon, is my understanding, was not a designated terrorist

2    organization, foreign terrorist, special designated global

3    terrorist organization, any designated terrorist organization

4    until 2007 in the United States; and that is the Department of

5    Treasury OLFAC list.  They listed them I believe July 2007.  I

6    have the list here.  It's the first time the Martyrs Foundation

7    appeared on the list.

8              So you have a couple of chains of logic here that the

9    plaintiff is alleging.  First, they are alleging you had a bank

10   account by the Orphans Project, that the Orphans Project was

11   connected to the Martyrs Foundation, and that the Martyrs

12   Foundation is connected to Hezbollah.  Nobody argues that

13   Hezbollah wasn't --

14             THE COURT:  I am looking at paragraph 2930, 31, so on

15   in the complaint.  The plaintiff alleges that the German State

16   of Baden-Wurtemberg considers the Orphans Project Lebanon part

17   of Hezbollah.  In the previous allegations the plaintiffs have

18   alleged that Hezbollah is an umbrella organization, including

19   various kinds of charitable organizations funding

20   interchangeably terrorist activities including the killing of

21   private citizens in Israel and the terrorizing of the

22   population of Israel and visitors to Israel.

23             Paragraph 30 goes on to say that the district court of

24   the German State of Kluten-Berg declared on December 5, 2008

25   that there is no doubt that the donations collected by the

1    Orphans Project Lebanon are made available to the martyrs

2    associations in Lebanon and the conclusion that this

3    association is affiliated with Hezbollah.

4            MR. NAGEL:  That is 2008.

5            THE COURT:  Yes.

6            MR. NAGEL:  The injury was in 2006, the account.

7            THE COURT:  But it's reflective of an activity that is

8    going on.

9            MR. NAGEL:  Yes, but if you have to allege the bank

10   knew, it wouldn't have known of a decision in 2008 of 2006.

11           THE COURT:  That is something you can bring out on

12   discovery.

13           MR. NAGEL:  Let me reference the state 2004 report.

14   It's referenced in the Nudelman declaration, Exhibit 2.

15           THE COURT:  This is a motion under Rule 56.

16           MR. NAGEL:  It's referenced in the complaint.

17           THE COURT:  12(b) motion.

18           MR. NAGEL:  Sure.

19           THE COURT:  So whether it's a little late or a little

20   earlier it's a matter for factual discovery.

21           MR. NAGEL:  It does matter.

22           THE COURT:  I don't read these allegations narrowly.

23   I read them for their meaning and their purpose.  This is a

24   sufficiently pleaded complaint and we are dealing with notice

25   pleadings.  Your clients have been given a notice that they

1    have been involved over a long period of time in financing

2    terrorism.

3         MR. NAGEL:  I don't really believe, your Honor, that

4    the allegations fairly read and the facts alleged in the

5    complaint either assert that Commerzbank engaged in intentional

6    misconduct; that they knew that the organization that they had

7    a bank account for was in any way connected to terrorism.  In

8    fact, if you look --

9         THE COURT:  Their intention was to finance and

10   facilitate the movement of funds through this organization into

11   the Hezbollah network.  People have known for a very long time

12   what Hezbollah does and how it mingles its funds from

13   charitable to terrorist activities.  It's the same thing with

14   Hamas, the same thing that figured in the other cases.

15        I hold that Counts 2 and 3 allege a legally sufficient

16   claim for relief at this point in time.  And so your motion is

17   denied with regard to dismissing the allegations of Counts 2

18   and 3.

19        What is now open, therefore, is the law of

20   Massachusetts with regard to claims for physical distress.  In

21   the briefing, which I will expect from you, say, in about a

22   week, Mr. Heideman?

23        MR. HEIDEMAN:  Yes, your Honor.

24        MR. NAGEL:  Sure, your Honor.

25        THE COURT:  Simultaneous submissions by noon of next

1    Monday.  So I will draw to your attention a treatise called

2    Massachusetts Proofs of Civil Cases, Section 15:17, the rule

3    states as follows:  "A plaintiff cannot recover for a

4    negligently inflicted emotional distress absent a showing of

5    physical harm.  It is not necessary that the harm be caused by

6    the impact or trauma.  Physical harm resulting from emotional

7    distress is sufficient.  The plaintiff's physical harm must

8    either cause or be caused by the emotional distress alleged.

9    The physical harm must be manifested by objective symptomology

10   and substantiated by expert medical testimony.  Its existence

11   may not be demonstrated solely by the plaintiff's complaints."

12            I think what is mentioned now is not an allegation but

13   proof.

14            And there is a long list of cases that follow.

15            Mr. Heideman, that is your challenge.

16            MR. HEIDEMAN:  Yes, your Honor.

17            THE COURT:  Is there anything more that either counsel

18   want to discuss with me?

19            MR. HEIDEMAN:  Just one matter.

20            Would the court have any objection to setting that

21   deadline for Wednesday noon instead of Monday noon?

22            THE COURT:  No, I do not.  Next Wednesday at noon,

23   simultaneously, and I would like it to be short, ten pages or

24   less.  Don't fool around with the fonts.  Don't fool around

25   with the margins.  I want a normal font that an elderly person

1    can read.

2         MR. NAGEL:  One other point.  There was an argument in

3    the briefing concerning the act-of-war exception to this

4    statute and --

5         THE COURT:  There is no act of war here.  There never

6    was a declared war between Hezbollah and the United States.

