UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

CHARLOTTE FREEMAN, et al.,

                                        Plaintiffs,

                    -against-                                    14-CV-6601 (DLI/CLP)

HSBC HOLDINGS PLC, et al.,

                                        Defendants.

**DEFENDANTS' JOINT MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

September 14, 2016

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ...........................................................................................ii

INTRODUCTION .........................................................................................................1

BACKGROUND ...........................................................................................................3

I.      STATUTORY BACKGROUND..........................................................................3

II.     PLAINTIFFS' ALLEGATIONS .........................................................................4

ARGUMENT ...............................................................................................................11

I.      THE RULE 12(b)(6) STANDARD ..................................................................11

II.     THE COMPLAINT FAILS PLAUSIBLY TO ALLEGE PROXIMATE CAUSE ..........12

        A.     *Rothstein* and Its Progeny Hold That the Alleged Provision of Financial
              Services to Iran, Even When in Violation of U.S. Law, Is Too Remote to
              Support Civil Liability under Section 2333 for Injuries Allegedly Caused
              by Terrorist Entities Funded by Iran.....................................................13

        B.     *Rothstein* and Its Progeny Foreclose Plaintiffs' Causal Theory Here....................17

III.    THERE IS NO CONSPIRACY-BASED LIABILITY UNDER SECTION 2333 ............24

IV.    THE COMPLAINT FAILS PLAUSIBLY TO ALLEGE THAT NON-U.S.
        MOVING DEFENDANTS ARE "UNITED STATES PERSON[S]" OR THAT
        THEY ENGAGED IN "A FINANCIAL TRANSACTION WITH THE
        GOVERNMENT" OF IRAN UNDER SECTION 2332D ...............................................28

V.     DISMISSAL WITH PREJUDICE IS APPROPRIATE WHERE PLAINTIFFS
        HAVE TRIED AND FAILED THREE TIMES TO SUCCESSFULLY STATE
        THEIR CLAIMS...............................................................................................30

CONCLUSION.............................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abecassis v. Wyatt*,
785 F. Supp. 2d 614 (S.D. Tex. 2011) ...................................................................29

*Ahmad v. Christian Friends of Israeli Comtys.*,
No. 13 Civ. 3376 (JMF), 2014 WL 1796322 (S.D.N.Y. May 5, 2014).................................20

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006).........................................................................................4, 21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).......................................................................................11, 12

*Bailey v. United States*,
516 U.S. 137 (1995).............................................................................................29

*Baron v. Complete Mgmt., Inc.*,
260 F. App'x 399, 2008 WL 205327 (2d Cir. Jan. 24, 2008)..................................30

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................11, 12, 15

*Central Bank of Denver v. First Interstate Bank of Denver*,
511 U.S. 164 (1994)....................................................................................25, 26

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000).............................................................................................29

*Daimler AG v. Bauman*,
134 S. Ct. 746 (2014)..........................................................................................29

*Denny v. Barber*,
576 F.2d 465 (2d Cir. 1978)...............................................................................2, 30

*Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*,
135 F.3d 837 (2d Cir. 1998)...........................................................................26, 27

*Fort Worth Emp'rs Ret. Fund v. Biovail Corp.*,
615 F. Supp. 2d 218 (S.D.N.Y. 2009).....................................................................2

*Gill v. Arab Bank, PLC*,
893 F. Supp. 2d 474 (E.D.N.Y. 2012) ...................................................................16

*Hemi Grp., LLC v. City of New York*,
    559 U.S. 1 (2010)..................................................................................................4, 21

*Holmes v. Secs. Investor Prot. Corp.*,
    503 U.S. 258 (1992)............................................................................................3, 4, 24

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*,
    191 F.3d 229 (2d Cir. 1999), *as amended* (Aug. 18, 1999)......................................21

*Lexmark Int'l. Inc. v. Static Control Components Inc.*,
    134 S. Ct. 1377 (2014).........................................................................................13, 24

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013)....................................................................................4, 5

*Linde v. Arab Bank, PLC*,
    944 F. Supp. 2d 215 (E.D.N.Y. 2013) ...............................................2, 25, 26, 27

*Linde v. Arab Bank, PLC*,
    97 F. Supp. 3d 287 (E.D.N.Y. 2015) ........................................................................16

*Mastafa v. Chevron Corp.*,
    770 F.3d 170 (2d Cir. 2014)................................................................................12, 28

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
    709 F.3d 109 (2d Cir. 2013)......................................................................................12

*O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)*,
    714 F.3d 118 (2d Cir. 2013)............................................................................. passim

*Oei v. Citibank, N.A.*,
    957 F. Supp. 492 (S.D.N.Y. 1997)..............................................................................7

*Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v.*
    *Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013)................................................................................11, 12

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013)............................................................................... passim

*Sampson v. MediSys Health Network, Inc.*,
    No. 10-CV-1342 SJF ARL, 2012 WL 3027838 (E.D.N.Y. July 24, 2012)...........................30

*Strauss v. Credit Lyonnais, S.A.*,
    925 F. Supp. 2d 414 (E.D.N.Y. 2013) ...............................................15, 16, 17, 18

*Stutts v. De Dietrich Group*,
    No. 03 Civ. 4058 (IGL), 2006 WL 1867060 (E.D.N.Y. June 30, 2006) ................................22

*Ungar v. Islamic Republic of Iran*,
211 F. Supp. 2d 91 (D.D.C. 2002) ........................................................................28

*United States v. Chalmers*,
474 F. Supp. 2d 555 (S.D.N.Y. 2007) ...................................................................29

*United States v. Coplan*,
703 F.3d 46 (2d Cir. 2012) ...................................................................................27

*Wright-Upshaw v. Nelson*,
No. 13 Civ. 3367, 2014 WL 692870 (E.D.N.Y. Feb. 19, 2014) ...........................28

*Zito v. Leasecomm Corp.*,
No. 02 Civ. 8074 (GEL), 2003 WL 22251352 (S.D.N.Y. Sept. 30, 2003)............27

**Statutes & Rules**

18 U.S.C. § 2331 ............................................................................................................3

18 U.S.C. § 2332d .............................................................................................2, 10, 28, 29

18 U.S.C. § 2333 .................................................................................................... passim

18 U.S.C. § 2339A ...................................................................................................3, 10, 11, 27

18 U.S.C. § 2339B .......................................................................................................10, 11, 27

Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-32,
§ 301(a)(7), 110 Stat. 1214, 1247 (1996).............................................................16

Fed. R. Civ. P. 8(a)(2) ...................................................................................................12

Fed. R. Civ. P. 12(b)(6)..................................................................................................11

Securities Exchange Act of 1934 ...................................................................................25

**Other Authorities**

31 C.F.R. § 560.516 (2006), *amended* 73 Fed. Reg. 66541 (Nov. 10, 2008)..................5

First Amended Complaint, *Linde*, No. 04 Civ. 2799 (E.D.N.Y. Aug. 10, 2004) ..........25

Prohibiting New Investment in Burma, Exec. Order No. 13047, 62 Fed. Reg.
28,301 (May 20, 1997).........................................................................................29

Transcript of Motion Hearing, *Linde*, No. 04 Civ. 02799 (E.D.N.Y. May 10,
2013) ..........................................................................................16, 19, 20, 26, 27

## INTRODUCTION

Attacks on U.S. soldiers, including those committed by terrorists during the Iraq war, are abhorrent.  But the undersigned Defendants—European financial institutions (the "Moving Defendants")[1]—are not responsible for these heinous acts.  The Moving Defendants did not commit any acts of terrorism and did not support any terrorists.  Nonetheless, the Second Amended Complaint (the "Complaint"), like its predecessors, seeks to stretch the civil provision of the Anti-Terrorism Act (the "ATA"), 18 U.S.C. § 2333, beyond its bounds in an effort to obtain monetary damages from these financial institutions in regard to unrelated terrorist attacks on U.S. forces.  The Complaint weaves together broad and conclusory allegations with hundreds of pages of extraneous details in an effort to conjure a portrait of an alleged decades-old conspiracy between the Moving Defendants, Iranian banks, the Government of Iran and various Iranian state entities to process U.S. dollar-denominated transactions and make payments on letters of credit, and then, through a far-fetched causal theory that relies on multiple unknown actors, attempts to jump from this commercial banking work to the detonation of explosive devices and other attacks in Iraq.

