UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHARLOTTE FREEMAN, et al., | |
| Plaintiffs, | |
| -against- | 14-CV-6601 (DLI/CLP) |
| HSBC HOLDINGS PLC, et al., | |
| Defendants. | |

**MEMORANDUM OF LAW OF DEFENDANT CREDIT SUISSE AG
IN SUPPORT OF MOTION TO DISMISS**

Richard W. Clary
Michael T. Reynolds
John D. Buretta
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1000
rclary@cravath.com
mreynolds@cravath.com
jburetta@cravath.com

*Attorneys for Defendant Credit Suisse AG*

September 14, 2016

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION .............................................................................................................1

FACTUAL STATEMENT ................................................................................................1

ARGUMENT ....................................................................................................................8

I.     THE COMPLAINT FAILS PLAUSIBLY TO ALLEGE PROXIMATE
       CAUSATION AS TO CREDIT SUISSE ...............................................................8

II.    THE TWO CLAIMS AGAINST CREDIT SUISSE RELY ENTIRELY ON A
       CONSPIRACY THEORY OF CIVIL LIABILITY FORECLOSED BY
       *ROTHSTEIN* AND ITS PROGENY .....................................................................9

CONCLUSION................................................................................................................10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Linde v. Arab Bank, PLC,*
    944 F. Supp. 2d 215 (E.D.N.Y. 2013) ........................................................................10

*O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001),*
    714 F.3d 118 (2d Cir. 2013)........................................................................................10

*Rothstein v. UBS AG,*
    708 F.3d 82 (2d Cir. 2013)................................................................................. passim

**Statutes & Rules**

18 U.S.C. § 2333 ...........................................................................................................8, 9, 10

18 U.S.C. § 2339A .........................................................................................................1, 2, 10

18 U.S.C. § 2339B .........................................................................................................1, 2, 10

## INTRODUCTION

As demonstrated in the Joint Memorandum, the two Claims for Relief (the First and Second Claims) in which Credit Suisse is named as a defendant in the Second Amended Complaint (the "Complaint") each fail to state a claim as a matter of law.[1] Credit Suisse respectfully submits this separate memorandum of law to highlight the deficiencies in those two claims as they pertain specifically to Credit Suisse. First, both claims fail as a matter of law plausibly to plead proximate cause as to Credit Suisse. Second, both claims hinge on a conspiracy-based theory of civil liability that *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013), and its progeny foreclose. Based on these two independent grounds, each claim against Credit Suisse must be dismissed.

## FACTUAL STATEMENT

The Complaint's First and Second Claims for Relief are both expressly predicated on each defendant's alleged participation in a criminal conspiracy to violate certain of the ATA's criminal law provisions. The First Claim for Relief alleges that "each Defendant violated § 2339A's express prohibition against conspiring to provide material support within the meaning of § 2339A, and committed and completed overt acts in furtherance of the Conspiracy". SAC ¶ 2180. Similarly, the Second Claim for Relief alleges that "each Defendant violated § 2339B's express prohibition against conspiring to provide material support within the meaning of § 2339B, and committed and completed overt acts in furtherance of the Conspiracy". *Id.* ¶ 2202;

---

[1] The following abbreviations are used in this memorandum of law: "Credit Suisse" for Defendant Credit Suisse AG; "Joint Memorandum" for the Joint Memorandum in Support of Motion to Dismiss; "SAC" to refer to the Second Amended Complaint filed on August 17, 2016 (Dkt. No. 115); and "ATA" for the Anti-Terrorism Act.

*see also id.* ¶¶ 930-91 ("V. M. Defendant Credit Suisse's Agreement To, And Participation In,

The Conspiracy").[2]

The Complaint asserts that, between 1995 and November 2006, Credit Suisse

participated in the alleged Conspiracy by acting as a correspondent bank clearing U.S.-dollar

denominated transactions for Bank Melli and Bank Saderat.  *Id*. ¶¶ 6, 22, 932, 944, 982; *see also*

*id*. ¶¶ 358, 372, 435, 442.  The Complaint does not allege that Credit Suisse processed U.S.

dollar-denominated transactions for any terrorists or terrorist groups, such as Hezbollah, the

Islamic Revolutionary Guards Corps Qods Force ("IRGC-QF") or any of the named or unnamed

Iraqi terrorist groups Hezbollah and IRGC-QF allegedly supported.  *See id*. ¶¶ 226-58 (Iran's

support of Hezbollah and IRGC-QF, not involving Credit Suisse); *id*. ¶¶ 282-329 (Iran's support

of terrorist groups in Iraq that coordinated with Hezbollah and IRGC-QF, not involving Credit

