UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

CHARLOTTE FREEMAN, *et al.*,

                Plaintiffs,

     v.

HSBC HOLDINGS PLC, *et al.*,

                Defendants.

No. Civ. 14-6601 (DLI) (CLP)

---

## DEFENDANT STANDARD CHARTERED BANK'S SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS

Sharon L. Nelles (*nelless@sullcrom.com*)
Bradley P. Smith (*smithbr@sullcrom.com*)
John C. Quinn (*quinnjc@sullcrom.com*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for Standard Chartered Bank*

September 14, 2016

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ *ii*

INTRODUCTION ................................................................................................................1

BACKGROUND ..................................................................................................................1

ARGUMENT ........................................................................................................................5

I.      The Second Amended Complaint Does Not Plausibly Allege That SCB's Conduct Proximately Caused the Terrorist Attacks that Injured Plaintiffs ........................................5

II.     Section 2333 Does Not Permit Conspiracy-Based Civil Liability ........................................9

CONCLUSION ....................................................................................................................10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009) ................................................................................................................. 9

*Bell Atlantic Corp.* v. *Twombly*,
550 U.S. 544 (2007) ................................................................................................................. 9

*Mike Vaughn Custom Sports, Inc.* v. *Piku*,
15 F. Supp. 3d 735 (E.D. Mich. 2014) .................................................................................... 8

*O'Neill* v. *Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)*,
714 F.3d 124 (2d Cir. 2013) ............................................................................................ *passim*

*Rothstein* v. *UBS AG*,
708 F.3d 82 (2d Cir. 2013) .............................................................................................. *passim*

*Sistrunk* v. *Dake Corp.*,
No. 13-2983, 2015 WL 4164910 (E.D. La. July 9, 2015) ...................................................... 8

*Strauss* v. *Credit Lyonnais, S.A.*,
925 F. Supp. 2d 414 (E.D.N.Y. 2013) .................................................................................... 7

*Stutts* v. *De Dietrich Grp.*,
No. 03 Civ. 4059 (IGL), 2006 WL 1867060 (E.D.N.Y. June 30, 2006) ......................... *passim*

*TDY Holdings, LLC* v. *United States*,
122 F. Supp. 3d 998 (S.D. Cal. 2015) ..................................................................................... 8

**Statutes**

18 U.S.C. § 2331 ........................................................................................................................ 10

18 U.S.C. § 2332d ...................................................................................................................... 10

18 U.S.C. § 2339 ........................................................................................................................ 10

18 U.S.C. § 2333 ..................................................................................................................... 1, 9

**Other Authorities**

Schuler AG, *The Entire World of Metal Forming* (2014/2015) ................................................... 8

## INTRODUCTION

Standard Chartered Bank ("SCB") respectfully submits this supplemental memorandum in support of its motion to dismiss the Second Amended Complaint ("SAC").

As demonstrated in the Joint Memorandum in Support of Motion to Dismiss, dated September 14, 2016 (the "Joint Memorandum"), Plaintiffs' claims against SCB in the SAC are just as deficient as the claims asserted in their prior pleadings. While the Joint Memorandum addresses all of the allegations directed against Defendants, SCB submits this supplemental memorandum to address certain new allegations about SCB in the SAC, which concern SCB's role in transactions involving letters of credit ("LCs"). These new allegations do not cure Plaintiffs' failure to plausibly allege proximate cause, and all of Plaintiffs' claims remain premised on a theory of conspiracy liability, which is not cognizable under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333. For these two independent reasons, the Court should dismiss all claims against SCB.

## BACKGROUND

The basis for Plaintiffs' claims against SCB in the SAC is the same as it was in their prior complaints: an alleged conspiracy in which SCB and other defendants agreed with the government of Iran and Iranian banks to violate U.S. economic sanctions and then, in furtherance of that conspiracy, altered or omitted information from payment messages, a process Plaintiffs refer to as "stripping." *See* SAC ¶¶ 6, 343, 619-869. In the SAC, Plaintiffs add new allegations that SCB "facilitated" LCs in connection with trade transactions involving Iranian entities in connection with the same conspiracy. *See id.* ¶¶ 673-838. Plaintiffs also assert a new claim for relief against SCB based on these allegations. *See id.* ¶¶ 2274-93 (Seventh Claim for Relief).

