OSEN LLC
ATTORNEYS AT LAW
WWW.OSENLAW.COM

2 UNIVERSITY PLAZA, SUITE 402, HACKENSACK, NJ 07601      420 LEXINGTON AVENUE, SUITE 1648, NEW YORK, NY 10170
T. 201.265.6400   F. 201.265.0303                                            T.212.354.0111

February 22, 2018

**VIA ECF**

Honorable Cheryl L. Pollak
United States Magistrate Judge
United States District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:    *Freeman, et al. v. HSBC Holdings plc, et al.*, 14-cv-6601 (DLI)(CLP)

Dear Judge Pollak:

    Plaintiffs write in response to Defendants' February 15, 2018 letter ("Letter") attaching the recent decision in *Linde v. Arab Bank, PLC*, No. 16-2119-cv (L), 2018 WL 797454 (2d Cir. Feb. 9, 2018), vacating the lower court's entry of judgment following a jury verdict. In *Linde*, the Court of Appeals confirmed both the availability of primary liability with the character of secondary liability under 18 U.S.C. § 2333(a) of the Anti-Terrorism Act and of secondary liability under § 2333(d). It also confirmed that plaintiffs need not plead either that defendant itself committed or intended to commit an act of international terrorism to prove a § 2333(d) claim.

    It then vacated and remanded for two reasons. First, it held that the questions of whether the defendant's acts of material support involved violent acts or acts dangerous to human life and whether those acts appeared to have the purposes listed in § 2331(1)(B) were fact questions for the jury separate from the question of whether the defendant knowingly violated 18 U.S.C. § 2339B. Second, it held that it could not decide as a matter of law that the jury's finding that Arab Bank knowingly violated § 2339B *necessarily* satisfied the elements of a § 2333(d) claim.[1] Nonetheless, Defendants argue that this Court should construe *Linde* to mean that, as a matter of law, they have not committed acts of international terrorism, and that they were not generally aware of their role in funding terrorist activities. These fact questions cannot be decided on a motion to dismiss.

    Defendants' Letter is erroneous in this and several further respects.

    *First*, the Court of Appeals expressly held that "[w]e conclude *only* that providing routine financial services to members and associates of terrorist organizations is not so akin to providing

---

[1] Section 2333(d) was enacted after the verdict in that case. Accordingly, the trial court did not instruct the jury on this claim. The Second Circuit analyzed the element of § 2333(d) purely to determine whether the failure to separately instruct the jury concerning § 2331(1)(B) was harmless error.

a loaded gun to a child as to excuse the charging error here *and compel a finding that as a matter of law*" the services constituted an act of international terrorism. *Linde* at *9 (emphasis added). The Second Circuit did not hold that plaintiffs' pleadings were insufficient, or that a jury could not find that Arab Bank's knowing provision of material support to Hamas (as the jury found) satisfied the § 2331 elements; only that the jury should have been separately instructed on those elements. The *Freeman* Plaintiffs have made hundreds of detailed allegations showing that the hundreds of billions of dollars that Defendants knowingly laundered for Iran, its state-owned banks,[2] the Islamic Revolutionary Guard Corps ("IRGC"), and other designated entities in violation of terrorism sanctions are acts dangerous to human life. Whether they are, and whether they would appear to be intended to have the purposes listed in § 2331(1)(B),[3] is a jury question (if Plaintiffs prove that Defendants knowingly violated §§ 2339A or 2339B).

*Second,* far from supporting Defendants' repeated argument that there is no *form* of secondary liability via incorporation of the material support statutes under the ATA except under the newly enacted § 2333(d), Letter at 2, the Court of Appeals opinion is predicated on the availability of *both* primary liability with the character of secondary liability, and secondary liability under § 2333(d). Plaintiffs have *never* argued that common law secondary liability was previously available under the ATA. But as the Second Circuit has once again confirmed, a civil ATA action may be predicated on a violation of one of the material support statutes (§§ 2339A or 2339B). In fact, it is solely because *Linde* involved a claim predicated on Arab Bank's violation of § 2339B that the court needed to assess the application of § 2331 to the jury instruction.

