UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CHARLOTTE FREEMAN *et al.*,

                    Plaintiffs,

              -against-

HSBC HOLDINGS PLC, HSBC BANK PLC,
HSBC BANK MIDDLE EAST LTD, HSBC
BANK USA, N.A., BARCLAYS BANK PLC,
STANDARD CHARTERED BANK, ROYAL
BANK OF SCOTLAND, N.V., CREDIT SUISSE
AG, BANK SADERAT PLC, COMMERZBANK
AG, AND JOHN DOES 1-50,

                    Defendants.
------------------------------------------------------------X

                                              **REPORT AND**
                                              <u>**RECOMMENDATION**</u>
                                              14 CV 6601 (DLI) (CLP)

**POLLAK,** United States Magistrate Judge:

       On November 10, 2014, plaintiffs, a group of American nationals and/or their families,

commenced this action pursuant to the Antiterrorism Act (the "ATA"), 18 U.S.C. § 2333, against

ten banking institutions, HSBC Holdings, PLC, HSBC Bank PLC, HSBC Bank Middle East Ltd,

HSBC Bank USA, N.A. (collectively, "HSBC" or the "HSBC defendants"), Barclays Bank PLC

("Barclays"), Standard Chartered Bank ("Standard Chartered" or "SCB"), Royal Bank of

Scotland, N.V. ("RBS" or "ABN"), Credit Suisse AG ("Credit Suisse"), Bank Saderat PLC

("Bank Saderat"), and Commerzbank AG ("Commerzbank"), and John Does 1-50, seeking

damages for injuries suffered in Iraq between 2004 and 2011 as a result of terrorist attacks.

(SAC[1]).  On April 2, 2015, plaintiffs filed their first Amended Complaint.  Following the filing

of defendants' motions to dismiss in May 2015, plaintiffs filed their Second Amended Complaint

---

[1] Citations to "SAC" refer to plaintiffs' corrected Second Amended Complaint, filed August 17, 2016.

on July 10, 2016.  On August 17, 2016, the plaintiffs filed a corrected Second Amended

Complaint, which is the operative pleading at issue in this Report and Recommendation.

On November 10, 2016, defendant Bank Saderat, an Iranian Bank, filed a motion to

dismiss the Second Amended Complaint based on: (1) the Act of War limitation to the ATA; (2)

lack of personal jurisdiction; (3) failure to establish proximate cause; and (4) failure to

demonstrate that Bank Saderat had the requisite scienter to be held liable under the ATA.

On that same date, November 10, 2016, the HSBC defendants, along with Barclays,

Standard Chartered, RBS, Credit Suisse and Commerzbank (the "Moving defendants") filed a

motion pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the Second Amended

Complaint on several grounds:  (1) there is no conspiracy-based liability under 18 U.S.C. § 2333;

(2) plaintiffs have failed to allege a plausible claim under the Antiterrorism Act because they

failed to allege facts showing proximate cause between their actions and the plaintiffs' injuries;

and (3) the Second Amended Complaint fails to allege that the U.S. branches of the non-U.S.

Moving defendant banks are "United States person[s]" or that they engaged in a financial

transaction with the government of Iran under 18 U.S.C. § 2332d.

On July 11, 2017, the motions to dismiss were referred to the undersigned to prepare a

Report and Recommendation.

For the reasons set forth below, the Court respectfully recommends that the Moving

defendants' motion to dismiss be denied, and that Bank Saderat's motion to dismiss be denied.


PRELIMINARY SUMMARY OF CLAIMS

As described in detail _infra_, plaintiffs allege that the defendant banks conspired with the

Islamic Republic of Iran ("Iran") and agents or proxies of Iran to provide material support for

terrorism.  Plaintiffs allege that the defendant banks conspired to evade U.S. economic sanctions and arms embargo, conduct illicit trade-finance transactions, and disguise financial payments to and from U.S. dollar denominated accounts, knowing or being deliberately indifferent to the fact that some of the funds would be used to finance the development by Iran and others of Improvised Explosive Devices ("IEDs")[2], which were supplied to various terrorist organizations[3] for the purpose of killing or maiming American citizens serving as part of the Coalition Forces in Iraq from 2004 to 2011.[4]  (SAC ¶¶ 6-9).

I.    Iran as a State Sponsor of Terrorism

As a background to the alleged conspiracy, on January 19, 1984, Iran was designated by the United States as a State Sponsor of Terrorism, pursuant to Section 6(j) of the Export Administration Act, Section 40 of the Arms Export Control Act, and Section 620 of the Foreign Assistance Act.  (Id. ¶¶ 10, 337).  In 1996, following a truck bombing in Saudi Arabia, Congress passed the Iran-Libya Sanctions Act, which among other things, was designed to prevent acts of international terrorism, through efforts "to deny Iran the financial means" to sustain its various weapons programs.  (Id. ¶ 107) (quoting the Iran-Libya Sanctions Act).  During this time, "banks [with] international operations or relationships with correspondent banks [had] a duty, based on

_____

[2] Plaintiffs allege that Iran's signature IED, known as an Explosively Formed Penetrator ("EFP"), is a "shaped charge, usually made with a manufactured concave copper disc and a high explosive packed behind the liner."  (Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Second Amended Complaint, filed November 10, 2016, ECF No. 117 ("Pls.' Mem.") at 1, n.2.  Plaintiffs allege that the EFPs, which are deemed "weapons of mass destruction" under the ATA, 18 U.S.C. § 2332a(c)(2)(A), were not produced in Iraq but were manufactured by Hezbollah and the Islamic Revolutionary Guard Corp. ("IRGC") for the specific purpose of targeting American and Coalition Forces' armored vehicles "with lethal results." (Id.)  (See also SAC ¶¶ 259-79).

[3] Plaintiffs allege in some detail Iran's connections with various terror groups, including the Badr Corps, the Jaysh al Mahdi, and Asa'ib Ahl Al-Haq.  (Id. ¶¶ 282-93, 294-301, 323-29).  (See discussion about Hezbollah and other terrorist entities infra at 6-11).

[4] The Court notes that the plaintiffs also include non-military members, such as Steven Vincent, a reporter reporting on the Iraq War, and translator Ahmed Al-Taie.  (Id. ¶¶ 1232-40, 1388-1400).

international banking norms, to adopt know-your-customer ("KYC"), anti-money laundering ("ATL") and anti-terrorist financing ("ATF") standards, as defined by and enforced by the Financial Action Task Force ("FATF") and its supporting governments."  Weiss v. National Westminster Bank PLC, 453 F. Supp. 2d 609, 619 (E.D.N.Y. 2006).[5]  HSBC, Barclays, SCB, and RBS are all banks headquartered in the United Kingdom, which is a participant in the FATF; therefore, all of these defendants were subject to the standards set by the FATF.  Id. (noting that "NatWest[] is a financial institution with its principal place of business in London. . . .It is part of the Royal Bank of Scotland Group," and was "bound by these standards").  Germany and Switzerland are also members of the FATF, for purposes of Commerzbank's and Credit Suisse's obligations at that time.[6]

The regulations issued by FATF "include a due diligence obligation to monitor publicly accessible information relating to 'high risk' customers[]."  Id.  In April 2002, an FATF report was issued, entitled "Guidance for Financial Institutions in Detecting Terrorist Financing."  Id.  The report advised that regardless of whether funds in a transaction "are related to terrorists for the purposes of national criminal legislation, business relationships with such individuals or other closely associated persons or entities could, under certain circumstances, expose . . . financial institutions to significant reputational, operational, and legal risk."  Id.

To ensure that U.S. financial institutions did not assist Iran in support of its weapons proliferation and acts of international terrorism, banks were required to use certain computer

---

[5] The Court takes judicial notice of the facts set forth in Weiss v. National Westminster Bank PLC, as well as other cases that relate to the same defendants and their actions during the time period at issue here.  (See discussion infra).  At the 12(b)(6) stage, the district court may properly consider "matters of which judicial notice may be taken, or documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit."  Halebian v. Berv, 644 F.3d 122, 131 (2d Cir. 2011).

[6] FATF, Members and Observers, http://www.fatf-gafi.org/about/membersandobservers/ (last visited June 26, 2018).

systems and software to screen and monitor wire transfers. (SAC ¶ 108). According to plaintiffs, defendants were briefed by the U.S. government "about the dangers posed (in terms of both weapons proliferation and terror financing) in conducting business with Iran," and RBS, Barclays, Credit Suisse, and HSBC all endorsed transparency measures beginning in April 2007. (Id. ¶¶ 31, 32, 33, 519).

At the same time, because the Iranian Rial was one of the least valued currencies in the world, Iran was dependent on access to U.S. dollars to facilitate trade and to "fuel its other terrorism . . . activities." (Id. ¶¶ 110-13). Over the years, additional executive orders have been issued prohibiting U.S. involvement in petroleum production in Iran and tightening sanctions, such that virtually all trade and investment activities with Iran by United States persons were prohibited during the time period of the SAC. (Id. ¶¶ 114-17). In addition to various efforts by law enforcement and intelligence agencies to thwart Iranian efforts to circumvent U.S. economic sanctions and embargo, the Treasury Department and Commerce Department blacklisted Iranian front companies and middlemen believed to be complicit in the efforts to avoid U.S. sanctions. (Id. ¶¶ 121-22).

The Second Amended Complaint alleges that Iran's objectives – to develop weapons of mass destruction – "were not secret," and, indeed, the U.S. Treasury and State Department launched a campaign in September 2006 to warn 40 major international banks and financial institutions about the risks of conducting business with Iran. (Id. ¶¶ 28, 30). Plaintiffs claim that defendants Standard Chartered, Commerzbank and HSBC were briefed at that time about these risks of terror financing in conducting business in Iran. (Id. ¶ 31). Defendants RBS, Barclays, Credit Suisse and HSBC were also alleged to have been part of the Wolfsberg Group, an association of global banks that issued a statement in 2007, endorsing certain measures to

promote transparency in financial transactions and to increase the effectiveness of global anti-money laundering and anti-terrorist financing programs.  (Id. ¶¶ 32-33).  The Wolfsberg Principles for the Suppression of Terror Financing committed the banks to "implement 'procedures for consulting applicable lists and taking reasonable and practicable steps to determine whether a person involved in a prospective or existing business relationship appears on such a list.'"  Weiss v. National Westminster Bank PLC, 453 F. Supp. 2d at 619, 626-27.

Plaintiffs further maintain that "'Iran's role in funding 'militant groups that target and kill Coalition and Iraqi forces and innocent civilians' was a matter of public record."  (SAC ¶ 35).  In support of this allegation, plaintiffs cite multiple news reports from the BBC in 2005 and 2006 discussing Iran's assistance in supplying weapons and technology to Shi'a extremist groups, and a report from CNN in September 2008 that Iran had provided Shi'a militias in Iraq with "millions of dollars" in funding as well as high-grade military explosives and military equipment.  (Id. ¶¶ 36-39).  Plaintiffs assert that each of the defendants knew that Iran had been designated a State Sponsor of Terrorism by the United States; each took affirmative steps to assist Iran and its agents in "clandestinely routing billions of dollars through the United States to hide its unlawful conduct;" and each knew or was deliberately indifferent to "the well-publicized fact that Iran and its terror proxies were killing and maiming American civilians and servicemen in Iraq and that U.S. nationals would foreseeably be injured or killed as a result of the substantial assistance those dollars provided to the IRGC and Hezbollah."  (Id. ¶¶ 42-44).

II.    Hezbollah and Terror Proxies in Iran

As will be discussed at length below, plaintiffs allege that Hezbollah is a major component of the Iranian terrorism apparatus, and that Hezbollah is Iran's "proxy, agent, and

strategic partner." (Id. ¶¶ 226, 227).  Hezbollah is a Shi'a Islamist militant group and political

party based in Lebanon, and plaintiffs allege that the EFPs used to kill or injure U.S. forces and

other civilians during the time period covered by the Second Amended Complaint were first used

by Hezbollah against Israeli armor in Lebanon.  (Id. ¶ 261).  In 1995, the United States

designated Hezbollah a Specially Designated Terrorist ("SDT"), and in 1997, Hezbollah was

designated a Foreign Terrorist Organization ("FTO"), as defined by 8 U.S.C. § 1189 of the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").[7]  (Id. ¶ 229).  Plaintiffs

contend that, during the time period of the Second Amended Complaint, Hezbollah helped Iran

to arm, train, and fund a variety of groups "in an effort to kill or maim Coalition Forces to coerce

the United States into withdrawing those forces and to terrorize Iraq's civilian population in

order to increase Iran's own influence."  (Id. ¶ 258).

 Hezbollah is alleged to have operated through multiple proxies, some of which are

controlled by the Iranian state.

---

[7] As discussed infra, 8 U.S.C. § 1189 empowers the Secretary of State to designate a Foreign Terrorist
Organization based on certain findings, including that the organization engages in terrorist activity which threatens
the security of United States nationals or the national security of the United States.  8 U.S.C. § 1189.

A. MODAFL

The MODAFL, an acronym for the Iranian Ministry of Defense and Armed Forces Logistics, is the "principal procurement arm of Iran's military and terror apparatus." (Id. ¶ 679). In October 2007, the United States designated MODAFL as a Specially Designated National, or SDN.[8] (Id. ¶ 12).[9] Previously, in November 2000, the U.S. government found that MODAFL "control[s] the [Iranian] Defense Industries Organization," which was sanctioned under the Arms Export Control Act and Export Administration Act "for its involvement in missile technology proliferation activities." (Id. ¶ 13). As described below, the IRGC-QF uses MODAFL to both "procure and develop weapons and equipment for its use." (Id. ¶ 15).

B. IRGC and IRGC-QF

The Islamic Revolutionary Guard Corp, or IRGC, is a subordinate directorate of the MODAFL. (Id. ¶¶ 14-15). Plaintiffs allege that, during the time period of the Second Amended Complaint, the IRGC directed different groups to "create disorder" by "attack[ing] bases of Coalition Forces" in southern Iraq. (Id. ¶ 257) (emphasis omitted).

The IRGC-QF, also known as the Qods Force, is a "special branch" of the IRGC. (Id. ¶ 270). The IRGC-QF was designated as a Specially Designated Global Terrorist ("SDGT")[10] in

---

[8] An "SDN" is designated by the United States Treasury Department pursuant to Executive Order 13382. The Office of Foreign Assets Control, "OFAC," administers and enforces economic sanctions program against SDNs and others. "SDN" refers to individuals and companies "owned or controlled by, or acting for or on behalf of, targeted countries," and also "lists individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific." Resource Center, United States Department of the Treasury (2018), https://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx (last visited July 17, 2018). "SDN," then, is an umbrella term to include sanctioned entities, including SDGTs. (See n.10, infra).

[9] See Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism, United States Department of the Treasury (2007), https://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx (last visited July 3, 2018).

[10] The United States Department of the Treasury designates SDGTs pursuant to Executive Order 13224 of September 23, 2001. See 31 C.F.R. § 594.310 ("The term specially designated global terrorist or SDGT means any person whose property and interests in property are blocked pursuant to § 594.201(a)") (referring to entities listed in

October 2007 for its long history of supporting terrorist activities by Hezbollah, operating training camps and supplying guidance, funding, weapons, intelligence and logistical support. (Id. ¶¶ 16, 249-50).  Additionally, the Treasury report designation of IRGC-QF as an SDGT specifically linked the group to "select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians."  (Id. ¶ 16) (emphasis omitted).

   C. IRISL

   The Islamic Republic of Iran Shipping Lines, or IRISL, is Iran's state-owned shipping line that plaintiffs allege has "a long history of facilitating arms shipments on behalf of the IRGC and the Iranian military, including copper disks that are a key component in EFPs[.]"  (Id. ¶¶ 22, 50-51, 197, 208-09; see also Pls.' Mem. at 20).  In 2007, a diplomatic cable from the State Department noted concern over IRISL shipments of Chinese arms to Iran "particularly given Iran's clear policy of providing arms and other support to Iraqi insurgents and terrorist groups like the Taliban and Hezbollah. . . ."  (Id. ¶ 198).  The cable referred specifically to an "IRISL-flagged vessel" loaded at a Chinese port with cartridges to be used in AK-47 assault rifles, and stated that "[w]e have specific information that Chinese weapons and components for weapons transferred to Iran are being used against U.S. and Coalition Forces in Iraq, which is a grave U.S. concern."  (Id. ¶¶ 198-99).

   On September 10, 2008, IRISL and several IRISL subsidiaries, including IRISL Europe GmbH, were designated by the United States as SDNs.  (Id. ¶¶ 203, 1035).  The designations

_____

the Annex of the Executive Order).  This designation allows for the United States to block property and prohibit transactions with the designated entity.  See id.  While every designation is accompanied by a specific set of factual findings as to the entity's actions (see discussion infra), Executive Order 13224 itself makes a finding of a "need . . . for further consultation and cooperation with, and sharing of information by, United States and foreign financial institutions as an additional tool to enable the United States to combat the financing of terrorism."  See 31 C.F.R. § 594.310.

were based on evidence that the IRISL network had engaged in the proliferation of weapons of mass destruction and had undertaken "new strategies which could afford it the potential to evade future detection of military shipments." (Id. ¶ 1035). Plaintiffs allege that some of these shipments provided key components of EFPs used by Hezbollah. (Id. ¶¶ 50-51, 197-98).

### D. NIOC

The National Iranian Oil Company, or "NIOC," has been identified as an agent of the IRGC and was designated as an SDN in 2008. (Id. ¶ 152).[11] Plaintiffs claim that NIOC used its own helicopters to conduct surveillance on bases occupied by Coalition Forces along the Iranian border. (Id. ¶ 403). The Iran Threat Reduction and Syria Human Rights Act of 2012 reflects Congress' belief that NIOC "'provide[s] significant support to Iran's Revolutionary Guard Corps and its affiliates.'" (Id. ¶ 402).

### E. Mahan Air

According to the U.S. Treasury Department, Mahan Air, a privately operated Iranian airline, facilitated the covert transport of IRGC-QF officers into and out of Iraq by bypassing normal security procedures and not including certain information on flight manifests so as to eliminate any record of the IRGC travel. (Id. ¶ 686). In addition, Mahan Air is alleged to have transported arms shipments on behalf of the IRGC-QF, and has also been identified as the

---

[11] Plaintiffs do not specify the date that NIOC was added to the SDN list. The Court takes judicial notice, however, that NIOC was apparently designated as an SDN in 2008. See OFAC Changes to List of Specially Designated Nationals and Blocked Persons Since January 1, 2008, United States Department of the Treasury (2008), https://www.treasury.gov/resource-center/sanctions/SDN-List/Documents/sdnew08.pdf (last visited July 17, 2018). Plaintiffs note that this designation was removed in January 2016 (see SAC ¶ 152 n.14), when President Obama signed the Joint Comprehensive Plan of Action ("JCPOA"). The Court further notes that, as of the date of this Report and Recommendation, President Trump has announced his plan to re-impose sanctions on Iran and Iranian entities. (See also n.75 infra (describing history of NIOC's designation)).

conduit for radio frequency modules recovered from IED devices used to target the Coalition Forces in Iraq. (Id. ¶ 678). The Treasury Department's 2011 notice designating Mahan Air as an SDGT indicated that "Mahan Air also provides transportation services to Hezbollah [sic], a Lebanon-based designated Foreign Terrorist Organization. [] Mahan Air has transported personnel, weapons, and goods on behalf of Hezbollah [sic] and omitted from Mahan Air cargo manifests secret weapons shipments bound for Hezbollah [sic]." (Id. ¶ 20) (alterations in original). It is further claimed that Mahan Air facilitated arms shipments and transported radio frequency modules from Singapore to Tehran to be used in IED devices in Iraq. (Id. ¶¶ 686-90).

III.    The Means and Methods of the Conspiracy

According to the Second Amended Complaint, the global Eurodollar market involves a network of banks outside the United States that makes loans and accepts deposits denominated in U.S. dollars. (Id. ¶ 133). Nearly all U.S. dollar transactions initiated outside the United States are processed through correspondent banks located almost exclusively in New York. (Id. ¶ 138).

When the United States instituted economic sanctions against Iran, the government also designed the "U-Turn Exemption," which allowed Iran access to U.S. dollars provided the transactions were fully disclosed to U.S. correspondent banks and were to be used strictly for Iran's legitimate agencies and operations. (Id. ¶¶ 140-41). The exemption, which operated until November 2008,[12] allowed U.S. financial institutions to process funds transfers under certain conditions: the payments had to be initiated by a non-Iranian institution; they were passed through to a non-Iranian, non-U.S. financial institution; and none of the parties could have been

---

[12] As described infra, defendant Bank Saderat was excluded from the U-Turn Exemption nearly two years earlier, in 2006, due to its recognized ties to terrorist funding, and specifically to Hezbollah. (SAC ¶ 365).

designated as an SDN. (Id. ¶ 142). These U-Turn Exemption transactions were to be closely monitored through computer systems used by U.S. financial institutions. (Id. ¶ 145).

Plaintiffs allege that, despite the existence of a lawful means for transferring funds to Iran for legitimate purposes through the U-Turn Exemption, defendants knowingly and intentionally agreed to manipulate payment orders to defeat the computer monitoring systems in order for Iran and other SDNs to obtain funding for unlawful uses. (Id. ¶ 146). Plaintiffs cite to a U.S. government agency release noting that "'[b]y 2008 it was clear that [the U-Turn system] had been abused,'" and there was recognition at that point that U.S. national security could be compromised if the system was not discontinued. (Id. ¶¶ 163, 170).

As part of the alleged conspiracy, plaintiffs contend that, beginning in 1987 and continuing to the date of the Second Amended Complaint, the defendants participated in a scheme whereby they agreed to alter, falsify or omit information from bank to bank payment orders[13] in order to: (1) conceal Iran's dollar denominated financial activities and transactions from detection by U.S. regulators, law enforcement and depository institutions; (2) facilitate illicit transactions for the benefit of various terrorist organizations, including Hezbollah, the MODAFL, the IRGC, IRISL, and other instrumentalities of Iranian state sponsored terror; (3) enable these organizations to conceal Iran's efforts to evade U.S. sanctions and allow Iran to acquire goods and technologies prohibited by U.S. law for sale to Iran, and (4) enable Iran, Bank

---

[13] According to plaintiffs, banks utilize different forms of message types for their transactions. Message type 103 ("MT 103") payment orders disclose the originator, beneficiary, and counter-parties of the transaction, whereas MT 202 payment orders do not require the transmitting bank to include this information. (Id. ¶ 25(b)). As detailed infra, plaintiffs allege that the bank defendants intentionally converted MT 103 payment orders to MT 202 orders in order to conceal the true parties of the transaction.

Saderat,[14] and the various terrorist organizations, including Hezbollah, to perpetrate acts of international terrorism, as defined by various U.S. statutes.  (Id. ¶ 23(a)-(f)).

Specifically, plaintiffs allege that in order to circumvent U.S. economic sanctions and to facilitate and conceal the flow of U.S. dollars without detection by the United States, Iran enlisted several Iranian state owned banks (including Bank Saderat Iran, and described as the "Iranian Bank Co-conspirators"[15]), and various international financial institutions including the Moving defendants, to alter, falsify, or omit information from payment order messages involving Iran and Iranian parties.  (Id. ¶¶ 338-40).  Plaintiffs claim that each of the named defendants knowingly entered into this agreement with Iran or its agents, and knowingly and unlawfully agreed to engage in "stripping," whereby the banks would remove or alter identifying information on the payment messages sent through U.S. correspondent banks to ensure the transfer of hundreds of millions of dollars of U.S. dollar-denominated transactions on behalf of Iran, knowing that Iran was a U.S.-designated State Sponsor of Terrorism.  (Id. ¶¶ 342, 343). Plaintiffs maintain that, despite this knowledge of Iran's status as a sponsor and supporter of terrorist organizations and the laws requiring defendants to disclose all fund transfers through the United States on behalf of Iran, each of the defendants "knowingly agreed to join the Conspiracy, knowingly and willfully participated in the Conspiracy; knew or was deliberately indifferent to the Conspiracy's criminal purposes and objectives; took initiatives to improve its workings," and, further, that each was "aware of the participation of many (if not all) of [the Conspiracy's] members."  (Id. ¶¶ 347-49).

---

[14] As set forth more fully below, plaintiffs allege that Bank Saderat, along with its parent company Bank Saderat Iran, was designated a SDGT in October 2007 for its role in channeling funds from the Government of Iran to terrorist organizations, including Hezbollah and EU designated groups such as Hamas and the Palestinian Islamic Jihad.  (Id. ¶¶ 17, 18).

[15] Plaintiffs define the "Iranian Bank Co-conspirators" as including, but not limited to, Bank Saderat Iran, the Central Bank of Iran, Bank Melli Iran, and Bank Sepah.  (Id. ¶ 22; see also id. ¶ 339).

Plaintiffs maintain that defendants HSBC, Commerzbank, Standard Chartered, Barclays and Credit Suisse falsified or omitted information from payment orders on behalf of Bank Saderat, "knowing, or deliberately indifferent to the fact, that Bank Saderat was engaged in money laundering on behalf of a State Sponsor of Terrorism," and that the HSBC defendants knew there was "'direct evidence'" of Bank Saderat's "'funding of Hezbollah.'" (Id. ¶¶ 49-50; see also id. ¶ 518). It is further claimed that the HSBC defendants, Standard Chartered, RBS, and Commerzbank facilitated payments on behalf of IRISL, knowing or being deliberately indifferent to the fact that IRISL was designated a SDN for facilitating shipments of military cargo destined for MODAFL which could be used against Coalition Forces in terrorist attacks. (Id. ¶ 50). Defendants Standard Chartered, Credit Suisse, Bank Saderat and Commerzbank are further alleged to have facilitated payment messages on behalf of NIOC, an agent of the IRGC, and Standard Chartered is alleged to have knowingly and actively financed illegal trade transactions on behalf of MODAFL, the IRGC, and companies working directly for Hezbollah and IRGC-Qods Force. (Id. ¶¶ 53-54). As a consequence, plaintiffs contend that Iran, through these state-controlled agencies, was able to provide material support to various terrorist groups, including Hezbollah, the IRGC and others, knowing and intending that the funds would be used to carry out acts of terrorism against Americans and others in Iraq. (Id. ¶ 350).[16]

Plaintiffs claim that defendants used Letters of Credit[17] as another means for subverting the Iranian sanctions program. (Id. ¶ 173). According to the Second Amended Complaint, trade

_____

[16] The Court notes that the Second Amended Complaint contains numerous allegations as to the circumstances under which each of the plaintiffs or a family member was killed or severely wounded as a result of a terrorist attack that occurred in Iraq. (Id. ¶¶ 1041-2178). Since the sufficiency of these allegations is not at issue at this time, the Court has not set forth in any factual detail the circumstances behind the tragic deaths and injuries of these Americans. The Court briefly addresses these allegations in the context of defendants' Act of War defense. (See discussion infra at 123).

[17] Plaintiffs describe the Letter of Credit ("LoC") transaction process as a "serpentine" one, which begins when a purchaser of goods opens the LoC with a bank. In a secured transaction, an issuing bank then guarantees, to

with Iran involving certain types of U.S. defense articles, such as nuclear weapons or other conventional weapons systems, along with dual-use products, was circumscribed by the International Traffic in Arms Regulations, the Export Administration Regulations, and the Iranian Transactions Regulations ("ITRs" or "Iran Trade Regulations"). (Id. ¶¶ 189-93). To circumvent these restrictions, Iran and its co-conspirators allegedly used Letters of Credit drawn on the Central Bank of Iran and other Iranian Banks, but altered the underlying payment orders to conceal the identity of those involved. (Id. ¶¶ 194-96). Plaintiffs allege that this enabled Hezbollah and others to acquire the components and technologies necessary to make IEDs and EFPs used to kill Coalition Forces. (Id. ¶ 196).

The First Claim for Relief in the Second Amended Complaint seeks imposition of civil liability under 18 U.S.C. § 2333(a) against all of the defendants for violations of 18 U.S.C. § 2339A, constituting acts of international terrorism. (Id. ¶¶ 2179-2200). The Second Claim for Relief seeks to impose liability under 18 U.S.C. § 2333(a) against all defendants for violations of 18 U.S.C. § 2339B. (Id. ¶¶ 2201-17). The Third Claim for Relief seeks to impose liability only against HSBC Bank USA, N.A. under 18 U.S.C. § 2333(a) for violations of 18 U.S.C. § 2332d. (Id. ¶¶ 2218-40). The Fourth Claim for Relief is brought against Standard Chartered, RBS, and Commerzbank for violations of 18 U.S.C. § 2332d. (Id. ¶¶ 2241-53). The Fifth and Sixth Claims for Relief are brought against Commerzbank, and the Seventh Claim is brought against Standard Chartered; these last three claims allege that Commerzbank and Standard Chartered

---

the seller, that the bank will examine required documentation and pay the contract sum if the documents comply with the terms and conditions of the LoC. A negotiating bank negotiates documents delivered by the beneficiary of the LoC. Thereafter, an advising bank, typically a foreign correspondent bank of the issuing bank, advises the beneficiary of the transaction; a confirming bank confirms the LoC for the beneficiary – thereby obligating itself to ensure payment under the LoC; and finally, a reimbursing bank pays part or all of the amount due to the beneficiary once the negotiating bank has affirmed that the documents comply with the conditions of the LoC. (Id. ¶¶ 173-88).

violated 18 U.S.C. §§ 2339A (Commerzbank and SCB) and 2339B (Commerzbank).  (<u>Id.</u> ¶¶ 2254-63, 2264-73, 2274-93).

The Moving defendants and Bank Saderat seek to dismiss the Second Amended Complaint in its entirety, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds that plaintiffs have failed to allege a plausible claim under the Antiterrorism Act; there is no conspiracy-based liability under 18 U.S.C. § 2333; the Act of War limitation bars plaintiffs' claims; and the defendant banks incorporated in foreign countries cannot be held liable under 18 U.S.C. § 2332d.  In addition, Bank Saderat moves to dismiss on the grounds that the Court lacks personal jurisdiction over it.

<u>DISCUSSION</u>

I.    <u>The Antiterrorism Act</u>

Plaintiffs bring each of their claims under the Antiterrorism Act, 18 U.S.C. § 2333 ("ATA").  The ATA provides:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in an appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. § 2333(a).

The statute defines "acts of international terrorism" as activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or any State . . .  (B) appear to be intended – (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by

> intimidation or coercion; or (iii) to affect the conduct of a government
> by mass destruction, assassination, or kidnapping[.]

18 U.S.C. § 2331(1)(A), (B).  See Linde v. Arab Bank, PLC, 882 F.3d 314 (2d Cir. 2018).  The

statute, as now amended by the Justice Against Sponsors of Terrorism Act ("JASTA"),[18]

provides that in order to be held liable for an injury arising from an act of international terrorism,

the organization that "committed, planned, or authorized" the attack must have been designated a

"Foreign Terrorist Organization" ("FTO") under Section 219 of the Immigration and Nationality

Act, 8 U.S.C. § 1189, "as of the date on which such act of international terrorism was committed,

planned, or authorized."  18 U.S.C. § 2333(d)(2).  The statute further provides for liability for

those who aid and abet or "conspire[] . . . with the person who committed such an act of

international terrorism."  Id.

