UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

CHARLOTTE FREEMAN, et al.,         :

                                 :     Case No. 14-CV-6601 (DLI)(CLP)

             Plaintiffs,     :

                                 :

     -against-               :

                                 :

HSBC HOLDINGS PLC, et al.,        :

                                 :

           Defendants.     :

_____:

**PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN RESPONSE TO
<u>DEFENDANTS' OBJECTIONS TO THE REPORT AND RECOMMENDATION</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iv

STANDARD OF REVIEW ................................................................................................. 1

PLAINTIFFS' RESPONSES TO DEFENDANTS' OBJECTIONS ............................................. 2

I.   THE R&R CORRECTLY ADDRESSED AND DISTINGUISHED COMMON LAW
     SECONDARY LIABILITY, PRIMARY LIABILITY WITH THE CHARACTER OF
     SECONDARY LIABILITY, AND JASTA LIABILITY FOR CONSPIRACY. ................... 2

     A.   Plaintiffs Asserted No Common Law Secondary Liability Claims. ............................ 3

     B.   Judge Pollak Correctly Held That Plaintiffs Pled Primary Liability Claims for
          Conspiracy. ........................................................................................................ 3

     C.   JASTA Conspiracy. .............................................................................................. 6

II.  PLAINTIFFS' RESPONSES TO MOVING DEFENDANTS' OBJECTIONS .................... 7

Response to Objection 1: Defendants Assert That "The R&R Misapplied the First Threshold
Requirement in Section 2333(d)(2) that the Act of International Terrorism Must Be
'Committed, Planned, or Authorized' *by an FTO* (R&R §§ IV.A-B, V.B.1-4)." ...................... 7

Response to Objection 2: Defendants Assert That "The R&R Did Not Apply the Second
Threshold Requirement in Section 2333(d)(2) that the Defendant Have 'Conspire[d] with *the
Person Who Committed the Act of International Terrorism*' (R&R §§ IV.A-B, V.B.1-4)." ...... 10

     A.   Defendants' Attack on Judge Pollak's Reading of "Person" Fails. ............................ 11

     B.   Plaintiffs Identified the Persons and Entities With Which Defendants Conspired. ... 14

     C.   Judge Pollak Correctly Rejected Defendants' "Different Conspiracy" Argument. ... 17

     D.   Because Defendants' Arguments Are Either Restated or Could Have Been Made
          Previously, Their Objection Is Not Entitled to De Novo Review. ........................... 18

Response to Objection 3: Defendants Assert That "The R&R Erroneously Applied *Halberstam* to
Override JASTA's Statutory Requirements (R&R §§ IV.A-B, V.B.1-4)." .................................. 19

     A.   Defendants' Argument that *Halberstam* Should Not Have Been Applied At All to
          JASTA Claims Here Is Contrived and Incorrect. ..................................................... 19

     B.   Defendants' Argument that Judge Pollak Misapplied *Halberstam* Fails. ................. 21

Response to Objection 4: Defendants Assert That "The R&R Failed to Analyze Plaintiffs' Primary Liability Claims Under *Rothstein* (Claims I-VII) (R&R § V.B)." .................................. 26

    A.    Defendants' Repeated Objection to Primary Liability with the Character of Secondary Liability Runs Contrary to Established ATA Law. .................................... 26

    B.    Defendants' Repeated Proximate Cause Objections Fail. .......................................... 26

Response to Objection 5: Defendants Assert That "The R&R Erroneously Failed to Apply the Independent Statutory Requirement Recognized in *Linde* That the Complaint Plausibly Allege That the Moving Defendants Committed Acts of International Terrorism (Claims I-VII) (R&R § V.B)." ....................................................................................................................... 30

Response to Objection 6: Defendants Assert That "The R&R Erroneously Applied the Definitional Requirements of Section 2332d (Claims III and IV) (R&R § V.B.6)." .................. 33

    A.    Judge Pollak Correctly Held That HSBC, RBS, SCB and Commerzbank Each Qualify as a "Juridical Person Organized Under The Laws Of The United States" Under § 2332d(b)(3)(C). .......................................................................................... 34

    B.    Judge Pollak Correctly Held That HSBC, RBS, SCB and Commerzbank Qualify as "Person[s] in the United States" Under § 2332d(b)(3)(D). ........................................ 35

    C.    Judge Pollak Correctly Held That Transactions With Iran's Agents and Alter Egos Qualify as Transactions with the Iranian Government. .............................................. 37

Response to Objection 7: Defendants Assert That "The R&R Erroneously Failed to Apply the Second Circuit's Requirements To State a Primary Liability Claim in the Separate Claims Asserted Against Commerzbank (Claims V and VI) (R&R § V.B.5)." ....................................... 39

    A.    Commerzbank Rehashes Its Argument That Its Support for SDN IRISL Could Not Qualify as an Act of International Terrorism or Proximately Cause Plaintiffs' Injuries. ................................................................................................................. 39

    B.    Commerzbank Rehashes Its Argument that Its Support for a Hezbollah Fundraiser Could Not Qualify as an Act of International Terrorism or Proximately Cause Plaintiff's Injuries. ......................................................................................... 41

    C.    Commerzbank Rehashes Its Argument that this Court Has No Personal Jurisdiction Over It. ................................................................................................. 42

Response to Objection 8: Defendants Assert That "The R&R Failed to Apply *Rothstein* and Incorrectly Applied *Linde* to Plaintiffs' Seventh Claim for Relief Against SCB (Claim VII) (R&R § V.B.4(d))." .................................................................................................................. 43

    A.    SCB Rehashes Its Argument That Plaintiffs Failed to Establish Proximate Cause. ... 43

B.    SCB's Cursory Argument that It Did Not Commit an Act of International Terrorism as a Matter of Law Conflicts with Second Circuit Law. ............................................ 44

C.    SCB Repeats Its Argument that Plaintiffs Failed to Allege Its Knowledge Under § 2339A. ................................................................................................................. 45

III. PLAINTIFFS' RESPONSES TO BANK SADERAT'S OBJECTIONS ............................. 46

Response to Bank Saderat's First Objection: "Act of War Limitation Precludes This Action Under the ATA." .................................................................................................................. 46

Response to Bank Saderat's Second Objection: "No Personal Jurisdiction Over BSPLC Under 'Conspiracy Jurisdiction'" ................................................................................................... 48

CONCLUSION .................................................................................................................... 50

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abecassis v. Wyatt*,
 7 F. Supp. 3d 668, 676 (S.D. Tex. 2014) ................................................................ 32

*Abecassis v. Wyatt*,
 785 F. Supp. 2d 614 (S.D. Tex. 2011) ................................................................... 36

*Boim v. Holy Land Found. for Relief & Dev.* ("*Boim III*"),
 549 F.3d 685 (7th Cir. 2008) (*en banc*) ...................................................... 3, 4, 7, 27

*Central Bank of Denver v. First Interstate Bank of Denver, N.A.*,
 511 U.S. 164 (1994) ............................................................................................. 7

*Crosby v. Nat'l Foreign Trade Council*,
 530 U.S. 363 (2000) ............................................................................................ 35

*Deposit Ins. Agency v. Leontiev*,
 No. 17-mc-00414(GBD)(SN), 2018 WL 3536083 (S.D.N.Y. July 23, 2018) ......................... 35

*DirectTV Latin Am. v. Park*,
 691 F. Supp.2d 405 (S.D.N.Y. 2010) ..................................................................... 50

*EM Ltd. v. Banco Cent. De La Republica Argentina*,
 800 F.3d 78 (2d Cir. 2015) ............................................................................. 34, 38

*Faroque v. Park W. Exec. Servs.*,
 No. 15-cv-6868(DLI)(CLP), 2017 WL 1214482 (E.D.N.Y. Mar. 31, 2017) ........................... 1

*Fritz v. Islamic Republic of Iran*,
 320 F. Supp. 3d 48 (D.D.C. 2018) ..................................................................... 9, 32

*Gill v. Arab Bank, PLC*,
 893 F. Supp. 2d 474 (E.D.N.Y. 2012) ................................................................... 13

*Goldberg v. UBS AG*,
 660 F. Supp. 2d 410 (E.D.N.Y. 2009) ............................................................... 13, 41

*Greenbaum v. Handlesbanken*,
 26 F. Supp. 2d 649 (S.D.N.Y. 1998) ................................................................ 34, 35

*Halberstam v. Welch*,
 705 F.2d 472 (D.C. Cir. 1983) ...................................................................... 7, 21, 27

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010)...................................................................................... 12

*Hussein v. Dahabshil Transfer Serv. Ltd.*,
   230 F. Supp. 3d 167 (S.D.N.Y. 2017) ....................................................... 4

*In re Aluminum Warehousing Antitrust Litig.*,
   90 F. Supp. 3d 219 (S.D.N.Y. 2015) ........................................................ 49

*In re Dental Supplies Antitrust Litig.*,
   No. 16-cv-696(BMC)(GRB), 2017 WL 4217115 (E.D.N.Y. Sept. 20, 2017)....................... 49

*In re Terrorist Attacks on Sept. 11, 2001*,
   No. 03 MDL 1570 (GBD) 2011 WL 13244047 (S.D.N.Y. December 22, 2011). ................. 38

*Jericho Grp. Ltd. v. Mid-Town Dev. Ltd. P'ship*,
   No. 14-cv-2329(DLI)(VMS), 2017 WL 4221068 (E.D.N.Y. Sept. 22, 2017) ........................ 1

*JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure, Ltd.*,
   536 U.S. 88 (2002)...................................................................................... 34

*Kaplan v. Cent. Bank of Islamic Republic of Iran*,
   961 F. Supp. 2d 185 (D.D.C. 2013)........................................................... 47

*Lelchook v. Commerzbank AG*,
   No. 10 CIV. 5795, 2011 WL 4087448 (S.D.N.Y. Aug. 2, 2011)........................... 42

*Linde v Arab Bank PLC*,
   882 F.3d 314 (2d Cir. 2018) .............................................................. *passim*

*Linde v. Arab Bank PLC*,
   944 F. Supp. 2d 215 (E.D.N.Y. 2013) ....................................................... 5

*Lombardi v. Choices Women's Med. Ctr., Inc.*,
   No. 15-cv-05542(DLI)(CLP), 2017 WL 1102678 (E.D.N.Y. Mar. 23, 2017) ........................ 2

*Mastafa v. Chevron Corp.*,
   770 F.3d 170 (2d Cir. 2014) ...................................................................... 32

*National Council of Resistance of Iran v. Dep't of State*,
   373 F.3d 152 (D.C. Cir. 2004)............................................................ 12, 13, 18

*O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)*,
   714 F.3d 118 (2d Cir. 2013) ...................................................................... 41

*O'Sullivan v. Deutsche Bank AG*,
    17-cv-08709-LTS-GWG, Dkt. No. 118 (S.D.N.Y. April 26, 2018) .......................................... 16

*Ofisi v. BNP Paribas, S.A.*,
    278 F. Supp. 3d 84 (D.D.C. 2017) .................................................................................... 35, 36

*Owens v. BNP Paribas S.A.*,
    235 F. Supp. 3d 85 (D.D.C. 2017) ...................................................................................... 4, 46

*Owens v. BNP Paribas, S.A.*,
    897 F.3d 266 (D.C. Cir. 2018) .......................................................................................... 26, 29

*Peterson v. Islamic Republic of Iran*,
    No. 10-cv-4518 KBF, 2013 WL 1155576, (S.D.N.Y. Mar. 13, 2013) ..................................... 38

*Riley v. Rivers*,
    No. 15-cv-5022 (DLI) (RLM), 2017 WL 1093193 (E.D.N.Y. Mar. 23, 2017) ......................... 1

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013) ............................................................................................. 3, 4, 28

*Samsun Logix Corp. v. Bank of China*,
    740 F. Supp. 2d 484 (S.D.N.Y. 2010) ................................................................................... 34

*Shaffer v. Deutsche Bank AG*,
    No. 16-CR-497-MJR-SCW, 2017 WL 8786497 (S.D. Ill. Dec. 7, 2017) ................................ 14

*Shoham v. Islamic Republic of Iran*,
    No. 12-CV-508 (RCL), 2017 WL 2399454 (D.D.C. June 1, 2017) ........................................ 38

*Stansell v. BGP, Inc.*,
    No. 09-cv-2501-T-30AEP, 2011 WL 1296881 (M.D. Fla. Mar. 31, 2011) ............................. 32

*Steuben Foods, Inc. v. Country Gourmet Foods, LLC*,
    No. 08-cv-561S(F), 2009 WL 3191464 (W.D.N.Y. Sept. 30, 2009).......................................... 16

*Strauss v. Crédit Lyonnais, S.A.*,
    925 F. Supp. 2d 414 (E.D.N.Y. 2013) ................................................................................. 4, 13

*Strauss v. Crédit Lyonnais, S.A.*,
    No. 06-cv-0702 (CPS), 2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006)....................................... 41

*Stutts v. De Dietrich Grp.*,
    No. 03-CV-4058 (ILG), 2006 WL 1867060 (E.D.N.Y. June 30, 2006)............................ 32, 47

*Theodoropoulos v. I.N.S.*,
  358 F.3d 162 (2d Cir. 2004) ............................................................................ 37

*Tymoshenko v. Firtash*,
  No. 11-CV-2794 (KMW), 2013 WL 1234943 (S.D.N.Y. Mar. 27, 2013) ........................ 49, 50

*Union Labor Life Ins. Co. v. Olsten Corp. Health & Welfare Benefit Plan*,
  617 F. Supp. 2d 131 (E.D.N.Y. 2008) .................................................................. 1

*United States v. Chalmers*,
  474 F. Supp. 2d 555 (S.D.N.Y. 2007) .................................................................. 35

*United States v. Jama*,
  217 F. Supp. 3d 882 (E.D. Va. 2016) .................................................................. 13

*United States v. Maldonado-Rivera*,
  922 F.2d 934 (2d Cir. 1990) ............................................................................ 21

*United States v. Martinez*,
  862 F.3d 223 (2d Cir. 2017) ............................................................................ 25

*Walden v. Fiore*,
  571 U.S. 277 (2014) ........................................................................................ 49

*Weiss v. Nat'l Westminster Bank PLC*,
  453 F. Supp. 2d 609 (E.D.N.Y. 2006) .......................................................... 27, 29, 41

*Weiss v. Nat'l Westminster Bank PLC*,
  768 F.3d 202 (2d Cir. 2014) ........................................................................ 4, 30, 42, 45

*Wultz v. Iran*,
  755 F. Supp. 2d 1 (D.D.C. 2010) ...................................................................... 31

**Statutes**

1 U.S.C. § 1 .................................................................................................. 11, 17

18 U.S.C. § 2331 ........................................................................................ *passim*

18 U.S.C. § 2332 .............................................................................................. 4

18 U.S.C. § 2332d ...................................................................................... *passim*

18 U.S.C. § 2333(a) ...................................................................................... 4, 27

18 U.S.C. § 2333(d) .................................................................................... *passim*

18 U.S.C. § 2336 ................................................................................................ 46, 47

18 U.S.C. § 2339A ........................................................................................ 18, 26, 30

18 U.S.C. § 2339B ................................................................................... 12, 13, 14, 26

22 U.S.C. § 1641 .................................................................................................... 36

Anti-Terrorism Clarification Act of 2018,
    Pub. L. 115-253 (2018)................................................................................... 47

Justice Against Sponsors of Terrorism Act,
    Pub. L. 114-222 (2016)................................................................... 3, 6, 12, 20

N.Y.C.P.L.R. § 302 ........................................................................................... 48, 50

**Rules**

Fed. R. Civ. P. 4(k)(1)........................................................................................... 50

Fed. R. Civ. P. 4(k)(2)...................................................................................... 49, 50

Fed. R. Civ. P. 72(b)(2)........................................................................................... 1

Fed. R. Civ. P. 72(b)(3)........................................................................................... 1

Pursuant to Rule 72(b)(2) and this Court's August 6, 2018 Order, Plaintiffs respectfully respond to Defendants' objections to Judge Pollak's Report and Recommendation ("R&R").

