OSEN LLC
ATTORNEYS AT LAW
WWW.OSENLAW.COM

2 UNIVERSITY PLAZA, SUITE 402, HACKENSACK, NJ 07601    1441 BROADWAY, SUITE 6022, NEW YORK, NY 10018
T. 201.265.6400   F. 201.265.0303                                                    T. 212.354.0111

April 9, 2019

**VIA ECF**

Honorable Dora L. Irizarry
United States District Judge
United States District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re:  *Freeman, et al. v. HSBC Holdings plc, et al.*, 14-cv-6601 (DLI) (CLP)

Dear Chief Judge Irizarry:

  Plaintiffs respectfully submit this letter in response to Defendants' March 29, 2019 letter, ECF No. 217, which enclosed Judge Swain's Memorandum and Order in *O'Sullivan, et al. v. Deutsche Bank AG, et al.*, 17-cv-8709 (LTS) (OWO) ("*O'Sullivan* Decision" or "*O'Sullivan* op.") (granting the defendants' motions to dismiss in that case) as support for Defendants' motions to dismiss the Second Amended Complaint ("SAC") in this case.

  While the *O'Sullivan* plaintiffs may have "borrowed" parts of the SAC, Judge Swain's Memorandum and Order and its recitation of the allegations in that case make clear that the factual allegations in the two cases diverge significantly, in part because the *O'Sullivan* plaintiffs appear to have lumped attacks by Al Qaeda, Hezbollah, and other terrorist groups together. Plaintiffs do not necessarily take issue with those parts of the *O'Sullivan* Decision that are dependent on the *O'Sullivan* court's reading of such allegations in that complaint.

  However, the *O'Sullivan* court erred fundamentally in summarily rejecting Magistrate Judge Pollak's careful and detailed Report and Recommendation in this case, 2018 WL 3616845 (E.D.N.Y. July 27, 2018), in a one-sentence footnote:

> The Court respectfully disagrees with [the Report and Recommendation], which appears to assume that a conspiracy to provide material support for terrorism is equivalent to a conspiracy whose object is *to commit an act of international terrorism*, despite the fact that not all conduct that violates a material support statute also satisfies *§ 2331(1)'s definition of an act of international terrorism*. See *Linde*, 882 F.3d at 326.

*O'Sullivan* op. at 20-21 n.14 (emphasis added). The *O'Sullivan* court misapplies the legal standard for both secondary liability under §2333(d) and primary liability under §2333(a).

1. ***O'Sullivan* Fails to Correctly Apply the Correct Legal Framework to §2333(d) Conspiracy Claims.**

Judge Swain's putative distinction conflates *secondary* liability's scope under 18 U.S.C. §2333(d) with *primary* liability's requirement of conduct that satisfies §2331(1)'s definition of "act of international terrorism." Section 2333(d) does *not* require that a defendant's aiding and abetting or agreement to join a conspiracy satisfy §2331(1)'s definitional requirements. Indeed, Congress eliminated that requirement, in part, to "provide civil litigants with the broadest possible basis . . . to seek relief against . . . [those who] have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." Justice Against Supporters of Terrorism Act ("JASTA"), Pub. L. 114-222, §2(b), Sept. 28, 2016, 130 Stat. 852.[1]

*O'Sullivan's* error on this point permeates the entire opinion. First, *O'Sullivan* requires the plaintiffs to plead that the defendants had the "common goal of *committing an act of international terrorism*." *O'Sullivan* op. at 20 (emphasis added); *id.* ("a defendant must have conspired *to commit an act of international terrorism*.") (emphasis added); *id.* at 21 (plaintiffs failed to plead "unlawful agreement *to commit an act of international terrorism*") (emphasis added). The error of importing §2331(1)'s definition into §2333(d) liability is demonstrated by *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which provides the "proper legal framework" for analyzing §2333(d) liability. JASTA, §2(a)(5). There, the court affirmed the secondary (aiding and abetting and conspiracy) liability of defendant Hamilton for the murder of Dr. Halberstam by Hamilton's housemate, Welch, during a night-time burglary that Welch committed. There was no showing or requirement that Hamilton *herself* agreed or conspired "to commit" a murder, violence of any kind, or even a burglary—or even *knew* about any such violence. It was enough that she "agreed to undertake an illegal enterprise to acquire stolen property." 705 F.2d at 487.[2] Requiring allegations

