OSEN LLC
ATTORNEYS AT LAW
WWW.OSENLAW.COM

2 UNIVERSITY PLAZA, SUITE 402, HACKENSACK, NJ 07601            1441 BROADWAY, SUITE 6022, NEW YORK, NY 10018
T. 201.265.6400   F. 201.265.0303                                                              T.212.354.0111

August 15, 2019

**VIA ECF**

Honorable Pamela K. Chen
United States District Judge
United States District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: *Freeman, et al. v. HSBC Holdings plc, et al.*, 14-cv-6601 (PKC)(CLP)

Dear Judge Chen:

  Plaintiffs respectfully write in response to the Court's August 8, 2019 Minute Order directing the parties to file letter briefs analyzing the relevance, if any, of the Second Circuit's decision in *Siegel v. HSBC N. Am. Holdings, Inc.*, No. 18-2540-cv, 2019 WL 3719976 (2d Cir. Aug. 8, 2019) ("*Siegel III*") to the motions and objections currently pending before the Court.

  In *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 118 (2d Cir. 2013), the Second Circuit affirmed dismissal of ATA claims against the Saudi bank Al Rajhi Bank ("ARB"), among others, for allegedly providing material support to al Qaeda because the plaintiffs had failed to adequately plead that ARB's accounts or donations were used to provide funds to al Qaeda and thereby proximately cause the September 11, 2001 attacks. Nonetheless, the *Siegel* plaintiffs not only sued ARB for the same alleged conduct (albeit for a different al Qaeda attack), but also added seven HSBC defendants whom they alleged provided support to ARB. After courts dismissed ARB and five of the seven HSBC defendants on personal jurisdiction grounds, the *Siegel* third amended complaint ("TAC") against the remaining HSBC defendants—that were even further removed from the ARB conduct already found insufficient to satisfy proximate cause—was also dismissed. The Second Circuit affirmed that dismissal in *Siegel III*.

  However, *Siegel* and its history are instructive as to how cases that copy *Freeman*'s allegations and theories out of context or rely on the *Freeman* Report and Recommendation ("R&R") to prop up legally insufficient complaints can be wielded by defendants as stalking horses against well-pleaded complaints such as the operative complaint here ("*Freeman* SAC").

***Siegel*'s Procedural History**

  The *Siegel* plaintiffs, victims of a series of bombings perpetrated by al Qaeda in Iraq ("AQI") in 2005, commenced their action in 2015 in the Northern District of Illinois. They named ARB and seven HSBC entities, alleging that ARB provided material support to AQI and that the HSBC defendants knew that ARB was suspected of doing so but nevertheless violated "banking regulations" by providing ARB with correspondent banking services.

The complaint's theory of liability was opaque. It asserted two claims under 18 U.S.C. § 2333. The first claim was asserted against the HSBC defendants for breach of fiduciary duty ("HSBC was under a heightened duty as a fiduciary of banks and charities, and as a public servant endowed with the public's trust." *Siegel* Compl. ¶ 95).[1] The plaintiffs asserted that "HSBC was under a general duty to implement and enforce due diligence methods to prevent its banks from being used to intentionally injure, maim or kill, commit criminal or tortuous acts, endanger lives, and engage in activity that would foreseeable [sic] lead to the personal injury and/or death of the plaintiffs." *Id.* ¶¶ 96-97. The second claim, asserting similar allegations, was directed against ARB. *Id.* ¶¶ 99-102.

