UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
CHARLOTTE FREEMAN, *et al*.,

                     Plaintiffs,

                 - against -

HSBC HOLDINGS PLC, HSBC BANK PLC,
HSBC BANK MIDDLE EAST LIMITED,
HSBC BANK USA, N.A., BARCLAYS,
STANDARD CHARTERED BANK, ROYAL
BANK OF SCOTLAND, N.V., CREDIT
SUISSE, BANK SADERAT PLC,
COMMERZBANK AG, *and* JOHN DOES 1-
50,

                    Defendants.
---------------------------------------------------------x

**MEMORANDUM & ORDER**
14-CV-6601 (PKC) (CLP)

PAMELA K. CHEN, United States District Judge:

        Plaintiffs, a group of American citizens killed or injured by terrorist attacks in Iraq, and/or

their families, filed this action in November 2014 against ten banking institutions—HSBC

Holdings, PLC, HSBC Bank PLC, HSBC Bank Middle East Ltd., HSBC Bank USA, N.A.

(collectively, "HSBC"), Barclays Bank PLC ("Barclays"), Standard Chartered Bank ("SCB"),

Royal Bank of Scotland, N.V. ("RBS"), Credit Suisse AG ("Credit Suisse"), Bank Saderat PLC

("Bank Saderat"), and Commerzbank AG ("Commerzbank")—as well as John Does 1–50, seeking

damages pursuant to the Antiterrorism Act (the "ATA"), 18 U.S.C. § 2333, as now amended by

the Justice Against State Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat.

852 (2016).[1]   Defendants moved to dismiss the Second Amended Complaint, which is the

---

[1] JASTA was enacted during the pendency of this case. *See* Pub. L. No. 114-222, 130 Stat. at 854 (Sept. 28, 2016). JASTA applies to pending civil actions "arising out of an injury to a person, property, or business on or after September 11, 2001." *See* JASTA § 7(2), 130 Stat. at 855. Because Plaintiffs' First and Second Claims for Relief assert primary liability based on an

operative complaint, on various grounds, including:  (1) failure to plead primary liability under 18 U.S.C. § 2333(a); (2) failure to allege facts establishing that Defendants' actions were the proximate cause of Plaintiffs' injuries; (3) failure to allege that the U.S. branches of certain Defendants are "United States persons" who engaged in a financial transaction with the government of Iran; and (4) as to the Iranian bank, Bank Saderat, lack of personal jurisdiction and a statutory exception to liability under the ATA for acts of war.  The Honorable Cheryl L. Pollak, Magistrate Judge, issued a Report and Recommendation ("R&R") on July 27, 2018 regarding Defendants' respective motions to dismiss, recommending that they be denied in their entirety. *Freeman v. HSBC Holdings PLC*, No. 14-CV-6601 (PKC) (CLP), 2018 WL 3616845 (E.D.N.Y. July 27, 2018) ("*Freeman I*").  For the reasons set forth herein, the Court declines to adopt the R&R and grants Defendants' motions to dismiss.[2]

---

alleged conspiracy to provide material support for terrorism, the Court construes Plaintiffs' First and Second Claims for Relief to also assert that Defendants are liable under the secondary conspiracy liability provisions added to the ATA by JASTA.

[2] As Judge Pollak observed in her R&R, the law in this area was "unclear" at the time she issued her R&R, and, indeed, has continued to evolve. *Freeman I*, at *48. This Court has had the benefit of further clarification in this area since the issuance of the R&R in cases presenting facts similar to this one. *See, e.g.*, *Kemper v. Deutsche Bank*, 911 F.3d 383 (7th Cir. Jan. 10, 2019); *O'Sullivan v. Deutsche Bank*, 17-CV-8709 (LTS) (GWG), 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019); *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. Aug. 8, 2019).  The Court finds that these decisions, in combination with pre-R&R case law, signal a decided trend toward disallowing ATA claims against defendants who did not deal directly with a terrorist organization or its proxy.  Even post-JASTA, courts have continued to recognize a distinction between ATA claims based on a defendant's provision of support or services to a state sponsor of terrorism, such as Iran, and those alleging the direct provision of support and services to a terrorist organization or its fundraising affiliate. *Compare O'Sullivan*, 2019 WL 1409446 (dismissing post-JASTA ATA claim alleging that U.S.-based bank conspired with Iranian banks to fund terrorist organizations) *and Kemper*, 911 F.3d 383 (dismissing ATA claim alleging material support conspiracy between western banks and Iranian governmental entities), *with Weiss v. Nat'l Westminster Bank*, 768 F.3d 202 (2d Cir. 2014) (holding that defendant bank could be liable under ATA for maintaining bank account and providing services to Interpal, which engaged in "terrorist activity" by soliciting funds and providing support to Hamas); *see also Siegel*, 933 F.3d 217 (dismissing post-JASTA ATA complaint alleging aiding and abetting liability against HSBC for providing financial services to a

# BACKGROUND

## I.     SAC's Factual Allegations

As described in detail by Judge Pollak's exceedingly thorough R&R,[3] Plaintiffs allege a wide-ranging conspiracy, first formed in 1987, to evade U.S. sanctions on financial and business dealings with Iran, conduct illicit trade-finance transactions, conceal the involvement of Iranian agents in financial payments to and from U.S. dollar-denominated accounts, and facilitate Iran's provision of material support to support terrorist activities and organizations, including Hezbollah. (Second Amended Complaint ("SAC"), Dkt. 115, ¶¶ 22–23.)   The members of the alleged conspiracy include Defendants, the Government of Iran, and multiple state-affiliated and private Iranian entities that, at times, operate as financial[4] and logistical[5] conduits for the Islamic Revolutionary Guard Corps's ("IRGC") and Hezbollah's terrorist activities.  (*Id.* ¶ 22.)

As members of the alleged conspiracy, Defendants agreed to engage in, among other things, "stripping," whereby the banks removed or otherwise altered information on payment messages sent through U.S. correspondent banks that might have alerted the banks and American

---

foreign bank with links to terrorist organizations).  It is this consistent trend, more discernable post-R&R, that informs the Court's decision not to adopt the well-considered recommendations of Judge Pollak's R&R and to dismiss this matter.

[3] The Court adopts the R&R's summary of the allegations in this action and incorporates it herein, though the Court briefly recounts certain facts for the sake of clarity and ease of reference. The Court assumes the truth of the SAC's non-conclusory factual allegations.  *Arar v. Ashcroft*, 585 F.3d 559, 567 (2d Cir. 2009) (*en banc*).

[4] The Iranian bank co-conspirators are Bank Saderat Iran, the Central Bank of Iran (also known as Bank Markazi), Bank Melli Iran, Bank Mellat, Bank Tejarat, Bank Refah, and Bank Sepah.  (SAC, Dkt. 115, ¶ 22.)

[5] Among the Iranian commercial actors involved in the alleged conspiracy are the Islamic Republic of Iran Shipping Lines ("IRISL"), the National Iranian Oil Company ("NIOC"), and Mahan Air.  (SAC, Dkt. 115, ¶ 22.)

authorities to the involvement of Iranian agents in the transaction. (*E.g.*, *id.* ¶¶ 25, 372, 482, 673, 1011.) Similarly, Defendants concealed the involvement of Iranian banks in Letters of Credit used to facilitate the purchase of export-controlled goods, technologies, and weapons. (*E.g.*, *id.* ¶¶ 25, 173–88, 195, 685–99, 719–21.) Defendants participated in this conspiracy despite knowing of Iran's status as a state sponsor and supporter of foreign terrorist organizations[6] ("FTOs") and Iran's associations with Specially Designated Global Terrorists[7] ("SDGTs"). (*Id.* ¶¶ 40, 42–45.) Many of the FTOs and SDGTs affiliated with Iran, including Hezbollah,[8] the IRGC, and an IRGC directorate known as the Islamic Revolutionary Guard Corps-Qods Force[9] ("IRGC-QF"), developed improvised explosive devices ("IEDs") that were used to kill or maim American citizens in Iraq from 2004 to 2011. (*Id.* ¶¶ 7, 196, 259–66, 347–350.)

---

[6] The Secretary of State is authorized to designate foreign organizations as FTOs under Section 219 of the Immigration and Nationality Act. 8 U.S.C. § 1189(a)(1).

[7] The United States Department of the Treasury designates SDGTs pursuant to Executive Order 13224. *See* 31 C.F.R. § 594.310 ("The term specially designated global terrorist or SDGT means any person whose property and interests in property are blocked pursuant to § 594.201(a).") (referring to entities listed in the Annex of the Executive Order). The United States may block the property of, and prohibit transactions with, any entity designated as an SDGT. *Freeman I*, at *4 n.10.

[8] Hezbollah is a terrorist organization and political party based in Lebanon that Plaintiffs allege to have used, both directly and through its agents and auxiliaries, IEDs to maim and kill Americans in Iraq. It was designated an FTO in 1997. (SAC, Dkt. 115, ¶ 229.)

[9] The IRGC-QF was designated as an SDGT in October 2007 based on its long history of supporting terrorist activities by Hezbollah, operating training camps and supplying guidance, funding, weapons, intelligence and logistical support. (SAC, Dkt. 115, ¶¶ 16, 249–50.) The United States government has specifically linked the IRGC-QF to terrorists in Iraq who targeted and killed Americans. (*Id.* ¶ 16.)

## II.     Plaintiffs' Claims

The majority of Plaintiffs are American citizens who served as part of the Coalition Forces in Iraq from 2004 to 2011 and were injured or killed by terrorist attacks in Iraq during that time. (SAC, Dkt. 115, ¶¶ 6–9.)[10]  Plaintiffs claim injury as a result of the alleged conspirators' direct and indirect provision of material support for terrorism.  Plaintiffs assert seven claims for relief under the ATA.  Plaintiffs' First Claim for Relief asserts that all Defendants are liable for predicate violations of 18 U.S.C. § 2339A.  (*Id.* ¶¶ 2179–2200.)  Similarly, Plaintiffs' Second Claim for Relief seeks to impose liability against all Defendants for predicate violations of 18 U.S.C. § 2339B.[11]  (*Id.* ¶¶ 2201–17.)  Plaintiffs' Third Claim for Relief seeks to impose liability only against HSBC Bank USA, N.A. ("HSBC-US") for predicate violations of 18 U.S.C. § 2332d.  (*Id.* ¶¶ 2218–40.)  The Fourth Claim for Relief is brought against Standard Chartered, RBS, and Commerzbank for predicate violations of 18 U.S.C. § 2332d.  (*Id.* ¶¶ 2241–53.)  The Fifth and Sixth Claims for Relief are brought against Commerzbank for predicate violations of 18 U.S.C. § 2339A and 18 U.S.C. § 2339B.  (*Id.* ¶¶ 2254–63, 2264–73.)  The Seventh Claim for Relief is brought against SCB based on predicate violations of 18 U.S.C. § 2339A.  (*Id.* ¶¶ 2274–93.)

## PROCEDURAL HISTORY

Plaintiffs filed this action on November 10, 2014, and the case was initially assigned to the Honorable Dora L. Irizarry, Chief Judge.  (Complaint, Dkt. 1.)  In response to motions to dismiss filed by a subset of the current Defendants (Dkts. 70, 71), Plaintiffs filed an amended complaint

---

[10] Plaintiffs include several non-military members, such as Steven Vincent, a reporter covering the Iraq War, and a translator, Ahmed Al-Taie.  *Freeman I*, at *1 n.4 (citing SAC, Dkt. 115, ¶¶ 1232–40, 1388–1400).

