UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHARLOTTE FREEMAN, et al., | Case No. 14-CV-6601 (PKC)(CLP) |
| Plaintiffs, | |
| -against- | |
| HSBC HOLDINGS PLC, et al., | |
| Defendants. | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR
PARTIAL RECONSIDERATION OF THE COURT'S SEPTEMBER 16, 2019 ORDER
GRANTING DEFENDANTS' MOTIONS TO DISMISS
<u>THE SECOND AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

I. PLAINTIFFS' 18 U.S.C. § 2333(d) CONSPIRACY CLAIMS AGAINST SCB ................... 3

    A. Because the SAC Adequately Pleads That SCB Conspired with the IRGC's Agent, NIOC, SCB Now Argues that Only Allegations that SCB Conspired "Directly" with the Principal Suffice ........................................................................................................ 3

    B. The IRGC and NIOC Designations Are Evidence of the Nature and Scope of the Conspiracy and Support a Plausible Inference of Scienter. ............................................. 4

    C. SCB Ignores the Allegations That Plausibly Support Its Culpable State of Mind. .......... 6

II. PLAINTIFFS' § 2333(d) AIDING & ABETTING CLAIMS AGAINST SCB .................. 7

    A. Plaintiffs Did Not Disclaim or "Waive" Their Aiding and Abetting Claims................... 7

    B. Plaintiffs have Adequately Pleaded that SCB was "Generally Aware" of Its Role. ........ 8

    C. SCB Fails to Respond to Plaintiffs' Showing of Substantial Assistance. ........................ 9

CONCLUSION ............................................................................................................................ 10

# TABLE OF AUTHORITIES

**Cases**

*Boim v. Holy Land Found. for Relief & Dev.*,
  549 F.3d 685 (7th Cir. 2008) (*en banc*) .................................................................. 5, 8

*Direct Sales Co. v. United States*,
  319 U.S. 703 (1943) ......................................................................................................... 6

*Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*,
  697 F.3d 59 (2d Cir. 2012) ............................................................................................. 2

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) .................................................................................... 7, 9

*Linde v. Arab Bank, PLC*,
  882 F.3d 314 (2d Cir. 2018) ......................................................................................... 8, 9

*Nat'l Council of Resistance of Iran v. Dep't of State*,
  373 F.3d 152 (D.C. Cir. 2004) ...................................................................................... 3, 4

*Rothstein v. UBS AG,*
  708 F.3d 82 (2d Cir. 2013) .......................................................................................... 8, 10

*Siegel v. HSBC N. Am. Holdings, Inc.*,
  933 F.3d 217 (2d Cir. 2019) ............................................................................................ 3

*United States v. Bicaksiz*,
  194 F.3d 390 (2d Cir. 1999) ............................................................................................ 3

*United States v. Peoni*,
  100 F.2d 401 (2d Cir. 1938) ............................................................................................ 7

*United States v. Rooney*,
  866 F.2d 28 (2d Cir. 1989) .............................................................................................. 3

*United States v. Salameh*,
  152 F.3d 88 (2d Cir. 1998) .............................................................................................. 7

*Weiss v. Nat'l Westminster Bank PLC*,
  768 F.3d 202 (2d Cir. 2014) ............................................................................................ 9

**Statutes**

15 C.F.R. § 742.8 ............................................................................................................... 3, 6

15 C.F.R. § 774 (Supp. 1) ................................................................................................. 3, 6

18 U.S.C. § 2333(d) ............................................................................................................... *passim*

18 U.S.C. § 2339A ....................................................................................................................... 7

18 U.S.C. § 2339B ....................................................................................................................... 1

**Other Authorities**

FinCEN, *Advisory on the Iranian Regime's Illicit and Malign Activities and Attempts to Exploit the Financial System*,
   Fed. Bank. L. Rep. P 155-748 (Oct. 11, 2018) ........................................................................ 1