7    It's like a fungus grown in Lebanon but it's not a state itself

8    and there is no war between Hezbollah and the United States,

9    except our war against terrorism which is not really a war, a

10   really declared war.  I don't think the act-of-war exception

11   applies.  In any event, these were not military targets.  There

12   is no military target around.  These were just missiles hurled

13   into Israel with the hope that it would land on somebody rather

14   than just a field.

15        There have been several references to Judge Wood's

16   decision in Kaplan v. Jazeera, 10 Civ. 5298, decided June 7,

17   2011.  The allegations in that complaint on behalf of a group

18   of American, Israeli, and Canadian civilians suing under the

19   Anti-Terrorism Act, the alien torts statute, was that the

20   broadcasting of Al-Jazeera, an Arab news network, of the random

21   terrorist acts of the Hezbollah rocket barrage in northern

22   Israel was intended to support Hezbollah and Judge Wood

23   reasoned "The suggestion of the allegations strains credulity

24   when a person donates money" -- I am reading the wrong

25   paragraph.

1          "The gravamen of plaintiff complaints is that

2     defendant broadcast to Hezbollah rocket attack with the

3     intention of assisting Hezbollah to improve its aiming

4     ability."  This has to do with the broadcasting of exactly

5     where the rockets landed in Israel, there being no internal

6     guidance system in a rocket so that the launchers, the rocket,

7     can't know where its going.  But that if a pattern of actual

8     landings can be identified the rocket can be launched with more

9     precision.  So the allegation is that Al-Jazeera repeatedly

10    recorded, transmitted, and broadcast the impact locations of

11    Hezbollah rockets with a specific intention of assisting

12    Hezbollah to harm Israel and the United States consistent with

13    and pursuant to Al-Jazeera's support for Hezbollah and its

14    goals.  And Judge Wood held "Plaintiff's allegations of

15    defendant's wrongful intent should not be accepted at face

16    value.  They must be supported by sufficient factual matter in

17    order for the plaintiff to survive defendant's motion to

18    dismiss on the Iqbal standard expressed by the Supreme Court,"

19    129 Supreme Court in 1949.

20          Plaintiff's complaint, she ruled, must allege facts

21    that are not merely consistent with the conclusion that the

22    defendant violated the law but which actively and plausibly

23    suggests that conclusion.  And Judge Wood found that plaintiffs

24    had failed to meet that burden.  She distinguished the

25    condition in Boim, which is very much like the condition here,

1    and she wrote "When a person donates money to an

2    organization" -- and I say the allegations alleged here where

3    money was funnelled through the banking system is the same

4    thing -- "the foreseeable consequence of that action is that

5    that money will be used to further the goals of the

6    organization or to augment the organization's resources,"

7    citing Boim.  Here plaintiffs have offered no facts suggesting

8    that defendant broadcast news of the rocket attacks with such

9    knowledge and such intent.

10             What we have in our case is a set of allegations

11   making just those allegations and I believe they are plausible

12   and they meet the test and a claim for relief is stated.

13             I can go on to say more about this but I don't think

14   it would serve any useful purpose.  So Count 1 is dismissed.

15             On Counts 2 and 3 the motion is denied and the legal

16   sufficiency of the complaint is accepted.  There is an open

17   question whether or not Alexander Lelchook, the surviving

18   brother, Doris Lelchook, the surviving mother, and Yael and

19   Michal Lelchook, the two surviving daughters, have standing to

20   sue.

21             I will make that ruling based upon what I see when I

22   get the submission, but my present view is that their standing

23   is absent and their complaint must be dismissed as to all

24   counts.  That would, if my reasoning is correct, sustain Counts

25   2 and Count 3 in the lawsuit by the Estate of David Lelchook

1    and the claims of Ester Lelchook, the surviving spouse.  But I

2    will be informed by the submissions.

3            Anything else?

4            MR. HEIDEMAN:  One question, your Honor.

5            Earlier you referenced the matter of legislative

6    intent and you inquired about that.  Would you like us to look

7    into that as part of the same brief as it may relate to the

8    solatium claims?

9            THE COURT:  If you can find anything on that, yes.

10   That would be a federal construct.  But only on that.  Don't

11   repeat your arguments that you made here as to how much the

12   bank knew.

13           MR. HEIDEMAN:  Yes, sir.

14           MR. NAGEL:  I just wanted to put in the record one

15   citation which I think is important, and I understand your

16   Honor made his ruling.  It's the Leachy v. American Express

17   Bank case, 704 F.Supp. 2d 403, a March 2010 opinion by Judge

18   Daniels involving very similar allegations in this case and

19   Hezbollah missile attacks.  The very same missile attacks

20   allegedly killed family members in that case with Judge Daniels

21   dismissing on causation grounds, and the quotation from the

22   case is "The injuries and death suffered by plaintiffs and

23   their family members were caused by the rockets launched by

24   Hezbollah, not the banking services provided through the

25   corresponding account or wire transfers with AMEX bank.

17ISLELCHOOK

1   Plaintiffs do not allege the rocket attacks were --"

2          THE COURT:  Which is an allegation similar to the

3   allegations under 2339.

4          MR. NAGEL:  Absolutely.  Because the court realized in

5   that case, and I think it is the law, your Honor, that under

6   2333(A), 2339(B) and (C) is one piece of 2333(A).  However,

7   2333(A) still requires not just the allegations that 2339(B)

8   and (C) were violated but also requires proximate causation to

9   be pled, which is a completely independent element of that

10  civil tort.

11         THE COURT:  You may renew that argument in connection

12  with a motion for summary judgment.  I think a lot of it

13  depends on the nature of the banking relationship and the

14  extent of knowledge of the bank.

15         Thanks very much.

16

17

18                              - - -

19

20

21

22

23

24

25