Although the Complaint is longer than the prior two complaints filed by Plaintiffs, it is no less deficient.  As demonstrated below, clear and controlling precedent in this Circuit holds that the Complaint's allegations fail to state a claim under the ATA as a matter of law.  First, the Complaint fails plausibly to allege that the Moving Defendants proximately caused Plaintiffs' injuries.  In *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013), the Second Circuit held that plaintiffs asserting Section 2333 claims must plausibly allege proximate cause and

---

[1] The "Moving Defendants" are HSBC Holdings PLC ("HSBC"), HSBC Bank PLC ("HSBC-Europe"), HSBC Bank Middle East Limited ("HSBC Middle East"), HSBC Bank USA, N.A. ("HSBC-US"), Barclays Bank PLC ("Barclays"), Standard Chartered Bank, The Royal Bank of Scotland N.V. ("RBS N.V."), Commerzbank AG and Credit Suisse AG.

affirmed dismissal of such claims against a European bank based on causal allegations that were more plausible, direct and substantiated than those alleged here. The Second Circuit's subsequent decision in *O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)*, 714 F.3d 118, 123 (2d Cir. 2013), applying *Rothstein*, also rejected the kind of indirect causal allegations asserted here. Second, because Plaintiffs' claims are grounded in a conspiracy theory of liability, the claims must be dismissed on the independent basis that conspiracy claims and other theories of secondary liability are not cognizable under Section 2333. *See Rothstein*, 708 F.3d at 97-98 (dismissing aiding-and-abetting claims under the ATA); *Linde v. Arab Bank, PLC*, 944 F. Supp. 2d 215, 216 (E.D.N.Y. 2013) (applying *Rothstein* to dismiss all conspiracy-based claims under the ATA). Further, the Third and Fourth Claims for Relief, brought against some of the Moving Defendants under 18 U.S.C. § 2332d, must be dismissed for the additional reason that the Complaint fails plausibly to allege that non-U.S. Moving Defendants are "United States person[s]" or that they engaged in "a financial transaction with the government" of Iran. The remaining claims for relief asserted in the Complaint are separately addressed in supplemental briefs filed by individual Moving Defendants and likewise merit dismissal.

Because plaintiffs have now had three bites at the apple to try to state a valid claim, and have again failed to do so, dismissal with prejudice is warranted. *See, e.g.*, *Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978) (holding that plaintiff was not entitled to a "third go-around"); *Fort Worth Emp'rs Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 233 (S.D.N.Y. 2009) (dismissing action with prejudice because "plaintiff has already amended its complaint once" and "the flaws in the pleading are incurable on the facts").

**BACKGROUND**

**I.    STATUTORY BACKGROUND**

While the ATA is largely comprised of criminal prohibitions relating to

terrorism,[2] Section 2333(a) of the ATA creates a civil cause of action for U.S. nationals "injured

. . . by reason of an act of international terrorism".  Section 2333(a) incorporates the definition of

"international terrorism" in 18 U.S.C. § 2331, to wit, activities that:

> (A)   involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> (B)   appear to be intended—
>
> > (i)    to intimidate or coerce a civilian population;
> >
> > (ii)   to influence the policy of a government by intimidation or coercion; or
> >
> > (iii)  to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
>
> (C)   occur primarily outside the territorial jurisdiction of the United States.

A Section 2333 claim thus consists of several basic elements.  First, the plaintiff

must be a U.S. national.  Second, the plaintiff must plausibly allege that the defendant itself

committed an act of international terrorism as defined in Section 2331.  *See Rothstein*, 708 F.3d

at 97.  Third, the plaintiff must plausibly allege that he or she was injured "by reason of" the

defendant's act of international terrorism, 18 U.S.C. § 2333(a)—which the Second Circuit has

defined to require plausible allegations that the defendant's act proximately caused the plaintiff's

injury.  *See Rothstein*, 708 F.3d at 95 (quoting *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S.

258, 267-68 (1992)); *accord Al Rajhi*, 714 F.3d at 123-24.  As the Supreme Court has held,

---

[2] For example, 18 U.S.C. § 2339A, a criminal provision of the ATA, makes it unlawful to "provide[] material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out, a violation of" one of several substantive terrorism offenses.

proximate cause requires "some direct relation between the injury asserted and the injurious conduct alleged". *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (quoting *Holmes*, 503 U.S. at 268); *accord Rothstein*, 708 F.3d at 91-92 ("with respect to 'proximate causation, the central question . . . is whether the alleged violation led directly to the plaintiff's injuries'") (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)).

## II.   PLAINTIFFS' ALLEGATIONS

The Complaint is premised on an alleged conspiracy principally among the Moving Defendants, several Iranian banks, the Government of Iran and various Iranian state entities. *See, e.g.*, Second Am. Compl. ("SAC") ¶¶ 6, 22. Plaintiffs define "the Conspiracy" as "an illegal criminal agreement, beginning in 1987 and, on information and belief, continuing to the present, between Iran, its banking agents and various international financial institutions by and through which Defendants knowingly participated in a criminal scheme in which they agreed to alter, falsify, or omit information from bank-to-bank payment orders sent on the SWIFT private financial messaging network . . . that involved Iran or Iranian parties (including several Iranian banks . . . such as Bank Melli Iran, Bank Saderat Iran, the [Central Bank of Iran], Bank Mellat, Bank Tejarat, Bank Refah and Bank Sepah, as well as the Islamic Republic of Iran Shipping Lines ('IRISL'), the National Iranian Oil Company ('NIOC') and Mahan Air) that serve as financial and logistical conduits for the [Iranian Revolutionary Guard Corps] and its terrorist activities". *Id.* ¶ 22.

*U.S.-dollar clearing allegations*. Plaintiffs allege that, as part of the Conspiracy, the Moving Defendants variously provided U.S. dollar-denominated correspondent banking services to certain Iranian banks.[3] *Id.* ¶¶ 351, 353-54, 358. For most of the period that the

---

[3] Correspondent banking involves the use of wire transfer instructions to facilitate the transfer of funds from an account in one bank to an account in another bank. *See generally Licci*

Moving Defendants are alleged to have provided such services, there was no blanket prohibition against clearing transactions denominated in U.S.-dollars for Iranian banks.  *See id.* ¶¶ 140-42. To the contrary, although the U.S. sanctions regime barred U.S. banks from many kinds of financial transactions with certain identified Iranian parties, it did permit certain dollar-clearing services pursuant to the "U-Turn" exemption, at least until November 2008.[4]  *Id.*  Plaintiffs allege, however, that when dealing with Iranian entities under the U-Turn exemption, the Moving Defendants omitted, altered or concealed certain Iranian identifying information in the payment messages for transactions being processed through U.S. clearing banks in order to avoid U.S. scrutiny of the transactions.  *See, e.g.*, *id.* ¶¶ 25, 146, 158, 581, 896.  Plaintiffs refer to this as "stripping".  *See, e.g.*, *id.* ¶¶ 23, 25, 195, 343.  Plaintiffs also allege that, at various times between 2009 and 2015, the Moving Defendants acknowledged to the U.S. Government their respective failures to include such identifying information in banking transactions with certain Iranian

---

*ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 166 n.3 (2d Cir. 2013) (describing international correspondent banking).  Often, there are multiple banks involved in a wire transaction:  a local bank, whose customer is the sending party; a receiving bank, whose customer is the receiving party; and one or more intermediary banks that provide correspondent banking services to the banks at either end of the transaction if they do not have direct relationships with each other.  Banks providing clearing services for U.S. dollar-denominated transactions are often located in the U.S.  *See* SAC ¶¶ 353-354.  In many instances, a U.S. bank or a U.S. branch of a foreign bank acting as a clearing bank would have information only about its direct counterparties but not about every upstream and downstream participant in the transaction.  Plaintiffs here allege that Iranian banks maintained accounts at the Moving Defendant financial institutions and that the Moving Defendants either cleared U.S. dollar-denominated fund transfers for these Iranian banks (when acting as a clearing bank) or used their own correspondent relationships with clearing banks to execute U.S. dollar-denominated wire transfers for the Iranian banks.  *See id.* ¶¶ 476-1040.

[4] The "U-Turn" exemption referred to a Treasury Department regulation under which certain funds transfers for the direct or indirect benefit of Iranian banks, other persons in Iran or the Government of Iran could be cleared through the United States, provided such payments were initiated offshore by a non-Iranian, non-U.S. financial institution and only passed through the U.S. financial system en route to another offshore, non-Iranian, non-U.S. financial institution.  31 C.F.R. § 560.516 (2006), *amended* 73 Fed. Reg. 66541 (Nov. 10, 2008).

entities, entered into deferred prosecution agreements with the U.S. Government, and agreed to pay civil penalties and/or forfeitures. *See id.* ¶¶ 164, 523, 571, 616, 989.  Importantly, nothing in the deferred prosecution agreements, which form the basis of Plaintiffs' allegations regarding the Moving Defendants' alleged unlawful acts, connects the Moving Defendants, or alleges the Moving Defendants provided any support, to any terrorist, terrorist organization or terrorist activity. *Id.*