Suisse); *id*. ¶¶ 930-91 (Credit Suisse's alleged banking transactions, with no reference to

terrorism).  Nor is Credit Suisse alleged to have dealt directly with the Government of Iran or

any arm of the Government of Iran, such as the Ministry of Defense and Armed Forces Logistics

("MODAFL"), the Islamic Republic of Iran's Shipping Lines ("IRISL") or Iran's Defense

Industries Organization ("DIO"), which allegedly provided support to Hezbollah and IRGC-QF,

which, in turn, allegedly provided support to terrorist groups in Iraq.  *See id*. ¶¶ 23, 25-26, 50,

224-25, 713-93, 930-91, 1012.

As to Credit Suisse's U.S. dollar-denominated banking transactions with Iranian

banks (not involving any terrorist groups), the Complaint concedes that, by January 2006, Credit

---

[2] 18 U.S.C. § 2339A criminalizes, *inter alia*, conspiring to "provide[] material support or resources … knowing or intending that they are to be used in preparation for, or in carrying out, a violation of" one of several substantive terrorism offenses, and 18 U.S.C. § 2339B criminalizes, *inter alia*, conspiring to "knowingly provide[] material support or resources to a foreign terrorist organization".

Suisse had decided to terminate all such banking services.  *Id.* ¶ 982.  Credit Suisse is alleged to have completed most of that wind-down by September 2006 and ceased all of its transactions with Iranian banks by October 27, 2006.  *Id.* ¶ 983.  Thus, while none of the funding or support for any of the alleged attacks in Iraq is linked in any way to Credit Suisse, nearly three-quarters of those alleged attacks, including the January 20, 2007 attack described in detail in the Complaint  occurred after Credit Suisse is alleged to have terminated all U.S. dollar-clearing transactions with Iranian banks.  *See id.* ¶¶ 1041-2178

   As the Complaint further acknowledges, during the time period when Credit Suisse allegedly acted as a correspondent bank for Iranian banks, processing U.S. dollar-denominated transactions was lawful when completed under the criteria in the Office of Foreign Assets Control's ("OFAC") "U-Turn" exemption.  *See id.* ¶¶ 140-42.  OFAC did not revoke the U-Turn exemption as to Bank Saderat until September 2006 (by which time Credit Suisse is alleged to have ceased almost all Iranian banking transactions), *see id.* ¶ 364, 983, and as to Bank Melli until October 2007 (one year after Credit Suisse is alleged to have stopped all Iranian banking transactions), *see id.* ¶¶ 142, 421, 983.  The Complaint further concedes that the U.S. Government did not designate either Bank Melli or Bank Saderat as sanctioned—*i.e.*, entirely prohibited—entities until October 2007, well after Credit Suisse terminated all U.S. dollar-denominated transactions for Iranian banks.  *Id.* ¶¶ 49, 384, 421.

   The Complaint alleges that when processing U.S. dollar transactions for Iranian banks under the U-Turn exemption, Credit Suisse "altered, falsified, or omitted information from payment messages", *id.* ¶ 52—a practice that Plaintiffs term as "stripping", *id.* ¶¶ 25, 343.  The Complaint does not, however, allege that any of these transactions directly benefited or involved any terrorist group.  *See id.* ¶¶ 343-49.  The Complaint also acknowledges that, in March 2007,

3

Credit Suisse initiated an internal investigation of its U.S. dollar-clearing transactions, subsequently cooperated with an investigation of these activities by U.S. authorities, entered a deferred prosecution agreement with the U.S. Government and agreed to a $536 million civil forfeiture relating to banking transactions with customers in several countries, including Iran, Burma, Cuba, Libya, Sudan and Syria.  *See id.* ¶¶ 987-89.  The deferred prosecution agreement does not suggest that Credit Suisse processed any U.S. dollar-denominated transactions that supported any terrorist group or terrorist act.  *Id.*  Nor does the Complaint allege, beyond the deferred prosecution agreement, any actual connection between Credit Suisse's alleged banking transactions and the terrorist organizations or acts identified in the Complaint.  *See id.* ¶¶ 930-91 (Credit Suisse's alleged banking transactions, with no reference to terrorism); *id.* ¶¶ 102-104, 226-58 (Iran's support of terrorism, not involving Credit Suisse).