As Plaintiffs allege, LCs are issued by one bank to another essentially to guarantee payment for the purchase of goods. *See id.* ¶ 173. Typically, the transaction is

initiated by a purchaser, who requests an LC from an "issuing" bank. *See id.* ¶¶ 174-75, 178. The issuing bank then sends the LC to an "advising" bank to confirm its authenticity. *See* SAC Ex. A at 25. The advising bank notifies the seller that an authentic LC has been issued, and the seller ships the goods to the purchaser. *See id.*; SAC ¶ 181. The seller then presents the shipping documents to a "negotiating" bank, which sends them to the issuing bank. *See* SAC Ex. A at 25. If the issuing bank accepts the shipping documents, it authorizes the negotiating bank to pay the seller. *See id.* The negotiating bank then claims reimbursement from a "reimbursing" bank, which pays the negotiating bank on behalf of the issuing bank, which in turn holds the purchaser's funds. *See id.*; SAC ¶ 188. Often, the reimbursing bank makes payment to the negotiating bank through correspondent banks, which facilitate dollar-denominated payments through a U.S. clearing bank. *See* SAC Ex. A at 25.

Plaintiffs allege that, from at least 2001 to 2007, SCB participated in LC transactions that involved certain Iranian entities' purchase of aircraft, aircraft parts, unspecified "U.S. origin goods," and, in one case, electromotors for hydraulic presses. *See* SAC ¶¶ 673-838. Plaintiffs allege that SCB conspired with those Iranian entities to evade U.S. sanctions in connection with these transactions, and that SCB used "stripping or cover payment methods" to avoid detection in furtherance of that alleged conspiracy. *Id*. ¶¶ 683, 772.

In all of the alleged LC transactions, SCB New York's alleged role was limited to the provision of U.S. dollar clearing services.[1] *See id.* ¶¶ 694, 697, 704, 715, 722, 724, 743, 745, 769, 771, 771 n.46, 772 n.47, 787, 790, 799, 802, 806, 807, 814, 817, 830. In some instances,

---

[1] Plaintiffs purportedly base their LC allegations on a confidential report prepared by Promontory Financial Group, which was engaged by SCB's outside counsel to analyze SCB transaction data and prepare written reports of such analyses. Final versions of Promontory's reports were shared by SCB with government agencies subject to certain understandings about confidentiality, and remained non-public until Plaintiffs attached one such report to their SAC and filed it publicly with this Court. *See* SAC Ex. A.

Plaintiffs allege that non-U.S. branches of SCB provided other intermediary services as the negotiating bank, the advising bank, and/or the reimbursing bank for an LC.  *See*, *e.g.*, *id.* ¶¶ 743, 799.  In instances where a non-U.S. branch of SCB acted as the negotiating bank, Plaintiffs allege in a conclusory fashion that SCB "received the detailed documentation for the shipment of goods, and knew that it was helping Iran's military and terrorist apparatus acquire prohibited U.S. goods and dual-use technologies."  *Id.* ¶ 867.  But Plaintiffs do not allege that the documentation received by SCB indicated that the goods would be used by terrorist organizations, nor do they allege any facts to support an allegation that SCB knew the purchasers and sellers of the goods were supporting terrorist groups.[2]

Plaintiffs try to establish some link between their LC allegations and support for terrorism by alleging that some of the purchasers and sellers involved in the underlying transactions to which those LCs related were designated by the United States Office of Foreign Assets Control ("OFAC") as Specially Designated Global Terrorists ("SDGTs") for their ties to terrorist organizations or as proliferators of weapons of mass destruction ("WMDs").[3]  *See id.* ¶¶ 685-86, 701, 707, 710, 714, 714 n.37, 715, 718, 719, 741, 768, 811 n.56, 816.  But as the SAC concedes, *all* of these entities were designated long after the LC transactions were completed.  *See id*.  For example, the SAC alleges that, between 2000 and 2006, SCB "facilitated" LCs for the purchase of aircraft and aircraft parts by Mahan Air—an entity that was designated as a SDGT in 2011.  *Id.* ¶¶ 685-86.