*Third,* Defendants mischaracterize the *Linde* court's reading of JASTA. In considering whether JASTA rendered the instructional error harmless, the Second Circuit confirmed that "plaintiffs are entitled to the benefits of JASTA's expansion of the ATA liability to aiders and abettors," that the controlling legal framework is supplied by *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), and that "under an aiding and abetting theory of ATA liability, plaintiffs would not have to prove that the bank's own acts constitute international terrorism satisfying all the definitional requirements of § 2331(1)." *Linde*, 2018 WL 797454, at *11. However, it then held that "in the absence of any aiding and abetting charge here, we cannot conclude that Arab Bank's secondary liability on that theory *was proved as a matter of law*." *Id.* at *10 (emphasis added). It reached the same conclusion regarding the Defendant's "substantial assistance" to Hamas: "even if a properly charged jury could conclude that Arab Bank's financial services provided substantial assistance to Hamas's murderous activities so as to support aiding and abetting liability, we cannot conclude *that such a finding is compelled as a matter of law . . . .*" *Id.* at *11 (emphasis added).

---

[2] Defendants call them "Iranian commercial banks," Letter at 2, eliding the fact that each was designated for its role in the conspiracy: transferring hundreds of millions of dollar-denominated assets ("Eurodollars") to Iran's terror agents, the Islamic Revolutionary Guard Corps and Hezbollah. For instance, Bank Saderat was designated a Specially Designated Global Terrorist ("SDGT") and Bank Melli was designated a Specially Designated National. *See, e.g.*, Complaint ¶¶ 17-18, 27, 163, 357, 385-87, 419-23.

[3] In addition to these hundreds of allegations, see also Complaint ¶ 2195, 2212, 2236, 2250, 2260, 2270, 2290 (specifically alleging that Defendants' acts were dangerous to human life), and ¶¶ 2197, 2214, 2238, 2251, 2261, 2271, 2291 (specifically alleging that Defendants' acts appeared to be intended to have the purposes listed in § 2331(1)(B)).

Yet again, Defendants urge this Court to decide *as a matter of law* that they all lacked the scienter necessary for a § 2333(d) claim, and that none of them conspired with entities that committed the attacks at issue.

Here, as a pleading matter, Plaintiffs' claims are supported by hundreds of allegations showing (1) that a Foreign Terrorist Organization ("FTO") "committed, planned, or authorized" the attacks at issue and (2) that Defendants conspired with persons who committed those attacks. *See* 18 U.S.C. § 2333(d). The FTO (Hezbollah) established, trained, and supplied the Iraqi Special Group cells with, and on behalf of, Iran and the IRGC, supplying, funding, training, ordering and authorizing them to commit attacks against Americans. *See, e.g.*, Complaint ¶¶ 226-58. *See also* Complaint ¶¶ 302-22 (describing the FTO Kata'ib Hezbollah). Hezbollah also directly planned attacks. For instance, the operative complaint alleges in detail how Hezbollah planned the coordinated terrorist attack on the Provincial Joint Coordination Center in Karbala, Iraq, resulting in the deaths and injuries of several Plaintiffs. Complaint ¶¶ 1041-80.

Plaintiffs' allegations also show that Defendants conspired with Iran and its agents[4] to provide or conceal the provision of material support to terrorism (i.e., agreeing to evade terrorism sanctions knowing or consciously disregarding that Iran's and the Iranian banks' objective was to provide and conceal the provision of material support for terrorism), and that the Conspiracy foreseeably resulted in the IRGC (*i.e.* Iran) and Hezbollah committing each of the attacks at issue.

The Complaint alleges in detail that following the 2003 U.S. overthrow of Saddam Hussein, Iran, operating through the IRGC and Hezbollah, initiated a campaign of attacking American and allied forces in Iraq. *See e.g.*, Complaint ¶¶ 47, 233-41. To attack American forces, Iran employed several means, including deploying a signature weapon, the Explosively Formed Penetrator ("EFP"), which Iran and Hezbollah jointly designed and which was capable of punching through American (and, previously, Israeli) vehicular armor. Complaint ¶¶ 36-39, 47, 259-81. Iran manufactured EFPs and smuggled them into Iraq via various means, including via IRGC and Hezbollah operatives (co-conspirator and SDGT Mahan Air also smuggled IRGC and Hezbollah operatives, along with money and weapons, into Iraq), Complaint ¶¶ 19-21, 232, 251, 271-76, 677-78, 709, 1073, 2277. Iran, operating through the IRGC and Hezbollah, supplied local terror cells with EFPs and trained them in their use, along with other advanced tactics for targeting American forces. *See, e.g.*, Complaint ¶¶ 16, 112, 226-58, 282-329. Iran and the IRGC are not excused from committing these attacks on American forces by interposing local agents to pull the trigger. These detailed allegations, which Defendants again call "conclusory," Letter at 3, are supported by Defendants' admissions in deferred prosecution agreements and findings issued by the American and British governments, as well as official statements by U.S. military leadership.