Section 2331(1)(C) provides that the acts must "occur primarily outside the territorial

jurisdiction of the United States, or transcend national boundaries in terms of the means by which

they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in

which their perpetrators operate or seek asylum."  18 U.S.C. § 2331(1)(C).


II.     Material Support Statutes

Plaintiffs allege that the defendants conspired to commit acts of international terrorism by

violating the material support statutes, 18 U.S.C. §§ 2339A and 2339B; 18 U.S.C. § 2332d.

These statutes serve as the predicates through which conspiracy-based civil liability under

Section 2333 attaches.  In Hussein v. Dahabshiil Transfer Servs. Ltd., the court explained that the

cause of action set forth in Section 2333(a) is an action for intentional torts requiring the

---

[18] See discussion relating to JASTA infra at 30.

plaintiffs to establish that the defendants "provided material support knowing that the 'recipient of the material support. . . is an organization that engages in terrorist acts'" or, at a minimum, there must be a showing that the defendants were "deliberately indifferent to whether or not the organization [engages in terrorist acts]." 230 F. Supp. 3d 167, 171 (S.D.N.Y. 2017). See also Strauss v. Credit Lyonnais, S.A., 925 F. Supp. 2d 414, 428 (E.D.N.Y. 2013); In re Terrorist Attacks on Sept. 11, 2001, 740 F. Supp. 2d 494, 517 (S.D.N.Y. 2010).

The criminal material support provisions of the Act – Sections 2339A and 2339B – themselves explicitly provide for liability for conspiring to provide aid to foreign terrorists. Section 2339A imposes liability on "[w]ho[m]ever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources . . . or *attempts or conspires to do such an act . . . .*" 18 U.S.C. § 2339A (emphasis added); see also 18 U.S.C. § 2339B (similarly imposing liability on "[w]ho[m]ever knowingly provides material support or resources to a [F]oreign [T]errorist [O]rganization, *or attempts or conspires to do so*"); 18 U.S.C. § 2339B (emphasis added). See also Hussein v. Dahabshiil Transfer Servs. Ltd., 230 F. Supp. 3d at 175.

As the material support provisions have slightly different requirements, each one is addressed at more length below.


A.  18 U.S.C. § 2339A

Plaintiffs rely on 18 U.S.C. § 2339A as the predicate act for their First Claim against all defendants under the ATA. Section 2339A requires that "material support" be provided "knowing or intending" that it will be used in aid of a violation of one of several criminal

statutes.  18 U.S.C. § 2339A; see also Linde v. Arab Bank, 882 F.3d at 314, n.11.  Material

support is defined as:

> Any property, tangible or intangible, or service, including currency
> or monetary instruments or financial securities, financial services,
> lodging, training, expert advice or assistance, safehouses, false
> documentation, or identification, communications equipment,
> facilities, weapons, lethal substances, explosives, personnel. . . .and
> transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

The criminal statutes referred to by Section 2339A include, but are not limited to, the

murder of U.S. nationals abroad, 18 U.S.C. § 2332(a), the extraterritorial use of a weapon of

mass destruction against a U.S. national, 18 U.S.C. § 2332a(a)(1), or the bombing of a

government facility, 18 U.S.C. § 2332f(a)(1).  While there is no requirement that the defendant

have specific knowledge of, or intent to further, a particular terrorist attack, Section 2339A does

require proof that the defendant knew or intended that its financial services would "generally

facilitate" the organization's activities.  Hussein v. Dahabshiil Transfer Servs. Ltd., 230 F. Supp.

3d at 171-172 (internal citations omitted).  As noted, Section 2339A explicitly allows for liability

when someone "conspires" to provide material support under this provision.


B.  18 U.S.C. § 2339B

Plaintiffs also bring claims under the ATA against all defendants, relying on 18 U.S.C. §

2339B as the predicate violation.  Section 2339B prohibits "knowingly provid[ing] material

support or resources to a [F]oreign [T]errorist [O]rganization," or attempting or conspiring to do

so.  18 U.S.C. § 2339B; see also Hussein v. Dahabshiil Transfer Servs. Ltd., 230 F. Supp. 3d at

172.  Section 2339B differs from Section 2339A in two significant ways:  Section 2339B limits

liability to those who provide support to a Foreign Terrorist Organization, but, at the same time, Section 2339B requires a lesser form of scienter compared to Section 2339A.

Subsection (g)(6) of Section 2339B defines "terrorist organization" as "an organization designated as a terrorist organization under section 219 of the Immigration and Nationality Act." 18 U.S.C. § 2339B(g)(6). Section 219 of the Immigration and Nationality Act authorizes the Secretary of State to designate an organization as a foreign terrorist organization if the Secretary determines that:

> (A) the organization is a foreign organization;
> (B) the organization engages in terrorist activity (as defined in section 1182(a)(3)(B) of this title or terrorism (as defined in section 2656f(d)(2) of [T]itle 22), or retains the capability and intent to engage in terrorist activity or terrorism); and
> (C) the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States.

8 U.S.C. § 1189 (a)(1).

Indeed, the Second Circuit in <u>Weiss v. National Westminster Bank PLC</u> explained:

> Section 2339B(a)(1) explicitly incorporates the meaning of 'engage[ ] in terrorist activity' from § 212(a)(3)(13) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(3)(13)(iv)(IV), which defines 'engage in terrorist activity' to include 'solicit[ing] funds or other things of value for ... (bb) a terrorist organization described in clause (vi)(I)....' Clause (vi)(I) defines 'terrorist organization' to mean 'an organization ... designated under section 1189 of this title ...,' 8 U.S.C. § 1182(a)(3)(13)(vi)(I), and § 1189 authorizes the Secretary of State to designate an organization as a Foreign Terrorist Organization ("'FTO'").

768 F.3d 202, 208-09 (2d Cir. 2014). The Circuit court further explained that "through this complex series of statutory incorporation . . . a defendant may be liable for civil remedies under 2333(a) for providing *material support to an organization that solicits funds for an FTO*," even if that support is not provided directly to the FTO itself. <u>Id.</u> at 209 (emphasis added). The relevant

Immigration and Nationality Act ("INA") provisions defining "engage[] in terrorist activity" also include: "(III) to gather information on potential targets for terrorist activity," and "(VI) to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, *funds, transfer of funds or other material financial benefit*, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training[.]" 8 U.S.C. § 1182(a)(3)(13)(iv)(III), (VI) (emphasis added).

Thus, Section 2339B imposes liability on providing material support to organizations designated by the Secretary of State as FTOs, including organizations that solicit funds or provide other forms of assistance and support, such as funds or transfer of funds, on behalf of a designated FTO.

Section 2339B also differs from Section 2339A in that liability may be imposed on "[w]hoever knowingly provides material support," with the "knowledge that the organization is a designated terrorist organization [FTO]," that the organization has "engaged or engages in terrorist activity," as defined in section 212(a)(3)(B) of the Immigration and Nationality Act, or that the organization has "engaged or engages in terrorism" as defined in the Foreign Relations Authorization Act ("FRAA"), Fiscal Years 1988 and 1989.[19]  18 U.S.C. § 2339B(a)(1).  In Weiss v. National Westminster Bank, PLC, the district court noted this distinction between Section 2339B and Section 2339A:

> When Congress enacted section 2339B, section 2339A
> already prohibited the act of providing material support
> or resources to further illegal terrorist activities when
> done by an individual 'knowing or intending that they
> are to be used in preparation for, or in carrying out'

---

[19] Section 140(d)(2) of the FRAA defines "terrorism" as "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents."

enumerated terrorist activities. . . .Congress's choice
to omit the word 'intending' from 2339B, while using
it in 2339A suggests that Congress did not wish for
2339B to include an intent requirement.

453 F. Supp. 2d at 625 (internal citations omitted).

Accordingly, under Section 2339B, there must be a showing that the defendant knew of

the beneficiary organization's "connection to terrorism," Weiss v. National Westminster Bank

PLC, 768 F.3d at 208, but plaintiff is not required to show that the defendant had the specific

intent to further the organization's terrorist activities.  18 U.S.C. § 2339B; see also Weiss v.

National Westminster Bank PLC, 768 F.3d at 208 (noting that "'Congress plainly spoke to the

necessary mental state for a violation of § 2339B, and it chose *knowledge* about the

organization's connection to terrorism, *not* specific intent to further the organization's terrorist

activities'") (quoting Holder v. Humanitarian Law Project, 561 U.S. 1, 16-17 (2010)) (emphasis

added).

The Second Circuit explained that because Congress determined that foreign

organizations that engage in terrorist activities are "so tainted by their criminal conduct" that any

contributions to such an organization facilitates that conduct, Congress was compelled to attach

liability to all donations to Foreign Terrorist Organizations, regardless of the giver's intent.[20]

Weiss v. National Westminster Bank, 768 F.3d at 208; see also Boim v. Holy Land Foundation

---

[20] Defendants argue that, while this may be true for FTOs, the same analysis is not true for the designation
of SDGTs.  (See, e.g. Defendant Commerzbank AG's Supplemental Memorandum of Law in Support of its Motion
to Dismiss, filed on November 10, 2016, ECF No. 124, ("Commerzbank Mem.") at 4);  Defendant Standard
Chartered Bank's Supplemental Memorandum of Law in Support of its Motion to Dismiss, filed on November 10,
2016, ECF No. 123 ("SCB Mem.") at 3, 7); Strauss v. Credit Lyonnais, 925 F. Supp. 2d at 433.  However, as
discussed above, the designation of SDGT can be relevant to show knowledge of a defendant's unlawful acts in a
conspiracy.  Additionally, this Court adopts the reasoning of the D.C. Circuit, noting that it would be "silly" to
enable an FTO to escape liability by virtue of creating a new front organization to fundraise on its behalf.   National
Council of Resistance of Iran v. Department of State, 373 F.3d 152, 157-58 (D.C. Cir. 2004).

for Relief and Development, 291 F.3d 1000, 1027 (7th Cir. 2002). Thus, the court in Weiss rejected the defendant's argument that plaintiffs needed to show that defendant not only knew of the organization's terrorist activities but also intended to have them succeed. 768 F.3d at 208.

The Second Circuit also clarified that "knowledge" for the purposes of Section 2339B is found "if the defendant has actual knowledge of such activity or if the defendant exhibited deliberate indifference to whether the [beneficiary] organization engages in such activity." Id. at 208 (citing Strauss v. Credit Lyonnais, S.A., 925 F. Supp. 2d at 428-29; In re Terrorist Attacks, 740 F. Supp. 2d at 517). A trier of fact may find "deliberate indifference" when a defendant "knows there is a substantial probability that the organization engages in terrorism but . . . does not care." Boim v. Holy Land Foundation for Relief and Development ("Boim III"), 549 F.3d 685, 693 (7th Cir. 2008) (en banc). Thus, for purposes of Section 2339B, a "defendant has knowledge that an organization engages in terrorist activity if the defendant has actual knowledge of such activity or if the defendant exhibited deliberate indifference to whether the organization engages in such activity." Weiss v. National Westminster Bank PLC, 768 F.3d at 208; see also Strauss v. Credit Lyonnais, S.A., 925 F. Supp. 2d at 428-29.

Accordingly, in analyzing plaintiffs' claims under Section 2339B, the Court must assess whether plaintiffs have raised a plausible claim that each defendant provided material support to an organization, while knowing or exhibiting deliberate indifference to whether that organization solicited funds or other things of value for Hezbollah or Kata'ib Hezbollah, the designated FTOs during the attacks at issue,[21] "regardless of whether those funds were used for terrorist or non-

---

[21] As noted supra, Hezbollah was designated an FTO in 1997, and Kata'ib Hezbollah was designated an FTO in 2009. Therefore, the role of Kata'ib Hezbollah as an officially-designated FTO is only discussed in the context of the attacks that occurred after 2009 for purposes of Section 2339B. Nonetheless, the designation of Kata'ib Hezbollah is also relevant evidence as to the defendants' knowledge of their recipients' unlawful acts for the purposes of Section 2339A.

terrorist activities." Id. at 209.  The Court also proceeds to examine whether there are allegations

that the beneficiary organizations "engage[d] in terrorist activity" by gathering information on

potential targets for terrorist activity, or afforded material support, including transfer of funds,

weapons, explosives, or training for the commission of terrorist activity.  8 U.S.C. §

1182(a)(3)(13)(iv).

In sum, in assessing plaintiffs' claims arising under Sections 2339A and 2339B, the Court

must make a recommendation as to whether plaintiffs have adequately alleged that the defendants

provided material support for certain terrorist activities, regardless of the official designation of

who was receiving the funds, in violation of Section 2339A, or to certain designated

organizations, regardless of the organization's purpose in using the funds, in violation of Section

2339B.


C.  18 U.S.C. § 2332d

Additionally, plaintiffs have brought claims under the ATA against HSBC, Standard

Chartered, RBS and Commerzbank, relying on violations of 18 U.S.C. § 2332d as the predicate

act.  Section 2332d makes it illegal for any "United States person, knowing or having reasonable

cause to know that a country is designated under section 6(j) of the Export Administration Act of

1979. . .as a country sponsoring international terrorism," to "engage[] in a financial transaction

with the government of that country[.]"  18 U.S.C. § 2332d.  The statute defines "financial

transaction" as "a transaction which in any way or degree affects interstate or foreign commerce .

. . involving the movement of funds by wire or other means or . . .  a transaction involving the

use of a financial institution which is engaged in, or the activities of which affect, interstate or

foreign commerce in any way or degree[.]"  18 U.S.C. § 2332d(b)(1).

Section 2332d(b)(2) also contains a specific definition of "United States person," as any:

> (A) United States citizen or national;
> (B) permanent resident alien;
> (C) juridical person organized under the laws of the United States; or
> (D) any person in the United States.

Section 2332d(b)(2). Thus, Section 2332d differs from the other material support provisions in that it only applies to "United States person[s]", and it prohibits dealings with governments, but not individuals or other organizations.

Here, there is no question that at the time of the alleged conduct, Iran had been designated as a country sponsoring international terrorism under section 6(j) of the Export Administration Act of 1979, thereby meeting that element of Section 2332(d). Accordingly, in assessing plaintiffs' claims against HSBC, Standard Chartered, RBS, and Commerzbank under this provision, the Court must first decide whether the Second Amended Complaint alleges facts to sufficiently support plaintiffs' claims that the branches of each of these banks should be considered "United States person[s]"[22] within the meaning of Section 2332(d), and then determine if those branches engaged in financial transactions with the government of Iran. 18 U.S.C. § 2332d(b)(2).

III.    Primary Liability Under the ATA

The First and Second Claims for Relief in plaintiffs' Second Amended Complaint seek to impose both primary and conspiracy liability claims against all of the defendants. The defendants argue that insofar as plaintiffs seek to impose primary liability against the banks, the claims must fail because plaintiffs cannot show that the banks committed an act of terrorism

---

[22]Although the parties' main disagreement concerns the meaning of this term, HSBC has not argued that it is not a "United States person" as defined in Section 2332d. (See discussion infra at 105, see n.71 infra).

themselves, nor can plaintiffs show that the banks' conduct was the proximate cause of plaintiffs' injuries.

A successful claim under the ATA includes "'unlawful action, the requisite mental state, and causation.'"  Hussein v. Dahabshiil Transfer Servs. Ltd., 230 F. Supp. 3d at 170-171 (emphasis omitted) (quoting Sokolow v. Palestine Liberation Org., 60 F. Supp. 3d 509, 514 (S.D.N.Y. 2014) (quoting Gill v. Arab Bank, PLC, 893 F. Supp. 2d 474, 502 (E.D.N.Y. 2012))). Courts have spilled much ink over the question of causation under the ATA.  See, e.g., Estate of Parsons v. Palestinian Authority, 715 F. Supp. 2d 27 n.5 (D.D.C. 2010) (noting that "courts have not settled on a causation standard for the ATA").  Historically, under Section 2333(a), it was widely understood by courts in the Second Circuit that plaintiffs must establish that the unlawful act of international terrorism was a proximate cause of plaintiff's injury.  See, e.g., Rothstein v. UBS AG, 708 F.3d 82 (2d Cir. 2013); Gill v. Arab Bank, PLC, 893 F. Supp. 2d at 507.

In its seminal analysis of the ATA, the Second Circuit in Rothstein v. UBS AG pointed to the "by reason of" language in the ATA and held "[w]e are not persuaded that Congress intended to permit recovery under [Section] 2333 on a showing of less than proximate cause[]."  708 F.3d at 95.  In doing so, the Rothstein court rejected the plaintiffs' theory of strict liability, noting that "plaintiffs' contention that proximate cause is established because they were injured after UBS violated federal law is a *post hoc, ergo propter hoc* proposition that would mean that any provider of U.S. currency to a State Sponsor of Terrorism would be strictly liable for injuries subsequently caused by a terrorist organization associated with that state."  Id. at 96.  Instead, the court adopted a proximate cause standard, with the "central question [being] . . . whether the

alleged violation led directly to the plaintiff's injuries." Id. at 91-92 (internal citations omitted).[23]

One year later, the Second Circuit decided In re Terrorist Attacks on Sept. 11, 2011 ("Al Rajhi"), 714 F.3d 118 (2d Cir. 2013). After reiterating Rothstein's holding that proximate cause is required to state a claim under Section 2333, the court proceeded to analyze plaintiffs' allegations to determine whether the pleadings sufficiently alleged proximate cause in the case of material support to al Qaeda. The court found that plaintiffs' claims – that "defendants are alleged to have provided funding to purported charity organizations known to support terrorism that, in turn, provided funding to al Qaeda and other terrorist organizations" – were insufficient to establish proximate cause. 714 F.3d at 124. The Circuit court noted that "plaintiffs do not allege that the Rule 12(b)(6) defendants participated in the September 11, 2001 attacks or that they provided money directly to al Qaeda; nor are there factual allegations that the money allegedly donated . . . to the purported charities actually was transferred to al Qaeda and aided in the September 11, 2001 attacks." Id.

The parties disagree as to the requirements for demonstrating proximate cause after Rothstein and Al Rajhi. Defendants argue that "the Second Circuit has ruled that where, as here, a complaint alleges only that the defendant at most provided *indirect* support to the Foreign Terrorist Organization that purportedly committed the attack by which the plaintiff was injured, the proximate cause requirement can be satisfied only by showing that funds provided by the

---

[23] To the extent that defendants claim that Rothstein requires plaintiffs to plead that if the bank defendants had not transferred U.S. currency to Iran, "Iran, with its billions of dollars in reserve, would not have funded the attacks in which plaintiffs were injured," Rothstein v. UBS AG, 708 F.3d 82, 97 (2d Cir. 2013), the Court notes that plaintiffs *do* plead such. (See, e.g. SAC ¶¶ 111, 113, 123-28 (describing the necessity of Iran's access to the Eurodollar market to "fuel its . . . terrorism and weapons proliferation activities through the IRGC")).

defendant *actually were transferred* to that Foreign Terrorist Organization *or* that such funds are otherwise a *but-for* cause[24] of the attack." (See, e.g., Commerzbank Mem. at 5 (citing Rothstein v. UBS AG, 708 F.3d at 97; Al Rajhi, 714 F.3d at 124)). (See also Commerzbank Reply Mem.[25] at 3-4).

Plaintiffs, on the other hand, take a narrower view of the Rothstein/Al Rajhi line of cases. Instead, plaintiffs argue that Rothstein only "affirmed that traditional tort principles of proximate cause are applicable to the ATA." (Pls.' Mem. at 4). Plaintiffs acknowledge that the Second Circuit rejected the notion that "'causation may be presumed'" when a defendant has committed a '*per se* violation of a statute.'" (Id. (citing Rothstein v. UBS AG, 708 F.3d at 95-97)). Instead, plaintiffs cite Rothstein for the proposition that "a defendant is liable 'to those with respect to whom his acts were a substantial factor in the sequence of responsible causation and whose injury was reasonably foreseeable or anticipated as a natural consequence.'" (Id. (citing Rothstein v. UBS AG, 708 F.3d at 92)).

In Linde v. Arab Bank, PLC, the Second Circuit recently addressed the proximate cause requirement in the context of establishing primary liability under Section 2333(a). 882 F.3d at 322, 328, 331. The district court in Linde had charged the jury that, as a matter of law, if the

---

[24] In Linde v. Arab Bank, PLC, the lower court rejected the defendant's argument that but-for causation was required to be shown and held instead that the ATA required only proof of proximate causation. See Linde v. Arab Bank, PLC, 97 F. Supp. 3d 287 (E.D.N.Y. 2015). On appeal, the Second Circuit declined to decide the issue, noting that "[c]ausation focuses on the relationship between an alleged act of international terrorism and a plaintiff's injury." 882 F.3d at 330. Thus, the court held that under JASTA's aiding and abetting theory of bank liability, there is no dispute that the terrorist attacks committed by Hamas, which the bank allegedly aided, were both the proximate and but-for cause of plaintiffs' injuries. Id. at 331 (noting that "Arab Bank does not—and cannot—dispute the sufficiency of the evidence to prove that the Hamas terrorists who committed the three attacks at issue caused plaintiffs' injuries). Accordingly, in line with the cases that agree that but-for causation is not required, this Court does not address this argument. See, e.g., Boim III, 549 F.3d at 697-98; Linde v. Arab Bank, 97 F. Supp. 3d at 325; see also In re Chiquita Brands Intern., Inc., 690 F. Supp. 2d 1296 (S.D. Fla. 2010). (But cf. Commerzbank Mem. at 4).

[25] Citations to "Commerzbank Reply Mem." refer to Defendant Commerzbank AG's Supplemental Reply Memorandum of Law in Further Support of its Motion to Dismiss, filed on November 10, 2016, ECF No. 127.

plaintiffs proved that the Arab Bank had violated 18 U.S.C. § 2339B by providing material support to a designated Foreign Terrorist Organization, then "you must find that plaintiffs have proved that defendant committed an act of international terrorism" under a theory of primary liability. Linde v. Arab Bank, PLC, 882 F.3d at 325 n.9. In reviewing the charge, the Second Circuit noted that the provision of material support to a terrorist organization "can certainly satisfy [] *part* of the statutory definition" supplied by 18 U.S.C. § 2331(1)—namely, that the defendant's conduct first "must violate federal or state law[]." Id. at 326 (citing 18 U.S.C. § 2331(1)(A)). However, the court further held that under the "plain text" of the statute, in order for an "act of international terrorism" to qualify for imposing primary liability under the ATA, there must be proof that the defendant's acts "*also* involve violence or endanger human life," and "appear to be intended to intimidate or coerce a civilian population or to influence or affect a government." Id. at 326 (citing 18 U.S.C. § 2331(1)(A), (B)). Contrasting the example of a suicide bomber as someone who satisfies the statutory definition of himself committing an "act of international terrorism," and also providing material support, the court noted that the provision of financial services to a known terrorist organization "may afford material support . . . even if the services do not involve violence or endanger life and do not manifest the apparent intent required by § 2331(1)(B)." Id.[26]

---

[26] The Second Circuit distinguished the holding in Boim III, noting that there, the Seventh Circuit had not determined that the provision of material support is "always" an act of international terrorism, but rather analogized that "'[g]iving money to Hamas' [is like] 'giving a loaded gun to a child.'" Id. at 327 (quoting Boim III, 549 F.3d at 690). Noting that the court in Boim III focused on the foreseeability that providing Hamas with funding would enable it to kill more people in Israel, the Second Circuit in Linde noted: "We need not here decide whether we would similarly conclude that a jury could find that direct monetary donations to a known terrorist organization satisfy § 2331(1)'s definitional requirements for an act of terrorism." Id. (citing Licci ex rel Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 68-69 (2d Cir. 2012)).

Thus, in vacating the lower court's decision and remanding for a new trial, the Second

Circuit found that the district court in Linde had committed error in its charge to the jury that the

provision of material support was sufficient to establish a violation of the ATA *as a matter of*

*law*. The court did not hold that banks could never be held primarily liable for providing

material support. Rather, the court made it clear that this was a question of fact, and the jury

needed to be instructed on and find proof of each separate element of 2331(1). Id.

In light of the above, this Court assesses plaintiffs' claims arising under a theory of

primary liability according to the standards set forth in Linde. (See, e.g., discussion infra at 101

(assessing plaintiffs' non-conspiracy Fifth and Sixth Claims)).


IV.    Secondary Liability under the ATA

    A. JASTA

As noted, plaintiffs in this case not only seek to impose primary liability against certain

defendants, but they have also alleged conspiracy claims against all defendants. Like the issue of

proximate cause, the question of secondary civil liability under the ATA has been litigated in

numerous courts since the passage of the ATA.[27] In Rothstein, the Second Circuit considered a

claim that UBS AG should be held liable as an aider and abettor, in that it facilitated certain

terrorist attacks in Israel by furnishing United States currency to Iran, which, as discussed supra,

the State Department had designated a State Sponsor of Terrorism in 1984. 708 F.3d at 93-94.

---

[27] Some courts have, instead, declined to decide the availability of secondary liability, instead noting that "'in the ATA context the secondary liability problem may be of little practical importance'" because "'[t]he federal anti-terrorism laws generally criminalize providing material support to terrorists and terrorist groups; a number of statutes provide for what is effectively aiding-and-abetting liability in the terrorism context.'" Hussein v. Dahabshiil Transfer Servs. Ltd., 230 F. Supp. 3d at 175 (citing Gill v. Arab Bank, PLC, 893 F. Supp. 2d at 502 (relying on 18 U.S.C. §§ 2339A, 2339B, 2339C)).

Noting that the ATA, at that time, was "silent as to the permissibility of aiding and abetting liability[,]" the court held that the aiding and abetting claims against UBS AG were properly dismissed by the lower court. Id. at 95, 97-98 (deciding that "[w]e doubt that Congress, having included in the ATA several express provisions with respect to aiding and abetting in connection with the criminal provisions, can have intended § 2333 to authorize civil liability for aiding and abetting through its silence") (internal citation omitted).

In 2016, Congress passed the Justice Against Sponsors of Terrorism Act ("JASTA"), amending Section 2333 of the ATA by providing a specific cause of action against "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d). Now, with the passage of JASTA, the ATA is no longer "silent" as to the permissibility of secondary liability, including both conspiracy and aiding and abetting liability. In Linde v. Arab Bank, PLC, the Second Circuit confirmed that Congress has now clearly provided for both conspiracy and aiding and abetting principles to provide a basis for imposing secondary liability upon those who provide material support to terrorists. 882 F.3d at 320.

Nonetheless, defendants contend that under Linde, "there is no secondary liability under Section 2333(a) for claims to which JASTA does not apply," and that prior to JASTA there was no basis for any secondary liability claims. (Defs.' 2/15/18 Ltr[28] at 2). To the extent that defendants may be arguing that the claims in the instant case are not covered by JASTA because they arose prior to the passage of the Act, Linde made it clear that "aiding and abetting and conspiracy claims can be asserted 'as of the date on which such act of international terrorism was

---

[28] Citations to "Defs.' 2/15/18 Ltr" refer to Defendants' Letter dated February 15, 2018, ECF No. 155.

committed, planned, or authorized,'" and that JASTA "applies to any civil action, '(1) pending on. . . the date' of JASTA's enactment; and '(2) arising out of an injury . . .on or after September 11, 2001.'" 882 F.3d at 320. Thus, given that this action was "pending" when JASTA was enacted, and the claims arise out of terrorist attacks that occurred between 2004 and 2011, the claims are covered by JASTA.

Aside from intentionally enacting JASTA to retroactively apply to suits such as the one at hand, Congress explained that the purpose in enacting JASTA and providing for aiding and abetting and conspiracy liability was to "provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, *wherever acting and wherever they may be found*, that have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA § 2(b) (emphasis added).[29] JASTA simply memorializes what some courts interpreting the ATA have already concluded – namely, by conspiring to violate the material support provisions of the Act, Sections 2339A and 2339B, a person may be held liable for violations of Section 2333(a), if the other elements of 2333(a) are satisfied. See, e.g., Gill v. Arab Bank, PLC, 893 F. Supp. 2d at 502; see also Hussein v. Dahabshill Transfer Servs. Ltd., 230 F. Supp. 3d at 176 (noting that "[w]ere Plaintiffs able

---

[29] Despite Congress's clear language about seeking to impose the "broadest possible basis" of civil liability," 18 U.S.C. § 2333(b), defendants still seek to limit JASTA's scope, contending that claims under JASTA "may be asserted only in . . . narrow circumstances[]" (See, e.g., Supplemental Reply of HSBC Holdings, HSBC Bank PLC, HSBC Bank Middle East Limited, HSBC Bank USA, N.A., and the Royal Bank of Scotland N.V. in Support of Their Motion to Dismiss the Second Amended Complaint" ("HSBC/RBS Reply Mem.") at 2, filed on November 10, 2016, ECF No. 129)). Defendants describe these "narrow circumstances" as "when an act of international terrorism is committed, planned or authorized by an FTO and a defendant knowingly provides substantial assistance to or 'who conspires with the person who committed such an act of international terrorism.'" (Id. (citing 18 U.S.C. § 2333(d)). As discussed infra, the Court disagrees that these "circumstances" – which simply recite JASTA's statutory provisions – are necessarily "narrow," and instead finds that they apply to the case at hand.

plausibly to allege a conspiracy to provide material support, that would potentially give rise to a civil claim under Section 2333(a))")".[30]

Accordingly, in order to assess plaintiffs' claims, the Court must preliminarily make a recommendation as to what Congress meant when it provided for aiding and abetting or conspiring with the "person who committed [ ] an act of international terrorism." 18 U.S.C. § 2333(d)(2). JASTA defines an "act of international terrorism" as one that is "committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act . . . as of the date on which such act of international terrorism was committed, planned, or authorized[]." 18 U.S.C. § 2333(d)(2).[31] In other words, in order to qualify as an "act of international terrorism," JASTA requires that the act must have been at least committed, planned, or authorized by a designated FTO. Id.

Defendants contend that in order for plaintiffs to establish secondary liability under JASTA, they must demonstrate that the organization receiving the funding was a designated FTO. (See, e.g., Commerzbank Mem. at 3; SCB Mem. at 3 n.3, 7 n.6). See also Strauss v. Credit

_____

[30] Ultimately, the court in Hussein v. Dahabshiil Transfer Servs. Ltd. found that plaintiffs had failed to plausibly allege a conspiracy in that case. The court's decision was based on plaintiffs' allegations of only "four small transfers" from individuals in the United States to individuals allegedly associated with the al-Shabab network. 230 F. Supp. 3d at 173. This is clearly distinguishable from the case at hand based on the sheer volume of the transfers allegedly facilitated by the Moving defendants and Bank Saderat. Furthermore, the court in Hussein v. Dahabshiil Transfer Servs. Ltd. found that these small transfers were "routine banking services," which, as noted infra, can hardly be said of the defendant banks' actions in this case. Id. at 176. Finally, plaintiffs in Hussein had failed to allege "any red flags that might have put Defendants on notice" that the transactions were intended for al-Shabaab. Id. at 177. In the instant case, plaintiffs have included excerpts from numerous internal acknowledgements from the banks, indicating that they understood the risk that one of the ultimate beneficiaries of their services was a formal terrorist organization or one of its agents. The court in Hussein v. Dahabshiil Transfer Servs. Ltd. pointed approvingly to the logic in Strauss v Credit Lyonnais, noting that "allegations that the defendants cleared suspicious transfers may also suggest an inference of knowledge or recklessness." Id. (citing Strauss v Credit Lyonnais, No. 06 CV 0702, 2006 WL 2862704, *14 (E.D.N.Y. Oct. 5, 2006)). Indeed, this logic applies to the case at hand, where defendants not only cleared suspicious transfers, but actively recruited business from these suspicious entities.