## STANDARD OF REVIEW

The Court "must determine de novo any part of the magistrate judge's disposition that has been *properly* objected to." Fed. R. Civ. P. 72(b)(3) (emphasis added). By contrast, any other portions are reviewed for clear error only. Improper objections include resubmission of arguments the magistrate judge has already reviewed. "[I]f a party 'simply relitigates his original arguments, the Court reviews the Report and Recommendation only for clear error.'" *Riley v. Rivers*, No. 15-cv-5022 (DLI) (RLM), 2017 WL 1093193, at *2 (E.D.N.Y. Mar. 23, 2017) (Irizarry, J.), *aff'd,* 710 F. App'x 503 (2d Cir. 2018) (citations omitted). *See also Faroque v. Park W. Exec. Servs.,* No. 15-cv-6868(DLI)(CLP), 2017 WL 1214482, at *2 (E.D.N.Y. Mar. 31, 2017) (Irizarry, J.) ("[A] rehashing of the same arguments set forth in the original papers ... would reduce the magistrate's work to something akin to a meaningless dress rehearsal.") (citation omitted); *Union Labor Life Ins. Co. v. Olsten Corp. Health & Welfare Benefit Plan*, 617 F. Supp. 2d 131, 134 (E.D.N.Y. 2008) (Irizarry, J.) ("[W]here a party's objections are simply a regurgitation of the arguments [it] made to the magistrate judge, a *de novo* review is unwarranted. Instead, the report and recommendation is reviewed by the district judge for clear error.") (citation omitted).

Improper objections also include new arguments that could have been raised before: "In this district and circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate, but were not." *Jericho Grp. Ltd. v. Mid-Town Dev. Ltd. P'ship*, No. 14-cv-2329(DLI)(VMS), 2017 WL 4221068, at *3 (E.D.N.Y. Sept. 22, 2017) (Irizarry, J.) (quoting *Sci. Components Corp. v. Sirenza Microdevices, Inc.*, No. 03-CV-1851(NGG)(RML), 2006 WL 2524187, at *2 (E.D.N.Y. Aug. 30, 2006)). "Indeed, '[f]iling objections to a report and

recommendation is not the tool for mopping up any inadvertent omissions.'" *Id.* (quoting *Gutman v. Klein*, No. 03-CV-1570(BMC)(RML), 2010 WL 4916722, at *5 (E.D.N.Y. Nov. 24, 2010)). *See also Lombardi v. Choices Women's Med. Ctr., Inc.*, No. 15-cv-05542(DLI)(CLP), 2017 WL 1102678, at *1 (E.D.N.Y. Mar. 23, 2017) (Irizarry, J., adopting R&R from Judge Pollak) ("A court will not 'ordinarily ... consider arguments, case law and/or evidentiary material which could have been, but [were] not, presented to the magistrate judge in the first instance.'") (quoting *Santiago v. N.Y.C.*, No. 15-cv-517 (NGG)(RER), 2016 WL 5395837, at *1 (E.D.N.Y. Sept. 26, 2016)).

In objecting to Judge Pollak's considered 135-page R&R, Defendants largely rehash arguments they made in their motions to dismiss. They also make new arguments they could have raised below, and, on two occasions, they reverse their prior positions. As a result, Defendants' Objections are not entitled to de novo review. Because Judge Pollak's recommendations and findings were not erroneous—much less clearly erroneous—the Court should adopt them in their entirety.

**PLAINTIFFS' RESPONSES TO DEFENDANTS' OBJECTIONS**

**I.   THE R&R CORRECTLY ADDRESSED AND DISTINGUISHED COMMON LAW SECONDARY LIABILITY, PRIMARY LIABILITY WITH THE CHARACTER OF SECONDARY LIABILITY, AND JASTA LIABILITY FOR CONSPIRACY.**

Throughout their Objections, Defendants attempt to relitigate arguments from their prior briefing, erroneously arguing that there is no "primary liability with the character of secondary liability" under § 2333(a) of the Anti-Terrorism Act ("ATA") in this Circuit. Moving Defs. Objections, ECF No. 174 ("Objs."), at 15 n.9 ("such liability was not viable pre-JASTA . . . ."); 23 & n.14 (such liability is "not recognized in this Circuit" and "not grounded in the law").[1] They further contend that because Plaintiffs do not allege that Defendants *themselves* detonated

---

[1]   Defendants make this argument several times, but wisely relegate them mostly to footnotes.

2

explosives or kidnapped or killed anyone, Plaintiffs' claims are predicated on secondary liability and can therefore be brought solely under § 2333(d), recently added to the ATA through the Justice Against Sponsors of Terrorism Act, Pub. L. 114-222 (2016) ("JASTA"). From these two false premises Defendants conclude that Judge Pollak erroneously recognized pre-JASTA secondary liability claims for conspiracy and improperly applied JASTA to the allegations of the Second Amended Complaint, ECF No. 115 ("Complaint" or "SAC"), thereby conflating all three theories of liability to find error where Judge Pollak made none. As shown below, Judge Pollak correctly applied the governing ATA law to Plaintiffs' allegations and found them sufficient to state a claim.

A.    **Plaintiffs Asserted No Common Law Secondary Liability Claims.**

In *Boim v. Holy Land Found. for Relief & Dev.* ("*Boim III*"), 549 F.3d 685 (7th Cir. 2008) (*en banc*), the Seventh Circuit held that because the ATA before JASTA was silent about common law secondary liability, no such liability was available. *Id.* at 688-89 (citing *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)). In this Circuit, *Rothstein* and *Linde* adopted *Boim III*'s holding as to such common law secondary liability claims. *See Rothstein v. UBS AG*, 708 F.3d 82, 98 (2d Cir. 2013) (citing *Boim III*, 549 F.3d at 689); *Linde v Arab Bank PLC*, 882 F.3d 314, 319-320 (2d Cir. 2018) (same, citing *Rothstein*). Judge Pollak duly noted this law, R&R at 30-31, but, because Plaintiffs did not plead any common law secondary liability claims, it has no relevance here.

B.  **Judge Pollak Correctly Held That Plaintiffs Pled Primary Liability Claims for Conspiracy.**

"Primary liability with the character of secondary liability" distills a holding of the Seventh Circuit's decision in *Boim III*: "By [a] chain of incorporations by reference (section 2333(a) to section 2331(1) to section 2339A to section 2332)," the provision of material support to terrorists "may violate section 2333." 549 F.3d at 690. Therefore, "[p]rimary liability in the form of material

support to terrorism has the character of secondary liability." *Id.* at 691. Material support crimes are inherently secondary – they consist of providing material support to another primary tortfeasor who directly injures the plaintiff. *Boim III* therefore held that "there is no impropriety" in using "conspiracy" or "aiding and abetting" concepts to analyze such primary liability. 549 F.3d at 691.

Contrary to Defendants' argument, this Circuit *has* adopted the chain of incorporation theory. Thus, Judge Pollak correctly explained that the Second Circuit has held "that 'through this complex series of statutory incorporation . . . a defendant may be liable for civil remedies under 2333(a) for providing *material support to an organization that solicits funds for an FTO*," R&R at 20 (quoting *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 209 (2d Cir. 2014)); *id.* (explaining that *Weiss* holds that § 2333(a) liability may attach "even if that support is not provided directly to the FTO itself"). *See also Strauss v. Crédit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 427 (E.D.N.Y. 2013), *on recons. in part*, 2017 WL 4480755 (E.D.N.Y. Sept. 30, 2017) (relying on the *Boim III* theory of statutory secondary liability); *Rothstein*, 708 F.3d at 82 at 85 (upholding plaintiffs' standing to bring a primary liability claim under § 2333(a) for a bank's provision of currency to a State Sponsor of Terrorism, but requiring them to plead proximate cause).

As Judge Pollak noted, R&R at 32-34, other courts have come to the same conclusion as to conspiracy, specifically. "By virtue of the statutory incorporation of Sections 2339A-C into the definition of 'international terrorism' in Section 2331, a person who conspires to violate Sections 2339A-C is a primary violator of Section 2333(a)," *Hussein v. Dahabshil Transfer Serv. Ltd.*, 230 F. Supp. 3d 167, 175 (S.D.N.Y. 2017), *aff'd*, 705 F. App'x 40 (2d Cir. 2017), which is true also of conspiracies to violate § 2332. *See Owens v. BNP Paribas S.A.*, 235 F. Supp. 3d 85, 91–92 (D.D.C. 2017), *aff'd*, 897 F.3d 266 (D.C. Cir. 2018) (noting that a conspiracy to provide material support

for terrorism qualifies as "primary liability with the character of secondary liability" under *Boim III*).[2]

Thus, Defendants conflate common law and statutory theories of secondary liability in arguing that "the Second Circuit held in *Linde* that there was no secondary liability under the ATA prior to the enactment of JASTA," and that "to the extent *Boim III* can be read to suggest otherwise, it is not good law in this Circuit." Objs. at 16 (citing *Linde*, 882 F.3d at 319-20). As shown above and explained by Judge Pollak, both the 2018 Second Circuit and 2013 District Court *Linde* decisions Defendants have cited only held that *common law* secondary liability was unavailable, and, far from rejecting *Boim III*, rely on that case to do so. *See Linde*, 882 F.3d at 319-20; *Linde*, 944 F. Supp. 2d 215, 216-17 (E.D.N.Y. 2013), (dismissing common law secondary liability claims for conspiracy that plaintiffs filed before *Boim III* was decided).

In fact, in vacating and remanding the *Linde* judgment predicated on those plaintiffs' primary liability claims, the Second Circuit held that a jury may find that a bank's provision of material support is itself an act of international terrorism if it finds that all of § 2331(1)'s the definitional elements are met. *See id.* at 327 (whether "financial transactions . . . were violent or life-endangering acts that appeared intended to intimidate or coerce civilians or to influence or affect governments," or could be called "routine," should not be decided as a matter of law but "raises questions of fact for a jury to decide"). Rejecting Defendants' repeated misreading of *Linde* as foreclosing primary liability with the character of secondary liability, Judge Pollak correctly noted that *Linde* "did not hold that banks could never be held primarily liable for providing material support. Rather, the court made it clear that this was a question of fact, and the jury needed to be

---

[2]    The parties briefed both of these cases in notices of new authority to the Court. *See* ECF Nos. 135-37.

instructed on and find proof of each separate element of 2331(1)." R&R at 30 (citing *Linde*, at 882 F.3d at 326).

In short, Judge Pollak correctly recognized the difference between claims of common law secondary liability, which are not available claims and not pleaded here, and claims of primary liability with the character of conspiracy which are available and well-pled here. Seeing through Defendants' conflation, she did not err (much less clearly err, the standard of review applicable here) in finding such primary liability claims still viable in this Circuit or in applying their elements. *See supra* at 3-4 (citing cases).

**C. JASTA Conspiracy.**

Finally, in refusing to recognize primary liability with the character of secondary liability, Defendants conflate it with conspiracy liability under JASTA. Judge Pollak recognized that the allegations of Plaintiffs' pre-JASTA Complaint plausibly supported "not only" their claims for primary liability with the character of conspiracy, but also JASTA § 2333(d)(2) liability for conspiracy. R&R at 30. JASTA provides plaintiffs "with the broadest possible basis" for relief by "recogniz[ing] the substantive causes of action[s] for aiding and abetting and conspiracy liability," which it does by codifying secondary liability for acts of international terrorism planned, authorized, or committed by foreign terrorist organizations. JASTA §§ 2(b), 2(a)(5). Furthermore, it expressly identifies *Halberstam* as the proper legal framework for "how such liability should function in the context of chapter 113B of Title 18 . . . ." JASTA, §§ 2(a)(4), (5). Judge Pollak carefully and separately identified this JASTA liability theory, R&R at 30 *et seq*., and thoroughly considered the proper *Halberstam* legal framework – the same framework which *Boim III* cited

for the principles that inform primary liability with the characteristics of aiding and abetting or conspiracy. 549 F.3d at 691 (citing *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)).[3]

Although Defendants' Objections in places appear to argue that Plaintiffs can now rely only on a JASTA conspiracy theory of liability, the R&R also correctly concluded that Plaintiffs were entitled to rely on "either theory" of liability – primary *or* JASTA liability. R&R at 49 n.40. *Accord Linde*, 882 F.3d at 328 (after finding that charging errors on claim of primary liability required vacatur and remand, asserting also that "plaintiffs are entitled to the benefits of JASTA's expansion of ATA liability to aiders and abettors on this appeal" and that "the possibility of liability on [JASTA aiding and abetting theory] would have to be pursued at a retrial on remand").

## II.    PLAINTIFFS' RESPONSES TO MOVING DEFENDANTS' OBJECTIONS

**Objection 1: Defendants Assert That "The R&R Misapplied the First Threshold Requirement in Section 2333(d)(2) that the Act of International Terrorism Must Be 'Committed, Planned, or Authorized' *by an FTO* (R&R §§ IV.A-B, V.B.1-4)." Objs. at 8.**

**Standard of Review:** Clearly erroneous. (Previously argued in Moving Defendants' Joint Reply Mem. in Supp. of Mot. to Dismiss, ECF No. 126 ("Joint Reply Mem."), at 8-9.)

**Judge Pollak's Finding:** "The Second Amended Complaint pleads numerous allegations showing that an FTO (Hezbollah) committed, planned, or authorized the attacks at issue; and that Hezbollah established, trained and supplied other terror organizations on behalf of Iran and the IRGC with funding and training, ordering and authorizing these other organizations to commit attacks on Americans." R&R at 56 n.47 (citing the SAC).

Judge Pollak correctly assessed Plaintiffs' allegations as to the first threshold requirement set out in § 2333(d)(2). Section 2333(d)(2) states:

> In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration

---

[3]    Congress not only expressly instructed  that *Halberstam* provides the proper framework for both JASTA conspiracy liability, but *Boim III* also unsurprisingly relied upon *Halberstam* in assessing primary liability with the character of conspiracy under the ATA because the opinion has "been widely recognized as the leading case regarding Federal civil aiding and abetting and conspiracy liability, including by the Supreme Court . . . ." JASTA § 2(a)(5) (referencing *Central Bank of Denver v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181 (1994) (which described it with approval as a "comprehensive opinion on the subject").

and Nationality Act (8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

Judge Pollak credited Plaintiffs' allegations that "an FTO (Hezbollah) committed, planned, or authorized the attacks at issue," "in conjunction with a State Sponsor of Terrorism and its agents." R&R at 56 n.47. Further, Judge Pollak found that Plaintiffs plausibly alleged "that Hezbollah established, trained and supplied other terror organizations on behalf of Iran and the IRGC with funding and training, *ordering and authorizing* these other organizations to commit attacks on Americans." *Id.* (emphasis added). In their Objections, Defendants simply ignore these findings which were based on multiple detailed allegations in the Complaint, themselves based on, and usually paraphrasing or quoting, U.S. government findings that FTO Hezbollah was Iran's terror proxy in Iraq which acted in concert with Iranian agent IRGC in funding, arming, training, and recruiting local terror organizations, and orchestrating their attacks on American servicemen.[4]

Finally, Judge Pollak rejected Defendants' argument, now rehashed here as their first objection, that Plaintiffs were required to identify the specific terrorists who "detonated [each] Iranian-manufactured weapon." R&R at 127 n.83. Instead, she credited Plaintiffs' argument that these emplacers and trigger-pullers, some of whom "may remain unknown," did not work alone, but instead were part of attacks that were committed, planned, and authorized by Hezbollah, Iran, and the IRGC. Judge Pollak noted that:

---

[4]     *See, e.g.*, SAC ¶¶ 247-48 (describing Hezbollah operations in Iraq on Iran's behalf), 255 ("[U.S. Army] General Bergner added, '[t]he Iranian Qods Force is using Lebanese Hezbollah essentially as a proxy, as a surrogate in Iraq'"), 266 (U.S. State Department: "The [IRGC], along with Lebanese Hezbollah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology."), 270 (General Bergner: "It shows how Iranian operatives are using Lebanese surrogates to create Hezbollah-like capabilities" in Iraq.), 278 (State Department: "The IRGC-QF . . . in concert with Lebanese Hezbollah, provided training outside of Iraq as well as advisors inside Iraq"), 311 (Treasury Department: "Kata'ib Hizballah was funded by the IRGC-Qods Force and received weapons training and support from Lebanon-based Hizballah.").

plaintiffs have alleged that not only were Hezbollah and IRGC-QF designated as terrorists for providing "training, funding, and guid[ing] select groups of Iraqi Shi'a militants who target and kill Coalition forces. . .", but the Second Amended Complaint clearly alleges that the attacks were all orchestrated by U.S. designated terrorist organizations, including Hezbollah, the [Specially Designated Global Terrorist] IRGC-QF and their proxies, such as FTO Kata'ib Hezbollah.