---

[1] Magistrate Judge Pollak correctly noted this distinction, "[t]he court in *Linde* further found that by enacting JASTA to allow for aiding and abetting liability under the ATA, Congress eliminated the need to prove that the aider and abettor's own actions involved violence or danger and appeared to be for the purpose of coercion or intimidation of civilians and/or governments, as required by Section 2331. The court held that 'under an aiding and abetting theory of ATA liability, plaintiffs would *not* have to prove that the bank's own acts constitute international terrorism satisfying all the definitional requirements of §2331(1)[.]'" 2018 WL 3616845, at *18, citing *Linde v. Arab Bank, PLC*, 882 F.3d 314, 328 (2d Cir. 2018). Magistrate Judge Pollak concluded that the Second Circuit would apply the same reasoning to conspiracy claims. 2018 WL 3616845, at *20.

[2] Magistrate Judge Pollak similarly noted, "In terms of the scope of the agreement, the HSBC and RBS defendants cite case law to argue that the 'object' of the conspiracy is limited to only those goals that a defendant 'possessed the specific intent to commit.' Accordingly, they argue that plaintiffs fail to allege that the defendants had 'the specific intent to engage [in] an objective that included terrorist attacks.' However, this is *not* a requirement for conspiracy according to *Halberstam*. Indeed, the *Halberstam* court made no such finding that Hamilton had any intent to engage in an objective that included killing. In that case, the killing was an overt act committed by her boyfriend Welch in *furtherance* of the conspiracy, but the object of the conspiracy was to 'obtain stolen goods.'" 2018 WL 3616845, at *24 (internal citations omitted).

that Defendants in this case agreed or conspired "to commit an act of international terrorism" is flatly inconsistent with the legal framework set forth in *Halberstam*.[3]

Nothing in §2333(d)'s language contradicts *Halberstam*'s analysis (nor could it, given Congress's specification of that analysis as the "proper legal framework"). That section makes liable anyone "who conspires *with* the person who committed such an act of international terrorism [committed, planned, or authorized by a Foreign Terrorist Organization]," not just one "who conspires *to commit* such an act," as *O'Sullivan* misreads it. Moreover, Congress expressly defined "person" to "include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 18 U.S.C. §2333(d)(1) (incorporating 1 U.S.C. §1).[4] It includes, therefore, associations like Iran's terror proxies, the Foreign Terrorist Organization ("FTO") Hezbollah and the Specially Designated Global Terrorist ("SDGT") (and, as of next week, FTO (*see infra* at 7)) Islamic Revolutionary Guard Corps ("IRGC") and its external division, the Islamic Revolutionary Guard Corps–Qods Force ("IRGC-QF"),[5] which jointly committed, planned and authorized the attacks at issue by creating, funding, equipping, training, and directing Shia terror cells to, *inter alia*, use the signature Hezbollah-designed and Iranian-supplied Explosively Formed Penetrators ("EFPs") in those attacks, and also committed, planned and authorized the January 20, 2007 Karbala attack. Section 2333(d) does not depart from the traditional conspiracy principle that a conspirator need not meet or deal directly with a conspirator, so long as they have agreed to the unlawful enterprise knowing of – in this case – the hub's (Iran's) intent (here, to fund terrorist activities). *See Freeman*, 2018 WL 3616845, at *26 (finding a hub-and-spoke conspiracy).

---

[3] Magistrate Judge Pollak cited *Callanan v. United States*, 364 U.S. 587, 593-94 (1961), for the proposition that "*the danger which a conspiracy generates is not confined to the substantive offense which is the immediate aim of the enterprise.*" (Emphasis added.) She then referenced *Halberstam*: "As to the extent of liability, *once the conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy.* A conspirator need not participate actively in or benefit from the wrongful action in order to be found liable. He need not even have planned or known about the injurious action . . . *so long as the purpose of the tortious action was to advance the overall object of the conspiracy.* 705 F.2d at 481 (emphasis added)." 2018 WL 3616845, at *22. Magistrate Judge Pollak concluded that in this case, as a result, "so long as the purpose of the tortious action was to advance the overall object of the conspiracy, conspiracy-based liability will stand*." Id.*