Having essentially articulated a negligence claim, the *Siegel* plaintiffs clearly did not allege that HSBC's relationship with ARB involved any of the illegal, active collusion comparable to the conduct alleged in *Freeman*. The complaint's single substantive source—a Staff Report from the U.S. Senate's Permanent Subcommittee on Investigations entitled *U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing*: *HSBC Case History* (July 17, 2010) (the "Senate Report")—does not either. Although the *Siegel* complaint did allege that the HSBC defendants engaged in wire stripping, that language was copied nearly verbatim from the original *Freeman* complaint. *Compare Siegel* Compl. ¶ 69 *and Freeman* Orig. Compl., ECF No. 1, ¶ 1019. The first amended *Siegel* complaint ("FAC") borrowed further from *Freeman*. *Compare Siegel* FAC ¶¶ 70-71, 89-90 *and Freeman* SAC ¶¶ 360-61, 572, 574.[2]

After Judge Blakey in the Northern District of Illinois dismissed the plaintiffs' claims against ARB, HSBC Holdings and HSBC Middle East for lack of personal jurisdiction and transferred the remainder of the action to the Southern District of New York, the *Siegel* plaintiffs sought leave to file a second amended complaint ("SAC") in order to resurrect their claims against ARB and HSBC Holdings. The SAC added allegations that HSBC Holdings' "personnel were aware of, supported, and encouraged HSBC Bank USA to provide U.S. correspondent banknotes accounts to Al Rajhi Bank," and that "[o]n and before November 9, 2005, Al Rajhi Bank did business with HSBC Bank USA inside the United States." *Siegel v. HSBC Holdings, PLC*, No. 17-cv-6593 (DLC), 2018 WL 501610, at *1-2 (S.D.N.Y. Jan. 19, 2018) ("*Siegel I*"). Judge Cote, however, denied the plaintiffs' application as futile and dismissed with prejudice all claims against ARB and HSBC Holdings. *Id.* at *4 (quoting *In re Terrorist Attacks*, 714 F.3d at 676).

After being given a final opportunity to amend their complaint as to the two remaining defendants, HSBC Bank USA, N.A. and HSBC North America Holdings, Inc., the plaintiffs filed their TAC on March 16, 2018. Like its predecessors, the TAC asserted a claim under § 2333 (without identifying which subsection) against the remaining (now exclusively U.S.-based) HSBC defendants for violating their "general duty to implement and enforce due diligence methods." *See,*

---

[1] So as not to burden the Court, we have not attached the *Siegel* complaints and briefs cited herein; however, we will readily provide copies of the cited documents at the Court's request.

[2] The original *Siegel* complaint's allegations relating to ARB consisted of allegations that ARB "knew or should have known that the funds deposited in the accounts established and maintained by it . . . were used to support, encourage, entice and make possible these suicide bombings . . . ." *Siegel* Compl. ¶ 93.

*e.g.*, TAC ¶¶ 119-21. During briefing of the defendants' motion to dismiss, the plaintiffs disavowed a primary liability claim in favor of aiding and abetting under § 2333(d) of the Justice Against Sponsors of Terrorism Act ("JASTA"). *See Siegel v. HSBC Bank USA, N.A.*, No. 17-cv-6593 (DLC), 2018 WL 3611967, at *4 (S.D.N.Y. July 27, 2018) ("*Siegel II*").

Nonetheless, because the TAC defendants were reduced to HSBC Bank USA, N.A. and HSBC North America Holdings, Inc., the recital of the same allegations that the plaintiffs had previously directed at the *dismissed* non-U.S.-based HSBC entities was now internally incoherent. To begin with, ARB (which the plaintiffs alleged was the direct conduit to AQI) had already been dismissed for lack of specific personal jurisdiction because the plaintiffs had failed to plead any specific flow of funds through the United States by ARB to AQI. Without such allegations there were, *a fortiori*, no non-conclusory allegations tying the *U.S.*-based HSBC defendants to ARB funds transfers to AQI. Instead, the plaintiffs had added (as of their FAC) cites to the Deferred Prosecution Agreement ("DPA") which the HSBC defendants entered into in 2012. Unsurprisingly, this was unavailing, as the DPA does not even mention Saudi Arabia, let alone ARB, but focuses chiefly on HSBC's relationship with sanctioned countries like Iran.

Inasmuch as the *Siegel* plaintiffs added no allegations tying the defendants to AQI, had fundamentally muddled the allegations in both the Senate Report and DPA, and materially misunderstood how correspondent banking works, the district court unsurprisingly concluded that the TAC "does not allege any direct relationship with the terrorist organizations" responsible for the attacks at issue, but only "accuses the defendants of adopting slipshod banking practices, and operating with inadequate anti-money laundering controls," without tying them to the terrorist organization at issue. *Siegel II*, 2018 WL 3611967, at *4.