[11] As discussed *infra*, Plaintiffs claim that Defendants may be held liable for violations of § 2339A and § 2339B under theories of both primary and secondary liability.

on April 2, 2015 (Dkt. 77).  The First Amended Complaint added new Plaintiffs to the action, added Commerzbank as a Defendant, and expanded on the factual allegations from the initial complaint.  (*See generally id.*)  In response to renewed motions to dismiss (Dkts. 89, 91), Plaintiffs filed their corrected Second Amended Complaint on August 17, 2016 (Dkt. 115).  The Second Amended Complaint added 108 new Plaintiffs, incorporated details from an anonymously obtained "Report on Iranian Trade Finance Transactions" prepared by Promontory Financial Group, LLC ("Promontory") for SCB, and added new claims for relief against Commerzbank and SCB.  (*See generally* SAC, Dkt. 115; *see also* Motion to Amend, Dkt. 108-1.)  In response, HSBC, Barclays, SCB, RBS, Credit Suisse, and Commerzbank (the "Moving Banks") filed a third motion to dismiss for failure to state a claim on November 10, 2016.  (*See* Moving Banks' Motion to Dismiss, Dkt. 119.)  The same day, Bank Saderat filed a separate motion to dismiss.  (*See* Bank Saderat's Motion to Dismiss, Dkt. 116.)

On July 11, 2017, Chief Judge Irizarry referred the pending motions to dismiss to Magistrate Judge Pollak for the preparation of a report and recommendation.  On July 27, 2018, Judge Pollak issued the R&R currently before the Court, recommending that Defendants' respective motions to dismiss be denied in their entirety.  (Report & Recommendation, Dkt. 165.)  Defendants filed objections to the R&R on August 31, 2018.  (Bank Saderat's Objections ("Bank Saderat's Objs."), Dkt. 173; Moving Banks' Objections ("Mov. Banks' Objs."), Dkt. 174.)  Subsequently, Plaintiffs sought leave to file a Third Amended Complaint, which would have added 450 additional plaintiffs to the action.  (Dkt. 199.)  Before that motion to amend was resolved, however, Plaintiffs' counsel opted to file additional related cases in this district, which were assigned to the undersigned.  (*See* Dkt. 202.)  *See also Freeman et al. v. HSBC Holdings, et al.*,

No. 18-CV-7359 (PKC) (CLP); *Bowman et al. v. HSBC Holdings, et al.*, No. 19-CV-2146 (PKC) (CLP).  On May 8, 2019, this case was reassigned to the undersigned.

## STANDARD OF REVIEW

A district court reviewing a magistrate judge's recommendations "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).  With respect to a magistrate judge's recommendation on a dispositive matter, the district court must review *de novo* all aspects of the recommendation to which a party has specifically objected.  *See id.* ("A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); Fed. R. Civ. P. 72(b)(3) ("The district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to.").

"[O]bjections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original papers will not suffice to invoke *de novo* review."  *Frankel v. New York City*, Nos. 06-CV-5450 (LTS) (DFE) & 07-CV-3436 (LTS) (DFE), 2009 WL 465645, at *2 (S.D.N.Y. Feb. 25, 2009) (quotation and brackets omitted); *see also Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (summary order) ("[M]erely referring the court to previously filed papers or arguments does not constitute an adequate objection under . . . [Federal Rule of Civil Procedure] 72(b)." (quoting *Mario v. P & C Food Mkts., Inc*., 313 F.3d 758, 766 (2d Cir. 2002))).  Accordingly, "[g]eneral or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge, are reviewed for clear error."  *Chime v. Peak Sec. Plus, Inc*., 137 F. Supp. 3d 183, 187 (E.D.N.Y. 2015) (quotation omitted).  A responsive objection, however, may establish entitlement to *de novo* review if it asserts that the magistrate judge committed legal error in failing to adopt a previously presented argument.  *See Watson v. Geithner*, No. 11-CV-9527 (AJN), 2013 WL

5441748, at *2 (S.D.N.Y. Sept. 27, 2013) ("[A]n objection that a magistrate's purely legal ruling was faulty may require convincing the district judge of an argument that the magistrate rejected; the only way for a party to raise such arguments is to reiterate them."); *see also Moss v. Colvin*, 845 F.3d 516, 519 n.2 (2d Cir. 2017) (quoting *Watson* approvingly). Even if neither party objects to the magistrate's recommendation, the district court may, in its discretion, *sua sponte* conduct *de novo* review as to any issues that the recommendation addresses. *See Moss*, 845 F.3d at 519 n.2 (quoting *Grassia v. Scully*, 892 F.2d 16, 19 (2d Cir. 1989)); *see also Thomas v. Arn*, 474 U.S. 140, 154 (1985) ("[W]hile [28 U.S.C. § 636] does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard."); *In re Holocaust Victim Assets Litig.*, 528 F. Supp. 2d 109, 116 (E.D.N.Y. 2007).

## DISCUSSION

I.   **Relevant Legal Standards**

A.   **Rule 12(b)(2)**

On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the plaintiff has the burden of demonstrating personal jurisdiction. *Troma Entm't, Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 217 (2d Cir. 2013) (citing *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010)). "[W]hen the issue of personal jurisdiction 'is decided initially on the pleadings and without discovery, the plaintiff need show only a *prima facie* case.'" *King Cty., Wash. v. IKB Deutsche Industriebank, AG*, 769 F. Supp. 2d 309, 313 (S.D.N.Y. 2011) (citing *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984)). In deciding whether the plaintiff has met this burden, the pleadings and affidavits must be viewed in the light most favorable to the plaintiff, with all doubts resolved in its favor. *See, e.g., DiStefano*

*v. Carozzi N. Am., Inc*., 286 F.3d 81, 84 (2d Cir. 2001); *Whitaker v. Am. Telecasting, Inc*., 261 F.3d 196, 208 (2d Cir. 2001).

**B.      Rule 12(b)(6)**

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual allegations, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. (quoting *Twombly*, 550 U.S. at 556).  The "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id*. (citation omitted).  Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id*. at 679 (citation omitted).

In addressing the sufficiency of a complaint, courts must "accept as true the factual allegations of the complaint, and construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff."  *Arar*, 585 F.3d at 567.  Nevertheless, a court "need not credit conclusory statements unsupported by assertions of facts or legal conclusions . . . presented as factual allegations."  *In re Livent, Inc. Noteholders Sec. Litig*., 151 F. Supp. 2d 371, 404 (S.D.N.Y. 2001) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  At the pleadings stage, the Court must limit its inquiry to the facts alleged in the complaint, the documents attached to the complaint or incorporated therein by reference, and "documents that, while not explicitly incorporated into the complaint, are 'integral' to plaintiff's claims and were relied upon in drafting the complaint."  *Id*. (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 44 (2d Cir. 1991)).

## II.     Defendants' Motions to Dismiss and Objections to the R&R

The R&R submitted by Magistrate Judge Pollak recommends that Defendants' pending motions to dismiss, based on Rules 12(b)(2) and 12(b)(6), be denied in their entirety.  *See Freeman I*, at *1.  Defendants have filed timely objections to the R&R.  (Bank Saderat's Objs., Dkt. 173; Mov. Banks' Objs., Dkt. 174.)  Two Defendants, Bank Saderat and Commerzbank, re-assert their personal jurisdiction arguments as to certain claims against them.[12]  (Bank Saderat's Objs., Dkt. 173, at 6–8 (asserting that there is no basis for the Court to exercise personal jurisdiction over Bank Saderat in relation to Plaintiffs' conspiracy claims); Mov. Banks' Objs., Dkt. 174, 36–37 (arguing that the Court cannot assert personal jurisdiction over Commerzbank with respect to Plaintiffs' Sixth Claim for Relief).)  All Defendants re-assert their arguments that Plaintiffs have failed to plausibly allege that: (1) Defendants' actions satisfy the definition of an act of international terrorism set forth in 18 U.S.C. § 2331(1) for purposes of their primary liability claims under § 2333(a); (2) Defendants' actions were a proximate cause of Plaintiffs' injuries, as required by 18 U.S.C. § 2333(a); and (3) Defendants' actions meet the threshold statutory requirements for their JASTA secondary liability conspiracy claims under 18 U.S.C. § 2333(d)(2).[13]  (Bank

---

[12] Bank Saderat also objects to the R&R's finding that Plaintiffs' claims are not barred by the act-of-war exception to liability under the ATA, which for the reasons discussed *infra*, the Court does not address.  (Bank Saderat's Objs., Dkt. 173, at 1–5.)

[13] The Moving Banks characterize their objections as follows: (1) the R&R misapplied § 2333(d)(2)'s requirement that the act of international terrorism must be "committed, planned, or authorized" by an FTO; (2) the R&R failed to apply § 2333(d)(2)'s requirement that the defendant have "conspire[d] with the person who committed the act of international terrorism"; (3) the R&R erroneously applied *Halberstam* to override § 2333(d)(2)'s statutory requirements; (4) the R&R failed to analyze Plaintiffs' primary liability claims in light of the ATA's proximate causation requirement; (5) the R&R failed to consider whether the Defendants' alleged actions met § 2331(1)'s independent statutory definition of an international act of terrorism; and (6) the R&R erroneously applied the definitional requirements of § 2332d in evaluating Plaintiffs' Third and Fourth Claims for Relief.  (Mov. Banks. Objs, Dkt. 174, at i–ii.)  For their Seventh and Eighth Objections, the Moving Banks argue that Plaintiffs have failed to plead proximate causation and

Saderat's Objs., Dkt. 173, at 1 (joining the Moving Banks' defenses to liability under Plaintiffs' First and Second Claims for Relief); Mov. Banks' Objs., Dkt. 174, 8, 22–23 (asserting these defenses as to all relevant claims for relief).)[14]  Defendants also raised in their objections the argument that Defendants' alleged conduct does not satisfy the elements of a JASTA conspiracy claim under § 2333(d)(2).[15]

Because Defendants' objections rest largely on questions of controlling law, the Court conducts a *de novo* review of the issues presented in Defendants' motions to dismiss and objections to the R&R.  *See Watson*, 2013 WL 5441748, at *2.

### A.    Bank Saderat's and Commerzbank's Personal Jurisdiction Defenses

The Court first addresses Bank Saderat's and Commerzbank's jurisdictional arguments. *See Morgan Stanley & Co. v. Seghers*, No. 10-CV-5378 (DLC), 2010 WL 3952851, at *3 (S.D.N.Y. Oct. 8, 2010); *see also Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999) ("[J]urisdiction generally must precede merits in dispositional order . . . .").

---

the definitional requirements of § 2331(1) with respect to their Fifth and Sixth Claims for Relief as to Commerzbank, and their Seventh Claim for Relief as to SCB.  (*Id.* at ii.)

[14] While Defendants' objections were pending, the parties submitted supplemental letter briefs alerting the Court to relevant cases decided after the close of the objections briefing.  (*See, e.g.*, Dkts. 234, 235 (analyzing the Second Circuit's August 2019 decision in *Siegel*, 933 F.3d 217).)

[15] JASTA was passed after Plaintiffs filed the Second Amended Complaint but before Defendants filed their motions to dismiss.  Because the R&R analyzed Plaintiffs' conspiracy claims as JASTA secondary liability claims under 18 U.S.C. § 2333(d)(2), Defendants objected to the R&R's denial of their motions to dismiss with respect to both Plaintiffs' § 2333(a) primary liability conspiracy claims and their § 2333(d)(2) secondary liability conspiracy claims.