Statement from the President on the Designation of the Islamic Revolutionary Guard Corps as a Foreign Terrorist Organization,
   2019 WL 1513228 (April 8, 2019) .......................................................................................... 1

Treasury Press Release SM-767,
   2019 WL 4187821 (Sept. 4, 2019)......................................................................................... 10

Defendant Standard Chartered Bank ("SCB") predicates its Opposition to Plaintiffs' Motion for Partial Reconsideration on several inaccurate assertions and misleading omissions. Specifically, SCB:

1. Implies that the IRGC, through its agents, engages in many legitimate functions that immunize it from liability. In reality, the U.S. government found that the IRGC's "support for terrorism is foundational and institutional." Plaintiffs' Brief in Supp. of Mot. for Reconsider. ("Pls. Br.") at 18, further noting that: "**If you are doing business with the IRGC, you will be bankrolling terrorism.**"[1]

2. Antiseptically characterizes its co-conspirator NIOC's relationship with the IRGC as mere "association" or "connection." SCB's Opp. ("SCB Br.") at 2. In reality, the U.S. Treasury Department found that NIOC was "an agent or affiliate" of the IRGC within a "complex network of front companies," Pls. Br. at 17, and concluded that "Iran's exportation of oil *directly* funds acts of terrorism by Iranian proxies . . . ."[2]

3. Dismisses the IRGC's designation as an FTO in 2019 as "after the fact" and irrelevant to SCB's interactions with its agent before 2019. SCB Br. at 15. However, Congress's finding that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct" is explicitly premised on their *conduct*, not on their *designation*. 18 U.S.C. § 2339B note. The IRGC's 2019 designation for its role in the attacks at issue (the "Attacks"), along with other conduct, confirms that SCB's contributions to it "facilitated that conduct."

4. Argues that Plaintiffs still have not alleged that it ever conspired "directly" with or "provided any services directly to … the IRGC," alleging only that it assisted NIOC "in its petroleum business." SCB Br. at 2, 3, 5. But SCB dealt directly with, and provided services directly to, the IRGC's *agent* in what the U.S. Treasury has described as an "oil-for-terror" scheme that deliberately violated and circumvented U.S. counter-terrorism laws.

5. Trivializes its services to IRGC-related agencies as, *inter alia*, "maintaining accounts for NIOC's benefit" and "facilitating *a* Letter of Credit . . . allegedly used to purchase certain banned items."[3] SCB Br. at 16 (emphasis added). In reality, the Second Amended Complaint ("SAC") alleges that for more than a decade SCB concealed the flow of *hundreds of billions* of dollars on the IRGC's behalf from U.S. regulators, law enforcement

---

[1] Statement from the President on the Designation of the Islamic Revolutionary Guard Corps as a Foreign Terrorist Organization, 2019 WL 1513228 (April 8, 2019, effective April 15, 2019). He added, "[t]he IRGC is the Iranian government's primary means of directing and implementing its global terrorist campaign."

[2] *See infra* n.10. In fact, Treasury's FinCEN found that "[t]he Iranian regime *has long used* front and shell companies to exploit financial systems around the world to generate revenues and transfer funds in support of malign conduct, *which includes support to terrorist groups*…." Advisory on the Iranian Regime's Illicit and Malign Activities and Attempts to Exploit the Financial System, Fed. Bank. L. Rep. P 155-748 (Oct. 11, 2018) (emphasis added).

[3] SCB describes that transaction as benefiting a UAE company, omitting that it was an Iranian front, SAC ¶ 827, and that its own internal audit showed it was for "re-export" to Iran. SAC, Ex. A, at 77.

1

and intelligence agencies, and facilitated *hundreds* of Letters of Credit for, among others, designated IRGC affiliates MODAFL and Mahan Air and the undesignated Zener Electronics,[4] to illegally obtain certain goods, including items banned for "anti-terrorism purposes." *See* SAC ¶¶ 14-5, 19-20, 673-869.