The Complaint further alleges that the Iranian Government sponsored terrorist groups. *Id.* ¶¶ 102-336.  Plaintiffs specifically allege that the Government of Iran used certain Iranian banks, which they allege are "banking agents" for Iran, *id.* ¶¶ 6, 22, to transfer funds to terrorist organizations such as Hezbollah and the Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF"). *Id.* ¶¶ 7, 23, 341.  Plaintiffs further allege in this regard that the Ministry of Defense and Armed Forces Logistics ("MODAFL") and Mahan Air served as essential conduits through which Iran acquired the parts and technologies needed to arm and transport Hezbollah and IRGC-QF operatives. *See id.* ¶ 196.  Plaintiffs claim that the purported Conspiracy enabled Iran to fund terrorist groups with greater "ease and efficiency", *id.* ¶ 46; without the Conspiracy, Plaintiffs maintain, Iran could not have:  "transferred the overall volume of USD funds through the international financial system that it did"; "surreptitiously transferred large amounts of these USD funds for the benefit of Hezbollah and the IRGC"; or "exploited the Iranian U-Turn exemption to blind U.S. regulators and law enforcement to the degree, and for the duration, that it did". *Id.* ¶ 169; *see also id.* ¶¶ 26, 281, 351.  The U.S. dollars, in turn, were allegedly important to Iran's purported terrorist proxies because these groups operated in Lebanon and Iraq, which Plaintiffs assert are "dollarized economies". *Id.* ¶ 154; *see also id.* ¶¶ 144, 388.  The Complaint does not, however, identify a single banking transaction by any of the Moving

Defendants that allegedly was used by the Government of Iran to transfer funds to any terrorist organizations.  *Id.* ¶¶ 364-1040.  Moreover, there is no allegation that, in processing U.S. dollar-denominated transactions for Iranian banks, the Moving Defendants processed even one dollar for any segment of the Iranian Government that allegedly funded terrorist organizations or groups, much less that the Moving Defendants processed transactions directly for any terrorist entity.

 *Letters of credit allegations*.  The Complaint also alleges that, in furtherance of the Conspiracy, Standard Chartered Bank and Credit Suisse provided intermediary banking services in connection with letters of credit that were issued by Iranian banks, and that payment messages used in connection with the same transactions were "stripped" or altered in order to help certain Iranian entities, such as certain alleged MODAFL sub-agencies and Mahan Air, "evade" U.S. export controls and acquire certain U.S.-origin goods.[5]  *See id.* ¶¶ 195, 196, 346, 433-441, 467-473.  The Complaint does not allege that these Moving Defendants themselves issued a single letter of credit to any Iranian entities.  *See id.*  ¶¶ 433-41, 673-838.  Nor does it allege that the letters of credit involved the sale or purchase of improvised explosive devices ("IEDs"), explosively formed penetrators ("EFPs"), or other types of weapons, or that the transactions resulted in the direct acquisition of export-controlled items by terrorist organizations

---

[5] Used to guarantee payment for the sale of goods, a letter of credit is a contract between a buyer of goods and an issuing bank whereby the bank agrees to pay the seller of goods after the seller presents certain documents.  *See, e.g.*, *Oei v. Citibank, N.A.*, 957 F. Supp. 492, 502 (S.D.N.Y. 1997) (describing the mechanics of a "classic" letter of credit).  In complex international transactions of the kind described in the Complaint, additional banks may provide intermediary services in the transaction by, for example, confirming the authenticity of the letter of credit, verifying the documentation provided by the seller, paying the seller on behalf of the issuing bank, and providing U.S. dollar-clearing services.  *See* SAC ¶¶ 173-88.  Plaintiffs' allegations that Standard Chartered Bank and Credit Suisse provided some intermediary services in connection with letters of credit issued by Iranian banks to various Iranian entities, *id.* ¶¶ 433-41, 673-838, are addressed in these Moving Defendants' respective supplemental briefs.

or caused the terrorist attacks alleged in the Complaint.  *See id*.  Plaintiffs attempt to bridge this causal gap by alleging that some of the buyers and sellers of goods in the underlying transactions were designated by the U.S. government as Specially Designated Global Terrorists for their ties to terrorist organizations or as proliferators of weapons of mass destruction.  *See id.*  But all of these entities were designated long after the alleged transactions were completed.  *See, e.g.*, *id.* ¶¶ 685-86.  In addition, Plaintiffs allege that some of the other buyers or sellers were charged with violating U.S. export laws, *see, e.g.*, *id.* ¶¶ 729, 754, but do not allege that these entities were themselves terrorist organizations or supporters of terrorism.  Plaintiffs therefore do not allege any actual causal connection between the alleged transactions involving letters of credit and the terrorist organizations or the attacks that caused their injuries.

    *Aims and effects of the alleged conspiracy.*  The Complaint continues to rely on a litany of other conclusory allegations regarding the purpose of the alleged Conspiracy which the Moving Defendants supposedly either "knew" of or were "deliberately indifferent to", *id.* ¶¶ 9, 23, 346, including:  (i) "Facilitating illicit transactions totaling at least $50 million USD for the benefit of Hezbollah"; (ii) "Facilitating illicit transactions totaling at least $100 million in USD funds for the direct benefit of the IRGC and billions in USD funds for the benefit of" entities controlled by the IRGC; (iii) "Facilitating at least hundreds of illicit transactions totaling more than $60 million on behalf of IRISL"; (iv) "Facilitating tens of millions of dollars in illicit transactions on behalf of MODAFL, the IRGC, Mahan Air and other instrumentalities of Iranian state sponsored terror to further numerous violations of the U.S. trade embargo against Iran".  *Id.* ¶ 346.  Plaintiffs further claim in conclusory fashion that the Conspiracy "enabl[ed] Iran, [various Iranian banks] (including Defendant Bank Saderat Plc), the IRGC, Hezbollah", and terrorist groups operating in Iraq, *id.* ¶ 346, "to plan for, conspire to, and perpetrate acts of international

8

terrorism", *id.*, by:  (i) providing "$200 million  U.S. dollars in funding" to Iran, the IRGC, IRISL, Mahan Air, Hezbollah and/or the Special Groups, *id.* ¶ 360; *see also id.* ¶¶ 4, 359, 2198, 2215, 2257; (ii) "provid[ing] Iran with the means by which it could transfer more than $150 million to the IRGC, Hezbollah and the Special Groups", *id.* ¶ 359; and (iii) enabling Iran to conceal its sponsorship of terrorism through access to a "clandestine stream of U.S. dollars", *id.* ¶ 2188, which it moved through the global financial system undetected, *id.* ¶¶ 52, 127-28, 355, 358.  Plaintiffs also make conclusory allegations that the Moving Defendants' alleged misconduct amounted to a "significant factor" in an unspecified "chain of events" that culminated with Plaintiffs' deaths and injuries at the hands of "Iranian terror proxies in Iraq".  *Id.* ¶ 360. None of these allegations,  however, actually connects any of the Moving Defendants' U.S. dollar-clearing transactions, or their payments on or facilitation of letters of credit, to any of the alleged terrorist attacks that injured Plaintiffs, or to any terrorist organizations or groups in Iraq or elsewhere.

      *"Special Groups" allegations.*  The Complaint further alleges that Hezbollah and IRGC-QF trained or sponsored  terrorist groups operating in Iraq, collectively called "Special Groups", of which only three  are identified in the Complaint—Kata'ib Hezbollah ("KH"), the Mahdi Army and Asa'ib Ahl al-Haq ("AAH").  *Id.* ¶¶ 7, 282-329.  The Complaint does not allege that the Moving Defendants  had any direct involvement with any of these three named Iraqi terrorist groups or that the  Moving Defendants' dollar-clearing transactions or payments on or facilitation of letters of credit were used to specifically fund, equip, train or transport any of those groups.  Indeed, for more than 90% of the attacks alleged in the Complaint (85 out of 92), almost all of which involved injuries caused by explosive devices, Plaintiffs do not even identify the individuals or entities responsible for placing or detonating those devices.  *Id.* ¶¶ 1041-2178.

Moreover, the Complaint does not allege that the Moving Defendants had any involvement with any of these unnamed individuals or entities, that any of the Moving Defendants' dollar-clearing transactions or payments on or facilitation of letters of credit were used by Iran to fund, equip, train or transport those unspecified actors, or that the attacks were otherwise financed or implemented by the Moving Defendants' conduct.

*Claims for relief.*   Based on these and other related conspiracy allegations, Plaintiffs conclusorily contend that the Moving Defendants are civilly liable under 18 U.S.C. § 2333(a) for injuries caused to U.S. military personnel in Iraq.  Plaintiffs allege that the Moving Defendants, collectively and individually, violated three predicate criminal statutes and thereby committed "acts of international terrorism" within the meaning of Section 2333.  *See id.* ¶¶ 2179-2217 (First and Second Claims for Relief); ¶¶ 2218-63 (Third, Fourth and Fifth Claims for Relief); ¶¶ 2264-73 (Sixth Claim for Relief); ¶¶ 2274-93 (Seventh Claim for Relief).  Specifically, Plaintiffs allege that each of the Moving Defendants, through the Conspiracy, violated the criminal material support provisions of  18 U.S.C. § 2339A (First Claim for Relief, *see id.* ¶¶ 2179-2200), which makes it unlawful to "provide[] material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out, a violation of" one of several substantive terrorism offenses, and 18 U.S.C. § 2339B (Second Claim for Relief, *see id.* ¶¶ 2201-17), which makes it unlawful to "knowingly provide[] material support or resources to a foreign terrorist organization".  Plaintiffs further allege that certain Moving Defendants[6] violated 18 U.S.C. §  2332d (Third and Fourth Claims for Relief, *see id.* ¶¶ 2218-53), which makes it unlawful for "a United States person", except as permitted by regulation, "knowing or having reasonable cause to know that a country is designated . . . as a country supporting international

---

[6] HSBC-US, Standard Chartered Bank, RBS N.V. and Commerzbank AG.

terrorism", to "engage[] in a financial transaction with the government of that country".  Lastly,

Plaintiffs allege that certain Moving Defendants further violated the criminal material support

provisions set forth in Sections 2339A and 2339B.[7]

## ARGUMENT

## I.     THE RULE 12(b)(6) STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The plausibility standard requires more than a "sheer possibility".  *Id.*  A plaintiff cannot cross

the threshold from "possible" to "plausible" by pleading only "facts that are 'merely consistent

with' a defendant's liability", *id.* (quoting *Twombly*, 550 U.S. at 557); the plaintiff instead must

plead facts that are "suggestive of" wrongdoing, *Pension Benefit Guar. Corp. ex rel. St. Vincent*

*Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir.