The Complaint further alleges that Credit Suisse participated in three "illicit transactions" as part of a scheme to "violat[e] . . . the U.S. trade embargo against Iran" and "enable Iran's acquisition" of export-controlled items.  *Id.* ¶ 23.  Specifically, the Complaint states that, between 2004 and 2006, Credit Suisse made U.S.-dollar payments as part of a series of payments and repayments that were originally set in motion by three letters of credit issued by Iranian banks.  *See id.* ¶¶ 434-35, 437-39, 697-98.  The Complaint alleges that Credit Suisse made U.S.-dollar payments to Bank of New York and Defendant Standard Chartered Bank in connection with letters of credit issued by Bank Melli and Bank Refah, and that these payments purportedly "facilitated" the "illegal purchase", *id.* ¶ 984-85, by Iranian–owned companies of (i) one U.S.-origin commercial aircraft engine, *id.* ¶¶ 433-36, 697, 984-85, (ii) one Airbus A320-232 commercial aircraft, *id.* ¶¶ 698, 984-85, and (iii) unspecified aircraft parts, *id.* ¶¶ 437-41, 697, 984.

4

The Complaint alleges no connection between these few U.S.-dollar denominated transactions and any terrorist group or terrorist act, much less any of the attacks alleged in the Complaint.  *See id.* ¶¶ 433-41, 697-98, 984-85.  While the Complaint claims that Mahan Air and Blue Sky Aviation Co. FZE ("Blue Sky Aviation")—the entities to which two of the underlying letters of credit were allegedly issued by parties other than Credit Suisse—were designated by OFAC as Specially Designated Global Terrorists ("SDGTs") for, respectively, supporting the IRGC-QF and engaging in sanctions-evading conduct, these designations did not occur until years *after* Credit Suisse is alleged to have made the U.S.-dollar payments.  *See id.* ¶ 19 (Mahan Air designated in 2011, seven years after the alleged U.S.-dollar denominated payments to Bank of New York); *id.* ¶ 699 (Blue Sky Aviation "later designated" after the alleged U.S. dollar-denominated payments to Defendant Standard Chartered Bank); *id.* ¶ 710 ("[N]either Mahan Air nor Blue Sky Aviation was designated as a terrorist at the time the [letters of credit] . . . were financed".).[3]  Furthermore, Iran Aircraft Industries—the entity to which the third underlying letter of credit was allegedly issued by a party other than Credit Suisse—is not a SDGT.[4]

The Complaint continues to rely on other wholly conclusory allegations about the alleged "Conspiracy", which do not connect Credit Suisse's alleged conduct in any way to attacks in Iraq.  Plaintiffs broadly claim (i) that the alleged Conspiracy "substantially assisted", *id.* ¶ 360, "substantially enhanced", *id.* ¶ 2198, "facilitated", *id.* ¶¶ 49-50, 280, 2189, 2203, "enabled", *id.* ¶ 7, or "provided . . . the means" for, *id.* ¶ 359, Iran's support for terrorism, (ii) that

---

[3] Although the Complaint does not specify when Blue Sky was designated as a SDGT, it is a matter of public record that the designation occurred in 2014, eight years after Credit Suisse allegedly made the U.S.-dollar denominated payments to Defendant Standard Chartered Bank. *See* SAC ¶ 984.

[4] The Complaint alleges that the third underlying letter of credit was issued to "a MODAFL sub-agency".  *Id.* ¶ 437.  However, the report attached as Exhibit A to the Complaint clarifies that this entity is Iran Aircraft Industries.  *See* Dkt. No. 115-1, at 75.  It is a matter of public record that Iran Aircraft Industries is not a SDGT.

5

"absent the access to the U.S. 'dollar clearing and settlement' system afforded to Bank Saderat by [the Moving Defendants], both Iran and Hezbollah's access to USDs would have been diminished", *id.* ¶ 358, and that (iii) without the Conspiracy, "Iran could not have successfully violated U.S. export controls, financed its illicit arms shipments or manufactured the same volume and sophistication of factory-grade Explosively Formed Penetrators [EFPs] to kill and maim Americans in Iraq", *id.* ¶ 47. These are the same kinds of allegations *Rothstein* rejected as for too attenuated to support an inference of proximate cause. 708 F.3d at 97. The Complaint does not allege that any of Credit Suisse's U.S. dollar-denominated transactions involved even one dollar of money being funneled to these terrorist organizations, or that its payments on letters of credit directly aided any terrorist groups in carrying out the alleged attacks on the Plaintiffs. *See id.* ¶¶ 226-58 (Iran's support of Hezbollah and IRGC-QF, not involving Credit Suisse); *id.* ¶¶ 282-329 (Iran's support of terrorist groups in Iraq that coordinated with Hezbollah and IRGC-QF, not involving Credit Suisse); *id.* ¶¶ 433-41, 698-99, 930-91 (Credit Suisse's dollar-clearing transactions and payments on letters of credit, with no reference to terrorism). In sum, whatever the purported interactions were between the Iranian banks and the Government of Iran concerning alleged funding of terrorism, none of Credit Suisse's banking services are actually alleged to have been part of that funding. *Id.*