---

[2] The Promontory report did not find—nor did any of SCB's settlements with government authorities find—that SCB engaged in transactions that facilitated or were in any way connected to terrorist activity.  *See* SAC Ex. A.

[3] These designations are distinct from the designations of Foreign Terrorist Organizations ("FTOs") by the United States Secretary of State pursuant to Section 219 of the Immigration and Nationality Act.  None of the purchasers or sellers involved in the LC transactions have been designated as FTOs.  *See* U.S. Dep't. of State, *Foreign Terrorist Orgs.*, *available at* http://www.state.gov/j/ct/rls/other/des/123085.htm; *see also* SAC ¶¶ 673-838.

Plaintiffs also allege that some of the entities that purchased or sold the underlying goods (or the owners or directors of such entities) were indicted for, and in a few cases convicted of, violating U.S. export controls. *See id.* ¶¶ 729, 754, 777, 796, 823. But the SAC does not allege that these entities were themselves terrorist organizations or supporters of terrorism.

Plaintiffs further allege that one indirect beneficiary of "at least four" LC transactions, Zener Electronics, was identified in 2014 by the U.S. Commerce Department as an entity involved in efforts to "supply[] U.S.-origin items to persons designated . . . as Foreign Terrorist Organizations." *See id.* ¶¶ 802, 802 n.53. But the alleged LC transactions involving Zener Electronics, which involved unspecified "U.S. goods," took place in 2003 and 2004, more than a decade before the designation. *See id.* ¶¶ 802, 804. With respect to other alleged transactions, including one for the purchase of electromotors for hydraulic presses, the sellers and purchasers are not alleged to have an OFAC designation, a history of export controls violations, or any connections to terrorist activity or organizations. *See, e.g.*, ¶¶ 825-35.

The SAC does not allege that SCB directly participated in any terrorist attacks. *Id.* ¶¶ 673-838. Nor does it allege that SCB provided banking services for Hezbollah, the Islamic Revolutionary Guards Corps ("IRGC"), or any terrorist organization. *Id*. The SAC also does not identify a single LC transaction involving SCB that allegedly was used by Iran or other entities to transfer funds or goods to Hezbollah, the IRGC, or any terrorist organization. *Id*. In addition, the SAC does not allege that SCB facilitated transactions for the purchase of improvised explosive devices ("IEDs"), explosively formed penetrators ("EFPs"), or any other type of weapon. *Id.* Nor does it allege that any of the goods that were purchased in connection with the LCs were used in—or were in any way tied to—the attacks that injured Plaintiffs. *Id.*

**ARGUMENT**

I. **THE SECOND AMENDED COMPLAINT DOES NOT PLAUSIBLY ALLEGE THAT SCB'S CONDUCT PROXIMATELY CAUSED THE TERRORIST ATTACKS THAT INJURED PLAINTIFFS.**

The SAC should be dismissed because it does not plausibly allege that SCB proximately caused Plaintiffs' injuries. As outlined in the Joint Memorandum, *Rothstein* and its progeny plainly hold that an ATA plaintiff must allege facts that substantiate an actual connection between a defendant's conduct and either the terrorist act that injured the plaintiff or the terrorist organization that funded or perpetrated that act. *Rothstein* v. *UBS AG*, 708 F.3d 82, 92, 97 (2d Cir. 2013). The SAC here makes no such allegations—nowhere do Plaintiffs allege any actual connection between SCB's conduct and the (largely unidentified) terrorist organizations or the terrorist acts alleged. Plaintiffs' new allegations concerning LC transactions are no different.