---

[4] Defendants not only participated in a conspiracy designed to transfer dollar-denominated assets to co-conspirator IRGC, itself an SDGT, Complaint ¶¶ 23, 346, 357, 422-23, Defendants also performed hundreds of transactions directly for several IRGC fronts and agents, including Mahan Air (also an SDGT), IRISL, and NIOC (a designated agent of the IRGC), including over 150 transactions for IRISL *after* it was designated for shipping weapons destined for Hezbollah. *See, e.g.*, Complaint ¶¶ 19-25, 41, 197-225, 360, 375, 400-07, 433-36, 505 n.27, 516, 568, 624, 671-838, 868, 918, 984, 1012-38, 2255, 2281.

*Fourth*, Defendants further mischaracterize *Linde* as requiring proof that aiders and abettors "were aware of their purported role *in the terrorist attacks*." Letter at 4 (emphasis added). *Halberstam* requires proof only that an aider and abettor was "generally aware of his role as part of an overall illegal or tortious activity at the time that he provides assistance." *Halberstam*, 705 F.2d at 477. *See also Linde*, 2018 WL 797454, at *11 ("awareness [does not] require proof that Arab Bank knew of the specific attacks at issue when it provided financial services for Hamas"). The *Halberstam* court, in upholding a finding that defendant was liable as an aider and abettor to her boyfriend's murder of plaintiff's decedent, did *not* require that defendant be aware of her role in the *murder*, only that she be aware of her role (acting "as banker, bookkeeper, recordkeeper, and secretary") in assisting her boyfriend's criminal acts, knowing only that "he was involved in some type of personal property crime at night," from which a murder foreseeably resulted. 705 F.3d at 488-89 ("violence and killing is a foreseeable risk" in the aided enterprises).

Plaintiffs have plausibly alleged that because Defendants knew that Iran, the world's foremost state sponsor of terrorism, sought and employed their assistance in circumventing terrorism sanctions, Defendants were "generally aware" that they played a significant role in Iran's material support of terrorism, and that acts of terrorism would foreseeably result. *See, e.g.*, Complaint ¶¶ 28, 344-50, 364-68, 380-87, 429, 510, 518-22, 528, 636-43, 657-66, 907 (describing defendants' "aware[ness]" of their role and the role of co-conspirators in a scheme to evade sanctions and provide funds for Iranian terrorism, including transactions with already-designated entities and emails from Defendants discussing terror financing concerns). As the U.S. National Security Advisor, Lt. Gen. H. R. McMaster, recently told the Munich Security Conference: "When you invest in Iran, you're investing in the IRGC. You might as well cut the Islamic Revolutionary Guard Corps a check and say, 'please use this to commit more murder across the Middle East.'"[5] This is especially true of transactions illegally performed in circumvention of the pre-2008 safe harbor provision known as the U-turn Exemption, which once permitted Iran to transfer dollar-denominated assets for what was expected to be *legitimate* purposes. *See* Pls.' Opp., ECF No. 125, at 5, 9.

Finally, Plaintiffs' Fifth through Seventh Claims for Relief each plausibly allege that Defendants Commerzbank AG or Standard Chartered Bank aided and abetted Iran's, the IRGC's and/or Hezbollah's acts of terrorism under § 2333(d) (and are themselves acts of international terrorism under § 2333(a)).[6]

---

[5] Jill Aitoro, *McMaster to allies: Track your investments and stop funding Iran's proxy militias*, Defense News (Feb. 17, 2018) https://www.defensenews.com/smr/munich-security-forum/2018/02/17/mcmaster-to-allies-track-your-investments-and-stop-funding-irans-proxy-militias/.

[6] In addition, as Plaintiffs pointed out in their opposition to Defendants' motions to dismiss, Plaintiffs' First and Second Claims for Relief, premised on §§ 2339A and 2339B criminal conspiracies, are also cognizable as *civil* conspiracies under JASTA. ECF No. 125 at 3, which operate slightly differently than criminal conspiracies. *See, e.g.*, *Halberstam*, 705 F.2d at 477 ("the agreement in a civil conspiracy does not assume the same importance it does in a criminal action"). As in *Halberstam*, Defendants "agreed to participate in an unlawful course of action" and the terrorist attacks that injured Plaintiffs were "reasonably foreseeable consequence[s] of the scheme . . . ." *Id.* at 487.

**Hon. Cheryl L. Pollak, U.S.M.J.**
**February 22, 2018**
**Page 5 of 5**

      For the reasons set forth here and in the prior briefing in this case, Defendants' motions should be denied in their entirety.

                                               Respectfully submitted,

                                               /s/ Gary M. Osen

cc:      Chief Judge Irizarry
          All Counsel