[31] As discussed supra, Section 219 of the Immigration and Nationality Act empowers the Secretary of State to designate an organization as an FTO.

Lyonnais, 925 F. Supp. 2d at 433. Defendants assert that being designated as a Specially Designated Global Terrorist is not enough. Indeed, because "all of these entities [alleged in the Second Amended Complaint to be involved] were designated [as SDGTs] long after the alleged transactions were completed," defendants argue that they cannot be held liable for violations of the ATA because the organizations allegedly funded by the defendants were not designated entities at the time that the transactions were processed. (Defs.' Mem.[32] at 8; see also SCB Mem. at 3 n.3 (same); Credit Suisse Mem.[33] at 5 (same)); see also SCB Reply Mem.[34] at 5 (arguing that, as the OFAC designations of "certain purchasers and sellers of goods underlying the [LoC] transactions were retroactive," these designations "say[] nothing about what [the banks] knew or reasonably could have foreseen at the time of the transactions at issue").

However, as discussed supra at 20, the Second Circuit in Weiss made it clear in a decision issued prior to the passage of JASTA that "through this complex series of statutory incorporation . . . a defendant may be liable for civil remedies under 2333(a) for providing *material support to an organization that solicits funds for an FTO.*" Id. (emphasis added). In assessing whether the bank in that case provided material support to a non-profit organization which solicited funds for the FTO Hamas, the court in Weiss considered the non-profit's SDGT designation as "one of several pieces of evidence" creating a triable issue of fact as to the defendant's knowledge, precluding summary judgment on that issue. 768 F.3d 202 n.9.

Furthermore, in the Second Amended Complaint, plaintiffs plead that FTOs Hezbollah and Kata'ib Hezbollah operate through many other agents and auxiliaries. This is not a case

---

[32] Citations to "Defs.' Mem." refer to Defendants' Joint Memorandum in Support of Motion to Dismiss, filed on November 10, 2016, ECF No. 120.

[33] Citations to "Credit Suisse Mem." refer to the Memorandum of Law of Defendant Credit Suisse AG in Support of Motion to Dismiss, filed on November 10, 2016, ECF No. 121.

[34] Citations to "SCB Reply Mem." refer to Defendant Standard Chartered Bank's Supplemental Reply Memorandum of Law in Further Support of its Motion to Dismiss, filed on November 10, 2016, ECF No. 130.

whereby a terrorist organization is alleged to have operated on its own; nor is it a case whereby a foreign state is alleged to have operated on its own in financing terrorism. Instead, plaintiffs allege that "defendants' illegal U.S. dollar clearing transactions on behalf of Iran and Iranian banks were not *'separate'* from Iran's material support to terrorism; they *were* the mechanism through which that material support was accomplished.'" (Pls.' Mem. at 46).

In providing for secondary liability, JASTA made it clear that liability may be imposed on persons other than just the members of the FTO itself. In the context of the phrase "person who committed" the act of terrorism, Congress specifically defines "person" in accordance with "the meaning given the term in section 1 of title 1" of the United States Code. 18 U.S.C. § 2333(d)(1), (2). Title 1, Section 1 of the United States Code defines a "person" as including "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1 (2012). Thus, it seems clear that Congress intended a broader definition of "person" beyond just the specific individual representative of the Foreign Terrorist Organization who, for instance, actually planted the EFP that injured or killed a plaintiff. 18 U.S.C. § 2333(a)(1).

Even before JASTA was enacted, courts had historically sanctioned this interpretation when assessing the meaning of an FTO designation, reasoning that Congress did not intend to protect an FTO from liability simply because it chose to operate under an alias or through an affiliated organization that did not bear the specific FTO designation. As the court in National Council of Resistance of Iran noted:

> Just as it is silly to suppose "that Congress empowered the Secretary to designate a terrorist organization . . . only for such periods of time as it took such organization to give itself a new name, and then let it happily resume the same status it would have enjoyed had it never been designated,". . . so too it is implausible to think that Congress permitted the Secretary to designate an FTO

to cut off its support in and from the United States, but did not
authorize the Secretary to prevent that FTO from marshaling all the
same support via juridically separate agents subject to its control.
For instance, under [plaintiff's] conception, the Government could
designate XYZ organization as an FTO in an effort to block United
States support to that organization, but could not, without a
separate FTO designation, ban the transfer of material support to
XYZ's fundraising affiliate, FTO Fundraiser, Inc.

National Council of Resistance of Iran v. Department of State, 373 F.3d at 157-58 (internal

citations omitted).  The court went on to assert that such a "crabbed view of alias status" "is at

war not only with the antiterrorism objective of AEDPA, but common sense as well."  Id. at 158.

See also Goldberg v. UBS AG, 660 F. Supp. 2d 410, 432 (E.D.N.Y. 2009) (relying on National

Council of Resistance of Iran v. Department of State); Gill v. Arab Bank, PLC, 893 F. Supp. 2d

at 555 (citing National Council of Resistance of Iran for the proposition that "liability may attach

under [section] 2339B when a defendant provides material support to the alter ego or alias of a

designated FTO").  This discussion of alias status is particularly salient at the pleading stage,

when it is not simple, or necessarily even feasible, to identify exactly which FTO was behind a

given attack.

This Court agrees with the reasoning of the court in National Council of Resistance of

Iran and finds that it would be "silly" to enable an FTO to escape liability simply by creating a

new front organization to fundraise or engage in financial transactions on its behalf.  By the same

token, the public designation of an entity or organization as a SDGT can provide evidence of

knowledge on the part of the defendant of the entity's unlawful acts and demonstrate defendant's

knowing involvement in the conspiracy.  Thus, the Court finds that not only would FTO

Hezbollah, or FTO Kata'ib Hezbollah, fall within the definition of a "person who committed an

act of terrorism," but a Hezbollah-affiliated entity would also fall within the definition of persons

or entities that Congress was concerned with in enacting JASTA.  See O'Sullivan v. Deutsche

<u>Bank AG</u>, No. 17 CV 8709, 2018 WL 1989585, at *6 (S.D.N.Y. Apr. 26, 2018) (noting that "2333(d)(2) specifically requires a defendant to conspire with 'the person who committed [] an act of international terrorism,'" but providing no detailed discussion as to the definition of "person" as provided by Congress in this context).

### B.  Halberstam v. Welch

In addition to defining who can be held liable under § 2333(d), Congress incorporated into JASTA an instruction that courts, when assessing secondary liability, should apply the test found in <u>Halberstam v. Welch</u> ("<u>Halberstam</u>"), 705 F.2d 472 (D.C. Cir. 1983).  <u>See</u> JASTA § 2(a)(5); <u>see</u> <u>Linde v. Arab Bank, PLC</u> ("<u>Linde</u>"), 882 F.3d at 328 (analyzing aiding and abetting liability under JASTA, and confirming that "'the proper legal framework for how [aiding and abetting] liability should function' under the ATA" [35] is that set forth in <u>Halberstam v. Welch</u>, 705 F.2d 472) (citing legislative history and quoting 18 U.S.C. § 2333 Statutory Note (Findings and Purpose § 5)).

In <u>Halberstam</u>, the appellee, Elliott Halberstam, brought a case on behalf of her late husband, Michael Halberstam.  705 F.2d at 474.  Mrs. Halberstam claimed that Bernard Welch killed her husband during the course of a home burglary, and that since Welch's girlfriend, Linda Hamilton, had been engaged in a "joint criminal venture and conspiracy" with Welch during that

---

[35]Since the Second Circuit's decision in <u>Linde</u>, the Supreme Court has decided a claim brought under the Alien Tort Statute, finding that corporations may not be held civilly liable under that statute.  <u>Jesner v. Arab Bank, PLC</u>, 138 S. Ct. 1386 (2018).  The parties in the instant case all agree that <u>Jesner</u> does not change the analysis for plaintiffs in this matter, who have brought their claims under the ATA.  (<u>See</u> Letter from John D. Buretta to Judge Pollak, filed by Credit Suisse and the Moving Defendants on May 9, 2018; Letter to the Honorable Cheryl L. Pollak in Response to the Court's Order of April 25, 2018, filed by Bank Saderat PLC on May 9, 2018; Letter from Gary M. Osen to Judge Pollak dated May 9, 2018, ECF Nos. 160, 161, 162).  However, the <u>Jesner</u> case is relevant here to the extent that dicta in <u>Jesner</u> describes the ATA as "reflect[ing] the careful deliberation of the political branches on when, and how, banks should be held liable for the financing of terrorism."  <u>Jesner v. Arab Bank, PLC</u>, 138 S. Ct. at 1405.

time, she could be held civilly liable.  Id.  Hamilton was alleged to have done secretarial work for her boyfriend over the course of five years.  Id.  However, she never accompanied him on any of his evening ventures, and claimed that she had no actual knowledge of the stolen goods that Welch had amassed in their shared home.  Id. at 475-476.  Nevertheless, she was still described by the court as a "willing partner" in Welch's criminal activities.  Id.

In analyzing the case, the D.C. Circuit detailed several guiding principles for assessing both aiding and abetting and conspiracy claims.  As for aiding and abetting liability, Halberstam described three elements needed to establish civil liability for aiding and abetting claims:  (1) "the party whom the defendant aids must perform a wrongful act that causes an injury," (2) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance," and (3) "the defendant must knowingly and substantially assist the principal violation."  Id. at 487.  See also Linde v. Arab Bank PLC, 882 F.3d at 329.

### 1.  Aiding and Abetting Liability under JASTA

Using these Halberstam elements, the Second Circuit in Linde considered the sufficiency of the evidence presented during the trial, finding that the first element in the Halberstam construct for assessing aiding and abetting claims – namely, that the primary actor performed an act that causes an injury – had been established.  882 F.3d at 329.  The court focused on the evidence offered in Linde that Hamas, the FTO in that case, had carried out the terror attacks as alleged and that these attacks satisfied the definitional requirements of Section 2331 in proving acts of international terrorism.  Id.  The court in Linde further found that by enacting JASTA to allow for aiding and abetting liability under the ATA, Congress eliminated the need to prove that

the aider and abettor's own actions involved violence or danger and appeared to be for the purpose of coercion or intimidation of civilians and/or governments, as required by Section 2331. The court held that "under an aiding and abetting theory of ATA liability, plaintiffs would *not* have to prove that the bank's own acts constitute international terrorism satisfying all the definitional requirements of § 2331(1)[.]" Id. at 328 (emphasis added).

The court in Linde also found that, because the jury had returned a verdict based on the charge as given, it was established that Arab Bank had provided material support, through financial services, to an organization that it knew was a designated terrorist organization. Id. The issue for the court was whether the second and third elements of the Halberstam test for aiding and abetting had been established – namely, the need to demonstrate the bank's awareness that by assisting the principal, the bank was assuming a "role" in the principal's terrorist activities, and the need to establish that the level of the bank's assistance was "substantial." Id. (citing Halberstam v. Welch, 705 F.2d at 477).

The Linde court held that while "awareness" does not require the type of proof of specific intent required for criminal aiding and abetting, nor does it require proof that the bank knew of the specific terrorist attacks, the jury needed to find that "in providing such services, the bank was 'generally aware' that it was thereby playing a 'role' in Hamas's violent or life-endangering activities." Id. (internal citations omitted). The court distinguished the *mens rea* required to prove aiding and abetting liability under the ATA from the *mens rea* required to prove the material support violations. To establish that the bank had provided material support to a designated terrorist organization in violation of the material support statute, Section 2339B,[36] the

_____

[36] Although the charge in Linde did not address liability under Section 2339A, the court noted that a different *mens rea* requirement is required for violations of Section 2339A. Under that statute, there must be proof

39

plaintiff need only prove that the bank had knowledge of the organization's connection to terrorism. By contrast, to prove aiding and abetting liability under the ATA, there must be a showing that the bank had the intent to further the terrorist activities or was aware that it was playing a role in those activities. Id.

In reviewing the evidence presented to the jury on this second prong, the Second Circuit in Linde noted that there were communications indicating that transfers of funds were being used to pay for suicide bombings. Id. at 321. However, the court could not conclude, as a matter of law, that this was sufficient to establish the bank's awareness that by processing transfers of funds, it was playing a role in violent or life-endangering acts with the apparent intent to intimidate or coerce civilians or to affect a government. Id. at 328-39. Instead, this was a question of fact for the jury to consider. The court in Linde also concluded that it could not find that a properly instructed jury would necessarily have concluded that the bank's financial assistance to Hamas was "substantial" assistance[37] sufficient to support an aiding and abetting charge under the third prong of the Halberstam test. Linde v. Arab Bank, PLC, 882 F.3d at 330.

2. Conspiracy Claims under JASTA

Since the plaintiffs in Linde did not include a conspiracy claim in their complaint, the Second Circuit did not expressly address the question of what would be required in order to

_____

that the defendant had knowledge or intended that the provision of funds as material support was for the preparation or carrying out of specified crimes, such as murder. 18 U.S.C. § 2339A. See Linde v. Arab Bank, PLC, 882 F.3d at n.11. (See discussion supra at 18).

[37] The court in Halberstam listed six factors to assist courts in determining whether the defendant had provided sufficient "encouragement or assistance" to satisfy the third element of "substantial assistance:" 1) the nature of the act encouraged, 2) the amount of assistance given, 3) whether the defendant was present at the time the wrongful act was committed, 4) the relationship between the defendant and the principal, 5) the defendant's state of mind, and 6) the period of defendant's assistance. Halberstam v. Welch, 705 F.2d at 478, 482-84.

establish a conspiracy claim under the ATA.  Nonetheless, given Congress's explicit approval of Halberstam as the proper framework for assessing secondary liability in ATA claims, this Court concludes that the Second Circuit would also adopt the Halberstam analysis of the elements of conspiracy-based claims just as it applied the Halberstam analysis to aiding and abetting claims.

Summarizing earlier decisions, the Halberstam court defined the elements of a civil conspiracy claim as:  (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme.  Halberstam v. Welch, 705 F.2d at 477 (citing Ryan v. Eli Lilly & Co., 514 F. Supp. 1004, 1012 (D.S.C. 1981)).  While the court explained that "the element of agreement is a key distinguishing factor for a civil conspiracy action," the court also noted that "[p]roof of a tacit, as opposed to explicit, understanding is sufficient to show agreement."  Id.  The court described certain relevant factors for inferring an agreement, including "the relationships between the actors and between the actions (e.g., the proximity in time and place of the acts, and the duration of the actors' joint activity)" and noted that "there may well be other significant factors in individual cases."  Id. at 481.

3.  Proximate Cause after Linde

One of the Moving defendants' primary arguments in support of their motion to dismiss is that plaintiffs have not sufficiently alleged, nor can they prove, that the defendants' actions were a proximate cause of the plaintiffs' injuries.  Defendants repeatedly assert that this Court should apply the standard of proximate cause as explicated in Rothstein and Al Rajhi to the case at hand.  (See, e.g., Commerzbank Mem. at 5-9).  In both of these cases, the courts held that

proximate cause had not been met because plaintiffs had failed to allege that the banks' "routine banking services" "proximately caused" plaintiffs' injuries.[38] (Id. at 5).

However, both Rothstein and Al Rajhi were decided before the enactment of JASTA, and prior to the Second Circuit's decision in Linde. The logic of both of these cases depends largely on the fact that secondary liability was not explicitly available under the ATA at that time.

Moreover, in examining the issue of causation, the Second Circuit in Linde explained that the "substantial assistance" inquiry for aiding and abetting liability is different from the inquiry necessary to establish proximate causation for primary liability. 882 F.3d at 330-31. The court in Linde explained that, in determining if causation has been established for purposes of imposing primary liability, the focus should be on the relationship between the alleged act of international terrorism and the plaintiff's injury: was the terrorist act the proximate cause of plaintiff's injury? By contrast, in the context of aiding and abetting liability, the focus is on the relationship between the secondary actor's alleged support and the act of international terrorism; has the secondary actor provided substantial assistance to the primary actor? Id. at 330-31. Thus, as discussed above, the court in Linde held that "under an aiding and abetting theory of ATA liability, plaintiffs would not have to prove that the bank's *own acts* constitute international terrorism satisfying all the definitional requirements of § 2331(1)." Id. at 328 (emphasis added).

---

[38] As discussed infra at 56, even under the stricter Al Rajhi/Rothstein standards, plaintiffs argue that the banks' actions in this case were *not* routine. The Second Circuit in Linde specifically noted that whether or not the defendant banks' actions were "routine" is a question of fact for the jury to decide. Linde v. Arab Bank, PLC, 882 F.3d at 327. Similarly, this Court agrees with plaintiffs that even if the passage of JASTA and the subsequent Linde decision did not change the causation analysis, plaintiffs have adequately raised questions of fact as to whether defendants' actions were "routine" banking practices, or were, instead, specially designed to aid in the circumvention of the law. Indeed, the defendants' own internal memoranda memorializing special ways of handling transactions on behalf of Iranian entities seem to indicate that these were not even considered routine practices by the banks themselves.

Although Linde did not address causation in the context of a conspiracy claim, it follows that, in the context of a conspiracy claim, each of the conspirator's actions need not themselves constitute an act of international terrorism under Section 2331(1). Instead, the acts of international terrorism committed by another member of the conspiracy may be separate and distinct from the "overt acts" committed by the conspiring bank in support of the overarching conspiracy. Thus, the causation requirement would be satisfied if there was a connection between the act of international terrorism and the plaintiffs' injuries. The Second Circuit said as much when, as discussed above, it noted that to establish causation, the focus should be on the relationship between the *alleged act of international terrorism and the plaintiff's injury*. Id. at 330-31 (emphasis added).

Not only does Linde make it clear that proximate cause, at least as interpreted by the defendants, is not a requirement in analyzing secondary liability under JASTA, but traditional conspiracy decisions further elucidate the principles to be applied in analyzing the instant conspiracy.

4. Case Law Explicating Conspiracy Principles

Five years prior to the Second Circuit's decision in Rothstein, the Seventh Circuit in Boim III found that conspiracy principles could inform the question of whether a defendant may be liable under a theory of secondary liability. 549 F.3d at 692-99. The Boim III court held that "[a]nyone who knowingly contributes to the nonviolent wing of an organization that he knows to engage in terrorism is knowingly contributing to the organization's terrorist activities." Id. However, where the monies or other financial support are laundered through other intermediate

organizations, the <u>Boim III</u> court noted that distant links between the donor and the terrorist organization may negate liability.  <u>Id.</u> at 701-02.

Furthermore, in line with plaintiffs' reading of <u>Rothstein</u> as simply applying traditional tort principles to the ATA context, other courts had historically determined that plaintiffs must show that the defendant's actions in connection with a conspiracy were "'a substantial factor in the sequence of responsible causation,' and that the injury was 'reasonably foreseeable or anticipated as a natural consequence.'"  <u>Weiss v. National Westminster Bank PLC</u>,[39] 453 F. Supp. 2d at 631; <u>Rothstein v. UBS AG</u>, 708 F.3d at 92.  (<u>See</u> discussion <u>supra</u> at 28).  These courts did not, however, require a showing that the funds attributed to the defendants were used to "buy the specific weapons and train the specific men who killed or injured the plaintiffs." <u>Weiss v. National Westminster Bank PLC</u>, 453 F. Supp. 2d at 631; <u>Strauss v. Credit Lyonnais, S.A.</u>, 925 F. Supp. 2d at 433-34 (noting that "plaintiffs who bring an ATA action are not required to trace specific dollars to specific attacks to satisfy the proximate cause standard.  Such a task would be impossible and would make the ATA practically dead letter").  (<u>But see</u> Defs.' Mem. at 7 (arguing that "there is no allegation that . . . the Moving Defendants processed even one dollar for any segment of the Iranian Government that allegedly funded terrorist organizations or groups, much less that the Moving Defendants processed transactions directly for any terrorist

---

[39] This Court looks to pre-<u>Rothstein</u> and pre-<u>Al Rajhi</u> district court cases as well to see how conspiracy should function in the ATA context, since only one court in this Circuit has assessed conspiracy-based claims in the wake of the Second Circuit's decision in <u>Linde</u>, confirming the availability of secondary liability under JASTA. <u>O'Sullivan v. Deutsche Bank AG</u>, 2018 WL 1989585.  In <u>O'Sullivan v. Deutsche Bank AG</u>, the Magistrate Judge was only asked to consider the bank defendants' request for a stay of discovery pending resolution of their motion to dismiss.  2018 WL 1989585, at *3.  The motion to dismiss was not before the Magistrate Judge at that time. However, in determining whether there was good cause to enter the stay, the judge considered whether defendants were likely to succeed on their motion to dismiss, analyzing plaintiffs' various claims under the ATA.  This decision is not binding on the Court.

entity")).  As plaintiffs correctly note, "th[is] kind of 'tracing' causation" is "not the legal standard under the ATA."  (Pls.' Mem. at 57 (citing <u>Boim III</u>, 549 F.3d at 697-98)).

Moreover, given the fungible nature of money, and the fact that it is difficult to say when any particular dollar is used by a terrorist organization, courts have declined to prescribe a certain formula for determining the question of proximate cause.  In particular, courts have declined to conclude that the length of time between a financial transaction and the subsequent terrorist act is necessarily decisive of the question of proximate cause.  <u>See, e.g.</u>, <u>Weiss v. National Westminster Bank PLC</u>, 453 F. Supp. 2d at 632 (finding that "[w]hile the lapse of time may factor into the proximate cause inquiry, given the fungible nature of money and the fact that it is difficult to say when the particular dollar given to a terrorist is actually used, I cannot conclude as a matter of law that NatWest's transaction in 2000 could not be the proximate cause of an attack that occurred less than two years later in 2002").

Principles of traditional criminal conspiracy law can also inform the discussion in this case.  The Supreme Court, when discussing the history of criminal conspiracy, has commented:

> The danger of a conspiratorial group [is not] limited to the particular end toward which it has embarked.  Combination in crime makes more likely the commission of crimes unrelated to the original purpose for which the group was formed.  *In sum, the danger which a conspiracy generates is not confined to the substantive offense which is the immediate aim of the enterprise.*

<u>Callanan v. United States</u>, 364 U.S. 587, 593-594 (1961) (emphasis added).

<u>Halberstam</u> further confirms this understanding:

> As to the extent of liability, *once the conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy.*  A conspirator need not participate actively in or benefit from the wrongful action in order to be found liable.  He need not even have planned or known about the injurious

> action . . . *so long as the purpose of the tortious action was to advance the overall object of the conspiracy.*

705 F.2d at 481 (emphasis added).

Accordingly, in line with <u>Halberstam</u>, so long as the purpose of the tortious action was to advance the overall object of the conspiracy, conspiracy-based liability will stand.

5. <u>Summary</u>

In light of the above, it now seems clear from the <u>Linde</u> decision that in the Second Circuit, plaintiffs seeking to pursue claims of primary liability must prove more than simply a violation of the material support provisions of the ATA; there must be proof of the other elements necessary to prove an "act of international terrorism" as defined by 18 U.S.C. § 2331. In other words, in order to establish primary liability, there must be proof that the defendant's acts "also involve violence or endanger human life," and "appear to be intended . . . to intimidate or coerce a civilian population . . . [or] to influence [or to affect] . . . a government." 18 U.S.C. § 2331(1).

In terms of conspiracy liability, since the <u>Linde</u> court did not expressly describe the standards to follow in assessing a conspiracy claim, this Court concludes that the Second Circuit would assess conspiracy claims under the <u>Halberstam</u> construct. Based on <u>Halberstam</u>'s understanding of conspiracy liability, as bolstered by traditional conspiracy law, the plaintiffs must allege: (1) an agreement to join a conspiracy, which can be inferred from a tacit understanding; (2) the performance of unlawful acts as part of the conspiracy; (3) injury caused by one or more of the parties; and (4) that these overt acts were pursuant to the common scheme and objective of the conspiracy. The parties need not share the same goal in joining the

conspiracy; nor must they be aware of a co-conspirator's intentions or goals in carrying out its overt acts.

Having set forth these elements, the Court must examine the pleadings to determine whether plaintiffs have met their burden at this stage of either alleging the definitional requirements of Section 2331(1) under a theory of primary liability under the ATA, or sufficiently pleading the elements of a conspiracy claim as set out in <u>Halberstam</u> necessary to survive defendants' motion to dismiss under Rule 12(b)(6).


V.      <u>The Moving Banks' Motion to Dismiss</u>

        A.  <u>Standards</u>

When deciding a motion to dismiss a complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court should consider whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 554, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Id.</u>  Under this heightened pleading standard, labels, conclusions, and mere recitation of the elements of a cause of action will not suffice.  <u>Id.</u>; <u>see also</u> <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555.  Instead, a plaintiff must provide enough factual support that, if true, would "raise a right to relief above the speculative level."  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555.  Ultimately, when the well-pleaded facts allow no more than an inference of a "mere possibility of misconduct" and the plaintiff has only alleged, rather than

shown, an entitlement to relief, the federal pleading standard of Rule 8(a)(2) has not been satisfied. Ashcroft v. Iqbal, 556 U.S. at 679.

The Second Circuit has stated that, in deciding a Rule 12(b)(6) motion, a court must "accept[] as true the factual allegations in the complaint and draw all inferences in the plaintiff's favor." Biro v. Conde Nast, 807 F.3d 541, 544 (2d Cir. 2015); see also Gorman v. Consol. Edison Corp., 488 F.3d 586, 591-92 (2d Cir. 2007); Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied, 513 U.S. 836 (1994); Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993). In making this determination, a plaintiff's claims "must be construed liberally." Hitchins v. New York City Dept. of Educ., No. 11 CV 4180, 2013 WL 1290981, at *3 (E.D.N.Y. Mar. 25, 2013). A court need not, however, accept the truth of legal conclusions or labels couched as factual allegations, see Papasan v. Allain, 478 U.S. 265, 286 (1986), and "bald assertions and conclusions of law will not suffice." Amron v. Morgan Stanley Inv. Advisors, Inc., 464 F.3d, 338, 344 (2d Cir. 2006). The issue is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds, Harlow v. Fitzgerald, 457 U.S. 800 (1982); accord Walker v. Schultz, 717 F.3d 119, 124 (2d Cir. 2013).

The Second Circuit in Rothstein, reviewing a complaint under the ATA, noted that "[i]n addressing the sufficiency of a complaint we accept as true all factual allegations and draw from them all reasonable inferences; but we are not required to credit conclusory allegations or legal conclusions couched as factual allegations." Rothstein v. UBS AG, 708 F.3d at 94 (internal citations omitted).

B. Analysis

The Court analyzes plaintiffs' allegations under the First and Second Claims for Relief in light of the conspiracy principles described above.[40] As Congress chose the broad construct of Halberstam for a reason when setting forth the standards by which civil liability should attach to secondary actors in the ATA context, this Court's analysis is guided by those standards.[41] The Court assesses plaintiffs' general allegations applicable to all bank defendants first, before assessing the allegations as to each bank's individual actions, and the extent of their knowledge and awareness of the connection between their conduct and terrorism activities.[42]

As a threshold matter, the defendants argue generally that Iran and its agents had legitimate uses for the money that they helped transfer. (See, e.g., Defs.' Mem. at 17; SCB Mem. at 3). While that may be true, plaintiffs plausibly allege that the defendants knew that transactions with certain designated government entities and terrorist groups were strictly

---

[40] As an initial matter, the Court need not make a determination as to whether plaintiffs can establish primary liability under the First and Second Claims for Relief against all defendants because of the availability of JASTA-based conspiracy. (See discussion supra at 30). Nonetheless, plaintiffs seem to recognize the distinction by separating their non-conspiracy Fifth, Sixth, and Seventh Claims for Relief against those individual bank defendants whom they allege to be primary violators of the ATA. At trial, plaintiffs, of course, may rely on either theory of the case that they can prove. Accordingly, at this stage in the proceedings, the Court addresses the First and Second Claims for Relief under the conspiracy framework set forth supra. The Fifth, Sixth, and Seventh Claims for Relief are discussed infra at 87, 101.

[41] In concluding that Congress meant to attach civil liability for terrorist acts to the "financial angels" such as the Moving defendants here, the Court is also persuaded by Boim III's well-reasoned analysis that "damages are a less effective remedy against terrorists and their organizations than against their financial angels. Terrorist organizations have been sued under section 2333 . . . but to collect a damages judgment against such an organization [is] . . . well-nigh impossible." Boim III, 549 F.3d at 690-691. The en banc Boim III court then proceeded to discuss Congress's scheme of authorizing the payment of judgments against "covert foreign organizations" from U.S. Treasury Funds. Id. (citing Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 2002, 114 Stat. 1464). The Seventh Circuit decided Boim III eight years prior to the passage of JASTA; Congress's intent seems even clearer now.

[42] While plaintiffs here did not plead aiding and abetting claims, many of their claims would also fall under an aiding-abetting theory as well. As the Second Circuit in Linde noted, it is an issue of fact, not a question of law, as to whether the evidence ultimately presented to the jury was sufficient to establish that the Bank was "generally aware" that by processing these transfers of funds in the secretive, roundabout way that it did, it was playing a role in violent or life-endangering acts with the apparent intent to intimidate or coerce civilians or to affect a government. Linde v. Arab Bank, PLC, 882 F.3d at 329-30. The same analysis applies here.

prohibited because of the concerns relating to terrorism, and yet the defendants deliberately undertook efforts to circumvent these prohibitions. It will ultimately be an issue for a jury to discern defendants' state of mind and knowledge as to the use of the funds. Additionally, to the extent that defendants argue that these transactions were legal pursuant to the U-Turn Exemption in place at the time, as described above, one of the conditions for the U-Turn Exemption is that none of the parties could have been designated as an SDN. (See SAC ¶ 142). It will be a question for the jury as to whether any of the entities in defendants' transactions were SDNs at the time, based on the principles governing alter ego liability discussed supra at 36.

1. An Agreement Between Two or More Persons

As described above, the Halberstam construct for conspiracy allows for the "agreement" prong of a conspiracy to be inferred. Indeed, "[p]roof of a tacit, as opposed to explicit, understanding is sufficient to show agreement." 705 F.2d at 477. The Second Amended Complaint is replete with examples of conduct and statements from which it can be inferred that the defendants were entering into an agreement to perform unlawful acts, the specifics of which are discussed infra.

a. Object of the Conspiracy

In the case at hand, as described supra, plaintiffs have alleged a conspiracy where the object was to provide material support for terrorism.[43]

---

[43] Explaining that criminal conspiracy laws require that the "'co-conspirators joined to effectuate a common design or purpose[,]'" the court in Shaffer v. Deutsche Bank noted that the complaint in that case alleged a "conspiracy to avoid U.S. economic sanctions to assist Iranian banks in securing U.S. currency." No. 16 CR 497, 2017 WL 8786497, at *5 (S.D. Ill. Dec. 7, 2017). However, in order to violate the ATA, the court held that the

In terms of the scope of the agreement, the HSBC and RBS defendants cite case law to argue that the "'object'" of the conspiracy is limited to only those goals that a defendant 'possessed "the specific intent to commit."'" (HSBC/RBS Reply Mem. at 7). Accordingly, they argue that plaintiffs fail to allege that the defendants had "the specific intent to engage [in] an objective that included terrorist attacks." (Id.; see also HSBC/RBS Mem.[44] at 2, 3).