R&R at 126.[5] *See, e.g.*, SAC ¶ 38 (quoting U.S. Army General Casey statement that Iran is "using surrogates to conduct terrorist operations both against us and against the Iraqi people.").

Defendants attempt to deflect from this clearly supported allegation by arguing that Judge Pollak improperly substituted "purported aliases of FTOs and non-FTOs [that] 'solicited funds or otherwise supported FTOs" for the FTO that Plaintiffs must allege "committed, planned, or authorized" the attacks at issue. Objs. at 9-10. In reality, Judge Pollak's discussion of alter egos came in her analysis of Plaintiffs' allegations showing that they conspired with "the person who committed" the attacks at issue—the second JASTA element at issue here. This element is the subject of Defendants' second objection, and Plaintiffs therefore discuss it in the following Response.

In sum, Defendants attempt to relitigate their argument that Plaintiffs did not allege that an FTO "committed, planned, or authorized" from their prior briefs. They now add for the first time

---

[5]    In fact, more complete information showing Hezbollah's role in every Iranian-backed terrorist attack against U.S. forces in Iraq is accumulating even now. In a D.C. district court decision finding Iran liable for directing Hezbollah to commit one of the attacks at issue here, the court made extensive findings on Hezbollah's role in these Iranian-backed attacks. *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 59-64 (D.D.C. 2018). Generally, the *Fritz* court found that "Hezbollah envisions itself as the sharp end of the spear[,] going where Iran tells it to go in defense of.... Shia [Muslims] around the world," and concluded that, "[c]onsistent with numerous other decisions from this Court, . . . Hezbollah is an Iranian proxy." *Id.* Specifically, the *Fritz* court found that: (1) "[a]t the behest of Iran, Hezbollah created a unit whose sole purpose was to train Iraqi Shia militants, including A[sa'ib] A[hl] [al-]H[aq], to carry out attacks in Iraq directed at U.S. troops and others;" (2) "[w]ith Hezbollah's assistance, Iran provided training at every level of the [Iraqi] militant organizations that received assistance, from foot soldier to leadership;" and (3) that the Hezbollah unit was "created to support the training, arming, funding, and, in some cases, *direction* of the militia extremists by the [IRGC-QF]." *Id.* (internal quotation marks and citations omitted). Further, U.S. Central Command recently released notes from the U.S. military's interrogation of AAH leader Qais Khazali, which outline in detail Hezbollah's role in planning, authorizing, and committing attacks such as those at issue here. *See* Michael R. Gordon and Ben Kesling, Declassified Interrogation Reports Show How Much Iran Shaped Iraq War, Wall St. J. (updated Aug. 30, 2018), *available at* https://www.wsj.com/articles/declassified-interrogation-reports-show-how-much-iran-shaped-iraq-war-1535621245.

their challenge to the alter ego liability, but, as explained below, Plaintiffs discussed alter-ego liability in their Opposition, ECF No. 117 ("Opp."). Therefore, Defendants are not entitled to de novo review. Moreover, Judge Pollak's conclusions were not erroneous, much less clearly erroneous.

**Objection 2: Defendants Assert That "The R&R Did Not Apply the Second Threshold Requirement in Section 2333(d)(2) that the Defendant Have 'Conspire[d] with *the Person Who Committed the Act of International Terrorism*' (R&R §§ IV.A-B, V.B.1-4)." Objs. at 11.**

**Standard of Review:** Clearly erroneous. (*See* Joint Reply Mem. at 8-10.)

**Judge Pollak's Finding:** "[N]ot only would FTO Hezbollah, or FTO Kata'ib Hezbollah, fall within the definition of a 'person who committed an act of terrorism,' but a Hezbollah-affiliated entity would also fall within the definition of persons or entities that Congress was concerned with in enacting JASTA." R&R at 36. Moreover, Plaintiffs plausibly pled that the attacks at issue were committed by "Iran and its terror proxies" and that the SAC "clearly alleges that the attacks were *all* orchestrated by U.S. designated terrorist organizations, including Hezbollah, the SDGT IRGC-QF and their proxies, such as FTO Kata'ib Hezbollah." R&R at 126 (emphasis added).

Judge Pollak noted that the explicit purpose of JASTA was to "provide civil litigants with the broadest possible basis consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, *wherever acting and wherever they may be found*, that have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activities against the United States." R&R at 32 (quoting JASTA § 2(b)). Judge Pollak observed that JASTA's purpose—and its retroactive application to "suits such as the one at hand"—memorialized what other courts "have already concluded—namely, by conspiring to violate the material support provisions of the Act, Sections 2339A and 2339B, a person may be held liable for violations of Section 2333(a), if the other elements of 2333(a) are satisfied." *Id.*

Finally, Judge Pollak explicitly rejected Defendants' argument that JASTA, despite all of the indications of its breadth, "may be asserted only in . . . narrow circumstances[]." *Id.* at 32 n.29 (quoting the Supp. Reply Brief of HSBC Defs. and RBS N.V. in Supp. of Their Mot. to Dismiss,

ECF No. 129 ("HSBC/RBS Reply Br.") at 2). As Judge Pollak noted, Defendants' argument is simply to repeat – and narrowly construe - the word "person" from § 2333(d)(2), without even citing the statutory definition provided in § 2333(d)(1). Contrary to Defendants' assertion,  Judge Pollak has not "broadened" the meaning of "person" in JASTA; Congress did – *explicitly*.

**A.  Defendants' Attack on Judge Pollak's Reading of "Person" Fails.**

Although Defendants repeat their argument that JASTA should be read narrowly, they now argue that Judge Pollak's reading of "person" and "foreign terrorist organization" under JASTA to include that person, entity, or FTO's aliases, agents, and affiliates is "clearly erroneous" and constitutes "a sweeping and impermissible view of . . . the person or entity that committed the terrorist attack." Objs. at 9, 12-13. But § 2333(d)(1) states that "the term 'person' has the same meaning given the term in section 1 of title 1." The latter defines "person" straightforwardly to "include[] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, *as well as individuals.*" 1 U.S.C. §1 (emphasis added). In fact, Congress thus deliberately chose a definition of "person" for § 2333(d) liability that is far broader than the ATA's existing definition in § 2331(3) ("any individual or entity capable of holding a legal or beneficial interest in property"). "Society" and "association" clearly encompass both FTO Hezbollah and the local Iraqi terror cells it funded, armed, trained and organized, and Congress's definition plainly contradicts Defendants' argument that § 2333(d)(2) only reaches the individual triggermen. Defendants' appeal  for a "narrower" construction of a statutory definition Congress expressly *broadened* is unsupportable. Judge Pollak's conclusion that "it seems clear that Congress intended a broader definition of 'person' beyond just the specific individual representative of the Foreign Terrorist Organization who, for instance, actually planted the EFP that injured or killed a plaintiff," R&R at 35, is plainly correct.

Defendants also contend, without support, that because JASTA does not explicitly *mention* alter ego liability, alter egos are exempted from the statute.[6] This argument is equally meritless. As Judge Pollak explained, *National Council of Resistance of Iran v. Dep't of State* correctly held that it would be "silly" to treat a foreign terrorist organization differently than its "fundraising affiliate" or other agent, alter ego, or alias. 373 F.3d 152, 157 (D.C. Cir. 2004). In fact, Defendants' gloss on the statute was rejected by Congress when it made the express finding that "contribut[ing] material support . . . 'directly *or indirectly*,' to organizations that pose a significant risk of committing acts of terrorism . . . threaten[s] the security of nationals of the United States." JASTA §§ 2(a)(6)-(7) (emphasis added), cited at R&R at 32. Defendants dismiss Judge Pollak's recitation of that finding as an errant search for legislative intent; however the language quoted is not "legislative history," but a congressional empirical *finding* that indirect material support threatens the security of U.S. nationals. Whether such support does so "is an empirical question" to which Congress's (and the Executive's) answer "is entitled to deference" and "significant weight." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 29, 34-36 (2010) ("Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine United States foreign policy, and those that will not").[7]

Now, Defendants argue that "[i]f Congress had wanted to include liability for terrorist acts committed by 'aliases' of FTOs or non-FTOs, it could have done so." Objs. at 10. But the law generally does not credit aliases or alter egos as separate entities, and Defendants cite no case

---

[6]     Defendants' argument should presumably apply to all statutes, but they do not assert this theory in the context of § 2339B, which, like JASTA, explicitly references foreign terrorist organizations but not their alter egos.

[7]     Congress's intent is *separately* set forth in the section of JASTA setting forth its "purpose." That language (JASTA § 2(b)) is even less helpful to Defendants' cause: "The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States."

suggesting otherwise. In fact, in *Nat'l Council*, the D.C. Circuit relied on "ordinary principles of agency law," which state that "[w]hen one entity so dominates and controls another that they must be considered principal and agent, it is appropriate, under AEDPA [Antiterrorism and Effective Death Penalty Act of 1996], to look past their separate juridical identities and to treat them as aliases." *Nat'l Council*, 373 F.3d at 157.

Defendants argue that *Nat'l Council*'s reasoning *only* applied to AEDPA, and "not the ATA." Objs. at 9-10. This is a false distinction. The court there was reviewing the designation of an Iranian entity as an FTO by the Secretary of State that would subject the FTO's members and representatives to prosecution under § 2339B(a)(1), a predicate crime for some of Plaintiffs' primary liability claims in this case. As the court found, "[t]he manifest purpose of these provisions is to deny terrorist organizations support – financial or otherwise – in and from the United States." 373 F.3d at 154.[8] Defendants' "'crabbed view of alias status' 'is at war *not only* with the antiterrorism objective of AEDPA'" and the ATA, "'*but common sense as well*.'" R&R at 36 (quoting *Nat'l Council* at 158) (emphasis added).

Indeed, Defendants admit that other ATA cases have relied on *Nat'l Council*, some of which are cited by Judge Pollak, *see id.* (citing *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 432 (E.D.N.Y. 2009) and *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 555 (E.D.N.Y. 2012)) but claim that they are inapposite because they are pre-JASTA cases.[9] *See also id.* at 34 (quoting

---

[8]     *See also United States v. Jama*, 217 F. Supp. 3d 882, 892 (E.D. Va. 2016), *aff'd sub nom. United States v. Dhirane*, 896 F.3d 295 (4th Cir. 2018) (holding that under § 2339B, material support provided to an intermediary qualifies as providing it to an FTO if the intermediary is "broadly" "acting for or on behalf of an FTO," as "Congress intended to reach all persons who act on behalf of an FTO to further its goals and objectives in significant ways.").

[9]     Defendants' argument is difficult to follow, as they mistakenly substituted *Hussein*, which is a post-JASTA decision, for *Goldberg*. Objs. at 10. Moreover, before making a 180-degree turn in its latest supplemental reply brief, Commerzbank *agreed* with Judge Pollak's conclusion, relying upon and quoting *Strauss*: "'A jury could find that Defendant sent the money to organizations that were controlled by Hamas, which is no different from sending the money directly to Hamas for purposes of the ATA.'" Defendant Commerzbank's Supp. Mem. in Supp. of Its Motion to Dismiss, ECF No. 124, at 6 (quoting *Strauss v. Credit Lyonnais*, 925 F. Supp. 414, at 434) (E.D.N.Y. 2013)).

*Weiss*, 768 F.3d at 202 n.9 (noting liability "under 2333(a) for providing *material support to an organization that solicits funds for an FTO*."). However, Defendants do not explain why JASTA would operate any differently than § 2339B, the statute at issue in those cases. Section 2339B, like JASTA, refers specifically to FTOs and does not expressly mention alter ego liability.

Finally, Defendants note that *Shaffer v. Deutsche Bank AG*, No. 16-CR-497-MJR-SCW, 2017 WL 8786497, at *5 (S.D. Ill. Dec. 7, 2017) held that JASTA required an allegation that defendant conspired with an FTO, rather than a State Sponsor of Terrorism like Iran. Defendants urge this Court to adopt the same *result* as in *Shaffer,* but tacitly concede that the *Shaffer* court erred in reading "person" in JASTA to be limited to FTOs (much less their agents or principles), inserting as a parenthetical the phrase "*or any other entity that committed an act of terrorism*." Objs. at 16 (emphasis added). Defendants made the same half-hearted argument previously (*see* December 19, 2017 Letter from John Buretta to Judge Pollak, ECF No. 150) and Judge Pollak addressed it. *See* R&R at 50 n.43, 63-64.

In sum, Judge Pollak's finding regarding agents, alter egos, fundraising affiliates and aliases is correct (and hardly "clearly erroneous").

**B. Plaintiffs Identified the Persons and Entities With Which Defendants Conspired.**

Repeating a portion of their prior briefing nearly verbatim, *see* Joint Reply Mem. at 9-10, Defendants argue that Plaintiffs never identified the "person who committed the act[s] of international terrorism" at issue, and only alleged that Defendants conspired with "Iran and Iranian parties" that "serve as financial and logistical conduits for the IRGC and its terrorist activities," and that "the Complaint did not plausibly allege … that Iran or any of 'its banking agents' 'committed' any 'act of international terrorism.'" Objs. at 11-12. Defendants are incorrect.

First, Judge Pollak stated repeatedly in the 135-page R&R that Plaintiffs have plausibly pled that *all* of the attacks were committed by Iran and its terrorist proxies. A short list includes:

- Iran and others supplied IEDs to "various terrorist organizations for the purpose of killing or maiming American citizens," R&R at 3 & n.3.

- "Plaintiffs allege that the EFPs . . . were not produced in Iraq but were manufactured by Hezbollah and the Islamic Revolutionary Guard Corp. ('IRGC') for the specific purpose of targeting American and Coalition Forces' armored vehicles 'with lethal results.'" *Id.* at 3 n.2.

- "the IRGC directed different groups to 'create disorder' by 'attack[ing] bases of Coalition Forces' in southern Iraq." *Id.* at 8.

- "the well-publicized fact that Iran and its terror proxies were killing and maiming American civilians and servicemen in Iraq," *Id.* at 6.

- "Hezbollah helped Iran to arm, train, and fund a variety of groups 'in an effort to kill or maim Coalition Forces' . . . . Hezbollah is alleged to have operated through multiple proxies, some of which are controlled by the Iranian state." *Id.* at 7.