[4] Instead of using §2331(3)'s definition of "person," Congress expressly adopted the broader definition of 1 U.S.C. §1, consistent with its declared purpose to expand the basis for civil liability of "*person, entities, and foreign countries*" for providing material support." JASTA, §2(b) (emphasis added). Magistrate Judge Pollak endorsed this wider interpretation of "person" ("it seems clear that Congress intended a broader definition of 'person' beyond just the specific individual representative of the Foreign Terrorist Organization who, for instance, actually planted the EFP that injured or killed a plaintiff."). 2018 WL 3616845, at *17. *See also Miller, et al. v. Arab Bank, PLC*, 18-cv-2192 (BMC) (PK), 2019 WL 1115027, at *9 (E.D.N.Y. Mar. 11, 2019) ("a defendant may be liable under the ATA for aiding the organization behind the attacks, not only the individual 'triggerman' or suicide bomber. That is precisely why Congress broadly defined 'person' under the ATA to include entities, as well as individuals.").

[5] Magistrate Judge Pollak reasoned that not only FTOs like Hezbollah were subsumed within the definition of "person"—SDGTs like the IRGC and IRGC-QF affiliated with FTOs like Hezbollah were, as well ("By the same token, the public designation of an entity or organization as a SDGT can provide evidence of knowledge on the part of the defendant of the entity's unlawful acts and demonstrate defendant's knowing involvement in the conspiracy. Thus, the Court finds that not only would FTO Hezbollah, or FTO Kata'ib Hezbollah, fall within the definition of a 'person who committed an act of terrorism,' but a Hezbollah-affiliated entity would also fall within the definition of persons or entities that Congress was concerned with in enacting JASTA."). 2018 WL 3616845, at *17.

Second, *O'Sullivan* makes a related mistake in requiring that plaintiffs plead that "the Defendants were 'generally aware' that they had a 'role' in the attacks that killed or injured them. *O'Sullivan* op. at 22 (citing *Siegel v. HSBC Bank USA, N.A.*, 2018 WL 3611967, at *4-5 (S.D.N.Y. July 27, 2018). Such a requirement is again inconsistent with the legal framework set forth in *Halberstam*, which the cited case, *Siegel*, *never even mentions*. *Halberstam* found that under an aiding and abetting theory of liability:

> It was not necessary that Hamilton [the burglar/murderer's housemate] knew specifically that Welch [the burglar/murderer] was committing burglaries. Rather, when she assisted him, it was enough that she knew he was involved in some type of personal property crime at night—whether as a fence, burglar, or armed robber made no difference—because violence and killing is a foreseeable risk in any of these enterprises.

705 F.2d at 488. Hamilton was not aware that she played any role in burglary, *let alone murder*, yet she was still held civilly liable for the murder.

So, too, in this case, Defendants did not have to be aware they were playing any "role in the attacks" that injured Plaintiffs, as *O'Sullivan* puts it. It was sufficient that they were aware – even if only "generally," as *Halberstam* found sufficient – that they were playing a role in concealing and disguising funds that Iran would use for the illicit purposes of terrorism or proliferation rather than for the lawful purposes for which the transparent U-Turn regulations were available. As the U.S Treasury Department put it:

> *Iran's access to the international financial system enables the Iranian regime to facilitate its support for terrorism and proliferation. The Iranian regime disguises its involvement in these illicit activities* through the use of a wide array of deceptive techniques, specifically designed to avoid suspicion and evade detection by responsible financial institutions and companies. Iran also is finding ways to adapt to existing sanctions, including by turning to non-designated Iranian banks to handle illicit transactions.

SAC ¶172 (emphasis added).

### 2. *O'Sullivan* Fails to Apply the Correct Legal Framework to §2333(a) Conspiracy Claims.

*O'Sullivan* not only incorrectly grafts the definitional elements of §2331 onto claims predicated on §2333(d), it also misapplies the legal standard applicable to claims predicated on §2333(a) where §2331 is relevant. While *O'Sullivan* is correct that a §2333(a) conspiracy must have, as an objective, the commission of an act of international terrorism, the decision incorrectly assumes that each conspirator must itself share or be motivated by that objective. Plaintiffs must only allege that Defendants were "aware of a *high probability* of *some* of the conspiracy's unlawful aims." *United States v. Garcia*, 509 F. App'x 40, 42 (2d Cir. 2013) (first emphasis added). While "not all conduct that violates a material support statute also satisfies § 2331(1)'s definition of an act of international terrorism," *O'Sullivan* op. at 20-21 n.14, Defendants' alleged conduct *does*

support the inference that they were aware of Iran's goals for the conspiracy, including the commission of acts of international terrorism.