Finally, on appeal, the parties and defendants' amici unsuccessfully attempted to draw the *Freeman* R&R into the dispute. The *Siegel* plaintiffs again tried to connect their allegations to those in *Freeman*, which they summarized as "an action pursuant to the ATA against HSBC, among other defendants, for terrorist actions in Iran." Appellants' Opening Brief, ECF No. 30, at 21-22. The *Siegel* defendants' amici, on the other hand, took the opportunity to denigrate the *Freeman* R&R as an "outlier report and recommendation," with conclusions that are "erroneous[]," "emphatically not the law," and reflecting a "disregard of *Bell Atlantic Corp v. Twombly*, 550 U.S. 544 (2007), *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and their progeny." Amici's Brief in Support of Defendants-Appellees, ECF No. 68, at 8, 11, 14 n.8, 25.

***Siegel* and *Freeman* Contrasted**

The Court of Appeals focused on the *Siegel* TAC's allegations and made a straightforward application of *In re Terrorist Attacks* and *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018) to affirm the dismissal for the following reasons.

*First*, assuming generously that the *Siegel* TAC's reference to § 2333 and alleged breaches of fiduciary duty were meant to articulate a claim under JASTA, the Court of Appeals found that the TAC failed to allege sufficient allegations for two of the three elements of a § 2333(d) aiding and abetting claim: general awareness and substantial assistance. *Siegel III* at *5. The *Freeman* SAC (which was filed prior to JASTA's enactment), on the other hand, asserts primary liability

claims under § 2333(a) against all defendants, predicated on conspiracy to violate the material support statutes (First & Second Claims), as well as additional claims against certain defendants for knowing violations of 18 U.S.C. § 2332d and material support statutes. *Freeman* SAC ¶¶ 2179-2293.[3] Civil conspiracy requires neither the defendant's general awareness of its role in the principal tort nor substantial assistance. Instead, a defendant's agreement to participate in an unlawful act makes it liable not just for its own acts, but also for the foreseeable acts of co-conspirators committed pursuant to and in furtherance of the conspiracy. *See Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983).

*Second*, as noted above, the *Siegel* plaintiffs' theory did *not* involve "stripped" transactions, though their complaints erroneously make cursory reference to the practice. Indeed, after losing most of the original defendants to personal jurisdiction challenges, the *Siegel* plaintiffs were left only with U.S.-based HSBC defendants. As the HSBC defendants' brief in support of their S.D.N.Y. motion to dismiss noted:

> [S]uch allegations have nothing to do with ARB or this action, do not find any factual grounding in the public materials on which Plaintiffs rely, and do not make sense in relation to Defendants—a U.S. bank and its U.S. bank-holding company parent. Stripping occurs when a non-U.S. financial institution omits or removes information from wire transfer documentation to conceal the participation of a prohibited person or country, so the transaction is not picked up by compliance filters when it is processed by the U.S. correspondent bank. *Id.* Thus any stripping activity or sanctions circumvention necessarily occurs before a transaction reaches the U.S. correspondent bank. . . .

No. 17-cv-06593 (DLC), ECF No. 105, at 4 n.2. *See also* Appellees' Br., No. 18-2540-cv, ECF No. 37, at 9-10 ("Plaintiffs do not allege that any transactions involving [ARB] or benefitting AQI were subjected to 'stripping.' Indeed, 'stripping' by definition, must occur outside the United States and is intended to deceive the U.S. correspondent bank (in this case, HSBC Bank USA).").

The district court agreed, noting: "[W]hile the TAC includes substantial quotations and descriptions of government findings, none of those sources are cited as providing a basis to allege that ARB and the defendants had entered into **an agreement about stripping** or that any of the defendants' transactions with ARB were subject to stripping." *Siegel II*, 2018 WL 3611967, at *1 n.1 (emphasis added). In other words, not only did the *Siegel* plaintiffs rely on the wrong parts of the Senate Report and the DPA (which did not even mention ARB), they also appear to have misunderstood "stripping" and how it works.