1.      Bank Saderat's Personal Jurisdiction Defense to the First and Second
        Claims for Relief

Bank Saderat argues[16] that it is not subject to personal jurisdiction in New York. Specifically, Bank Saderat argues that the theory of conspiracy jurisdiction relied upon by Plaintiffs was rejected by the Supreme Court in *Walden v. Fiore*, 571 U.S. 277 (2014), and accordingly, that the SAC lacks sufficient allegations of contact with New York to establish specific personal jurisdiction over Bank Saderat. (*See* Bank Saderat Objs., Dkt. 173, at 6–8.) The Court finds that Bank Saderat's jurisdictional arguments are without merit.[17]

2.      Basis for Personal Jurisdiction

Under New York CPLR § 302(a)(1), "a court may exercise personal jurisdiction over any non-domiciliary who . . . in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. § 302(a)(1). It is well established under this long-arm statute that "activities of a co-conspirator may . . . be imputed to an out-of-state tortfeasor for jurisdictional purposes under an agency rational." *In re N. Sea Brent Crude Oil Futures Litig.*, No. 13-MD-2475 (ALC), 2017 WL 2535731, at *9 (S.D.N.Y. June 8, 2017) (quotation omitted). Even without the existence of an agency relationship, courts in this Circuit have held that jurisdiction over out-of-state members of a conspiracy comports with due process where the out-of-state conspirators "should reasonably anticipate being haled into court there," *Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 292 (S.D.N.Y. 2019) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)), based on the well-established

---

[16] As previously noted, all parties re-assert in their objections the same arguments they made in their original motion briefing.

[17] The R&R reached the same conclusion, which the Court adopts. *Freeman I*, at *60–62.

principle that "a defendant's contacts with the forum State may be intertwined with his transactions or interactions with . . . other parties," *Walden*, 571 U.S. at 286.

### 3.  Application of *Walden*

In *Walden*, on which Bank Saderat's objection relies, the Supreme Court considered whether a court in Nevada could exercise personal jurisdiction over a DEA agent working at the Atlanta Hartsfield-Jackson Airport.  571 U.S. at 279.  Two professional gamblers, who had flown in from Puerto Rico with cash proceeds from gambling at a casino, were waiting for a flight to Las Vegas when the agent approached them for questioning.  *Id.* at 280.  After using a drug-sniffing dog, the agent seized the gamblers' proceeds, advising them that the funds would be returned if they could later prove the cash was derived from a legitimate source.  *Id.*  Following this encounter, the gamblers boarded their plane to Las Vegas.  *Id.*  Subsequently, the agent moved the cash to a secure location and allegedly drafted a false and misleading affidavit intended to show probable cause for forfeiture of the funds.  *Id.* at 280–81.  The gamblers later sued the agent for damages in the District of Nevada.  *Id.* at 281.

Evaluating these factual circumstances, the Supreme Court held that the DEA agent did not have the "minimum contacts" with Nevada necessary to create specific jurisdiction.  *Id*. at 282; *see also Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (stating that specific jurisdiction "depends on an affiliation between the forum and the underlying controversy") (quotation omitted).  Such minimum contacts "must arise out of contacts that the defendant *himself* creates with the forum," not the "'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with" the forum.  *Walden*, 571 U.S. at 284, 286 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

The facts of *Walden* are materially distinguishable from the facts alleged in the SAC.  The defendant in *Walden* had no apparent intent to interact with Nevada; rather, he "random[ly]"

interacted with two gamblers who "fortuitous[ly]" resided in Nevada and resided there when the agent prepared an allegedly false affidavit.  By contrast, here, Plaintiffs have alleged that Bank Saderat engaged in affirmative acts aimed at New York, directing its co-conspirators to illegally clear and settle dollar-denominated transactions through correspondent accounts in New York. (*See, e.g.*, SAC, Dkt. 115, ¶ 387.)  The SAC is replete with allegations that Bank Saderat entered into a conspiracy with the Moving Banks intending that they operate as Bank Saderat's agents in transferring U.S. dollars through correspondent accounts in New York, and that Bank Saderat took steps to ensure that such transfers were accomplished.  (*See, e.g.*, SAC, Dkt. 115, ¶¶ 375–81, 387.) Bank Saderat's conduct was not simply directed at international banks with their headquarters in foreign countries; it was purposefully targeted at obtaining benefits available to it only by using agents in New York.  It is no defense that Bank Saderat was not *itself* transacting business in New York.  *See Peterson v. Islamic Republic of Iran*, No. 10-CV-4518 (KBF), 2013 WL 1155576, at *17 (S.D.N.Y. Mar. 13, 2013) ("Even if UBAE itself was not transacting business in New York, its agents most certainly were.").

Accordingly, the Court finds that, at the pleading stage, Plaintiffs have met their burden to establish specific jurisdiction over Bank Saderat for claims arising from the alleged conspiracy in this action under New York CPLR § 302(a)(1).[18]

## B.      Commerzbank's Personal Jurisdiction Defense to the Sixth Claim for Relief

Commerzbank argues that Plaintiffs' Sixth Claim for Relief must be dismissed for lack of personal jurisdiction because the claim lacks any apparent connection to the United States and the Court therefore cannot exercise specific jurisdiction over Commerzbank with respect to the claim.

---

[18] For the reasons stated *infra*, however, the Court finds that Plaintiffs' conspiracy claims against Bank Saderat fail on their merits.

(*See* Commerzbank's Supplemental Memorandum, Dkt. 124, at 10; Mov. Banks' Objs., Dkt. 174, at 36–37.)  The Court agrees, and finds that there is no basis for the Court to exercise jurisdiction over the Sixth Claim for Relief.

In this claim, Plaintiffs allege that Commerzbank provided material support for terrorism by maintaining an account in Germany for, and processing transactions on behalf of, Waisenkinderprojekt Libanon e.V. ("the Orphans Project").  (SAC, Dkt. 115, ¶¶ 1039, 2265.)  The Orphans Project allegedly provided material support to Hezbollah by transferring funds from its Commerzbank account in Germany to the Martyrs Foundation, which was designated as an SDGT in 2007 for its role in channeling financial support from Iran to terrorist organizations, including Hezbollah.  (*Id.* ¶ 1040.)  *See also* U.S. Dep't of the Treas. Press Center, *Twin Treasury Actions Take Aim at Hizballah's Support Network* (July 24, 2007), https://www.treasury.gov/press-center/press-releases/Pages/hp503.aspx.   None of the transactions Commerzbank allegedly executed for the Orphans Project were processed through the United States banking system or banks in New York.

Plaintiffs argue that the Court could exercise "pendent personal jurisdiction" over this claim because it "arises from the same common nucleus of fact as another claim for which the court properly has jurisdiction over the defendant[,]" *i.e.*, the material support conspiracy claim under § 2333.  *Freeman I*, at *49 n.69 (citing, *inter alia*, *Strauss v. Credit Lyonnais*, 175 F. Supp. 3d 3, 20 (E.D.N.Y. 2016)).[19]   However, even assuming that pendent jurisdiction can be asserted

---

[19] While acknowledging that this doctrine is typically used to permit the adjudication of state law claims that arise from the same factual circumstances as a federal claim, the R&R noted that other courts have used the doctrine to assert jurisdiction over related federal and foreign claims.  *Id.* (citing *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 35 (D.D.C. 2010)).  Finding that Commerzbank's alleged actions in providing services to the Orphans Project were based on the same nucleus of fact as Plaintiffs First and Second Claims for relief, *i.e.*, the provision of

over a foreign claim where the Court has jurisdiction over a related claim, the Court declines to do so here, because, as discussed *infra*, the Court finds that Plaintiffs have failed to allege a conspiracy to provide material support. Rather, the conspiracy alleged in the SAC appears to have been limited to the evasion of U.S. sanctions on Iran. The unifying theme of Plaintiffs' allegations is a conspiracy to conceal and facilitate financial transactions in New York on behalf of various Iranian commercial entities—conduct that bears no connection or relationship to Commerzbank's maintenance of a bank account in Germany for an organization that is an alleged fundraising front for Hezbollah and the bank's transfer of funds from Germany to the organization in Lebanon. Thus, there is no common nucleus of facts that warrants the exercise of pendent jurisdiction over the Sixth Claim of Relief. *See Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 42–43 (E.D.N.Y. 2019) ("To exercise specific jurisdiction over a defendant consistent with the defendant's due process rights, 'the defendant's suit-related conduct must create a substantial connection with the forum State.'" (quoting *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 335 (2d Cir. 2016))).

This lack of jurisdiction operates as a bar to the Court's consideration of the merits of Plaintiffs' claim. *See Ruhrgas AG*, 526 U.S. at 577 (1999) ("Jurisdiction to resolve cases on the merits requires both authority over the category of claim in suit (subject-matter jurisdiction) and authority over the parties (personal jurisdiction), so that the court's decision will bind them."); *see also Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 510 (D.C. Cir. 2018). Accordingly, Plaintiffs' Sixth Claim for Relief is dismissed for lack of personal jurisdiction.

---

material support directly or indirectly to terrorist entities, the R&R recommended that the Court assert pendent jurisdiction over Plaintiffs' Sixth Claim for Relief. *Id*. The Court declines to adopt this recommendation for the reasons discussed *infra*. The Court further notes, as also discussed later, that the R&R's recommendation regarding the exercise of pendent jurisdiction is bound up in its determination that Plaintiffs have sufficiently alleged Defendants' participation in a conspiracy to provide material support for terrorism, including facilitating funding to Hezbollah— a conclusion with which the Court disagrees.

### C.      Plaintiffs' Claims of Primary Liability Under Section 2333(a)

Each of Plaintiffs' claims for relief is brought pursuant to 18 U.S.C. § 2333(a), which provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States . . . ."  18 U.S.C. § 2333(a).  The Second Circuit has interpreted § 2333(a) as creating only primary liability.  *See In re Terrorist Attacks on Sept. 11, 2001* ("*Al-Rajhi*"), 714 F.3d 118, 123 (2d Cir. 2013); *Linde v. Arab Bank, PLC*, 882 F.3d 314, 319 (2d Cir. 2018).  In other words, § 2333(a) creates a cause of action against "the principal perpetrators of acts of international terrorism . . . , [but] not against secondary actors who facilitate[] such acts by others."  *Lelchook v. Islamic Republic of Iran*, __ F. Supp. 3d __, 2019 WL 2647998, at *3 (E.D.N.Y. June 27, 2019); *see also Siegel*, 933 F.3d at 222 ("In its original form, the ATA afforded relief only against the perpetrators of the terrorist attacks, not against secondary, supporting actors.").

To state a claim for primary liability, a plaintiff must allege: "(1) an injury to a U.S. national, (2) an act of international terrorism, and (3) causation."  *O'Sullivan*, 2019 WL 1409446, at *4 (quoting *Shaffer v. Deutsche Bank AG*, No. 16-CR-497 (MJR) (SCW), 2017 WL 8786497, at *3 (S.D. Ill. Dec. 7, 2017)).  Defendants' motions and objections do not dispute that Plaintiffs suffered injuries due to terrorist attacks in Iraq, so only the second and third requirements are at issue here.

### 1.      The Definitional Requirements of Section 2331(1)

In order to state a primary liability claim under the ATA, Plaintiffs must plausibly allege that Defendants' actions were, themselves, acts of international terrorism in order to give rise to primary liability under § 2333(a).  The ATA provides a statutory definition of an act of

17

international terrorism in 18 U.S.C. § 2331(1).  Pursuant to that provision, acts of international

terrorism include:

> activities that—
>
> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> (B) appear to be intended—
>
>> (i) to intimidate or coerce a civilian population;
>>
>> (ii) to influence the policy of a government by intimidation; or
>>
>> (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
>
> (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum[.]