But the allegations that Plaintiffs assert this Court overlooked directly refute these arguments and evasions. In the light most favorable to *Defendants*, NIOC's agency relationship with the IRGC is a disputed question of fact that should not be resolved against Plaintiffs on a Rule 12(b)(6) motion to dismiss. *See Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 71 (2d Cir. 2012) ("[T]he existence and scope of an agency relationship can be resolved as a matter of law only if: (1) the facts are undisputed; or (2) there is but one way for a reasonable jury to interpret them."). For purposes of that motion, the SAC's allegations and U.S. government findings support the plausible inference that SCB conspired "directly" with, and aided and abetted, a foreign terrorist organization ("FTO") (the IRGC) that was jointly responsible for the Attacks through its designated agent, NIOC. These findings undermine a key predicate of the Court's analysis that SCB just "agreed to provide illegal financial services to Iranian financial and commercial entities, which have legitimate interests and functions . . . ." Op. at 28. Instead, they plausibly allege that SCB substantially assisted an FTO to covertly funnel U.S. dollars through the United States and thereby helped facilitate that FTO's terrorism.

The SAC's allegations also support the plausible inference that SCB knew that one of the foreseeable results of its agreement to further Iran's criminal scheme was terrorism, because SCB helped IRGC entities, including NIOC and MODAFL, conceal the movement of hundreds of billions of dollars from U.S. counter-terror financing agencies and acquire blacklisted goods,

---

[4] SCB argues that the SAC does not allege its role in facilitating Letters of Credit designed to conceal the participation of Hezbollah. SCB Br. at 13 n.6. In fact, the SAC alleges that "between 2003 and 2004, Standard Chartered Bank knowingly facilitated at least four unlawful USD funds transfer transactions . . . that involved Eurodollar payments to Zener Electronics (UAE), a procurement company for Hezbollah." SAC ¶¶ 802-10.

including those *specifically restricted* for "anti-terrorism purposes." 15 C.F.R. §§ 742.8. *See* SAC Ex. A at 77 (items listed in "[15 C.F.R. § 774 (Supp. 1)] 2B999.j"). Moreover, SCB did so in the face of repeated U.S. government investigations and explicit warnings concerning the terror financing threat posed by its conduct, a criminal prosecution, and court-supervised monitoring, further alerting SCB to the role it was likely playing as a terror financing agent.

## I. PLAINTIFFS' 18 U.S.C. § 2333(d) CONSPIRACY CLAIMS AGAINST SCB

### A. Because the SAC Adequately Pleads That SCB Conspired with the IRGC's Agent, NIOC, SCB Now Argues that Only Allegations that SCB Conspired "Directly" with the Principal Suffice.

SCB repeats the term "directly" a dozen times in 17 pages, hoping that repetition will somehow establish that JASTA immunizes conspiring with a terrorist's agents. While this Court did hold that "the plain text of JASTA's *conspiracy* liability provision requires that a defendant conspire directly with the person or entity that committed the act of international terrorism that injured the plaintiff," it also "agree[d]" with the principle in *Nat'l Council of Resistance of Iran v. Dep't of State*, 373 F.3d 152, 157-58 (D.C. Cir. 2004), that "entities can operate as fronts or alter egos of FTOs." Op. at 45 n.40.[5] *See also id.* at 45 n.41 (noting "indirect assistance may suffice" for JASTA aiding and abetting) (citing *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 223 n.5 (2d Cir. 2019)). The Court then based its dismissal largely on its conclusion that the SAC did not sufficiently "allege[] a basis from which to plausibly infer that any of the Iranian financial or commercial entities with whom Defendants allegedly conspired qualify as such with respect to Hezbollah" and that "there is not a single allegation in the SAC that any of the Defendants *directly* conspired with Hezbollah *or the IRGC*." *Id.* at 44-45 & n.40 (emphasis added).