---

[7] Plaintiffs allege that Commerzbank AG violated 18 U.S.C. § 2339A by "concealing and disguising the nature, location, source, and ownership of material support it provided to IRISL, knowing or deliberately indifferent to the fact that IRISL and the IRGC would use that support in preparation for, or in carrying out acts of international terrorism".  SAC ¶ 225; *see also id.* ¶¶ 2254-63 (Fifth Claim for Relief).  Plaintiffs further allege that Commerzbank AG violated 18 U.S.C. § 2339B "by providing material support to Hezbollah through Commerzbank's acts on behalf of its customer Waisenkinderprojekt Libanon e.V. (Orphans Project Lebanon e.V.)".  *Id.* ¶ 2265; *see also id.* ¶¶ 2264-73 (Sixth Claim for Relief).  Commerzbank AG separately addresses these claims in its supplemental brief.  Plaintiffs also allege that Standard Chartered Bank violated 18 U.S.C. § 2339A by: (i) "provid[ing] material support to the IRGC and its Qods Force through its acts on behalf of Mahan Air, MODAFL and other entities . . . by concealing and disguising the nature, location, source, and ownership of material support it provided to Mahan Air, MODAFL and other entities . . . knowing or deliberately indifferent to the fact that the IRGC and its Qods Force would use that support in preparation for, or in carrying out, acts of international terrorism"; and (ii) by "[knowing] or [being] deliberately indifferent to the fact that Mahan Air, MODAFL and other entities . . . were utilizing Letters of Credit facilitated by Standard Chartered Bank to evade U.S. sanctions and acquire materials used, *inter alia*, to effectuate arms shipments, transport weapons, personnel and technology to the IRGC-QF and Hezbollah".  *Id.* ¶¶ 2275-76; *see also id.* ¶¶ 2274-93 (Seventh Claim for Relief).  Standard Chartered Bank separately addresses this claim in its supplemental brief.

2013) (quoting *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 121 (2d Cir. 2013)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted).

In making the plausibility determination, a court may consider only well-pleaded factual allegations. *See Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014).  A court must ignore "legal conclusions[] and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements". *Id.* (citation omitted).  "[L]abels and conclusions", "a formulaic recitation of the elements of a cause of action", and "'naked assertion[s]' devoid of 'further factual enhancement'" all must be disregarded. *Pension Benefit Guar. Corp.*, 712 F.3d at 717 (quoting *Iqbal*, 556 U.S. at 678) (internal citations omitted).

The portions of the Complaint not excluded must be assessed to determine whether the inferences drawn from the specific alleged facts are actually "plausible". *Twombly*, 550 U.S. at 556.  This is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense". *Mastafa*, 770 F.3d at 177 (internal quotation marks and citation omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'–'that the pleader is entitled to relief.'" *Pension Benefit Guar. Corp.*, 712 F.3d at 718 (quoting *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2))).

## II.    THE COMPLAINT FAILS PLAUSIBLY TO ALLEGE PROXIMATE CAUSE

The Complaint still fails plausibly to allege that the Moving Defendants proximately caused Plaintiffs' injuries, although Plaintiffs have now had three chances to state a proper claim in this matter.  In *Rothstein*, the Second Circuit rejected an indirect causal theory that was similar to, and if anything stronger than, the indirect theory of causation alleged here.

708 F.3d at 95-97.  Because Plaintiffs fail to adequately allege proximate cause, their claims must be dismissed as a matter of law.  *See id.*; *see also Lexmark Int'l. Inc. v. Static Control Components Inc.*, 134 S. Ct. 1377, 1391 n.6 (2014) (proximate cause "must be adequately alleged at the pleading stage in order for the case to proceed") (citation omitted).

> **A.**     ***Rothstein* and Its Progeny Hold That the Alleged Provision of Financial Services to Iran, Even When in Violation of U.S. Law, Is Too Remote to Support Civil Liability under Section 2333 for Injuries Allegedly Caused by Terrorist Entities Funded by Iran**

In *Rothstein*, plaintiffs who were injured in bombings and rocket attacks "conducted by Hamas or H[e]zbollah" brought a Section 2333 claim against a European financial institution, UBS, alleging that UBS "facilitated" those attacks by directly "furnishing United States currency to Iran".  *Rothstein*, 708 F.3d at 84-87.  The *Rothstein* plaintiffs alleged that U.S. sanctions on Iran "made it difficult for Iran to obtain the large sums of cash dollars needed for the H[e]zbollah and Hamas operations", *id.* at 87, and that defendant UBS "solved this problem for Iran by illegally providing Iran with hundreds of millions of dollars in cash", *id.*, "kn[owing] full well that the cash dollars it was providing  . . . would be used to cause and facilitate terrorist attacks by Iranian-sponsored terrorist organizations such as Hamas [and] H[e]zbollah", *id.* at 97.  The *Rothstein* plaintiffs further alleged that "the ability of H[e]zbollah and Hamas to . . . carry out those attacks was substantially increased by those organizations' receipt of cash dollars from Iran".  *Id.* at 87.  In affirming dismissal of these claims, the Second Circuit held that plaintiffs had failed plausibly to allege that UBS's actions were the proximate cause of plaintiffs' injuries.  *Id.* at 95.

The Second Circuit's proximate cause holding rested on Section 2333's requirement that persons seeking recovery have been injured "*by reason of* an act of international terrorism".  18 U.S.C. § 2333(a) (emphasis added).  The Second Circuit found that the phrase

13

"by reason of" has a "well-understood meaning" in other statutes such as RICO and federal antitrust laws and has "historically been interpreted as requiring proof of proximate cause". *Rothstein*, 708 F.3d at 95.  Thus, the *Rothstein* court held that, in order to state a Section 2333 claim, a plaintiff must plausibly allege that the defendant's conduct was the "proximate cause" of the plaintiff's injury.  *Id.*; *accord Al Rajhi*, 714 F.3d at 123-24.

The Second Circuit in *Rothstein* also squarely rejected the argument that a bank's violation of U.S. laws in engaging in financial transactions with Iran, a state sponsor of terrorism, is a sufficient basis to hold a bank "liable for injuries subsequently caused by a terrorist organization associated with that state".  *Rothstein*, 708 F.3d at 96.  "[P]laintiffs' contention that proximate cause is established because they were injured after [defendant] violated federal law is a *post hoc, ergo propter hoc* proposition that would mean that any provider of U.S. currency to a state sponsor of terrorism would be strictly liable [under the ATA]."  *Id.*  The Second Circuit concluded:  "If Congress had intended to impose strict liability" on the basis of violations of U.S. law, including regulations issued by the Office of Foreign Assets Control, "it would have found words more susceptible to that interpretation, rather than repeating the language it had used in other statutes to require a showing of proximate cause".  *Id.*

Thus, the Second Circuit rejected as legally insufficient the following indirect causal allegations regarding defendant UBS's alleged financial transactions with Iran:

- The plaintiffs were injured by attacks committed by Hamas and Hezbollah, both of which allegedly received extensive funding directly from Iran.  *See id.* at 85, 87.

- Due to restrictions imposed on wire transfers involving Hamas, Hezbollah and related entities, the terrorists needed physical U.S. banknotes—actual dollar bills—to fund their operations.  *See id.* at 86.

- "Iran was subject to United States government sanctions", which "made it difficult for Iran to obtain the large sums of cash dollars needed for the H[e]zbollah and Hamas operations".  *Id.* at 87.  And "UBS solved this problem for Iran by illegally providing Iran with hundreds of millions of dollars in cash between 1996 and 2004."  *Id.*

14

- UBS transferred significant amounts of U.S. banknotes directly to the Iranian Government.  *See id.*

- "UBS knew full well that the cash dollars it was providing to a state-sponsor of terrorism such as Iran would be used to cause and facilitate terrorist attacks by Iranian-sponsored terrorist organizations such as Hamas, H[e]zbollah and PIJ."  *Id.* at 97 (emphases omitted).