The Complaint also alleges that each defendant "knew" of or was "deliberately indifferent to", *id.* ¶¶ 23, 346, the fact that the supposed conspiracy was (i) "[f]acilitating illicit transactions totaling at least $50 million USD for the benefit of Hezbollah"; (ii) "[f]acilitating illicit transactions totaling at least $100 million in USD funds for the direct benefit of the IRGC and billions in USD funds for the benefit of' entities controlled by the IRGC; (iii) "[f]acilitating at least hundreds of illicit transactions totaling more than $60 million on behalf of IRISL"; and (iv)

"[f]acilitating tens of millions of dollars in illicit transactions on behalf of MODAFL, the IRGC, Mahan Air and other instrumentalities of Iranian state-sponsored terror to further numerous violations of the U.S. trade embargo against Iran". *Id.* ¶¶ 23, 346.  But as stated above, no substantiating facts are alleged as to Credit Suisse.  *See id.* ¶¶ 36-39 (news reports of Iran's terrorism-financing activities with no reference to Credit Suisse); *id.* ¶¶ 49, 384, 421 (Bank Melli's and Bank Saderat's designation as sanctioned entities after Credit Suisse concededly ceased all Iranian transactions); *id.* ¶¶ 988-90 (Credit Suisse's deferred prosecution agreement and related documents with no reference to terrorism).

Nor does the Complaint allege that, absent Credit Suisse's handling of U.S. dollar-denominated transactions for Iranian banks, the Government of Iran would not have  supported Hezbollah or IRGC-QF, that Hezbollah or IRGC-QF would not have trained or  sponsored named and unnamed terrorist groups in Iraq, or that the attacks on Plaintiffs would not have otherwise been financed by Iran or its related entities.  *Id.* ¶¶ 226-58 (Iran's support of  Hezbollah and IRGC-QF, not involving Credit Suisse); *id.* ¶¶ 930-91 (Credit Suisse's dollar-clearing transactions, with no reference to terrorism).

Lastly, the Complaint alleges in conclusory fashion that Credit  Suisse "worked closely with . . . Iran's Atomic Energy Organization [("AEOI")] (and other designated Weapons of Mass  Destruction proliferators) for many years".  *See id.* ¶ 932.  The Complaint provides no details regarding the nature of the alleged relationship.  Moreover, the AEOI is not alleged to have anything whatsoever to do—directly or indirectly—with terrorist attacks in Iraq.  Thus, with regard to AEOI, Credit Suisse is alleged, at most, to have participated in Iran's separate and (insofar as it relates to the terrorist acts alleged the Complaint) irrelevant nuclear development activities.  *See id.*

**ARGUMENT**

## I.   THE COMPLAINT FAILS PLAUSIBLY TO ALLEGE PROXIMATE CAUSATION AS TO CREDIT SUISSE

The First and Second Claims for Relief—the only claims in which Credit Suisse is named as a defendant—must be dismissed because they fail adequately to plead proximate cause as to Credit Suisse.  To state a Section 2333 claim, a plaintiff must plausibly allege that the defendant's act was the proximate cause of the injury.  *See* Joint Memorandum at 1-2.  The Complaint does not plausibly allege that Credit Suisse's alleged U.S.-dollar denominated banking transactions with Iranian banks proximately caused Plaintiffs' injuries.  As demonstrated in the Joint Memorandum, the Complaint's purported causal connection between Credit Suisse's banking services and Plaintiffs' injuries is premised on precisely the same kind of indirect causal theory the Second Circuit rejected in *Rothstein*.  *See* Joint Memorandum at 12-24.