In fact, the theory underlying Plaintiffs' LC allegations has already been rejected by this Court. In *Stutts* v. *De Dietrich Grp.*, No. 03 Civ. 4059 (IGL), 2006 WL 1867060 (E.D.N.Y. June 30, 2006), plaintiffs were injured by exposure to toxic agents contained in chemical weapons developed or obtained by the government of Iraq, which were subsequently detonated by Coalition Forces during the First Gulf War. They brought an action under the ATA against banks that acted as correspondent banks in connection with LCs issued for the purchase of chemical precursors and manufacturing equipment by the Iraqi government. *Id.* at *1. The Court dismissed the complaint for lack of proximate cause, holding that "general publicity" concerning Iraq's stockpiling and use of chemical weapons, and "connections and cooperation between agents of the Iraqi regime and known terrorist organizations" were insufficient to plausibly allege proximate causation. *Id.* at *4.

The absence of proximate cause is even starker here. In *Stutts*, the purchaser in the LC transactions was the Iraqi government—the very entity that stockpiled the chemical weapons that caused the plaintiffs' injuries—and the goods involved in the LC transactions were chemical precursors used to manufacture those weapons. Here, by contrast, Plaintiffs do not allege that any of the purchasers carried out any of the attacks that caused their injuries. *Id.* ¶¶ 673-838. In fact, Plaintiffs do not identify a single transaction through which funds or goods of any type were transferred, directly or indirectly, to any terrorist group, let alone the ones they allege are responsible for the attacks on Plaintiffs. *Id.*[4] Nor do Plaintiffs allege that any of the goods purchased using the LCs were weapons, were actually used to make weapons, or were used in the attacks that injured Plaintiffs. *Id.* There is simply no connection alleged between the LC transactions and the detonation of explosive devices in Iraq by terrorist groups. As the Second Circuit made clear in *Rothstein* and *Al Rajhi*, proximate cause is not plausibly alleged based on mere allegations that a defendant provided banking services to an organization that separately may have supported terrorists.[5] *Rothstein*, 708 F.3d at 96-97; *O'Neill* v. *Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)*, 714 F.3d 118, 124 (2d Cir. 2013).

Plaintiffs' allegations with respect to particular purchasers, sellers and goods only confirm that there is no connection between the LCs and Plaintiffs' injuries. Plaintiffs'

---

[4] For these reasons, Plaintiffs' conclusory and wholly unsupported allegation that SCB "was integral to Iran's . . . money laundering techniques in the service of weapons procurement, arms shipments, acquisition of WMDs and terror financing that substantially and foreseeably assisted MODAFL, the IRGC and Hezbollah in their campaign of violence and terror against Coalition Forces in Iraq," SAC ¶ 838, is plainly insufficient to establish proximate cause. *See Stutts*, 2006 WL 1867060 at *4 n.8 (finding plaintiffs' argument that bank defendants were "essential" to Iraq's stockpiling of chemical weapons insufficient to establish proximate cause).

[5] Plaintiffs' assertion that SCB had knowledge of the underlying transaction through its role as negotiating bank does not remedy this causal deficiency. SAC ¶ 867. Indeed, "issuers of letters of credit are third parties ignorant of the specifics of the transactions who merely deal in documents describing the terms of the credit extended." *Stutts*, 2006 WL 1867060, at *13.

allegations that the purchasers and sellers of goods underlying the LCs were designated by OFAC as SDGTs or WMD proliferators, *see, e.g.*, SAC ¶¶ 686, 718, do not establish any causal link between SCB's conduct and Plaintiffs' injuries because all of the designated entities allegedly involved in the LC transactions were designated years after the LCs were issued. *See id.* ¶¶ 685-86, 701, 707, 710, 714, 714 n.37, 715, 718, 719, 741, 768, 811 n.56, 816. Plaintiffs acknowledge this, but allege that SCB's own conduct of assisting entities in evading sanctions through the use of stripping and cover payments was illegal, *see id.* ¶ 710, and that the commission of terrorist acts against Americans was somehow a foreseeable consequence of this conduct, *id.* ¶ 683. However, this argument—that a defendant's violation of U.S. laws restricting trade with Iran is sufficient to establish proximate cause—was flatly rejected in *Rothstein*. 708 F.3d at 96 (such an argument would mean that "any provider of U.S. currency to a state sponsor of terrorism would be strictly liable for injuries subsequently caused by a terrorist organization associated with that state").[6] Similarly, allegations that entities were indicted for or convicted of export controls violations, *see, e.g.*, SAC ¶ 754, are insufficient to establish proximate cause— there is still no link whatsoever to terrorist acts or terrorist groups. *See Rothstein*, 708 F.3d at 96.