However, this is *not* a requirement for conspiracy according to Halberstam. Indeed, the Halberstam court made no such finding that Hamilton had any intent to engage in an objective that included killing. In that case, the killing was an overt act committed by her boyfriend Welch in *furtherance* of the conspiracy, but the object of the conspiracy was to "obtain stolen goods." Id. (See Pls.' Mem. at 39 (noting that there was "no evidence whatsoever that [the girlfriend, Hamilton] had a 'common goal of murdering' (or even burglarizing) Halberstam")). Similarly, it is clear that where the object of the conspiracy is to provide material support for terrorism, that support is not limited to monetary support.[45] Instead, the actual *terrorist attacks* allegedly committed against the Coalition Forces and others in this case also constitute "material support" in that they advanced the overall object of the conspiracy of providing material support for terrorism. Indeed, the Second Circuit in Linde cited a suicide bomber as the paradigmatic example of one who, in providing material support for terrorism*,* also satisfies each of the

---

object of the conspiracy must be to provide material support for terrorism, which the court found that the plaintiffs in Shaffer had not pleaded.

[44] Citations to "HSBC/RBS Mem." refer to the Supplemental Memorandum of Law of HSBC Holdings, PLC, HSBC Bank PLC, HSBC Bank Middle East Limited, HSBC Bank USA, N.A., and the Royal Bank of Scotland N.V. in Support of Motion to Dismiss, filed on November 10, 2016, ECF No. 122.

[45] With regards to direct monetary support, it is further alleged that Iran provided direct monetary support by paying terror proxies in Iraq between $4,000 and $13,000 per rocket or roadside bomb. (SAC ¶ 252). As one additional example of direct funding, plaintiffs allege that the trainer in charge of one of the attacks (in Karbala) was paid $3 million in U.S. currency every month. (Id. ¶ 248).

required elements of committing an act of international terrorism.  See Linde v. Arab Bank, PLC, 882 F.3d at 326.

As with Halberstam, an interrelated concept from criminal conspiracy law is that the exact goal of the conspiracy need not be identical for each co-conspirator.  See United States v. Maldonado-Rivera, 922 F.2d 934, 963 (2d Cir. 1990) (noting that "[t]he goals of all the participants need not be congruent for a single conspiracy to exist, so long as their goals are not at cross-purposes");  United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1192 (2d Cir. 1989).  In other words, where the object of the conspiracy is to provide material support for terrorism, even if the defendants' goal in participating in the conspiracy was based on greed and for financial gain, and not intentionally to fund terror, this goal is not at "cross-purposes" from what the other members' goals might have been:  the bank defendants gained business worth hundreds of millions of U.S. dollars, while the terrorist proxies were able to fund their attacks against U.S. and Coalition Force troops.

In alleging that the defendants entered into an agreement, the object of which was to provide material support for terrorism, the Second Amended Complaint contains numerous allegations claiming that the Moving defendants entered into agreements with various Iranian entities in which the defendants agreed to engage in financial transactions designed to provide funding in U.S. dollars to Iran and/or its proxies.  Moreover, plaintiffs cite numerous examples of news reports and other items of publicly available information disseminated prior to and during the period of the alleged conspiracy of which defendants were aware or should have been aware that described Iran's role in providing assistance to FTOs such as Hezbollah, as well as other terrorist groups, and Iran's link to the use of EFPs against Coalition Forces.  (SAC ¶¶ 35, 36-44).  State Department reports issued in 2006, 2007, and 2008 documented Iran's efforts to

provide terrorists in Iraq with EFPs and to provide training and funding to terror proxies. (Id. ¶¶ 266, 273). These reports also connect Hezbollah and the IRGC-QF to "sophisticated IED technology." (Id. ¶ 276).

These official reports and other publicly disseminated information support plaintiffs' allegation that, by agreeing to participate in the funding scheme, defendants knew, or should have known, that they were potentially providing material support for terrorism, particularly since Iran had been designated as a State Sponsor of Terrorism as early as 1984 and was subjected to sanctions in 1996, long in advance of the conduct alleged in the Second Amended Complaint. (SAC ¶¶ 10, 107, 337). In line with this Circuit's precedent in Rothstein, this fact is not determinative of defendants' agreement to participate in the conspiracy with other co-conspirators aside from Iran, since "Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund." 708 F.3d at 97. Nonetheless, as the Rothstein court pointed out, "[t]he fact that the transfers were made to a state sponsor of terrorism of course made it more likely that the moneys would be used for terrorism than if the transfers were to a state that did not sponsor terrorism." Id. Likewise, this information makes it more likely that one of the other co-conspirators was a group aiding in terrorist acts through the direct control of Iran.[46] Just as the Halberstam court found that it "defi[ed] credulity" that the burglar's girlfriend did not know that "*something illegal* was afoot" by her boyfriend's activities, 705 F.2d at 487 (emphasis added), so too do these allegations, when taken together, "defy credulity" that the

---

[46] This information also supports a claim under 18 U.S.C. § 2339A. For the specific references in the Second Amended Complaint relating to plaintiffs' claims under the material support statutes, see the discussion infra as to each bank. The Second Amended Complaint also contains specific allegations that the defendants provided material support either directly or indirectly through other banks, such as Bank Saderat, to a designated Foreign Terrorist Organization – namely, Hezbollah – in violation of 18 U.S.C. § 2339B. Hezbollah had been designated as a SDT and FTO in 1995 and 1997, respectively, long in advance of the defendant banks' financial activities alleged in the Second Amended Complaint. (SAC ¶¶ 225, 229).

bank defendants did not know that, at minimum, "*something illegal*" was afoot with their Iranian co-conspirators, particularly given that the banks intentionally sought ways to surreptitiously arrange for funding and U.S. dollar transfers that did not identify Iranian connections even though legitimate means were in fact available.  (See discussion supra at 49).

Nonetheless, precise awareness of who one's co-conspirators are is not a required element in the Halberstam construct, or in traditional conspiracy law generally.  See, e.g., United States v. Maldonado-Rivera, 922 F.2d at 963 (describing the principle that "it is not necessary that the conspirators know the identities of all the other conspirators in order for a single conspiracy to be found") (citing Blumenthal v. United States, 332 U.S. 539, 557 (1947); United States v. Gleason, 616 F.2d 2, 16 (2d Cir. 1979), cert. denied, 444 U.S. 1082 (1980); United States v. Vila, 599 F.2d 21, 24 (2d Cir.), cert. denied, 444 U.S. 837 (1979); United States v. Moten, 564 F.2d 620, 625 (2d Cir.), cert. denied, 434 U.S. 942 (1977)).

However, in terms of the relationships between the co-conspirators, the HSBC and RBS defendants draw upon criminal conspiracy law to argue that plaintiffs allege a hub-and-spoke conspiracy, in which "Iran and its banks were the central actors in a hub-and-spoke conspiracy, in which HSBC or RBS N.V. were one spoke . . . and Hezbollah and the Special Groups were another."  (See HSBC/RBS Reply Mem. at 7).  HSBC and RBS cite case law to argue that "absent evidence that the spoke conspirators are 'mutually interdependent," there can be no single conspiracy.'"  (Id. at 8 (citing United States v. Maldonado-Rivera, 922 F.2d at 963; United States v. Berger, 224 F.3d 107, 115 (2d Cir. 2000))).

Plaintiffs, instead, characterize the hub-and-spoke conspiracy as Iran, Hezbollah, and Bank Saderat (as an agent of Hezbollah) – namely, the Iranian "terror apparatus" – as the central actors in the conspiracy, and the Moving defendants as different spokes.  (Pls.' Mem. at 17).

Plaintiffs allege that Iran, through Hezbollah and the IRGC, commenced a campaign against American forces in Iraq following the fall of Saddam Hussein in which Iran and Hezbollah, working together, designed the EFP, smuggled EFPs into Iraq through IRGC and Hezbollah operatives, supplied local terror cells with these weapons, and trained them in their use in targeting U.S. forces.  (Id. ¶¶ 16, 19-21, 47, 112, 226-32, 233-41, 251-58, 271-76, 282-329, 677-78, 709, 1073, 2277).   Each of the Moving defendants is alleged to have cooperated with, and provided financial assistance, to Bank Saderat, which operated in the central "hub" of this configured conspiracy.  (See SAC ¶¶ 478, 521 [HSBC], 576, 614 [Barclays], 623, 645, 660, 668 [SCB], 863, 874 [RBS], 932-33 [Credit Suisse], 994 [Commerzbank]).  Moreover, plaintiffs assert that the Moving defendants were either aware of, or deliberately indifferent to, Bank Saderat's connections with Hezbollah as comprising the hub of this terror apparatus.  As just one example, the HSBC defendants are alleged to have known that there was "direct evidence of Bank Saderat 'funding of Hezbollah,'" but they nevertheless proceeded to falsify or omit information from payment orders at Bank Saderat's request.  (Id. ¶ 49).  Additionally, plaintiffs plead certain allegations as to the "mutual interdepend[ence]" of the Moving defendants.  (See HSBC/RBS Reply Mem. at 7; see, e.g., SAC ¶ 917 (noting that, after communications between higher-ups at HSBC and RBS, those two banks both decided that their payment practices to conceal Iranian financial transactions were in line with market practice)).

Therefore, it is respectfully recommended that plaintiffs' allegations be found to be sufficient to meet this element of the Halberstam construct for conspiracy liability – namely, the existence of an agreement between two or more parties, with the object of the agreement to provide material support for terrorism – through providing support to a State Sponsor of Terrorism and its agents, including FTO Hezbollah.

2. Unlawful Acts

As for the second element required for a conspiracy under Halberstam, namely, the performance of unlawful acts, the Second Amended Complaint details numerous examples of unlawful acts by each of the bank defendants. The acts described in detail below – including stripping financial transactions, disguising payment sources, transferring funds to sanctioned entities, and manually altering payment information – all in an effort to provide material support either explicitly to FTO Hezbollah, in violation of 18 U.S.C. § 2339B[47] or to other entities who would commit criminal acts, in violation of 18 U.S.C. § 2339A – constitute the "unlawful acts" of defendants in their roles as members of the conspiracy. To the extent that defendants argue that the provision of routine financial services can never be sufficient to support a claim under the ATA, the Second Circuit in Linde held that this was a question for the jury, concluding "only" that providing routine financial services to terrorist organizations "is not so akin to providing a loaded gun to a child as to excuse the charging error here and compel a finding that as a matter of law[,] such services constituted an act of international terrorism." Linde v. Arab Bank, PLC, 882 F.3d at 327. Apart from the fact that the issue before this Court is presented at the pleading stage, where the proof requirements are even lower, here there are serious questions raised as to whether the conduct of the defendants in this case in working with the Iranian entities to develop sophisticated means to evade detection and avoid U.S. sanctions could be considered "'routine banking services'[.]" Id. at 327. (See also Pls.' Mem. at 5 (noting that "the [Second

_____

[47] The Second Amended Complaint further alleges that the acts of international terrorism were carried out by an FTO, Hezbollah, in conjunction with a State Sponsor of Terrorism and its agents. The Second Amended Complaint pleads numerous allegations showing that an FTO (Hezbollah) committed, planned, or authorized the attacks at issue (see, e.g., id. ¶¶ 1041-80 (describing how Hezbollah operatives planned the terrorist attack on the Provincial Joint Coordination Center in Karbala, Iraq, resulting in the deaths of several plaintiffs)); and that Hezbollah established, trained and supplied other terror organizations on behalf of Iran and the IRGC with funding and training, ordering and authorizing these other organizations to commit attacks on Americans. (Id. ¶¶ 226-58).

Amended] Complaint, however, does not allege 'the mere provision of banking services to Iran'")) (alteration added).

As described in detail when discussing each bank's activities <u>infra</u>, the banks' behavior is quite different from the "sole allegation of conduct" alleged by the plaintiffs in <u>Stutts v. De Dietrich Group</u>, No. 03 CV 4058, 2006 WL 1867060, at *2 (E.D.N.Y. June 30, 2006), where the conduct alleged was the processing of a single Letter of Credit to an arms manufacturer. (<u>Cf.</u> HSBC/RBS Mem. at 4; HSBC/RBS Reply Mem. at 4). Here, each bank is alleged to have engaged in multiple transactions over a period of years, involving manipulative and deceptive methods designed to conceal the identity of the Iranian participants.[48] The banks' actions are also different from the conclusory assertions of conspiracy that concerned the court in <u>Gill v. Arab Bank, PLC</u>, 893 F. Supp. 2d at 556 (noting that "[t]here is no evidence regarding any agreement entered into by the Bank explicitly or implicitly or steps taken by it in furtherance of such a conspiracy . . .").

Indeed, the alleged unlawful acts here are arguably more deceptive and more involved than the unlawful acts undertaken by Linda Hamilton in <u>Halberstam</u>, who is only alleged to have done secretarial work for her boyfriend's business. <u>Halberstam v. Welch</u>, 705 F.2d at 475. Accordingly, this Court respectfully recommends a finding that this element of the <u>Halberstam</u> construct is satisfied by the pleadings in the Second Amended Complaint.

---

[48] The banks' conduct in altering and concealing the identity of those involved in these thousands of transactions makes it difficult for plaintiffs at the pleading stage to allege exactly what organization or terror group was involved in a specific transaction. Discovery of these hidden identities may reveal hundreds of examples of conduct by the banks that provided funding directly to Hezbollah or other terrorists.

3. Overt Act Pursuant to Common Scheme

As described above, once the conspiracy has been formed, all of its members are liable for injuries caused by any overt acts committed pursuant to or in furtherance of the conspiracy, regardless of who commits them. Id. at 481. Accordingly, in Halberstam, the court explicitly noted that "[t]he use of violence to escape apprehension was certainly not outside the scope of a conspiracy to obtain stolen goods through regular nighttime forays and then to dispose of them." Id. at 487. Similarly, the use of violence to further the goal of the instant conspiracy – to finance and enrich Iranian terror proxies – is certainly not outside the scope of the conspiracy pleaded by plaintiffs in this case.

In the case at hand, each of the conspirators played a crucial role in the success of the conspiracy: (1) the Moving defendants are alleged to have provided funding to Iran and its agents through their methods for circumventing U.S. sanctions and regulations; (2) Bank Saderat and other agents of Iran, including the IRGC, MODAFL and others, were conduits for the funds that were then transferred to (3) Hezbollah or other terror groups which committed, planned, or authorized the terror acts.

The banks' overt acts also were in "furtherance of the conspiracy." Plaintiffs claim that, without the defendant banks' funding, the terrorist entities would not have been able to engage in the overt acts of actualizing the attacks that killed or injured plaintiffs to "the same extent and magnitude" as they did, and Iran and its entities would have been "severely hampered in its terror financing." (SAC ¶ 5; see also ¶¶ 47, 132, 273, 278, 2216, 2286; Pls.' Mem. at 23, 32, 43-44). Nevertheless, as described above, although each member of the conspiracy may not have committed the ultimate act of murder or bombing, each is liable for the injuries suffered as a result. Halberstam v. Welch, 705 F.2d at 481 (noting that a co-conspirator "need not even have

planned or known about the injurious action . . . so long as the purpose of the tortious action was to advance the overall object of the conspiracy"). (See discussion supra at 46).

In attempting to differentiate the Second Amended Complaint from Halberstam, defendants argue that in Halberstam, the girlfriend, Linda Hamilton, "knew full well the purpose of her boyfriend's forays," whereas in this case, defendants contend that there are "no non-conclusory allegations" that "the Moving Defendants 'knew full well that the U.S. dollars they allegedly helped Iranian banks acquire would be diverted to the terrorist groups that injured Plaintiffs[.]" (Defs.' Reply[49] at 7 n.2 (quoting Halberstam v. Welch, 705 F.2d at 486)). However, contrary to defendants' contentions, the Halberstam court did not make, and thus did not rely on, a finding that Hamilton knew full well the *exact* purpose of Welch's forays. Apart from the fact that the Second Amended Complaint *does* allege knowledge on the part of defendants of the risk that funds would be used by terrorists, here the case is still at the pleading stage: Hamilton's knowledge in Halberstam was evaluated after a trial when all the evidence had been presented. Furthermore, after evaluating the evidence presented at trial, the Halberstam court explicitly found that "it was not necessary that Hamilton knew specifically that Welch was committing burglaries. Rather, when she assisted him, it was enough that she knew he was involved in some type of personal property crime at night – whether as a fence, burglar, or armed robber made no difference – because violence and killing is a foreseeable risk in any of these enterprises." (Pls.' Mem. at 39 (citing Halberstam v. Welch, 705 F.2d at 488)). See also United States v. Lanza, 790 F.2d 1015, 1022 (2d Cir. 1986) (noting that "knowledge" of a conspiracy

---

[49] Citations to "Defs.' Reply" refer to the Defendants' Joint Reply Memorandum in Further Support of Motion to Dismiss, filed on November 10, 2016, ECF No. 126.

requires "knowing participation or membership in the scheme charged and *some knowledge* of the unlawful aims and objectives of the scheme") (emphasis added).

Similarly, as violence against American and other Coalition troops and civilians is a "foreseeable risk" and not outside the scope of a conspiracy to provide material support for terrorism, the Court recommends a finding that the allegations in the Second Amended Complaint satisfy the pleading standards insofar as this element of the Halberstam construct is concerned.

4. Injury Caused by One of the Parties

The Second Amended Complaint also clearly alleges that there was an injury caused by an unlawful overt act performed by one of the parties to the conspiracy. Halberstam v. Welch, 705 F.2d at 477. Each of the plaintiffs was injured by an act of international terrorism – namely, the terrorist attacks and other conduct designed to kill and maim Coalition troops and terrorize ordinary Iraqis, as described in hundreds of paragraphs in the Second Amended Complaint. These overt acts committed by other members of the conspiracy qualify as "violent acts or acts dangerous to human life" intended to "intimidate or coerce a civilian population[,]" influence government policy or "affect the conduct of the government by mass destruction, assassination or kidnapping[,]" as required by 18 U.S.C. § 2331.

As described above, each of the terrorist entities that is alleged to have injured plaintiffs is a part of the conspiracy, as are the Moving defendants who funded these entities. (See discussion supra at 52, 54). The Second Amended Complaint contains over 1,000 paragraphs alleging that various terrorist organizations, whose activities were funded through illegal transfers facilitated by the defendant banks, committed overt acts of terrorism resulting in

significant injury and in many instances death to the plaintiffs.  These allegations are sufficient at this stage of the pleadings to satisfy this element of the <u>Halberstam</u> conspiracy analysis.

In light of the specificity with which plaintiffs plead different claims for each individual bank, the Court proceeds to set forth the unlawful acts alleged to have been performed by each bank defendant.  Since a key component of the conduct undertaken by each of the non-Iranian banks relates in some aspect to Bank Saderat (<u>see</u> discussion <u>supra</u> at 54, describing Bank Saderat as one of the "hub" actors of the conspiracy), the allegations of that bank's actions are described first.[50]

a)  <u>Bank Saderat</u>

Plaintiffs allege that Bank Saderat Iran is one of Iran's largest banks with approximately 3,400 branches worldwide, including branches in the U.K., Frankfurt, Paris, Athens, Dubai and Beirut.  (<u>Id.</u> ¶ 90).  According to the Second Amended Complaint, Bank Saderat was nationalized after the Iranian Revolution, and subsequently privatized in 2009, with 49% of its shares owned by the Iranian government.  (<u>Id.</u> ¶ 91).

Plaintiffs allege that for many years prior to 2006, Bank Saderat conspired with the Moving defendants and others to illegally route U.S. dollar transactions through the United States in order to facilitate the transfer of funds to various terrorist organizations, including specifically transferring "tens of millions of dollars to Hezbollah and other designated terrorist groups."  (<u>Id.</u> ¶¶ 369-70).  By using Letters of Credit and altered fund transactions, Bank Saderat provided the funds that enabled Hezbollah and other terrorist organizations to acquire the

---

[50] Additional details as they relate to Bank Saderat's motion to dismiss will be addressed <u>infra</u> at 123.

technologies and components needed to make the IEDs and EFPs used to kill Coalition Forces. (Id. ¶ 196).

According to the Second Amended Complaint, in 2003, non-party Lloyds TSB Bank PLC ended its relationship with Bank Saderat after entering into a Deferred Prosecution Agreement with U.S. law enforcement. (Id. ¶ 371). At that time, it is alleged that defendant Credit Suisse assumed Lloyds' role of illegally transferring funds through the United States by stripping references to Bank Saderat and Iran from the transactions. (Id. ¶ 372). On February 13, 2004, plaintiffs claim that Bank Saderat turned to defendant Standard Chartered, which opened accounts for Bank Saderat and assisted in financing the acquisition of export-controlled goods on behalf of Mahan Air and sub-agencies of MODAFL through Letters of Credit. (Id. ¶¶ 374-81; see discussion infra at 83). It is further alleged that the HSBC defendants also maintained one or more accounts for Bank Saderat during this time, despite the recognition of HSBC Middle East's Regional Head of Legal and Compliance that there was "'direct evidence against Bank Saderat particularly in relation to the alleged funding of Hezbollah[.]'" (Id. ¶ 383).

In September 2006, OFAC amended the ITRs to exclude Bank Saderat from the U-Turn Exemption, discussed supra at 11. (Id. ¶ 364). In doing so, OFAC stated that it had cut off the bank because "'Bank Saderat has been a significant facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah . . . .'" (Id. ¶ 365). The Treasury Department's 2006 press release noted that "'a Hezbollah-controlled organization [] has received $50 million directly from Iran through Bank Saderat since 2001.'" (Id. ¶ 367).

In October 2007, the United States designated Bank Saderat Iran as an SDGT, stating in a press release that Bank Saderat had been used by the Iranian government to channel funds to terrorist organizations, including Hezbollah, Hamas and the Palestinian Islamic Jihad. (Id. ¶¶

384-85). Despite this designation and the public announcement of the Bank's connection to terrorism, plaintiffs claim that it was not until months later, in 2008, that Barclays closed its accounts for Bank Saderat. (Id. ¶ 386). However, the HSBC defendants, Commerzbank, SCB, and Credit Suisse continued to facilitate transactions on behalf of Bank Saderat, knowing or deliberately indifferent to the fact that Bank Saderat had been designated a SDGT. (Id. ¶¶ 386-87). Plaintiffs allege that Bank Saderat's provision of tens of millions of dollars to Hezbollah provided substantial assistance in carrying out terrorist activities that killed and injured the plaintiffs. (Id. ¶¶ 388-90).

The allegations set out in the Second Amended Complaint not only allege the elements of a Halberstam conspiracy under the ATA, but allege that Bank Saderat's activities in illegally transferring funds through the United States were undertaken on behalf of the Iranian government in order to channel funds to designated terrorist organizations, including Hezbollah, Hamas and the Palestinian Islamic Jihad. This direct connection between Bank Saderat and the FTOs and other terrorist organizations is supported by the analysis of U.S. government agencies, such as the Treasury Department, as reflected in a 2006 press release stating that between 2001 and 2006, Bank Saderat directly sent over $50 million to "'a Hezbollah-controlled organization[.]'" (SAC ¶¶ 366-67). The allegations further connect Bank Saderat to the financing of Iranian agencies identified by the U.S. government as facilitators of the transport of the radio frequency modules recovered from the devices used to target the Coalition Forces, as well as the transport of weapons, arms shipment and suspected IRGC-QF officers, on behalf of Hezbollah. (Id. ¶ 677).

Unlike the allegations in some earlier cases, the allegations here clearly describe the object of the alleged conspiracy as, among other things, to provide material support for terrorism.

(SAC ¶ 23); cf. Shaffer v. Deutsche Bank AG, 2017 WL 8786497.  (See also discussion supra at 50).  The allegations here also state facts from which a jury could infer that Bank Saderat was aware of and deliberately transferred funds to terrorist organizations.  (Compare SAC ¶¶ 367-77; 677 (describing Bank Saderat's direct fund transfers to terrorist organizations), with Hussein v. Dahabshiil Transfer Servs. Ltd., 230 F. Supp. 3d at 175 (dismissing the complaint, finding that the "[p]laintiffs do not plausibly allege any facts from which the Court could infer that the Defendants were aware of, or deliberately indifferent to, transfers of money to al-Shabaab. . . a necessary element of a claim under the ATA")).

At this stage of the proceedings, when plaintiffs' burden is simply to allege plausible facts sufficient to sustain a claim and allow the case to proceed with discovery, the Court respectfully recommends that Bank Saderat's motion to dismiss the First and Second Claims as against it be denied.

b)  HSBC

Defendant HSBC Holdings PLC ("HSBC Holdings") is a public limited company organized under the laws of the United Kingdom that directly or indirectly owns HSBC Bank PLC ("HSBC-London" or "HSBC-Europe"), HSBC Bank Middle East Limited ("HSBC-Middle East"), and HSBC Bank USA, NA ("HSBC-US") (collectively, "HSBC").  (SAC ¶ 61).  HSBC-US has more than 240 branches throughout the United States; its headquarters are in Virginia and its principal office is in New York City.  (Id. ¶¶ 68-69).

As with Bank Saderat, the Second Amended Complaint alleges that HSBC entered into an agreement with Iran and various other Iranian banks to provide material support to Iran and its terror proxies by processing trade arrangements and financial transfers in violation of U.S.

sanctions. (See, e.g., ¶¶ 476-83). Specifically, it is alleged that between 2001 and 2007, the HSBC defendants utilized various methods to facilitate Eurodollar payments and other trade and finance transactions on behalf of Iran by disguising the Iranian transactions in violation of U.S. sanctions. (Id. ¶ 481). Moreover, as discussed supra in reference to all defendants, at all relevant times, the HSBC defendants knew that Iran had been designated a State Sponsor of Terrorism. These allegations satisfy the first two elements of the Halberstam conspiracy construct.

Plaintiffs allege that the HSBC defendants have had a relationship with Iran as far back as 1999, when they launched an "Iran Representative" office in Tehran and established a relationship with the Bank Melli Iran. (Id. ¶¶ 476, 477). In December 2000, the HSBC defendants allegedly entered into a $500 million project finance agreement with six Iranian commercial banks. (Id. ¶¶ 478, 499). Shortly thereafter, in April 2001, HSBC-Europe presented a proposal to Bank Melli (the "Bank Melli Proposal"), whereby HSBC-Europe would process Bank Melli payments in a way that would not identify Bank Melli as a sender in any payment order and ensure that Iranian transactions involving U.S. dollar funds would not run into any obstacles. (Id. ¶¶ 500-03). In exchange, HSBC would receive the majority of Bank Melli's U.S. dollar funds clearing and settlement business. (Id. ¶ 500). HSBC-Europe developed a template for use in these transactions that explicitly advised: "DO NOT QUOTE IF IRANIAN." (Id. ¶ 504). Plaintiffs contend that the Bank Melli Proposal "documented the HSBC Defendants' active coordination and participation in the Conspiracy to illegally remove, omit or falsify essential information from the SWIFT-NET[51] messages so as not to trigger OFAC sanctions

---

[51] SWIFT-NET is a network that enables financial institutions to send and receive information about Eurodollar transactions in a standardized message format. (SAC ¶ 22 n.4).

screening filters or otherwise permit. . .[detection of] Iranian transactions in USD funds." (Id. ¶ 505).

Several methods were allegedly used to facilitate the unlawful transfer of USD funds from HSBC-Europe and HSBC-Middle East. (Id. ¶ 482). Among these methods was "stripping," or deliberately deleting references to Iran from the payment instructions, or otherwise altering the SWIFT-NET messages by omitting or falsifying information that would indicate Iran's involvement in the transaction. (Id.) According to the plaintiffs, in the late 1990s, HSBC-Europe and HSBC-Middle East developed a procedure whereby their Iranian Bank Co-conspirators would add a cautionary note to their SWIFT-NET payment order messages, such as "'care sanctioned country,'" "'do not mention our name in NY,'" and "'do not mention Iran.'" (Id. ¶ 479). HSBC employees would then manually remove any mention of Iranian entities from the SWIFT-NET messages connected with these Eurodollar payment transactions. (Id. ¶ 480). HSBC-Europe is alleged to have subsequently created a mechanism to avoid HSBC-US's automated OFAC filter software, thereby eliminating the need for the employees to manually alter the SWIFT-NET messages and enabling defendants to do business with Iran in the Eurodollar market "quickly and profitably." (Id. ¶¶ 483-84). A 2001 email from the HSBC-Europe's Institutional Banking Relationship Manager for HSBC-Europe's Bank Melli account described the method by which messages were altered as the bank's standard or "usual method." (Id. ¶¶ 506-08). The same email discussed the Bank Melli Proposal as a way to eliminate the need for manually altering the wording of Iranian payment order messages and avoid the type of incident described in the email, whereby a payment involving an Iranian bank had been blocked because HSBC-Europe's payment department had "failed to spot the poor input and did not follow the normal procedure of altering the payment." (Id. ¶ 508).

Plaintiffs claim that another method used by the HSBC defendants was to style transactions as bank to bank "cover" transactions between two non-Iranian banks.  (Id. ¶ 482(b)).  That way, under the MT 202[52] payment order message format for these type of transactions, HSBC was not obligated to identify the transaction's originator and beneficiary, blocking the electronic filter algorithms and avoiding disclosure of the Iranian connections to the transaction.  (Id.)  Plaintiffs maintain that the HSBC defendants deliberately used the MT 202 payment format and amended the SWIFT-NET payment order messages to conceal the transactions from automated OFAC screening filters and thus avoid detection by U.S. financial institutions.  (Id. ¶¶ 488-89).  These allegations support plaintiffs' claim that the HSBC defendants knowingly participated in this conspiracy to conceal the fact that Iran and its Iranian bank counterparts were engaging in financial transactions in violation of U.S. law.

Plaintiffs further allege that HSBC maintained accounts for NIOC at a time when it was controlled by the IRGC, an agent of Iran that was directly involved in acts of terrorism that caused injury to plaintiffs.  (Id. ¶ 516 n.28).  During this time, plaintiffs allege that NIOC provided the IRGC with billions of dollars in oil and gas revenues and conducted surveillance on Coalition Forces using NIOC's own helicopters.  (Id. ¶ 403) (see discussion supra at 10; see also discussion supra at 24 (describing one of the statutorily-proscribed actions under Section 2339B as gathering information on potential targets for terrorist activity)).

Plaintiffs assert that HSBC Holdings was aware of what HSBC-Europe and HSBC-Middle East were doing.  They cite as an example an email in June 2000 to the HSBC Anti-

---

[52] According to plaintiffs, MT 103 payment orders disclose the originator, beneficiary, and counter-parties of the transaction, whereas MT 202 payment orders do not require the transmitting bank to include this information. (Id. ¶ 25(b) (see also supra n.13)).