- Describing "Iran's role in providing assistance to FTOs such as Hezbollah, as well as other terrorist groups, and Iran's link to the use of EFPs against Coalition Forces." *Id.* at 52.

- "the Second Amended Complaint clearly alleges that the attacks were *all* orchestrated by U.S. designated terrorist organizations, including Hezbollah, the [Specially Designated Global Terrorist ("SDGT")] IRGC-QF and their proxies, such as FTO Kata'ib Hezbollah." *Id.* at 126 (emphasis added).

- Describing Iranian "terror proxies in Iraq." *Id.* at 51 n.41.

- "Plaintiffs allege that Iran, through Hezbollah and the IRGC, commenced a campaign against American forces in Iraq following the fall of Saddam Hussein in which Iran and Hezbollah, working together, designed the EFP, smuggled EFPs into Iraq through IRGC and Hezbollah operatives, supplied local terror cells with these weapons, and trained them in their use in targeting U.S. forces." *Id.* at 55.

Second, Judge Pollak credited Plaintiffs' allegations that Defendants conspired with these persons and their agents, alter egos, aliases, and fundraising affiliates. *See, e.g.*, R&R at 10 (describing co-conspirator National Iranian Oil Company ("NIOC") as an IRGC agent); 14 (crediting allegations that Defendants facilitated payments for NIOC, MODAFL, the IRGC, and "companies working directly for Hezbollah and IRGC-Qods Force,"); 10-11 (finding that co-conspirator Mahan Air "facilitated the cover transport of IRGC-QF officers into and out of Iraq"

15

and "provides transportation services to Hezbollah"); 61-62 (describing Defendants' knowing payment processing with Bank Saderat, including after its designation for financing Hezbollah, and transfers for Mahan Air, MODAFL, Hezbollah, and others); 68 (describing HSBC's alleged admissions as to its "deliberate and calculated method to avoid US OFAC sanctions," which it knew could "turn[] out to be connected to terrorism"); 71 (crediting allegations of transactions with IRISL, which was designated for shipping weapons for Hezbollah and the IRGC).

Finally, Defendants' reliance on Chief Magistrate Judge Gorenstein's opinion on a motion to stay discovery in *O'Sullivan v. Deutsche Bank AG*, 17-cv-08709-LTS-GWG, Dkt. No. 118 at 13 (S.D.N.Y. April 26, 2018), *objs. overruled*, Dkt. No. 154 at 1 (S.D.N.Y. Aug. 20, 2018), only highlights the clear error of their argument. Even if Judge Gorenstein's "preliminary peek" at the eventual merits on a discovery motion, *Steuben Foods, Inc. v. Country Gourmet Foods, LLC*, No. 08-cv-561S(F), 2009 WL 3191464, at *3 (W.D.N.Y. Sept. 30, 2009) (citation omitted), was entitled to the same weight as Judge Pollak's comprehensive R&R on the actual motions to dismiss, that "peek" rested on a clear misreading of the statute. It found that the allegations there did "not show a conspiracy or agreement between any defendant *and a foreign terrorist organization* as opposed to a conspiracy or agreement between a defendant and Iran or the Agents and Proxies sponsoring such organizations." R&R at 14 (emphasis in original). But the United States government has repeatedly found, and the Plaintiffs plausibly allege in this case, that FTO Hezbollah *is* Iran's terror "Agent[] and Prox[y]"in Iraq. *See, e.g., id.* at 6-7 (crediting Plaintiffs' allegations that "Hezbollah is Iran's 'proxy, agent, and strategic partner'"), 55 ("Iran, through Hezbollah and the IRGC, commenced a campaign against American forces in Iraq . . . in which Iran and Hezbollah, working together," deployed EFPs against Americans). *See also* SAC allegations listed *supra* at 8 n.4 (describing Hezbollah as a proxy of Iran and the IRGC). Moreover,

16

*O'Sullivan* also found, without support and without reference to the incorporated definition of 1 U.S.C. § 1, that the "person" who committed the attack at issue must be the FTO that committed, planned*, or* authorized it. *Id.* at 13. This is the same error the *Shaffer* court made in reading "person" in JASTA to be limited to FTOs. *See supra* at 14.

Defendants simply repeat both of *O'Sullivan*'s errors: falsely distinguishing between Hezbollah and Iran's agents and proxies, when the U.S. government has repeatedly found that they were one and the same in Iraq; and ignoring the expressly incorporated definition of "person" to include entities such as Hezbollah. But Judge Pollak did not repeat those errors, and her findings were not clearly erroneous.

### C. Judge Pollak Correctly Rejected Defendants' "Different Conspiracy" Argument.

Judge Pollak also rejected repeated Defendants' argument that the conspiracy they joined was, *as a matter of law*, different from Iran's conspiracy to fund its terror apparatus. Specifically, she rejected HSBC and RBS's argument that "plaintiffs allege a hub-and-spoke conspiracy, in which 'Iran and its banks were the central actors in a hub-and-spoke conspiracy, in which HSBC or RBS N.V. were one spoke ... and Hezbollah and the Special Groups were another." R&R at 54 (quoting HSBC/RBS Reply Mem. at 7). As Judge Pollak explained, this is a mischaracterization:

> Plaintiffs, instead, characterize the hub-and-spoke conspiracy as Iran, Hezbollah, and Bank Saderat (as an agent of Hezbollah)—namely, the Iranian "terror apparatus"—as the central actors in the conspiracy, and the Moving defendants as different spokes. (Pls.' Mem. at 17). Plaintiffs allege that Iran, through Hezbollah and the IRGC, commenced a campaign against American forces in Iraq following the fall of Saddam Hussein in which Iran and Hezbollah, working together, designed the EFP, smuggled EFPs into Iraq through IRGC and Hezbollah operatives, supplied local terror cells with these weapons, and trained them in their use in targeting U.S. forces.
>
> Each of the Moving defendants is alleged to have cooperated with, and provided financial assistance, to Bank Saderat, which operated in the central "hub" of this configured conspiracy. Moreover, plaintiffs assert that the Moving defendants were either aware of, or deliberately indifferent to, Bank Saderat's connections with

> Hezbollah as comprising the hub of this terror apparatus. As just one example, the HSBC defendants are alleged to have known that there was "direct evidence of Bank Saderat 'funding of Hezbollah,'" but they nevertheless proceeded to falsify or omit information from payment orders at Bank Saderat's request. Additionally, plaintiffs plead certain allegations as to the "mutual interdepend[ence]" of the Moving defendants ["communications between higher-ups at HSBC and RBS"].

*Id.* (SAC citations omitted).[10] Defendants are entitled to dispute Plaintiffs' conspiracy allegations, but Judge Pollak accurately characterized those allegations, and they are well pled.

### D. Because Defendants' Arguments Are Either Restated or Could Have Been Made Previously, Their Objection Is Not Entitled to De Novo Review.

As shown above, whereas Defendants' conspiracy and JASTA arguments are merely repeated from their prior briefs, the agency argument they now make is raised here for the first time, even though Plaintiffs identified the issue in their Opposition. In fact, Plaintiffs discussed alter-ego and agency liability at length in their Opposition – citing the same case Judge Pollak discussed, *Nat'l Council of Resistance of Iran v. Dep't of State II (NCRI)*, 373 F.3d 152 (D.C. Cir. 2004). *See* Opp. at 51-52, 66-67. Plaintiffs made this argument specifically in the JASTA context, *see id.* ("That 'crabbed view'" rejected in *Nat'l Council* "is also one that Congress expressly rejected in JASTA, when it found that contributing material support, 'directly *or indirectly*,'" to terrorist organizations, "threatens the security of U.S. nationals"), as well as in the context of § 2339A, *id.* at 50-53, and § 2332d, *id.* at 65-67. Defendants did not respond to these arguments in their Reply, and therefore should not be heard to raise them belatedly now.

In fact, Plaintiffs' Opposition repeatedly highlighted allegations that Defendants provided material support to entities under the control of FTO Hezbollah, the IRGC, and Iran, which were

---

[10]    *See also id.* at 57 n.45 (noting that Defendants' own "conduct in altering and concealing the identity of those involved in these thousands of transactions makes it difficult for plaintiffs at the pleading stage to allege exactly what organization or terror group was involved in a specific transaction. Discovery of these hidden identities may reveal hundreds of examples of conduct by the banks that provided funding directly to Hezbollah or other terrorists."). *See also id.* at 60-61 (crediting Plaintiffs' "over 1,000 paragraphs alleging that various terrorist organizations, whose activities were funded through illegal transfer facilitated by the defendant banks, committed overt acts of terrorism resulting in significant injury and in many instances death to the plaintiffs.").

each responsible for "committing" the attacks at issue. 18 U.S.C. § 2333(d). For instance, Plaintiffs

highlighted in their Opposition that they alleged that:

- Defendants SCB, RBS, and HSBC "launder[ed] billions of dollars for *an agent of the IRGC* – one of the Iranian instrumentalities *directly* responsible for the acts of terrorism that injured Plaintiffs," Opp. at 22 (first emphasis added);

- "Standard Chartered Bank actively conspired with entities later designated as terrorists or *agents of FTOs*," *id.* at 56 (emphasis added); and

- Co-conspirators and counterparties IRISL, Bank Melli, CBI, and others were "alter egos" of and "instrumentalities and entities" controlled by Iran, *id.* at 65-68.

The only Defendant to address the availability of alter ego liability was Commerzbank, which took

the *opposite* position in its supplemental reply brief to the position Defendants take now.[11]

Because Defendants did not raise this issue before, despite having had the opportunity to

do so (except for Commerzbank, which has evidently reversed position), they are not entitled to

de novo review. Judge Pollak's conclusions were not erroneous, much less clearly erroneous.

**Objection 3: Defendants Assert That "The R&R Erroneously Applied *Halberstam* to Override JASTA's Statutory Requirements (R&R §§ IV.A-B, V.B.1-4)." Objs. at 18.**

**Standard of Review:** Clearly erroneous. (*See* Joint Reply Mem. at 7 n.2.)

**Judge Pollak's Finding:** Plaintiffs plausibly alleged that the objectives of the conspiracy included "facilitat[ing] illicit transactions for the benefit of various terrorist organizations, including Hezbollah, the MODAFL, the IRGC, IRISL, and other instrumentalities of Iranian state sponsored terror," R&R at 12; *see also id.* at 50-55 (discussing at length the object of the alleged conspiracy).

### A. Defendants' Argument that *Halberstam* Should Not Have Been Applied At All to JASTA Claims Here Is Contrived and Incorrect.

Defendants argue that Judge Pollak applied the "less demanding" *Halberstam* standards

for conspiracy and aiding and abetting to impermissibly skip application of "the two statutory

---

[11]   Commerzbank accepted that FTOs may act through an agent but argued that "the Complaint [does not] contain any allegations, much less non-conclusory allegations, that IRISL is an *alter ego* of, or controlled by, Hezbollah or any other FTO, such that IRISL can be said to be the same entity as that FTO, as would be alleged in the case of direct support." Commerzbank's Supp. Mem., ECF No. 124, at 6. Because Commerzbank is joining this contrary argument for the first time, it is likewise not entitled to de novo review of this issue.

thresholds" discussed in their first two Objections, Objs. at 18-19—namely, that Plaintiffs must allege that an FTO "committed, planned, or authorized" the attacks and that Defendants conspired with the "person[s] who committed" them, 18 U.S.C. § 2333(d)(2). They argue Plaintiffs' JASTA theory of liability thus fails before even reaching the *Halberstam* framework. Objs. at 18 (arguing—without any quotation—that *Linde* held that "courts are to apply" *Halberstam* "but only after *first* clearing the statutory hurdles" of § 2333(d)). Characteristically, Defendants provide no examples of this putative error—instead citing to nearly the entire R&R. *See id.* (citing "R&R at 30-37, 30-123").

But Congress "*instructed*" courts to apply *Halberstam* as the "proper legal framework" for Plaintiffs' conspiracy allegations. *Linde*, 882 F.3d at 329 (emphasis added). *Linde* did not impose any artificial restrictions on the application of *Halberstam*, but in fact construed JASTA's otherwise undefined statutory reference in § 2333(d)(2) to "aids and abets" by applying *Halberstam. Id.* at 329-31 (finding that judgment could not be sustained on JASTA aiding and liability theory because jury was not instructed in *Halberstam* elements of aiding and abetting). Similarly, Judge Pollak used *Halberstam* to construe the otherwise undefined statutory reference in the same section to "conspires." Nothing in JASTA supports Defendants' nonsensical and unsupported "sequencing" theory. As Congress expressly stated, *Halberstam* provides "the proper legal framework for how such liability should function…." JASTA § 2(a)(5). That "framework" does not occur in a vacuum nor does it come after a court has applied JASTA's statutory reference to "conspires"; as Congress expressly instructed, it provides the "proper legal framework" for construing § 2333(d) as a whole.

Defendants also take issue with Judge Pollak's observation that JASTA's Findings and Purpose section calls for "the broadest possible basis" for civil litigants to seek relief," arguing

that it is contrary to the "law's explicit and unambiguous requirements." Obj. at 18. But Defendants never point to any language in the statute that requires a narrower reading than the one Judge Pollak provided.[12]

**B. Defendants' Argument that Judge Pollak Misapplied *Halberstam* Fails.**

Defendants also argue that Judge Pollak's application of *Halberstam* was "defective," providing three "example[s]" of purported errors. Objs. at 19. *First*, Defendants fault Judge Pollak for "conflat[ing]" a "conspiracy to commit acts of international terrorism" with what they characterize as "a conspiracy to evade economic sanctions." Objs. at 19 (citing R&R at 52-53).[13] However, there is no question that Plaintiffs have adequately pled that *Iran*'s objective within the conspiracy was to orchestrate numerous terrorist attacks directed at Americans. *See* R&R at 51-52 (citing *Halberstam*, *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990)).

Further, Plaintiffs also plausibly alleged that each Defendant conspired to provide or to conceal or disguise the nature, location, or source of material support (including letters of credit for items restricted due to their military uses) knowing it would be used in preparation for acts of terrorism or by FTOs. As Judge Pollak made clear, Plaintiffs alleged, in hundreds of paragraphs, that the objectives of the conspiracy included "facilitat[ing] illicit transactions for the benefit of

---

[12]    To the extent that Defendants also (confusingly) refer in this objection to Judge Pollak's analysis of aliases, alter egos, agents, and fundraising affiliates of FTOs, this argument is addressed above. *See supra* at 12-13.

[13]    Defendants are not all on the same page. SCB more candidly characterizes the conspiracy's objects as including "keeping U.S. depository institutions, law enforcement and *counter-terrorism agencies* blind to Iran's movement of U.S. dollars through the international financial system," Objs. at 40 (emphasis added). In any event, Defendants provide no rational basis for arguing that their participation in Iran's conspiracy – however characterized – was less than the defendant in *Halberstam*. "We have upheld the district court's finding that Hamilton and Welch agreed to undertake an illegal enterprise to acquire stolen property. The only remaining issue, then, is whether Welch's killing of Halberstam during a burglary was an overt act in furtherance of the agreement. We believe it was. As noted above, a conspirator can be liable even if he neither planned nor knew about the particular overt act that caused injury, so long as the purpose of the act was to advance the overall object of the conspiracy. Welch was trying to further the conspiracy by escaping after an attempted burglary, and he killed Halberstam in his attempt to do so. The use of violence to escape apprehension was certainly not outside the scope of a conspiracy to obtain stolen goods through regular nighttime forays and then to dispose of them." *Halberstam*, 705 F.2d at 487.

various terrorist organizations, including Hezbollah, the MODAFL, the IRGC, IRISL, and other instrumentalities of Iranian state sponsored terror," R&R at 12; *see also id.* at 50-55 (discussing at length the object of the alleged conspiracy). The Complaint sets forth in detail that Defendants knew the aims of the conspiracy, given that they knew that their counterparties included a State Sponsor of Terrorism and Iranian banks that funded terrorist groups (for instance, Judge Pollak noted that "the HSBC defendants knew there was 'direct evidence' of Bank Saderat's 'funding of Hezbollah,'" and other banks received warnings from industry groups and the U.S. government) and knew the purpose of the laws they were violating. R&R at 13-14.