*O'Sullivan* also errs in deciding *as a matter of law* that Defendants' prolonged actions in so doing were not dangerous to human life within the terms of §2331(1), citing *Linde v. Arab Bank, PLC*, 882 F.3d 314, 326 (2d Cir. 2018). *O'Sullivan* op. at *16-18. But *Linde* carefully limited its holding on this issue:

> We conclude *only* that providing routine financial services to members and associates of terrorist organizations is not so akin to providing a loaded gun to a child *as to* excuse the charging error here and *compel a finding that as a matter of law,* the services were violent or life-endangering acts that appeared intended to intimidate or coerce civilians or to influence or affect governments.

882 F.3d at 327 (emphasis added).

Here, Plaintiffs plausibly allege that the Defendant banks' alteration and falsification of transactional documents using "special procedures" devised in collusion with Iranian banks is the antithesis of "routine banking." That conduct, instead, raises precisely the opposite inference: The banks knew that their counterparts intended to use the concealed and disguised transactions for illicit purposes, identified by the U.S. Treasury as support for terrorism and proliferation, and the procedures were therefore dangerous to human life. Plaintiffs maintain that Defendants cannot credibly contend that such procedures are "routine" banking;[6] at most, any dispute would be for the jury to determine, as *Linde* expressly held.

In fact, in *yet another* enforcement action taken against Defendant Standard Chartered Bank ("SCB") today, the United States set out the inherent danger to human life in violating U.S. sanctions against Iran. The criminal information explains that SCB "willfully and knowingly conspired" to violate sanctions which "arose in response to repeated support by [Iran and other sanctioned nations] for international terror against the United States and its allies, and, with regard to Iran, the proliferation of weapons of mass destruction." *United States v. Standard Chartered Bank*, No. 12-cr-262 (JEB), ¶ 9 (D.D.C. April 9, 2019), annexed hereto as <u>Exhibit A</u>.

*O'Sullivan* therefore turned *Linde* on its head, deciding at the pleading stage – *as a matter of law* – precisely what the Court of Appeals instructed is a *matter of fact* for the jury to determine. For the *O'Sullivan* court itself to have decided that such "special procedures" do not show general awareness or "involv[e] . . . acts dangerous to human life," §2331(1), it had to find not only that no reasonable jury could reach the opposite conclusions, but that Magistrate Judge Pollak's

---

[6] Magistrate Judge Pollak noted, "there are serious questions raised as to whether the conduct of the defendants in this case in working with the Iranian entities to develop sophisticated means to evade detection and avoid U.S. sanctions could be considered 'routine banking services'… each bank is alleged to have engaged in multiple transactions over a period of years, involving manipulative and deceptive methods designed to conceal the identity of the Iranian participants." 2018 WL 3616845, at *27.

opposite conclusions were unreasonable.[7] *Linde*'s directive is, on the contrary, that this decision must be left to the jury.

### 3. *O'Sullivan*'s Analysis of Proximate Cause Rests on Erroneous Assumptions

The foregoing errors in *O'Sullivan* carried over to its analysis of proximate cause. Having erroneously concluded that conspiracy liability required an agreement "to commit an act of international terrorism," the court never applied *Halberstam*'s directive that all conspirators "are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy." 705 F.2d at 481. Indeed, its entire discussion of proximate cause appears as part "A" of "Primary Liability Claims Under 18 U.S.C. §2333(a)," and not under its discussion of §2333(d) liability.[8]

Furthermore, *O'Sullivan*'s proximate cause discussion is predicated on assumptions that do not apply in this case. First, it asserts that the *O'Sullivan* complaint "does not even allege that the IRGC-QF, Hezbollah, and Al-Qaeda carried out the attacks that killed or injured Plaintiffs." *O'Sullivan* op. at *12. In this case, the SAC abundantly alleges that the IRGC and Hezbollah jointly committed, planned and authorized the attacks as noted above, and it plausibly ties them to the attacks by the use of the signature Hezbollah-designed and Iranian-supplied EFPs in the vast majority of the attacks at issue.