In *Freeman*, by contrast, the operative complaint accurately cites U.S. government findings to allege that Defendants, including HSBC Defendants, engaged in a longstanding and highly sophisticated conspiracy with Iran and Iranian counterparties, including the Islamic Revolutionary Guard Corps ("IRGC"), to fund the IRGC and Hezbollah, both Foreign Terrorist Organizations ("FTOs") that planned, authorized and committed the terrorist attacks at issue.

---

[3] Once JASTA was enacted, the parties fully briefed the applicability of § 2333(d) to the allegations set forth in the operative complaint. Therefore, it was fully considered in Magistrate Judge Pollak's R&R.

*Third*, unlike Bank Saderat Plc, Bank Melli, IRISL, Mahan Air and various other alleged co-conspirators identified in *Freeman*, ARB has never been designated a Specially Designated Global Terrorist ("SDGT") or Specially Designated National ("SDN"), and Saudi Arabia has never been designated a state sponsor of terrorism.[4] In *Freeman*, by contrast, many of the Defendants' documented counterparties were designated SDGTs and/or SDNs and instrumentalities of a designated state sponsor of terrorism and were, in many cases, agents of the IRGC.

*Finally*, in the absence of any connection between the remaining HSBC defendants and ARB's alleged illicit conduct, let alone a connection between the defendants and AQI, the Court of Appeals correctly held that the *Siegel* TAC did not sufficiently plead defendants' general awareness of their role in AQI's terrorist activities. In stark contrast, in *Freeman*, Plaintiffs alleged that HSBC *conspired* to facilitate clandestine transactions for, *e.g.*, Bank Saderat (an SDGT), and quoted HSBC-Middle East's Regional Head of Legal and Compliance, who informed senior HSBC group officials that the U.S. government had "direct evidence against Bank Saderat *particularly in relation to the alleged funding of Hezbollah*." *Freeman* SAC ¶ 518 (emphasis added). Indeed, that senior HSBC official acknowledged that U.S. officials suspected "*all* major Iranian state-owned banks *of involvement in terrorist financing* and WMD procurement." *Id.* (emphasis added). These were among the ample non-conclusory allegations that led Magistrate Judge Pollak to find that "the pleadings allege facts from which a jury could infer that HSBC was *fully aware* that Bank Saderat and Bank Melli, among others, were using HSBC banking services as a means to avoid U.S. sanctions *and to transfer funds to terrorist organizations, including the FTO Hezbollah*." R&R at 72 (emphasis added).

Like several other actions filed in this District and in the Southern District of New York, the *Siegel* plaintiffs appear to have borrowed substantially from *Freeman* without fully comprehending the allegations they were incorporating. It then added additional HSBC defendants and cut and pasted from the Senate Report's findings concerning ARB – all in a misguided effort to relitigate *In re Terrorist Attacks* and paper over the gaps in the causal chain previously identified by the Second Circuit. As we noted during the May 30, 2019 status conference, the *Freeman* plaintiffs cannot copyright their complaint. Nor, unfortunately, can they prevent other plaintiffs' counsel from attempting to associate their (in some cases poorly-developed) claims with those made here, which were brought against Defendants that have (except for Bank Saderat PLC) entered into DPAs in which they admitted to crimes that bear directly on Plaintiffs' claims.

For the reasons set forth in the past several years of briefing, Plaintiffs respectfully request that Defendants' objections to the R&R and their motions to dismiss be rejected in their entirety.

Respectfully submitted,

/s/ Gary M. Osen

---

[4] Moreover, the TAC itself admitted that HSBC ceased doing business with ARB ten months before the attacks at issue, detracting from the "presence" factor in the "substantial assistance" analysis required for aiding and abetting liability. *Siegel III*, at *6. In *Freeman*, the conspiracy continued during the attacks at issue and even afterward.