18 U.S.C. § 2331(1).

Criminal violations of 18 U.S.C. § 2332d,[20] 18 U.S.C. § 2339A,[21] and 18 U.S.C. § 2339B[22] can, under some circumstances, satisfy § 2331(1)'s definition of an act of international terrorism. *See, e.g.*, *Boim v. Holy Land Found. for Relief & Dev.* ("*Boim III*"), 549 F.3d 685, 689–94 (7th Cir. 2008) (*en banc*); *Weiss*, 768 F.3d at 209.  But the Second Circuit has recently clarified that conduct that violates these provisions, such as the provision of banking services to members of a terrorist organization, does not necessarily satisfy that definition standing alone.  *See Linde*, 882 F.3d at 325–26.  Rather, a plaintiff must plausibly allege that a defendant's actions, while violating the ATA's prohibitions on material support for terrorism or financial transactions with state sponsors of terrorism, "*also* involve violence or endanger human life" and "appear to be intended to intimidate or coerce a civilian population or to influence or affect a government."  *Id.* at 326.[23]

---

[20] Section 2332d provides, in relevant part, that "whoever, being a United States person, knowing or having reasonable cause to know that a country is designated under section 6(j) of the Export Administration Act of 1979 . . . as a country supporting international terrorism, engages in a financial transaction with the government of that country, shall be fined under this title, imprisoned for not more than 10 years, or both."  18 U.S.C. § 2332d(a).

[21] Section 2339A provides, in relevant part, that "[w]hoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of [certain enumerated provisions,] or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts *or conspires to do such an act*, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life."  18 U.S.C. § 2339A(a) (emphasis added).

[22] Section 2339B provides, in relevant part that "[w]hoever knowingly provides material support or resources to a foreign terrorist organization, or attempts *or conspires to do so*, shall be fined under this title or imprisoned not more than 20 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life."  18 U.S.C. § 2339B(a)(1).  To violate § 2339B, a person must know that the organization is a designated terrorist organization, that the organization has engaged or engages in terrorist activity, or that the organization has engaged or engages in terrorism.  *Id.*

[23] The element required by § 2331(1)(C)—*i.e.*, that the conduct "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the

Thus, where a plaintiff fails to plausibly allege all of the elements of § 2331(1), he has not stated a claim for relief under § 2333(a).

2.   The Proximate Causation Standard Under Section 2333(a)

As the Seventh Circuit has recently stated, "the ATA ultimately is a tort statute." *Kemper*, 911 F.3d at 390; *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 558 (E.D.N.Y. 2012) ("In enacting the ATA's civil remedy provision in 1992 Congress . . . 'intended to incorporate general principles of tort law . . . into the civil cause of action under the ATA.'" (quoting *Wultz*, 755 F. Supp. 2d at 55 (brackets omitted))). Accordingly, in addition to satisfying the definitional requirements of § 2331(1), an ATA plaintiff must prove a causal relationship between the defendant's acts and the plaintiff's injury in order to impose liability for that injury.

The Second Circuit's seminal case on the causal relationship necessary to impose liability under the ATA is *Rothstein v. UBS AG*. 708 F.3d 82 (2d Cir. 2013). There, the Circuit distinguished Article III's standing requirement that a plaintiff's injury be "fairly traceable" to the defendant's conduct from the showing of causation required to impose liability under § 2333(a). *Id.* at 91–92. Whereas a plaintiff's burden in all cases to allege traceability is "relatively modest," ATA plaintiffs are held to a higher standard to show causation and must plausibly allege that a defendant's conduct was a "proximate cause" of their injury. *Id.* at 92. In defining § 2333(a)'s proximate cause requirement, the Circuit explained that

> [c]entral to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his *acts were a substantial factor in the sequence of responsible causation* and whose injury was reasonably foreseeable or anticipated as a natural consequence.

---

means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum"—is not in dispute here.

*Id.* at 91 (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003)).  Other courts applying the ATA's proximate cause requirement have considered the directness of the link between a defendant's conduct and its alleged consequences.  *See Kemper*, 911 F.3d at 392 (describing directness and foreseeability as inherently linked concepts); *see also Fields v. Twitter, Inc.*, 881 F.3d 739, 748 (9th Cir. 2018) ("[T]he relevant precedents analyzing the phrase 'by reason of' [in the ATA] dictate that it must require a showing of at least some direct relationship between a defendant's acts and a plaintiff's injuries.").

In light of *Rothstein*'s requirement that a plaintiff plead proximate causation, a plaintiff must plausibly allege that the defendant's actions were a "substantial factor in the sequence of responsible causation" leading to the plaintiff's injury and that the plaintiff's injuries were "reasonably foreseeable" or "anticipated as a natural consequence" of those actions.  *Rothstein*, 708 F.3d at 91.  Accordingly, a court cannot allow a plaintiff to proceed under § 2333(a) where he or she alleges only a remote, purely contingent, or overly indirect causal connection.[24]

3.   Defendants' Arguments Regarding Plaintiffs' Primary Liability Claims

Defendants argue that Plaintiffs' § 2333(a) claims fail to satisfy § 2331(1)'s definitional requirements or meet the proximate causation standard under *Rothstein*.  The Court agrees as to both issues.

---

[24] Importantly, however, *Rothstein*'s proximate causation requirement does not require a plaintiff to allege that the defendant's conduct was a "but for" cause of his injuries.  *See Gill*, 893 F. Supp. 2d at 507 ("'But for' caus[ation] cannot be required in the [S]ection 2333(a) context."). Such a requirement would, in light of the fungibility of money, eviscerate the cause of action for material support violations.  *See Miller*, 372 F. Supp. 3d at 46 (citing *Linde*, 97 F. Supp. 3d at 324).

a.      Plaintiffs Fail to Allege a Material Support Conspiracy[25]

Plaintiffs' First and Second Claims for Relief assert that Defendants violated 18 U.S.C. §
2339A and 18 U.S.C. § 2339B by conspiring to provide material support to Iran, despite knowing
or being deliberately indifferent to the fact that Iran provides financial, material, and logistical
support to terrorist organizations, including FTOs such as Hezbollah.  As alleged in the SAC,
Defendants agreed to and did, in fact, assist Iranian banks, airlines, shipping, and oil companies in
evading American sanctions.  As a result of Defendants' actions, Iran acquired hundreds of
millions of dollars that it was legally barred from obtaining.  Having obtained these illegal funds,
Plaintiffs allege that Iran subsequently provided support to Hezbollah, the IRGC, and other
terrorist groups, which later conducted the terrorist attacks in Iraq that injured Plaintiffs between
2004 and 2011.

(i)      Conspiracy Liability Under Section 2333(a)

The theory of liability that Plaintiffs articulate in their First and Second Claims for Relief
is drawn from the *en banc* Seventh Circuit's decision in *Boim III*.  *See* 549 F.3d at 689.  There, the
Seventh Circuit reasoned that, notwithstanding the unavailability of purely *common law* secondary
liability under the ATA, § 2333(a) creates a species of primary liability for certain acts of an

---

[25] Though Plaintiffs bring their First and Second Claims for Relief under *both* § 2333(a)
and § 2333(d)(2), the R&R did not evaluate whether Plaintiffs' First and Second Claims for Relief
plausibly stated claims of primary liability.  *See Freeman I*, at *23 n.40 ("As an initial matter, the
Court need not make a determination as to whether [P]laintiffs can establish primary liability under
the First and Second Claims for Relief against all [D]efendants because of the availability of
JASTA-based conspiracy.").  The Court's review of Plaintiffs' conspiracy claims, to the extent
that they assert a theory of primary liability, is conducted for the first time herein.  Furthermore,
the Court finds that, in this regard, the R&R erroneously elided the distinction between a
conspiracy-predicated primary liability claim brought under § 2333(a) and a secondary liability
conspiracy claim brought under § 2333(d)(2), the latter of which imposes requirements that are
distinct from those of a § 2339 material support conspiracy claim.  (*See infra* at 39–45.)

inherently secondary nature, including conspiring to provide material support of terrorism.  As the

Seventh Circuit explained:

> Section 2331(1)'s definition of international terrorism . . . includes not only violent
> acts but also "acts dangerous to human life that are a violation of the criminal laws
> of the United States."  Giving money to Hamas, like giving a loaded gun to a child
> (which also is not a violent act), is an "act dangerous to human life."  And it violates
> a federal criminal statute[,] . . . 18 U.S.C. § 2339A(a), which provides that
> "whoever provides material support or resources . . . , knowing or intending that
> they are to be used in preparation for, or in carrying out, a violation of [18 U.S.C.
> § 2332]," shall be guilty of a federal crime.  So we go to 18 U.S.C. § 2332 and
> discover that it criminalizes the killing (whether classified as homicide, voluntary
> manslaughter, or involuntary manslaughter), conspiring to kill, or inflicting bodily
> injury on, any American citizen outside the United States.[26]

*Id.* at 690.  Through this "chain of incorporations by reference," the Seventh Circuit found that the

"financial angels" of terrorist organizations could be held liable under the ATA.  *Id.*  Judge Posner,

writing for the majority, stated that the concepts of conspiracy and aiding and abetting "can be

used to establish tort liability, and there is no impropriety in discussing them in reference to the

liability of donors to terrorism under section 2333[a] just because that liability is primary.  *Primary

liability in the form of material support to terrorism has the character of secondary liability*."  *Id.*

at 691 (emphasis added).  The *en banc* majority in *Boim III* then went on to "analyze the tort

liability of providers of material support to terrorism under general principles of tort law."[27]  *Id.* at

692.

---

[26] Both 18 U.S.C. § 2339A(a) and 18 U.S.C. § 2339B(a) also make it a crime to conspire
to provide material support for terrorism.

[27] The Court notes that a panel of the Seventh Circuit has questioned *Boim III*'s reasoning
in the wake of JASTA and its addition of an explicit textual basis for secondary liability under the
ATA.  *See Kemper*, 911 F.3d at 396.  The *Kemper* panel's commentary, however, does not overrule
*Boim III*, which remains the law of the Seventh Circuit.  *See* 7th Cir. Rule 40(e) (detailing the
process for a panel decision to overrule prior precedent and stating that any opinion doing so "shall
contain a footnote" noting the decision's effect).  Even assuming that *Boim III*'s reasoning as to
primary liability based on conspiracy to provide material support for terrorism remains valid, for

Relying on *Boim III*, Plaintiffs argue that Defendants' actions, in conspiring to facilitate the transfer of billions of dollars to Iran despite that country's known support of terrorist activities, constitute violations of §§ 2339A and 2339B, were dangerous to human life, and, viewed objectively, appear intended to intimidate or coerce civilians or influence or affect the conduct of a government.  Defendants respond that *Rothstein* forecloses primary liability for conspiring to provide material support for terrorism and, even if Plaintiffs may assert primary liability claims based on a theory of conspiracy liability, they have failed to allege the definitional requirements of § 2331(1) and proximate causation.

While the Court agrees with Plaintiffs that primary liability under § 2333(a) can be predicated on a material support conspiracy under §§ 2339A-C, *see, e.g.*, *Hussein v. Dahabshiil Transfer Servs. Ltd.*, 230 F. Supp. 3d 167, 175–76 (S.D.N.Y. 2017); *Gill*, 893 F. Supp. 2d at 502, Plaintiffs' primary liability claims alleging conspiracy violations of § 2339A and § 2339B nonetheless fail because they do not satisfy the definitional elements of § 2331(1) and  § 2333(a)'s proximate cause requirement.