---

[5] In the Second Circuit, a defendant can conspire through an agent or intermediary even when it does not know the specific identity of one or more of the parties it is conspiring with. *See United States v. Bicaksiz*, 194 F.3d 390, 399 (2d Cir. 1999). *See also United States v. Rooney*, 866 F.2d 28, 32-33 (2d Cir. 1989) ("There is no requirement that each member of a conspiracy conspire **directly** with every other member of it or be aware of all acts committed in furtherance of the conspiracy, or even know every other member.") (emphasis added) (citations omitted).

3

Plaintiffs respectfully submit that this conclusion overlooks the significance of the U.S. government's identification of NIOC as the IRGC's agent, which raises a plausible inference that SCB conspired directly with the IRGC through its agent. SCB's response is that "the only 'IRGC agent' that SCB allegedly transacted with (NIOC) was not the IRGC 'agent' that allegedly carried out any attack that injured Plaintiffs here." SCB Br. at 17. But nothing in JASTA, the Court's opinion, or "ordinary principles of agency law," *Nat'l Council*, 373 F.3d at 157-58, requires that the "person" who committed the attack operate entirely through *one* unitary agent.

As the Court noted, the SAC plausibly alleges that the IRGC planned, authorized, or committed the Attacks at issue with its agents and proxies in Iraq (jointly with FTO Hezbollah). The Court also noted that "it would make little sense to relieve a financial institution of liability for conspiring with an FTO that happened to use agents or an alter ego to engage in acts of terrorism." Op. at 43-44. It makes equally little sense to immunize SCB (or any other defendant) for conspiring with an FTO's fundraising agent. Doing so would immunize a defendant that conspires with a terrorist organization's fundraising and money laundering agents (like NIOC) for terrorist attacks that the organization committed, planned, or authorized, unless those attacks were perpetrated by the *same fundraising agents*. Obviously, terrorist organizations do not typically utilize their fundraisers to perpetrate terrorist attacks. Nothing in JASTA's language ("provid[ing] civil litigants with the broadest possible basis" for relief) suggests that liability is limited to those who conspire solely with the triggerman. *See id.* at 43-44.

### B. The IRGC and NIOC Designations Are Evidence of the Nature and Scope of the Conspiracy and Support a Plausible Inference of Scienter.

SCB argues that even if it conspired with (or aided and abetted) the agent of an FTO responsible for the Attacks it could not have known it was doing so because "the IRGC was designated as an FTO in 2019, and NIOC was designated as an SDN in 2012," after the last Attacks

4

occurred. SCB Br. at 3, 10 (same). But these two designations are not the source of SCB's knowledge. Designations reflect often widely-known historical facts, such as that the IRGC "has engaged in terrorist activity or terrorism *since its inception 40 years ago*" and that its "support for terrorism *is foundational and institutional*." Pls. Br. at 16-18. These facts also include other related designations, such as the 2007 Specially Designated Global Terrorist designation of the IRGC-QF for conduct including the Attacks. *See* SAC ¶ 16. *See also* Pls. Br. at 19-20 (describing SCB's contemporaneous knowledge). In *Boim v. Holy Land Found. for Relief & Dev.* ("*Boim III*"), 549 F.3d 685 (7th Cir. 2008) (*en banc*), Hamas had not yet been designated as an FTO at the time the defendants allegedly provided material support to it. But the plaintiffs successfully pointed to defendants' *knowledge* of Hamas's history of engaging in terrorism, which formed the basis for its later designation. *Boim III* held that "[t]o give money to an organization that commits terrorist acts is not intentional misconduct unless one either knows that the organization engages in such acts or is deliberately indifferent to whether it does or not, meaning that one knows there is a substantial probability that the organization engages in terrorism but one does not care." *Id.* at 693. This is especially true when the assistance is provided through extraordinary and unlawful means.