    The Second Circuit found that these indirect causal allegations failed to satisfy

Section 2333's proximate cause requirement for a number of reasons, including:

- **UBS did not participate in the attacks:**  "The Complaint does not allege that UBS was a participant in the terrorist attacks that injured plaintiffs."  *Id.*

- **UBS did not provide banknotes directly to terrorists:**  "[The Complaint] does not allege that UBS provided money to H[e]zbollah or Hamas.  It does not allege that U.S. currency UBS transferred to Iran was given to H[e]zbollah or Hamas."  *Id.*

- **UBS's alleged acts were not necessary to Iran's terrorism funding:**  "[The Complaint] does not allege that if UBS had not transferred U.S. currency to Iran, Iran, with its billions of dollars in reserve, would not have funded the attacks in which plaintiffs were injured."  *Id.*

- **Iran has legitimate uses for financial services:**  "[T]he fact remains that Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund."  *Id.*

    The Second Circuit concluded that, while "[t]he fact that the transfers were made

to a state sponsor of terrorism of course made it more likely that the moneys would be used for

terrorism than if the transfers were to a state that did not sponsor terrorism", these allegations

were insufficient to "meet *Twombly*'s plausibility standard with respect to the need for a

proximate causal relationship between the cash transferred by UBS to Iran and the terrorist

attacks by H[e]zbollah and Hamas that injured plaintiffs".  *Id.*

    As this Court observed in *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414,

433 (E.D.N.Y. 2013), under *Rothstein*, there is a "meaningful" difference between a proximate

cause allegation that a defendant provided funds directly to a foreign terrorist organization, such

as Hamas or Hezbollah, and a proximate cause allegation that a defendant provided funds to the

Government of Iran, a state sponsor of terrorism that "performs myriad legitimate functions in addition to allegedly funding terrorist organizations". "Congress has specifically found that 'foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct' . . . . The same thing cannot be said about a government." *Id.* (quoting Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-32, § 301(a)(7), 110 Stat. 1214, 1247 (1996)); *accord Rothstein*, 708 F.3d at 97.

The same meaningful proximate cause distinction identified in *Rothstein* and *Strauss* is borne out in other recent decisions in this District, where courts have found causal allegations sufficient based on a direct causal connection between the defendant's conduct and a designated terrorist organization that perpetrated the attack which injured plaintiff. For example, in *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287 (E.D.N.Y. 2015), the defendant bank maintained an account for a "leader of Hamas", *id.* at 311, and processed transfers into an account which "explicitly listed 'Hamas' as the beneficiary party", *id.* at 328-29.

The *Linde* court observed, "here factually in contrast to *Rothstein* the facts proffered support a direct connection between the bank's provision of services and the terrorist acts that caused injury". Transcript of Motion Hearing at 72, *Linde*, No. 04 Civ. 02799 (E.D.N.Y. May 10, 2013). Similarly, in *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 479-80 (E.D.N.Y. 2012), the defendant bank was "alleged to have maintained accounts for and provided financial services to Hamas, its leaders, and its affiliates". Here, by contrast, there is no allegation that the Moving Defendants maintained any accounts for or provided any services to any terrorist entity.

16

The Second Circuit's decision in *Al Rajhi*, decided shortly after this Court's decision in *Strauss,* reaffirms the inadequacy, as a matter of law, of proximate cause allegations lacking a direct connection between the defendant and the terrorist organization and terrorist acts that allegedly caused the plaintiff's injury.  In *Al Rajhi*, the Second Circuit rejected as a matter of law proximate cause claims that the defendants there, including several financial institutions, were liable under Section 2333 to victims of the September 11 attacks because the defendants allegedly provided "financial support" and "financial [and bank account] service" to purported charities that in turn allegedly supported al Qaeda.  714 F.3d at 123 (alteration in original) (internal citations omitted).  In affirming dismissal of those claims under Rule 12(b)(6) for failure adequately to plead proximate cause, the *Al Rajhi* court, relying on *Rothstein*, held that "plaintiffs do not allege that the Rule 12(b)(6) defendants participated in the September 11, 2001 attacks or that they provided money directly to al Qaeda; nor are there factual allegations that the money allegedly donated by the Rule 12(b)(6) defendants to the purported charities actually was transferred to al Qaeda and aided in the September 11, 2001 attacks."  *Id.* at 124.  As shown below, the absence of any plausible proximate causal allegations here likewise requires dismissal.

**B.**   ***Rothstein* and Its Progeny Foreclose Plaintiffs' Causal Theory Here**

The very gaps in causation that were dispositive in *Rothstein* and its progeny are also present and dispositive here:

- **The Moving Defendants did not participate in the attacks:**  As in *Rothstein*, there are no allegations here that the Moving Defendants were "participant[s] in the terrorist attacks that injured plaintiffs".  *Rothstein*, 708 F.3d at 97.

- **The Moving Defendants did not provide banking services directly to terrorists:**  As in *Rothstein*, Plaintiffs here do not allege that the Moving Defendants provided services directly to terrorist entities.  *See id*.

- **The Moving Defendants' actions were not necessary to any terrorism funding by Iran:**  As in *Rothstein*, Plaintiffs here do not allege that, if the Moving Defendants had not provided dollar-clearing transactions for Iranian banks, Iran would not have been able

to fund terrorist groups.  *See id.*; *see also* SAC ¶¶ 151, 168 (stating that oil sales provided the Iranian government with "substantial revenue" worth nearly $1 trillion).

- **Iran has legitimate uses for financial services:**  As in *Rothstein*, "[t]he fact remains that Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund".  *Rothstein*, 708 F.3d at 97; *see also* SAC ¶ 355 (admitting that Iran could use U.S. correspondent banks for "ordinary commercial purposes").

In light of *Rothstein* and its progeny, Plaintiffs have not, as a matter of law, pleaded a proximate causal relationship between the Moving Defendants' alleged conduct and the attacks that injured Plaintiffs.  The Second Circuit has already held that the mere provision of banking services to Iran, a state sponsor of terrorism, is too indirect to satisfy the proximate cause standard.  *See Rothstein*, 708 F.3d at 96; *see also Al Rajhi*, 714 F.3d at 124;  *Strauss*, 925 F. Supp. 2d at 433.  Thus, dismissal is required under *Rothstein*.

The causal theory alleged here with respect to the Moving Defendants' provision of banking services is even more attenuated than the causal theory rejected in *Rothstein*.  In *Rothstein*, plaintiffs claimed that the attacks injuring them were carried out directly by Hamas or Hezbollah, which the Government of Iran allegedly directly financed using U.S. banknotes, and defendant UBS allegedly supplied U.S. banknotes directly to the Government of Iran.  *See* 708 F.3d at 85-87.  "In other words, UBS allegedly provided funding to a known state sponsor of terrorism that, in turn, provided funding to H[e]zbollah and Hamas", the perpetrators of the attacks.  *Al Rajhi*, 714 F.3d at 124.  The Moving Defendants' alleged role here is further removed.  According to the Complaint, the Moving Defendants allegedly provided U.S. dollar-clearing transactions for Iranian banks, those Iranian banks allegedly then were separately used by the Government of Iran to provide financial support to Hezbollah and IRGC-QF, Hezbollah and IRGC-QF allegedly then provided support to named and unnamed terrorist groups in Iraq, and these named and unnamed Iraqi terrorist groups, or more often unidentified individuals or entities, allegedly then carried out or facilitated the attacks which injured Plaintiffs.  *See, e.g.*,

SAC ¶¶ 6, 149 (Iran's alleged use of "banking agents" to fund terrorist organizations); *id*. ¶ 236 (Defendant Bank Saderat Plc, not the Moving Defendants, "provided" Hezbollah "$50 million"); *id.* ¶ 419 (Bank Melli Iran and Melli Bank Plc, not the Moving Defendants, "transferred approximately $100 million USD to IRGC-QF ,which trained, armed, and funded terrorist groups that targeted, killed and maimed American . . . forces"); *id.* ¶¶ 7, 254, 266, 276, 287, 299, 302, 327, 1067 (alleged sponsorship and training of Iraqi terrorist operatives by Hezbollah and IRGC-QF); *id.* ¶¶ 226-258 (Iran's alleged support of Hezbollah and IRGC-QF); *id.* ¶ 231 ("Iran, through the IRGC, has funded, trained and equipped Hezbollah"); *id.* ¶ 234 (Iran's alleged reliance on "both Hezbollah and the IRGC" to support Iraqi terrorists).   Plaintiffs thus do not allege that the Moving Defendants "participated in the . . . attacks[,] or that they provided money directly to" the individuals or entities that carried out the attacks, or that the money from the U.S. dollar-denominated transactions conducted by the defendants for Iranian banks was "transferred to" the individuals or entities that committed the attacks.[8]   *Al Rajhi*, 714 F.3d at 124.   Under *Rothstein* and its progeny, the theory of causation pleaded by Plaintiffs here—far less direct than in *Rothstein* itself—fails as a matter of law.