The Complaint's causal allegations as to Credit Suisse are even more indirect and implausible than was the case in *Rothstein*.  There is no allegation that Credit Suisse's processing of electronic wire transfers in U.S. dollar denominations for Iranian banks (even if allegedly "stripped" of Iranian identifiers) involved any terrorist group in Iran, in Iraq or elsewhere.  *See* SAC ¶¶ 49, 358, 372, 387, 443, 559, 562, 704, 930-91.  The Complaint also does not allege that Credit Suisse processed transactions for anyone else—including any arm of the Government of Iran—that allegedly used money processed by Credit Suisse to in turn fund Hezbollah, IRGC-QF or any other terrorist group.  *See id.*  Nor does the Complaint allege that the few U.S.-dollar denominated transfers relating to the alleged purchase of a commercial aircraft, engine and parts had any connection to terrorist groups or acts, much less proximately caused any of the attacks in Iraq alleged in the Complaint.  In sum, as in *Rothstein*, 708 F.3d at 97, there is no plausible connection alleged between Credit Suisse's banking services and any terrorist attack in Iraq that

injured Plaintiffs.  *See* Joint Memorandum at 17-21; *see also O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)*, 714 F.3d 118, 124 (2d Cir. 2013) ("We are also not persuaded that providing routine banking services to organizations and individuals said to be affiliated with al Qaeda—as alleged by plaintiffs—proximately caused the September 11, 2001 attacks or plaintiffs' injuries.").

In addition, Plaintiffs' conclusory foreseeability allegations are not a substitute for pleading a direct connection between Credit Suisse's conduct and the attacks in Iraq.  *See* Joint Memorandum at 21-23.  The Complaint's foreseeability allegations are, in any case, entirely unsubstantiated as to Credit Suisse, which the Complaint concedes ceased all of its Iranian U.S. dollar-denominated clearing services well before OFAC designated any of the Iranian banks with which Credit Suisse allegedly dealt.  *See* SAC ¶¶ 49, 384, 421, 982-83; *see also supra* at 6-7.

For all of the reasons set forth in the Joint Memorandum and stated here, dismissal is required for failure to plead proximate cause.  *See* Joint Memorandum at 12-24; *see also Al Rajhi*, 714 F.3d at 124 (dismissing complaint because there were no plausible allegations that defendants "provided money directly to al Qaeda" or that "the money allegedly donated by the . . . defendants to the purported charities actually was transferred to al Qaeda and aided in the September 11, 2001 attacks"); *Rothstein*, 708 F.3d at 97 (dismissing complaint because it contained "no nonconclusory allegation . . . that plausibly shows that the moneys [defendant] transferred to Iran were in fact sent to H[e]zbollah or Hamas", which then injured plaintiffs).

## II.   THE TWO CLAIMS AGAINST CREDIT SUISSE RELY ENTIRELY ON A CONSPIRACY THEORY OF CIVIL LIABILITY FORECLOSED BY *ROTHSTEIN* AND ITS PROGENY

The First and Second Claims for Relief against Credit Suisse must also be dismissed on the independent ground that they are predicated exclusively on a civil conspiracy

theory of liability.  Both claims explicitly allege that Credit Suisse is liable under Section 2333 because Credit Suisse allegedly participated in a criminal conspiracy to violate 18 U.S.C. § 2339A (First Claim for Relief) and 18 U.S.C. § 2339B (Second Claim for Relief).  *See supra* at 1.  For the reasons set forth in the Joint Memorandum, Section 2333 civil claims predicated on a criminal conspiracy theory of liability are not cognizable.  *See* Joint Memorandum at 24-27; *Rothstein*, 708 F.3d at 97-98 (dismissing aiding-and-abetting claims because civil secondary liability is not available under Section 2333); *Linde v. Arab Bank, PLC*, 944 F. Supp. 2d 215, 216-17 (E.D.N.Y. 2013) (applying *Rothstein* to dismiss all conspiracy-based civil claims under Section 2333).[5]

## CONCLUSION

For the foregoing reasons, Credit Suisse respectfully submits that the First and Second Claims for Relief in the Complaint should be dismissed with prejudice as to Credit Suisse.

---

[5] Because conspiracy-based civil liability is not available under Section 2333, Credit Suisse does not address the Complaint's separate failure adequately to allege a claim of conspiracy or any other conduct satisfying the requirements of 18 U.S.C. § 2339A and § 2339B.

Respectfully submitted,

Dated:  September 14, 2016

CRAVATH, SWAINE & MOORE LLP,

by
   */s/ Richard W. Clary*
                            Richard W. Clary
                            Michael T. Reynolds
                            John D. Buretta

                            Members of the Firm

        Worldwide Plaza
        825 Eighth Avenue
        New York, NY 10019
                (212) 474-1000
                rclary@cravath.com
                mreynolds@cravath.com
                jburetta@cravath.com


    *Attorneys for Defendant Credit Suisse AG*

11