    Plaintiffs' allegations concerning one particular transaction for the purchase of electromotors for hydraulic presses also do not allege any actual connection between SCB's alleged conduct and Plaintiffs' injuries. Plaintiffs trumpet their allegation that hydraulic presses are "the precise type of machinery required to manufacture EFPs," *id.* ¶ 832, but they fail to acknowledge that they are also used to manufacture kitchen appliances, automotive parts, and an

---

[6] Moreover, none of the entities involved in the LC transactions have been designated as FTOs. This is "meaningful" because the "Supreme Court's finding that FTOs are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct is specific to FTOs" and does not apply to other entities, even if they are involved in funding terrorism. *See Strauss* v. *Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 433 (E.D.N.Y. 2013) (Irizarry, J.).

-7-

array of other products.[7]  Nowhere do Plaintiffs allege that the electromotors that were the subject of the transaction involving SCB were used to manufacture hydraulic presses that, in turn, manufactured EFPs.  *See* SAC ¶¶ 825-35.  Nor do they allege that the electromotors were purchased by, transferred to, or otherwise used by terrorist groups, much less the groups that committed the attacks against Plaintiffs.  *Id.*[8]  These allegations therefore fail to allege proximate cause.  *See Rothstein*, 708 F.3d at 97; *Al Rajhi*, 714 F.3d at 124; *Stutts*, 2006 WL 1867060, at *4.

Plaintiffs' allegations involving Mahan Air also fail to plausibly allege the requisite causal link between SCB's conduct and Plaintiffs' injuries.  Plaintiffs allege that, between 2000 and 2006, SCB provided banking services in LC transactions through which Mahan Air purchased aircraft and aircraft parts.  *See* SAC ¶¶ 685-712.  Plaintiffs further allege that, five years later, Mahan Air was identified by the U.S. government as having transported weapons, personnel and technology for terrorist groups.  *See id.* ¶ 686.  Plaintiffs do not allege that Mahan Air engaged in such activity at the time of the LC transactions, nor do they allege that the aircraft and aircraft parts purchased through the LCs were used to transport weapons or terrorists, much less weapons or terrorists involved in the attacks that injured Plaintiffs.  *See id.* ¶¶ 685-712.  As a result, Plaintiffs do not allege any actual connection between SCB's conduct and the terrorist acts that injured Plaintiffs or the terrorist organizations that funded or perpetrated those acts.  *See Rothstein*, 708 F.3d at 97 (2d Cir. 2013); *Al Rajhi*, 714 F.3d at 124.

---

[7] *See Sistrunk* v. *Dake Corp.*, No. 13-2983, 2015 WL 4164910, at *1 (E.D. La. July 9, 2015) (noting that a "generic hydraulic press . . . can be used for a number of purposes"); *TDY Holdings, LLC* v. *United States*, 122 F. Supp. 3d 998, 1009 (S.D. Cal. 2015) (noting use of hydraulic presses by aeronautical products manufacturer); *Mike Vaughn Custom Sports, Inc.* v. *Piku*, 15 F. Supp. 3d 735, 742 (E.D. Mich. 2014) (noting use of a hydraulic press to manufacture hockey equipment); Schuler AG, *The Entire World of Metal Forming*, at 15-21 (2014/2015), *available at* http://bit.ly/2cHyUJw (describing the "wide range of applications" of hydraulic presses, including the production of stainless steel sinks and automotive parts).