Money Laundering ("AML") Compliance Head, Susan Wright, informing her of the practice of client banks replacing the remitter's name with that of the client bank so as to avoid identification of the underlying party and the beneficiary of the transaction. (Id. ¶¶ 492-93). The email expressly stated: "'[i]n this way a payment in US$ can be made for an individual or company on the OFAC list, without the name being "detected" by the OFAC filters that all US banks would apply.'" (Id. ¶ 494). Wright expressed the opinion that the practice was "unacceptable," contrary to SWIFT guidelines, and "a deliberate and calculated method to avoid US OFAC sanctions," and forwarded the email to the Head of HSBC Group Compliance, Matthew King. (Id. ¶ 496). In another email authored by King in October 2001, King cautioned that pending U.S. legislation would give the United States authority over foreign banks, "particularly if we are unfortunate enough to process a payment which turns out to be connected to terrorism." (Id. ¶¶ 510-11). The email, which was sent to Wright and David Bagley, the Regional Head of Legal and Compliance for HSBC-Middle East, also suggested that the methods "traditionally used" to avoid sanctions "may no longer be acceptable." (Id.) These emails demonstrate knowledge at the highest levels of HSBC of the risk incurred in HSBC's financial transactions.

Plaintiffs maintain that despite the fact that senior HSBC officials were aware of the methods used by Iran, the Iranian Banks, and HSBC itself, they did not end this illicit practice; instead, they allowed HSBC to continue refining these procedures to facilitate illegal Eurodollar payments from and for Iran in USD funds. (Id. ¶¶ 497-98). A January 2003 HSBC memorandum circulated among the HSBC defendants explicitly acknowledged the participation of the Iranian Bank Co-conspirators by stating: "'Currently, it is estimated that Iranian banks issue up to 700 USD payments a day using their USD providers, mainly banks in the UK and

Europe, which in turn use their New York USD correspondents to effect the payments.'" (Id. ¶¶ 513-14). The memorandum further noted that "'[t]here is substantial income opportunity'" to provide a solution to the Iranian banks who may run afoul of the OFAC regulations. (Id. ¶ 515). Plaintiffs allege that from 2003 forward, HSBC laundered Eurodollars on behalf of the Iranian banks, despite the fact that HSBC was aware of the view of U.S. authorities that "'all major Iranian State owned banks,'" including Bank Saderat, Bank Melli and the Central Bank of Iran, were involved "'in terrorist funding and WMD procurement.'" (Id. ¶¶ 516 n.28, 518). An eventual audit conducted in 2010 by Deloitte & Touche LLP ("Deloitte"), HSBC-US's outside auditor, examined HSBC's OFAC sensitive U.S. dollar transactions involving Iran and other prohibited persons or countries; the audit identified more than 25,000 illegal transactions involving Iran, worth more than $19.4 billion in U.S. dollar funds. (Id. ¶¶ 485, 486).

The Second Amended Complaint alleges that even though defendant HSBC-US was aware of the agreement to transmit Iranian funds through U.S. banks, including HSBC-US, the HSBC defendants failed to take substantive measures to ensure that HSBC would not facilitate provision of illegal support to terrorists. Plaintiffs allege that, instead, the HSBC defendants actually discussed expanding HSBC's relationships with Iran, the Central Bank of Iran, and Bank Melli. (Id. ¶¶ 534-36). Plaintiffs describe a memorandum authored by HSBC-London's Multicurrency Payments Department Head, Malcolm Eastwood, in November 2002, in which he discussed HSBC's "'cover payment method'" of evading U.S. sanctions and the actions taken by HSBC to send payments originating from institutions in OFAC regulated countries through payment instructions that contain no mention of the country or entity involved. (Id. ¶ 543). In the memorandum, Eastwood discussed the "substantial Reputational and Operational Risks, not

to mention financial losses associated with" operating with Iranian banks and entities. (Id. ¶¶ 543-44).

Plaintiffs point to other examples of instances in which HSBC was made aware of the risks of a continued relationship with Bank Melli and the ongoing process of altering payment order messages. (Id. ¶¶ 550-51, 552 (alleging that in June 2003 and December 2003, the OFAC screening filter identified and rejected payment orders from Bank Melli that stated: "'Do not mention our name in NY'")). Notice of these halted transactions was sent to HSBC-US's compliance officers. (Id. ¶ 553).

Plaintiffs contend that during 2004, approximately 7,000 Iranian Eurodollar transactions were sent for clearance by defendant HSBC-US and other correspondent banks, and in 2005, approximately 5,700 transactions were sent without disclosing their source; HSBC failed to report any of these allegedly-illegal transactions to law enforcement or to U.S. regulators. (Id. ¶¶ 555, 556). According to plaintiffs, 44 payments were stopped by HSBC-US's filters in May 2005 because they inadvertently disclosed Iranian involvement. (Id. ¶ 560).

In October 2006, David Bagley (as described above, the Regional Head of Legal and Compliance for HSBC-Middle East) informed HSBC officials that U.S. policymakers were considering withdrawing the U-Turn Exemption after receiving evidence that Bank Saderat had been involved in the funding of Hezbollah and that "all major Iranian State owned banks [were suspected] of involvement in terrorist funding and WMD procurement." (Id. ¶ 518). In June 2007, Bagley informed the CEO of HSBC Holdings that "if HSBC did not withdraw from relationships with [certain redacted parties] we may well make ourselves a target for action in the US." (Id. ¶ 520). Despite these emails acknowledging that the United States had evidence that Bank Saderat and the other major Iranian banks were involved in funding terrorists and procuring

weapons of mass destruction, the HSBC banks continued to facilitate financial transactions in furtherance of the conspiracy to provide material support to these entities. (See, e.g., id. ¶ 525).

On December 9, 2010, the U.S. Treasury designated Tajco Ltd., and its subsidiary Kairaba Supermarket, as SDGTs. (Id. ¶¶ 526-28). The Treasury Department designation described these businesses as "the primary entit[ies] to purchase and develop properties in Lebanon on behalf of Hizballah." (Id. ¶ 526). HSBC later agreed to remit $32,400 to settle a potential civil action stemming from the fact that HSBC-US facilitated transactions benefitting Tajco in late 2010 and early 2011. (Id. ¶¶ 529-30). Plaintiffs allege that this incident and the bank's agreement to settle demonstrates the bank's acknowledgment that its funding was benefitting Hezbollah, and that as of early 2011, defendants still had not remediated their controls. (Id. ¶ 531). Indeed, plaintiffs allege that the HSBC defendants' process of clearing Iranian transactions through the SWIFT-NET network continued into 2012. (Id. ¶¶ 564-67). Among these transactions were at least 24 Eurodollar transactions directly on behalf of IRISL or its subsidiaries or front companies. (Id. ¶ 568). As described supra at 9, IRISL had been designated as an SDN in 2008 based on evidence that it was engaged in the proliferation of weapons of mass destruction and illegal shipments of military products in violation of the Iranian embargo. (See, e.g., id. ¶ 50). Thus, plaintiffs allege that HSBC was aware or should have been aware that its operations were being used for the purpose of facilitating unlawful transactions on behalf of Iran and its terrorist agencies.

In announcing that HSBC Holdings and HSBC-US had entered into a Deferred Prosecution Agreement in December 2012, the Department of Justice ("DOJ") noted that the bank had admitted to violations of the AML and OFAC sanctions and agreed to pay $1.256 billion. (Id. ¶ 523). The charges brought by the Justice Department included: 1) willfully failing

to maintain an effective AML program; 2) willfully failing to conduct due diligence on their foreign correspondent affiliates; 3) violating the International Emergency Economic Powers Act ("IEEPA"); and 4) violating the Trading with the Enemy Act ("TWEA"). (Id. ¶ 524). Plaintiffs allege that, despite these charges and an agreement to overhaul their compliance procedures, the HSBC defendants continued to serve as a conduit for illicit Iranian transactions. (Id. ¶ 525).

The allegations in the Second Amended Complaint not only describe the object of the alleged conspiracy in which HSBC participated as aimed at providing material support for terrorism (id. ¶ 23), but the pleadings allege facts from which a jury could infer that HSBC was fully aware that Bank Saderat and Bank Melli, among others, were using HSBC banking services as a means to avoid U.S. sanctions and to transfer funds to terrorist organizations, including the FTO Hezbollah. (See, e.g., id. ¶ 367). As noted supra at 4, banks, such as HSBC, with international operations or correspondent banks were under a duty to adopt anti-money laundering and anti-terrorist financing standards as early as 1996, and the FATF issued a report in April 2002 providing guidance for financial institutions in detecting terrorist financing. HSBC was one of the banks to endorse transparency measures, while at the same time agreeing to provide the means for secretly conducting thousands of illegal Iranian transactions.

The Second Amended Complaint alleges numerous facts which, if proven, would allow a jury to conclude that despite having knowledge that the procedures of the United States were designed to prevent the funding of terrorists, HSBC deliberately ignored the warnings of various entities as well as publicly available information, instead continuing to assist Iranian entities with ties to terrorism. Among the allegations supporting this claim is the fact that even though Bank Saderat and Bank Melli were designated as SDGTs based upon their transfer of funds to FTO Hezbollah and others, HSBC continued to participate in the conspiracy by transferring funds to

these two banks. Indeed, as early as 2006, Bank officials acknowledged an awareness that Bank Saderat had been involved in the funding of Hezbollah, and yet even after Bank Saderat had been designated as a SDGT and after obtaining knowledge of "direct evidence" that Bank Saderat was providing funding to Hezbollah, the HSBC defendants continued to facilitate these financial transactions for Bank Saderat. (Id. ¶¶ 383, 518).

The allegations are sufficient to withstand a motion to dismiss both the plaintiffs' First and Second Claims for Relief under the ATA based on the alleged agreement to facilitate funding that HSBC knew was being transmitted to the designated Foreign Terrorist Organization Hezbollah, or to other organizations that engaged in terrorist activity, in violation of 18 U.S.C. §§ 2339B, and 2339A, respectively. Accordingly, it is respectfully recommended that the HSBC defendants' motion to dismiss the First and Second Claims for relief be denied.

c)  Barclays

Plaintiffs raise similar allegations against defendant Barclays, headquartered in London and one of the largest banks in the world. (Id. ¶¶ 71-75). The Second Amended Complaint alleges that Barclays is a member of SWIFT-Brussels and has used the SWIFT-NET system to transmit international payment messages from and for financial institutions around the world. (Id. ¶ 577). Plaintiffs allege that Barclays used various means to cause its New York branch and other financial institutions in the United States to process Eurodollar payment on behalf of Iranian institutions in violation of U.S. sanctions. (Id. ¶ 580). These included: 1) following instructions from Iranian agents not to mention their names in payment transaction messages; 2) routing transactions through an internal Barclay's "sundry" account to hide Iranian connections; 3) amending the SWIFT-NET payment order messages to remove identifying information; and

4) using the MT 202 bank to bank cover format and re-sending Iranian SWIFT-NET MT 103 payment order messages as cover payments.  (Id. ¶ 581).

According to plaintiffs, Barclays maintained correspondent banking relationships with several of the Iranian Banks, including Bank Saderat and Bank Melli, until at least 2008.  (Id. ¶ 576).  It is alleged that, in 1987, Bank Melli instructed Barclays to process USD transactions in favor of Bank Melli's London branch by, among other things, referencing only the account number and not the name of the bank.  (Id. ¶ 582).  Barclays memorialized these instructions in a memorandum sent to its Head Office; the memorandum included instructions on how to process payments for both sanctioned and non-sanctioned banks with which Barclays had correspondent relationships.  (Id. ¶¶ 584-85).  In November 1987, the instructions received from an Iranian bank directed Barclays to route payments involving U.S. Dollars "'without mentioning the name of our bank.'"  (Id. ¶ 587).  Plaintiffs allege that Barclays' employees followed these instructions, ensuring that the name of the sanctioned Iranian banks would not appear in any MT 202 cover payments.  (Id. ¶ 589).  One instruction stated:  "'Certain payments may be blocked by the US Authorities.  Therefore, any branch with a USD transfer is advised to contact the remitter beneficiary or beneficiary's bankers to request specific routing instructions.'"  (Id. ¶ 590).

Whenever Barclays' employees identified a transaction referencing an Iranian entity, plaintiffs allege that the payment order message was stopped and the employees would either return it to the remitter, alter or delete fields in the message, or convert the message to an MT 202 cover payment to hide any connection to the Iranian entity.  (Id. ¶¶ 592-93).  In returning payment orders that had been flagged by the OFAC filter, Barclays would identify the language that had caused the message to be detected on a special fax cover sheet, and indicate that

payments to the US "'must NOT contain the word listed below.'" (Id. ¶ 598). Some of these payment messages would then be re-sent without the offending language. (Id. ¶ 599).

In November 2001, Barclays' internal auditors identified the use of this fax cover sheet as problematic because of the possibility that the recipient of the fax "'may not be aware of the implications and may merely remove the offending text and re-submit the payment without any wider consideration.'" (Id. ¶ 601). The language was thereafter changed to indicate that the offending wording "'does not comply with the U.S.A./U.K./E.C./U.N. Sanctions.'" (Id. ¶ 602). Although the fax language was amended, plaintiffs claim that the practice of avoiding sanctions continued. (Id. ¶ 603). Pointing to various emails issued by Barclays' employees, plaintiffs allege that the employees were well aware of the methods used to "'get around [OFAC seizure],'" noting that by using cover payments, "'the US Treasury [would] remain blissfully unaware of [the payment's] existence.'" (Id. ¶¶ 606-07).

Plaintiffs quote from internal Barclays' correspondence sent in December 2002 in which the author acknowledged the use of cover payment messages to avoid Iranian sanctions, stating: "'To circumvent US legislation, [Barclays is] currently rout[ing] US$ items for sanctioned institutions via unnamed account numbers, without mention of the sanctioned party.'" (Id. ¶ 608). In subsequent memoranda and reports issued in January 2004, July 2004, and April 2005, Barclays' employees discussed the payments processing procedures and acknowledged the risks of facilitating payments for Iran. (Id. ¶¶ 609-11). One memorandum referred to the "[m]oral risk" of continuing with the practice, but still concluded that the practice should continue, accepting the risk that the true beneficiaries might be sanctioned individuals. (Id. ¶ 611). On August 16, 2010, Barclays was charged with violating the IEEPA and the TWEA, and on August

18, 2010, Barclays entered into a deferred prosecution agreement with the DOJ, agreeing to forfeit $298 million.  (Id. ¶¶ 617-18).

The allegations in the Second Amended Complaint state a plausible claim that Barclays, being fully aware of the fact that Iran had been designated a State Sponsor of Terrorism, entered into a conspiracy to help the Iranian banks, including Bank Saderat and Bank Melli, process Eurodollar payment transactions in violation of U.S. sanctions that had been put in place to combat terrorism.  (Id. ¶ 580).  Like other U.K. banks, Barclays was subject to the regulations issued by the FATF and should have acted in response to the April 2002 report from the FATF which advised banks of the risks of funding terrorist activities.  Weiss v. National Westminster Bank PLC, 453 F. Supp. 2d at 619.  Indeed, Barclays, like HSBC, RBS, and Credit Suisse, were part of the Wolfsberg Group, which committed the banks to engage in certain anti-terrorist financing measures.  (SAC ¶¶ 32-33).  As with the other defendants, plaintiffs claim that Barclays was fully aware that the purpose of these financing measures was to prevent terrorist financing.  (See generally id.; see also id. ¶ 611 (acknowledging the risk of concealing "true beneficiaries" when using cover payments)).  Nonetheless, Barclays is alleged to have undertaken numerous overt acts in furtherance of an agreement to follow instructions from Iranian agents not to mention their names in payment transaction messages and to route transactions and amend payment orders in ways to conceal the Iranian and potential terrorist connections.  (See, e.g., id. ¶ 581).

The Second Amended Complaint further claims that Barclays knew that SDGT designations were instituted because Bank Saderat and Bank Melli had been transferring funds to Hezbollah and the IRGC, respectively.  (Id. ¶¶ 613-15).  Thus, the allegations that Barclays agreed to participate in an agreement with these Iranian banks, knowing that they were funding

Hezbollah, an FTO, satisfy the pleading requirements under Section 2339B that Barclays conspired to provide material support to a designated terrorist organization, knowing or being deliberately to its designation. The allegations also support a claim of conspiracy under Section 2339A in that by providing financial assistance to the Iranian Banks, it was reasonably foreseeable that the transferred funds could be used to finance a terrorist attack and, therefore, given all of the publicly available information at the time and the conscious efforts Barclays undertook to conceal its conduct, an inference could be drawn that Barclays knew that it was engaging in unlawful acts that could assist terrorism. At this preliminary pleading stage, when no discovery has been taken,[53] the Court finds that the Second Amended Complaint adequately alleges plausible claims against Barclays under the ATA based on violations of 18 U.S.C. §§ 2339A and 2339B. Thus, it is respectfully recommended that Barclays' motion to dismiss the First and Second Claims for Relief against it be denied.

d) <u>Standard Chartered Bank</u>

Plaintiffs allege that Standard Chartered Bank ("SCB") is headquartered in London, operates principally in Asia, Africa, and the Middle East, and has over 1,700 branches. (<u>Id.</u> ¶ 76). Since 1976, SCB has had a license to operate in New York, N.Y., and is the seventh largest U.S. dollar correspondent bank in the world. (<u>Id.</u> ¶¶ 78-79).

---

[53] <u>See also</u> 5 Charles Alan Wright & Arthur R. Miller, <u>Federal Practice & Procedure (Second)</u> § 1233 (1990) (internal citations omitted) (noting that courts "have recognized that the nature of conspiracies often makes it impossible to provide details at the pleading stage and that the pleader should be allowed to resort to the discovery process and not be subjected to a dismissal of his complaint").

1) <u>SCB's Financial Transactions Assistance</u>

Plaintiffs contend that SCB began providing Eurodollar and foreign exchange banking services to Iranian clients in approximately 1993.  (<u>Id.</u> ¶ 619).  As early as June 1, 1995, SCB's General Counsel wrote an email advising regulatory staff that if SCB-London ignored OFAC regulations, but SCB-NY was not involved and had no knowledge of the activities, and could not be found to control SCB-London, then OFAC could not do anything against SCB-London or SCB-NY.  (<u>Id.</u> ¶ 621).  According to plaintiffs, the General Counsel instructed that this email not be sent to New York.  (<u>Id.</u> ¶ 622).

Plaintiffs assert that in early 2001, SCB was approached by the Central Bank of Iran and asked to act as the recipient for U.S. dollar proceeds from daily oil sales made by NIOC in the Eurodollar market.  (<u>Id.</u> ¶ 624).  In an email dated February 19, 2001, the head of SCB's Inbound Sales noted that "'in essence, SCB would be acting as Treasurer to the CBI [Central Bank of Iran].'"  (<u>Id.</u> ¶ 625).  According to the Second Amended Complaint, SCB, along with RBS and HSBC, maintained accounts for NIOC during the time that it was controlled by IRGC.  (<u>Id.</u> ¶¶ 152, 516).  NIOC provided Iran and the IRGC with access to billions of dollars in oil and natural gas revenues, allowing the IRGC to gain entry through the conspiracy to the global financial market.  (<u>Id.</u> ¶ 682).  Plaintiffs further allege that based on a published report, NIOC used its own helicopters to conduct surveillance and provide intelligence to support attacks on Coalition Forces operating bases along the Iranian border, participating directly in terrorist activities.  (<u>Id.</u> ¶ 403).  (<u>See</u> discussion <u>supra</u> at 10, 67).

Plaintiffs maintain that SCB and the Central Bank of Iran developed procedures to mask the involvement of Iranian entities in payment orders sent to SCB-NY; thereafter, SCB transferred "billions of dollars" to the IRGC, in violation of U.S. laws. (Id. ¶¶ 626, 628).[54] In an email dated March 23, 2001, SCB's Group Legal Advisor indicated that "our payment instructions [for Iranian clients] should not identify the client or the purpose of the payment." (Id. ¶ 627).

Plaintiffs claim that SCB-London would send a SWIFT-NET MT 100[55] or MT 103 to the beneficiary bank's non-U.S., non-Iranian correspondent bank with the details of the Iranian beneficiary bank, but then send a separate MT 202 to SCB-NY whenever the beneficiary bank was an Iranian bank. (Id. ¶ 629). Plaintiffs further allege that SCB-London set up rules to route all incoming SWIFT-NET messages from the Central Bank of Iran to a "repair queue" which required manual review to prevent SCB-London from processing outbound payment instructions with reference to the Central Bank of Iran for clearance in the United States. (Id. ¶ 630). Initially, SCB-London instructed the Central Bank of Iran to use SCB-London's SWIFT-NET address and not the Central Bank's SWIFT-NET address, but when the Central Bank of Iran failed to remove its own address, SBC-London employees would manually change the address in order to hide the Central Bank's involvement in the payments. (Id. ¶¶ 631-32).

According to the Second Amended Complaint, as early as February 2002, other Iranian banks approached SCB to open accounts; as a result, SCB-London developed a procedure for

[54] To the extent that SCB argues that "the SAC also does not identify a single LoC transaction involving SCB that allegedly was used by Iran or other entities to transfer funds or goods to Hezbollah, the IRGC, or any terrorist organization," the Court reiterates its analysis that plaintiffs need not trace the specific dollars transferred to satisfy their obligation of alleging that the provision of material support was made knowingly. (See discussion supra at 44).

[55] An "MT 100" is a customer credit transfer. (SAC ¶ 25(c) n.7).

processing Iranian bank transactions generally. (Id. ¶¶ 634-37). The instructions, issued to SCB-London staff on February 20, 2004, included instructions for omitting reference to the Iranian banks' SWIFT code and for using cover payments to process Iranian bank payments. (Id. ¶ 639). Plaintiffs allege that approximately 60,000 payments related to Iran were ultimately processed by SCB, totaling $250 billion. (Id. ¶ 641).

Plaintiffs allege that, based on a March 9, 2003 email, it appears that SCB learned that another bank was "'withdrawing their services' with one of its Iranian client banks 'primarily for reputational risk reasons.'" (Id. ¶ 642). Although SCB addressed the risks posed by Iranian business in triggering an action from OFAC, and "'potential reputational damage,'" a memorandum issued at that time rejected the concern in favor of pursuing Iranian business. (Id. ¶ 643). An October 15, 2003 email to the Head of Legal & Compliance, Americas, and the Head of Legal for Corporate & Institutional Banking, outlined how the CBI was to send in their MT 202s using SCB's identifier so that "'payments going to NY do not appear to NY to have come from an Iranian Bank.'" (Id. ¶ 644).

In October 2004, SCB consented to a formal enforcement action and executed an agreement with the Federal Reserve Board of New York and the New York State Banking Department, requiring SCB to adopt regulatory compliance measures and anti-money laundering practices with respect to foreign bank correspondent accounts. (Id. ¶ 647). This agreement required SCB to hire an independent consultant to conduct a retrospective review for the period July 2002 through October 2004 to identify suspicious activity involving transactions or accounts at SCB-NY. (Id. ¶¶ 649-50). SCB retained Deloitte to conduct the review, and in August 2005 and September 2005, Deloitte provided SCB with two historical transactions reports that Deloitte had prepared for other foreign banking clients under investigation for OFAC and money

laundering violations.  (Id. ¶¶ 653-54).  SCB asked Deloitte to delete from its report any

reference to certain payments that would reveal the Iranian related practices of SCB.  (Id. ¶ 656).

According to plaintiffs, Deloitte agreed to delete any reference to payments that would reveal

SCB's illegal Iranian U-Turn practice because "'this is too much and too politically sensitive for

both SCB and Deloitte.'"  (Id. ¶ 658).  According to the Second Amended Complaint, a

December 1, 2005 internal memorandum indicated that the procedures set up via the

enforcement action did "not provide assurance that [the procedure] does not relate to a prohibited

transaction and therefore SCB-NY is exposed to the risk of a breach of sanctions."  (Id. ¶ 659).

A subsequent internal memorandum, dated February 23, 2006, entitled "Iranian Business,"

confirmed the Bank's recognition that its policies enabled Iran and its agents to evade detection

by the United States.  (Id. ¶ 660).

　　　In September 2006, in response to a request from state regulators for statistics on the

number of Iranian U-Turns handled by SCB, the Bank identified 2,626 transactions totaling over

$16 billion.  (Id. ¶¶ 661-63).  Rather than disclose these transactions, the SCB-New York Head

of Compliance was directed by his superiors to disclose only four days' worth of transactions

"masquerading as a log covering two-years of transaction data."  (Id. ¶ 664).  Plaintiffs allege

that in October 2006, the CEO for SCB's U.S. Operations urged a review of the Iranian business

to "evaluate if its returns and strategic benefits are. . . still commensurate with the potential to

cause very serious or even catastrophic reputational damage. . .there is equally potential risk of

subjecting management in US and London (e.g. you and I) and elsewhere to personal

reputational damages and/or serious criminal liability."  (Id. ¶ 665).  Plaintiffs claim that SCB's

Group Executive Director responded:  "'You f---ing Americans.  Who are you to tell us, the rest

of the world, that we're not going to deal with Iranians.'"  (Id. ¶ 666).

Plaintiffs allege that based on the "watered down" report from Deloitte, in 2007, the Federal Reserve and the New York Banking Department lifted their consent order on SCB, described <u>supra</u> at 80. (<u>Id.</u> ¶ 667). Plaintiffs contend that up until that point – specifically, between January 2001 through 2007 – SCB had transferred at least $250 billion through the New York branch on behalf of Bank Melli Iran, the Central Bank of Iran, and Bank Saderat. (<u>Id.</u> ¶ 668).

Plaintiffs maintain that SCB, along with the other co-conspirator banks, was responsible for facilitating illegal funds transfers of more than $100 million on behalf of IRISL, including after 2008 when IRISL was designated as an SDN. (<u>Id.</u> ¶¶ 23, 50, 346, 671, 1022). Plaintiffs further allege that although SCB conducted another "internal investigation" into its OFAC screening procedures in early 2009, SCB continued to act as "the conduit for at least 50 post-U.S. designation transactions on behalf of IRISL and its various front companies" through June 2010. (<u>Id.</u> ¶¶ 670-71). In 2011, the New York State Banking Department found that SCB-NY had "'[n]o documented evidence of investigation before the release of funds for transactions with parties whose names matched the OFAC-sanctioned list'" and that SCB had outsourced the NY branch's compliance process to India with no evidence of oversight or communication between the two offices. (<u>Id.</u> ¶ 672).

2) <u>SCB's Letters of Credit Assistance</u>

Plaintiffs contend that between 2001 and 2007, SCB also facilitated over 1,300 Letters of Credit using methods designed to conceal the participation of Iranian parties, including the IRGC, MODAFL, and Hezbollah. (<u>Id.</u> ¶¶ 673-74). These Letters of Credit were allegedly used to finance the illegal acquisition of materials and technologies used as components for IEDs and

EFPs, which in turn were used against Coalition Forces in Iraq. (Id. ¶ 674). These components included U.S.-manufactured, export-controlled products acquired by Iranian-controlled front companies on behalf of, amongst others, Mahan Air, NIOC, and four subsidiaries of MODAFL. (Id. ¶ 675).

Specifically, plaintiffs allege that between 2000 and 2006, SCB facilitated Letters of Credit for Mahan Air, the Iranian commercial airline, which plaintiffs allege was "identified as the conduit to Iran of thousands of radio frequency modules recovered by Coalition Forces in IRAQ" from IEDs used to target U.S. and Coalition forces. (Id. ¶¶ 686-90).[56] Plaintiffs maintain that five Letters of Credit listing Mahan Air as the "Applicant" were issued by Bank Saderat, Bank Melli, and Bank Sepah,[57] and cleared through SCB-NY, involving illegal shipments of items ranging from aviation parts to a U.S. shipment of an Airbus A320. (Id. ¶¶ 692-94). Plaintiffs allege that SCB knew it was working with Iranian banks, concealing the Iranian connection and facilitating the unlawful delivery of export-controlled parts through Mahan Air. (Id. ¶ 696).

As one example, plaintiffs claim that a 2005 Letter of Credit facilitated by SCB listed Mahan Air as the applicant and Sirjanco Trading LLC as the beneficiary; in 2013, Sirjanco Trading LLC was designated as a Specially Designated Global Terrorist, and described as "a United Arab Emirates-based company. . . acting for or on behalf of Mahan Air." (Id. ¶¶ 701, 703). Plaintiffs describe two other Letters of Credit facilitated by SCB with Mahan Air as applicant and Blue Sky Aviation as the beneficiary. (Id. ¶ 706). Blue Sky Aviation was

---

[56] Plaintiffs further allege that Mahan Air transported IRGC-QF officers into and out of Iraq, altering flight manifests to hide their travel. (Id. ¶ 686).

[57] As discussed supra, these banks are described by plaintiffs as the "Iranian Bank Co-conspirators."

designated as a SDGT in 2014 and described as a "UAE-based company that is owned or controlled by Mahan Air.[]" (Id. ¶ 707).

The Second Amended Complaint describes a number of MODAFL sub-agencies and companies that were used to obtain equipment and machinery for use in manufacturing EFPs. (Id. ¶¶ 825, 831-33, 835). Plaintiffs allege that the majority of these transactions were conducted through SCB, including facilitating the illegal purchase of $2.79 million U.S. dollars' worth of electromotors for hydraulic presses, "the precise type of machinery required to manufacture EFPs."[58] (Id. ¶¶ 831-33). An export license is required because of the electromotors' use in manufacturing weapons of mass destruction, and SCB allegedly assisted in the purchase of this prohibited equipment for the gain of an "Iranian-controlled front company[y]."[59] (Id. ¶¶ 675, 831-33).

### 3) Summary of SCB's Role in the Conspiracy

As described above, plaintiffs allege that SCB knowingly conspired with Iran, Bank Saderat, and other Iranian agents to facilitate illicit trade for all of these entities in violation of U.S. law, with the common scheme of enhancing these groups by providing material support. (Id. ¶ 683). Plaintiffs assert that during the time period alleged in the Second Amended Complaint, SCB knew that Iran had been designated as a State Sponsor of Terrorism, and knew

---

[58] SCB cites several cases, and one article, to argue that hydraulic presses can be used for many purposes. (SCB Mem. at 8) (internal citations omitted). As discussed supra, the purpose of the hydraulic press, along with SCB's knowledge as to which organization would be using this item and to achieve what goal, are questions of fact for a later point in this litigation.

[59] This is only one of several examples of the bank defendants' role in the conspiracy, which, contrary to the allegations in Rothstein, demonstrate that plaintiffs do indeed contend that Iran's involvement in the conspiracy would not have been possible without the defendants' cooperation. See also discussion supra at 58 (citing specific allegations that the defendant banks' funding made it possible for Iranian terror proxies to carry out the attacks that killed or injured plaintiffs).

that Iran had an accepted method for conducting legitimate financial transactions through the U-Turn Exemption, which was available until 2008. (SAC ¶¶ 140-49; see also Defs.' Mem. at 4-5 (arguing that "for most of the period that the Moving Defendants are alleged to have provided such services . . . the U.S. sanctions regime [] permit[ted] certain dollar-clearing services pursuant to the 'U-Turn' exemption[]"). Nevertheless, despite legitimate means for Iran to conduct business through the U-Turn exemption, SCB agreed to conduct financial transactions for Iran in a clandestine and unlawful manner designed to conceal Iran's involvement. This conduct, undertaken as part of an agreement with Iranian entities having clear ties to terrorism, supports an inference that SCB knew, or consciously avoided the knowledge, that the purposes for which the funds were being used were illegitimate: otherwise, they would have used the U-Turn Exemption. (See also Pls.' Mem. at 5; see discussion supra at 49). Thus, SCB is alleged to have undertaken overt acts in furtherance of the conspiracy in an effort to hide the fact that the transactions were being conducted for illegal purposes.