Defendants may have been *motivated* by greed, but they acted in furtherance of Iran's objectives: "the bank defendants gained business worth hundreds of millions of U.S. dollars, while the terrorist proxies were able to fund their attacks against U.S. and Coalition Force troops." R&R at 52. While Iran's object was certainly to commit acts of international terrorism, Judge Pollak did not have to find that this was the *Defendants*' motivating object. She correctly found that the allegations plausibly pled a conspiracy to provide and to conceal and disguise material support for terrorism, and the *Halberstam* conspiracy elements incorporated into JASTA do not require additional allegations.

To justify their challenge to Plaintiffs' conspiracy claims, Defendants argue that "[m]ultiple courts have rejected the argument that an alleged conspiracy to evade economic sanctions is a conspiracy to commit an act of international terrorism," but then cite two *aiding and abetting* cases, *Rothstein* and *Siegel*. Objs. at 20. Tellingly, on one occasion Defendants attempts to obscure the *Siegel* holding by describing the case as "dismissing *secondary liability* claims," *id.* (emphasis added), although elsewhere they are more forthright, *see* Objs. at 7 (acknowledging that *Siegel* is an aiding and abetting case).

22

*Second*, Defendants also object to Judge Pollak's recitation of black letter conspiracy law that "precise awareness of who one's co-conspirators are is not a required element." Objs. at 20-21. *See* R&R at 54 (citing Second Circuit and Supreme Court cases). Defendants instead argue that the Iranian co-conspirators could be the "legitimate agencies" of Iran described in *Rothstein*. Objs. at 20-21. However, as Judge Pollak described at length, Plaintiffs have plausibly alleged that Defendants' co-conspirators included the IRGC, FTO Hezbollah, Iranian banks known to fund the IRGC and Hezbollah, and various entities that, as even Defendants characterize Plaintiffs' allegations, "serve as financial and logistical conduits for the IRGC and its terrorist activities." Objs. at 12.[14]

*Third*, Defendants argue that "in addressing the additional elements of a *Halberstam* conspiracy—'unlawful acts', 'an overt act' and 'injury'—the R&R errs repeatedly because it does not also address the elements of Section 2333(d)(2)." Objs. at 21-22. This is the same error Defendants made in arguing that *Halberstam* does not come into play at all because the SAC fails preliminary statutory hurdles. *See supra* at 19-20. *Halberstam* simply defines these elements of a JASTA conspiracy; it is not some foreign law outside of what Congress itself defined as "the proper legal framework." And Judge Pollak correctly assessed those elements. She found that Defendants' unlawful acts, including "stripping financial transactions, disguising payment sources, transferring funds to sanctioned entities, and manually altering payment information," were "all in an effort to provide material support either explicitly to FTO Hezbollah, in violation of 18 U.S.C. § 2339B or to other entities who would commit criminal acts, in violation of 18 U.S.C. § 2339A." R&R at 56.

---

[14]    Defendants repeat their argument that Judge Pollak's analysis "does not address Section 2333(d)(2)'s requirement that the defendant conspire with the entities who committed acts that injured or killed plaintiffs." Objs. at 21. As explained in Plaintiffs' responses to the prior two objections, this is incorrect.

This is also precisely the finding of the U.S. Treasury Department:

Iran's Islamic Revolutionary Guards Corps (IRGC) and IRGC-Qods Force, who channel funds to militant groups that target and kill Coalition and Iraqi forces and innocent Iraqi civilians, have used Bank Melli and other Iranian banks to move funds internationally. Bank Melli used deceptive banking practices to obscure its involvement from the international banking system by requesting that its name be removed from financial transactions when handling financial transactions on behalf of the IRGC.

SAC ¶ 27. In short, Defendants' "deceptive banking practices" "obscur[ing]" the involvement of Iranian banks and other entities in the international banking system *is* how Iran was able to target Coalition Forces in Iraq.

Finally, two Defendants added individual arguments to this objection in footnotes. RBS argued the only way the R&R "purport[ed] to tie RBS to the 'central hub' of the alleged terror conspiracy" is through RBS's connection to Bank Saderat or an agent of the IRGC, but that Plaintiffs alleged no such connections. Objs. at 20 n.12. However, as Judge Pollak recognized, the SAC is replete with well-pled allegations that RBS knowingly performed illegal transactions for the Central Bank of Iran (which also operated through its agent, Bank Saderat) and Bank Melli (which together funded the IRGC and Hezbollah), R&R at 90, along with IRGC agents NIOC, *see* SAC ¶ 400, and IRISL, including 90 transactions *after* IRISL was designated, *id.* ¶ 918. Plaintiffs also demonstrated RBS's knowledge, quoting RBS emails acknowledging violations of U.S. "AML/anti-terrorism" regulations, *id.* ¶ 907, and its concession in a deferred prosecution agreement ("DPA") that it "willfully and knowingly conspired" with the Iranian entities to violate, *inter alia*, the International Emergency Economic Powers Act, *see id.* ¶¶ 919-29 (and forfeited $500 million). *See also* R&R at 91-92 (describing these allegations).

Credit Suisse likewise argues in its footnote that claims against it should be dismissed because Plaintiffs did not allege that it conspired with "any specific person or entity that

"committed . . . an act of international terrorism" and that it "'ceased U.S. dollar clearing transactions for Iran in November 2006' which is prior to the date of the alleged commission of the only two attacks in the Complaint that are alleged to satisfy the first threshold requirement of Section 2333(d)(2)." Objs. at 22 n.13 (citations omitted). Neither argument is correct. First, as Judge Pollak found, Plaintiffs alleged that Credit Suisse conspired with Hezbollah fundraising-affiliate Bank Saderat and IRGC fundraising-affiliate Bank Melli, and helped Mahan Air (designated an SDGT for, *inter alia*, transporting IRGC officers in and out of Iraq and indicted for smuggling IED components into Iran, R&R at 10-11) acquire aircraft equipment listed on the U.S. Commerce Control List for its military uses. R&R at 62-63, 94, 96-97 (noting "indications that the items were intended for entities such as the IRGC and MODAFL").

Second, Credit Suisse participated in the conspiracy during or before *all* of the attacks at issue—not just the two it credits. Credit Suisse's claim that it "ceased" active participation in the conspiracy in 2006, Objs. at 22 n.13, does not immunize it—or any conspirator—from subsequent overt acts performed in furtherance of that conspiracy. *See, e.g.*, *United States v. Martinez*, 862 F.3d 223, 232–33 (2d Cir. 2017) ("proof merely that he ceased conspiratorial activity is not enough . . . . He must also show . . . either the making of a clean breast to the authorities, or communication of the abandonment in a manner reasonably calculated to reach co-conspirators") (internal citation omitted). Without such notorious rejection or abandonment of the conspiracy – of which there is no evidence – Credit Suisse's "participation in [the] conspiracy is presumed to continue until the last overt act by any of the conspirators," *id.*, and it is therefore liable for all of those overt acts.

**Objection 4: Defendants Assert That "The R&R Failed to Analyze Plaintiffs' Primary Liability Claims Under *Rothstein* (Claims I-VII) (R&R § V.B)." Objs. at 23.**

**Standard of Review:** Clearly erroneous. (Primary Liability previously argued in Defendants' Joint Mem. in Sup. of Mot. to Dismiss, ECF No. 120 ("Joint Mem."), at 24-27 and their Joint Reply Mem. at 10-12; Proximate Cause objections previously argued in the Joint Mem. at 12-24 and Joint Reply Mem. at 3-7.)

**Judge Pollak's Finding:** Plaintiffs can bring claims for violations of the material support statutes provided the allegations satisfy the elements of such claims under *Linde* and *Weiss*.

### A. Defendants' Repeated Objection to Primary Liability with the Character of Secondary Liability Runs Contrary to Established ATA Law.

As noted above at 2-5, Defendants repeatedly argue that claims predicated on violations of 18 U.S.C. §§ 2339A and 2339B ("primary liability with the character of secondary liability") "are not recognized in this Circuit." Objs. at 23 (citing *Rothstein*, 708 F.3d at 97). *See also id.* at 15 n.9; 23 n.14. For the reasons Plaintiffs state above, Judge Pollak's conclusion that conspiracy to provide material support can form the basis of a primary liability claim is legally correct (and thus certainly not less clearly erroneous).

### B. Defendants' Repeated Proximate Cause Objections Fail.

Defendants repeat their arguments from their prior briefs that Plaintiffs failed to meet the proximate cause standard set out in *Rothstein*. *See* Objs. at 23-24 (admitting that their arguments were "set forth" "in the Moving Defendants' prior submissions").[15] Defendants argue that Judge Pollak "did not address the application of *Rothstein* to such primary liability claims," and therefore Defendants "are entitled to a ruling on the insufficiency of those claims as primary liability claims under *Rothstein* and *Linde*." *Id.*

But their Objections ignore *Linde*'s observation that even "on a theory of aiding and abetting liability, there can be no question that Hamas acts of terrorism satisfy both the proximate

---

[15]     Defendants add one case that they did not have the opportunity to brief before——*Owens v. BNP Paribas, S.A.*, 897 F.3d 266 (D.C. Cir. 2018). *Owens*, however, is inapposite here because, like the other cases cited by Defendants, it is an aiding and abetting case. *See supra* at 22.

and but-for causation standards." 882 F.3d at 332. Whether Defendants' conspiracy liability for providing and concealing material support for terrorism is through the incorporation of statutes in § 2333(a) or through JASTA, it is Iran's terror proxies in Iraq which are plausibly alleged to have directly caused plaintiffs' injuries. The causation issue for a conspirator (as opposed to an aider-and-abettor) is therefore whether the acts of those terror proxies were foreseeably in furtherance of the conspiracy. R&R at 42-43 (carefully drawing this distinction both for aiding and abetting and for conspiracy). Thus, Judge Pollak correctly held that liability for an injury proximately caused by an act performed in furtherance of a conspiracy falls on all co-conspirators:

> As to the extent of liability, *once the conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy.* A conspirator need not participate actively in or benefit from the wrongful action in order to be found liable. He need not even have planned or known about the injurious action . . . *so long as the purpose of the tortious action was to advance the overall object of the conspiracy.*

*Id.* at 45-46 (quoting *Halberstam v. Welch*, 705 F.2d at 481) (emphasis added in the R&R). Judge Pollak accepted "plaintiffs' reading of *Rothstein* as simply applying traditional tort principles to the ATA context," and that courts required a showing "that the injury was 'reasonably foreseeable or anticipated as a natural consequence.'" *Id.* at 44 (quoting *Weiss v. National Westminster Bank PLC*, 453 F. Supp. 2d 609, 631 (E.D.N.Y. 2006)). What *Boim III* called the "rubrics of 'conspiracy' and 'aiding and abetting,'" are part of those traditional tort principles, which is why there was "no impropriety" in using them to measure the primary tort liability of those who give material support to terrorists and their agents, as well as JASTA liability. 549 F.3d at 691.

Defendants also mischaracterize *Rothstein* as holding that providing material support to Iran, its agents, or its terror apparatus generally cannot proximately cause terrorist attacks. Objs. at 26-27. *Rothstein* holds only that allegations that a defendant provided currency to a State Sponsor of Terrorism, *without more*, does not *per se* satisfy the pleading standard for plausibly

27

alleging that that provision proximately caused the acts of terrorism at issue. *See* Pls. Opp. at 56. In *Rothstein*, the Second Circuit provided alternative examples of types of allegations that, if pled, could support proximate cause. Defendants purport to summarize these examples, Objs. at 26, but their list only provides three of the four—whether they (1) participated in the attacks, (2) provided banking services directly to terrorists, or (3) provided services necessary to Iran's terrorism funding—and omits a fourth (listed third in the *Rothstein* court's list of examples), whether the funds that they transferred to Iran were given to terrorists. *Rothstein*, 708 F.3d at 97.[16]

In fact, as Judge Pollak found, Plaintiffs have satisfied all but the first of these as to Defendants' conduct, even though this is not required to state a conspiracy claim. First, Plaintiffs alleged that Defendants provided services directly to terrorist groups or to their agents and fundraising affiliates, including Bank Saderat, Bank Melli, CBI, IRISL, Mahan Air, and the Martyrs Foundation. *See, e.g.*, R&R at 14-15, 55, 61-71, 74, 78-104. Second, Plaintiffs alleged that Defendants provided services necessary to Iran's terror financing regime. *See* R&R at 27 n.23 ("the Court notes that plaintiffs *do* plead such . . . . describing the necessity of Iran's access to the Eurodollar market to 'fuel its . . . terrorism and weapons proliferation activities through the IRGC'") (citing SAC ¶¶ 111, 113, 123-28)). Third, Plaintiffs repeatedly alleged that Iran used some of the banks directly, and each of them through the conspiracy—as found by the U.S. Treasury—to move money to terrorists, including $150 million directly to Hezbollah and the IRGC. *See, e.g.*, R&R at 62, SAC ¶ 357. Defendants also moved $100 million directly to IRISL, including significant sums *after* IRISL was designated a Specially Designated National ("SDN"). R&R at 82. Even under the rubric of aiding-and-abetting analysis, these allegations are precisely

---

[16]     Their "fourth" just states that "Iran has legitimate uses for financial services." Defendants begrudgingly acknowledge the example elsewhere. *See* Objs. at 34, 35 (acknowledging "the proximate cause element of . . . allegations that the funds provided by the defendant actually were transferred to a terrorist organization or were used in carrying out an attack perpetrated by that organization.").

the kind that plaintiffs failed to plead in *Rothstein* and *Owens*. 897 F.3d at 275-76. *See also infra* at 46 (discussing the *Owens* allegations). Thus, even though *Rothstein* is not a conspiracy case, there can be no doubt that the illegal financial services Defendants provided to Iran's terror and weapons procurement network are not the "legitimate agencies" the *Rothstein* court contemplated.

Finally, as Judge Pollak noted, the ATA does not "require a showing that the funds attributed to the defendants were used to 'buy the specific weapons and train the specific men who killed or injured the plaintiffs.'" R&R at 44 (quoting *Weiss*, 453 F. Supp. 2d at 631). Further, "given the fungible nature of money, . . . courts have declined to prescribe a certain formula for determining the question of proximate cause," or "that the length of time between a financial transaction and the subsequent terrorist act is necessarily decisive of the question of proximate cause." *Id.* (citing *Weiss* at 632). For instance, Judge Pollak rejected arguments that Plaintiffs failed to allege that letters of credit that Credit Suisse and SCB facilitated, such as those for aircraft for Iranian airline and SDGT Mahan Air, did not proximately cause the terrorist attacks at issue:

> As discussed above, plaintiffs need not trace individual transfers directly to the parts recovered from the terrorist attacks at issue in this action, especially during the pleading stage of the case. Nonetheless, plaintiffs *do* allege that "Mahan Air has also been identified as the conduit for radio frequency modules recovered from IED devices used to target the Coalition Forces in Iraq," and that Mahan Air was responsible for transporting Hezbollah operatives. (SAC ¶¶ 678, 2277).

*Id.* at 96 n.65.