Second, *O'Sullivan* relies on the fact that Congress made no findings concerning State Sponsors of Terrorism similar to those it made concerning FTOs, meaning it was implausible to infer that Defendants' financial services proximately caused terrorism. *Id*. at *14. But here the U.S. Treasury expressly found that Iran used exactly the same "deceptive techniques" as those alleged in the SAC (based on Defendants' admissions) for accessing the international financial system "to facilitate its support for terrorism and proliferation." *Supra* at 4. Given Defendants' deliberate bypass of the lawful means of accessing the system for legitimate agencies and operations (the U-turn) in favor of "special procedures," any reliance on the proposition that Iran has "many legitimate agencies and operations" is misplaced. A jury could reasonably infer that Iran only used the special procedures in order to clandestinely access funding for its illicit activities, as the U.S. Treasury found, and that Defendants knew it.

---

[7]   Magistrate Judge Pollak quoted *Linde*'s above-cited language that it was for a jury to determine whether the provision of material support constituted an act dangerous to human life, and stated that "[a]s the Second Circuit in *Linde* noted, it is an issue of fact, not a question of law, as to whether the evidence ultimately presented to the jury was sufficient to establish that the Bank was 'generally aware' that by processing these transfers of funds in the secretive, roundabout way that it did, it was playing a role in violent or life-endangering acts with the apparent intent to intimidate or coerce civilians or to affect a government." 2018 WL 3616845, at *23 n.42. Magistrate Judge Pollak noted that the analysis for conspiracy claims would be the same. *Id.*

[8]   *O'Sullivan* also never discussed the proper causation standard for aiding and abetting liability under §2333(d). *Halberstam* held that the first requirement for aiding and abetting is that "*the party whom the defendant aids* must perform a wrongful act that causes the injury." *Halberstam*, 705 F.2d at 477 (emphasis added). If the aided party (here, Iran and its terror proxies) proximately caused the injury, the question is whether the aider and abettor substantially assisted the principal violation, not whether the aider and abettor *itself* caused the injury. *O'Sullivan* never applied the multi-factor standard specified by *Halberstam* for measuring substantial assistance.

   Any conceivable doubt on this score has been put to rest by the announcement on April 8, 2019 that the State Department would be designating the IRGC as an FTO, effective April 15, 2019.[9] The State Department specifically cited IRGC's attacks on the Plaintiffs and other U.S. service members in Iraq as grounds for the designation: "The Iranian regime is responsible for the deaths of at least 603 American service members in Iraq since 2003," and the IRGC has provided "financial and other material support, training, technology transfer, advanced conventional weapons, guidance, or direction to a broad range of terrorist organizations, including . . . Kata'ib Hizballah in Iraq . . . ."[10] The planned designation conclusively establishes that the IRGC and the entities it controls are outside any category of "legitimate agencies and operations" on which *O'Sullivan*'s proximate cause analysis rested and that these IRGC entities have been since at least 2003. Setting aside the IRGC's direct role in injuring Plaintiffs herein, the SAC specifically identifies Defendants SCB, HSBC, Credit Suisse, Commerzbank, Royal Bank of Scotland (ABN Amro) and Bank Saderat as having engaged directly with NIOC (an entity the U.S. government found to be controlled by the IRGC during the relevant period), SAC ¶¶ 52, 158, 400, 404, 516 & n.28, 624, in the conspiracy to provide Iran – as the U.S Treasury Department put it – "access to the international financial system enabl[ing] the Iranian regime to facilitate its support for terrorism and proliferation."

   Today's enforcement action and yesterday's announced designation of the IRGC as a Foreign Terrorist Organization serve to reinforce what Magistrate Judge Pollak's carefully considered Report and Recommendation already determined – that the SAC sets forth plausible claims that should, as *Linde* urges, be decided by a jury.

             Respectfully submitted,

             /s/ Gary M. Osen

cc: All Counsel via ECF

---

[9]  See Fact Sheet, U.S. State Dep't, "Designation of the Islamic Revolutionary Guard Corps" (April 8, 2019), available at https://www.state.gov/r/pa/prs/ps/2019/04/290963.htm.

[10]  *Id.*