(ii)    <u>The Predicate Criminal Violation for an Act of<br>International Terrorism under Section 2331(1)</u>

Plaintiffs' First and Second Claims for Relief are premised on predicate violations of 18 U.S.C. § 2339A and 18 U.S.C. § 2339B, which, *inter alia*, prohibit conspiring to provide material support for terrorism.  *See* 18 U.S.C. § 2331(1)(A) (defining an act of international terrorism as including "acts dangerous to human life *that are a violation of the criminal laws of the United States*") (emphasis added); *see also Boim III*, 549 F.3d at 689, 694; *Weiss*, 768 F.3d at 209.  Thus, to state the predicate violations in this case, Plaintiffs must allege facts from which it can be

---

reasons discussed *infra*, the Court finds *Kemper*'s analysis of primary liability claims based on substantially similar allegations under § 2333(a) to be persuasive.

reasonably inferred that Defendants joined a conspiracy that had as its object the provision of material support.  *See Shaffer*, 2017 WL 8786497, at *5 ("For [plaintiffs'] claim to be viable under the ATA, the object of the participants' conspiracy must be to provide material support for terrorism . . . .").

To plausibly plead the existence of a criminal conspiracy, a plaintiff must allege facts tending to show that the alleged co-conspirators "agreed 'on the essence of the underlying illegal objectives and the kind of criminal conduct in fact contemplated.'"  *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 113 (2d Cir. 2008) (quoting *United States v. Salameh*, 152 F.3d 88, 151 (2d Cir. 1998) (alterations and internal quotation marks omitted)).  Proof of an explicit agreement is not necessary, but the plaintiff must at least allege that the defendant "shared some knowledge of the conspiracy's unlawful aims and objectives."  *Id.* (internal quotation omitted).  Provided that the co-conspirators have agreed on the object of the conspiracy, they may be held liable for injuries caused by overt acts of co-conspirators that are done pursuant to and in furtherance of the agreed-upon objective of the conspiracy.  *See Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983) ("A conspirator need not participate actively in or benefit from the wrongful action in order to be found liable[,] . . . so long as the purpose of the tortious action was to advance the overall object of the conspiracy.").

Accepting the allegations of the SAC as true, the Court finds that they do not support a plausible inference that Defendants conspired to provide material support to Hezbollah or any other terrorist organizations, to support terrorism activities, or to conceal or disguise the nature, location, source, or ownership of funds that were to be used for these purposes.[28]  Rather, the SAC

---

[28] This is where the Court disagrees with a critical conclusion in the R&R that drives much of the rest of the Report's analysis and conclusions.  In finding that the SAC sufficiently alleges

Defendants' participation in a material support conspiracy under §§ 2339A and 2339B, the R&R, in effect, applied a multi-object conspiracy analysis to conclude that Defendants did not need to actually *agree* to achieve the goal of providing material support, but only needed to "know or be deliberately indifferent" to the "conspiracy's criminal purposes and objectives," and to otherwise agree to achieve another goal of the conspiracy, *e.g.*, evading U.S. sanctions. *See Freeman I*, at *25 ("As with *Halberstam*, an interrelated concept from criminal conspiracy law is that the exact goal of the conspiracy need not be identical for each co-conspirator.") (citing *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (1980)); *id*. at *6 (describing Plaintiffs' conspiracy theory as alleging, *inter alia*, that Defendants "'knowingly agreed to join the Conspiracy, knowingly and willfully participated in the Conspiracy; knew or [were] deliberately indifferent to the Conspiracy's criminal purposes and objectives; took initiatives to improve its workings,' and, further, that each was 'aware of the participation of many (if not all) of [the Conspiracy's] members.'") (quoting SAC, Dkt. 115, ¶¶ 347–49); *id*. at *40 ("The allegations that SCB agreed to participate in an agreement with Iranian banks and with other Iranian agencies, knowing that they were providing equipment and funding to Hezbollah, an FTO, satisfy the requirement under Section 2339B that SCB, knowingly or being deliberately indifferent, conspired with and provided material support to a designated terrorist organization.").)   Seizing upon the language in *Maldonado-Rivera*, that "[t]he goals of all of the participants need not be congruent for a single conspiracy to exist, so long as their goals are not at cross-purposes," *Maldonado-Rivera*, 922 F.2d at 963 (citing *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1192 (2d Cir. 1989)), the R&R concluded that "where the object of the conspiracy is to provide material support for terrorism, even if the defendants' goal in participating in the conspiracy was based on greed and for financial gain, and not intentionally to fund terror, this goal is not at 'cross-purposes' from what the other members' goals might have been: the bank defendants gained business worth hundreds of millions of U.S. dollars, while the terrorist proxies were able to fund their attacks against U.S. and Coalition Force troops." *Freeman I*, at *25. From there, the R&R applied the well-established principle, confirmed in *Halberstam*, that any member of a conspiracy, *once established*, can be held responsible for any act committed *in furtherance of* the conspiracy. *Freeman I*, at *27–28.

While the Court agrees that Defendants could have joined a multi-object conspiracy that included the goals of promoting terrorism and making money by evading U.S. sanctions, it finds that the allegations in the SAC are insufficient to support that inference. Although a defendant's goals or motivations in joining a conspiracy need only be "not at cross-purposes" with his fellow co-conspirators, in order to show that a single (if multi-object) conspiracy existed at all, there needs to be a common underlying goal of the conspiracy that all co-conspirators are agreeing to further. "The gist of the crime of conspiracy . . . is the agreement . . . to commit one or more unlawful acts, and multiple agreements to commit separate crimes constitute multiple conspiracies." *United States v. Jones*, 482 F.3d 60, 72 (2d Cir. 2006) (quotation omitted); *see also United States v. Broce*, 488 U.S. 563, 570–71 (1989) ("A single agreement to commit several crimes constitutes one conspiracy. By the same reasoning, multiple agreements to commit separate crimes constitute multiple conspiracies."). As *Maldonado-Rivera* also states, "[t]he essence of any conspiracy[,]" even a conspiracy with multiple objectives, "is, of course, agreement and in order to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he

26

only alleges, albeit in significant and compelling detail, a conspiracy to help Iranian financial and commercial entities evade American sanctions.  Plaintiffs allege that Defendants "conspired with Iran and its banking agents (including Defendant Bank Saderat Plc, Bank Melli Iran, the Central Bank of Iran . . . , Bank Mellat, Bank Tejarat, Bank Refah and Bank Sepah) to evade U.S. economic sanctions, conduct illicit trade-finance transactions, and disguise financial payments to and from U.S. dollar-denominated accounts."  (SAC, Dkt. 115, ¶ 6.)  The actions taken by Defendants pursuant to this conspiracy allegedly "enabled Iran and its agents to provide a combination of funding, weapons, munitions, intelligence, logistics, and training" to Hezbollah and other terrorist groups.  (*Id.* ¶ 7.)  Those terrorist groups were subsequently involved in the terrorist attacks in Iraq that injured Plaintiffs.  (*Id.*)

---

knew to be a collective venture directed toward a common goal."  922 F.2d at 963; *see also Salameh*, 152 F.3d 88, 151 (2d Cir. 1998) ("To identify the essential nature of the [conspiracy] plan, we focus on the essence of the underlying illegal objectives, and the kind of criminal conduct in fact contemplated.") (quotation and alterations omitted).  "A single conspiracy, rather than multiple conspiracies, may be found where the co[-]conspirators had a common purpose."  *Beech-Nut Nutrition Corp.*, 871 F.2d at 1191 (quotation omitted).

Here, the SAC does not allege sufficient facts to support the inference that Defendants had such a common purpose to join a single multi-object conspiracy to both evade U.S. sanctions and provide material support to Hezbollah.  Rather, at most, the SAC alleges that Defendants agreed to join a conspiracy with the sole purpose of evading U.S. sanctions and that some of the actors involved in this conspiracy were also members of a separate and distinct conspiracy to provide material support to Hezbollah.  Contrary to Plaintiffs' theory and the R&R's conclusion, the Court does not find that Defendants' knowledge of, or deliberate indifference to, their Iranian co-conspirators' involvement in funding terrorism is sufficient to make Defendants co-conspirators in those material support plots or efforts.  Indeed, the consequence of this reasoning is that, in a § 2333(a) case such as this, it would allow for civil liability to be imposed on defendants who did not actually agree to participate in the predicate material support conspiracy, but were, at most, deliberately indifferent to that possibility.  Finally, though the SAC sufficiently alleges Defendants' participation in a conspiracy with Iranian entities to evade U.S. sanctions, any acts of promoting terrorism engaged in by the Iranian entities, even if done with funds transferred by Defendants, would not be an act "in furtherance of" that much more limited conspiracy, so as to make Defendants liable for that conduct.  *Cf. United States v. Mulder*, 273 F.3d 91, 118 (2d Cir. 2001).

These allegations only indicate that *Iran* conspired with IRISIL, Mahan Air, and others to provide material support to Hezbollah and other terrorist organizations in order to facilitate acts of terrorism in Iraq. But the object of the conspiracy that Plaintiffs allege *Defendants* joined was more limited. As another district court has found, "[p]rocessing funds for Iranian financial institutions, even if done to evade U.S. sanctions, is not the same as processing funds for a terrorist organization." *Shaffer*, 2017 WL 8786497, at \*5. Even assuming Defendants knew of Iran's myriad ties to, and history of, supporting terrorist organizations, including Hezbollah, the Court cannot infer from this fact that Defendants agreed to provide illegal financial services to Iranian financial and commercial entities, which have many legitimate interests and functions, with the intent that those services would ultimately benefit a terrorist organization. *See Salameh*, 152 F.3d at 151 ("To identify the essential nature of the [conspiracy] plan, we focus on the essence of the underlying illegal objectives, and the kind of criminal conduct in fact contemplated.") (quotation and alterations omitted); *see also O'Sullivan*, 2019 WL 1409446, at \*9 (dismissing JASTA secondary liability conspiracy claims because defendant-banks' alleged provision of material support was so far removed from the alleged acts of terrorism that the court could not infer that defendants shared the "common goal" of committing the alleged act of terrorism). Nor is it enough for Defendants to have been deliberately indifferent to this possibility. *See Kemper*, 911 F.3d at 395 ("[O]ne cannot join a conspiracy through apathy . . . ."); *see also Maldonado-Rivera*, 922 F.2d at 963 ("[I]n order to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal.").

Moreover, the fact that overt acts taken by Defendants in furtherance of their more limited conspiracy may have incidentally increased Iran's ability to provide material support for terrorism

28

does not support an inference that Defendants themselves agreed to provide material support for terrorism or knowingly agreed to join a conspiracy with that purpose as its object. *Cf. Kemper*, 911 F.3d at 395 ("The facts here suggest only that Deutsche Bank may have engaged in business dealings that incidentally assisted a separate terrorism-related conspiracy involving Iran; they do not suggest that Deutsche Bank ever agreed to join that conspiracy."). Nor can Defendants be held responsible for overt acts committed by the Iranian entities in furtherance of a separate conspiracy to provide material support to Hezbollah. This case is distinguishable from cases where the defendant banks were alleged to have dealt directly with an FTO or a known FTO fundraiser or front organization. *See, e.g.*, *Linde*, 882 F.3d at 326 (finding that a § 2339B violation for providing material support for terrorism could constitute an act of terrorism under § 2331(1) where defendant bank allegedly provided financial services to Hamas and Hamas-controlled charities). It is also distinguishable from the situation presented in *Halberstam*, where the co-conspirators (one of whom played a "passive" role) "agreed to undertake an enterprise to acquire stolen property," and the passive co-conspirator, who was necessarily aware that her co-conspirator was stealing goods to be sold, was then found liable for a murder, an overt act committed during a burglary by the other co-conspirator in furtherance of their mutually-agreed upon conspiracy. *See Halberstam*, 705 F.2d at 486–87.