The designations also make clear that the overt acts SCB took in furtherance of the conspiracy did not, in the Court's phrasing, merely "incidentally increase" Iran's ability to provide material support for terrorism. Op. at 28. They were *central* to Iran's support for terrorism because they were central to the IRGC's ability to transfer billions of U.S. dollars undetected through the U.S. financial system. As the SAC alleges,[6] SCB was (according to available data) the single largest foreign player in Iran's (and the IRGC's) efforts to clandestinely move U.S. dollars through

---

[6] "Based on figures from both the International Monetary Fund and the Central Bank of Iran, from 2004 through 2011 Iran's total revenues from oil and natural gas export sales totaled approximately $972.9 billion USD." SCB clandestinely transferred the equivalent of more than 25% of that total amount on behalf of Iran the IRGC. SAC ¶ 168.

5

the U.S. financial system. ¶¶ 109-110, 168, 651. In fact, SCB's conduct was in many ways *more* central to Iran's terror financing than Bank Saderat's both in sheer volume and because it offered (clandestine) access to the U.S. financial system that an Iranian bank could not.

**C. SCB Ignores the Allegations That Plausibly Support Its Culpable State of Mind.**

According to SCB, aside from the designations, "[t]he SAC contained no facts from which the Court could have inferred that SCB was aware that the Iranian entities with whom it is alleged to have transacted were at the same time engaging in acts of international terrorism." SCB Br. at 15. But § 2333(d) does not require that SCB knew that it was specifically conspiring with the person or entity committing the Attacks.

Here, SCB not only knew that Iran (a state sponsor of *terrorism*) and its instrumentalities engaged in terrorism and actively agreed to assist them in moving vast amounts of money clandestinely through the United States. It also conspired to help them acquire goods it knew the U.S. government sought to deny Iran for, according to the blacklists' statutory language, "**anti-terrorism purposes**." 15 C.F.R. §§ 742.8, 774 (Supp. 1) (emphasis added). *See also* SAC ¶ 831 n.60; *Direct Sales Co. v. United States*, 319 U.S. 703, 710-11 (1943) ("The difference between sugar, cans, and other articles of normal trade, on the one hand, and narcotic drugs, machine guns and such restricted commodities, on the other, arising from the latter's inherent capacity for harm *and from the very fact they are restricted*, makes a difference in the quantity of proof required to show knowledge that the buyer will utilize the article unlawfully.") (emphasis added).

Moreover, SCB engaged in this illegal conduct for years in the face of "repeated warnings that its conduct was potentially financing terrorism." *See* Pls. Br. at 19. SAC ¶¶ 30-31. These also include multiple investigations and governmental findings.[7] Having observed SCB's decade-long

---

7    In revoking the U-Turn exemption in 2008, the U.S. government unequivocally put SCB and all other banks on notice that "Iran's access to the international financial system enables the Iranian regime to facilitate its support

crime spree – laundering massive amounts of money for Iranian instrumentalities, covering up its illicit conduct, falsifying records and submissions to the U.S. government, entering into consent orders and then resuming its criminal conduct, New York banking regulators ultimately concluded that "SCB operated as a rogue institution." SAC ¶ 840.

In short, those allegations *alone* plausibly satisfy the governing standard set forth for civil conspiracy in *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983) as well as this Court's requirement that the defendant "shared some knowledge of the conspiracy's unlawful aims and objectives." Op. at 25 (quoting *United States v. Salameh*, 152 F.3d 88, 151 (2d Cir. 1998)).[8]

## II. PLAINTIFFS' § 2333(d) AIDING & ABETTING CLAIMS AGAINST SCB

### A. Plaintiffs Did Not Disclaim or "Waive" Their Aiding and Abetting Claims.

SCB argues that Plaintiffs (a) did not make an aiding and abetting claim against SCB because it cannot find one in the SAC and (b) Plaintiffs' April 24, 2019 letter (the "Letter") (ECF No. 222) "expressly disclaimed . . . any such claim," when it told this Court that its claims were premised on conspiracy, "not aiding and abetting." SCB Br. at 14. Neither argument is tenable.