   For the same reasons, and as explained further in the supplemental briefs of Standard Chartered Bank and Credit Suisse, the Complaint fails plausibly to allege that these Moving Defendants' purported facilitation of trade embargo violations proximately caused Plaintiffs' injuries.   Plaintiffs do not allege that these Moving Defendants actually issued a letter of credit, nor do they allege any "direct connection" between the letters of credit and any terrorist acts or terrorist groups, much less the attacks that allegedly injured Plaintiffs. *See* Transcript of Motion

---

[8]   The Complaint's assertion that the supposed aim of the alleged Conspiracy was to facilitate banking services "for the benefit" of various foreign terrorist organizations, *see, e.g.*, SAC ¶¶ 346, 351, does not amount to an allegation, as required by *Rothstein*, that the Moving Defendants directly provided banking services to such organizations.

Hearing at 72, *Linde*, No. 04 Civ. 02799 (E.D.N.Y. May 10, 2013); *see also Rothstein*, 708 F.3d at 97.  The Complaint does not identify a single transaction through which funds or goods of any type were transferred, directly or indirectly, to a terrorist group, nor does it allege that the U.S. origin goods for which the letters of credit were issued caused or in any way facilitated any of the 92 attacks listed in the Complaint.  The conduct of Standard Chartered Bank and Credit Suisse in connection with the alleged letters of credit is thus far too remote to support a plausible inference of proximate causation.  *See Al Rajhi*, 714 F.3d at 124 (stating that "plaintiffs do not allege that the . . . defendants participated in [terrorist] attacks or that they provided money directly to [terrorists]", nor do they allege that money allegedly provided by the defendant was ultimately "transferred to [terrorists] and aided in" their attacks).[9]

As to the claims based on the 85 attacks alleged in the Complaint for which Plaintiffs do not even identify the responsible individuals or entities, SAC ¶¶ 1179-1879, 1888-94, 1921-59, 1973-2024, dismissal is required for the additional reason that the alleged link between Iran and whomever may be responsible for these attacks is pure speculation, as is the even more distant alleged link between the Moving Defendants and those unspecified actors. *See, e.g.*, *Ahmad v. Christian Friends of Israeli Comtys.*, No. 13 Civ. 3376 (JMF), 2014 WL 1796322, at *4 (S.D.N.Y. May 5, 2014) (where "the Amended Complaint does not even identify which individuals or organizations were responsible for the attacks that injured the American

---

[9] Plaintiffs' conclusory allegation that, if Standard Chartered Bank and Credit Suisse had not provided intermediary banking services in connection with letters of credit, "Iran could not have . . . manufactured the same volume and sophistication of factory-grade Explosively Formed Penetrators [EFPs] to kill and main Americans in Iraq", SAC ¶ 47, rests on the same sort of conclusory assertion rejected in *Rothstein*, namely, that the actions of these Moving Defendants "substantially increased" the ability of terrorist groups funded by Iran to carry out their attacks. 708 F. 3d at 87 (rejecting causal allegations that UBS "substantially increased" the ability of Iran-backed terrorist groups to commit attacks).  *Rothstein* and its progeny squarely foreclose such an inchoate theory of causation.

Plaintiffs", allegations that defendants "transferred funds to an unorganized group of approximately five hundred thousand people, and that some people in that group committed attacks against the American Plaintiffs" are insufficient to satisfy proximate causation).

Plaintiffs' frequent use of the word "foreseeable" in the Complaint does not cure their failure to plead proximate cause. *See* SAC ¶¶ 23, 45, 48, 55-56, 346, 390, 683, 2190, 2198-99, 2215-16, 2232, 2235, 2249, 2258, 2268.  First, as the Second Circuit recognized in *Rothstein*, the Supreme Court has held that "with respect to 'proximate causation, the central question . . . is whether the alleged violation led directly to the plaintiff's injuries'".  708 F.3d at 91-92 (quoting *Anza*, 547 U.S. at 461); *see also Hemi Grp.*, 559 U.S. at 9 ("the focus" of proximate cause "is on the directness of the relationship between the conduct and the harm").  Thus, in "establishing proximate causation", foreseeability considerations "are *additional elements*, not substitutes for alleging (and ultimately, showing) a direct injury".  *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 235-36 (2d Cir. 1999), *as amended* (Aug. 18, 1999) (emphasis in original).

Second, in *Rothstein*, causation allegations more direct than those made here were far too indirect to even merit a detailed analysis of foreseeability.  708 F.3d at 97.  Indeed, while the *Rothstein* court mentioned foreseeability of harm as a factor in proximate causation, *id*. at 91, the Court did not analyze the causal allegations there under the foreseeability standard, instead finding failure to plead proximate cause based on the indirect causal connection alleged.  *Id.* at 97.  Similarly, the Second Circuit held in *Al Rajhi* that provision of "routine banking services to organizations and individuals said to be affiliated with al Qaeda"—again a more direct causal theory than the one alleged here—was nonetheless insufficient to satisfy proximate cause, because, despite plaintiffs' foreseeability allegations, they did not allege, among other things, that

"the money allegedly donated by the . . . defendants to the purported charities actually was transferred to al Qaeda and aided in September 11, 2001 attacks". 714 F.3d at 124. In *Stutts v. De Dietrich Group*, No. 03 Civ. 4058 (IGL), 2006 WL 1867060, at *4 (E.D.N.Y. June 30, 2006), the court rejected another indirect causal theory that, given the "widespread publicity about Iraq's illegal use of chemical weapons", it was "foreseeable" that defendant banks that issued letters of credit to chemical manufacturers would "contribute to Saddam Hussein's use of chemical weapons". The court in *Stutts* held that "[s]uch general publicity does not provide a causal link between the Bank Defendants' conduct and the plaintiffs' injuries" from exposure to chemical weapons during the Gulf War. *Id.*

Here, Plaintiffs' similar conclusory allegations that the Moving Defendants knew Iran was a state sponsor of terrorism, SAC ¶¶ 42-45, 49, 53, 343, 347, 362, 569, were aware of Iran's terrorism funding activities, *id.* ¶¶ 9, 49, and "knew or [were] deliberately indifferent to, the fact that Iran, as a U.S. designated State Sponsor of Terrorism, would (and, in fact, did) channel hundreds of millions of the dollars that Defendants helped launder and conceal from U.S. regulators and law enforcement agencies to the IRGC and Hezbollah as part of the Conspiracy", *id.* ¶ 43; *see also id.* ¶¶ 49-50, 52, 346, 359, 387, 2180, 2185, 2187-89, 2193-94, 2202, 2204-06, 2209-10, do not establish proximate causation between the Moving Defendants' alleged conduct and the attacks that injured Plaintiffs. *See Rothstein*, 708 F.3d at 97; *Al Rajhi*, 714 F.3d at 124; *Stutts*, 2006 WL 1867060, at *4. Nor do those allegations distinguish this case from *Rothstein*, where the defendant allegedly "knew full well that the cash dollars it was providing to a state-sponsor of terrorism such as Iran would be used to cause and facilitate terrorist attacks by Iranian-sponsored terrorist organizations such as Hamas, H[e]zbollah and PIJ", 708 F.3d at 97 (emphases omitted), or from *Al Rajhi*, where the defendant was alleged to have "knowingly

provid[ed] financial support" to "purported charity organizations known to support terrorism",

714 F.3d at 123-24.

Plaintiffs' remaining conclusory allegations (i) that the Moving Defendants

"substantially assisted", SAC ¶ 360, "substantially enhanced", *id.* ¶ 2198, "facilitated", *id.*

¶¶ 49-50, 280, 2189, 2203, "enabled", *id.* ¶ 7, or "provided . . . the means" for, *id.* ¶ 359, Iran's

support for terrorism, (ii) that "absent the access to the U.S. 'dollar clearing and settlement'

system afforded to Bank Saderat by [the Moving Defendants], both Iran and Hezbollah's access

to USDs would have been diminished", *id.* ¶ 358, and (iii) that, without the Conspiracy, "Iran

could not have successfully violated U.S. export controls, financed its illicit arms shipments or

manufactured the same volume and sophistication of factory-grade Explosively Formed

Penetrators [EFPs] to kill and maim Americans in Iraq", *id.* ¶ 47, are the same kinds of allegations

*Rothstein* rejected as far too remote to establish proximate cause.  The *Rothstein* plaintiffs alleged

that it  was "difficult for Iran to obtain the large sums of cash dollars needed for H[e]zbollah and

Hamas operations" due to U.S. trade sanctions on Iran; that the bank defendant in that case

"solved the problem for Iran by illegally providing Iran with hundreds of millions of dollars in

cash"; and that the defendant's provision of funds to Iran thus "substantially increased" the

ability of terrorist organizations funded by Iran to carry out the attacks.  708 F.3d at 87.  The

Second Circuit dismissed these allegations, holding that the mere fact that the defendant's

transfer of funds to Iran made it "more likely that the moneys would be used for terrorism" was

not  sufficient to adequately plead proximate cause.  *Id.* at 97.