[8] The Promontory report upon which Plaintiffs base their claims makes no connection between the electromotors and EFPs or other terrorist weapons or activity.  *See* SAC Ex. A.

-8-

Plaintiffs' allegations involving Zener Electronics similarly fail to plausibly allege proximate cause. Plaintiffs allege that Zener Electronics was identified by the U.S. Commerce Department as supporting foreign terrorist organizations in 2014. *See* SAC ¶ 802 n.53. But the alleged LC transactions in which Zener Electronics was an indirect beneficiary occurred a decade earlier between 2003 and 2004. *See id.* ¶ 802. Plaintiffs do not allege that Zener Electronics supported terrorists at the time of the LC transactions, nor do they allege that the unspecified "U.S. goods" for which the LCs were issued or the funds transferred to Zener Electronics in connection with the LCs were provided to or used to support terrorists organizations. *See id.* ¶¶ 802-09. Like the allegations concerning Mahan Air, the allegations involving Zener Electronics fail to plausibly allege the requisite causal link. *See Rothstein*, 708 F.3d at 97; *Al Rajhi*, 714 F.3d at 124.[9]

For these reasons, as well as those outlined in the Joint Memorandum, Plaintiffs have failed to allege that SCB's conduct was a proximate cause of Plaintiffs' injuries, and Plaintiffs' claims against SCB must therefore be dismissed.

## II.   SECTION 2333 DOES NOT PERMIT CONSPIRACY-BASED CIVIL LIABILITY

The new claim asserted against SCB based on the LC allegations must also be dismissed on the independent ground that—like all of the other claims asserted in the SAC—it is premised on a conspiracy theory of liability. *See, e.g.*, SAC ¶¶ 683, 710, 711, 749, 772, 774, 836, 837. Indeed, the SAC's allegations concerning LC transactions appear under the heading, "Defendant Standard Chartered Bank's Agreement To, And Participation In, the Conspiracy."

---

[9] Plaintiffs' suggestion that the true nature of SCB's involvement in LC transactions might have been more extensive than what the SAC actually alleges, *see, e.g.*, SAC ¶¶ 673 n.31, 859-60, 866, is wholly speculative and plainly insufficient to survive dismissal. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) ("'naked assertion[s]' devoid of 'further factual enhancement'" are insufficient to state a claim) (quoting *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 557 (2007)).

*See id.* ¶¶ 673-838. And as demonstrated in the Joint Memorandum the ATA does not permit conspiracy-based civil liability. *See* Joint Memorandum at 24-27.[10]

Plaintiffs' last-ditch, conclusory assertions of primary liability in their Claims for Relief against SCB, *see* SAC ¶¶ 2197, 2214, 2251, 2291, are insufficient to circumvent *Rothstein*, particularly when the entirety of the SAC is expressly grounded in a theory of conspiracy. Plaintiffs assert—in a wholly conclusory fashion—that SCB's "conduct itself constitutes an act of international terrorism," *see*, *e.g.*, ¶ 2291, but allege no facts to support such an allegation. As observed by the court in *Stutts*, "[t]he plain language of the ATA compels the conclusion that, by engaging in commercial banking activity [involving the issuance of LCs], the Bank Defendants were not involved in 'violent acts or acts dangerous to human life.'" 2006 WL 1867060, at *2; *see* 18 U.S.C. § 2331.

## CONCLUSION

For the foregoing reasons, SCB respectfully submits that Plaintiffs' claims against SCB should be dismissed with prejudice.

Dated: September 14, 2016
       New York, New York

Respectfully submitted,

 /s/ Sharon L. Nelles
Sharon L. Nelles (*nelless@sullcrom.com*)
Bradley P. Smith (*smithbr@sullcrom.com*)
John C. Quinn (*quinnjc@sullcrom.com*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel for Standard Chartered Bank*

---

[10] Because civil conspiracy liability is not a cognizable claim under the ATA, SCB does not address the SAC's failure to adequately allege a conspiracy claim or any other conduct satisfying the requirements of 18 U.S.C. § 2339(A), (B), (C) or 18 U.S.C. § 2332d.