The allegations in the Second Amended Complaint are sufficient to sustain the claim that SCB conspired with Bank Saderat, Bank Melli, and other listed Iranian agencies which had been designated SDGTs, based on their funding of Hezbollah and the IRGC, to facilitate the transfer of large amounts of funds to other entities that, in some instances, had been designated as SDGTs or were known to have been involved in the illegal shipment of export-controlled items in violation of U.S. government regulations. Like the other defendants, SCB was subject to the FATF regulations, and was fully aware that the purpose of these regulations, the computer software system, and other sanctions were designed to prevent the transfer of funds to Iran so that the funds could not be used to finance terrorism. (See discussion supra at 4). Plaintiffs also maintain that U.S. regulators publicly acknowledged that Iran had been using the U-Turn

Exemption to "finance terror groups, including Hezbollah, Hamas and the Palestinian Islamic Jihad," and to "assist[] OFAC-sanctioned weapons dealers" during the time period at issue in the SAC. (SAC ¶ 163).

It is alleged that SCB not only developed mechanisms to avoid detection of SCB's money laundering activities on behalf of its Iranian customers, but also undertook numerous unlawful acts in altering bank transfer messages to delete references to Iran and Iranian entities, and structured Letters of Credit to hide the fact that embargoed equipment and materials used to create weapons of mass destruction were being shipped to the IRGC, MODAFL, IRISL, Mahan Air, and ultimately, Hezbollah. (See, e.g., id. ¶ 852). Additionally, SCB maintained accounts on behalf of entities such as NIOC that had been complicit in providing intelligence in support of terrorist attacks, and allegedly deliberately lied, and provided false statistics, to U.S. regulators and enforcement agencies in an effort to avoid sanctions, knowing that SCB was in violation for dealing with Iran and its proxies. (Id. ¶¶ 811-66). Contrary to SCB's argument that "[p]laintiffs do not allege any facts to substantiate a claim that SCB knew or could reasonably foresee that allegedly 'illegitimate' entities had ties to terrorist organizations or the proliferation of weapons of mass destruction at the time of the transactions at issue'" (SCB Reply Mem. at 5), plaintiffs *do* allege that SCB entered into the conspiracy knowing or consciously avoiding the fact that the goal was to provide material support to Iranian-sponsored terrorists, including FTO Hezbollah.

The allegations that SCB agreed to participate in an agreement with Iranian banks and with other Iranian agencies, knowing that they were providing equipment and funding to Hezbollah, an FTO, satisfy the requirement under Section 2339B that SCB, knowingly or being deliberately indifferent, conspired with and provided material support to a designated terrorist organization. The allegations also support a claim of conspiracy under Section 2339A in that, by

providing assistance to the Iranian Banks, and other proxies of the Iranian government, including

the IRGC, it was reasonably foreseeable that these funds could be used to finance a terrorist

attack.  Therefore, given all of the publicly available information at the time and the conscious

efforts SCB undertook to conceal its conduct, an inference could be drawn that SCB knew that it

was engaging in unlawful activity that could assist or lead to enabling a terrorist attack.  At this

preliminary pleading stage, when no discovery has been conducted, the Court finds that the

Second Amended Complaint adequately states claims against SCB under the ATA based on

violations of 18 U.S.C. § 2339A and § 2339B.  Accordingly, it is respectfully recommended that

SCB's motion to dismiss the First and Second Claims for relief be denied.


4)  Seventh Claim for Relief

Furthermore, the Second Amended Complaint asserts a Seventh Claim for Relief against

SCB on a theory that SCB violated 18 U.S.C. § 2339A by "provid[ing] material support to the

IRGC and its Qods Force through its acts on behalf of Mahan Air, MODAFL and other entities .

. . by concealing and disguising the nature, location, source, and ownership of material support it

provided to Mahan Air, MODAFL and other entities []."  (SAC ¶¶ 2275-76).  This is not a

conspiracy claim; it is a claim based on a theory of primary liability.  (See Pls.' Mem. at 44

(noting that the "Fifth, Sixth and Seventh Claims for Relief are *not* predicated on conspiracy to

violate the material support statutes")).

Standard Chartered, in turn, argues that the Seventh Claim should be dismissed because

the Second Amended Complaint contains "no alleg[ation] that SCB provided banking services

for Hezbollah, the Islamic Revolutionary Guards Corps [], or any terrorist organization."  (SCB

Mem. at 4).  However, as plaintiffs point out, this contention "conflates liability predicated on

violating § 2339B – material support for [F]oreign [T]errorist [O]rganizations – with liability for violating § 2339A, material support in preparation for, or in carrying out, acts of terrorism[].” (Pls.’ Mem. at 56).

SCB also analogizes this claim against it to the claim in <u>Stutts v. De Dietrich Group</u>, where the court dismissed the action because plaintiffs failed to allege sufficient facts to show the bank defendants’ knowledge and intent. 2006 WL 1867060 at *3. However, <u>Stutts v. De Dietrich Group</u> is inapposite for several reasons.[60] As just one example, the bank defendants’ actions in <u>Stutts</u> *can* be considered to be “routine:” they were only alleged to have processed Letters of Credit to various suppliers, who in turn provided Saddam Hussein’s regime with access to chemical weapons. <u>Id.</u> at *1. The <u>Stutts</u> plaintiffs’ argument as to the bank defendants’ liability rested entirely on the notion that, simply by the process of acting as correspondent banks, the bank defendants should have known about the ultimate beneficiaries of the transaction because they reviewed various documents about the trading parties. <u>Id.</u> Plaintiffs did not allege that the bank defendants in that case had any other sources of information, such as the internal memoranda or the public press releases described <u>supra</u> in the case at hand, as to the risk of the ultimate beneficiary of the transferred funds being members of terrorist organization, or to the funds being used for criminal acts. Additionally, <u>Stutts</u> contained no allegations of money laundering, no alleged violations of U.S. export controls, nor did plaintiffs allege direct contacts or conspiracy with a military or terror-supporting apparatus. (<u>See</u> Pls.’ Mem. at 55-56). In declining SCB’s invitation to read <u>Stutts</u> as dispositive in the case at hand, the Court instead reiterates the Second Circuit’s analysis as to primary liability as explicated in <u>Linde v. Arab</u>

_____

[60] Additional reasons are discussed <u>infra</u> at 125, when analyzing the applicability of the Act of War defense to the case at hand.

<u>Bank, PLC</u>:  the question of whether the transactions on behalf of MODAFL and sub-agencies of Mahan Air, were, definitionally, "acts of international terrorism" is a question for the jury, as are other questions of fact raised here regarding SCB's actions.  (<u>See</u> discussion <u>supra</u> at 46).

At this early stage in the proceedings, where the state of the law in terms of primary liability is still unclear,[61] the Court finds that plaintiffs have adequately pleaded facts for a primary liability theory as to this material support claim, and respectfully recommends denying dismissal of the Seventh Claim against SCB on this ground.

e)  <u>Royal Bank of Scotland</u>

According to the Second Amended Complaint, the Royal Bank of Scotland ("RBS") is the legal successor to ABN Amro Bank ("ABN").[62]  (SAC ¶ 870).  Through a 2010 statutory demerger process, ABN was renamed RBS N.V., and RBS acquired the New York and Chicago branches of ABN.  (<u>Id.</u> ¶¶ 81-84).

Plaintiffs assert that in May 1995, RBS officials in Amsterdam emailed the entire management of RBS, advising them that any financial transactions in USD funds on behalf of or for Iranian persons or banks were subject to seizure or blocking from the United States.  (<u>Id.</u> ¶ 871).  It is alleged that RBS employees, contrary to the advice of outside counsel, discussed requests by Iranian banks to circumvent the U.S. sanctions, and thereafter until 2005, conspired with Iranian banks to conceal evidence of RBS's financial transactions from the U.S. government and its agencies.  (<u>Id.</u> ¶¶ 873-74).  To conceal the identity of the Iranian banks, RBS

---

[61] As described <u>supra</u>, the Second Circuit in <u>Linde</u> court assessed what a plaintiff would need to *prove*, not what a plaintiff needs to *allege*, for a theory of primary liability to ultimately succeed.

[62] Although some of the acts described in the Second Amended Complaint were conducted by ABN, the Court refers to the bank as RBS, its current name.

removed and/or falsified payment messages on its funds transfer systems and developed methods with the Iranian banks to format USD payments to avoid detection by automated filters used in the U.S. (Id. ¶¶ 876-77). RBS employees would manually alter or amend the payment messages to ensure that the transaction would go undetected. (Id. ¶ 878). Plaintiffs allege that RBS also altered Letters of Credit by replacing the names of the Iranian banks. (Id. ¶ 880). Plaintiffs contend that the RBS payment manual listed specific instructions on how to avoid OFAC filters to ensure that the word "Iran" did not appear. (Id. ¶¶ 882-83).

Plaintiffs further claim that RBS instructed the Iranian banks to use the word "SPARE" in their payment messages so that RBS employees could separate the Iranian bank messages and amend them. (Id. ¶¶ 887-88). In addition, plaintiffs contend that RBS and the Iranian banks discussed the fact that without such amendments, the OFAC filters at clearing banks in the United States would likely halt most of the payments. (Id. ¶ 892). RBS also allegedly used the SWIFT-NET MT 202 cover payment messages to shield the identities of the Iranian banks (id. ¶¶ 895-96), and maintained accounts for NIOC during the time that it was controlled by the IRGC. (Id. ¶¶ 410-11).

In or about June and July 1995, it is alleged that RBS's Amsterdam headquarters and New York offices were advised by outside counsel that the proposal by the Iranian banks to bypass the United States sanctions "risked breaching U.S. law." (Id. ¶ 899). Requests from Iranian banks, indicating an effort to circumvent U.S. sanctions, were sent and forwarded to officials located in several departments of RBS's Amsterdam headquarters. (Id. ¶¶ 900-02). Plaintiffs assert that, as early as 1997, an internal strategy paper described a product initiative with opportunities in Letter of Credit discounting for the Central Bank of Iran and Bank Melli. (Id. ¶ 903). On February 5, 2000, an official at the Dubai branch of RBS wrote to one of the

Iranian banks indicating that RBS "under[stood] the special nature of your US$ transactions and will ensure that all operations departments concerned are properly briefed. . . ." (Id. ¶ 905). In another email in 2003, there was a discussion of the use of MT 202 cover payments and it was noted that: "'There is no way the payment will get stopped as all NY ever sees is a bank to bank instruction.'" (Id. ¶ 906).

In a July 25, 2003 email, the Senior Relationship Banker for Iranian Banks wrote:

> Twenty-four years of US sanctions and OFAC listing and Iran
> continues to sell oil and gas in USD. . . .All of this is clearly done
> through accounts in Europe and elsewhere. There is a very good
> case to be made for getting an overall acceptance that when issues
> are purely US, we should not be a part of it. In fact, we should see
> it as an opportunity. OFAC is not the Bible for money laundering.
> . . . It is a tool of broader US policy. We therefore need to
> distinguish between US Foreign policy on the one hand and
> AML/anti-Terrorism on the other, however much the US
> administration may wish to insist that the two are closely linked. It
> is well worth working on a solution for clients who find themselves
> in this position or who fear . . .that they, one day soon might find
> themselves there.

(Id. ¶ 907). The head of the RBS Amsterdam Office compliance team also expressed a similar view that the US sanctions "are politically motivated," and that is why the Bank does not comply. (Id. ¶ 908). In an April 2004 email, other financial vehicles were discussed as ways around the OFAC restrictions. (Id. ¶ 912).

In July 2004, U.S. regulators found that the New York Branch of RBS had processed wire transfers originated by Bank Melli with the payment instructions modified by RBS's overseas branch to delete any reference to Bank Melli Iran, and had administered Letters of Credit issued by Bank Melli with no reference to Iran. (Id. ¶¶ 914-15).

In May 2010, RBS was charged with, *inter alia*, one count of conspiracy to defraud the United States and to violate IEEPA and the TWEA. (Id. ¶ 920). The charge alleged that "[i]t

was part of the conspiracy that the defendant caused its United States affiliates to submit materially false and misleading reports or statements to the United States Department of the Treasury, OFAC." (Id. ¶ 929). RBS entered into a deferred prosecution agreement and agreed to forfeit $500 million. (Id. ¶ 919).

Like the other banks, RBS was well aware of the designation of Iran as a State Sponsor of Terrorism, and was well aware of the existence of U.S. sanctions for dealing with Iran and Iranian Banks, such as Bank Melli and the Central Bank of Iran. Contrary to the advice of outside counsel, RBS conspired with the Iranian banks to conceal the identity of the Iranian banks and their financial transactions from the U.S. government and its agencies, falsified information on payment messages, and altered Letters of Credit to hide the role of the Iranian banks in order to avoid OFAC filters. (Id. ¶¶ 873-74, 880, 882-83).[63] Despite being warned that they "risked breaching U.S. law" by this agreement to work with the Iranian banks to bypass the United States sanctions (id. ¶ 899), senior bank officials blatantly rejected the concerns and falsified documents filed with OFAC, evidencing an understanding that what they were doing was in violation of law and, accordingly, could subject the bank to sanctions and further liability.

These allegations, along with the allegations that RBS was subject to the know-your-customer standards and had agreed to the Wolfsberg Principles, which were explicitly designed

---

[63] As noted supra at 4, National Westminster Bank ("NatWest") is a financial institution with its principal place of business in London that, like ABN, is part of the Royal Bank of Scotland. Weiss v. National Westminster Bank PLC, 453 F. Supp. 2d at 619. In 2005, prior to the time of most of the attacks at issue in the instant Second Amended Complaint, a group of plaintiffs injured in attacks committed by the FTO Hamas brought suit against NatWest alleging very similar claims to those brought in the Second Amended Complaint – namely, that the bank engaged in the kinds of financial transactions alleged here which were designed to conceal the fact that funds were being funneled through NatWest to support terrorist attacks. Id. Despite these claims that NatWest, a subsidiary of RBS, was providing material support to terrorists engaged in attacks on Americans, RBS continued for years to engage in the same types of activities, deliberately ignoring their complicity. (See SAC ¶ 921 (quoting from the criminal information filed against RBS that its participation in the conspiracy continued "until in or about December 2007")).

to provide guidance in "Detecting Terrorist Financing," are sufficient to plead the elements of conspiracy and a knowing involvement in providing material support for terrorism. Indeed, the Second Amended Complaint explicitly alleges that RBS knowingly laundered funds for an agent of the IRGC, one of the Iranian entities that was directly responsible for the acts of terrorism that injured the plaintiffs. These allegations, together with the claim that the IRGC and other members of the conspiracy committed acts that resulted in injury to Coalition Forces, are sufficient to sustain a claim at this stage of the proceedings that RBS conspired to violate the ATA through violations of 18 U.S.C. § 2339A. Furthermore, as plaintiffs have sufficiently pleaded the IRGC's connection to Hezbollah (see discussion supra at 8), the Court finds that the pleadings in this case are sufficient to connect RBS to FTO Hezbollah at this stage in violation of 18 U.S.C. § 2339B. Therefore, the Court respectfully recommends denying RBS's motion to dismiss the First and Second Claims for Relief.

f) Credit Suisse

Credit Suisse is headquartered in Zurich and has its U.S. headquarters in New York, N.Y. (Id. ¶ 86). Plaintiffs allege that Credit Suisse used defendant HSBC Bank USA, the Bank of New York Mellon, Deutsche Bank Trust Co. Americas, and Wells Fargo Bank NY International to clear and settle its Eurodollar transactions. (Id. ¶ 88).

The Second Amended Complaint alleges that Credit Suisse, like the other defendant banks, knew of Iran's designation as a State Sponsor of Terrorism, and yet acted at Iran's behest and worked with the Iranian banks to structure USD payments in an effort to evade U.S.

sanctions and conceal Iran's financial activities.  (Id. ¶ 930).[64]  According to the plaintiffs, Credit

Suisse worked with Bank Melli, Bank Saderat, and the Atomic Energy Organization of Iran for

many years engaging in the same types of conduct as the other bank defendants:  1) developing

methods to avoid disclosure of the originators and beneficiaries of Iranian transactions; 2)

deleting information from transactions to be processed through the United States; and 3)

providing incorrect information in transfer instructions executed on behalf of sanctioned

individuals and entities.  (Id. ¶¶ 931-32).  It is alleged that after Lloyds ended its business with

Iran in 2003 (see discussion supra at 62), Bank Saderat and others moved their accounts to Credit

Suisse, which became one of the main clearing banks for USD funds for the Iranian banks.  (Id.

¶¶ 933-34).

Plaintiffs contend that as early as the 1990s, Credit Suisse's Iran desk added warnings to

its Iranian bank clients not to mention the name of the Iranian bank in payment orders.  (Id. ¶

936).  Following the issuance of presidential orders strengthening sanctions against Iran, the

Iranian banks requested that Credit Suisse omit their names from payment messages sent to U.S.

correspondent banks to bypass U.S. financial institution filters; Credit Suisse complied.  (Id. ¶¶

939-40).  After a corporate reorganization in 1998, Credit Suisse provided its Iranian clients with

a pamphlet entitled "How to transfer USD payments."  (Id. ¶ 941).  The pamphlet included

---

[64] Credit Suisse argues that the news reports of Iran's terrorist financing activities have no specific
reference to Credit Suisse.  However, the Court has considered the news sources generally in its overall assessment
of whether plaintiffs have met their pleading standard in alleging that defendants had actual knowledge, or were
deliberately indifferent to, the activities of Iranian-backed terror proxies.  A news source need not name a bank
directly for the plaintiffs to argue general awareness on the part of all of the defendant banks to the demonstrated
connection between Iran and terrorist attacks, particularly in light of FATF's obligation for banks to monitor
publicly accessible information relating to 'high risk' customers.  (See discussion supra at 4).  Discovery of bank
employees may provide additional bases for supporting the claim that bank officials were well aware of the fact that
their funding could be funneled to terrorist organizations.

instructions for formatting USD fund transfers to avoid triggering the U.S. banks' OFAC filters. (Id. ¶ 942).

Plaintiffs allege that procedures were developed and promoted among Credit Suisse employees for formatting payment order messages to avoid OFAC screening filters. (Id. ¶¶ 946-49). Internal communications confirm Credit Suisse's continuing efforts to avoid U.S. screening by not mentioning the name of the Iranian bank or Iranian party, and similar instructions were sent to the Iranian banks between 2000 and 2004 by a standard letter. (Id. ¶¶ 951-55, 956). Plaintiffs claim that this "Order of a Customer" method, whereby Credit Suisse populated a field with the words "one of our clients" instead of an Iranian bank's name, was the standard method used by Credit Suisse until 2004. (Id. ¶¶ 949-50). Credit Suisse also allegedly configured its payment system to interdict payments for manual review and used cover payments to prevent detection. (Id. ¶¶ 958-59, 960-62). Plaintiffs maintain that in addition to developing procedures to avoid OFAC filters, Credit Suisse also gave materials to Iranian banks for use in training other banks how to prepare payment messages to evade sanctions filters. (Id. ¶ 967).

In July 2004, the Swiss Federal Banking Commission issued an ordinance requiring the disclosure of the remitter in payment orders as part of its implementation of the FATF's Special Recommendation on Terrorist Financing VII. (Id. ¶¶ 973-74). Although Credit Suisse ceased to use the "Order of a Customer" method after this July 2004 ordinance, plaintiffs claim that the bank continued to illegally process electronic funds transfers for Iran and its financial institutions by having the bank's employees use other methods, such as by removing and altering information in SWIFT payment order messages sent to U.S. correspondent banks. (Id. ¶¶ 975-80).

Plaintiffs allege that between 2004 and 2005, Credit Suisse sent letters to the Iranian banks describing its internal procedures for forwarding Iranian payment orders and continued to process electronic funds transfers through U.S. financial institutions for the benefit of Iran up until November 2006. (Id. ¶¶ 979, 980). Credit Suisse also allegedly facilitated Letters of Credit in connection with Mahan Air's purchase of $120 million in U.S. aircraft and aircraft parts expressly prohibited by the U.S. Commerce Control List. (Id. ¶¶ 685, 984).[65]

In 2009, the Department of Justice filed a criminal information against Credit Suisse, charging it with one count of violating IEEPA, and on December 16, 2009, the Department of Justice announced that Credit Suisse had agreed to forfeit $536 million in connection with violations of the IEEPA and New York State law. (Id. ¶¶ 988-91).

The Second Amended Complaint contains sufficient allegations that Credit Suisse entered into an agreement with the Iranian banks to conceal their identity in order to bypass U.S. financial institution filters and avoid triggering the U.S. banks' OFAC filters, including developing its own written instructions to give to its Iranian clients. (Id. ¶¶ 939-40, 41). As with the other banks, plaintiffs allege that Credit Suisse was fully aware of the purpose of the sanctions and the computer systems which the bank was attempting to circumvent. Like the other banks, Credit Suisse was part of the Wolfsberg Group and endorsed various transparency

_____

[65] Credit Suisse argues that the Second Amended Complaint does not allege "that the few U.S.-dollar denominated transfers relating to the alleged purchase of a commercial aircraft, engine and parts had any connection to terrorist groups or acts, much less proximately caused any of the attacks in Iraq alleged in the [Second Amended] Complaint." (Credit Suisse Mem. at 8; see also Reply Memorandum of Law of Defendant Credit Suisse AG in Further Support of Motion to Dismiss, filed on November 10, 2016, ECF No. 128 ("Credit Suisse Reply Mem.") (asserting that "[n]owhere does the [Second Amended] Complaint allege that the particular commercial aircraft, commercial aircraft engine or unspecified aircraft parts at issue were used in or helped facilitate any of the attacks") (alterations added). As discussed above, plaintiffs need not trace individual transfers directly to the parts recovered from the terrorist attacks at issue in this action, especially during the pleading stage of the case. Nonetheless, plaintiffs do allege that "Mahan Air has also been identified as the conduit for radio frequency modules recovered from IED devices used to target the Coalition Forces in Iraq," and that Mahan Air was responsible for transporting Hezbollah operatives. (SAC ¶¶ 678, 2277).

measures designed to prevent terror financing, while, at the same time, participating in this conspiracy to violate U.S. sanctions and ultimately provide material support for terrorism. Indeed, plaintiffs allege that Credit Suisse routed payments for Bank Melli, a well-known participant in funding terror activities. (Id. ¶ 697). The allegations are sufficient to demonstrate knowledge on the part of Credit Suisse that the transactions were for unlawful purposes since altering the Letters of Credit, and the contraband nature of the goods and their intended destination were, among other things, indications that the items were intended for entities such as the IRGC and MODAFL, against whom restrictions had been imposed. As discovery proceeds, it is likely that the identity of these various Iranian entities which engaged in these schemes to circumvent the restrictions will be revealed, further clarifying the connections to terrorism.

Plaintiffs maintain that these facts support a conspiracy claim under the ATA and the material support provisions because the inference could be drawn that the bank "knowingly served as merchants of death on behalf of a State Sponsor of Terrorism." (Pls.' Mem. at 13 (citing SAC ¶¶ 673-838)).[66] The Court agrees, and for the reasons stated above in connection with the other defendants, respectfully recommends that the motion to dismiss the First and Second Claims against Credit Suisse be denied at this time.

g) Commerzbank

Defendant Commerzbank is headquartered in Frankfurt with a branch in New York and over 1,200 branches in Germany alone. (Id. ¶¶ 96, 98). Commerzbank has used its New York branch, along with HSBC Bank USA, N.A., SCB-NY, and Deutsche Bank Trust Co. Americas to

---

[66] Like the other banks, Credit Suisse argues that there are no allegations of even "one dollar of money" being funneled to these terrorist organizations (Credit Suisse Mem. at 6); the Court repeats its analysis, discussed supra at 44-45, that this is not necessary.

settle its Eurodollar transactions.  (Id. ¶ 97).  Like the other defendant banks, the Second

Amended Complaint alleges that Commerzbank assisted Iranian Bank Co-conspirators, including

Bank Sepah, Bank Melli, and Bank Saderat, to evade regulations and executive orders;  as with

the other banks, Commerzbank adopted a variety of methods, including stripping, altering or

changing SWIFT-NET payment order messages.  (Id. ¶¶ 992-94).  It is further claimed that

Commerzbank engaged in illegal gold transactions on behalf of the Central Bank of Iran, trading

through Commerzbank's New York branch by disguising the Iranian source of the trades.  (Id. ¶

995).  In a qui tam action filed against Commerzbank, it was alleged that the "'gold trade has

been essential to Iran's withstanding the increasingly restrictive U.S. sanctions. . . . .It used gold

to preserve its wealth especially to withstand the devaluation of its currency and to engage in

trading that would bypass U.S. sanctions.'"  (Id. ¶ 996 (quoting the qui tam case, 13 CV 8095

(S.D.N.Y. 2013))).

In a policy document dated April 17, 2003, Commerzbank "admonished employees to

'[u]nder no circumstances mention the Iranian background in the cover order.'"  (Id. ¶ 997).

Plaintiffs allege that in July 2003, a back office employee emailed other employees indicating

that Bank Melli and Bank Saderat wanted to route their entire USD funds clearing business

through Commerzbank.  (Id. ¶ 1001).  The email closed by stating "'If . . .New York inquires

why our turnover has increase [sic] so dramatically under no circumstances may anyone mention

that there is a connection to the clearing of Iranian banks!!!!!!!!!!!!!'"  (Id.)

On November 19, 2003, a memorandum was allegedly circulated describing the internal

rules that Commerzbank had developed for processing Iranian payments, including using MT

202 cover transactions, and using serial MT 103 messages, manually replacing the name of the

Iranian ordering party with the bank code for Commerzbank Frankfurt.  (Id. ¶ 1007).

Moreover, according to the Second Amended Complaint, Commerzbank worked directly with IRISL in laundering U.S. dollars, despite the fact that IRISL was Iran's primary means for transporting conventional and non-conventional weapons. (Id. ¶¶ 1012-13). In January 2005, the New York branch of Commerzbank rejected a series of transactions containing mention of IRISL Europe GmbH, a wholly owned subsidiary of IRISL. (Id. ¶ 1014). In a presentation that Commerzbank allegedly delivered to IRISL immediately after the New York branch rejected those transactions, a Commerzbank-Hamburg bank representative explained that "'IRISL is in [sic] the OFAC list,'" but that "'payments which are sent through a . . . subsidiary are unlikely to be rejected to our present knowledge.'" (Id. ¶¶ 1017-18) (alteration added). Indeed, the bank then developed a process by which IRISL initiated USD transfers using the accounts of less conspicuous subsidiaries to conceal those transfers from its New York branch's detection. (Id. ¶ 1019). By the end of 2006, based on this process and others, the Chief Compliance Officer of Commerzbank described the "'[p]ersistent disregarding of OFAC rules by foreign branches. Hamburg is notorious for it.'" (Id. ¶ 1030).

According to the Second Amended Complaint, Commerzbank's relationship with IRISL continued, despite clear public warnings about the danger involved. For example, as described above, a 2008 State Department cable warned of the dangers of shipments of arms from China to Iran via IRISL, "'particularly given Iran's clear policy of providing arms and other support to Iraqi insurgents and terrorist groups like the Taliban and Hezbollah[.]'" (Id. ¶ 1025). In October 2009, a German-owned freighter, under charter to IRISL, was intercepted by U.S. troops and found to contain ammunition and copper discs which are a key component used to make EFPs; the shipment was headed to Syria from Iran. (Id. ¶¶ 1026-28).

On September 11, 2008, the day after IRISL, along with IRISL subsidiaries, was designated an SDN, a senior OFAC official sent the press release announcing the designation to Commerzbank's Head of Compliance in New York; this press release was then forwarded to employees in Germany with IRISL responsibilities. (Id. ¶¶ 1035, 36). Despite the warning in the press release that IRISL was an Iranian government maritime carrier that routinely and "systematically circumvents the Iranian arms embargo," plaintiffs allege that Commerzbank continued to engage in transactions for IRISL and its subsidiaries, directing "close to $40 million on behalf of IRISL subsidiaries and related entities" in a three month period after IRISL's designation. (Id. ¶¶ 1037-38).

Furthermore, plaintiffs allege that during this same period of time, Commerzbank maintained an account for "an open and notorious Hezbollah fundraising organization in Germany known as Waisenkinderprojekt Libanon e.V. ('the Orphans Project Lebanon e.V.')." (Id. ¶ 1039). Prior public reports issued by the German government had identified this organization as a Hezbollah fundraising organization. (Id. ¶ 1040).[67] Indeed, on July 24, 2007, the United States designated Hezbollah's Martyrs Foundation, which was the primary recipient of these funds as an SDGT. (Id. ¶¶ 1039-40). Plaintiffs claim that Commerzbank knew, or consciously avoided knowing, that by continuing to provide financial services for this Waisenkinderprojekt organization, Commerzbank was providing funding to support an FTO –

_____

[67] See Lelchook v. Commerzbank AG, No. 10 CV 5795 (S.D.N.Y. 2011), Transcript of Oral Argument at 21-22, attached as Exhibit I to the Declaration of Michael J. Radine in Opposition to Joint Motion to Dismiss for Failure to State a Claim ("Radine Decl."), filed on November 11, 2016, ECF No. 125-1. In the transcript of the oral argument held before Judge Hellerstein on July 18, 2011, the judge rejected defendant's notion that the Orphans Project Lebanon had "never been, even today . . . on a designated terrorist watch list of any kind, in the United States or in Germany." Id. Instead, the court noted that the district court of the German State of Kluten-Berg had, indeed, in 2008, found Orphans Project Lebanon to be part of Hezbollah. Id. Accordingly, the judge found that this designation, which was made two years after the attacks at issue, was "reflective of an activity" that was ongoing during the time period alleged in the complaint. (See discussion supra at 36).

Hezbollah.  (Id. ¶ 1040).  On March 11, 2015, Commerzbank entered into a deferred prosecution agreement after being charged with a conspiracy to violate IEEPA.  (Id. ¶ 992).

The allegations in the Second Amended Complaint plausibly allege that Commerzbank knowingly entered into a conspiracy to provide material support to an FTO in violation of Section 2339B, as shown by its maintenance of an account on behalf of a fundraising organization known to fund Hezbollah.  The allegations are also sufficient to demonstrate that Commerzbank, after becoming aware of the connection between IRISL and terrorist activities on behalf of a State Sponsor of Terrorism, nonetheless continued to engage in transactions designed to provide funding for materials and other items, which were then used to commit attacks on the plaintiffs, in violation of Section 2339A.

Based on the totality of the claims in the Second Amended Complaint, the Court respectfully recommends that Commerzbank's motion to dismiss the First and Second Claims against it be denied.

5.  Fifth and Sixth Claims for Relief Pursuant to Section 2339A and 2339B

Additionally, plaintiffs' Fifth and Sixth Claims for Relief are against Commerzbank under a theory of primary liability in violation of Sections 2339A and 2339B.[68]  In their Fifth Claim for Relief, plaintiffs claim that Commerzbank itself violated Section 2339A by "concealing and disguising the nature, location, source and ownership of material support it provided to IRISL, knowing or deliberately indifferent to the fact that IRISL and the IRGC would use that support in preparation for, or in carrying out acts of international terrorism."  (Id.