Ironically, one of the specific aircraft Credit Suisse and SCB illegally financed through New York on behalf of Mahan Air has been itself designated by the United States Treasury Department for its use in support of terrorism.[17]

---

[17]    *Compare* United States Department of the Treasury Notification dated September 19, 2012, https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20120919.aspx (identifying Mahan Air aircraft EP-MHJ as a Specially Designated Global Terrorist) *with* Exhibit A to the SAC at 70 and 104 (identifying the same aircraft).

**Objection 5: Defendants Assert That "The R&R Erroneously Failed to Apply the Independent Statutory Requirement Recognized in *Linde* That the Complaint Plausibly Allege That the Moving Defendants Committed Acts of International Terrorism (Claims I-VII) (R&R § V.B)." Objs. at 27.**

**Standard of Review:** Clearly erroneous. (Raised in Defendants' prior briefs, as Defendants admit, Objs. at 27 (citing moving papers).)

**Judge Pollak's Finding:** The *Linde* court "did not hold that banks could never be held primarily liable for providing material support. Rather, the court made it clear that this was a question of fact, and the jury needed to be instructed on and find proof of each separate element of 2331(1)." R&R at 30.

Defendants repeat their arguments from their prior briefs that "Plaintiffs cannot plausibly assert that an objective observer would conclude" that they "committed violent acts or acts dangerous to human life," Objs. at 27, 28, or that their extensive efforts to conceal and disguise financial transactions with Iranian counterparts for the purpose of evading counter-terror financing sanctions "appear[ed] to be intended'" to intimidate a civilian population or government, as required by § 2331(1). *Id.* at 27.

First, contrary to Defendants' continuing misstatement, § 2331(1)(A) does not require that their acts *themselves* be violent or dangerous to human life. Defendants have simply elided (without ellipsis) a layer of separation that Congress expressly inserted into the definition. "International terrorism means *activities that involve* acts or acts dangerous to human life," and not necessarily that are themselves violent and dangerous. The separation is consistent with the fact that several of the predicate crimes referenced in the rest of the provision are material support crimes. Providing "financial services," or even a "safehouse" or "false documentation," § 2339A(b)(1), is not violent or, *by itself*, dangerous to human life, but when such support is provided for terrorist crimes, it surely "involves" the crimes for which it is used. And when such support is for an FTO, Congress has found that *any* support "facilitates" its terrorist activity. *See Weiss*, 768 F.3d at 208 (quoting AEDPA, §301(a)(7), 18 U.S.C. § 2339B note). Defendants'

extensive and pervasive criminal conduct constitutes "activities that involve violent acts" because they enabled a State Sponsor of Terrorism and terrorists to commit those violent acts. *See also* R&R at 60 (finding that "violence against American and other Coalition troops and civilians is a 'foreseeable risk' and not outside the scope of a conspiracy to provide material support for terrorism . . . ."). Obviously, no ATA civil decision, including *Linde*, has required a showing that the banking services in question were *themselves* violent or dangerous to human life, and several have clearly held the opposite. *See, e.g.*, *Wultz v. Iran*, 755 F. Supp. 2d 1, 43-44 (D.D.C. 2010).

Second, Defendants' assertion that providing banking services can never meet the standards of § 2331(1) is, again, plainly wrong. Defendants cite *Linde*, although that court came to essentially the opposite conclusion. As explained *supra* at 5-6, *Linde* held that whether financial services meet § 2331(1)'s definitional requirements for an act of terrorism "raises questions of fact for a jury to decide." *Linde*, 882 F.3d at 327. *See also* R&R at 30, 38, 40, 42 n.38, 88-89, 103, 104.[18] Judge Pollak pointed out that the *Linde* court "did not hold that banks could never be held primarily liable for providing material support. Rather, the court made it clear that this was a question of fact, and the jury needed to be instructed on and find proof of each separate element of 2331(1)." R&R at 30. She later elaborated at length:

> To the extent that defendants argue that the provision of routine financial services can never be sufficient to support a claim under the ATA, the Second Circuit in *Linde* held that this was a question for the jury, concluding "only" that providing routine financial services to terrorist organizations "is not so akin to providing a loaded gun to a child as to excuse the charging error here and compel a finding that as a matter of law[,] such services constituted an act of international terrorism." *Linde v. Arab Bank, PLC*, 882 F.3d at 327. Apart from the fact that the issue before this Court is presented at the pleading stage, where the proof requirements are even lower, here there are serious questions raised as to whether the conduct of the defendants in this case in working with the Iranian entities to

---

[18]     Defendants themselves admit that *Linde* only held "that it was reversible error [not] to instruct the jury" as to the elements required by § 2331 – a holding that is irrelevant to the Court's assessment of the sufficiency of the allegations at the pleading stage. Objs. at 27.

develop sophisticated means to evade detection and avoid U.S. sanctions could be considered "'routine banking services'[.]" *Id.* at 327. (*See also* Pls.' Mem. at 5 (noting that "the [Second Amended] Complaint, however, does not allege 'the mere provision of banking services to Iran'")) (alteration added).

R&R at 56-57. *See also id.* at 42 n.38 ("Indeed, the defendants' own internal memoranda memorializing special ways of handling transactions on behalf of Iranian entities seem to indicate that these were not even considered routine practices by the banks themselves.")

Judge Pollak also correctly recognized that a scienter requirement for knowledge can be satisfied by actual knowledge of the consequence of defendant's actions *or* deliberate indifference: knowing that there is a substantial probability that the consequence will result. *See* R&R at 23 (applying this definition to § 2339B, quoting both *Boim III* and *Weiss* to same effect). An objective observer could reasonably infer that Defendants' knowledge of the high probability (indeed, substantial certainty) that at least some of the funds they illegally provided, concealed, and disguised for Iran would be used for terrorist acts and by FTO Hezbollah to coerce and intimidate the United States into withdrawing from Iraq. *See Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 86 (D.D.C. 2018) ("[Iran engaged in] a comprehensive campaign to deter the U.S. from maintaining a presence in the Middle East by terrorizing and intimidating coalition forces").

Defendants point to three cases in support of their assertion that this Court should decide their "apparent intent" as a matter of law. Two are outlier cases Defendants raised in their prior briefing and which Plaintiffs have already distinguished,[19] as has Judge Pollak. *See* R&R at 57 and 88-89 (distinguishing *Stutts*). In the eighth objection, SCB cites these again, and adds *Mastafa v. Chevron Corp.*, 770 F.3d 170, 194 (2d Cir. 2014), an *Alien Tort Statute* case involving actual,

---

[19]    Plaintiffs addressed these in their Opposition. *See* Opp. at 31 n.40. These are *Stansell v. BGP, Inc.*, No. 09-cv-2501-T-30AEP, 2011 WL 1296881, at *9 (M.D. Fla. Mar. 31, 2011), in which the plaintiffs conceded the point, as noted in *Abecassis*, 7 F. Supp. 3d at 676, and *Stutts v. De Dietrich Grp.*, No. 03-CV-4058 (ILG), 2006 WL 1867060, at *1 (E.D.N.Y. June 30, 2006), a case that did not involve an act of terrorism or §§ 2339A or 2339B claims, and in which defendants allegedly performed routine and legal banking services for the purchase of chemicals that later injured U.S. soldiers allegedly exposed to those chemicals during post-war clean-up efforts in Iraq.

subjective intent, not the objective appearance of intent required by § 2331(1)(A). Defendants have

no substantive answer to Plaintiffs' or Judge Pollak's analysis. *See* Objs. at 28 n.18 (offering, in a

footnote, the conclusory assertion that Judge Pollak's analysis has "no plausible basis").

**Objection 6: Defendants Assert That "The R&R Erroneously Applied the Definitional Requirements of Section 2332d (Claims III and IV) (R&R § V.B.6)." Objs. at 29.**

**Standard of Review:** Clearly erroneous (certain arguments raised in Defendants' prior briefs, Joint Mem. at 28-30, Joint Reply Mem. at 14-15, and certain arguments made here for the first time, even though Plaintiff raised them in their Opp., at 61-68).

**Judge Pollak's Finding:** "U.S. branches of foreign banks, depending on their structure and legal status, may be covered under subsection (C) if it is determined that they are 'organized under the laws of the United States,' or they may fit under the definition of subsection (D) and Section 2331 as persons who can be held liable for actions while here in the United States if for some reason it is determined that because of how the 2332d defendant banks are structured they are not 'organized' under U.S. law." R&R at 118. Transacting with "agents and proxies" of the Iranian government qualifies under § 2332d. *Id.* at 121-22.

Judge Pollak held that Plaintiffs plausibly alleged a primary liability claim (although, like

each of Plaintiffs' claims, these are also cognizable under JASTA) against HSBC, SCB, RBS, and

Commerzbank for violating 18 U.S.C. § 2332d, which criminalizes engaging in a financial

transaction with a State Sponsor of Terrorism, like Iran. *See* R&R at 105. Judge Pollak found that

these Defendants qualify as "United States persons"[20] under the statute because they are each a

"juridical person organized under the laws of the United States" under § 2332d(b)(2)(C), given

their hybrid roles as foreign banks operating in the United States (as made clear by the regulations

implementing the Iranian sanctions regime). Judge Pollak further found that they each qualify as

a "person in the United States" under § 2332d(b)(2)(D), as dictated by the language (including the

definition of "person" explicitly incorporated by reference from § 2331(3)), the structure, and the

policy goals of the statute. *Id.* at 105-21. In doing so, Judge Pollak analyzed the language and

---

[20]    HSBC Bank US N.A. is incorporated in the United States and does not dispute that it is a United States person.

structure of § 2332d, the sanctions implementation regulations, and other related laws and regulations. She also considered and rejected the arguments made by Defendants. *Id.*

### A. Judge Pollak Correctly Held That HSBC, RBS, SCB and Commerzbank Each Qualify as a "Juridical Person Organized Under The Laws Of The United States" Under § 2332d(b)(3)(C).

Defendants repeat their arguments against Plaintiffs' § 2332d claims from their opening and reply briefs nearly verbatim; however, they only now challenge the applicability of the implementing Iranian Trade Regulations ("ITRs"), even though Plaintiffs raised them in their Opposition. *See* Joint Mem. at 28-29, Joint Reply Mem. at 14-15; R&R at 109 (relying "particularly [on] the ITRs applicable to all banks" along with other bank regulations). Specifically, Defendants now challenge these regulations as "separate bodies of rules, with distinct purposes and scopes," Objs. at 30. As Judge Pollak made clear, however, these regulations are directly related to the regulation of foreign banks operating in the United States and the United States' counter-terror sanctions against Iran. In fact, as in their prior briefing, it is Defendants that attempt to analogize § 2332d to inapposite legal regimes. *JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure, Ltd.*, 536 U.S. 88, 90 (2002) (interpreting New York law), *Samsun Logix Corp. v. Bank of China*, 740 F. Supp. 2d 484, 493 (S.D.N.Y. 2010) (interpreting the Edge Act), *EM Ltd. v. Banco Cent. De La Republica Argentina*, 800 F.3d 78, 89 (2d Cir. 2015) (interpreting the Foreign Sovereign Immunities Act).

Defendants' new cases fare no better. In *Greenbaum*, the court held that a foreign bank is the same entity as its U.S. branch in certain contexts (there, Title VII)—but not in others. *Greenbaum v. Handlesbanken*, 26 F. Supp. 2d 649, 653 (S.D.N.Y. 1998). The court noted that "for certain purposes, both New York and federal law treat branches as separate entities," and while the "rationale which underlies these limited exceptions to the legal identity of a bank and its branches have no application to Title VII law," *id.* at 654, the rationales of the implementing the

ITR regulations clearly *do* relate precisely to § 2332d; otherwise, as Judge Pollak explained, U.S. branches of foreign banks could transact with the Iranian government with impunity.[21]

*Deposit Insurance Agency,* cited by Defendants, held that "a foreign governmental agency" is not a "United States person" under the Magnitsky Act. *Deposit Ins. Agency v. Leontiev*, No. 17-mc-00414(GBD)(SN), 2018 WL 3536083, at *7 (S.D.N.Y. July 23, 2018). Its dicta about the status of foreign *corporations* as "United States persons" relied on *United States v. Chalmers*, 474 F. Supp. 2d 555 (S.D.N.Y. 2007), *Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84 (D.D.C. 2017), and *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 379 (2000). However, Judge Pollak correctly distinguished *Chalmers* and *Crosby* and found *Ofisi* unpersuasive. R&R at 111-16.

## B. Judge Pollak Correctly Held That HSBC, RBS, SCB and Commerzbank Qualify as "Person[s] in the United States" Under § 2332d(b)(3)(D).

Judge Pollak rejected Defendants' arguments in their moving papers that "any person in the United States" should be read as "natural person." Judge Pollak noted that § 2331(3), which "provides the definition of 'person' for purposes of § 2332d(b)(2)(D), "explicitly defines 'person' to include 'any individual or *entity* capable of holding a legal or beneficial interest in property.'" R&R at 110 (quoting 18 U.S.C. § 2331(3)). Judge Pollak therefore agreed with Plaintiffs' conclusion that because Defendants are entities that can hold an interest in property and have branches in the United States, "they should be considered 'persons *in* the United States.'" *Id.* at 110-111 (quoting § 2332d(b)(2)(D)). Furthermore, if Congress had intended "person" in § 2332d(b)(2)(D) to mean only a natural person, it knows how to say so. *See, e.g.*, 22 U.S.C.

---

[21]    The *Greenbaum* court also noted that the legislative history and "purposes" of three statutes—Title VII, the ADA, and the ADEA—made clear that "domestic operations of foreign companies" were subject to all three. *Greenbaum*, 26 F. Supp. 2d at 651 (quoting *Morelli v. Cedel*, 141 F.3d 39, 43 (2d Cir. 1998)) ("[I]t is not apparent why the domestic operations of foreign companies should be subject to Title VII and the ADA, but not to the ADEA.").

§ 1641(1) ("'Person' means a natural person, partnership, association, other unincorporated body, corporation, or body politic.").

Judge Pollak also rejected Defendants' citation to *Ofisi*, 278 F. Supp. 3d at 99, which read the word "natural" into § 2332d(b)(2)(C). The *Ofisi* court held that because a "juridical person organized under the laws of the United States" could also be a "person in the United States," the latter must refer to natural persons. Judge Pollak noted that *Ofisi* ignored the ATA's "explicit definition of 'person,' which does not limit the term to 'natural person,'" R&R at 112, and found that any purported conflict between (C) and (D) is easily resolved, *id.* at 116-18. As Judge Pollak explained, sections (A) through (C) "relate to transactions involving U.S. citizens, permanent residents and entities," and (D) is "clearly intended to apply to conduct occurring in the United States," by domestic or foreign entities. *Id.* at 117. In addition to conforming to the language of the statute, any other reading would provide a massive loophole in the Iranian sanctions regime, by allowing foreign entities in the United States and operating under United States law, to engage in transactions with Iranian government instrumentalities without any of the limitations otherwise imposed on domestic entities. *Id.* at 118-20.

Defendants now claim that "every other court to interpret the statute has held" that "'any person in the United States' . . . reaches only natural persons." Objs. at 30. However, the two cases it cites other than *Ofisi* say no such thing. As Judge Pollak explained, the *Chalmers* court held that Bayoil S & T, a Bahamian company *with no U.S. presence*, was not a "United States person" under § 2332(d) just because it was owned by a U.S. citizen. R&R at 113. *Abecassis*, which involved the same defendant along with another foreign company with no U.S. contacts, came to the same conclusion, citing *Chalmers*. *Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 648 (S.D. Tex. 2011), *on*

*reconsideration in part*, 7 F. Supp. 3d 668 (S.D. Tex. 2014). *Neither* case interprets or even discusses § 2332d(b)(2)(D) as being limited to natural persons or even uses that term.