Even as to a § 2339A conspiracy to conceal or disguise the nature, location, source, or ownership of funds that were to be used for terrorism, the Court does not find that the SAC's allegations give rise to a plausible inference that Defendants joined such a conspiracy. While there can be no doubt that the SAC sufficiently alleges that Defendants knowingly and willfully conspired with and assisted the Iranian entities in concealing and disguising the source and location of the funds transmitted in violation of U.S. sanctions, these factual allegations are still not enough

from which to plausibly infer that Defendants knew that these funds were intended to finance or facilitate Hezbollah's or any other terrorism activities or that Defendants joined a conspiracy to engage in this conduct *for* that purpose, which is what §2339A requires.

Because Plaintiffs have failed to plausibly allege that Defendants agreed to provide material support for terrorism or knowingly agreed to join a conspiracy having that common goal, they cannot establish the necessary element of a criminal conspiracy in violation of § 2339A and § 2339B to support their First and Second Claims for Relief. *Cf. Shaffer*, 2017 WL 8786497, at *5 ("For a claim to be viable under the ATA, the object of the participants' conspiracy must be to provide material support for terrorism . . . ."). Accordingly, those claims must be dismissed.

> b.   Plaintiffs Fail to Plausibly Allege that Defendants' Conduct
>      Satisfies the Other Elements of Section 2331(1)

Even if the SAC sufficiently alleged that Defendants entered into a conspiracy whose object was to provide material support for terrorism, the Court would find that Plaintiffs fail to plausibly allege that Defendants' actions otherwise satisfy § 2331(1)'s definition of an act of international terrorism. As discussed *supra*, in addition to stating a predicate criminal act, § 2331(1) requires a showing that the criminal violation "involve[d] violent acts or acts dangerous to human life," *Linde*, 882 F.3d at 326, and "appear to be intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping[.]"  18 U.S.C. § 2331(1).

All seven of Plaintiffs' Claims for Relief allege that some or all Defendants provided financial services to various Iranian banks, airlines, shipping, and oil companies. (*See, e.g.*, SAC, Dkt. 115, ¶¶ 532–575, 2227 (Plaintiffs' Third Claim for Relief detailing the HSBC Defendants' provision of financial services to Iran through Bank Melli and others); 1012–1038, 2255

(Plaintiffs' Fifth Claim for Relief describing Commerzbank's facilitation of $40 million in transactions on behalf of IRISL subsidiaries).)  As stated above, Plaintiffs bear the burden at the pleadings stage to plausibly allege that Defendants' actions giving rise to these claims constitute acts of international terrorism within the meaning of § 2331(1).  *See Linde*, 882 F.3d at 326 (requiring that a jury find that a plaintiff has proved that the defendant's actions meet the definitional requirements of § 2331(1) to establish primary liability); *cf. Jucha v. City of N. Chicago*, 63 F. Supp. 3d 820, 831 (N.D. Ill. 2014) ("While [the plaintiff] bears no burden of proof at the motion to dismiss stage, he must plausibly allege the elements of each count in order to withstand a motion to dismiss.").  Thus, Plaintiffs must plausibly allege, among other things, that Defendants' actions "involve violence or endanger human life" and "appear to be intended to intimidate or coerce a civilian population or to influence or affect a government." *Linde*, 882 F.3d at 326.  While Plaintiffs acknowledge that the financial services Defendants provided to the various Iranian entities were not themselves inherently violent or dangerous to human life, they argue that "laundering hundreds of billions of dollars to a State Sponsor of Terrorism in calculated violation of those regulations so as to conceal the transactions was an 'act dangerous to human life' that foreseeably resulted" in the subsequent provision of funding to the terrorist entities responsible for Plaintiffs' injuries.  (Plaintiffs' Opposition to Defendants' Motion to Dismiss., Dkt. 125, at 38 (emphasis omitted); *see also* Plaintiffs' Response to Defendants' R&R Objections ("Pls.' Resp."), Dkt. 183, at 30–31.)

Plaintiffs' arguments would be sound if they could identify a direct connection between the financial services provided by Defendants and an organization directly involved in acts of terrorism.  But Plaintiffs have only alleged that Defendants dealt with Iranian intermediaries, all of whom have significant legitimate operations and are not merely fundraising fronts for terrorist

organizations.  *See O'Sullivan*, 2019 WL 1409446, at *7–8 (finding defendant-bank's provision of financial services to Iran and its "agents and proxies," including IRISL, to avoid U.S. sanctions did not satisfy § 2331(1)'s requirement that defendant's acts be "dangerous to human life"); *see also Kemper*, 911 F.3d at 390 (finding that defendant-banks' assistance to Iranian entities with terrorist connections in evading U.S. sanctions did not satisfy § 2331(1)'s requirements of conduct being "violent" or "dangerous to human life" and displaying "terroristic intent," and distinguishing defendant's conduct from that alleged in *Boim III*, which involved providing direct financial services to Hamas); *id*. ("While giving fungible dollars to a terrorist organization may be 'dangerous to human life,' doing business with companies that have significant legitimate operations is not necessarily so." (quoting § 2331(1))).  And the Court has been unable to identify any non-conclusory allegations that any specific transaction facilitated by Defendants went directly to a terrorist organization or directly accrued to its benefit.[29]

At best, the SAC can be read to allege that Defendants' Iranian clients have engaged in acts dangerous to human life by transferring funds directly to Hezbollah and other terrorist organizations.  This fact alone, however, is insufficient to make business dealings with such governmental and commercial organizations, even extensive and illegal ones, dangerous to human life as required by § 2331(1).  Accepting Plaintiffs' logic under these circumstances would mean, in effect, that any dealings with these entities is dangerous to human life, which the Court finds would stretch the statutory definition of an act of terrorism too far.  *Cf. Kemper*, 911 F.3d at 393–94 (noting that the United Kingdom's governmental interactions with Bank Saderat Iran and IRISL "surely furthers Iran's ability to engage in terrorism," but that cannot possibly subject British

---

[29] In this respect, the definitional requirements of § 2331(1) overlap with the causation element of a § 2333(a) claim.  (*See infra* at 36–38.)

regulators to ATA liability).  For example, as Plaintiffs acknowledge, Mahan Air is a "commercial airline," which the Court infers to mean that it uses planes for more than simply transporting weapons for Hezbollah.  (*See* SAC, Dkt. 115, ¶ 19.)  Similarly, IRISL is Iran's national maritime carrier, with a "long history of facilitating arms shipments" on behalf of the Iranian military.  (*Id.* ¶ 197.)  And NIOC is involved in "daily oil sales" in addition to the activities it allegedly engages in on behalf of terrorist organizations.  (*Id.* ¶ 624.)  Given the many legitimate activities that these entities engage in, the mere act of providing financial services to them cannot be violent or dangerous.  And even though Defendants were providing non-"routine" services, that amounted to violations of U.S. sanctions, this does not make Defendants' conduct dangerous in itself; the Iranian entities could still have used, and presumably did use, the illegally transferred funds for legitimate purposes.  In short, without a more substantial or more direct connection between Defendants' corrupt banking practices on behalf of Iranian entities and dangerous and violent conduct, § 2331(1)(B) cannot be met and the Court cannot plausibly conclude that Defendants' actions were sufficiently life-endangering to meet the statutory definition of an act of international terrorism.  *See Linde*, 882 F.3d at 326.  This finding alone requires the dismissal of all seven of Plaintiff's Claims for Relief.[30]

---

[30] The factual allegations underlying Plaintiffs' "non-conspiracy" claims for relief, *i.e.*, the Fifth, Sixth, and Seventh Claims for Relief, and their Third and Fourth claims for violations of § 2332d, suffer from the same attenuation described with respect to the First and Second Claims for Relief.  As to each, Plaintiffs allege that certain of the Defendants facilitated financial transactions on behalf of Iran and/or various Iranian commercial entities, which "provided foreseeable substantial assistance" to the IRGC, Hezbollah, and others.  (*See, e.g.*, SAC, Dkt. 115, ¶¶ 2290–91 (describing SCB's facilitation of letters of credit used by Mahan Air to acquire certain materials in violation of U.S. sanctions).)  Critically, however, there are no non-conclusory allegations that any of Defendants' illegal business activities were so closely linked to dangerous and violent conduct by terrorist organizations as to satisfy § 2331(1)'s definitional elements for the Third, Fourth, Fifth, Sixth, and Seventh Claims.

With respect to § 2331(1)'s intent requirement, Plaintiffs ask the Court to infer the requisite "appearance" of intent based on Defendants' "knowledge of the high probability (indeed, substantial certainty) that at least some of the funds they illegally provided, concealed, and disguised for Iran would be used for terrorist acts and by FTO Hezbollah to coerce and intimidate the United States into withdrawing from Iraq."  (Pls.' Resp., Dkt. 183, at 32); *see also Boim III*, 549 F.3d at 694 (stating that § 2331(1)'s intent requirement "is a matter of external appearance rather than subjective intent").  Based on the Court's review of the SAC, however, Plaintiffs' allegations do not support such an inference.  Rather, Defendants "appear" to have been purely motivated by the opportunity to make money.  (*See, e.g.*, SAC, Dkt. 115, ¶¶ 534a–b ("We have been approached by the Central Bank of Iran to take back their USD clearing business from Natwest.  In principal I am keen to do this but on the clear proviso that it can be done profitably and on a sustainable basis. . . .  Obviously many foreign banks are chasing the same business and so we need to demonstrate some competitive or relational advantage.").)  Plaintiffs' allegations that Defendants were deliberately indifferent to Iran's involvement with terrorism or the risk that the transferred funds would end up in the hands of FTOs like Hezbollah are insufficient to overcome this appearance. *Cf. Kemper*, 911 F.3d at 390.  Indeed, some of Defendants' alleged co-conspirators were only designated as SDGTs after the attacks that injured Plaintiffs.  (SAC, Dkt. 115, ¶¶ 685–86 (describing SCB's facilitation of letters of credit on behalf of Mahan Air between 2000 and 2006, while also noting that Mahan Air was designated as an SDGT in 2011).)  This further weakens any inference that Defendants intended to intimidate civilians or influence a government by providing material support for terrorism.[31]

---

[31] The R&R credited Plaintiffs' conclusory allegations that Defendants' actions constituted acts of international terrorism and treated § 2331(1)'s definitional requirements as a question for

34

The allegations of the SAC are distinguishable from those in cases that have found a secondary actor's actions could satisfy § 2331(1)'s definition of an act of international terrorism, because those cases involved a financial institution dealing directly with an FTO or its proxy.  In *Boim III*, the Seventh Circuit found that donors who gave money directly to Hamas with knowledge of the organization's aims and activities acted with the intent required of § 2331(1).  *See* 549 F.3d at 693–94.  And in *Linde*, the Second Circuit found that there was a triable issue of fact as to whether Arab Bank's actions met the standards of § 2331(1) where the plaintiffs had adduced evidence, *inter alia*, that Arab Bank held accounts for and processed monetary transfers on behalf of terrorist leaders and processed transfers that "were explicitly identified as payments for suicide bombings."  882 F.3d at 321–22, 326.  The circumstances in those cases are so closely analogous to "giving a loaded gun to a child," *Boim III*, 549 F.3d at 690, that an inference of the requisite appearance of intent under § 2331(1) is possible.  Crucially, however, there are intervening actors in this case, *i.e.*, Iran and its commercial entities, whose independent actions break that inferential chain.[32]

---

the jury.  *See, e.g.*, *Freeman I*, at *41.  While that approach may be appropriate where the defendants are alleged to have conspired directly with an FTO or front organization, as in *Boim III* and *Gill*, the Court finds that it is not appropriate here, where the complaint's allegations do not raise a plausible inference that the elements of § 2331(1) can be met.