*First*, Plaintiffs filed the SAC before JASTA was enacted. After it was enacted, Plaintiffs repeatedly made clear that they considered their claims brought under both primary liability and JASTA, as the R&R at 30-33 and Your Honor acknowledged. *See* Pls. Br. at 1-2 n.1. Further, the SAC's Seventh Claim for Relief stated a primary liability claim for SCB's knowing provision of material support in violation of 18 U.S.C. § 2339A. Unlike the First and Second Claims, which expressly alleged conspiracy, the Seventh Claim alleged knowing, substantial assistance – i.e.,

---

for terrorism and proliferation" and that Iran was doing so by "disguis[ing] its involvement in these illicit activities through the use of a wide array of deceptive techniques, specifically designed to avoid suspicion and evade detection …." SAC ¶ 172.

[8] *Salameh,* like most conspiracy cases the Opinion cites (except *Halberstam*), applies the standard for *criminal* conspiracy—but the touchstone of scienter for *civil* conspiracy is lower—only that the injury be a "natural consequence of [defendant's] original act." *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938).

7

aiding and abetting – as a primary liability claim. *See Boim III,* 549 F.3d 685 at 691-92; *Rothstein v. UBS AG,* 708 F.3d 82, 97-98 (2d Cir. 2013). This claim was explicitly made as JASTA aiding and abetting claims in both *Freeman II* and *Bowman* (Twelfth Claim for Relief in each).

*Second*, the Letter never "expressly disclaim[ed]" anything. It was the fourth in a series of letters discussing purported new authority during the pendency of the motions to dismiss.[9] The Letter rejected Defendants' argument that *Weiss* and *Strauss* "compel dismissal of *Freeman*" because, as Plaintiffs noted, those decisions involved claims predicated *solely* on aiding and abetting, whereas Plaintiffs' § 2333(d) claims "here are premised on conspiracy." Letter at 2. SCB *adds* the phrase "not on aiding and abetting" to suggest that Plaintiffs *expressly* disclaimed a position it has held consistently for nearly five years. Indeed, Plaintiffs discussed aiding and abetting liability in the *same* letter ("even under an aiding and abetting theory, *Weiss* and *Strauss* do not help Defendants here") and noted the R&R's finding that "many of [Plaintiffs'] claims also fall under an aiding-abetting theory" which may be "presented to the jury." *Id.* at 2 & n.2.

**B. Plaintiffs have Adequately Pleaded that SCB was "Generally Aware" of Its Role.**

SCB argues that Plaintiffs can allege only that "SCB was 'generally aware of its role in the criminal enterprise'" – that is, "evading U.S. sanctions" – but that that "is not the equivalent of knowledge that by its conduct it was assuming a role in IRGC's *terrorist activities*," as required under *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018). SCB Br. at 15 (emphasis added). As shown above, SCB's conduct plausibly suggests general awareness of a role in "terrorist activities," however defined. Nevertheless, in *Linde,* 882 F.3d at 329, the Second Circuit explicitly

---

[9] Defendants' March 29, 2019 Letter to Judge Irizarry, ECF No. 217, argued that *O'Sullivan v. Deutsche Bank AG*, No. 17 Civ. 8709 (LTS) (GWG) and *Freeman* were predicated on "essentially the same . . . theories of alleged liability" – that is, both were predicated on conspiracy and aiding and abetting. In Plaintiffs' April 9, 2019 response, ECF No. 218, Plaintiffs did not disclaim aiding and abetting claims, instead arguing at length that *O'Sullivan* was wrongly decided on both conspiracy *and* aiding and abetting grounds. SCB does not mention this letter in its brief.

8

adopted *Halberstam* as the controlling framework, which requires only that plaintiffs show defendant's "general awareness of her role in a continuing criminal enterprise" *that was not itself violent,* but from which "violence and killing [wa]s a foreseeable risk." 705 F.2d at 488. It was enough that the defendant's bookkeeping and other clerical services constituted "assuming a role" in "property crimes at night," that led to the foreseeable risk of murder. *Id.*

For *Linde* to be read in harmony with *Halberstam*, "assuming a 'role' in terrorist activities," 882 F.3d at 329, cannot mean that the "terrorist activities" *themselves* must be violent or equivalent to murder, rather than, for instance, the full range of "terrorist activities" defined by Congress as construed in *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 208-209 (2d Cir. 2014). Requiring a showing that defendant "was 'generally aware' that it was thereby playing a 'role' in Hamas's violent or life-endangering activities" means awareness of criminal activities from which such violence and danger to life is a foreseeable risk. 882 F.3d at 329. Any other gloss on "general awareness" would not only be contrary to *Halberstam,* it would impose a scienter standard higher than the express language of § 2333(d)(2), which uses the words "knowingly provides."