In sum, when, as here and in *Rothstein*, a defendant is alleged to have dealt (here,

indirectly) with a state sponsor of terrorism and not with a terrorist organization allegedly

supported by that state, or with a still further removed named or unnamed terrorist group alleged

23

to have actually perpetrated the attack on the plaintiff, that "alleged harm" is simply "'too remote' from the defendant's [allegedly] unlawful conduct". *Lexmark Int'l, Inc.*, 134 S. Ct. at 1390 (quoting *Holmes*, 503 U.S. at 268-69). The Complaint must therefore be dismissed for failure plausibly to allege proximate cause.

## III. THERE IS NO CONSPIRACY-BASED LIABILITY UNDER SECTION 2333

The Complaint must also be dismissed on the independent ground that it is premised on a conspiracy theory of civil liability that is not cognizable under Section 2333. Plaintiffs frame their Section 2333 causes of action against each of the Moving Defendants as conspiracy-based claims.[10] Courts in this circuit have expressly held that such secondary liability allegations are not a basis for civil recovery under Section 2333.

In *Rothstein*, the Second Circuit held that, because Congress was "silent as to the permissibility of aiding and abetting liability", Section 2333 does not permit a civil cause of action premised on an aiding-and-abetting theory of liability. *Rothstein*, 708 F.3d at 97-98. The Second Circuit observed that there is no "general civil aiding and abetting statute" and, thus, there is "no general presumption that the plaintiff may also sue aiders and abettors" under Section 2333. *Id.* at 97. "Further counseling against a judicial interpretation of [Section 2333] as authorizing [aiding-and-abetting civil] liability" was Congress's explicit authorization of aiding-and-abetting liability in the ATA's separate criminal provisions. *Id.* at 97-98. The court

---

[10] *See, e.g.*, SAC ¶ 6 ("This is a civil action under 18 U.S.C. § 2333(a) by American nationals and/or their families for treble damages against six Western international banks that knowingly conspired with Iran and its banking agents[.]"); "V. Overview of the Conspiracy"; "V.J. Defendant Barclay's Agreement To, And Participation In, The Conspiracy", "V.K. Defendant Standard Chartered Bank's Agreement To, And Participation In, The Conspiracy", "V.L. Defendant Royal Bank of Scotland N.V.'s Agreement To, And Participation In, The Conspiracy", "V.M. Defendant Credit Suisse's Agreement To, And Participation In, The Conspiracy"; "V. N. Defendant Commerzbank AG's Agreement To, And Participation In, The Conspiracy"; *id.* ¶ 2180 (First Claim for Relief); *id.* ¶ 2202 (Second Claim for Relief).

concluded, "[w]e doubt that Congress, having included in the ATA several express provisions with respect to aiding and abetting in connection with the criminal provisions, can have intended § 2333 to authorize civil liability for aiding and abetting through its silence." *Id*. at 98 (citation omitted); *accord Al Rajhi*, 714 F.3d at 123 (again rejecting Section 2333 aiding-and-abetting civil liability). In rejecting aiding-and-abetting liability under Section 2333, both *Rothstein* and the Second Circuit's subsequent decision in *Al Rajhi* relied upon the Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 185 (1994), which held that an "implicit congressional intent to impose . . . aiding and abetting liability" in the Securities Exchange Act of 1934 could not plausibly be inferred from "statutory silence". The Supreme Court explained in *Central Bank* that "Congress kn[ows] how to impose aiding and abetting liability" and that if Congress had intended to impose it, "we presume it would have used the words 'aid' and 'abet' in the statutory text. But it did not." *Id.* at 176-77 (citations omitted).

For the same reasons, Section 2333 does not authorize civil recovery based on a conspiracy theory of liability. Judge Gershon explicitly so held in the *Linde* case, dismissing "all conspiracy claims" under Section 2333 based on *Central Bank* and *Rothstein*. *See Linde*, 944 F. Supp. 2d at 217. In *Linde*, the plaintiffs asserted claims under Section 2333 based on an alleged conspiracy to "provide substantial material support to Palestinian terrorist organizations and to provide a meaningful incentive both to prospective recruits and to individuals contemplating the commission of independent acts of violence in the name of 'popular resistance'". First Amended Complaint ¶ 316, *Linde*, No. 04 Civ. 2799 (E.D.N.Y. Aug. 10, 2004). The *Linde* plaintiffs argued that *Rothstein* "[does not] eliminate [these] conspiracy [claims]" because *Rothstein* and *Central Bank* dealt only with "common-law" secondary liability, not secondary claims that are "imported from the [ATA's] criminal law" in the form of Section 2333 claims premised on

violations of the criminal conspiracy provisions found elsewhere in the ATA.  Transcript of

Motion Hearing at 10, 9, *Linde*, No. 04 Civ. 02799 (E.D.N.Y. May 10, 2013).  The plaintiffs in

*Linde* argued that criminal conspiracy claims pleaded in a civil case should be treated as "[civil]

primary liability with characteristics of secondary liability" and thus should be cognizable under

Section 2333.  *Id.* at 12, 9.

> Judge Gershon rejected these arguments, concluding that the Second Circuit
would likely "treat claims for civil conspiracy as akin to civil aiding and abetting claims under
§ 2333(a)".  *Linde*, 944 F. Supp. 2d at 216.  In *Dinsmore v. Squadron, Ellenoff, Plesent,
Sheinfeld & Sorkin*, 135 F.3d 837, 838, 841 (2d Cir. 1998), the Second Circuit held that the
"Supreme Court's reasoning in *Central Bank*" about not imputing congressional intent to include
a secondary claim in a statute in the face of statutory silence "applies not only to aiding and
abetting claims, but to conspiracy claims as well".  The *Dinsmore* court observed that when
Congress wishes to create liability for conspiracy, it does so directly:  "[j]ust as Congress clearly
knew how to impose aiding and abetting liability when it chose to do so . . . the existence of
statutes expressly providing for conspiracy liability warrants the same conclusion" with respect
to conspiracy.  *Id.* at 842 (internal citations omitted).  Judge Gershon ruled that it logically
followed from *Rothstein* and *Dinsmore* that Section 2333 likewise does not permit conspiracy-
based theories of liability.  *See Linde*, 944 F. Supp. 2d at 216-17.  Judge Gershon further ruled
that Congress's choice to include conspiracy liability in neighboring criminal provisions of the
ATA only reinforces Congress's conscious decision <u>not</u> to include conspiracy-based liability
under Section 2333.  *Id*. at 217.

> In addition, Judge Gershon rejected the *Linde* plaintiffs' asserted difference
between pleading an underlying criminal conspiracy that causes a violation of Section 2333 and

pleading a civil conspiracy directly under Section 2333.  *See* Transcript of Motion Hearing at 10, 9, *Linde*, No. 04 Civ. 02799 (E.D.N.Y. May 10, 2013).  Judge Gershon held that *Rothstein* precludes all conspiracy-based civil claims under Section 2333, whether characterized as a criminal or a civil conspiracy.  *Linde*, 944 F. Supp. 2d at 217.  The *Linde* court thus dismissed "all conspiracy claims" in that case, including both a claim that an alleged criminal conspiracy gave rise to civil liability under Section 2333, and a separate claim of civil conspiracy liability under Section 2333 itself.  *Id.*

Plaintiffs here plead the same kinds of conspiracy-based claims that were dismissed in *Linde*.  Plaintiffs define the alleged "Conspiracy" as "an illegal criminal agreement . . . to alter, falsify, or omit information from bank-to-bank payment orders . . . that involved Iran or Iranian parties", SAC ¶ 22; Plaintiffs allege that the Moving Defendants, through the alleged Conspiracy, violated the "express [criminal] prohibition[s] against conspiring to provide material support within the meaning of" Sections 2339A and 2339B, *id.* ¶¶ 2180, 2202; and Plaintiffs plead that the Moving Defendants thus violated Section 2333 by participating in the Conspiracy, *id.* ¶¶ 7, 22.  As recognized in *Linde*, the reasoning in *Rothstein* and *Dinsmore* precludes these claims as a matter of law.  To construe *Rothstein* otherwise "would largely undo the effect of [*Rothstein*] itself, inasmuch as many aiding and abetting claims would simply be repleaded as conspiracy claims".  *See Dinsmore*, 135 F.3d at 843.  Because Plaintiffs' Section 2333 claims are all predicated on an alleged conspiracy, they must all be dismissed.[11]

---

[11] Because conspiracy civil liability is not available, the Moving Defendants do not here discuss in detail other legal deficiencies in the Complaint, including Plaintiffs' failure plausibly to allege the necessary elements of a conspiracy.  For example, courts have dismissed conspiracy allegations in other contexts where, as here, the plaintiff cannot show "that a defendant joined the conspiracy with the intent to commit the offenses that are its object".  *Zito v. Leasecomm Corp.*, No. 02 Civ. 8074 (GEL), 2003 WL 22251352, at *20 (S.D.N.Y. Sept. 30, 2003); *see also United States v. Coplan*, 703 F.3d 46, 71 (2d Cir. 2012) (emphasizing "the basic requirement [of

## IV.   THE COMPLAINT FAILS PLAUSIBLY TO ALLEGE THAT NON-U.S. MOVING DEFENDANTS ARE "UNITED STATES PERSON[S]" OR THAT THEY ENGAGED IN "A FINANCIAL TRANSACTION WITH THE GOVERNMENT" OF IRAN UNDER SECTION 2332D

The Third and Fourth Claims of Relief, which allege that some defendants violated a prohibition on certain financial transactions by "United States person[s]" with the government of a designated state sponsor of terrorism, must be dismissed for the additional and independent reason that they fail to satisfy the statutory requirements of 18 U.S.C. § 2332d.