_____

[68] As discussed supra at 87, these claims are non-conspiracy claims.

¶ 2255).   In their Sixth Claim for Relief, plaintiffs assert that Commerzbank violated 2339B by

"providing material support to Hezbollah through Commerzbank's acts on behalf of its customer

Waisenkinderprojekt Libanon e.v."  (Id. ¶¶ 2264-73).

In terms of the Fifth Claim for Relief, the allegations sufficiently plead that

Commerzbank directly transacted with IRISL, even after IRISL was designated an SDN, and that

the bank therefore can be found to be primarily liable for the attacks perpetrated by IRISL's

shipping of arms and other materials to terrorists.  Commerzbank argues that "the [Second

Amended] Complaint does not contain a single allegation that any of the proceeds of the dollar-

clearing transactions between Commerzbank and IRISL were in fact transferred to Hezbollah or

any other terrorists who committed the attacks by which Plaintiffs were injured[]."

(Commerzbank Mem. at 4) (alterations added).

However, this argument ignores the definition of "material support" necessary to plead a

violation of 2339A.  As discussed supra at 18, Section 2339A requires that "material support" be

provided "knowing or intending" that it will be used in aid of a violation of one of several

criminal statutes.  Plaintiffs have plausibly pleaded facts to show that, in providing support for

IRISL, Commerzbank knew that IRISL channeled support for terrorist activities.  Indeed, as

described above, plaintiffs need not show that the dollar-clearing transactions "were in fact

transferred to Hezbollah" to succeed on their Section 2339A claim at this stage, particularly in

light of the fact that Section 2339A does not require a designated FTO, but rather only

"knowledge" that the banks' actions may be funding transactions used in support of several

criminal statutes.  (See also Pls.' Mem. at 50 n.54) (noting that "Commerzbank has the wrong

claim; the Fifth Claim for relief is based on a violation of Section 2339**A**, not 2339**B**") (emphasis

in original).

Once again, the Court reiterates Linde's analysis as to primary liability: the question of whether the transactions on behalf of IRISL were, definitionally, "acts of international terrorism" is a question for the jury, as are other questions of fact raised here. As one example, plaintiffs correctly point out that "Commerzbank may, of course, argue at summary judgment or at trial that IRISL is (contrary to the [Second Amended] Complaint's allegations) independent of Iran or that because IRISL was 'Iran's national maritime carrier' it falls within Rothstein's safe harbor for 'legitimate agencies, operations, and programs[.]" (Pls.' Mem. at 52) (alterations added). At this early stage in the proceedings, where the state of the law in terms of primary liability is still unclear, and where discovery has yet to be conducted, the Court respectfully recommends denying Commerzbank's motion to dismiss the Fifth Claim for Relief on this ground.

In terms of the Sixth Claim for Relief (the "Orphans Project" claim), the Court respectfully recommends a finding that the Second Amended Complaint sufficiently pleads that Commerzbank held accounts for known Hezbollah operatives. Commerzbank argues that "there are no allegations (even conclusory ones) that either Orphans Project Lebanon or the Martyrs Foundation is an alter ego of, or controlled by, Hezbollah[.]" (Commerzbank Mem. at 9). The Court notes that, while some courts have looked for allegations that an entity is an alter ego of the FTO, Strauss v. Credit Lyonnais, 2006 WL 2862704, other cases in this district have reasoned that "a violation of 2339B may be found where an entity provides money or support to an organization knowing that the ultimate beneficiary is the FTO." Goldberg v. UBS, 660 F. Supp. 2d at 433. Similar to the court's findings in Goldberg that, in August of 2003, President Bush noted that the designation of an organization as an SDGT was due to its provision of financial support to Hamas, here, plaintiffs have incorporated by reference a Treasury Report designating the Martyrs Foundation as an SGDT for channeling "financial support from Iran to

several terrorist organizations in the Levant, including H[e]zbollah[.]" (SAC ¶ 1040 n.65). To the extent that the district court would concur with the test for assessing the alter ego of the FTO adopted in <u>Strauss v. Credit Lyonnais</u>, the district court there looked for the fundraising affiliate of the terrorist organization, which is well-pleaded here. See <u>Strauss v. Credit Lyonnais, S.A.</u>, 2006 WL 2862704, at *10 (adopting the reasoning of <u>National Council of Resistance of Iran v. Department of State</u>, 373 F.3d at 157–58 (finding it "silly" that Congress could only empower the Secretary to designate a terrorist organization, but not to ban the transfer of material support to its fundraising affiliate)). (<u>See</u> discussion <u>supra</u> at 35). Additionally, in its supplemental brief, Commerzbank argues that the Orphans Project claim is indistinguishable from the "purported charity organizations" at issue in <u>Al Rajhi</u>. (Commerzbank Reply Mem. at 6, 7). To the extent that <u>Al Rajhi</u> required the organizations to have "aided in the [] attacks" at issue, the Court notes that plaintiffs here *do* allege that the organizations have, indeed, aided in the attacks at issue by providing direct support to Hezbollah.

In terms of the theories of primary liability in this case, the Court notes that there are clearly questions of fact for a jury to decide, but the pleadings are sufficient to state a plausible claim. Thus, the Court respectfully recommends that Commerzbank's motion to dismiss the Second Amended Complaint on the basis of these claims be denied.[69]

---

[69] Commerzbank contests personal jurisdiction over the Orphans Project claims (the Sixth Claim for Relief), arguing that "this claim only alleges that Commerzbank provided banking services to its customer in Germany, and the 'primary recipient' of funds from that customer's account was in Lebanon.'" (<u>See</u> Commerzbank Mem. at 7). Plaintiffs point out that pendent personal jurisdiction is available for a claim "that arises from the same common nucleus of fact as another claim for which the court properly has jurisdiction over the defendant" (Pls.' Mem. at 77) (citing <u>Strauss v. Credit Lyonnais</u>, 175 F. Supp. 3d 3, 20 (E.D.N.Y. 2016)). Commerzbank asserts that the Orphans Project claim is based on "distinct, not common facts" from the rest of the conspiracy allegations. (Commerzbank Mem. at 7) (arguing that "that the Court may have personal jurisdiction as to the conspiracy claims does not provide a basis for asserting personal jurisdiction over Commerzbank with respect to the separate Orphans Project claim based on some hypothetical connection between the two claims that is not alleged in the [Second Amended] Complaint or even explained in Plaintiffs' Opposition") (alterations added). However, the Court finds that the Orphans Project claim is based on the same nucleus of fact as the conspiracy claims – namely, providing material support directly, or indirectly, to terrorist entities or their alter egos. Just because plaintiffs have brought

6. <u>Third and Fourth Claims for Relief Pursuant to 18 U.S.C. § 2332d</u>

Plaintiffs allege that defendants HSBC, SCB, RBS and Commerzbank[70] are also liable under the ATA for violating 18 U.S.C. § 2332d, which makes it a crime for a "United States person, knowing or having reasonable cause to know that a country is designated under section 6(j) of the Export Administration Act of 1979. . . as a country sponsoring international terrorism," to "engage[] in a financial transaction with the government of that country." SCB, RBS, and Commerzbank[71] (the "2332d defendants") challenge the plaintiffs' claims under Section 2332d on the grounds that they are not "United States person[s]," and that they did not engage with financial transactions with the government of Iran.

Accordingly, as discussed above, this Court must make a recommendation as to this mixed question of law and fact: (1) whether the plaintiffs have adequately pleaded that the 2332d defendant bank branches are "United States persons" as intended by this statute; and (2) whether the pleadings include plausible factual allegations tying their transactions with the government of Iran, as opposed to other, independent entities.

---

this claim separately as a non-conspiracy claim does not mean it does not arise from the same operative facts as the rest of the conspiracy. Furthermore, plaintiffs note that, while the doctrine of pendent personal jurisdiction is typically employed to permit the adjudication of pendent state law claims, courts in other Circuits have used this doctrine in assessing claims related to federal, or foreign, claims as well. <u>See, e.g.</u>, <u>Wultz v. Islamic Republic of Iran</u>, 755 F. Supp. 2d 1, 35 (D.D.C. 2010) (discussing how the doctrine of pendent personal jurisdiction "insures against due-process concerns over hauling the defendant into court to defend against [pendent claims], because the defendant is already justifiably hauled in to defend against [other claims with respect to which the Court has original personal jurisdiction]"). The Court finds this logic persuasive and, having been unable to locate a Second Circuit case to the contrary, respectfully recommends that plaintiffs be allowed to proceed on their Sixth Claim for Relief, since the Court has found original personal jurisdiction for all other claims.

[70] While plaintiffs allege that Barclays' New York branch "constitutes a 'U.S. person'" for purposes of 18 U.S.C. § 2332d(b)(2) (<u>see</u> SAC ¶¶ 75, 363) and that Barclays is one of the defendants to have committed acts of international terrorism in violation of Section 2332d (<u>see</u> <u>id.</u> ¶ 54), the Fourth Claim for Relief is only against SCB, RBS, and Commerzbank, with no mention of Barclays. Accordingly, the Court does not assess the allegations against Barclays in analyzing the plausibility of this claim.

[71] HSBC-US is a U.S. national bank chartered under federal law, with its principal office in New York and its corporate headquarters in Virginia. (<u>Id.</u> ¶¶ 67-68). Therefore, it is a "United States person" for purposes of Section 2332d, and the bank has not raised an argument to the contrary.

a)  <u>United States Persons</u>

SCB, RBS, and Commerzbank challenge the plaintiffs' claims under Section 2332d on the grounds that they are not "United States person[s]."  The statute defines "United States person" as a: "(A) United States citizen or national; (B) permanent resident alien; (C) juridical person organized under the laws of the United States; or (D) any person in the United States." 18 U.S.C. § 2333d(b)(2).  These defendants contend, however, that their U.S. branches are not "juridical persons organized under the laws of the United States," nor do they qualify under the fourth category of "person[s] in the United States."  (Defs.' Mem. at 28-30).  The Court addresses these arguments in turn.


1)  <u>Organized Under the Laws of the United States – Section 2332d(b)(2)(C)</u>

Plaintiffs argue that individual U.S. bank branches are not foreign entities; they are hybrid entities.  They are treated as "'foreign' entities for certain purposes, such as personal jurisdiction" (Pls.' Mem. at 78), and they are also treated as "functionally equivalent" to domestic entities for other purposes.  Plaintiffs argue that the U.S. branches of foreign banks are "juridical persons organized under the laws of the United States," 18 U.S.C. § 2332d(b)(2)(C), because as branches of a foreign bank, they cannot operate and do business in the United States unless they have a license and are registered to do business in the United States.  (Pls.' Mem. at 78); (<u>see also</u> SAC ¶ 78 (describing SCB's license issued by New York to operate as a foreign bank branch); ¶¶ 81-84 (describing RBS and ABN's statutory demerger process by which RBS acquired the New York and Chicago branches); ¶ 98 (describing Commerzbank's license of its New York Branch, which was first granted in 1967)).   Indeed, it is alleged that as a result of its actions in connection with the conspiracy, SCB was required by the New York State Banking

Department and the Federal Reserve to adopt certain anti-money laundering practices, demonstrating that it was subject to New York State banking regulations and rules. (SAC ¶ 647). Additionally, the deferred prosecution agreement between RBS and the DOJ notes that RBS was "also subject to oversight and regulation by the New York State Banking Department." (RBS DP,[72] Ex. A ¶ 13). Commerzbank New York was similarly subject to regular investigations of its AML compliance program by the New York State Department of Financial Services. (Commerzbank DP ¶ 93). Once a foreign bank obtains its license and appoints an agent for service of process, the bank is, according to state law, subject to the same rules governing service of process as if it were a domestic corporation. N.Y. BANKING LAW § 200 (McKinney 2006). Furthermore, every foreign banking corporation licensed to maintain one or more branches or agencies in New York state may exercise the same powers as all other trust companies. Id. § 100.

Not only are these foreign banks required to obtain licenses in order to operate in New York and the United States generally, but Congress has demonstrated a strong preference for treating the U.S. branches of foreign banks as equal to their domestic counterparts in many respects. U.S. branches of non-U.S. banks are subject to supervision and oversight by various regulatory authorities, including the Federal Reserve, the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency, and the Financial Stability Oversight Council. They are also subject to a host of federal banking statutes, including the Federal Reserve Act, 12 U.S.C. § 461 et seq.; see also 12 C.F.R. Pt. 204.1(c)(2); the Federal Deposit Insurance Act, 12

---

[72] Citations to "RBS DP" refer to the Deferred Prosecution Agreement and Factual Statement between the United States Department of Justice and RBS, attached to the Radine Decl. as Exhibit D; citations to "Commerzbank DP" refer to the Deferred Prosecution Agreement and Factual Statement between the United States Department of Justice and Commerzbank AG, attached to the Radine Decl. as Exhibit F.

U.S.C. § 1811 et seq.; the Bank Holding Company Act, 12 U.S.C. § 1841 et seq.; the Bank

Secrecy Act, 31 U.S.C. § 5311 et seq.; and the International Banking Act, 12 U.S.C. § 3102 et

seq. As just one example, the International Banking Act of 1978, which establishes a

comprehensive framework for the supervision and regulation of non-U.S. banks in the United

States, treats the U.S. branch of a non-U.S. bank as if it were a U.S. bank. See 12 U.S.C. §

3102(b) (noting that "except as otherwise specifically provided . . . operations of a foreign bank

at a Federal branch . . . shall be conducted with the same rights and privileges as a national bank

at the same location . . .").  The regulations in the Bank Holding Company Act also apply to

branches of a foreign bank that are located in the United States.  In fact, as a testament to the

depth of the regulatory regime to which U.S. branches of foreign banks are subject, even the

foreign bank itself is subject to the restrictions of the Bank Holding Company Act and to the

enforcement powers of the Federal Reserve.  12 U.S.C. § 1841 et seq.

The treatment of U.S. bank branches by other regulatory agencies further supports a

finding that U.S. branches of foreign banks are often treated as if they were domestic entities.

For example, in 1990, the Securities and Exchange Commission issued a release providing

guidance as to the application of an exemption to U.S. branches of foreign banks from certain

registration requirements.  The release noted the International Banking Act's treatment of

domestic banks, discussed supra, and declared that U.S. branches of foreign banks are subject to

domestic supervision sufficient to render them "functionally indistinguishable from their

domestic counterparts."  See Securities and Exchange Commission; Interpretation of Section

3(a)(2) of the Securities Act of 1933, 51 Fed. Reg. 34,460 (Sept. 29, 1986) (codified at 17 C.F.R.

Pt. 231).

Perhaps most critical to this analysis is the fact that the Treasury Department, in issuing various regulations imposing restrictions on trade or in engaging in financial transactions with Iran, did not exempt the foreign banks from these restrictions, nor did it distinguish between U.S. banks and U.S. branches of foreign banks in requiring compliance with its regulations. All banks, including U.S. branches of foreign banks, were subject to the U-Turn Exemption requirements while they remained in effect, and all banks were otherwise prohibited from dealing with Iran and various designated Iranian entities. Potentially in recognition of the hybrid status of these foreign bank branches, and the strict parameters under which they were permitted to operate in the United States, the foreign bank U.S. branches were treated exactly the same as U.S. banks when dealing with Iran. To allow foreign banks to operate outside of these controls would be detrimental to the financial interests of U.S. national banks, which were clearly barred from engaging in transactions with Iran. In other words, by defendants' reading of the statute, the Treasury Department enacted regulations to bar U.S. national banks such as CitiBank or Wells Fargo from engaging in highly-profitable transactions with Iran, but the 2332d defendants would have an unfettered opportunity to engage in hundreds of millions of U.S. dollar transactions and highly profitable Letters of Credit on behalf of Iranian customers when these competitor banks were barred from engaging in the same types of transactions by regulations. This defies common sense. Similarly, to allow foreign banks to operate outside of these controls, which were designed specifically to prevent the funding of terrorists, would also be counterproductive to U.S. efforts more generally in halting the financing of Iranian terrorist activities with U.S. dollars.

In sum, considering these various regulatory authorities, and particularly the ITRs applicable to all banks, branches of foreign banks located in the U.S. are subject to an intensive

regulatory regime that is sufficient to characterize these branches as being "organized under the laws of the United States," as the interpretive guidance described above has also made clear. While it may be that after discovery, a 2332d defendant could provide evidence that it was exempt from these various regulations or subject to some other exception that would warrant different treatment, at this stage of the proceedings, the Court respectfully recommends that plaintiffs have adequately alleged that the 2332d defendants fall within Subparagraph (C) of the definition of "United States person."

2) <u>Any Person in the United States – Section 2332d(b)(2)(D)</u>

Even if the district court does not find that the bank branches are "juridical persons organized under the laws of the United States" under 18 U.S.C. § 2332d(b)(2)(C), plaintiffs note that the U.S. branches of these banks also fall within the category of "any person in the United States" under 18 U.S.C. § 2332d(b)(2)(D).

Although the parties debate the meaning of "person" as used in Section 2332d, Section 2331(3) actually provides the definition of "person" for purposes of the Section. <u>See, e.g.</u>, <u>Almog v. Arab Bank</u>, 471 F. Supp. 2d 257, 266 (E.D.N.Y. 2007) (discussing history of the re-designation of 2331 of Title 18 of the United States Code to Section 2332). Section 2331(3) explicitly defines "person" to include "any individual or *entity* capable of holding a legal or beneficial interest in property." 18 U.S.C. § 2331(3) (emphasis added). Therefore, the plain language of the definition of "person" for the Terrorism Chapter of the United States Code is not limited to individuals, but specifically includes "entit[ies] capable of holding a legal or beneficial interest in property," such as a bank. Since the defendants had branches in the United States,

plaintiffs argue that they should be considered "persons *in* the United States." 18 U.S.C. § 2332d(b)(2)(D) (emphasis added).

      a)  <u>Ofisi v. BNP Paribas, S.A.</u>

Few courts have analyzed claims under Section 2332d, and only one case has specifically considered this statutory provision in the context of multinational banks. <u>See</u> <u>Ofisi v. BNP Paribas, S.A.</u>, 278 F. Supp. 3d 84, 99 (D.D.C. 2017), <u>reconsideration denied</u>, No. 15 CV 2010, 2018 WL 396234 (D.D.C. Jan. 11, 2018), and <u>order vacated in part</u>, 285 F. Supp. 3d 240 (D.D.C. 2018), <u>appeal dismissed</u>, No. 18 CV 7007, 2018 WL 1391572 (D.C. Cir. Feb. 26, 2018). In <u>Ofisi</u>, the plaintiffs, who were victims and family members of victims of the 1998 terrorist bombings of the U.S. embassies in Kenya and Tanzania, brought suit against BNPP, alleging that BNPP violated the ATA through the predicate statute, 18 U.S.C. 2332d,[73] by engaging in financial transactions with the Sudanese government, a designated State Sponsor of Terrorism. <u>Id.</u> at 91-92. Sudan is alleged to have provided safe harbor, as well as financial, military and intelligence assistance to al Qaeda, which was responsible for perpetrating the attacks. <u>Id.</u> at 91-92.

In considering the plaintiffs' claim that BNPP qualified as a "United States person" under Section 2332d(b)(2)(C), the court held that BNPP was not a "juridical person organized under the laws of the United States" because it was "a French multinational bank, incorporated under

---

[73] The <u>Ofisi</u> complaint also raised claims under Sections 2339A and 2339C. The court dismissed the Section 2339C claim because the statute was enacted four years after the subject embassy bombings, and it dismissed the Section 2339A aiding and abetting claim finding that there was no aiding and abetting liability under Section 2333 in the context of that case, where the claims were not covered by JASTA. 278 F. Supp. 3d at 97-98.

the laws of France." Id. at 98-99.[74] The Ofisi court also found that Section 2332d(b)(2)(D) did not cover BNPP, interpreting the provision as "meant to apply to natural persons who are physically present in U.S. territory." Id. at 99. The court explained that: "It would make little sense to accept plaintiffs' argument that subparagraph (D) extends beyond natural persons to reach juridical persons like BNPP." Id. According to the Ofisi court's analysis, interpreting subsection (D) to cover juridical persons would render subparagraph (C) superfluous "because companies organized under the laws of the U.S. are by definition located in the U.S. as that is their place of incorporation." Id.

Ofisi is not binding on this Court and, indeed, this Court respectfully disagrees with its reasoning as to Section 2332d. Notably, the Ofisi court failed to address Section 2331(3)'s explicit definition of "person," which does not limit the term to "natural persons." Nor did the court mention the equal treatment of U.S. banks and U.S. branches of foreign banks when dealing with banking and financial regulations designed to combat the funding of terrorists. While BNPP was alleged to have operated "affiliates, branch offices, and subsidiaries in the U.S.," during the timeline at issue in Ofisi, the court in Ofisi did not consider the hybrid nature of foreign bank U.S. branches, and their extensive regulation by state and federal authorities. Instead, the court relied on the few precedents that had discussed the application of the statute in the context of foreign corporations, not multinational banks. These cases are discussed below.

---

[74] The Ofisi court, in assessing BNPP's role in providing financial transactions to Sudan, focused in part on the absence of an admission by BNPP to being a "United States person" under Section 2332d when it entered a guilty plea in a related criminal case. Id. at 99.

b)  United States v. Chalmers

Specifically, the court in Ofisi and the defendants here rely on the decision in United States v. Chalmers, where the court declined to impose criminal liability for wire fraud on a U.S. subsidiary to a Bahamian corporation that had no independent presence in the United States. (Defs.' Mem. at 29 (citing 474 F. Supp. 2d 555 (S.D.N.Y. 2007)); see also Abecassis v. Wyatt, 785 F. Supp. 2d 614, 648 (S.D. Tex. 2011) (analyzing the applicability of Section 2332d to a foreign corporation and finding that "[Section 2332d's] basis for liability does not extend to Bayoil Supply & Trading or NuCoastal Panama, because they are foreign entities").  In seeking to hold the Bahamian corporation liable under 18 U.S.C. § 2332d, the government in Chalmers argued that the corporation was a "United States person" solely because a United States citizen was the owner and operator of the corporation and because the illegal transactions were conducted in Texas.  474 F. Supp. 2d at 565.

The court in Chalmers found that the subsidiary was not a U.S. citizen, based on two rationales: (1) the United States Supreme Court's interpretation of a federal law proscribing trade with Burma, see Crosby v. National Foreign Trade Council ("Crosby"), 530 U.S. 363 (2000); and (2) the absence of statutory language in 18 U.S.C. § 2332d analogous to the Cuban Assets Control  Regulations, defining "corporations" as ones "wherever organized or doing business," that are "owned or controlled by United States citizens or residents."  Id.

In examining the Chalmers court's reliance on Crosby v. National Foreign Trade Council, this Court is not convinced that the Supreme Court's interpretation of "United States person" in the context of discussing sanctions against Burma is dispositive of the issue in the case at hand. First, the Supreme Court in Crosby considered whether a Massachusetts state statute boycotting wholly foreign corporations was pre-empted by federal law, specifically, the Foreign Operations,

Export Financing, and Related Programs Appropriations Act, 1997 ("FOEFRPAA"). 530 U.S. at 363. (See also Pls.' Mem. at 63). In analyzing the presumption question, the Court paid particular attention to the legislative record in that case, and specifically Congress' "deliberate effort 'to steer a middle path'" in trade with Burma. Id. at 378. The Court found that Massachusetts had taken a "different course," which undermined the federal scheme by proscribing trade with entities that Congress had "explicitly exempted or excluded from sanctions." Id.

Defendants argue that, in Crosby, "the Supreme Court, in construing identical language with respect to sanctions against Burma, noted that *this prohibition* [in FOEFRPAA] does not apply to 'foreign companies,'" suggesting that the Court should similarly recommend that the ATA's prohibition does not apply to the defendant banks because they are foreign entities. (Defs.' Mem. at 29 (citing Crosby, 530 U.S. at 379)) (emphasis added).

However, the issue in Crosby was one of state and federal law interaction, specifically regarding federal preemption. The circumstances here are completely different. The "prohibition" at issue in Crosby was designed to prohibit "new investment" in Burmese economic development, and "new investment" was expressly defined in the statute. Massachusetts had ignored Congress' decision to grant certain exceptions to the prohibition and enacted its own broader prohibition that conflicted with congressional intent. By contrast to FOEFRPAA, the prohibition on "financial transactions" in 18 U.S.C. § 2332(d) is not so limited; rather than prohibiting only "new investment" as in the FOEFRPAA, Section 2332(d) bars all financial transactions with Iran and other specifically designated agents and entities. Therefore, while the Supreme Court held that the statutory prohibition in FOEFRPAA did not apply to

foreign companies, the Court was not assessing the statutory language of 18 U.S.C. § 2331 or the prohibited conduct of 18 U.S.C. § 2332(d).

Moreover, unlike FOEFRPAA, where Congress was "steer[ing] a middle path with Burma," in the case at hand, Congress developed and implemented a well-defined scheme of sanctions against Iran to combat terrorism. Since the initial passage of the Iran-Libya Sanctions Act in 1996, the government has consistently added new entities to the OFAC sanctions list to eliminate exemptions and exceptions in dealing with Iran. (See, e.g., SAC ¶¶ 12 (describing the designation of MODAFL in 2007); 16 (the designation of the IRGC-QF in 2007); 17 (the designation of Bank Saderat in 2007), 19 (the designation of Mahan Air in 2011)).[75] Therefore, unlike Crosby, where congressional intent was more measured, congressional intent behind the Iranian sanctions was unambiguous in its goal of halting trade and U.S. dollar transactions with Iran and is drastically different from the Burmese sanctions scheme in Crosby.

In sum, the Crosby court's observation that, in the context of investment in Burma, FOEFRPAA was intended to be limited to discrete entities and representatives, whereas the Massachusetts law had created broader restrictions on foreign and domestic companies, has little to no bearing on whether a U.S. branch of non-U.S. banks constitutes a "United States person" as

---

[75] A selection from the history of NIOC's designation is informative as to this point about the evolution of sanctions. On November 26, 2008, NIOC was first added to OFAC's SDN list. See OFAC Changes to List of Specially Designated Nationals and Blocked Persons Since January 1, 2008, United States Department of the Treasury (2008), https://www.treasury.gov/resource-center/sanctions/SDN-List/Documents/sdnew08.pdf (last visited July 17, 2018). On June 16, 2010, changes were made to NIOC's entry on OFAC's SDN list, and the designation was expanded to all offices worldwide. See Recent OFAC Actions, United States Department of the Treasury (2010), https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20100616.aspx (last visited July 17, 2018). On July 2, 2013, the Treasury Department applied secondary sanctions to NIOC, as well as designated corporations linked to NIOC and senior managers. See OFAC Changes to List of Specially Designated Nationals and Blocked Persons Since January 1, 2013, United States Department of the Treasury (2013), https://www.treasury.gov/ofac/downloads/sdnew13.pdf (last visited July 17, 2018).

defined by 18 U.S.C. § 2332d, particularly in view of Section 2331's express inclusion of "entity" in its definition of person.

Turning to the second rationale relied upon by the Chalmers court regarding the Cuban Assets Control Regulations' definition of corporations, this Court finds that there is a significant difference between corporations and banks. In Chalmers, the argument in support of the corporation's status as a "United States person" was based largely on the owner's status as a United States citizen and the fact that the transaction occurred in Texas. As discussed in detail above, unlike corporations, the U.S. branches of non-U.S. banks are considered hybrid entities, doing business only through licenses issued by the states, and subject to a series of oversight and regulations that render them "functionally equivalent" to the domestic branches of U.S. banks in certain circumstances. Moreover, there is no limitation in Section 2332d, as there was in the Cuban Assets Control Regulations, to entities "owned or controlled by United States citizens or residents." Where, as here, Section 2331 provides an express definition of the term "person," the Supreme Court has "recently cautioned that 'the presumption of consistent usage readily yields to context,'" and that "'a statutory term may mean different things in different places.'" (See Pls.' Mem. at 64 (quoting King v. Burwell, 135 S. Ct. 2480, 2493 n.3 (2015)).

Accordingly, the Court finds that neither Chalmers nor Crosby is controlling in this case insofar as the ATA's definition of "United States person" and its application to U.S. branches of foreign banks is concerned.


3) The Alleged Tension Between Section 2332d(b)(2)(C) and (D)

This Court also respectfully disagrees with the Ofisi court's analysis of the interpretation of subsection (D) of 2332(b)(2) as applying only to individuals, and the court's conclusion that

subparagraph (C) would be rendered superfluous if subsection (D) were read to include entities. In construing 18 U.S.C. § 2332d(b)(2)(D), as described above, the <u>Ofisi</u> court reasoned that to include the U.S. branches of the foreign bank under the definition of "any person" would "render subparagraph (C) superfluous because companies organized under the laws of the U.S. are by definition located in the U.S., as that is their place of incorporation." <u>Ofisi v. BNP Paribas, S.A.</u>, 278 F. Supp. 3d at 99; (<u>see also</u> Defs.' Mem. at 28-30 (arguing that "any person" is limited to a natural person and does not include an entity such as a bank)). As noted <u>supra</u>, the <u>Ofisi</u> court failed to consider the definition of "person" as set forth in Section 2331, the definitional section of the statute. Clearly, under that definition, the term "person" is not so limited; it applies to individuals as well as "entit[ies] capable of holding a legal or beneficial interest in property." 18 U.S.C. § 2331(3). Contrary to the <u>Ofisi</u> court's concerns, such a reading would not render subparagraph (C) superfluous: paragraphs (A) through (C) would relate to transactions involving U.S. citizens, permanent residents, and entities organized under U.S. law *located anywhere in the world,* making it clear that if an entity is a U.S. organization, it is prohibited from dealing with terrorists even if it is headquartered abroad or conducts transactions abroad.

By contrast, subparagraph (D) was clearly intended to apply to conduct occurring in the United States. Perhaps in recognition of the jurisdictional limitations and reach of United States law over strictly foreign individuals and entities, subparagraph (D) was included to ensure that any conduct proscribed by Section 2332d occurring on U.S. soil is subject to sanctions regardless of who commits it. Thus, subparagraph (D), in contrast to subparagraphs (A) and (B) which are limited to U.S. citizens or permanent resident aliens, applies to *any* individual "person," including those foreigners who are not U.S. citizens or residents, who engage in prohibited activities *while they are geographically in the United States*. Similarly, given Section 2331's

definition of "person" as including "entities" capable of holding property, it is equally arguable that Congress intended subsection (D) to apply to non-U.S., foreign entities who engage in prohibited conduct *while they are in the United States.* Although the Ofisi court was correct that subsection (C) contained the modifying term "juridical," which does not appear in subsection (D), its absence is not determinative in light of Section 2331's definition of "person." Certainly, under this Court's interpretation, U.S. branches of foreign banks, depending on their structure and legal status, may be covered under subsection (C) if it is determined that they are "organized under the laws of the United States," or they may fit under the definition of subsection (D) and Section 2331 as persons who can be held liable for actions while here in the United States if for some reason it is determined that because of how the 2332d defendant banks are structured they are not "organized" under U.S. law.