Defendants argue that notwithstanding the plain language of the statute, this Court must read the word "natural" into the statute. First, Defendants argue that "[i]t is a fundamental principle of statutory construction that 'the specific governs the general,'" and thus "specific language and context of Section 2332d displaces the general definitions in Section 2331." Objs. at 31. Second, Defendants argue that Judge Pollak's assessment of "the policies underlying the Iranian sanctions regime" cannot "supersede statutory language." *Id.* at 31-32.

In both cases, the "specific language" and the "statutory language"—"natural person"—is supplied by Defendants, not Congress. Needless to say, the plain meaning of a statute governs, and the law's actual language is not superseded by inserting a non-existent word simply because a party prefers it. *See, e.g.*, *Theodoropoulos v. I.N.S.*, 358 F.3d 162, 171 (2d Cir. 2004) ("we need not resort to canons of statutory construction beyond the most basic one: construing [the statute] according to its plain meaning."). Even if the statute were in some way ambiguous, Judge Pollak's interpretation (including of the regulatory regime's policies, undisputed by Defendants) avoids the absurd result of reading into the statute a safe harbor for U.S. branches of foreign banks to conduct transactions with the Iranian government that no U.S. bank, corporation or "natural" person can, lawfully conduct.

### C.  Judge Pollak Correctly Held That Transactions With Iran's Agents and Alter Egos Qualify as Transactions with the Iranian Government.

Judge Pollak credited Plaintiffs' allegations that Defendants transacted with "agents and proxies of the Iranian government," knowing, or willfully disregarding knowledge of, that relationship. R&R at 121-22. The R&R also cited cases finding that Bank Melli and IRISL are controlled by Iran. *Id.* at 122. *See also Shoham v. Islamic Republic of Iran*, No. 12-CV-508 (RCL),

2017 WL 2399454, at *8 (D.D.C. June 1, 2017) ("In 2009, Iran announced a program to privatize Bank Saderat, but that process has been a sham because the bank is still controlled by the government.").

Defendants argue that "agents and instrumentalities of Iran are not the government of Iran for purposes of Section 2332d," Objs. at 32 (although they take the opposite position when discussing *Rothstein*, *see* Objs. at 20), but only cite a case interpreting the attachment procedures under the Foreign Sovereign Immunities Act. *Id.* (citing *EM Ltd. v. Banco Cent. De La Republica Argentina*, 800 F.3d 78, 89 (2d Cir. 2015)). In fact, Defendants' case itself states:

> But this presumption of separateness may be rebutted by evidence establishing an alter-ego relationship between the instrumentality and the sovereign state that created it. Specifically, the presumption may be overcome and an alter-ego relationship established if: (1) the instrumentality "is so extensively controlled by its owner that a relationship of principal and agent is created"; or (2) the recognition of an instrumentality's separate legal status would work a "fraud or injustice."

*EM Ltd.*, 800 F.3d at 90. Indeed, courts have *already found* that the Central Bank of Iran does not act with the independence of, e.g., the Central Bank of Argentina at issue in *EM Ltd. See Peterson v. Islamic Republic of Iran*, No. 10-cv-4518 KBF, 2013 WL 1155576, at *26 (S.D.N.Y. Mar. 13, 2013), *aff'd*, 758 F.3d 185 (2d Cir. 2014), *aff'd sub nom. Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016) ("E.O. 13599 suggests that Bank Markazi is not engaged in activities protected by § 1611(b)"). As shown above, Judge Pollak found that Plaintiffs plausibly alleged that Defendants transacted with alter egos of Iran—including the Central Bank of Iran.[22]

---

[22]    "The entire apparatus of the Iranian state and government, and many parts of Iran's private sector, including corporations (e.g., National Iranian Oil Company, Iran Air, Iran Shipping Lines); banks (e.g., Central Bank [of Iran], Bank Sepah); state-run media . . .; private individuals; and even charities are at the service of [Iran's] Supreme Leader, the IRGC, and the [Ministry of Intelligence] *when it comes to support of terrorism.*" *In re Terrorist Attacks on Sept. 11, 2001*, No. 03 MDL 1570 (GBD) 2011 WL 13244047, at *6 (S.D.N.Y. December 22, 2011).

**Objection 7: Defendants Assert That "The R&R Erroneously Failed to Apply the Second Circuit's Requirements To State a Primary Liability Claim in the Separate Claims Asserted Against Commerzbank (Claims V and VI) (R&R § V.B.5)." Objs. at 34.**

**Standard of Review:** Clearly erroneous. (*See* Commerzbank's Supp. Mem. in Supp. of Its Mot. to Dismiss, ECF No. 124 ("Commerz. Supp. Mem."), at 5-10, Commerzbank AG's Supp. Reply Mem. in Supp. of Its Mot. to Dismiss, ECF No. 127 ("Commerz. Supp. Reply Mem."), at 2-8).

**Judge Pollak's Finding:** "Once again, the Court reiterates *Linde*'s analysis as to primary liability: the question of whether the transactions on behalf of IRISL were, definitionally, 'acts of international terrorism' is a question for the jury, as are other questions of fact raised here." R&R at 103. Judge Pollak also held that Plaintiffs plausibly alleged that Commerzbank knowingly transferred money between fundraising affiliates of Hezbollah. (Finally, Judge Pollak found that Plaintiffs alleged facts showing that Commerzbank conspired with Hezbollah's fundraising apparatus, which establishes pendant personal jurisdiction.)

### A. Commerzbank Rehashes Its Argument That Its Support for SDN IRISL Could Not Qualify as an Act of International Terrorism or Proximately Cause Plaintiffs' Injuries.

Although Defendants raised the proximate cause argument generically in Objection 4, Commerzbank makes the same argument again individually as Objection 7. In fact, Commerzbank's argument is drawn, nearly verbatim, from its Supplemental Memorandum, where it argued that its provision of material support to IRISL, including support even *after* IRISL was designated an SDN for its involvement in Iran's WMD program (EFPs are a type of WMD), cannot qualify as an act of international terrorism and cannot have proximately cause Plaintiffs' injuries. *Compare* Objs. at 34 *with* Commerz. Supp. Mem. at 5-7. Specifically, Commerzbank repeats its argument that Plaintiffs did not allege that IRISL passed on the very funds that Commerzbank illegally processed for it to Hezbollah.

As Judge Pollak correctly found, Plaintiffs allege that Commerzbank provided tens of millions of dollars to IRISL both before and after its designation for transporting weapons, including EFP components, on behalf of Hezbollah and the rest of Iran's terror apparatus. As discussed above, because the great majority of Plaintiffs allege that they were injured in Iranian EFP attacks orchestrated by Hezbollah, the allegations support both proximate cause and the other

elements of an act of international terrorism. *See* R&R at 103. The *Linde* court obviously did not require allegations of payments traceable to particular suicide bombings; payments for an entity notorious for shipping WMDs and their components used in terrorist attacks suffice.

Commerzbank also argues, without elaboration, that Judge Pollak erred in concluding that whether its transfer of tens of millions of dollars to IRISL was an act of international terrorism is a question for the jury, because "Plaintiffs' allegations . . . are plainly distinct from the facts at issue in the *Linde* trial, which included evidence that the defendant bank may have knowingly processed 'payments for suicide bombings.'" Objs. at 35 (citing *Linde*, 882 F.3d at 330). To begin with, a complaint does not have to provide evidence *establishing* its allegations, although the Complaint certainly comes close based on its detailed reliance on findings by the United States government. Second, the Complaint plausibly makes allegations from which a jury could infer the required apparent intent from Commerzbank's knowledge that there was a high probability that the funds it concealed and disguised for the WMD-transporting IRISL and the Hezbollah fundraiser, Waisenkinderprojekt, would support terrorist attacks intended to coerce and intimidate Coalition Forces and Iraq's civilian population. *See, e.g.*, R&R at 9-10 (describing IRISL's role in transporting WMDs, including EFP components), 14 ("Commerzbank facilitated payments on behalf of IRISL, knowing or being deliberately indifferent to the fact that IRISL was designated a SDN for facilitating shipments of military cargo destined for MODAFL which could be used against Coalition Forces in terrorist attacks."), 99-103 (same), 103-04 (noting Plaintiffs' allegations that the Orphan's Project provided "direct support to Hezbollah"). *See also* SAC ¶¶ 992, 1012-31, 1035-38, 1040. Indeed, that result was substantially certain when Commerzbank continued such transactions even after IRISL's designation. *Id.* ¶1038.

40

**B.  Commerzbank Rehashes Its Argument that Its Support for a Hezbollah Fundraiser Could Not Qualify as an Act of International Terrorism or Proximately Cause Plaintiff's Injuries.**

Commerzbank also repeats its argument that Plaintiffs never alleged that the Martyrs Foundation, to which it allegedly transferred funds on behalf of Hezbollah-linked charity Waisenkinderprojekt, itself transferred funds to or was an alter ego of Hezbollah. *Compare* Objs. 35-37 with Commerzbank Supp. Mem. at 8-9.[23] Judge Pollak, however, credited the "Treasury Report announcing the designation of the Martyrs Foundation as an SDGT for channeling 'financial support from Iran'" to Hezbollah. R&R at 103-04.[24] Judge Pollak further held that these allegations can support a § 2339B violation under both the funds pass-through standard given in *Goldberg v. UBS*, 660 F. Supp. 2d at 433, and the alter ego standard in *Strauss v. Crédit Lyonnais, S.A.*, No. 06-cv-0702 (CPS), 2006 WL 2862704, at *10 (E.D.N.Y. Oct. 5, 2006). R&R at 103-104. Contrary to Commerzbank's undeveloped and unsupported assertion, *O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)*, 714 F.3d 118 (2d Cir. 2013), did not overrule *Goldberg* or *Strauss sub silentio*, or address them at all. *See* Opp. at 50 (discussing *Al Rajhi*). Judge Pollak's holding was not erroneous, much less clearly erroneous, as required here.

Commerzbank also cites *Weiss*, 453 F. Supp. 2d at 623, to argue that fundraising for Hezbollah is insufficient to establish control by Hezbollah. Objs. at 36. But this raises fact questions about degree of control and alter ego status that should not be decided on a motion to

---

[23]     Commerzbank also argued that Judge Pollak "did not address" the act of international terrorism "requirement for the Orphans Project Claim at all, and this claim in any event fails to satisfy this requirement." Commerzbank does not support this objection except to cite to Defendants' Objection 5, which Plaintiffs address *supra*.

[24]     That Report also noted the U.S. government's designation of "Qasem Aliq, a Hizballah official who was previously the director for the Martyrs Foundation branch in Lebanon. In addition to overseeing Martyrs Foundation's operation, Aliq worked closely with senior Hizballah officials." The Report also noted the designation of Ahmad al-Shami. According to the Report, "Hizballah leadership placed Ahmad al-Shami in his position at the Martyrs Foundation in Lebanon." *See* Press Release, U.S. Dep't Treasury, Twin Treasury Actions Take Aim at Hizballah's Support Network (July 24, 2007) (hereafter "Treasury Report"), *available at* https://www.treasury.gov/press-center/press-releases/Pages/hp503.aspx.

dismiss. Further, as noted *supra* at 4, the Second Circuit later ruled in *Weiss* that "a defendant may be liable for civil remedies under § 2333(a) for providing material support to an organization that solicits funds for an FTO," and that scienter is established if the bank "provided material support to [the fund-raiser] while having knowledge that, or exhibiting deliberate indifference to whether, [the fundraiser] 'solicit[ed] funds or other things of value' for [an FTO]…." 768 F.3d at 209 (internal citation omitted). The Complaint sufficiently alleges that Commerzbank knew of or was deliberately indifferent to the Martyr's Foundation's fundraising for Hezbollah. SAC ¶¶ 1039-40.

Moreover, Judge Pollak addressed and rejected Commerzbank's citations to *Rothstein* and *Al Rajhi*, pointing out that another court has rejected the same argument. *See* R&R at 100 n.67 (quoting *Lelchook v. Commerzbank AG*, No. 10 CIV. 5795, 2011 WL 4087448, at *1 (S.D.N.Y. Aug. 2, 2011)). Judge Pollak noted that Judge Hellerstein in *Lelchook* "found Orphans Project Lebanon to be part of Hezbollah" for pleading purposes. *Id.* Judge Hellerstein held that because Commerzbank allegedly "maintained a bank account for a Hezbollah front; this distinction takes the case outside the rule of *Rothstein,* for a terrorist front organization has no legitimate function that the United States recognizes." *Lelchook*, 2011 WL 4087448, *1. Judge Pollak also noted that "[t]o the extent that *Al Rajhi* required the organizations [receiving the funding] to have 'aided in the [ ] attacks' at issue, the Court notes that plaintiffs here *do* allege that the organizations have, indeed, aided in the attacks at issue by providing direct support to Hezbollah." R&R at 104.

### C. Commerzbank Rehashes Its Argument that this Court Has No Personal Jurisdiction Over It.

Commerzbank argues again that Plaintiffs' allegations against it do not arise from the same nucleus of facts as the larger conspiracy allegedly involving the other Defendants, and therefore that there can be no pendent personal jurisdiction. Judge Pollak rejected this argument, noting that although the Fifth and Sixth Claims for Relief are not styled as conspiracy claims, Plaintiffs'

allegations show "that Commerzbank knowingly entered into a  conspiracy to provide material support to an FTO in violation of Section 2339B, as shown by its maintenance of an account on behalf of a fundraising organization known to fund Hezbollah." R&R at 101.

Commerzbank argues that the larger conspiracy "is defined by its objectives to facilitate and conceal dollar transactions *through the United States on behalf of Iran and its agents*," whereas Plaintiffs did not allege that "any of the Orphans Project transactions involved the United States or that Orphans Project was an agent or alter ego of Iran . . . ." Objs. at 37. As noted above, neither Judge Pollak nor Judge Hellerstein has accepted Commerzbank's argument that the Orphan's Project is not an alter ego of Hezbollah, an alleged co-conspirator. Further, in its personal jurisdiction argument, Commerzbank quietly drops the Martyrs Foundation, presumably because, as shown above, the U.S. Treasury Department reported that the Martyrs Foundation "is an Iranian parastatal organization that channels financial support from Iran to several terrorist organizations in the Levant, including Hizballah . . . ." Treasury Report, *supra* at 41 & n.24.

**Objection 8: Defendants Assert That "The R&R Failed to Apply *Rothstein* and Incorrectly Applied *Linde* to Plaintiffs' Seventh Claim for Relief Against SCB (Claim VII) (R&R § V.B.4(d))." Objs. at 37.**

**Standard of Review:** Clearly erroneous (proximate cause arguments raised in Standard Chartered Bank's Supp. Mem. in Supp. of Its Mot. to Dismiss, ECF No. 123 ("SCB Supp. Mem."), at 5-9, SCB's Supp. Reply Mem. in Supp. of Its Mot. to Dismiss, ECF No. 130 ("SCB Supp. Reply Mem."), at 1-6; *Linde* arguments raised in Defendants' Notice of New Authority dated February 15 and March 2, 2018 (*See* ECF Nos. 155-57); SCB's knowledge arguments not raised before, even though Plaintiffs made and relied on the relevant allegations in their SAC, ¶¶ ¶¶ 52-53, 56, 626, 683, 685-793, 802, 812, 2275-93)

**Judge Pollak's Finding:** Plaintiffs sufficiently alleged that SCB's alleged illegal facilitation of letters of credit proximately caused their injuries and meet the definitional requirements of an act of international terrorism under § 2331(1).