[32] In fact, the circumstances alleged by Plaintiffs, whereby Defendants facilitated transfers on behalf of official Iranian entities who later provided support to terrorist organizations, are more akin to giving a loaded gun to the parent of a small child who then gives the gun to the child.  The parent's decision to give the gun to the child is certainly dangerous and likely gives rise to an inference of malintent, but it constitutes an intervening act that attenuates any meaningful connection between the original gun donor and the consequences of the child pulling the gun's trigger.  Here, again, the definitional elements of § 2331(1) overlap with the causation requirement of § 2333(a).

Though Defendants' actions in flouting U.S. sanctions are deplorable, the factual allegations of the SAC cannot plausibly be read to suggest even the appearance of intent required by § 2331(1).  Because Plaintiffs have failed to plausibly allege that any of the Defendants engaged in acts of international terrorism as defined by § 2331(1), all of their primary liability claims in Claims for Relief One through Seven[33] must be dismissed.[34]

        c.     <u>Plaintiffs Fail to Plausibly Allege that Defendants' Actions were a Proximate Cause of Their Injuries</u>

Finally, even if Plaintiffs could overcome the definitional hurdles imposed by § 2331(1), the Court finds for substantially similar reasons that they have failed to plausibly allege that Defendants' actions proximately caused their injuries, which is fatal to all seven of Plaintiffs' Claims for Relief.

Critically, Plaintiffs cannot meaningfully distinguish their allegations from those presented to the Second Circuit in *Rothstein*.  In *Rothstein*, the plaintiffs had alleged that UBS engaged in unlawful financial transactions with Iran, that Iran subsequently used various entities to transfer funds to Hezbollah and Hamas, and that those Iranian funds substantially increased Hezbollah's

---

[33] Though the claim against Commerzbank in the Sixth Claim of Relief, which alleges that the bank provided financial services to an organization that directly funds Hezbollah presents a closer question as to the violence and intent elements of § 2331(1), the Court does not further analyze that issue with respect to Commerzbank and the Sixth Claim, given the Court's dismissal of that claim for lack of personal jurisdiction. (*See supra* at 14–16.)

[34] The R&R declined to consider whether Plaintiffs' First and Second Claims for Relief, which it found were based on Defendants' membership in a conspiracy that had as at least one object the provision of material support to terrorist organizations, could satisfy § 2331(1)'s requirements, finding that Plaintiffs' could rely on either a primary or secondary liability theory at trial so long as either was established.  *See Freeman I*, at \*21 & n.40 (noting that the "court in *Linde* held that 'under an aiding and abetting theory of ATA liability, plaintiffs would not have to prove that the bank's *own acts* constitute international terrorism satisfying all the definitional requirements of § 2331(1).'" (emphasis in R&R) (citation omitted)).  As to Plaintiffs' remaining claims, the R&R treated § 2331(1)'s requirements as a question for the jury. *See id.* at \*41, \*48. The Court does not adopt these recommendations.

and Hamas's ability to carry out the terrorist attacks that injured the *Rothstein* plaintiffs.  708 F.3d

at 85–87.  Based on these allegations, the Second Circuit noted that it was "reasonable to infer that

Iran's ability to amass U.S. currency was increased by UBS's transfers," that "the more U.S.

currency Iran possessed, the greater its ability to fund H[e]zbollah and Hamas for the conduct of

terrorism," and that "the greater the financial support H[e]zbollah and Hamas received, the more

frequent and more violent the terrorist attacks they could conduct" would be.  *Id.* at 93.

  Nevertheless, applying the proximate causation requirement to state a claim under

§ 2333(a), the Circuit rejected the *Rothstein* plaintiffs' argument that UBS's violations of OFAC

regulations were a proximate cause of their injuries, even though UBS knew of Iran's general

connection to terrorist organizations and its status as a state sponsor of terrorism.  *Id.* at 96–97.

Specifically, it noted the absence of any nonconclusory allegations that "UBS provided money to

H[e]zbollah or Hamas"; that "U.S. currency UBS transferred to Iran was given to H[e]zbollah or

Hamas"; or that "if UBS had not transferred U.S. currency to Iran, Iran, with its billions of dollars

in reserve, would not have funded the attacks in which plaintiffs were injured."  *Id.* at 97; *see also*

*Al-Rajhi*, 714 F.3d at 124 (2d Cir. 2013) (applying *Rothstein* and holding that the plaintiffs failed

to plead proximate causation where there were no allegations that the "defendants participated in

the September 11, 2001 attacks or that they provided money directly to al Qaeda[,] . . . nor [were]

there factual allegations that the money allegedly donated by the . . . defendants to the purported

charities actually was transferred to al Qaeda and aided in the September 11, 2001 attacks").

  Plaintiffs' allegations suffer from the same fatal causal gaps.  There are no allegations that

Defendants directly provided funds or services to a terrorist group, no non-conclusory allegations

that the specific funds processed by Defendants were destined for a terrorist organization rather

than some more benign or legitimate purpose, and no plausible allegations that the attacks in Iraq

37

were only possible due to Defendants' actions.  While Plaintiffs allege that Defendants provided services to Iranian financial institutions and commercial businesses, and that those entities have some association or relationship with Hezbollah and other terrorist organizations, they do not allege that these entities solely exist for terrorist purposes.  As previously discussed, the Iranian government and commercial entities that Plaintiffs assisted engage in a myriad of legitimate functions and activities.  (*See* SAC, Dkt. 115, ¶ 19 (noting that Mahan Air is a "commercial airline"); *id.* ¶ 197 (noting that IRISL is Iran's national maritime carrier with a "long history of facilitating arms shipments" on behalf of the Iranian military); *id.* ¶ 624 (noting that NIOC is involved in "daily oil sales" in addition to the activities it allegedly engages in on behalf of terrorist organizations).)  Thus, given that Defendants' alleged Iranian clients are engaged in worldwide commerce, it strains credulity to assume or infer that any person or business that provides services to such organizations, even illegal services, becomes "a substantial factor in the sequence of responsible causation" for any terrorist attack that the Iranian organization later supports. *Rothstein*, 708 F.3d at 91; *Al-Rajhi*, 714 F.3d at 124; *see also Fields*, 881 F.3d at 748.

Without a more direct connection between Defendants' conduct and the attacks that injured Plaintiffs, the provision of financial services to Iran or various Iranian entities is insufficient on its own to support a plausible inference that the transactions facilitated by Defendants proximately caused the IED explosions in Iraq that injured Plaintiffs.  Accordingly, Plaintiffs' primary liability claims in all seven Claims of Relief must be dismissed for failure to plead proximate causation.[35]

---

[35] The R&R found causation to be sufficiently alleged.  *Freeman I*, at *29, *45 n.65.  In doing so, the R&R rejected Defendants' requests to apply *Rothstein* and *Al Rajhi*, finding that the causation standards in those cases were effectively superseded by the addition of secondary liability under JASTA.  *Freeman I*, at *20 ("However, both *Rothstein* and *Al Rajhi* were decided before the enactment of JASTA, and prior to the Second Circuit's decision in *Linde*.  The logic of

### D.    Plaintiffs' Claims of Secondary Conspiracy Liability Under Section 2333(d)(2)

Defendants also argue Plaintiffs' secondary conspiracy liability claims under JASTA's

newly added secondary liability provision should be dismissed.  *See* 18 U.S.C. § 2333(d)(2).  These

---

both of these cases depends largely on the fact that secondary liability was not explicitly available under the ATA at that time.").  From there, the R&R reasoned:

> Although *Linde* did not address causation in the context of a conspiracy claim, it follows that, in the context of a conspiracy claim, each of the conspirator's actions need not themselves constitute an act of international terrorism under Section 2331(1).  Instead, the acts of international terrorism committed by another member of the conspiracy may be separate and distinct from the "overt acts" committed by the conspiring bank in support of the overarching conspiracy.  Thus, the causation requirement would be satisfied if there was a connection between the act of international terrorism and the plaintiffs' injuries.  The Second Circuit said as much when, as discussed above, it noted that to establish causation, the focus should be on the relationship *between the alleged act of international terrorism and the plaintiff's injury*.  [*Rothstein*, 882 F.3d] at 330–31 (emphasis added).

*Id.* at \*21.  Once again, this finding is premised on the R&R's key determination that the SAC adequately pleads a material support conspiracy that includes Defendants, even if Defendants did not specifically agree to the goal of providing material support.  Because the Court disagrees with that premise, it finds that the R&R's causation analysis was erroneous.  Furthermore, even if JASTA could be viewed as superseding the causation principles applied in *Rothstein* and *Al Rajhi*—which this Court does not find—because Plaintiffs have pled their material support conspiracy claims as primary liability claims under § 2333(a) (as well as § 2333(d)(2) claims), any pre-JASTA case law would apply to those claims.  As discussed *supra*, the Court has applied both *Rothstein* and *Al Rajhi* in assessing the sufficiency of the causation allegations in this case.

Lastly, although Congress enacted JASTA to provide "the broadest possible basis [for civil litigants] . . . to seek relief against persons, entities, and foreign countries" that have provided direct or indirect material support to terrorism, JASTA § 2(b), the Act's amendments themselves do not alter the applicable causation standard.  Indeed, despite adding conspiracy and aiding and abetting secondary liability to the ATA, which allows for civil litigants to pursue claims against persons whose acts do not constitute acts of terrorism, Congress significantly limited that secondary liability to defendants who conspired *with* the FTO that committed the act of terrorism.  18 U.S.C. § 2333(d)(2).  Furthermore, Congress's invocation of *Halberstam* as the governing causation standard does not alter the causation analysis in this case, given the absence of a conspiracy that Defendants joined to provide material support to Hezbollah or its affiliates.

objections are only relevant to Plaintiffs' First and Second Claims for Relief, through which Plaintiffs also assert a theory of secondary liability.

       1.    <u>Conspiracy Liability Under JASTA</u>

In September 2016, Congress amended the ATA by enacting JASTA. Without altering the ATA's pre-existing primary liability provision, JASTA provides that:

> In an action under [§ 2333(a)] for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization . . . as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

18 U.S.C. § 2333(d)(2). Congress's stated purpose in enacting JASTA was "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA § 2(b).