**C. SCB Fails to Respond to Plaintiffs' Showing of Substantial Assistance.**

SCB cites the Court's finding that the Attacks were not proximately caused by its conduct because the "SAC contained 'no allegations that Defendants directly provided funds or services to a terrorist group [and] no non-conclusory allegations that the specific funds processed by Defendants were destined for a terrorist organization rather than some more benign or legitimate purpose.'" SCB Br. at 8. Notwithstanding the IRGC's designation as an FTO and NIOC's designation as the IRGC's agent, SCB reasons that its co-conspirators were "Iranian financial institutions and commercial businesses" which "engage in a myriad of legitimate functions and activities" and that NIOC's "daily oil sales" were "legitimate business activities" it conducts "*in*

9

*addition* to the activities it allegedly engages in on behalf of terrorist organizations." *Id.* at 5-6, 8 (emphasis added) (citing Op. at 33).

But this overlooks the SAC's non-conclusory allegations that thousands of transactions SCB facilitated went directly to a terrorist organization (IRGC) through its agent (NIOC) and that this conduct accrued to the IRGC's benefit. *See, e.g.*, Pls. Br. at 17, 23, 25. *But see* Op. at 32. It also overlooks the U.S. government's determination that NIOC's oil sales were used for what the U.S. Treasury called "*another oil-for-terror scheme*," Pls. Br. at 17, and that "Iran's exportation of oil *directly funds acts of terrorism by Iranian proxies* . . . ."[10] Indeed, SCB's criminal conduct was a significant, if not the primary, source of the IRGC's access to illicit funding. *See supra* at 5 n.6. Similarly, the export license blacklists signal that the restricted items SCB helped Iran acquire—including equipment useful in manufacturing EFPs and aircraft used in transporting weapons into Iraq, SAC ¶¶ 19-20, 825-38, 673-712—were not for "legitimate business activities."

When the Second Circuit in *Rothstein v. UBS* observed that "Iran is a government, and as such it has many legitimate agencies," it was merely rejecting Plaintiffs' contention that any provision of support to Iran *presumptively* satisfied proximate cause. 708 F.3d at 97. It would, however, be clear error to read *Rothstein* as positing that an Iranian FTO that has killed over 600 U.S. service members since 2003 (and was designated in part for the conduct described in the SAC), or its agent for the sale of oil that "directly funds acts of terrorism," qualifies as a "legitimate agency" of Iran and therefore could not, as a matter of law, proximately cause terrorist attacks.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court reconsider portions of its ruling and deny SCB's and Bank Saderat's motions to dismiss.

---

[10] The same designation depicts NIOC as the source of oil distributed through the "vast *oil-for-terror* shipping network" (emphasis added). *See* Treasury Press Release SM-767, 2019 WL 4187821 (Sept. 4, 2019).

Dated: October 17, 2019
Hackensack, New Jersey

                              Respectfully submitted,

                              **OSEN LLC**

By:   /s/ Gary M. Osen
       Gary M. Osen
       Ari Ungar
       Peter Raven-Hansen, Of Counsel
       Michael J. Radine
       2 University Plaza, Suite 402
       Hackensack, NJ 07601
       (201) 265-6400

       TURNER & ASSOCIATES, P.A.
       C. Tab Turner
       4705 Somers Avenue, Suite 100
       North Little Rock, AR 72116
       (501) 791-2277

       Attorneys for Plaintiffs