First, the Fourth Claim for Relief—alleged against the non-U.S. entities Standard Chartered Bank, RBS N.V. and Commerzbank AG—fails because these entities do not qualify as a "United States person" as defined by the statute.  A "United States person" includes any "(A) United States citizen or national; (B) permanent resident alien; (C) juridical person organized under the laws of the United States; or (D) any person in the United States".  18 U.S.C. § 2332d(b)(2).  Subparagraph (C)—which applies to "juridical person[s]"—does not encompass these defendants, because none is organized under "the laws of the United States".  Plaintiffs do not contend otherwise.  *See* SAC ¶¶ 76-80, 81-85, 96-101.[12]

_____

conspiracy] that the person charged with conspiracy *knew* of the existence of the scheme alleged in the indictment and *knowingly joined and participated* in it") (emphasis in original) (internal quotation marks omitted).  Plaintiffs allege that the Moving Defendants participated in a conspiracy with the "common goal of helping Iran transfer billions of dollars through the United States while avoiding detection", SAC ¶ 345, in order to finance terrorist groups committed to "murdering and maiming U.S. servicemen and  civilians in Iraq", *id*. ¶ 351. Plaintiffs do not plausibly allege that the Moving Defendants  shared this "common goal" as part of the alleged Conspiracy.  *See Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 100 (D.D.C. 2002). The conclusory allegations in this regard, that Moving Defendants  specifically intended to attack U.S. soldiers, are wholly implausible.  *See Mastafa*, 770 F.3d at 194.

[12] The Court should take judicial notice of the fact that each of these Moving Defendants is organized under the laws of a *foreign* country based on public records such as their respective filings with the U.S. Securities and Exchange Commission.  *See Wright-Upshaw v. Nelson*, No. 13 Civ. 3367, 2014 WL 692870, at *1 n.1 (E.D.N.Y. Feb. 19, 2014).

Plaintiffs instead allege that these banks qualify as "any person in the United States" under subparagraph (D) of the definition.  That argument is legally untenable: subparagraph (D) reaches only natural persons located within the territory of the United States— as two district courts have expressly held.  *See Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 648 (S.D. Tex. 2011); *United States v. Chalmers*, 474 F. Supp. 2d 555, 565 (S.D.N.Y. 2007).  And the Supreme Court, in construing identical language with respect to sanctions against Burma,  noted that this prohibition does not apply to "foreign companies".  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 379 (2000) (examining Prohibiting New Investment in Burma, Exec. Order No. 13047, 62 Fed. Reg. 28,301 (May 22, 1997)).

Because subparagraph (C) specifically addresses "juridical persons"—*i.e.*, corporations—while the other provisions do not, the remaining subparagraphs are limited to natural persons.  That is confirmed by the fact that if, as Plaintiffs assert, subparagraph (D) also reached "juridical" persons, it would render subparagraph (C) wholly superfluous, as all companies organized under the laws of the United States are also, by definition, in the United States, because that is their place of incorporation.  *See, e.g.*, *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014) (a company is located in its place of incorporation and principal place of business).  There is a strong presumption against interpreting a statute in this manner.  *Bailey v. United States*, 516 U.S. 137, 145-46 (1995) (recognizing the general assumption that "Congress intended each of its terms to have meaning" and avoid redundancies).  In sum, Section 2332d does not apply to foreign corporations such as these defendants.

Second, Plaintiffs fail to allege a "financial transaction with the government" of Iran.  18 U.S.C. § 2332d(a).  Particularly with respect to the Third Claim for Relief, Plaintiffs allege only that Iranian banks conducted wire transfers using foreign, non-U.S. banks in Europe

and the Middle East, which in turn cleared transactions through U.S. clearinghouses. *See, e.g.*, SAC ¶¶ 2229-30. That may mean that U.S. clearing banks engaged in transactions with foreign banks for the benefit of Iran. But Plaintiffs offer no basis to conclude that those U.S. clearing banks engaged in transactions with the Iranian government itself. Nor can Plaintiffs demonstrate that U.S. clearing banks like HSBC US knew that Iran was the beneficiary of transactions, as the nub of Plaintiffs' allegations is that this information was stripped from wire transfers before it reached the U.S. clearing bank.

## V.   DISMISSAL WITH PREJUDICE IS APPROPRIATE WHERE PLAINTIFFS HAVE TRIED AND FAILED THREE TIMES TO SUCCESSFULLY STATE THEIR CLAIMS

This litigation has been pending for over two years; in that time, Plaintiffs have twice been granted leave to amend their pleadings but, for the reasons set forth above and in the Moving Defendants' prior motions to dismiss, Plaintiffs have failed successfully to state a claim against the Moving Defendants. Accordingly, the Moving Defendants respectfully request that this action be dismissed with prejudice.[13]

### CONCLUSION

The Complaint fails to state a claim and, accordingly, should be dismissed with prejudice in its entirety as a matter of law as to each of the Moving Defendants.

---

[13] *See, e.g.*, *Baron v. Complete Mgmt., Inc.*, 260 F. App'x 399, 2008 WL 205327, at *1 (2d Cir. Jan. 24, 2008) (affirming dismissal with prejudice); *Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978) (dismissing with prejudice and finding that the plaintiff was not entitled to a "third go-around"); *Sampson v. MediSys Health Network, Inc.*, No. 10-CV-1342 SJF ARL, 2012 WL 3027838, at *6 (E.D.N.Y. July 24, 2012) (concluding that "three bites at the apple is enough" and that "further amendment would be futile").

Respectfully submitted,

MAYER BROWN LLP,

by
 */s/ Mark G. Hanchet*
　　　Mark G. Hanchet
1221 Avenue of the Americas
New York, NY 10020-1001
(212) 506-2500
mhanchet@mayerbrown.com


　　　Andrew J. Pincus
　　　Marc R. Cohen
　　　Alex C. Lakatos
1999 K Street, N.W.
Washington, DC 20006-1101
(202) 263-3000
apincus@mayerbrown.com
mcohen@mayerbrown.com
alakatos@mayerbrown.com

*Attorneys for Defendants HSBC
Holdings PLC, HSBC Bank PLC,
HSBC Bank Middle East Limited and
HSBC Bank USA, N.A.*

CRAVATH, SWAINE & MOORE LLP,

by
 */s/ Richard W. Clary*
　　　Richard W. Clary
　　　Michael T. Reynolds
　　　John D. Buretta
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(12) 474-1000
rclary@cravath.com
mreynolds@cravath.com
jburetta@cravath.com


*Attorneys for Defendant Credit Suisse AG*

SULLIVAN & CROMWELL LLP,

by

   */s/ Michael T. Tomaino, Jr.*
      Michael T. Tomaino, Jr.
      Jeffrey T. Scott
      Jonathan M. Sedlak
125 Broad Street
New York, NY 10004
(212) 558-4000
tomainom@sullcrom.com
scottj@sullcrom.com
sedlakj@sullcrom.com

*Attorneys for Defendant Barclays Bank PLC*

SULLIVAN & CROMWELL LLP,

by

   */s/ Sharon L. Nelles*

      Sharon L. Nelles
      Bradley P. Smith
      John C. Quinn
125 Broad Street
New York, NY 10004
(212) 558-4000
nelless@sullcrom.com
smithbr@sullcrom.com
quinnjc@sullcrom.com

*Attorneys for Defendant Standard Chartered Bank*

CLIFFORD CHANCE US LLP,

by

   */s/ Steven T. Cottreau*
      Steven T. Cottreau
2001 K Street NW
Washington, DC 20006-1001
(202) 912-5000
steve.cottreau@cliffordchance.com

      Robert G. Houck
31 West 52nd Street
New York, NY  10019-6131
robert.houck@cliffordchance.com

*Attorneys for Defendant The Royal Bank of Scotland N.V.*

CLEARY GOTTLIEB STEEN & HAMILTON LLP,

by

   */s/ Lawrence B. Friedman*
      Lawrence B. Friedman
      Lewis J. Liman
      Avram E. Luft
One Liberty Plaza
New York, NY 10006
(212) 225-2000
lfriedman@cgsh.com
lliman@cgsh.com
aluft@cgsh.com

*Attorneys for Defendant Commerzbank AG*