4)  Policy Rationales

An interpretation of "United States person" that would include the domestic branches of foreign banks in the definitions of 18 U.S.C. § 2332d(b)(2)(C) and (D) is bolstered by policy considerations. Specifically, support for this interpretation can be found in the underlying purpose of the OFAC sanctions and subsequent implementation of the ITRs, which were designed to prevent a State Sponsor of Terrorism from obtaining funding in U.S. dollars to support terrorist activities. It seems unlikely that Congress intended to allow foreign banks operating through branches in the United States—branches that are subject to a host of U.S. laws and regulations—to be exempt from the prohibition on dealing with Iran, while prohibiting U.S. entities, including U.S.-incorporated banks, from dealing with State Sponsors of Terrorism

"anywhere in the world." (See, e.g., Pls.' 10/25/17 Ltr[76] (noting that defendants' reading would make it so that "engaging in financial transactions with State Sponsors of Terrorism is illegal for U.S. citizens anywhere and natural persons located in the United States, but U.S. branches and depository institutions associated with foreign banks enjoy a safe harbor, allowing them to transact [business] with Iran, from the U.S. with impunity"); see also Pls.' Mem. at 64 (noting that "defendants effectively ask this Court to carve a giant loophole in 2332d and its implementing regulatory regime")).

Further supporting this interpretation, the Iran Trade Regulations focus on location in terms of their prohibited conduct. As an example, one ITR expressly provides that "[a]ny transaction by any United States person *or within the United States* that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited." 31 C.F.R. § 560.203 (emphasis added). As with subsection (D), this ITR contains the same statutory construct in that it applies not only to U.S. individuals and U.S. entities, but it applies to transactions "*within the United States.*" Another ITR prohibits "the exportation, reexportation, sale or supply, directly or indirectly*, from the United States*, or by a United States person, *wherever located*.[]" 31 C.F.R. § 560.204 (emphasis added). These regulations focus on the location of the conduct, similar to 18 U.S.C. § 2332(d)(2)(D)'s focus on persons located "*in* the United States."

The definition of "depository institution" in the regulations further supports an interpretation of "in the United States" in Section 2332d predicated on the physical location of the branches in question. The C.F.R. defines "U.S. financial institution" as including "those

_____

[76] Citations to "Pls.' 10/25/17 Ltr" refer to plaintiffs' Letter from Gary M. Osen to the Hon. Cheryl L. Pollak responding to Defendants' October 16, 2017 Letter providing Supplemental Authority, filed on October 25, 2017, ECF No. 147.

branches, offices, and agencies of foreign financial institutions that are located *in the United States*, but not such institutions' foreign branches, offices or agencies." 31 C.F.R. § 560.327 (emphasis added). Furthermore, the definition of "United States depository institution" in Section 560.319 of the C.F.R. includes these U.S. branches of foreign banks. 31 C.F.R. § 560.319. Accordingly, the Court concludes that the U.S. branches of defendants' banks could readily be considered "United States person[s]" based on 18 U.S.C. § 2332d(b)(2)(D).

The Second Amended Complaint alleges that the U.S. branches of SCB, RBS and Commerzbank conducted financial transactions within the United States, because their U.S. branches provided clearing and other services. As described above, nearly all U.S. dollar transactions initiated outside the United States are processed through correspondent banks located almost exclusively in New York. (SAC ¶ 138). Under the banks' conception of Section 2332d, Stockman Bank,[77] headquartered in Miles City, Montana, and operating only 33 branches throughout the state, could be held liable for engaging in financial transactions with Iran, while the New York branches of SCB, RBS, and Commerzbank would not. Not only does it strain credulity to imagine that this is what Congress intended when it enacted Section 2332d, but it also strains credulity to imagine that this is what the banks themselves *believed* Congress intended. If they believed they were exempt, why would the foreign banks feel the need to implement elaborate mechanisms to avoid detection of their Iranian transactions all the while expressing concern as to the appearance and/or legality of their conduct? Furthermore, if foreign banks were so clearly exempted from the imposition of sanctions when they used their U.S. branches to provide U.S. dollar transactions for prohibited Iranian entities, why was the U-Turn

_____

[77] See STOCKMAN BANK, TRUE MONTANA COMMUNITY BANK, https://www.stockmanbank.com/ (last visited July 13, 2018).

Exemption enacted in the first place? The banks' own internal memoranda and, indeed, the lengths they went to in order to conceal their conduct, suggest that they knew their transactions with Iran were prohibited – not just under the sanctions regime, but also under the anti-terrorism provisions – and that their current argument is not in line with United States policy with respect to dealings with Iran.

Accordingly, in the absence of clarifying, binding authority to the contrary, the Court respectfully recommends that the 2332d defendants' motion to dismiss the Third and Fourth Claims, based on their interpretation that would exclude the U.S. bank branches of foreign banks from the definition of "United States person[s]" under either 18 U.S.C. § 2332d(b)(2)(C), § 2332d(b)(2)(D) or, indeed, under both of these sections, be denied.

b) <u>Transaction with the Government of Iran</u>

In addition to their arguments as to whether or not they can be considered "United States person[s]" under Section 2332d, defendants jointly contend that the Second Amended Complaint is deficient because it fails to allege that the banks dealt directly with the designated State Sponsor of Terrorism – namely, the Iranian government. (Defs.' Mem. at 29).

However, apart from the fact that plaintiffs have alleged that the defendant banks conspired with agents and proxies of the Iranian government, case law has generally found that simply because a terrorist or, in this case a State Sponsor of Terrorism, acts through another agent or under an alias is not a ground for failing to impose liability. <u>See, e.g., National Council of Resistance of Iran v. Department of State</u>, 373 F.3d at 157-58 (finding that it would be "silly" or "implausible" to allow a designated terrorist to escape liability because it adopted an alias) (<u>see</u> discussion <u>supra</u> at 36). The ITRs prohibiting transactions with Iran include within their

prohibited entities those "owned or controlled by the Government of Iran," defined as "any corporation, partnership, association, or other entity in which the Government of Iran owns a 50 percent or greater interest or a controlling interest, and any entity which is otherwise controlled by that government." 31 C.F.R. § 560.313. This would presumably include the National Iranian Oil Company (NIOC). Furthermore, Section 560.304 explicitly defines the Government of Iran to include the "Central Bank of Iran." 31 C.F.R. § 560.304.

Additionally, the Second Amended Complaint alleges that one of the Iranian Bank Co-conspirators, Bank Melli, is an instrumentality of the Government of Iran, and the Bank has, in fact, conceded such in Weinstein v. Islamic Republic of Iran, 609 F.3d 43, 48 (2d Cir. 2010)). (See also SAC ¶ 914 (quoting U.S. regulators' finding that Bank Melli is a financial institution owned or controlled by Iran)). IRISL has also been held to be an instrumentality of the Iranian government. Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch, 919 F. Supp. 2d 411, 429 (S.D.N.Y. 2013) (noting that "[a]s Iran's 'national maritime carrier,' IRISL functions as an instrumentality of the government of Iran).

The Second Amended Complaint alleges that each of the banks charged in the Section 2332d counts was aware of the connection between these instrumentalities and the Government of Iran, and they knew it was unlawful for them to engage in financial transactions with, inter alia, Bank Saderat, Bank Melli and the NIOC. (SAC ¶¶ 400, 516, 532-71, 621-72, 881-918). While defendants argue that plaintiffs will be unable to "demonstrate that U.S. clearing banks. . . knew that Iran was the beneficiary of transactions" largely because the identifying information was stripped from the transactions before they reached the United States, plaintiffs argue that, to the contrary, defendants willfully disregarded knowledge about the ultimate beneficiaries of their transactions. (See, e.g., Pls.' Mem. at 67-68, n.70 (noting that the press release issued by the

Department of Justice announcing the deferred prosecution agreement for HSBC cited "HSBC's willful flouting of U.S. sanctions laws and regulations'"")).  Defendants' language alone—that plaintiffs will be unable to *demonstrate* the U.S. clearing banks' knowledge—indicates that this is ultimately an issue of fact, not an issue relevant at this time when evaluating the sufficiency of the allegations in the Second Amended Complaint.  This Court's recommendation, if adopted, will not bar defendants from arguing at a later date that the entities listed above were independent from the government of Iran.  (See discussion supra at 103-03 (noting that Commerzbank will be able to argue on summary judgment that IRISL is separate from Iran)).

In light of the above, the Court respectfully recommends that the district court deny the banks' motion to dismiss plaintiffs' claims pursuant to 18 U.S.C. § 2332d.

VI.   Bank Saderat's Motion to Dismiss

Bank Saderat raises several additional defenses to the plaintiffs' claims:  1) the claims are barred by the Act of War limitation set forth in 18 U.S.C. § 2336(a); and 2) the Court lacks personal jurisdiction over Bank Saderat.[78]  (Saderat Mem.[79]).

A.   Act of War Defense

Section 2336(a) of the ATA provides that "[n]o action shall be maintained under [the ATA] for injury or loss by reason of an act of war."  18 U.S.C. § 2336(a).  Under the ATA, "act of war" has been defined as "any act occurring in the course of – (A) a declared war; (B) armed

---

[78] To the extent that Bank Saderat also argues that plaintiffs have failed to show "but for" causation connecting the Bank's conduct to plaintiffs' injuries and failed to adequately allege scienter on the part of Bank Saderat, those arguments were addressed supra at 50 when discussing all defendants.

[79] Citations to "Saderat Mem." refer to the Memorandum of Law of Defendant Bank Saderat PLC in Support of its Motion to Dismiss the Second Amended Complaint, dated September 14, 2016, ECF No. 116.

conflict, whether or not war has been declared, between two or more nations; or (C) armed conflict between military forces of any origin."  18 U.S.C. § 2331(4)(C).

Bank Saderat contends that, based on Congress' 2002 Authorization for Use of Military Force ("AUMF") against Iraq, the 115 servicemembers, the interpreter, the journalist, and the contractors who were injured in the case at hand in Iraq were injured in the course of the Iraq War.  (Saderat Mem. at 2-3).  Accordingly, Bank Saderat argues that the Act of War exemption applies, and that because it should be considered an element of subject matter jurisdiction,[80] the Second Amended Complaint should be dismissed.  (Id. at 4-5; see also Saderat Reply[81] at 2).

Bank Saderat first argues that the AUMF makes it clear that the Iraq War was an "armed conflict," either between two or more nations or two armed forces.  (Saderat Mem. at 2).  However, this argument ignores the participants and the timing of the incidents alleged to be at issue in this case.  First, plaintiffs contend that as of May 1, 2003, President Bush declared that "major combat operations in Iraq have ended."[82]  The attacks at issue in this case all occurred

---

[80] Courts are divided as to whether the Act of War defense is jurisdictional, an element of the claim, or an affirmative defense.  The most recent decision on this issue was by the D.C. Circuit in Kaplan v. Central Bank of the Islamic Republic of Iran, where the court concluded that the Act of War exception "presents a merits issue, not a jurisdictional one".  No. 16 CV 7142, 2018 WL 3490072, at *7 (D.C. Cir. July 20, 2018).  Accord Gill v. Arab Bank, PLC, 891 F. Supp. 2d 335, 374-76 (E.D.N.Y. 2012) (finding that the exemption provides defendant with an affirmative defense, and is not jurisdictional); Weiss v. Arab Bank, PLC, No. 06 CV 1623, 2007 WL 4565060, at *5 (E.D.N.Y. Dec. 21, 2007) (expressly declining to treat the Act of War exemption as jurisdictional, and considering the question as one under Rule 12(b)(6)).  But cf. Morris v. Khadr, 415 F. Supp. 2d 1323 (D. Utah 2006) (finding that the court had subject matter jurisdiction when the Act of War exception did not apply); Biton v. The Palestinian Interim Self-Government Authority, 412 F. Supp. 2d 153, 163 (D.D.C. 2005) (assuming, arguendo, based on the parties' briefing, that Section 2336(a)'s Act of War exemption was jurisdictional).  Other courts have not addressed the issue directly but simply considered the exemption under a Rule 12(b)(6) analysis.  See, e.g., Estate of Klieman v. Palestinian Auth., 424 F. Supp. 2d 153 (D.D.C. 2006); Stutts v. De Dietrich Group, 2006 WL 1867060; see also Kaplan v. Central Bank of Islamic Republic of Iran, 961 F. Supp. 2d 185, 200 (D.D.C. 2013) (expressly declining to decide if the Act of War exemption was jurisdictional, an element, or an affirmative defense).  Since the Court recommends a finding that the allegations in the Second Amended Complaint are sufficient to allege that the conduct leading to the injuries of the plaintiffs here were acts of terrorism and not acts of war (see discussion infra at 127), it is unnecessary for this Court to decide at this time if the exemption is jurisdictional.

[81] Citations to "Saderat Reply" refer to Bank Saderat's Reply in Support re Motion to Dismiss for Failure to State a Claim, filed by Bank Saderat on November 10, 2016, ECF No. 118.

[82] See President Bush Announces Major Combat Operations in Iraq Have Ended (May 1, 2003), http://georgewbush-whitehouse.archives.gov/news/releases/2003/05/20030501-15.html (last visited July 3, 2018).

after the disbandment of Iraqi forces, and were launched against Coalition Forces who were authorized to serve in the capacity of preventing and deterring terrorism in post-conflict Iraq. U.N. SCOR, 58th Sess., U.N. Doc. S/Res/1546 (June 8, 2004). Unlike the situation in Stutts, where the Act of War defense was found to preclude liability where the plaintiffs claimed that the attacks occurred "during the '1991 Persian Gulf War,'" Stutts v. De Dietrich Group, 2006 WL 1867060 at *4, in the case at hand, the plaintiffs allege that their injuries were not suffered during the Iraq War, but rather resulted from acts committed by known terrorist organizations after the actual armed conflict ended.

Nonetheless, the Court need not recommend a finding as to whether the Iraq War formally ended in May 2003. There was never a declaration of war or armed conflict with *Iran*, which is the nation alleged to have funded and sponsored the terrorist activity at issue in this case. In the Second Amended Complaint, plaintiffs allege that at no time relevant to this action did the United States declare war or authorize the use of military force against Iran, nor did the United States engage in an armed conflict with Iran's military forces. (SAC ¶¶ 330-31).

Moreover, these alleged acts of terrorism were not committed by "military forces" of either Iraq *or* Iran as that term is defined within Section 2336(a) of the ATA. The exemption for "military forces" under the ATA was designed to "bar actions for injuries that result from military action by recognized governments as opposed to terrorists. . . ." H. Rep. 1-2-1040, at 7 (1992), S. Rep. 102-342 at 46 (1992). See In re Sept. 11 Litigation, 751 F.3d 86 (2d Cir. 2014) (noting that "[t]he ATA is designed precisely to differentiate between acts of terrorism and acts of war"), cert. denied sub nom, Cedar & Washington Assocs, LLC v. Port Authority of N.Y. & N.J., 135 S. Ct. 742 (2014). In Gill v. Arab Bank, the court concluded that to qualify as a

"military force," a group would have to act like the armed forces of a nation. 891 F. Supp. 2d at 374-77.

Here, the Second Amended Complaint alleges that the operatives of Hezbollah, the IRGC, and those groups who killed and injured Coalition Forces in Iraq were all terrorists or terrorist organizations, and the actions that caused the injuries and attacks against the plaintiffs were not carried out by armed forces of recognized governments or military forces, but were acts of international terrorism as defined by 18 U.S.C. § 2331. (SAC ¶¶ 333, 336). In support of that allegation, plaintiffs allege that the operatives responsible for the attacks did not carry arms openly, did not have any fixed distinctive signs, and did not conduct their operations in accordance with the customs and laws of war. (Id. ¶ 332). According to plaintiffs, none of these Iranian-backed terrorists acted like a military force as defined in the ATA; they did not wear uniforms, nor did they distinguish themselves from civilians. (Id. ¶ 333). Instead, plaintiffs allege that the terrorist operatives often masqueraded as members of U.S. armed forces, executing defenseless prisoners and carrying out attacks upon civilians as part of their objectives. (Id. ¶ 335; see also id. ¶ 1044 (describing the "military-style fatigues" worn by the group that carried out the January 20, 2007 attack in Karbala)).

The Court notes that plaintiffs have alleged that not only were Hezbollah and IRGC-QF designated as terrorists for providing "training, funding, and guid[ing] select groups of Iraqi Shi'a militants who target and kill Coalition forces. . .", but the Second Amended Complaint clearly alleges that the attacks were all orchestrated by U.S. designated terrorist organizations, including Hezbollah, the SDGT IRGC-QF and their proxies, such as FTO Kata'ib Hezbollah.

(See, e.g., id. ¶¶ 1450, 2151).[83]  Indeed, plaintiffs claim that the groups engaged in typical acts of terror, laying explosive devices with the intent to use the violence to coerce the civilian population and to influence the United States to withdraw from Iraq.  (Id. ¶ 336).  See Weiss v. Arab Bank PLC, 2007 WL 4565060, at *5 (holding that allegations that terrorists engaged in military activities does not make them a "military force" exempt under the ATA).  To adopt Bank Saderat's definition of armed military forces would effectively eliminate liability for anyone under the ATA, since an act of international terrorism would also qualify as an act of war, giving the actor a complete defense.  See, e.g., Stansell v. BGP, Inc., No. 8:09 CV 2501, 2011 WL 1296881, at *11 (M.D. Fla. Mar. 31, 2011) (noting that "to find that a terrorist organization can be a military force under the ATA would defeat the purpose of the Act").

Having reviewed the allegations in the Second Amended Complaint, and accepting them as true for purposes of this Rule 12(b)(6) motion to dismiss, the Court respectfully recommends that Bank Saderat's motion to dismiss on grounds of the Act of War exemption be denied.  There are numerous issues of fact relating to the timing and classification of the conduct involved here that prevent this Court from recommending, as a matter of law, that the acts at issue here were not acts of designated terrorist organizations, but were acts of war, particularly given that there was no armed conflict between the United States and Iran at the time.  See Gill v. Arab Bank, 893 F. Supp. 2d at 509 (noting that "[t]he relevant questions raised by section 2331 generally and

---

[83] Defendants argue that plaintiffs do not specify that Hezbollah itself is directly responsible for many of the attacks, essentially, in this argument, attempting to shift the burden to plaintiffs to have this information at the very beginning of litigation.  (Defs.' Mem. at 9; see also Defs.' 2/15/18 Ltr at 3; Commerzbank Mem. at 4).  The Court notes that plaintiffs submitted the SAC before the Circuit in Linde confirmed that the language of JASTA is such that the attacks must have been planned or authorized by an officially-designated FTO.  It will not be until after discovery is completed that a trier of fact is able to make a finding as to the entity behind each of the alleged attacks.  Indeed, this is the purpose of discovery in these sorts of cases. (See Pls.' Mem. at 3-4) (noting that "[t]he fact that the identities of the terrorists who detonated Iranian-manufactured weapons may remain unknown does not mean – as Defendants imply – that the terrorist acts at issue were caused *solely* by 'multiple unknown actors'") (citing Defs.' Mem. at 1, 9).

by subsection 2331(4)(c) in particular – whether injury or loss occurred during the course of an 'armed conflict,' and whether a given organization qualifies as a 'military force' – seem at least in part to be factual, requiring adjudication either on summary judgment or by a jury").

B. Lack of Personal Jurisdiction

Bank Saderat argues that the Court lacks personal jurisdiction over it and moves to dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(2).

Where a motion to dismiss for lack of personal jurisdiction has been filed pursuant to Rule 12(b)(2), the plaintiff bears the initial burden of establishing that the court has personal jurisdiction over the defendant. See Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir.), cert. denied, 519 U.S. 1007 (1996). In Strauss v. Credit Lyonnais, S.A., the Honorable Dora L. Irizarry set out the appropriate standard for a plaintiff to make a *prima facie* showing that personal jurisdiction exists:

> (1) proper service of process upon the defendant;
> (2) a statutory basis for personal jurisdiction over the defendant;
> (3) that [the court's] exercise of jurisdiction over the defendant is in accordance with constitutional due process principles.

175 F. Supp. 3d at 16; see also Arrowsmith v. United Press Int'l, 320 F.2d 219, 223 (2d Cir. 1963) (holding that the court must conduct an inquiry to determine whether the defendant is amenable to service of process and whether the court's assertion of jurisdiction is in accordance with the constitutional requirements of due process); Weiss v. National Westminster Bank PLC, 176 F. Supp. 3d at 276. Since the Bank does not appear to contest proper service, the Court examines the remaining two elements of the test.

1. <u>Statutory Basis</u>

Plaintiffs assert personal jurisdiction over Bank Saderat based on New York's Long Arm Statute, N.Y. Civil Practice Law & Rules ("CPLR") §§ 302(a)(1) and (a)(2), and Rule 4(k)(2) of the Federal Rules of Civil Procedure. Sections 302(a)(1) and (a)(2) of the CPLR provide in pertinent part:

> [A] court may exercise personal jurisdiction over any non domiciliary, . . .who in person or through an agent:
> 1. Transacts any business within the state or contracts anywhere to supply goods or services in the state; or
> 2. Commits a tortious act within the state. . . .

Under CPLR § 302(a)(1), the plaintiffs must establish that Bank Saderat "transacted business within the state" and that the claim arises from that business activity. <u>Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC</u>, 450 F.3d 100 (2d Cir. 2006). Plaintiffs contend that under the New York Court of Appeals' decision in <u>Licci v. Lebanese Canadian Bank, SAL</u>, 20 N.Y.3d 327, 960 N.Y.S.2d 695 (2012), they have satisfied the first prong of the Long Arm Statute by alleging that Bank Saderat transacted business within the state by directing its co-conspirators to send Eurodollars through New York correspondent banks, which funds were subsequently sent to Hezbollah and other terrorist entities. (Pls.' Mem. at 70 (citing SAC ¶¶ 364-90)). Plaintiffs cite the Deferred Prosecution Agreement entered into by Lloyds detailing the fact that Bank Saderat held accounts for the purpose of clearing money through Lloyds' New York correspondent accounts, and that Bank Saderat used such means as reviewing and altering SWIFT messages so as to remove references to Iran, thus ensuring that the U.S. depository institutions in New York would not recognize these as prohibited transactions. (<u>Id.</u> (quoting SAC ¶¶ 16, 20)).

Bank Saderat disputes this analysis and argues that, because it has no correspondent accounts in the United States, there is no personal jurisdiction over it under CPLR § 302(a). (See Saderat Mem. at 14; Pls.' Mem. at 71). Plaintiffs, however, do not argue that Bank Saderat had correspondent accounts in the United States, noting that U.S. sanctions prohibited Bank Saderat from having such accounts. Rather, plaintiffs contend that personal jurisdiction may be found under CPLR § 302(a) when the defendant acts "through an agent." (Pls.' Mem. at 71). Under the various Licci decisions, when a U.S. correspondent bank performs a clearing transaction for the account of a foreign bank, the U.S. bank is operating as an agent of the foreign bank. (Id. (citing Licci v. Lebanese Canadian Bank, SAL ("Licci IV"), 732 F.3d 161 (2d Cir. 2013)). Thus, plaintiffs contend that even if Bank Saderat was funneling funds through the correspondent branch of another bank, such as Lloyds, that branch was operating as an "agent" of Bank Saderat.

As the court in Shpak v. Curtis, No. 10 CV 1818, 2011 WL 4460605, *8 (E.D.N.Y. Sept. 26, 2011), noted: "Whether a defendant's representative is an 'agent' for purposes of § 302(a) turns on whether the representative acted 'for the benefit of and with the knowledge and consent of [the] defendant and [the defendant] exercised some control over [the agent] in the matter.'" (citations omitted). New York courts "have defined 'agent' broadly to include not only a defendant's formal agents, but also, under certain circumstances, a defendant's co-conspirators." Emerald Asset Advisors, LLC v. Schaffer, 895 F. Supp. 2d 418, 431 (E.D.N.Y. 2012) (citations omitted).

The Second Amended Complaint clearly alleges that Bank Saderat transferred U.S. dollars through New York based correspondent accounts and worked with the other defendants to clear Letters of Credit through New York, which plaintiffs allege were used to fund and

procure various aircraft parts and military equipment for Iranian instrumentalities of terror.  (See, e.g., SAC ¶¶ 163, 365, 375-81, 387, 745).  Plaintiffs' burden in establishing personal jurisdiction at this point is a "modest" one:  plaintiffs must simply allege facts that would support Bank Saderat's purposeful use of New York banks as agents to engage in prohibited transactions. Emerald Asset Advisors, LLC v. Schaffer, 895 F. Supp. 2d at 431.  Here, plaintiffs have not only alleged that Bank Saderat transferred funds through defendants' New York bank branches, but plaintiffs have also adequately alleged that the transactions were related to the provision of support to terrorist groups.  See Strauss v. Credit Lyonnais, S.A., 175 F. Supp. 3d at 20 (noting that at this stage, plaintiffs' burden is only to "plead facts that, if credited, would establish jurisdiction over Defendant").[84]

Plaintiffs also allege that there is personal jurisdiction over Bank Saderat under CPLR § 302(a)(2) because Bank Saderat committed tortious acts in New York.  (Pls.' Mem. at 73). Plaintiffs' theory is that the acts of a defendant's agent or co-conspirator within New York provide a basis for personal jurisdiction under Section 302(a)(2) even if the defendant was not within the state at the time.  (Id.)  However, Bank Saderat argues that the conduct plaintiffs attribute to Bank Saderat was not a tort that occurred in New York:  "the locus of the tort is where the last event necessary to make the actor liable occurred, which is generally the place of

---

[84] As discussed supra, Bank Saderat argues that because it was barred from maintaining a correspondent account in New York and lost its access to the U-Turn Exemption, it is immune from suit in New York.  (Saderat Mem. at 15).  It contends that there are "no allegations of direct dealing by [Bank Saderat] in New York, nor could there be."  (Id.)  Bank Saderat argues that because there are no specific transactions identified in plaintiffs' Second Amended Complaint, plaintiffs have failed to demonstrate that Bank Saderat was "purposefully" doing business in New York.  As noted, this is the pleading stage of the litigation.  If, after discovery, plaintiffs are unable to demonstrate that Bank Saderat transferred funds and engaged in transactions using New York banks as agents to complete these transactions, then the motion would be ripe.  At this time, the Court finds that the allegations are sufficient to plead jurisdiction under Section 302(a).

injury."  (Defs.' Mem. at 18) (citing <u>LaSala v. Lloyds TSB Bank, PLC</u>, 514 F. Supp. 2d 447, 464 (S.D.N.Y. 2007) (internal citations omitted)).[85]

Plaintiffs argue, and the Court agrees, that defendant misconstrues the "last event" test, which is used for determining choice of law, not personal jurisdiction.  (Pls.' Mem. at 84). <u>LaSala v. TSB Bank, PLC</u>, 514 F. Supp. 2d at 464 (assessing the locus of the tort for purposes of determining which jurisdiction has the "greatest interest" in having its law applied) (citing <u>Brink's Ltd. v. South African Airways</u>, 93 F.3d 1022, 1031 (2d Cir. 1996)).  <u>See also</u> <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 482 (1985) (noting that "[c]hoice of law analysis–which focuses on all elements of a transaction, and not simply on the defendant's conduct–is distinct from minimum-contacts jurisdictional analysis–which focuses at the threshold solely on the defendant's purposeful connection to the forum").  Accordingly, the Court respectfully recommends a finding that plaintiffs have alleged a sufficient statutory basis to subject Bank Saderat to personal jurisdiction in New York.

2.  <u>Constitutional Due Process</u>

The next step in the personal jurisdiction analysis requires the Court to assess whether the exercise of personal jurisdiction comports with the Constitution's Due Process Clause.  <u>Chloe v. Queen Bee of Beverly Hills, LLC</u>, 616 F.3d 158 (2d Cir. 2010).   This test "has two related components: the 'minimum contacts' inquiry and the 'reasonableness' inquiry."   <u>Id.</u> at 164.

---

[85] As with the other defendants, Bank Saderat's brief was written immediately after JASTA was passed, but before the Second Circuit had interpreted it to clearly provide for secondary liability as described in <u>Linde v. Arab Bank, PLC</u>, described <u>supra</u>.  Bank Saderat, in its brief, contends that conspiracy-based jurisdiction is not available because the ATA does not provide for conspiracy liability, and would thus not be considered a "tort" under New York law.  (Saderat Mem. at 18).  As discussed <u>supra</u>, this Court disagrees and has concluded that, in light of JASTA, plaintiffs have sufficiently pleaded conspiracy claims under the ATA.

As for the minimum contacts inquiry, a Court must determine whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction. International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed 95 (1945). This assessment is based on a totality of all defendant's contacts with the forum state. See, e.g., Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 166 (2d Cir. 2005). As for the reasonableness inquiry, the Court asks whether the exercise of personal jurisdiction would comport with "traditional notions of fair play and substantial justice." International Shoe Co v. Washington, 326 U.S. at 316. The reasonableness inquiry includes assessing the following factors: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies. Asahi Metal Indus. Co v. Superior Ct., 480 U.S. 102, 113-114 (1987).

Plaintiffs note that the Second Circuit has observed that it would be "rare" and "unusual" for a court to determine that the exercise of personal jurisdiction was permitted by Section 302(a)(1), but prohibited under principles of due process. (Pls.' Mem. at 75 (citing Licci IV, 732 F.3d at 170)). This Court agrees, and notes that the transactions described above sufficiently constitute minimum contacts. The Court further recommends a finding that, at the pleading stage, the exercise of jurisdiction in this case is reasonable, especially since the exercise of jurisdiction is favored where the plaintiff has met the minimum contacts stage of the inquiry. See, e.g., Burger King Corp. v. Rudzewicz, 471 U.S. at 477.

Accordingly, the Court respectfully recommends that the court deny Bank Saderat's motion to dismiss on the ground that the court lacks personal jurisdiction.[86]

---

[86] Plaintiffs argue that personal jurisdiction would be satisfied under Fed R. Civ. Pro. 4(k)(2) as well. Courts have interpreted this standard to mean that "there must be a federal claim, personal jurisdiction must not exist over the defendant in New York or any other state, and the defendant must have sufficient minimum contacts with the United States as a whole such that the exercise of jurisdiction does not violate Fifth Amendment due process." In re Terrorist Attacks on Sept. 11, 2001, 392 F. Supp. 2d 539, 557 (S.D.N.Y. 2005). However, since the Court recommends that personal jurisdiction over Bank Saderat is satisfied pursuant to the NY CPLR, the Court need not assess plaintiffs' claims of personal jurisdiction under a 4(k)(2) analysis.

<u>CONCLUSION</u>

Having carefully analyzed the SAC and considered all of the parties' arguments, this Court respectfully recommends that defendants' motions to dismiss be denied in their entirety. Not only have the plaintiffs alleged sufficient facts to state a plausible claim as to each of the named defendants, but the briefing has exposed many issues of fact, which are best left for a properly-instructed jury to decide after the parties have conducted discovery. Indeed, this Court respectfully submits that recent congressional action in passing JASTA, coupled with the Second Circuit's case law interpreting this recent congressional action, <u>see</u> <u>Linde v. Arab Bank, PLC</u>, urges judicial restraint at this preliminary stage in the litigation. Accordingly, this Court respectfully recommends denying the Moving defendants' motion to dismiss, and denying Bank Saderat's motion to dismiss at this time.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's Order. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; <u>Caidor v. Onondaga Cty.</u>, 517 F.3d 601, 604 (2d Cir. 2008).

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
      July 27, 2018

                                    */s/ Cheryl L. Pollak*
                                      Cheryl L. Pollak
                                      United States Magistrate Judge
                                      Eastern District of New York