### A.  SCB Rehashes Its Argument That Plaintiffs Failed to Establish Proximate Cause.

SCB argues that Judge Pollak failed to determine whether Plaintiffs plausibly alleged that its illegal facilitation of letters of credit proximately caused their injuries. Objs. at 37-39. As it

admits, the argument is repeated from its motion to dismiss briefing. Objs. at 38 (citing SCB Supp. Mem. at 5-9). However, Judge Pollak *did* determine that proximate cause was adequately pled as to all of Plaintiffs' primary liability claims. *See, e.g.,* R&R at 27, 30, 42-45, 67, 96 n.65. As shown *supra*, Judge Pollak specifically explained how Plaintiffs' primary liability claims alleging that SCB violated Section 2339A by financing illegal trade on behalf of the IRGC and MODAFL through letters of credit satisfy the proximate cause requirements of *Rothstein* and *Weiss*.[25] SCB adds nothing new in this objection.

### B. SCB's Cursory Argument that It Did Not Commit an Act of International Terrorism as a Matter of Law Conflicts with Second Circuit Law.

SCB presents its own version of the Defendants' arguments concerning § 2331(1)'s definitional requirements, although it adds nothing in doing so. Specifically, Defendants argue that (1) Plaintiffs did not allege that SCB "committed violent or dangerous acts," because they did not allege that "banking services or LC transactions *themselves* were violent or dangerous to human life," Objs. at 39-40 (citing *Linde*, 882 F.3d at 326) (emphasis added); and (2) Plaintiffs did not allege that SCB "intended to intimidate or coerce civilians or a government," because Plaintiffs *only* alleged that its aims included "keeping U.S. depository institutions, law enforcement and counter-terrorism agencies blind to Iran's movement of U.S. dollars through the international financial system." Objs. at 40.

Like the other Defendants, SCB omits the operative language from § 2331(1)(A), which defines "international terrorism" as "*activities* that [] *involve* violent acts or acts dangerous to human life." (Emphasis added.) And, as explained above, no court has held that banking activities cannot satisfy that definition. *See supra* at 30-31. Unlike the other Defendants, however, SCB also

---

[25] Unlike most of Plaintiffs' claims predicated on conspiracy principles, Claim VII is properly analyzed through the prism of aiding-and-abetting principles of proximate cause.

omits the operative language of § 2331(1)(B), when it argues that the SAC does not allege "that SCB intended to intimidate or coerce civilians or a government." Objs. at 40. Section 2331(1)(B) does not require any such allegation; it requires that plaintiffs allege only that defendant's activities "*appear* to be intended" to have such objectives or effects. This standard "does not depend on the actor's beliefs, but imposes on the actor an objective standard to recognize the apparent intentions of actions." *Weiss*, 768 F.3d at n.6 (citing *Boim III*, 549 F.3d at 693-94). But Plaintiffs have plausibly alleged that SCB's massive and years-long central role in Iranian terror financing could objectively appear to be intended to accomplish Iran's terrorist goals, and that such an apparent intent can be inferred from the Defendants' knowledge of the high probability of such effects. In fact, SCB's own characterization of Plaintiffs' allegations—that SCB sought *to blind U.S. counter-terrorism agencies for Iran's benefit*—demonstrates that apparent intent and supports such an inference.[26]

## C. SCB Repeats Its Argument that Plaintiffs Failed to Allege Its Knowledge Under § 2339A.

In a footnote, SCB posits, without elaboration, that Plaintiffs failed to allege "the requisite scienter under Section 2339A," Objs. at 40 n.23—that is, that the material support it provided or concealed and disguised would be used in preparation for terrorist attacks. SCB made a similarly cursory argument in its prior briefing. *See* SCB Supp. Mem. at 3 ("But Plaintiffs do not allege . . . any facts to support an allegation that SCB knew the purchasers and sellers of the goods were supporting terrorist groups"). SCB's unsupported assertion is thus not entitled to de novo review.

---

[26]   Further demonstrating SCB's apparent intent, SCB is *again* negotiating with U.S. authorities as to yet more illegal banking it allegedly performed on Iran's behalf—this time, it is "bracing" for a $1.5 billion penalty. *See* Ambereen Choudhury et al., *StanChart Said to Brace for New Iran Fine of $1.5 Billion*, Bloomberg (Oct. 1, 2018), *available at* https://www.bloomberg.com/news/articles/2018-10-01/stanchart-said-to-brace-for-new-iran-fine-of-about-1-5-billion. Despite multiple extensions of its prior agreements with U.S., "[a]uthorities said the bank's sanctions-compliance program 'has not yet reached the standard required.'" *Id.*

This time, SCB cites *Owens*, which held that "plaintiffs must allege sufficient facts to show either that (1) defendants knew Sudan was acting as an agent of al Qaeda or of an individual terrorist; or (2) that defendants knew the ultimate beneficiaries of the financial services would be a terrorist organization or terrorist." *Owens v. BNP Paribas S.A.*, 235 F. Supp. 3d 85, 98–99 (D.D.C. 2017), *aff'd,* 897 F.3d 266 (D.C. Cir. 2018). However, the *Owens* plaintiffs failed to so allege—the court noted that "the extent to which the arrangement between al Qaeda and Sudan was generally known" in the relevant time period was "unclear from the complaint"; and in fact "it was al Qaeda that appears to have provided cash to Sudan." *Id.* at 99. Those threadbare allegations are a far cry from the hundreds of detailed allegations here showing that Iran was the world's foremost State Sponsor of Terrorism for years and had notoriously used Hezbollah and the IRGC to commit terrorist attacks against U.S. soldiers in Iraq. Further, the allegations here detail dozens of specific illicit transactions—performed knowingly and brazenly by SCB–that made it possible for Iran's military and terror apparatus to acquire vital materials that the U.S. government has expressly prohibit Iran from obtaining. SAC ¶¶ 652, 673-684, 685-712, 713-93, 794-810, 811-24, 825-38. It was therefore not "clearly erroneous" for Judge Pollak to reject SCB's absurd throw-away argument, which is deservedly buried in a footnote.

## III. PLAINTIFFS' RESPONSES TO BANK SADERAT'S OBJECTIONS

**Bank Saderat's First Objection: "Act of War Limitation Precludes This Action Under the ATA." BS Objs. at 1.**

**Standard of Review:** Clearly erroneous (*see* Bank Saderat's Mem. in Supp. of Its Mot. to Dismiss, ECF No. 116 ("BS Mem."), at 2-12, Bank Saderat's Reply Mem. Supp. if its Mot. to Dismiss, ECF. No. 118 ("BS Reply Mem."), at 2-9.

**Judge Pollak's Finding:** Bank Saderat failed to prove that the act of war exemption applied at the pleading stage of the case.

Bank Saderat repeats its argument from its moving papers that § 2336's act of war exemption to ATA civil liability applies to the terrorist attacks that injured or killed Plaintiffs,

although it has since abandoned its argument that the act of war exemption is jurisdictional. While Bank Saderat's arguments remain incorrect for the reasons outlined in the R&R and Plaintiffs' prior briefing, they are now mooted by the passage of the Anti-Terrorism Clarification Act of 2018, Pub. L. 115-253 ("ATCA 2018"). The ATCA 2018, which applies "to any civil action pending on . . . the date of the enactment of the Act," provides a "clarification of the term 'act of war'" in § 2331. *Id.*, § 2. Specifically, it states that "the term 'military force' does not include any person that [] has been designated as" an FTO or SDGT or "(B) has been determined by the court to not be a 'military force'." *Id.* Because both Hezbollah and the IRGC (and IRGC-QF) have been so designated and are responsible for the attacks at issue, the attacks at issue cannot satisfy § 2336 definitional standard for acts of war.[27]

Bank Saderat's remaining argument, also repeated from prior briefing, is its reliance on *Stutts*, 2006 WL 1867060, at *4, which found that injuries to U.S. service members sustained from disposing of Iraqi military munitions seized in the 1991 Persian Gulf War were the result of "acts of war" within the meaning of §§ 2336(a) and 2331(4). Judge Pollak correctly rejected the argument, crediting Plaintiffs' allegations: (1) the attacks at issue all occurred "after the actual armed conflict ended," (2) "[t]here was never a declaration of war or armed conflict with *Iran*," and (3) the attacks were perpetrated by Hezbollah, the IRGC, and other terrorist groups, not "military forces." R&R at 124-27. Finally, Judge Pollak also correctly held that "[t]o adopt Bank Saderat's definition of armed military forces"—which can include terrorists laying explosive

---

[27]   Specifically, ATCA 2018 moots Bank Saderat's (already incorrect) argument that "Judge Pollak also erroneously relied on the notion that a designated terrorist organization cannot be a 'military force,'" because "[n]owhere in ATA's text are "designated individuals and organizations categorically barred under" the act of war exemption. BS Objs. at 4 (arguing that doing so "would make no practical sense."). ATCA 2018 also renders Bank Saderat's cited case, *Kaplan v. Cent. Bank of Islamic Republic of Iran*, 961 F. Supp. 2d 185 (D.D.C. 2013), *reversed in part* 896 F.3d 501 (D.C. Cir. 2018), which was already limited to "the context of [that] case, and [that] particular conflict" (Israel's 2006 war with Lebanon), completely irrelevant.

devices with the intent to coerce civilian populations and governments—"would effectively eliminate liability for anyone under the ATA . . . ." *Id.* at 127.

**Bank Saderat's Second Objection: "No Personal Jurisdiction Over BSPLC Under 'Conspiracy Jurisdiction'" BS Objs. at 6.**

**Standard of Review:** Clearly erroneous (*see* BS Mem. at 13-21, BS Reply Mem. at 9-12).

**Judge Pollak's Finding:** Plaintiffs plausibly alleged that Bank Saderat (1) transacted business in New York through an agent (N.Y.C.P.L.R. § 302(a)(1)) and, in the alternative, (2) Bank Saderat's co-conspirators committed a tortious action within the state of New York (§ 302(a)(2)).

As an initial matter, Bank Saderat does not substantively address Judge Pollak's primary personal jurisdiction finding—that Bank Saderat's use of Lloyds Bank's correspondent account in New York to strip Iranian transactions means it transacted business in New York through an agent, R&R at 130. Bank Saderat repeats its irrelevant claim from prior briefs that it did not maintain a correspondent account in New York and that other Iranian banks were also listed in Lloyds Bank's DPA. *Compare* BS. Objs. at 7-8 *with* BS Mem. at 14-15, n. 28, BS Reply Mem. at 9-10. As Judge Pollak found, Bank Saderat, in its role as part of the "hub" of the conspiracy, "transferred funds through defendants' New York bank branches," which "transactions were related to the provision of support to terrorist groups." R&R at 131. Under Bank Saderat's theory, because its interposed agents between itself and its exploitation of the New York-based dollar clearing system, it is immune from suits resulting from terrorism it facilitated through those agents.

Bank Saderat's substantive argument contests Judge Pollak's conspiracy jurisdiction finding, which it erroneously argues was Judge Pollak's sole ground for personal jurisdiction. BS Objs. at 6 ("To find a recommended basis for specific personal jurisdiction, Judge Pollak erroneously adopted and applied 'conspiracy jurisdiction.'"). However, Bank Saderat now reverses its prior position—whereas it previously granted that "a person may be subject to jurisdiction under § 302(a)(2) if a co-conspirator carries out activity in New York connected to the

48

conspiracy," BS Mem. at 19, it now argues that other courts in this District have not adopted it, and the Supreme Court purportedly rejected it in *Walden v. Fiore*, 571 U.S. 277 (2014). Bank Saderat also repeats its argument that Plaintiffs' conspiracy allegations are insufficient.

Judge Pollak addressed the sufficiency of Plaintiffs' conspiracy allegations throughout her 135-page R&R—these findings, particularly as to Bank Saderat, which was allegedly in the "hub" of the conspiracy—are not clearly erroneous. Bank Saderat's legal arguments likewise fail. It relies upon *Walden*, which was not a conspiracy jurisdiction case and instead criticized jurisdiction premised on a defendant's "relationship with a plaintiff or *third party*, *standing alone*." *Id.* at 286 (emphasis added). Plaintiffs here do not rely on Bank Saderat's "'random, fortuitous, or attenuated contacts' or on the 'unilateral activity' of a plaintiff," *id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)), but instead upon its own "intentional conduct . . . that creates the necessary contacts with the forum," *id.* Plaintiffs allege, citing *inter alia*, Bank Saderat's designation as a Specially Designated Global Terrorist, that Bank Saderat was at the hub of a conspiracy with all of the *other Defendants*, which conspiracy was specifically directed at New York as the preeminent forum for dollar-clearing.[28]

Bank Saderat's remaining cases fare no better. *Tymoshenko* recognized the availability of conspiracy jurisdiction under "New York's long-arm statute under Rule 4(k)(1)," questioning only the availability of conspiracy jurisdiction under Rule 4(k)(2). *Tymoshenko v. Firtash*, No. 11-CV-2794 (KMW), 2013 WL 1234943, at *4 (S.D.N.Y. Mar. 27, 2013). *In re Aluminum Warehousing Antitrust Litig.* likewise distinguished conspiracy jurisdiction under New York's long arm statute and Rule 4(k)(2). 90 F. Supp. 3d 219, 227 (S.D.N.Y. 2015). The *Tymoshenko* court noted that

---

[28]     Unlike the limited allegations in Bank Saderat's remaining case, *In re Dental Supplies Antitrust Litig.*, No. 16-cv-696(BMC)(GRB), 2017 WL 4217115, at *7 (E.D.N.Y. Sept. 20, 2017), the operation of the conspiracy at issue here is premised on purposefully availment of the dollar clearing system and accompanying laws in New York.

courts addressing "conspiracy jurisdiction ha[ve] centered on the defendant's *awareness* of the commission of [co-conspirator's] acts pursuant to a conspiracy committed within the forum state." *Id.* at *4 n.3 (citation omitted). The *Tymoshenko* plaintiffs could not allege that the "conspiracy took place in the United States or that [defendant] was aware of any overt acts committed in furtherance of the conspiracy in the United States." *Id.* No Defendant here has seriously contested Plaintiffs' allegations as to the conspiracy's New York nexus.[29] Because Judge Pollak found conspiracy jurisdiction under New York's CPLR 302(a)(2) and Rule 4(k)(1), and not a nationwide tort under Rule 4(k)(2), the cases are inapposite.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court adopt Judge Pollak's R&R in its entirety.

Dated: October 5, 2018
    Hackensack, NJ                 Respectfully submitted,

                                       OSEN LLC

                 By:     /s/ Gary M. Osen
                            Gary M. Osen
                            Ari Ungar
                            Peter Raven-Hansen, Of Counsel
                            Michael J. Radine
                            William A. Friedman
                            Dina Gielchinsky
                            2 University Plaza, Suite 402
                            Hackensack, NJ 07601
                            (201) 265-6400
                            (201) 265-0303 Fax

---

[29]     Bank Saderat tacks on two cursory arguments at the end of its brief. For the first time, it argues that "as to CPLR § 301(a)(2), personal jurisdiction has been traditionally predicated on physical presence in New York, which is absent here." *Id.* at 8 (citing *DirectTV Latin Am. v. Park,* 691 F. Supp.2d 405,418 (S.D.N.Y. 2010)). As *DirectTV* states, § 301(a)(2) includes "a non-domiciliary who in person or *through an agent* 'commits a tortious act' within New York." *DirecTV*, 691 F. Supp. 2d at 418 (quoting § 302(a)(2)) (emphasis added). Finally, Bank Saderat repeats its prior argument that conspiracy jurisdiction is unavailable because the "ATA does not provide for conspiracy-based liability," BS Objs. at 9, BS Mem. at 18; the argument, absurd before, is even more so now that § 2333(d) has been added to the ATA.

TURNER & ASSOCIATES, P.A.
C. Tab Turner
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
(501) 791-2277

Attorneys for Plaintiffs