Thus, in contrast to the primary liability provided for in § 2333(a), JASTA allows for plaintiffs to assert secondary liability against persons and entities whose own acts do not, themselves, meet the statutory definition of an act of international terrorism yet who have knowingly aided and abetted, or conspired with, terrorist organizations involved in acts of terrorism. Plaintiffs argue that their First and Second Claims for Relief state claims for secondary conspiracy liability under the newly enacted § 2333(d)(2). (*See* SAC, Dkt. 115, ¶ 2189 (stating that Defendants "knowingly and purposefully agreed to provide material support and services to Iran in an illegal manner, knowing or deliberately indifferent to the fact that such illegal support and services facilitated Iran's clandestine support for the IRGC and Hezbollah"); *id.* ¶ 2202 (stating that Defendants "knowingly agree[d] to provide, and provide[d], material support to Iran in an

illegal manner, and [knew], or [were] deliberately indifferent to the fact, that the objects and aims of the [alleged] [c]onspiracy were to provide material support to [FTOs], including Hezbollah and Kata'ib Hezbollah").)[36]

> 2.   Defendants' Arguments Regarding Plaintiffs' JASTA Conspiracy Claims
>
> > a.   JASTA's First Statutory Requirement

Defendants first argue that Plaintiffs' § 2333(d)(2) claim fails to plausibly allege that the acts of international terrorism that injured Plaintiffs were "committed, planned, or authorized" by an entity designated as an FTO "as of the date on which [the act] . . . was committed, planned, or authorized." 18 U.S.C. § 2333(d)(2).  (*See also* Mov. Banks' Objs., Dkt. 174, at 8–11.)  According to Defendants, only two of the 92 attacks identified in the SAC are directly alleged to have been "committed, planned, or authorized" by an entity designated as an FTO at the time of the attack. (*See* SAC, Dkt. 115, ¶ 1042 (stating that the January 20, 2007 attack in Karbala was "largely planned by Hezbollah, under the direction of Ali Musa Daqduq, and carried out by the aforementioned [non-FTO] Iraqi Shi'a terrorist group known as Asa'ib Ahl al-Haq"); *id.* ¶ 2139 (describing a June 29, 2011 terrorist attack in Wasit Province by Kata'ib Hezbollah).)  In light of Plaintiffs' failure to identify an FTO with respect to each alleged attack, Defendants argue that all JASTA claims related to the remaining 90 attacks must be dismissed.

The Court agrees with Defendants that the express terms of 18 U.S.C. § 2333(d)(2) require a JASTA plaintiff's injuries to arise from an act of international terrorism that was committed,

---

[36] In addition to the reasons discussed below for dismissing Plaintiffs' § 2333(d)(2) claim, the Court also finds that the SAC fails to sufficiently allege a JASTA conspiracy for the same reasons discussed earlier in the primary liability section.  The Court therefore does not adopt the R&R's recommendation that a material support conspiracy under § 2333(d)(2) involving Defendants has been sufficiently alleged.

planned, or authorized by an FTO that has been officially designated as such.  *See* 18 U.S.C. § 2333(d)(2).  Contrary to Defendants' assertions, however, the Court finds that Plaintiffs have adequately pleaded this statutory requirement.[37]

As explained in the R&R, the allegations of the SAC give rise to the reasonable inference that Hezbollah was responsible, at minimum, for authorizing the 92 attacks at issue in this case. *See Freeman I*, at *27 n.47 ("The Second Amended Complaint pleads numerous allegations showing that an FTO (Hezbollah) committed, planned, or authorized the attacks at issue . . . and that Hezbollah established, trained and supplied other terror organizations on behalf of Iran and the IRGC with funding and training, ordering and authorizing these other organizations to commit attacks on Americans.").  The Court agrees with the R&R's characterization of Plaintiffs' allegations, which, taken as a whole, describe Hezbollah as deeply involved in supporting and coordinating an extensive campaign of terrorist activity against American citizens in Iraq.  (*See, e.g.*, SAC, Dkt. 115, ¶¶ 278 (relaying State Department reports that Hezbollah provided advisors to Shi'a militants in Iraq); 1055, 1070 (alleging that Hezbollah leader Ali Musa Daqduq was directed in 2005 to assist Iran in training its terrorist proxies in Iraq); 2028 (describing Hezbollah and the IRGC-QF's role in training and arming the terrorist group involved in the October 16, 2008 attack in Baqubah).)  Though Plaintiffs have not named the precise individuals clandestinely involved in committing each attack, a fair reading of the SAC points to the high-level involvement of Hezbollah and its affiliates.  Drawing all reasonable inferences in Plaintiffs' favor, the Court may reasonably infer that a designated FTO, namely Hezbollah, was responsible for committing, planning, or, at the very least, authorizing the attacks that injured Plaintiffs.  *See Chase Grp. Alliance LLC v. N.Y.C. Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010) (stating that the court

---

[37] The R&R found the same, *Freeman I*, at *15 n.29, and the Court adopts that finding.

"constru[es] the complaint liberally, accept[s] all factual allegations in the complaint as true, and draw[s] all reasonable inferences in the plaintiff's favor" (quotation omitted)).

b.      JASTA's Second Statutory Requirement

Next, Defendants argue that the SAC contains no allegations connecting them to the person or entity that committed the acts of international terrorism that injured Plaintiffs, as distinct from Iran or any of its banking agents.  (*See* Mov. Banks' Objs., Dkt. 174, at 12.)  As a result, Defendants contend, the SAC fails to state a claim of secondary conspiracy liability under § 2333(d).  (*See id.* at 11.)  Here, the Court agrees with Defendants.

JASTA provides that its use of the term "'person' has the meaning given" in 1 U.S.C. § 1." *See* 18 U.S.C. § 2333(d)(1).  Thus, the term "person" in § 2333(d)(2) includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." [38]  1 U.S.C. § 1.

JASTA's inclusion of societies and associations within its definition of "person" clearly indicates that the "person" committing an act of terrorism need not be the literal triggerman, as Defendants appear to suggest.  *See* 1 U.S.C. § 1.  Where Congress has expressed an intent to create a broad form of liability through JASTA and provided an expansive definition of the term "person," it would make little sense to relieve a financial institution of liability for conspiring with

---

[38] The R&R considered this definition in light of pre-JASTA case law finding that primary liability may attach for violations of the material support statutes where a defendant provides material support to the alter ego or alias of an FTO.  *Freeman I*, at *17 (citing *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 432 (E.D.N.Y. 2009) and *Gill*, 893 F. Supp. 2d at 555).  Accordingly, the R&R concluded that a defendant may be liable under § 2333(d) even if it did not directly conspire with "the specific individual representative of the [FTO] who, for instance, actually planted the EFP that injured or killed a plaintiff."  *Id.* at *17.  The Court agrees with and adopts this conclusion.  At the same time, however, the Court interprets § 2333(d)(2) as requiring the defendant to have conspired with the FTO that "committed" the act of terrorism.

an FTO that happened to use agents or an alter ego to engage in acts of terrorism.  *See* JASTA, § 2(b), 130 Stat. at 853.

Nevertheless, § 2333(d)'s expansive definition of the "person" who commits an act of international terrorism does not relieve Plaintiffs of their duty to allege that a defendant directly conspired with that "person."  Given the most generous reading possible, the SAC alleges that FTOs Hezbollah and Kata'ib Hezbollah[39] and the IRGC (an SGDT), acting through agents and proxies, are the entities responsible for committing the acts of international terrorism that injured Plaintiffs.[40]  Yet there is not a single allegation in the SAC that any of the Defendants *directly*

---

[39] The SAC alleges that two attacks were committed by Asa'ib Ahl al-Haq and Kata'ib Hezbollah, while others were committed by unidentified terrorists or Iraqi insurgent groups such as the Mahdi Army.

[40] The R&R found that the SAC sufficiently alleges the "conspiring with" element of Plaintiffs' § 2333(d)(2) claim and that it is for the jury to determine whether the Iranian entities with which Defendants conspired were, in effect, Hezbollah-affiliated organizations so as to support the imposition of secondary liability under § 2333(d)(2).  *Cf. Freeman I*, at *26 (endorsing Plaintiffs' characterization of the alleged conspiracy as a "hub-and-spoke conspiracy [with] Iran, Hezbollah, and Bank Saderat (as an agent of Hezbollah)—namely, the Iranian 'terror apparatus'— as the central actors in the conspiracy, and the Moving defendants as different spokes.").  Relying on pre-JASTA case law, the R&R explained:

> This Court agrees with the reasoning of the court in *National Council of Resistance of Iran* and finds that it would be "silly" to enable an FTO to escape liability simply by creating a new front organization to fundraise or engage in financial transactions on its behalf.  By the same token, the public designation of an entity or organization as a SDGT can provide evidence of knowledge on the part of the defendant of the entity's unlawful acts and demonstrate defendant's knowing involvement in the conspiracy.  Thus, the Court finds that not only would FTO Hezbollah, or FTO Kata'ib Hezbollah [which allegedly committed one of the two terrorist attacks], fall within the definition of a "person who committed an act of terrorism," but a *Hezbollah-affiliated entity* would also fall within the definition of persons or entities that Congress was concerned with in enacting JASTA.  *See O'Sullivan v. Deutsche Bank AG*, No. 17 CV 8709, 2018 WL 1989585, at *6 (S.D.N.Y. Apr. 26, 2018) (noting that "2333(d)(2) specifically requires a defendant to conspire with 'the person who committed [] an act of international terrorism,'" but providing no

conspired with Hezbollah or the IRGC. And there are no allegations that any of Defendants'

alleged co-conspirators, *e.g.*, the Iranian banks, IRISL, NIOC, or Mahan Air, directly participated

in the attacks that injured Plaintiffs. These omissions are fatal to Plaintiffs' First and Second

Claims for Relief to the extent that they assert secondary liability under § 2333(d)(2).[41]

---

detailed discussion as to the definition of "person" as provided by Congress in this context).

*Id.* at *17 (emphasis added).

While the Court agrees that entities can operate as fronts or alter egos of FTOs, the Court does not find that the SAC sufficiently alleges a basis from which to plausibly infer that any of the Iranian financial or commercial entities with whom Defendants allegedly conspired qualify as such with respect to Hezbollah, Kata'ib Hezbollah, or Asa'ib Ahl al-Haq, so as to allow a finding that the SAC plausibly alleges that Defendants conspired with the FTOs that committed the alleged acts of terrorism that caused Plaintiffs' injury. The Court therefore does not adopt the R&R's recommendation to find that Plaintiffs have stated a § 2333(d)(2) conspiracy claim.

[41] The Court recognizes Congress's apparent intent to provide liability for actions that indirectly assist in the commission of acts of terrorism. The Second Circuit has also acknowledged this congressional intent and has suggested that the provision of indirect assistance may suffice to give rise to aiding-and-abetting liability under § 2333(d). *Siegel*, 933 F.3d at 223 n.5. Nevertheless, the plain text of JASTA's *conspiracy* liability provision requires that a defendant conspire directly with the person or entity that committed the act of international terrorism that injured the plaintiff. *See* 18 U.S.C. § 2333(d)(2). Notwithstanding Congress's apparent intent, the Court must give effect to the plain meaning of the statute that Congress enacted. *See Lockhart v. United States*, 546 U.S. 142, 146 (2005).

\*       \*       \*

Having found that Plaintiffs have failed to adequately allege the threshold requirements for both primary liability under § 2333(a) and secondary conspiracy liability under § 2333(d)(2), the Court must dismiss all of Plaintiffs' claims for relief.[42]

## CONCLUSION

The tragedy of what happened to Plaintiffs and their families at the hands of terrorists in Iraq cannot be understated nor should their sacrifices for this country be forgotten.  Unsatisfying as the Court's decision today may be from a moral or policy perspective, it is up to Congress, and not the judiciary, to authorize terrorism victims to recover damages for their injuries from financial institutions that conspire with state sponsors of terrorism like Iran to evade U.S. sanctions under circumstances such as those presented in this case.  In its present form, however, the law does not provide for such recovery.

For the reasons stated herein, Defendants' motions to dismiss the SAC are granted pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), and this action is dismissed.  The Clerk of Court is respectfully directed to enter judgment and close this case accordingly.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 16, 2019
        Brooklyn, New York

---

[42] Though Defendants' assert additional objections to the R&R's analysis of Plaintiffs' claims, *see supra* n.13, the Court need not address them in light of its finding that Plaintiffs have failed to make a *prima facia* claim of liability under the ATA.